# Exhibit 3

**International Centre for Settlement of Investment Disputes**

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

CLAIMANT

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

RESPONDENT

**Decision on Liability and the Principles of Quantum**

Rendered by a tribunal composed of:

Professor Dr. Klaus M. Sachs, President
The Honorable Charles N. Brower, Arbitrator
Mr. Gabriel Bottini, Arbitrator

Secretary of the Tribunal
Ms. Natalí Sequeira

**Date of dispatch to the Parties: 30 December 2016**

## TABLE OF CONTENTS

A.  **THE PARTIES**..................................................................................**8**

    I.  Claimant ................................................................................8

    II.  Respondent .............................................................................8

B.  **THE ARBITRAL TRIBUNAL**....................................................**8**

    I.  The Honorable Charles N. Brower...............................................9

    II.  Mr. Gabriel Bottini .................................................................9

    III.  Prof. Dr. Klaus Sachs .............................................................9

C.  **SUMMARY OF THE PROCEDURAL HISTORY** ............................**9**

    I.  Arbitration Agreement and Institution of the Proceedings .............9

    II.  The Arbitral Proceedings.........................................................16

D.  **FACTUAL BACKGROUND**......................................................**26**

    I.  Claimant ...............................................................................26

    II.  Claimant's Decision to Expand Production Capacity and Search for an Expansion Site in South America....................................................28

    III.  Claimant's Decision to Invest in Venezuela................................32

    IV.  VAT Credits .........................................................................33

    V.  Construction of the Plant.........................................................35

    VI.  Bauxite Price Increases ..........................................................36

    VII.  Production and Sale of Proppants Prior to the Take-over of the Plant..........40

    VIII.  Labor Unrest........................................................................42

    IX.  Temporary Takeover of the Plant on 24 March 2010 ...................46

    X.  Final Takeover of the Plant on 15 May 2010...............................48

    XI.  Negotiations after the Takeover of the Plant...............................51

XII.  The Expropriation Decree and Follow-up Correspondence...........................57

XIII. The Administrative Expropriation Procedure and Claimant's Notice of Dispute
        59

XIV.  Further Negotiations between the Parties........................................................61

XV.   The Judicial Expropriation Procedure and Parallel Negotiations ..................62

E.    **PARTIES' POSITIONS** ....................................................................................**64**

      I.    Summary of Claimant's Position and Relief Sought .....................................64

      II.   Summary of Respondent's Position and Relief Sought .................................74

F.    **THE TRIBUNAL'S REASONING** ...................................................................**84**

      I.    Jurisdiction .....................................................................................................84

      II.   Admissibility ..................................................................................................87

      III.  Breach of the Treaty .......................................................................................91

      IV.   The Principles of Quantum............................................................................143

      V.    Decision on Costs..........................................................................................232

G.    **THE TRIBUNAL'S DECISION**.......................................................................**233**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| App. BF- | Appendixes to the Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores |
| Claimant's Proposal | Proposal to Disqualify Mr. Gabriel Bottini submitted by Claimant on 29 October 2012 |
| Brailovsky/Flores I | First Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores dated 21 March 2014 |
| Brailovsky/Flores II | Second Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores dated 18 September 2014 |
| CETA | EU-Canada Free Trade Agreement |
| CLA- | Claimant's Legal Authorities |
| Claimant's Cost Submission | Claimant's Cost Submission of 30 June 2015 |
| Claimant's Post-Hearing Submission | Claimant's Post-Hearing Submission of 2 April 2015 |
| Claimant's Second Post-Hearing Submission | Claimant's Simultaneous Second-Round Post-Hearing Submission of 22 May 2015 |
| Claimant's Updated Cost Submission | Claimant's submission of its Updated Cost Submission of 23 November 2015 |
| Claimant's Valuation Update | Claimant's submission of the requested updates of its experts' valuations of 22 October 2015 |
| Confidentiality Order | The Confidentiality Order contained in Procedural Order No. 2 issued by the Tribunal on 10 June 2014 |
| Counter Memorial | Respondent's Counter Memorial dated 21 March 2014 |
| CVG | Corporación Venezolana de Guyana |
| CVG Bauxilum | CVG Bauxilum, C.A. |
| CVG EDELCA | CVG Electrificación del Caroní, C.A. |
| DAC | *Demandé d'Autorisation Compagnie* |

| | |
|---|---|
| Decision on Disqualification | Prof. Sachs and Judge Browers Decision on Claimant's Proposal to Disqualify Mr. Bottini from the Tribunal dated 27 February 2013 |
| Declaration | Mr. Bottini's new declaration under Rule 6(2) of the ICSID Arbitration Rules submitted on 1 March 2013 to the Secretary-General, dated 28 February 2013 |
| Exhibit C- | Claimant's Exhibits |
| Exhibit CLEX- | Exhibits to the Damages Assessment of Saint-Gobain's Investments in Venezuela of Professor Pablo T. Spiller of Compass Lexecon |
| Exhibit ER- | Accompanying Exhibits to Mr. Rondón's Witness Statement |
| Exhibit R- | Respondent's Exhibits |
| Exhibit RL- | Respondent's Legal Authorities |
| FET | Fair and Equitable Treatment |
| Fort Smith Plant | The Saint-Gobain proppants plant in Fort Smith, Arkansas |
| FPS | Full Protection and Security |
| France-Venezuela-BIT or "the Treaty" | Agreement on Encouragement and Reciprocal Protection on Investments Between the Government of the French Republic and the Goverment of the Bolivarian Republic of Venezuela |
| IBA Rules | International Bar Association Rules on the Taking of Evidence in International Arbitration (2010) |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | The ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID Convention | The Convention on the Settlement of Investment Disputes Between States and Nationals of Other States |
| ICSID Institution Rules | Rules of Procedure for the Institution of Conciliationand Arbitration Procedures |
| ILC Draft Articles | International Law Comission's Draft Articles on Responsibility of States for Internationally Wrongful Acts |
| Larry I | First Witness Statement of Mr. Larry dated 28 October 2013 |
| Larry II | Second Witness Statement of Mr. Larry dated 17 June 2014 |

| | |
|---|---|
| Memorial | Claimant's Memorial dated 28 October 2013 |
| MIBAM | Ministry of the People's Power for Basic Industries and Mining |
| MILCO | Ministry of Light Industry and Commerce |
| Millot | Witness Statement of Mr. Millot dated 28 October 2013 |
| PCIJ | Permanent Court of International Justice |
| PDVSA Gas | PDVSA Gas, S.A. |
| Pedersen | Witness Statement of Mr. Pedersen dated 25 October 2013 |
| Rejoinder | Respondent's Rejoinder on the Merits dated 18 September 2014 |
| Reply | Claimant's Reply Memorial dated 18 June 2014 |
| Request | Request for Arbitration against Respondent dated 25 May 2012 |
| Respondent's Cost Submission | Respondent's Cost Submission of 30 June 2015 |
| Respondent's Post-Hearing Brief | Respondent's Post-Hearing Submission of 2 April 2015 |
| Respondent's Post-Hearing Reply Brief | Respondent's Simultaneous Second-Round Post-Hearing Submission of 22 May 2015 |
| Respondent's Updated Cost Submission | Respondent's submission of its Updated Cost Submission of 23 November 2015 |
| Respondent's Valuation Update | Respondent's submission of the requested updates of its experts' valuations of 22 October 2015 |
| Rondón | Witness Stament of Mr. Rondón dated 17 March 2014 |
| Secretariat | Secretariat of the ICSID |
| Secretary-General | Secretary-General of the ICSID |
| SINPROTRAC | *Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares* |
| Spiller I | Damages Assessment of Saint-Gobain's Investments in Venezuela of Prof. Pablo T. Spiller of Compass Lexecon dated 28 October 2013 |

| | |
|---|---|
| Spiller II | Prof. Spiller's Second Damages Assessment dated 18 June 2014 |
| The "Bauxite Claims" | Claimant's claims that, by virtue of the increase of the bauxite price that had initially been agreed upon in the Bauxite Contract between Claimant and CVG Bauxilum, Respondent failed to accord to Claimant fair and equitable treatment pursuant to Article 3(1) of the Treaty and to protect and secure Claimant's investment pursuant to Article 3(2) of the Treaty. |
| The "Bauxite Contract" | The contract signed by CVG Bauxilum and Saint-Gobain Proppants Venezuela C.A. on 25 October 2005 |
| The "Court" | First Court of First Instance in Civil, Corporate and Agrarian Matter of the Second Circuit of the Judicial Circumscription of the State of Bolivar, Venezuela |
| The "Expropriation Decree" | Decree No. 8,133 published by Respondent [Venezuela] in the Official Gazette No. 39,644 on 29 March 2011 |
| The "Expropriation Law" | Expropriation Law for Reasons of Public or Social Purposes |
| The "Expropriation Procedure" | The judicial expropriation procedure pursuant to Articles 22-24 of the Expropriation Law initiated by PDVSA Industrial on 18 April 2012 |
| The "Halliburton MPA" | Master Purchase Agreement between Norpro Venezuela, along with two other Saint-Gobain proppant facilities and Halliburton of 1 April 2009 |
| The "Law on Access" | The Law on the Defense of Access to Goods and Services |
| The "Worldbank Guidelines" | The World Bank Guidelines on the Treatment of Foreign Direct Investment of 1992 |
| Venezuelan Court Proceedings | Court Proceedings ongoing in Venezuela relating to the Norpro Venezuela, C.A. expropriation |
| Vienna Convention | The Vienna Convention on the Law of Treaties |

## A.    THE PARTIES

### I.    CLAIMANT

1.    Saint-Gobain Performance Plastics Europe, hereinafter referred to as "**Claimant**" or "**Saint-Gobain**", represented in this arbitration by its duly authorized attorneys Mr. Alexander A. Yanos of Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004-1482, United States of America, Ms. Elizabeth C. Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, United States of America and Ms. Noiana Marigo, of Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, 31st Floor, New York, NY 10022, United States of America..

### II.    RESPONDENT

2.    The Bolivarian Republic of Venezuela, hereinafter referred to as "**Respondent**" or "**Venezuela**", represented in this arbitration by Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República and Dr. Felipe Andrés Daruiz Ferro, Coordinador Integral del Despacho del Procurador, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas Bolivarian Republic of Venezuela. Respondent is also represented by its duly authorized attorneys Mr. Benard V. Preziosi, Jr. of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, United States of America, and Mr. Eloy Barbará de Parres, Ms. Gabriela Álvarez Ávila, Ms. Kate Brown de Vejar and Ms. Dori Yoldi of Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Mexico City, United Mexican States.

3.    Claimant and Respondent are hereinafter each referred to as a "**Party**" and jointly as the "**Parties**".

## B.    THE ARBITRAL TRIBUNAL

4.    The Arbitral Tribunal has been constituted as follows:

## I.     THE HONORABLE CHARLES N. BROWER

(appointed by Claimant)

20 Essex Street Chambers
20 Essex Street
London WC2R 3AL
GREAT BRITAIN
Tel: +44 (0)20 7842 1200
Fax: +44 (0)20 7842 1270
E-mail: cbrower@20essexst.com

## II.    MR. GABRIEL BOTTINI

(appointed by Respondent)

Parana 580- Piso 5° "J"
C1017AAL- Buenos Aires
Argentina
Tel.: + 54 11 4371-3165
Fax: + 54 11 4372-7974
E-mail gbottini@outlook.com

## III.   PROF. DR. KLAUS SACHS

(appointed by the Parties)

Nymphenburger Str. 12
D-80335 München
GERMANY
Tel.: +49 89 23 807-109
Fax: + 49 89 23 807-40 621
E-mail: Klaus.Sachs@cms-hs.com

## C.     SUMMARY OF THE PROCEDURAL HISTORY

## I.     ARBITRATION AGREEMENT AND INSTITUTION OF THE PROCEEDINGS

5.     This arbitration concerns a legal dispute between Saint-Gobain and Venezuela arising out of Venezuela's alleged refusal to compensate Saint-Gobain for the expropriation of Saint-

Gobain's investment in its 99.99%[1] subsidiary Norpro Venezuela C.A. ("**Norpro Vene-zuela**" or "**Norpro**") following a televised speech of Venezuela's President Hugo Chávez on 15 May 2010. Claimant alleges that Respondent breached the *Agreement on Encouragement and Reciprocal Protection of Investments between the Government of the French Republic and the Government of the Bolivarian Republic of Venezuela* (the "**France-Venezuela-BIT**" or the "**Treaty**"), which entered into force on 15 April 2004, by refusing to offer compensation for the expropriation of Norpro Venezuela's proppants plant in Puerto Ordaz, Bolivar State, as well as by sanctioning or failing to intervene in the increase of the price for the supply of bauxite allegedly in breach of a contract entered into with a State-owned entity, thus failing to treat Claimant fairly and equitably and to accord its investment full protection and security, in violation of Articles 5(1) and 3(1) and (2) of the Treaty.

6.    Article 5(1) of the France-Venezuela BIT provides in its authentic French and Spanish versions:[2]

<table>
<tr>
<td>

"*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés*

</td>
<td>

"*Las Partes Contratantes no adoptarán medidas de expropriación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra*

</td>
</tr>
</table>

---

[1] One share is held by Mr. Luis Páez, a Venezuelan national and the President of Norpro Venezuela, who subscribed a single share when Norpro Venezuela was incorporated. The planned transfer of Mr. Páez's share to Saint-Gobain has not yet been completed. Request, ¶ 4, note 4.

[2] The free English translation of the French text published in the Official Journal of the French Republic No. 102, 30 April 2004, which has been submitted by Claimant as **Exhibit C-1** and has not been challenged by Respondent, reads:

"*1. The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement.*

*All measures of expropriation which could be taken must result in the payment of prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*

*The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment.*"

*de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusque'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié.*"[3]

*Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropriación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tadar a la fecha de la expropriación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado.*"[4]

9.    Article 3(1) and (2) of the Treaty provides:[5]

---

[3] *Journal Officiel de la République Française nº102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.

[4] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

[5] The free English translation submitted by Claimant as **Exhibit C-1** reads:

"*1. Each of the Contracting Parties will ensure fair and equitable treatment for investments by nationals and companies of the other Party in its territory and in its maritime area, in accordance with the rules and principles of international law, and will ensure that the exercise of this right thus recognized shall have no impediments either in law or in fact. In particular, although not exclusively, impediments to fair and equitable treatment in law or in fact are any arbitrary or discriminatory restrictions to the purchase and transport of raw and ancillary materials, of energy and*

"*1. Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et équitable, conformément aux règles et principe du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de miyens de production et d'exploitation de tout type, tout entrave à la vente et au transport des produits à l'intérieur du pays à l'étranger, ainsi que toutes autres mesures ayant un effet analogue.*

*2. Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières.*"[6]

"*1. Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así como cualquier otra medida que pueda tener un efecto análogo.*

*2. Las inversiones efectuadas por nacionales o sociedades de una o otra de las Partes Contratantes gozarán, en el territorio y en la zona*

---

*fuels, as well as to any means of production and exploitation, or any impediment to the sale and transport of products within the country and overseas, along with all other measures having a similar effect.*

*2. Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security.*"

[6] *Journal Officiel de la République Française n°102 du 30 avril 2004,* **Exhibit C-1**, p. 7775.

> *marítima de la otra Parte contra-*
> *tante, de una protección y de una*
> *seguridad plenas y completas.*"[7]

12.   Claimant has invoked the arbitration provisions in Article 8 of the France-Venezuela BIT providing for arbitration before the International Centre for Settlement of Investment Disputes (**"ICSID"**). Article 8 of the Treaty provides:[8]

<table>
<tr>
<td>

"*1. Tout différend qui survient entre un national ou une société d'une Partie contractante et l'autre Partie contractante, au sujet d'une obligation de cette dernière relative à un investissement en vertu du présent Accord, est réglé à l'amiable entre les deux parties concernées.*

*2. Si un tel différend n'a pas pu être réglé dans un délai de six mois à partir de moment où il a été soulevé par l'une ou l'autre des parties*

</td>
<td>

"*1. Cualquier controversia que surja entre un nacional o una sociedad de una Parte Contratante y la otra Parte Contratante en lo concerniente a una obligación de esta última en relación con una inversión en virtud del presente Acuerdo, será resuelta amistosamente entre las dos partes interesadas.*

*2. Si dicha controversia no pudiese ser resuelta en un plazo de seis meses a partir del momento en que ha sido identificada por una u otra de*

</td>
</tr>
</table>

---

[7] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004,* **Exhibit C-1**, pp. 332-353-332.354.

[8] The free English translation submitted by Claimant as **Exhibit C-1** reads:

> "*1. Any dispute which arises between a national or a company of a Contracting Party and the other Contracting Party, regarding an obligation of the latter relating to an investment under the terms of the present Agreement, shall be settled amicably between the two party concerned.*
>
> *2. If such a dispute cannot be settled within six months from the time it was raised by either of the parties to the dispute, at the request of the national or the company in question it shall be submitted to either the competent court of the State in which the investment was made or to arbitration by the International Center* [sic] *for the Settlement of Investment Disputes (ICSID), pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965. This decision is the choice of the national or the company concerned. Once the decision has been made to pursue arbitration, the decision becomes final.*
>
> *3. The arbitral tribunal shall determine if the Contracting Party to the dispute has met their obligations under the terms of the provisions of this agreement. If this is not the case, the court* [sic] *will set the amount of compensation for the national or company party to the dispute.*
>
> *4. The arbitral award is final and binding to the parties to the dispute.*"

*au différend, il es soumis à la demande du national ou de la société en question soit à la juridiction compétente de l'Etat dans lequel l'investissement a été réalisé soit à l'arbitrage du Centre international pour le règlement des différends relatifs aux investissements (CIRDI), créé par la Convention entre Etats et ressortissants d'autres Etats, signée à Washington le 18 mars 1965. Cette option relève du choix du national ou de la société intéressé. Une fois l'option effectuée en faveur de l'arbtrage, celle-ci devient définitive.*

*3. Le tribunal arbitral détermine si la Partie contractante partie au différend a respecté ses obligations en vertu des dispositions du présent accord. Si tel n'est pas le cas, le tribunal fixera le montant de l'indemnisation du national ou de la société partie au différend.*

*4. La sentence arbitrale est définitive et obligatoire pour les parties au différend."*"[9]

*las partes en controversia, se someterá, a pedido del nacional o de la sociedad en cuestión, a la jurisdicción competente del Estado en el cual se ha efectuado la inversión o bien el arbitraje del Centro Internacional para el Arreglo de Diferencias relativas a Inversiones (C.I.A.D.I.) creado por la Convención para el arreglo de diferencias relativas a las inversiones entre Estados y nacionales de otros Estados, firmado en Washington el 18 marzo de 1965. Dicha opción queda a elección del nacional o de la sociedad interesada. Una vez ejercida la opción de arbitraje esta será definitiva.*

*3. El tribunal arbitral determinará si la Parte Contratante, parte en la controversia, ha cumplido sus obligaciones en virtud de lo dispuesto en el presente Acuerdo. Si eso no fuera el caso, el tribunal fijará el monto de la indemnización del nacional o de la sociedad parte en la controversia.*

*4. El laudo arbitral es definitivo y obligatorio para las partes en controversia."*[10]

17.    On 25 May 2012, Claimant filed a Request for Arbitration against Respondent (**"Request"**), together with Exhibits C-001 to C-047, with the Secretary-General of ICSID (the "**Secretary-General**") in accordance with Article 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the **"ICSID**

---

[9] *Journal Officiel de la République Française n°102 du 30 avril 2004*, **Exhibit C-1**, pp. 7775-7776.

[10] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

**Convention"**) and the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "**ICSID Institution Rules**").

18.   On 29 May 2012, the Secretariat of ICSID (the "**Secretariat**") transmitted the Request to Respondent.

19.   On 15 June 2012, the Secretary-General registered Claimant's Request in accordance with Article 36 of the ICSID Convention and Rules 6 and 7 of the ICSID Institution Rules and notified the Parties of such registration. The case was assigned the ICSID Case Number ARB/12/13.

20.   On 28 September 2012, Claimant appointed Judge Charles N. Brower, a national of the United States of America, as arbitrator.

21.   On 3 October 2012, Respondent appointed Mr. Gabriel Bottini, a national of the Argentine Republic, as arbitrator.

22.   On 4 October 2012, Judge Brower accepted his appointment as arbitrator by Claimant, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**").

23.   On 25 October 2012, Mr. Bottini accepted his appointment as arbitrator by Respondent, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Arbitration Rules.

24.   On 29 October 2012, Claimant submitted a Proposal to Disqualify Mr. Gabriel Bottini pursuant to Articles 57 and 58 of the ICSID Convention and Rule 9 of the ICSID Arbitration Rules (**"Claimant's Proposal"**), together with Annexes A to H. The Secretariat acknowledged receipt of Claimant's Proposal on 30 October 2012.

25.   On 12 November 2012, the Secretary-General informed Prof. Dr. Klaus Sachs that the Parties agreed on his appointment as President of the Tribunal. By letter of 14 November 2012, Prof. Sachs accepted his appointment, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Arbitration Rules.

26.   On 26 November 2012, the Secretary-General informed the Parties that Prof. Sachs, Judge Brower and Mr. Bottini had accepted their appointments as arbitrators and, accordingly, pursuant to Rules 6(1) of the ICSID Arbitration Rules, the Tribunal was deemed to have been constituted and the proceedings to have begun as of such date; in addition, Ms. Natalí Sequeira was designated to serve as the Secretary of the Tribunal (the "**Secretary**"). As provided for by ICSID Arbitration Rule 9(2), on the same date, the Secretariat transmitted Claimant's Proposal to the three members of the Tribunal.

## II.    THE ARBITRAL PROCEEDINGS

27.    Pursuant to ICSID Arbitration Rule 9(6), on 27 November 2012, the Secretariat informed the Parties that the proceedings were suspended until a decision on Claimant's Proposal would be made.

28.    By letter of 28 November 2012, Prof. Sachs and Judge Brower set a schedule for submissions on Claimant's Proposal.

29.    On 7 December 2012, Respondent filed its Observations to Claimant's Proposal to Disqualify Mr. Bottini, together with Exhibits R-001 to R-003 and Legal Authorities RL-001 to RL-013.

30.    By letter of 14 December 2012, Mr. Bottini furnished his explanations, together with Exhibit 1, to the Tribunal, pursuant to Rule 9(3) of the ICSID Arbitration Rules.

31.    By letter of 21 December 2012, Claimant commented on Respondent's Observations of 7 December 2012 and Mr. Bottini's letter of 14 December 2012 and submitted Annexes I to L.

32.    On the same date, Respondent filed its Final Observations to Claimant's Proposal to Disqualify Mr. Bottini.

33.    On 27 February 2013, Prof. Sachs and Judge Brower issued a Decision on Claimant's Proposal to Disqualify Mr. Bottini from the Tribunal under Article 57 of the ICSID Convention ("**Decision on Disqualification**"), rejecting Claimant's Proposal on the condition that Mr. Bottini complete, sign, and transmit to the ICSID Secretary-General a new Declaration under Rule 6(2) of the ICSID Arbitration Rules within 10 days of the date of the Decision on Disqualification.

34.    Pursuant to Rule 9(6) of the ICSID Arbitration Rules, the proceedings were resumed on 27 February 2013.

35.    On 1 March 2013, in accordance with the Decision on Disqualification, Mr. Bottini submitted to the Secretary-General a new Declaration under Rule 6(2) of the ICSID Arbitration Rules, dated 28 February 2013 ("**Declaration**").

36.    By letter to the Secretary-General of 7 March 2013, Claimant referred to Mr Bottini's Declaration and requested that he "*notify the parties upon his acceptance of any mandate from the Argentine Government which involves providing advice regarding a bilateral investment treaty or any controversy relating thereto.*" Claimant reserved its right to renew objections to Mr. Bottini.

37.   On 13 March 2013, Mr Bottini made a disclosure in accordance with his Declaration of 28 February 2013.

38.   By letter of 14 March 2013, the Tribunal provided the Parties with a draft agenda for the first session and a draft procedural order, for their comments and review. The Tribunal further proposed to appoint Mr. Felix Lautenschlager of Prof. Sachs' law firm as Assistant to the Tribunal.

39.   By letter of 20 March 2013, Claimant indicated its availability for the first session, via telephone or videoconference, and agreed to the appointment of Mr. Lautenschlager as Assistant to the Tribunal.

40.   By email of 20 March 2013, Respondent stated that it considered that the first session should be held in person, and confirmed that it would make itself available on the June or July dates indicated in the Tribunal's letter of 14 March 2013.

41.   By email of 28 March 2013, the Parties jointly proposed a draft procedural order for the Tribunal's consideration.

42.   By email of 3 April 2013, Claimant informed the Tribunal of its availability for an in-person first session on the June and July dates proposed by the Tribunal in the letter of 14 March 2013.

43.   By letter of 4 April 2013, Claimant requested further information regarding Mr. Bottini's disclosure of 12 March 2013.

44.   By letter of 5 April 2013, the Tribunal invited Claimant to agree pursuant to Rule 13(1) of the ICSID Arbitration Rules to an in-person hearing to be held in Paris on 6 June 2013.

45.   By email of 9 April 2013, Claimant indicated that that it remained available for an in-person first session on the proposed date.

46.   By letter of 11 April 2013, the Tribunal confirmed to the Parties that the first session would take place in Paris on 6 June 2013.

47.   By letter of 13 April 2013, Mr. Bottini responded to Claimant's letter of 4 April 2013.

48.   On 6 June 2013, the Tribunal held the first session with the Parties in Paris, France.

49.   By email of 8 June 2013, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

50.   By email of 11 June 2013, ICSID provided to the Parties a revised draft procedural order no.1 and invited the Parties to confirm or submit any comments on its content by 14 June 2013.

51.   By email of 13 June 2013, Claimant provided its comments on the revised draft procedural order no.1.

52.   By email of 13 June 2013, Respondent stated that it had no comments on the revised draft procedural order no.1.

53.   On 18 June 2013, the Tribunal issued Procedural Order No. 1, including the Procedural Rules governing this arbitration.

54.   By letter of the same date, Claimant requested further information from Mr. Bottini in light of his disclosure of 8 June 2013.

55.   By letter of 27 June 2013, Mr. Bottini responded to Claimant's letter of 18 June 2013.

56.   By email of 6 August 2013, the Secretary provided the Parties with the Spanish version of Procedural Order No.1.

57.   By email of 13 August 2013, Mr. Bottini informed the other members of the Tribunal and the Parties that he had been appointed as arbitrator by the Bolivarian Republic of Venezuela in the case of *Venezuela US, S.R.L. (Barbados) v. The Bolivarian Republic of Venezuela*, PCA Case N°AA494.

58.   By email of 5 September 2013, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

59.   By letter of 27 September 2013, Claimant informed ICSID and the Tribunal of the Parties' agreement to request that the procedural calendar set forth in Section 13 of Procedural Order No. 1 be amended in respect of the Schedule for Submission of Pleadings and Document Production. By email of the same date, Respondent confirmed its agreement.

60.   By letter of 4 October 2013, the Tribunal confirmed to the Parties that it had no objection to the procedural calendar proposed by the Parties on 27 September 2013.

61.   By cover letter of 28 October 2013, received on 29 October 2013, Claimant submitted its Memorial ("**Memorial**") together with Exhibits C-048 to C-136 and Legal Authorities CLA-001 to CLA-090**,** the Witness Statements of Mr. Jack Larry, Mr. Jorgen Pedersen and Mr. Patrick Millot, the Damages Assessment of Saint-Gobain's Investments in Venezuela of Prof. Pablo T. Spiller of Compass Lexecon and its accompanying exhibits

CLEX-1 to CLEX-79, and Exhibits C-001 to C-047 accompanying the Request for Arbitration, amended to include the translation of two foreign language exhibits (as required by Procedural Order No. 1).

62.    By letter of 31 October 2013, ICSID submitted the revised Procedural Order No.1 to the Parties.

63.    By email of 30 November 2013, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

64.    By letter of 12 February 2014, Claimant informed Respondent and the Tribunal of an inadvertent error in the Expert Report of Prof. Spiller, namely that exhibit CLEX-80 had been omitted, and that all references to CLEX-07 should be read as references to CLEX-80. Claimant enclosed with its letter an updated list of exhibits and exhibit CLEX-80.

65.    By cover letter of 21 March 2014, Respondent submitted its Counter-Memorial ("**Counter Memorial**"), together with Exhibits R-004 to R-071 and Legal Authorities RL-014 to RL-125, the Witness Statement of Mr. Eduardo Rondón and its English translation with its accompanying exhibits ER-001 to ER-010, and the Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores with its accompanying appendixes BF-001 to BF-099.

66.    On 4 April 2014, in accordance with Procedural Order No. 1, the Parties exchanged requests for the production of documents.

67.    On 5 May 2014, the Parties produced the requested documents to which they did not object, and exchanged objections to the remainder of the requests.

68.    By letter of 12 May 2014, Claimant

   a)    submitted its Redfern Schedule, setting out its replies to Respondent's objections to Claimant's document requests; and

   b)    applied for an order, pursuant to Article 9(4) of the International Bar Association Rules on the Taking of Evidence in International Arbitration (2010) ("**IBA Rules**"), to protect documents that are produced in this arbitration and that Claimant considered to be commercially and technically confidential as contemplated by Article 9(2)(e) of the IBA Rules.

69.    By email of 12 May 2014, Respondent submitted its Redfern Schedule setting out its replies to Claimant's objections to Respondent's document requests.

70.  By letter of 15 May 2014, the Tribunal asked for clarifications from the Parties regarding their document requests and invited Respondent to respond to Claimant's application for a confidentiality order by 19 May 2014.

71.  On 15 May 2014, Claimant submitted a Request for Provisional Measures pursuant to Article 47 of the ICSID Convention and Rule 39 (1) of the ICSID Arbitration Rules, together with an Annex A and Legal Authorities CLA-091 to CLA-102, requesting that the Tribunal direct Respondent to discontinue court proceedings ongoing in Venezuela relating to the expropriation of Norpro Venezuela, C.A (the "**Venezuelan Court Proceedings**").

72.  By letter of 18 May 2014, Respondent responded to the Tribunal's letter of 15 May 2014, regarding Claimant's requests for documents, and provided comments objecting to Claimant's application for a confidentiality order.

73.  By letter of 19 May 2014, Claimant responded to the Tribunal's letter of 15 May 2014, regarding Respondent's requests for documents.

74.  By letter of 27 May 2014, the Tribunal invited Claimant to submit further details with respect to Respondent's Request No. 10 in its document requests, relating to "*accountant-client privilege*", as well as to comment on Respondent's submission that Claimant had waived any privilege.

75.  By letter of 28 May 2014, Claimant provided further details on its claim of accountant-client privilege with respect to Respondent's Request No.10, together with Annexes A, B and C to its letter.

76.  On 28 May 2014, Respondent submitted its Response to Claimant's Request for Provisional Measures, together with Exhibit R-072 and Legal Authorities RL-126 to RL-132. Hard copies of the Response and accompanying exhibits were transmitted to ICSID within two business days, in accordance with Procedural Order No.1.

77.  By email of 30 May 2014, Respondent provided comments in relation to its Request No. 10, further to Claimant's letter of 28 May 2014.

78.  By letter of 3 June 2014, the Tribunal invited the Parties to exchange a second round of submissions regarding Claimant's Request for Provisional Measures, on or before 10 June 2014 for Claimant, and on or before 17 June 2014 for Respondent.

79.  On 10 June 2014, the Tribunal issued its Procedural Order No. 2, which contained a confidentiality order ("**Confidentiality Order**") and its decision on the Parties' requests for document production.

80. On 10 June 2014, Claimant submitted its Reply on Request for Provisional Measures, together with Exhibit C-137 and Legal Authorities CLA-103 to CLA-107, and the Legal Expert Opinion of Dr Allan R. Brewer Carías with its accompanying appendixes A, B and C.

81. By letter of 12 June 2014, Claimant informed the Tribunal that the Parties had agreed to exchange documents for which no objection was sustained by 25 June 2014.

82. By letter of 16 June 2014, Respondent provided to the Tribunal a list of people Respondent designated to have access to the Highly Confidential Documents subject to the Tribunal's Confidentiality Order in Procedural Order No. 2.

83. By letter of 17 June 2014, Claimant objected to the inclusion of Mr. Eduardo José Rondón Cedeño on Respondent's list of designated persons and requested that Respondent be required to identify a replacement designee. Claimant also noted that it would rely on certain documents to be produced in its Reply Memorial the following week as Highly Confidential Documents and requested confirmation from Respondent that, until such time as the Tribunal approved Respondent's list of designees, the Highly Confidential Documents would not be shared beyond the individuals identified as Venezuela's external legal advisers and its external experts, failing which Claimant requested an order from the Tribunal to the same effect.

84. On 17 June 2014, Respondent submitted its Additional Response to Claimant's Request for Provisional Measures, together with Exhibits R-073 to R-077.

85. On 18 June 2014, the Tribunal invited Respondent to comment on Claimant's letter of 17 June 2014 concerning Respondent's list of designated persons, by 20 June 2014.

86. By cover letter of 18 June 2014, Claimant submitted its Reply Memorial ("**Reply**"), together with Exhibits C-138 to C-156 and Legal Authorities CLA-108 to CLA-151, the Second Witness Statement of Mr. Jack Larry, the Second Legal Expert Opinion of Dr. Allan R. Brewer Carías with its accompanying appendixes D to L, and the Supplemental Report of Prof. Spiller of Compass Lexecon with its accompanying exhibits CLEX-81 to CLEX-195.

87. By letter of 20 June 2014, Respondent noted that it disagreed with the contents of Claimant's letter of 17 June 2014, but would nevertheless remove Mr. Rondón Cedeño from its list of designated persons, to be replaced by Mr. Luis Govanny Cárdenas Rodríguez.

88. On 23 June 2014, the Tribunal invited Claimant to state whether it had any objections to the designation of Mr. Cárdenas Rodríguez. By email of the same day, Claimant confirmed that it had no objections.

89. By email of 24 June 2014, Respondent transmitted to the Secretary the signed confidentiality undertakings of the 22 persons designated by Respondent to have access to the Highly Confidential Documents.

90. By letter of 25 June 2014, the Tribunal approved Respondent's list of Recipients of the Highly Confidential Documents as set out in Respondent's letter dated 16 June 2014 and modified by letter dated 20 June 2014. The Secretary then transmitted the signed undertakings to the Tribunal.

91. By email of 22 July 2014, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

92. By letter of 8 August 2014, the Tribunal informed the Parties that it had concluded its deliberations on Claimant's Request for Provisional Measures and decided, by majority decision, that the Request was to be denied. The reasons for this decision would be conveyed to the Parties in due course by way of a Procedural Order, which would also attach the dissenting opinion.

93. On 9 September 2014, Procedural Order No. 3, containing the reasons for the decision on Claimant's Request for Provisional Measures, was issued on behalf of the majority of the Tribunal, attaching the Dissenting Opinion of Judge Brower.

94. By cover letter of 18 September 2014, Respondent submitted its Rejoinder on the Merits ("**Rejoinder**"), together with Exhibits R-78 to R-125, Legal Authorities RL-133 to RL-189 and the Second Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores with its accompanying appendixes BF-100 to BF-177.

95. By email of 30 September 2014, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

96. By letter of 14 November 2014, the Tribunal invited the Parties to propose any procedural items they wished to discuss during the Pre-Hearing Conference Call on 10 December 2014 and indicate whether they had been able to reach any agreement on these items by 25 November 2014.

97. On 25 November 2014, the Parties submitted their Procedural Proposals to the Tribunal, identifying the items on which they were able to reach an agreement as well as the items to be discussed during the Pre-Hearing Conference Call.

98. By emails of 3 and 4 December 2014, in accordance with Section 9 of Procedural Order No. 1, both Parties agreed to hold the hearing in Washington, D.C., United States of America.

99.   By letter of 5 December 2014, ICSID informed the Parties and the Tribunal that Ms. Sequeira would take maternity leave and that Ms. Giuliana Canè would serve as Secretary of the Tribunal during her absence.

100.  By letter of the same date, the Tribunal informed the Parties that Mr. Lautenschlager would leave the President's law firm by the end of the year and thus cease to act as the Tribunal's Assistant in this case. The President proposed to the Parties that his associate Ms. Susanne Häusler act as the future Assistant to the Tribunal and, unless the Parties had any objections, attend the Pre-Hearing Conference Call instead of Mr. Lautenschlager.

101.  By emails of 8 and 9 December 2014, the Parties informed the Tribunal that they had no objections to Ms. Häusler being designated as Assistant to the Tribunal.

102.  On 10 December 2014 at 12 p.m. EST, the Tribunal held the Pre-Hearing Conference Call with the Parties, during which it heard the Parties on their respective positions regarding the issues on which the Parties had not been able to reach an agreement according to their Procedural Proposals of 25 November 2014.

103.  By letter of 12 December 2014, the Tribunal informed the Parties about its decision on the Parties' Procedural Proposals of 25 November 2014.

104.  By e-mails of 22 December 2014, each Party notified the Tribunal and the opposing Party of the names of the other Party's fact and/or expert witnesses that it wished to cross examine at the Hearing.

105.  By e-mail of 19 January 2015, Claimant notified the Tribunal and Respondent about the order in which it intended to present its witnesses at the Hearing.

106.  On 23 January 2015, Respondent submitted corrections to the second Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores, together with corrected appendixes BF-100A and BF-103A.

107.  By letter of 26 January 2015, Respondent submitted a request that the Tribunal admit additional factual exhibits into the record. On the same day, Claimant submitted additional legal authorities CLA-152 to CLA-154 and Respondent submitted additional legal authorities RL-190 and RL-191.

108.  By letter of 29 January 2015, Claimant commented on and opposed Respondent's request that the Tribunal admit additional factual exhibits into the record. By letter of the same day, Respondent replied to Claimant's comments.

109. On 30 January 2015, the Tribunal granted Respondent's request, provided that such evidence would be submitted by 2 February 2015, and granted Claimant leave to submit evidence in rebuttal by 4 February 2015.

110. On 31 January 2015, Respondent submitted Exhibits R-126 to R-129 to the Tribunal. On 1 February 2015, Claimant submitted Exhibits C-159 to C-162 as evidence in rebuttal.

111. From 2 to 6 February 2015, the Tribunal held the Hearing with the Parties at the facilities of ICSID in Washington, D.C., USA.

112. On 11 February 2015, the Tribunal transmitted to the Parties a list of questions for them to address in their Post-Hearing Briefs.

113. By e-mail of 11 March 2015, Claimant requested that any Award issued in these proceedings would be withheld from publication pursuant to Section 18.1 of Procedural Order No. 1, pending Claimant's review and redaction of confidential, business sensitive information.

114. On 16 March 2015, the Tribunal confirmed that, as reflected in Section 18.1 of Procedural Order No. 1, no procedural order, decision or award issued in these proceedings would be published without the consent of the Parties.

115. On 2 April 2015, the Parties simultaneously submitted their post-hearing submissions ("**Claimant's Post-Hearing Submission**"; "**Respondent's Post-Hearing Brief**").

116. On 22 May 2015, the Parties simultaneously submitted their second round of post-hearing submissions ("**Claimant's Second Post-Hearing Submission**"; "**Respondent's Post-Hearing Reply Brief**").

117. On 2 June 2015, Respondent submitted comments on allegedly new arguments raised in Claimant's Second Post-Hearing Submission.

118. On 12 June 2015, Claimant replied to Respondent's comments of 2 June 2015.

119. On 19 June 2015, the Tribunal decided to admit Sections 1 and 4 of Respondent's letter of 2 June 2015 as responsive submissions relating to new arguments raised in Claimant's Second Post-Hearing Submission; the Tribunal further considered Sections 2 and 3 of Respondent's letter an inadmissible further submission to be struck from the record.

120. On 30 June 2015, the Parties simultaneously submitted their cost submissions ("**Claimant's Cost Submission**"; "**Respondent's Cost Submission**").

121. On 3 August 2015, ICSID informed the Parties and the Tribunal that Ms. Sequeira had resumed her functions as Secretary to the Tribunal.

122. On 13 August 2015, the Tribunal asked the Parties for an update of their experts' valuation of Norpro Venezuela, S.A. as of the date of the award, based on 31 August 2015 as the date of valuation. The Tribunal emphasized that it requested this update for comparison purposes, without prejudice to the Tribunal's final decision on the date of valuation to be applied in the present case. Finally, the Tribunal asked the Parties to confer with their experts whether the requested updated could be submitted by 30 September 2015.

123. On 15 August 2015, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

124. By e-mail of 21 August 2015, Respondent requested an extension of the proposed time limit for the submission of the updated experts' valuations until 15 October 2015.

125. By e-mail of 25 August 2015, Claimant confirmed that it had no objection to the extended deadline requested by Respondent. By e-mail of the same day, the Tribunal agreed to the extension of the proposed time limit until 15 October 2015.

126. On 14 October 2015, Claimant informed the Tribunal that its expert required some additional time to prepare the updated report requested by the Tribunal and therefore requested that the time limit for its submission be extended to 22 October 2015. Claimant further noted that Respondent did not oppose the proposed extension.

127. On 15 October 2015, the Tribunal granted Claimant's request and extended the deadline for the submission of the updated reports of both Parties' experts until 22 October 2015.

128. On 22 October 2015, the Parties simultaneously submitted the requested updates of their experts' valuations ("**Claimant's Valuation Update**"; "**Respondent's Valuation Update**").

129. On 30 October 2015, Respondent requested leave from the Tribunal to submit a letter of no more than three pages to address certain issues raised in Claimant's Valuation Update.

130. On 3 November 2015, the Tribunal granted Respondent's request and permitted both Parties to submit brief comments on the Valuation Update of the opposing Party by 6 November 2015.

131. On 6 November 2015, the Parties simultaneously submitted their comments on the Valuation Update of the opposing Party; Respondent further submitted Exhibit R-131. In its e-mail to the Tribunal, Claimant reserved its right to amend its Cost Submission in light

of the additional fees and costs incurred in relation to its Valuation Update and its comments on Respondent's Valuation Update.

132. On 9 November 2015, the Tribunal invited both Parties to submit any amendments they wished to make to their respective Cost Submissions by 23 November 2015.

133. On 23 November 2015, the Parties simultaneously submitted their updated cost submissions ("**Claimant's Updated Cost Submission**"; "**Respondent's Updated Cost Submission**").

## D.   FACTUAL BACKGROUND

134. The following is a summary of the background facts that are not disputed between the Parties, or which have otherwise been established by the evidence submitted in these proceedings to the satisfaction of the Tribunal. The following summary is intended to give a general overview of the present dispute and should not be taken to be exhaustive of all facts that may be relevant. Such additional facts may be discussed in the Tribunal's analysis below.

## I.   CLAIMANT

135. Saint-Gobain is a company incorporated under the laws of the French Republic and was registered on 28 March 1995.[11] It is an indirect and wholly-owned subsidiary of Compagnie de Saint Gobain and a member of the Compagnie de Saint-Gobain group of companies.[12]

136. Norpro Venezuela is a wholly owned subsidiary of Saint-Gobain and is a corporation organized and existing under the laws of Venezuela.[13]

---

[11] Memorial, ¶ 1; **Exhibit C-46**.

[12] Memorial, ¶ 1. Saint-Gobain is wholly-owned by Société de Participations Financières et Industrielles, which in turn is wholly-owned by Compagnie de Saint-Gobain. Request, ¶ 11.

[13] Request, ¶ 4. Saint-Gobain's Foreign Direct Investment in Norpro Venezuela was registered before the Superintendence of Foreign Investments of Venezuela. **Exhibit C-9**. Norpro Venezuela was initially registered on 25 October 2005, under the name Saint-Gobain Proppants Venezuela, C.A., before the Fifth Mercantile Registry of the Capital District and Miranda State Circuit. **Exhibit C-4**. By shareholder agreement, the company subsequently changed its name to Proppants Venezuela, C.A. and moved its seat from Caracas to Puerto Ordaz, Bolivar State, Venezuela. On 19 December 2005, Proppants Venezuela C.A. was registered before the Mercantile Registry of the Bolivar State Circuit in Puerto Ordaz, Venezuela. **Exhibit C-5**. On 15 December 2008, the shareholders agreed to change the company's name from Proppants Venezuela to Norpro Venezuela, C.A.; this name change was officially registered on 26 December 2008. **Exhibit C-13**. One share in Norpro Venezuela is held by Luis Páez, a Venezuelan national and the President of Norpro Venezuela. The planned transfer of Mr. Páez's share to Saint-Gobain has not yet been completed.

137.  Effected through its Venezuelan subsidiary, Claimant constructed and operated a plant in Puerto Ordaz, Bolivar State, Venezuela, designed to produce ceramic proppants – small ceramic beads made from bauxite used as part of the hydraulic fracturing process to "*prop*" open fissures within a well induced in reservoir rock formations, in order to speed up and increase the recovery of hydrocarbons from each formation.[14]

138.  Claimant (through its affiliates) has been manufacturing ceramic proppants to support the oil and gas industry for approximately 30 years.[15] By the end of the 1990s, Saint-Gobain had developed a strong market position in North America, particularly with respect to high-grade ceramic proppants.[16]

139.  In its Memorial, Claimant described the recent evolution of the proppants business, *inter alia*, as follows:

> "[T]*he market for proppants has developed and expanded significantly in the last ten years and the major driver of this development and expansion has been technological advancement in the oil and gas industry. Specifically, advances have allowed oil and gas producers to: (a) drill deeper wells; (b) drill horizontally; and (c) use hydraulic fracturing, or 'fracking,' to permit the extraction of hydrocarbons from unconventional sources such as shale rock formations. Fracking is a technique whereby fluids are injected at high pressure into a wellbore drilled into non-permeable shale formations. The fluids create cracks in the shale, which unlocks oil and gas trapped inside. The proppants get inside the microfissures created by the high-pressure fluids injected and hold them open, increasing production.* […]
>
> *Thus, in an industry increasingly characterized by deeper, horizontal wells and fracking, proppants allow for a more efficient extraction of hydrocarbons.*
>
> *Additionally, by stimulating a well, not only do proppants improve extraction rates for oil and natural gas, but they also contribute to increased well productivity and longevity.*
>
> *There are four grades of proppants. In order of increasing strength, they include: (a) sand; (b) resin-coated sand; (c) ceramic; and (d) resin-coated ceramic. The choice of which proppant to use in a particular well derives largely from the closure stress of that well. Saint-Gobain makes ceramic proppants, which are suited for the deeper, higher-closure-stress wells typical in shale formations in the United States. Other types of proppants, particularly sand proppants, cannot withstand such conditions.*"[17]

---

[14] Request, ¶ 4. Memorial, ¶ 2.
[15] Memorial, ¶ 5. **Exhibit C-133**.
[16] Memorial, ¶ 8.
[17] Memorial, ¶¶ 5-7. Internal citations omitted.

## II.    CLAIMANT'S DECISION TO EXPAND PRODUCTION CAPACITY AND SEARCH FOR AN EXPANSION SITE IN SOUTH AMERICA

140.    In light of the growing proppants industry in North America, but also internationally, the Saint-Gobain Group began in the early 2000s to research options for increasing its production capacity.[18] At that time, there were not sufficient proven bauxite reserves available in the US either for an expansion of the Saint-Gobain proppants plant in Fort Smith, Arkansas (the "**Fort Smith Plant**") or for a new North American facility. Therefore, in 2004, Saint-Gobain started to search for a site for the production of proppants in South America, anticipating that 70 to 80% of the proppants to be produced there would be sold in the North American market, while the remaining percentage would go to the South American market.[19]

141.    The following were identified by Claimant as the main requirements for the production of proppants:

> "*(a) steady supplies of bauxite* [*i.e.*, the primary raw material required for the production or proppants]*, gas and electricity (at competitive prices); (b) proximity to the U.S. market in order to access the largest (current) market for proppants at reasonable transportation costs; (c) access to a skilled workforce capable of dealing with the technical aspects of proppants production; and (d) the ability to build a plant and produce on a short timeline to meet ever-increasing customer needs.*"[20]

142.    Of these requirements, access to bauxite and proximity to the target market were considered to be the key drivers of investment location.[21]

143.    Initially, Claimant considered four countries, *i.e.*, Brazil, Guyana, Trinidad and Venezuela, as potential locations for the new proppants plant. However, following several business development explorations trips taken by employees of the Saint-Gobain Group, the locations in Guyana, Trinidad and Brazil were rejected as either unfeasible in the near future or not economically competitive.[22]

---

[18] Memorial, ¶ 8.

[19] Memorial, ¶ 10; Pedersen, ¶¶ 9, 11, 44.

[20] Memorial, ¶ 12. Internal citations omitted. *See* also Pedersen, ¶ 15; Larry, ¶¶ 17, 22; **Exhibits C-069** and **C-107**.

[21] Memorial, ¶ 12.

[22] Memorial, ¶ 11. Pedersen, ¶¶ 16, 17. Claimant submits that Guyana lacked readily accessible gas supplies; in addition, electricity costs were high, and shipping options were rather limited. In Trinidad, Saint-Gobain would have been required to import bauxite from Guyana, the steady supply of which could not be guaranteed, and land at the preferred industrial location would not be available for several years. Finally, in Brazil, the domestic bauxite was already being sold to aluminium producers and extractors and, in addition, Saint-Gobain would have had to mine and transport bauxite itself. Memorial, ¶¶ 13-15; **Exhibits C-063** and **C-071.**

144.  Claimant considered Venezuela an interesting potential site for the construction of a prop-
pants plant given the ready availability of bauxite, electricity and natural gas,[23] and, ac-
cording to Claimant, the prospect of entering into favorable contracts with State-owned
entities for the supply of those resources and logistical benefits such as the availability of
a well-established shipping route from the local port in Puerto Ordaz to Corpus Christi,
Texas – where the finished proppants would be shipped for distribution within the North
American market. In addition, Saint-Gobain had experience in Venezuela and in the
Puerto Ordaz region and was hoping for governmental support to complete the project on
time and on budget.[24]

145.  In 2004, representatives of the Saint-Gobain Group met with officials from the Ministry
of the People's Power for Basic Industries and Mining ("**MIBAM**") as well as represent-
atives of the State-owned companies CVG Bauxilum, C.A. ("**CVG Bauxilum**"), respon-
sible for the supply of bauxite; CVG Electrificación del Caroní, C.A. ("**CVG
EDELCA**"), responsible for the supply of electricity; and PDVSA Gas, S.A. ("**PDVSA
Gas**"), responsible for the supply of gas, to discuss a possible investment.[25] The Parties
agree that, during these meetings, Venezuelan officials expressed general support for the
project; they are in dispute, however, as to whether Venezuelan officials further gave
specific assurances in the sense that, if Saint-Gobain agreed to invest in Venezuela, Ven-
ezuela would ensure that favorable long-term contracts could be signed for the delivery
of bauxite, gas and electricity to Saint-Gobain.[26]

146.  In September 2004, Jorgen Pedersen, Vice President and General Manager of Saint-Go-
bain NorPro, met with officials from State-owned Corporación Venezolana de Guayana
("**CVG**") and its wholly-owned subsidiary, CVG Bauxilum, to further investigate a po-
tential investment in Venezuela. According to Claimant, CVG further outlined on this
occasion the possibility to enter into favorable long-term contracts for the supply of baux-
ite to Claimant. The Parties are again in dispute as to what was discussed as regards the
possibility and terms of long-term contracts for the purchase of bauxite.[27]

147.  On 3 February 2005, the team responsible for identifying the location for Claimant's new
investment submitted a *Demande d'Autorisation Compagnie* ("**DAC**") with respect to the
proposed greenfield investment in Venezuela with a capacity to produce 50,000 metric

[23] Memorial, ¶ 16; Request, ¶ 12.
[24] Memorial, ¶ 16.
[25] Memorial, ¶ 17.
[26] Memorial, ¶ 17; Rejoinder, ¶¶ 62 *et seq*.
[27] Memorial, ¶ 18; Pedersen, ¶ 21.

tons of ceramic proppants per year to senior management at Compagnie de Saint-Gobain.[28] The DAC, which served as an official request to the shareholders to receive approval for an investment, was approved on 7 February 2005.[29]

148.  Around the same time, Jorgen Pedersen and Guy Rolli, head of the Saint-Gobain Delegation covering Colombia, Mexico and Venezuela, "*and others*"[30] started to meet with senior officials within the Venezuelan Government, in particular from MIBAM and the Ministry of Light Industry and Commerce ("**MILCO**"). According to Claimant, MIBAM – the ministry which oversaw CVG's activity – was "*the driving force within the Venezuelan Government, not only to obtain approval for the project generally, but also specifically to secure a long-term bauxite supply contract*"; thus, it considered the meetings with MIBAM to be of "*critical importance and determinative with respect to* [its] *assessment of the viability of its investment.*"[31]

149.  On 27 April 2005, Saint-Gobain representatives met with Valmore Vásquez, Vice-Minister of Promotion of Investment for MIBAM, as well as representatives from PDVSA Gas and CADAFE (*Compañía Anónima de Administración y Fomento Eléctrico*) to discuss the potential project.[32] According to Claimant, MIBAM acknowledged at the meeting that the availability of a domestic proppants production and supply would be of value for Venezuela.[33]

150.  According to Mr. Pedersen's recollection, on 6 May 2005, Carmen Velásquez, Investment Promotion Coordinator of MIBAM, informally informed Claimant's representatives that "*Vice-Minister Raiza Molina would recommend to Minister Alvarez that Saint-Gobain's bauxite supply request be granted.*"[34] At a meeting on 10 May 2005 attended, among others, by MIBAM Vice-Minister Raiza Molina and CVG Bauxilum President Jesús Imery, MIBAM once more noted its strategy for increasing exports of non-oil-based products and for developing future domestic production through the transfer of technology.[35] Claimant claims that Ms. Molina "*confirmed the terms of the proposed long-term supply contracts with CVG Bauxilum and PDVSA Gas for the supply of bauxite and gas, respectively, for any future investment by Saint-Gobain.*"[36]

---

[28] Memorial, ¶ 19; Counter-Memorial, ¶ 6; **Exhibit C-057**.

[29] Memorial, ¶ 19; Counter Memorial, ¶ 6; **Exhibit C-058**.

[30] It is not specified in Claimant's Memorial or in the witness statement submitted by Mr. Pedersen who such "*other*" participants were. *Cf.* Memorial, ¶ 20; Pedersen, ¶ 24.

[31] Memorial, ¶ 20; Pedersen, ¶ 24.

[32] Memorial, ¶ 22; **Exhibit C-2**.

[33] Memorial, ¶ 22.

[34] Pedersen, ¶ 27; Memorial, ¶ 23.

[35] Memorial, ¶ 23; **Exhibit C-3**.

[36] Memorial, ¶ 23.

151.  According to Mr. Pedersen's notes of a meeting on 11 June 2005 with CVG Bauxilum President Jesús Imery, Mr. Imery noted that he had received support for Saint-Gobain's proppants investment from President Chávez and MIBAM Minister Victor Alvarez.[37] Subsequently, at a high-level meeting between representatives of the French and Venezuelan Governments on 20 October 2005, Claimant's representative at the meeting recorded in a memorandum that MIBAM Vice-Minister Vásquez confirmed that he had tasked the president of CVG Bauxilum with finalizing the contract as soon as possible.[38]

152.  On 25 October 2005, Claimant registered Saint-Gobain Proppants Venezuela, C.A., predecessor in interest to Norpro Venezuela.[39]  Three months later, on 27 January 2006, CVG Bauxilum, acting "*under the auspices of* […] *MIBAM and* […] *CVG*," and Saint-Gobain Proppants Venezuela C.A. signed a Purchase and Sale Agreement (the "**Bauxite Contract**").[40]

153.  In the course of 2005, Claimant also negotiated with CVG EDELCA and PDVSA Gas regarding long-term contracts for the supply of electricity and gas, respectively. According to Claimant, MIBAM agreed at a meeting on 2 March 2006 to ensure that CVG EDELCA and PDVSA Gas would enter into long-term supply contracts with Norpro Venezuela in support of Saint-Gobain's proppants project.[41]

154.  On 22 August 2006, MIBAM requested that CVG appoint (on behalf of the Ministry) an interlocutor based in Puerto Ordaz as the day-to-day contact for Saint-Gobain.[42] Accordingly, on 29 August 2006, Saint-Gobain was notified that Manuel Henriquez had been appointed as the interlocutor to assist Saint-Gobain with, among other things, obtaining the necessary permits to effect its investment in Venezuela.[43]

155.  After additional meetings with representatives from the two State-owned companies, on 16 August 2006, Norpro Venezuela entered into a long-term supply contract for electricity with CVG EDELCA and, on 10 October 2006, into a long-term supply contract for electricity with PDVSA Gas.[44]

---

[37] **Exhibit C-068**.
[38] **Exhibit C-074**.
[39] **Exhibit C-9**. *Cf*. note 3 above.
[40] English translation submitted by Claimant in its Memorial, ¶ 25. The original Spanish text reads: "*CVG BAUXILUM C.A., actuando bajo el auspicio del Ministerio de Industrias Básicas y Minería (MIBAM) y la Corporación Venezolana de Guayana (C.V.G.), suscribió un acuerdo con la empresa SAINT-GOBAIN PROPPANTS VENEZUELA, C.A.* […]." **Exhibit C-6**.
[41] Memorial, ¶ 26; **Exhibit C-077**.
[42] Memorial, ¶ 27; **Exhibit C-080**.
[43] **Exhibit C-081**.
[44] Memorial, ¶ 28; **Exhibits C-8** and **C-10**.

### III.   CLAIMANT'S DECISION TO INVEST IN VENEZUELA

156.   On 7 February 2006, the team responsible for the investment in Venezuela submitted an addendum to the DAC on the expanded capacity for the greenfield proppants plant in Venezuela, providing for an increased capacity of 70,000 metric tons per year.[45] This DAC was approved on 20 February 2006;[46] an update of the DAC, projecting higher costs than anticipated in the addendum, was submitted on 23 October 2006 and approved on 9 November 2006.[47]

157.   Upon receipt of the required internal approvals, Saint-Gobain proceeded to finalize the acquisition of land in Puerto Ordaz on which it intended to build its proppants plant.[48] Claimant claims that it had chosen Puerto Ordaz for the following reasons:

> "[I]*t boasted good transportation options; and it was a terminus for the necessary supplies of gas and electricity; it offered a population of skilled workers. Of particular importance, Saint-Gobain's supplier of bauxite, CVG Bauxilum, was located in Puerto Ordaz. EDELCA—the electricity supplier—was also headquartered there.*"[49]

158.   Following the purchase of land in Puerto Ordaz, Saint-Gobain employees with experience in Venezuela helped determine staffing needs and costs of the new investment.[50] Jack Larry, General Manager of Saint-Gobain Proppants (responsible for managing the proppants business worldwide), was involved in developing the business case as well as in considering the technical issues of how to develop a plant in Venezuela.[51]

159.   Also in 2006, Saint-Gobain appointed Dominique Objois, the former General Manager of a Saint-Gobain plant in Korea, to spearhead the construction effort with his team. Mr. Objois was supported on site by a number of experienced employees seconded from the Fort Smith Plant.[52]

160.   Claimant then started focusing on the technical requirements for the proppants, in particular on the characteristics of the bauxite, *i.e.*, of the primary raw material that was going to be supplied by CVG Bauxilum.[53]

161.   To that end, on 28 February 2006 and again a year later, at the end of March 2007, representatives of Saint-Gobain visited the CVG Bauxilum facility at Puerto Ordaz in order to

---

[45] Memorial, ¶ 29; Counter-Memorial, ¶ 6; **Exhibit C-075**.
[46] **Exhibit C-076**.
[47] **Exhibits C-082** and **C-083**.
[48] Memorial, ¶ 30; Pedersen, ¶¶ 38, 39.
[49] Memorial, ¶ 30. Internal citations omitted. *See* also Pedersen, ¶ 39.
[50] Pedersen, ¶ 41.
[51] Memorial, ¶ 31; Larry, ¶ 21.
[52] Memorial, ¶ 32; Pedersen, ¶ 40; Larry, ¶ 28.
[53] Memorial, ¶ 36.

develop the technical requirements for the bauxite to be provided under the Bauxite Contract and to learn more about CVG Bauxilum's business and production.[54] While noting that CVG Bauxilum was "*at present not receptive to providing customer specific Alumina/iron levels*," Claimant's representatives assessed that CVG Bauxilum's operation was "*very well run.*"[55]

162.  In early April 2007, Saint-Gobain made an additional presentation to CVG Bauxilum and met with its President "*to discuss about possibilities to supply other grades of Bauxite and potential developments for the future.*"[56] Shortly thereafter, in May 2007, Saint-Gobain submitted its request for bauxite supplies under the Bauxite Contract to CVG Bauxilum.[57] In June 2007, Norpro Venezuela reported internally that CVG Bauxilum had confirmed that it would "*supply up to 30% high Alumina content Bauxite*," which assured Claimant that CVG Bauxilum would provide the type of bauxite required to produce ceramic proppants in Venezuela.[58]

## IV.  VAT CREDITS

163.  Venezuelan law requires Venezuelan companies to pay VAT for goods and services they acquire and to collect VAT from Venezuelan, but not from foreign, purchasers of their goods and services, thus exempting exporters of goods manufactured in Venezuela from collecting VAT. When a company makes VAT payments on its purchases of goods and services, it accumulates VAT credits, and when it collects VAT from the buyer, it accumulates VAT debits, which are offset against the credits on a monthly basis. If the company has paid more VAT than it has collected, it carries the net balance forward to the next month.[59]

164.  Norpro Venezuela was to a large extent an exporter of goods manufactured in Venezuela and thus did not collect VAT from its foreign customers, but it nonetheless incurred VAT on most of its purchases because most of the equipment for the plant acquired during the construction phase as well as the raw materials (such as bauxite) used in the production of proppants and the labor services of the outsourcing companies were acquired in Venezuela and thus subject to VAT. As a result of this imbalance between its VAT payments and its VAT collections, as of 31 December 2009, Norpro Venezuela had accumulated VAT credits of VEF 11.7 million on its balance sheet.[60]

---

[54] Memorial, ¶ 37; **Exhibits C-078** and **C-087**.
[55] Memorial, ¶ 37; **Exhibit C-087**.
[56] **Exhibits C-089** and **C-088**.
[57] Memorial, ¶ 38; **Exhibit C-090**.
[58] Memorial, ¶ 38; **Exhibit C-091**.
[59] Counter-Memorial, ¶¶ 48-49.
[60] Memorial, ¶ 162; Counter-Memorial, ¶ 51.

165.  While imported goods, such as equipment for a manufacturing facility, are generally subject to VAT, on 19 October 2006, Respondent issued Decree 4,908, which established a procedure that could result in the exoneration from import taxes and VAT on certain imported equipment.[61] If a company wanted to obtain such an exoneration, it had to apply for an exoneration certificate from the Ministry of Light Industry and Commerce (MILCO).[62]

166.  In late March 2005, Jorgen Pedersen met with William Cañas, Director General of Capital Goods of MILCO, to discuss the proposed proppants plant and, more specifically, the exoneration from VAT and import tax to make the project economically sustainable.[63] By e-mail of 1 June 2006, Mr. Pedersen informed Mr. Patrick Millot, Vice President of Corporate Planning, Strategy and Finance for Saint-Gobain's High Performance Materials, that at a meeting on 26 May 2006, MIBAM had agreed to support Saint-Gobain's efforts to obtain import duty and import tax exemptions.[64]

167.  In its 23 October 2006 DAC update, Claimant reported internally that President Chávez had just announced during a press conference the enactment of a Presidential Decree whereby a broad exoneration covering both VAT and import duties, applicable to imported capital goods not currently produced in Venezuela, such as equipment, machinery and spare parts, would be granted to promote the development of the industrial sector. In the same document, Claimant noted that "*the Ministry of Basic Industries and Mining (MIBAM) has supported us to get an exemption.*"[65] In an e-mail to Mr. Rolli and Mr. Millot dated 2 November 2006, Mr. Pedersen wrote that "*the new exoneration decree will probably make it more likely we get exoneration and simplify the process.*"[66]

168.  Claimant applied for, and was granted on 25 October 2007, an Exemption for Capital Goods, covering VAT and import duties for machinery and other materials, in total 29 specific types of equipment, which Claimant required for the installation and operation of the plant;[67] thus, when that equipment was imported, no import tax or VAT was collected. For the rest of its purchases, Claimant had to pay regular import taxes and VAT, thus leading to the net credit balance of VEF 11.7 million.[68]

169.  VAT credits do not create in themselves a payment liability of the State, but there is a process set out in the Venezuelan VAT law by which exporters of goods can obtain a

---

[61] **Exhibit R-43**.
[62] Counter-Memorial, ¶ 52.
[63] Memorial, ¶ 21; Pedersen, ¶ 24.
[64] **Exhibit C-079**.
[65] **Exhibit C-082**.
[66] **Exhibit C-084**.
[67] Memorial, ¶ 21; **Exhibit C-092**.
[68] *Cf*. Counter-Memorial, ¶¶ 53-54.

financial benefit by filing a request on a monthly basis for the recovery of the VAT credits based on the amount of export sales during the month. If the tax authorities grant the request, a special tax recovery certificate is issued, which may be used by the taxpayer to pay its Venezuelan taxes or it may be sold to a third party, who likewise can use the certificate to pay its taxes.[69]

170.  As of 15 May 2010, Norpro Venezuela had, according to the recollection of Mr. Rondón:

> "*notified the authorities of its intention to start the process to recover VAT credits by applying for a special tax recovery certificate based upon export sales, in accordance with the relevant legislation,* [but] *was still in the process of compiling the relevant documentation necessary to support its application.*"[70]

## V.   CONSTRUCTION OF THE PLANT

171.  In 2007, Claimant began to construct the proppants plant in Puerto Ordaz, with the majority of the necessary equipment arriving on site in September 2007.[71] In order to allow future increases of production capacity, construction was designed to be phased, with one production line to be built at first, and the addition of a second production line to be revisited in the future, "*once the facilities were working properly and delivering a profitable return*."[72] Claimant anticipated that the planned second production line would essentially be "*copied and pasted*" from the first production line and would therefore take less time to go from initiation to full ramp-up, doubling the plant's capacity.[73]

172.  The first production line was designed to begin with two mixers, with a total capacity of approximately 4,500 tons per month, but including designated space for a third mixer, which would raise total capacity to approximately 6,000 tons per month.[74] After the construction of the first production line with two mixers was completed, production of proppants began in September 2008. Despite beginning plans in early 2010, the third mixer, scheduled to come online in the beginning of 2013, was never installed.[75]

---

[69] Counter-Memorial, ¶¶ 57-58 and note 159 referring to Articles 43 and 44 of the *Decreto con rango, valor y fuerza de ley de reforma parcial del decreto n° 5.189 con rango, valor y fuerza de ley que establece el impuesto al valor agregado*, published in the Official Gazette on 26 February 2007 (Decree No. 5.212) and Article 1 of the *Decreto No. 611, Reforma Parcial del Reglamento Parcial No. 1 de la Ley que Establece el Impuesto al Valor Agregado, en Materia de Recuperación de Créditos Fiscales,* published in the OPfficial Gazette No. 37.794 on 10 October 2003. **Exhibits R-41** and **R-47**.

[70] Rondón, ¶ 38. During the Hearing, Mr. Rondón confirmed that the request for a special tax recovery certificate had indeen been submitted to the authorities. Transcript (Day 3), p. 775 lines 10-19. *See* also Claimant's Post-Hearing Submission, ¶ 156; Respondent's Reply Post-Hearing Brief, note 204.

[71] Memorial, ¶ 39; Pedersen, ¶ 42.

[72] Pedersen, ¶ 46; *cf.* Larry, ¶ 33; **Exhibit C-057**.

[73] Memorial, ¶ 40; Pedersen, ¶ 46.

[74] Memorial, ¶ 40.

[75] Larry, ¶ 32.

## VI.    BAUXITE PRICE INCREASES

### 1.    First Price Increase in September 2008

173. On 15 July 2008, then President of CVG Bauxilum, Mr. Carlos Acosta Pérez, invited representatives of Claimant and Norpro Venezuela to a meeting for an "[o]*pen analysis of the contractual relation, in regards of the bauxite price*."[76] It is in dispute between the Parties whether the meeting, which took place on 29 July 2008, was held to "*discuss the situation*"[77] or simply to inform Claimant about the upcoming price increase as a *fait accompli*.[78]

174. In an e-mail to Mr. Pedersen dated 30 July 2008, the General Manager of Norpro Venezuela, Mr. Oscar Cid, reported that CVG Bauxilum had presented the following reasons for an increase of the bauxite price: (i) increase in the Orinoco River Toll by 600%; (ii) adjustment of the extraction and production cost to a break even point; (iii) increase in the freight costs from Jobal Mine to the ACBL port due to an increase of the labor contract with the unionized ACBL workers; and (iv) an international market analysis comparing bauxite prices of various suppliers, according to which the price agreed under the Bauxite Contract was lower than the international market.[79] Mr. Cid further noted in his e-mail that, "*to* [his] *understanding, the* [bauxite price] *increase is a fact and in a very short time, maybe 1 month*," and that CVG Bauxilum "*offer*[ed] *the right for a written reply, maximum by the end of this week, with any allegations, complaints and any other comment related to the impact of the increase in* [Norpro Venezuela]."[80]

175. On 31 July 2008, Decree No. 6,220 with Rank, Value and Force of Law of Canalization and Maintenance of Navigation Routes was published in the Official Gazette, legally enacting the anticipated price increase for the Orinoco River Toll by 600%.[81]

176. By letter of 1 August 2008, the President of Norpro Venezuela, Luis Páez, wrote to Mr. Pérez:

> "C*onsidering that, in accordance, with the policies of the MPPIBAM, Bauxilum has guaranteed to* [Norpro Venezuela] *a long-term supply of bauxite under the Contract, and considering that any adjustment in the sale price of bauxite is governed by the provisions of Clause 10 of the Contract, we wish to discuss with you the negative impact of any modification of the terms and conditions of the Contract could have for the*

---

[76] Memorial, ¶ 46; **Exhibit C-093**. *Cf*. Counter-Memorial, ¶ 64.
[77] Counter-Memorial, ¶ 64.
[78] Memorial, ¶¶ 46-47.
[79] **Exhibit C-093**. *Cf*. Counter-Memorial, ¶ 64.
[80] **Exhibit C-093**.
[81] **Exhibit R-50**.

> *Proppants Project and, consequently, for the plans of substitution of imports of Petróleos de Venezuela, S.A. (PDVSA), the policies of promotion of investment of MPPIBAM and the cooperation agreement between Venezuela and France.*"[82]

177. In the same letter, Mr. Páez also requested a meeting with CVG Bauxilum to discuss the potential effects of the price increase on Claimant's investment.[83] According to Claimant, CVG Bauxilum informed Norpro Venezuela at the meeting, which took place on 21 August 2008, that the bauxite price would be increased from USD 25.50 to USD 33.80 per metric ton, effective immediately.[84]

178. In a letter to Mr. Cid under the combined letterhead of MIBAM, CVG and CVG Bauxilum, dated 2 September 2008, Mr. Pérez undisputedly confirmed that USD 33.80 per metric ton would be the new price for the rest of the year 2008; he invoked the price revision clause in Clause 10.2 of the Bauxite Contract, based on the new tariffs for navigation on the Orinoco River and "*the significant variation experienced by extraction, transportation, and unloading costs of the bauxite at our Matanzas plant.*"[85] Mr. Pérez concluded by noting that the new price remained favorable because it "*correspond*[ed] *to the selling free on board price for the year 2007, and, on the other hand, to a gradual adjustment* [of the price beyond that] *applicable to the present fiscal period.*"[86]

179. In his letter dated 4 September 2008, addressed to the Vice Minister of MIBAM, Ms. Isabel Cristina Delgado, Norpro Venezuela's President Mr. Páez stated that Norpro Venezuela and MIBAM had "*agreed that the different contracts for the supply required for the Project, including the* [Bauxite] *Contract, would be structured as long-term agreements.*" Mr. Páez stated that Norpro Venezuela wished to discuss the negative impact of the price increase on the plant and, as a consequence, on PDVSA's plan to substitute imported by locally produced products, MIBAM's investment policies and the France-Venezuela BIT.[87]

---

[82] **Exhibit C-095**. English translation provided in Memorial, ¶ 47.

[83] Memorial, ¶ 47; **Exhibit C-095**; Counter-Memorial, ¶ 65.

[84] Memorial, ¶ 48: Further to a previous price increase, the original contract price of USD 23.50 per metric ton had been raised to USD 25.50. Pedersen, ¶ 50, note 9; Counter-Memorial, ¶ 63.

[85] Clause 10.2 of the Bauxite Contract reads: "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva Filed las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será applicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior.*" **Exhibit C-6**, Clause 10.2.

[86] **Exhibit C-11**. Quotations from English translations submitted by Respondent with **Exhibit R-51**. *Cf.* Counter-Memorial, ¶ 65.

[87] **Exhibit C-096**. English quote from Memorial, ¶ 170.

180. On 9 September 2008, representatives from Norpro Venezuela again met with CVG Bauxilum.[88] According to Claimant, they protested against the price increase as being *ultra vires*, but – in the interest of maintaining stable commercial conditions – requested that the new price be maintained through, at least, 31 December 2009.[89] In his letter to CVG Bauxilum dated 17 September 2008, Mr. Cid wrote:

> "*Even though* [Norpro Venezuela] *does not share Bauxilum's opinion expressed in the Official Writ with regards to the interpretation and application of item 10.2 of Clause Ten of the Contract in order to justify the Price Increase referred to in the Official Writ,* [Norpro Venezuela] *reaffirms its willingness to discuss with Bauxilum alternatives to guarantee, in the long term, the effective performance of the obligations of both parties under the Contract.*
>
> *Taking into account that the main interest of* [Norpro Venezuela] *is to maintain clear and stable conditions regulating the long-term supply of bauxite under the Contract, in accordance with what was discussed with Mr. Carlos Acosta Pérez and his advisors during our meeting* [on 9 September 2008], [Norpro Venezuela] *formally requests Bauxilum to consider the possibility of guaranteeing that the* […] *US\$ 33.80 per ton of bauxite set forth in the Letter be maintained without any change until December 31, 2009.*
>
> […]
>
> *In any event, while the relevant discussions regarding the revision of this request take place,* [Norpro Venezuela] *wishes to clarify that the issuance of any purchase order of bauxite under the Contract, the payment of any amount owed by* [Norpro Venezuela] *to Bauxilum for such purposes, or the remittance of any correspondence or communication to Bauxilum, as of the Official Writ's date, shall not be deemed as an express or tacit acceptance of the Price Increase mentioned in the Official Writ by* [Norpro Venezuela], *or of any fact, assertion, declaration, circumstance or argument exposed by Bauxilum in the Official Writ.*"[90]

181. Claimant claims that it received no response to its request that the new price be maintained at least until 31 December 2009;[91] Respondent merely submits that the price indeed remained fixed at USD 33.80 per metric ton through 2009.[92]

182. In order to receive the required bauxite shipments for the remainder of 2008 and the whole of 2009, Norpro Venezuela had to submit its purchase order to CVG Bauxilum by 17

---

[88] Counter-Memorial, ¶ 66.
[89] Memorial, ¶ 50.
[90] **Exhibit C-12**. English translation submitted by Respondent with **Exhibit R-52**.
[91] Memorial, ¶ 50.
[92] Counter-Memorial, ¶ 68.

October 2008.[93] Norpro Venezuela did so and scheduled the deliveries at the increased price in order to secure a continuing supply of bauxite for its plant; however, according to Mr. Pedersen, it reserved its rights.[94] In a PowerPoint presentation on 11 October 2008, Claimant also informed MIBAM about the price increase of 2 September 2008, claiming it to be "*unjustified*."[95]

183. In an e-mail dated 21 November 2008, Mr. Pedersen informed Mr. Rolli and Mr. Larry that he had met with the new President of CVG Bauxilum, Mr. Jesús Calvo, the day before and, in particular, discussed the price increase. Mr. Pedersen wrote:

> "*Explained to him the current issue we have with pricing proposals out of the contract coming from the prior president and how that was impacting our business.*
> *Asked him to reconsider his proposal and return to the contractual obligation that we have together.*
>
> *They started up with explaining the increase of the river toll which they have had and how their costs have gone up. I then explained that naturally we will pay the increase in transportation costs which is according to the contract that we are not looking at no increase but an increase according to the inflation clause in the contract. He understood the position and his reaction was that we should make a proposal in writing to him and that he would consider it.*"[96]

184. On 8 June 2009, in an update to the DAC of 23 October 2006, Norpro Venezuela reported:

> "*The cost of bauxite from our primary supplier Bauxilum was raised in mid 2008 by 34%. This increase was done outside of the terms and conditions of our existing contract. Bauxilum cited increases in barge transportation costs (River Toll) combined with the increased mining cost account form* [sic] *most if* [sic] *the price increases. A meeting was held on January 15, 2009 with the president of Bauxilum to seek a reduction of the increase that was imposed. In spite of continuous attempts to further discuss to date we are still awaiting their reply.*"[97]

185. Norpro Venezuela never invoked the dispute resolution mechanism provided in Article 16 of the Bauxite Contract, *i.e.*, arbitration before the Center for Conciliation and Arbitration of the Chamber of Commerce of Caracas in relation to the bauxite price increase.[98]

---

[93] Memorial, ¶ 52; **Exhibit C-101**.
[94] Memorial, ¶ 52; Pedersen, ¶ 53.
[95] Memorial, ¶ 53; **Exhibit C-100**.
[96] **Exhibit C-102**.
[97] **Exhibit C-107**.
[98] **Exhibit C-6**. Counter-Memorial, ¶ 68, note 185.

## 2.    Second Price Increase in March 2010

186.    At a meeting held on 10 March 2010, CVG Bauxilum informed Norpro Venezuela that it sought to increase the price for bauxite supplied in 2010 to USD 51.28 per metric ton.[99] By letter to Mr. Cid, dated 12 April 2010 and under the letterhead of MIBAM, CVG and CVG Bauxilum, Mr. Calvo confirmed the price increase, again invoking Clause 10 of the Bauxite Contract.[100] Claimant claims that it protested against this price increase, both at the meeting on 10 March 2010 and in subsequent communications with CVG Bauxilum.[101] A further meeting between Claimant and CVG Bauxilum scheduled for 18 March 2010 was cancelled due to a visit of President Chávez to the area.[102] The parties to the Bauxite Contract never met to discuss this proposed price increase further and Norpro Venezuela never paid this price for any bauxite purchased from CVG Bauxilum.[103]

## VII.    PRODUCTION AND SALE OF PROPPANTS PRIOR TO THE TAKE-OVER OF THE PLANT

187.    Once construction had been completed and the necessary permits had been obtained, the proppants plant entered the production ramp-up phase. On 26 September 2008, the plant produced its first saleable proppants, and on 13 December 2008, the first shipment of 1,500 tons of Venezuelan-produced proppants arrived in the US.[104]

188.    During the early part of 2009, Claimant focused on securing a long-term customer base for its Venezuelan proppants production. In the North American market, even though the oil and gas field operators are involved in selecting the type, quantity, etc. of the proppants, the oil service companies are the ones who buy the proppants from the supplier and then pump them into the drilled well.[105] Claimant thus intended to secure a long-term supply contract with its biggest client – Halliburton, a large oil services provider – as well as to diversify its customer base in North and South America.[106]

189.    On 1 April 2009, Norpro Venezuela, along with two other Saint-Gobain proppants facilities, entered into a Master Purchase Agreement with Halliburton (the "**Halliburton MPA**").[107] Pursuant to this agreement, Halliburton agreed to a "*take or pay*" arrangement,

---

[99] Memorial, ¶ 67; *cf.* Counter-Memorial, ¶ 69.
[100] **Exhibit C-16**.
[101] Memorial, ¶ 68; *cf.* Larry, ¶ 39, note 7.
[102] Memorial, ¶ 68; **Exhibit C-108**.
[103] Counter-Memorial, ¶ 69.
[104] Memorial, ¶¶ 54-55; Pedersen, ¶ 45; Larry, ¶ 26.
[105] Memorial, ¶ 57.
[106] Millot, ¶ 17; Memorial, ¶ 58.
[107] Memorial, ¶ 59; **Exhibit C-106**.

starting with 40 million pounds of proppants for the second quarter of 2009 rising steadily to a peak of 100 million for every quarter of 2011 and the first quarter of 2012.[108]

190. The proppants that Norpro Venezuela produced at Puerto Ordaz were stored at the plant or in an external warehouse near the Venezuelan port. Apart from the proppants that were sold on the South American market (generally 60 to 100 tons per month), the proppants were shipped from Venezuela to Corpus Christi, Texas. Once the Halliburton MPA was in place, the vast majority of the shipped proppants was sold to Halliburton under this contract.[109]

191. Prior to the start of production, Claimant brought a group of manufacturing employees from Venezuela to its Fort Smith, Arkansas proppants plant and trained them in the plant's processes. Norpro Venezuela's managers were sent to Fort Smith for supplemental training and also received training on site in Puerto Ordaz.[110] In addition, Claimant sent operators, maintenance and quality control personnel from Fort Smith to Puerto Ordaz to assist during the ramp-up phase, which according to Claimant, continued until August 2009.[111]

192. Norpro Venezuela operated using the "*overall equipment effectiveness*" (OEE) production method. This method computes the effectiveness of the plant *vis-à-vis* its overall capacity. According to Claimant, a plant operating at 85% OEE is considered world-class, and its proppants plants routinely operate at approximately 80 to 87%.[112]

193. As regards the Venezuelan plant during the ramp-up phase, Mr. Larry stated in his first witness statement:

> "[A]*djustments are always necessary during the ramp-up phase, and there is always a learning process for employees and management at a new plant. As expected, therefore, the quality and quantity of the proppants produced at Norpro Venezuela improved throughout ramp-up as the plant perfected production processes relating to time and termperature. Specifically, by July 2009, the plant was running quite efficiently on a continuous basis – based on my recollection of OEE numbers, it is clear that production had improved. And by September 2009* […]*, all of the technical issues normally associated with the start-up of a new plant had been addressed. Likewise, Norpro Venezuela had developed*

---

[108] Article 6, Table 1 of the Halliburton MPA provides that Halliburton had to take those quantities "*or 45% of Buyer's total purchases of ceramic proppants from all its suppliers, whichever is less.*" **Exhibit C-106**. According to Claimant, Halliburton thus had the option to buy 45% of its total purchases of ceramic proppants from all of its suppliers upon giving adequate notice pursuant to Article 6(b) of the Halliburton MPA. Memorial, ¶ 59, note 126.
[109] Memorial, ¶ 60; Larry, ¶¶ 34-36.
[110] Larry, ¶ 27.
[111] Larry, ¶ 28; Memorial, ¶ 56.
[112] Memorial, ¶ 69; Larry, ¶ 29.

*the skills of a critical mass of workers in order to be able to effectively run the plant.*"[113]

194. In the 8 June 2009 update to the DAC, it was noted that "[t]*he project has encountered delay both in the initial start up of the project and during commissioning and start-up phase in achieving planned production levels.*"[114]

195. In November 2009, the plant was temporarily shut down, the reason for which is disputed between the Parties.[115] As a proppants plant is required to run continuously for six months in order to reach a "*steady state*," *i.e.*, 85% OEE or in the case of the Venezuelan plant a production of approximately 53,000 tons per year, the plant never reached its full production capacity with two mixers. By May 2010, the plant was producing approximately 3,400 tons of proppants per month, which would have resulted in an annual production of approximately 42,000 tons.[116]

196. In a presentation on the 2011-2015 Strategic Plan, dated 18 March 2010, Claimant laid out a "*Venezuela Action Plan,*" noting that a "*Specialist* 'SURGE' [was] *underway to address critical VZ issues*": (i) "*Process Stability*"; (ii) "*Additives*"; (iii) "*Maintenance pm focus*"; and (iv) "*Operator training*" and that the *"Key focus of team"* was to "*Audit all processes to insure consistency and adherence to control systems*" and "*Stabilize, stabilize, stabilize.*"[117]

197. In a further presentation on the 2011-2015 Strategic Plan, dated 4 May 2010, Claimant noted that "*Venezuela plant output has declined since mid-March. Problems linked to several key issues*": (i) "*Elimination of refire addition to maintain production levels*"; (ii) "*Significant degradation of systems and controls within plant,*" caused, *inter alia*, by "*Labor issues leading to low worker cooperation and productivity*"; (iii) "*Batch stability impacted by critical changes*"; and (iv) "*High level of electrical failures during April due to maintenance by EDELCA in Puerto Ordaz.*"[118]

## VIII. LABOR UNREST

198. As of the operational start-up of the plant, the majority of the workers at the plant was not directly employed by Norpro Venezuela (or any other of Claimant's subsidiaries), but rather by outsourcing companies. Already in the 3 February 2005 DAC, Claimant pro-

---

[113] Larry, ¶ 30.
[114] **Exhibit C-107**.
[115] Memorial, ¶ 65; Larry, ¶ 31; Counter-Memorial, ¶ 18; Rondón, ¶ 20. *See also* ¶ 207 below.
[116] Larry, ¶ 31; Memorial, ¶ 65.
[117] **Exhibit CLEX-80**; **Exhibit R-9**.
[118] **Exhibit CLEX-80**; **Exhibit R-10**.

posed the establishment of a new subsidiary in Venezuela rather than using SGMC Venezuela (one of Claimant's existing Venezuelan subsidiaries), naming as one of the reasons "*to avoid the creation of a labor union.*"[119] The DAC stated:

> "*In Venezuela, employees of a company have right to establish a labor union if the total number of employees of the company is more than 25. With a Proppants projects, the number of employees of SGMC Venezuela would be more than 25 and a labor union would become inevitable. With a new company, we would keep the number of permanent employees limited to 24, using third parties to supply temporary labor for the balance of our employment, a practice typically used in Venezuela. We therefore propose to establish a new company.*"[120]

199. The labor outsourcing model referred to in the DAC was indeed being used in Venezuela at that time and was known as "*tercerización.*"[121]

200. When Norpro Venezuela's operations and maintenance workforce returned from training at Fort Smith, Arkansas in 2008, they were informed that they would have to resign their positions with Norpro Venezuela and they would then be re-hired by RH Consultores, a third-party labor outsourcing company.[122] Regarding the terms of the new contracts, Respondent's witness Mr. Eduardo Rondón stated in his witness statement:

> "*One of the most significant changes was with respect to job security. RH Consultores was offering contracts of only six months' duration. These contracts could be renewed for a further six months, and then for a third period of six months. After this, there was a prospect of being hired as an employee under a contract of unlimited duration. Thus, it was as if the workers had a series of trial periods during which they were to be employed by the outsourcing company without the same job security and benefits. Although the basic salary was the same, there were some important differences in terms of benefits. I recall that the workers employed through RH Consultores only received an annual bonus of 15 days' salary (the minimum required by law). They received no performance-based bonus. They had their salary increased when required by law but there were no performance-based increases, and I remember hearing complaints that these increases were not even suffi-*

---

[119] The second reason was that SGMC Venezuela owned 100% of Carburo Del Caroni, a newly acquired company, whose former owner still had significant liabilities to some third parties, including employees, and it was considered that there was some risk that some of the former owner's creditors might sue Carburo del Caroni "*potentially implicating its mother company SGMC Venezuela*" in case of failure of the former owner to pay the liabilities. **Exhibit C-057**.

[120] **Exhibit C-057**.

[121] Counter-Memorial, ¶ 14, note 14. Outsourcing was made illegal in 2012, *cf*. Article 48 of Decree No. 8,938, with Rank, Value and Force of Organic Labor and Workers Law, published in the Official Gazette No. 6,076 (Extraordinary), dated 7 May 2012. **Exhibit R-12**. *See* also ¶ 209 below.

[122] Counter-Memorial, ¶ 15; Rondón, ¶ 10.

> *cient to keep up with inflation. Although the approximately 30-40 work-*
> *ers to whom this new policy was applied were unhappy about it, they*
> *accepted the new arrangement because it was made clear to them by*
> *Oswaldo Luna* [head of HR] *that this was the only way that they would*
> *keep their jobs."*[123]

201. In the course of 2008, Norpro Venezuela recruited further workers that were employed through RH Consultores; according to Mr. Rondón's recollection, by the end of 2008, there were close to 70 workers who had contracts with this outsourcing company.[124]

202. Mr. Rondón further stated in his witness statement:

> *"Early in 2009, rumblings began among the Plant workers about the*
> *possibility of trying to get organized to form a union. The main com-*
> *plaint expressed by the workers was the outsourcing contracts, and the*
> *consequent lack of job security.* […] *The proponents of the union were*
> *employees that were very active among the operations and maintenance*
> *personnel at the Plant."*[125]

203. Before the labor union had been formed, some of the workers who, according to Mr. Rondón, "[p]*lant management identified as being the main union agitators,*"[126] had their contracts terminated. Norpro Venezuela also terminated its relationship with RH Consultores and, on 16 June 2009, entered into an agreement with Outstaffing Corporation, a different outsourcing company in Venezuela.[127] As a consequence, the workers were told that their contracts with RH Consultores would be liquidated, meaning that the remaining time under their six-month contract would be paid out, and that they would have to sign new contracts with Outstaffing Corporation.[128]

204. The change of outsourcing companies led to growing discontent among the workers at the plant. Mr. Rondón described the situation in his witness statement as follows:

> *"The Plant workers saw this move* [*i.e.*, that they had to sign new con-
> tracts with Outstaffing Corporation] *as evidence that their contracts*
> *could be manipulated and even terminated at any time, with no justifi-*
> *cation whatsoever.* […] *some of the workers were on their third 6-*
> *month contract with RH Consultores and, with this move, their hopes*
> *that their next contract would be direct and of unlimited duration van-*
> *ished because Outstaffing Corporation was offering only 6 month con-*
> *tracts again. The workers began to realize that the prospect of a direct*
> *contract of unlimited duration with Norpro Venezuela was not realistic.*

---

[123] Rondón, ¶ 11.
[124] Rondón, ¶ 13.
[125] Rondón, ¶ 14.
[126] Rondón, ¶ 15.
[127] **Exhibit ER-2**; Rondón, ¶ 15; Counter-Memorial, ¶ 16.
[128] Counter-Memorial, ¶ 16; Rondón, ¶ 17.

> *Although eventually all of the Plant workers signed the new contracts*
> *with Outstaffing Corporation, this move led more workers to be sympa-*
> *thetic to the idea of forming a union.*"[129]

205. A few months later, union organizers managed to obtain the required signatures to form a labor union and created the *Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares* ("**SINPROTRAC**").[130]

206. On 15 September 2009, Norpro Venezuela terminated the contract of Mr. Luna, head of HR, who had been employed directly by Norpro Venezuela.[131] By letter of 10 October 2009, Norpro Venezuela also terminated the contract with Outstaffing Corporation, effective 13 November 2009, resulting in the termination of the contracts of approximately 70 workers at the plant.[132] In the termination letter, Norpro Venezuela confirmed that it "*assume*[d] *the costs derived from the termination of the Agreement that may be billed by OUTSTAFFING CORPORATION, C.A after November 13, 2009.*"[133]

207. According to Respondent, the "*mass dismissal of workers*" was the true reason for the shutdown of the plant in November 2009 that lasted well into January 2010, not the "*series of mechanical improvements*" that Mr. Larry referred to in his witness statement;[134] Respondent acknowledges, however, that "*Norpro Venezuela did make use of the November 2009 Plant shutdown to carry out certain repairs and improvements.*"[135]

208. Following the termination of its contract with Outstaffing Corporation, Norpro Venezuela entered into contracts with three new outsourcing companies: Gestión Industrial Bolivar, C.A., Gerencia de Personal Guayana, C.A. and Guayana Internacional Cargo, C.A.

---

[129] Rondón, ¶ 17.

[130] Counter-Memorial, ¶ 17; Rondón, ¶ 18.

[131] Mr. Luna later brought a claim for wrongful dismissal against Norpro Venezuela, which was upheld by the Court of First Instance of Labor Trials, State of Bolivar, territorial extension Puerto Ordaz, dated 14 October 2010. **Exhibit ER-3**. The appeal filed against the decision was held to be meritless, and the decision of 14 Octoboer 2010 was upheld, by the Third Superior Labor Tribunal, State of Bolivar, territorial extension, dated 13 July 2011. **Exhibit ER-4**. Rondón, ¶ 18.

[132] Counter-Memorial, ¶ 17. Rondón, ¶ 19; **Exhibit ER-6**.

[133] **Exhibit ER-6**. Thirteen workers whose contracts were terminated in this context, filed a request for reinstallation and payment of accrued wages before the Chamber of Jurisdictions (*Sala de Fueros*) of the Office of the Work Inspector "*Alfredo Maneiso*" on 14 December 2009. In the administrative decision of 15 April 2010, Outstaffing Corporation was ordered to perform the immediate reinstallation of all thirteen workers and to pay their accrued wages since the date of their dismissal on 12 December 2009 until the final reinstallation of their work positions, based on the grounds that "*the dismissals were performed with no authorization for such purpose resulting from a fault qualification proceeding.*" **Exhibit ER-8**. On 29 July 2010, the same workers filed claims against Outstaffing Corporation before the Judge of First Instance of Substantiation, Mediation and Execution of Labor, State of Bolívar, claiming that the motive for their dismissal was the fact that they had been in the process of negotiating a draft collective bargaining agreement on behalf of the SINPROTRAC union. **Exhibit ER-7**.

[134] Larry, ¶ 31.

[135] Counter-Memorial, ¶ 18; Rondón, ¶ 20.

Through these companies, half of the plant workers were re-hired. According to Mr. Rondón, the other half joined with the SINPROTRAC union leaders, "*and began staging daily protests in front of the Norpro Venezuela Plant.*"[136]

209. The tension between Norpro Venezuela's management and the SINPROTRAC labor union was not an isolated case in the area, but rather the Ciudad Guayana industrial sector in general was experiencing labor unrest at that time. Workers employed in the iron, steel and aluminum industries were publicly demanding an end to unfair labor practices, one of their main complaints being the outsourcing labor arrangements. In addition, there was a nationwide political initiative to retain control of Venezuela's natural resources and related downstream manufacturing and refining processes in order to ensure that Venezuela would gain from the potential economic and social benefits of those sectors. As a consequence, in mid-2009, working groups were formed who developed and executed the *Plan Guayana Socialista*, aimed at involving the workers in the management and administration of basic industries and, *inter alia*, improving the working conditions.[137]

210. In Claimant's 18 March 2010 presentation on the 2011-2015 Strategic Plan, one of the issues was the "*Heavy focus on safety of away team* [referring to the SURGE team that was to address operational issues]": (i) "*All team members at Mara Inn*"; (ii) "*Restrictions on activities outside hotel*"; (iii) "*Travel to/from plant controlled*"; and (iv) "*Guidelines issued for worker conflicts*."[138]

## IX. TEMPORARY TAKEOVER OF THE PLANT ON 24 MARCH 2010

211. On 24 March 2010, approximately 40 individuals, a group of former workers from an outsourcing company Norpro Venezuela had used, assembled outside the plant, then gained access to it and occupied the operation area of the plant for approximately four hours.[139] Among those individuals were, *inter alia*, Mr. Angel Marcano, a member of the Venezuelan National Assembly, and Mr. Asdrúbal López, a member of the Bolívar State Legislative Assembly and of President Chávez's ruling party.[140] Their role within the group is disputed between the Parties.[141]

212. Also present were Mr. Vicent Acosta Williams Jose, General Secretary of SINPRO-TRAC, and other leading members of the labor union. In the Request for Judicial Inspection filed by Norpro Venezuela on the same date, Mr. Jose is also listed as the first of five people who were identified to be in control of the takeover; Mr. Marcano and Mr. López

---

[136] Rondón, ¶ 21.
[137] Counter-Memorial, ¶ 20, note 57; Rondón, ¶ 25; **Exhibits C-14** and **ER-9**.
[138] **Exhibits CLEX-80** and **R-9**.
[139] Larry, ¶ 41; Rondón, ¶ 24.
[140] Memorial, ¶ 69.
[141] *Cf.* Memorial, ¶¶ 69, 71; Rejoinder, ¶ 10.

were not among those five people.[142] One of the pictures taken by the judicial inspector shows a banner which states: "*The community of workers (la masa obrera) united in support of our comrades who were fired for a non-justified cause. Norpro, we demand that they are re-hired immediately.*"[143]

213.   When the leader of the union took a megaphone and called out to the workers inside the plant to stop their work, Norpro Venezuela's management shut down the plant's major equipment and put the kiln into idle mode. They regained control of the plant the next day, but the Parties are in dispute as to the time it took to get the production the plant up and running again.[144] According to Claimant, the group also damaged the main gate of the plant, destroyed its lock and blocked the entrance; they further prevented employees from carrying out normal plant activities and forcefully removed Norpro Venezuela employees from the plant production areas.[145] The National Guard that Norpro Venezuela had engaged to provide security for the plant did not intervene.[146]

214.   In response to the takeover, Norpro Venezuela requested a judicial inspection, during which the judge documented the names of the individuals participating in the takeover, identified the leaders of the takeover, and detailed the damages inflicted.[147] After the confrontation with the judge, the group left the plant, but several members remained outside and continued to partially block the entrance.[148]

215.   In its 4 May 2010 presentation on the 2011-2015 Strategic Plan, Claimant noted that "*Black Union outsource contract expires May 21*": (i) "*Expect unstable work situation for 2nd half of May*"; and (ii) "*Operator and maintenance experience will again be an issue.*" With regard to the "*Key Issue*" "*Work Force (Unstable => high turnover => influenced by external forces*," the Plan set out the following actions: (i) "*Unionize the site - Create 2 unions: One for SG employees, another for outsourced labor => use the unions to reduce external pressure and promote some stability*"; (ii) "*Keep the strategy of outsourcing from more than one source*"; (iii) "*Lengthen the labor contract from 6 months to 1-3 years*"; (iv) "*Study the introduction of an affordable benefit plan to reduce turnover and labor tension*"; and (v) "*Promote stability through improved communication with workforce.*"[149]

---

[142] **Exhibits C-15** and **R-14**.
[143] **Exhibits C-15** and **R-14**.
[144] Memorial, ¶ 73; Millot, ¶ 23; Rondón, ¶ 24.
[145] Memorial, ¶ 69.
[146] Memorial, ¶ 70.
[147] **Exhibit C-15**.
[148] Memorial, ¶ 72; **Exhibit C-15**.
[149] **Exhibits CLEX-80** and **R-10**.

## X.   FINAL TAKEOVER OF THE PLANT ON 15 MAY 2010

216.   On 15 May 2010, the findings of the *Plan Guayana Socialista* working groups were presented to President Chávez during a public ceremony, which was also broadcast live on television and radio. During the presentation, President Chávez read and approved certain proposals made by the working groups, *inter alia*, with regard to Norpro Venezuela. The official transcript of the radio broadcast reads in relevant part:

> "*Discuss with PDVSA the purchase of the Proppants produced and commercialized by the company Norpro Venezuela, a product produced with bauxite, Cornstarch and water, used for mud and drilling. It is suggested here* [in the document] *that should it become necessary, this company should become state-controlled and transferred to the hands of PDVSA. Let the company Norpro Venezuela become state controlled and transfer it to the hands of Petróleos de Venezuela.*"[150]

217.   On the same day, a local group arrived at the Plant, coming directly from the event at which President Chávez had spoken.[151] The group again included Messrs. Marcano and López,[152] as well as members of the SINPROTRAC union.[153] Oscar Cid, Pierre Gramond and Eric Dixon of Norpro Venezuela also arrived on site, removed some personal items as well as their laptops and documents and, even though the group tried to stop them, eventually left the plant.[154] Approximately 4,000 tons of finished proppants that were stored on site remained inside the plant; a shipment scheduled for 17 May 2010 had to be cancelled.[155]

218.   Norpro Venezuela again requested a judicial inspection to document the events, which took place on 17 May 2010. The local judiciary noted that (i) when Norpro Venezuela's employees arrived for work on Monday, 17 May 2010, they were denied access to the plant; (ii) the judicial inspector and Norpro Venezuela officials were refused access to the plant by Messrs. Marcano and López, who stated that they were acting for the *Plan Guayana Socialista*, under instructions given by President Chávez; (iii) a SINPROTRAC banner hung from the main entrance of the plant; and (iv) the group orchestrating the

---

[150] English translation submitted by Respondent. Counter-Memorial, ¶ 24. The original Spanish version reads: "*Consultar con PDVSA sobre la compra de Propan*[ts] *producido y comercializado por empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario – aquí se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela.*" **Exhibit R-15**.
[151] Memorial, ¶ 77; Rondón, ¶28.
[152] **Exhibit C-20**
[153] Rondón, ¶ 28.
[154] Rondón, ¶¶ 28-29.
[155] Memorial, ¶¶ 78-79; Larry, ¶ 44.

takeover refused to accept a memorandum from Norpro Venezuela requesting, *inter alia*, the appointment of a representative with whom to negotiate.[156]

219.  On 18 May 2010, the *Oficina de Comunicación y Relaciones Institucionales* published a summary of national and international press stories, including a story from *El Nacional* reporting that:

> "*Contracted workers of the Norpro Venezuela company took over the factory after the nationalization announcement of President Hugo Chávez. With the National Guard and a commission presided over by the National Assembly Representative Angel Marcano, the workers prevented the legal representative of the enterprise from entering the facilities.*"[157]

220.  By letters of 19 and 27 May 2010, Mr. Páez informed Mr. Rafael Ramírez, President of PDVSA and Minister of Hydrocarbons (Ministry of Oil and Mining), and Mr. José Khan, President of CVG and Minister of MIBAM, that Claimant's investment had been taken on 15 May 2010 and offered technical assistance to ensure the proper use of the equipment and the safety of the workers on site. He further requested that an official interlocutor be appointed with whom Claimant could discuss the expropriation.[158]

221.  On 24 and 27 May 2010, officials from PDVSA, PDVSA Exploration and Production East and PDVSA Industrial visited the plant.[159] According to a press report in the *Prensa Unete*, these officials acted under direct instructions of Minister Ramírez.[160]

222.  In May and June 2010, the following reports and presentations were prepared by PDVSA:

-   "*EVALUACIÓN GLOBAL DE LA SITUACIÓN ACTUAL DE LA EMPRESA NORPRO VENEZUELA C.A.,*" dated May 2010 (preliminary report prepared by PDVSA E&P);[161]

-   "*Sector Hidrocarburos – PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO DE VENEZUELA, C.A.,*" dated May 2010 (PowerPoint Presentation prepared by PDVSA Industrial);[162]

-   "*DIAGNÓSTICO SITUACIÓN ACTUAL Y PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO VENEZUELA,*

---

[156] Memorial, ¶ 81; **Exhibit C-20**.
[157] **Exhibit C-114**.
[158] Memorial, ¶¶ 82, 84, 89, 95. **Exhibit C-22; Exhibit C-23**.
[159] Memorial, ¶ 84; Counter-Memorial, ¶ 28.
[160] **Exhibit C-123**.
[161] **Exhibit C-141**.
[162] **Exhibit C-111**.

*C.A.,*" dated June 2010 (PowerPoint Presentation prepared by PDVSA Industrial);[163] and

- "*SITUACIÓN ACTUAL DE PROCESO DE ESTATIZACIÓN EMPRESA NORPRO DE VENEZUELA, C.A. (NORPRO)*," dated 2 June 2010 (internal memorandum prepared by PDVSA Industrial).[164]

223. On 2 and 8 June 2010, meetings took place between Norpro Venezuela, PDVSA and others. The meeting minutes are entitled: "*PROCESO DE NACIONALIZACION NORPRO VENEZUELA, C.A.*"[165]

224. On 8 June 2010, Mr. Guy Rolli wrote to Mr. Temir Porras, Vice-Minister for Foreign Relations for Europe, referring to press reports according to which PDVSA was involved in the expropriation, and equipment of the plant had been damaged during the events on and after 15 May 2010. He further reiterated Claimant's request that an official interlocutor be appointed and Claimant's offer to provide technical assistance.[166]

225. By letter of 6 July 2010, addressed to Minister Ramírez, Mr. Páez reiterated Claimant's offer of technical assistance to ensure the proper use of the equipment and the safety of the workers on site.[167]

226. By letter of 3 August 2010, Mr. Patrick Dupin, Claimant's President, addressed Mr. Eulogio del Pino, Vice-President of Exploration and Production of PDVSA, reiterating Claimant's concern about damage that might occur to workers at the plant and assets of Norpro Venezuela. Mr. Dupin referred to press reports pursuant to which the plant's kiln was out of order and PDVSA was planning to initiate repairs shortly. He further reiterated Claimant's requests that "*an authorized interlocutor be promptly appointed to determine the next steps necessary to complete the nationalization of the Facility and its assignment of PDVSA, as ordered by President Chávez.*" Apart from requesting a meeting with PDVSA, Mr. Dupin confirmed Claimant's willingness to "*analyze the possibility of providing PDVSA with the technical assistance required to properly start and operate the Facility.*"[168]

227. On 5 August 2010, Norpro Venezuela requested another judicial inspection, which documented that a red "*PDVSA*" flag was flying over the plant and that the gate of the plant

---

[163] **Exhibit C-142**.
[164] **Exhibit C-143**.
[165] **Exhibit C-25**.
[166] Memorial, ¶ 97; **Exhibit C-26**.
[167] **Exhibit C-28**.
[168] **Exhibit C-30**.

had been painted bright red. Court officials and Norpro Venezuela management were again denied entry into the plant on this day.[169]

228. Shortly after the takeover on 15 May 2010, Norpro Venezuela began notifying its contractual partners in Venezuela, including INPSASEL and CVG EDELCA, that a *causa extraña no imputable* had occurred.[170] In August 2010, Norpro Venzuela published notifications of *force majeure* in Venezuelan newspapers including in *Ciudadanos Nacional* (a sub-section of *El Nacional*) and in *Correo del Caroní*.[171] Around the same time, Norpro Venezuela officially terminated the majority of its workforce, only retaining certain individuals who would enable Claimant to provide technical assistance in case the Venezuelan Government would accept that offer.[172]

## XI. NEGOTIATIONS AFTER THE TAKEOVER OF THE PLANT

### 1. The 30 August 2010 Meeting

229. On 30 August 2010, a meeting was held between PDVSA Industrial, Compagnie de Saint-Gobain and the French Embassy in Venezuela.[173] According to the minutes of that meeting, PDVSA Industrial made the following declarations and presented the following issues:[174]

- PDVSA Industrial had received specific instructions from President Chávez to carry out the transfer of Norpro Venezuela to State control and would comply with such order as promptly as possible;

- An expropriation decree was being prepared and, although PDVSA Industrial had no knowledge of the precise date of its publication, it would be desirable if it was published before 15 November 2010, the date on which the six-month term provided in Article 8(1) of the Treaty would expire;

- Norpro Venezuela and its shareholders were free to commence legal proceedings to safeguard their rights under the applicable law and, especially, for labor and workplace safety purposes;

---

[169] **Exhibit C-31**; Memorial, ¶ 86.
[170] Memorial, ¶ 98; **Exhibit C-21**; **Exhibit C-27**.
[171] Memorial, ¶ 98; **Exhibit C-32**; **Exhibit C-33**.
[172] Memorial, ¶ 98; Millot, ¶ 25.
[173] Memorial, ¶ 99; Counter-Memorial, ¶ 29.
[174] **Exhibit C-34**. Quotations from the English translation submitted by Respondent with **Exhibit R-17**. While the submitted document bears the note "*BORRADOR PARA DISCUSIÓN*," it appears to be undisputed that the meeting minutes were executed during the following meeting on 14 October 2010. **Exhibit C-36**.

- Without prejudice to the instruction that Norpro Venezuela was to become State-controlled, PDVSA Industrial was "*open to considering any proposal that the shareholders from Norpro may wish to present with the objective of bringing about this change in control and the transfer of Norpro's assets to PDVSA, in an amicable and mutually agreeable fashion,*" but PDVSA Industrial required a written statement of willingness from the shareholders in order to obtain the necessary authorizations "*to consider any mechanism other than expropriation which might lead to the amicable resolution of the dispute*";

- Until the publication of the expropriation decree, PDVSA Industrial could not act or intervene in Norpro Venezuela and its presence at the plant "*is in response to the necessity to enter into possession formally, once the Decree is published.*"

230. Compagnie de Saint-Gobain made the following declarations and presented the following issues at the meeting:[175]

- Compagnie de Saint-Gobain thanked PDVSA Industrial's representatives for having responded to its written request for a meeting and recalled that the project had always been carried out "*with the support and sponsorship*" from MIBAM and various other governmental Venezuelan authorities;

- Compagnie de Saint-Gobain ratified what had been expressed in various communications since 15 May 2010 relating to the occupation of the plant and confirmed its "*intention to cooperate with the authorities in respect to the transfer of Norpro to State control, for the purpose of resolving any controversy in a* [sic] *amicable fashion, pursuant to the Treaty*";

- Compagnie de Saint-Gobain reiterated its readiness to provide technical assistance to PDVSA Industrial regarding product quality control and standardization of process, if PDVSA Industrial so required, and proposed to conduct a thorough technical inspection of the plant with the aim of restarting its production and to assemble a technical commission for the purpose of studying the form that the technical assistance may take;

- Compagnie de Saint-Gobain "*expressed its interest to consider an eventual* 'Take Off Agreement' *or purchase agreement for the products that PDVSA may produce in Norpro's plant after its expropriation, subject to conditions that must be detailed and agreed at a convenient time, including product specs, technical characteristics, and quality standards. This proposal that may not exceed half of the plant's capacity due*

---

[175] **Exhibit C-34**. Quotations from the English translation submitted by Respondent with **Exhibit R-17**.

*to the loss of clients who could not be satisfied since the transfer of the company to State control was ordered in 2010*";

- Compagnie de Saint-Gobain reiterated its interest in "*clarifying the legal situation of the investment made by* [Claimant] *in Venezuela, through its subsidiary Norpro, over whose plant it has no control since the date of the presidential announcement on May 15, 2010*" and requested PDVSA Industrial to clarify when the expropriation decree would be published, in light of the expiration of the six-month term under Article 8(1) of the Treaty on 15 November 2010;

- Compagnie de Saint-Gobain was interested in reaching a framework agreement with PDVSA Industrial over the basic issues related to the transfer of Norpro Venezuela to State control and would "*analyze with PDVSA mechanisms that would allow for the resolution of the dispute in an amicable manner, pursuant to the terms of the Treaty, such as, for example, the purchase of the shares in substitution for an expropriation proceeding.*"

231. PDVSA Industrial and Compagnie de Saint-Gobain agreed at the 30 August 2010 meeting: (i) to draft and execute minutes of the meeting; (ii) to "[h]*old regular meetings for the purpose of analyzing issues of common interest related to the transfer of Norpro to State control*"; (iii) to keep an open communication between the parties; and (iv) to hold a meeting of the technical commission on 13 September 2010.[176]

## 2.  The 14 October 2010 Meeting

232. On 14 October 2010, the joint technical commission, which was attended by representatives from PDVSA Industrial and Norpro Venezuela on behalf of Compagnie de Saint-Gobain, held its first meeting.[177]

233. According to the draft minutes of that meeting, Norpro Venezuela made the following declarations and presented the following issues:[178]

- Norpro Venezuela asked whether PDVSA Industrial had any information on the status of the drafting of the expropriation decree and its possible publication date (PDVSA Industrial answered in the negative, but stated that it had received its instructions pursuant to the declarations of President Chávez on 15 May 2010);

---

[176] **Exhibit C-34**. Quotations from the English translation submitted by Respondent with **Exhibit R-17**.
[177] Memorial, ¶ 100; Counter-Memorial, ¶ 30.
[178] **Exhibit C-36**. Quotations from the English translation submitted by Respondent with **Exhibit R-70**. While it appears from the record that these meeting minutes were never executed, their content seems to be undisputed between the Parties.

- Norpro Venezuela gave an electronic presentation, described as "*Virtual tour of the Plant*," described its proposal for technical assistance and explained the need for quality control of operations and the performance of an evaluation and diagnosis of the actual plant conditions.

234. PDVSA Industrial made the following declarations and presented the following issues at the meeting:[179]

- PDVSA Industrial clarified that "*the scope and purpose of the meeting is of a technical nature*" and "*legal issues of the process of transfer to State control shall be analyzed with the Legal Counsel of PDVSA*";

- PDVSA Industrial requested additional information on the proposal for technical assistance (questions were answered by Norpro Venezuela) and suggested the "*exploration of other structures*" besides the technical assistance proposal that would allow them to bring about the transfer, referring to other cases in which PDVSA Industrial and the respective owners of the transferred assets had created mixed companies, in which PDVSA Industrial maintained control and a majority shareholding;

- PDVSA Industrial asked about the environmental situation of the plant which was explained by Norpro Venezuela as being "*very clean*" and in compliance with all applicable laws and the permits issued by the Ministry for the Popular Power of Environment;

- PDVSA Industrial requested information about the production capacity of the plant, which Norpro Venezuela provided with an explanation of the development in two phases, the first of which "*was totally executed*" with 70,000 tons per year and the second of which was intended to start shortly, in order to double the capacity.

235. PDVSA Industrial and Norpro Venezuela agreed at the 14 October 2010 meeting: (i) to execute the minutes of the 30 August meeting; (ii) to draft and sign minutes of this meeting; and (iii) to set 8 November 2010 as a tentative date for a new meeting.[180]

**3.    Further Correspondence and Meeting on 26 October 2010**

236. By e-mail of 22 October 2010, Gabriel Rojas from PDVSA Industrial's Legal Department wrote to Luis Páez (President of Norpro Venezuela) and proposed the following agreement:

---

[179] **Exhibit C-36**. Quotations from the English translation submitted by Respondent with **Exhibit R-70**.
[180] **Exhibit C-36**; **Exhibit R-70**.

"*1)    NORPRO shall yield to PDVSA Industrial the plant, its existing products and raw material;*

*2)     PDVSA Industrial shall assume the control, responsibility and operations of the plant, its products and raw materials;*

*3)     PDVSA Industrial shall assume the responsibility of hiring the necessary personnel for operating the plant;*

*4)     NORPRO shall help and assure that PDVSA Industrial puts into full operation the plant and complies with every safety standard;*

*5)     Information regarding the state and actual operability conditions of the facilities shall be gathered, in order to determine the fair value of such infrastructure, its products and raw materials.*"[181]

237.  Mr. Rojas clarified that this proposal was made "*without prejudice to the possible incorporation of a state company of mixed capital,*" and invited Norpro Venezuela to hold a meeting to discuss the proposal.[182]

238.  On 26 October 2010, a meeting was held between Mr. Armando Giraud, the General Counsel of PDVSA, representatives of PDVSA Industrial, Norpro Venezuela and the French Embassy. At that meeting, Mr. Giraud outlined the possibility that Norpro Venezuela enter into a mixed company (*empresa mixta*) arrangement with PDVSA, whereby the latter would retain a 60% interest in the venture.[183] The Parties are in dispute as to whether Mr. Giraud presented a "*sufficiently advanced proposal*"[184] or rather a mere suggestion, which would have had to be supported by concrete documents following the meeting in order to be given serious consideration by Claimant.[185]

239.  In his follow-up e-mail of 1 November 2010 to Mr. Giraud, Mr. Paúl noted that Claimant expected to receive the documents that PDVSA had promised to provide, including draft bylaws and an agreement for the suggested *empresa mixta*.[186]

---

[181] **Exhibit C-121**. Quotation from the English translation submitted by Respondent with **Exhibit R-71**.

[182] **Exhibit C-121**. Quotation from the English translation submitted by Respondent with **Exhibit R-71**.

[183] Memorial, ¶ 102; Counter-Memorial, ¶ 31.

[184] Respondent's Post-Hearing Brief, note 101.

[185] Claimant's Second Post-Hearing Submission, § 23. When asked during his cross-examination whether Mr. Giraud had made a proposal during that meeting, Mr. Millot stated: "*I would not call it a proposal. This is, I said, a suggestion, which means some consideration. A proposal would have been different. […] I think Mr. Giraud made a suggestion. I don't know how documented would have been the proposal. What I know is we received nothing concrete after this meeting.*" Transcript (Day 2), p. 419 lines 1-9. *See also* Millot, ¶ 31.

[186] **Exhibit C-151**.

240.    In his letter dated 18 November 2010, Mr. Páez informed Mr. Giraud that, on 2 November 2010, two PDVSA officials, escorted by armed members of the National Guard, had approached Oscar Cid and Pierre-Yves Grammond of Norpro Venezuela and had demanded that they turn over their company vehicles because the PDVSA officials claimed to have instructions to reunite Norpro Venezuela's assets for a judicial inspection of the company. Mr. Páez requested that Mr. Giraud present the documents pursuant to which those PDVSA officials were authorized to confiscate Norpro Venezuela's assets, considering in particular that the parties had agreed during the meeting of 26 October 2010 to analyze alternatives to the expropriation of Norpro Venezuela. Mr. Páez then reiterated Claimant's offer to provide technical assistance to PDVSA.[187]

241.    In a further e-mail to Mr. Giraud dated 19 November 2010, Mr. Paúl attached Mr. Páez' letter of 18 November 2010 as well as pictures taken of the confiscated company vehicles and copies of the identification cards of the two PDVSA officials. He further noted that Claimant had still not received the promised documents in relation to the suggested *empresa mixta*.[188]

242.    In his letter to Mr. Giraud dated 19 January 2011, Mr. Páez stated that Claimant remained willing to analyze the alternatives to the expropriation that Mr. Giraud had suggested during the meeting on 26 October 2010 and noted that Claimant had still not received the documents that Mr. Giraud had promised to provide for Claimant's consideration of his *empresa mixta* proposal. He emphasized that Claimant was disposed to meet with PDVSA in order to discuss the mentioned alternatives.[189]

243.    In his letter to Mr. Giraud dated 3 March 2011, Mr. Páez stated that he had not received any response to the letters that he had sent following the meeting on 26 October 2010 and reiterated that Claimant had still not received the documents in relation to the suggested *empresa mixta*. Mr. Páez concluded by requesting a meeting to discuss the alternatives that Mr. Giraud had proposed during the 26 October 2010 meeting.[190]

244.    In his letter to Mr. del Pino dated 21 March 2011, Mr. Páez stated that there had been no communication with PDVSA after the 26 October 2010 meeting as he had not received any response to his follow-up letters. Mr. Páez noted that almost one year had passed since the expropriation of Norpro Venezuela had been announced and, to his surprise, the negotiations that started in August 2010 had stalled. Finally, he reiterated his request for a meeting to solve the dispute in an amicable manner.[191]

---

[187] **Exhibit C-122**.
[188] **Exhibit C-151.**
[189] **Exhibit C-37**.
[190] **Exhibit C-38**.
[191] **Exhibit C-39**.

## XII. THE EXPROPRIATION DECREE AND FOLLOW-UP CORRESPONDENCE

245. On 29 March 2011, Respondent published Decree No. 8,133 in the Official Gazette No. 39,644 (the "**Expropriation Decree**"):[192]

> "[…] *pursuant to the authorities conferred by Articles 115, 226 and 236 Numeral 2 of the Constitution of the Bolivarian Republic of Venezuela, in accordance with the provisions set forth in Article 4 of the Organic Law on Hydrocarbons, Article 4 of the Decree with Rank, Value and Force of Law of the Organic Law on Gaseous Hydrocarbons, Article 5 of the Law on Expropriations in the Public or Social Interest, and Article 6 of the Law for the Defense of Persons in Access to Goods and Services, in the Council of Ministers,*
>
> ### WHEREAS
>
> *It is the duty of the State to strengthen the Oil and Gas Industry, and to adopt measures conducive to guaranteeing the operational stability of that industry, and the fulfillment of the plans and goals of Petróleos de Venezuela, S.A. (PDVSA) and its subsidiaries;*
>
> ### WHEREAS
>
> *Activities relating to hydrocarbons and gaseous hydrocarbons, and the projects required in order to undertake them, are of public utility and social interest;*
>
> ### WHEREAS
>
> *Considering that the timely availability of ceramic proppants is of key importance in raising the output of oil and gas fields;*
>
> ### WHEREAS
>
> *That the compulsory acquisition by the State of the moveable and immoveable property and other assets that belong to or are held by the business corporation NORPRO VENEZUELA, C.A. and of any and all related companies or persons, is indispensable for execution of the project "INDUSTRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROPPANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS."*
>
> ### DECREES
>
> **Article 1**. *The compulsory acquisition is hereby ordered of the moveable and immoveable property and other assets including land, improvements, construction, facilities, industrial and office equipment, work implements and materials, inventories, licenses, means of transportation and rights necessary for the execution of the project indicated in*

---

[192] Quotation from the English translation submitted by Claimant with **Exhibit C-40**.

*this article, or for the marketing or distribution of the products set forth therein, that are owned by or possessed by the firm of NORPRO VENEZUELA, C.A. and those of any and all related companies or persons that might be indispensable for the execution of the project "INDUSTRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROPPANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS."*

*Article 2. The project "INDUSTRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROPPANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS" shall be executed by the company of PDVSA Industrial, S.A. or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA) as it may designate under the Ministry of Popular Power of Energy and Petroleum, as the expropriating entity, or such subsidiary as it may designate.*

*Article 3. Pursuant to Article 12 of the Law on Expropriations in the Public or Social Interest, the firm of PDVSA Industrial, S.A., or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA), as it may designate, is hereby authorized to conduct the procedures necessary to acquire the immoveable assets and other goods set forth in Article 1 of the this Decree, with all rights and obligations thereof being assumed by the Bolivarian Republic of Venezuela, until the total and definitive transfer of the ownership of said assets.*

*Article 4. The expropriated assets shall be conveyed free of encumbrances or restrictions to the Venezuelan State, through PDVSA Industrial, S.A., or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA) as it may designate, in accordance with provisions of Article 11 of the Law on Expropriations in Public or Social Interest.*

*Article 5. PDVSA Industrial, S.A., or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA) as may be designated by it, shall conduct the negotiations and expropriation procedures as provided by law, until the total and definitive transfer of the assets referred to in this Decree.*

*Article 6. In the enforcement of this Decree, special care must be taken to safeguard the guarantees and rights of workers employed at NORPRO VENEZUELA, C.A., or any other related firm or persons affected by the provisions of this Decree.*

*Article 7. Execution of the project "INDUSTRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROPPANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS" is hereby qualified as urgent, placing into operating, utilization, and benefit of the goods indicated in Article 1 of this Decree, in order to ensure functional continuity of production and distribution of high performance ceramics required by the oil and gas industry. To this end, the measures referred to in Article 6 of the Law for the Defense of Persons in Access to Goods and Services, may be resorted to, upon due compliance with current regulations.*

*Article 8. The Ministry of Popular Power for Energy and Petroleum is charged with executing this Decree.*

*Article 9. This Decree shall be in force upon being published in the Official Gazette of the Bolivarian Republic of Venezuela.*

[…]"

246. On 14 April 2011, Mr. Páez wrote to Minister Ramírez and made reference to the expropriation of Norpro Venezuela's assets ordered by the Expropriation Decree, "*confirm*[ing] *President Chávez's decision, publicly announced on 15 May 2010, to transfer Norpro to the State's control*." He further stated that it had regrettably been impossible "*to move forward in a process leading to the effective expropriation of Norpro*," and expressed his hope that the publication of the Expropriation Decree would allow the parties to "*promptly advance in the definition of the terms of an amicable resolution of this controversy, which will guarantee the payment of a compensation determined on the basis of the just value of the investment made in Norpro*" by Claimant. Mr. Páez reiterated Claimant's offer of technical assistance and requested that PDVSA Industrial as the expropriating entity pursuant to the Expropriation Decree "*appoint an authorized speaker to analyze, together with Norpro's representaives, matters related to the future steps of the expropriation process*."[193]

247. According to press reports in *Correo del Caroní* on 13 and 15 April 2011 and in *Nueva Prensa de Guayana* on 15 April 2011, 25,000 tons of bauxite were removed from the plant to cover an emergency of CVG Bauxilum.[194] On 25 April 2011, Norpro Venezuela wrote to the President of PDVSA Industrial noting that "*Norpro, in its role as legitimate proprietor of all the goods that are located inside the facilities, has not authorized or ratified these actions.*"[195]

## XIII. THE ADMINISTRATIVE EXPROPRIATION PROCEDURE AND CLAIMANT'S NOTICE OF DISPUTE

248. On 24 June 2011, PDVSA Industrial published the following notifications in *Últimas Noticias* and *Nueva Prensa de Guayana*:

> "*1*) […]*; 2) To declare as existent the precautionary order of temporary occupation and operation of the personal property, real estate and other assets including the intangible assets that are the property of or in possession of the company NORPRO VENEZUELA, C.A., and of any other related companies or people, pursuant to the provisions of subsection 1 of article 112 of the People's Defense in the Access to Property*

---

[193] **Exhibit C-41**. Quotation from the English translation submitted by Respondent with **Exhibit R-16**.
[194] **Exhibit C-124**; **Exhibit C-125**; **Exhibit C-126**; Memorial, ¶ 110.
[195] **Exhibit C-127**.

*and Services Law; (3) to give notice to the aforementioned people through the publishing of this newspaper notice, simultaneously and for one time, in the newspapers* 'Última Noticias' *and* 'Nueva Prensa de Guayana' *in order for them to appear at the headquarters of this Company, located in* […]*, within the terms of thirty (30) continuous days following the publishing of this notifications in business days and in the time schedule between* […] *8:30 am and* […] *4:30 pm, proving evidence, in each case, of their rights upon the aforementioned affected assets.*

*Also, the interested parties are given notice that 1)* […]*; 2) that they can exercise the remedy which is prescribed in article 113 of the People's Defense in the Access to Property and Services Law against the precautionary order; and (3) that in the event that no party appears on their own behalf or through a legal representative in the corresponding authority, this proceeding will be declared as exhausted and the expropriation of the affected assets will be judicially requested.*

*This notice is given pursuant to article 22 of the Law on Expropriation for Reasons of Public or Social Purposes.*"[196]

249. On 4 July 2011, Claimant notified Respondent of a dispute under the Treaty and requested that "*adequate compensation equal to the fair value of its investment in Norpro prior to May 15, 2010, be promptly paid by Venezuela pursuant to Article 5.*" Claimant referred to the meetings held on 30 August, 14 October and 26 October 2010 and stated that "*Saint-Gobain has made its best efforts to meet and discuss with Venezuelan authorities the terms of an amicable resolution of the current controversy, in accordance with the France-Venezuela Treaty. However, no response has been provided to Saint-Gobain by PDVSA, PDVSAI*[ndustrial] *or any other competent Venezuelan authority.*" Claimant reiterated its willingness to resolve the dispute amicably in accordance with the provisions of the Treaty and stated that it was "*prepared to meet immediately with an authorized representative of Venezuela with the objective of reaching a fair and adequate resolution for both parties.*" Claimant concluded the letter by emphasizing that "*in the event that this dispute is not settled amicably within the term of six (6) months starting from the date hereof, Saint-Gobain may refer this matter to arbitration.*"[197]

250. On 26 July 2011, PDVSA Industrial published a notice declaring the amicable settlement proceeding terminated, "[c]*onsidering that on June 24, 2011 the press notifications provided for by article 22 of the Law on Expropriation for Reasons of Public or Social Purposes were published, and taking into consideration that the corresponding term expires as of this day, without the appearance of any party or third party, on their own or through a legal representative,*" and instructed the Legal Department to commence the judicial

---

[196] Quotation from the English translation submitted by Respondent with **Exhibit R-20**.
[197] **Exhibit C-42**.

proceedings under the Expropriation Law for Reasons of Public or Social Purposes (the "**Expropriation Law**").[198]

## XIV. FURTHER NEGOTIATIONS BETWEEN THE PARTIES

251. On 26 October 2011, Mr. Carmelo Ursaneta, General Counsel to the Oil and Energy Ministry, wrote to Claimant, seeking to schedule a meeting for 3 November 2011 to discuss the expropriation of Norpro Venezuela.[199] Claimant responded to Mr. Urdaneta by letter dated 3 November 2011.[200] On the same day, a meeting was held during which the Ministry again proposed to form a mixed company to run the plant in Venezuela; Claimant agreed to consider this proposal.[201]

252. As acknowledged by Mr. Páez in his follow-up letter of 20 December 2011, Claimant was further requested to prepare a communication including a brief presentation of Norpro Venezuela and the business objectives that had led to its establishment in Venezuela and a summary of the terms of a possible agreement pursuant to which the parties would pursue a joint investment project resulting in an *empresa mixta* in which PDVSA would hold a majority share. In his 20 December 2011 letter, Mr. Páez explained that the group was still in the process of analyzing the general conditions and specification of the proposed joint investment project, as well as the modalities and the scope of the technical assistance and training of personnel that the group may be able to provide; they would send the requested communication once this analysis was concluded, which he expected to occur in the first weeks of January 2012.[202] According to Respondent, Claimant never provided the requested information to the Ministry.[203]

253. By letter to Respondent dated 17 January 2012, Claimant reiterated the existence of a dispute under the Treaty, stating that "[d]*espite several meeting and communications between representatives of Saint-Gobain and PDVSA to review the status of Norpro's expropriation and future actions to be undertaken by the Government of Venezuela (including the payment of an appropriate compensation in accordance with the Treaty's provisions) during the six-month 'cooling-off' period as required by the Treaty, no friendly agreement in relation to this dispute with Venezuela has been reached.*" Claimant confirmed its acceptance of Respondent's offer provided in Article 8(2) of the Treaty to settle the dispute by arbitration before ICSID and, although it expressed its hope to "*reach an*

---

[198] Quotation from the English translation submitted by Respondent with **Exhibit R-21**. *Ley de Expropiación por Causa de Utilidad Pública o Social*, published in the Official Gazette No. 37.475, dated 1 July 2002. **Exhibit R-4**.
[199] **Exhibit C-130**.
[200] **Exhibit C-43**.
[201] Memorial, ¶ 113; **Exhibit C-131**.
[202] **Exhibit C-131**; Counter-Memorial, ¶¶ 38-39.
[203] Counter-Memorial, ¶ 40.

*amicable agreement with the Government of Venezuela*," it announced that, if such agreement failed, it would, "*very promptly*," initiate arbitration proceedings before ICSID.[204]

254. On 24 January 2012, Respondent denounced the ICSID Convention.[205] The denunciation became effective on 25 July 2012.

## XV. THE JUDICIAL EXPROPRIATION PROCEDURE AND PARALLEL NEGOTIATIONS

255. On 18 April 2012, PDVSA Industrial initiated the judicial expropriation procedure pursuant to Articles 22-24 of the Expropriation Law (the "**Expropriation Procedure**") by submitting a claim against Norpro Venezuela before the First Court of First Instance in Civil, Corporate and Agrarian Matter of the Second Circuit of the Judicial Circumscription of the State of Bolivar (the "**Court**").[206] PDVSA Industrial requested that the Court "*decree the expropriation*" of Norpro Venezuela's assets and that the interim measure, *i.e.*, the temporary occupation of the plant based on Article 112(1) of the People's Defense in the Access to Property and Services Law (*see* PDVSA's notification of 24 June 2011 above), be upheld. In addition, it requested that Norpro Venezuela, in the person of its legal representative Dr. Jorge Paúl, be summoned.[207]

256. On 25 May 2012, Claimant initiated the present arbitration proceedings by filing its Request for Arbitration under the France-Venezuela Treaty with ICSID.

257. On 20 June 2012, the Court issued a public notice ordering "*to summon* […] *the alleged owners, holders, tenants, creditors and, in general, any other person who might have any right over the assets owned by NORPRO VENEZUELA, C.A.*" The Court stated that the public notice would be published three times in the newspapers *Primicia* and *Correo del Orinoco*, in an interval of ten calendars between the publications, in order for the interested parties to appear within ten business days following the date of the last publication or, in case no person appeared within the specified term, the Court would appoint a public defendant in Norpro Venezuela's favor.[208] On 10 July 2012, the notice of summons was personally served to the secretary at the office of Dr. Paúl.[209]

258. By e-mail of 17 July 2012, Mr. Carmelo Urdaneta (General Director of PDVSA Industrial's Legal Department Office) sought to schedule a meeting with Dr. Paúl, who replied by e-mail of 20 July 2012; the meeting took place on 15 August 2012.[210]

---

[204] **Exhibit C-44**. Quotations from the English translation submitted by Respondent with **Exhibit R-22**.
[205] Memorial, ¶ 114.
[206] Counter-Memorial, ¶ 41; **Exhibit R-23**.
[207] **Exhibit R-23**.
[208] **Exhibit R-24**.
[209] **Exhibit R-25**.
[210] **Exhibit R-26**; **Exhibit R-27**; **Exhibit R-29**.

259. On 23 August 2012, Mr. Urdaneta sent a draft confidentiality agreement to Dr. Paúl as it had been discussed during the meeting.[211] The agreement was to be concluded with Respondent, "*by means of its Ministry for the Popular Power of Petroleum and Mining,*" and included the following passage: "*the **PARTIES** and their respective affiliates have maintained and shall continue to maintain negotiations in order to reach an agreement in connection with the provisions of the **DECREE**, including without limitation any compensation to which **xxxxx** or its affiliates may be entitled.*"[212]

260. By letter of 4 September 2012, Dr. Paúl inquired whether the Ministry had begun the selection of the experts who would undertake the valuation of Claimant's investment in Venezuela, as Mr. Urdaneta had stated during the 15 August 2012 meeting, and attached a revised version of the confidentiality agreement.[213]

261. On 26 September 2012, the Court issued a second public notice again summoning the interested parties on the part of Norpro Venezuela under the same terms as in the 20 June 2012 notice; the notice was published on 2, 12 and 22 November 2012 in the newspapers *Primicia* and *Vea*.[214]

262. Approximately one year later, on 11 October 2013, the judicial inspection pursuant to Article 57 of the Expropriation Law was carried out,[215] and on 13 November 2013, the Court issued a public notice ordering, pursuant to Articles 19, 56 and 57 of the Expropriation Law and "*taking notice that the relevant proceedings for summoning the defendant have been duly taken,*" that the appointment of the Valuators forming the Valuation Committee shall take place five business days later.[216]

263. On the same day, PDVSA Industrial requested that the Court appoint a public defender in accordance with Article 27 of the Expropriation Law to represent Norpro Venezuela in the Expropriation Procedure.[217] Two days later, on 15 November 2013, the Court issued a public notice appointing Mr. José Neptali Blanco as Judicial Defender for Norpro Venezuela in the Expropriation Procedure and ordering him to appear before the Court on the third business day following his notification to accept or refuse his appointment.[218] On 22 November 2013, the Court noted that the Expropriation Procedure was "*currently at a stage of notification to the appointed Judicial Defender*" and thus decided that the order

---

[211] **Exhibit R-30**.
[212] **Exhibit R-31**.
[213] **Exhibit R-29**.
[214] Counter-Memorial, ¶ 44, note 122; **Exhibit R-32**.
[215] **Exhibit R-33**.
[216] **Exhibit R-34**.
[217] **Exhibit R-35**.
[218] **Exhibit R-36**.

of 13 November 2013 was "*left without effect*" until Mr. Neptali had been duly notified and his summon had been incorporated into the record.[219]

264. On 3 February 2014, Mr. Neptali formally accepted his appointment as judicial defender for Norpro Venezuela.[220] On the next day, 4 February 2014, Norpro Venezuela, represented by its Venezuelan counsel Dr. Paúl, appeared for the first time before the Court, requesting the Stay, Suspension and Extinction of the Judicial Expropriation Proceeding and challenging the Court's jurisdiction based on the fact that Claimant had begun the present ICSID arbitration proceedings.[221] On 12 March 2014, the Court dismissed Norpro Venezuela's request.[222]

## E.   PARTIES' POSITIONS

265. In the following, the positions of the Parties as argued in their written submissions and during the Hearing will be briefly summarized.

## I.   SUMMARY OF CLAIMANT'S POSITION AND RELIEF SOUGHT

266. Claimant submits that Respondent committed several breaches of the Treaty and therefore claims compensation in the amount of the higher of the Fair Market Value of Norpro Venezuela as of the date of the award (calculated at USD 90.3 million as of 31 August 2015), or the Fair Market Value of Norpro Venezuela as of the date of the expropriation (calculated at USD 99.5 million) plus pre-award interest, as well as post-award interest.

### 1.   Admissibility

267. Claimant submits that Respondent's admissibility objections regarding (i) the claims related to the bauxite price increase; and (ii) the claim for breach of Article 5(1) subparagraph 1 of the Treaty, should be dismissed.

268. With regard to the claims related to the bauxite price increase, Claimant emphasizes that its claims are not based on the Bauxite Contract as such, but they are rather based on the fact that Respondent sanctioned or could have prevented CVG Bauxilum's conduct and thereby breached the Treaty.[223]

---

[219] **Exhibit R-37**.
[220] **Exhibit R-38**.
[221] Counter-Memorial, ¶ 45; **Exhibit R-39**.
[222] **Exhibit R-40**.
[223] Reply, ¶¶ 67-68.

269. As to its claim for breach of Article 5(1) subparagraph 1 of the Treaty that it raised for the first time during the Hearing, Claimant submits that this claim was informed by Respondent's statement in its Rejoinder "*that what happened between May of 2010 and March of 2011 was not the expropriation, and that the expropriation only occurred in* [March] *of 2011.*"[224] Claimant further claims that its claim is "*neither new nor untimely*" because the argument that the expropriation was not carried out in a fair and equitable manner and failed to accord Claimant due process was raised from the outset of the proceedings.[225]

### 2. Breach of the Treaty

270. Claimant submits that Respondent committed breaches of

- Article 5(1) of the Treaty with respect to its obligations regarding expropriation (**a)**);
- Article 3(1) of the Treaty with respect to its obligation to accord fair and equitable treatment (**b)**); and
- Article 3(2) of the Treaty with respect to its obligation to grant full protection and security (**c)**).

### a)    Expropriation (Article 5(1) of the Treaty)

271. Claimant submits that Respondent was in breach of Article 5(1) subparagraph 1 of the Treaty (**aa)**) as well as subparagraphs 2 and 3 of the same provision (**bb)**).

### aa)    Breach of Article 5(1) Subparagraph 1 of the Treaty

272. Claimant contends that Respondent's conduct prior to the publication of the Expropriation Decree in March 2011 amounted to an "*expropriation*" within the meaning of Article 5(1) of the Treaty. During the Hearing,[226] Claimant raised the argument that this conduct was in conflict with Respondent's obligations under Article 5(1) subparagraph 1 of the Treaty. In particular, Claimant contends, first, that the expropriation was not carried out with a formal expropriation instrument and hence not pursuant to a "*measure*" ("*mesures*"/"*medidas*").[227] Second, Claimant argues that the physical taking of the plant prior to March 2011 was not conducted following due process and granting full protection to Claimant's investment, contrary to Respondent's obligations under Article 3(1) and Article 3(2) of

---

[224] Transcript (Day 3), p. 881 lines 18-21.
[225] Claimant's Second Post-Hearing Submission, ¶¶ 30, 44-45 referring to Memorial, ¶¶ 180-184 and Reply, ¶¶ 89-95, 125-130.
[226] Transcript (Day 1), p. 83 line 16 – p. 84 line 21.
[227] Claimant's Post-Hearing Submission, ¶¶ 38-39.

the Treaty, and therefore violated a "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*") within the meaning of Article 5(1) subparagraph 1 of the Treaty.[228]

### bb)    Breach of Article 5(1) Subparagraphs 2 and 3 of the Treaty

273.    In addition, Claimant contends that Respondent is in breach of its obligation to provide prompt and adequate compensation and to specify the amount of compensation on the date of the expropriation pursuant to Article 5(1) subparagraphs 2 and 3 of the Treaty.

274.    It is Claimant's position that Respondent expropriated Claimant's investment with respect to the plant on 15 May 2010 or shortly thereafter.[229] Claimant submits that, in view of the law, the takeover by the SINPROTRAC union following President Chávez' announcement and the subsequent active management of the plant by the state-owned PDVSA amounted to an "*expropriation*" within the meaning of Article 5(1) of the Treaty.[230] Claimant emphasizes that it constantly asserted its rights with regard to the plant, *i.e.*, that it attempted to re-enter it but was denied access.[231]

275.    With regard to the specification requirement pursuant to Article 5(1) subparagraph 3 of the Treaty, Claimant submits that, despite the clear wording of the Treaty, Respondent was far from having determined compensation at the time of the expropriation, given that Respondent has never communicated the amount or method of payment to be made to Claimant and has yet to offer any compensation for the expropriation, despite numerous attempts by Claimant to negotiate.[232] In particular, Claimant contends that the specification requirement is not met by the mere existence of, or reference to, a procedure in domestic law.[233]

276.    With respect to the promptness requirement pursuant to Article 5(1) subparagraph 2 of the Treaty, Claimant similarly contends that the Treaty is very specific about the requirement that an expropriation be accompanied by "*prompt*" compensation and that the Contracting Parties left no room for doubt as to the interpretation of the prompt compensation requirement: The Treaty provides that "*the amount and method of payment of compensation should be specified on the date of expropriation at the latest*" and "*payments shall be made without delay.*"[234] Claimant argues that, over four years after the expropriation, such

[228] Claimant's Post-Hearing Submission, ¶¶ 40-47.
[229] Reply, ¶ 25.
[230] Reply, ¶¶ 21-24; Claimant's Post-Hearing Submission, ¶¶ 19-32.
[231] Claimant's Post-Hearing Submission, ¶ 32.
[232] Memorial, ¶ 140; Reply, ¶ 75; Claimant's Post-Hearing Submission, ¶¶ 50-54.
[233] Reply, ¶ 83.
[234] Memorial, ¶ 137. Emphasis added by Claimant. *See* also Reply, ¶ 75.

compensation is long overdue and can in no way be considered "*prompt*" in accordance with the Treaty language.[235]

277. Assuming *arguendo* that Article 5(1) of the Treaty did not require Respondent to make an offer of compensation on the date of the expropriation, Claimant submits that for two separate reasons, Respondent may not invoke, with recourse to its domestic law, that it "*acknowledge*[d] *its compensation obligation*" and provided a mechanism for the determination of compensation in the Expropriation Decree.[236]

278. First, Claimant argues that Respondent cannot rely on municipal law to excuse its obligations under international law;[237] in any event, Claimant considers the domestic rules on expropriation followed by Respondent "*a State-instigated generic procedure*" which Respondent "*takes no steps to effectuate.*"[238]

279. Second, Claimant contends that Respondent's conduct was not in line with the provisions of its own domestic laws on expropriation. In particular, Claimant argues that neither the administrative occupation of the plant by PDVSA on 4 April 2011 nor the judicial occupation issued on 20 June 2012 was conducted in accordance with Article 56 of the Expropriation Law. This provision allows for "*anticipatory occupation*" only in cases involving urgent circumstances and only after the (probable) amount of the compensation, as determined by an evaluation commission, has been deposited with the expropriation court. Moreover, Claimant submits that the measures taken by Respondent could not properly be based on Articles 6 and 112(1) of the Law on the Defense of Access to Goods and Services (the "**Law on Access**").[239]

280. In the event that, due to the provisions of its domestic expropriation law, Respondent was not required under Article 5(1) subparagraphs 2 and 3 of the Treaty to make a prompt compensation offer on the date of the expropriation, Claimant contends that Respondent is nevertheless in breach of the Treaty because it failed to make any attempt to negotiate compensation for the expropriation with Claimant in good faith.[240] In particular, Claimant submits that (i) it received "*no direct word from Venezuela concerning the expropriation during the entire period between the President's announcement on 15 May 2010 and the issuance of the Expropriation Decree on 29 March 2011*"; (ii) Respondent never

---

[235] Reply, ¶ 76.
[236] Reply, ¶ 84.
[237] Reply, ¶¶ 85-86.
[238] Reply, ¶ 83.
[239] Reply, ¶ 87; Brewer-Carías II, ¶¶ 14-26; Claimant's Post-Hearing Submission, ¶¶ 64-68. *Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios*, published in the Official Gazette No. 39.358 dated 1 February 2010. **Exhibit R-76**.
[240] Reply, ¶ 89.

acknowledged an obligation to pay compensation; and (iii) Respondent refused to engage in good faith negotiations even after the publication of the Expropriation Decree.[241]

281.  Claimant submits that Respondent's failure to meet the specification and/or promptness requirements pursuant to Article 5(1) subparagraphs 2 and 3 of the Treaty renders its expropriation unlawful, and claims that the belated issuance of the Expropriation Decree did not rectify the violation of Article 5(1) subparagraphs 2 and 3 of the Treaty.[242] In support of this submission, Claimant cites several commentators as well as a number of arbitral decisions as authorities (*see* in more detail below).

282.  In its Reply, Claimant also submitted that there was an expropriation with regard to the Bauxite Contract and the VAT credits it had accrued, and claimed that this expropriation also has to be compensated.[243] During the Hearing and in its Post-Hearing Submission, however, Claimant no longer dealt with this issue as a matter of expropriation, but rather focused on the argument that Respondent's conduct with respect to the Bauxite Contract and the VAT credits was in conflict with its obligations to ensure fair and equitable treatment ("**FET**") and to grant full protection and security ("**FPS**") under Article 3(1) and (2) of the Treaty.[244]

**b)  Fair and Equitable Treatment (Article 3(1) of the Treaty)**

283.  Claimant submits that the FET standard provided for in Article 3(1) of the Treaty refers to the prevailing concepts of FET in international law – and not only to the minimum standard of treatment –, including "*contemporary notions of due process, good faith, and legitimate expectations*," and that Respondent breached its obligations thereunder with respect to both the takeover of the plant and the Bauxite Contract, in light of any reading of Article 3(1) of the Treaty.[245]

284.  With regard to the union takeover of the plant following President Chávez' statement on 15 May 2010 and Respondent's conduct thereafter, Claimant asserts that Respondent failed to follow due process in the expropriation and thereby violated its FET obligation.[246] Claimant contends that the expropriation was effectively carried out "*overnight,*" with a "*public and sudden announcement*" on TV, and that despite Claimant's attempts to negotiate in good faith on the terms of the expropriation, Respondent "*gave Saint-Gobain*

---

[241] Claimant's Post-Hearing Submission, ¶¶ 34-37.
[242] Memorial, ¶ 141; Reply, ¶¶ 77-83; Claimant's Post-Hearing Submission, ¶¶ 58-63.
[243] Reply, ¶¶ 96-100.
[244] Transcript (Day 1), p. 93 line 1 – p. 95 line 18; Claimant's Post-Hearing Submission, ¶¶ 79-88.
[245] Reply, ¶ 112.
[246] Memorial, ¶¶ 180-184; Reply, ¶¶ 125-130.

*no indication of what process would be followed to ensure that Saint-Gobain would receive adequate compensation*" and even "*failed to follow its own expropriation procedure.*"[247]

285.  During the Hearing and in its Post-Hearing Submission, Claimant included this FET claim in the expropriation claim relating to Article 5(1) subparagraph 1 of the Treaty.[248] The Tribunal notes, however, that Claimant thereby did not intend to abandon its separate FET claim relating to the taking of the plant, given that it maintains in its relief sought the request for a separate declaration that Respondent has breached Article 3(1) of the Treaty.[249]

286.  With respect to the Bauxite Contract between Norpro Venezuela and CVG Bauxilum, Claimant submits, on the one hand, that CVG Bauxilum was acting as a State organ within the meaning of the International Law Commission's Draft Articles on Responsibility of States for Internationally Wrongful Acts ("**ILC Draft Articles**") and, on the other hand, that Respondent, through MIBAM and other organs, made "*specific promises*" and "*commitments*" and thereby "*created specific expectations,*" which Claimant relied on in making its investments.[250] It is Claimant's position that Respondent (through CVG Bauxilum) breached the Bauxite Contract and "*repudiated these expectations, failing to address […] CVG Bauxilum's actions in raising the bauxite price.*"[251]

### c) Full Protection and Security (Article 3(2) of the Treaty)

287.  Claimant further submits that Respondent failed to protect and secure Claimant's investment and hence violated Article 3(2) of the Treaty with regard to the takeover of the plant and the bauxite price increase.

288.  As an alternative argument with regard to its expropriation claim, Claimant submits that if Respondent's conduct prior to 29 March 2011 did not amount to an "*expropriation*" within the meaning of Article 5(1) of the Treaty, PDVSA's control of the plant and failure to return it to Claimant before that date must be considered a breach of the obligation to provide Claimant with full protection and security pursuant to Article 3(2) of the Treaty.[252]

---

[247] Memorial, ¶ 183; Claimant's Post-Hearing Submission, ¶ 42 (with note 116); Reply, ¶ 126.
[248] Transcript (Day 1), p. 82 line 13; p. 93 lines 5-7. Claimant's Post-Hearing Submission, ¶¶ 40-47.
[249] Claimant's Second Post-Hearing Submission, ¶ 116. This is confirmed by the cross-reference in Claimant's Post-Hearing Submission (¶ 42 with note 116) to the relevant section in the Memorial (¶¶ 180-184) and Claimant's submission of its FET arguments in its Second Post-Hearing Submission (¶¶ 30-45).
[250] Memorial, ¶¶ 173-176; Reply, ¶ 120; Claimant's Post-Hearing Submission, ¶ 80.
[251] Memorial, ¶ 169; Reply, ¶ 120. *Cf.* Claimant's Post-Hearing Submission, ¶¶ 79-82.
[252] Claimant's Post-Hearing Submission, ¶¶ 48-49.

289. As to the bauxite price increase, Claimant submits that, after Respondent was notified of breaches of the Bauxite Contract, it failed to act and accord Claimant's investment legal security. In this context, Claimant asserts that the FPS standard requires the State to take all reasonable measures "*to ensure a secure investment environment,*" including not only physical but also commercial and legal security.[253] Claimant contends that, contrary to this standard, Respondent made no attempt to investigate or take action to protect Claimant's rights under the Bauxite Contract, despite Claimant's repeated calls for action.[254]

### 3. Quantum

**a)    Compensation standard and valuation date**

290. It is Claimant's submission that the appropriate remedy for an unlawful expropriation is the customary international law standard of restitution, *i.e.*, the higher compensation as between that valued at the date of expropriation and the date of the award.[255]

291. In support of its approach, Claimant emphasizes that Article 5(1) of the Treaty provides for the appropriate standard of compensation only in case all of the conditions for a lawful expropriation are met. As this is not the case here, the appropriate standard of compensation, including the appropriate date at which the value is to be assessed, is set by customary international law.[256]

292. In support of its argumentation, Claimant refers to the *Chorzów Factory* judgment rendered by the Permanent Court of International Justice ("**PCIJ**") as well as several arbitral awards (*see* in more detail below).

**b)    Calculation of damages**

**aa)    Valuation Method**

293. Claimant submits that Respondent must pay full compensation for the expropriated plant and refers to the World Bank Guidelines on the Treatment of Foreign Direct Investment of 1992[257] and the commentary on the ILC Draft Articles.[258]

294. Claimant refers to its expert on quantum, Prof. Spiller, who suggests that a third-party buyer would pay the lower of (i) the net present value of the cash flows that a willing

---

[253] Memorial, ¶ 186.
[254] Reply Memorial, ¶¶ 131-142.
[255] Claimant's Post-Hearing Submission, ¶ 73.
[256] Memorial, ¶ 197; Reply-Memorial, ¶ 152.
[257] Memorial, ¶¶ 203-204 referring to The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), p. 11.
[258] Reply, ¶ 154 quoting from James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), p. 225.

buyer could obtain from acquiring a 100% stake in Norpro Venezuela; and (ii) the opportunity cost that a willing buyer would incur if it constructed a similar plant outside Venezuela, which consists of the sum of contruction costs plus the foregone cash flows during the construction period.[259]

295.  According to the calculation of Prof. Spiller as of 15 May 2010, the opportunity cost for the construction of a similar plant in the US would be lower than the net present value of Norpro Venezuela's future cash flows (USD 99.5 million compared to USD 115.1 million). Consequently, Claimant is of the view that the Tribunal should determine the fair market value of the expropriated plant based on the construction cost approach.[260] In any event, Claimant made the following submissions with regard to the DCF calculation.

### bb)  Discount Rate

296.  Claimant submits that Respondent's experts Mr. Brailovsky and Dr. Flores applied "*an absurdly high discount rate of 26%,*" which results in a value that implies that "*no reasonable investor would invest in a new proppant plant, or add capacity to an existing proppant plant.*"[261]

297.  In particular, Claimant argues that the "*exorbitant*" country risk premium of 13.92% that Mr. Brailovsky and Dr. Flores applied for Venezuela is a "*desperate way for a State to try to evade responsibility for its actions.*" According to Claimant, this spike reflects President Chávez's threats to expropriate all foreign investments in Venezuela without compensation.[262] Claimant argues, however, that a State "*may not use its own propensity to violate the law to reduce the value of compensation for the expropriation.*"[263] It therefore takes the position that the "*generalized threat of confiscation*" has to be eliminated from the calculation of the fair market value because Respondent would otherwise be rewarded for the unlawful conduct that this arbitration is meant to remedy.[264]

298.  Claimant claims that Prof. Spiller has excluded only the confiscation risk in his calculation but appropriately took into account "*other risks of investing in Venezuela, such as the risks of a volatile economy, civil disorder, less developed infrastructure, and other issues.*" Claimant submits that Prof. Spiller took the average spread of sovereign bonds

---

[259] Reply, ¶¶ 155-156 referring to Prof. Spiller's Second Damages Assessment dated 18 June 2014 ("**Spiller II**"), ¶ 5; Claimant's Post-Hearing Submission, ¶ 90.
[260] Reply, ¶¶ 157, 187 and 196; Claimant's letter to the Tribunal dated 6 November 2015; Spiller II, Table 12.
[261] Reply, ¶ 158 quoting from Spiller II, ¶ 28.
[262] Reply, ¶ 161; Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing Submission, ¶ 55.
[263] Reply, ¶ 162 quoting from *Occidental v. Ecuador* (**CLA-061**), ¶ 564; Claimant's Post-Hearing Submission, ¶ 110 referring in particular to *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841.
[264] Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing submission, ¶ 56 and ¶ 59.

of countries with a B1 rating such as Venezuela, which includes many developing countries with "*significant country risk, including political risks.*"[265]

299. Claimant further contends that it also took Venezuela's "*heightened country risk*" into account when it assigned a discount rate of 15% to the project in 2006 and undertook significant efforts to secure meaningful support of the Venezuelan Government, in reliance on the fact that the France-Venezuela Treaty had entered into force in 2004.[266] Claimant emphasizes that the "*high risk*" discount rate of 12%, which included a country risk premium of 4%, was not assigned by the members of the project team (they even added a further 3% "*to be conservative*"), but rather served as a "*company-wide objective measure to consider the potential risks and rewards of proposed ventures in various locations.*"[267]

### cc)   Future Cash Flows

300. With regard to the calculation of the future cash flows, Claimant considers it "*baseless*" to split the profits that a willing buyer would generate from Norpro Venezuela's exports to account for internal cost allocation. In Claimant's view, the fair market valuation is "*not dependent on idiosyncratic qualities of the buyer or seller*"; therefore, it must be assumed that the highest-bidding willing buyer would most likely be a strategic investor that already has a distribution and marketing network similar to that of Saint-Gobain and is thus in a position to accrue 100% of the profits.[268]

301. Claimant further notes that Mr. Brailovsky and Dr. Flores assumed in their calculation that CVG Bauxilum would supply bauxite at the increased price that it unilaterally imposed on Norpro Venezuela in September 2008. According to Claimant, this price increase was unlawful and therefore must not be taken into account based on the principle that "*a party may not reduce its liability for one wrongful act (here, the expropriation) on the basis of another (the price increase).*"[269]

---

[265] Claimant's Post-Hearing Submission, ¶¶ 105-106; Claimant's Second Post-Hearing Submission, ¶ 60 and ¶ 67. Claimant argues that one way to "*check*" this is to look at the CDS spreads outstanding on countries' sovereign debts and notes that on Prof. Damodaran's list of 63 countries as of January 2014, Prof. Spiller's proposed premium of 4.5% would rank as the fourth-highest after Argentina (14.73%), Venezuela (10.8%) and Tunisia (4.57%) and thus "*far above the typical country risk premium in a developing country.*" Claimant's Second Post-Hearing Submission, ¶¶ 61-62 referring to **App. BF-66**, pp. 23-25.

[266] Claimant's Post-Hearing Submission, ¶ 107, ¶ 116 and ¶ 130.

[267] Claimant's Post-Hearing Submission, ¶¶ 131-134 referring to the oral testimony of its witness Patrick Millot. Transcript (Day 2), p. 428 lines 14-17 and p. 438 lines 13-16.

[268] Reply, ¶¶ 170-172; Claimant's Post-Hearing Submission, ¶¶ 174-175 referring to Prof. Spiller's oral testimony during the Hearing. Transcript (Day 4), p. 1249 lines 11-14, p. 950 line 12 – p. 951 line 9 and p. 948 lines 8-22. See also Claimant's Second Post-Hearing Submission, ¶¶ 89-90.

[269] Reply, ¶ 176; Claimant's Second Post-Hearing Submission, ¶¶ 96-97.

302. As to the transportation costs, Claimant claims that (i) Prof. Spiller's estimate of the transportation costs is based on an actual shipment in March 2010 and confirmed by Saint-Gobain's contemporaneous transportation contracts; and (ii) the average price applied by Prof. Spiller for shipping costs within the US accurately accounts for the various locations and contractual arrangements with Claimant's ultimate customers.[270]

303. Claimant further asserts that Mr. Brailovsky and Dr. Flores fail to distinguish between the concepts of (i) maintenance capex aimed at "*maintain*[ing] *the plant in the condition to continue functioning at its current levels*"; and (ii) investment capex aimed at "*increas*[ing] *plant production through efficiency and technological improvements.*"[271] According to Claimant, only the maintenance capex should be included in the calculation of capital expenditures.[272]

304. In respect of the working capital required to operate the plant, Claimant refers to Prof. Spiller's assumptions that (i) the outstanding balance of VAT credits as of 2009 would have been paid in 2010; and (ii) going forward, it would have taken 60 days to monetize the VAT certificates and Norpro Venezuela would have recovered 80% of their value. As to the administrative delays invoked by Respondent, Claimant notes that such delays have been found to be in breach of the FET standard and claims that it had a legitimate expectation that Respondent would follow its own VAT credit procedure, given that this issue was specifically discussed with the Venezuelan Government before Claimant invested in Venezuela.[273]

### 4.   Claimant's Relief Sought

305. Claimant requests that the Tribunal:[274]

(i)    DECLARE that: (A) Venezuela has breached Article 5 of the Treaty by unlawfully expropriating Saint-Gobain's investment in Venezuela; and (B) Venezuela has breached Articles 3(1) and 3(2) of the Treaty by failing to accord Saint-Gobain's

---

[270] Reply, ¶ 179; Claimant's Post-Hearing Submission, ¶ 166 and ¶¶ 169-171 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), p. 10; Claimant's Second Post-Hearing Submission, ¶¶ 91-92 referring to Spiller II, Table 7 and ¶¶ 83-85.

[271] Reply, ¶ 180 referring to Larry II, ¶¶ 21-23.

[272] Reply, ¶ 181.

[273] Reply, note 381 referring to Spiller II, ¶ 93 and ¶¶ 115-116 and *Impregilo S.p.A. v. Argentina*, Concurring and Dissenting Opnion of Judge Charles N. Brower (**CLA-127**), ¶ 9; Claimant's Post-Hearing Submission, ¶¶ 158-161.

[274] Claimant's Second Post-Hearing Submission, ¶ 116. The fair market value that Claimant claims Norpro Venezuela had as of the date of the award has been updated in Claimant's Valuation Update submitted on 22 October 2015. Given that as of the Valuation Update, the date-of-the-award valuation yields a value that is lower than the date-of-the-expropriation valuation, Claimant now claims compensation in the amount of the value Norpro Venezuela had as of the date of the expropriation. *See* Claimant's letter dated 6 November 2015.

investment in Venezuela fair and equitable treatment, and full protection and security;

(ii)     ORDER Venezuela to pay Saint-Gobain the higher of the Fair Market Value of Norpro Venezuela as of the date of the award (calculated at USD 90.3 million as of 31 August 2015), or the Fair Market Value of Norpro Venezuela as of the date of the expropriation (calculated at USD 99.5 million) plus pre-award interest at the rate of 13.04%, or, subsidiarily, 9.08% per annum until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(iii)    ORDER Venezuela to pay post-award interest at the rate of 9.08% per annum from the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(iv)    DECLARE that: (A) the award of damages and interest is made net of applicable Venezuelan taxes; and (B) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest;

(v)     ORDER Venezuela to indemnify Saint-Gobain in respect of any double taxation liability that would arise in France or elsewhere that would not have arisen but for Venezuela's adverse measures;

(vi)    AWARD such other relief as the Tribunal considers appropriate; and

(vii)   ORDER Venezuela to pay all of the costs and expenses of this Arbitration, including Saint-Gobain's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and ICSID's additional costs.

## II.    SUMMARY OF RESPONDENT'S POSITION AND RELIEF SOUGHT

306.  It is Respondent's position that it fully complied with its Treaty obligations, in particular with respect to the expropriation of the plant, and that Claimant is merely entitled to compensation based on Article 5(1) of the Treaty in the amount of USD 9.5 million, the fair market value of the plant as of 15 May 2010, plus pre-award simple interest at a rate equal to the rate of a three-month US Treasury Bill plus 1.1 percentage points.[275] To the extent that Claimant's claim exceeds this amount, Respondent submits that it should be dismissed.

---

[275] Respondent's Post-Hearing Reply Brief, ¶ 64. This position has remained unchanged following the submission of Respondent's Valuation Update on 22 October 2015.

## 1.    Admissibility Objections

307.  Respondent contends that (i) the claims relating to the Bauxite Contract; and (ii) the claims relating to Article 5(1) subparagraph 1 of the Treaty are inadmissible.

308.  With respect to the Bauxite Contract, Respondent argues that, even if Claimant could establish that the bauxite prices were increased in breach of the Bauxite Contract, this could not, in itself, give rise to a responsibility of Respondent under international law because CVG Bauxilum, an entity legally distinct from Respondent, is party to the Bauxite Contract.[276] Respondent maintains that Claimant is unable to identify any legal instrument entered into with the State, or any relevant act on the part of the State, on which it can base its claims regarding bauxite pricing.[277]

309.  As regards the alleged breach of the Article 5(1) subparagraph 1 of the Treaty, Respondent submits that this claim should be dismissed as Claimant never raised its "*new theory*" with regard to Article 5(1) subparagraph 1 of the Treaty prior to the Hearing. Respondent further contends that Claimant's change of position is in conflict with Rule 31(3) of the ICSID Arbitration Rules.[278]

## 2.  No Breach of the Treaty

310.  With respect to the merits of the claims, Respondent submits that it did not breach any of its obligations under the Treaty.

### a)    Expropriation (Article 5(1) of the Treaty)

311.  It is Respondent's position that it acted in full conformity with the requirements of both Article 5(1) subparagraph 1 of the Treaty (**aa)**) and of subparagraphs 2 and 3 of the same provision (**bb)**).

### aa)   No Breach of Article 5(1) Subparagraph 1 of the Treaty

312.  Respondent submits that the claim relating to the Article 5(1) subparagraph 1 of the Treaty is without legal merit as (i) the term "*measure*" has a "*far broader meaning than that suggested by Claimant*"; and (ii) the reference to a "*particular agreement*" ("*engagement particulier*"/"*compromiso especial*") is "*not intended to mean the Treaty itself, but rather an agreement external to the Treaty,*" as evidenced by the use of the same term in Article 10 of the Treaty.[279]

---

[276] Counter-Memorial, ¶¶ 73-74; Respondent's Post-Hearing Brief, ¶¶ 125-126.
[277] Rejoinder, ¶ 78.
[278] Respondent's Post-Hearing Brief, ¶¶ 21-23.
[279] Respondent's Post-Hearing Brief, ¶¶ 25-26; Respondent's Post-Hearing Reply Brief, ¶ 7.

### bb)   No Breach of Article 5(1) Subparagraphs 2 and 3 of the Treaty

313.  Respondent further contends that its conduct was in conformity with the requirements of Article 5(1) subparagraph 2 and 3 of the Treaty.

314.  Respondent submits that the "*date of expropriation*" within the meaning of Article 5(1) subparagraph 3 of the Treaty was 29 March 2011, *i.e.*, the date of the issuance of the Expropriation Decree, which triggered the procedures under the Venezuelan Expropriation Law.[280] With regard to the takeover of the plant on 15 May 2010 and the events thereafter, Respondent contends, first, that it was the labor union SINPROTRAC, not the State, which occupied the plant, and, second, that PDVSA's presence at the plant thereafter was a "*responsible and necessary action pending the expropriation decree to assure the safety and security of the plant*" after Norpro Venezuela's management had effectively abandoned it.[281]

315.  With regard to the first point, Respondent denies the existence of an intrinsic causal link between President Chávez's "*announcement*" and the takeover of the plant, because the President "*did not order the takeover of the Plant.*"[282]

316.  With respect to the second aspect, Respondent maintains that PDVSA's presence prior to the publication of the expropriation decree was arranged for the purpose of ensuring plant safety and stability, as a "*caretaker.*" Respondent asserts that, with the plant under the control of the union, and in the absence of supervision by Norpro Venezuela's management staff, there were legitimate grounds for concern regarding worker safety and the proper operation of the plant's equipment.[283]

317.  In this context, Respondent alleges that Claimant neither challenged the legal foundation of PDVSA's presence nor demanded return of the plant nor requested access to it after 15 May 2010.[284]

318.  At the same time, Respondent does not contest that, in the aftermath of 15 May 2010, "*there was a 'process of nationalization' to the extent that, as everyone recognized, the Plant had not been expropriated but that it would be transferred to State control in the future.*" Respondent submits that the Parties also recognized (i) that a formal expropriation decree was being drafted at that time; (ii) that the decree was supposed to mark the starting point of the expropriation procedure under Venezuelan law; and (iii) that the Par-

---

[280] Respondent's Post-Hearing Brief, ¶ 87 (with note 187).
[281] Counter-Memorial, ¶ 26 (with note 68); Respondent's Post-Hearing Brief, ¶¶ 60-65.
[282] Respondent's Post-Hearing Brief, ¶¶ 30-31.
[283] Rejoinder, ¶¶ 20-22; Respondent's Post-Hearing Reply Brief, ¶ 25.
[284] Rejoinder, ¶ 23; Post-Hearing Brief, ¶ 60 (with note 108), ¶¶ 42-51.

ties would consider, in the meantime, alternatives to expropriation, including the formation of a mixed company ("*empresa mixta*"), with PDVSA as a majority shareholder and the Claimant holding a minority stake.[285]

319.  As regards the precise content of the specification requirement in Article 5(1) subparagraph 3 of the Treaty, Respondent rejects Claimant's interpretation pursuant to which the provision requires not only an acknowledgment that an amount equivalent to that specified in the second paragraph of Article 5(1) will be paid, but also that the precise figure constituting that "*amount*" be determined on the date an intention to expropriate is announced. In particular, Respondent submits that, on the basis of a good faith interpretation of Article 5(1) of the Treaty pursuant to Article 31(1) of the Vienna Convention on the Law of Treaties ("**Vienna Convention**"), asking for a specified figure on the date of expropriation is "*not a good faith interpretation and cannot be correct, as it would establish an obligation that the Contracting States could not satisfy except by pure chance.*"[286]

320.  Respondent points out that the Treaty does not require that the State "*must, before it announces an expropriation, engage in discussions with the expropriated entity to obtain the facts necessary to determine the precise figure*" of compensation, and that "*without such information, it would be impossible* […] *to determine that figure in good faith.*" For this reason, Respondent suggests a, in its view, more reasonable interpretation of the word "*amount*" that does not refer to a "*precise dollar or Euro figure, but rather to the required concept (i.e., a 'sum* […] *equal to the actual value of the investments').*"[287]

321.  With respect to the promptness requirement, Respondent submits that Article 5(1) of the Treaty does not require the State to pay compensation to the investor on the date of the expropriation: While subparagraph 2 provides that "*[a]ll measures of expropriation which could be taken must result in payment of a prompt and adequate compensation,*" it is only subparagraph 3, which requires that, after compensation has been determined, "*payments shall be made without delay.*"[288]

322.  It is Respondent's position that it fully complied with these requirements. First, Respondent submits that Decree No. 8.133 and the Venezuelan Expropriation Law indeed provided the mechanism for the determination and payment of compensation in the event of an expropriation, consistent with Respondent's obligations under Article 5(1) of the Treaty and international law.[289]

---

[285] Respondent's Post-Hearing Brief, ¶ 61.
[286] Respondent's Post-Hearing Brief, ¶¶ 83-84.
[287] Respondent's Post-Hearing Brief, ¶ 83.
[288] Rejoinder, ¶ 155.
[289] Rejoinder, ¶¶ 36-39, 169-170, 172.

323. Moreover, contrary to Claimant's contentions, Respondent asserts that it has been duly following the mandatory procedures required by the national laws on expropriation to determine compensation, namely Article 56 of the Expropriation Law and the provision of the Law on Access. Respondent contends that the fact that those procedures are yet to come to a close and Claimant is yet to receive payment of compensation is largely due to Claimant's own failure to participate in those procedures and Claimant's attempts to have them discontinued.[290]

324. Finally, Respondent also rejects Claimant's good faith argument and submits that, apart from its continued efforts to determine compensation in accordance with the Expropriation law, it met regularly with Claimant to negotiate compensation, including the option of forming an "*empresa mixta.*"[291]

325. In any event, it is Respondent's submission that the mere fact that compensation is yet to be paid does not render the expropriation unlawful, taking into account that Respondent acknowledged its obligation to pay compensation and commenced the expropriation procedure in consistency with its domestic law.[292] Respondent refers to several commentators and decisions rendered by arbitral tribunals in order to substantiate its submission (*see* in more detail below).

### b)    Fair and Equitable Treatment (Article 3(1) of the Treaty)

326. Respondent submits that Article 3(1) of the Treaty calls only for the minimum standard of treatment under customary international law. In any event, Respondent contends that even under more expansive formulations, there would be no FET violation.

327. With regard to the Bauxite Contract, Respondent submits that it did not give any "*guarantee*" or "*commitments*" to Saint-Gobain regarding bauxite supply or price and claims that Claimant is "*unable to identify a single legal instrument or document containing any so-called State guarantees and commitments regarding bauxite supply or price.*"[293] In Respondent's view, Claimant refers to CVG Bauxilum's commercial decision to accomplish an increase in the bauxite price under the Bauxite Contract, even though CVG Bauxilum's conduct is not attributable to Respondent under international law.[294]

328. In response to Claimant's contention that Respondent did not accord Saint Gobain due process in the expropriation, Respondent emphasizes that PDVSA established a presence on the plant after 15 May 2010 only in a caretaker capacity and pending the publication

---

[290] Rejoinder, ¶¶ 171, 173-187.
[291] Rejoinder, ¶¶ 44-56, 188.
[292] Counter-Memorial, ¶¶ 161-173; Rejoinder, ¶¶ 159-168.
[293] Rejoinder, ¶¶ 127, 131.
[294] Rejoinder, ¶¶ 132-134; Counter-Memorial, ¶¶ 77-81.

of the formal Expropriation Decree, which was in full accordance with Venezuelan law. Respondent further points out that, after the takeover of the plant, PDVSA met with Claimant for negotiations as soon as possible.[295]

329. Finally, Respondent argues that due process does not require discussions with the expropriated party prior to the expropriation announcement and that due process is fully satisfied if there is access to the judiciary to be heard – which is the case in Venezuela. Again, Respondent contends that Claimant could have challenged the occupation of the plant by the union or PDVSA prior to the issuance of the Expropriation Decree before Venezuelan courts. It is Respondent's position that "*the fact that Claimant chose not to avail itself of remedies in the Venezuelan courts does not equate with a denial of due process.*"[296]

### c) Full Protection and Security (Article 3(2) of the Treaty)

330. It is Respondent's position that an analysis of a breach of the FPS standard requires consideration of whether the investment has been physically interfered with or harmed and whether the State complied with its due diligence obligation, and that the FPS standard does not entail the concept of "*legal security.*"[297] In any event, Respondent rejects Claimant's FPS claims with regard to both the Bauxite Contract and the plant takeover.

331. Respondent emphasizes that it was not responsible for CVG Bauxilum's price increases under the Bauxite Contract. Moreover, Respondent contends that an investor, "*by communicating its discontent with the behavior of a commercial partner to a government representative,*" cannot create an obligation of the State under international law "*to investigate the merits of its commercial complaint and make the government responsible for any damages*" if the investor's commercial partner continues its unpleasant behavior.[298]

332. With respect to the plant takeover, Respondent submits that it fully complied with its FPS obligations prior to the issuance of the Expropriation Decree. Respondent emphasizes that, had it "*not established a presence through PDVSA Industrial pending the issuance of Decree No. 8.133, and had the assets been destroyed or stolen or had people been injured, Venezuela very well may have been subject to a claim for non-compliance with its FPS obligations.*"[299]

### 3. Quantum

---

[295] Counter-Memorial, ¶ 140; Rejoinder, ¶ 136.
[296] Respondent's Post-Hearing Reply Brief, ¶ 11.
[297] Counter-Memorial, ¶ 149; Rejoinder, ¶ 143.
[298] Rejoinder, ¶¶ 141-142.
[299] Respondent's Post-Hearing Reply Brief, ¶ 11 (note 42).

### a)    Compensation Standard and Valuation Date

333.   Respondent submits that, irrespective of whether or not Venezuela complied with the requirements of Article 5(1) subparagraph 2 and 3 of the Treaty, the proper valuation date is the "*date prior to the threat of expropriation*," as required by Article 5(1) subparagraph 2 of the Treaty.[300]

334.   Respondent refers to the wording of Article 5(1) subparagraph 2 of the Treaty, according to which the value of the expropriated asset is to "*be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*" It is Respondent's position that this standard relates to both lawful and unlawful expropriations and is not limited to expropriations that comply with the requirements set out in Article 5(1) subparagraph 1 of the Treaty.[301]

335.   Moreover, Respondent contends that, in case of a mere failure of the State to promptly specify and pay compensation, even the compensation standard under customary international law does not allow for calculating damages by way of "*constructing a 'but-for' world in which the possibility of expropriation is excluded until the date of the award.*"[302]

### b)    Calculation of Damages

#### aa)    Valuation Method

336.   Respondent agrees that the amount of compensation to be paid should reflect the fair market value of the plant, *i.e.*, "*the amount that a willing buyer would pay to a willing seller.*"[303]

337.   Respondent sees no need to consider Prof. Spiller's approach to compare the DCF-based valuation with the opportunity costs of constructing a similar plant in any detail because according to its experts on quantum, Mr. Brailovsky and Dr. Flores, those costs would exceed the price that a willing buyer would pay for Claimant's plant (USD 43.7 million plus foregone cash flows of USD 1.3 million as of 15 May 2010 compared to USD 9.5 million).[304]

338.   In any event, Respondent emphasizes that the asset to be evaluated in the present case is a stand-alone plant in Venezuela, not in the United States, and therefore argues that the

---

[300] Transcript (Day 1), p. 241 lines 7-8.
[301] Rejoinder, ¶ 190; Counter-Memorial, ¶¶ 174 *et seq*.
[302] Respondent's Post-Hearing Brief, ¶ 109.
[303] Counter-Memorial, ¶¶ 185-187; Respondent's Post-Hearing Brief, ¶ 137.
[304] Counter-Memorial, ¶ 188; Rejoinder, ¶ 201; Respondent's Post-Hearing Brief, ¶ 138 and ¶ 204-208; Respondent's Post-Hearing Reply Brief, ¶ 63; Mr. Brailovsky and Dr. Flores' Second Expert Report on Quantum ("**Brailovsky/Flores II**"), ¶¶ 227 and 242.

only appropriate way of assessing the compensation to be paid to Claimant is to apply a DCF analysis, including a discount rate that accounts for the fact that the plant is located in Venezuela.[305]

339. With regard to the DCF calculation, Respondent made the following submissions.

### bb)    Discount Rate

340. Respondent submits that the discount rate calculated by Prof. Spiller would be "*low even for a company such as Norpro Venezuela operating in a mature economy*." Respondent argues that (i) Prof. Spiller deviated from the risk-free-rate suggested by Ibbotson/Morningstar for long-term projects, *i.e.*, the 20-year US Treasury bond yield as of the valuation date; (ii) he deviated from the general market risk premium (MRP) calculated by Ibbotson/Morningstar; and (iii) he "*ignore*[d] *the empirical evidence establishing that the CAPM tends to underestimate the cost of equity for financial assets*," which is corrected by the *alpha* coefficient.[306]

341. According to Respondent, the biggest difference between the experts' estimates concerns the applicable country risk premium. Respondent claims that this premium is "*far higher*" than the 4.5% applied by Prof. Spiller, which in fact does not reflect Venezuelan country risk but rather the default risk on US corporate bonds.[307] Respondent refers to the calculations of its experts Mr. Brailovsky and Dr. Flores who primarily relied on the Country Risk Rating Model (CRRM) compiled by Ibbotson/Morningstar and cross-checked their results by using the so-called "*bludgeon method*" devised by Prof. Damodaran.[308]

342. While acknowledging that the valuation must exclude the impact of the actual expropriation of the Plant, Respondent argues that this "*should not be confused with the expropriation risk inherent in any project from its very inception*," which is part of the "*normal economic situation prevailing*" prior to the announcement of the expropriation of the Plant and therefore also a risk that a willing buyer would take into account in its assessment of the purchase price it would be willing to pay for the Plant.[309]

343. Respondent argues that the country risk premium must be based on the buyer's perception of risk; the elimination of the risks inherent to an investment in Venezuela would result

---

[305] Rejoinder, ¶¶ 202-203.
[306] Counter-Memorial, ¶¶ 234-236; Rejoinder, ¶ 206. For an overview of the diffences regarding the US cost of equity components, *see* also the table in Respondent's Post-Hearing Brief, following ¶ 140.
[307] Counter-Memorial, ¶ 240; Rejoinder, ¶ 207 and ¶ 228. In Respondent's view, Prof. Spiller should at least have used corporate bonds from other emerging countries with the same rating as Venezuela, which would have resulted on a spread of about 9%. Rejoinder, ¶ 221; Respondent's Post-Hearing Brief, ¶ 169.
[308] Respondent submits that its experts used the same methodology to determine the appropriate discount rate for both valuation dates. Counter-Memorial, ¶ 259.
[309] Rejoinder, ¶ 227.

in "*the use of a discount rate that a willing buyer would not use and derive a value that a willing buyer would not pay, thereby granting Claimant a windfall that it could never achieve in an arm's-length transaction.*" In Respondent's view, this would further be punitive to Venezuela and thus "*impermissible under any theory of compensation in international law.*"[310]

344. In any event, Respondent claims that "*there is no way to isolate, and thus quantify*" the risk of uncompensated expropriation. According to Respondent, Prof. Spiller did not propose any method to do so in his expert reports but argued only at the Hearing that one could take the difference between the EMBI spread for Venezuela and his 4.5% country risk premium.[311]

345. As to Claimant's emphasis during the Hearing on the 15% discount rate reflected in its 23 October 2006 DAC, Respondent notes that the significance and purpose of this rate remains unclear and further argues that at that time, Venezuela's default risk was "*at one of its all-time lowest points*," with the yield of its sovereign bonds being only 2.18% higher than US Treasury bonds. At that point, Respondent submits, the 3% country risk premium could have been justified. More importantly, however, Respondent emphasizes that Claimant took Venezuelan default risk into account in its assessment of the country risk, just like a buyer would in its assessment of an appropriate discount rate for determining the fair market value of the Plant. In Respondent's view, there is then no reason for excluding such risk when such risk increased with the passage of time.[312]

### cc)  Future Cash Flows

346. Respondent submits that it is undisputed between the Parties that prior to the expropriation Norpro Venezuela received only 27% of the profits, while the remaining 73% were allocated to Claimant's US affiliate SGCP.[313] Consequently, Respondent rejects Prof. Spiller's assumption that Norpro Venezuela would retain 100% of the profits as of the valuation date. It claims that a willing buyer would not pay for 100% of the profits because it would not be acquiring the capabilities of SGCP and would not be willing to

---

[310] Respondent's Post-Hearing Brief, ¶ 157.
[311] Respondent's Post-Hearing Brief, ¶¶ 163-164, 171.
[312] Respondent's Post-Hearing Brief, ¶¶ 158-162. Respondent further notes that the same documents reflect that Claimant was willing to invest in Venezuela at an internal rate of return of 26.4%. Therefore, Respondent argues that, while still being 3% higher than Prof. Spiller's discount rate, the 15% discount rate is not relevant in this case. Respondent's Post-Hearing Reply Brief, note 132.
[313] Counter-Memorial, ¶¶ 198-199 and ¶ 256 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**); Rejoinder, ¶¶ 238-242; Respondent's Post-Hearing Brief, ¶ 182.

transfer the profits it expects to earn through its own existing marketing, logistics and distribution network.[314]

347.  Respondent therefore refers to the assumption of its experts that a buyer of the Plant would achieve "*at the very most*" 75% of the profits as Claimant itself concluded in its transfer pricing study that the 25% portion of "*marketing intangibles*" was contributed 100% by SGCP.[315]

348.  As to the bauxite price to be paid by Norpro Venezuela to CVG Bauxilum, Respondent submits that there is no basis for Claimant's instruction to Prof. Spiller to reduce the agreed price of USD 33.8 per MT to the original contract price, given that Norpro Venezuela agreed to the increased price as long as there would be no further increase throughout 2009. Therefore, Respondent instructed its experts to base their calculation on the increased price, escalated by the US PPI-Commodities.[316]

349.  With regard to the transportation costs, Respondent submits that Claimant's own budgeted cost for transportation from Venezuela to Alice, Texas amount to EUR 110 (converted to USD 154) per MT. According to Respondent, this figure is also supported by Claimant's transfer pricing study.[317] Respondent further rejects Prof. Spiller's estimate for the shipping costs within the US and claims that Claimant's budgeted cost and the Halliburton SPA reflect a "*significantly higher*" cost, which is why its experts based their estimate on the budgeted cost.[318]

350.  In relation to the capital expenditures, Respondent agrees with Prof. Spiller's assumption up to and including 2018 but argues that annual capital expenditures would significantly increase "*as the Plant aged and equipment reached the end of its useful life*."[319] While Prof. Spiller included only maintenance expenditures, Respondent claims that expendi-

---

[314] Counter-Memorial, ¶¶ 200-202. *See* also Rejoinder, ¶ 244. Respondent emphasizes that, while such a buyer might achieve 100% of the revenues from the ultimate sale of the proppants, it would not benefit from 100% of the profits because "*a substantial portion of the profits* " would be tied to the marketing, distribution and logistics functions that were not part of the transfer from Claimant in consideration for the purchase price. Respondent's Post-Hearing Brief, ¶¶ 184-185.

[315] Counter-Memorial, ¶ 203 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 5; Rejoinder, ¶ 243; Respondent's Post-Hearing Reply Brief, ¶ 54.

[316] Counter-Memorial, ¶ 210 and ¶ 256; Rejoinder, ¶ 251 quoting from the letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit R-52**).

[317] Counter-Memorial, ¶ 214 and ¶ 256 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), pp. 10 and 42 and Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 1; Respondent's Post-Hearing Brief, ¶¶ 195-198; Respondent's Post-Hearing Reply Brief, ¶¶ 58-59.

[318] Counter-Memorial, ¶¶ 215-216 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 1.

[319] Counter-Memorial, ¶¶ 217-218 and ¶ 256.

tures for "*health and safety, technology or improvements to reduce breakdowns and process disruptions*" are also required to assume operation in perpetuity and therefore takes the position that all four capexes as foreseen for the claimant's Fort Smith plant should be included in the calculation.[320]

351.    In respect of the working capital, Respondent agrees with Prof. Spiller's calculation except for the VAT credits. Respondent contends that as of 15 May 2010 Norpro Venezuela had not even applied for the tax recovery certificates and claims that the recovery procedure is usually a "*lengthy and complex*" process. Respondent submits that its experts therefore assumed that the outstanding VAT credits as of 15 May 2010 would have been monetized in 2013 and further VAT credits accumulated thereafter would have been monetized on a two-year rolling basis and thus been part of working capital that a buyer would not separately value.[321]

### 4.    Respondent's Relief Sought

352.    Respondent concludes that the Tribunal should declare that the expropriation of the plant was lawful and award Claimant compensation based on Article 5(1) of the Treaty in the amount of USD 9.5 million, the fair market value of the plant as of May 15, 2010, plus pre-award simple interest at a rate equal to the rate of a three-month US Treasury Bill plus 1.1 percentage points. The claims based on the bauxite price increase should be declared inadmissible, or, if they were to be entertained, dismissed on the facts and the law. All other claims should be dismissed on the facts and the law. The costs of these proceedings incurred by Respondent (including legal fees and disembursements) should be deducted from the amount of compensation awarded to Claimant.[322]

## F.    THE TRIBUNAL'S REASONING

### I.    JURISDICTION

353.    It is undisputed between the Parties that the Tribunal's jurisdiction derives from Article 25(1) of the ICSID Convention and Article 8(2) of the Treaty. Article 25(1) of the ICSID Convention provides in relevant part:

---

[320] Rejoinder, ¶ 262.
[321] Rejoinder, ¶¶ 269-271; Respondent's Post-Hearing Brief, ¶ 201.
[322] Respondent's Post-Hearing Reply Brief, ¶ 64. Respondent's relief sought has not changed through its Valuation Update submitted on 22 October 2015 because this submission related exclusively to the date-of-the-award valuation of the Plant, which was updated to 31 August 2015. Respondent, however, maintains its position that the Plant's value must be assessed as of the date of the first threat of expropriation, in accordance with Article 5(1) subparagraph 2 of the Treaty. *Cf.* Respondent's Post-Hearing Brief, ¶ 137.

> "*The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State* […] *and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.*"

354.  Article 8(2) of the Treaty provides:

> "*If such a dispute* [between a national or a company of a Contracting Party and the other Contracting Party, regarding an obligation of the latter relating to an investment under the terms of the present Agreement] *cannot be settled within six months from the time it was raised by either of the parties to the dispute, at the request of the national or the company in question it shall be submitted to either the competent court of the State in which the investment was made or to arbitration by the International Center for Settlement of Investment Disputes (ICSID), pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965. This decision is the choice of the national or the company concerned. Once the decision has been made to pursue arbitration, the decision becomes final.*"[323]

355.  Pursuant to Article 25(1) of the ICSID Convention, the following four requirements have to be satisfied: (i) there must be a legal dispute between the Parties; (ii) the dispute must arise directly out of an investment; (iii) the Parties must be a Contracting State and a national of another Contracting State; and (iv) both Parties must have given their consent in writing to submit the dispute to ICSID.

356.  There is no dispute between the Parties that all four requirements are met in the present case.[324] First, there is a legal dispute between the Parties because Claimant seeks reparation for Respondent's alleged breaches of Articles 5(1), 3(1) and (2) of the Treaty.[325]

357.  Second, this dispute arises directly out of an investment within the meaning of Article 1(1) of the Treaty, which includes "*all assets, such as the property rights and interests of any nature*" and, in particular, "[s]*hareholdings* […] *in companies incorporated in the territory of one of the Contracting Parties,*" "*rights in rem such as mortgages*" and "*all entitlements having an economic value.*"[326] In this case, Claimant submits that (i) it holds 99.99% of the shares in Norpro Venezuela, a company organized and existing under the

---

[323] Free translation submitted as **Exhibit C-1**. The original French and Spanish texts have been quoted in paragraph 12 above.

[324] Respondent has not raised any objections to the jurisdiction of this Tribunal. During the Hearing, Respondent stated in this regard: "*Now we're here. Now this Tribunal will have to determine compensation as well. That's fine.*" Transcript (Day 1), p. 160 lines 17-18.

[325] *Cf.* Memorial, ¶ 123; RfA, ¶ 69.

[326] Article 1(1)(a), (b) and (c) of the Treaty. Free translation submitted as **Exhibit C-1**.

laws of Venezuela; (ii) it provided debt financing to Norpro Venezuela, which was secured by a mortgage on Norpro Venezuela; and (iii) it held property, contractual rights with local suppliers and rights pursuant to the law such as licenses and permits.[327] None of these submissions was contested by Respondent. Therefore, the dispute between the Parties arises directly out of Claimant's investment in Norpro Venezuela.

358. Third, Respondent does not dispute that, even though Venezuela denounced the ICSID Convention on 24 January 2012,[328] it was a Contracting State within the meaning of Article 25(1) of the ICSID Convention for the purposes of these proceedings. Claimant notes that the ICSID Convention entered into force for Venezuela on 1 June 1995 and Venezuela was therefore a Contracting State at the time (i) it consented to ICSID Arbitration under the Treaty on 2 July 2001; (ii) Claimant sent its notices of dispute to Respondent on 4 July 2011 and 17 January 2012; and (iii) Claimant filed its Request for Arbitration on 25 April 2012, given that Venezuela's denunciation of the ICSID Convention only took effect on 25 July 2012.[329] Further, Claimant is a national, *i.e.*, a juridical person within the meaning of Article 25(2)(b) of the ICISD Convention, of another Contracting State because Claimant is a corporation incorporated and organized under the laws of France, for which the ICSID Convention entered into force on 20 September 1967.[330]

359. Finally, both Parties gave their consent in writing to submit this dispute to ICSID. Respondent' consent is comprised in Article 8(2) of the Treaty. The requirements of this provision have also been satisfied: (i) The dispute was raised by a national or a company of a Contracting Party to the Treaty (company incorporated in France) against the other Contracting Party (Venezuela); (ii) a notice of dispute (4 July 2011) was sent at least six months before submission of the dispute to arbitration (25 April 2012) and no amicable settlement has been reached during that time period; and (iii) the dispute under the Treaty has not been submitted to Venezuelan courts by the national or company.[331]

360. Claimant gave its consent in its notice of dispute dated 4 July 2011, which was, *inter alia*, addressed to the President of Venezuela, and reiterated this consent in its second letter to the President dated 17 January 2012.[332]

361. As a result, the Tribunal concludes that the requirements of Article 25(1) ICSID Convention have been satisfied and that it has jurisdiction to decide over the dispute submitted to it.

---

[327] Memorial, ¶¶ 117-118; RfA, ¶ 66.
[328] Memorial, ¶ 114.
[329] Memorial, ¶¶ 126, 128.
[330] Memorial, ¶ 126; RfA, ¶ 69.
[331] *Cf.* Memorial, ¶¶ 120-121; RfA, ¶¶ 72-73.
[332] Memorial, ¶ 127; RfA, ¶ 69. **Exhibits C-42** and **C-44**.

## II.    ADMISSIBILITY

362.    Respondent raises objections with regard to the admissibility of the following two claims raised by Claimant in these proceedings: (i) that, by virtue of the increase of the bauxite price that had initially been agreed upon in the Bauxite Contract between Claimant and CVG Bauxilum, Respondent failed to accord to Claimant fair and equitable treatment pursuant to Article 3(1) of the Treaty and to protect and secure Claimant's investment pursuant to Article 3(2) of the Treaty (the "**Bauxite Claims**");[333] and (ii) that Respondent acted "*contrary to a particular agreement*" within the meaning of Article 5(1) subparagraph 1 of the Treaty.[334]

### 1.    Bauxite Claims

#### a)    Summary of Respondent's Position

363.    Respondent submits that the Bauxite Claims are inadmissible. Even if Claimant could establish that the bauxite prices were increased in breach of the Bauxite Contract, this could not, in itself, give rise to the responsibility of Respondent under international law given that it is not party to the Bauxite Contract.[335] Respondent claims that Claimant is unable to identify any legal instrument entered into with the State, or any relevant act on the part of the State, on which it can base its Bauxite Claims.[336]

364.    In particular, Respondent contends that the price increases invoked by CVG Bauxilum are not attributable to Respondent under the ILC Draft Articles.[337] Respondent argues that CVG Bauxilum, which has a legal personality distinct from that of Respondent and does not wield any executive power under Venezuelan law, cannot be considered as a State organ within the meaning of Article 4 of the ILC Draft Articles. Respondent further submits that CVG Bauxilum did not exercise governmental authority pursuant to Article 5 of the ILC Draft Articles because, while acting as a commercial company in the mining sector for the benefit of Respondent, it neither possesses nor exercises governmental authority when carrying out its activities.[338]

365.    Finally, Respondent argues that CVG Bauxilum did not act on the instructions, or under the direction or control, of Respondent within the meaning of Article 8 of the ILC Draft Articles; even though CVG Bauxilum is ultimately subject to the administrative oversight

---

[333] Memorial, ¶¶ 165-177; 190-194.
[334] Claimant's Post-Hearing Submission, ¶¶ 38-47.
[335] Counter-Memorial, ¶¶ 73-74; Respondent's Post-Hearing Brief, ¶¶ 125-126.
[336] Rejoinder, ¶ 78.
[337] Counter-Memorial, ¶¶ 76-106; Respondent's Post-Hearing Brief, ¶¶ 125-126.
[338] Counter-Memorial, ¶¶ 84, 89.

("*tutela*") of MIBAM, this is not sufficient for establishing direct State control within the meaning of Article 8 of the ILC Draft Articles.[339]

### b)    Summary of Claimant's Position

366. Claimant submits that the arguments raised by Respondent do not affect the admissibility of the Bauxite Claims, but are rather related to the merits of the case. Claimant contends that admissibility merely concerns "*whether the claim, as presented, can or should be resolved by an international tribunal, which otherwise has found jurisdiction.*"[340] Claimant emphasizes that its Bauxite Claims are not based on the Bauxite Contract as such, but rather on Respondent's breaches of the Treaty, and are therefore "*analytically distinct*" from any claim that Norpro Venezuela could have brought under the Bauxite Contract.[341]

367. Claimant refers to its position that during the negotiation of the Bauxite Contract, Venezuela made it clear that "*it controlled CVG Bauxilum and that all material decisions concerning the conduct of CVG Bauxilum would be made at the ministerial level.*" Claimant submits that its Bauxite Claims are based on the fact that CVG Bauxilum's conduct was either sanctioned or could have been prevented by the competent ministry; therefore, they are claims for breach of the Treaty.[342]

### c)    The Tribunal's Analysis

368. On the admissibility level, the Tribunal's analysis is limited to the question whether "*it cannot be ruled out, at least prima facie,*" that the alleged conduct of Respondent with respect to Claimant's rights under the Bauxite Contract is, "*if proven,*" capable of falling within the scope of Respondent's obligations under the Treaty.[343]

369. The Tribunal notes that Respondent's objections to the admissibility of the Bauxite Claims are related, to a certain extent, to the common and important distinction between treaty claims and contract claims. This distinction is particularly relevant in cases where the investor enters into contractual relations directly with the State; in these cases, the investor's contractual rights may very well fall within the scope of a bilateral investment treaty. However, the same distinction may also play a role in case such a contractual relationship has been entered into with a State-owned entity, as is the case here.

---

[339] Counter-Memorial, ¶¶ 104-105.
[340] Reply, ¶ 67, citing from V. Heiskanen, *Jurisdiction, Admissibility, and Competence in Investment Treaty Arbitration*, ICSID Review (2013), **CLA-126**, p. 237.
[341] Reply, ¶ 67.
[342] Reply, ¶ 68.
[343] Citations from *Bayindir v. Pakistan*, ¶ 246. **Exhibit CLA-009**. Arbitrator Bottini would favor a broader definition of admissibility, under which the Bauxite Claims could be dealt with as an admissibility matter. Yet given the Tribunal's decision on these claims, he thinks that nothing turns on this observation.

370. Tribunals in investment treaty disputes are often called upon to clearly distinguish between mere contract violations and treaty violations. In this regard, Respondent correctly pointed to the holding of the tribunal in *Bayindir v. Pakistan:*

> "[B]*ecause a treaty breach is different from a contract violation, the Tribunal considers that the Claimant must establish a breach different in nature from a simple contract violation, in other words one which the State commits in the exercise of its sovereign power.*"[344]

371. While Claimant does contend in the present case that, *inter alia*, CVG Bauxilum was acting in breach of the Bauxite Contract and that such conduct is attributable to Respondent,[345] it does not claim that the alleged breach of contract as such constituted, at the same time, a breach of the Treaty. Claimant rather argues that Respondent had a monopoly over the production and sale of bauxite in Venezuela, which is why Norpro Venezuela did not have a choice but to accept the newly imposed terms.[346] In addition, Claimant claims that Respondent made "*specific promises*" and "*commitments*" and thereby "*created specific expectations,*" which Claimant relied on in making its investments, and further claims that Respondent "*repudiated these expectations, failing to address […] CVG Bauxilum's actions in raising the bauxite price.*"[347]

372. Based on these allegations, Claimant contends that Respondent breached its obligations under Article 3(1) of the Treaty (Fair and Equitable Treatment) and Article 3(2) of the Treaty (Full Protection and Security).[348]

373. For the purpose of deciding on the admissibility of the Bauxite Claims, the Tribunal will "*accept pro tem the facts as alleged*" by Claimant "*to be true,*"[349] *i.e.*, that Respondent indeed made specific promises and commitments to Claimant with regard to the Bauxite Contract, which went beyond general incentives offered in order to promote a general investor-friendly environment. On this basis, the Tribunal finds that, *prima facie*, the alleged conduct of Respondent does fall within the scope of its obligations to ensure fair and equitable treatment under Article 3(1) of the Treaty and to grant full protection and security under Article 3(2) of the Treaty. Whether or not the Respondent in fact made any such promises or commitments will be discussed in the merits section of the present decision.

---

[344] Respondent's Post-Hearing Brief, ¶ 135 (note 288). *Bayindir v. Pakistan,* ¶ 180. **Exhibit CLA-009**.
[345] Memorial, ¶ 169 and ¶¶ 173 *et seq*.
[346] Memorial, ¶ 171.
[347] Reply-Memorial, ¶ 120; Claimant's Post-Hearing Submission, ¶ 80.
[348] Reply-Memorial, ¶¶ 122, 137-142.
[349] Citations from *Case Concerning Oil Platforms (Islamic Republic of Iran v US)*, Separate Opinion of Judge Higgins on Preliminary Objections of 12 December 1996, (1996) ICJ Reports, 847 (856). **Exhibit CLA-017**.

### 2.   Claim Relating to Article 5(1) Subparagraph 1 of the Treaty

374.  During the Hearing and in its Post-Hearing Submissions, Claimant argues that Respondent was in breach not only of the Article 5(1) subparagraphs 2 and 3 of the Treaty, but also of subparagraph 1. Specifically, Claimant contends, first, that the expropriation was not pursuant to a "*measure*" ("*mesures*"/"*medidas*") and, second, that it violated a "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*").[350]

**a)   Summary of Respondent's Position**

375.  Respondent submits that the claim relating to Article 5(1) subparagraph 1 of the Treaty should be dismissed. Respondent argues that Claimant never raised its "*new, untimely, theory*" with regard to subparagraph 1 prior to the Hearing – neither in its Memorial, nor in its Reply, nor during the pre-hearing conference or in any pre-hearing request. Respondent contends that Claimant's change of position is therefore in conflict with Rule 31(3) of the ICSID Arbitration Rules.[351]

376.  In particular, Respondent contests that this claim has been triggered by a change of position in its Rejoinder and emphasizes that, already in its Counter-Memorial, it took the position that the expropriation took place when the Decree was issued on 29 March 2011, as Claimant recognized in its summary of the "*Facts in Dispute*" in its Reply.[352]

**b)   Summary of Claimant's Position**

377.  Claimant argues that its arguments relating to Article 5(1) subparagraph 1 of the Treaty were informed by the fact that, for the first time in its Rejoinder, Respondent raised the argument "*that what happened between May of 2010 and March of 2011 was not the expropriation, and that the expropriation only occurred in* [March] *of 2011.*"[353]

378.  Claimant further claims that its claim is "*neither new nor untimely*" because Claimant never limited its expropriation claim to the argument that there was a lack of compensation. Rather, Claimant had raised the argument that the expropriation was not carried out in fair and equitable manner and failed to accord Claimant due process from the outset of the proceedings.[354]

---

[350] Transcript (Day 1), p. 22 line 19 – p. 23 line 8; p. 309 line 17 – p. 311 line 21; Claimant's Post-Hearing Submission, ¶¶ 38-47.

[351] Respondent's Post-Hearing Brief, ¶¶ 4, 21-23.

[352] Respondent's Post-Hearing Brief, ¶ 6 referring to Counter-Memorial, ¶ 2 and Reply, ¶ 9(c).

[353] Transcript (Day 3), p. 881 lines 18-21.

[354] Claimant's Second Post-Hearing Submission, ¶¶ 30, 44-45 referring to Memorial, ¶¶ 180-184 and Reply, ¶¶ 89-95, 125-130.

379. Finally, Claimant argues that even if it had raised a new claim during the Hearing, Respondent failed to establish "*why this is problematic*." According to Claimant, Rule 31(3) of the ICSID Arbitration Rules "*assumes some natural evolution of argument*" in the course of the proceedings. In addition, Claimant notes that Respondent had the opportunity to present its views in its opening statement and throughout the Hearing as well in its two Post-Hearing Briefs.[355]

### c) The Tribunal's Analysis

380. The Tribunal is aware that the provisions relating to written submissions contained in Rule 31 of the ICSID Arbitration Rules are closely related to a party's fundamental procedural right to be heard. Rule 31(3) provides in this regard:

> "*A memorial shall contain: a statement of the relevant facts; a statement of law; and the submissions. A counter-memorial, reply or rejoinder shall contain an admission or denial of the facts stated in the last previous pleading; any additional facts, if necessary; observations concerning the statement of law in the last previous pleading; a statement of law in answer thereto; and the submissions.*"

381. In this case, each of the Parties claims that the other Party raised, at an advanced stage of the proceedings, a new issue which was not part of the other Party's earlier submissions, and that it should have the opportunity to duly respond to the new issue.

382. In order to give full effect to the Parties' procedural rights, the Tribunal suggested, at the end of the Hearing, that there should be two rounds of post-hearing submissions.[356] This way, both Parties had the opportunity to react to what they considered to be a new position of the other Party, and to respond to the other Party's reaction. The Tribunal also suggested that there should be no fixed page limits for the post-hearing submissions so that each Party could elaborate on the issues as they saw fit, but both Parties preferred to have, and agreed on, page limits for both submissions.[357]

383. For this reason, the Tribunal finds that, even though it may have been rather late for Claimant to raise a claim relating to Article 5(1) subparagraph 1 of the Treaty at the Hearing, both Parties had sufficient opportunity to react to, and elaborate on, the positions of the other Party as part of their post-hearing submissions. Therefore, the Tribunal does not consider it appropriate to reject this claim without considering whether it has legal merit.

## III. BREACH OF THE TREATY

---

[355] Claimant's Second Post-Hearing Submission, ¶¶ 46-48.
[356] Transcript (Day 4), p. 1267 line 17 – p. 1268 line 4.
[357] Transcript (Day 4) p. 1268 line 15 – p. 1269 line 21.

384. In the following, the Tribunal will consider whether or not Respondent was in breach of the Treaty. Claimant submits that Respondent committed breaches of

- Article 5(1) of the Treaty with respect to its obligations regarding expropriation (**1.**);
- Article 3(1) of the Treaty with respect to its obligation to fair and equitable treatment (**2.**); and
- Article 3(2) of the Treaty with respect to its obligation to grant full protection and security (**3.**).

## 1.    Expropriation (Article 5(1) of the Treaty)

385. Claimant submits that Respondent was in breach of the Article 5(1) subparagraph 1 of the Treaty (**a)**) as well as subparagraphs 2 and 3 of the same provision (**b)**).

### a)    Breach of Article 5(1) Subparagraph 1 of the Treaty

#### aa)    Summary of Claimant's Position

386. Claimant's argumentation with respect to its claim relating to Article 5(1) subparagraph 1 of the Treaty is twofold:

387. First, Claimant submits that the expropriation was not pursuant to a "*measure.*" According to Claimant, a "*measure*" of expropriation or nationalization within the meaning of Article 5(1) subparagraph 1 of the Treaty has to consist of "*any type of administrative, legislative or judicial act, taken by any of the powers that form the Bolivarian Republic,*" and that there was no such formal act in the present case until Respondent issued the Expropriation Decree in March 2011. According to Claimant, a State that takes property without any legal instrument supporting such expropriation is not expropriating pursuant to a measure, and thus not in accordance with any notion of due process.[358]

388. Second, Claimant contends that the expropriation of the plant was not in line with Respondent's obligation under Article 3(1) of the Treaty to treat Claimant's investment fairly and equitably and hence violated a "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*") within the meaning of Article 5(1) subparagraph 1 of the Treaty.[359] In particular, Claimant submits that Respondent "*took the Plant in direct violation of Saint-Gobain's due process rights*" and "*without a measure of any kind establishing a legal framework for the expropriation or an effort to engage in good faith*

---

[358] Claimant's Post-Hearing Submission, ¶ 39, citing from *OI European Group v. Venezuela* ¶ 324. **Exhibit CLA-156** (free translation).
[359] Claimant's Post-Hearing Submission, ¶¶ 40-47.

*negotiations concerning compensation.*" Claimant contends that the expropriation was hence unlawful.[360]

### bb)    Summary of Respondent's Position

389.    Respondent submits that the claim relating to Article 5(1) subparagraph 1 of the Treaty is without legal merit. With regard to Claimant's argument relating to the term "*measure,*" Respondent argues that the term "*has a far broader meaning than that suggested by Claimant*" and alleges that even if, contrary to Respondent's position, President Chávez' TV announcement were to constitute the expropriation, it would constitute a "*measure*" under the Treaty and international law.[361]

390.    Respondent further argues that the reference to a "*particular agreement*" ("*engagement particulier*"/"*compromiso especial*") is "*not intended to mean the Treaty itself, but rather an agreement external to the Treaty.*" In this regard, Respondent notes that Claimant did not cite any legal precedent for its position and emphasizes that in the sole case cited by Claimant in this regard, the tribunal had to decide on a treaty provision, which – unlike Article 5(1) subparagraph 1 of the Treaty – explicitly included the requirement that the expropriation be "*carried out under due process of law*" as a condition of the lawfulness of an expropriation.[362]

391.    In support of its position, Respondent further refers to: (i) the use of the term "*agreement*" ("*accord*"/"*accuerdo*") where the Treaty refers to itself; (ii) the distinct use of the term "*particular agreement*" ("*engagement particulier*"/"*compromiso particuliar*") for an external agreement in Article 10 of the Treaty; and (iii) the language of other investment treaties, which state explicitly that the expropriation has to be carried out in accordance with other substantive provisions of the treaty in question.[363]

### cc)    The Tribunal's Analysis

392.    In deciding on this first claim for breach of the Treaty, the Tribunal will examine Article 5(1) subparagraph 1 of the Treaty in light of its wording and its context within the Treaty. In the French and Spanish original versions, the provision reads as follows:

---

[360] Claimant's Post-Hearing Submission, ¶ 42 citing the tribunal in *Kardassopoulos v. Georgia*, ¶ 396. **Exhibit CLA-046**.
[361] Respondent's Post-Hearing Brief, ¶ 29 (note 40); Respondent's Post-Hearing Reply Brief, ¶ 7.
[362] Respondent's Post-Hearing Reply Brief, ¶¶ 8-9 referring to *Kardassopoulos v. Georgia*, ¶ 386. **Exhibit CLA-46**.
[363] Respondent's Post-Hearing Brief, ¶¶ 25-27.

"*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*"[364]

"*Las Partes Contratantes no adoptarán medidas de expropriación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*"[365]

393. The English translation submitted by Claimant reads:

"*The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement.*"[366]

394. With regard to the first argument advanced by Claimant, the Tribunal is of the view that the term "*measures*" ("*mesures*"/"*medidas*") of expropriation or nationalization referred to in Article 5(1) subparagraph 1 of the Treaty does not in itself constitute any requirement as to the lawfulness of the expropriation or nationalization, but is rather meant to include all acts or omissions by the State that could amount to expropriatory conduct. The Tribunal agrees with the description given by the ICJ in the Fisheries Jurisdiction Case:

"[I]*n its ordinary sense the word is wide enough to cover any acts, step or proceedings, and imposes no particular limit on their material content or on the aim pursued thereby.*"[367]

395. As a result, the Tribunal considers that a breach of Article 5(1) subparagraph 1 of the Treaty cannot result from a State's failure to act in the form of a "*measure,*" but only from a failure to observe the three substantive requirements of that subparagraph, *i.e.*, that the

---

[364] *Journal Officiel de la République Française nº102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.

[365] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

[366] Free translation submitted in **Exhibit C-1**.

[367] Cited in *Saluka v. Czech Republic*, ¶ 459. **Exhibit CLA-071**.

measure must be justified by a public purpose, be non-discriminatory and not be in conflict with any particular undertaking or agreement.

396. With respect to the meaning of the term "*particular agreement*" or "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*"),[368] the Tribunal is not convinced by Claimant's interpretation pursuant to which the term includes undertakings both external and internal to the Treaty. Pursuant to Article 31(1) of the Vienna Convention, which both Parties refer to in relation to the interpretation of the Treaty provisions, Article 5(1) of the Treaty should "*be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[369] In the Tribunal's view, the ordinary meaning of the attributes "*particulier*" and "*especial*" in connnection with an "*engagement*" or "*compromiso*" entails a reference to obligations arising from agreements distinct from, or external to, the Treaty.

397. As correctly pointed out by Respondent, this understanding is confirmed by the language used in Article 10 of the Treaty (which forms part of the context of Article 5(1), in accordance with Article 31(2) of the Vienna Convention):

| "*Les investissements ayant fait l'objet d'un engagement particulier de l'une des Parties contractantes à l'égard des nationaux et sociétés de l'autre Partie contractante sont régis, sans préjudice des dispositions du présent accord, par les termes de cet engagement dans la mesure où celui-ci comporte des dispositions plus favorable que celles qui sont prévues par le présent accord.*"[370] | "*Las inversiones que hubiesen sido objeto de un compromiso particular de una de las Partes Contratantes referente a nacionales y sociedades de la otra Parte Contratante serán administradas, sin perjuicio de las disposiciones del presente Convenio, por los términos de este compromiso en caso que este incluya disposiciones más favorables que las previstas por el presente Convenio.*"[371] |

---

[368] The Parties agree that a more precise translation of the terms used in the Spanish and French texts would be "*particular undertaking,*" "*specific undertaking*" or "*specific commitment.*" Claimant's Post-Hearing Submission, ¶ 38 (note 109); Respondent's Post-Hearing Brief, ¶ 24 (note 35). However, none of the Parties has made an argument that any of these translation would have resulted in a different meaning of the term. In fact, Claimant stated at the Hearing and again in its Post-Hearing Submission that "*it's a distinction without a difference.*" Transcript (Day), p. 147 line 10; Claimant's Post-Hearing Submission, ¶ 40 (note 113).

[369] **Exhibit CLA-086**, Article 31(1).

[370] *Journal Officiel de la République Française nº102 du 30 avril 2004*. **Exhibit C-1**, p. 7776.

[371] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*. **Exhibit C-1**, p. 332.354.

398.   While the Tribunal notes that the wording of Article 5(1) subparagraph 1 and that of Article 10 of the Treaty are not entirely identical in the Spanish version because Article 10 refers to "*compromiso particular*" instead of "*compromiso especial,*" the wording of the French version is indeed identical ("*engagement particulier*"). In the context of Article 10, these terms clearly refer to an agreement external to the Treaty, which applies to the investment if the agreement contains more favorable provisions than the Treaty itself, the Treaty being referred to as "*présent accord*" and "*presente Convenio.*"  In the Tribunal's view, there is no reason in this case to assume that the Contracting Parties to the Treaty intended to assign different meanings to the same (or in the Spanish text, very similar) term in the two provisions.

399.   Finally, Respondent correctly pointed out that Contracting States that wish to make the lawfulness of an expropriation subject to the satisfaction of other substantive provisions of the BIT, in particular the requirement to carry out the expropriation in accordance with due process, usually include an explicit requirement to this effect in the expropriation provision. For example, in the case cited by Claimant, *Kardassopoulos v. Georgia*, the tribunal's finding was based on Article 13 of the Energy Charter Treaty, which states:

> "*Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subject to a measure or measures having effect equivalent to nationalization or expropriation* […] *except where such Expropriation is:* […] *(c) carried under due process of law.*"[372]

400.   In the present case, the Contracting Parties did not include such a requirement in Article 5(1) subparagraph 1 of the Treaty (or any other subparagraph or paragraph of Article 5); thus, there is no indication that the contracting Parties nevertheless intended to make the lawfulness of an expropriation subject to the compliance with due process. It rather appears that any breach of an investor's right to be accorded due process, which is included in the FET standard (*see* in more detail below), was to be addressed within the context of Article 3(1) of the Treaty, but was not meant to affect the lawfulness of the expropriation.

401.   Therefore, the Tribunal finds that the term "*particular agreement*" or "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*") does not include a reference to other substantive provisions of the Treaty itself, but only to agreements, which are distinct from the Treaty. Given that Claimant does not invoke a breach of any such agreement, apart from the Treaty provisions itself,[373] the Tribunal concludes that Respondent has not breached Article 5(1) subparagraph 1 of the Treaty.

---

[372] *Kardassopoulos v. Georgia*, ¶ 386. **Exhibit CLA-046**.
[373] Transcript (Day 1), p. 312 lines 20-22.

    **b)**    **Breach of Article 5(1) Subparagraphs 2 and 3 of the Treaty**

402.    The Tribunal will now turn to the second claim for breach of the Treaty. It is Claimant's position that Respondent violated its obligations under Article 5(1) subparagraphs 2 and 3 of the Treaty with respect to the requirement of prompt compensation and the specification of the amount and method of payment. In its analysis, the Tribunal will first determine the precise scope and content of Respondent's Treaty obligations (**aa)**); the Tribunal will then assess whether or not Repondent complied with these requirements (**bb**)) and finally determine whether its finding has any impact on the lawfulness of the expropriation (**cc**)).

**aa)**    **The Scope of Respondent's Obligation to Pay "*Prompt*" Compensation and to Specify the "*Amount and Method of Payment*" for Compensation**

        **(i)**    **Summary of Claimant's Position**

403.    It is Claimant's position that the requirements of Article 5(1) subparagraphs 2 and 3 of the Treaty must be accorded their plain meaning.[374] Claimant contends that the Treaty is very specific about the requirement that an expropriation be accompanied by "*prompt*" compensation, given that it provides that "*the amount and method of payment for compensation should be specified on the date of expropriation at the latest*" and "*payments shall be made without delay.*"[375] In Claimant's view, this leaves no room for doubt as to the interpretation of the prompt compensation requirement.[376]

404.    Claimant refers to the decisions of other international tribunals in order to demonstrate that the promptness requirement is a well-established principle of international law. For example, in *Norwegian Shipowners*, the tribunal spoke of "*the right of the claimants to receive immediate and full compensation,*" holding that "*full compensation should have been paid, including loss of progress payments, etc., at the latest on the day of the effective taking [...].*"[377] In *Goldenberg,* the tribunal held that, while international law authorizes the State to interfere with private property when the public interest so requires, "*it does so on the condition sine qua non that fair payment shall be made for the expropriated or requisitioned property as quickly as possible.*"[378]

405.    Claimant therefore submits that payment of compensation should be "*contemporaneous with a taking*" or should at least "*follow it as quickly as possible,*" and that "*the passage*

---

[374] Claimant's Post-Hearing Submission, ¶ 51.
[375] Memorial, ¶ 137; **Exhibit C-1**.
[376] Reply, ¶ 75.
[377] Memorial, ¶ 138; **Exhibit CLA-057**.
[378] Memorial, ¶ 139; **Exhibit CLA-040**.

*of several months after the taking without the furnishing by the State of any real indication that compensation would shortly be forthcoming would raise serious doubt that the State intended to make prompt compensation at all.*"[379]

406.  In particular, Claimant contends that the specification requirement is not met by the mere existence of, or reference to, a certain expropriation procedure in domestic law.[380] Claimant further rejects the proposition that "*a sovereign's obligation to make adequate provision for just compensation in due time*" can be satisfied under international law "*by its mere willingness to discuss the possibility of a compromise. To so rule is to deprive the obligation of any meaning.*"[381]

407.  In relation to the discussion of an *empresa mixta* arrangement, Claimant contends that this "*lacked sufficient details to be considered adequate negotiation of compensation terms.*" Claimant refers to Mr. Millot's testimony during the Hearing that Claimant understood this to be a "*suggestion*" rather than a "*concrete proposal*" because it was unsupported by documentation that Claimant never received, in particular as regards any compensation for the loss of Claimant's 100% ownership in Norpro Venezuela.[382]

### (ii)    Summary of Respondent's Position

408.  With regard to the specification requirement, it is Respondent's position that the provisions contained in Article 5(1) subparagraphs 2 and 3 of the Treaty have to be read in conjunction and should be interpreted to mean that "*compensation shall be assessed so that the amount is equal to the* 'actual value' *of the investments as of the date set forth in the second sentence of the second paragraph of Article 5(1) and that as of the* 'date of expropriation at the latest,' *the expropriating party shall acknowledge its obligation to make payment in such equivalent amount and establish the modalities of payment.*"[383]

409.  Respondent contends that clauses such as Article 5(1) of the Treaty merely require that "*the law or the expropriation decision mention the criteria and procedures that will allow to assess compensation.*"[384]

---

[379] Memorial, ¶ 139, citing from L. B. Sohn and R. R. Baxter, *Responsibility of States for Injuries to the Economic Interests of Aliens*, 55 AMERICAN JOURNAL OF INTERNATIONAL LAW 545, 558 (1961), **Exhibit CLA-079**.

[380] Reply-Memorial, ¶ 83.

[381] Claimant's Post-Hearing Submission, ¶ 55, citing from *Amoco v. Iran*, p. 83 (concurring, J. Brower). **Exhibit CLA-004.**

[382] Claimant's Post-Hearing Submission, ¶ 56 citing from Transcript (Day 2) p. 418 line 13 – p. 419 line 9, p. 420 lines 5-9.

[383] Repondent's Post-Hearing Brief, ¶ 82.

[384] Rejoinder, ¶ 156, citing from J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, p. 207, **Exhibit RL-155**.

410. With regard to Claimant's interpretation of Article 5(1) subparagraphs 2 and 3 of the Treaty that the precise figure constituting the "*amount*" must be determined on the date an intention to expropriate is announced, Respondent makes two arguments. First, Respondent refers to Article 31(1) of the Vienna Convention and alleges that asking for a specified figure on the date of expropriation is "*not a good faith interpretation and cannot be correct, as it would establish an obligation that the Contracting States could not satisfy except by pure chance.*" Respondent further points out that the Treaty does not require that the State "*must, before it announces an expropriation, engage in discussions with the expropriated entity to obtain the facts necessary to determine the precise figure that equates to the actual value of the assets in question*" and that "*without such information, it would be impossible […] to determine that figure in good faith.*"[385]

411. Second, Respondent contends that an interpretation as proposed by Claimant would lead to "*manifestly absurd or unreasonable*" results and hence would conflict with Article 32 lit. b) of the Vienna Convention, as neither French nor Venezuelan expropriation law requires compensation to be determined at the time the expropriation process is initiated – which would place each of the Contracting States in breach of their Treaty obligations.[386]

412. Against this background, Respondent suggests what is, in its view, more reasonable interpretation of the word "*amount,*" which does not refer to a "*precise dollar or Euro figure, but rather to the required concept (i.e., a* 'sum […] equal to the actual value of the investments'*).*"[387]

413. With respect to the promptness requirement, Respondent submits that neither the case law cited by Claimant nor, by its clear terms, Article 5(1) of the Treaty require the State to pay compensation to the investor on the date of the expropriation. While subparagraph 2 provides that "[a]*ll measures of expropriation which could be taken must result in payment of a prompt and adequate compensation,*" it is only subparagraph 3, which requires that, after compensation has been determined, "*payments shall be made without delay.*"[388] In determining whether or not payment of "*prompt and adequate compensation*" is made "*without delay,*" "*the particularities of each national legislation, the eventual delays caused by internal remedies, and the specificity of each situation*" are to be taken into account.[389] Further, Respondent argues that it should be taken into consideration whether

[385] Respondent's Post-Hearing Brief, ¶¶ 83-84.
[386] Respondent's Post-Hearing Brief, ¶ 87.
[387] Respondent's Post-Hearing Brief, ¶ 83.
[388] Counter-Memorial, ¶ 167; Rejoinder, ¶ 155.
[389] Rejoinder, ¶ 157, citing from J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, p. 207, **Exhibit RL-155**.

the "*State has made good faith efforts to comply with its obligation to pay compensation.*"[390]

### (iii)   The Tribunal's Analysis

414.   The Tribunal has considered all arguments made by the Parties in their submissions, in particular, but not exclusively, the arguments summarized above. In determining the precise requirements with respect to compensation under Article 5(1) subparagraphs 2 and 3 of the Treaty, the Tribunal will first and foremost take into account the wording of the Treaty provisions and their systematic context.

415.   In the French and Spanish original versions, Article 5(1) subparagraphs 2 and 3 of the Treaty read:

"*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié.*"[391]

"*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación econonómica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado.*"[392]

---

[390] Rejoinder, ¶ 158, citing from S. Ripinsky, DAMAGES IN INTERNATIONAL INVESTMENT LAW 68 (2008), pp. 68-69, **Exhibit CLA-140**.

[391] *Journal Officiel de la République Française nº102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.

[392] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

416.  The English translation from the French text submitted by Claimant reads as follows:

> "*All measures of expropriation which could be taken must result in payment of a prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*
>
> *The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment.*"[393]

417.  The Tribunal notes that the Treaty requires not only the payment of "*prompt"* compensation, but according to the unusually strict wording of subparagraph 3, that the amount for compensation ("[c]*ette indemnité, son montant*"/"[e]*sa indemnización, su monto*") be specified – or more precisely: fixed ("*fixés*"/"*fijados*") – on the date of expropriation at the latest. The ordinary meaning of the language used in subparagraph 3 suggests that the expropriating State indeed has to indicate a specified figure constituting the amount of compensation at the time of the expropriation; there is no indication that the term "*amount*" ("*montant*"/"*monto*") refers only to a certain concept or method of calculation. The sole reference to "*method*" ("*modalités*"/"*modalidades*") in subparagraph 3 is made with respect to "*payment*" ("*versement*"/"*pago*"), implying that "*payment of a prompt and adequate compensation*" ("*paiement d'une indemnité prompte et adéquate*"/"*pago de una pronta y adecuada indemnización*") as referred to in subparagraph 2 does not require payment to be made to the investor on the very date of the expropriation.

418.  While the Tribunal agrees with Respondent that subparagraph 3 has to be read in conjunction with subparagraph 2, which indeed provides more details as to the calculation of the compensation ("*d'une indemnité prompte et adéquate dont le montant* […]"/"*una pronta y adecuada indemnización cuyo monto* […]"), this connection does not imply in any way that the term "*amount*" ("*montant*"/"*monto*") in subparagraph 3 has to be interpreted restrictively in terms of requiring only an acknowledgment of the applicable concept of compensation. Rather, subparagraph 3 contains a more precise specification further to the widely used term "*prompt*" ("*prompte*"/"*pronta*") in subparagraph 2.

419.  In light of the unambiguous wording and structure of Article 5(1) subparagraphs 2 and 3 of the Treaty, the Tribunal finds that, *prima facie*, subparagraph 3 required Respondent to specify a precise figure constituting the "*amount*" ("*montant*"/"*monto*") of compensation at the time of the expropriation. Subsequently, the amount of compensation as fixed

---

[393] **Exhibit C-1**, p. 7775.

("*fixés*"/"*fijados*") on the date of expropriation had to be paid "*without delay*" ("*sans retard*"/"*sin retraso*"). Only if both of these requirements were satisfied, the compensation could be considered "*prompt*" within the specific meaning intended by the Contracting Parties in to Article 5(1) subparagraph 2 of the Treaty.

420. As indicated above, Respondent raised objections to this interpretation of Article 5(1) of the Treaty. The Tribunal considers, however, that none of these objections is compelling. In particular, to require the State to specify a certain figure constituting the amount of compensation on the date of the expropriation neither contravenes the principle of good faith interpretation as set out in Article 31(1) of the Vienna Convention, nor does it lead to "*manifestly absurd or unreasonable*" results within the meaning of Article 32 lit. b) of the Vienna Convention.

421. The requirement of fixing the exact amount of compensation on the date of expropriation is not an absurd ambition, as Respondent intends to demonstrate. While the Tribunal agrees with Respondent that the date of the expropriation (*i.e.*, the formal expropriation decision and/or seizure of the asset) does not (necessarily) correspond to the date on which the expropriation procedure is initiated,[394] this does not mean that the State may *de facto* take the property of the investor in the meantime and thereby circumvent the provision of the Treaty. In many jurisdictions, including France and Venezuela as Respondent correctly pointed out, the formal expropriation decision and the taking of the asset do not commence but rather occur only at the end of the expropriation procedure. In the course of such an expropriation procedure, the State usually asserts and ensures that the requirements of a lawful expropriation are met, including the verification of a sufficient public purpose as well as the fixation of an adequate amount for compensation, based on a proper valuation of the asset.

422. In the Tribunal's view, it is apparent that the drafters of Article 5(1) subparagraph 3 of the Treaty indeed envisaged such a design of the expropriation procedure as it is in place in both Contracting States. This does not mean, however, that the term "*amount*" refers only to the concept to be applied in the course of such an expropriation procedure, but rather that the expropriation procedure has to be carried out prior to the taking of the asset.

423. The fact that the Treaty does not provide for detailed procedural rules as to how the expropriating State shall obtain the facts necessary to determine the precise figure to be fixed on the date of the expropriation does not conflict with the proposed interpretation of Article 5(1) of the Treaty. Subparagraphs 2 and 3 merely stipulate the fundamental requirements, which have to be met in case of an expropriation. The Treaty is not designed to establish a detailed expropriation procedure. Rather, it is up to the Contracting States

---

[394] *Cf.* Respondent's Post-Hearing Brief, ¶ 87 (with note 187).

to ensure that the expropriation proceedings are conducted in conformity with the fundamental Treaty requirements.

424. In this regard, the Tribunal is of the view that it does not have to examine whether Venezuelan law actually implements a standard expropriation procedure as set out in Article 5(1) of the Treaty. First, Claimant has not raised a claim that the Expropriation Law does not conform to the requirements of the Treaty. In addition, any agreement in bilateral investment treaties would be redundant if the Parties were only to agree on protection standards which are already part of their respective legal systems. Interpreting Article 5(1) of the Treaty as providing stricter expropriation standards than the Venezuelan Expropriation Law (and possibly also the French equivalent) would therefore not produce "*manifestly absurd or unreasonable*" results within the meaning of Article 32 lit. b) of the Vienna Convention.

425. In conclusion, the Tribunal finds that the compensation requirements set out in Article 5(1) subparagraphs 2 and 3 required the Respondent to specify a precise figure constituting the amount of compensation on the date of the expropriation.

### bb)   Compliance with, or breach of, the Compensation Requirements

426. Whether or not Respondent complied with the requirements set out in Article 5(1) subparagraphs 2 and 3 of the Treaty depends, to a certain extent, on the date on which the expropriation of the plant took place, *i.e.*, the date of expropriation within the meaning of subparagraph 3. This question will hence be examined first (**i**). On this basis, Respondent's conduct will then be assessed (**ii**).

### (i)   Date of Expropriation of the Plant

427. The Parties' positions differ as to the date on which the expropriation of the plant occurred. In particular, it is in dispute whether the expropriation was effected only once the Expropriation Decree was formally issued or whether the takeover of the plant on 15 May 2010 already amounted to an expropriation within the meaning of the Treaty. Although the Parties exclusively deal with this issue as a matter of facts, it appears that it also involves questions of law.

### (1)    Summary of Claimant's Position

428. It is Claimant's position that the expropriation with respect to the plant was effected on 15 May 2010. Claimant submits that the takeover following President Chávez' announcement and the subsequent active management of the plant by PDVSA amounted to an expropriation within the meaning of Article 5(1) of the Treaty.[395]

429. Claimant submits that, following the one-day takeover of the plant on 24 March 2010, it was President Chávez' announcement that caused local workers to take over the plant on 15 May 2010, the effect of which was to force out Norpro Venezuela's management. Further, Claimant submits that there were politicians among those who effected the plant takeover – National Assemblyman Ángel Marcano, the President of the Sub-commission on Basic Industries, and Representative Asdrúbal López, the President of the Commission on Social Development – acting on behalf of the State and pursuant to the instructions of the President. Therefore it was President Chávez who practically "*commanded the takeover of the Plant by union members and sympathizers*" on 15 May 2010.[396] As Claimant never regained control of its investment after that date, the Expropriation Decree published on 29 March 2011 simply formally notified what the Government had already effected.[397]

430. With respect to the status of the plant after these events, Claimant contends that PDVSA took control over the plant in order to "*coordinate the expropriation process.*"[398] In this context, Claimant refers to various circumstances of PDVSA's occupation of the plant, including *inter alia:*

   - documents authored by PDVSA reflecting that PDVSA was carrying out the ongoing expropriation process on behalf of Respondent, in particular the minutes of meetings between PDVSA and Norpro Venezuela dated 2 and 8 June 2010 which were entitled "*Proceso de Nacionalización Norpro Venezuela, C.A.*";[399]

   - changes in the appearance of the plant and its personnel, with the PDVSA flag flying in tandem with the Venezuelan flag over the plant and workers wearing PDVSA uniforms;[400] and

---

[395] Reply, ¶¶ 21-25.

[396] Reply, ¶¶ 21-22; Claimant's Post-Hearing Submission, ¶¶ 19-22.

[397] Memorial, ¶ 134.

[398] Reply, ¶ 30; Claimant's Post-Hearing Submission, ¶¶ 23-32.

[399] Claimant's Post-Hearing Submission, ¶ 24. Minutes of Meetings among Norpro Venezuela, C.A., Petróleos de Venezuela, S.A. and others, 2 June and 8 June 2010. **Exhibit C-25**.

[400] Claimant's Post-Hearing Submission, ¶ 27, referring to Request by Norpro Venezuela, C.A. for Judicial Inspection, 5 August 2010. **Exhibit C-119**, p. 14.

- PDVSA's efforts to get the plant back into operation, *e.g.*, its attempt to ready the plant to produce so-called green proppants.[401]

431. Claimant therefore contests Respondent's submission that PDVSA stepped in as a "*caretaker*" and adds that, if that had actually been the case, PDVSA should have returned the plant to Claimant. In Claimant's view, the burden should not be on the foreign company after having "*witnessed the President's order and been denied access to its property, to do more in order to preserve its rights.*"[402]

432. Finally, Claimant emphasizes that it constantly asserted its rights with regard to the plant, *i.e.*, that it attempted to re-enter the plant but was denied access, as evidenced by the judicial inspections it initiated on 17 May 2010 and again on 5 August 2010 as well as the letters that Norpro Venezuela's President sent to PDVSA's General Counsel on 18 November 2010 and to the President of PDVSA Industrial on 25 April 2011.[403]

### (2)    Summary of Respondent's Position

433. Respondent submits that the date of expropriation within the meaning of Article 5(1) of the Treaty was 29 March 2011, *i.e.*, the date of the issuance of the Expropriation Decree, which triggered the procedures under the Venezuelan Expropriation Law.[404] In response to Claimant's assertions with respect to the takeover of the plant on 15 May 2010 and the events thereafter, Respondent contends, first, that it was the labor union SINPROTRAC, not the State, which occupied the Claimant's plant both on 24 March and on 15 May 2010, and, second, that PDVSA's presence at the plant thereafter was a "*responsible and necessary action pending the expropriation decree to assure the safety and security of the plant*" after Norpro Venezuela's management had effectively abandoned it.[405]

434. With regard to the first point, Respondent denies that there was an intrinsic causal link between President Chávez' "*announcement*" and the takeover of the plant. Respondent emphasizes that it was union discontent, which caused Norpro Venezuela's name to appear in the *Plan Guayana Socialista 2009-2019*, ultimately leading to the proposal that Norpro Venezuela pass to State control, which President Chávez read live on television on 15 May 2010. Moreover, Respondent contends that it was actually a phone call from shift workers at the plant to SINPROTRAC's leadership reporting that Plant management was removing laptops and documents from the premises, which prompted union officials and Norpro Venezuela's ex-workers to act on 15 May 2010. Against this background,

---

[401] Post-Hearing Submission, ¶ 27, referring to Rondón, ¶ 33.
[402] Claimant's Post-Hearing Submission, ¶¶ 29, 31.
[403] Claimant's Post-Hearing Submission, ¶ 32 referring to **Exhibit C-20**, **Exhibit C-119**, **Exhibit C-122** and **Exhibit C-127**.
[404] Respondent's Post-Hearing Brief, ¶ 87 (with note 187).
[405] Counter-Memorial, ¶ 26 (with note 68); Respondent's Post-Hearing Brief, ¶¶ 60-65.

Respondent argues that the 15 May 2010 plant takeover cannot be considered as an act of the State.[406]

435. Furthermore, Respondent contests Claimant's allegations that certain individuals among those that effected the plant takeover were actually acting on behalf or under the instructions of Respondent. Respondent argues that the mere fact that politicians sympathetic to the plight of the workers were present does not mean that Respondent itself took over the plant.[407]

436. With respect to the second point, *i.e.*, PDVSA's presence on the plant after the events of 15 May 2010, Respondent maintains that PDVSA's presence prior to the publication of the expropriation decree was arranged for the purpose of ensuring plant safety and stability, as a "*caretaker.*" Respondent contends that Norpro Venezuela effectively abandoned the plant after 15 May 2010, and that the plant was "*in the hands of the union and the workers who took over on May 15, without supervision.*" Respondent asserts that these were legitimate grounds for concern regarding worker safety and the proper operation of the plant's equipment.[408]

437. In this context, Respondent emphasizes that Claimant neither challenged the legal foundation of PDVSA's presence nor did it demand return of the plant or request access to it after 15 May 2010.[409] In particular, Respondent contends that "*none of the other letters that were sent on May 17, 2010 or thereafter demanded the return of the Plant,*" and that Claimant never raised such a claim during the meetings of 30 August 2010 and of 14 October 2010 between Claimant and PDVSA. It is therefore Respondent's position that "*PDVSA Industrial was at the Plant because Norpro Venezuela was not present and the Plant posed risks to the workers and community.*"[410]

438. At the same time, Respondent does not contest that, in the aftermath of 15 May 2010, "*there <u>was</u> a 'process of nationalization' to the extent that, as everyone recognized, the Plant had not been expropriated but that it would be transferred to State control in the future.*" Respondent submits that the Parties also recognized (i) that a formal expropriation decree was being drafted at that time; (ii) that the decree was supposed to mark the starting point of the expropriation procedure under Venezuelan law; and (iii) that the Par-

---

[406] Rejoinder, ¶¶ 12-13.
[407] Rejoinder, ¶ 16: Counter-Memorial, note 68.
[408] Rejoinder, ¶¶ 20-22; Respondent's Post-Hearing Brief, ¶ 60; Respondent's Post-Hearing Reply Brief, ¶ 25.
[409] Rejoinder, ¶ 23; Respondent's Post-Hearing Brief, ¶¶ 60 (with note 108), 42-51.
[410] Respondent's Post-Hearing Brief, ¶¶ 45-50.

ties would consider, in the meantime, alternatives to expropriation, including the formation of a mixed company, with PDVSA as a majority shareholder and the Claimant holding a minority stake.[411]

439. It is Respondent's position that this ongoing nationalization process was not in conflict with PDVSA's "*caretaker*" role. Respondent points out that PDVSA had "*instructions from the President of the Bolivarian Republic of Venezuela to carry out the transfer of Norpro to State control,*" but "*until the publication of the Decree, it may not act or intervene in Norpro. Its presence at the plant is in response to the necessity to enter into possession formally, once the Decree is published.*"[412]

### (3)  The Tribunal's Analysis

440. Before addressing the individual circumstances of the case related to the events of 15 May 2010 **(b)** and thereafter **(c)**, the Tribunal wishes to recall the legal standard as to whether and when an "*expropriation*" within the meaning of Article 5(1) of the Treaty has occurred **(a)**.

### (a)  Legal Standard as to Whether and When an "*Expropriation*" Has Occurred

441. As the tribunal in *SD Myers v. Canada* noted, the term "*expropriation*" has to be interpreted "*in light of the whole body of state practice, treaties and judicial interpretations of that term in international law cases.*" The tribunal went on to find that, in general,

> "*the term* 'expropriation' *carries with it the connotation of a* 'taking' *by a governmental-type authority of a person's* 'property' *with a view to transferring ownership of that property to another person, usually the authority that exercised its de jure or de facto power to do the* 'taking'."[413]

442. These considerations are confirmed, for example, by the tribunal in *Rumeli v. Kazakhstan*, which described (direct) expropriation as "*resulting from a deliberate formal act of taking*"[414] and referred to the reasoning of the tribunal in *Generation Ukraine v. Ukraine*,

---

[411] Respondent's Post-Hearing Brief, ¶ 61. Emphasis in the original.

[412] Rejoinder, ¶ 32 (note 135), citing from Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated August 30, 2010, **Exhibit R-017**, pp. 2-3:

> "*PDVSA Industrial, S.A. ('PDVSA') mencionó que ha recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro.* […] *PDVSA informó que mientras no se haya publicado el Decreto, no puede actuar o intervenir en Norpro. Su presencia en la planta corresponde a la necesidad de prepararse para la futura toma formal de posesión, una vez que se realice la publicación del Decreto.*"

[413] *SD Myers v. Canada* ¶ 280. **Exhibit RL-119**.

[414] *Rumeli v. Kazakhstan*, ¶ 700. **Exhibit CLA-069**.

which in turn stated that a direct expropriation is characterized by a "*transfer* [of the investor's] *proprietary rights in its investment to the State or to a third party*."[415]

443. Against this background, the term "*expropriation*" is clearly characterized by a number of elements, including: (i) the act of a State; (ii) in relation to a person's property; (iii) consisting in a *de jure* or *de facto* taking of the property; and (iv) to the benefit of the State or of a third party.

444. There is no dispute between the Parties as to the applicable standard with regard to the definition of the legal term "*expropriation,*" as they did not deal with this issue in their submissions. On the contrary, the Parties agree that, at some point, Claimant was expropriated within the meaning of Article 5(1) of the Treaty. Rather, the Parties' disagreement relates to the exact point in time at which the expropriation occurred.

445. With respect to the elements of an expropriation referred to above in paragraph 443, Claimant contends that all those criteria were already fulfilled when the plant was taken over on 15 May 2010 or, at least, shortly thereafter.[416] Respondent, in contrast, argues that: (i) the takeover on 15 May 2010 was not an act of State; and (ii) the subsequent occupation of the plant by PDVSA was not a taking of the asset to the benefit of Respondent but rather a compelling necessity imposed on Respondent by Claimant's abandonment of the plant, which required PDVSA's presence in order to restore and ensure safety on the plant, as a "*caretaker,*" not as the "*owner*" of the plant.[417] In this context, Respondent emphasizes that PDVSA had instructions "*not* [to] *act or intervene in Norpro*" ("*no puede actuar o intervenir en Norpro*").[418] In conclusion, it is Respondent's position that the criteria of an "*expropriation*" were not fulfilled until the expropriation decree was formally issued on 29 March 2011.[419]

446. In light of the foregoing, the Tribunal will now consider the evidence presented by the Parties and determine whether or not the conduct of Respondent before 29 March 2011 amounted to an "*expropriation*" within the meaning of Article 5(1) of the Treaty.

**(b)    Takeover on 15 May 2010 Following President Chávez' "*Expropriation Directive*"**

447. With regard to President Chávez' announcement of 15 May 2010 and the subsequent takeover of the plant carried out by members of the SINPROTRAC union, the Tribunal considers that this takeover as such cannot be attributed to Respondent.

---

[415] *Generation Ukraine v. Ukraine*, ¶ 20.21. **Exhibit CLA-039**.
[416] *Cf.* Claimant's Post-Hearing Submission, ¶¶ 19-22.
[417] *Cf.* Respondent's Post-Hearing Brief, ¶ 60.
[418] Rejoinder, ¶ 32 (note 135), citing from Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated August 30, 2010, **Exhibit R-017**, pp. 2-3.
[419] Respondent's Post-Hearing Brief, note 187.

448. It is uncontested by Claimant that the plant takeover was not directly carried out by organs of the State in their official capacity but rather "*by union members and sympathizers.*"[420] At the same time, it is a well-established principle under international law that, in general, the conduct of private persons or entities is not attributable to the State. This general principle is clearly reflected, *inter alia*, in Article 8 of the ILC Draft Articles which states that, as an exception from that principle, the

> "*conduct of a person or group of persons shall* [only] *be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.*"[421]

449. The Tribunal considers it plausible that there was a certain causal link between President Chávez' TV announcement on 15 May 2010 and the plant takeover. As Mr. Eduardo Rondón testified, the "*members of the SINPROTRAC union*" who took over the plant on 15 May 2010 "*came directly from the event at which President Chávez had spoken.*"[422] While the takeover may have further been triggered by Norpro Venezuela management's removal of documents and computers from the plant and the tensions between the management of the plant and the unions,[423] the Tribunal is of the view that the union members and sympathizers would most probably not have taken over the plant on 15 May 2010 if President Chávez had not stated on this very day that the plant would eventually be handed over to PDVSA. The President's announcement of this prospect therefore appears to have been *conditio sine qua non* of (and therefore a causal factor in relation to) the plant takeover.

450. Plain causality, however, does not establish State responsibility under international law. Conduct of private persons can be attributed to the State only if there exists "*a specific factual relationship between the person or entity engaging in the conduct and the State.*"[424] The Tribunal is of the view that there was no such specific factual relationship between President Chávez' announcement and the takeover of the plant carried out by union members and sympathizers.

451. During the broadcast on 15 May 2010, President Chávez read out and approved a number of proposals prepared by the *Plan Guayana Socialista* working groups, an association of

---

[420] Claimant's Post-Hearing Submission, ¶ 21.
[421] International Law Commission, *Responsibility of States for Internationally Wrongful Acts* (2001), **Exhibit CLA-044**. *Cf.* J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Exhibit CLA-119** and **Exhibit RL-021**, p. 110.
[422] Rondón, ¶ 28.
[423] Counter-Memorial, ¶¶ 15, 137, 140 (note 352); Rejoinder, ¶¶ 8 *et seq.*, 14.
[424] J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Exhibit CLA-119** and **Exhibit RL-021**, p. 110.

unions in the Guayana region.[425] One of these recommendations was related to Norpro Venezuela. President Chávez read out and approved this proposal as follows:

> "*Discuss with PDVSA the purchase of the Proppants produced and commercialized by the company Norpro Venezuela, a product produced with Bauxite, Cornstarch and water, used for mud and drilling. It is suggested here [in the document] that should it become necessary, this company should become state-controlled and transferred to the hands of PDVSA. Let the company Norpro Venezuela become state controlled and transfer it to the hands of Petróleos de Venezuela.*"[426]

452.   Without context, the President's statement "*Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela*"[427] could indeed be understood as an invitation, or even a command, addressed to all listeners, including the members of the union and sympathizers, to take over the plant. Taking into account the aforementioned circumstances, however, it appears that the language used by President Chávez was meant to express and emphasize his general approval and affirmation of the working groups' proposals. President Chávez' statements, including the approval of the union proposal related to the nationalization of Norpro Venezuela and "*similar announcements regarding other foreign-owned businesses,*"[428] implied a promise to the people that the State would nationalize the businesses referred to in the statement in the future; the President did not, however, actually give specific orders or instructions for an immediate physical takeover of the plant.

453.   Considering the foregoing, President Chávez did not empower the unions to take over the businesses concerned with governmental authority by virtue of his announcements. Moreover, even though members of the SINPROTRAC union may have actually taken President Chávez "*at his word,*"[429] the Tribunal considers that they did not act "*on the instructions of, or under the direction or control of*" President Chávez within the meaning of Article 8 of the ILC Draft Articles.

---

[425] Claimant's Post-Hearing Submission, ¶ 19; Counter-Memorial, ¶ 24.

[426] *Record and Transcript of Opinion Programs and Special Transmissions of Venezuelan Tv*, TVRADIO 2021, C. A., May 15, 2010 (English translation), **Exhibit R-15**. The original announcement was made in Spanish, *see Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Exhibit R-15**, p.14. In relevant parts, the announcement reads as follows:

> "*Consultar con PDVSA sobre la compra de Propan producido y comercializado por empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario –aquí se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela.*"

[427] *Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Exhibit R-15**, p.14.

[428] Claimant's Post-Hearing Submission, ¶ 19.

[429] Memorial, ¶ 77.

454.  The fact that national and/or local politicians were sympathizing with the union members and may have been participating in the takeover of 15 May 2010 is not sufficient in itself to establish Respondent's responsibility for these actions. Assuming that the individuals referred to by Claimant actually did participate in the takeover of 15 May 2010,[430] the Tribunal finds that there is not sufficient evidence that they were acting on behalf, or under the instructions, of Respondent. Moreover, as to the presence of the Venezuelan National Guard, which was, as Claimant contends, involved in the occupation of the plant on and after 15 May 2010,[431] the Tribunal cannot exclude that it was present at the plant "*in order to preserve order and public safety,*" as Respondent asserts.[432]

**(c)    PDVSA's Conduct and Presence on the Plant after 15 May 2010**

455.  The Tribunal is convinced, however, that the subsequent conduct of PDVSA and its presence on the plant after 15 May 2010 did amount to an "*expropriation*" within the meaning of Article 5(1) of the Treaty. In particular, the Tribunal finds that, first, by means of the conduct of the State-owned PDVSA, the Respondent took effective control of the plant on 15 May 2010 or shortly thereafter **(aa)**. Second, the Tribunal holds that PDVSA's conduct constituted a taking of the plant to the benefit of Respondent as required by the term "*expropriation*" within the meaning of Article 5(1) of the Treaty; the Tribunal is not convinced by Respondent's argumentation that there was no taking of the plant to the benefit of the State because PDVSA was merely acting as a "*caretaker*" **(bb)**.

**(aa)   Respondent's Effective Control of the Plant**

456.  With regard to the first point, the Tribunal finds that, by means of its conduct after the plant takeover of 15 May 2010 carried out by the members of the SINPROTRAC union, PDVSA acknowledged and adopted the union's actions as its own. On the basis of the applicable principles of customary international law on State responsibility as reflected in Article 11 of the ILC Draft Articles, the plant takeover on 15 May 2010 therefore has to be considered as an act of Respondent. In any event, PDVSA took effective control over the plant and started the expropriation process shortly after 15 May 2010, as confirmed by its internal memoranda and reports of early June 2010.

---

[430] *Cf.* Memorial, ¶ 77; Reply, ¶ 22.

[431] Reply, ¶ 23, citing from Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**, p. 5; Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**, p. 3.

[432] Rejoinder, ¶ 13 (note 73).

**(1)    Attribution of PDVSA's Conduct to Respondent**

457.    Before examining PDVSA's conduct relating to the plant more closely, the Tribunal notes that, although PDVSA is a State-owned company with distinct legal personality, its conduct is attributable to Respondent pursuant to Article 5 of the ILC Draft Articles, which states that the

> "*conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.*"[433]

458.    Both in its alleged function as a "*caretaker*" and in its capacity as supervisor and promoter of the nationalization of the plant, PDVSA was vested with governmental authority. This is not contested by Respondent; on the contrary, Respondent emphasizes in the context of the negotiations that took place in late 2010 that PDVSA "*had been instructed to carry out the transition of the Plant to a State-controlled operation.*"[434] This is further confirmed by PDVSA's contemporaneous statement during the meeting on 30 August 2010 that "*it had received specific instructions from the President of the Bolivarian Republic of Venezuela to carry out the transfer of Norpro to State control.*"[435]

459.    In an internal memorandum prepared by PDVSA, entitled "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*" dated 2 June 2010, reference was also made to the instructions of the President:

> "*En fecha Martes 25 de Mayo, personal de PDVSA bajo instrucciones de la Gerencia General EyP División Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciónes de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*
> […]
> *27 de mayo 2010, se incorpora al proceso de estatización de la empresa NORPRO Venezuela,C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente.*"[436]

460.    The Tribunal is of the view that in light of PDVSA's undisputed mandate from the President of Venezuela to carry out the nationalization of Norpro Venezuela, there should and cannot be a distinction between PDVSA's conduct aimed at carrying out its mandate and

---

[433] International Law Commission, *Responsibility of States for Internationally Wrongful Acts* (2001), **Exhibit CLA-044**.
[434] Counter-Memorial, ¶ 29.
[435] Quotation from the English translation submitted by Respondent with **Exhibit R-17**.
[436] **Exhibit C-143**.

conduct that was possibly aimed at ensuring the safety of workers and maintenance of the equipment at the plant in the meantime. Rather, all of PDVSA's actions with regard to the plant can and have to be attributed to Respondent.

## (2)   Adoption of the Union's Actions by PDVSA as its Own

461. As a rule of customary international law, laid down in Article 11 of the ILC Draft Articles, "[c]*onduct which is not attributable to a State*" at the time of its commission "*shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.*"[437] In contrast to cases of mere State support, endorsement or general acknowledgment of a factual situation created by private individuals, attribution under this rule requires that the State clearly and unequivocally "*identifies the conduct in question and makes it its own.*"[438]

462. In the present case, PDVSA has acknowledged and adopted the plant takeover of 15 May 2010 carried out by union members as its own. In a number of internal notes and reports, PDVSA made clear that the union's plant takeover was not only in line with Respondent's intentions with regard to the expropriation of the plant, but was subsequently made an integral part of the process of nationalizing Norpro Venezuela within the framework of the "*Plan Guayana Socialista*" to be implemented by the "*Ejecutivo Nacional,*" *i.e.*, the national executive power.[439] The above referenced internal memorandum of 2 June 2010 contains a chronology of the steps within the course of the nationalization of the Norpro plant, including President Chávez' "*order*" of 15 May 2010 and the subsequent plant takeover:

> "*PROPÓSITO:*
>
> *lnformar al Sr. Luis Pulido Director Interno de enlace de PDVSA Industrial, S.A., sobre la situación actual del proceso de Estatización de la Empresa NORPRO de Venezuela, C.A., (NORPRO).*
>
> *ANTECEDENTES:*
>
> *• En fecha 15 de Mayo del 2010, el Presidente de la República Bolivariana de Venezuela, Hugo Rafael Chávez Frías ordenó la estatización de la empresa productora de proppants la cual utiliza como materia prima la Bauxita de nombre 'NORPRO Venezuela C. A.', informando que la misma pasaría a manos de Petróleos de Venezuela S.A.*

---

[437] International Law Commission, *Responsibility of States for Internationally Wrongful Acts* (2001), **Exhibit CLA-044**; J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), **Exhibit RL-021**, p. 121.

[438] J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), **Exhibit RL-021**, p. 123.

[439] Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**, p. 4.

> *El mismo día 15 de Mayo los trabajadores de NORPRO asumieron el control productivo de la planta y el personal Gerencial tomó la decisión de abandonar las instalaciones de la misma, la cual quedó en custodia de los trabajadores con apoyo de la Guardia Nacional Bolivariana.*
>
> *• **En fecha Martes 25 de Mayo**, personal de PDVSA bajo instrucciones de la Gerencia General EyP División Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciones de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*
>
> *• **26 de mayo 2010**, el personal de PCP de PDVSA Industrial, S.A., realiza visita e inspección a las instalaciones de la empresa NORPRO Venezuela, C.A.*
>
> *• **27 de mayo 2010**, se incorpora al proceso de estatización de la empresa NORPRO Venezuela,C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente.*
>
> *• **28 de mayo 2010**, vista la empresa NORPRO Venezuela, C.A., el Gerente del Sector Hidrocarburos de PDVSA Industrial S.A., donde se realizó reunión de trabajo con el grupo multidisciplinario conformado por PDVSA Industrial, S.A. y PDVSA EyP División Oriente. Durante esta actividad, se dictan los próximos paso a seguir:* […]
>
> *• **31 de mayo de 2010**, siguiendo lineamientos emanados desde la Dirección del Sector Hidrocarburos de PDVSA Industrial S.A., realiza vista a la instalaciones de la empresa NORPRO Venezuela, C.A., el Gerente ( E ) del Sector Hidrocarburos Región Oriente de PDVSA Industrial S.A., con el fin de presentar el Plan Maestro de Abordaje a la Estatización de la empresa NORPRO Venezuela, C.A.* […]"[440]

463. Similar (but less detailed) statements and descriptions of the steps of the implementation of the *Plan Guayana Socialista* by Respondent can be found, in particular, in:

- a preliminary report prepared by PDVSA's "*Comisión de Evaluación*" dated May 2010 on the assessment of the current situation of Norpro Venezuela ("*Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*");[441]

---

[440] Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**, p. 1.

[441] Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**, p. 4.

- a report prepared by PDVSA's "*Comisión de Evaluación*" dated 4 June 2010 on the progress of the restructuring process of Norpro Venezuela ("*Informe de avance 'Restructuración empresa Norpro'*");[442]

- PDVSA's "*Diagnostic of the Current Situation and Restructuring Plan*" dated June 2010;[443]

- a memorandum from PDVSA to Respondent's Minister of Energy and Petroleum dated 9 June 2010 on the current situation and the strategic plan for the administrative and operational control of Norpro Venezuela ("*Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo y Operacional de la Empresa NORPRO VENEZUELA, C.A.*");[444] and

- Mr. José Carrasco's final technical report dated 15 July 2010 ("*Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*").[445]

464. In view of these facts, the Tribunal concludes that PDVSA built upon the situation created by the union members in order to carry out the nationalization process as "*ordered*" ("*ordenó*") by President Chávez on 15 May 2010. After the plant takeover of 15 May 2010, PDVSA was able, without any disturbance, to assess the current situation of the plant and to determine how it could be restructured and operated by PDVSA.[446] Respondent further acknowledges that, in June and July 2010, PDVSA established "*a permanent presence, as it had been assigned responsibility for ensuring Plant safety and stability pending the determination of the precise mechanism and timing by which State control of the Plant was to be achieved.*"[447]

---

[442] Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**, pp. 2-3.

[443] Diagnostic of the Current Situation and Restructuring Plan for Optimization of the Productive Processes of Norpro Venezuela, C.A., June 2010, **Exhibit C-142**, p. 5 ("*Antecedentes*").

[444] Memorandum from PDVSA Dirección Ejecutiva de Producción to Rafael Ramírez Carreño (Minister of Energy and Petroleum), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 June 2010, **Exhibit C-145**, pp. 1-2.

[445] Final Technical Report, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 July 2010, **Exhibit C-148**, p. 3.

[446] *Cf.* Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**; Diagnostic of the Current Situation and Restructuring Plan for Optimization of the Productive Processes of Norpro Venezuela, C.A., June 2010, **Exhibit C-142**; Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**.

[447] Counter-Memorial, ¶ 28.

465. According to Respondent's witness Mr. Rondón, later in October 2010, PDVSA installed Mr. Ángel Salvarría as Plant General Manager, and Mr. Salvarría "*reorganized the supervisory structure which had been in place at the Plant since the union takeover, and began readying the Plant to re-start production*"; finally, in November 2010, plant workers officially became employees of PDVSA.[448]

466. While Respondent may not have anticipated or intended that the plant would be taken over by the members of the SINPROTRAC union on 15 May 2010, it is apparent that PDVSA immediately availed itself of this situation for the purpose of carrying out the nationalization process, thereby acknowledging and adopting the union members' conduct as its own. In any event, even if PDVSA's conduct were not to be considered as an acknowledgment and adoption of the union's plant takeover as its own action, Respondent effectively took control of the plant in June and July 2010 when it established "*a permanent presence*" at the plant, as Respondent acknowledges.[449] In the Tribunal's view, the 2 June 2010 memorandum prepared by PDVSA, entitled "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro),*"[450] as well as the 4 June 2010 prepared by PDVSA's "*Comisión de Evaluación*", entitled "*Informe de avance 'Restructuración empresa Norpro',*"[451] confirm that the expropriation process started at least shortly after 15 May 2010.

**(bb)  Nature and Purpose of Respondent's Presence at the Plant**

467. With regard to the second point, the Tribunal notes that a State's *de facto* control of assets does not necessarily entail expropriation. In this context, Respondent maintains that PDVSA's presence at the plant was arranged for the purpose of ensuring plant safety and stability, as a "*caretaker,*" not as an owner.[452] Furthermore, Respondent contends that, although PDVSA was instructed at the same time "*to carry out the transfer of Norpro to State control,*" it was not allowed to "*act or intervene in Norpro*" ("*no puede actuar o intervenir en Norpro*") until the publication of the formal expropriation decree.[453] However, as the reasoning relating to the plant takeover above indicates, the Tribunal finds that PDVSA actually did, in Respondent's own words, "*act*" and "*intervene in Norpro*"

---

[448] Rondón, ¶ 33; Transcript (Day 3), p. 712 lines 15-18; p. 714 line 19 – p. 725 line 8.

[449] Counter-Memorial, ¶ 28.

[450] *Cf.* Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143.**

[451] Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**.

[452] Counter-Memorial, ¶¶ 29 and 140; Rejoinder, ¶¶ 3, 18, 22 (note 101) and 32 (note 135); Post Hearing Brief, ¶ 20, citing from Transcript (Day 1), p. 213 lines 20-22; Respondent's Post-Hearing Reply Brief, ¶¶ 11 (note 42), 35.

[453] Rejoinder, ¶¶ 20-22, 32 (note 135), citing from Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated August 30, 2010, **Exhibit R-017**, pp. 2-3.

and hence took control of the plant, not as a "*caretaker,*" but to the benefit of Respondent, thereby excluding Norpro Venezuela as the owner of the plant.

468.  In its defense, Respondent maintains that PDVSA's presence at the plant was aimed at "*ensuring Plant safety and stability,*"[454] more specifically "*the safety and security of the personnel and the assets*" at the plant.[455] Respondent refers in particular to the "*substantial*" and "*escalating tension*" between Norpro Venezuela and union representatives and to the "*industrial action*" that ultimately resulted in the takeover on 15 May 2010.[456] Further, Respondent submits that the "*operation of the Plant without proper supervision*" posed a substantial "*risk to the safety of Plant personnel*" and emphasizes that the "*dangers associated with the Plant*" were recognized by both the Norpro management and the French Embassy.[457] Most importantly, Respondent contends that the Norpro management "*abandoned*" the plant on 15 May 2010, leaving it in the hands of the union, and claims that Claimant "*never attempted to regain possession*" or "*be granted access to the Plant*" and also never claimed after 15 May 2010 that PDVSA's presence was "*without legal foundation.*"[458]

469.  While the temporary occupation of an asset for reasons of public safety does not amount to an "*expropriation*" within the meaning of Article 5(1) of the Treaty, the Tribunal finds that the taking of Norpro Venezuela's plant by Respondent was essentially carried out for reasons connected to the impending expropriation process.

470.  As stated above in **(aa)**, the taking of the plant on or after 15 May 2010 was made an integral part of the undisputed "*process of nationalization*"[459] of Norpro Venezuela within the framework of the "*Plan Guayana Socialista*" to be implemented by the national executive power.[460] Within this framework, it was upon PDVSA "*to carry out*" the nationalization of Norpro ("*de llevar a cabo la estatización de Norpro*").[461] The Tribunal finds that carrying out this task was the main purpose of PDVSA's presence on the plant and outweighed any other purposes, including safety reasons.

471.  Most importantly, the Tribunal refers to the numerous internal memoranda and reports prepared by PDVSA on the assessment of the current economic situation of the plant and

---

[454] Counter-Memorial, ¶ 28; Respondent's Post-Hearing Brief, ¶ 7.
[455] Respondent's Post Hearing Brief, ¶ 8. *See also* Rejoinder, ¶¶ 3, 18; Respondent's Post Hearing Brief, ¶ 60.
[456] Counter-Memorial, ¶¶ 137-138; Rejoinder, ¶¶ 8, 18.
[457] Rejoinder, ¶ 20; Respondent's Post-Hearing Brief, ¶ 20.
[458] Rejoinder, ¶¶ 20, 23. *Cf.* Post-Hearing Brief 60.
[459] Post-Hearing Brief 61.
[460] *Cf.* Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**, p. 4.
[461] Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated 30 August 2010, **Exhibit C-34** and **Exhibit R-17**, p. 2.

on determining how the plant could be restructured and operated by PDVSA in the future,[462] including *inter alia* assessments of the plant's inventory, payment obligations and equipment and its overall financial situation.[463] In the Tribunal's view, this work was not the conduct of a mere "*caretaker.*"

472. The purpose of PDVSA's presence on the plant after 15 May 2010 was also reflected by certain changes in the appearance of the plant and its personnel. By August 2010, the PDVSA flag was flying together with the Venezuelan flag over the plant and the workers were wearing PDVSA uniforms.[464] As detailed above in **(aa)**, later in October 2010, PDVSA's Ángel Salvarría was installed as Plant General Manager and "*reorganized the supervisory structure which had been in place at the Plant since the union takeover, and began readying the Plant to re-start production.*" In November 2010, plant workers officially became employees of PDVSA. Finally, between November 2010 and March 2011, "*after operations re-started, the Plant produced and stockpiled green proppants.*"[465] Again, these measures are not typical for ensuring safety and stability; they illustrate that PDVSA was making the plant ready for operation and production under the *aegis* of Respondent.

473. The Tribunal considers that, contrary to Respondent's submissions, it is not relevant whether or not the formal expropriation decree was still being drafted at that time and property rights were yet to be formally transferred, and whether or not Claimant took

---

[462] *Cf.* Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**; Diagnostic of the Current Situation and Restructuring Plan for Optimization of the Productive Processes of Norpro Venezuela, C.A., June 2010, **Exhibit C-142**; Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**; Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**; Memorandum from PDVSA Dirección Ejecutiva de Producción to Rafael Ramírez Carreño (Minister of Energy and Petroleum), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 June 2010, **Exhibit C-145**; PDVSA Evaluation Committee Report, *Reestructuración Empresa Norpro*, 11 June 2010, **Exhibit C-146**; PDVSA Evaluation Committee Report, *Reestructuración Empresa Norpro*, 2 July 2010, **Exhibit C-147**; Final Technical Report, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 July 2010, **Exhibit C-148**; Memorandum from Ower Manrique to Eulogio del Pino, *Situación actual de la empresa Norpro Venezuela C.A. (plan estratégico para la puesta en operación),* 27 July 2010, **Exhibit C-149**; PDVSA Evaluation Committee Report, *Reestructuración Empresa Norpro*, 3 August 2010, **Exhibit C-150**.

[463] Memorandum from PDVSA Dirección Ejecutiva de Producción to Rafael Ramírez Carreño (Minister of Energy and Petroleum), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 June 2010, **Exhibit C-145**, p. 3; Final Technical Report, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 July 2010, **Exhibit C-148**, pp. 9-10.

[464] Request by Norpro Venezuela, C.A. for Judicial Inspection, 5 August 2010, **Exhibit C-119**, p. 11; María Ramírez Cabello, *Norpro de Venezuela inicia fase de prearranque*, Correo del Caroní, 23 July 2010, **Exhibit C-117**.

[465] Rondón, ¶¶ 33-34; Transcript (Day 3), p. 712 lines 15-18; p. 714 line 19 – p. 715 line 8.

legal steps in order to regain control.[466] The fact that the expropriation decree was "*being drafted*" at that time "*by the competent governmental authorities, within the process provided for in the applicable laws*" ("*El Decreto que ordena la expropiación de Norpro y sus activos industriales está siendo elaborado por las autoridades gubernamentales competentes, dentro del proceso previsto en las leyes aplicables.*")[467] does not exclude a finding that Claimant had already been expropriated within the meaning of Article 5(1) of the Treaty.

474. The concepts and formalities of domestic law and compliance with its rules are not decisive for the purpose of determining whether or not an expropriation within the meaning of international law has occurred. Rather, it is decisive under Article 5(1) of the Treaty that Respondent had *de facto* control of the plant on or shortly after 15 May 2010, with no prospect of giving it back to its owners, and used it to prepare and restart operation and production of proppants. While the assessment of the plant's economic situation, including its inventory and payment obligations, was also relevant for preparing the (formal) expropriation decree and determining the fair compensation as required under Article 5(1) of the Treaty, Respondent did not collect this data within the framework of a formal administrative procedure. Rather, it availed itself of the plant takeover carried out by the union, established a permanent presence on the plant and started the nationalization process without providing for any significant participation of Claimant or the Norpro management at that time.

475. With respect to the second point, *i.e.*, whether Claimant attempted to regain control of the plant after the takeover on 15 May 2010, the Tribunal notes that Norpro Venezuela filed two requests for judicial inspection of the plant on 17 May 2010 and on 5 August 2010.[468] Moreover, Norpro Venezuela and Claimant repeatedly attempted to enter into negotiations with Respondent concerning the nationalization of the plant, requested the assignment of an interlocutor, offered technical assistance and reserved their right to indemnification, starting with a letter from Norpro's former president Luis Páez to Rafael Ramírez, dated 19 May 2010:

> "*Considerando el interés que posee el Grupo Saint-Gobain en preservar la seguridad del personal de la planta y la condición de los activos de Norpro nos permitimos solicitar que PDVSA, en caso de ser desig-*

---

[466] Respondent's Post-Hearing Brief, ¶¶ 60-61.

[467] Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, 30 August 2010, **Exhibit C-34** and **Exhibit R-17**,

[468] Request by Norpro Venezuela, C.A. for Judicial Inspection, 17 May 2010, **Exhibit C-20**; Request by Norpro Venezuela, C.A. for Judicial Inspection, 5 August 2010, **Exhibit C-119**.

> *nado como ente que llevará a cabo la estatización, designe a un inter-locutor válido para analizar con los representantes del Grupo Saint-Gobain, la forma bajo la cual la misma se desea llevar a cabo.*
>
> *Debe destacarse que el Grupo Saint-Gobain sin prejuicio* [sic] *a sus derechos en materia de indemnización está abierto a proporcionar a corto y mediano plazo asistencia técnica una vez que lleve a cabo la estatización, a los fines de preservar la seguridad del personal y evitar la degradación del estado de los activos de Norpro.*"[469]

476. Other letters from Claimant and Norpro Venezuela, written in the course of 2010, contain similar statements.[470] These messages do not convey the impression that Claimant and Norpro Venezuela, still being the rightful owners of the plant, had access to the plant at any time, but had decided "*to disclaim responsibility for anything that happened at the Plant*" and to leave the plant to the State, as alleged by Respondent.[471] It rather appears that, in view of President Chávez' announcement of 15 May 2010 and the subsequent takeover of the plant, Claimant accepted as a fact that the plant was *de facto* nationalized and tried to make the best of the situation by cooperating with Respondent rather than exhausting its legal remedies, such as, *e.g.*, an "*amparo*" in order to preserve its constitutional rights.[472] This cooperative attitude does not, however, preclude Claimant from asserting that an "*expropriation*" within the meaning of Article 5(1) of the Treaty occurred already at that time.

477. In conclusion, the Tribunal has no doubt that on, or at least shortly after, 15 May 2010, Respondent obtained at least *de facto* control of the plant, with the aim of ultimately carrying out the expropriation process. This conduct amounts to an "*expropriation*" within the meaning of Article 5(1) of the Treaty and is therefore decisive for the expropriation date within the meaning of subparagraph 3.

### (ii) Respondent's Compliance with, or Breach of, its Treaty Obligations after the Expropriation Date

478. From the findings made above in **aa)** with regard to the requirements as to the specification and promptness of the compensation under Article 5(1) subparagraph 2 and 3 of the Treaty and in **(i)** with regard to the "*date of expropriation*" within the meaning of subparagraph 3, it follows that Respondent did not comply with its Treaty obligations under Article 5(1) subparagraphs 2 and 3 after 15 May 2010.

---

[469] Letter from Luis E. Páez to Rafael Ramírez, 19 May 2010, **Exhibit C-22**, pp. 1-2.
[470] *Cf.* Letter from Luis E. Páez to José Khan, 27 May 2010, **Exhibit C-23**; Letter from Guy Rolli to Temir Porras, 8 June 2010, **Exhibit C-26**; Letter from Luis E. Páez to Rafael Ramírez, 6 July 2010, **Exhibit C-28**; Letter from Patrick Dupin to Eulogio del Pino, 3 August 2010, **Exhibit C-30**.
[471] Respondent's Post-Hearing Brief, ¶ 60.
[472] Rejoinder ¶ 23.

479.  Respondent has never communicated the amount of payment to be made to Claimant and has yet to offer any compensation for the expropriation, despite the aforementioned attempts by Claimant to negotiate the terms of the nationalization. The Tribunal is aware that it is Respondent's position that it offered compensation in the context of its offer to form an "*empresa mixta*," in which PDVSA would become the major shareholder.[473] However, regardless of whether Respondent's offer was sufficiently concrete in order for Claimant to be considered,[474] Respondent did in any event not specify any amount that it would pay to Claimant in consideration for its acquisition of a majority stake in the mixed company. Therefore Respondent failed to specify the amount of compensation within the meaning of Article 5(1) subparagraph 3 of the Treaty and thus also failed to pay prompt compensation as required under subparagraph 2.

### c)    Conclusion

480.  In conclusion, the Tribunal finds that the expropriation of the plant was not carried out in accordance with the compensation requirements set out in Article 5(1) subparagraphs 2 and 3. As to the consequences of this finding, *i.e.*, the question whether this breach renders the expropriation unlawful, the Tribunal notes that the dispute between the Parties is focused on the question of which compensation standard is to be applied in this case. The Tribunal will thus address this issue in the section on quantum (*see* below in **III.1.**).

### 2.    Fair and Equitable Treatment (Article 3(1) of the Treaty)

481.  The Tribunal now turns to the FET claims. After briefly defining the applicable FET standard **(a)**, the Tribunal will assess the FET claims with respect to the plant **(b)** and the Bauxite Contract **(c)**. As to the additional claims based on Respondent's failure to provide VAT refunds that it allegedly owed to Claimant under Venezuelan law and on Respondent's alleged arbitrary restriction of the proppants production through the 24 March 2010 takeover of the plant,[475] the Tribunal notes that Claimant has not continued to pursue these arguments as independent FET claims following its Memorial. Therefore, the Tribunal will also refrain from addressing these arguments in the present section.[476]

---

[473] Respondent's Post-Hearing Brief, ¶¶ 53-54 referring to the letter from Gabriel Rojas to Luis Páez, dated 22 October 2010. **Exhibit R-071.** Respondent also refers to the meeting between PDVSA and Claimant on 26 October 2010 discussed by Claimant's witness Mr. Millot in his witness statement. Millot, ¶ 31.

[474] The Parties are in dispute as to whether the offer corresponded to a concrete proposal that Claimant agreed to consider or whether it was a mere "*suggestion*" that PDVSA promised to substantiate before it would have been for Claimant to consider it. Claimant's Post-Hearing Submission, ¶ 35; Millot, ¶ 31; Transcript (Day 2), p. 418 line 9 – p. 419 line 9; Respondent's Post-Hearing Brief, ¶ 54 (with note 101).

[475] *Cf.* Memorial, ¶¶ 162-164 and ¶¶ 178-179.

[476] The argument relating to the VAT refunds will be discussed in the section on quantum at paragaphs 824 *et seq.* below.

### a)    Applicable FET Standard

#### aa)    Summary of Claimant's Position

482.  Claimant submits that the FET standard provided for in Article 3(1) of the Treaty refers, in a broad sense, to the prevailing concepts of FET in international law – and not only to the minimum standard of treatment –, including the following:[477]

-   The ensurance of a "*stable legal and business environment,*" with treatment "*in a manner that is consistent, predictable, and transparent*";

-   The creation of an "*appropriate legal, administrative, and regulatory framework, the legal environment that modern investment theory has come to recognize as a conditio sine qua non of the success of private enterprise*";

-   "*due process*" to the exclusion of a "*lack of transparency and candor in an adminis-trative process*";

-   The absence of "*arbitrary or discriminatory conduct*"; and

-   A conduct "*in accordance with the principle of good faith.*"

483.  Claimant submits that the reference in Article 3(1) of the Treaty to the "*rules and princi-ples of international law*" does not constitute a cap but rather the baseline for the treatment to be accorded to foreign investors.[478]

#### bb)    Summary of Respondent's Position

484.  Respondent submits that, by virtue of the reference to the "*rules and principles of inter-national law,*" Article 3(1) of the Treaty calls only for the minimum standard of treatment under customary international law. For the purpose of defining this restrictive FET stand-ard, Respondent refers to an early decision of the tribunal in *Neer v. Mexico* (1926), which held that, to violate this standard, the treatment of an alien

> "*should amount to an outrage, to bad faith, to willful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily rec-ognize its insufficiency.*"[479]

---

[477] Memorial, ¶¶ 152-156.
[478] Reply, ¶ 104.
[479] Counter-Memorial, ¶ 125, citing from *Neer v. Mexico*, Mexico-US General Claims Commission, Docket No. 136, Opinion dated October 15, 1926, 21 THE AMERICAN JOURNAL OF INTERNATIONAL LAW 555 (1927), p. 556, **Exhibit RL-79**.

485. Respondent further cites several FET provisions contained in more recent investment law frameworks such as the draft EU-Canada Free Trade Agreement ("**CETA**"), which specifies the FET standard as to cover, for example: "*Fundamental breach of due* process*, including a fundamental breach of transparency, in judicial and administrative proceedings*" as well as "*breach of legitimate expectations*", "*limited to situations where the investment took place only because of a promise made by the State that was subsequently not honoured.*"[480]

### cc)    The Tribunal's Analysis

486. The FET clause contained in Article 3(1) of the Treaty reads as follows:

"*Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et équitable, conformément aux règles et principes du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de moyens de production et d'exploitation de tout type, toute entrave à la vente et au transport des produits à l'intérieur du pays et à l'étranger, ainsi que toutes autres*

"*Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así*

---

[480] Rejoinder, ¶ 121, citing from European Commission, *Investment Provisions in the EU–Canada Free Trade Agreement*, dated December 3, 2013, **Exhibit RL-142**; European Commission, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text,"* dated August 5, 2014, **Exhibit RL-143**.

> *mesures ayant un effet ana-*     *como cualquier otra medida que*
> *logue.*"[481]                     *pueda tener un efecto análogo.*"[482]

487. The English translation submitted by Claimant reads:

> "*Each of the Contracting Parties will ensure fair and equitable treat-*
> *ment for investments by nationals and companies of the other Party in*
> *its territory and in its maritime area, in accordance with the rules and*
> *principles of international law, and will ensure that the exercise of this*
> *right thus recognized shall have no impediments either in law or in fact.*
> *In particular, although not exclusively, impediments to fair and equita-*
> *ble treatment in law or in fact are any arbitrary or discriminatory re-*
> *strictions to the purchase and transport of raw and ancillary materials,*
> *of energy and fuels, as well as to any means of production and exploi-*
> *tation, or any impediment to the sale and transport of products within*
> *the country and overseas, along with all other measures having a sim-*
> *ilar effect.*"[483]

488. The Tribunal notes that the reference to the "*rules and principles of international law*"
("*conformément aux règles et principes du droit international*"/"*conforme a las reglas y
principios del Derecho Internacional*") and the non-exhaustive enumeration ("*En par-
ticulier, bien que non exclusivement*"/"*En particular, aunque no exclusivamente*") of cer-
tain aspects of FET in the second part of the provision might, in principle, raise doubts as
to the correct interpretation of the FET clause. However, the Tribunal does not have to
make a finding in this regard because, as discussed in the following paragraphs, at least
certain aspects of Respondent's involvement in the price increases under the Bauxite Con-
tract and the expropriation of the plant as alleged by Claimant could, if proven, also be in
breach of the more restrictive FET concept as described by Respondent in this case.

489. With regard to the takeover of the plant, Claimant argues that Respondent failed to follow
due process in the expropriation procedure. As Respondent's reference to the FET stand-
ard under the draft CETA illustrates, Respondent apparently accepts that a "[f]*undamen-
tal breach of due process, including a fundamental breach of transparency, in judicial
and administrative proceedings*" forms part of the FET standard contained in Article 3(1)
of the Treaty.[484]

---

[481] Journal Officiel de la République Française n°102 du 30 avril 2004, **Exhibit C-1**, p. 7775.
[482] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Exhibit C-1**, p. 332.354.
[483] Free English translation submitted by Claimant as **Exhibit C-1**.
[484] Rejoinder 121, citing from European Commission, *Investment Provisions in the EU–Canada Free Trade Agree-ment*, dated December 3, 2013, **Exhibit RL-142**; European Commission, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text,"* dated August 5, 2014, **Exhibit RL-143**.

490.  As to the price increases under the Bauxite Contract, it is Claimant's position that Respondent made, through MIBAM and other State organs, "*specific promises*" and "*commitments*" and thereby "*created specific expectations,*" which Claimant relied on in making its investments, and which were subsequently frustrated.[485] Respondent advances that the FET standard includes protection of "*legitimate expectations,*" "*limited to situations where the investment took place only because of a promise made by the State that was subsequently not honoured.*"[486]

491.  In light of the Parties' positions in this case, the Tribunal will consider "*due process*" and protection of "*legitimate expectations*" as being, in principle, undisputed elements of the FET under Article 3(1) of the Treaty. If necessary, the Tribunal will further detail the precise scope of these two elements below.

### b)    Due Process in the Expropriation

#### aa)    Summary of Claimant's Position

492.  Claimant submits that Respondent failed to treat Claimant's investment fairly and equitably because its actions in relation to the expropriation were not transparent and did not satisfy the standard of good faith under the Treaty. Claimant argues that its investment was "*effectively expropriated overnight*" without any forewarning and its employees were "*kicked out the same day*" as a result of the "*public and sudden announcement*" on television by President Chávez on 15 May 2010.[487]

493.  Claimant claims that the tribunal in *Middle East Cement v. Egypt* confirmed that the manner in which the investment was expropriated can in itself violate the FET standard and further refers to the tribunal's finding in *Tecmed v. Mexico* that a failure to consult with the claimant prior to the expropriatory action gave rise to a breach of the FET obligation.[488] In addition, Claimant relies on the tribunal's statement in *OI European Group v. Venezuela* that it is difficult to imagine an unlawful direct expropriation, which does not at the same time imply a violation of the FET standard.[489]

---

[485] Reply, ¶ 120; Claimant's Post-Hearing Submission, ¶ 80.
[486] Rejoinder, ¶ 121, citing from European Commission, *Investment Provisions in the EU–Canada Free Trade Agreement*, dated December 3, 2013, **Exhibit RL-142**; European Commission, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text,"* dated August 5, 2014, **Exhibit RL-143**.
[487] Memorial, ¶¶ 180-181; Reply, ¶ 127.
[488] Memorial, ¶ 182 referring to *Middle East Cement v. Egypt* (**CLA-053**), ¶ 143 and *Tecmed v. Mexico* (**CLA-082**), ¶¶ 173-174.
[489] Claimant's Post-Hearing Submission, ¶ 47 referring to *OI European Group v. Venezuela* (**CLA-156**), ¶ 501.

494. According to Claimant, it repeatedly approached Respondent in order to negotiate the amount of compensation to be paid under the Treaty but its efforts were to no avail. Respondent failed to make any offer and further failed to give any indication as to the process it intended to follow in order to ensure the payment of adequate compensation. Claimant refers to the tribunal's statement in *ADC v. Hungary* that the claimant's legitimate expectation included to receive fair treatment and just compensation.[490] By contrast, Claimant claims, Respondent took the plant without establishing a legal framework for the expropriation or an effort to engage in any good faith negotiations on compensation for a period of over ten months.[491]

495. Claimant argues that due process requires that the affected investor be granted "*a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard.*" In Claimant's view, the "*significant delays*" and the "*opaque process*" together with Respondent's insistence on continuing with its domestic expropriation proceedings despite Claimant's choice to pursue its claims before an ICSID tribunal constitute a violation of Respondent's obligation to accord Claimant due process during the expropriation.[492]

496. Claimant maintains that Respondent did not respect "*anyone's understanding of due process*" when it (i) "*abruptly declared the Plant national property in a television announcement*"; (ii) failed to take "*any legal measure, decree or procedure*" for almost a year and could not even outline a timeframe for the start of the process; (iii) failed to provide any authority for PDVSA's "*occupation and control*" of the plant; (iv) refused to negotiate in good faith despite Claimant's repeated efforts and made "*only unsubstantiated 'suggestions' of a mixed enterprise*," which cannot be considered a good-faith offer given that the suggestion did not include any compensation for the loss of the 60% ownership that would be taken by PDVSA; (v) did not offer any compensation as required by both the Treaty and its domestic Expropriation Law; and (vi) failed to act in accordance with the terms of the Expropriation Law as confirmed by its legal expert Dr. Brewer-Carías who states that under Venezuelan law, compensation has to be paid prior to expropriation.[493]

### bb) Summary of Respondent's Position

497. Respondent rejects Claimant's claim that the expropriation was not carried out following due process and argues that there is no requirement under international law to give prior

---

[490] Memorial, ¶¶ 183-184 referring to *ADC v. Hungary* (**CLA-001**), ¶ 424.
[491] Claimant's Post-Hearing Submission, ¶ 42.
[492] Reply, ¶¶ 128-130.
[493] Claimant's Post-Hearing Submission, ¶¶ 45-46; Claimant's Second Post-Hearing Submission, ¶¶ 22-29; Reply, ¶ 126 referring to Brewer-Carías II, ¶¶ 14-17.

warning of its intention to announce an expropriation because this would effectively undermine the State's sovereign right to expropriate.[494] Respondent submits that when PDVSA had established a caretaker presence at the plant, it met with Claimant as soon as possible to negotiate the formation of an *empresa mixta* and, even before the Expropriation Decree was issued, PDVSA "*took active steps to engage with Claimant, to collaborate with Claimant, and ensure that Claimant was aware of the available legal remedies.*"[495]

498.  In response to Claimant's argument that Respondent failed to abide by its domestic Expropriation Law, Respondent maintains that PDVSA was authorized to enter into provisional possession of the plant under Venezuelan law and, in any event, not every failure of the host State to "*comply strictly with the requirements of its laws*" constitutes a breach of its FET obligation under international law.[496]

499.  Respondent emphasizes that after the Decree was issued, PDVSA initiated the administrative amicable expropriation procedure required by the Expropriation Law, which is aimed at determining the compensation to be paid. According to Respondent, Claimant was well aware of the Expropriation Decree and its role in resolving the question of compensation; nevertheless, it chose not to participate in the amicable settlement procedure and to ignore the subsequent judicial procedure. In Respondent's view, the present case is therefore not comparable to the cases cited by Claimant because it neither challenged the expropriation nor did it participate in the determination of just compensation and therefore cannot complain about the resulting delays.[497]

500.  Specifically with regard to *OI European Group v. Venezuela*, Respondent notes that the applicable expropriation provision in that case included an explicit requirement to carry out the expropriation "*under due process of law*" and emphasizes that the tribunal rejected all but one of the claimant's due process arguments. In particular, Respondent emphasizes that the tribunal found that due process does not require prior discussions with the expropriated party and is fully satisfied if the party is subsequently granted the right to be heard before the judiciary.[498] Respondent maintains that this possibility would have been open to Claimant at any time and concludes that "*the fact that Claimant chose not to avail itself of remedies in the Venezuelan courts does not equate with a denial of due process.*"[499]

---

[494] Rejoinder, ¶ 137.
[495] Counter-Memorial, ¶¶ 139-140.
[496] Rejoinder, ¶ 136 (with note 469).
[497] Counter-Memorial, ¶¶ 141-142; Rejoinder, ¶¶ 138-139.
[498] Respondent's Post-Hearing Reply Brief, ¶¶ 10-11 referring to *OI European Group v. Venezuela* (CLA-156), ¶ 322 and ¶¶ 388, 392.
[499] Respondent's Post-Hearing Reply Brief, ¶ 11.

501. Finally, Respondent is of the view that Claimant's argument that the ongoing judicial procedure ignores Claimant's choice to initiate ICSID arbitration is rendered moot by the Tribunal's decision to deny Claimant's request for provisional measures that was based on the same argument.[500]

502. In any event, Respondent submits that Claimant did not suffer any damage during the ten-and-a-half-month period until the Expropriation Decree was issued that is not already included in the calculation of the compensation for the expropriation as of 15 May 2010. According to Respondent, even a finding of an FET violation would not give rise to any change in the manner in which compensation is to be calculated in the present case.[501]

### cc)   The Tribunal's Analysis

503.  During the Hearing and in its Post-Hearing Submission, Claimant included this FET claim in the expropriation claim relating to Article 5(1) subparagraph 1 of the Treaty.[502] The Tribunal notes, however, that Claimant thereby did not intend to abandon its separate FET claim relating to the taking of the plant, given that it maintains in its relief sought the request for a separate declaration that Respondent has breached Article 3(1) of the Treaty.[503]

504. The Tribunal notes the Parties' positions on Claimant's claim for breach of due process during the expropriation process. However, as correctly pointed out by Respondent, Claimant does not allege that it suffered any damage from the alleged breach that would not be included in the compensation for the expropriation itself. Therefore, the Tribunal does not have to make a finding on whether the FET has indeed been breached in this regard because it would not alter the amount of compensation to which Claimant will be entitled pursuant to the Award.

### c)   Price Increases under the Bauxite Contract

### aa)   Summary of Claimant's Position

### (i)   CVG Bauxilum's Conduct Is Attributable to Respondent

505. Claimant claims that CVG Bauxilum's actions are attributable to Respondent because it is "*wholly-owned by, and subject to the direction and oversight of CVG,*" which is an

---

[500] Rejoinder, ¶ 139.

[501] Respondent's Post-Hearing Brief, ¶¶ 108, 112; Respondent's Post-Hearing Reply Brief, note 32

[502] Transcript (Day 1), p. 82 line 13; p. 93 lines 5-7. Claimant's Post-Hearing Submission, ¶¶ 40-47.

[503] Claimant's Second Post-Hearing Submission, ¶ 116. This is confirmed by the cross-reference in Claimant's Post-Hearing Submission (¶ 42 with note 116) to the relevant section in the Memorial (¶¶ 180-184) and Claimant's submission of its FET arguments in its Second Post-Hearing Submission (¶¶ 30-45).

autonomous institute under Venezuelan law and thus forms part of the "*functionally de-centralized*" public entities of Respondent. Claimant adds that CVG enjoys the same priv-ileges and prerogatives as the State, is subject to the coordination of the President of Ven-ezuela and was "*ascribed*" to MIBAM. Consequently, Claimant argues that the same ap-plies to its subsidiary CVG Bauxilum whose activities and services have been declared of public utility and public interest under Venezuela's Mining Law.[504]

506. Claimant therefore argues that (i) CVG Bauxilum should be considered an organ of the State under Article 4 of the ILC Draft Articles; and even if this were not the case, (ii) its conduct would be attributable under Article 5 as it is "*empowered by the law of [the] State to exercise elements of governmental authority*" and "*was acting in that capacity in the particular instance*" because it contracted with Norpro Venezuela on the basis of the State-granted monopoly.[505]

507. To the extent that CVG Bauxilum is considered an organ of the State, Claimant argues that its breach of the Bauxite Contract in itself amounts to an internationally wrongful act rising to the level of a Treaty breach because Claimant is entitled to the same treatment afforded to third-party nationals under the most-favored nation clause in the Treaty. Ac-cording to Claimant, the scope of the MFN clause includes umbrella clauses found in other treaties such as the UK-Venezuela BIT.[506]

508. Claimant also refers to Article 8 of the ILC Draft Articles and notes that this provision does not even require governmental activity.[507] In addition, Claimant claims that Re-spondent, through MIBAM, adopted the Bauxite Contract as its own and then "*sanctioned the contractual breach by refusing to address it when approached directly by Norpro Venezuela*," which creates its responsibility under Article 11 of the ILC Draft Articles.[508]

### (ii)    Respondent's Conduct (Through MIBAM) Created Legitimate Ex-pectations

509. Claimant further submits that, even if CVG Bauxilum's conduct were not attributable un-der the ILC Draft Articles, Respondent's State officials gave "*specific promises*" and thus created "*specific expectations*," which they then repudiated by failing to address CVG

---

[504] Memorial, ¶¶ 173-174; Reply, ¶ 14.
[505] Memorial, ¶¶ 176-177 referring to International Law Commission, Responsibility of States for Internationally Wrongful Acts (2001) (**CLA-044**), Articles 4 and 5.
[506] Memorial, note 340; Reply, note 253.
[507] Reply, note 252.
[508] Reply, ¶ 118.

Bauxilum's actions in raising the bauxite price in violations of the terms of the Bauxite Contract.[509]

510.  In Claimant's view, Respondent "*induced*" its investment through "*a series of promises*," including a guarantee that its State-owned entities would enter into long-term supply contracts for the required inputs (gas, electricity and bauxite). According to Claimant, the "*long-term supply of bauxite at a competitive price*" was "*of critical importance*" to Claimant, which is why it discussed the supply of bauxite directly with MIBAM in 2005.[510]

511.  Claimant contends that Respondent "*regularly discussed and promoted the Bauxite Contract*" and that MIBAM gave "*express assurances* […] *that it had directed CVG Bauxilum to fulfill Norpro Venezuela's bauxite needs on the terms agreed.*"[511] In this regard, Claimant refers, *inter alia*, to a meeting on 10 May 2005 in which the Vice-Minister "[c]*onfirmed the terms that will guide the bauxite and gas supply*" as well as a meeting on 20 October 2005 in which the Vice-Minister confirmed that he had asked "*the president of* [CVG] *Bauxilum to finalize the contract asap.*"[512]

512.  According to Claimant, the Government was aware of the importance to secure bauxite supply and therefore "*directly committed to Saint-Gobain that it would secure such a supply at the Bauxite Contract price.*" Claimant claims that CVG Bauxilum entered into the Bauxite Contract "[a]*t MIBAM's direction*," as confirmed by the fact that the Contract was concluded "*under the auspices of the Ministry of Basic and Mining Industries (MIBAM) and the Corporación Venezolana de Guayana (CVG)*" and embossed with "*Ministry of Basic Mining Industries*" in the header.[513] Consequently, Claimant argues that its legitimate expectations, as "*memorialized*" in the Bauxite Contract with CVG Bauxilum, were created by MIBAM prior to the signing given that it "*controlled and orchestrated*" the negotiations on the supply of bauxite and confirmed the parameters of the contract.[514]

513.  Claimant alleges that even though the Bauxite Contract provides that the bauxite price can be increased only (i) by an automatic annual adjustment by the US PPI for commod-

---

[509] Reply, ¶ 120.
[510] Memorial, ¶ 165; Reply, ¶ 114.
[511] Claimant's Post-Hearing Submission, ¶¶ 79-80 referring to the oral testimony of its witness Mr. Pedersen. Transcript (Day 2), pp. 499-501 and pp. 567-577.
[512] Memorial, ¶¶ 165-166 referring to Minutes of a Meeting among Saint-Gobain, MIBAM and CVG Bauxilum (**Exhibit C-3**) and a Memo from Michel Boyer-Chammard to Guy Rolli, et al., 20 October 2005 (**Exhibit C-074**).
[513] Memorial, ¶¶ 167-168; Purchase and Sale Agreement between CVG Bauxilum, C.A. and Proppants Venezuela, C.A., 27 January 2006 (**Exhibit C-6**).
[514] Reply, ¶¶ 116-117 and ¶ 123.

ities (Article 10.1); and (ii) in the event of increased transportation costs by a jointly reviewed price adjustment (Article 10.2), CVG Bauxilum unilaterally increased the price in violation of these terms. Claimant notes that it objected to the price increase by separate letters to both MIBAM and CVG Bauxilum, as confirmed by its witness Mr. Millot during his oral testimony.[515]

514. In response to Respondent's argument that the price increase was based on the increased transportation costs, in particular the raised tariffs for navigating the Orinoco River, and thus justified under Article 10.2, Claimant submits that, despite "*extensive efforts*" from Norpro Venezuela's management, CVG Bauxilum failed to adequately document the alleged reasons for the price increase, several of which were "*inadequate on their face*."[516]

515. Claimant argues that Respondent's conduct does not merely amount to a breach of contract but a violation of its legitimate expectation that Respondent would ensure compliance with the contract. In this regard, Claimant claims that the tribunal in *Nykomb v. Latvia* "*clearly established the relevance of market-dominance for attribution purposes*."[517] Claimant argues that, in light of Respondent's monopoly over the bauxite production in Venezuela, MIBAM and CVG Bauxilum could impose their terms on Norpro Venezuela, knowing that bauxite was the critical raw material for the production of Claimant's ceramic proppants. While emphasizing that it protested against the increase, Claimant submits that it therefore "*simply had no other choice*" than to pay the increased price.[518]

516. Contrary to what Respondent suggests, Claimant submits that it could not change the supplier of bauxite because the process had been calibrated to the quality of the raw bauxite required for the production proppants and delivery was scheduled only once a year. According to Claimant, the availability of bauxite in sufficient quantities at prices that made the proppants production economically feasible was the entire reason for choosing Venezuela as its investment location. Under these circumstances, Claimant argues that the unilateral price increase was "*antithetical to the transparentand stable legal environment Saint-Gobain was promised*" and thus "*eviscerated*" its legitimate expectations.[519]

---

[515] Memorial, ¶¶ 169-170; Reply, ¶ 15 referring to the letter from Luis Páez to MIBAM, 4 September 2008 (**Exhibit C-096**) and the letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit C-12**); Claimant's Post-Hearing Submission, ¶ 82 referring to Transcript (Day 2), pp. 373-381.

[516] Claimant's Post-Hearing Submission, ¶¶ 83-85.

[517] Reply, ¶ 123 (note 251).

[518] Memorial, ¶ 171; Reply, ¶ 124 (with note 251 referring to *Nykomb v. Latvia* (CLA-058), Section 4.2); Claimant's Post-Hearing Submission, ¶ 82.

[519] Memorial, ¶ 172; Reply, note 49; Claimant's Post-Hearing Submission, ¶¶ 86-87.

### bb)    Summary of Respondent's Position

517.    Respondent rejects Claimant's claim and emphasizes that neither Claimant nor Venezuela was party to the Bauxite Contract, which was rather a "*purely commercial arrangement*" between CVG Bauxilum and Norpro Venezuela and cannot give rise to any obligations of Respondent under international law.

### (i)    CVG Bauxilum's Conduct Is Not Attributable to Respondent

518.    Respondent contests that the actions of CVG Bauxilum are attributable to the State under the ILC Draft Articles because these provisions apply only to "*internationally wrongful acts.*" As there is no allegation that the conclusion of the Bauxite Contract in itself was an internationally wrongful act, Respondent contends that the ILC Draft Articles do not apply.[520]

519.    Respondent submits that, even if the ILC Draft Articles were applicable, CVG Bauxilum cannot be considered an organ of the State under Article 4 because CVG is an autonomous institute and its subsidiary, CVG Bauxilum, is a State-owned company. According to Respondent, neither of them has any executive power but they are decentralized entities of the Public Administration and thus separate and distinct legal persons under Venezuelan commercial law.[521] Respondent argues that if the status is as clearly defined under internal law as is the case here, the internal law is decisive for the classification as an "*organ*" under Article 4.[522]

520.    Respondent further takes the position that CVG Bauxilum's conduct is not attributable under Article 5. In Respondent's view, the exercise of "*governmental authority*" means the "*authority to exercise sovereign prerogatives*" and cannot be equated with "*activities of a commercial character that are routinely carried out by State companies for the benefit of the State.*" Respondent submits that, while CVG Bauxilum is a commercial company acting for the benefit of Respondent in the mining sector, it does not possess or exercise any governmental authority in carrying out its activities.[523]

521.    While acknowledging that CVG Bauxilum indeed has a State-granted monopoly in Venezuela, Respondent notes that Claimant had identified three alternative sources in Guayana and the Dominican Republic and was "*perfectly free*" to import the bauxite from any of those countries. According to Respondent, CVG Bauxilum's monopoly is irrelevant because CVG Bauxilum's decision to increase the price due to the fact that its own

---

[520] Counter-Memorial, ¶¶ 131-132 and ¶¶ 74-81; Rejoinder, ¶ 80.
[521] Counter-Memorial, ¶¶ 82-85; Rejoinder, ¶ 84 and ¶¶ 89-90.
[522] Rejoinder, ¶¶ 85-86.
[523] Counter-Memorial, ¶¶ 86-90 referring to *Hamester v. Ghana* (RL-27), ¶¶ 251-255.

performance had become unviable is not a sovereign act, but rather a "*quintessentially*" commercial act.[524]

522. Respondent is further of the view that CVG Bauxilum's conduct cannot be attributed to Respondent under Article 8 of the ILC Draft Articles because Claimant cannot show a particular act that was internationally wrongful and the result of the State's "*instructions, directions or control.*"[525] Respondent refers to the commentary to the ILC Draft Articles in which Prof. Crawford states:

> "*Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled. If such corporations act inconsistently with the international obligations of the State concerned the question arises whether such conduct is attributable to the State. In discussing this issue it is necessary to recall that international law acknowledges the general separateness of corporate entities at the national level, except in those cases where the* 'corporate veil' *is a mere device or a vehicle for fraud or evasion. The fact that the State initially establishes a corporate entity, whether by a special law or otherwise, is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity. Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, prima facie their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority within the meaning of article 5.*"[526]

523. With regard to Claimant's argument that CVG (and therefore effectively also CVG Bauxilum) is under the administrative guardianship and oversight (*tutela*) of MIBAM, Respondent notes that under Venezuelan law, *control de tutela* is a form of "*general oversight*" to ensure that the activities of decentralized entities or State-owned companies are carried out in line with State policy, but argues that it cannot make the State responsible for the commercial decisions of a State-owned company.[527]

524. Finally, Respondent contends that Claimant's reference to Article 11 of the ILC Draft Articles contradicts its previous arguments related to Article 4, 5 and 8 because Article 11 is premised on the absence of any governmental or sovereign conduct. In addition, Respondent submits that Claimant has not identified any "*clear and unequivocal*" statement or act of adoption on the part of Respondent and still cannot overcome the hurdle of an internationally wrongful conduct.[528]

---

[524] Counter-Memorial, ¶¶ 91-98; Rejoinder, ¶ 96.
[525] Counter-Memorial, ¶¶ 99-101.
[526] *James Crawford*, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (**RL-21**), Article 8, p. 112.
[527] Counter-Memorial, ¶¶ 102-106.
[528] Rejoinder, ¶¶ 99-102.

### (ii)    Claimant's Claim is Factually Inaccurate

525.    In any event, Respondent claims that Norpro Venezuela was not forced to accept any price increase but, after initial protest, "*appreciated the underlying reasons*" given by CVG Bauxilum for the increase, *i.e.*, the new tariffs for navigation on the Orinoco River and the significant variation of extraction, transport and unloading costs at the Matanzas plant. According to Respondent, Norpro Venezuela made a business decision to agree to the price increase, subject to its request that the price be maintained at that level through 2009. Respondent emphasizes that CVG Bauxilum honored that request and did not seek a further price increase until 2010.[529] Respondent further claims that none of the documents invoked by Claimant reflect its alleged request that additional reasons or documentation of such reasons be provided.[530]

526.    Respondent argues that Norpro Venezuela could have decided not to purchase any bauxite from CVG Bauxilum and could instead have imported bauxite from any of the three alternative resources it had identified in Guayana and the Dominican Republic. Alternatively, Respondent notes, it could have resorted to arbitration proceedings under the Bauxite Contract against CVG Bauxilum.[531]

527.    Respondent further rejects Claimant's submission that its investment hinged on the expectation that it would receive a stable supply of bauxite from CVG Bauxilum at the same price. According to Respondent, Claimant "*certainly never received any guarantee from the Republic regarding supply or price*" but even advised its parent company in 2005 that there were considerable risks associated with the supply of bauxite, which they could mitigate by securing multiple viable alternative sources. Respondent notes that Claimant therefore stated internally that they were in need of an "*alternative supply of bauxite from Guayana if tomorrow CVG no longer supplies us with any*."[532]

528.    Respondent argues that in the absence of any specific promises or guarantees from the State, Claimant's "*expectations*" are not protected and claims that even the cases relied on by Claimant support this. According to Respondent, none of the documents referred to by Claimant with regard to the alleged commitments of the State show any involvement "*beyond support of a general nature for the proppant plant project*," which does not suffice to give rise to legitimate expectations, or that Respondent "*sanctioned*" CVG Bauxilum's decision to increase the bauxite price.[533] In Respondent's view, this is confirmed by Mr.

---

[529] Counter-Memorial, ¶ 133; Rejoinder, ¶ 132; Respondent's Post-Hearing Brief, ¶ 124 referring to letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit R-52**).

[530] Respondent's Post-Hearing Reply Brief, ¶ 28.

[531] Counter-Memorial, ¶ 134; Respondent's Post-Hearing Brief, ¶ 125.

[532] Counter-Memorial, ¶ 135 referring to February 2005 DAC (**Exhibit R-5**), p. 5 and quoting from Email from Guy Rolli to Jorgen Pedersen, 16 February 2005 (**Exhibit C-059**); Rejoinder, ¶ 127.

[533] Rejoinder, ¶¶ 128-133; Respondent's Post-Hearing Brief, ¶ 127.

Pedersen's oral testimony because he could not point to any specific documents or communications in which the alleged guarantees or commitments were made. In particular, Respondent notes that Mr. Pedersen could not identify a specific meeting in which the wording "*under the auspices of* […] *MIBAM*" was discussed and given the meaning that Claimant now alleges.[534]

529. Consequently, Respondent maintains that the Government "*did nothing more than to facilitate the discussions with CVG Bauxilum*" and made no commitments regarding the supply or price of bauxite to Norpro Venezuela. Therefore and apart from the fact that it considers the price increase justified under the Bauxite Contract, Respondent is of the view that it had no obligation to intervene and assist in the resolution of the dispute between CVG Bauxilum and Norpro Venezuela.[535]

### cc)    The Tribunal's Analysis

530. In the Tribunal's view, Claimant's argument on the bauxite price increase is twofold: First, Claimant argues that at the time it made the decision to invest in Venezuela in 2005, Respondent (through its own State officials, in particular from MIBAM) created a legitimate expectation that CVG Bauxilum would supply Norpro Venezuela with bauxite at stable prices in the long term, but then failed to intervene when CVG Bauxilum unilaterally increased the price in 2008 and thus breached those expectations. Second, Claimant argues that CVG Bauxilum's conduct in breach of the Bauxite Contract can be attributed to Respondent in accordance with the ILC Draft Articles and, in light of its State-granted monopoly over the supply of bauxite in Venezuela, amounts to a violation of Respondent's international obligations.

531. As to the first argument, the Tribunal notes that there is common ground between the Parties that, while Respondent generally supported Claimant's investment in 2005 and 2006, this alone cannot give rise to Respondent's liability under international law. Rather, a legitimate expectation can be created only by specific promises or commitments made by the State. The dispute between the Parties relates to whether Respondent has made such specific promises in relation to the supply of bauxite at stable prices.

532. In the Tribunal's view, the evidence presented by Claimant in this regard does not establish that the State (through MIBAM) made any specific commitments in relation to the terms of the Bauxite Contract and in particular the prices at which CVG Bauxilum would supply the bauxite. In his written witness statement, Mr. Pedersen described that MIBAM

---

[534] Respondent's Post-Hearing Brief, ¶¶ 128-132 referring to Transcript (Day 2), pp. 500-510 and pp. 576-579. See also Respondent's Post-Hearing Reply Brief, ¶ 28.
[535] Respondent's Post-Hearing Brief, ¶¶ 129 and 134.

was very involved in the negotiations with CVG Bauxilum and repeatedly voiced its support for the project.[536] Mr. Pedersen did not, however, make reference to any specific commitment made by MIBAM in relation to the bauxite price. When he was asked about this during the Hearing, Mr. Pedersen clarified:

> "*I don't think, frankly, it was—if you look at it from that way, was the bauxite price negotiated with MIBAM. No, it was not, but the support to get a contract with Bauxilum was discussed and agreed with MIBAM. And then later on there are, of course, commercial negotiations between us and Bauxilum.*"[537]

533.   Mr. Pedersen's oral testimony confirms the Tribunal's impression from the record that MIBAM indeed facilitated and supervised the negotiations with CVG Bauxilum and even approved the general terms that would govern the supply of bauxite. However, Respondent correctly pointed out that none of the statements made can be qualified as a commitment that the State would guarantee CVG Bauxilum's compliance with the pricing terms of the Bauxite Contract.

534.   Claimant further argues that the term "*bajo el auspicio del* […] *MIBAM*"[538] can be equated to an "*express assurance*" that CVG Bauxilum would supply Norpro Venezuela with bauxite at the agreed terms.[539] When asked about this term at the Hearing, Mr. Pedersen testified that it was discussed in the meetings with MIBAM that "*they were basically standing behind this contract and standing behind Bauxilum in agreeing this with us.*" Mr. Pedersen could not, however, identify a concrete meeting at which, or a concrete person by whom, such statement was made.[540] The Tribunal is therefore not convinced that the term was subject to any discussion before the Bauxite Contract was signed and, more importantly, there is no indication that it was to be assigned such a far-reaching meaning as to ensure compliance with the Bauxite Contract and/or to guarantee stable prices in the long term.

535.   In sum, the Tribunal finds that Claimant has not established that there were any promises or commitments made by Respondent (through MIBAM) specifically in relation to the supply of bauxite at the price agreed with CVG Bauxilum under the Bauxite Contract. Consequently, MIBAM's conduct did not give rise to a legitimate expectation of Claimant that it would guarantee CVG Bauxilum's compliance with the Bauxite Contract.

---

[536] Pedersen, ¶¶ 21-33.
[537] Transcript (Day 2), p. 504 lines 11-17.
[538] Purchase and Sale Agreement between CVG Bauxilum, C.A. and Proppants Venezuela, C.A., 27 January 2006 (**Exhibit C-6**), Preamble.
[539] Claimant's Post-Hearing Submission, ¶ 79.
[540] Transcript (Day 2), p. 577 line 5 – p. 579 line 1.

536. As to Claimant's second argument, the Tribunal does not have to decide whether CVG Bauxilum's conduct is attributable to Respondent under the ILC Draft Articles and whether a breach of contract could give rise to Respondent's liability under international law in light of CVG Bauxilum's State-granted monopoly over the supply of bauxite in Venezuela. Even if this were the case, Claimant has not established that the price increase in September 2008 amounted to a breach of contract.

537. CVG Bauxilum based the increase on Article 10.2 of the Bauxite Contract, which provides:

> "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será aplicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior.*"[541]

538.  During the first meeting in which the price increase was discussed, CVG Bauxilum invoked the following reasons: (i) increase in the Orinoco River toll by 600%; (ii) impact of the extraction and production cost that were higher than the selling price; (iii) increase of the freight costs due to increased labor costs; (iv) international market analysis according to which CVG Bauxilum's price was lower than in the international market.[542]

539. While the Tribunal agrees with Claimant that not all of those reasons justified a price increase under the terms of the Bauxite Contract, the letter of 2 September 2008 by which CVG Bauxilum informed Claimant about the price increase to USD 33.8 per MT relies on "*las nuevas tarifas del canal de Navegación del Río Orinoco*" and "*la apreciable variación que ha experimentado el costo de extracción, transporte y descarga de la bauxita en nuestra Planta de Matanzas*."[543] These reasons are explicitly provided for in Article 10.2 of the Bauxite Contract and would therefore, if proven, justify an increase of the bauxite price.

540. Claimant does not dispute that the tariffs on the Orinoco River were indeed raised by 600% by decree of 31 July 2008.[544] Neither does it dispute that the extraction, transportation and unloading fees at the Matanza plant had increased. Claimant rather argues, as

---

[541] Purchase and Sale Agreement between CVG Bauxilum, C.A. and Proppants Venezuela, C.A., 27 January 2006 (**Exhibit C-6**), Article 10.2.

[542] Email from Oscar Cid to Jorgen Pedersen, 30 July 2008 (**Exhibit C-093**).

[543] Letter from Carlos Acosta Pérez to Oscar Cid, 2 September 2008 (**Exhibit C-11**).

[544] Decreto No. 6.220 con Rango, Valor y Fuerza de Ley de Canalización y Mantenimiento de la Vías dee Navegación), published in the Official Gazette No. 5.891 (Extraordinary), 31 July 2008 (**Exhibit R-50**).

repeatedly confirmed by Mr. Pedersen during the Hearing,[545] that it was never provided with documentation or a calculation for the price increase. While it claims that it repeatedly requested to receive such information, Claimant has not identified any occasion on which it ever voiced such a specific request but only refers to requests for "*further discussion of the proposed price increase*," its emphasis on the applicability of Article 10.2 to any price increase and its protests against the increase which they considered to be outside the terms of the Bauxite Contract.[546] When Mr. Pedersen was asked during the Hearing whether Claimant had ever requested to receive such documentation, he stated:

> "*Yes. I don't know if it was in here, but I mean, yeah, I mean in the meetings with them, we certainly asked for to let us know.*
>
> *Arbitrator Brower: So, did that company refuse to provide such information, or it just did not provide it, and you moved on?*
>
> *The Witness: Yeah, I mean, we never got something, I mean, which was unfortunate. Every now and then it's difficult to get information. This is also back to why it took 15 months to actually sign the Contract* […]."[547]

541. In light of this rather vague testimony, the Tribunal is not convinced that Claimant ever expressly voiced the request to be provided with documentation for the reasons invoked by CVG Bauxilum. From the record, in particular Claimant's letter of 17 September 2008, it rather appears that Norpro Venezuela made the decision to accept the price increase, albeit under protest, under the condition that it would remain at that level throughout the following year, *i.e.*, until 31 December 2009.[548] It is undisputed between the Parties, and confirmed by CVG Bauxilum's invoices to Claimant in 2009,[549] that CVG Bauxilum adhered to this request and did not request a further price increase until early 2010. While Claimant emphasized in its letter that this should not be considered a tacit acceptance of the price increase, the Tribunal notes that Norpro Venezuela never took action against CVG Bauxilum in this regard under the dispute resolution clause provided for in the Bauxite Contract.

542. In light of the above, the Tribunal finds that Claimant has not established that the price increase of September 2008 was not justified under Article 10.2 of the Bauxite Contract. In the absence of a breach of contract on the part of CVG Bauxilum, in the circumstances

---

[545] Transcript (Day 2), p. 526 line 14 – p. 527 line 1; p. 530 lines 14-19; p. 532 line 21 – p. 533 line 12; p. 585 lines 13-18; p. 587 lines 15-18.
[546] Cf. Claimant's Post-Hearing Submission, ¶ 84.
[547] Transcript (Day 2), p. 596 lines 2-15.
[548] Letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit C-12**).
[549] CVG Bauxilum Invoices, Doc. R Bates numbers 0041 – 0046 (**Exhibit CLEX-83**).

of this case it can therefore be left open whether Respondent could be held liable for such breach under international law.

### 3. Full Protection and Security (Article 3(2) of the Treaty)

543. Finally, the Tribunal will address Claimant's claim based on the full protection and security provision contained in Article 3(2) of the Treaty. Following a brief analysis of the applicable FPS standard (**(a)**), the Tribunal will turn to Claimant's FPS claims as regards the Bauxite Contract (**(b)**) and the takeover of the plant (**(c)**).

### a) Applicable FPS Standard

#### aa) Summary of Claimant's Position

544. Claimant submits that the FPS standard imposes an obligation of "*due diligence*" and "*vigilance*" on the host State, which requires "*reasonable measures of prevention" that a "well-administered government could be expected to exercise in similar circumstances*."[550]

545. Claimant submits that, in the "*modern commercial and business context*," investment treaty tribunals have not confined the FPS standard to physical security, but rather extended it to encompass legal security.[551] Claimant argues that the FPS standard has evolved to include "*more generally, the rights of investors*" and applies "*at least in situations* 'involving either physical violence or the discard of legal rights.'"[552]

546. Even if Article 3(2) were to be limited to physical security, Claimant submits that it would still benefit from the "*full legal protection*" that Respondent granted to third-party nationals in the Uruguay-Venezuela BIT on the basis of the most-favored nation clause contained in Article 4 of the Treaty.[553]

#### bb) Summary of Respondent's Position

547. It is Respondent's position that an analysis of a breach of the FPS standard requires consideration of whether the investment has been physically interfered with or harmed and whether the State complied with its due diligence obligation.[554] According to Respondent, this limitation is required in order "*to maintain a meaningful distinction*" between the

---

[550] Memorial, ¶ 185 quoting from *AAPL v. Sri Lanka* (**CLA-005**), ¶ 77.
[551] Reply, ¶ 133 citing various legal authorities.
[552] Reply, ¶ 134 quoting from *Vannessa Ventures v. Venezuela.* **Exhibit CLA-150,** ¶ 223.
[553] Memorial, note 379 referring to the Agreement between the Oriental Republic of Uruguay and the Government of the Republic of Venezuela for zhe Promotion and Protection of Investments (20 May 1997, in force on 18 January 2002) (**Exhibit C-050**), Article 4; Reply, ¶ 135.
[554] Counter-Memorial, ¶ 149.

FPS standard and other protection standards set out in the Treaty, in particular the FET standard.[555]

548.  While acknowledging that it has a duty of diligence under the FPS standard, Respondent claims that a breach of this duty requires "*a degree of negligence, defective administration or bad faith*" that reflects the relationship between the FPS standard and the international minimum standard of treatment.[556]

549.  Respondent rejects Claimant's argument that the FPS standard entails the concept of "*legal security*" and claims that international case law is rather in favor of the view that the FPS obligation "*relates primarily, and perhaps exclusively, to the physical integrity of the investment.*"[557] Respondent emphasizes that unlike other treaties, which expressly refer to "*full protection and legal security*," the present Treaty does not make reference to legal security and is therefore not designed to turn contract breaches into treaty claims.[558]

### cc)    The Tribunal's Analysis

550.  Article 3(2) of the Treaty provides:

"*Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières.*"[559]

"*Las inversiones efectuadas por nacionales o sociedades de una o otra de las Partes Contratantes gozarán, en el territorio y en la zona marítima de la otra Parte contratante, de una protección y de una seguridad plenas y completas.*"[560]

552.  The English translation submitted by Claimant reads:

"*Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security.*"[561]

---

[555] Rejoinder, ¶ 144 referring to various legal authorities.
[556] Rejoinder, ¶ 145.
[557] Counter-Memorial, ¶¶ 146-148 referring to various legal authorities; Rejoinder, ¶ 143.
[558] Counter-Memorial, ¶¶ 152, 156.
[559] Journal Officiel de la République Française n°102 du 30 avril 2004, **Exhibit C-1**, p. 7775.
[560] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Exhibit C-1**, pp. 332-353-332.354.
[561] Free translation submitted as **Exhibit C-1**.

553. The Tribunal notes that while there is common ground between the Parties that Article 3(2) of the Treaty imposes a duty of due diligence on Respondent, there is a dispute as to (i) the exact scope of such duty; and (ii) whether the FPS standard extends to legal security. These issues can be left open if Claimant's two claims based on the FPS standard in Article 3(2) are to be dismissed in any event, *i.e.*, even under the broader standard advanced by Claimant. Therefore, the Tribunal will make a decision on the exact scope of Article 3(2) only if and to the extent necessary to make a finding on Claimant's claims.

### b)    Claimant's Rights under the Bauxite Contract

#### aa)    Summary of Claimant's Position

554. Claimant submits that in light of MIBAM's involvement in the negotiations and conclusion of the Bauxite Contract, it considered MIBAM as a "*key interlocutor capable of addressing any concerns they might have with the Government.*" For that reason, Claimant contends, Norpro Venezuela first wrote to MIBAM and copied MIBAM on its correspondence to CVG Bauxilum when it was faced with the price increase in 2008. However, Claimant notes that MIBAM ignored Claimant's requests to intervene and Respondent thus failed to protect Claimant's investment from CVG Bauxilum's actions in spite of its FPS obligation.[562]

555. According to Claimant, the tribunal in *Nykomb v. Latvia* found "*in similar circumstances*" that Latvia's failure to protect the foreign investor against contractual breaches of a State-owned entity, despite being fully aware of them, constituted a breach of the FPS obligation.[563] Claimant further refers to the tribunal's emphasis in *CME v. Czech Republic* on the obligation to "*ensure that neither by amendment of its laws nor by actions of its administrative bodies is the agreed and approved security and protection of the foreign investor's investment withdrawn or devalued.*"[564]

556. Claimant therefore argues that Respondent's failure to act upon notification of CVG Bauxilum's breaches of the Bauxite Contract constitutes a violation of its obligation to accord Claimant's investment legal security under Article 3(2) of the Treaty.[565]

#### bb)    Summary of Respondent's Position

557. Respondent submits that Claimant's allegation pursuant to which the price increase was not in accordance with the Bauxite Contract, despite the fact that it was accepted by

---

[562] Memorial, ¶¶ 190-192; Reply, ¶ 138.
[563] Memorial, ¶ 193 referring to *Nykomb v. Latvia* (**CLA-058**), Section 4.2.
[564] Memorial, ¶ 188 referring to *CME v. Czech Republic*, (**CLA-019**), ¶ 613.
[565] Reply, ¶ 142.

Norpro Venezuela, "*does not even come close to triggering a State's duty of due diligence.*"[566]

558. Respondent maintains that it is not responsible for CVG Bauxilum's decision to increase the price under the Bauxite Contract. In response to Claimant's argument that it wrote to MIBAM to seek its intervention, Respondent argues that Claimant thereby attempts to create an obligation of the State by "*communicating its discontent with the behavior of a commercial partner to a government representative,*" which Respondent considers clearly untenable. In Respondent's view, Claimant's position would render the dispute resolution clause in the Bauxite Contract pointless and in any event the dispute was resolved amicably by the parties to the Contract when CVG Bauxilum explained the reasons for the price increase and Norpro Venezuela accepted the increase on the condition that the price would remain at the same level until the end of 2009.[567]

### cc)    The Tribunal's Analysis

559. The Tribunal has already determined above in the context of Claimant's FET claim that Claimant has not established that Respondent (through MIBAM) made any specific commitments in relation to the supply of bauxite at the price agreed with CVG Bauxilum under the Bauxite Contract. The Tribunal has also found that CVG Bauxilum's conduct in relation to the price increase in September 2008 did not amount to a breach of contract.

560. Therefore, the Tribunal does not have to decide whether the FPS standard contained in Article 3(2) of the Treaty extends to the concept of "*legal security,*" as alleged by Claimant. In any event, Respondent did not have an obligation to intervene in relation to the bauxite price increase and thus has not breached its obligation to accord Claimant's investment full protection and security in the manner invoked by Claimant.

## c)    Takeover of the Plant

### aa)    Summary of Claimant's Position

561. In the alternative that the Tribunal should follow Respondent's position that the expropriation occurred only on 29 March 2011 when the Expropriation Decree was issued, Claimant further claims that Respondent has breached its FPS obligation because PDVSA took over and remained in control of the plant between the takeover on 15 May 2010 and the issuance of the Expropriation Decree.[568]

---

[566] Counter-Memorial, ¶ 150.

[567] Rejoinder, ¶¶ 140-142 and ¶ 150. *See* also Respondent's Post-Hearing Brief, ¶¶ 124-126.

[568] Claimant's Post-Hearing Submission, ¶ 48; Claimant's Second Post-Hearing Submission, note 3.

562. Claimant argues that if there was no expropriation on 15 May 2010, PDVSA had no right to occupy the plant on any date prior to 29 March 2011 and thus should have contacted Claimant "[t]*he minute it obtained control*" and should have allowed it to reoccupy the plant. Instead, Claimant contends that its personnel was barred by the National Guard from re-entering the plant and PDVSA started production for its own benefit. According to Claimant, this conduct amounts to a clear breach of Respondent's FPS obligation under Article 3(2) of the Treaty.[569]

### bb)   Summary of Respondent's Position

563. Respondent maintains that the expropriation occurred when the Expropriation Decree was issued on 29 March 2011. Respondent acknowledges that PDVSA was present during the time period prior to that date but argues that this was "*both appropriate and necessary given the dangers associated with the Plant*." Respondent further submits that there was no contemporaneous evidence of any complaints about PDVSA's role and claims that not only did Claimant never ask for the return of the plant but it even encouraged PDVSA's presence at the plant and the appointment of an interlocutor, precisely because it was not present and the plant was "*a dangerous facility in the hand of unsupervised workers.*"[570]

564. Therefore, Respondent is of the view that it complied with its FPS obligation and adds that, by contrast, if it had not established a presence at the plant and the equipment had been damaged or workers had been issued, Claimant may well have had a claim for non-compliance with Respondent's FPS obligation.[571]

### cc)   The Tribunal's Analysis

565. The Tribunal notes that Claimant has raised this claim in the alternative that the Tribunal should find that the expropriation did not occur on or shortly after 15 May 2010, but only on 29 March 2011 when the Expropriation Decree was issued. Given the Tribunal's finding at paragraph 477 above that PDVSA's presence at the plant and its memos in early June 2010 mark the start of the expropriation process, there is thus no need to decide on this alternative claim.

## IV.   THE PRINCIPLES OF QUANTUM

566. The Tribunal will now turn to the principles of quantum applicable as a result of the expropriation and Respondent's non-compliance with Article 5(1) subparagraphs 2 and 3 of the Treaty. The Parties' positions differ significantly as to the applicable compensation

---

[569] Claimant's Post-Hearing Submission, ¶ 49.
[570] Respondent's Post-Hearing Brief, ¶ 20; Respondent's Post-Hearing Reply Brief, note 42.
[571] Respondent's Post-Hearing Reply Brief, note 42.

standard, in particular with respect to the appropriate valuation date (**1.**), and the criteria for the calculation of damages (**2.**).

## 1.    Compensation Standard and Valuation Date

567.   One of the key legal questions in dispute between the Parties is the applicable compensation standard and, in this context, particularly the applicable valuation date. As noted above, the Tribunal finds that Respondent did not comply with the compensation requirements set out in Article 5(1) subparagraphs 2 and 3 of the Treaty. Whether this finding renders the expropriation unlawful and whether this would have any impact on the compensation standard to be applied in the present case is therefore going to be addressed first in this section.

### a)    Summary of Claimant's Position

#### aa)    Unlawfulness of the Expropriation

568.   Claimant submits that Respondent's failure to meet the specification and/or promptness requirements renders the expropriation unlawful.[572]

569.   Claimant contends that several awards rendered by the Iran-United States Claims Tribunal "*recognize the payment of prompt compensation to be a consideration relevant to the lawfulness of a taking under customary international law.*"[573]

570.   In the investment treaty context, Claimant submits that the tribunal in *Unglaube v. Costa Rica* found an expropriation to be unlawful when compensation was not paid "*within a reasonable period of time after the State declare*[s] *its intention to expropriate.*"[574]

571.   Similarly, the tribunal in *Burlington v. Ecuador* confirmed that, in a case where a State has expropriated a foreign investor's property and "*has neither paid nor offered compensation* […] *the Tribunal cannot but conclude that* [the] *expropriation was unlawful.*"[575]

572.   Claimant further refers to the tribunal in *ConocoPhillips v. Venezuela*, which recently found that while "*payment is not required at the precise moment of expropriation* […] [p]*arties must engage in good faith negotiations to fix the compensation in terms of the standard set* […] *if a payment satisfactory to the investor is not proposed at the outset.*" In that case, the tribunal found that "*the Respondent breached its obligation to negotiate*

---

[572] Memorial, ¶ 141; Reply, ¶¶ 77-83.
[573] Memorial, ¶ 141; **Exhibit CLA-014**.
[574] Memorial, ¶ 141; **Exhibit CLA-051**.
[575] Memorial, ¶ 141; **Exhibit CLA-015**.

*in good faith for compensation for its taking*" and thus, that the expropriation was unlawful.[576]

573. Moreover, Claimant submits that in *Siemens v. Argentina*, the arbitral tribunal stated:

> "[C]*ompensation has never been paid on grounds that* […] *the Tribunal finds that are lacking in justification. For these reasons, the expropriation did not meet the requirements of Article 4(2)* [of the Argentina-Germany BIT] *and therefore was unlawful.*"[577]

574. Similarly, in *Vivendi v. Argentina II*, the tribunal reasoned:

> "*If we conclude that the challenged measures are expropriatory, there will be violation of Article 5(2) of the Treaty, even if the measures might be for a public purpose and non-discriminatory, <u>because no compensation has been paid.</u>*"[578]

575. Finally, Claimant contends that, in *Gemplus v. Mexico*, the tribunal concluded:

> "[T]*hese expropriations were unlawful under the BITs and international law, given the facts found by the Tribunal and <u>the further fact that the Respondent did not meet the condition required by Article 5 of both treaties regarding the payment of adequate compensation.</u>*"[579]

### bb)   Compensation Standard to Be Applied

576. It is Claimant's submission that the appropriate remedy for an unlawful expropriation is the customary international law standard of restitution, *i.e.*, the higher compensation as between that valued at the date of expropriation and the date of the award.[580]

577. In support of its approach, Claimant emphasizes that Article 5(1) of the Treaty provides for the appropriate standard of compensation only in case all of the conditions for a lawful expropriation are met. As this is not the case here, the appropriate standard of compensation, including the appropriate date at which the value is to be assessed, is set by customary international law.[581]

578. Claimant initially argued that Respondent must either return the plant to Claimant – which is impossible here – or pay the cash equivalent of such a return, both of which would therefore have to occur as of the date of the award.[582] During the Hearing and in its Post-Hearing Submission, Claimant emphasized, however, that, in case the Tribunal were to

---

[576] Memorial, ¶ 141; **Exhibit CLA-025**.
[577] Reply, ¶ 78; **Exhibit CLA-077**.
[578] Reply, ¶ 78; **Exhibit CLA-024**. Emphasis added by Claimant.
[579] Reply, ¶ 78; **Exhibit CLA-125**. Emphasis added by Claimant.
[580] Claimant's Post-Hearing Submission, ¶ 73.
[581] Memorial, ¶ 197; Reply, ¶ 152.
[582] Memorial, ¶¶ 199, 208; Reply, ¶ 152.

find that the value as of the date of the expropriation is higher than the value as of the date of the award, the Tribunal should determine the compensation based on the value as of the date of expropriation.[583]

579. According to Claimant's Valuation Update, Norpro Venezuela's value as of 31 August 2015 (the assessment date for the date-of-the-award valuation that the Tribunal is ultimately to take into account for its decision) is lower than the value as of 15 May 2010.[584] Therefore, Claimant now claims that it is entitled to compensation in the amount of Norpro Venezuela's value as of 15 May 2010.[585]

580. According to Claimant, the *rationale* behind the investor's right of selecting the valuation date is the aim to award full compensation to the investor who was deprived of making the choice whether to retain the investment and enjoy the fruits derived therefrom or whether to sell it at the optimal moment. As a result, the investor "*must be accorded the upside since that time, but cannot be forced to shoulder the downside.*"[586]

581. Claimant submits that this argumentation is consistent with the approach taken by the Permanent Court of International Justice in the landmark *Chorzów Factory* decision.[587] In support of its argumentation, Claimant particularly refers, in its written submissions,[588] to the cases *Biwater v. Tanzania,*[589] *Siemens v. Argentina,*[590] *ADC v. Hungary,*[591] *Kardassopoulos v. Georgia,*[592] *Unglaube v. Costa Rica,*[593] *ConocoPhillips v. Venezuela,*[594] *Texaco v. Libya,*[595] *CMS v. Argentina,*[596] *Vivendi v. Argentina II,*[597] *Siag v. Egypt,*[598] *Saipem v. Bangladesh,*[599] *Funnekotter v. Zimbabwe*[600] and *Yukos v. Russia.*[601]

### b)    Summary of Respondent's Position

---

[583] Transcript (Day 1), p. 30 line 22 – p. 31 line 14; Claimant's Post-Hearing Submission, ¶ 77.
[584] Claimant's Valuation Update, Table 1.
[585] Claimant's letter dated 6 November 2015.
[586] Claimant's Post-Hearing Submission, ¶¶ 75-76.
[587] Memorial, ¶ 209; Claimant's Post-Hearing Submission, ¶ 73. **Exhibit CLA-033**.
[588] Memorial, ¶¶ 210-212 (with notes 408, 409); Reply, ¶ 146 (note 302); Claimant's Post-Hearing Submission, ¶¶ 74-75.
[589] **Exhibit CLA-013**.
[590] **Exhibit CLA-077**.
[591] **Exhibit CLA-001**.
[592] **Exhibit CLA-046**.
[593] **Exhibit CLA-051**.
[594] **Exhibit CLA-025**.
[595] **Exhibit CLA-083**.
[596] **Exhibit CLA-021**.
[597] **Exhibit CLA-024**.
[598] **Exhibit CLA-144**.
[599] **Exhibit CLA-070**.
[600] **Exhibit CLA-036**.
[601] **Exhibit CLA-153**.

### aa) Lawfulness of the Expropriation

582. Respondent submits that the mere fact that compensation is yet to be paid does not render the expropriation unlawful, taking into account that Respondent acknowledged its obligation to pay compensation and commenced the expropriation procedure in consistency with its domestic law.[602]

583. Respondent points out that, in his separate opinion in *Sedco v. Iran*, Judge Brower noted:

> "*Likewise I must express doubt as to whether, under customary international law, a State's mere failure, in the end, actually to have compensated in accordance with the international law standard set forth herein necessarily renders the underlying taking ipso facto wrongful. If, for example, contemporaneously with the taking the expropriating State provides a means for the determination of compensation which on its face appears calculated to result in the required compensation, but which ultimately does not, or if compensation is immediately paid which, though later found by a tribunal to fall short of the standard, was not on its face unreasonable, it would appear appropriate not to find that the taking itself was unlawful but rather only to conclude that the independent obligation to compensate has not been satisfied.*"[603]

584. Moreover, in *Mondev v. USA*, the tribunal found:

> "[F]*or a taking to be lawful under Article 1110 [NAFTA], at least the obligation to compensate must be recognised by the taking State at the time of the taking, or a procedure must exist at that time which the claimant may effectively and promptly invoke in order to ensure compensation.*"[604]

585. Further, Respondent contends that in *CDSE v. Costa Rica*, the fact that Costa Rica had expropriated the property and had not paid compensation for 20 years did not render the expropriation unlawful.[605] In *Amoco*, the tribunal held that there was no unlawful expropriation even though there was no payment of compensation at the time of the taking.[606]

586. Respondent also submits that, in *American International Group v. Iran*, the tribunal held that the nationalization of shares in an Iranian insurance company was lawful where Iran

---

[602] Counter-Memorial, ¶¶ 161-173; Rejoinder, ¶¶ 159-168.

[603] Counter-Memorial, ¶ 162; **Exhibit RL-099**. Judge Brower further noted: "*If, on the other hand, no provision for compensation is made contemporaneously with the taking, or one is made which clearly cannot produce the required compensation, or unreasonably insufficient compensation is paid at the time of taking, it would seem appropriate to deem the taking itself wrongful. It is in such cases that restitutio in integrum may be appropriate as a remedy that, in addition to that, or to a monetary award of damages, should that alternative be selected, a tribunal might consider an award of punitive damages.*"

[604] Counter-Memorial, ¶ 162; **Exhibit RL-100**.

[605] Counter-Memorial, ¶ 162; **Exhibit RL-102**.

[606] Counter-Memorial, ¶ 162; **Exhibit CLA-004**.

had recognized the obligation to compensate, even though no compensation had been paid.[607]

587. In *Southern Pacific Properties v. Egypt*, the tribunal did not consider the expropriation of the claimant unlawful, although no compensation had been paid for 13 years.[608]

588. Moreover, Respondent contends that in *LIAMCO v. Libya*, the tribunal held that even though no compensation had been paid, the nationalization of the claimant's concession interests was lawful because Libya had recognized its obligation to compensate.[609]

589. Similarly, in *Aminoil v. Kuwait*, the tribunal held that the nationalization of Aminoil's concession was lawful despite the fact that compensation had not been paid.[610]

590. Finally, Respondent observes that, analyzing Article 5(2) of the France-Poland Treaty, which is in material respects similar to Article 5(1) of the France-Venezuela Treaty, the tribunal in *Servier v. Poland* specifically found that the question whether the expropriation was legal or not did not turn on whether compensation had been paid.[611]

### bb) Compensation Standard to Be Applied

591. Respondent submits that, regardless of whether the expropriation was lawful or unlawful, the proper valuation date is prior to the *"threat of expropriation*," as set out in Article 5(1) subparagraph 2 of the Treaty.[612] During the Hearing, Respondent emphasized that, while it maintains its position that the expropriation occurred only on 29 March 2011, it nevertheless considers 15 May 2010 to be the correct valuation date because the expropriation was announced by President Chávez on that date.[613]

592. Respondent refers to the, in its view, clear and unambiguous wording of Article 5(1) subparagraph 2 of the Treaty, according to which the value of the expropriated asset is to "*be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*"[614] It is Respondent's submission that the reference to "[t]*outes les mesures d'expropriation qui pourraient être prises*", "[t]*odas las medidas de expropiación que pudieran tomarse*" ("[a]*ll measures of expropriation which could be*

---

[607] Counter-Memorial, ¶ 162; **Exhibit RL-104**.
[608] Counter-Memorial, ¶ 162; **Exhibit CLA-80**.
[609] Counter-Memorial, ¶ 162; **Exhibit RL-105**.
[610] Counter-Memorial, ¶ 162; **Exhibit RL-106**.
[611] Rejoinder, ¶ 159; **Exhibit RL-165**.
[612] Respondent's Post-Hearing Brief, ¶¶ 96, 100.
[613] Transcript (Day 1), p. 239 line 17 – p. 241 line 8, p. 243 lines 1-4.
[614] Counter-Memorial, ¶ 174; Rejoinder, ¶ 190.

*taken*") comprises both lawful and unlawful expropriations and is, in particular, not limited to expropriations in compliance with the requirements set out in Article 5(1) subparagraph 1 of the Treaty.

593.  Respondent argues that any delay in payment of compensation can be fully compensated by an award of interest and claims that an evaluation of the asset as of the date of the award would impose a pecuniary penalty on Respondent.[615] In particular, Respondent contends that Claimant has not established that it suffered any damage that could not be compensated in full by an amount determined as of 15 May 2010.[616]

594.  Moreover, it is Respondent's position that, in case of a mere failure of the State to promptly specify and pay compensation, even the compensation standard under customary international law does not allow for calculating damages by way of "*constructing a 'but-for' world in which the possibility of expropriation is excluded until the date of the award,*" as Claimant contends. Respondent refers to the "*fundamental distinction*" between a situation in which the expropriation is prohibited no matter how it is carried out and the situation in which the expropriation as such is permitted but the manner in which it is carried out fails to comply with the conditions set out in the treaty.[617] According to Respondent, this position is in line with the PCIJ's *Chorzów Factory* decision, which also distinguishes between those two situations.[618]

595.  In support of its argumentation, Respondent refers in its written submissions,[619] in particular, to the cases *Middle East Cement v. Egypt,*[620] *Tecmed v. Mexico,*[621] *Wena Hotels v. Egypt,*[622] *CME v. Czech Republic,*[623] *Metalclad v. Mexico,*[624] *Phillips v. Iran,*[625] *LIAMCO v. Lybia,*[626] *Servier v. Poland,*[627] *Merrill & Ring v. Canada,*[628] *Funnekotter v. Zimbabwe,*[629] *Norwegian Shipowners v. USA*[630] and *Gemplus v. Mexico.*[631]

---

[615] Rejoinder, ¶ 190; Counter-Memorial, ¶¶ 175 and 180.
[616] Respondent's Post-Hearing Brief, ¶ 112.
[617] Respondent's Post-Hearing Brief, ¶ 109.
[618] Counter-Memorial, ¶¶ 177-179; Rejoinder, ¶ 193; Respondent's Post-Hearing Brief, ¶ 110. **Exhibit CLA-033**.
[619] Counter-Memorial, ¶ 176 (note 467); Rejoinder, ¶¶ 189-191, 195; Respondent's Post-Hearing Brief, ¶¶ 101-102, 106-107, 110.
[620] **Exhibit CLA-053**.
[621] **Exhibit CLA-082**.
[622] **Exhibit CLA-089**.
[623] **Exhibit CLA-020**.
[624] **Exhibit CLA-052**.
[625] **Exhibit CLA-065**.
[626] **Exhibit RL-105**.
[627] **Exhibit RL-165**.
[628] **Exhibit RL-184**.
[629] **Exhibit RL-036**.
[630] **Exhibit CLA-057**.
[631] Rejoinder, ¶ 196; **Exhibit CLA-125**.

### c)    The Tribunal's Analysis

596. In determining the applicable compensation standard and the relevant valuation date, the Tribunal will first consider whether the expropriation was unlawful and whether this has any impact on the compensation standard to be applied in the present case (**aa)**). Subsequently, the Tribunal will assess the applicable compensation standard and in particular the applicable valuation date (**bb)**).

### aa)    Relevance of a Finding of Unlawfulness

597. The Tribunal notes that the existing case law referred to by the Parties in relation to the question whether or not a breach of the requirement to specify and/or promptly pay compensation renders the expropriation unlawful, appears to be inconsistent. This indicates that the individual circumstances of each case as well as the individual BIT standard played a decisive role for the respective tribunal's finding.

598. In the present case, it could be argued, on the one hand, that Respondent's failure to carry out the expropriation in accordance with the compensation requirements set out in Article 5(1) subparagraphs 2 and 3 of the Treaty renders the expropriation unlawful, *i.e.*, in violation of Respondent's obligations under the Treaty. If the Tribunal were to follow this argument, the label of "*unlawfulness*" would not entail any indication that Respondent was precluded from expropriating Norpro Venezuela *per se*; it would simply serve as a synonym for an expropriation that was carried out in breach of a provision that the Contracting Parties agreed on in relation to the manner in which the expropration was supposed to be carried out.

599. On the other hand, it must be noted that Article 5(1) subparagraph 1 of the Treaty explicitly stipulates certain conditions under which an expropriation is permitted, *i.e.*, the existence of a public purpose as well as the absence of discriminatory treatment and of a conflict with a particular agreement. This subparagraph does not, however, make any reference to compensation, which is rather addressed in two separate subparagraphs. As a result, it could be argued that there should be a difference between the conditions set out in subparagraph 1, in the absence of which Respondent would have been precluded from expropriating Norpro Venezuela *per se*, and the requirements set out in subparagraphs 2 and 3, which relate to the manner in which the expropriation has to be carried out.

600. At this point, the Tribunal wishes to emphasize that the distinction between a lawful and an unlawful expropriation should not be an end in itself, but the question whether an expropriation is labelled "*unlawful*" should rather be considered in light of the consequences resulting from such a finding.

601.  As noted above, the dispute between the Parties as to these consequences is focused on the question of which compensation standard has to be applied: While a lawful expropriation undisputedly results in an obligation to pay compensation, which is calculated pursuant to the standard set out in Article 5(1) of the Treaty, the Parties are in dispute as to whether the same compensation standard also applies in case the Tribunal finds that the expropriation was unlawful.

602.  Considering the foregoing, the Tribunal is of the view that it is not appropriate to make a finding on whether the label "*unlawfulness*" should be attributed to the expropriation of Norpro Venezuela, without at the same time taking into account the consequences that such a finding would have for the compensation standard to be applied. Moreover, this question can be left open if, due to the recent developments on the proppants market, both compensation standards advanced by the Parties would result in the same amount of compensation to be paid to Claimant.

603.  Therefore, the Tribunal will now turn to the question whether the compensation standard set out therein also applies in case of a breach of the compensation requirements set out in its subparagraphs 2 and 3.

### bb)    Analysis of Article 5(1) of the Treaty

604.  Article 5(1) of the Treaty provides in its original French and Spanish versions:

"*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont*

"*Las Partes Contratantes no adoptarán medidas de expropriación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, deber se tasado con*

*le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusque'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié.*"[632]

*relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropriación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropriación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado.*"[633]

606. The Tribunal notes that Article 5(1) of the Treaty has a clear structure: Systematically, subparagraph 1 prohibits expropriatory measures in principle. However, such measures can be justified if: (i) they are based on a sufficient public purpose; (ii) they are not discriminatory; and (iii) they are not contrary to a particular agreement. Subparagraphs 2 and 3 provide for additional requirements and/or consequences of an expropriation, namely prompt and adequate compensation (subparagraph 2) as well as specification of the amount and effectiveness of compensation (subparagraph 3).

607. Whether or not the compensation standard contained in Article 5(1) subparagraphs 2 and 3 of the Treaty applies only to an expropriation that is in conformity with the requirements set out in subparagraph 1 and/or the additional requirements set out in the very same subparagrahs 2 and 3 depends in particular on the interpretation of the terms "[t]*outes les mesures d'expropriation qui pourraient être prises*"/"[t]*odas las medidas de expopiación que pudieran tomarse.*"

608. On the one hand, the organization of Article 5(1) with three unnumbered subparagraphs suggests that they must be read to be compatible with each other. While subparagraph 1 contains the requirements "*in the public interest*" and "*neither discriminatory, nor contrary to a particular agreement,*" it does not make reference to compensation, which is

---

[632] *Journal Officiel de la République Française n°102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.
[633] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

addressed in subparagraphs 2 and 3. It could be argued that "[a]*ll measures of expropriation which could be taken*" refers to all "*lawful*" measures, *i.e.*, those taken within the terms laid out in Article 5(1) as a whole. This view could further be supported by the fact that the requirements set out in subparagraph 3 are tied, by the words "[c]*ette indemnité*"/"[e]*sa indemnización*," to the valuation as set out in subparagraph 2. As a result, a failure to fix the amount and payment method of the value as calculated according to subparagraph 2 not later than on the date of expropriation could result in the inapplicability of the compensation standard contained in Article 5(1) because the compensation was not "*prompt*" and therefore in breach of this very same provision.

609.  On the other hand, the structure of Article 5(1) could also be interpreted to distinguish between (substantive) requirements set out in subparagraph 1, in the absence of which the expropriation would be precluded *per se* and thus be "*unlawful*," and (additional) compensation requirements set out in subparagraphs 2 and 3, which do not relate to the lawfulness of the expropriation. It could be argued that "[a]*ll measures of expropriation which could be taken*" refers to any measures, whether in compliance with Article 5(1) or not, *i.e*, without adding any qualifications extraneous to the text itself. The fact that subparagraphs 2 and 3 are linked by the words "[c]*ette indemnité*"/"[e]*sa indemnización*" could also indicate that the absence of such an explicit link between subparagraphs 1 and 2 should be interpreted to mean that the compensation requirements apply to all expropriations.

610.  Considering the foregoing, the Tribunal is faced with competing interpretations of Article 5(1) of the Treaty. In particular, the phrase "[a]*ll measures of expropriation which could be taken*" and more specifically, the word "*could*," is equally susceptible to two interpretations: either it includes all measures that the State is permitted to take, or it includes all measures that the State could possibly take.

611.  However, the question of the precise relationship between the three subparagraphs of Article 5(1) and the compensation standard to be applied need not be decided if, as noted above, both compensation standards advanced by the Parties would result in the same amount of compensation to be paid to Claimant. In this regard, it has to be emphasized that both Parties are in agreement that, in case the date-of-expropriation valuation yields a higher value than the date-of-the-award valuation, the Tribunal should determine the amount of compensation to be paid to Claimant based on the value as of the date of expropriation.[634]

612.  As per the Tribunal's request dated 13 August 2015, both Parties instructed their experts to update their date-of-the-award valuations and to evaluate the plant as of 31 August

---

[634] *Cf.* Claimant's Post-Hearing Submission, ¶ 77; Respondent's Post-Hearing Brief, ¶ 106.

2015. These Valuation Updates were simultaneously submitted on 22 October 2015,[635] and both Parties had the opportunity to simultaneously submit comments on the opposing Party's Valuation Update.[636] As per this date, both experts calculated a value of the plant that was lower than the value they had calculated for the plant as of the date of expropriation. Specifically, Claimant's expert Prof. Spiller calculated the value of the plant as of 31 August 2015 at USD 90.3 million (compared to USD 99.5 million as of 15 May 2010).[637] According to Respondent's experts Mr. Brailovsky and Dr. Flores, the plant had a negative value of USD 27.6 million as of 31 August 2015 (compared to a positive value of USD 9.5 million as of 15 May 2010).[638]

613.  In light of these developments, Claimant explicitly requested in its letter dated 6 November 2015 that it be awarded compensation in the amount of USD 99.5 million plus pre-award interest, *i.e.*, the value that it claims Norpro Venezuela had as of 15 May 2010.[639]

614.  As a result, the Tribunal does not have to make a finding in this context as to whether the compensation standard to be applied is the standard contained in Article 5(1) subparagraphs 2 and 3 of the Treaty or rather the customary international law standard of restitution. In any event, the amount of compensation to be paid to Claimant will be based on the valuation of Norpro Venezuela as of the date of expropriation, *i.e.*, 15 May 2010.

### 2.  Criteria for the Calculation of Damages

615.  The Tribunal will now turn to the criteria for the calculation of Claimant's damages. In this context, the Tribunal will first determine the relevant valuation method (**a**)), then determine the criteria for assessing the value of Norpro Venezuela based on that method (**b**)) and finally deal with the alleged historical losses associated with the increase of the bauxite price (**c**)).

### a)  Valuation Approach

#### aa)  Summary of Claimant's Position

---

[635] *See* Claimant's Valuation Update and Respondent's Valuation Update, both dated 22 October 2015.

[636] *See* Claimant's letter and Respondent's letter, both dated 6 November 2015.

[637] Given Prof. Spiller's approach to consider the lower of (i) the DCF-based value including historical but-for cash flows (if applicable); and (ii) the construction costs for a comparable plant including lost cash flows during the construction period, as the value to be compensated by Respondent, the figure as of 15 May 2010 reflects the construction costs (compared to a DCF-based value of USD 116.4 million including the bauxite price increase). By contrast, the value as of 31 August 2015 reflects the DCF-based value (compared to construction costs of USD 94.8 million). *See* Claimant's Valuation Update, Table 1.

[638] In Dr. Flores and Mr. Brailovsky's calculation, both figures reflect the DCF-based value of the plant including historical but-for cash flows (if applicable). Respondent's Valuation Update, Table 1 and ¶ 8 (note 18).

[639] Claimant's letter dated 6 November 2015, p. 3.

616. Claimant submits that Respondent must pay full compensation for the expropriated plant and refers to the World Bank Guidelines on the Treatment of Foreign Direct Investment of 1992 (the "**World Bank Guidelines**") pursuant to which compensation for expropriation "*will be deemed* 'adequate' *if it is based on the fair market value of the taken asset.*"[640]

617. While Claimant maintains that the compensation standard in Article 5(1) of the Treaty is not applicable in the present case, but that compensation must rather be determined in line with the standard of full reparation standard of customary international law, Claimant emphasizes that the Treaty itself reflects the "*fair market value*" principle in its standard for calculating the compensation for a lawful expropriation.[641]

618. Claimant also refers to the commentary on the ILC Draft Articles pursuant to which "[c]*ompensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the* 'fair market value' *of the property lost.*"[642]

619. Claimant further refers to the definition of fair market value in *Starret Housing Corp v. Iran*:

> "*the price that a willing buyer would buy given goods at and the price at which a willing seller would sell it in on the condition that none of the parties* [is] *under any kind of duress and that both parties have good information about all relevant circumstances involved in the purchase.*"[643]

620. As the investment was a "*going concern*," Claimant argues that the assessment of the fair market value must take into account the plant's future profitability and prospects. In this regard, Claimant refers to its expert on quantum, Prof. Spiller, who suggests that a third-party buyer would pay the lower of (i) the net present value of the cash flows that a willing buyer could obtain from acquiring a 100% stake in Norpro Venezuela; and (ii) the opportunity cost that a willing buyer would incur if it constructed a similar plant outside Venezuela, which consists of the sum of construction costs plus the foregone cash flows during the construction period.[644]

621. As to the second approach, Claimant submits that the "*most accurate information available*" is the actual construction costs of Claimant's ceramic proppants plant in Little Rock,

---

[640] Memorial, ¶¶ 203-204 referring to The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), p. 11.

[641] Memorial, ¶¶ 197-198 and ¶ 206; Reply, ¶¶ 143-146.

[642] Reply, ¶ 154 quoting from James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), p. 225.

[643] Memorial, ¶ 105 quoting from *Starrett Housing Corp. v. Iran* (**CLA-081**), ¶ 18.

[644] Reply, ¶¶ 155-156 referring to Prof. Spiller's Second Damages Assessment dated 18 June 2014 ("**Spiller II**"), ¶ 5; Claimant's Post-Hearing Submission, ¶ 90.

Arkansas (United States) finished in late 2013 which – like Norpro Venezuela – produces the highest quality bauxite-based ceramic proppants by means of a dry-process technology.[645] Claimant argues that apart from the fact that there is no comparable plant in Venezuela, the costs are the same regardless of whether the similar plant is built in the US or in Venezuela because "*the plants have similar risk-adjusted cost structures*" and "*the cost advantages and disadvantages associated with a particular location can offset one another.*"[646]

622. According to the calculation of Prof. Spiller as of 15 May 2010, the opportunity cost for the construction of a similar plant in the US would be lower than the net present value of Norpro Venezuela s future cash flows (USD 99.5 million compared to USD 115.1 million). Consequently, Claimant is of the view that the Tribunal should determine the fair market value of the expropriated plant based on the construction cost approach.[647]

### bb)    Summary of Respondent's Position

623. Respondent agrees that the amount of compensation to be paid should reflect the fair market value of the plant as a going concern, *i.e.*, "*the amount that a willing buyer would pay to a willing seller.*" Respondent further agrees that this figure can be determined by assessing the "*projected cash flows […] based on reasonable assumptions as of May 15, 2010 and discounted to their net present value as of that date using an appropriate discount rate.*"[648]

624. In response to Claimant's reliance on the full reparation standard of customary international law, Respondent claims that the standard set out in Article 5(1) of the Treaty is "*consistent with both traditional and contemporary notions of* 'full' *or* 'adequate' *compensation.*"[649]

625. Respondent sees no need to consider Prof. Spiller's approach to compare the DCF-based valuation with the opportunity costs of constructing a similar plant in any detail because according to its experts on quantum, Mr. Brailovsky and Dr. Flores, those costs would exceed the price that a willing buyer would pay for Claimant's plant (USD 43.7 million plus foregone cash flows of USD 1.3 million as of 15 May 2010 compared to USD 9.5 million).[650]

---

[645] Reply, ¶¶ 189-191; Claimant's Post-Hearing Submission, ¶¶ 92 and 93.
[646] Claimant's Post-Hearing Submission, ¶¶ 91 and 95.
[647] Reply, ¶¶ 157, 187 and 196; Claimant's letter to the Tribunal dated 6 November 2015; Spiller II, Table 12.
[648] Counter-Memorial, ¶¶ 185-187; Respondent's Post-Hearing Brief, ¶ 137.
[649] Rejoinder, ¶ 197.
[650] Counter-Memorial, ¶ 188; Rejoinder, ¶ 201; Respondent's Post-Hearing Brief, ¶ 138 and ¶¶ 204-208; Respondent's Post-Hearing Reply Brief, ¶ 63; Mr. Brailovsky and Dr. Flores' Second Expert Report on Quantum ("**Brailovsky/Flores II**"), ¶¶ 227 and 242.

626. In any event, Respondent emphasizes that the asset to be evaluated in the present case is a stand-alone plant in Venezuela, not in the United States, and therefore argues that the only appropriate way of assessing the compensation to be paid to Claimant is to apply a DCF analysis, including a discount rate that accounts for the fact that the plant is located in Venezuela.[651] If one were to assess the construction costs, Respondent argues that one would have to assess the costs in Venezuela (not in the US) and based on assumptions "*consistent with the DCF analysis that is being used for comparative purposes*."[652]

### cc)   The Tribunal's Analysis

627. At the outset, the Tribunal notes the Parties' agreement that the compensation to be paid by Respondent for the expropriation of Norpro Venezuela should reflect the fair market value of the plant as a going concern as of 15 May 2010.[653] First, this value reflects the compensation standard contained in Article 5(1) subparagraphs 2 and 3 of the Treaty, which provides that compensation must be equal to the "*actual value*" ("*valeur réelle*" / "*valor real*") of the going concern Norpro Venezuela. Second, the fair market value also reflects the compensation standard under customary international law as reflected in the ILC Draft Articles and the World Bank Guidelines. While Article 35 of the ILC Draft Articles provides that, primarily, the State has to make restitution for the damage caused, Article 36 states that, subsidiarily ("*insofar as such damage is not made good by restitution*"), the State has to pay compensation, which "*shall cover any financially assessable damage including loss of profits insofar as it is established.*"[654] As correctly pointed out by Claimant, the ILC states in the Commentary to Article 36 that "[c]*ompensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the* 'fair market value' *of the property lost*."[655] The World Bank Guidelines similarly provide with regard to expropriations that "[c]omp*ensation will be deemed* 'adequate' *if it is based on the fair market value of the taken asset*."[656] Consequently, the Tribunal again does not have to decide on the applicable compensation standard in the present case because both standards require the determination of Norpro Venezuela's fair market value as of 15 May 2010.

---

[651] Rejoinder, ¶¶ 202-203.

[652] Respondent's Post-Hearing Brief, ¶¶ 138 and 202.

[653] The Tribunal notes that both Parties repeatedly refer to "*the Plant*" as the expropriated asset. As Respondent correctly stated in its Counter-Memorial (¶ 188), however, the asset to be valued in the present case is "t*he Plant being operated as a going concern*." The Tribunal will thus refer to the expropriated asset as "*Norpro Venezuela*" or "*the going concern*."

[654] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Article 36.

[655] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Article 36, ¶ 22.

[656] The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Section IV, ¶ 3.

628. The Parties further agree that the fair market value is equal to the amount that a willing buyer would pay to a willing seller, provided that the buyer is informed about all relevant circumstances and none of the parties is under any kind of duress to sell or to acquire the asset.[657] This is confirmed by the World Bank Guidelines, which also refer to the "*amount that a willing buyer would normally pay to a willing seller*" taking into account all relevant circumstances.[658]

629. Finally, the Parties are in agreement that, as the plant was a going concern prior to its expropriation, its fair market value can be assessed by calculating the net present value of Norpro Venezuela's future cash flows. Consequently, both Parties' experts have calculated the future cash flows of the going concern and then applied a discount rate to those cash flows in order to obtain their net present value.

630. However, Claimant's expert Prof. Spiller has advanced a further approach to calculate the value, *i.e.*, by assessing the opportunity cost of constructing a comparable plant in the US (consisting of the construction cost plus lost cash flows during the construction period). According to Prof. Spiller, a willing buyer would pay only the lower of the amounts obtained by applying the DCF-method on the one hand and the construction cost approach on the other hand. Therefore, he has compared the two values and concluded that the construction cost value as of 15 May 2010 (USD 99.5 million) is lower than the DCF value as of that date (USD 115.1 million) and thus reflects the value to be compensated by Respondent.[659]

631. It appears to the Tribunal that Respondent does not contest Prof. Spiller's approach to compare the two values as such but rather (i) claims that the comparison would have to be made to a plant located in Venezuela and consistent with the assumptions applied in the DCF calculation; and (ii) in any event considers the construction cost approach irrelevant in light of its experts' conclusion that the DCF value of Norpro Venezuela (USD 9.5 million) is lower than the opportunity costs of a similar plant in the US (USD 43.7 million plus foregone cash flows of USD 1.3 million as of 15 May 2010).[660]

632. At this point, the Tribunal wishes to express its doubts as to the general applicability of the approach to determine the fair market value of a particular asset, such as the going concern in this case, by assessing the opportunity cost of constructing a different plant. In particular, the Tribunal is not convinced that, even if the opportunity costs were to be

---

[657] *Cf.* the definition provided by the tribunal in *Starrett Housing Corp. v. Iran,* which has been quoted in paragraph 619 above.

[658] The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Section IV, ¶ 5.

[659] Spiller II, ¶ 5 and Table 12.

[660] Respondent's Post-Hearing Brief, ¶¶ 138 and 202; Brailovsky/Flores II, ¶¶ 227 and 242.

lower than the DCF-based value of Norpro Venezuela, this would result in a lower fair market value of Claimant's investment under any of the compensation standards advanced in this case.

633. However, the Tribunal does not have to form a definite opinion on the general suitability of this approach because, in any event, the Tribunal considers that the calculations of the opportunity cost performed by the Parties' experts are inconclusive under the present circumstances. Specifically, the Tribunal agrees with Respondent that a plant located in Little Rock, Arkansas, cannot be compared to the going concern to be evaluated in this arbitration. The same must apply to the comparison made by Respondent's experts to an average of other plants located in the US.

634. Claimant itself acknowledges that there are "*cost advantages and disadvantages associated with a particular location*" but argues that these *"can offset one another."*[661] The Tribunal is aware that Prof. Spiller explained during the Hearing that he applied an adjustment factor to account for "*Economies of Scale and Scope Differences*," which in his view offset one another.[662] However, the Tribunal is not convinced that this adjustment factor accounts for all differences to be taken into account when looking at highly specialized production facilities in two markets, which are as different as the mature US market and the emerging Venezuelan market.

635. As neither Party alleges that there exists a comparable plant in Venezuela, the Tribunal will therefore disregard the construction cost approach and determine the criteria for assessing the fair market value of Norpro Venezuela on a going concern basis, *i.e.*, based on the DCF calculation performed by the experts of both Parties for the valuation date of 15 May 2010.

### b)   DCF-Based Fair Market Value of Norpro Venezuela

636. While the Parties agree that the discounted cash flow analysis is in principle an appropriate method to determine the value of Norpro Venezuela, their experts arrive at significantly differing results for such value as of 15 May 2010, *i.e.*, between USD 115.1 million as calculated by Claimant's expert Prof. Spiller and USD 9.5 million as calculated by Respondent's experts Dr. Flores and Mr. Brailovsky. The biggest point of disagreement between the experts relates to the discount rate to be applied to the future cash flows; therefore, the Tribunal will address this issue first (**aa**)). In a second step, the Tribunal will address the additional points of disagreement regarding the calculation of Norpro Venezuela's future cash flows (**bb**)). As determined above, the Tribunal will assess both

---

[661] Claimant's Post-Hearing Submission, ¶ 91.
[662] Prof. Spiller's Opening Presentation, slide 32.

the applicable discount rate and the future cash flows from the perspective of a willing buyer as of 15 May 2010.

### aa)    Discount Rate

#### (i)    Summary of Claimant's Position

637. Claimant submits that Respondent's experts Mr. Brailovsky and Dr. Flores applied "*an absurdly high discount rate of 26%*," which results in a value that implies that "*no reasonable investor would invest in a new proppant plant, or add capacity to an existing proppant plant.*"[663]

638. Claimant claims that the 26% discount rate is unprecedented and more than double the discount rate that tribunals typically adopt in ICSID arbitrations. According to Claimant, the US cost of equity they propose is "*entirely afield of any other estimate found in the record*" and further inconsistent with Claimant's own calculation for the project in 2006, considering that interest rates have fallen since then.[664]

639. In particular, Claimant rejects Mr. Brailovsky's and Dr. Flores' use of a 2.66% "*size premium*" because (i) literature is "*inconclusive*" as regards the applicability to foreign investments; (ii) Prof. Damodaran has rejected it as duplicative; and (iii) its application would double count the country risk in Venezuela where Norpro Venezuela cannot be classified as a small company.[665] Claimant further rejects the use of a risk-free rate based on the spot yield to maturity of 20-year US Treasury bonds on the valuation date and notes that the 10-year bond used by Prof. Spiller is recommended by Prof. Damodaran and reflects the fact that majority of cash flows in the experts' models are received in ten years or less.[666]

640. With regard to the market risk premium (MRP), Claimant alleges that the average historical premium used by Mr. Brailovsky and Dr. Flores is not appropriate in light of the proximity of the 2008-2009 financial crisis, which "*distorts the MRP from historical returns.*" According to Claimant, this development led Prof. Damodaran to replace this

---

[663] Reply, ¶ 158 quoting from Spiller II, ¶ 28.

[664] Reply, ¶ 160; Claimant's Post-Hearing Submission, ¶ 103 referring to Prof. Spiller's Opening Presentation, slide 5; Claimant's Second Post-Hearing Submission, ¶ 73.

[665] Reply, ¶ 165; Claimant's Post-Hearing Submission, ¶ 103 referring to Prof. Spiller's Opening Presentation, slide 22, which quotes the following statement of Prof. Damodaran: "*Adding a small cap premium strikes me as not only a sloppy (and high error) way of adjusting expected returns but also an abdication of the mission in intrinsic valuation, which is to build up your numbers from fundamentals.*" **Exhibit CLEX-114**, p. 2. *See* also Claimant's Second Post-Hearing Submission, ¶ 81.

[666] Reply, ¶ 166; Claimant's Second Post-Hearing Submission, ¶ 82.

method by a recommendation that is based on "*an extensive study of methods*," which still includes the historical average as the highest premium.[667]

641.   Claimant further argues that the "*exorbitant*" country risk premium of 13.92% that Mr. Brailovsky and Dr. Flores applied for Venezuela is a "*desperate way for a State to try to evade responsibility for its actions.*" According to Claimant, this spike reflects President Chávez's threats to expropriate all foreign investments in Venezuela without compensation.[668] Claimant argues, however, that a State "*may not use its own propensity to violate the law to reduce the value of compensation for the expropriation.*"[669] It therefore takes the position that the "*generalized threat of confiscation*" has to be eliminated from the calculation of the fair market value because Respondent would otherwise be rewarded for the unlawful conduct that this arbitration is meant to remedy.[670]

642.   Claimant emphasizes that this logic should apply for both lawful and unlawful expropriations because both the Treaty standard and the customary international law standard require that "*any valuation of the asset taken eliminate the State's threats to confiscate the asset taken*." While acknowledging that the tribunals in *Tidewater v. Venezuela, Mobil v. Venezuela* and *Venezuela Holdings v. Venezuela* have chosen not to follow this approach in case of a lawful expropriation, Claimant claims that no tribunal has done the same in case of a treaty breach and refers in particular to the tribunal's finding in *Gold Reserve v. Venezuela* that "*it is not appropriate to increase the country risk premium to reflect the market's perception that a State may have a propensity to expropriate investments in breach of BIT obligations*."[671] In Claimant's view, a country would otherwise be allowed to "*benefit from a regime of committing to fair treatment in order to attract foreign investors, and then subsequently revoking those commitments across the board.*"[672]

643.   Claimant claims that, unlike the claimant's expert in *Tidewater v. Venezuela*, Prof. Spiller has excluded only the confiscation risk from the country risk premium but appropriately took into account "*other risks of investing in Venezuela, such as the risks of a volatile*

---

[667] Claimant's Second Post-Hearing Submission, ¶¶ 76-77 referring to Spiller II, Table 15

[668] Reply, ¶ 161; Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing Submission, ¶ 55.

[669] Reply, ¶ 162 quoting from *Occidental v. Ecuador* (**CLA-061**), ¶ 564; Claimant's Post-Hearing Submission, ¶ 110 referring in particular to *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841.

[670] Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing submission, ¶ 56 and ¶ 59.

[671] Claimant's Post-Hearing Submission, ¶ 113 and ¶ 117 quoting from *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841. Claimant notes that the tribunal in that cause ultimately applied a country risk premium of 4% for Venezuela. Claimant also refers to the tribunal in *OI European v. Venezuela* who agreed with the claimant that the country risk premium had to exclude the effect of the "*negative messages in the business environment about potential expropriations*" put out by Venezuela, but found no evidence that the 6% premium proposed by Venezuela was affected by these negative messages. Claimant's Second Post-Hearing Submission, ¶ 57 and note 87 referring to *OI European v. Venezuela* (**CLA-156**), ¶ 782.

[672] Claimant's Post-Hearing Submission, ¶ 114. *See also* Claimant's Second Post-Hearing Submission, ¶ 64.

*economy, civil disorder, less developed infrastructure, and other issues.*" Claimant submits that Prof. Spiller took the average spread of sovereign bonds of countries with a B1 rating such as Venezuela, which includes many developing countries with "*significant country risk, including political risks.*"[673]

644.  Claimant alleges that Mr. Brailovsky's and Dr. Flores' approach based on the Country Risk Rating Model (CRRM), on the other hand, "*by definition incorporates* [institutional] *investors' perception of the risk of investing in Venezuela under the current politico-economic conditions, including that of uncompensated expropriations.*" Similarly, Claimant contends that the "*extremely high*" Venezuelan sovereign bond spread pursuant to the EMBI Index does not reflect Venezuela's lack of capacity to pay (as reflected in its B1 rating) but rather its lack of willingness to pay.[674]

645.  In relation to the CRRM, Claimant submits that it is not only "*inherently unreliable*" but particularly inapt in the present "*complex politico-economic situation*" in Venezuela. In response to the argument that the CRRM has produced "*constant*" rates over the last twenty years, Claimant argues that this is inconsistent with Respondent's argument that the country risk has increased since 2005 when Claimant invested in Venezuela and the EMBI was around 2%.[675] Claimant also rejects Respondent's argument that the EMBI has been at an average of 10% over the same time period because this time horizon includes a number of "*outliers*" in the country's history, which had "*extreme effect*" on the government but not on private investors, and therefore renders the EMBI an "*artificial rate that reflects political expectations rather than economic assessments.*"[676]

---

[673] Claimant's Post-Hearing Submission, ¶¶ 105-106; Claimant's Second Post-Hearing Submission, ¶ 60 and ¶ 67. Claimant argues that one way to "*check*" this is to look at the CDS spreads outstanding on countries' sovereign debts and notes that on Prof. Damodaran's list of 63 countries as of January 2014, Prof. Spiller's proposed premium of 4.5% would rank as the fourth-highest after Argentina (14.73%), Venezuela (10.8%) and Tunisia (4.57%) and thus "*far above the typical country risk premium in a developing country.*" Claimant's Second Post-Hearing Submission, ¶¶ 61-62 referring to **App. BF-66**, pp. 23-25.

[674] Claimant's Post-Hearing Submission, ¶ 118; Claimant's Second Post-Hearing Submission, ¶ 63.

[675] Claimant's Post-Hearing Submission, ¶¶ 120-121.

[676] Claimant's Post-Hearing submission, ¶ 122. Claimant argues that Venezuela is approaching default and refers to the tribunal's finding in *EDF International v. Argentina* that the country debt spread approach becomes "*an unrealistic measure for a cost of equity calculation*" when countries approach "*default-like situations*" as Argentina did in 2001. Claimant's Post-Hearing Submission, ¶ 126 quoting from *EDF International v. Argentina* (**CLA-122**), ¶¶ 634, 1264, 1266-1268. Claimant further refers to the tribunal in *Sempra Energy v. Argentina*, which found that in 2001, "*the country risk premium required by an investor in a private company in Argentina was significantly lower than the Governments' credit risk premium during the same period.*" Claimant's Post-Hearing Submission, ¶ 128 quoting from *Sempra Energy v. Argentina* (**Exhibit CLEX-106**), ¶ 433.

646. Therefore, Claimant concludes that the difference between the country risk premia calculated by Prof. Spiller and Mr. Brailovsky, respectively, is "*largely attributable to Venezuela's confiscation threats.*"[677] It emphasizes that in *OI European v. Venezuela*, Venezuela's own experts calculated a 2010 country risk premium of 6%.[678]

647. Claimant further contends that it also took Venezuela's "*heightened country risk*" into account when it assigned a discount rate of 15% to the project in 2006 and undertook significant efforts to secure meaningful support of the Venezuelan Government, in reliance on the fact that the France-Venezuela Treaty had entered into force in 2004.[679] Claimant emphasizes that the "*high risk*" discount rate of 12%, which included a country risk premium of 4%, was not assigned by the members of the project team (they even added a further 3% "*to be conservative*"), but rather served as a "*company-wide objective measure to consider the potential risks and rewards of proposed ventures in various locations.*"[680]

648. In Claimant's view, an investor like Saint-Gobain is "*immune from the vast majority of risk factors*" that are included in Mr. Brailovsky and Dr. Flores' country risk premium. Claimant contends that (i) the proppants produced by Norpro Venezuela's activity were to be exported under a long-term take-or-pay contract; (ii) Norpro Venezuela had concluded long-term supply contracts for bauxite and energy; and (iii) Venezuela's sovereign credit risk, which forms the basis for Mr. Brailovsky's and Dr. Flores' calculation, is influenced by its risk of entering into default and therefore does not accurately reflect the country risk of Claimant's long-term, non-speculative investment in Venezuela.[681]

649. In Claimant's view, particularly the fact that Norpro Venezuela derived more than 80% of its revenues from exports made it subject to a lower country risk than the average Venezuelan company, which has to face the stagnant consumer demand. Claimant refers to a statement made by Prof. Damodaran that "[t]*he most obvious determinant of a company's risk exposure to country risk is how much of the revenues it derives from the country.*"[682] Claimant further emphasizes that Norpro Venezuela was not a natural resources company but a manufacturing company "*twice removed from the oil industry*" and thus was not affected by the "*typical reasons for political risk*" affecting oil companies.[683] As to the further risks invoked by Mr. Brailovsky and Dr. Flores, Claimant claims that they

[677] Claimant's Post-Hearing Submission, ¶ 119.
[678] Claimant's Second Post-Hearing Submission, ¶ 65 referring to *OI European v. Venezuela* (**CLA-156**), ¶¶ 772-773.
[679] Claimant's Post-Hearing Submission, ¶ 107, ¶ 116 and ¶ 130.
[680] Claimant's Post-Hearing Submission, ¶¶ 131-134 referring to the oral testimony of its witness Patrick Millot. Transcript (Day 2), p. 428 lines 14-17 and p. 438 lines 13-16.
[681] Reply, ¶¶ 163-164.
[682] Claimant's Post-Hearing Submission, ¶¶ 136-139 quoting from **Exhibit CLEX-108**.
[683] Claimant's Post-Hearing Submission, ¶¶ 140-141.

either do not apply to Norpro Venezuela or they were already taken into account in the country risk premium as derived by Prof. Spiller from the sovereign bond rating.[684]

### (ii)    Summary of Respondent's Position

650. Respondent submits that the discount rate calculated by Prof. Spiller would be "*low even for a company such as Norpro Venezuela operating in a mature economy*." Respondent argues that (i) Prof. Spiller deviated from the risk-free-rate suggested by Ibbotson/Morningstar for long-term projects, *i.e*., the 20-year US Treasury bond yield as of the valuation date; (ii) he deviated from the general market risk premium (MRP) calculated by Ibbotson/Morningstar; and (iii) he "*ignore*[d] *the empirical evidence establishing that the CAPM tends to underestimate the cost of equity for financial assets*," which is corrected by the *alpha* coefficient.[685]

651. First, Respondent argues that it is appropriate to use the 20-year US Treasury bond as the risk-free rate in this case, given the "*perpetuity*" nature of the cash flows that are being valued.[686] Second, Respondent claims that the view of Prof. Damodaran as to the appropriate MRP that Prof. Spiller relies on "*fluctuates from year to year and sometimes even within the same year, is not based on an analysis of the underlying empirical data, and cannot be replicated*."[687] Respondent further refers to the tribunal in *Tidewater v. Venezuela*, which determined that an equity risk premium of 6.5% was reasonable in a valuation as of May 2009.[688] Third, Respondent rejects Claimant's argument that the *alpha* coefficient is a size premium and notes that this coefficient, while "*more pronounced in small companies (which is why it attracts the* 'size premium' *label)*," applies to companies of all sizes. In any event, Respondent claims that Norpro Venezuela would indeed qualify as a small company in the US, which is why the *alpha* coefficient should be added to the US cost of equity.[689]

652. Respondent contends that these differences cause Prof. Spiller's estimate of the cost of equity in the US to be considerably lower than "*a range of independent results for SIC Code 1381, using the basic CAPM and varations thereon*," which are very similar to the cost of equity estimated by Respondent's experts and in fact almost equal to the total discount rate applied by Prof. Spiller.[690]

---

[684] Claimant's Post-Hearing Submission, ¶¶ 142-144.

[685] Counter-Memorial, ¶¶ 234-236; Rejoinder, ¶ 206. For an overview of the diffences regarding the US cost of equity components, *see* also the table in Respondent's Post-Hearing Brief, following ¶ 140.

[686] Respondent's Post-Hearing Brief, ¶ 146.

[687] Respondent's Post-Hearing Brief, ¶ 141; Respondent's Post-Hearing Reply Brief, note 118.

[688] Respondent's Post-Hearing Brief, ¶ 142 quoting from *Tidewater v. Venezuela* (**RL-207**), ¶ 181.

[689] Respondent's Post-Hearing Brief, ¶ 145; Respondent's Post-Hearing Reply Brief, note 120.

[690] Counter-Memorial, ¶ 237 referring to Brailovsky/Flores I, Table 10; Rejoinder, ¶ 204 referring to Brailovsky/Flores II, Table 15 and ¶ 205; Respondent's Post-Hearing Brief, ¶ 147; Respondent's Post-Hearing Reply Brief,

653. According to Respondent, the biggest difference between the experts' estimates, however, concerns the applicable country risk premium. Respondent claims that this premium is "*far higher*" than the 4.5% applied by Prof. Spiller, which in fact does not reflect Venezuelan country risk but rather the default risk on US corporate bonds.[691] Respondent refers to the calculations of its experts Mr. Brailovsky and Dr. Flores who primarily relied on the Country Risk Rating Model (CRRM) compiled by Ibbotson/Morningstar and cross-checked their results by using the so-called "*bludgeon method*" devised by Prof. Damodaran.[692]

654. In response to Claimant's criticism on the CRRM, Respondent refers to Prof. Ibbotson who stated that the CRRM has the following advantages over other cost of equity models: "*1. Breadth of coverage; 2. Reasonable results; 3. Stability of results*."[693] Respondent further refers to its experts who demonstrate that the results the CRRM has produced over the last 20 years for Venezuela are stable and in line with Prof. Damodaran's methodology.[694]

655. With regard to Claimant's criticism on the EMBI spread that Respondent's experts used to derive the yield on Venezuela's sovereign debt over the US treasury bond yield, Respondent acknowledges that the spread is indeed "*very high*" but argues that it is in no way comparable to an actual default situation as Argentina experienced in 2001 through 2003 when the EMBI increased to 50% and more.[695]

656. By contrast, Respondent claims that the 4.5% premium applied by Prof. Spiller does not reflect Prof. Damodaran's methodology because Prof. Damodaran's interactive spreadsheet demonstrates that his "*best estimate*" is actually based on the "*bludgeon method*," including the application of the 1.5 multiplier, and is thus in line with the estimate of Respondent's experts.[696] According to Respondent, Prof. Damodaran establishes in his

---

¶¶ 32-35. As to the numbers presented by Prof. Spiller during the Hearing, Respondent contends that the source he relies on are "irrelevant to the determination of the discount rate in this case," as Claimant's internal estimate dates of 2005 and the round figures derived from two analyst reports indicate that they were not the result of detailed calculations but simply part of a "buy" recommendation and further relate to the market for financial instruments, which is "entirely different" from the market for physical assets. Respondent's Post-Hearing Reply Brief, ¶ 36.

[691] Counter-Memorial, ¶ 240; Rejoinder, ¶ 207 and ¶ 228. In Respondent's view, Prof. Spiller should at least have used corporate bonds from other emerging countries with the same rating as Venezuela, which would have resulted on a spread of about 9%. Rejoinder, ¶ 221; Respondent's Post-Hearing Brief, ¶ 169.

[692] Respondent submits that its experts used the same methodology to determine the appropriate discount rate for both valuation dates. Counter-Memorial, ¶ 259.

[693] Rejoinder, ¶ 212 quoting from Ibbotson/Morningstart, SBBI 2013 Valuation Yearbook (**App. BF-44**), pp. 136-137.

[694] Rejoinder, ¶ 213 referring to Brailovsky/Flores, Figure 19.

[695] Rejoinder, ¶¶ 216-217 referring to Brailovsky/Flores, Figure 20.

[696] Counter-Memorial, ¶¶ 243-244 referring to the spreadsheet from June 2013 (**App. BF-65**); Rejoinder, ¶ 210 referring to Brailovsky/Flore II, Table 10 and the spreadsheet from January 2014 (**App. BF-66**).

writings "*a hierarchy of methods to derive a country default spread*" and states that if a country has USD-denominated bonds, the default spread should be derived by looking at the yield of those bonds over the risk-free bond in the same currency or the spread in the CDS market. Respondent further claims that Prof. Damodaran suggests the alternative approach based on comparably rated US corporate bonds ("*synthetic spread*") only "*as a last resort*," in case the country in question – unlike Venezuela – does not have USD-denominated bonds.[697]

657.  Respondent claims that Prof. Damodaran's preferred method is an "*obvious first choice*" because "*specific data for the country in question is undoubtedly a better indicator of [the market's perception of] risk than a synthetic indicator.*" According to Respondent, both Venezuela's EMBI spread and its spread in the CDS market would have yielded a default spread of about 10%, to be converted into an equity risk premium of about 15%. According to Respondent, the same applies to the second method advanced by Prof. Damodaran, *i.e.*, the "*Average (Normalized) spread on bond*," as the average spread on Venezuela's sovereign bonds over the entire life of the EMBI since 1993 was 10%.[698]

658.  Respondent further rejects Claimant's allegation that Norpro Venezuela was immune from the majority of risk factors reflected in the country risk premium and claims that none of the arguments advanced by Claimant materially influences Norpro Venezuela's risk exposure. As to the exporter argument, Respondent refers to its experts' statement that "[c]*ountry risk is a much larger concept than exposure to domestic demand, involving taxation, regulation and other government actions in the economy, especially in the hydrocarbon sector*" and adds "*the disproportionate effect of natural phenomena such as storms, floods and droughts.*"[699] Respondent further notes that the invoked long-term contracts expire in 2016 (gas and electricity) and 2018 (bauxite) without any automatic right of renewal or a guaranteed price under a renewal and, in any event, they would not protect Norpro Venezuela from a disruptions in supply. Finally, Respondent alleges that the existence of the France-Venezuela BIT has "*no discernible impact on the country risk assessment*" as confirmed by political risk insurers.[700]

659.  In Respondent's view, there are therefore no factors specific to Norpro Venezuela that would reduce its country risk exposure compared to the average Venezuelan company but, "*if anything, the factors relating to Norpro Venezuela would increase it.*" Respondent

[697] Counter-Memorial, ¶ 246; Rejoinder, ¶ 208 referring to *Aswath Damodaran*, Equity Risk Premiums (ERP): Determinants, Estimation and Implications – The 2013 Edition, updated: March 2013 (**App. BF-64**), pp. 53, 55; Respondent's Post-Hearing Brief, ¶ 168; Respondent's Post-Hearing Reply Brief, ¶¶ 45-47.

[698] Respondent's Post-Hearing Brief, ¶¶ 164-166; Respondent's Post-Hearing Reply Brief, ¶ 47.

[699] Rejoinder, ¶ 226 quoting from Brailovsky/Flores, ¶ 201; Respondent's Post-Hearing Brief, ¶ 175.

[700] Rejoinder, ¶ 226 referring to Brailovsky/Flores, Figure 23 and **App. BF-166;** Respondent's Post-Hearing Brief, ¶¶ 177-179.

refers to the possibility of exchange controls on the export of raw materials and further to Prof. Damodaran's statement that "[a] *company can be exposed to country risk, even if it derives no revenues from that country, if its production facilities are in that country*."[701] Respondent quotes from the oral testimony of Mr. Brailovsky, who stated that "*natural resource projects, particularly oil or oil-related, bear more Country Risk than the average company*" and cited as an example the suspension of bauxite supply combined with import restrictions.[702]

660. While acknowledging that the valuation must exclude the impact of the actual expropriation of the plant, Respondent argues that this "*should not be confused with the expropriation risk inherent in any project from its very inception*," which is part of the "*normal economic situation prevailing*" prior to the announcement of the expropriation of the plant and therefore also a risk that a willing buyer would take into account in its assessment of the purchase price it would be willing to pay for the plant.[703]

661. Respondent emphasizes that Article 5(1) of the Treaty requires compensation to be equal to the "*actual value*," *i.e.*, the fair market value, of the plant, which takes into account "*all of the generalized risks associated with an investment in Venezuela*," including "*the risk that after the acquisition is completed, Venezuela might expropriate and either not compensate at all or compensate only in an amount and in a manner that the buyer might deem unfair*."[704]

662. Contrary to what Claimant appeared to suggest during the Hearing, Respondent is of the view that the determination of fair market value does not change depending on whether the expropriation is lawful or unlawful. According to Respondent, the willing buyer would be indifferent to the lawfulness or unlawfulness of the expropriation because the particular expropriation is to be excluded from the buyer's consideration. Respondent adds that the buyer would, however, take into account the underlying risks, including the risk of expropriation without compensation that the buyer deems adequate.[705]

663. Respondent refers to the tribunal's finding in *Tidewater v. Venezuela* that the claimant's expert, who had advanced the same argument as in the present case, "*conflates two separate elements in a legal claim of this kind*," *i.e.*, the question of liability and the economic

---

[701] Respondent's Post-Hearing Brief, ¶¶ 172-175 quoting from *Aswath Damodaran*, Measuring Company Exposure to Country Risk: Theory and Practice, September 2003 (**App. BF-55**), p. 18.

[702] Respondent's Post-Hearing Brief, ¶ 176 quoting from Transcript (Day 4), p. 1142.

[703] Rejoinder, ¶ 227.

[704] Respondent's Post-Hearing Brief, ¶ 148. In Respondent's view, Claimant's position on the risk of "*uncompensated expropriation*" remains unclear because it could either include each case in which the obligation to compensate or the amount to be paid is in dispute, i.e., every case litigated under bilateral investment treaties, or it could be limited to cases in which the State refuses to acknowledge its compensation obligation and to participate in the determination of the amount due – which is not the case here. Respondent's Post-Hearing Brief, ¶ 149.

[705] Respondent's Post-Hearing Brief, ¶¶ 150-152.

question as to the value that the market would attribute to the investment in question; the tribunal then referred to the World Bank Guidelines, which "*specifically invite a consideration of* 'the risk associated with such cash flow under realistic circumstances'."[706] Respondent further quotes the tribunal's following statement:

> "*This is not a matter of permitting a respondent State to profit from its own wrong. On the contrary, the damages that the Tribunal is empowered by virtue of the Treaty to award are designed to ensure that the private investor is compensated for the loss of its investment. But, in determining the amount of that compensation by reference to a discounted cash flow analysis, the Tribunal should consider the value that a willing buyer would have placed on the investment. In determining this value, one element that a buyer would consider is the risk associated with investing in a particular country. Such a factor is not specific to the particular State measure that gives rise to the claim.* […] *Rather the country risk premium quantifies the general risks, including political risks, of doing business in the particular country, as they applied on that date and as they might then reasonably have been expected to affect the prospects, and thus the value to be ascribed to the likely cash flow of the business going forward.*"[707]

664. Respondent argues that the country risk premium must be based on the buyer's perception of risk; the elimination of the risks inherent to an investment in Venezuela would result in "*the use of a discount rate that a willing buyer would not use and derive a value that a willing buyer would not pay, thereby granting Claimant a windfall that it could never achieve in an arm's-length transaction.*" In Respondent's view, this would further be punitive to Venezuela and thus "*impermissible under any theory of compensation in international law.*"[708]

665. As to Claimant's emphasis during the Hearing on the 15% discount rate reflected in its 23 October 2006 DAC, Respondent notes that the significance and purpose of this rate remains unclear and further argues that at that time, Venezuela's default risk was "*at one of its all-time lowest points,*" with the yield of its sovereign bonds being only 2.18% higher than US Treasury bonds. At that point, Respondent submits, the 3% country risk premium could have been justified. More importantly, however, Respondent emphasizes that Claimant took Venezuelan default risk into account in its assessment of the country risk,

---

[706] Respondent's Post-Hearing Brief, ¶¶ 153-155 quoting from *Tidewater v. Venezuela* (**RL-207**), ¶¶ 184-185. Respondent notes that the tribunal found in that case that the failure to pay compensation did not render the expropriation unlawful.

[707] *Tidewater v. Venezuela* (**RL-207**), ¶ 186. Respondent submits that the Tidewater tribunal then adopted the approach by Dr. Flores and Mr. Brailovsky who also acted as Venezuela's experts in that case and used the same approach as in this case, i.e., the CRRM benchmarked against Prof. Damodaran's bludgeon method, and thus concludes that a country risk premium of 14.75% was a "*reasonable, indeed conservative, premium.*" Respondent's Post-Hearing Brief, ¶ 156 quoting from *Tidewater v. Venezuela* (**RL-207**), ¶ 190.

[708] Respondent's Post-Hearing Brief, ¶ 157.

just like a buyer would in its assessment of an appropriate discount rate for determining the fair market value of the plant. In Respondent's view, there is then no reason for excluding such risk when the risk increased with the passage of time.[709]

666. Respondent further claims that "*there is no way to isolate, and thus quantify*" the risk of uncompensated expropriation. According to Respondent, Prof. Spiller did not propose any method to do so in his expert reports but argued only at the Hearing that one could take the difference between the EMBI spread for Venezuela and his 4.5% country risk premium. Respondent takes the position that Prof. Spiller's argument is based on his flawed understanding of Prof. Damodaran's hierarchy of methods and argues that "*country risk is composed of elements that are mutually interrelated and influence one another, and therefore are not separable*."[710]

667. In response to Claimant's allegation that Venezuela's sovereign spread was too wide because it openly declared that it would not comply with its international obligations, Respondent notes that Claimant cannot cite any evidence for those "*incredible propositions*" and claims that "*Venezuela has not defaulted on any of its sovereign debt obligations, and Venezuela has paid compensation in its expropriation cases*."[711]

668. Respondent further rejects Claimant's argument that Prof. Spiller took into account country-specific risks except for the risk of uncompensated expropriation and claims that he just applied an assumption that every country with a B1 rating could be assigned a 4.5% yield spread, without doing any analysis whether this actually reflected the average sovereign bond spread of other countries with the same rating.[712] In particular, Respondent emphasizes that Prof. Spiller did not assess the yield on developing countries with the same rating that Claimant refers to but simply accepted Prof. Damodaran's 4.5% spread applied to all B1-rated countries on the assumption that their sovereign ratings are comparable to US corporate ratings. According to Respondent, however, the yields for those 15 countries according to the CRRM were actually around 15%, just like the yield for Venezuela.[713]

---

[709] Respondent's Post-Hearing Brief, ¶¶ 158-162. Respondent further notes that the same document reflects that Claimant was willing to invest in Venezuela at an internal rate of return of 26.4%. Therefore, Respondent argues that, while still being 3% higher than Prof. Spiller's discount rate, the 15% discount rate is not relevant in this case. Respondent's Post-Hearing Reply Brief, note 132.
[710] Respondent's Post-Hearing Brief, ¶¶ 163-164, 171.
[711] Respondent's Post-Hearing Reply Brief, ¶¶ 39-42.
[712] Respondent's Post-Hearing Reply Brief, ¶¶ 43-44.
[713] Respondent's Post-Hearing Reply Brief, ¶¶ 48-51.

### (iii)  The Tribunal's Analysis

669.  At the outset, the Tribunal notes that there is common ground between the Parties and their experts that the discount rate is derived by (i) determining the cost of equity for a proppants plant in the US using the Capital Asset Pricing Model (CAPM), consisting of the risk-free rate plus a market risk premium; (ii) adding a country risk premium for Venezuela; and (iii) taking into account the debt-to-equity ratio of the cost of capital.[714]

670.  The Tribunal will therefore follow this structure in the present analysis and determine in a first step the cost of equity for a company in the same business as Norpro Venezuela in the US by assessing the risk-free rate in the US (**(1)**); and the market risk premium in the US, consisting of a general market risk premium, a *beta* coefficient and, possibly, an *alpha* coefficient (**(2)**). In a second step, the Tribunal will determine the applicable country risk premium to account for the fact that the plant is not located in the US but rather in Venezuela (**(3)**). Finally, the Tribunal will convert the so derived equity risk premium into the discount rate for the weighted average cost of capital (WACC) on the basis of Norpro Venezuela's debt-to-equity ratio (**(4)**).

### (1)  Risk-Free Rate in the US

671.  The first element of the cost of equity for a company operating in the US is the risk-free rate. Claimant's expert Prof. Spiller used the average yield on the 10-year US Treasury bond rate during the 12 months preceding the valuation date, which amounted to 3.6% as of 15 May 2010.[715] Respondent's experts Mr. Brailovsky and Dr. Flores relied on the 20-year US Treasury bond rate prevailing on the valuation date, *i.e.*, on 15 May 2010, which amounted to 4.1%.[716] The experts thus agree on the use of the US Treasury bond but differ as to the appropriate maturity and the point in time or term over which the yield is to be taken into account.

672.  Prof. Spiller explained his choice by stating that the 10-year bond is more liquid and less sensitive to unexpected changes in inflation than bonds with a longer maturity and thus avoids "*a non-risk-based upward bias*" to the cost of capital. He added that the use of the 10-year bond is recommended by academics and practitioners for long-term valuation purposes "*fundamentally, but not exclusively, because of duration matching.*" Prof. Spiller further stated that he used the 12-month average yield because it smoothes out

---

[714] Spiller I, Appendix C; Spiller II, ¶ 31 and ¶ 139; Counter-Memorial, ¶ 235 referring to Brailovsky/Flores I, ¶¶ 179-180; Brailovsky/Flores II, ¶¶ 154-155.
[715] Spiller I, ¶ 156; Spiller II, ¶ 148.
[716] Brailovsky/Flores I, ¶ 184; Brailovsky/Flores II, ¶ 221.

volatilities resulting from short-term fluctuations and is thus more stable and reliable than the spot yield on the valuation date.[717]

673. Mr. Brailovsky and Dr. Flores stated that the 20-year bond on the valuation date is recommended by Ibbotson/Morningstar for long-term projects and is thus appropriate for a DCF valuation of cash flows that continue in perpetuity. As to their choice of the yield on the valuation date, they stated that it gives credit to the notion of fair market value, which requires a valuation "*immediately before the time at which the taking occurred*," and the fact that an actual transaction cannot be based on a 365-day average.[718]

674. The Tribunal notes that in their second report, Mr. Brailovsky and Dr. Flores did not respond to Prof. Spiller's statement that the 10-year bond is the more commonly recommended measure of the risk-free rate, which is particularly due to duration matching. While the Tribunal is aware of Respondent's argument that the 20-year bond reflects the duration because the present valuation assumes that cash flows will be generated in perpetuity,[719] it must be noted that this is usually the case in DCF valuations and therefore does not justify a deviation from a commonly recommended measure. In addition, Claimant correctly points out that the majority of Norpro Venezuela's expected future cash flows would have been generated in the next ten years and thus within the duration of the 10-year bond.[720]

675. The Tribunal further agrees with Prof. Spiller that the use of a spot yield on a certain date is less reliable than a 12-month average because it may reflect short-term or even daily fluctuations. The Tribunal is not convinced by the argument that the recommendation contained in the World Bank Guidelines to determine fair market value "*immediately*" prior to the expropriation makes it necessary to consider only the spot yield on the valuation date. While it is of course the purpose of this valuation to determine the purchase price that a willing buyer would have paid on that date, the Tribunal considers it doubtful that a willing buyer would have based its assessment of the risk-free rate exclusively on data from that day, given that the buyer would be interested to obtain a reliable result for its long-term investment.

676. Consequently, the Tribunal follows Prof. Spiller's approach to determine the risk-free rate based on the 12-year average yield of the 10-year US Treasury bond rate, which results in a risk-free rate of 3.6% as of 15 May 2010.

---

[717] Spiller I, ¶ 156; Spiller II, ¶¶ 149-151 referring to **Exhibits CLEX-180**, **CLEX-181** and **CLEX-17**.
[718] Brailovsky/Flores I, ¶¶ 184-185 referring to **App. BF-42**, p. 5 and quoting from the World Bank Guidelines (**App. BF-43**), Chapter 4, ¶ 3.
[719] Respondent's Post-Hearing Brief, ¶ 146.
[720] *Cf.* Reply, ¶ 166.

**(2)    Market Risk Premium in the US**

677.    The second element to be determined for the US cost of equity is the market risk premium, which consists of a general market risk premium multiplied by an industry-specific *beta* coefficient. It is in dispute between the Parties and their experts whether this premium should then be increased by a further *alpha* coefficient.

**General Market Risk Premium**

678.    As for the general market risk premium, Prof. Spiller relied on the recommendation of a prominent scholar in the field, Prof. Damodaran, to apply a premium of 4.5% for the year 2010.[721] Mr. Brailovsky and Dr. Flores relied on Ibbotson/Morningstar's use of the arithmetic mean over historical market risk premia as from 1926, which resulted in a general market risk premium of 6.7% as of 15 May 2010.[722]

679.    While acknowledging that the market risk premium is "*commonly estimated from historical data using the largest historical period available*," Prof. Spiller explained that the financial crisis in 2008-2009 tends to distort the results of this method in light of the large negative returns suffered during this period, which made the historical average fall, which is why Prof. Damodaran suspended his practice of using historical returns and replaced it with the above recommendation.[723] Prof. Spiller further referred to various scholars taking the position that the discount factor for long-term projects should be determined by using the geometric mean rather than the arithmetic mean applied by Respondent's experts.[724] Finally, he noted that the market risk premium derived by Respondent's experts is not supported by any recent research, which yielded much lower results, *e.g.*, a 2011 study conducted by Dimson *et al*. that resulted in a world-wide market risk premium of 3-3.5% on a geometric mean basis and 4-4.5% on an arithmetic mean basis.[725]

680.    Mr. Brailovsky and Dr. Flores stated that they used the historic average to "*reduce as much as possible the variability of the mean estimate*," while Prof. Spiller simply relied on the opinion of Prof. Damodaran. They further noted that, for the US, Dimson *et al*. actually estimated an arithmetic market risk premium of 6.4-7.2% for 2011, which is in line with their estimate for 2010.[726] Finally, they stated that the scholars referred to by

---

[721] Spiller I, ¶¶ 157-158; Spiller II, ¶ 152.
[722] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221.
[723] Spiller I, ¶ 157 referring to **Exhibits CLEX-71** and **CLEX-72;** Spiller II, ¶ 152 referring to **Exhibit CLEX-72**.
[724] Spiller II, ¶¶ 153-156 quoting from **Exhibits CLEX-184**, **CLEX-181**, **CLEX-185** and **CLEX-72**.
[725] Spiller II, ¶ 157-158 referring to **Exhibit CLEX-186**. Prof. Spiller's other references concern market risk premia for 2014, which are in the range of 4.14-6.18%. *Cf.* Spiller II, ¶¶ 158-161 and Table 15.
[726] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221 referring to **App. BF-170**, p. 169.

Prof. Spiller do not generally favor the geometric mean over the arithmetic mean and referred to further scholars who prefer the arithmetic mean.[727]

681.  The Tribunal notes that Prof. Spiller in principle acknowledged the approach used by Mr. Brailovsky and Dr. Flores as a recognized and commonly used method to determine the market risk premium. While the Tribunal is of course aware that the financial crisis in 2008-2009 had a serious impact on the US stock market, it is not convinced by Prof. Spiller's argument that falling returns in the stock market have necessarily rendered the historic average unreliable. In particular, the Tribunal notes that, while falling returns may indeed have led to a suggestion that investors were willing to invest at lower returns and thus lower risk premia, this does not explain why the risk premium derived by Respondent's experts from the historical average is higher than the recommendation provided by Prof. Damodaran.

682.  In addition, the Tribunal considers the data from proven market developments over a time period of more than 80 years more reliable than the recommendation of one scholar. While it is undisputed that Prof. Damodaran is a highly accomplished authority in this regard, this does not elevate his recommendation above the necessity for an evidentiary basis supporting Prof. Spiller's choice. In the document that Prof. Spiller relied on, Prof. Damodaran simply states that "[a]*s risk premiums came down in 2009, I moved back to using a 4.5% equity risk premium for mature markets in 2010.*"[728] In the Tribunal's view, this statement cannot be considered sufficient to justify a deviation from an established method.

683.  While Prof. Spiller did refer to additional sources in his second report, there is only one document, the study of Dimson *et al.* dating from 2011, which can provide relevant information for the valuation date of 15 May 2010. In this regard, Mr. Brailovsky and Dr. Flores correctly pointed out, however, that the figures presented by Prof. Spiller (3-3.5% geometric mean; 4-4.5% arithmetic mean) do not relate to the US market but rather to a world-wide analysis of different markets.[729] They further pointed to a different document authored by the same scholars dating from the same year, which reports higher figures for the US market (4.4-5.3% geometric mean; 6.4-7.2% arithmetic mean).[730] Therefore, the Tribunal does not have any evidence before it that would support Prof. Damodaran's estimate for 2010.

684.  As to the dispute between the Parties relating to the question whether it is appropriate to use the geometric mean or rather the arithmetic mean of a certain method, it appears to

---

[727] Brailovsky/Flores II, ¶ 221 referring to **App. BF-171**, p. 156, **BF-172**, p. 56 and **BF-173**, p. 159.
[728] **Exhibit CLEX-72**, p. 77.
[729] **Exhibit CLEX-186**.
[730] **App. BF-170**.

the Tribunal that this is a disputed issue among scholars. The Tribunal notes that it has not been provided with the geometric mean of the historical premia for the valuation date of 15 May 2010. However, the Ibbotson/Morningstar report on which Respondent's experts relied as a source for their 6.7% premium provides for different premia for short-term, mid-term and long-term horizons, with 6.7% being the premium for the long-term horizon. In light of the fact that both Parties's experts rely on data from Ibbotson/Morningstar in relation to various aspects of their calculation, the Tribunal has no reason to consider Ibbotson/Morningstar's choice to derive the equity risk premium on the basis of the arithmetic mean unwarranted.

685. Consequently, the Tribunal follows Mr. Brailovsky's and Dr. Flores' approach to derive the general market risk premium for the US from the arithmetic mean of the historical premia since 1926, which results in a premium of 6.7% for the valuation as of 15 May 2010.

### Industry-specific *Beta* Coefficient

686. There is common ground between the Parties and their experts that the general market risk premium has to be multiplied by an industry-specific component, *i.e.*, the *beta* coefficient. They further agree that the appropriate raw *beta* for Norpro Venezuela is to be derived from SIC Code 1381 Drilling Oil and Gas Wells, as calculated by Ibbotson/Morningstar.[731] The Parties' experts also use the same method for adjusting and levering the raw *beta* in order to arrive at the final *beta* to be used for the present purposes.[732]

687. The Tribunal notes that there is a difference between the Parties' experts with regard to the particular raw *beta* they chose from the Ibbotson/Morningstar data. While Prof. Spiller used the 5-year average of the composite company,[733] Mr. Brailovsky and Dr. Flores relied on the median raw *beta*.[734] However, the Tribunal does not have to express an opinion on this issue because both the composite and the median raw *beta* as reported by Ibbotson/Morningstar for March 2010 amount to 1.3, which results in an adjusted levered *beta* of 1.2.[735]

688. For its valuation of Norpro Venezuela as of 15 May 2010, the Tribunal will thus multiply the general market risk premium by an industry-specific factor of 1.2.

---

[731] Counter-Memorial, ¶ 236; Spiller I, ¶ 161; Brailovsky/Flores I, note 318 and ¶ 190.
[732] Spiller I, ¶¶ 162-164; Brailovsky/Flores I, ¶ 191.
[733] Spiller II, ¶¶ 146-147.
[734] Brailovsky/Flores I, ¶ 190.
[735] Spiller II, ¶ 147; Brailovsky/Flores II, Table 8; Ibbotson/Morningstar, Statistics for SIC Code 1381, Drilling Oil and Gas Wells, 31 March 2010 (**App. BF-37**).

### *Alpha* Coefficient

689. Finally, the Tribunal has to deal with the question whether the industry-specific market risk premium has to be increased by a further *alpha* coefficient, as alleged by Respondent.

690. Mr. Brailovsky and Dr. Flores explain that the CAPM tends to underestimate the cost of capital for financial assets and therefore has to be adjusted to capture the actual performance of the stocks of publicly traded companies, *i.e.*, the *alpha* coefficient. Despite their view that Norpro Venezuela qualifies as a small company within the industry captured in SIC Code 1381, Mr. Brailovsky and Dr. Flores emphasized that they used the *alpha* for the median company, as reported by Ibbotson/Morningstar for March 2010, *i.e.*, 1.3%.[736] They explained that the *alpha* accounts for "*systemic volatilities of companies both large and small*" and noted that, even though "*many practitioners, including Prof. Spiller, forget this finding*," the *alpha* is routinely reported by financial data services providers such as Bloomberg.[737] While acknowledging that the *alpha* is greater in smaller companies, which is why it is also labelled "*size premium*", *e.g.*, by Ibbotson/Morningstar, they stated that large companies may also have a significant *alpha*, which is why it should be added to the market risk premium.[738]

691. Prof. Spiller considered it inappropriate to add a "*size premium*" to the market risk premium and noted that it is contested among financial practitioners and academics, including Prof. Damodaran. With reference to various scholars, he further stated that the *alpha* has been found to be "*empirically unreliable across regions and time periods*" and is understood to reflect underlying market risk factors rather than the inherent effect of size.[739] In addition, Prof. Spiller took the view that the addition of a "*size premium*" would potentially be duplicative of the country risk premium because Venezuelan firms are smaller than firms in the US and Norpro Venezuela cannot be qualified as a small or even medium company within Venezuela.[740]

692. The Tribunal notes that there are two issues to be distinguished with regard to the *alpha* coefficient: (i) whether it reflects in general an established phenomenon to be accounted for the cost of equity; and (ii) whether it would in this particular case be duplicative of country risk to be determined in the next section.

693. As to the second argument, the Tribunal is not convinced that the *alpha* coefficient amounts to a size premium for smaller companies, which would be double-counting the

---

[736] Brailovsky/Flores I, ¶¶ 192-193; Brailovsky/Flores II, ¶¶ 206-207; Ibbotson/Morningstar, Statistics for SIC Code 1381, Drilliing Oil and Gas Wells, 31 March 2010 (**App. BF-37**).

[737] Brailovsky/Flores II, ¶¶ 209-213.

[738] Brailobsky/Flores I, ¶ 192; Brailovsky/Flores II, ¶ 214.

[739] Spiller II, ¶¶ 48-49 referring to **Exhibits CLEX-113** through **CLEX-119**,

[740] Spiller II, ¶¶ 50-52 and Table 6.

fact that companies in Venezuela are in general smaller than US companies. While it is apparent from the Ibbotson/Morningstar data and also acknowledged by Respondent's experts that the *alpha* is greater for smaller companies than for larger companies, Prof. Spiller also recognized that the *alpha* does not capture an inherent size effect but rather underlying market risk factors. These factors may be more pronounced for smaller companies but they do exist for larger companies as well. Contrary to what Claimant appears to suggest, Mr. Brailovsky and Dr. Flores did not apply the *alpha* for the small composite but rather chose the median. In the Tribunal's view, Claimant thus has failed to establish that the application of the median *alpha* would be duplicative of the country risk for Norpro Venezuela.

694.    However, the Tribunal is aware of Prof. Spiller's general criticism of the *alpha*, which is supported by various references to scholars and practitioners. The Tribunal also notes that Mr. Brailovsky and Dr. Flores even acknowledged that "*many practitioners* […] *forget*" to apply the *alpha* coefficient to the market risk premium. It therefore appears to be undisputed that the *alpha* cannot be considered a well-established element of determining the market risk premium. On the balance of the evidence, the Tribunal is thus not convinced that the *alpha* coefficient should be added to the US cost of equity rate.

### Conclusion on Cost of Equity for a Company in the US

695.    In sum, the Tribunal's findings result in the following cost of equity for a company in the US as of 15 May 2010: (i) a risk-free rate of 3.6%; plus (ii) a market risk premium of 8%, consisting of the general market risk premium of 6.7%, to be multiplied by the industry-specific *beta* coefficient of 1.2. For the reasons laid out above, the Tribunal does not make any further addition in relation to an *alpha* coefficient.

696.    Consequently, the Tribunal finds that the US cost of equity to be used to determine the applicable discount rate in this case amounts to 11.6%.

### (3)    Country Risk Premium for Venezuela

697.    The Parties agree that the cost of equity as determined above for a company in the US operating in the same business as Norpro Venezuela has to be increased by a country risk premium to account for the fact that the plant is located in Venezuela. However, the Parties' experts have applied different methods to determine this country risk premium, which lead to significantly differing results.

698.    Prof. Spiller relied on a method devised by Prof. Damodaran, which is based on the local currency sovereign rating assigned to Venezuela by Moody's (B1 as of 15 May 2010), converted into a default spread pursuant to Prof. Damodaran's estimate for the B1 rating

class (4.5% in 2010). Prof. Spiller applied this default spread as the country risk premium without making any further adjustments for equity risk.[741]

699. Mr. Brailovsky and Dr. Flores primarily relied on the Country Risk Rating Model (CRRM) compiled by Ibbotson/Morningstar, which is based on an ongoing survey of 75-100 bankers conducted every six months by the publication *Institutional Investor*. In this survey, the bankers are asked to rate 170 countries on a scale of 0 to 100 and the editors of *Institutional Investor* weigh the responses based on their perception of the banks' level of global performance and sophistication of their credit research methods. These country risk ratings are then converted into equity discount rates based on a study conducted by Erb, Harvey and Viskanta, which is updated on a regular basis. For Venezuela, the CRRM resulted in a country equity risk premium of 14.3% as of 15 May 2010.[742]

700. For cross-checking purposes, Mr. Brailovsky and Dr. Flores further used the so-called "*bludgeon method*" devised by Prof. Damodaran, which is based on the spread on Venezuela's sovereign bond denominated in US Dollars. They chose JP Morgan's Emerging Market Bond Index (EMBI), which measures the difference between the USD-nominated sovereign bond yields of Venezuela and those of the US and amounted to 10.26% as of 15 May 2010. Mr. Brailovsky and Dr. Flores then applied the global multiplier (1.5) suggested by Prof. Damodaran to account for the fact that investment in equity is riskier than investment in bonds and arrived at a country risk premium of 15.4% as of 15 May 2010.[743]

701. While acknowledging that experts may disagree on data and methodology, Prof. Spiller stated that Mr. Brailovsky's and Dr. Flores' choice does not reflect Norpro Venezuela's country risk exposure because they failed to take into account three factors specific for its business: (i) Norpro Venezuela exported its products and was therefore not subject to domestic demand conditions and risks; (ii) it had secured the supply of its key production inputs through long-term contracts with State-owned companies; and (iii) it was protected by a bilateral investment treaty, which requires that risks related to expropriation and "*crisis conditions*" be excluded from the present valuation.[744] According to Prof. Spiller, Venezuela's current "*very high*" EMBI spreads reflect the possibility of it entering into default due to its lack of willingness to pay its obligations, but not the company-specific risks faced by a private long-term investor that is not subject to the Government's willingness or ability to pay. He added that Mr. Brailovsky's and Dr. Flores' choice to use the EMBI spread of only one day amplifies the contrast between their short-term measure of

---

[741] Spiller I, ¶¶ 165-166; Spiller II, ¶ 33 relying on **Exhibit CLEX-75**.
[742] Brailovsky/Flores I, ¶¶ 197-199.
[743] Brailovsky/Flores I, ¶¶ 201-204.
[744] Spiller II, ¶¶ 35-36 and ¶¶ 40-44.

risk and Norpro Venezuela's long-investment.[745] Prof. Spiller took the view that, by contrast, his own assessment of the country risk captures the "*long-term impact of country risk on Norpro Venezuela's operations*" consistent with Prof. Damodaran's assessment.[746] Prof. Spiller further took the position that it is "*neither necessary under the CAPM nor advisable*" to calculate a separate country risk for equity because the equity risk converges to debt risk in the long term, which is why Prof. Damodaran recommends the application of a mutiplier only for the short term.[747] As to the CRRM, Prof. Spiller raised several points of criticism, including (i) a lack of transparency; (ii) the subjective and qualitative nature of the ratings; (iii) claims that the surveys are biased towards specific regions of the world; (iv) a lack of statistical or economic explanations; and (v) unreliability for small or illiquid stock exchanges with unreliable stock market data, such as Venezuela.[748]

702. Mr. Brailovsky and Dr. Flores pointed out that Prof. Spiller's country risk premium is in fact equal to a 10-year B-rated generic US bond over the corresponding US Treasury bond and therefore reflects US corporation debt risk but not Venezuelan country risk.[749] They further stated that, contrary to what he suggested, Prof. Spiller did not apply Prof. Damodaran's method because Prof. Damodaran has a hierarchy of methods: his first choice is to use the spread on sovereign bonds denominated in "*strong currencies*" such as the US Dollar or Euro (*i.e.*, the "*bludgeon method*") and only for those countries that do not issue such bonds, he suggests an alternative approach of assuming that sovereign ratings are comparable to corporate ratings.[750] In any event, Mr. Brailovsky and Dr. Flores considered it necessary to scale the default spread by a multiplier because their analysis of both the US and Venezuelan market over a period of 20 years did not support a convergence of the risk but rather yielded volatilities of 2.05 and 2.74, respectively, as of 15 May 2010.[751] Finally, they took the view that Norpro Venezuela is not less exposed to country risk than other companies operating in Venezuela because (i) country risk is a much larger concept than exposure to domestic demand, involving taxation, regulations and other government actions such as currency controls; (ii) the invoked long-term contracts expire in 2016 and 2018, respectively, and do not contain any renewal option; and (iii) the risk of expropriation forms part of fair market value and would be taken into account by any willing buyer; in any event, bilateral treaties do not have a discernible impact on country

---

[745] Spiller II, ¶¶ 37, 46 and 140-141.
[746] Spiller II, ¶ 47.
[747] Spiller II, ¶¶ 142 and 144.
[748] Spiller II, ¶ 143.
[749] Brailovsky/Flores I, ¶¶ 213, 215.
[750] Brailovsky/Flores I, ¶¶ 210, 216 referring to **App. BF-64**, pp. 51, 53; Brailovsky/Flores II, ¶¶ 161, 182. According to Mr. Brailovsky and Dr. Flores, Prof. Damodaran's best estimate of the equity country risk premium is in fact in line with their own estimate. Brailovsky/Flores I, ¶ 212; Brailovsky/Flores II, ¶¶ 185, 190.
[751] Brailovsky/Flores II, ¶ 199 and Table 14. Mr. Brailovsky and Dr. Flores emphasize that they nevertheless use (only) Prof. Damodaran's generic multiplier of 1.5 as a benchmark for their calculation.

risk according to political risk insurers.[752] As to Prof. Spiller's criticism on the CRRM, Mr. Brailovsky and Dr. Flores acknowledged that the criteria are subjective (albeit based on economic fundamentals) but stated that their consequences are objective, given that they form the basis for banks' lending practices. In addition, they pointed out that the model has produced stable results over the last 25 years.[753] They further took the position that the EMBI spread on 15 May 2010 was not out of the ordinary but rather "*almost exactly in the middle of the distribution of the daily data since 1993 – a total of 5,336 observations*."[754]

703. The Tribunal notes that there are several points of disagreement between the Parties' experts in relation to the determination of an appropriate country risk premium for Norpro Venezuela as of 15 May 2010. However, it appears that a large portion of them depends on a fundamental issue that the Tribunal will therefore address at the outset, *i.e.*, whether the risk of being expropriated without the payment of (sufficient) compensation as required by the Treaty should be excluded from the country risk premium applicable to Venezuela.

704. At the outset, the Tribunal wishes to emphasize that, in principle, it agrees with Respondent that the country risk premium to be applied in the present case should be a realistic estimate of the premium that a willing buyer would have applied in May 2010. At the same time, the Tribunal understands Claimant's position that the risk of being expropriated with no or insufficient compensation should be excluded from the valuation of Norpro Venezuela in the context of this arbitration.

705. In this context, Claimant's expert Prof. Spiller stated in his second expert report that protections from the France-Venezuela BIT served as "*an additional mitigation of country risk*";[755] however, he neither quantified the impact of such mitigation nor did he present any evidence in support of this statement. By contrast, Respondent's experts presented a study conducted by Lauge N. Skovgaard Poulson, who has examined whether political risk insurers placed any weight on the possiblity whether bilateral investment treaties reduce risk and concluded that "[bilateral investment] *treaties have very little impact on political risk insurance (PRI) providers' coverage and pricing policies*."[756] While the Tribunal would not go as far as to consider that Respondent has thereby established that protection of investments by bilateral investment treaties has "*no discernible impact on country risk*,"[757] it must be noted that Claimant never addressed the evidence presented

---

[752] Brailovsky/Flores II, ¶¶ 200-205 referring to **App. BF-166**.
[753] Brailovsky/Flores II, ¶¶ 169, 174-179 and Figure 19.
[754] Brailovsky/Flores II, ¶¶ 166, 172.
[755] Spiller II, ¶ 41.
[756] Brailovsky/Flores II, ¶ 205 quoting from **App. BF-166**, p. 1.
[757] *Cf.* Respondent's Post-Hearing Brief, ¶ 179.

by Respondent's experts, nor has it, or its expert Prof. Spiller, presented any evidence to the contrary of its own. Against this background, the majority of the Tribunal cannot conclude that the existence of the France-Venezuela BIT would have had a quantifiable impact on the risk assessment of a willing buyer – from a strictly economical point of view.

706. Nevertheless, it could be argued that if the Tribunal were not to make any adjustment as regards the risk of expropriation with no or insufficient compensation, this would allow Respondent to benefit from its own internationally wrongful conduct, *i.e.*, not only the breach of Article 5(1) of the Treaty, but its alleged general policy to expropriate investments without paying adequate compensation. As compensation is a crucial aspect of Respondent's obligations in connection with an expropriation and Respondent would be responsible for its alleged failure to comply with this obligation, the risk of expropriation without (sufficient) compensation should be eliminated from the country risk. The Tribunal notes that this argument is no longer based on a strictly economic perspective, but includes a normative element reflecting the ambition that treaty protection should be respected and enforced. According to this argument, the notion of fair market value under the Treaty would thus have to be interpreted in the context of its own protection standards.

707. In the Tribunal's view, this rationale would apply not only to expropriation-related risks, but also to risks related to other provisions of the Treaty, such as the risk of unfair regulation, adoption of arbitrary measures, serious due process violations, etc. According to Claimant's rationale, all of these risks should be excluded from the country risk because they emerge from Respondent's alleged tendency not to live up to its international obligations.

708. This position is supported in particular by the tribunal in *Gold Reserve v. Venezuela*, which held that the country risk premium should not reflect "*the market's perception that a State might have the propensity to expropriate in breach of BIT obligations.*"[758] While the tribunal found in that case that no expropriation had occurred, it nevertheless considered that risks related to expropriation should be excluded from the country risk for the purposes of determining the compensation to be paid to the claimant. At the same time, the tribunal emphasized that political risks other than the expropriation risk must be reflected in the country risk premium. As it considered that these risks were not reflected in the 1.5% country risk premium applied by the claimant's expert, it relied on the 4% premium used in an analyst report instead, without however giving any further reasons for its choice.[759]

---

[758] *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841.
[759] *Gold Reserve v. Venezuela* (**CLA-152**), ¶¶ 841-842.

709. On the other hand, the Tribunal notes that there are also arguments in favor of Respondent's position that the country risk premium should include all political risk associated with investing in Venezuela, including the alleged general risk of expropriation with no or insufficient compensation.

710. First, the Tribunal recalls that both Parties agree that, regardless of the compensation standard to be applied, the Tribunal has to determine Norpro Venezuela's fair market value, *i.e.*, the amount that a willing buyer would pay to a willing seller. Taking into account this definition, it could be in accordance with the economic notion of fair market value to maintain the risk of expropriation without (sufficient) compensation as one of the risks that a willing buyer would realistically take into account.

711. In addition, as noted by the ILC in the commentary to Article 36 of its Draft Articles, "*the function of compensation is to address the actual losses incurred as a result of the internationally wrongful act*" and is thus "*purely compensatory*"; "[i]*t is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character.*"[760] It could be argued that if one were to exclude the risk of uncompensated expropriation from the present valuation, Claimant would be granted a windfall because it would receive compensation in an amount that it would not have been able to obtain as a purchase price if it had actually sold Norpro Venezuela to a willing buyer in 2010, and thus more than "*the actual losses incurred*" as a result of Respondent's breach of Article 5(1) subparagraphs 2 and 3 of the Treaty.

712. As correctly pointed out by Respondent, this position is supported in particular by the tribunal in *Tidewater v. Venezuela*, which concluded based on these arguments that, while the particular State measure giving rise to the claim must of course be excluded from the valuation, the country risk premium reflects "*the general risks, including political risks, of doing business in the particular country, as they applied on that date*."[761] The tribunal concluded that a country risk premium of 14.75% was appropriate under the circumstances.[762]

713. In the Tribunal's view, the fundamental issue to be resolved in this regard is thus whether in its determination of the compensation to be paid to Claimant, the Tribunal should disregard only the impact of the particular breach of Article 5(1) that it has found under the present Treaty, or whether it should also eliminate the risk of further potential breaches

---

[760] **CLA-027**, Article 36, ¶ 4.
[761] *Tidewater v. Venezuela* (**RL-207**), ¶ 186.
[762] *Tidewater v. Venezuela* (**RL-207**), ¶ 190.

of international law that generally reduce the value of all investments in Venezuela because Respondent would otherwise be allowed to take advantage of its alleged policy not to respect its international obligations.

714. This question cannot be answered without taking into account the circumstances prevailing when Claimant made its decision to invest in Venezuela. Specifically, the Tribunal considers it relevant whether the risk, which Claimant now seeks to be excluded from the country risk premium, already existed in 2006 or whether there was an apparent change of policy since the investment was made, *i.e.*, from an investor-friendly environment towards establishing a tendency to expropriate foreigners without adequate compensation as alleged by Claimant.

715. In this context, it is undisputed that when the team surrounding Patrick Millot sought approval of the project from Claimant's mother company Compagnie de Saint-Gobain in 2006, a discount rate of 15% was used, consisting of the 12% rate usually assigned within Claimant's group to "*high risk*" countries plus a 3% premium to account for "*additional risks by conservatism.*"[763] While this rate cannot simply be equated to an objective assessment that a willing buyer might have conducted, it serves as an indication that Claimant already considered Venezuela a "*high risk*" country and even added 3% for additional risk when it made its investment decision in 2006. In its own words, Claimant invested "*during the height of the Bolivarian Revolution.*"[764] In the Tribunal's view, this demonstrates that, already in 2006, Claimant factored in certain risks that are not covered by the usual risk of investing in "*high risk*" countries and most probably relate to a risk of being expropriated with no or insufficient compensation.

716. It must further be noted that it is undisputed between the Parties that the country risk has increased since 2006.[765] The question is whether such increased risk must, or rather must not, be taken into account in the present valuation of Norpro Venezuela because the increase is due to Respondent's alleged practice to expropriate investments without (sufficient) compensation and would thus allow it to benefit from its own wrongful conduct.

717. In this regard, the majority of the Tribunal agrees with the tribunal in *Tidewater v. Venezuela* that Claimant's argument "*conflates two separate elements in a legal claim of this kind,*" *i.e.*, (i) the question of liability where the Tribunal has found that Respondent failed to carry out the expropriation in accordance with the compensation requirements of the Treaty; and (ii) the quantum stage where the Tribunal must determine the fair market

---

[763] Claimant's Post-Hearing Submission, ¶¶ 130-133; DAC: Grains and Powders – Venezuela 70 kt Greenfield proppants update 38 M$ revised capex, 23 October 2006 (**Exhibit C-082**) and Financial Mopdel for DAC #3 (**Exhibit CLEX-166**).
[764] Memorial, ¶ 2.
[765] Claimant's Post-Hearing Submission, ¶ 121; Respondent's Post-Hearing Brief, ¶¶ 159-162.

value of Claimant's investment. As the *Tidewater* tribunal has found, "*the second element in the claim is in essence an economic question. It depends upon the value that the market would attribute to the investment in question.*"[766] The tribunal further held:

> "*This is not a matter of permitting a respondent State to profit from its own wrong. On the contrary, the damages that the Tribunal is empowered by virtue of the Treaty to award are designed to ensure that the private investor is compensated for the loss of its investment. But, in determining the amount of that compensation by reference to a discounted cash flow analysis, the Tribunal should consider the value that a willing buyer would have placed on the investment. In determining this value, one element that a buyer would consider is the risk associated with investing in a particular country. Such a factor is not specific to the particular State measure that gives rise to the claim. […] Rather the country risk premium quantifies the general risks, including political risks, of doing business in the particular country, as they applied on that date and as they might then reasonably have been expected to affect the prospects, and thus the value to be ascribed to the likely cash flow of the business going forward.*"[767]

718. The majority of the Tribunal agrees with this finding and therefore cannot follow Claimant's argument that a failure to exclude the risk of expropriation with no or insufficient expropriation would allow Respondent to benefit from its own wrongful conduct. In the Tribunal's view, Claimant's own risk assessment in 2006 shows that, from an economic perspective, any "*additional risks*" associated with investing in Venezuela would be taken into account by an investor or a willing buyer – irrespective of the existence of the present Treaty.

719. The notion of fair market value, which the Tribunal has identified above as the applicable compensation standard,[768] requires the elimination of the specific measure that was subject of the Tribunal's finding on liability, *i.e.*, in this case Respondent's failure to comply with its obligation to pay prompt and adequate compensation to Claimant. However, it does not require, and in fact does not allow for, a correction of the economic willing-buyer perspective on the basis of normative considerations. In particular, the majority of the Tribunal is of the view that the Treaty and this arbitration do not serve the purpose of insuring Claimant against the general risks of investing in Venezuela that a willing buyer would take into account in its assessment of the purchase price it would pay for Norpro Venezuela.

---

[766] *Tidewater v. Venezuela* (**RL-207**), ¶¶ 184-185.
[767] *Tidewater v. Venezuela* (**RL-207**), ¶ 186.
[768] *See* paragraph 627 above.

720. In any event, the Tribunal notes that, while acknowledging the increased country risk, Respondent strongly contests Claimant's allegation that it is making generalized threats to expropriate all foreign investments in Venezuela and/or public statements that it does not intend to honor its obligations under international law. Respondent emphasizes that Claimant has not presented any evidence with regard to these allegations and claims that "*Venezuela has not defaulted on any of its sovereign obligations, and Venezuela has paid compensation in its expropriation cases.*"[769] In its letter of 6 November 2015, Respondent again contested that there is any divergence between Venezuela's willingness to pay and its ability to pay and referred to the director of the Venezuelan economic consulting firm Ecoanalítica who stated on 28 October 2015 that PDVSA's debt payments in the total amount of USD 5 billion over the last 15 days confirmed "*Venezuela's strong willingness to pay.*"[770]

721. Consequently, it is very much in dispute between the Parties whether there is a general risk of uncompensated expropriation in Venezuela. While Respondent correctly pointed out that Claimant has not presented any specific evidence in support of its allegation, in the Tribunal's view the high country risk in Venezuela may be due, at least in part, to the uncertain situation surrounding certain of Respondent's expropriation measures. Respondent does not contest that it is involved in several disputes with investors that relate to the payment of adequate compensation.

722. However, in light of its finding above that the determination of fair market value has to be made in accordance with economic principles and thus factor in all risks that a willing buyer would take into account, the Tribunal does not have to make a decision on Respondent's expropriation measures in general (assuming it had jurisdiction to adopt such a finding).

723. Consequently, the majority of the Tribunal agrees with Respondent that the country risk premium must reflect all political risks associated with investing in Venezuela, including the alleged general risk of being expropriated without payment of (sufficient) compensation.

724. Accordingly, the Tribunal does not have to decide the further question whether it is possible to quantify and thus eliminate the expropriation risk from the country risk, without at the same time excluding other country-specific risks that undisputedly have to be accounted for in the country risk premium. Instead, the Tribunal must assess from the per-

---

[769] Respondent's Post-Hearing Reply Brief, ¶¶ 39-42.
[770] Respondent's letter dated 6 November 2015; **Exhibit R-131**.

spective of the willing buyer, which of the various methods presented by the Parties' experts adequately reflects the country risk to which Norpro Venezuela was in fact exposed as of 15 May 2010.

725.  At this point, the Tribunal notes that it is in dispute between the Parties whether the difference between the approach applied by Prof. Spiller and the two approaches applied by Respondent's experts is due (exclusively) to the risk of uncompensated expropriation. While Respondent claims that it is not possible to isolate and thus quantify the risk of uncompensated expropriation,[771] Claimant contends that Prof. Spiller's method based on Venezuela's local currency rating excludes the risk of uncompensated expropriation but includes "*other risks of investing in Venezuela, such as the risks of a volatile economy, civil disorder, less developed infrastructure, and other issues*."[772] Claimant explicitly states that, as Venezuela's "*extremely high*" USD-denominated bond spread reflects its lack of willingness to pay, the difference between the country risk premia computed by the Parties' experts is "*largely attributable to Venezuela's confiscation threats*."[773] It is thus apparently Claimant's position that the approach selected by Prof. Spiller does not include the alleged general risk of uncompensated expropriation and thus does not capture the actual country risk that a willing buyer would take into account in its valuation of Norpro Venezuela.

726.  The Tribunal notes that Prof. Spiller did not state at the Hearing that Prof. Damodaran's local currency rating method is in fact designed to eliminate the risk of uncompensated expropriation from the country risk premium. However, he gave the following explanation for the fact that the alternative approach selected by Mr. Brailovsky and Dr. Flores based on Venezual's EMBI spread renders much higher results than the rating-based method:

> "*The investors in Venezuelan bonds all the way up to December 2013 were assessing that although the fundamental economics of Venezuela were comparable to B1 credit-rating countries, they were fearing that Venezuela may not be willing to uphold its international obligations, not dissimilar to, what for example, Ecuador did when it defaulted recently on its debt, which was based on willingness to pay to uphold the international obligations rather than economic fundamentals, as may be the case now with Greece, which cannot repay the debt.*"[774]

727.  Prof. Spiller thus confirms Claimant's position that the divergence between the results yielded by the two methods is due to Venezuela's alleged unwillingness to live up to its

---

[771] Respondent's Post-Hearing Brief, ¶ 163.
[772] Claimant's Post-Hearing Submission, ¶¶ 105-106.
[773] Claimant's Post-Hearing Submission, ¶¶ 118-119.
[774] Transcript (Day 4), p. 903 lines 5-16.

international obligations. Prof. Spiller further argues that in the case of Venezuela, there is a significant discrepancy between the country's ability to pay (reflected in its local currency rating) and its willingness to pay (reflected in its USD-denominated bond spreads). Prof. Damodaran's spreadsheet as of 1 July 2013[775] indeed shows that the divergence between the two methods amounted to 7.62% for Venezuela, but less than 1% for most other countries. The only other countries with a divergence of more than 2% are Tunisia (2.22%) and Argentina (31.72%).[776]

728. In the Tribunal's view, the unusual divergence between the results yielded by the two methods supports Prof. Spiller's explanation that the CDS spreads (just like the EMBI spread) might reflect a risk that is not usually associated with countries that are assigned a B1 rating. While this additional risk could indeed be the risk associated with Venezuela's alleged policy not to live up to its international obligations, the Tribunal has already found above that it is beyond the scope of this arbitration to make a finding on Venezuela's general policy towards foreign investors and to make any corresponding adjustment to the country risk premium in this regard.

729. Respondent further pointed out in its Post-Hearing Reply Brief that Prof. Spiller did not analyze the spreads on USD-denominated bonds of countries with the same rating as Venezuela but rather took the 4.5% spread that Prof. Damodaran applied to all B1-rated countries on the assumption that sovereign ratings are comparable to US corporate ratings, without making any analysis on market data relating to these countries.[777] Already in its Rejoinder, Respondent raised the argument that, instead of relying on the spreads of US corporate bonds, Prof. Spiller should at least have analyzed corporate bonds from emerging countries and referred to the analysis of Mr. Brailovsky and Dr. Flores, which yielded an average debt spread of 9%.[778]

730. Even though Respondent's argument was again raised by Mr. Brailovsky during the Hearing,[779] Claimant did not respond to it in its Post-Hearing Submission, but argued for the first time in its Second Post-Hearing Submission that the accuracy of Prof. Spiller's measure of country risk could be checked by looking at the CDS spreads outstanding on other countries' sovereign debts. Claimant noted that pursuant to Prof. Damodaran's list as of

---

[775] While Prof. Damodaran's excel sheet for 2010 is on file as **App. BF-62**, it does not contain a calculation of the country risk premium based on the CDS spreads. For comparison purposes, the Tribunal therefore refers to the excel sheet as of July 2013.
[776] **Exhibit CLEX-75**, pp. 5-6 and **App. BF-65**, pp. 3-4.
[777] Respondent's Post-Hearing Reply Brief, ¶¶ 44-45 and ¶ 48.
[778] Rejoinder, ¶ 221 referring to Brailovsky/Flores II, ¶¶ 194-195 and Table 12.
[779] Trascript (Day 4), p. 1210 line 21 to p. 1211 line 3.

January 2014, the 4.5% premium applied by Prof. Spiller would rank as the fourth-highest, "*far above the typical country risk premium in a developing country.*"[780]

731. Respondent replied to this argument by a separate letter pointing out that (i) Prof. Spiller had never referred to CDS spreads in the context of the method he applied; (ii) more than half of the countries with CDS spreads in Prof. Damodaran's list could not be classified as "*developing countries*"; and (iii) "*typicality*" was not a valid concept for the valuation of a project in particular country for which country-specific data was readily available, *i.e.*, in the case of Venezuela, a CDS spread of 10.8%.[781]

732. In the Tribunal's view, it would indeed have been helpful to have a comprehensive analysis of market data from other countries with the same B1 rating that Venezuela was assigned as of 15 May 2010. In particular, Claimant should have raised the argument relating to CDS spreads of other countries at an earlier stage of the proceedings, which would have allowed Respondent and its experts an adequate opportunity to respond to this argument. In addition, the Tribunal could have consulted the Parties' experts on this issue during the Hearing. In the absence of a proper discussion on this issue, the Tribunal does not consider it fair to rely on the data that Claimant pointed to, which in any event relates to 2014 and not to the valuation date in 2010.

733. In addition, the Tribunal recalls Mr. Brailovsky's and Dr. Flores' analysis of corporate bond spreads in emerging markets based on data from Merrill Lynch, which they converted into a generic emerging market corporate bond yield of 9.11% as of May 2014.[782] While they did not provide a figure for the valuation date of 15 May 2010, this undisputed calculation raises doubts as to whether the 4.5% premium calculated by Prof. Spiller reflects even the country risks typically associated with a B-1 rated country that should undisputedly be taken into account in the present valuation – apart from the issue of the expropriation risk.

734. The Tribunal will therefore now turn to the two alternative approaches that Respondent's experts relied on, *i.e.*, the CRRM and the "*bludgeon method,*" which both undisputedly include any risk of uncompensated expropriation and yielded a country risk premium of 14.3% and 15.4% respectively.

735. As to the "*bludgeon method,*" which is based on USD-denominated sovereign spreads, Respondent's experts have chosen to rely on data from the EMBI. While Prof. Spiller criticized in his second report that it is not appropriate to rely on the EMBI in the present

---

[780] Claimant's Second Post-Hearing Submission, ¶¶ 61-62 referring to **App. BF-66**, pp. 23-25.
[781] Respondent's letter dated 2 June 2015, pp. 1-2. The Tribunal admitted Respondent's submission relating to the CDS spreads into the record by letter of 19 June 2015.
[782] Brailovsky/Flores II, ¶¶ 191-197.

case because Venezuela's sovereign credit risk does not reflect Norpro Venezuela's country risk exposure, he did not contest the choice of this particular index as such. Prof. Spiller did challenge the use of the spot index on the valuation date rather than a long-term average; however, he did not provide the Tribunal with an alternative figure that would reflect any such average.[783]

736. The Tribunal is of course aware that Mr. Brailovsky and Dr. Flores have applied Prof. Damodaran's "*bludgeon method*" only to cross-check their primary calculation, which is based on the CRRM. The Tribunal is also aware that Prof. Spiller has raised various points of criticism in relation to this method, in particular as regards a lack of transparency of the method and a lack of reliability in the results it yields,[784] and that Mr. Brailovsky and Dr. Flores have addressed these points of criticism in detail in their second expert report.[785] The Tribunal is of the view that there is no need to express an opinion as to the reliability of the CRRM as both Parties' positions are reflected in one of the methods devised by Prof. Damodaran, who appears to be recognized as a leading authority by both Parties' experts. The Tribunal will therefore focus on the methods that he recommends.

737. Respondent and its experts have taken the position that Prof. Spiller has ignored Prof. Damodaran's hierarchy of methods and that Prof. Damodaran's best estimate is the result yielded by the "*bludgeon method*."[786] While neither Claimant nor its expert has explicitly addressed this argument, the Tribunal notes that the record does not clearly establish that Prof. Damodaran indeed provides for a ranking of his methods. Contrary to what Respondent and its experts suggest, Prof. Damodaran does not state in his writing on equity risk premiums that the rating-based synthetic approach should be applied only for countries that do not have USD-denominated sovereign bonds. By contrast, he states that the default spread "*can be estimated in three ways*," one of which is the synthetic spread.[787] While noting that the other two ways are available only for countries with USD-denominated bonds, he does not state that those ways should be preferred over the synthetic spread. He refers to the assumption that sovereign ratings are comparable to corporate ratings as an "*alternative approach*" and, after laying out the three possible approaches, concludes that one "*could choose one of these approaches and stay consistent over time or average across them.*"[788]

738. In his spreadsheet that formed the basis for Prof. Spiller's choice of the 4.5% premium for 2013, Prof. Damodaran also states that to "[e]*stimate the default spread for the country*

---

[783] Spiller II, ¶¶ 32-36 and ¶¶ 140-141.
[784] Spiller II, ¶¶ 142-143.
[785] Brailovsky/Flores II, ¶ 169 and ¶¶ 174-179.
[786] Brailovsky/Flores I, ¶ 212 and ¶ 216.
[787] **App. BF-64**, pp. 53-55.
[788] **App. BF-64**, pp. 55, 57 and Figure 8.

*in question,*" he "*offer*[s] *two choices, one based upon the local currency sovereign rating for the country from Moody's and the other is the CDS spread for the country (if one exists).*"[789] Again, he does not state that one should prefer the CDS spread approach over the rating approach. Finally, the Tribunal notes that in his spreadsheet for 2010, Prof. Damodaran does not even provide for the CDS spread approach but simply states that "[t]*o estimate the long term country risk premium, I start with the country rating (from Moody's: www.moodys.com) and estimate the default spread for that rating (U.S. corporate and country bonds) over the treasury rate. This becomes a measure of the added country risk premium for that country.*"[790]

739. In light of these statements, the Tribunal is not convinced that there is a hierarchy of methods that Prof. Spiller failed to observe in his choice to rely on the local currency rating model instead of the USD-denominated bond spreads. However, the Tribunal recalls that (i) according to Claimant's own submissions, Prof. Spiller's approach aims to exclude the risk of uncompensated expropriation and therefore does not reflect the actual country risk that a willing buyer would take into account; and (ii) it remains unclear whether it includes even the country risks that are typically associated with a B-1 rated country, as demonstrated by Mr. Brailovsky's and Dr. Flores' analysis of corporate bond spreads in emerging markets.

740. By contrast, the Tribunal has no reason to doubt that Prof. Damodaran's "*bludgeon method*" includes both the risk of uncompensated expropriation and the typical country risks that should undisputedly form part of the present valuation. While the Tribunal is not necessarily convinced that the difference between the results yielded by the two methods is attributable in its entirety to the risk of uncompensated expropriation, Claimant has not presented any evidence that the "*bludgeon method*" includes any risk that would not be taken into account by a willing buyer in its valuation of Norpro Venezuela. Therefore, the Tribunal follows Respondent's experts in this regard and finds that the country risk premium should be determined on the basis of Venezuela's USD-denominated bond spreads as reflected in the EMBI.

741. However, there remains one question to be assessed in this regard, *i.e.*, whether the Tribunal should apply Prof. Damodaran's generic multiplier of 1.5 for its determination of the country equity risk premium on the assumption that investment in equity is riskier than investment in bonds, as stated by Respondent's experts,[791] or whether it should refrain from applying any multiplier on the assumption that equity and debt risk converge

---

[789] **Exhibit CLEX-75**, p. 1 and **App. BF-65**, p. 1.
[790] **App. BF-62**, p. 3.
[791] Brailovsky/Flores I, ¶¶ 202-205; Brailovsky/Flores II, ¶¶ 198-199 and Table 14.

for a long-term investment, as stated by Claimant's expert.[792] The Tribunal notes that both sides relied in particular on Prof. Damodaran's statements in this regard. Dr. Flores and Mr. Brailovsky pointed to the fact that Prof. Damodaran states in his spreadsheet:

> "*You can estimate an adjusted country risk premium by multiplying the default spread by the relative equity market volatility for that market (Std dev in country equity market/Std dev in country bond). In this spreadsheet, I have used the global average of equity to bond market volatility of 1.5 to estimate the country equity risk premium.*"[793]

742. The Tribunal notes, however, that this statement is preceded by the sentence: "*In the short term especially, the equity country risk premium is likely to be greater than the country's default spread.*"[794] Prof. Spiller also relies on the following statement from Prof. Damodaran:

> "[T]*he differences between standard deviations in equity and bond prices narrow over longer periods and the resulting relative volatility will generally be smaller[795]. Thus, the equity risk premium will converge to the country bond default spread as we look at longer term expected returns.*"[796]

743. In response, Mr. Brailovsky and Dr. Flores presented the results of their own analysis on the relative volatilities of the bond and equity markets in the US and in Venezuela over a 20-year/5-year period[797] preceding 15 May 2010, which yielded a ratio of 2.05 and 2.74, respectively.[798] The Tribunal notes that, in their first expert report, they stated in a footnote that Prof. Damodaran had calculated a volatility ratio of 0.69 for Venezuela over two years through February 2012, but then a volatility ratio of 1.77 for two years through March 2013.[799] Mr. Brailovsky and Dr. Flores criticized Prof. Damodaran for not having converted the Venezuelan Stock Market Index, which is denominated in bolivars, into US Dollars, which is the currency of the Venezuelan bond index. In addition, as they quoted in the same footnote, Prof. Damodaran notes that "*the relative standard deviation of equity is a volatile number, both across countries (ranging from 2.48 for Czech Republic*

---

[792] Spiller II, ¶ 144.
[793] **App. BF-62**, p. 3.
[794] **App. BF-62**, p. 3. Prof. Spiller refers to he same sentence in Prof. Damodaran's spreadsheet fro 2012. Spiller II, ¶ 144 referring to Exhibit CLEX-178, p. 1.
[795] [Internal citation:] *Jeremy Siegel reports on the standard deviation in equity markets in his book* 'Stocks for the very long run' *and notes that they tend to decrease with time horizon.*
[796] **Exhibit CLEX-108 / App. BF-55**, p. 12.
[797] Even though Mr. Brailovsky and Dr. Flores refer only to the 20-year period in their second report, it is apparent from **App. BF-105**, Table 7 that they relied on data from 6 May 2005 through 10 May 2010 for Venezuela, *i.e.*, a 5-year period. This corresponds to what they state in their first report. Brailovsky/Flores I, ¶ 205.
[798] Brailovsky/Flores II, ¶ 199 and Table 14. They emphasize that for their benchmark calculation, they used Prof. Damodaran's generic multiplier of 1.5.
[799] Brailovsky/Flores I, note 352.

*and 0.69 for Venezuela) and across time (Brazil's relative volatility numbers have ranged from close to one to well above 2.*"[800]

744. However, it appears to the Tribunal that the two calculations cannot be compared directly, as Prof. Damodaran has calculated the relative volatility to the US market (with the US market being assigned a volatility of 1.00), whereas Mr. Brailovsky and Dr. Flores have calculated the relative volatility to the bond market for both the US and Venezuela.

745. Finally, the Tribunal notes that, contrary to what Respondent and its experts suggest, it does not appear from Prof. Damodaran's writings that he actually recommends the use of the equity multiplier. Rather, the following statement can be found in one his writings dating from 2010: "*Some analysts believe that the equity risk premiums of markets should reflect the differences in equity risk, as measured by the volatilities of equities in these markets.*"[801] Similar statements can be found in other writings.[802] From his spreadsheet, it also appears that he leaves it to the user to decide whether to apply a multiplier, given that he offers two choices: "*Choice 1: Use the default spread as the measure of the additional country risk premium. To make this choice, go into the ERP worksheet and set cell E5 to 1.00*"; and "*Choice 2: Scale the default spread up to reflect the higher risk of equity in the market, relative to the default spread. You can see the relative ratios for individual countries in the worksheet* 'Equity vs. Govt Bond' *in this spreadsheet. Set cell E5 in the ERP worksheet to that number.*"[803] For June 2013 and January 2014, Prof. Damodaran presented a relative standard deviation (to the US market) of 0.69 for Venezuela; for May 2010, the Tribunal has not been provided with the relevant data.[804]

746. In the absence of sufficient clarity on the appropriate multiplier to be applied for Venezuela, the Tribunal is not convinced that the generic 1.5 multiplier would adequately reflect the risk of an equity investment in Venezuela. Given the undisputed long-term nature of the investment to be valued in the present case, it further remains in dispute whether any multiplier should be applied at all or whether it can be assumed that debt and equity risk will converge. While Mr. Brailovsky and Dr. Flores took the position that this theory is dispelled by their analysis on the relative volatilities of the equity and bond markets in the US and in Venezuela, the Tribunal notes that the ratio they calculated indeed appears to depend to a large extent on the maturity of the bonds selected in comparison to the stock market. While Mr. Brailovsky and Dr. Flores did not present figures for different

---

[800] **App. BF-63**, p. 60.
[801] **App. BF-61**, p. 178.
[802] **App. BF-63**, p. 50; **App. BF-64**, p. 52.
[803] **Exhibit CLEX-75**, p. 1; **App. BF-65**, p. 1.
[804] **Exhibit CLEX-75**, p. 21; **App. BF-65**, p. 22; **App. BF-66**, p. 27.

bond maturities for the Venezuelan market, the ratio for the US market differs between 1.55 for 20-year bonds and 2.81 for 5-year bonds as of May 2010.[805]

747. Andrew Smithers and Stephen Wright on whom Mr. Brailovsky and Dr. Flores relied in support of their argument that equity is riskier than debt, confirm that the volatility of bond returns is "*distinctly lower*" than that of stocks, but also state that long-term bonds are riskier than short-term bonds.[806] Jeremy Siegel, however, who has also been cited by Respondent's experts, makes the following statement:

> "*As was noted previously, stocks are riskier than fixed-income investments over short-term holding periods. But once the holding period increases to between 15 and 20 years, the standard deviation of average annual returns, which is the measure of the dispersions of returns used in portfolio theory, become lower than the standard deviation of average bond or bill returns. Over 30-year periods, equity risk falls to only two-thirds that of bonds or bills. As the holding period increases, the standard deviation of average stock returns falls nearly twice as fast as that of fixed-income assets.*"[807]

748. In light of this evidence, the Tribunal considers it plausible that the risk of investment in equity and the risk of investment in bonds converge in the long term. As the subject of this valuation, *i.e.*, Claimant's investment in Norpro Venezuela, was undisputedly made as a long-term investment according to the standards applied by Prof. Damodaran, Messrs. Smithers and Wright, and Mr. Siegel, Respondent and its experts have not established that a multiplier should be applied to the default spread for the computation of the equity risk premium. Consequently, the Tribunal will apply the country risk premium calculated by Mr. Brailovsky and Dr. Flores on the basis of Prof. Damodaran's "*bludgeon method*", excluding the 1.5 multiplier. As of 15 May 2010, they determined a sovereign bond spread of 10.26% based on data from the EMBI, which in the absence of a multiplier to be applied in the present case is equal to the country equity risk premium.

749. The Parties and their experts have further debated certain factors specific to Norpro Venezuela as a result of which its country risk exposure might deviate from the average Venezuelan company.[808] Apart from the factor of protection under a bilateral investment treaty, which has been discussed in detail above, the debate focused on two further issues: (i) the fact that Norpro Venezuela exported more than 80% of the produced proppants,

---

[805] **App. BF-105**, Table 9.
[806] **App. BF-60**, p. 176.
[807] **App. BF-70**, p. 32.
[808] Cf. Claimant's Post-Hearing Submission, ¶¶ 136-144; Respondent's Post-Hearing Brief, ¶¶ 172-180.

most of it to North America, *i.e.,* a mature market, and (ii) the fact that it had concluded long-term supply contracts for its key inputs such as energy and bauxite.[809]

750.   As to the second issue, Mr. Brailovsky and Dr. Flores correctly pointed out that the long-term contracts were set to expire in 2016 and 2018, respectively, and did not provide for a renewal term, let alone a renewal at the same or similar prices.[810] Therefore, the Tribunal is not convinced that this factor would cause a willing buyer to lower his assessment of Norpro Venezuela's country risk exposure.

751.   With regard to the first issue, Claimant relied on Prof. Damodaran's statement that "[t]*he most obvious determinant of a company's risk exposure to country risk is how much of the revenues it derives from the country.*"[811] However, Respondent pointed out that Prof. Damodaran further stated in the same writing that "[a] *company can be exposed to country risk, even if it derives no revenues from that country, if its production facilities are in that country.*"[812] In this context, Respondent and its experts argue that country risk is a much larger concept than exposure to domestic demand.[813] Mr. Brailovsky further stated at the Hearing that "[t]*here is a substantial amount of literature showing that natural resource projects, particularly oil or oil-related, bear more Country Risk than the average company.*"[814]

752.   The Tribunal notes that Claimant never argued that Norpro Venezuela is not subject to Venezuelan country risk at all but only that it is less exposed to Venezuelan country risk than the average Venezuelan company.[815] In response to Mr. Brailovsky's comment at the Hearing, Claimant submits that Norpro Venezuela was not a natural resource company and claims that, in any event, resource-based companies are typically assigned a better rating than companies in other industries.[816]

753.   While the Tribunal considers it plausible that Norpro Venezuela's country risk exposure may indeed be different from that of the average Venezuelan company, Mr. Brailovsky and Dr. Flores correctly pointed out that Prof. Spiller never quantified the impact of the factors invoked by Claimant on the country risk to which Norpro Venezuela was in fact exposed.[817] As explained by Prof. Damodaran, the fact that Norpro Venezuela exports most of its products could have been factored in as part of a *lambda* approach pursuant to

---

[809] Spiller II, ¶ 35, ¶¶ 41-43; Brailovsky/Flores II, ¶¶ 200-202.
[810] Brailovsky/Flores II, ¶ 202.
[811] Claimant's Post-Hearing Submission, ¶ 139 quoting from **Exhibit CLEX-108**, p. 18.
[812] Respondent's Post-Hearing Brief, ¶ 175 quoting from **Exhibit CLEX-108**, p. 18.
[813] Respondent's Post-Hearing Brief, ¶ 175; Brailovsky/Flroes II, ¶ 201.
[814] Transcript (Day 4), p. 1142 lines 9-12.
[815] Claimant's Post-Hearing Submission, ¶ 136.
[816] Claimant's Post-Hearing submission, ¶¶ 140-141.
[817] Brailovsky/Flores, ¶ 160 and ¶ 200.

which the country risk premium as derived for the average Venezuelan company could have been multiplied by a certain *lambda* coefficient.[818] However, given that none of the Parties' experts have included such a coefficient in their calculations, the Tribunal will not give any further consideration to this approach. In the absence of any quantification of Norpro Venezuela's specific country risk exposure, the Tribunal will thus apply the country risk premium of 10.26% as yielded by the "*bludgeon method*" devised by Prof. Damodaran (excluding any equity risk multiplier).

### (4) Conclusion on Equity Risk Premium and Conversion Into Discount Rate

754. In conclusion, the Tribunal, by majority, finds that the equity risk premium to be applied to an investment in Norpro Venezuela as of 15 May 2010 consists of the following elements: (i) the cost of equity for a company operating in the US in the amount of 11.6%, *i.e.*, a risk-free rate of 3.6% plus a market risk premium of 8%, consisting of the general market risk premium of 6.7%, to be multiplied by the industry-specific *beta* coefficient of 1.2; and a country risk premium for Venezuela in the amount of 10.26%. This results in a total equity risk premium of 21.86%.

755. As a final step, the Tribunal must determine the applicable debt-to-equity ratio in order to calculate the weighted average cost of capital (WACC) and thus the nominal discount rate to be applied to Claimant's investment. The Parties' experts used similar but not identical debt-to-equity ratios in their calculations as of 15 May 2010. Prof. Spiller applied a ratio of 18.0% debt to 82.0% equity, representing a 5-year average of the ratio reported by Ibbotson/Morningstar for the composite company of SIC Code 1381;[819] Mr. Brailovsky and Dr. Flores applied a ratio of 15.7% debt to 84.3% equity, representing a 1-year average as reported by Ibbotson/Morningstar for the median company of SIC Code 1381.[820]

756. While Prof. Spiller states that a single-year average is biased because it may be affected by particular events that occurred during that year,[821] the Tribunal notes that this issue has not been subject to any further debate between the Parties or their experts. As Ibbotson/Morningstar reports both the "*latest*" figures and the 5-year average, the Tribunal does not consider it established that it should prefer one over the other. The same applies to the choice of the composite company or the median company. Therefore, the Tribunal will not give preference to the choices of either expert, but will rather apply the average

---

[818] **Exhibit CLEX-108**, pp. 17-23.
[819] Spiller II, ¶ 162; **Exhibit CLEX-81**, p. 29.
[820] Brailovsky/Flores II, Table 8; **App. BF-37**.
[821] Spiller II, ¶ 163.

between the ratios in its assessment of the nominal discount rate, *i.e.*, a ratio of 16.85% debt to 83.15% equity.

757. For the determination of the cost of debt (after tax), the Tribunal refers to Table 8 of Mr. Brailovsky and Dr. Flores' second expert report, pursuant to which the cost of debt (after tax) is equal to the US risk-free rate (3.6%) plus the country debt risk premium (10.26%) plus an industry risk premium (set by both Parties' experts at 1.5% for 2010)[822] multiplied by one minus the applicable tax rate (34%). According to the majority of the Tribunal, this results in the following calculation:

$$(3.6\% + 10.26\% + 1.5\%) * (1 - 34\%) = 10.14\%.$$

758. On the basis of the above determined average debt-to-equity ratio of 16.85/83.15, the majority of the Tribunal arrives at a nominal discount rate of 19.88%.[823]

### bb) Future Cash Flows

759. In the following section, the Tribunal will turn to the discrepancies between the Parties and their experts in the determination of Norpro Venezuela's future cash flows.

### (i) Summary of Claimant's Position

760. With regard to the calculation of the future cash flows, Claimant considers it "*baseless*" to split the profits that a willing buyer would generate from Norpro Venezuela's exports to account for internal cost allocation. In Claimant's view, the fair market valuation is "*not dependent on idiosyncratic qualities of the buyer or seller*"; therefore, it must be assumed that the highest-bidding willing buyer would most likely be a strategic investor that already has a distribution and marketing network similar to that of Saint-Gobain and is thus in a position to accrue 100% of the profits.[824] Claimant argues that the marketing costs is a fixed cost of the buyer that does not change through the acquisition, but the buyer can rather leverage its existing resources to take full advantage of the incremental value of the acquired asset just like Saint-Gobain internalized 100% of the profits. Finally, Claimant notes that both experts' estimates already include marketing and distribution costs in the amount of 7%.[825]

---

[822] Brailovsky/Flores II, Tables 8 and 9; **Exhibits CLEX-81**, p. 29 and **CLEX-192**; **App. BF-156**.

[823] 10.1376% * 0.1685 + 21.86% * 0.8315 = 19.8847756%.

[824] Reply, ¶¶ 170-172; Claimant's Post-Hearing Submission, ¶¶ 174-175 referring to Prof. Spiller's oral testimony during the Hearing. Transcript (Day 4), p. 1249 lines 11-14, p. 950 line 12 – p. 951 line 9 and p. 948 lines 8-22. *See* also Claimant's Second Post-Hearing Submission, ¶¶ 89-90.

[825] Claimant's Post-Hearing Submission, ¶¶ 176-178 referring to Prof. Spiller's Opening Presentation, slide 15 and the oral testimony of Prof. Spiller and Dr. Flores. Transcript (Day 4), p. 918 lines 13-14, p. 1190 lines 7-8 and p. 1192 line 18 – p. 1193 line 4.

761.  Claimant further notes that Mr. Brailovsky and Dr. Flores assumed in their calculation that CVG Bauxilum would supply bauxite at the increased price that it unilaterally imposed on Norpro Venezuela in September 2008. According to Claimant, this price increase was unlawful and therefore must not be taken into account based on the principle that "*a party may not reduce its liability for one wrongful act (here, the expropriation) on the basis of another (the price increase).*"[826] According to Claimant, the bauxite price should reflect the agreement under the Bauxite Contract and thus amount to USD 25.5 per MT.[827]

762.  As to the transportation costs, Claimant refers to its witness Jack Larry who testified that, contrary to Mr. Brailovsky's and Dr. Flores' assumption, proppants were not usually shipped from Corpus Christi to Alice (both in Texas) for storage, but the majority was rather shipped directly from the port in Corpus Christi to the customer, which is why the budgeted cost to Alice in the 2011-2015 Strategic Plan was "*merely for illustrative purposes.*"[828] Claimant claims that (i) Prof. Spiller's estimate of the transportation costs is based on an actual shipment in March 2010 and confirmed by Saint-Gobain's contemporaneous transportation contracts; and (ii) the average price applied by Prof. Spiller for shipping costs within the US accurately accounts for the various locations and contractual arrangements with Claimant's ultimate customers.[829]

763.  Claimant further asserts that Mr. Brailovsky and Dr. Flores fail to distinguish between the concepts of (i) maintenance capex aimed at "*maintain*[ing] *the plant in the condition to continue functioning at its current levels*"; and (ii) investment capex aimed at "*increas*[ing] *plant production through efficiency and technological improvements.*"[830] According to Claimant, only the maintenance capex should be included in the calculation of capital expenditures.[831]

764.  In respect of the working capital required to operate the plant, Claimant refers to Prof. Spiller's assumptions that (i) the outstanding balance of VAT credits as of 2009 would have been paid in 2010; and (ii) going forward, it would have taken 60 days to monetize the VAT certificates and Norpro Venezuela would have recovered 80% of their value. As

---

[826] Reply, ¶ 176; Claimant's Second Post-Hearing Submission, ¶¶ 96-97.

[827] Reply, ¶ 177.

[828] Reply, ¶ 179 referring to Larry II, ¶ 13; Claimant's Post-Hearing Submission, ¶ 167 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), p. 42 and Mr. Larry's oral testimony during the Hearing. Transcript (Day 3), p. 701 lines 11-18. With regard to the budgeted cost of EUR 110 in the 2011-2015 Strategic Plan, Mr. Larry further stated that "*the overall for freight, including the delivery of the customer, was in this €110-per-metric-tonne range.*" Transcript (Day 3), p. 696 lines 6-8.

[829] Reply, ¶ 179; Claimant's Post-Hearing Submission, ¶ 166 and ¶¶ 169-171 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), p. 10; Claimant's Second Post-Hearing Submission, ¶¶ 91-92 referring to Spiller II, Table 7 and ¶¶ 83-85.

[830] Reply, ¶ 180 referring to Larry II, ¶¶ 21-23.

[831] Reply, ¶ 181.

to the administrative delays invoked by Respondent, Claimant notes that such delays have been found to be in breach of the FET standard and claims that it had a legitimate expectation that Respondent would follow its own VAT credit procedure, given that this issue was specifically discussed with the Venezuelan Government before Claimant invested in Venezuela.[832] In addition, Claimant claims that the invoked two-year delay is "*purely speculative*" as all documents invoked by Respondent date from several years prior to 2010 and are further "*without legal basis*" as the Venezuelan law provides that the tax authority must issue its decision within 30 days.[833]

### (ii)    Summary of Respondent's Position

765.  Respondent submits that it is undisputed betweem the Parties that prior to the expropriation Norpro Venezuela received only 27% of the profits, while the remaining 73% were allocated to Claimant's US affiliate SGCP. Respondent notes that this is based on Claimant's transfer pricing study, which distinguished between four equally weighted categoried: functions, risks, manufacturing intangibles and marketing intangibles. According to Respondent, the contribution of the plant and SGCP to the first three categories were split; the fourth category "*marketing intangibles*," however, was assigned 100% to SGCP. Respondent argues that 25% of the plant's profits were directly tied to the marketing, logistics and distribution capabilities of SGCP, which were not expropriated together with the plant.[834]

766.  In response to Claimant's argument that the study was only an internal accounting mechanism, Respondent notes that under Venezuelan law, taxpayers conducting transactions with related parties must "*determine their income, costs and deductions resulting from those transactions considering the prices and amounts that would have been used with or between independent parties in comparable transactions.*" Therefore, Respondent maintains its presumption that the agreement between Norpro Venezuela and SGCP reflected an arm's-length transaction.[835]

---

[832] Reply, note 381 referring to Spiller II, ¶ 93 and ¶¶ 115-116 and *Impregilo S.p.A. v. Argentina*, Concurring and Dissenting Opnion of Judge Charles N. Brower (**CLA-127**), ¶ 9; Claimant's Post-Hearing Submission, ¶¶ 158-161.

[833] Claimant's Post-Hearing Submission, ¶ 154 and note 348. Claimant further considers it contradictory that, on the one hand, Respondent's witness Eduardo Rondón acknowledges that the request for a special tax recovery certificate had been submitted to the authorities but, on the other hand, Respondent alleges that Norpro Venezuela was still collecting documentation for its first recovery request. Claimant's Post-Hearing Submission, ¶ 156 and Claimant's Second Post-Hearing Submission, ¶ 95 referring to Mr. Rondón's oral testimony. Transcript (Day 3), p. 775 lines 10-19.

[834] Counter-Memorial, ¶¶ 198-199 and ¶ 256 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**); Rejoinder, ¶¶ 238-242; Respondent's Post-Hearing Brief, ¶ 182.

[835] Respondent's Post-Hearing Brief, ¶ 183 quoting from the *Ley de Impuesto sobre la Renta* (**App. BF-113**), Article 111.

767. Consequently, Respondent rejects Prof. Spiller's assumption that Norpro Venezuela would retain 100% of the profits as of the valuation date. It claims that a willing buyer would not pay for 100% of the profits because it would not be acquiring the capabilities of SGCP and would not be willing to transfer the profits it expects to earn through its own existing marketing, logistics and distribution network. If the buyer were not to have such network itself, Respondent notes that it would even have to pay for acquiring these capabilities or for the services of a third party. In short, Respondent claims, "*no buyer would pay for something that it was not getting in the transaction.*"[836]

768. According to Respondent, the willing buyer would "*value the Plant, not the assets in the full value chain, and would only take into account the profits that could be realized by the Plant itself.*"[837]

769. Respondent therefore refers to the assumption of its experts that a buyer of the plant would achieve "*at the very most*" 75% of the profits, as Claimant itself concluded in its transfer pricing study that the 25% portion of "*marketing intangibles*" was contributed 100% by SGCP.[838]

770. As to the bauxite price to be paid by Norpro Venezuela to CVG Bauxilum, Respondent submits that there is no basis for Claimant's instruction to Prof. Spiller to reduce the agreed price of USD 33.8 per MT to the original contract price, given that Norpro Venezuela agreed to the increased price as long as there would be no further increase throughout 2009. Therefore, Respondent instructed its experts to base their calculation on the increased price, escalated by the US PPI-Commodities.[839]

771. With regard to the transportation costs, Respondent submits that Prof. Spiller's estimate of the shipping costs to the US is apparently based on a single shipment in March 2010 and notes that the same document on which Prof. Spiller relies includes Claimant's own budgeted cost for transportation from Venezuela to Alice, Texas of EUR 110 (converted to USD 154) per MT. According to Respondent, this figure is also supported by Claimant's transfer pricing study.[840] As to the contemporaneous transportation documents relied

---

[836] Counter-Memorial, ¶¶ 200-202. *See* also Rejoinder, ¶ 244. Respondent emphasizes that, while such a buyer might achieve 100% of the revenues from the ultimate sale of the proppants, it would not benefit from 100% of the profits because "*a substantial portion of the profits*" would be tied to the marketing, distribution and logistics functions that were not part of the transfer from Claimant in consideration for the purchase price. Respondent's Post-Hearing Brief, ¶¶ 184-185.

[837] Respondent's Post-Hearing Brief, ¶ 186.

[838] Counter-Memorial, ¶ 203 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 5; Rejoinder, ¶ 243; Respondent's Post-Hearing Reply Brief, ¶ 54.

[839] Counter-Memorial, ¶ 210 and ¶ 256; Rejoinder, ¶ 251 quoting from the letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit R-52**).

[840] Counter-Memorial, ¶ 214 and ¶ 256 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), pp. 10 and 42 and Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009

on by Prof. Spiller in his second report, Respondent submits that these documents do not reflect actual costs incurred in connection with transportation, which is why its experts maintained their original estimate.[841]

772. Respondent further rejects Prof. Spiller's estimate for the shipping costs within the US and claims that Claimant's budgeted cost and the Halliburton SPA reflect a "*significantly higher*" cost, which is why its experts based their estimate on the budgeted cost.[842] Respondent notes that, even though Claimant did not provide any data in support of Prof. Spiller's assumption that 30% of the proppants would be sold *ex works* and the remaining 70% would be sold in equal volumes to each of the three distribution areas, Respondent's experts have applied that assumption together with the price provided for in the Halliburton SPA, which results in costs that are even higher than the costs they estimated.[843]

773. In relation to the capital expenditures, Respondent agrees with Prof. Spiller's assumption up to and including 2018 but argues that annual capital expenditures would significantly increase "*as the Plant aged and equipment reached the end of its useful life*."[844] While Prof. Spiller included only maintenance expenditures, Respondent claims that expenditures for "*health and safety, technology or improvements to reduce breakdowns and process disruptions*" are also required to assume operation in perpetuity and therefore takes the position that all four capexes as foreseen for Claimant's Fort Smith Plant should be included in the calculation.[845]

774. In respect of the working capital, Respondent agrees with Prof. Spiller's calculation except for the VAT credits. Respondent contends that as of 15 May 2010 Norpro Venezuela had not even applied for the tax recovery certificates and claims that the recovery procedure is usually a "*lengthy and complex*" process. Respondent submits that its experts therefore assumed that the outstanding VAT credits as of 15 May 2010 would have been monetized in 2013 and further VAT credits accumulated thereafter would have been monetized on a two-year rolling basis and thus been part of working capital that a buyer would not separately value.[846]

---

(**Exhibit CLEX-35**), p. 1; Respondent's Post-Hearing Brief, ¶¶ 195-198; Respondent's Post-Hearing Reply Brief, ¶¶ 58-59.

[841] Rejoinder, ¶ 255; Respondent's Post-Hearing Brief, ¶ 194. Respondent notes that its experts did adjust their estimate based on the new information that some of the proppants were shipped directly from Corpus Christi to the customer and assumed that only half of the shipment was first shipped to Alice for storage. Rejoinder, ¶¶ 255-256.

[842] Counter-Memorial, ¶¶ 215-216 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 1.

[843] Rejoinder, ¶¶ 257-258.

[844] Counter-Memorial, ¶¶ 217-218 and ¶ 256.

[845] Rejoinder, ¶ 262.

[846] Rejoinder, ¶¶ 269-271; Respondent's Post-Hearing Brief, ¶ 201.

775. In support of its position, Respondent refers to (i) newspaper articles reporting delays of several years in 2000 and 2003; (ii) the witness testimony of Eduardo Rondón that the "*procedure to recover VAT in Venezuela lasts at least two years from the initial filing of the request*"; and (iii) Claimant's statement in its June 2009 DAC that "[r]*ecovering the VAT from the tax treasury has become a very lengthy and complex process*."[847]

### (iii)    The Tribunal's Analysis

776. The Tribunal will now address the various points of disagreement regarding Norpro Venezuela's future cash flows in turn.

### (1)    Proppants Prices

777. As to the projections for proppants prices to be applied, the Tribunal notes that the dispute between the Parties has focused primarily on the impact of recent developments on the oil market on price projections in a date-of-the-award valuation. It is undisputed between the Parties that this development could not have been foreseen as of 15 May 2010 and therefore does not have be taken into account in the present valuation. However, the Parties' experts also applied different assumptions with regard to the proppants prices in their 15 May 2010 valuations.

778. Prof. Spiller stated in his Updated Valuation Model, submitted together with his second expert report, that he based the prices for exports to the US: (i) for 2010, on historical sales in Venezuela for 2010; (ii) for 2011-2012, on historical sales in the US; (iii) for 2013, on the growth rate of Norpro Venezuela's average prices between 2012 and 2013; (iv) for 2014-2015, on the average growth rate of analyst reports and Claimant's forecasts; and (v) for 2016-2018, on the increase of the US PPI. Prof. Spiller's prices for exports to South America and local sales within Venezuela are based: (i) for 2010, on Claimant's April 2010 Business Plan; (ii) for 2011, on the growth rate of Versaprop and Interprop sales in the US between 2010 and 2011; and (iii) for 2012-2017, on the same assumptions as exports to the US.[848]

779. Mr. Brailovsky and Dr. Flores based the prices for sales to North America, South America and Venezuela (i) for 2010-2015, on the projections contained in Claimant's April 2010 Business Plan; and (ii) for the time period thereafter, on long-term inflation forecasts as of 2010.[849]

---

[847] Respondent's Post-Hearing Brief, ¶ 200 referring to *Pedro García, Exportaciones crecieron 4% en el trimestre*, 3 April 2000 (**App. BF-34**), *Eduardo Camel, Contracción de 35% en las exportaciones de la Nación*, 28 August 2003 (**App. BF-35**), Rondón, ¶ 38 and the 8 June 2009 Update to the 23 October 2006 DAC (**Exhibit R-7**), p. 6.
[848] **Exhibit CLEX-81**, p. 36.
[849] Brailovsky/Flores I, ¶¶ 50-51 and Table 4; Brailovsky/Flores II, ¶ 40; **Exhibit CLEX-40**, pp. 13-14.

780.  The Tribunal agrees with Mr. Brailovsky and Dr. Flores that it is inaccurate for a valuation as of 15 May 2010 to use actual sales prices beyond April 2010 because those could not be known at the valuation date. Mr. Brailovsky and Dr. Flores further pointed out that Prof. Spiller's price projections are higher than Claimant's own projections for Norpro Venezuela as of April 2010.[850] The Tribunal is of the view that, while a willing buyer may have decided not to rely exclusively on the seller's projections but to take into account further data, *e.g.*, based on analyst reports, it would certainly have given considerable weight to the projections in the April 2010 Business Plan. If Prof. Spiller considered that there was a reason to deviate from the Business Plan, he could have explained his choice, but he did not even address the discrepancy between the Business Plan and his own projections for the May 2010 valuation in his expert report.

781.  Consequently, the Tribunal has no reason to doubt the reasonableness of Claimant's own price projections as of April 2010 and thus follows the approach of Respondent's experts in this regard.

### (2)    Profit Split for Marketing Part

782.  As to the question of whether there should be a profit split for the export sales, there is common ground between the Parties that, prior to the expropriation, Norpro Venezuela in fact retained 27% of the profits from the sales of proppants; the remaining 73% were allocated to Claimant's US affiliate Saint-Gobain Ceramics & Plastics (SGCP) that was responsible, *inter alia*, for the marketing and distribution of the proppants.[851] There is a dispute as to whether a willing buyer would have assumed a profit split in its calculation of the purchase price to account for the fact that Norpro Venezuela itself did not have the marketing and distribution network required to sell the proppants to the customer.

783.  Prof. Spiller assumed that a willing buyer would have included 100% of the profits in its calculation of the purchase price on the assumption that the highest bidder would have been a company with marketing and distribution capabilities similar to those of SGCP. According to Prof. Spiller, this assumption is compatible with fair market value because it is not based on "*unique synergies*" that could be realized only by a specific buyer, but rather on the reasonable consideration that there are several potential buyers with these capabilities in the market; therefore, Claimant would have sold to a buyer that could realize 100% of the profits and would be willing to factor this synergy into its offer for Norpro Venezuela. Prof. Spiller emphasized that he did not value any revenues or costs associated with a network outside the plant, but simply valued the additional profits that

---

[850] Brailovsky/Flores II, ¶¶ 44-45 and Table 5.
[851] Spiller I, ¶ 112 and note 55; Brailovsky/Flores I, ¶¶ 52-58; Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**).

a buyer with access to such a network could obtain from adding Norpro Venezuela's capacity to its own capacity.[852]

784.  Mr. Brailovsky and Dr. Flores took the position that Prof. Spiller incorrectly made specific assumptions regarding the characteristics of the willing buyer and ignored the fact that the marketing and distribution network was not expropriated. Even if the buyer indeed had such a network, Mr. Brailovsky and Dr. Flores argued, it would not have been willing to pay for, and give away the profits associated with, such network, precisely because it already had the network and did not acquire one in the transaction.[853] According to Mr. Brailovsky and Dr. Flores, the asset to be valued is only the going concern Norpro Venezuela and not the marketing and distribution network of SGCP. Therefore, they referred to Claimant's transfer pricing study that both Parties relied on for the historical profits and noted that 25% of the profits were allocated to "*Market Intangibles.*" As Norpro Venezuela could not provide any of the services under this heading, they assumed that it could have retained "*at most*" 75% of the entire profits.[854]

785.  As correctly pointed out by Claimant, both Parties' experts further included a cost item of 7% labelled "*Selling/R&D/Admin.*" in their calculations.[855] Claimant and Prof. Spiller refer to this cost item as marketing and distribution costs and argue that a further deduction would double count the marketing part.[856] Respondent takes the position, however, that this cost covered only the local marketing costs in Venezuela and notes that it existed already under the transfer pricing document, which also made a further deduction of 25% for marketing in the US.[857] In response to the question whether the 7% should not at least be deducted from the 25%, Dr. Flores explained the correlation between the two items at the Hearing as follows:

> "*7 percent is an operating cost, so it goes in the cost line. 25 percent is not a cost. It comes from the profit line. You calculate the entire profit, which means all the revenue coming from final consumers paying for proppants, minus all the costs at any level—like cost in Venezuela, cost of transportation, cost inside the U.S. And then that 7 percent is one of the costs. Then you do the deduction, and you get a total profit. That is 100 percent of the profit.* […] *So as of that,* [Norpro Venezuela] *captured at most, and we think that's a generous assumption, at most, 75*

---

[852] Spiller II, ¶¶ 64-68.
[853] Brailovsky/Flores I, ¶¶ 59-63; Brailovsky/Flores II, ¶ 49 and ¶ 60.
[854] Brailovsky/Flores I, ¶¶ 69-71; Brailovsky/Flores II, ¶¶ 50-55 and Figure 3 referring to the Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**).
[855] **Exhibit CLEX-81**, p. 37; **App. BF-101**, Tables 4A, 4B and 4C.
[856] Prof. Spiller's Opening Presentation, slide15; Claimant's Post-Hearing Submission, ¶ 178.
[857] Respondent's Post-Hearing Brief, note 385.

> *percent of the entire profit. So, you cannot compare the 25 and 7; they*
> *are different concepts.*"[858]

786. The Tribunal considers Dr. Flores' explanation convincing and will therefore analyze the question of whether any profit split should be made independently of the fact that Norpro Venezuela already incurred 7% in "*Selling/R&D/Admin.*" expenses. In the view of the majority of the Tribunal, Dr. Flores' explanation is further confirmed by the transfer pricing study that allocated 25% of the profits to "*Marketing Intangibles*" because the same document in fact includes the 7% cost item in its preliminary price calculation.[859] The fact that pursuant to the transfer pricing study all of the services under the heading "*Marketing Intangibles*" are performed by SGCP demonstrates that these services had to be performed in addition to any services for which Norpro Venezuela incurred costs under the 7% cost item.[860]

787. As to the question whether any deduction should be made, the Tribunal considers it plausible that the highest bidder would indeed have been a company with access to a marketing and distribution network that could have internalized 100% of the profits from the sale of proppants. However, this does not answer the question whether the buyer would have factored in 100% of these profits in its calculation of the purchase price for Norpro Venezuela. While the plant would produce the finished proppants, this alone did not enable the buyer to realize 100% of the profits, but this would be possible only by contributing its own marketing and distribution capabilities.

788. It is indeed plausible to assume that the buyer would be able to realize cost synergies by adding Norpro Venezuela's capacities to its own capacities and factor those synergies into its calculation of the purchase price for the plant. However, the majority of the Tribunal is not convinced by the assumption that the buyer would have been willing to pay the same amount as if Norpro Venezuela had been able to market and distribute the proppants on its own. The buyer would have at least deducted the additional costs it would incur by marketing and distributing the additional capacities it acquired.

789. While the amount of these additional costs factored in by the buyer is of course not known, the Tribunal recalls that Prof. Spiller assumed that the buyer would have a network similar to that of SGCP. Therefore, it appears reasonable to refer to Claimant's transfer pricing study in this regard. While the Tribunal is aware that the buyer's additional costs may not be equal to the portion of profits that Claimant allocated to "*Marketing Intangibles,*" it also has to be noted that Norpro Venezuela undisputedly retained only 27% of the profits prior to the expropriation. Against this background, to the majority of

---

[858] Transcript (Day 4), p. 1190 line 7 – p. 1191 line 5.
[859] **Exhibit CLEX-35**, p. 1.
[860] *Cf*. As**Exhibit CLEX-35**, p. 5.

the Tribunal it appears to be a rather conservative assumption that the buyer would have factored in additional costs for the marketing and distribution of the proppants in an amount that is at least equal to 25% of the profits.

790. Consequently, the majority of the Tribunal follows the approach of Mr. Brailovsky and Dr. Flores to deduct 25% of the profits on export sales from Norpro Venezuela's future cash flows.

### (3)    Foreign Exchange Rate and Inflation

791. As to the applicable foreign exchange rate at which Norpro Venezuela could have converted US Dollars into bolivars and *vice versa*, the Tribunal notes that in their 15 May 2010 valuations, both Parties' experts used the forecasts for the official CADIVI exchange rate throughout the entire valuation period.[861] As neither Party argues that the introduction of the more favorable SICAD II exchange rate in early 2014 was foreseeable in May 2010, the Tribunal thus does not have to express an opinion on the applicability of this exchange rate from 2014 onwards.

792. However, there appears to be a difference with regard to the devaluation assumptions after 15 May 2010 caused by the fact that the Parties' experts relied on exchange rate forecasts from different sources. While Prof. Spiller relied on the forecast of Ecoanalítica, a private, Venezuela-based macroeconomic consulting firm,[862] Mr. Brailovsky and Dr. Flores projected the evolution of the exchange rate based on forecasts of the International Monetary Fund.[863] As pointed out by Prof. Spiller during the Hearing, the IMF does not directly project the development of the USD-bolivar exchange rate but rather inflation rates in the US and in Venezuela.[864] Mr. Brailovsky and Dr. Flores stated in response that the IMF projects the gross domestic product for Venezuela in US Dollars and in bolivars and explained that they derived the exchange rate from the ratio of the two figures.[865]

793. While the Parties' experts further debated whether the IMF makes any separate assumptions about devaluation or simply assumes that the exchange rate will develop in line with inflation,[866] the Tribunal considers that it does not have to make a decision in this regard. There is no dispute between the Parties' experts that Econalítica directly projects the development of the USD-bolivars exchange rate. Mr. Brailovsky and Dr. Flores further did not question the reliability of Ecoanalítica's forecasts; to the contrary, they cite

---

[861] Spiller II, note 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, note 167.
[862] Spiller I, note 68; **Exhibit CLEX-81**, p. 57.
[863] Brailovsky/Flores I, ¶ 98; App.BF-33 and BF-101, Table 12; Dr. Flores' Opening Presentation, slide 24.
[864] Transcript (Day 4), p. 1217 lines 4-8.
[865] Transcript (Day 4), p. 1218 line 18 – p. 1219 line 11.
[866] *Cf.* Transcript (Day 4), p. 1217 line 8 – p. 1218 line 15 and p. 1219 line 12 – p. 1222 line 7.

Ecoanalítica's director, Mr. Asdrúbal Oliveros, as authority for their assumption regarding a unified exchange rate that does not play a role in the 15 May 2010 valuation.[867]

794.    As Ecoanalítica is a Venezuela-based economic consulting firm, the Tribunal has no reason to doubt that it is familiar with the particularities of the Venezuelan foreign exchange market and thus in a position to provide reliable forecasts for the exchange rate. Therefore, the Tribunal will follow Prof. Spiller's approach to rely on the contemporaneous projections of Ecoanalítica with regard to the evolution of the foreign exchange rate after 15 May 2010. In any event, the Tribunal notes that Respondent referred to a "*slight difference*" with regard to devaluation assumptions and did not even quantify such difference.[868] Consequently, the Tribunal considers it safe to assume that the difference is in any event negligible.

### (4)    Bauxite Costs

795.    As to the applicable bauxite price that Norpro Venezuela would have had to pay to CVG Bauxilum under the Bauxite Contract after 15 May 2010, the Parties' experts were provided with differing instructions from the Parties. Consistent with Claimant's position that the bauxite price increase of September 2008 amounts to a violation of the FET standard, Prof. Spiller was instructed to eliminate the price increase from his calculation and to apply the original contract price instead, increased by the US PPI as provided for in Clause 10. 1 of the Bauxite Contract.[869] Mr. Brailovsky and Dr. Flores on the other hand were instructed by Respondent to apply the increased price that Norpro Venezuela actually paid as of September 2008 and throughout 2009, increased as of 2010 by the US PPI.[870]

796.    The Tribunal notes that apart from the dispute about the justification of the September 2008 price increase, Mr. Brailovsky and Dr. Flores also stated that Prof. Spiller had failed to take into account two former, undisputed, price increases for transportation in August 2007 and January 2008.[871] Prof. Spiller did not address the two price increases, but noted that pursuant to his adjustment of the price for inflation, his price for 2008 was identical to the price referred to in the document relied on by Mr. Brailovsky and Dr. Flores, *i.e.*, USD 25.5 per MT.[872] While it is not entirely clear to the Tribunal why the prices are

---

[867] *Cf.* Brailovsky/Flores II, ¶ 82; Transcript (Day 4), p. 1221 lines 15-22.
[868] Respondent's Post-Hearing Brief, note 389.
[869] Spiller I, ¶ 126 and Figure 20; Spiller II, ¶¶ 124-125.
[870] Brailovsky/Flores I, ¶¶ 103, 105; Brailovsky/Flores II, ¶ 99.
[871] Brailosvky/Flores I, ¶ 102 referring to **Exhibit C-100**, slide 13; Brailovsky/Flores II, ¶ 95. In August 2007, the original contract price of USD 23.5/MT was increased to USD 25.0/MT based on Clause 10.2 of the Bauxite Contract, and in January 2008, the price was increased to USD 25.5/MT, consisting of an adjustment for inflation based on Clause 10.1 (USD 0.23/MT) and an increase based on Clause 10.2 (USD 0.27/MT).
[872] Spiller II, ¶ 125.

indeed the same for 2008 even though Prof. Spiller made adjustments only for inflation but not for the increased transportation costs, the Tribunal notes that Prof. Spiller's argument is not valid for 2007 (he applied a price of USD 23.8/MT despite the increase to USD 25.0/MT in August 2007).[873] In the present context, however, the Tribunal needs to assess the applicable prices for the time period following 15 May 2010 so that an incorrect price for 2007 is irrelevant as long as the price as of 2008 is correct.

797. As to the main dispute between the Parties, *i.e.*, whether the calculation should include the price increase of September 2008, Prof. Spiller correctly identified the dispute about the legality of the price increase as a legal matter on which he did not express a professional opinion.[874] Mr. Brailovsky and Dr. Flores noted that it was in any event unreasonable to assume that a willing buyer would not have taken into account the actual price Norpro Venezuela was paying as of 2008.[875] The Tribunal agrees with Mr. Brailovsky and Dr. Flores that the starting point must be the perspective of the willing buyer in May 2010. Even if the price increase constituted a breach of contract, the buyer would have taken into account that Norpro Venezuela was paying the increased price and had not undertaken any legal action for breach of contract before the dispute resolution forum provided for in the Bauxite Contract. Therefore, the Tribunal considers that the alleged illegality of the price increase would not be sufficient justification to eliminate the price increase from the present valuation.

798. If, on the other hand, the Tribunal were convinced that the price increase was indeed illegal and Respondent was responsible for the increase under the FET standard or the FPS standard (either because CVG Bauxilum's conduct is attributable to the State or because MIBAM was obliged to intervene), this internationally wrongful conduct would indeed have to be eliminated from the valuation. However, the Tribunal refers to its finding above that Claimant has not established that the price increase of September 2008 amounted to a breach of contract on the part of CVG Bauxilum. Therefore: (i) it can be left open whether Respondent could be held liable for such contractual breach – even if it had been established – under the FET standard; and (ii) Respondent did not have an obligation to intervene in relation to the bauxite price increase under the FPS standard.[876]

799. In the absence of any internationally wrongful conduct in connection with the bauxite price increase, Claimant is not entitled to any compensation in this regard. Consequently, there is no reason to eliminate the price increase from the present valuation. As to the

---

[873] *Compare* **Exhibit CLEX-81**, p. 40 *to* **Exhibit C-100**, slide 13.
[874] Spiller II, ¶ 124.
[875] Brailovsky/Flores II, ¶ 96.
[876] *See* paragraphs 542 and 559-560 above.

additional issue raised by Mr. Brailovsky and Dr. Flores regarding the exchange rate applied by Prof. Spiller who assumed that Norpro Venezuela would have paid the USD price in bolivars,[877] the Tribunal recalls that both Parties' experts used the CADIVI exchange rate in their May 2010 valuations.[878] Therefore, no decision is required in this regard.

### (5)    Transportation Costs

800. The next issue concerns the transportation costs that Norpro Venezuela would have incurred for shipping the finished proppants to the customers. Both Parties' experts distinguished between three categories of transportation costs: (i) for all proppants, local shipping costs within Venezuela to transport the proppants from the plant to the port of Puerto Ordaz; (ii) for North and South American exports, shipping costs from the port of Puerto Ordaz to the port of Corpus Christi, Texas (and possibly on to the warehouse in Alice, Texas); and (iii) for North American exports, shipping costs from Texas to the ultimate customer.

### Local Shipping Costs in Venezuela

801. As for the local shipping costs within Venezuela for all proppants, Mr. Brailovsky and Dr. Flores adopted Prof. Spiller's projection that these costs amounted to VEF 50.5 per MT, increased in accordance with the (projected) Venezuelan PPI. While the Parties' experts disagree as to the applicable exchange rate in their date-of-the-award valuations, they both apply the official CADIVI exchange rate in their May 2010 valuations, which results in costs of USD 11.9 per MT as of 2010.[879]

### Shipping Costs from Venezuela to the US

802. As to the shipping costs from Venezuela to the US for all proppants to be exported, Prof. Spiller relied on an actual shipment in March 2010 from Puerto Ordaz to Corpus Christi, Texas at a cost of USD 99.0 per MT.[880] He cross-checked that figure on the basis of several contractual documents provided to him by Claimant, which yielded a charge of USD 91.43 per MT.[881] Based on the information from Claimant's witness Mr. Larry that some of the proppants were shipped directly from the port of Corpus Christi to the customer while others were first shipped on to Claimant's warehouse in Alice, Texas, Prof. Spiller also calculated the shipping costs from Corpus Christi to Alice at USD 17.6 per

---

[877] Brailovsky/Flores II, ¶¶ 97-99 and Figure 9.
[878] Spiller II, note 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, note 167.
[879] Spiller II, Figure 8; **Exhibit CLEX-81**, p. 38; Brailovsky/Flores I, ¶¶ 116-117; Brailovsky/Flores II, ¶ 102.
[880] Spiller II, ¶ 81 relying on CLEX-80, slide 10.
[881] Spiller II, ¶ 82 and Table 7 referring to **Exhibit CLEX-152**.

MT and concluded that the average between the total costs to Alice (USD 109.03 per MT) and the costs to Corpus Christi (USD 91.43 per MT) were in line with his estimate of USD 99.0 per MT.[882]

803. Mr. Brailovsky and Dr. Flores relied on Claimant's budgeted transportation costs for 2010, which amounted to EUR 110 per MT (converted to USD 154 per MT). They assumed that this cost included the local shipping costs of USD 11.9 per MT, thus resulting in a cost of USD 142.1 per MT for the second category of shipping costs.[883] Mr. Brailovsky and Dr. Flores further noted that Norpro Venezuela's transfer pricing study showed a cost for freight to the US in 2009 of USD 0.072 per pound, which translates into USD 158.7 per MT.[884] Finally, they adopted Prof. Spiller's assumption that only half of the finished proppants were shipped to Alice and his estimate of the shipping costs between Corpus Christi and Alice (USD 17.6 per MT). Consequently, they estimated average transportation costs of USD 133.3 per MT.[885]

804. The Tribunal notes that both Parties' experts relied on Claimant's 2011-2015 Strategic Plan as the primary source for their respective estimates. While Prof. Spiller applied the costs for one actual shipment in March 2010, Mr. Brailovsky and Dr. Flores referred to the budgeted costs for 2010.[886] In principle, the Tribunal considers it reasonable to rely on Claimant's own estimate for its 2010 budgeted costs. Claimant's witness Mr. Larry, who was involved in the creation of this slide,[887] confirmed during the Hearing that this estimate included the shipping costs to Alice, Texas.[888] With regard to the divergence between the numbers relied on by the Parties, Mr. Larry further explained:

> "*So, if we look, we have an actual cost per shipment in March, dollars per metric tonne, and then we were constantly trying to optimize the shipment to the customer. So, if we're placing material in the Permian Basin, we wouldn't send it to Alice, Texas. We would take it from the warehouse, ship it, with as much efficiency as possible, directly to the Permian Basin. And you can see that actual number for March, which was a number of—which was a month of strong sales in the Permian Basin, was actually $37 per pound.*"[889]

805. In the Tribunal's view, Mr. Larry's testimony not only supports the assumption adopted by both Parties' experts that half of the proppants were shipped to Alice and the other half

---

[882] Spiller II, ¶ 81 and ¶¶ 83-85 referring to Larry I, ¶ 35.
[883] Brailovsky/Flores II, ¶¶ 118-119; Brailovsky/Flores II, ¶¶ 104 and 106 and Figure 11 referring to **Exhibit CLEX-80**, slide 42.
[884] Brailovsky/Flores I, ¶ 120; Brailovsky/Flores II, ¶ 106 referring to **Exhibit CLEX-35**, p. 1.
[885] Brailovsky/Flores II, ¶ 117.
[886] *Compare* **Exhibit CLEX-80**, slide 10 *to* slide 42.
[887] Transcript (Day 3), p. 685 lines 15-20.
[888] Transcript (Day 3), p. 701 lines 11-18.
[889] Transcript (Day 3), p. 605 lines 6-16.

was shipped directly from Corpus Christi to the customer.[890] More importantly, Mr. Larry explained that the divergence between the costs for the actual shipment in March 2010 and the budgeted costs for 2010 resulted, at least in part, from the fact that the shipment in March did not go to Alice but directly from Corpus Christi to the customer in the Permian Basin.

806. Mr. Larry further testified that "*the overall cost for freight, including the delivery of the customer, was in this €110-per-metric-tonne range.*"[891] Prof. Spiller also stated that "[his] *understanding is that the 110 euros includes all the expenses from Puerto Ordaz to the customer.*"[892] However, the Tribunal notes that the slide from the 2011-2015 Strategic Plan states "*Supply to Alice, Texas.*" Therefore, the Tribunal is not entirely convinced by Mr. Larry and Prof. Spiller's statements and will therefore also look at the subsidiary sources that the Parties' experts presented in support of their respective estimates.

807. As to the costs for "*Freight to U.S.*" set out in the transfer pricing study that Mr. Brailovsky and Dr. Flores translated into USD 158.7 per MT, the Tribunal notes that there is no separate cost item for local freight costs within Venezuela so that it can again be assumed that the costs of USD 11.9 per MT are included in that amount. However, there is a separate costs item for "*U.S. Inland freight+handling*" so that it can also be assumed that the shipping costs to the customer are not included in that amount.[893] As the amount of USD 146.8 per MT (excluding local shipping costs) is even higher than Mr. Brailovsky and Dr. Flores' estimate, the study supports the accuracy of the 2010 budgeted costs.

808. As to Prof. Spiller's cross-check of the costs to Corpus Christi on various contractual documents provided to him by Claimant, which resulted in an amount that is even lower than the costs of the actual shipment in March 2010 (USD 91.43 per MT to Corpus Christi), the Tribunal notes that Mr. Brailovsky and Dr. Flores questioned this cross-check in various aspects. In particular, they pointed out that the documents included an undated memorandum of understanding and an offer transmitted by e-mail in 2008; (ii) the service contract dating from 2008 was set to expire in August 2010 and would have been in the process of re-negotiation in May 2010; and (iii) Prof. Spiller made various assumptions pursuant to which the shipping costs in 2010 were lower than in 2008 when the documents were signed or transmitted.[894]

809. While the Tribunal considers that these points of criticism do not render the documents and Prof. Spiller's cross-check entirely unreliable, they also do not provide conclusive

[890] *See* also Larry I, ¶ 35 and Larry II, ¶ 13.
[891] Transcript (Day 3), p. 696 lines 6-8.
[892] Transcript (Day 4), p. 972 lines 15-17.
[893] *See* **Exhibit CLEX-35**, p. 1.
[894] Brailovsky/Flores II, ¶¶ 111-115.

evidence on the transportation costs. The resulting costs of USD 91.43 per MT are even lower than the costs of the actual shipment in March 2010, which according to Mr. Larry also did not include any costs to Alice.

810. On the balance of the evidence, the Tribunal therefore considers it appropriate to base its conclusion on the average of all four figures presented by the Parties' experts, *i.e.*, USD 99.0 per MT, USD 124.5 per MT,[895] USD 129.2 per MT,[896] and USD 91.43 per MT (all excluding the undisputed shipping costs of USD 17.6 per MT from Corpus Christi to Alice). This results in an average of USD 111.03 per MT to Corpus Christi and an average of USD 128.63 to Alice. As the Parties' experts agreed to take the average between the costs to the two possible locations in Texas, this results in an overall average of USD 119.83 per MT.

### Shipping Costs from Texas to Customers

811. Finally, the Parties' experts apply differing assumptions to estimate the shipping costs from Corpus Christi or Alice to the ultimate customer. Prof. Spiller again relied on the costs of an actual shipment in March 2010, which amounted to USD 37.0 per MT. He assumed that 30% of the proppants were sold *ex works* and the remaining 70% were evenly distributed between Claimant's geographic sales areas in the US and thus considered the costs of a shipment to a location in Texas a reasonable proxy.[897]

812. Mr. Brailovsky and Dr. Flores again relied on Claimant's budgeted costs for 2010; however, as there was no budget for costs from Corpus Christi or Alice to the customer, they referred to the costs for transportation from Claimant's Fort Smith Plant, Arkansas, to Alice, which amounted to EUR 31.0 per MT (converted to USD 43.4 per MT). Mr. Brailovsky and Dr. Flores assumed that the distance between Fort Smith and Alice represented a good estimate of average transportation costs to locations throughout the entire US.[898] While noting that Claimant delivers not only within the US but also to Canada, Mr. Brailovsky and Dr. Flores stated that, even on the assumption that Prof. Spiller's estimate of the sales distribution were correct, this would result in an average cost of USD 51 per MT if applied to the prices per pound set out in the Halliburton Master Agreement.[899] By including the sales to Canada, they calculated average costs of USD 54 per MT.[900]

---

[895] USD 154.0 – USD 11.9 (local shipping costs) – USD 17.6 (shipping costs to Alice) = USD 124.5 per MT.
[896] USD 158.7 – USD 11.9 (local shipping costs) – USD 17.6 (shipping costs to Alice) = USD 129.2 per MT.
[897] Spiller II, ¶ 86; **Exhibit CLEX-81**, p. 37; **Exhibit CLEX-80**, slide 10.
[898] Brailovsky/Flores I, ¶¶ 124-126; Brailovsky/Flores II, ¶¶ 118-119.
[899] Brailovsky/Flores II, ¶¶ 120-122 and Table 6.
[900] Brailovsky/Flores II, ¶ 123 and Table 7.

813. The Tribunal is of the view that neither approach is sufficiently substantiated. The approach of Mr. Brailovsky and Dr. Flores based on the transportation costs from Fort Smith to Alice appear rather speculative because those costs relate to a different plant and a different route. As to Prof. Spiller's approach, the Tribunal notes that he was not provided with any actual sales data but rather stated that he understood that approximately 30% of proppants were sold *ex works* and assumed that the rest would be evenly distributed between Claimant's three US geographic sales regions. However, apart from the fact that Mr. Brailovsky and Dr. Flores pointed out that Claimant also sells proppants to locations in Canada, there is no evidence in the record that Prof. Spiller made a realistic assumption. The Tribunal agrees with Respondent that it would have been for Claimant to disclose the actual ratio of Norpro Venezuela's sales in North America.

814. In addition, the Tribunal is not convinced by Prof. Spiller's assumption that the costs of an actual shipment to a location within Texas is a good proxy for the sales throughout the US. In particular, the fact that Mr. Brailovsky and Dr. Flores applied Prof. Spiller's sales assumption to the prices under the Halliburton Master Agreement and arrived at a weighted average of USD 51 per MT, creates doubt as to the reliability of Prof. Spiller's costs estimate of USD 37 per MT.

815. In light of the fact that Claimant failed to disclose conclusive evidence in this regard and further taking into account that Mr. Brailovsky and Dr. Flores' estimate of USD 43.4 per MT is still considerably lower than the cost they calculated under the Halliburton Master Agreement, the Tribunal considers it appropriate to adopt their estimate for shipping costs within North America.

### Conclusion on Transportation Costs

816. In sum, the Tribunal finds that the present valuation should include (i) USD 11.9 per MT of local shipping costs within Venezuela for all sales; (ii) USD 119.83 per MT of shipping costs from Venezuela to Corpus Christi or Alice, Texas for all export sales; and (iii) USD 43.4 per MT of shipping costs within North America for all North American export sales.

### (6)    Capital Expenditures

817. As to the capital expenditures, the Tribunal notes that there is agreement between the Parties with regard to the time horizon 2010-2018. For this time period, Mr. Brailovsky and Dr. Flores adopted Prof. Spiller's approach to rely on the figures estimated in Claimant's April 2010 Business Plan for 2010-2015 (USD 1.4 million in 2010; USD 1.0 million in 2011; USD 1.5 million in 2012; USD 5.0 million in 2013; and USD 0.5 million *per*

*annum* in 2014-2015) and to assume that the amount of USD 0.5 million *per annum* (inflated in accordance with the US PPI) would also be required in 2016-2018.[901]

818.  However, the Parties' experts have applied differing figures for the time period after 2018. Prof. Spiller assumed that the long-term capex would amount to USD 0.6 million in perpetuity and noted that this was in line with the estimate of the maintenance capex of Claimant's 30-year old Fort Smith Plant for 2010-2018.[902]

819.  Mr. Brailovsky and Dr. Flores considered that it was unreasonable to assume that Norpro Venezuela would have the same capex over its entire life cycle and ultimately relied on the four capexes of the Fort Smith Plant: (i) Health, Safety and Environmental (HSE); (ii) Maintenance of Business (MOB); (iii) Technology (TECH); and (iv) World Class Manufacturing (WCM). They calculated that adjusted to the size of Norpro Venezuela, this resulted in a capex of USD 1.6 million in perpetuity.[903]

820.  Prof. Spiller argued that apart from the MOB capex, the other three capexes were not related to maintenance, but rather to efficiency and technological improvements, which could be included in the valuation only if one were to account for increased production or efficiency gains as well. However, both Parties' experts assumed that Norpro Venezuela's efficiency factors would remain constant in the long term.[904]

821.  Mr. Brailovsky and Dr. Flores noted that the three "*non-maintenance*" capexes included items such as roof repairs and improvements to prevent slide, trips and falls (HSE), replacements of old technology (TECH) and improvements to reduce breakdowns and process disrutpions (WCM). They concluded that all of these components were necessary to keep the plant running in perpetuity and remain competitive.[905]

822.  In principle, the Tribunal agrees with Prof. Spiller that the inclusion of expenditures that are not related to maintenance but improvements of technology or efficiency would make it necessary to account for the corresponding added value as well. However, as the first example cited by Mr. Brailovsky and Dr. Flores under the "*Health, Safety and Environmental*" capex shows, maintenance cannot necessarily be reduced to capex labelled "*Maintenance of Business*." Maintenance in terms of keeping the plant running at the same techonological and efficiency level also includes expenditures for, *e.g.*, adapting to new regulatory requirements or safety improvements.

---

[901] Spiller I, ¶ 137; **Exhibit CLEX-81**, p. 50; Brailovsky/Flores I, ¶¶ 128-130; Brailovsky/Flores II, ¶ 128.
[902] Spiller II, ¶¶ 88-90 and Figures 9 and 10; **Exhibit CLEX-81**, p. 50.
[903] Brailovsky/Flores II, ¶¶ 130-136; **App. BF-104**, Table 8.
[904] Spiller II, ¶ 89.
[905] Brailovsky/Flores II, ¶¶ 134-135 referring to **Exhibit CLEX-91**, slides 142, 144 and 145.

823.   Therefore, the Tribunal agrees with Mr. Brailovsky and Dr. Flores that Prof Spiller's distinction between one "*maintenance*" capex and three "*non-maintenance*" capexes is not quite accurate. In particular, the Tribunal's understanding of maintenance includes several of the items that form part of the "*Health, Safety and Environmental*" capex. As for the "*Technology*" and "*World Class Manufacturing*" capexes, however, the Tribunal considers that they primarily relate to technology and efficiency improvements, which cannot be taken into account without at the same time accounting for the resulting efficiency gains (which Mr. Brailovsky and Dr. Flores did not do). Consequently, the Tribunal finds that the long-term capex for Norpro Venezuela should reflect the expenditures foreseen for the Fort Smith Plant under the MOB and the HSE capexes, but not the TECH and WCM capexes.

### (7)    Working Capital – VAT Credits

824.   As to the working capital required to operate the plant, Mr. Brailovsky and Dr. Flores agreed with Prof. Spiller's modelling in his second expert report, except for his approach to the VAT credits.[906] Mr. Brailovsky and Dr. Flores further did not question Prof. Spiller's calculation pursuant to which as of April 2010 Norpro Venezuela had a balance of outstanding VAT credits in the amount of VEF 12.3 million (converted to USD 2.9 million).[907] The approaches of the Parties' experts differ, however, as regards the time period it would have taken to monetize those VAT credits.

825.   As per instruction from counsel, Prof. Spiller relied on Venezuelan administrative law pursuant to which claims for tax credits must be decided within 30 days and therefore assumed that the balance of VEF 12.3 million would have been collected in the course of 2010. He modeled a working capital requirement on the assumption that (i) it would have taken 60 days from the date of filing the request for reimbursement to monetize the VAT certificates; and (ii) Norpro Venezuela would have recovered 80% of the VAT receivables.[908]

826.   Mr. Brailovsky and Dr. Flores noted that Norpro Venezuela had not obtained its export license and had not started the VAT recovery process as of May 2010 and assumed that it would submit its first VAT recovery requests in late 2010 or 2011. According to Mr. Brailovsky and Dr. Flores, Norpro Venezuela would therefore have received its first recovery certificates only approximately two years later, *i.e*., in 2013 due to the well-known long delays in the recovery procedure. They further assumed that until then, Norpro Venezuela would have acquired additional inputs and supplies, which would have resulted in

---

[906] Brailovsky/Flores II, ¶ 145.
[907] **Exhibit CLEX-81**, p. 53.
[908] Spiller II, ¶¶ 92-93.

new VAT credits and thus a continuous outstanding balance of VAT credits. Consequently, they did not include VAT-related cash flows in their model.[909]

827. The Tribunal considers that there are two issues to be discussed in this regard: (i) whether Respondent may rely on delays in its own administrative procedure for the purposes of the present valuation; and (ii) whether Respondent has established that exporters were in fact facing delays of approximately two years in the recovery procedure.

828. As to the first issue, the Tribunal notes that from the strictly economic perspective of a willing buyer, administrative delays resulting in delayed cash flows would certainly have to be taken into account – provided that the delays actually exist. However, Claimant argues that if Venezuela had acted in good faith, it would have followed its own administrative law to decide on the VAT credits within 30 days. While it initially raised a separate FET claim in this regard,[910] Claimant no longer pursued this argument in its subsequent pleadings or at the Hearing but referred to the VAT credits only in its discussion on quantum and noted that "*lengthy administrative delays have, in themselves, been found to violate the FET standard*."[911] According to Claimant, it would be "*inequitable for the State to use its own time lag in processing legal obligations as a way to avoid the obligation altogether*."[912]

829. While the Tribunal is not inclined to allow Respondent to invoke its own administrative deficiencies to lower the amount of Claimant's compensation, Claimant's argument could be successful only if it were established that the delays either did not exist when Claimant made the decision to invest in Venezuela or if Claimant was assured that it would not be subject to such delays. The evidence shows that administrative delays in the VAT recovery procedure have been a rather well-known issue in Venezuela already back in the early 2000s when Claimant considered investing in Venezuela. A news article dating from 2000 reports that VAT refunds in the amount of VEF 100 billion were due since 1993.[913] A further news article dating from 2003 reported that since 2001, VEF 170 billion were owed in VAT refunds.[914] Finally, a news article dating from 2007 reported the issuance of recovery certificates in the amount of up to VEF 3.1 billion following delays of several months.[915]

830. Claimant does not contest that exporters were facing considerable delays in obtaining VAT recovery when it made the decision to invest in Venezuela, but claims that it was

---

[909] Brailovsky/Flores I, ¶¶ 170-175; Brailovsky/Flores II, ¶¶ 148-150.
[910] *Cf.* Memorial, ¶ 162-164.
[911] Reply, note 381.
[912] Claimant's Post-Hearing Submission, ¶ 159.
[913] **App. BF-34**.
[914] **App. BF-35**.
[915] **App. BF-36**.

assured that Venezuela would follow its own VAT credit procedure.[916] Claimant relies in particular on Article 43 of the VAT Law, which provides that the tax administration shall render its decision on the recovery request within thirty business days "*counted from the date in which the request is definitely received, so long as all of the requirements set forth to that end in the Rules, have been met*."[917] According to this language, the 30-day period starts only once the tax administration has received all of the supporting documentation required under the VAT Law, which is not necessarily equal to the date on which it has received the request because it is not unusual that the administration requests further documentation or information on certain issues, as Mr. Rondón explained in his written witness statement.[918]

831.    In any event, the Tribunal does not consider it established that Claimant indeed received specific assurances that Venezuela would comply with this provision. In particular, Claimant could not point to any statement from a Government official that it would not be subject to the same delays that exporters were generally facing in Venezuela at the time. Mr. Pedersen testified in his written statement that based on meetings with CVG in 2005 they anticipated that they would receive "*beneficial VAT and import tax treatment*," without stating, however, that any specific assurances were made with regard to the VAT recovery procedure.[919]

832.    The contemporaneous documents that Claimant relies on in this regard explicitly refer to exemptions from VAT and import duties pursuant to a Presidential Decree granted in 2006, but not to the VAT recovery procedure for materials that were not exempted from VAT duty.[920] As explained by Mr. Brailovsky and Dr. Flores in their first expert report, the VAT exemptions and the VAT recovery procedure concerned different materials, as under an exemption, Norpro Venezuela did not have to pay any VAT in the first place and could thus not be entitled to any refunds.[921] As Norpro Venezuela was in fact granted an Exemption for Capital Goods Certificate by MILCO on 25 October 2007 that covered 29 specific types of equipment, it appears that the company actually received the "*beneficial VAT treatment*" that it had been promised. As there is no specific reference to the VAT recovery procedure for materials that were not covered by this certificate, the Tribunal finds that there is no legal basis under international law to exclude delays in the recovery procedure, provided that they are established, from the present valuation.

---

[916] Claimant's Post-Hearing Submission, ¶ 159.
[917] English translation submitted by Respondent as **Exhibit R-41**.
[918] Rondón, ¶ 38.
[919] Pedersen, ¶ 24.
[920] *See* in particular **Exhibits C-079**, **C-082, p. 4** and **C-084**.
[921] Brailovsky/Flores I, ¶ 163.

833.  The Tribunal therefore has to assess whether Respondent has established that there were indeed delays of approximately two years in the VAT recovery procedure in 2010. As to the three news articles referred to above, Claimant correctly pointed out that they all date from three to ten years earlier.[922] While they thus serve as evidence that delays were an issue when Claimant invested in Venezuela, they do not establish that the same delays still existed in 2010.

834.  Mr. Brailovsky and Dr. Flores further pointed to a statement in Claimant's 8 June 2009 update to the DAC:

> "*Partially linked to the export issues, recovering the VAT from the tax treasury has become a very lengthy and complex process.* […] *The main causes for the delay are related to the legal requirements that have to be fulfilled before being granted an export license. Every single requirement has been identified and assigned a plan.*"[923]

835.  While the DAC update confirms that the VAT recovery still took a considerable amount of time, the main reasons for the delays were seen in obtaining the export license, which had not been obtained as of June 2009. Apart from the fact that it was reported that every legal requirement was being tackled, Respondent's witness Mr. Rondón stated in his written witness statement that by the time of the expropriation "*Norpro Venezuela had notified the tax authorities of its intention to start the process to recover VAT credits by applying for a special tax recovery certificate based upon export sales.*"[924] During the Hearing, Mr. Rondón clarified that Norpro Venezuela had actually submitted its application for a special tax recovery certificate and thus started the recovery process.[925] As explained by Mr. Brailovsky and Dr. Flores in their first expert report, the company first had to obtain the export license before it could submit a tax recovery request.[926] As Mr. Rondón's testimony confirms that Norpro Venezuela had initiated the second step by May 2010, it must have completed the first step by that time, which had been described as the main cause for delays in the DAC update.

836.  At the same time, the Tribunal notes that Mr. Rondón stated in his written witness statement:

> "*We were conscious that, even after a request for a special tax recovery certificate was initially submitted, the process would be lengthy and tedious and would involve verification of all related transactions. We also knew that it would be typical as part of the process for the tax authorities to seek additional documentation. I understand that this procedure*

---

[922] Claimant's Post-Hearing Submission, note 348.
[923] **Exhibit R-7**, p. 6.
[924] Rondón, ¶ 38.
[925] Transcript (Day 3), p. 775 lines 10-19.
[926] Brailovsky/Flores I, ¶ 168.

*to recover VAT in Venezuela lasts at least two years from the initial filing of the request.*"[927]

837. As correctly pointed out by Respondent, Mr. Rondón was not cross-examined on his statement on the VAT recovery procedure.[928] The Tribunal also noted above that the 30-day period in Article 43 of the VAT Law starts only once the tax authority has received all documentation that it deems necessary for its decision on the recovery request. Apart from this provision, Claimant has not presented any indication that the statement made by Mr. Rondón was inaccurate or that the situation had changed since the news articles dating from 2000, 2003 and 2007.

838. Consequently, the Tribunal follows the approach of Respondent's experts that the recovery procedure took considerable time during which new VAT credits were accumulating, thus creating a continuous balance of outstanding VAT credits. As Norpro Venezuela could not operate without continuously accumulating new VAT credits while waiting for the recovery of the initial balance, the Tribunal considers it plausible to assume that they form part of Norpro Venezuela's working capital as a going concern. As both Parties' experts assumed that production would have increased until 2014,[929] – and with it the annual amount of newly accumulated VAT credits – the Tribunal further follows Respondent's experts in that Norpro Venezuela would have had a continuing outstanding balance of VAT credits equal to at least the amount outstanding in April 2010. As such amount would have continuously been locked in the operating business, it does not present any separate value that a willing buyer would pay for in addition to Norpro Venezuela's value as a going concern.

### (8)    New Taxes Introduced after the Expropriation

839. Finally, there has been a debate between the Parties and their experts as to the point in time from which Norpro Venezuela would have been subject to a contribution of 1% of the annual income to be made by companies with more than 50 employees under the Organic Law on Drugs. However, as explicitly noted by Respondent, Mr. Brailovsky and Dr. Flores did not include this contribution in their 15 May 2010 valuation because it was not applicable to Norpro Venezuela as of 2010 due to the use of its outsourcing model.[930]

840. There is further common ground that a second contribution of 1% of the annual income under the Organic Law on Sports, Physical Activity and Physical Education is not to be

---

[927] Rondón, ¶ 38.
[928] Respondent's Post-Hearing Brief, note 412. The clarification referred to in paragraph 835 was made in response to a question from the Tribunal.
[929] *Cf.* Spiller I, ¶¶ 52 et seq. and Figure 4; Barilovsky/Flores I, ¶ 174.
[930] Counter-Memorial, ¶ 256; Brailovsky/Flores I, ¶ 243.

included in the 15 May 2010 valuation because this law was enacted only in 2011 and thus not known to a willing buyer in 2010.[931]

841. As there is agreement between the Parties that neither contribution could be foreseen as of 15 May 2010, the Tribunal finds that the two contributions cannot be included in the DCF calculation evaluating Norpro Venezuela as of that date.

### c)    Historical Losses Associated with the Increase of the Bauxite Price

#### aa)    Summary of Claimant's Position

842. In addition to the fair market value of the plant, Claimant claims that it is entitled to compensation for the losses it has incurred for the supply of bauxite under the Bauxite Contract due to the price increase in violation of Article 3(1) and (2) of the Treaty. In Claimant's view, Respondent is liable for the overpayment of USD 1.3 million as of 15 May 2010.[932]

843. Claimant argues that its "*legal right to bauxite at the designated contractual price*" of USD 25.5 per MT in 2008, inflated to USD 24.3 per MT in 2009, was part of the rights that were expropriated by Respondent. According to Claimant, Norpro Venezuela could otherwise have pursued its legal claims under the Bauxite Contract against CVG Bauxilum; thus, Claimant must be compensated for the taking of this intangible right.[933]

#### bb)    Summary of Respondent's Position

844. Respondent submits that Claimant's claim for damages is meritless because (i) Norpro Venezuela agreed to the bauxite price increase as long as there would be no further price increase throughout 2009; and (ii) the claim is inadmissible, as Norpro Venezuela should have pursued this claim for an alleged breach of the Bauxite Contract in an arbitration proceeding in Caracas, as provided for in the Contract.[934]

845. In response to Claimant's argument that it expropriated Norpro Venezuela's legal right to vindicate its alleged claim against CVG Bauxilum, Respondent argues that Norpro Venezuela's contractual claims against CVG Bauxilum, even if it had any, were not expropriated.[935]

---

[931] Counter-Memorial, ¶ 256; Brailovsky/Flores I, ¶ 243.
[932] Claimant's Post-Hearing Submission, ¶¶ 162-163; Spiller II, Table 12.
[933] Reply, ¶¶ 198-199; Memorial, ¶ 221.
[934] Counter-Memorial, ¶ 266.
[935] Rejoinder, note 857.

### cc)    The Tribunal's Analysis

846.    The Tribunal notes that this claim again relates to Claimant's FET and FPS claims regarding the bauxite price increase in September 2008. Similar to the Tribunal's finding above that there is no basis to exclude the price increase from the valuation of Norpro Venezuela's future cash flows as of 15 May 2010, it also finds that there is no basis for Claimant's separate claim to be compensated for the payment of the increased price prior to 15 May 2010.

847.    This finding is independent of the question whether any contractual claims of Norpro Venezuela against CVG Bauxilum would have formed part of the expropriated rights for which Claimant is to be compensated. In any event, the Tribunal found that Claimant has not established that the price increase was not justified under the Bauxite Contract and is therefore not convinced that Norpro Venezuela had any claims for breach of contract against CVG Bauxilum that could have been expropriated.

848.    Consequently, Claimant is not entitled to compensation for the fact that it paid the increased price of USD 33.8 per MT between September 2008 and May 2010 that was quantified by Prof. Spiller at USD 1.3 million as of May 2010.[936]

### d)    Conclusion on the Calculation of Damages

849.    In conclusion, the Tribunal has found that the calculation of the compensation to be paid by Respondent has to be based on the net present value of Norpro Venezuela's future cash flows as of 15 May 2010. The net present value is to be determined by applying a nominal discount rate of 19.88%.

850.    As to the future cash flows of Norpro Venezuela, the Tribunal has found that (i) the assumptions on proppants prices should be based on the projections in Claimant's April 2010 Business Plan; (ii) a deduction of 25% should be made on the profits on export sales to account for the fact that Norpro Venezuela did not have its own marketing and distribution network; (iii) as to the foreign exchange rate to be applied, the devaluation assumptions after 15 May 2010 should be based on the exchange rate forecasts made by Ecoanalítica; (iv) the bauxite costs should be calculated on the basis of the increased price of USD 33.8 per MT that Norpro Venezuela in fact paid as of September 2008; (v) the transportation costs should include USD 11.9 per MT of local shipping costs within Venezuela for all sales, plus USD 119.83 per MT of shipping costs from Venezuela to Corpus Christi or Alice, Texas for all export sales, plus USD 43.4 per MT of shipping costs within North America for all North American export sales; (vi) the long-term capex for Norpro

---

[936] Spiller II, Table 12.

Venezuela should reflect the expenditures foreseen for the Fort Smith Plant under the MOB and the HSE capexes, but not the TECH and WCM capexes; and (vii) it should be assumed that the VAT credits form part of the working capital required for the continuous operation of Norpro Venezuela and thus do not present any separate value in addition to Norpro Venezuela's value as a going concern.

851. Finally, the Tribunal has found that Claimant is not entitled to any compensation for historic losses associated with the increase of the bauxite price in September 2008 because the price increase was justified under Article 10.2 of the Bauxite Contract.

### 3. Interest

852. As a final step, the Tribunal has to decide on Claimant's claim for pre-award interest as of 15 May 2010 and its claim for post-award interest until the date of payment by Venezuela.

### a) Summary of Claimant's Position

853. Claimant claims that it is entitled to both pre-award interest and post-award interest. According to Claimant, it must be brought in the position it would have been in if the expropriation had not occurred; thus, the interest rate should be equal to the return it expected to earn from its investment in Venezuela, *i.e.*, its opportunity cost.[937]

854. Claimant relies on the tribunal in *Vivendi v. Argentina*, which ordered interest at the claimant's cost of capital, finding that the interest rate should be "*a reasonable proxy for the return the Claimants could otherwise have earned on the amounts invested and lost in the* […] *concession*."[938] Claimant further refers to the tribunal in *France Telecom v. Lebanon*, which awarded interest at a rate of 10% as the reasonable profitability of capital of which the claimant had been deprived by the State's unlawful actions.[939] Claimant also relies on the tribunal in *Alpha Projektholding v. Ukraine*, which awarded pre-award interest at the risk-free rate plus the market risk premium on the assumption that "*this rate better reflects the opportunity costs associated with Claimant's losses, adjusted for the risks of investing in the Ukraine*."[940] In addition, Claimant refers to the ICC tribunal in

---

[937] Memorial, ¶¶ 230, 232; Reply, ¶ 202.

[938] Memorial, ¶ 232; Claimant's Post-Hearing Submission, note 406 quoting from *Vivendi v. Argentina* (**CLA-024**), ¶ 9.2.8.

[939] Memorial, ¶ 232; Claimant's Post-Hearing Submission, note 406 referring to *France Telecom v. Lebanon* (**CLA-034**), ¶ 209.

[940] Memorial, ¶ 233; Claimant's Post-Hearing Submission, note 406 quoting from *Alpha Prjektholding v. Ukraine* (**CLA-002**), ¶¶ 514, 518.

*ConocoPhillips v. PDVSA*, which granted interest at a rate corresponding to an investor's cost of equity in Venezuela.[941]

855. Claimant argues that if they had re-invested the cash flows generated by Norpro Venezuela, they would have earned returns at its cost of equity. Therefore, Claimant claims that it should also be awarded both pre-award interest and post-award interest at a rate equivalent to Norpro Venezuela's cost of equity.[942] Claimant takes the position that there is no reason to distinguish between the pre-award interest rate and the post-award interest rate except that the post-award interest rate should capture the present-day cost of equity figure (14.53% as of 31 August 2015).[943]

856. In addition, Claimant is of the view that any other interest rate would lead to an unjust enrichment of Respondent because it had free access to the expropriated funds. Claimant contends that the reasonable cost that PDVSA would have incurred if it had to borrow the amount in question is equal to the yields on its bullet bonds, which was close to 9% in 2013.[944] According to Claimant, this would also be the minimum "*appropriate*" market interest rate under Article 5(1) of the Treaty, but maintains that under the standard of customary international law, it is entitled to Norpro Venezuela's cost of equity.[945]

857. In Claimant's view, the interest rate cannot be based on the risk-free rate in the present case because Venezuela has trouble paying its debts and has to pay the Award in US dollars, *i.e.*, a currency other than its own so that it cannot print money to satisfy the Award. Claimant argues that for more than five years it was forced to lend money to Venezuela despite the risk that it might not pay, which is why the market interest rate must reflect the costs of a mid- to long-term loan to Venezuela.[946]

858. In particular with regard to the post-award interest rate, Claimant argues that otherwise Respondent would have no interest in paying the Award before it has paid all of its other

---

[941] Memorial, ¶ 234; Claimant's Post-Hearing Submission, note 406 referring to *ConocoPhillips v. PDVSA* (**CLA-064**), ¶¶ 294-296; Reply, ¶ 203 quoting from ¶ 295(ii).

[942] Memorial, ¶ 235; Reply, ¶ 204.

[943] Reply, ¶ 207; Prof. Spiller's Valuation Update, Table 6; **Exhibit CLEX-198**, p. 2. Norpro Venezuela's cost of equity as of 15 May 2010 was calculated by Prof. Spiller at 13.56%. **Exhibit CLEX-81**, p. 32.

[944] Reply, ¶¶ 205-206. According to Claimant, this rate is "*quite conservative*" because Respondent's long-term borrowing rate is close to 13%. Claimant's Post-Hearing Submission, ¶ 182.

[945] Claimant's Post-Hearing Submission, ¶¶ 180-181, 183.

[946] Claimant's Post-Hearing Submission, ¶¶ 184-186, Claimant's Second Post-Hearing Submission, ¶¶ 111, 114-115. In support of its position that the interest rate should reflect Respondent's risk, Claimant relies on a paper written by Fisher and Romaine, which discusses pre-judgment interest for damages awarded in US litigation. Claimant's Second Post-Hearing Submission, ¶ 110 quoting from **App. BF-96**, p. 147. However, Respondent clarified that Fisher and Romaine ultimately "*retain the position that prejudgment interest should be awarded at the risk-free rate.*" Respondent's letter dated 2 June 2015, ¶ 4 quoting from **App. BF-96**, pp. 147-148. This submission was admitted into the record by the Tribunal on 19 June 2015. The paper was also discussed with Respondent's expert during the Hearing. Transcript (Day 4), p. 1113.

debts to its creditors. In Claimant's view, this would not serve the purpose of post-award interest to serve as an effective incentive to comply with the terms of the Award.[947]

859.    In any event, Claimant asserts that the interest rate advanced by Respondent is not a market interest rate but rather equivalent to an inter-bank rate and refers to the tribunal in *Tidewater v. Venezuela*, which rejected Venezuela's suggestion on that basis. In addition, Claimant submits that none of the tribunals relied on by Respondent has applied a 3-month treasury bond but considers it "*well settled*" that the pre-award interest rate should reflect a mid- to long-term interest rate.[948]

860.    In Claimant's view, the Tribunal should award interest on an annual compounding basis in order to fully reflect the time value of its losses and thus give effect to the standard of full reparation under customary international law.[949] Claimant argues that "*nearly all real-life transactions and financial operations*" involve compound interest and notes that the tribunals in the five most recent ICSID decisions involving Venezuelan expropriations have awarded compound interest.[950]

### b)    Summary of Respondent's Position

861.    Respondent rejects Claimant's claim that it should be awarded interest in the amount of Norpro Venezuela's cost of equity and argues that this does not qualify as an "*appropriate market interest rate*" under Article 5(1) of the Trreaty. In addition, Respondent considers it "*absurd*" to update past cash flows at a higher rate than the discount rate that Prof. Spiller calculated for the purposes of discounting future cash flows, even though the risks and uncertainties of the future do not apply.[951]

862.    In Respondent's view, Claimant's alternative argument of applying the rate applicable to PDVSA's debt is equally inappropriate because interest as a form of compensation should focus on Claimant's loss caused by the fact that it did not receive payment on a fixed date. As Claimant no longer bore any risk associated with its investment as of 15 May 2010, Respondent claims that the appropriate interest rate is the risk-free-rate.[952]

863.    According to Respondent, market interest rates in the commercial context are "*almost always*" based on a base rate, such as the LIBOR or the short term US Treasury bill rate, to be increased by a certain spread depending on the creditworthiness of the borrower, *i.e.*, in this case Claimant's ultimate parent company Compagnie de Saint-Gobain. In light

---

[947] Claimant's Post-Hearing submission, ¶¶ 188, 190.
[948] Claimant's Second Post-Hearing Submission, ¶ 109 quoting from *Tidewater v. Venezuela* (**CLA-155**), ¶ 206.
[949] Memorial, ¶¶ 236-237; Reply, ¶ 208; Claimant's Post-Hearing Submission, ¶¶ 191-194.
[950] Claimant's Second Post-Hearing Submission, ¶ 112.
[951] Counter-Memorial, ¶ 250; Rejoinder, ¶ 273.
[952] Respondent's Post-Hearing Brief, ¶¶ 114-115 and ¶ 121.

of the integrity issue raised with regard to the LIBOR, Respondent takes the view that the interest rate should be based on the US Treasury bills; it selects the 3-month bills to compensate Claimant for any "*short-term borrowing*" it may have required pending the issuance of the present Award.[953]

864.  Respondent refers to the tribunal in *Siemens v. Argentina*, which awarded pre-award interest based on the average 6-month US Treasury bills (2.66%).[954] Respondent further relies on the cases of *LG&E* and *BG Group* in which the tribunals applied short-term US Treasury bill rates.[955] Respondent also refers to the tribunal in *Occidental v. Ecuador*, which applied the monthly rate on US Treasury bills stating that it "*reflect*[ed] *a prudent, risk-free and conservative re-investment practice*."[956] Finally, Respondent relies on the tribunal in *Yukos v. Russia*, which awarded pre-award interest based on the average yield of the 10-year US Treasury bond.[957] According to Respondent, various tribunals explicitly refused to apply the claimant's cost of capital as the basis for the pre-award interest rate.[958]

865.  Respondent submits that the average yield on debt with a 3-month maturity carrying the same rating as that of Compagnie de Saint-Gobain (BBB) was 1.09%, while the yield on short-term US Treasury bills was 0.08%. Respondent concludes that the applicable market interest rate to be applied to the net present value of the cash flows as of 15 May 2010 should thus be the 3-month US Treasury bill rate plus 1.01%.[959]

866.  Finally, Respondent submits that interest should be calculated on a simple basis because compound interest is prohibited under Venezuelan law.[960] In this regard, Respondent relies in particular on the tribunal in *Yukos v. Russia*, which held that simple interest was "*just and reasonable*."[961] Respondent further contests Claimant's suggestion that awarding compound interest is the norm in international arbitration and refers to various decisions in which simple interest was applied.[962]

---

[953] Counter-Memorial, ¶ 251; Rejoinder, ¶ 274; Respondent's Post-Hearing Brief, note 242.

[954] Respondent's Post-Hearing Brief, ¶ 117 referring to *Siemens v. Argentina* (**CLA-77**), ¶ 396.

[955] Respondent's Post-Hearing Brief, ¶ 117 referring to *LG&E* (**CLA-48**), ¶¶ 102, 105 and *BG Group* (**CLA-113**), ¶ 455.

[956] Respondent's Post-Hearing Brief, ¶ 117 quoting from *Occidental v. Ecuador* (**CLA-61**), ¶ 842.

[957] Respondent's Post-Hearing Brief, ¶ 117 referring to *Yukos v. Russia* (**CLA-153**), ¶¶ 1685-1687.

[958] Respondent's Post-Hearing Brief, ¶¶ 118-120 referring to PSEG (RL-86), ¶ 345, Guaracachi (RL-125), ¶ 615 and Tza Yap Shum (RL-173), ¶¶ 288, 290.

[959] Counter-Memorial, ¶ 251 and ¶ 260; Rejoinder, ¶ 274; Respondent's Post-Hearing Brief, note 242. In its request for relief, however, Respondent requests that 1.1% be added to the 3-month US Treasury bill rate. Respondent's Post-Hearing Brief, ¶ 209; Respondent's Post-Hearing Reply Brief, ¶ 64.

[960] Counter-Memorial, ¶ 252.

[961] Respondent's Post-Hearing Brief, ¶ 122 quoting from *Yukos v. Russia* (**CLA-153**), ¶ 1689.

[962] Respondent's Post-Hearing Brief, note 244 referring to *RosInvestCo* (**RL-172**), ¶¶ 687-692, *Desert Line* (**RL-88**) ¶ 295, *CME* (**CLA-20**), ¶ 647 and *SPP* (**CLA-80**), ¶ 236.

### c)    The Tribunal's Analysis

867. The Tribunal will first determine the applicable pre-award interest rate (**aa)**) and then assess whether there is any reason to apply a differing rate for post-award interest (**bb)**). Finally, the Tribunal will address the issue of simple versus compound interest (**cc)**).

#### aa)    Pre-Award Interest Rate

868. As the value of Norpro Venezuela and thus the amount of compensation to be paid to Claimant is to be assessed as of 15 May 2010, it is undisputed between the Parties that Claimant is further entitled to payment of pre-award interest as from this date.

869. The Tribunal notes that Prof. Spiller did not discuss pre-award interest (or the update of historical cash flows to be made in the alternative date-of-the-award valuation) but simply applied Norpro Venezuela's cost of equity based on an instruction from Claimant's counsel.[963] In his 15 May 2010 valuation, he calculated pre-award interest on the basis of Norpro Venezuela's cost of equity (estimated at 13.04% as of 2014) and in the alternative based on PDVSA's cost of debt as the average yield of seven USD bullet bonds during 2013 (estimated at 9.08%), but again he did not discuss either alternative.[964]

870. Mr. Brailovsky and Dr. Flores took the position that "*from a strict economic point of view*" the pre-award interest rate should be the risk-free rate. However, they recognized that it is common in arbitration to apply "*some sort of* 'normal' *commercial rate*." Therefore, they adopted two criteria: (i) a short-term maturity of three months as the date of the award is not known and the loan required as a result of the delay in payment must thus be renewed constantly; and (ii) Claimant's risk measured as the yield of debt with a BBB rating, *i.e.*, the rating that Compagnie de Saint-Gobain carries. According to Mr. Brailovsky and Dr. Flores, the yield on BBB bonds with a 3-month maturity issued by industrial companies in the US was on average 1.09%, *i.e.*, a spread of 1.01% over the US 3-month US Treasury bills.[965]

871. As to the approach applied by Prof. Spiller, Mr. Brailovsky and Dr. Flores considered it incorrect to use 2013 and 2014 interest rates for a period starting on 15 March 2010 instead of a certain average over the time period in question. In addition, they note that only

---

[963] Spiller I, note 73; **Exhibit CLEX-01**, ¶ 3(d).
[964] Spiller II, ¶ 138 (with note 217) and Table 13.
[965] Brailovsky/Flores I, ¶¶ 248-250; Brailovsky/Flores II, ¶¶ 252-254 and Table 19. Mr. Brailovsky and Dr. Flores also note that, while the LIBOR rate has often been used as a benchmark in the past, it might be inappropriate to use it in the present case given that its integrity as suitable interest rate benchmark has recently been challenged. Brailovsky/Flores I, note 445.

two of the PDVSA bonds used by Prof. Spiller had a short-term maturity – they yielded an average of 3.6% three months before maturity.[966]

872.  The Tribunal recalls that Article 5(1) subparagraph 3 of the Treaty provides that interest shall accrue at an "*appropriate market interest rate*" ("*taux d'intérêt de marché approprié*" / "*adecuada tasa de interés del mercado*").[967] As to the standard under customary international law, Article 38 of the ILC Draft Articles provides that "[t]*he interest rate and mode of calculation shall be set so as to achieve* [the] *result* [of ensuring full reparation]."[968] While the Tribunal is aware that an appropriate market interest rate is not necessarily the same as an interest rate that ensures full reparation of the damage Claimant incurred, it appears possible under the present circumstances to settle on a rate that satisfies both standards.

873.  Claimant takes the position that under the standard of full reparation it would be entitled to interest at the rate of Norpro Venezuela's cost of equity as being equal to the return Claimant expected to earn from its investment.[969] However, the Tribunal notes that, regardless of whether the expropriation would be labelled as "*lawful*" or "*unlawful*," this is not a case in which Respondent was not permitted to expropriate Norpro Venezuela *per se.* The Tribunal rather found that Respondent failed to comply with the requirements concerning the payment of compensation that should have accompanied the expropriation. Consequently, Claimant is not to be brought in the position it would have been in if it were still the owner of Norpro Venezuela, but rather in the position it would have been in if Respondent had paid compensation on or shortly after 15 May 2010.

874.  Under these circumstances, the Tribunal agrees with Respondent that it would not be accurate to award Claimant interest at a rate that accounts for the risks of investing in a company located in Venezuela even though Claimant was no longer bearing these risks and, more importantly, would also not have been bearing these risks if it had been compensated on 15 May 2010. Therefore, the Tribunal will not award interest at Norpro Venezuela's cost of equity.

875.  Alternatively, Claimant claims that the appropriate market interest rate would be PDVSA' cost of debt, arguing that it was forced to grant a loan to Respondent in the amount of the compensation owed to it as of 15 May 2010.[970]

[966] Brailovsky/Flores II, ¶ 259.
[967] **Exhibit C-1**, Article 5(1) subparagraph 2.
[968] **CLA-027**, Article 38(1).
[969] Memorial, ¶ 232; Reply, ¶ 202.
[970] Claimant's Post-Hearing Submission, ¶¶ 180-186.

876. There is no indication that the determination of an appropriate market interest rate should account for the State's cost of debt. Claimant has not cited any decision from an international tribunal in support of its submission but refers to a paper from Fisher and Romaine on pre-judgment interest in US litigation and a statement from Prof. Damodaran. However, as Respondent correctly pointed out in its letter of 2 June 2015, Fisher and Romaine considered that the risks associated with the particular defendant resulted from litigation rather than the violation itself and thus ultimately did not justify a deviation from the application of the risk-free rate.[971] As to the statement made by Prof. Damodaran, the Tribunal notes that this statement did not concern the determination of an appropriate interest rate but was rather made as part of the requirements for an investment to be risk-free.[972] Therefore, the Tribunal considers that none of the authorities cited by Claimant supports its position that the "*appropriate market interest rate*" should reflect Respondent's cost of debt.

877. In principle, the Tribunal agrees with Respondent and its experts (reyling on Fisher and Romaine) that the loss to be compensated by awarding interest on the principal amount is the time value of money, without factoring in any risks that Claimant did not bear.[973] However, this does not render it completely irrelevant that, if Claimant had received the compensation on or shortly after 15 May 2010, it would have had the opportunity to re-invest this amount and earn a return considerably above the return of the risk-free rate. Therefore, the Tribunal considers that, in the circumstances of this case, both the customary international law standard of full reparation and the standard in Article 5(1) of the Treaty require the application of what Mr. Brailovsky and Dr. Flores described as "*some sort of* 'normal' *commercial rate*" that is commonly applied in arbitrations.[974]

878. While Mr. Brailovsky and Dr. Flores therefore added Claimant's cost of debt for short-term loans to the risk-free rate, the Tribunal is not convinced that this appropriately captures Claimant's loss of investment opportunity in the present case. The Tribunal wishes to re-emphasize that it does not intend to award interest at a rate equal to the opportunity cost of Claimant's investment in Norpro Venezuela (nor in any hypotethical alternative investment), primarily because Claimant in fact did not bear the risk associated with such a rate of return. At the same time, the Tribunal is of the view that Claimant's own cost of debt does not adequately reflect the fact that, over a period of several years, Claimant was deprived of the opportunity to dispose of the money it should have received in connection with the expropriation of its investment in Venezuela.

---

[971] Respondent's letter dated 2 June 2015, ¶ 4 quoting from **App. BF-96**, pp. 147-148. This portion of the letter was admitted into the record by Tribunal on 19 June 2015.
[972] **Exhibit C-158**, p. 6.
[973] Brailovsky/Flores II, ¶ 251 quoting from **App. BF-96**, p. 146.
[974] Brailovsky/Flores I, ¶ 248; Brailovsky/Flores II, 252.

879. Under these circumstances, the interest rate to be applied in the present case should therefore achieve a balance between, on the one hand, avoiding the granting of a rate of return that would not have been achievable without considerable risk, and on the other hand, acknowledging that Claimant would have been in a position to use its funds for more than just a risk-free investment if it had been paid on or shortly after 15 May 2010. In the Tribunal's view, this applies in particular in times where the risk-free interest rates are close to zero as they were for almost the entire time period between the date of the expropriation and the date of the Award.

880. Consequently, the Tribunal exercises the discretion it has under either Article 5(1) of the Treaty and under customary international law and awards an interest rate that qualifies as both an "*appropriate market interest rate*" and a rate that "*ensure*[s] *full reparation*" in terms of a reasonable opportunity to invest the principal amount in the market. Taking up the concerns raised by Respondent and its experts regarding the integrity of the LIBOR rate as a reliable benchmark for interest rates, the Tribunal will instead refer to the US Treasury bill rate, which both Parties' experts have relied on in various aspects of their valuations. As to the appropriate maturity, the Tribunal notes that, while Mr. Brailovsky and Dr. Flores applied the 3-month rate, this choice is not supported by any of the cases relied on by Respondent in the context of its submissions on interest. It rather appears that the 6-month rate is a rate that is commonly applied by investment treaty tribunals.[975]

881. The Tribunal sees no reason to deviate from this practice and therefore finds that the pre-award interest rate should be based on the 6-month US Treasury bill rate. In order to reflect the above mentioned considerations relating to the balance between risk and re-investment opportunity, the Tribunal considers it appropriate to add a spread of 2% to this risk-free rate.

882. In sum, the Tribunal finds that Claimant is entitled to pre-award interest at a rate equal to 2% over the average 6-month US Treasury bill rate.

### bb)   Post-Award Interest Rate

883. The Tribunal notes that Claimant explicitly takes the position that there is no reason to distinguish between pre-award interest and post-award interest.[976] However, the Tribunal is aware that Claimant makes this statement in the context of its argument that it should

---

[975] *See*, *e.g.*, *Siemens v. Argentina* (**CLA-077**), ¶ 396; *LG&E Energy Corp. et al. v. Argentina* (**CLA-048**), ¶ 105; *BG Group Plc. v. Argentina* (**CLA-113**), ¶ 455; *Occidental Petroleum Corporation et al. v. Ecuador* (**CLA-061**), ¶¶ 841-842. Tribunals that applied the LIBOR rate also commonly referred to the 6-month rate, *see*, *e.g.*, *Lemire v. Ukraine* (**RL-122**), ¶ 353; *PSEG Global Inc. et al. v. Turkey* (**RL-86**), ¶ 348.
[976] Reply, ¶ 207.

be awarded pre-award interest at a rate at least equal to Respondent's cost of debt. Specifically with regard to post-award interest, Claimant argues that if the interest rate were lower than Respondent's cost of debt, Venezuela would have no incentive to comply with the Award – contrary to the very purpose of awarding post-award interest.[977]

884. Neither Respondent nor its expert makes any explicit statement as to what they consider to be the applicable post-award interest rate in the present case. They also do not address Claimant's argument that post-award interest should serve as an incentive to comply with the Award.

885. The Tribunal notes that both Article 5(1) of the Treaty and Article 38(2) of the ILC Draft Articles provide that interest shall continue to accrue until the date on which the actual payment is made.[978] Therefore, the Tribunal will award post-award interest on the amount to be paid pursuant to the Award.

886. As to the applicable rate, the Tribunal agrees with Claimant that, in principle, there is no reason to apply differing rates for pre-award interest and post-award interest. The Tribunal further sees no reason to deviate from this general rule because it has found above that the applicable pre-award interest rate might be lower than Respondent's (alleged) cost of debt. In the Tribunal's view, post-award interest serves the same purpose as pre-award interest, *i.e.*, to compensate Claimant for the time value of money and the fact that it cannot dispose of the amount until the date of actual payment; however, it is not meant to ensure compliance with the Award. Therefore, the Tribunal again considers that Respondent's cost of debt is not the appropriate benchmark to determine the applicable interest rate; rather, interest shall accrue at the same rate both prior to and following the Award.

### cc)    Simple / Compound Interest

887. Finally, the Tribunal has to determine whether interest shall be calculated on a simple basis, as advanced by Respondent, or compounded annually, as claimed by Claimant.

888. The Tribunal is aware of Respondent's argument that compound interest is prohibited pursuant to Article 530 of the Venezuelan Commercial Code and its reliance on the case of *Autopista Concesionada de Venezuela v. Venezuela*, in which the tribunal did not

---

[977] Claimant's Post-Hearing Submission, ¶ 188 referring to Irmgard Marboe, Calculation of Compensation and Damages in International Investment Law, 2009, (**RL-97**), ¶¶ 6.245-6.246.
[978] **Exhibit C-1**, Article 5(1) subparagraph 2; **CLA-027**, Article 38(2).

award compound interest based on the combined fact that this was not allowed by Venezuelan law and not required by international law.[979]

889.   However, the Tribunal notes that this decision, which is the only one cited by Respondent in this regard, dates from 2003. As correctly pointed out by Claimant, several more recent decisions involving Venezuela included an award of compound interest, in particular *Tidewater*, *OI European* and *Venezuela Holdings* dating from 2015 and 2014 respectively.[980]

890.   In the Tribunal's view, the fact that compound interest is not allowed under Venezuelan law does not prevent this Tribunal from awarding compound interest because the legal basis for Claimant's claim for interest is either Article 5(1) of the Treaty or customary international law. This finding is not in contradiction with the tribunal's finding in *Autopista v. Venezuela* because the tribunal in that case did not hold that Article 530 of the Venezuelan Commercial Code prevented it from awarding compound interest *per se* but rather noted this fact in addition to its finding that compound interest was not an established principle under, and therefore not required by, international law.

891.   As more than a decade has passed since the *Autopista* award was rendered, the Tribunal considers it appropriate to re-assess the finding whether compound interest can be considered a well-established principle under international law. Upon review of the cases cited by the Parties in connection with interest, the Tribunal notes that a majority of them awarded compound interest.[981] While Respondent did cite several cases in which interest was awarded on a simple basis, it appears that this was either due to the particular circumstances prevailing in the respective case or not supported by any reasoning for the tribunal's decision.

892.   In particular, the tribunal in *Yukos v. Russia* on which Respondent relies explicitly recognized that "*the awarding of compound interest under international law now represents a form of* 'jurisprudence constante' *in investor-state expropriation cases*" but deviated from

---

[979] Counter-Memorial, ¶ 252 referring to **Exhibit R-55**, Article 530 and *Autopista Concesionada de Venezuela v. Venezuela* (**RL-124**), ¶¶ 396-397.

[980] Claimant's Second Post-Hearing Submission, ¶ 112 referring to *Tidewater v. Venezuela* (**CLA-155**), ¶¶ 208-209, *OI European v. Venezuela* (**CLA-156**), ¶¶ 946, 952 and *Venezuela Holdings v. Venezuela* (**CLA-154**), ¶¶ 394, 399.

[981] *Alpha Projektholding v. Ukraine* (**CLA-002**), ¶ 514; *Compañia de Aguas v. Argentina* (**CLA-024**), ¶ 9.2.8; *France Telecom v. Lebanon* (**CLA-034**), ¶ 209; *LG&E v. Argentina* (**CLA-048**), ¶¶ 102-105; *Unglaube v. Costa Rica* (**CLA-051**), ¶¶ 319, 325; *Occidental v. Ecuador* (**CLA-061**), ¶¶ 842, 845; *Phillips v. Petróleos de Venezuela* (**CLA-64**), ¶¶ 294 et seq.; *Siemens v. Argentina* (**CLA-077**), ¶¶ 396, 401; *Wena v. Egypt* (**CLA-089**), ¶ 129; *BG Group v. Argentina* (**CLA-113**), ¶¶ 454-457; *PSEG v. Turkey* (**RL-86**), ¶¶ 345, 348; *Lemire v. Ukraine* (**RL-122**), ¶¶ 353, 356, 361; *Guaracachi v. Bolivia* (**RL-125**), ¶¶ 615-617; *Tza Yap Shum v. Peru* (**RL-173**), ¶¶ 289-292.

this practice in light of the "*significant amount of damages*" owed by Russia.[982] In *RosInvest v. Russia*, the tribunal recognized that "*recent investment treaty arbitration have awarded compound interest*" but also noted that "*this practice is by no means unanimous*" and held that "*in light of the speculative nature of the investment*" it would be unjust to award compound interest.[983] The tribunal in *Desert Line v. Yemen* did not give any reasons for its decision to award simple interest rather than compound interest as requested by the claimants in that case.[984]

893.  In *CME v. Czech Republic*, the tribunal again recognized that "*in recent years international arbitral tribunals, particularly those acting under bilateral investment treaties, have increasingly have* [sic] *awarded compound interest essentially in recognition of the prevalent contemporary commercial reality that companies that borrow pay compound interest*." The tribunal found, however, that the claimant had not established that it actually had paid compound interest on loans it had borrowed from banks and therefore did not find "*particular circumstances*" that would justify to award compound interest.[985] The Tribunal notes that, while the *CME* tribunal apparently considered it necessary to find "*particular circumstances*" that justified compound interest, this decision again dates from 2003 and might therefore not be representative of recent developments in both market lending and international investment arbitration.

894.  Finally, the tribunal in *SPP v. Egypt* again decided that interest was not to be compounded without giving any specific reasons for its decision.[986] As the decision dates from 1992, the Tribunal in any event considers that it does not provide useful guidance as to recent developments in international investment arbitration.

895.  In sum, the majority of investment tribunals have in recent years decided to award compound interest and even most of those tribunals that decided to award simple interest for a particular reason, recognized that compound interest represents what the *CME* tribunal described as the "*prevalent contemporary commercial reality*." The Tribunal would not go as far as saying that it would thus be for Respondent to establish particular circumstances that would justify not awarding compound interest. However, since the Tribunal has decided to award an appropriate market rate, it does not see any reason in the present case not to follow the majority of tribunals, which have decided to award compound interest on the principal amount.

---

[982] *Yukos v. Russia* (**CLA-153**), ¶¶ 1689, 1691.
[983] *RosInvest v. Russia* (**RL-172**), ¶¶ 689-690.
[984] *Desert Line v. Yemen* (**RL-88**), ¶¶ 295-298.
[985] *CME v. Czech Republic* (**CLA-020**), ¶¶ 645-647.
[986] *SPP v. Egypt* (**CLA-080**), ¶ 236.

896. Consequently, the Tribunal finds that both pre-award interest and post-award interest shall be subject to compounding. As to the periodicity, the Tribunal follows Claimant's argument that interest should be compounded annually.

### 4. Taxation Liabilities

897. Finally, Claimant requests in its two post-hearing submissions a declaration that (i) the award of damages and interest be made net of applicable Venezuelan taxes; and (ii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest. In addition, Claimant requests that Respondent be ordered to indemnify Claimant in respect of any double taxation liabilities that would arise in France or elsewhere that would not have arisen but for Venezuela's adverse measures.[987]

898. Respondent did not comment on this request in its Post-Hearing Reply Brief.

899. The Tribunal notes that Claimant has raised its claim regarding taxation liabilities only after the hearing, *i.e.*, in its relief sought as set out in its Post-Hearing Submission and its Second Post-Hearing Submission. In addition, besides failing to provide any justification for its decision to raise this claim only at such a late point in time, Claimant has not made any submissions on the claim outside its relief sought.

900. Nevertheless, the Tribunal considers that it needs to distinguish between the first two claims relating to taxation of the awarded compensation within Venezuela on the one hand and the additional claim relating to potential double taxation liabilities that might arise outside of Venezuela on the other.

901. As to the first two claims, the Tribunal notes that the Parties' experts have both taken an income tax rate of 34% into account as part of their respective valuation of the compensation to which Claimant is entitled.[988] The Tribunal further notes that, while the experts initially disagreed on a specific aspect of Claimant's expert Prof. Spiller's determination of the taxable income, *i.e.*, the aspect of depreciation as modeled by Prof. Spiller in his first report,[989] Prof. Spiller adopted the method of Respondents' experts Dr. Brailovsky and Dr. Flores in his second report.[990] This was acknowledged by Respondents' experts in their second report.[991] It therefore appears to the Tribunal that the Parties' experts are in agreement as to the treatment of income taxes and depreciation in their calculations.

---

[987] Claimant's Post-Hearing Submission, ¶ 195; Claimant's Second Post-Hearing Submission, ¶ 116.
[988] Spiller I, ¶ 138; Brailovsky/Flores I, ¶ 136.
[989] Brailovsky/Flores I, ¶¶ 136-147.
[990] Spiller II, ¶ 101.
[991] Brailovsky/Flores II, ¶ 139.

902. In light of the above, the Tribunal considers it justified to assume that the valuation method agreed on by the Parties adequately accounts for income taxes that would have had to be paid by Norpro Venezuela in the future in the but-for scenario.[992]  Any further taxation by Venezuela of the compensation to be paid to Claimant would therefore amount to a double-taxation of this amount. Consequently, the Tribunal holds that Claimant's request that (i) the award of damages and interest be made net of applicable Venezuelan taxes; and (ii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest, is justified. In fact, it logically results from the valuation method selected by the Parties' experts and in particular their agreement on how to deal with income taxes in their calculations. In the Tribunal's view, no further elaboration on Claimant's part was necessary to grant this declaratory request and, moreover, it is unproblematic that Claimant included this request in its relief sought only as of its Post-Hearing Submission.

903. Consequently, Claimant's request relating to the taxation of the awarded compensation with Venezuela is granted.

904. As to the additional claim for an indemnification in respect of any hypothetical future double taxation liabilities that might arise in any third country, the Tribunal considers that such claim would have required at least some elaboration by Claimant in order to be considered substantiated. Claimant has specified neither the legal basis for eventual taxation, nor the tax rate nor the grounds based on which Respondent should compensate it for incurring such liability. In addition, there is no indication that any such liability towards third-party States was included in the calculations of the Parties' experts and, thus, that a failure to grant Claimant's request in this regard would lead to a double-taxation of the awarded amount. Finally, the relief Claimant is seeking would have required at least a certain degree of probability that a third-party State will indeed impose taxes on the awarded compensation, which has not been alleged by Claimant.

905. In the absence of any submissions on this request outside Claimant's relief sought, the Tribunal considers that such request is speculative and unfounded;[993] the Tribunal therefore sees no basis for ordering an indemnification against foreign taxation liabilities as requested by Claimant. Consequently, Claimant's claim that Respondent be ordered to indemnify Claimant in respect of any double taxation liabilities that would arise in France or elsewhere that would not have arisen but for Venezuela's adverse measures is denied.

## V.    DECISION ON COSTS

---

[992] *See* also *Venezuela Holdings v. Venezuela* (**CLA-154**), ¶ 389.
[993] *See Venezuela Holdings v. Venezuela* (**CLA-154**), ¶ 388.

906. In accordance with Article 61(2) of the ICSID Convention, the Tribunal's decision on costs will form part of its Award.

## G.   THE TRIBUNAL'S DECISION

907. The present decision reflects the Tribunal's findings on liability and the principles of quantum as set out above. Subsequent to the notification of this decision to the Parties, the Tribunal will, by separate order, invite the Parties to attempt to seek agreement on the final amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of Norpro Venezuela – based on the findings contained in the present decision. Failing agreement reached between the Parties within two months from the notification of this decision, the Tribunal will, following consultation with the Parties, fix a calendar for submissions of the Parties on the remaining quantum issues to be decided.

908. Based on the above, the Tribunal renders the following

### DECISION ON LIABILITY AND THE PRINCIPLES OF QUANTUM

1. **Respondent has breached Article 5(1) subparagraphs 2 and 3 of the Treaty by failing to specify the amount of compensation and to pay prompt compensation for the expropriation of Claimant's investment in Venezuela.**

2. **Respondent shall pay to Claimant the amount of compensation to be calculated on the basis of the Tribunal's findings summarized at paragraphs 849 through 851 above, plus pre-award interest as of 15 May 2010 until the date of the Award at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually.**

3. **Respondent shall pay to Claimant post-award interest on the amount of compensation under 2 as of the date of the Award until the date of payment at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually. Post-award interest is to be paid only on the principal amount of compensation, and not on the pre-award interest awarded.**

4. **The award of damages and interest is made net of applicable Venezuelan taxes, and Respondent may not deduct taxes in respect of the payment of the award of damages and interest.**

5. **The decision on costs is reserved for the Award.**

6. **All other claims and requests are dismissed.**

_____
The Honorable Charles N. Brower
Arbitrator
Date: 21 DECEMBER 2016
Subject to the attached Concurring
and Dissenting Opinion

_____
Mr. Gabriel Bottini
Arbitrator
Date: 9 December 2016

_____
Professor Dr. Klaus Sachs
President
Date: 2 December 2016

**CONCURRING AND DISSENTING OPINION OF JUDGE CHARLES N. BROWER**

1.      I agree with the Tribunal's finding (paragraph 908(1)) that Respondent is responsible for a breach of Article 5(1), subparagraphs 2 and 3 of the Agreement between the Government of the French Republic and the Government of the Bolivarian Republic of Venezuela on Reciprocal Encouragement and Protection of Investments (hereinafter "the BIT") in expropriating Claimant's 99.99%-owned Venezuelan subsidiary Norpro Venezuela C.A. (hereinafter "Norpro"), as well as with most of the Tribunal's detailed analysis of the correct elements to guide the discounted cashflow calculation of the compensation to be awarded to Claimant.  I must dissent, however, from two aspects of that analysis that, both as an economic matter as well as a matter of the applicable law, deprive the Claimant of much of that to which it is entitled, whether under the BIT or under international law generally.  *See Case Concerning the Factory at Chorzów (Claim for Indemnity) (Germany v. Poland)*, P.C.I.J. Series A No. 17 (1928).  Specifically, the Tribunal has failed to enforce the BIT and international law generally in that it:

(a)      Has included in the country risk portion of the percentage by which the projected cash flow of Norpro is to be discounted (i.e., 10.26% as per paragraph 753) precisely the risk of uncompensated expropriation, as well as other violations of the BIT (paragraphs 713-714), from which this Tribunal has been constituted to rescue Claimant, and which in the instant Decision on Liability and the Principles of Quantum (hereinafter "the Decision") the Tribunal professes to accomplish, resulting in a country risk factor that is 5.76 points above, hence 228% of, 4.5%, the only country risk factor number either Party has placed before the Tribunal as excluding the risk of BIT violations; and

(b)      Has excluded 25% of Norpro's export sales profits on the ground that the Claimant, Norpro's 99.99% owner, has by tax-related intercompany transfer pricing or other bookkeeping choices charged Norpro approximately that amount of its profits for Claimant's contributions to Norpro's marketing.

2

The vices of these two reductions of Claimant's entitlement under the BIT and general international law should be obvious.

2.      The first problem, under 1(a) just above, arises from the misunderstanding by the Tribunal of Article 5(1), paragraph 2, which specifies that compensation for an expropriation must be "equal to the actual value of the investment[] concerned," and of general international law, which as per *Chorzów* (page 47 of the Judgment), requires "that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed." The Decision has morphed the applicable law into applying a compensation standard of "fair market value," which, as applied by the Decision, unfortunately has led to injustice to the Claimant.

3.      By increasing the country risk factor to include precisely the risk against which the Decision undertakes to insulate the Claimant, whom the Tribunal has found to have been injured by the expropriatory breach of the BIT by the Respondent, the Tribunal does an injustice to the Claimant. It takes away with one hand what it has purported to give the Claimant with the other. To reduce the recovery to the injured Claimant by applying a "fair market value" that incorporates the very risk of which the Claimant purportedly is being relieved by the Tribunal is to deny the Claimant the full compensation to which it is entitled. It is like undertaking to restore to the owner of a severely damaged automobile a perfectly repaired and restored vehicle but then leaving parts of it missing because it just might be damaged again in the future. The obvious logic of this was recognized by a very distinguished tribunal in *Gold Reserve, Inc. v. Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (22 Sept. 2014) ¶ 841, which should have persuaded my colleagues not to follow the misguided precedent of *Tidewater Investment SRL v. Venezuela*, ICSID Case No. ARB/10/5, Award (13 Mar. 2015). Significantly, the necessity of excluding from the country risk factor the very treaty risk of which a claimant is found to have been a victim was underscored already 27 years ago, in 1989, by the Iran-United States Claims Tribunal in *Phillips Petroleum Company Iran* v. *The Islamic Republic of Iran, et al.*, Award No. 425-39-2 (29 June 1989) ¶¶ 111, 152, *reprinted in* 21 Iran-U.S. C.T.R. 79, and ten years later, in 1999 by the UNCITRAL Rules Tribunal in *Himpurna California Energy Ltd. v. PT. (Persero) Perusahaan Listruik Negara*, Final Award (4 May 1999) ¶ 357, *in* YEARBOOK COMMERCIAL ARBITRATION, VOL. XXV (A. Jan van den Berg ed., Kluwer 2000).

3

4.    Apart from the fact that the majority's position deprives the Claimant of the compensation to which it is entitled, it fails to adhere to the Parties' agreement as to what constitutes "fair market value."  In paragraph 628 of the Decision the Tribunal points out that "[t]he Parties agree that the fair market value is equal to the amount that a willing buyer would pay to a willing seller, *provided that the buyer is informed about all relevant circumstances and none of the parties is under any kind of duress to sell or to acquire the asset*."  (Emphasis added.)  If a willing buyer is, for example, a national of France (Party to the BIT here), or of another State that has equivalent treaty protection as did and should the Claimant here, is that not a part of the buyer being "informed about all relevant circumstances"?  Might not such status possibly lead the purchaser to pay more for the expropriated asset than would a potential buyer that lacks such protection?  "Fair market value" cannot as, the Parties to this case have agreed, be determined devoid of "all the relevant circumstances."

5.    As to paragraph 1(b) above, awarding the 99.99%-owner of the expropriated concern, namely the Claimant, which is entitled to 99.99% of the profits of Norpro, only the lesser compensation derived from 99.99% minus 25% of Norpro's export sales profits means that to that extent the Claimant is deprived of the compensation to which it is entitled.  The intercompany bookkeeping practiced by the parent and the subsidiary has no effect whatsoever on the actual profit created for the parent by the subsidiary.  Assuming, as an example, that 25% of Norpro's export sales profits adds up to 10% of Norpro's total profits, then the parent Claimant, which in fact has lost 99.99% of Norpro's profits, receives as compensation, not that 99.99% of which it was deprived, but instead only 89.99%.  How can that be considered to lead to "fair market value" by whatever standard?

For the reasons, and to the extent, stated above I respectfully dissent from the Decision.

4

The Honorable Charles N. Brower
Arbitrator
Date: 21 DECEMBER 2016