# EXHIBIT 3

# ALSTON & BIRD

90 Park Avenue
New York, NY 10016
212-210-9400 | Fax: 212-210-9444

Carlos Ramos-Mrosovsky          Direct Dial:          Email:  carlos.ramos-mrosovsky@alston.com
                                212-210-9585

December 14, 2018

Eulalia Tabares Roldán
Directora General de la Oficina de Relaciones Consulares
Ministerio del Poder Popular para Relaciones Exteriores
Oficina de Relaciones Consulares
(Ministry of People's Power of Foreign Affairs
Office of Consular Affairs)
Avenida Urdaneta
Esquina Carmelitas a Puente Llaguno
Torre Anexo a Torre MRE Piso 1
Caracas, 1010
República Bolivariana de Venezuela

Re:   Service of Process pursuant to Hague Convention on the Service Abroad of
      Judicial and Extrajudicial Documents in Civil or Commercial Matters
      (1965) and 28 U.S.C. § 1608

Dear Director General Roldán:

Enclosed, please find Requests for Service of Process pursuant to the Hague Convention on the
Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (1965)
and 28 U.S.C. § 1608 in connection with an action that has been filed against the Bolivarian
Republic of Venezuela and Petróleos de Venezuela S.A. (PDVSA) by Saint-Gobain Performance
Plastics Europe in the United States District Court for the District of Delaware.  *See Saint-Gobain
Performance Plastics Europe v. Bolivarian Republic of Venezuela, Petroleos de Venezuela, S.A.*,
No. 1:18-cv-01963-UNA (D. Del. filed Dec. 12, 2018).  Duplicate service packets in both the
original English and Spanish translation are enclosed for both the Republic and PDVSA.

I would be grateful for your confirmation of receipt and thank you for your cooperation in this
regard.

Respectfully,

Carlos Ramos-Mrosovsky
*Counsel for Saint-Gobain Performance Plastics Europe*

Encl. (8)

Alston & Bird LLP                                                              www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

# PETICIÓN
# A LOS FINES DE NOTIFICACIÓN O TRASLADO EN EL EXTRANJERO DE UN DOCUMENTO JUDICIAL O EXTRAJUDICIAL

REQUEST FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS
*DEMANDE AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER*
*D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

**Convenio relativo a la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia Civil o Comercial, firmado en La Haya, el 15 de noviembre de 1965.**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965.
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965.*

| Identidad y dirección del requirente | Dirección de la autoridad destinataria |
|---|---|
| Identity and address of the applicant | Address of receiving authority |
| *Identité et adresse du requérant* | *Adresse de l'autorité destinataire* |
| Carlos Ramos-Mrosovsky | Ministerio del Poder Popular para Relaciones Exteriores |
| Alston & Bird LLP | Oficina de Relaciones Consulares |
| 90 Park Avenue | (Ministry of People's Power of Foreign Affairs |
| New York, NY 10016 | Office of Consular Affairs) |
| USA | Avenida Urdaneta |
| Tel: +1-212-210-9585 | Esquina Carmelitas a Puente Llaguno |
| | Torre Anexo a Torre MRE Piso 1 |
| | Caracas, 1010 |
| | República Bolivariana de Venezuela |
| | Tel: +58 (0) 212 806 4449/802-800, Ext. 6701-6704-6709-6713 |

**El requirente infrascrito tiene el honor de remitir – en doble ejemplar – a la autoridad destinataria los documentos enumerados, rogándole, conforme al artículo 5 del Convenio antes citado, haga remitir sin demora un ejemplar al destinatario, a saber:**

The undersigned applicant has the honour to transmit – in duplicate – the documents listed below and, in conformity with Article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.:
*Le requérant soussigné a l'honneur de faire parvenir – en double exemplaire – à l'autorité destinataire les documents ci-dessous énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, à savoir :*

---

**(identidad y dirección)**
(identity and address) / *(identité et adresse)*

Bolivarian Republic of Venezuela
Ministerio del Poder Popular para Relaciones Exteriores
Oficina de Relaciones Consulares
(Ministry of People's Power of Foreign Affairs
Office of Consular Affairs)
Avenida Urdaneta
Esquina Carmelitas a Puente Llaguno
Torre Anexo a Torre MRE Piso 1
Caracas, 1010
República Bolivariana de Venezuela

---

| | | |
|---|---|---|
| ☒ | a) | **Según las formas legales (artículo 5, párrafo primero, letra a)\*** in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention* *selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ☐ | b) | **Según la forma particular siguiente (artículo 5, párrafo primero, letra b)\*** in accordance with the following particular method (sub-paragraph b) of the first paragraph of Article 5)*: *selon la forme particulière suivante (article 5, alinéa premier, lettre b)\* :* |
| ☐ | c) | **En su caso, por simple entrega al interesado (artículo 5, párrafo segundo)\*** by delivery to the addressee, if he accepts it voluntarily (second paragraph of Article 5) * *le cas échéant, par remise simple (article 5, alinéa 2) \** |

**Se ruega a esa autoridad envíe o haga enviar al requirente un ejemplar del documento – y de sus anexos\* – con el certificado adjunto.**

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes* - with the attached certificate
*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes*- avec l'attestation ci-jointe.*

### Enumeración de los documentos
List of documents / *Énumération des pièces*

- Summons in a Civil Action
- Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgment
- Declaration of Alexander A. Yanos
- Exhibits Nos. 1 to 5
- Rule 7.1 Corporate Disclosure Statement
- Notice of Right to Consent to Trial Before a Magistrate Judge

\* Si procede
*if appropriate / s'il y a lieu*

| **Hecho en** <u>New York</u><br>Done at / *Fait à*<br>**el** <u>14 December 2018</u><br>the / *le* | **Firma y / o sello**<br>Signature and/or stamp / *Signature et / ou cachet*<br><br>*Carlos Ramos-Mrosovsky* |
| --- | --- |

# CERTIFICADO
## CERTIFICATE
### *ATTESTATION*

**La autoridad infrascrita tiene el honor de certificar, conforme al artículo 6 de dicho Convenio,**
The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

☐ **1. que la petición ha sido ejecutada\***
  that the document has been served *
  *que la demande a été exécutée\**

| — **el (fecha):**<br>the (date) / *le (date)* : | —— |
|---|---|
| — **en (localidad, calle, número):**<br>at (place, street, number) / *à (localité, rue, numéro)* : | —— |

| — **en una de las formas siguientes previstas en el artículo 5:**<br>in one of the following methods authorised by Article 5:<br>*dans une des formes suivantes prévues à l'article 5 :* | |
|---|---|
| ☐ | *a)* | **según las formas legales (artículo 5, párrafo primero, letra *a*)\***<br>in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention*<br>*selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ☐ | *b)* | **según la forma particular siguiente\*:**<br>in accordance with the following particular method*:<br>*selon la forme particulière suivante\* :*<br>———— |
| ☐ | *c)* | **por simple entrega\***<br>by delivery to the addressee, if he accepts it voluntarily*<br>*par remise simple\** |

**Los documentos mencionados en la petición han sido entregados a:**
The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à :*

| **Identidad y calidad de la persona:**<br>Identity and description of person :<br>*Identité et qualité de la personne :* | —— |
|---|---|
| **Vínculos de parentesco, subordinación u otros, con el destinatario del documento:**<br>Relationship to the addressee (family, business or other):<br>*Liens de parenté, de subordination ou autres, avec le destinataire de l'acte :* | —— |

☐ **2. que la petición no ha sido ejecutada, en razón a los hechos siguientes\*:**
  that the document has not been served, by reason of the following facts*:
  *que la demande n'a pas été exécutée, en raison des faits suivants\* :*

| —— |
|---|

☐ **Conforme al artículo 12, párrafo 2, de dicho Convenio, se ruega al requirente el pago o reembolso de los gastos cuyos detalles figuran en la declaración adjunta\*.**
  in conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.
  *Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.*

*Anexos*
Annexes / *Annexes*

| **Documentos reenviados:**<br>Documents returned:<br>*Pièces renvoyées :* | Summons in a Civil Action; Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgment; Declaration of Alexander A. Yanos; Exhibits Nos. 1 to 5; Rule 7.1 Corporate Disclosure Statement; and Notice of Right to Consent to Trial Before a Magistrate Judge |
|---|---|
| **En su caso, los documentos justificativos de la ejecución:**<br>In appropriate cases, documents establishing the service:<br>*Le cas échéant, les documents justificatifs de l'exécution :* | —— |

\* SI procede
*if appropriate / s'il y a lieu*

| **Hecho en** ——<br>Done at / *Fait à*<br><br>**el** ——<br>the / *le* | **Firma y / o sello**<br>Signature and/or stamp / *Signature et / ou cachet*<br>—— |
|---|---|

# AVISO
## WARNING
### *AVERTISSEMENT*

**Identidad y dirección del destinatario**
Identity and address of the addressee
*Identité et adresse du destinataire*

Bolivarian Republic of Venezuela

Ministerio del Poder Popular para Relaciones Exteriores

Oficina de Relaciones Consulares

(Ministry of People's Power of Foreign Affairs

Office of Consular Affairs)

Avenida Urdaneta

Esquina Carmelitas a Puente Llaguno

Torre Anexo a Torre MRE Piso 1

Caracas, 1010

República Bolivariana de Venezuela

## IMPORTANTE

**EL DOCUMENTO ADJUNTO ES DE NATURALEZA JURÍDICA Y PUEDE AFECTAR SUS DERECHOS Y OBLIGACIONES. LOS "ELEMENTOS ESENCIALES DEL DOCUMENTO" LE PROPORCIONAN INFORMACIÓN SOBRE SU NATURALEZA Y OBJETO. NO OBSTANTE, ES INDISPENSABLE LEER ATENTAMENTE EL TEXTO DEL DOCUMENTO. PUEDE REQUERIR ASISTENCIA JURÍDICA.**

**SI SUS RECURSOS SON INSUFICIENTES, INFÓRMESE SOBRE LA POSIBILIDAD DE OBTENER ASISTENCIA JUDICIAL O ASESORAMIENTO JURÍDICO EN SU PAÍS O EN EL PAÍS DE ORIGEN DEL DOCUMENTO.**

**LAS SOLICITUDES DE INFORMACIÓN SOBRE LA POSIBILIDAD DE OBTENER ASISTENCIA JUDICIAL O ASESORAMIENTO JURÍDICO EN EL PAÍS DE ORIGEN DEL DOCUMENTO PUEDEN DIRIGIRSE A:**

### IMPORTANT

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

### *TRÈS IMPORTANT*

*LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.*

*SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.*

*LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :*

DELAWARE STATE BAR ASSOCIATION
405 North King Street
Suite 100
Wilmington, DE 19801
Phone: (302) 658-5279

**Se recomienda que las menciones impresas en esta nota se redacten en francés y en inglés y, en su caso, además, en otra lengua o en otra de las lenguas oficiales del Estado de origen del documento. Los espacios en blanco podrían completarse en la lengua del Estado al que deba remitirse el documento, en francés o en inglés.**

It is recommended that the standard terms in the notice be written in English and French and where appropriate also in the official language, or in one of the official languages of the State in which the document originated. The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.

*Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les blancs pourraient être remplis soit dans la langue de l'État où le document doit être adressé, soit en langue française, soit en langue anglaise.*

# ELEMENTOS ESENCIALES DEL DOCUMENTO
### SUMMARY OF THE DOCUMENT TO BE SERVED
#### *ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Convenio relativo a la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en materia Civil o Comercial,**

**firmado en La Haya, el 15 de noviembre de 1965 *(artículo 5, párrafo cuarto).***

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).

Convention relative à la signification à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).

| | |
|---|---|
| **Nombre y dirección de la autoridad requirente:**<br>Name and address of the requesting authority:<br>*Nom et adresse de l'autorité requérante :* | Carlos Ramos-Mrosovsky<br>Alston & Bird LLP<br>90 Park Avenue<br>New York, NY 10016<br>USA<br>Tel: +1-212-210-9585 |
| **Identidad de las partes*:**<br>Particulars of the parties*:<br>*Identité des parties* :* | Saint-Gobain Performance Plastics Europe, Plaintiff<br>v.<br>Bolivarian Republic of Venezuela; Petroleos De Venezuela, S.A., Defendants<br><br>Case filed in the United States District Court of Delaware (Case Number 1:18-cv-01963-UNA) |

\* Si procede, identidad y dirección de la persona interesada en la remisión del documento.
if appropriate, identity and address of the person interested in the transmission of the document
*s'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*

☒ **DOCUMENTO JUDICIAL \*\***
JUDICIAL DOCUMENT\*\*
*ACTE JUDICIAIRE\*\**

| | |
|---|---|
| **Naturaleza y objeto del documento:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | A civil lawsuit seeking to recognize and enforce an ICSID arbitration award against the Bolivarian Republic of Venezuela and Petroleos de Venezuela, S.A., as a foreign judgment has been instituted in the U.S. District Court for the District of Delaware.  Response due within 60 days from receipt of Summons |
| **Naturaleza y objeto del procedimiento y, en su caso, cuantía del litigio:**<br>Nature and purpose of the proceedings and, when appropriate, the amount in dispute:<br>*Nature et objet de l'instance, le cas échéant, le montant du litige :* | Saint-Gobain is seeking to recognize and enter judgment on an ICSID award against Defendants, in the amount of US$ 42,342,379.31 (calculated as of 7 December 2018) |
| **Fecha y lugar de comparecencia\*\*:**<br>Date and Place for entering appearance\*\*:<br>*Date et lieu de la comparution\*\* :* | 60 days from receipt of Summons before the U.S. District Court for the District of Delaware |
| **Autoridad judicial que ha dictado la decisión\*\*:**<br>Court which has given judgment\*\*:<br>*Juridiction qui a rendu la décision\*\* :* | N/A |
| **Fecha de la decisión\*\*:**<br>Date of judgment\*\*:<br>*Date de la décision\*\* :* | N/A |
| **Indicación de los plazos que figuran en el documento\*\*:**<br>Time limits stated in the document\*\*:<br>*Indication des délais figurant dans l'acte\*\* :* | 60 days from receipt of the accompanying Summons to make an appearance before the U.S. District Court for the District of Delaware |

\*\* Si procede
if appropriate / *s'il y a lieu*

☐ **DOCUMENTO EXTRAJUDICIAL \*\***
EXTRAJUDICIAL DOCUMENT\*\*
*ACTE EXTRAJUDICIAIRE\*\**

| **Naturaleza y objeto del documento:**<br>Nature and purpose of the document:<br>*Nature et objet de l'acte :* | N/A |
|---|---|
| **Indicación de los plazos que figuran en el documento**:**<br>Time-limits stated in the document**:<br>*Indication des délais figurant dans l'acte** :* | N/A |

** Si procede
    *If appropriate / s'il y a lieu*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

District of Delaware

| | |
|---|---|
| SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE <br><br>  ――――――――――――――――――― <br> *Plaintiff(s)* <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA; PETRÓLEOS DE VENEZUELA, S.A., <br> ――――――――――――――――――― <br> *Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 18-cv-1963-UNA |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Bolivarian Republic of Venezuela
> Ministerio del Poder Popular para Relaciones Exteriores
> Oficina de Relaciones Consulares
> Avenida Urdaneta, Esquina de "Carmelitas" a "Puente Llaguno,"
> Piso 1 del Edificio Anexo a la Torre "MRE,"
> Caracas, 1010, República Bolivariana de Venezuela

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3), or a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, within the meaning of 28 U.S.C. § 1608(d) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| | |
|---|---|
| Laura Davis Jones (Bar No. 2436) <br> Peter J. Keane (Bar No. 5503) <br> Pachulski Stang Ziehl & Jones LLP <br> 919 N. Market Street, 17th Floor <br> P.O. Box 8705 <br> Wilmington, DE 19899-8705 (Courier 19801) | Alex Yanos, *pro hac vice pending* <br> Carlos Ramos-Mrosovsky, *pro hac vice pending* <br> Rajat Rana, *pro hac vice pending* <br> ALSTON & BIRD LLP <br> 90 Park Avenue <br> New York, NY 10016 |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  DEC 1 3 2018

*Signature of Clerk or Deputy Clerk*

DOCS_DE:222275.2 76899/001

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

➤  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

➤  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

➤  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

➤  I returned the summons unexecuted because _____ ; or

➤  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09)  Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT

for the
District of Delaware

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.*  A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment.  The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court.  A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences.  The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.*  The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

### Reference Order

**IT IS ORDERED:**  This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____        _____

*District Judge's signature*

_____

*Printed name and title*

Note:    Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge.  Do not return this form to a judge.

AO 85A  (Rev. 01/09) Notice, Consent, and Reference of a Dispositive Motion to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
District of Delaware

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A DISPOSITIVE MOTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings and enter a final order dispositive of each motion. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have motions referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's consideration of a dispositive motion.* The following parties consent to have a United States magistrate judge conduct any and all proceedings and enter a final order as to each motion identified below *(identify each motion by document number and title).*

**Motions:** _____

_____

_____

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## Reference Order

**IT IS ORDERED:** The motions are referred to a United States magistrate judge to conduct all proceedings and enter a final order on the motions identified above in  accordance with 28 U.S.C. § 636(c).

Date: _____          _____
                                                                 *District Judge's signature*

                                                     _____
                                                                 *Printed name and title*

Note:   Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge.  Do not return this form to a judge.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE, | |
| Plaintiff, | |
| v. | Civil Action No.: _____ |
| BOLIVARIAN REPUBLIC OF VENEZUELA; PETRÓLEOS DE VENEZUELA, S.A., | |
| Defendants. | |

## COMPLAINT TO REGISTER AND ENFORCE ICSID ARBITRATION AWARD AS A FOREIGN JUDGMENT

Saint-Gobain Performance Plastics Europe ("Plaintiff" or "Saint-Gobain"), by and through its undersigned counsel, for its complaint (the "Complaint") hereby petitions this Court for an order pursuant to 22 U.S.C. § 1650a and 28 U.S.C. § 1738 registering as a foreign judgment an arbitral award ("the Award"), dated November 3, 2017 (Yanos Decl., Ex. 1),[1] and issued under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270 (the "ICSID Convention" or the "Convention") in favor of Saint-Gobain and against Defendant the Bolivarian Republic of Venezuela ("Venezuela"), in a dispute arising from Venezuela's expropriation of Saint-Gobain's investment. Pursuant to 22 U.C.S. § 1650a, pecuniary obligations created by awards issued pursuant to the ICSID Convention "shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several

---

[1] As used in this Complaint, "Yanos Decl." refers to the December _, 2018, Declaration of Alexander A. Yanos in Support of Saint-Gobain's Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgment.

States," while "[t]he Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention."

Therefore, 28 U.S.C. § 1738 requires that the Award be registered as a foreign judgment and granted full faith and credit in this district.  Because this action involves a foreign sovereign, the registration of the Award as a foreign judgment must proceed following service pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*

In support of its Complaint, Saint-Gobain further alleges as follows:

**Parties, Jurisdiction, and Venue**

1.      Plaintiff Saint-Gobain is a corporation organized and existing under the laws of France.  It is an indirect and wholly-owned subsidiary of Compagnie de Saint-Gobain and a member of the Compagnie de Saint-Gobain group of companies.

2.      Defendant Venezuela is a foreign state within the meaning of the FSIA.

3.      Defendant Petróleos de Venezuela S.A. ("PDVSA") is, as this Court has already found, an alter ego of Venezuela.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 1:17-mc-00151, 2018 U.S. Dist. LEXIS 138978, *71 (D. Del. Aug. 9, 2018) (finding that "PDVSA may be deemed the alter ego of Venezuela . . . .").  PDVSA is an instrumentality of Venezuela within the meaning of 28 U.S.C. § 1603(b) and does business in Delaware through its wholly owned subsidiary and a Delaware corporation, PDV Holding, Inc. ("PDVH").  *Id.*

4.      The Court has jurisdiction over Defendants pursuant to 28 U.S.C. §§ 1330(a) and 1605(a) and 22 U.S.C. § 1650a.  In particular, Venezuela waived its immunity from the jurisdiction of this Court under 28 U.S.C. § 1605(a)(1) by becoming a party to the ICSID Convention and to the Treaty.  Venezuela is likewise subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1605(a)(6)(B) because this action seeks confirmation of an award governed by a treaty in force in the United States calling for the recognition and enforcement of

2

arbitral awards, namely the ICSID Convention.  In addition, the Court has subject matter jurisdiction pursuant to 22 U.S.C. § 1650a because this Complaint seeks to enforce a pecuniary obligation created by an arbitral award rendered under the ICSID Convention.

5.      Venue in this District is proper under 28 U.S.C. § 1391(f)(3) because Defendant PDVSA is an instrumentality of Venezuela that does business in Delaware through PDVH. Venue is also proper under 28 U.S.C. § 1738 because the final judgment of a court of general jurisdiction of one of the several States is entitled to "full faith and credit" in "every court within the United States," while 22 U.C.S. § 1650a requires that an ICSID award must be "given the same full faith and credit" as "a final judgment of a court of general jurisdiction of one of the several States."

6.      The Court may exercise personal jurisdiction over Venezuela and its alter ego PDVSA pursuant to 28 U.S.C. § 1330(b).

## The ICSID Convention and the Treaty

7.      The ICSID Convention establishes a framework for the arbitration of investment disputes between "Contracting States" and nationals of other "Contracting States."  *See* Yanos Decl., Ex. 2 (the ICSID Convention).  The Convention also establishes the International Centre for Settlement of Investment Disputes ("ICSID"), a part of the World Bank, to administer arbitral proceedings governed by the ICSID Convention, including the arbitration yielding the Award.

8.      Article 25(1) of the ICSID Convention gives tribunals acting within the ICSID framework jurisdiction over "any legal dispute arising directly out of an investment, between a Contracting State . . . and a national of another Contracting State, which the parties to the dispute agree in writing to submit to the Centre."

9.      The ICSID Convention also obliges Contracting States to enforce ICSID awards. Article 54(1) of the Convention provides that:

> Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that state.  A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

10.  The United States has been a Contracting State to the ICSID Convention since 1966.  The United States' obligations under Article 54(1) of the Convention are implemented in U.S. law at 28 U.S.C. § 1650a(a), which in relevant part states:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the Convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.

11.  Awards rendered under the ICSID Convention are not subject to the same review under the Federal Arbitration Act as other international arbitration awards and do not require confirmation in the manner prescribed by the Federal Arbitration Act.  This is established clearly at 28 U.S.C. § 1650a, which states "[t]he Federal Arbitration Act (9 U.S.C. 1 *et seq.*) shall not apply to enforcement of awards rendered pursuant to the Convention."  *See also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 102 (2d Cir. 2017) ("Member states' courts are . . . not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award.").

12.  Instead, and by design, review of ICSID awards is encapsulated within the procedural framework of the ICSID Convention itself.  ICSID Awards may be annulled or set aside only by specially-constituted *ad hoc* committees appointed by the Chairman of the

Administrative Council of ICSID (*ex officio* the President of the World Bank) on specific

grounds enumerated in the ICSID Convention.  *See* Yanos Decl., Ex. 2 Arts. 52-53.

13.     The ICSID Convention entered into force for Venezuela on June 1, 1995.

Venezuela formally withdrew from the ICSID Convention on January 25, 2012, with effect from

July 25, 2012.  Venezuela's withdrawal from the ICSID Convention has no bearing on this case.

Under Article 72 of the ICSID Convention, a State's notice of withdrawal from the Convention

"shall not affect the rights or obligations under th[e] Convention of that State . . . arising out of

consent to the jurisdiction of [ICSID] given . . . before such notice was received."  *Id.*, Ex. 2.

14.     Here, in Article 8 of the France-Venezuela Bilateral Investment Treaty dated

April 30, 2004, France and Venezuela consented to submit disputes with one another's investors

arising under the Treaty to ICSID.  Saint-Gobain accepted Venezuela's offer to arbitrate Treaty

disputes by notices of dispute sent to Venezuela July 4, 2011 and January 17, 2012.  *See id.*, Ex.

1 ¶¶ 249, 253.  Therefore, both parties consented to arbitrate this dispute before Venezuela's

denunciation of the ICSID Convention.

15.     Indeed, Venezuela has never disputed the Tribunal's jurisdiction over Saint-

Gobain's expropriation claims under the Treaty or the ICSID Convention.

### The Arbitration and the Award

16.     On March 29, 2011, Venezuelan President Hugo Chávez decreed the

expropriation of Saint-Gobain's 99.99% interest in NorPro Venezuela C.A., a company which

manufactured ceramic proppants used during fracking to keep induced hydraulic fractures

"propped" open.  *See* Yanos Decl., Ex. 1 ¶¶ 245-47.

17.     Saint-Gobain filed a request for ICSID arbitration against Venezuela on May 25,

2012.  In its Request, Saint-Gobain sought compensation for Venezuela's unlawful expropriation

of its investment in Venezuela.  *Id.* ¶¶ 5, 266.

18.     Saint-Gobain's request for arbitration was registered as ICSID Case Number ARB/12/13 on June 15, 2012.

19.     Consistent with the ICSID Convention and Arbitration Rules, a three-member Tribunal was constituted for the case.  Three eminent international lawyers constituted the Tribunal: Judge Charles N. Brower, a U.S. citizen and former judge of the Iran-U.S. Claims Tribunal, appointed by Saint-Gobain; Mr. Gabriel Bottini, an Argentine citizen and former Director of International Affairs and Disputes of the Treasury-Attorney General's Office of Argentina, appointed by Venezuela; and Prof. Dr. Klaus Sachs, a German citizen and noted international arbitrator, jointly selected by the parties as President of the Tribunal.

20.     Following the exchange of voluminous written submissions, the Tribunal held a four-day oral hearing at the World Bank from February 2 to 5, 2015.

21.     On December 30, 2016, the Tribunal rendered a Decision on Liability and the Principles of Quantum ("Decision on Liability").  *See* Yanos Decl., Ex. 3 (Decision on Liability). In the Decision on Liability, the Tribunal found that Venezuela had breached Article 5 of the Treaty by expropriating Saint-Gobain's investment without paying compensation.  *See id.* ¶ 908.

22.     The Decision on Liability also discussed, at length, the principles upon which the Tribunal would assess the quantum of compensation to be paid to Saint-Gobain.  *See id.* ¶¶ 566-905.  The Tribunal then gave the parties two months to attempt to reach agreement on the amount of compensation to be paid to Saint-Gobain, failing which it would hear further submissions on outstanding quantum issues.  *See id.* ¶ 907.

23.     Venezuela and Saint-Gobain were not able to reach agreement on the quantum of compensation to be paid.  The parties accordingly submitted further extensive pleadings and

expert testimony on the appropriate quantum of compensation for Venezuela's unlawful
expropriation of Saint-Gobain's investment.

24.     Subsequently, on November 3, 2017, the Tribunal issued its Award pursuant to
Chapter IV (Articles 48-49) of the ICSID Convention.  The Tribunal ordered Venezuela to pay
Saint-Gobain compensation as follows:

(i)     US$ 29.6 million as the principal amount of compensation for the expropriation
of Saint-Gobain's investment in Venezuela;

(ii)    US$ 4.8 million as pre-award interest from May 15, 2010 through March 31,
2017, with further pre-award interest through November 3, 2017 to be calculated
at a rate equal to 2% over the average 6-month U.S. Treasury bill rate,
compounded annually;

(iii)   Post-award interest on the principal amount of compensation at a rate equal to 2%
over the average 6-month U.S. Treasury bill rate, compounded annually;

(iv)    The costs of the arbitration, in the amount of US$ 1,303.189.99;

(v)     Two-thirds of Saint-Gobain's legal fees and expenses in the amount of US$
4,634,532.05; and

(vi)    Post-award interest on costs at a rate equal to 2% over the average 6-month U.S.
Treasury bill rate, compounded annually.

*See* Yanos Decl., Ex. 1 ¶ 72.

25.     A detailed calculation of amounts payable under the Award (US$ 42,342,379.31
as of December 7, 2018) is attached.  *See* Yanos Decl., Ex. 4.

26.     The Award is binding on Venezuela and its alter ego PDVSA.  Pursuant to Article
53 of the ICSID Convention, Venezuela and its alter ego PDVSA are obligated to "abide by and

comply with the terms of the award" unless and "except to the extent that enforcement shall have been stayed" by an *ad hoc* committee constituted under Article 52 of the ICSID Convention.

27. The Award has not been stayed. To the contrary, an ICSID *ad hoc* committee constituted on June 7, 2018 at Venezuela's request has expressly *refused* to stay the Award.

28. In a Procedural Order issued on October 24, 2018 (the "Procedural Order"), the *ad hoc* committee found "no circumstances that require the stay of enforcement of the Award." *See* Yanos Decl., Ex. 5 (Procedural Order, dated Oct. 24, 2018) ¶ 25. The *ad hoc* committee also announced the suspension of its proceedings due to Venezuela's repeated failure to pay mandatory advances on costs. *See id.* ¶¶ 27-30.

29. Neither Venezuela nor its alter ego PDVSA have paid any of the amounts due under the Award.

## COUNT ONE

### For Registration of the Award as a Foreign Judgment
### Pursuant to 22 U.S.C. § 1650a

30. Plaintiff Saint-Gobain restates and reincorporates all of the foregoing paragraphs of this Complaint as though fully set forth herein.

31. The Award was rendered by an arbitral tribunal pursuant to the ICSID Convention.

32. Article 54(1) of the ICSID Convention requires Contracting States to "recognize an award rendered pursuant to [the ICSID] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."

33.    Article 54(1) is incorporated into U.S. law by 22 U.S.C. § 1650a, which requires that the Award "shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."

34.    Finally, 28 U.S.C. § 1738 requires this Court to accord full faith and credit to the judgments of the several states.

35.    For all these reasons, the Court should register the Award as a Foreign Judgment.

## COUNT TWO

### For Enforcement of the Award Pursuant to 22 U.S.C. § 1650a

36.    Plaintiff Saint-Gobain restates and reincorporates all of the foregoing paragraphs of this Complaint as though fully set forth herein.

37.    22 U.S.C. § 1650a, requires that "[t]he pecuniary obligations imposed by" the Award "shall be enforced as if the award were a final judgment of a court of general jurisdiction of one of the several States."

38.    For all these reasons, the Court should enforce the pecuniary obligations of the Award.

## PRAYER FOR RELIEF

WHEREFORE, Saint-Gobain respectfully requests that the Award be registered in this Court and that such Judgment be made a final personal judgment of this Court in favor of Saint-Gobain and against Venezuela and its alter ego, PDVSA, and directing as follows:

A. Ordering Venezuela and PDVSA to pay to Saint-Gobain an amount equal to the pecuniary obligations of the Award (calculated at US$ 42,342,379.31 as of December 7, 2018), and comprising:

   a. US$ 29.6 million as the principal amount of compensation for the expropriation of Saint-Gobain's investment in Venezuela; plus US$ 4.8

million as pre-award interest from May 15, 2010 through March 31, 2017, with further pre-award interest through November 3, 2017 in the amount of US$ 542,189.80, and post-award interest rate of 2% over the average 6-month U.S. Treasury bill rate, compounded annually (equal to US$ 1,218,115.14 as of December 7, 2018);

b.  US$ 1,303,189.99 as the costs of the arbitration; and US$ 4,634,532.05 representing two-thirds of Saint-Gobain's legal fees and expenses, both subject to post-award interest through the date of satisfaction of the Award at a rate of 2% over the average 6-month U.S. Treasury bill rate, compounded annually (equal to US$ 244,352.32 as of December 7, 2018); and

B.  Granting such other and further relief against Venezuela and PDVSA as the Court may deem just and proper.

Dated: December 12, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (Bar No. 2436)
Peter J. Keane (Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
      pkeane@pszjlaw.com

– and –

Alex Yanos, *pro hac vice pending*
Carlos Ramos-Mrosovsky, *pro hac vice pending*
Rajat Rana, *pro hac vice pending*
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel:    202-210-9400
Fax:    212-210-9444
Email:  alex.yanos@alston.com
       carlos.ramos-mrosovsky@alston.com
       rajat.rana@alston.com

*Counsel for Plaintiff Saint-Gobain Performance Plastics Europe*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

          Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF
VENEZUELA; PETRÓLEOS DE
VENEZUELA, S.A.,

          Defendants.

Civil Action No.: 18-cv-1963-UNA

---

### DECLARATION OF ALEXANDER A. YANOS
### IN SUPPORT OF COMPLAINT TO REGISTER AND ENFORCE ICSID
### ARBITRATION AWARD AS A FOREIGN JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, Alexander A. Yanos, hereby declare as follows:

1.      I am an attorney at Alston & Bird, LLP. I represent Saint-Gobain Performance Plastics Europe ("Saint-Gobain or "Plaintiff") in connection with the above-captioned matter.

2.      I submit this declaration in support of the Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgment filed by Saint-Gobain on December 12, 2018.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the certified Award issued in favor of Saint-Gobain by the arbitral tribunal on November 3, 2017 in an arbitration between Saint-Gobain and the Republic of Venezuela ("Venezuela" or "Defendant") under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270 (the "ICSID Convention" or the "Convention").

4.      Attached hereto as Exhibit 2 is a true and correct copy of the ICSID Convention.

5.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of the "Decision on Liability and the Principles of Quantum" issued by the arbitral tribunal on December 30, 2016 in an arbitration between Saint-Gobain and Venezuela.

6.      Attached hereto as <u>Exhibit 4</u> is a worksheet detailing the calculation of compensation and costs awarded by the arbitral tribunal to Saint-Gobain as of December 7, 2018.

7.      Attached hereto as <u>Exhibit 5</u> is a true and correct copy of "Procedural Order No.2" issued by the arbitral tribunal on October 24, 2018.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
      December 13, 2018

Alex Yanos
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel:    202-210-9400
Fax:    212-210-9444
alex.yanos@alston.com

Case 1:20-cv-00129-RG   Document 9-3   Filed 04/24/19   Page 26 of 703

# Exhibit 1

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW   |   WASHINGTON, DC 20433   |   USA
TELEPHONE (202) 458 1534   |   FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# **C E R T I F I C A T E**

**SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE**

**V.**

**BOLIVARIAN REPUBLIC OF VENEZUELA**

**(ICSID CASE NO. ARB/12/13)**

I hereby certify that the attached document is a true copy of the English version of the Tribunal's Award dated November 3, 2017, which was rendered in the English and Spanish languages.

Martina Polasek
Acting Secretary-General

Washington, D.C., November 3, 2017

## International Centre for Settlement of Investment Disputes

### SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

CLAIMANT

v.

### BOLIVARIAN REPUBLIC OF VENEZUELA

RESPONDENT

## Award

Rendered by a tribunal composed of:

Professor Dr. Klaus M. Sachs, President
The Honorable Charles N. Brower, Arbitrator
Mr. Gabriel Bottini, Arbitrator

Secretary of the Tribunal
Ms. Natalí Sequeira (until 7 August 2017)
Mr. Francisco Grob

**Date of dispatch to the Parties: 3 November 2017**

# TABLE OF CONTENTS

**A.    THE PARTIES** ............................................................................................ **5**

    I.    Claimant ............................................................................ 5

    II.    Respondent ....................................................................... 5

**B.    THE ARBITRAL TRIBUNAL** ................................................................ **5**

    I.    The Honorable Charles N. Brower ...................................... 6

    II.    Mr. Gabriel Bottini .............................................................. 6

    III.    Prof. Dr. Klaus Sachs ......................................................... 6

**C.    SUMMARY OF THE PROCEDURAL HISTORY** .................................. **7**

**D.    FACTUAL BACKGROUND** ................................................................ **11**

**E.    PARTIES'' POSITIONS** ...................................................................... **11**

    I.    Agreed Amount of Quantum and Joint Proposal ................ 11

    II.    Summaries of the Parties' Positions on Costs .................... 12

**F.    THE TRIBUNAL'S REASONING** ...................................................... **18**

    I.    The Parties' Agreement on Quantum ................................. 18

    II.    Decision on Costs .............................................................. 19

**G.    THE TRIBUNAL'S DECISION** ........................................................... **23**

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| CLA- | Claimant's Legal Authorities |
| Claimant's Cost Submission | Claimant's Cost Submission of 30 June 2015 |
| Claimant's First Updated Cost Submission | Claimant's submission of its Updated Cost Submission of 23 November 2015 |
| Claimant's Second Updated Cost Submission | Claimant's submission of its Updated Cost Submission of 28 July 2017 |
| Claimant's Second Post-Hearing Submission | Claimant's Simultaneous Second-Round Post-Hearing Submission of 22 May 2015 |
| Counter Memorial | Respondent's Counter Memorial dated 21 March 2014 |
| CVG Bauxilum | CVG Bauxilum, C.A. |
| FET | Fair and Equitable Treatment |
| France-Venezuela-BIT or "the Treaty" | Agreement on Encouragement and Reciprocal Protection on Investments Between the Government of the French Republic and the Goverment of the Bolivarian Republic of Venezuela |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | The ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID Convention | The Convention on the Settlement of Investment Disputes Between States and Nationals of Other States |
| ICSID Institution Rules | Rules of Procedure for the Institution of Conciliation and Arbitration Procedures |
| Rejoinder | Respondent's Rejoinder on the Merits dated 18 September 2014 |
| Request | Request for Arbitration against Respondent dated 25 May 2012 |
| Respondent's Additional Cost Submission | Respondent's submission of its Additional Cost Submission of 28 July 2017 |
| Secretariat | ICSID Secretariat |

| Secretary-General | ICSID Secretary-General |
|---|---|
| The "Bauxite Claims" | Claimant's claims that, by virtue of the increase of the bauxite price that had initially been agreed upon in the Bauxite Contract between Claimant and CVG Bauxilum, Respondent failed to accord to Claimant fair and equitable treatment pursuant to Article 3(1) of the Treaty and to protect and secure Claimant's investment pursuant to Article 3(2) of the Treaty. |
| The "Bauxite Contract" | The contract signed by CVG Bauxilum and Saint-Gobain Proppants Venezuela C.A. on 25 October 2005 |
| The "Decision" | The Decision on Liability and the Principles of Quantum rendered by the Tribunal in this arbitration proceeding on 30 December 2016 |

## A.   THE PARTIES

### I.   CLAIMANT

1.   Saint-Gobain Performance Plastics Europe, hereinafter referred to as "**Claimant**" or "**Saint-Gobain**", represented in this arbitration by its duly authorized attorneys Mr. Alexander A. Yanos of Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, NY 10016-1387 , United States of America, Ms. Elizabeth C. Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, United States of America and Ms. Noiana Marigo, of Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, 31st Floor, New York, NY 10022, United States of America.

### II.   RESPONDENT

2.   The Bolivarian Republic of Venezuela, hereinafter referred to as "**Respondent**" or "**Venezuela**", represented in this arbitration by Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas, Bolivarian Republic of Venezuela. Respondent is also represented by its duly authorized attorneys Mr. Benard V. Preziosi, Jr. of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, United States of America, and Mr. Eloy Barbará de Parres, Ms. Gabriela Álvarez Ávila, Ms. Kate Brown de Vejar and Ms. Dori Yoldi of Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Mexico City, United Mexican States.

3.   Claimant and Respondent are hereinafter each referred to as a "**Party**" and jointly as the "**Parties**".

## B.   THE ARBITRAL TRIBUNAL

4.   The Arbitral Tribunal has been constituted as follows:

## I.    THE HONORABLE CHARLES N. BROWER

(appointed by Claimant)

20 Essex Street Chambers
20 Essex Street
London WC2R 3AL
GREAT BRITAIN
Tel: +44 (0)20 7842 1200
Fax: +44 (0)20 7842 1270
E-mail: cbrower@20essexst.com

## II.   MR. GABRIEL BOTTINI

(appointed by Respondent)

Paraná 580- Piso 5° "J"
C1017AAL- Buenos Aires
Argentina
Tel.: + 54 11 4371-3165
Fax: + 54 11 4372-7974
E-mail gbottini@outlook.com

## III.  PROF. DR. KLAUS SACHS

(appointed by the Parties)

Nymphenburger Str. 12
D-80335 München
GERMANY
Tel.: +49 89 23 807-109
Fax: + 49 89 23 807-40 621
E-mail: Klaus.Sachs@cms-hs.com

## C.    SUMMARY OF THE PROCEDURAL HISTORY

5.    This arbitration concerns a legal dispute between Saint-Gobain and Venezuela arising out of Venezuela's alleged refusal to compensate Saint-Gobain for the expropriation of Saint-Go-bain's investment in its 99.99%[1] subsidiary Norpro Venezuela C.A. ("**Norpro Venezuela**" or "**Norpro**") following a televised speech of Venezuela's President Hugo Chávez on 15 May 2010. Claimant alleges that Respondent breached the *Agreement on Encouragement and Reciprocal Protection of Investments between the Government of the French Republic and the Government of the Bolivarian Republic of Venezuela* (the "**France-Venezuela-BIT**" or the "**Treaty**"), which entered into force on 15 April 2004, by refusing to offer compensation for the expropriation of Norpro Venezuela's proppants plant in Puerto Ordaz, Bolivar State, as well as by sanctioning or failing to intervene in the increase of the price for the supply of bauxite allegedly in breach of a contract entered into with a State-owned entity, thus failing to treat Claimant fairly and equitably and to accord its investment full protection and security, in violation of Articles 5(1) and 3(1) and (2) of the Treaty.

6.    On 25 May 2012, Claimant filed a Request for Arbitration against Respondent (the "**Request**") with the Secretary-General of ICSID in accordance with Article 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**") and the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "**ICSID Institution Rules**").

7.    On 29 May 2012, the Secretariat of ICSID (the "**Secretariat**") transmitted the Request to Respondent.

8.    On 15 June 2012, the Secretary-General registered Claimant's Request in accordance with Article 36 of the ICSID Convention and Rules 6 and 7 of the ICSID Institution Rules and notified the Parties of such registration. The case was assigned the ICSID Case Number ARB/12/13.

9.    On 28 September 2012, Claimant appointed Judge Charles N. Brower, a national of the United States of America, as arbitrator.

10.   On 3 October 2012, Respondent appointed Mr. Gabriel Bottini, a national of the Argentine Republic, as arbitrator.

---

[1] One share is held by Mr. Luis Páez, a Venezuelan national and the President of Norpro Venezuela, who subscribed a single share when Norpro Venezuela was incorporated. The planned transfer of Mr. Páez's share to Saint-Gobain has not yet been completed. Request, ¶ 4, note 4.

11.   On 4 October 2012, Judge Brower accepted his appointment as arbitrator by Claimant, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**").

12.   On 25 October 2012, Mr. Bottini accepted his appointment as arbitrator by Respondent, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Arbitration Rules.

13.   On 12 November 2012, the Secretary-General informed Prof. Dr. Klaus Sachs that the Parties agreed on his appointment as President of the Tribunal. By letter of 14 November 2012, Prof. Sachs accepted his appointment, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Arbitration Rules.

14.   On 26 November 2012, the Secretary-General informed the Parties that Prof. Sachs, Judge Brower and Mr. Bottini had accepted their appointments as arbitrators and, accordingly, pursuant to Rules 6(1) of the ICSID Arbitration Rules, the Tribunal was deemed to have been constituted and the proceedings to have begun as of such date; in addition, Ms. Natalí Sequeira was designated to serve as the Secretary of the Tribunal (the "**Secretary**").

15.   Following the exchange of written submissions and an oral hearing held in Washington, D.C., USA from 2 to 6 February 2015, the Tribunal rendered its Decision on Liability and the Principles of Quantum on 30 December 2016 (the "**Decision**"), which forms an integral part of the Award. For the summary of the procedural history leading up to the issuance of the Decision, reference is made to Section C. of the Decision.

16.   In the operative part of its Decision, the Tribunal held:

   1.   Respondent has breached Article 5(1) subparagraphs 2 and 3 of the Treaty by failing to specify the amount of compensation and to pay prompt compensation for the expropriation of Claimant's investment in Venezuela.

   2.   Respondent shall pay to Claimant the amount of compensation to be calculated on the basis of the Tribunal's findings summarized at paragraphs 849 through 851 above, plus pre-award interest as of 15 May 2010 until the date of the Award at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually.

   3.   Respondent shall pay to Claimant post-award interest on the amount of compensation under 2 as of the date of the Award until the date of payment

at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually. Post-award interest is to be paid only on the principal amount of compensation, and not on the pre-award interest awarded.

4.  The award of damages and interest is made net of applicable Venezuelan taxes, and Respondent may not deduct taxes in respect of the payment of the award of damages and interest.

5.  The decision on costs is reserved for the Award.

6.  All other claims and requests are dismissed.

17. On 11 January 2017, the Tribunal issued Procedural Order No. 4, in which it ordered:

> The Parties are invited to liaise in an attempt to reach agreement on the final amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of Norpro Venezuela – based on the Tribunal's findings summarized in paragraphs 849 to 851 of the Tribunal's Decision on Liability and the Principles of Quantum.

> The Parties shall inform the Tribunal within two months from the notification of the Decision, *i.e.*, by Wednesday, 1 March 2017, whether and to what extent they have been able to reach agreement on the matter set out under paragraph 3 above.

> In case the Parties have not been able to reach agreement on the final amount of compensation to be paid by Respondent to Claimant by 1 March 2017, the Tribunal will invite the Parties to agree on, or failing agreement to submit their respective proposals for, a calendar for submissions of the Parties on the remaining quantum issues to be decided.

18. By e-mail of 17 February 2017, the Parties jointly requested an extension of the 1 March 2017 deadline identified in paragraph 4 of Procedural Order No. 4 to 31 March 2017. By e-mail of 18 February 2017, the Tribunal granted the Parties' extension request.

19. By letter of 30 March 2017, Respondent filed its submission on the final amount of compensation to be awarded to Claimant based on the findings made by the Tribunal in its Decision. In particular, it presented four figures calculated by the Parties' experts using their respective DCF models and proposed that the Parties agree on the second highest of these four amounts, *i.e.*, the amount derived by Respondent's expert using its own economic model.

20.   By letter of 31 March 2017, Claimant informed the Tribunal that it considered the results of the application of the DCF method based on the parameters set out by the Tribunal in its Decision inconsistent with the standard of compensation mandated by the Treaty and customary international law and requested that the Tribunal direct the Parties to confer and propose a calendar for submissions on the quantum issues to be decided.

21.   Following the exchange of further submissions between the Parties as regards the necessity to file new submissions on quantum and as regards Claimant's requests for reconsideration and correction of the Tribunal's Decision, the Tribunal issued its Decision on Claimant's Requests for Reconsideration and Correction on 28 June 2017 (the "**Reconsideration Decision**"). For a detailed summary of the submissions exchanged prior to the issuance of the Reconsideration Decision, reference is made to Section A. of the Reconsideration Decision.

22.   In the cover letter dated 28 June 2017, transmitted to the Parties together with the Reconsideration Decision, the Tribunal made reference to paragraph 89 of the Reconsideration Decision, where it expressed the view that it was not yet in a position to determine the final amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of Claimant's investment without providing Claimant with the opportunity to comment on the contents of Respondent's letter of 30 March 2017. The Tribunal therefore invited Claimant to file its comments, in particular on Respondent's proposal to adopt the second highest of four figures calculated by the Parties' experts on the basis of the Tribunal's findings in its Decision as the final amount of compensation, by 12 July 2017.

23.   By letter of 12 July 2017, Claimant commented on Respondent's letter of 30 March 2017 and, in particular and without prejudice to its previous submissions made in the context of its requests for reconsideration and correction, agreed with Respondent's proposal to adopt the second highest of four amounts. Claimant further requested leave to amend its submission on costs in light of additional fees and costs incurred subsequent to the last cost update in November 2015.

24.   In its letter of 14 July 2017, the Tribunal invited both Parties to submit any updates to the Cost Submissions that they wished to be considered in the Tribunal's decision on costs to be included in the Award by 28 July 2017.

25.   On 28 July 2017, Claimant filed an updated cost submission ("**Claimant's Updated Cost Submission**"). On the same date, Respondent filed an additional cost submission ("**Respondent's Additional Cost Submission**").

26.  On 7 August 2017, the Centre informed the Parties and the Tribunal that Mr. Francisco Grob, ICSID Legal Counsel, would replace Ms. Sequeira as Secretary of the Tribunal.

27.  On 20 September 2017, the Tribunal declared the proceeding closed pursuant to Rule 38(1) of the ICSID Arbitration Rules.

## D.  FACTUAL BACKGROUND

28.  A detailed summary of the background facts that are not disputed between the Parties, or which have otherwise been established by the evidence submitted in these proceedings to the satisfaction of the Tribunal has been set out in Section D. of the Decision.

## E.  PARTIES'' POSITIONS

29.  For detailed summaries of the Parties' positions on liability and quantum as argued in their written submissions and during the Hearing, reference is made to Sections E. and F. of the Decision.

30.  Further to the Tribunal's Decision, which dealt with the question of Respondent's liability under the Treaty and the principles of quantum applicable to the determination of the amount of compensation, the remaining issues to be addressed in this Award are: (i) the exact amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of its investment based on the findings made by the Tribunal in its Decision; and (ii) the allocation of the costs of the arbitration and the legal fees and costs incurred by the Parties in connection with this arbitration.

### I.  AGREED AMOUNT OF QUANTUM AND JOINT PROPOSAL

31.  In its letter of 30 March 2017, Respondent presented the results which had been calculated by the Parties' experts, who had each run their own and the other Party's expert's economic model based on the Tribunal's findings in its Decision, and exchanged between the Parties on 7 March 2017. These results were as follows:

| Respondent's Expert's Calculations | | |
| Using Claimant's DCF Model | | Using Respondent's DCF Model |
| (US$ Million) | | |
| 1. Value as of May 15, 2010 | $ 25.6 | $ 29.6 |
| 2. Interest through March 31, 2017 | $ 4.1 | $ 4.8 |
| 3. **Total** | **$ 29.8** | **$ 34.4** |

| Claimant's Expert's Calculations | | |
| Using Claimant's DCF Model | | Using Respondent's DCF Model |
| (US$ Million) | | |
| 4. Value as of May 15, 2010 | $ 23.0 | $ 30.6 |
| 5. Interest through March 6, 2017 | $ 3.6 | $ 4.7 |
| 6. **Total** | **$ 26.6** | **$ 35.3** |

32.   On that basis, Respondent proposed that the Parties agree on the final amount of compensation derived by its expert using his own economic model, *i.e.*, an amount of USD 34.4 million (including interest through to 31 March 2017).

33.   Upon invitation from the Tribunal to comment on Respondent's letter of 30 March 2017 and in particular the above mentioned proposal after the Tribunal's Reconsideration Decision had been rendered on 28 June 2017, Claimant stated in its letter of 12 July 2017 that: (i) Respondent's letter accurately reflected the four amounts calculated by the Parties' experts on the basis of the parameters set out in the Tribunal's Decision; and (ii) without prejudice to its previous submissions made in the context of its requests for reconsideration and correction of the Tribunal's Decision, it agreed with Respondent's proposal to adopt the second highest of these four amounts, *i.e.*, USD 34.4 million including interest through to 31 March 2017.

## II.   SUMMARIES OF THE PARTIES' POSITIONS ON COSTS

34.   Both Parties request that the Tribunal order reimbursement by the other Party of the costs they have incurred, respectively. In the following, the positions of the Parties on costs, as argued in their written submissions will be summarized.

### 1.  Summary of Claimant's Position on Costs

35.  Claimant submits that in light of the Tribunal's finding in its Decision that Respondent breached Article 5(1) subparagraphs 2 and 3 of the Treaty, Respondent should be ordered to bear the entirety of Claimant's costs plus compound interest calculated annually from the date of the Award until the date of payment by Venezuela.[2]

36.  Claimant submits that the Tribunal's authority to assess and apportion the costs between the Parties is derived from Article 61(2) of the ICSID Convention, which is generally understood broadly so as to include: (i) fees, allowances and any other expenses incurred by attorneys and experts; and (ii) all travel expenses and costs incurred by witnesses, advisors and representatives of the Parties.[3]

37.  Claimant further submits that a tribunal should exercise its authority to award costs and to apply the rule of "*costs follow the event*" particularly in cases where a respondent State has breached its treaty obligations. According to Claimant, tribunals "*have consistently awarded the claimant all or a portion of its reasonable costs*" in such circumstances. Claimant makes reference to *ADC v. Hungary* and *Gold Reserve*, where the tribunals linked their costs award to the principle of full reparation established in *Chorzów*.[4] Claimant further quotes from an authority who considers that "*there is a case for treating the arbitration costs incurred by a claimant who is found to have suffered damages at the hands of a State (or vice versa) as being among the* 'natural, normal and predictable consequences of the damage inflicted.'"[5]

38.  Claimant argues that it is not necessary for a claimant to prevail on each of its claims in order to be eligible for reimbursement of its reasonable costs and refers to the tribunal in *Hochtief v. Argentina*, which considered it sufficient that "*the core of the claim ha*[d] *been upheld*" and that the claimant was "*entitled to reparation for the losses caused by Respondent's violation of Claimant's rights under the BIT*."[6] According to Claimant, the logic of full repara-

---

[2] Claimant's Updated Cost Submission, p. 1.
[3] Claimant's Cost Submission, ¶ 4.
[4] Claimant's Cost Submission, ¶¶ 5-7, *quoting from ADC v. Hungary* (**CLA-001**), ¶¶ 531, 533 *and Gold Reserve v. Venezuela* (**CLA-152**), ¶ 860.
[5] Claimant's Cost Submission, ¶ 8, *quoting from* Bienvenu, Pierre and Valasek, Martin J., "*Compensation for Unlawful Expropriation, and Other Recent Manifestations of the Principle of Full Reparation in International Investment Law*", in Albert Jan van den Berg (ed.), 50 Years of the New York Convention: ICCA International Arbitration Conference, 14 ICCA Congress Series 231 (2009) (**CLA-011**).
[6] Claimant's Cost Submission, ¶ 9, *quoting from Hochtief v. Argentina* (**CLA-160**), ¶ 330.

tion mandates that "*as long as there has been some breach of a claimant's treaty rights requiring resort to arbitration, a costs award is necessary to put the claimant back in the position it would have been in had the breach never occurred.*"[7]

39.   Claimant claims that the tribunals in *OI European v. Venezuela* and *Flughafen Zürich v. Venezuela* applied this approach by requiring Venezuela to pay for the costs of the proceeding and a substantial part of the claimant's reasonable legal costs, respectively.[8]   In addition, Claimant makes reference to the decision in *Tidewater v. Venezuela*, where the tribunal held that the expropriation was lawful but nevertheless awarded costs to the claimants, holding that "[t]*he result is that* [claimants] *have been put to a great deal of time, trouble and expenses in order to obtain compensation that Venezuela had vouchsafed to provide under the terms of the Barbados BIT and ought to have so provided in 2009.*"[9]

40.   Claimant notes that Respondent does not challenge the Tribunal's authority to grant a costs award but rather seeks one itself, relying on Claimant's non-participation in the procedures provided under Venezuelan law for the determination of the compensation due to Claimant. In response to that argument, Claimant emphasizes that it would not have had to participate in such proceedings if Respondent had complied with its obligations under the Treaty and Venezuelan law by providing Claimant with adequate compensation at the time of expropriation. As a result of Respondent's failure to do so, Claimant argues that it had to initiate legal action, which resulted in delays that cost it significant time and financial resources.[10]

41.   In Claimant's view, the fact that its challenge and application for provisional measures were not successful cannot serve as grounds to deviate from the principle of full reparation, arguing that "*good-faith procedural conduct resulting in a minor delay*" does not justify awarding costs to the opposing party. Claimant refers to the case of *Poštová Banka v. Hellenic Republic* where the tribunal did not make a costs order despite ruling in favor of the respondent on jurisdiction, holding that the "*issue was not clear-cut and involved a complex factual and legal background. Each side presented valid arguments in support of its respective case and acted fairly and professionally.*"[11]

---

[7] Claimant's Cost Submission, ¶ 9.
[8] Claimant's Cost Submission, ¶ 10, *referring to OI European Group v. Venezuela* (**CLA-156**), ¶¶ 969-976 *and Flughafen Zürich v. Venezuela* (**CLA-161**), ¶¶ 994-995, 997, 1000-1001.
[9] Claimant's Cost Submission, ¶ 11, *referring to Tidewater v. Venezuela* (**CLA-155**), ¶ 213.
[10] Claimant's Cost Submission, ¶¶ 13-14. *See also* Claimant's First Updated Cost Submission, p. 1.
[11] Claimant's Cost Submission, ¶ 16, *quoting from Poštová Banka v. Hellenic Republic* (**CLA-163**), ¶ 377.

42.   On the other hand, Claimant claims that an adjustment to the costs award may be warranted "*in light of extreme conduct or abuse of process by parties, including deliberate obstruction of proceedings*," which it considers to be the case here due to Respondent's refusal to pay its share of the advances on costs as required by ICSID Regulation 14(3)(d). Claimant argues that Respondent thereby "*threatened the continuity of the proceedings*" and forced it to pay Respondent's share to avoid discontinuance of the proceedings. Claimant refers to the decision in *Venoklim v. Venezuela*, where the tribunal took note of Venezuela's similar conduct and ordered it to reimburse the claimant for its unpaid share of the advance on costs.[12]

43.   Based on the above and pursuant to Rule 28 of the ICSID Arbitration Rules, Claimant seeks reimbursement of: (i) the advances of fees and expenses of the members of the Tribunal and ICSID's administrative fees; (ii) the travel costs and expenses of Claimant's witnesses and party representatives; and (iii) the costs of its legal representation, independent experts and consultants.[13] According to Claimant's Updated Cost Submission filed on 28 July 2017, Claimant has incurred the following costs:[14]

| Description | Updated Total Amount as of 28 July 2017 (USD) |
|---|---|
| Tribunal and ICSID Costs | 1,425,000[15] |
| Travel Costs and Expenses of Witnesses and Representatives | 85,227.27 |
| Attorney's Fees and Disbursements | 5,214,398.70 |
| Valuation Expert Fees and Disbursements | 1,652,172.11 |
| **Total Costs Claimed** | **8,376,798.08** |

---

[12] Claimant's Cost Submission, ¶ 18, *referring to Venoklim v. Venezuela* (**CLA-165**), ¶¶ 163-165.
[13] Claimant's Cost Submission, ¶ 19.
[14] Claimant's Second Updated Cost Submission, p. 2.
[15] This amount includes the final advance on costs requested by ICSID by letter of 17 August 2017, which was paid by Claimant and received by ICSID on 6 September 2017.

### 2. Claimant's Relief Sought

44. Claimant requests that the Tribunal:[16]

    (a)    ORDER that Venezuela reimburse Saint-Gobain for the following fees and costs, plus compound interest calculated annually at a commercial rate from the date of the Award until the date of payment by Venezuela:

        (i)    USD 1,425,000.00, which corresponds to the advances on the fees and expenses of the Tribunal and administrative fees of ICSID made by Saint-Gobain;

        (ii)    USD 85,227.27, which corresponds to the reasonable travel and other expenses incurred by Saint-Gobain's witnesses and representatives;

        (iii)    USD 5,214,398.70, which corresponds to the fees and disbursements of Saint-Gobain's counsel Freshfields Bruckhaus Deringer US LLP, Hughes Hubbard & Reed LLP, LEC Partnes LLC, and Sosa & Martínez Estudio Jurídico (including USD 53,374.49, which corresponds to the fees and expenses of Saint-Gobain's legal expert, Dr. Brewer-Carías, and USD 15,512.26, which corresponds to the fees and expenses of Saint-Gobain's technology consultants, FTI Consulting and Immersion Legal Graphics, LCC); and

        (iv)    USD 1,652,172.11, which corresponds to the fees and expenses of Saint-Gobain's valuation expert, Compass Lexecon.

    (b)    AWARD any other relief it may deem appropriate.

### 3. Summary of Respondent's Position on Costs

45. Respondent agrees with Claimant that Article 61(2) of the ICSID Convention grants the Tribunal authority to assess by whom the expenses of the Parties, as well as the fees and expenses of the Tribunal and charges for the use of ICSID facilities, shall be borne.[17]

46. Respondent submits that ICSID tribunals often exercise their discretion by awarding costs to the party that prevailed in the arbitration proceedings and claims that it should be considered

---

[16] Claimant's Cost Submission, ¶ 30 with figures updated from Claimant's Second Updated Cost Submission, p. 2.
[17] Counter Memorial, ¶ 271; Rejoinder, ¶ 280.

the prevailing party in this case. Respondent makes reference to Claimant's request to reconsider the Tribunal's Decision, which was unanimously rejected, and to the figures derived by the Parties' experts based on the Tribunal's findings. Respondent notes that all of these figures, which range from USD 23 million to USD 30 million (excluding pre-award interest) are "*far lower than the grossly exaggerated amounts that Claimant demanded throughout the case*," *i.e.*, USD 99.5 million as of 15 May 2010 or USD 120.5 million as of 31 May 2014.[18]

47.  Respondent further invokes Claimant's refusal to participate in the procedures for determining compensation under Venezuelan law and its request for provisional measures against those procedures, which, in Respondent's view, "*frustrated their implementation*." According to Respondent, there would have been no need to incur the expenses of this arbitration if Claimant had "*taken a reasonable position*" in this regard.[19]

48.  Respondent argues that "[i]*n light of Claimant's strategic decision not to participate in the procedures provided under Venezuelan law for the determination of just compensation and instead to engage in tacitcs to delay such a determination, and given Claimant's grossly excessive compensation demand in this case*," Claimant should be ordered to bear all of the costs incurred by the Parties as well as the costs of the arbitration.[20]

49.  Pursuant to Respondent's Additional Cost Submission filed on 28 July 2017, Respondent has incurred the following costs:

| Category | Amount (USD) |
|---|---|
| Fees of Curtis, Mallet-Prevost, Colt & Mosle, LLP until 23 November 2015 | 4,144,946.25 |
| Fees of Venezuelan Legal Counsel | 162,637.00 |
| Economic Expert – Vladimir Brailovsky | 340,565.63 |
| Economic Expert – Econ One (Daniel Flores) until 23 November 2015 | 1,415,833.74 |
| Transportation and Travel Expenses | 199,955.50 |

---

[18] Respondent's Additional Cost Submission, p. 2.
[19] Respondent's Additional Cost Submission, p. 2.
[20] Counter Memorial, ¶ 272; Rejoinder, ¶ 281.

| Category | Amount (USD) |
|---|---|
| Document Production/Duplicating & Word Processing | 126,876.84 |
| Courier Service | 9,390.96 |
| Fees and disbursements of Curtis, Mallet-Prevost, Colt & Mosle, LLP after 23 November 2015 | 127,468.75 |
| Fees and disbursements of Respondent's economic expert Econ One (Daniel Flores) after 23 November 2015 | 61,370.11 |
| **Total Costs Claimed** | **6,589,044.78** |

### 4. Respondent's Relief Sought

50. Respondent requests that the Tribunal award costs against Claimant and, in this case, imple-ment that decision by deducting from the final amount of compensation determined by the Tribunal all of Respondent's costs indicated in the updated Cost Submission of 23 November 2015 and in the Additional Cost Submission.[21]

## F.   THE TRIBUNAL'S REASONING

### I.   THE PARTIES' AGREEMENT ON QUANTUM

51. As noted above, the Parties have reached agreement on the final amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of Norpro Venezuela based on the findings contained in the Tribunal's Decision. This consent is expressed in Respond-ent's letter of 30 March 2017 and Claimant's letter of 12 July 2017.

52. Based on the agreement reached between the Parties, the Tribunal therefore determines that the final amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of its investment, calculated on the basis of the Tribunal's findings summarized at paragraphs 849 through 851 of its Decision, amounts to USD 34.4 million. This amount includes pre-award interest as of 15 May 2010 through to 31 March 2017 in the amount of USD 4.8 million.

---

[21] Respondent's Additional Cost Submission, p. 2.

53.   Respondent shall further pay to Claimant pre-award interest, calculated at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually, from 1 April 2017 until the date of this Award.

54.   Finally, Respondent shall pay to Claimant post-award interest as determined by the Tribunal in its Decision. Such interest shall start to accrue from the 30th day following the date of this Award.

## II.   DECISION ON COSTS

55.   There is common ground between the Parties that the Tribunal's authority to render a decision on the allocation of costs is based on Article 61(2) of the ICSID Convention, which provides:

> "*In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the Award.*"

56.   There is further common ground that the Tribunal's discretion to "*assess the expenses incurred by the parties*" extends to all costs incurred by the Parties in connection with the arbitration proceedings, *i.e.*, including the fees charged for their legal representation and valuation experts.

57.   The Tribunal will thus exercise its discretion under Article 61(2) of the ICSID Convention and decide on the allocation of: (i) the costs of the arbitration, which includes the administrative fees charged by ICSID as well as the fees and expenses of the members of the Tribunal; and (ii) the fees and expenses incurred by the Parties in connection with this arbitration.

### 1.   The Costs of the Arbitration

58.   First, the Tribunal will address the question of who shall bear the costs of the arbitration. As to the advances on costs paid in this regard, the Tribunal notes that, in accordance with Regulation 14(3)(d) of ICSID Administrative and Financial Regulations, ICSID requested the Parties to pay each of the respective advances on costs in equal shares. Respondent, however, has not paid its 50% share pursuant to any of the advance payment requests issued by ICSID over the course of this proceeding. Upon request, Claimant has therefore paid its own as well as Respondent's share of the advances on costs in the total amount of USD 1,425,000.

59.  The Tribunal agrees with Claimant that Respondent's refusal to pay its share of the advances on costs constitutes a breach of the ICSID procedural framework, which the Tribunal will take into account in its decision on the allocation of the arbitration costs.

60.  The Tribunal further recalls its finding in the Decision that Respondent has breached Article 5(1) subparagraphs 2 and 3 of the Treaty by failing to specify the amount of compensation and to pay prompt compensation for the expropriation of Claimant's investment.[22] At the same time, the Tribunal notes that it did not make a finding on whether Respondent has breached its own domestic laws concerning the expropriation process and whether any such breach amounted to a lack of due process as alleged by Claimant in this proceeding.[23]

61.  In any event and irrespective of whether Respondent's conduct was in compliance or in breach of its own expropriation laws, the Tribunal notes that, to its knowledge, Respondent has to date, *i.e.*, more than seven years after the expropriation date, not paid any amount of compensation to Claimant and has not deposited any amount of preliminary compensation with a competent court in Venezuela – despite the fact that it has always recognized the occurence of an expropriation that requires payment of just compensation. In this context, the Tribunal cannot follow Respondent's argument that Claimant's request for provisional measures frustrated the implementation of Venezuelan procedures for determining compensation,[24] given that the Tribunal decided in its Procedural Order No. 3 to deny Claimant's request in full and thus refrained from ordering Respondent to discontinue any domestic proceedings related to the expropriation of Norpro Venezuela.

62.  Against this background and taking into account Respondent's failure to comply with the requirements of Article 5(1) subparagraphs 2 and 3 of the Treaty, the Tribunal agrees with Claimant that it was forced by Respondent's conduct to initiate this arbitration proceeding in order to obtain adequate compensation for the expropriation of its investment in Venezuela.[25] Consequently, the Tribunal considers it appropriate that Respondent shall bear the costs of the arbitration, which amount to (in USD):[26]

---

[22] Decision, ¶ 480 and order no. 1.
[23] Decision, ¶ 504.
[24] *Cf.* Respondent's Additional Cost Submission, p. 2.
[25] *Cf.* Claimant's Cost Submission, ¶¶ 13-14.
[26] The ICSID Secretariat will provide the parties with a detailed Financial Statement of the case account.

Arbitrators' fees and expenses

| | |
|---|---|
| Prof. Dr. Klaus Sachs | 508,122.79 |
| The Honorable Charles N. Brower | 256,489.47 |
| Mr. Gabriel Bottini | 229,089.47 |
| ICSID's administrative fees | 160,000 |
| Direct expenses[27] | 149,488.26 |
| **Total** | **1,303,189.99** |

63. Accordingly, the Tribunal orders Respondent to pay Claimant USD 1,303,189.99 for the expended portion of the advances to ICSID.[28]

### 2. The Costs Incurred by the Parties in Connection with this Arbitration

64. Second, the Tribunal will assess the question of who shall bear the fees and expenses incurred by the Parties in connection with this arbitration. At the outset, the Tribunal notes that neither Party has raised any objection to the reasonableness of the costs incurred by the other Party and that, in fact, the total costs that each of them incurred are within a similar range of approximately USD 6.5-7 million.

65. For the reasons set out above, in particular given that Claimant had to initiate the present arbitration proceeding to obtain compensation, the Tribunal considers it appropriate that Respondent shall bear a certain portion of the costs incurred by Claimant in connection with this proceeding. In its assessment of the specific portion that should be borne by Respondent, the Tribunal has particularly taken into account the following considerations.

66. First, the Tribunal recalls that while it has found a breach of Article 5(1) subparagraphs 2 and 3 of the Treaty and left open whether there was a breach of due process in the expropriation process, it denied Claimant's Bauxite Claims, *i.e.*, its claims that Respondent breached Article 3(1) and 3(2) of the Treaty by virtue of the increase of the bauxite price that was initially agreed upon in the Bauxite Contract entered into between Claimant and CVG Bauxilum.[29]

---

[27] This amount includes charges relating to the dispatch of the Award (courier, printing and copying).
[28] The remaining balance of the advances will be reimbursed to Claimant.
[29] Decision, ¶¶ 542 and 560.

67.   Second, as for quantum, the Tribunal recalls that while Claimant requested in its final sub-
      mission to be awarded compensation in the amount of USD 99.5 million plus pre-award in-
      terest as of 15 May 2010,[30] Respondent requested that compensation should be awarded in
      the amount of USD 9.5 million excluding pre-award interest.[31] Respondent argues that in
      light of the amount agreed upon by the Parties pursuant to the Tribunal's findings in its De-
      cision, *i.e.*, USD 29.6 million excluding pre-award interest, it should be considered the pre-
      vailing party in this arbitration.[32] The Tribunal cannot agree with this characterization.
      Apart from the Tribunal's finding on liability that Respondent has breached its obligations under
      the Treaty, the Tribunal notes that as a result of its findings on the principles of quantum,
      Claimant is entitled to approximately 30% of what it has requested or to more than 300% of
      the compensation that Respondent has considered just in the context of this arbitration.

68.   As pointed out by Respondent,[33] Claimant has further initiated three incidental proceedings,
      *i.e.*, (i) a request to disqualify arbitrator Bottini; (ii) a request for provisional measures di-
      rected at discontinuing all domestic proceedings in Venezuela related to the expropriation of
      Norpro Venezuela; and (iii) a request for reconsideration and correction of the Tribunal's
      Decision. The Tribunal does not consider it necessary at this stage to express an opinion as
      to whether each of these three requests was "*substantial and properly required the Tribunal's
      consideration*," as was the case in *Tidewater v. Venezuela* on which Claimant relies in this
      regard.[34] In the Tribunal's view, it suffices to note for the present purposes that all three
      requests were unsuccessful.

69.   Taking into account all of the above considerations, the Tribunal does not consider it justified
      to order that Respondent shall bear the entirety of the costs incurred by Claimant in connec-
      tion with this arbitration. The Tribunal is of the view that it is appropriate for Respondent to
      bear two thirds of the costs incurred by Claimant. Consequently, Respondent shall reimburse
      Claimant with an amount of USD 4,634,532.05.

### 3.   Interest on Costs Award

70.   As a final matter, Claimant requests that Respondent be ordered to reimburse its costs, plus
      compound interest calculated annually at a commercial rate from the date of the Award until
      the date of payment by Venezuela.

---

[30] Claimant's Second Post-Hearing Submission, ¶ 116.
[31] Respondent's Post-Hearing Reply Brief, ¶ 64.
[32] Respondent's Additional Cost Submission, p. 2.
[33] Respondent's Additional Cost Submission, p. 2.
[34] Claimant's Cost Submission, ¶ 17, *quoting from Tidewater v. Venezuela* (**CLA-155**), ¶ 212.

71.    The Tribunal considers it appropriate to award interest on the amount of costs that Respond-
ent is ordered to reimburse at the same post-award interest rate as on the principal amount of
compensation, *i.e*., at a rate equal to 2% over the average 6-month US Treasury bill rate,
compounded annually. Such interest shall start to accrue from the 30th day following the date
of this Award.

## G.    THE TRIBUNAL'S DECISION

72.    Based on the above, the Tribunal[35] renders the following

## AWARD

1.    **Respondent shall pay to Claimant within 30 days of the date of this Award: (i)
USD 29.6 million as principal amount of compensation for the expropriation of
Claimant's investment in Venezuela; and (ii) USD 4.8 million as pre-award in-
terest as of 15 May 2010 through to 31 March 2017.**

2.    **Respondent shall further pay to Claimant within 30 days of the date of this
Award pre-award interest on the principal amount of compensation under 1, *i.e*.,
USD 29.6 million, as of 1 April 2017 until the date of this Award at a rate equal
to 2% over the average 6-month US Treasury bill rate, compounded annually.**

3.    **Subject to the limitation that post-award interest is to be paid only on the prin-
cipal amount of compensation, and not on the pre-award interest awarded, Re-
spondent shall pay to Claimant post-award interest on the principal amount of
compensation under 1, *i.e*., USD 29.6 million, as from the 30th day following the
date of this Award until the date of payment at a rate equal to 2% over the av-
erage 6-month US Treasury bill rate, compounded annually.**

---

[35] Arbitrator Bottini believes that, whenever an ICSID tribunal exercises its discretion under Article 61(2) of the ICSID
Convention and enters an adjusted costs order (i.e., ordering one party to pay the other party's costs or the tribunal's
costs, in full or in part), two relevant factors to be considered are the extent to which the claimants' damages claim has
been granted and who has prevailed in any incidental proceeding decided in the arbitration. Arbitrator Bottini finds
that the Tribunal's decision on costs reflects neither of these two factors.

**4.** **The award of damages and interest is made net of applicable Venezuelan taxes, and Respondent may not deduct taxes in respect of the payment of the award of damages and interest.**

**5.** **Respondent shall bear the costs of the arbitration, *i.e*., the fees and expenses of the members of the Tribunal as well as the charges for the use of the facilities of ICSID, in full. Consequently, Respondent shall reimburse Claimant with an amount of USD 1,303,189.99 within 30 days of the date of this Award.**

**6.** **Respondent shall further bear two thirds of the costs incurred by Claimant in connection with this arbitration proceeding and thus reimburse Claimant with an amount of USD 4,634,532.05 within 30 days of the date of this Award.**

**7.** **Respondent shall pay to Claimant post-award interest on the amount of costs to be reimbursed under 5 and 6 as from the 30th day following the date of this Award until the date of payment at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually.**

**8.** **All other claims and requests are dismissed.**

The Honorable Charles N. Brower
Arbitrator
Date September 28, 2017

Mr. Gabriel Bottini
Arbitrator
Date October 9, 2017

Professor Dr. Klaus Sachs
President
Date October 25, 2017

Case 1:20-cv-00129-RG Document 9-3 Filed 04/24/19 Page 53 of 703

# Exhibit 2

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

## Table of Contents

| Chapter | Section | | Articles | Page |
|---------|---------|---|----------|------|
| | | **Preamble** | | **11** |
| **I** | | **International Centre for Settlement of Investment Disputes** | **1-24** | **12** |
| | 1 | Establishment and Organization | 1-3 | 12 |
| | 2 | The Administrative Council | 4-8 | 12 |
| | 3 | The Secretariat | 9-11 | 14 |
| | 4 | The Panels | 12-16 | 15 |
| | 5 | Financing the Centre | 17 | 16 |
| | 6 | Status, Immunities and Privileges | 18-24 | 16 |
| **II** | | **Jurisdiction of the Centre** | **25-27** | **18** |
| **III** | | **Conciliation** | **28-35** | **19** |
| | 1 | Request for Conciliation | 28 | 19 |
| | 2 | Constitution of the Conciliation Commission | 29-31 | 20 |
| | 3 | Conciliation Proceedings | 32-35 | 20 |
| **IV** | | **Arbitration** | **36-55** | **22** |
| | 1 | Request for Arbitration | 36 | 22 |
| | 2 | Constitution of the Tribunal | 37-40 | 22 |
| | 3 | Powers and Functions of the Tribunal | 41-47 | 23 |
| | 4 | The Award | 48-49 | 25 |
| | 5 | Interpretation, Revision and Annulment of the Award | 50-52 | 25 |
| | 6 | Recognition and Enforcement of the Award | 53-55 | 27 |
| **V** | | **Replacement and Disqualification of Conciliators and Arbitrators** | **56-58** | **28** |
| **VI** | | **Cost of Proceedings** | **59-61** | **29** |
| **VII** | | **Place of Proceedings** | **62-63** | **30** |

| | | | |
|---|---|---|---|
| VIII | Disputes Between Contracting States | 64 | 30 |
| IX | Amendment | 65-66 | 30 |
| X | Final Provisions | 67-75 | 31 |
| | Signature Clause | | 33 |

Convention

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

## Preamble

**The Contracting States**

**Considering** the need for international cooperation for economic development, and the role of private international investment therein;

**Bearing in mind** the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States;

**Recognizing** that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases;

**Attaching particular importance** to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire;

**Desiring** to establish such facilities under the auspices of the International Bank for Reconstruction and Development;

**Recognizing** that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with; and

**Declaring** that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,

**Have agreed** as follows:

Convention

11

# Chapter I
# International Centre for
# Settlement of Investment Disputes

## Section 1
## Establishment and Organization

**Convention**

### Article 1

(1) There is hereby established the International Centre for Settlement of Investment Disputes (hereinafter called the Centre).

(2) The purpose of the Centre shall be to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.

### Article 2

The seat of the Centre shall be at the principal office of the International Bank for Reconstruction and Development (hereinafter called the Bank). The seat may be moved to another place by decision of the Administrative Council adopted by a majority of two-thirds of its members.

### Article 3

The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators.

## Section 2
## The Administrative Council

### Article 4

(1) The Administrative Council shall be composed of one representative of each Contracting State. An alternate may act as representative in case of his principal's absence from a meeting or inability to act.

(2) In the absence of a contrary designation, each governor and alternate governor of the Bank appointed by a Contracting State shall be *ex officio* its representative and its alternate respectively.

### Article 5

The President of the Bank shall be *ex officio* Chairman of the Administrative Council (hereinafter called the Chairman) but shall

have no vote. During his absence or inability to act and during any vacancy in the office of President of the Bank, the person for the time being acting as President shall act as Chairman of the Administrative Council.

**Article 6**

(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, the Administrative Council shall:

> (a) adopt the administrative and financial regulations of the Centre;
>
> (b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;
>
> (c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);
>
> (d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;
>
> (e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;
>
> (f) adopt the annual budget of revenues and expenditures of the Centre;
>
> (g) approve the annual report on the operation of the Centre.

The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council.

(2) The Administrative Council may appoint such committees as it considers necessary.

(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention.

**Article 7**

(1) The Administrative Council shall hold an annual meeting and such other meetings as may be determined by the Council, or convened by the Chairman, or convened by the Secretary-General at the request of not less than five members of the Council.

(2) Each member of the Administrative Council shall have one vote and, except as otherwise herein provided, all matters before the Council shall be decided by a majority of the votes cast.

(3) A quorum for any meeting of the Administrative Council shall be a majority of its members.

**Convention**

13

(4) The Administrative Council may establish, by a majority of two-thirds of its members, a procedure whereby the Chairman may seek a vote of the Council without convening a meeting of the Council. The vote shall be considered valid only if the majority of the members of the Council cast their votes within the time limit fixed by the said procedure.

**Article 8**

Members of the Administrative Council and the Chairman shall serve without remuneration from the Centre.

## Section 3
## The Secretariat

**Article 9**

The Secretariat shall consist of a Secretary-General, one or more Deputy Secretaries-General and staff.

**Article 10**

(1) The Secretary-General and any Deputy Secretary-General shall be elected by the Administrative Council by a majority of two-thirds of its members upon the nomination of the Chairman for a term of service not exceeding six years and shall be eligible for re-election. After consulting the members of the Administrative Council, the Chairman shall propose one or more candidates for each such office.

(2) The offices of Secretary-General and Deputy Secretary-General shall be incompatible with the exercise of any political function. Neither the Secretary-General nor any Deputy Secretary-General may hold any other employment or engage in any other occupation except with the approval of the Administrative Council.

(3) During the Secretary-General's absence or inability to act, and during any vacancy of the office of Secretary-General, the Deputy Secretary-General shall act as Secretary-General. If there shall be more than one Deputy Secretary-General, the Administrative Council shall determine in advance the order in which they shall act as Secretary-General.

**Article 11**

The Secretary-General shall be the legal representative and the principal officer of the Centre and shall be responsible for its administration, including the appointment of staff, in accordance with the provisions of this Convention and the rules adopted by the Administrative

*Convention*

14

Council. He shall perform the function of registrar and shall have the power to authenticate arbitral awards rendered pursuant to this Convention, and to certify copies thereof.

## Section 4
## The Panels

### Article 12

The Panel of Conciliators and the Panel of Arbitrators shall each consist of qualified persons, designated as hereinafter provided, who are willing to serve thereon.

### Article 13

(1) Each Contracting State may designate to each Panel four persons who may but need not be its nationals.

(2) The Chairman may designate ten persons to each Panel. The persons so designated to a Panel shall each have a different nationality.

### Article 14

(1) Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgment. Competence in the field of law shall be of particular importance in the case of persons on the Panel of Arbitrators.

(2) The Chairman, in designating persons to serve on the Panels, shall in addition pay due regard to the importance of assuring representation on the Panels of the principal legal systems of the world and of the main forms of economic activity.

### Article 15

(1) Panel members shall serve for renewable periods of six years.

(2) In case of death or resignation of a member of a Panel, the authority which designated the member shall have the right to designate another person to serve for the remainder of that member's term.

(3) Panel members shall continue in office until their successors have been designated.

### Article 16

(1) A person may serve on both Panels.

**Convention**

15

(2) If a person shall have been designated to serve on the same Panel by more than one Contracting State, or by one or more Contracting States and the Chairman, he shall be deemed to have been designated by the authority which first designated him or, if one such authority is the State of which he is a national, by that State.

(3) All designations shall be notified to the Secretary-General and shall take effect from the date on which the notification is received.

## Section 5
## Financing the Centre

### Article 17

If the expenditure of the Centre cannot be met out of charges for the use of its facilities, or out of other receipts, the excess shall be borne by Contracting States which are members of the Bank in proportion to their respective subscriptions to the capital stock of the Bank, and by Contracting States which are not members of the Bank in accordance with rules adopted by the Administrative Council.

## Section 6
## Status, Immunities and Privileges

### Article 18

The Centre shall have full international legal personality. The legal capacity of the Centre shall include the capacity:

- (a) to contract;
- (b) to acquire and dispose of movable and immovable property;
- (c) to institute legal proceedings.

### Article 19

To enable the Centre to fulfil its functions, it shall enjoy in the territories of each Contracting State the immunities and privileges set forth in this Section.

### Article 20

The Centre, its property and assets shall enjoy immunity from all legal process, except when the Centre waives this immunity.

### Article 21

The Chairman, the members of the Administrative Council, persons acting as conciliators or arbitrators or members of a Committee appointed pursuant to paragraph (3) of Article 52, and the officers and employees of the Secretariat

> (a) shall enjoy immunity from legal process with respect to acts performed by them in the exercise of their functions, except when the Centre waives this immunity;
>
> (b) not being local nationals, shall enjoy the same immunities from immigration restrictions, alien registration requirements and national service obligations, the same facilities as regards exchange restrictions and the same treatment in respect of travelling facilities as are accorded by Contracting States to the representatives, officials and employees of comparable rank of other Contracting States.

### Article 22

The provisions of Article 21 shall apply to persons appearing in proceedings under this Convention as parties, agents, counsel, advocates, witnesses or experts; provided, however, that sub-paragraph (b) thereof shall apply only in connection with their travel to and from, and their stay at, the place where the proceedings are held.

### Article 23

(1) The archives of the Centre shall be inviolable, wherever they may be.

(2) With regard to its official communications, the Centre shall be accorded by each Contracting State treatment not less favourable than that accorded to other international organizations.

### Article 24

(1) The Centre, its assets, property and income, and its operations and transactions authorized by this Convention shall be exempt from all taxation and customs duties. The Centre shall also be exempt from liability for the collection or payment of any taxes or customs duties.

(2) Except in the case of local nationals, no tax shall be levied on or in respect of expense allowances paid by the Centre to the Chairman or members of the Administrative Council, or on or in respect of salaries, expense allowances or other emoluments paid by the Centre to officials or employees of the Secretariat.

(3) No tax shall be levied on or in respect of fees or expense allowances received by persons acting as conciliators, or arbitrators, or

**Convention**

members of a Committee appointed pursuant to paragraph (3) of Article 52, in proceedings under this Convention, if the sole jurisdictional basis for such tax is the location of the Centre or the place where such proceedings are conducted or the place where such fees or allowances are paid.

# Chapter II
# Jurisdiction of the Centre

### Article 25

(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

(2) "National of another Contracting State" means:

(a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and

(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.

(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting

States. Such notification shall not constitute the consent required by paragraph (1).

### Article 26

Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.

### Article 27

(1) No Contracting State shall give diplomatic protection, or bring an international claim, in respect of a dispute which one of its nationals and another Contracting State shall have consented to submit or shall have submitted to arbitration under this Convention, unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute.

(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute.

## Chapter III
## Conciliation

### Section 1
### Request for Conciliation

### Article 28

(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to conciliation in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

## Section 2
## Constitution of the Conciliation Commission

### Article 29

(1) The Conciliation Commission (hereinafter called the Commission) shall be constituted as soon as possible after registration of a request pursuant to Article 28.

- (2) (a) The Commission shall consist of a sole conciliator or any uneven number of conciliators appointed as the parties shall agree.

- (b) Where the parties do not agree upon the number of conciliators and the method of their appointment, the Commission shall consist of three conciliators, one conciliator appointed by each party and the third, who shall be the president of the Commission, appointed by agreement of the parties.

### Article 30

If the Commission shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 28, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the conciliator or conciliators not yet appointed.

### Article 31

(1) Conciliators may be appointed from outside the Panel of Conciliators, except in the case of appointments by the Chairman pursuant to Article 30.

(2) Conciliators appointed from outside the Panel of Conciliators shall possess the qualities stated in paragraph (1) of Article 14.

## Section 3
## Conciliation Proceedings

### Article 32

(1) The Commission shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Commission, shall be considered by the Com-

mission which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

**Article 33**

Any conciliation proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Conciliation Rules in effect on the date on which the parties consented to conciliation. If any question of procedure arises which is not covered by this Section or the Conciliation Rules or any rules agreed by the parties, the Commission shall decide the question.

**Article 34**

(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms. To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties. The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, and shall give their most serious consideration to its recommendations.

(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement. If, at any stage of the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the submission of the dispute and recording the failure of the parties to reach agreement. If one party fails to appear or participate in the proceedings, the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate.

**Article 35**

Except as the parties to the dispute shall otherwise agree, neither party to a conciliation proceeding shall be entitled in any other proceeding, whether before arbitrators or in a court of law or otherwise, to invoke or rely on any views expressed or statements or admissions or offers of settlement made by the other party in the conciliation proceedings, or the report or any recommendations made by the Commission.

Convention

# Chapter IV
# Arbitration

## Section 1
## Request for Arbitration

### Article 36

(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

## Section 2
## Constitution of the Tribunal

### Article 37

(1) The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36.

(2) (a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree.

(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties.

### Article 38

If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible,

appoint the arbitrator or arbitrators not yet appointed. Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute.

**Article 39**

The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute; provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties.

**Article 40**

(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38.

(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14.

## Section 3
## Powers and Functions of the Tribunal

**Article 41**

(1) The Tribunal shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

**Article 42**

(1) The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

(2) The Tribunal may not bring in a finding of *non liquet* on the ground of silence or obscurity of the law.

(3) The provisions of paragraphs (1) and (2) shall not prejudice the power of the Tribunal to decide a dispute *ex aequo et bono* if the parties so agree.

**Convention**

### Article 43

Except as the parties otherwise agree, the Tribunal may, if it deems it necessary at any stage of the proceedings,

- (a) call upon the parties to produce documents or other evidence, and
- (b) visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate.

### Article 44

Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.

### Article 45

(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.

(2) If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so.

### Article 46

Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.

### Article 47

Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party.

**Convention**

## Section 4
## The Award

**Article 48**

(1) The Tribunal shall decide questions by a majority of the votes of all its members.

(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it.

(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based.

(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent.

(5) The Centre shall not publish the award without the consent of the parties.

**Article 49**

(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties. The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.

(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.

## Section 5
## Interpretation, Revision and
## Annulment of the Award

**Article 50**

(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General.

(2) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter. The

**Convention**

Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.

**Article 51**

(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence.

(2) The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered.

(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter.

(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request.

**Article 52**

(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:

> (a) that the Tribunal was not properly constituted;
>
> (b) that the Tribunal has manifestly exceeded its powers;
>
> (c) that there was corruption on the part of a member of the Tribunal;
>
> (d) that there has been a serious departure from a fundamental rule of procedure; or
>
> (e) that the award has failed to state the reasons on which it is based.

(2) The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.

(3) On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an *ad hoc* Committee of three persons. None of the members of the Committee shall have been a member of

Convention

the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).

(4) The provisions of Articles 41-45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply *mutatis mutandis* to proceedings before the Committee.

(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.

(6) If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter.

## Section 6
## Recognition and Enforcement
## of the Award

### Article 53

(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

### Article 54

(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

### Article 55

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

## Chapter V
## Replacement and Disqualification
## of Conciliators and Arbitrators

### Article 56

(1) After a Commission or a Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged; provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel.

(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy.

### Article 57

A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification

**Convention**

of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.

**Article 58**

The decision on any proposal to disqualify a conciliator or arbitrator shall be taken by the other members of the Commission or Tribunal as the case may be, provided that where those members are equally divided, or in the case of a proposal to disqualify a sole conciliator or arbitrator, or a majority of the conciliators or arbitrators, the Chairman shall take that decision. If it is decided that the proposal is well-founded the conciliator or arbitrator to whom the decision relates shall be replaced in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

# Chapter VI
# Cost of Proceedings

**Article 59**

The charges payable by the parties for the use of the facilities of the Centre shall be determined by the Secretary-General in accordance with the regulations adopted by the Administrative Council.

**Article 60**

(1) Each Commission and each Tribunal shall determine the fees and expenses of its members within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.

(2) Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or Tribunal concerned upon the fees and expenses of its members.

**Article 61**

(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings.

(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tri-

Convention

bunal and the charges for the use of the facilities of the Centre shall be
paid. Such decision shall form part of the award.

# Chapter VII
# Place of Proceedings

### Article 62

Conciliation and arbitration proceedings shall be held at the seat of
the Centre except as hereinafter provided.

### Article 63

Conciliation and arbitration proceedings may be held, if the parties
so agree,

> (a) at the seat of the Permanent Court of Arbitration or of any
> other appropriate institution, whether private or public,
> with which the Centre may make arrangements for that
> purpose; or
> (b) at any other place approved by the Commission or Tri-
> bunal after consultation with the Secretary-General.

# Chapter VIII
# Disputes Between Contracting States

### Article 64

Any dispute arising between Contracting States concerning the
interpretation or application of this Convention which is not settled by
negotiation shall be referred to the International Court of Justice by the
application of any party to such dispute, unless the States concerned
agree to another method of settlement.

# Chapter IX
# Amendment

### Article 65

Any Contracting State may propose amendment of this Conven-
tion. The text of a proposed amendment shall be communicated to the
Secretary-General not less than 90 days prior to the meeting of the
Administrative Council at which such amendment is to be considered

Convention

and shall forthwith be transmitted by him to all the members of the Administrative Council.

**Article 66**

(1) If the Administrative Council shall so decide by a majority of two-thirds of its members, the proposed amendment shall be circulated to all Contracting States for ratification, acceptance or approval. Each amendment shall enter into force 30 days after dispatch by the depositary of this Convention of a notification to Contracting States that all Contracting States have ratified, accepted or approved the amendment.

(2) No amendment shall affect the rights and obligations under this Convention of any Contracting State or of any of its constituent subdivisions or agencies, or of any national of such State arising out of consent to the jurisdiction of the Centre given before the date of entry into force of the amendment.

# Chapter X
# Final Provisions

**Article 67**

This Convention shall be open for signature on behalf of States members of the Bank. It shall also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign the Convention.

**Article 68**

(1) This Convention shall be subject to ratification, acceptance or approval by the signatory States in accordance with their respective constitutional procedures.

(2) This Convention shall enter into force 30 days after the date of deposit of the twentieth instrument of ratification, acceptance or approval. It shall enter into force for each State which subsequently deposits its instrument of ratification, acceptance or approval 30 days after the date of such deposit.

**Article 69**

Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.

Convention

31

### Article 70

This Convention shall apply to all territories for whose international relations a Contracting State is responsible, except those which are excluded by such State by written notice to the depositary of this Convention either at the time of ratification, acceptance or approval or subsequently.

### Article 71

Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice.

### Article 72

Notice by a Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary.

### Article 73

Instruments of ratification, acceptance or approval of this Convention and of amendments thereto shall be deposited with the Bank which shall act as the depositary of this Convention. The depositary shall transmit certified copies of this Convention to States members of the Bank and to any other State invited to sign the Convention.

### Article 74

The depositary shall register this Convention with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations and the Regulations thereunder adopted by the General Assembly.

### Article 75

The depositary shall notify all signatory States of the following:

- (a) signatures in accordance with Article 67;
- (b) deposits of instruments of ratification, acceptance and approval in accordance with Article 73;
- (c) the date on which this Convention enters into force in accordance with Article 68;
- (d) exclusions from territorial application pursuant to Article 70;

**Convention**

(e) the date on which any amendment of this Convention enters into force in accordance with Article 66; and

(f) denunciations in accordance with Article 71.

DONE at Washington, in the English, French and Spanish languages, all three texts being equally authentic, in a single copy which shall remain deposited in the archives of the International Bank for Reconstruction and Development, which has indicated by its signature below its agreement to fulfil the functions with which it is charged under this Convention.

Convention

Case 1:20-cv-00199-RS Document 9-3 Filed 04/24/19 Page 80 of 703

# Exhibit 3

**International Centre for Settlement of Investment Disputes**

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

CLAIMANT

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

RESPONDENT

**Decision on Liability and the Principles of Quantum**

Rendered by a tribunal composed of:

Professor Dr. Klaus M. Sachs, President
The Honorable Charles N. Brower, Arbitrator
Mr. Gabriel Bottini, Arbitrator

Secretary of the Tribunal
Ms. Natalí Sequeira

**Date of dispatch to the Parties: 30 December 2016**

## TABLE OF CONTENTS

A.     THE PARTIES...........................................................................................8

    I.      Claimant ...........................................................................................8

    II.     Respondent .......................................................................................8

B.     THE ARBITRAL TRIBUNAL..................................................................8

    I.      The Honorable Charles N. Brower ...................................................9

    II.     Mr. Gabriel Bottini ..........................................................................9

    III.    Prof. Dr. Klaus Sachs ......................................................................9

C.     SUMMARY OF THE PROCEDURAL HISTORY ...................................9

    I.      Arbitration Agreement and Institution of the Proceedings .............9

    II.     The Arbitral Proceedings................................................................16

D.     FACTUAL BACKGROUND.....................................................................26

    I.      Claimant .........................................................................................26

    II.     Claimant's Decision to Expand Production Capacity and Search for an
        Expansion Site in South America....................................................28

    III.    Claimant's Decision to Invest in Venezuela ..................................32

    IV.     VAT Credits ...................................................................................33

    V.      Construction of the Plant................................................................35

    VI.     Bauxite Price Increases ..................................................................36

    VII.    Production and Sale of Proppants Prior to the Take-over of the Plant...........40

    VIII.   Labor Unrest...................................................................................42

    IX.     Temporary Takeover of the Plant on 24 March 2010 ....................46

    X.      Final Takeover of the Plant on 15 May 2010.................................48

    XI.     Negotiations after the Takeover of the Plant..................................51

XII.   The Expropriation Decree and Follow-up Correspondence ..........................57

XIII.  The Administrative Expropriation Procedure and Claimant's Notice of Dispute
           59

XIV.  Further Negotiations between the Parties.......................................................61

XV.   The Judicial Expropriation Procedure and Parallel Negotiations .................62

**E.     PARTIES' POSITIONS** ........................................................................**64**

I.     Summary of Claimant's Position and Relief Sought .....................................64

II.    Summary of Respondent's Position and Relief Sought .................................74

**F.     THE TRIBUNAL'S REASONING** ....................................................**84**

I.     Jurisdiction .....................................................................................................84

II.    Admissibility ..................................................................................................87

III.   Breach of the Treaty .......................................................................................91

IV.    The Principles of Quantum...........................................................................143

V.     Decision on Costs.........................................................................................232

**G.     THE TRIBUNAL'S DECISION**..........................................................**233**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| App. BF- | Appendixes to the Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores |
| Claimant's Proposal | Proposal to Disqualify Mr. Gabriel Bottini submitted by Claimant on 29 October 2012 |
| Brailovsky/Flores I | First Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores dated 21 March 2014 |
| Brailovsky/Flores II | Second Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores dated 18 September 2014 |
| CETA | EU-Canada Free Trade Agreement |
| CLA- | Claimant's Legal Authorities |
| Claimant's Cost Submission | Claimant's Cost Submission of 30 June 2015 |
| Claimant's Post-Hearing Submission | Claimant's Post-Hearing Submission of 2 April 2015 |
| Claimant's Second Post-Hearing Submission | Claimant's Simultaneous Second-Round Post-Hearing Submission of 22 May 2015 |
| Claimant's Updated Cost Submission | Claimant's submission of its Updated Cost Submission of 23 November 2015 |
| Claimant's Valuation Update | Claimant's submission of the requested updates of its experts' valuations of 22 October 2015 |
| Confidentiality Order | The Confidentiality Order contained in Procedural Order No. 2 issued by the Tribunal on 10 June 2014 |
| Counter Memorial | Respondent's Counter Memorial dated 21 March 2014 |
| CVG | Corporación Venezolana de Guyana |
| CVG Bauxilum | CVG Bauxilum, C.A. |
| CVG EDELCA | CVG Electrificación del Caroní, C.A. |
| DAC | *Demandé d'Autorisation Compagnie* |

| Decision on Disqualification | Prof. Sachs and Judge Browers Decision on Claimant's Proposal to Disqualify Mr. Bottini from the Tribunal dated 27 February 2013 |
|---|---|
| Declaration | Mr. Bottini's new declaration under Rule 6(2) of the ICSID Arbitration Rules submitted on 1 March 2013 to the Secretary-General, dated 28 February 2013 |
| Exhibit C- | Claimant's Exhibits |
| Exhibit CLEX- | Exhibits to the Damages Assessment of Saint-Gobain's Investments in Venezuela of Professor Pablo T. Spiller of Compass Lexecon |
| Exhibit ER- | Accompanying Exhibits to Mr. Rondón's Witness Statement |
| Exhibit R- | Respondent's Exhibits |
| Exhibit RL- | Respondent's Legal Authorities |
| FET | Fair and Equitable Treatment |
| Fort Smith Plant | The Saint-Gobain proppants plant in Fort Smith, Arkansas |
| FPS | Full Protection and Security |
| France-Venezuela-BIT or "the Treaty" | Agreement on Encouragement and Reciprocal Protection on Investments Between the Government of the French Republic and the Goverment of the Bolivarian Republic of Venezuela |
| IBA Rules | International Bar Association Rules on the Taking of Evidence in International Arbitration (2010) |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | The ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID Convention | The Convention on the Settlement of Investment Disputes Between States and Nationals of Other States |
| ICSID Institution Rules | Rules of Procedure for the Institution of Conciliationand Arbitration Procedures |
| ILC Draft Articles | International Law Comission's Draft Articles on Responsibility of States for Internationally Wrongful Acts |
| Larry I | First Witness Statement of Mr. Larry dated 28 October 2013 |
| Larry II | Second Witness Statement of Mr. Larry dated 17 June 2014 |

| Memorial | Claimant's Memorial dated 28 October 2013 |
| MIBAM | Ministry of the People's Power for Basic Industries and Mining |
| MILCO | Ministry of Light Industry and Commerce |
| Millot | Witness Statement of Mr. Millot dated 28 October 2013 |
| PCIJ | Permanent Court of International Justice |
| PDVSA Gas | PDVSA Gas, S.A. |
| Pedersen | Witness Statement of Mr. Pedersen dated 25 October 2013 |
| Rejoinder | Respondent's Rejoinder on the Merits dated 18 September 2014 |
| Reply | Claimant's Reply Memorial dated 18 June 2014 |
| Request | Request for Arbitration against Respondent dated 25 May 2012 |
| Respondent's Cost Submission | Respondent's Cost Submission of 30 June 2015 |
| Respondent's Post-Hearing Brief | Respondent's Post-Hearing Submission of 2 April 2015 |
| Respondent's Post-Hearing Reply Brief | Respondent's Simultaneous Second-Round Post-Hearing Submission of 22 May 2015 |
| Respondent's Updated Cost Submission | Respondent's submission of its Updated Cost Submission of 23 November 2015 |
| Respondent's Valuation Update | Respondent's submission of the requested updates of its experts' valuations of 22 October 2015 |
| Rondón | Witness Stament of Mr. Rondón dated 17 March 2014 |
| Secretariat | Secretariat of the ICSID |
| Secretary-General | Secretary-General of the ICSID |
| SINPROTRAC | *Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares* |
| Spiller I | Damages Assessment of Saint-Gobain's Investments in Venezuela of Prof. Pablo T. Spiller of Compass Lexecon dated 28 October 2013 |

| | |
|---|---|
| Spiller II | Prof. Spiller's Second Damages Assessment dated 18 June 2014 |
| The "Bauxite Claims" | Claimant's claims that, by virtue of the increase of the bauxite price that had initially been agreed upon in the Bauxite Contract between Claimant and CVG Bauxilum, Respondent failed to accord to Claimant fair and equitable treatment pursuant to Article 3(1) of the Treaty and to protect and secure Claimant's investment pursuant to Article 3(2) of the Treaty. |
| The "Bauxite Contract" | The contract signed by CVG Bauxilum and Saint-Gobain Proppants Venezuela C.A. on 25 October 2005 |
| The "Court" | First Court of First Instance in Civil, Corporate and Agrarian Matter of the Second Circuit of the Judicial Circumscription of the State of Bolivar, Venezuela |
| The "Expropriation Decree" | Decree No. 8,133 published by Respondent [Venezuela] in the Official Gazette No. 39,644 on 29 March 2011 |
| The "Expropriation Law" | Expropriation Law for Reasons of Public or Social Purposes |
| The "Expropriation Procedure" | The judicial expropriation procedure pursuant to Articles 22-24 of the Expropriation Law initiated by PDVSA Industrial on 18 April 2012 |
| The "Halliburton MPA" | Master Purchase Agreement between Norpro Venezuela, along with two other Saint-Gobain proppant facilities and Halliburton of 1 April 2009 |
| The "Law on Access" | The Law on the Defense of Access to Goods and Services |
| The "Worldbank Guidelines" | The World Bank Guidelines on the Treatment of Foreign Direct Investment of 1992 |
| Venezuelan Court Proceedings | Court Proceedings ongoing in Venezuela relating to the Norpro Venezuela, C.A. expropriation |
| Vienna Convention | The Vienna Convention on the Law of Treaties |

## A.   THE PARTIES

### I.   CLAIMANT

1.   Saint-Gobain Performance Plastics Europe, hereinafter referred to as "**Claimant**" or "**Saint-Gobain**", represented in this arbitration by its duly authorized attorneys Mr. Alexander A. Yanos of Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, NY 10004-1482, United States of America, Ms. Elizabeth C. Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, United States of America and Ms. Noiana Marigo, of Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, 31st Floor, New York, NY 10022, United States of America..

### II.   RESPONDENT

2.   The Bolivarian Republic of Venezuela, hereinafter referred to as "**Respondent**" or "**Venezuela**", represented in this arbitration by Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República and Dr. Felipe Andrés Daruiz Ferro, Coordinador Integral del Despacho del Procurador, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas Bolivarian Republic of Venezuela. Respondent is also represented by its duly authorized attorneys Mr. Benard V. Preziosi, Jr. of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, United States of America, and Mr. Eloy Barbará de Parres, Ms. Gabriela Álvarez Ávila, Ms. Kate Brown de Vejar and Ms. Dori Yoldi of Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Mexico City, United Mexican States.

3.   Claimant and Respondent are hereinafter each referred to as a "**Party**" and jointly as the "**Parties**".

## B.   THE ARBITRAL TRIBUNAL

4.   The Arbitral Tribunal has been constituted as follows:

I.    THE HONORABLE CHARLES N. BROWER

      (appointed by Claimant)

      20 Essex Street Chambers
      20 Essex Street
      London WC2R 3AL
      GREAT BRITAIN
      Tel: +44 (0)20 7842 1200
      Fax: +44 (0)20 7842 1270
      E-mail: cbrower@20essexst.com

II.   MR. GABRIEL BOTTINI

      (appointed by Respondent)

      Parana 580- Piso 5° "J"
      C1017AAL- Buenos Aires
      Argentina
      Tel.: + 54 11 4371-3165
      Fax: + 54 11 4372-7974
      E-mail gbottini@outlook.com

III.  PROF. DR. KLAUS SACHS

      (appointed by the Parties)

      Nymphenburger Str. 12
      D-80335 München
      GERMANY
      Tel: +49 89 23 807-109
      Fax: + 49 89 23 807-40 621
      E-mail: Klaus.Sachs@cms-hs.com


C.    SUMMARY OF THE PROCEDURAL HISTORY

I.    ARBITRATION AGREEMENT AND INSTITUTION OF THE PROCEEDINGS

5.    This arbitration concerns a legal dispute between Saint-Gobain and Venezuela arising out
      of Venezuela's alleged refusal to compensate Saint-Gobain for the expropriation of Saint-

Gobain's investment in its 99.99%[1] subsidiary Norpro Venezuela C.A. ("**Norpro Venezuela**" or "**Norpro**") following a televised speech of Venezuela's President Hugo Chávez on 15 May 2010. Claimant alleges that Respondent breached the *Agreement on Encouragement and Reciprocal Protection of Investments between the Government of the French Republic and the Government of the Bolivarian Republic of Venezuela* (the "**France-Venezuela-BIT**" or the "**Treaty**"), which entered into force on 15 April 2004, by refusing to offer compensation for the expropriation of Norpro Venezuela's proppants plant in Puerto Ordaz, Bolivar State, as well as by sanctioning or failing to intervene in the increase of the price for the supply of bauxite allegedly in breach of a contract entered into with a State-owned entity, thus failing to treat Claimant fairly and equitably and to accord its investment full protection and security, in violation of Articles 5(1) and 3(1) and (2) of the Treaty.

6.   Article 5(1) of the France-Venezuela BIT provides in its authentic French and Spanish versions:[2]

| | |
|---|---|
| "*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés* | "*Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra* |

---

[1] One share is held by Mr. Luis Páez, a Venezuelan national and the President of Norpro Venezuela, who subscribed a single share when Norpro Venezuela was incorporated. The planned transfer of Mr. Páez's share to Saint-Gobain has not yet been completed. Request, ¶ 4, note 4.

[2] The free English translation of the French text published in the Official Journal of the French Republic No. 102, 30 April 2004, which has been submitted by Claimant as **Exhibit C-1** and has not been challenged by Respondent, reads:

"*1. The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement.*

*All measures of expropriation which could be taken must result in the payment of prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*

*The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment.*"

*de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié.*"[3]

*Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tadar a la fecha de la expropriación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado.*"[4]

9.    Article 3(1) and (2) of the Treaty provides:[5]

---

[3] *Journal Officiel de la République Française nº102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.

[4] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

[5] The free English translation submitted by Claimant as **Exhibit C-1** reads:

"*1. Each of the Contracting Parties will ensure fair and equitable treatment for investments by nationals and companies of the other Party in its territory and in its maritime area, in accordance with the rules and principles of international law, and will ensure that the exercise of this right thus recognized shall have no impediments either in law or in fact. In particular, although not exclusively, impediments to fair and equitable treatment in law or in fact are any arbitrary or discriminatory restrictions to the purchase and transport of raw and ancillary materials, of energy and*

*"1. Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et équitable, conformément aux règles et principe du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de miyens de production et d'exploitation de tout type, tout entrave à la vente et au transport des produits à l'intérieur du pays à l'étranger, ainsi que toutes autres mesures ayant un effet analogue.*

*2. Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières."*[6]

*"1. Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así como cualquier otra medida que pueda tener un efecto análogo.*

*2. Las inversiones efectuadas por nacionales o sociedades de una o otra de las Partes Contratantes gozarán, en el territorio y en la zona*

---

*fuels, as well as to any means of production and exploitation, or any impediment to the sale and transport of products within the country and overseas, along with all other measures having a similar effect.*

    *2. Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security."*

[6] *Journal Officiel de la République Française n°102 du 30 avril 2004,* **Exhibit C-1**, p. 7775.

> *marítima de la otra Parte contra-*
> *tante, de una protección y de una*
> *seguridad plenas y completas.*"[7]

12.   Claimant has invoked the arbitration provisions in Article 8 of the France-Venezuela BIT providing for arbitration before the International Centre for Settlement of Investment Disputes (**"ICSID"**). Article 8 of the Treaty provides:[8]

> "*1. Tout différend qui survient entre un national ou une société d'une Partie contractante et l'autre Partie contractante, au sujet d'une obligation de cette dernière relative à un investissement en vertu du présent Accord, est réglé à l'amiable entre les deux parties concernées.*
>
> *2. Si un tel différend n'a pas pu être réglé dans un délai de six mois à partir de moment où il a été soulevé par l'une ou l'autre des parties*

> "*1. Cualquier controversia que surja entre un nacional o una sociedad de una Parte Contratante y la otra Parte Contratante en lo concerniente a una obligación de esta última en relación con una inversión en virtud del presente Acuerdo, será resuelta amistosamente entre las dos partes interesadas.*
>
> *2. Si dicha controversia no pudiese ser resuelta en un plazo de seis meses a partir del momento en que ha sido identificada por una u otra de*

---

[7] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004,* **Exhibit C-1**, pp. 332-353-332.354.

[8] The free English translation submitted by Claimant as **Exhibit C-1** reads:

> "*1. Any dispute which arises between a national or a company of a Contracting Party and the other Contracting Party, regarding an obligation of the latter relating to an investment under the terms of the present Agreement, shall be settled amicably between the two party concerned.*
>
> *2. If such a dispute cannot be settled within six months from the time it was raised by either of the parties to the dispute, at the request of the national or the company in question it shall be submitted to either the competent court of the State in which the investment was made or to arbitration by the International Center* [sic] *for the Settlement of Investment Disputes (ICSID), pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965. This decision is the choice of the national or the company concerned. Once the decision has been made to pursue arbitration, the decision becomes final.*
>
> *3. The arbitral tribunal shall determine if the Contracting Party to the dispute has met their obligations under the terms of the provisions of this agreement. If this is not the case, the court* [sic] *will set the amount of compensation for the national or company party to the dispute.*
>
> *4. The arbitral award is final and binding to the parties to the dispute.*"

*au différend, il es soumis à la demande du national ou de la société en question soit à la juridiction compétente de l'Etat dans lequel l'investissement a été réalisé soit à l'arbitrage du Centre international pour le règlement des différends relatifs aux investissements (CIRDI), créé par la Convention entre Etats et ressortissants d'autres Etats, signée à Washington le 18 mars 1965. Cette option relève du choix du national ou de la société intéressé. Une fois l'option effectuée en faveur de l'arbtrage, celle-ci devient définitive.*

*3. Le tribunal arbitral détermine si la Partie contractante partie au différend a respecté ses obligations en vertu des dispositions du présent accord. Si tel n'est pas le cas, le tribunal fixera le montant de l'indemnisation du national ou de la société partie au différend.*

*4. La sentence arbitrale est définitive et obligatoire pour les parties au différend.""*[9]

*las partes en controversia, se someterá, a pedido del nacional o de la sociedad en cuestión, a la jurisdicción competente del Estado en el cual se ha efectuado la inversión o bien el arbitraje del Centro Internacional para el Arreglo de Diferencias relativas a Inversiones (C.I.A.D.I.) creado por la Convención para el arreglo de diferencias relativas a las inversiones entre Estados y nacionales de otros Estados, firmado en Washington el 18 marzo de 1965. Dicha opción queda a elección del nacional o de la sociedad interesada. Una vez ejercida la opción de arbitraje esta será definitiva.*

*3. El tribunal arbitral determinará si la Parte Contratante, parte en la controversia, ha cumplido sus obligaciones en virtud de lo dispuesto en el presente Acuerdo. Si eso no fuera el caso, el tribunal fijará el monto de la indemnización del nacional o de la sociedad parte en la controversia.*

*4. El laudo arbitral es definitivo y obligatorio para las partes en controversia."*[10]

17.    On 25 May 2012, Claimant filed a Request for Arbitration against Respondent (**"Request"**), together with Exhibits C-001 to C-047, with the Secretary-General of ICSID (the **"Secretary-General"**) in accordance with Article 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the **"ICSID**

---

[9] *Journal Officiel de la République Française nº102 du 30 avril 2004*, **Exhibit C-1**, pp. 7775-7776.
[10] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

Convention") and the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "**ICSID Institution Rules**").

18.   On 29 May 2012, the Secretariat of ICSID (the "**Secretariat**") transmitted the Request to Respondent.

19.   On 15 June 2012, the Secretary-General registered Claimant's Request in accordance with Article 36 of the ICSID Convention and Rules 6 and 7 of the ICSID Institution Rules and notified the Parties of such registration. The case was assigned the ICSID Case Number ARB/12/13.

20.   On 28 September 2012, Claimant appointed Judge Charles N. Brower, a national of the United States of America, as arbitrator.

21.   On 3 October 2012, Respondent appointed Mr. Gabriel Bottini, a national of the Argentine Republic, as arbitrator.

22.   On 4 October 2012, Judge Brower accepted his appointment as arbitrator by Claimant, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**").

23.   On 25 October 2012, Mr. Bottini accepted his appointment as arbitrator by Respondent, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Arbitration Rules.

24.   On 29 October 2012, Claimant submitted a Proposal to Disqualify Mr. Gabriel Bottini pursuant to Articles 57 and 58 of the ICSID Convention and Rule 9 of the ICSID Arbitration Rules (**"Claimant's Proposal"**), together with Annexes A to H. The Secretariat acknowledged receipt of Claimant's Proposal on 30 October 2012.

25.   On 12 November 2012, the Secretary-General informed Prof. Dr. Klaus Sachs that the Parties agreed on his appointment as President of the Tribunal. By letter of 14 November 2012, Prof. Sachs accepted his appointment, having provided a duly signed declaration to the Secretariat in accordance with Rule 6(2) of the ICSID Arbitration Rules.

26.   On 26 November 2012, the Secretary-General informed the Parties that Prof. Sachs, Judge Brower and Mr. Bottini had accepted their appointments as arbitrators and, accordingly, pursuant to Rules 6(1) of the ICSID Arbitration Rules, the Tribunal was deemed to have been constituted and the proceedings to have begun as of such date; in addition, Ms. Natalí Sequeira was designated to serve as the Secretary of the Tribunal (the "**Secretary**"). As provided for by ICSID Arbitration Rule 9(2), on the same date, the Secretariat transmitted Claimant's Proposal to the three members of the Tribunal.

## II.   THE ARBITRAL PROCEEDINGS

27.   Pursuant to ICSID Arbitration Rule 9(6), on 27 November 2012, the Secretariat informed the Parties that the proceedings were suspended until a decision on Claimant's Proposal would be made.

28.   By letter of 28 November 2012, Prof. Sachs and Judge Brower set a schedule for submissions on Claimant's Proposal.

29.   On 7 December 2012, Respondent filed its Observations to Claimant's Proposal to Disqualify Mr. Bottini, together with Exhibits R-001 to R-003 and Legal Authorities RL-001 to RL-013.

30.   By letter of 14 December 2012, Mr. Bottini furnished his explanations, together with Exhibit 1, to the Tribunal, pursuant to Rule 9(3) of the ICSID Arbitration Rules.

31.   By letter of 21 December 2012, Claimant commented on Respondent's Observations of 7 December 2012 and Mr. Bottini's letter of 14 December 2012 and submitted Annexes I to L.

32.   On the same date, Respondent filed its Final Observations to Claimant's Proposal to Disqualify Mr. Bottini.

33.   On 27 February 2013, Prof. Sachs and Judge Brower issued a Decision on Claimant's Proposal to Disqualify Mr. Bottini from the Tribunal under Article 57 of the ICSID Convention ("**Decision on Disqualification**"), rejecting Claimant's Proposal on the condition that Mr. Bottini complete, sign, and transmit to the ICSID Secretary-General a new Declaration under Rule 6(2) of the ICSID Arbitration Rules within 10 days of the date of the Decision on Disqualification.

34.   Pursuant to Rule 9(6) of the ICSID Arbitration Rules, the proceedings were resumed on 27 February 2013.

35.   On 1 March 2013, in accordance with the Decision on Disqualification, Mr. Bottini submitted to the Secretary-General a new Declaration under Rule 6(2) of the ICSID Arbitration Rules, dated 28 February 2013 ("**Declaration**").

36.   By letter to the Secretary-General of 7 March 2013, Claimant referred to Mr Bottini's Declaration and requested that he "*notify the parties upon his acceptance of any mandate from the Argentine Government which involves providing advice regarding a bilateral investment treaty or any controversy relating thereto.*" Claimant reserved its right to renew objections to Mr. Bottini.

37.    On 13 March 2013, Mr Bottini made a disclosure in accordance with his Declaration of 28 February 2013.

38.    By letter of 14 March 2013, the Tribunal provided the Parties with a draft agenda for the first session and a draft procedural order, for their comments and review. The Tribunal further proposed to appoint Mr. Felix Lautenschlager of Prof. Sachs' law firm as Assistant to the Tribunal.

39.    By letter of 20 March 2013, Claimant indicated its availability for the first session, via telephone or videoconference, and agreed to the appointment of Mr. Lautenschlager as Assistant to the Tribunal.

40.    By email of 20 March 2013, Respondent stated that it considered that the first session should be held in person, and confirmed that it would make itself available on the June or July dates indicated in the Tribunal's letter of 14 March 2013.

41.    By email of 28 March 2013, the Parties jointly proposed a draft procedural order for the Tribunal's consideration.

42.    By email of 3 April 2013, Claimant informed the Tribunal of its availability for an in-person first session on the June and July dates proposed by the Tribunal in the letter of 14 March 2013.

43.    By letter of 4 April 2013, Claimant requested further information regarding Mr. Bottini's disclosure of 12 March 2013.

44.    By letter of 5 April 2013, the Tribunal invited Claimant to agree pursuant to Rule 13(1) of the ICSID Arbitration Rules to an in-person hearing to be held in Paris on 6 June 2013.

45.    By email of 9 April 2013, Claimant indicated that that it remained available for an in-person first session on the proposed date.

46.    By letter of 11 April 2013, the Tribunal confirmed to the Parties that the first session would take place in Paris on 6 June 2013.

47.    By letter of 13 April 2013, Mr. Bottini responded to Claimant's letter of 4 April 2013.

48.    On 6 June 2013, the Tribunal held the first session with the Parties in Paris, France.

49.    By email of 8 June 2013, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

50. By email of 11 June 2013, ICSID provided to the Parties a revised draft procedural order no.1 and invited the Parties to confirm or submit any comments on its content by 14 June 2013.

51. By email of 13 June 2013, Claimant provided its comments on the revised draft procedural order no.1.

52. By email of 13 June 2013, Respondent stated that it had no comments on the revised draft procedural order no.1.

53. On 18 June 2013, the Tribunal issued Procedural Order No. 1, including the Procedural Rules governing this arbitration.

54. By letter of the same date, Claimant requested further information from Mr. Bottini in light of his disclosure of 8 June 2013.

55. By letter of 27 June 2013, Mr. Bottini responded to Claimant's letter of 18 June 2013.

56. By email of 6 August 2013, the Secretary provided the Parties with the Spanish version of Procedural Order No.1.

57. By email of 13 August 2013, Mr. Bottini informed the other members of the Tribunal and the Parties that he had been appointed as arbitrator by the Bolivarian Republic of Venezuela in the case of *Venezuela US, S.R.L. (Barbados) v. The Bolivarian Republic of Venezuela*, PCA Case N°AA494.

58. By email of 5 September 2013, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

59. By letter of 27 September 2013, Claimant informed ICSID and the Tribunal of the Parties' agreement to request that the procedural calendar set forth in Section 13 of Procedural Order No. 1 be amended in respect of the Schedule for Submission of Pleadings and Document Production. By email of the same date, Respondent confirmed its agreement.

60. By letter of 4 October 2013, the Tribunal confirmed to the Parties that it had no objection to the procedural calendar proposed by the Parties on 27 September 2013.

61. By cover letter of 28 October 2013, received on 29 October 2013, Claimant submitted its Memorial ("**Memorial**") together with Exhibits C-048 to C-136 and Legal Authorities CLA-001 to CLA-090**,** the Witness Statements of Mr. Jack Larry, Mr. Jorgen Pedersen and Mr. Patrick Millot, the Damages Assessment of Saint-Gobain's Investments in Venezuela of Prof. Pablo T. Spiller of Compass Lexecon and its accompanying exhibits

CLEX-1 to CLEX-79, and Exhibits C-001 to C-047 accompanying the Request for Arbitration, amended to include the translation of two foreign language exhibits (as required by Procedural Order No. 1).

62. By letter of 31 October 2013, ICSID submitted the revised Procedural Order No.1 to the Parties.

63. By email of 30 November 2013, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

64. By letter of 12 February 2014, Claimant informed Respondent and the Tribunal of an inadvertent error in the Expert Report of Prof. Spiller, namely that exhibit CLEX-80 had been omitted, and that all references to CLEX-07 should be read as references to CLEX-80. Claimant enclosed with its letter an updated list of exhibits and exhibit CLEX-80.

65. By cover letter of 21 March 2014, Respondent submitted its Counter-Memorial ("**Counter Memorial**"), together with Exhibits R-004 to R-071 and Legal Authorities RL-014 to RL-125, the Witness Statement of Mr. Eduardo Rondón and its English translation with its accompanying exhibits ER-001 to ER-010, and the Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores with its accompanying appendixes BF-001 to BF-099.

66. On 4 April 2014, in accordance with Procedural Order No. 1, the Parties exchanged requests for the production of documents.

67. On 5 May 2014, the Parties produced the requested documents to which they did not object, and exchanged objections to the remainder of the requests.

68. By letter of 12 May 2014, Claimant

   a)   submitted its Redfern Schedule, setting out its replies to Respondent's objections to Claimant's document requests; and

   b)   applied for an order, pursuant to Article 9(4) of the International Bar Association Rules on the Taking of Evidence in International Arbitration (2010) ("**IBA Rules**"), to protect documents that are produced in this arbitration and that Claimant considered to be commercially and technically confidential as contemplated by Article 9(2)(e) of the IBA Rules.

69. By email of 12 May 2014, Respondent submitted its Redfern Schedule setting out its replies to Claimant's objections to Respondent's document requests.

70.    By letter of 15 May 2014, the Tribunal asked for clarifications from the Parties regarding their document requests and invited Respondent to respond to Claimant's application for a confidentiality order by 19 May 2014.

71.    On 15 May 2014, Claimant submitted a Request for Provisional Measures pursuant to Article 47 of the ICSID Convention and Rule 39 (1) of the ICSID Arbitration Rules, together with an Annex A and Legal Authorities CLA-091 to CLA-102, requesting that the Tribunal direct Respondent to discontinue court proceedings ongoing in Venezuela relating to the expropriation of Norpro Venezuela, C.A (the "**Venezuelan Court Proceedings**").

72.    By letter of 18 May 2014, Respondent responded to the Tribunal's letter of 15 May 2014, regarding Claimant's requests for documents, and provided comments objecting to Claimant's application for a confidentiality order.

73.    By letter of 19 May 2014, Claimant responded to the Tribunal's letter of 15 May 2014, regarding Respondent's requests for documents.

74.    By letter of 27 May 2014, the Tribunal invited Claimant to submit further details with respect to Respondent's Request No. 10 in its document requests, relating to "*accountant-client privilege*", as well as to comment on Respondent's submission that Claimant had waived any privilege.

75.    By letter of 28 May 2014, Claimant provided further details on its claim of accountant-client privilege with respect to Respondent's Request No.10, together with Annexes A, B and C to its letter.

76.    On 28 May 2014, Respondent submitted its Response to Claimant's Request for Provisional Measures, together with Exhibit R-072 and Legal Authorities RL-126 to RL-132. Hard copies of the Response and accompanying exhibits were transmitted to ICSID within two business days, in accordance with Procedural Order No.1.

77.    By email of 30 May 2014, Respondent provided comments in relation to its Request No. 10, further to Claimant's letter of 28 May 2014.

78.    By letter of 3 June 2014, the Tribunal invited the Parties to exchange a second round of submissions regarding Claimant's Request for Provisional Measures, on or before 10 June 2014 for Claimant, and on or before 17 June 2014 for Respondent.

79.    On 10 June 2014, the Tribunal issued its Procedural Order No. 2, which contained a confidentiality order ("**Confidentiality Order**") and its decision on the Parties' requests for document production.

80.   On 10 June 2014, Claimant submitted its Reply on Request for Provisional Measures, together with Exhibit C-137 and Legal Authorities CLA-103 to CLA-107, and the Legal Expert Opinion of Dr Allan R. Brewer Carías with its accompanying appendixes A, B and C.

81.   By letter of 12 June 2014, Claimant informed the Tribunal that the Parties had agreed to exchange documents for which no objection was sustained by 25 June 2014.

82.   By letter of 16 June 2014, Respondent provided to the Tribunal a list of people Respondent designated to have access to the Highly Confidential Documents subject to the Tribunal's Confidentiality Order in Procedural Order No. 2.

83.   By letter of 17 June 2014, Claimant objected to the inclusion of Mr. Eduardo José Rondón Cedeño on Respondent's list of designated persons and requested that Respondent be required to identify a replacement designee. Claimant also noted that it would rely on certain documents to be produced in its Reply Memorial the following week as Highly Confidential Documents and requested confirmation from Respondent that, until such time as the Tribunal approved Respondent's list of designees, the Highly Confidential Documents would not be shared beyond the individuals identified as Venezuela's external legal advisers and its external experts, failing which Claimant requested an order from the Tribunal to the same effect.

84.   On 17 June 2014, Respondent submitted its Additional Response to Claimant's Request for Provisional Measures, together with Exhibits R-073 to R-077.

85.   On 18 June 2014, the Tribunal invited Respondent to comment on Claimant's letter of 17 June 2014 concerning Respondent's list of designated persons, by 20 June 2014.

86.   By cover letter of 18 June 2014, Claimant submitted its Reply Memorial ("**Reply**"), together with Exhibits C-138 to C-156 and Legal Authorities CLA-108 to CLA-151, the Second Witness Statement of Mr. Jack Larry, the Second Legal Expert Opinion of Dr. Allan R. Brewer Carías with its accompanying appendixes D to L, and the Supplemental Report of Prof. Spiller of Compass Lexecon with its accompanying exhibits CLEX-81 to CLEX-195.

87.   By letter of 20 June 2014, Respondent noted that it disagreed with the contents of Claimant's letter of 17 June 2014, but would nevertheless remove Mr. Rondón Cedeño from its list of designated persons, to be replaced by Mr. Luis Govanny Cárdenas Rodríguez.

88.   On 23 June 2014, the Tribunal invited Claimant to state whether it had any objections to the designation of Mr. Cárdenas Rodríguez. By email of the same day, Claimant confirmed that it had no objections.

89.   By email of 24 June 2014, Respondent transmitted to the Secretary the signed confidentiality undertakings of the 22 persons designated by Respondent to have access to the Highly Confidential Documents.

90.   By letter of 25 June 2014, the Tribunal approved Respondent's list of Recipients of the Highly Confidential Documents as set out in Respondent's letter dated 16 June 2014 and modified by letter dated 20 June 2014. The Secretary then transmitted the signed undertakings to the Tribunal.

91.   By email of 22 July 2014, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

92.   By letter of 8 August 2014, the Tribunal informed the Parties that it had concluded its deliberations on Claimant's Request for Provisional Measures and decided, by majority decision, that the Request was to be denied. The reasons for this decision would be conveyed to the Parties in due course by way of a Procedural Order, which would also attach the dissenting opinion.

93.   On 9 September 2014, Procedural Order No. 3, containing the reasons for the decision on Claimant's Request for Provisional Measures, was issued on behalf of the majority of the Tribunal, attaching the Dissenting Opinion of Judge Brower.

94.   By cover letter of 18 September 2014, Respondent submitted its Rejoinder on the Merits ("**Rejoinder**"), together with Exhibits R-78 to R-125, Legal Authorities RL-133 to RL-189 and the Second Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores with its accompanying appendixes BF-100 to BF-177.

95.   By email of 30 September 2014, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

96.   By letter of 14 November 2014, the Tribunal invited the Parties to propose any procedural items they wished to discuss during the Pre-Hearing Conference Call on 10 December 2014 and indicate whether they had been able to reach any agreement on these items by 25 November 2014.

97.   On 25 November 2014, the Parties submitted their Procedural Proposals to the Tribunal, identifying the items on which they were able to reach an agreement as well as the items to be discussed during the Pre-Hearing Conference Call.

98.   By emails of 3 and 4 December 2014, in accordance with Section 9 of Procedural Order No. 1, both Parties agreed to hold the hearing in Washington, D.C., United States of America.

99.  By letter of 5 December 2014, ICSID informed the Parties and the Tribunal that Ms. Sequeira would take maternity leave and that Ms. Giuliana Canè would serve as Secretary of the Tribunal during her absence.

100. By letter of the same date, the Tribunal informed the Parties that Mr. Lautenschlager would leave the President's law firm by the end of the year and thus cease to act as the Tribunal's Assistant in this case. The President proposed to the Parties that his associate Ms. Susanne Häusler act as the future Assistant to the Tribunal and, unless the Parties had any objections, attend the Pre-Hearing Conference Call instead of Mr. Lautenschlager.

101. By emails of 8 and 9 December 2014, the Parties informed the Tribunal that they had no objections to Ms. Häusler being designated as Assistant to the Tribunal.

102. On 10 December 2014 at 12 p.m. EST, the Tribunal held the Pre-Hearing Conference Call with the Parties, during which it heard the Parties on their respective positions regarding the issues on which the Parties had not been able to reach an agreement according to their Procedural Proposals of 25 November 2014.

103. By letter of 12 December 2014, the Tribunal informed the Parties about its decision on the Parties' Procedural Proposals of 25 November 2014.

104. By e-mails of 22 December 2014, each Party notified the Tribunal and the opposing Party of the names of the other Party's fact and/or expert witnesses that it wished to cross examine at the Hearing.

105. By e-mail of 19 January 2015, Claimant notified the Tribunal and Respondent about the order in which it intended to present its witnesses at the Hearing.

106. On 23 January 2015, Respondent submitted corrections to the second Expert Report on Quantum of Mr. Vladimir Brailovsky and Dr. Daniel Flores, together with corrected appendixes BF-100A and BF-103A.

107. By letter of 26 January 2015, Respondent submitted a request that the Tribunal admit additional factual exhibits into the record. On the same day, Claimant submitted additional legal authorities CLA-152 to CLA-154 and Respondent submitted additional legal authorities RL-190 and RL-191.

108. By letter of 29 January 2015, Claimant commented on and opposed Respondent's request that the Tribunal admit additional factual exhibits into the record. By letter of the same day, Respondent replied to Claimant's comments.

109. On 30 January 2015, the Tribunal granted Respondent's request, provided that such evidence would be submitted by 2 February 2015, and granted Claimant leave to submit evidence in rebuttal by 4 February 2015.

110. On 31 January 2015, Respondent submitted Exhibits R-126 to R-129 to the Tribunal. On 1 February 2015, Claimant submitted Exhibits C-159 to C-162 as evidence in rebuttal.

111. From 2 to 6 February 2015, the Tribunal held the Hearing with the Parties at the facilities of ICSID in Washington, D.C., USA.

112. On 11 February 2015, the Tribunal transmitted to the Parties a list of questions for them to address in their Post-Hearing Briefs.

113. By e-mail of 11 March 2015, Claimant requested that any Award issued in these proceedings would be withheld from publication pursuant to Section 18.1 of Procedural Order No. 1, pending Claimant's review and redaction of confidential, business sensitive information.

114. On 16 March 2015, the Tribunal confirmed that, as reflected in Section 18.1 of Procedural Order No. 1, no procedural order, decision or award issued in these proceedings would be published without the consent of the Parties.

115. On 2 April 2015, the Parties simultaneously submitted their post-hearing submissions ("**Claimant's Post-Hearing Submission**"; "**Respondent's Post-Hearing Brief**").

116. On 22 May 2015, the Parties simultaneously submitted their second round of post-hearing submissions ("**Claimant's Second Post-Hearing Submission**"; "**Respondent's Post-Hearing Reply Brief**").

117. On 2 June 2015, Respondent submitted comments on allegedly new arguments raised in Claimant's Second Post-Hearing Submission.

118. On 12 June 2015, Claimant replied to Respondent's comments of 2 June 2015.

119. On 19 June 2015, the Tribunal decided to admit Sections 1 and 4 of Respondent's letter of 2 June 2015 as responsive submissions relating to new arguments raised in Claimant's Second Post-Hearing Submission; the Tribunal further considered Sections 2 and 3 of Respondent's letter an inadmissible further submission to be struck from the record.

120. On 30 June 2015, the Parties simultaneously submitted their cost submissions ("**Claimant's Cost Submission**"; "**Respondent's Cost Submission**").

121. On 3 August 2015, ICSID informed the Parties and the Tribunal that Ms. Sequeira had resumed her functions as Secretary to the Tribunal.

122. On 13 August 2015, the Tribunal asked the Parties for an update of their experts' valuation of Norpro Venezuela, S.A. as of the date of the award, based on 31 August 2015 as the date of valuation. The Tribunal emphasized that it requested this update for comparison purposes, without prejudice to the Tribunal's final decision on the date of valuation to be applied in the present case. Finally, the Tribunal asked the Parties to confer with their experts whether the requested updated could be submitted by 30 September 2015.

123. On 15 August 2015, Mr. Bottini made a further disclosure in accordance with his Declaration of 28 February 2013.

124. By e-mail of 21 August 2015, Respondent requested an extension of the proposed time limit for the submission of the updated experts' valuations until 15 October 2015.

125. By e-mail of 25 August 2015, Claimant confirmed that it had no objection to the extended deadline requested by Respondent. By e-mail of the same day, the Tribunal agreed to the extension of the proposed time limit until 15 October 2015.

126. On 14 October 2015, Claimant informed the Tribunal that its expert required some additional time to prepare the updated report requested by the Tribunal and therefore requested that the time limit for its submission be extended to 22 October 2015. Claimant further noted that Respondent did not oppose the proposed extension.

127. On 15 October 2015, the Tribunal granted Claimant's request and extended the deadline for the submission of the updated reports of both Parties' experts until 22 October 2015.

128. On 22 October 2015, the Parties simultaneously submitted the requested updates of their experts' valuations ("**Claimant's Valuation Update**"; "**Respondent's Valuation Update**").

129. On 30 October 2015, Respondent requested leave from the Tribunal to submit a letter of no more than three pages to address certain issues raised in Claimant's Valuation Update.

130. On 3 November 2015, the Tribunal granted Respondent's request and permitted both Parties to submit brief comments on the Valuation Update of the opposing Party by 6 November 2015.

131. On 6 November 2015, the Parties simultaneously submitted their comments on the Valuation Update of the opposing Party; Respondent further submitted Exhibit R-131. In its e-mail to the Tribunal, Claimant reserved its right to amend its Cost Submission in light

of the additional fees and costs incurred in relation to its Valuation Update and its comments on Respondent's Valuation Update.

132. On 9 November 2015, the Tribunal invited both Parties to submit any amendments they wished to make to their respective Cost Submissions by 23 November 2015.

133. On 23 November 2015, the Parties simultaneously submitted their updated cost submissions ("**Claimant's Updated Cost Submission**"; "**Respondent's Updated Cost Submission**").

## D.   FACTUAL BACKGROUND

134. The following is a summary of the background facts that are not disputed between the Parties, or which have otherwise been established by the evidence submitted in these proceedings to the satisfaction of the Tribunal. The following summary is intended to give a general overview of the present dispute and should not be taken to be exhaustive of all facts that may be relevant. Such additional facts may be discussed in the Tribunal's analysis below.

## I.   CLAIMANT

135. Saint-Gobain is a company incorporated under the laws of the French Republic and was registered on 28 March 1995.[11] It is an indirect and wholly-owned subsidiary of Compagnie de Saint Gobain and a member of the Compagnie de Saint-Gobain group of companies.[12]

136. Norpro Venezuela is a wholly owned subsidiary of Saint-Gobain and is a corporation organized and existing under the laws of Venezuela.[13]

---

[11] Memorial, ¶ 1; **Exhibit C-46**.

[12] Memorial, ¶ 1. Saint-Gobain is wholly-owned by Société de Participations Financières et Industrielles, which in turn is wholly-owned by Compagnie de Saint-Gobain. Request, ¶ 11.

[13] Request, ¶ 4. Saint-Gobain's Foreign Direct Investment in Norpro Venezuela was registered before the Superintendence of Foreign Investments of Venezuela. **Exhibit C-9**. Norpro Venezuela was initially registered on 25 October 2005, under the name Saint-Gobain Proppants Venezuela, C.A., before the Fifth Mercantile Registry of the Capital District and Miranda State Circuit. **Exhibit C-4**. By shareholder agreement, the company subsequently changed its name to Proppants Venezuela, C.A. and moved its seat from Caracas to Puerto Ordaz, Bolivar State, Venezuela. On 19 December 2005, Proppants Venezuela C.A. was registered before the Mercantile Registry of the Bolivar State Circuit in Puerto Ordaz, Venezuela. **Exhibit C-5**. On 15 December 2008, the shareholders agreed to change the company's name from Proppants Venezuela to Norpro Venezuela, C.A.; this name change was officially registered on 26 December 2008. **Exhibit C-13**. One share in Norpro Venezuela is held by Luis Páez, a Venezuelan national and the President of Norpro Venezuela. The planned transfer of Mr. Páez's share to Saint-Gobain has not yet been completed.

137. Effected through its Venezuelan subsidiary, Claimant constructed and operated a plant in Puerto Ordaz, Bolivar State, Venezuela, designed to produce ceramic proppants – small ceramic beads made from bauxite used as part of the hydraulic fracturing process to "*prop*" open fissures within a well induced in reservoir rock formations, in order to speed up and increase the recovery of hydrocarbons from each formation.[14]

138. Claimant (through its affiliates) has been manufacturing ceramic proppants to support the oil and gas industry for approximately 30 years.[15] By the end of the 1990s, Saint-Gobain had developed a strong market position in North America, particularly with respect to high-grade ceramic proppants.[16]

139. In its Memorial, Claimant described the recent evolution of the proppants business, *inter alia*, as follows:

> "[T]*he market for proppants has developed and expanded significantly in the last ten years and the major driver of this development and expansion has been technological advancement in the oil and gas industry. Specifically, advances have allowed oil and gas producers to: (a) drill deeper wells; (b) drill horizontally; and (c) use hydraulic fracturing, or 'fracking,' to permit the extraction of hydrocarbons from unconventional sources such as shale rock formations. Fracking is a technique whereby fluids are injected at high pressure into a wellbore drilled into non-permeable shale formations. The fluids create cracks in the shale, which unlocks oil and gas trapped inside. The proppants get inside the microfissures created by the high-pressure fluids injected and hold them open, increasing production.* […]
>
> *Thus, in an industry increasingly characterized by deeper, horizontal wells and fracking, proppants allow for a more efficient extraction of hydrocarbons.*
>
> *Additionally, by stimulating a well, not only do proppants improve extraction rates for oil and natural gas, but they also contribute to increased well productivity and longevity.*
>
> *There are four grades of proppants. In order of increasing strength, they include: (a) sand; (b) resin-coated sand; (c) ceramic; and (d) resin-coated ceramic. The choice of which proppant to use in a particular well derives largely from the closure stress of that well. Saint-Gobain makes ceramic proppants, which are suited for the deeper, higher-closure-stress wells typical in shale formations in the United States. Other types of proppants, particularly sand proppants, cannot withstand such conditions.*"[17]

---

[14] Request, ¶ 4. Memorial, ¶ 2.
[15] Memorial, ¶ 5. **Exhibit C-133**.
[16] Memorial, ¶ 8.
[17] Memorial, ¶¶ 5-7. Internal citations omitted.

## II. CLAIMANT'S DECISION TO EXPAND PRODUCTION CAPACITY AND SEARCH FOR AN EXPANSION SITE IN SOUTH AMERICA

140. In light of the growing proppants industry in North America, but also internationally, the Saint-Gobain Group began in the early 2000s to research options for increasing its production capacity.[18] At that time, there were not sufficient proven bauxite reserves available in the US either for an expansion of the Saint-Gobain proppants plant in Fort Smith, Arkansas (the "**Fort Smith Plant**") or for a new North American facility. Therefore, in 2004, Saint-Gobain started to search for a site for the production of proppants in South America, anticipating that 70 to 80% of the proppants to be produced there would be sold in the North American market, while the remaining percentage would go to the South American market.[19]

141. The following were identified by Claimant as the main requirements for the production of proppants:

> "*(a) steady supplies of bauxite* [*i.e.*, the primary raw material required for the production or proppants]*, gas and electricity (at competitive prices); (b) proximity to the U.S. market in order to access the largest (current) market for proppants at reasonable transportation costs; (c) access to a skilled workforce capable of dealing with the technical aspects of proppants production; and (d) the ability to build a plant and produce on a short timeline to meet ever-increasing customer needs.*"[20]

142. Of these requirements, access to bauxite and proximity to the target market were considered to be the key drivers of investment location.[21]

143. Initially, Claimant considered four countries, *i.e.*, Brazil, Guyana, Trinidad and Venezuela, as potential locations for the new proppants plant. However, following several business development explorations trips taken by employees of the Saint-Gobain Group, the locations in Guyana, Trinidad and Brazil were rejected as either unfeasible in the near future or not economically competitive.[22]

---

[18] Memorial, ¶ 8.

[19] Memorial, ¶ 10; Pedersen, ¶¶ 9, 11, 44.

[20] Memorial, ¶ 12. Internal citations omitted. *See also* Pedersen, ¶ 15; Larry, ¶¶ 17, 22; **Exhibits C-069** and **C-107**.

[21] Memorial, ¶ 12.

[22] Memorial, ¶ 11. Pedersen, ¶¶ 16, 17. Claimant submits that Guyana lacked readily accessible gas supplies; in addition, electricity costs were high, and shipping options were rather limited. In Trinidad, Saint-Gobain would have been required to import bauxite from Guyana, the steady supply of which could not be guaranteed, and land at the preferred industrial location would not be available for several years. Finally, in Brazil, the domestic bauxite was already being sold to aluminium producers and extractors and, in addition, Saint-Gobain would have had to mine and transport bauxite itself. Memorial, ¶¶ 13-15; **Exhibits C-063** and **C-071.**

144. Claimant considered Venezuela an interesting potential site for the construction of a proppants plant given the ready availability of bauxite, electricity and natural gas,[23] and, according to Claimant, the prospect of entering into favorable contracts with State-owned entities for the supply of those resources and logistical benefits such as the availability of a well-established shipping route from the local port in Puerto Ordaz to Corpus Christi, Texas – where the finished proppants would be shipped for distribution within the North American market. In addition, Saint-Gobain had experience in Venezuela and in the Puerto Ordaz region and was hoping for governmental support to complete the project on time and on budget.[24]

145. In 2004, representatives of the Saint-Gobain Group met with officials from the Ministry of the People's Power for Basic Industries and Mining ("**MIBAM**") as well as representatives of the State-owned companies CVG Bauxilum, C.A. ("**CVG Bauxilum**"), responsible for the supply of bauxite; CVG Electrificación del Caroní, C.A. ("**CVG EDELCA''**), responsible for the supply of electricity; and PDVSA Gas, S.A. ("**PDVSA Gas**"), responsible for the supply of gas, to discuss a possible investment.[25] The Parties agree that, during these meetings, Venezuelan officials expressed general support for the project; they are in dispute, however, as to whether Venezuelan officials further gave specific assurances in the sense that, if Saint-Gobain agreed to invest in Venezuela, Venezuela would ensure that favorable long-term contracts could be signed for the delivery of bauxite, gas and electricity to Saint-Gobain.[26]

146. In September 2004, Jorgen Pedersen, Vice President and General Manager of Saint-Gobain NorPro, met with officials from State-owned Corporación Venezolana de Guayana ("**CVG''**) and its wholly-owned subsidiary, CVG Bauxilum, to further investigate a potential investment in Venezuela. According to Claimant, CVG further outlined on this occasion the possibility to enter into favorable long-term contracts for the supply of bauxite to Claimant. The Parties are again in dispute as to what was discussed as regards the possibility and terms of long-term contracts for the purchase of bauxite.[27]

147. On 3 February 2005, the team responsible for identifying the location for Claimant's new investment submitted a *Demande d'Autorisation Compagnie* ("**DAC**") with respect to the proposed greenfield investment in Venezuela with a capacity to produce 50,000 metric

---

[23] Memorial, ¶ 16; Request, ¶ 12.
[24] Memorial, ¶ 16.
[25] Memorial, ¶ 17.
[26] Memorial, ¶ 17; Rejoinder, ¶¶ 62 *et seq*.
[27] Memorial, ¶ 18; Pedersen, ¶ 21.

tons of ceramic proppants per year to senior management at Compagnie de Saint-Go-bain.[28] The DAC, which served as an official request to the shareholders to receive ap-proval for an investment, was approved on 7 February 2005.[29]

148. Around the same time, Jorgen Pedersen and Guy Rolli, head of the Saint-Gobain Delega-tion covering Colombia, Mexico and Venezuela, "*and others*"[30] started to meet with sen-ior officials within the Venezuelan Government, in particular from MIBAM and the Min-istry of Light Industry and Commerce ("**MILCO**"). According to Claimant, MIBAM – the ministry which oversaw CVG's activity – was "*the driving force within the Venezuelan Government, not only to obtain approval for the project generally, but also specifically to secure a long-term bauxite supply contract*"; thus, it considered the meetings with MIBAM to be of "*critical importance and determinative with respect to* [its] *assessment of the viability of its investment.*"[31]

149. On 27 April 2005, Saint-Gobain representatives met with Valmore Vásquez, Vice-Min-ister of Promotion of Investment for MIBAM, as well as representatives from PDVSA Gas and CADAFE (*Compañía Anónima de Administración y Fomento Eléctrico*) to dis-cuss the potential project.[32] According to Claimant, MIBAM acknowledged at the meet-ing that the availability of a domestic proppants production and supply would be of value for Venezuela.[33]

150. According to Mr. Pedersen's recollection, on 6 May 2005, Carmen Velásquez, Investment Promotion Coordinator of MIBAM, informally informed Claimant's representatives that "*Vice-Minister Raiza Molina would recommend to Minister Alvarez that Saint-Gobain's bauxite supply request be granted.*"[34] At a meeting on 10 May 2005 attended, among others, by MIBAM Vice-Minister Raiza Molina and CVG Bauxilum President Jesús Imery, MIBAM once more noted its strategy for increasing exports of non-oil-based prod-ucts and for developing future domestic production through the transfer of technology.[35] Claimant claims that Ms. Molina "*confirmed the terms of the proposed long-term supply contracts with CVG Bauxilum and PDVSA Gas for the supply of bauxite and gas, respec-tively, for any future investment by Saint-Gobain.*"[36]

---

[28] Memorial, ¶ 19; Counter-Memorial, ¶ 6; **Exhibit C-057**.

[29] Memorial, ¶ 19; Counter Memorial, ¶ 6; **Exhibit C-058**.

[30] It is not specified in Claimant's Memorial or in the witness statement submitted by Mr. Pedersen who such "*other*" participants were. *Cf.* Memorial, ¶ 20; Pedersen, ¶ 24.

[31] Memorial, ¶ 20; Pedersen, ¶ 24.

[32] Memorial, ¶ 22; **Exhibit C-2**.

[33] Memorial, ¶ 22.

[34] Pedersen, ¶ 27; Memorial, ¶ 23.

[35] Memorial, ¶ 23; **Exhibit C-3**.

[36] Memorial, ¶ 23.

151. According to Mr. Pedersen's notes of a meeting on 11 June 2005 with CVG Bauxilum President Jesús Imery, Mr. Imery noted that he had received support for Saint-Gobain's proppants investment from President Chávez and MIBAM Minister Victor Alvarez.[37] Subsequently, at a high-level meeting between representatives of the French and Venezuelan Governments on 20 October 2005, Claimant's representative at the meeting recorded in a memorandum that MIBAM Vice-Minister Vásquez confirmed that he had tasked the president of CVG Bauxilum with finalizing the contract as soon as possible.[38]

152. On 25 October 2005, Claimant registered Saint-Gobain Proppants Venezuela, C.A., predecessor in interest to Norpro Venezuela.[39] Three months later, on 27 January 2006, CVG Bauxilum, acting "*under the auspices of* […] *MIBAM and* […] *CVG*," and Saint-Gobain Proppants Venezuela C.A. signed a Purchase and Sale Agreement (the "**Bauxite Contract**").[40]

153. In the course of 2005, Claimant also negotiated with CVG EDELCA and PDVSA Gas regarding long-term contracts for the supply of electricity and gas, respectively. According to Claimant, MIBAM agreed at a meeting on 2 March 2006 to ensure that CVG EDELCA and PDVSA Gas would enter into long-term supply contracts with Norpro Venezuela in support of Saint-Gobain's proppants project.[41]

154. On 22 August 2006, MIBAM requested that CVG appoint (on behalf of the Ministry) an interlocutor based in Puerto Ordaz as the day-to-day contact for Saint-Gobain.[42] Accordingly, on 29 August 2006, Saint-Gobain was notified that Manuel Henriquez had been appointed as the interlocutor to assist Saint-Gobain with, among other things, obtaining the necessary permits to effect its investment in Venezuela.[43]

155. After additional meetings with representatives from the two State-owned companies, on 16 August 2006, Norpro Venezuela entered into a long-term supply contract for electricity with CVG EDELCA and, on 10 October 2006, into a long-term supply contract for electricity with PDVSA Gas.[44]

---

[37] **Exhibit C-068**.
[38] **Exhibit C-074**.
[39] **Exhibit C-9**. *Cf.* note 3 above.
[40] English translation submitted by Claimant in its Memorial, ¶ 25. The original Spanish text reads: "*CVG BAU-XILUM C.A., actuando bajo el auspicio del Ministerio de Industrias Básicas y Minería (MIBAM) y la Corporación Venezolana de Guayana (C.V.G.), suscribió un acuerdo con la empresa SAINT-GOBAIN PROPPANTS VENE-ZUELA, C.A.* […]." **Exhibit C-6**.
[41] Memorial, ¶ 26; **Exhibit C-077**.
[42] Memorial, ¶ 27; **Exhibit C-080**.
[43] **Exhibit C-081**.
[44] Memorial, ¶ 28; **Exhibits C-8** and **C-10**.

## III.  CLAIMANT'S DECISION TO INVEST IN VENEZUELA

156.  On 7 February 2006, the team responsible for the investment in Venezuela submitted an addendum to the DAC on the expanded capacity for the greenfield proppants plant in Venezuela, providing for an increased capacity of 70,000 metric tons per year.[45] This DAC was approved on 20 February 2006;[46] an update of the DAC, projecting higher costs than anticipated in the addendum, was submitted on 23 October 2006 and approved on 9 November 2006.[47]

157.  Upon receipt of the required internal approvals, Saint-Gobain proceeded to finalize the acquisition of land in Puerto Ordaz on which it intended to build its proppants plant.[48] Claimant claims that it had chosen Puerto Ordaz for the following reasons:

> "[I]t boasted good transportation options; and it was a terminus for the necessary supplies of gas and electricity; it offered a population of skilled workers. Of particular importance, Saint-Gobain's supplier of bauxite, CVG Bauxilum, was located in Puerto Ordaz. EDELCA—the electricity supplier—was also headquartered there."[49]

158.  Following the purchase of land in Puerto Ordaz, Saint-Gobain employees with experience in Venezuela helped determine staffing needs and costs of the new investment.[50] Jack Larry, General Manager of Saint-Gobain Proppants (responsible for managing the proppants business worldwide), was involved in developing the business case as well as in considering the technical issues of how to develop a plant in Venezuela.[51]

159.  Also in 2006, Saint-Gobain appointed Dominique Objois, the former General Manager of a Saint-Gobain plant in Korea, to spearhead the construction effort with his team. Mr. Objois was supported on site by a number of experienced employees seconded from the Fort Smith Plant.[52]

160.  Claimant then started focusing on the technical requirements for the proppants, in particular on the characteristics of the bauxite, i.e., of the primary raw material that was going to be supplied by CVG Bauxilum.[53]

161.  To that end, on 28 February 2006 and again a year later, at the end of March 2007, representatives of Saint-Gobain visited the CVG Bauxilum facility at Puerto Ordaz in order to

---

[45] Memorial, ¶ 29; Counter-Memorial, ¶ 6; **Exhibit C-075**.
[46] **Exhibit C-076**.
[47] **Exhibits C-082** and **C-083**.
[48] Memorial, ¶ 30; Pedersen, ¶¶ 38, 39.
[49] Memorial, ¶ 30. Internal citations omitted. See also Pedersen, ¶ 39.
[50] Pedersen, ¶ 41.
[51] Memorial, ¶ 31; Larry, ¶ 21.
[52] Memorial, ¶ 32; Pedersen, ¶ 40; Larry, ¶ 28.
[53] Memorial, ¶ 36.

develop the technical requirements for the bauxite to be provided under the Bauxite Contract and to learn more about CVG Bauxilum's business and production.[54] While noting that CVG Bauxilum was "*at present not receptive to providing customer specific Alumina/iron levels*," Claimant's representatives assessed that CVG Bauxilum's operation was "*very well run*."[55]

162.  In early April 2007, Saint-Gobain made an additional presentation to CVG Bauxilum and met with its President "*to discuss about possibilities to supply other grades of Bauxite and potential developments for the future*."[56] Shortly thereafter, in May 2007, Saint-Gobain submitted its request for bauxite supplies under the Bauxite Contract to CVG Bauxilum.[57] In June 2007, Norpro Venezuela reported internally that CVG Bauxilum had confirmed that it would "*supply up to 30% high Alumina content Bauxite*," which assured Claimant that CVG Bauxilum would provide the type of bauxite required to produce ceramic proppants in Venezuela.[58]

## IV.  VAT CREDITS

163.  Venezuelan law requires Venezuelan companies to pay VAT for goods and services they acquire and to collect VAT from Venezuelan, but not from foreign, purchasers of their goods and services, thus exempting exporters of goods manufactured in Venezuela from collecting VAT. When a company makes VAT payments on its purchases of goods and services, it accumulates VAT credits, and when it collects VAT from the buyer, it accumulates VAT debits, which are offset against the credits on a monthly basis. If the company has paid more VAT than it has collected, it carries the net balance forward to the next month.[59]

164.  Norpro Venezuela was to a large extent an exporter of goods manufactured in Venezuela and thus did not collect VAT from its foreign customers, but it nonetheless incurred VAT on most of its purchases because most of the equipment for the plant acquired during the construction phase as well as the raw materials (such as bauxite) used in the production of proppants and the labor services of the outsourcing companies were acquired in Venezuela and thus subject to VAT. As a result of this imbalance between its VAT payments and its VAT collections, as of 31 December 2009, Norpro Venezuela had accumulated VAT credits of VEF 11.7 million on its balance sheet.[60]

---

[54] Memorial, ¶ 37; **Exhibits C-078** and **C-087**.
[55] Memorial, ¶ 37; **Exhibit C-087**.
[56] **Exhibits C-089** and **C-088**.
[57] Memorial, ¶ 38; **Exhibit C-090**.
[58] Memorial, ¶ 38; **Exhibit C-091**.
[59] Counter-Memorial, ¶¶ 48-49.
[60] Memorial, ¶ 162; Counter-Memorial, ¶ 51.

165. While imported goods, such as equipment for a manufacturing facility, are generally subject to VAT, on 19 October 2006, Respondent issued Decree 4,908, which established a procedure that could result in the exoneration from import taxes and VAT on certain imported equipment.[61] If a company wanted to obtain such an exoneration, it had to apply for an exoneration certificate from the Ministry of Light Industry and Commerce (MILCO).[62]

166. In late March 2005, Jorgen Pedersen met with William Cañas, Director General of Capital Goods of MILCO, to discuss the proposed proppants plant and, more specifically, the exoneration from VAT and import tax to make the project economically sustainable.[63] By e-mail of 1 June 2006, Mr. Pedersen informed Mr. Patrick Millot, Vice President of Corporate Planning, Strategy and Finance for Saint-Gobain's High Performance Materials, that at a meeting on 26 May 2006, MIBAM had agreed to support Saint-Gobain's efforts to obtain import duty and import tax exemptions.[64]

167. In its 23 October 2006 DAC update, Claimant reported internally that President Chávez had just announced during a press conference the enactment of a Presidential Decree whereby a broad exoneration covering both VAT and import duties, applicable to imported capital goods not currently produced in Venezuela, such as equipment, machinery and spare parts, would be granted to promote the development of the industrial sector. In the same document, Claimant noted that "*the Ministry of Basic Industries and Mining (MIBAM) has supported us to get an exemption.*"[65] In an e-mail to Mr. Rolli and Mr. Millot dated 2 November 2006, Mr. Pedersen wrote that "*the new exoneration decree will probably make it more likely we get exoneration and simplify the process.*"[66]

168. Claimant applied for, and was granted on 25 October 2007, an Exemption for Capital Goods, covering VAT and import duties for machinery and other materials, in total 29 specific types of equipment, which Claimant required for the installation and operation of the plant;[67] thus, when that equipment was imported, no import tax or VAT was collected. For the rest of its purchases, Claimant had to pay regular import taxes and VAT, thus leading to the net credit balance of VEF 11.7 million.[68]

169. VAT credits do not create in themselves a payment liability of the State, but there is a process set out in the Venezuelan VAT law by which exporters of goods can obtain a

---

[61] **Exhibit R-43**.
[62] Counter-Memorial, ¶ 52.
[63] Memorial, ¶ 21; Pedersen, ¶ 24.
[64] **Exhibit C-079**.
[65] **Exhibit C-082**.
[66] **Exhibit C-084**.
[67] Memorial, ¶ 21; **Exhibit C-092**.
[68] *Cf.* Counter-Memorial, ¶¶ 53-54.

financial benefit by filing a request on a monthly basis for the recovery of the VAT credits based on the amount of export sales during the month. If the tax authorities grant the request, a special tax recovery certificate is issued, which may be used by the taxpayer to pay its Venezuelan taxes or it may be sold to a third party, who likewise can use the certificate to pay its taxes.[69]

170. As of 15 May 2010, Norpro Venezuela had, according to the recollection of Mr. Rondón:

> "*notified the authorities of its intention to start the process to recover VAT credits by applying for a special tax recovery certificate based upon export sales, in accordance with the relevant legislation,* [but] *was still in the process of compiling the relevant documentation necessary to support its application.*"[70]

## V.   CONSTRUCTION OF THE PLANT

171. In 2007, Claimant began to construct the proppants plant in Puerto Ordaz, with the majority of the necessary equipment arriving on site in September 2007.[71] In order to allow future increases of production capacity, construction was designed to be phased, with one production line to be built at first, and the addition of a second production line to be revisited in the future, "*once the facilities were working properly and delivering a profitable return.*"[72] Claimant anticipated that the planned second production line would essentially be "*copied and pasted*" from the first production line and would therefore take less time to go from initiation to full ramp-up, doubling the plant's capacity.[73]

172. The first production line was designed to begin with two mixers, with a total capacity of approximately 4,500 tons per month, but including designated space for a third mixer, which would raise total capacity to approximately 6,000 tons per month.[74] After the construction of the first production line with two mixers was completed, production of proppants began in September 2008. Despite beginning plans in early 2010, the third mixer, scheduled to come online in the beginning of 2013, was never installed.[75]

---

[69] Counter-Memorial, ¶¶ 57-58 and note 159 referring to Articles 43 and 44 of the *Decreto con rango, valor y fuerza de ley de reforma parcial del decreto n° 5.189 con rango, valor y fuerza de ley que establece el impuesto al valor agregado*, published in the Official Gazette on 26 February 2007 (Decree No. 5.212) and Article 1 of the *Decreto No. 611, Reforma Parcial del Reglamento Parcial No. 1 de la Ley que Establece el Impuesto al Valor Agregado, en Materia de Recuperación de Créditos Fiscales,* published in the OPfficial Gazette No. 37.794 on 10 October 2003. **Exhibits R-41** and **R-47**.
[70] Rondón, ¶ 38. During the Hearing, Mr. Rondón confirmed that the request for a special tax recovery certificate had indeen been submitted to the authorities. Transcript (Day 3), p. 775 lines 10-19. *See* also Claimant's Post-Hearing Submission, ¶ 156; Respondent's Reply Post-Hearing Brief, note 204.
[71] Memorial, ¶ 39; Pedersen, ¶ 42.
[72] Pedersen, ¶ 46; *cf.* Larry, ¶ 33; **Exhibit C-057**.
[73] Memorial, ¶ 40; Pedersen, ¶ 46.
[74] Memorial, ¶ 40.
[75] Larry, ¶ 32.

## VI.   BAUXITE PRICE INCREASES

### 1.   First Price Increase in September 2008

173.   On 15 July 2008, then President of CVG Bauxilum, Mr. Carlos Acosta Pérez, invited representatives of Claimant and Norpro Venezuela to a meeting for an "[o]*pen analysis of the contractual relation, in regards of the bauxite price*."[76] It is in dispute between the Parties whether the meeting, which took place on 29 July 2008, was held to "*discuss the situation*"[77] or simply to inform Claimant about the upcoming price increase as a *fait accompli*.[78]

174.   In an e-mail to Mr. Pedersen dated 30 July 2008, the General Manager of Norpro Venezuela, Mr. Oscar Cid, reported that CVG Bauxilum had presented the following reasons for an increase of the bauxite price: (i) increase in the Orinoco River Toll by 600%; (ii) adjustment of the extraction and production cost to a break even point; (iii) increase in the freight costs from Jobal Mine to the ACBL port due to an increase of the labor contract with the unionized ACBL workers; and (iv) an international market analysis comparing bauxite prices of various suppliers, according to which the price agreed under the Bauxite Contract was lower than the international market.[79] Mr. Cid further noted in his e-mail that, "*to* [his] *understanding, the* [bauxite price] *increase is a fact and in a very short time, maybe 1 month,*" and that CVG Bauxilum "*offer*[ed] *the right for a written reply, maximum by the end of this week, with any allegations, complaints and any other comment related to the impact of the increase in* [Norpro Venezuela]."[80]

175.   On 31 July 2008, Decree No. 6,220 with Rank, Value and Force of Law of Canalization and Maintenance of Navigation Routes was published in the Official Gazette, legally enacting the anticipated price increase for the Orinoco River Toll by 600%.[81]

176.   By letter of 1 August 2008, the President of Norpro Venezuela, Luis Páez, wrote to Mr. Pérez:

> "*Considering that, in accordance, with the policies of the MPPIBAM, Bauxilum has guaranteed to* [Norpro Venezuela] *a long-term supply of bauxite under the Contract, and considering that any adjustment in the sale price of bauxite is governed by the provisions of Clause 10 of the Contract, we wish to discuss with you the negative impact of any modification of the terms and conditions of the Contract could have for the*

---

[76] Memorial, ¶ 46; **Exhibit C-093**. *Cf.* Counter-Memorial, ¶ 64.
[77] Counter-Memorial, ¶ 64.
[78] Memorial, ¶¶ 46-47.
[79] **Exhibit C-093**. *Cf.* Counter-Memorial, ¶ 64.
[80] **Exhibit C-093**.
[81] **Exhibit R-50**.

> *Proppants Project and, consequently, for the plans of substitution of imports of Petróleos de Venezuela, S.A. (PDVSA), the policies of promotion of investment of MPPIBAM and the cooperation agreement between Venezuela and France.*"[82]

177. In the same letter, Mr. Páez also requested a meeting with CVG Bauxilum to discuss the potential effects of the price increase on Claimant's investment.[83] According to Claimant, CVG Bauxilum informed Norpro Venezuela at the meeting, which took place on 21 August 2008, that the bauxite price would be increased from USD 25.50 to USD 33.80 per metric ton, effective immediately.[84]

178. In a letter to Mr. Cid under the combined letterhead of MIBAM, CVG and CVG Bauxilum, dated 2 September 2008, Mr. Pérez undisputedly confirmed that USD 33.80 per metric ton would be the new price for the rest of the year 2008; he invoked the price revision clause in Clause 10.2 of the Bauxite Contract, based on the new tariffs for navigation on the Orinoco River and "*the significant variation experienced by extraction, transportation, and unloading costs of the bauxite at our Matanzas plant.*"[85] Mr. Pérez concluded by noting that the new price remained favorable because it "*correspond*[ed] *to the selling free on board price for the year 2007, and, on the other hand, to a gradual adjustment* [of the price beyond that] *applicable to the present fiscal period.*"[86]

179. In his letter dated 4 September 2008, addressed to the Vice Minister of MIBAM, Ms. Isabel Cristina Delgado, Norpro Venezuela's President Mr. Páez stated that Norpro Venezuela and MIBAM had "*agreed that the different contracts for the supply required for the Project, including the* [Bauxite] *Contract, would be structured as long-term agreements.*" Mr. Páez stated that Norpro Venezuela wished to discuss the negative impact of the price increase on the plant and, as a consequence, on PDVSA's plan to substitute imported by locally produced products, MIBAM's investment policies and the France-Venezuela BIT.[87]

---

[82] **Exhibit C-095**. English translation provided in Memorial, ¶ 47.

[83] Memorial, ¶ 47; **Exhibit C-095**; Counter-Memorial, ¶ 65.

[84] Memorial, ¶ 48: Further to a previous price increase, the original contract price of USD 23.50 per metric ton had been raised to USD 25.50. Pedersen, ¶ 50, note 9; Counter-Memorial, ¶ 63.

[85] Clause 10.2 of the Bauxite Contract reads: "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será applicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior.*" **Exhibit C-6**, Clause 10.2.

[86] **Exhibit C-11**. Quotations from English translations submitted by Respondent with **Exhibit R-51**. *Cf.* Counter-Memorial, ¶ 65.

[87] **Exhibit C-096**. English quote from Memorial, ¶ 170.

180. On 9 September 2008, representatives from Norpro Venezuela again met with CVG Bauxilum.[88] According to Claimant, they protested against the price increase as being *ultra vires*, but – in the interest of maintaining stable commercial conditions – requested that the new price be maintained through, at least, 31 December 2009.[89] In his letter to CVG Bauxilum dated 17 September 2008, Mr. Cid wrote:

> "*Even though* [Norpro Venezuela] *does not share Bauxilum's opinion expressed in the Official Writ with regards to the interpretation and application of item 10.2 of Clause Ten of the Contract in order to justify the Price Increase referred to in the Official Writ,* [Norpro Venezuela] *reaffirms its willingness to discuss with Bauxilum alternatives to guarantee, in the long term, the effective performance of the obligations of both parties under the Contract.*
>
> *Taking into account that the main interest of* [Norpro Venezuela] *is to maintain clear and stable conditions regulating the long-term supply of bauxite under the Contract, in accordance with what was discussed with Mr. Carlos Acosta Pérez and his advisors during our meeting* [on 9 September 2008], [Norpro Venezuela] *formally requests Bauxilum to consider the possibility of guaranteeing that the* […] *US$ 33.80 per ton of bauxite set forth in the Letter be maintained without any change until December 31, 2009.*
>
> […]
>
> *In any event, while the relevant discussions regarding the revision of this request take place,* [Norpro Venezuela] *wishes to clarify that the issuance of any purchase order of bauxite under the Contract, the payment of any amount owed by* [Norpro Venezuela] *to Bauxilum for such purposes, or the remittance of any correspondence or communication to Bauxilum, as of the Official Writ's date, shall not be deemed as an express or tacit acceptance of the Price Increase mentioned in the Official Writ by* [Norpro Venezuela], *or of any fact, assertion, declaration, circumstance or argument exposed by Bauxilum in the Official Writ.*"[90]

181. Claimant claims that it received no response to its request that the new price be maintained at least until 31 December 2009;[91] Respondent merely submits that the price indeed remained fixed at USD 33.80 per metric ton through 2009.[92]

182. In order to receive the required bauxite shipments for the remainder of 2008 and the whole of 2009, Norpro Venezuela had to submit its purchase order to CVG Bauxilum by 17

---

[88] Counter-Memorial, ¶ 66.
[89] Memorial, ¶ 50.
[90] **Exhibit C-12**. English translation submitted by Respondent with **Exhibit R-52**.
[91] Memorial, ¶ 50.
[92] Counter-Memorial, ¶ 68.

October 2008.[93] Norpro Venezuela did so and scheduled the deliveries at the increased price in order to secure a continuing supply of bauxite for its plant; however, according to Mr. Pedersen, it reserved its rights.[94] In a PowerPoint presentation on 11 October 2008, Claimant also informed MIBAM about the price increase of 2 September 2008, claiming it to be "*unjustified.*"[95]

183.   In an e-mail dated 21 November 2008, Mr. Pedersen informed Mr. Rolli and Mr. Larry that he had met with the new President of CVG Bauxilum, Mr. Jesús Calvo, the day before and, in particular, discussed the price increase. Mr. Pedersen wrote:

> "*Explained to him the current issue we have with pricing proposals out of the contract coming from the prior president and how that was impacting our business.*
> *Asked him to reconsider his proposal and return to the contractual obligation that we have together.*
>
> *They started up with explaining the increase of the river toll which they have had and how their costs have gone up. I then explained that naturally we will pay the increase in transportation costs which is according to the contract that we are not looking at no increase but an increase according to the inflation clause in the contract. He understood the position and his reaction was that we should make a proposal in writing to him and that he would consider it.*"[96]

184.   On 8 June 2009, in an update to the DAC of 23 October 2006, Norpro Venezuela reported:

> "*The cost of bauxite from our primary supplier Bauxilum was raised in mid 2008 by 34%. This increase was done outside of the terms and conditions of our existing contract. Bauxilum cited increases in barge transportation costs (River Toll) combined with the increased mining cost account form* [sic] *most if* [sic] *the price increases. A meeting was held on January 15, 2009 with the president of Bauxilum to seek a reduction of the increase that was imposed. In spite of continuous attempts to further discuss to date we are still awaiting their reply.*"[97]

185.   Norpro Venezuela never invoked the dispute resolution mechanism provided in Article 16 of the Bauxite Contract, *i.e.*, arbitration before the Center for Conciliation and Arbitration of the Chamber of Commerce of Caracas in relation to the bauxite price increase.[98]

---

[93] Memorial, ¶ 52; **Exhibit C-101**.
[94] Memorial, ¶ 52; Pedersen, ¶ 53.
[95] Memorial, ¶ 53; **Exhibit C-100**.
[96] **Exhibit C-102**.
[97] **Exhibit C-107**.
[98] **Exhibit C-6**. Counter-Memorial, ¶ 68, note 185.

**2.      Second Price Increase in March 2010**

186.   At a meeting held on 10 March 2010, CVG Bauxilum informed Norpro Venezuela that it sought to increase the price for bauxite supplied in 2010 to USD 51.28 per metric ton.[99] By letter to Mr. Cid, dated 12 April 2010 and under the letterhead of MIBAM, CVG and CVG Bauxilum, Mr. Calvo confirmed the price increase, again invoking Clause 10 of the Bauxite Contract.[100] Claimant claims that it protested against this price increase, both at the meeting on 10 March 2010 and in subsequent communications with CVG Bauxilum.[101] A further meeting between Claimant and CVG Bauxilum scheduled for 18 March 2010 was cancelled due to a visit of President Chávez to the area.[102] The parties to the Bauxite Contract never met to discuss this proposed price increase further and Norpro Venezuela never paid this price for any bauxite purchased from CVG Bauxilum.[103]

**VII.   PRODUCTION AND SALE OF PROPPANTS PRIOR TO THE TAKE-OVER OF THE PLANT**

187.   Once construction had been completed and the necessary permits had been obtained, the proppants plant entered the production ramp-up phase. On 26 September 2008, the plant produced its first saleable proppants, and on 13 December 2008, the first shipment of 1,500 tons of Venezuelan-produced proppants arrived in the US.[104]

188.   During the early part of 2009, Claimant focused on securing a long-term customer base for its Venezuelan proppants production. In the North American market, even though the oil and gas field operators are involved in selecting the type, quantity, etc. of the proppants, the oil service companies are the ones who buy the proppants from the supplier and then pump them into the drilled well.[105] Claimant thus intended to secure a long-term supply contract with its biggest client – Halliburton, a large oil services provider – as well as to diversify its customer base in North and South America.[106]

189.   On 1 April 2009, Norpro Venezuela, along with two other Saint-Gobain proppants facilities, entered into a Master Purchase Agreement with Halliburton (the "**Halliburton MPA**").[107] Pursuant to this agreement, Halliburton agreed to a "*take or pay*" arrangement,

---

[99] Memorial, ¶ 67; *cf.* Counter-Memorial, ¶ 69.
[100] **Exhibit C-16**.
[101] Memorial, ¶ 68; *cf.* Larry, ¶ 39, note 7.
[102] Memorial, ¶ 68; **Exhibit C-108**.
[103] Counter-Memorial, ¶ 69.
[104] Memorial, ¶¶ 54-55; Pedersen, ¶ 45; Larry, ¶ 26.
[105] Memorial, ¶ 57.
[106] Millot, ¶ 17; Memorial, ¶ 58.
[107] Memorial, ¶ 59; **Exhibit C-106**.

starting with 40 million pounds of proppants for the second quarter of 2009 rising steadily to a peak of 100 million for every quarter of 2011 and the first quarter of 2012.[108]

190. The proppants that Norpro Venezuela produced at Puerto Ordaz were stored at the plant or in an external warehouse near the Venezuelan port. Apart from the proppants that were sold on the South American market (generally 60 to 100 tons per month), the proppants were shipped from Venezuela to Corpus Christi, Texas. Once the Halliburton MPA was in place, the vast majority of the shipped proppants was sold to Halliburton under this contract.[109]

191. Prior to the start of production, Claimant brought a group of manufacturing employees from Venezuela to its Fort Smith, Arkansas proppants plant and trained them in the plant's processes. Norpro Venezuela's managers were sent to Fort Smith for supplemental training and also received training on site in Puerto Ordaz.[110] In addition, Claimant sent operators, maintenance and quality control personnel from Fort Smith to Puerto Ordaz to assist during the ramp-up phase, which according to Claimant, continued until August 2009.[111]

192. Norpro Venezuela operated using the "*overall equipment effectiveness*" (OEE) production method. This method computes the effectiveness of the plant *vis-à-vis* its overall capacity. According to Claimant, a plant operating at 85% OEE is considered world-class, and its proppants plants routinely operate at approximately 80 to 87%.[112]

193. As regards the Venezuelan plant during the ramp-up phase, Mr. Larry stated in his first witness statement:

> "[A]*djustments are always necessary during the ramp-up phase, and there is always a learning process for employees and management at a new plant. As expected, therefore, the quality and quantity of the proppants produced at Norpro Venezuela improved throughout ramp-up as the plant perfected production processes relating to time and temperature. Specifically, by July 2009, the plant was running quite efficiently on a continuous basis – based on my recollection of OEE numbers, it is clear that production had improved. And by September 2009 […], all of the technical issues normally associated with the start-up of a new plant had been addressed. Likewise, Norpro Venezuela had developed*

---

[108] Article 6, Table 1 of the Halliburton MPA provides that Halliburton had to take those quantities "*or 45% of Buyer's total purchases of ceramic proppants from all its suppliers, whichever is less.*" **Exhibit C-106**. According to Claimant, Halliburton thus had the option to buy 45% of its total purchases of ceramic proppants from all of its suppliers upon giving adequate notice pursuant to Article 6(b) of the Halliburton MPA. Memorial, ¶ 59, note 126.
[109] Memorial, ¶ 60; Larry, ¶¶ 34-36.
[110] Larry, ¶ 27.
[111] Larry, ¶ 28; Memorial, ¶ 56.
[112] Memorial, ¶ 69; Larry, ¶ 29.

> *the skills of a critical mass of workers in order to be able to effectively run the plant."*[113]

194.  In the 8 June 2009 update to the DAC, it was noted that "[t]*he project has encountered delay both in the initial start up of the project and during commissioning and start-up phase in achieving planned production levels.*"[114]

195.  In November 2009, the plant was temporarily shut down, the reason for which is disputed between the Parties.[115] As a proppants plant is required to run continuously for six months in order to reach a "*steady state,*" *i.e.*, 85% OEE or in the case of the Venezuelan plant a production of approximately 53,000 tons per year, the plant never reached its full production capacity with two mixers. By May 2010, the plant was producing approximately 3,400 tons of proppants per month, which would have resulted in an annual production of approximately 42,000 tons.[116]

196.  In a presentation on the 2011-2015 Strategic Plan, dated 18 March 2010, Claimant laid out a "*Venezuela Action Plan,*" noting that a "*Specialist* 'SURGE' [was] *underway to address critical VZ issues*": (i) "*Process Stability*"; (ii) "*Additive*s"; (iii) "*Maintenance pm focus*"; and (iv) "*Operator training*" and that the *"Key focus of team"* was to "*Audit all processes to insure consistency and adherence to control systems*" and "*Stabilize, stabilize, stabilize.*"[117]

197.  In a further presentation on the 2011-2015 Strategic Plan, dated 4 May 2010, Claimant noted that "*Venezuela plant output has declined since mid-March. Problems linked to several key issues*": (i) "*Elimination of refire addition to maintain production levels*"; (ii) "*Significant degradation of systems and controls within plant,*" caused, *inter alia*, by "*Labor issues leading to low worker cooperation and productivity*"; (iii) "*Batch stability impacted by critical changes*"; and (iv) "*High level of electrical failures during April due to maintenance by EDELCA in Puerto Ordaz.*"[118]

## VIII. LABOR UNREST

198.  As of the operational start-up of the plant, the majority of the workers at the plant was not directly employed by Norpro Venezuela (or any other of Claimant's subsidiaries), but rather by outsourcing companies. Already in the 3 February 2005 DAC, Claimant pro-

---

[113] Larry, ¶ 30.
[114] **Exhibit C-107**.
[115] Memorial, ¶ 65; Larry, ¶ 31; Counter-Memorial, ¶ 18; Rondón, ¶ 20. *See* also ¶ 207 below.
[116] Larry, ¶ 31; Memorial, ¶ 65.
[117] **Exhibit CLEX-80**; **Exhibit R-9**.
[118] **Exhibit CLEX-80**; **Exhibit R-10**.

posed the establishment of a new subsidiary in Venezuela rather than using SGMC Venezuela (one of Claimant's existing Venezuelan subsidiaries), naming as one of the reasons "*to avoid the creation of a labor union.*"[119] The DAC stated:

> "*In Venezuela, employees of a company have right to establish a labor union if the total number of employees of the company is more than 25. With a Proppants projects, the number of employees of SGMC Venezuela would be more than 25 and a labor union would become inevitable. With a new company, we would keep the number of permanent employees limited to 24, using third parties to supply temporary labor for the balance of our employment, a practice typically used in Venezuela. We therefore propose to establish a new company.*"[120]

199. The labor outsourcing model referred to in the DAC was indeed being used in Venezuela at that time and was known as "*tercerización.*"[121]

200. When Norpro Venezuela's operations and maintenance workforce returned from training at Fort Smith, Arkansas in 2008, they were informed that they would have to resign their positions with Norpro Venezuela and they would then be re-hired by RH Consultores, a third-party labor outsourcing company.[122] Regarding the terms of the new contracts, Respondent's witness Mr. Eduardo Rondón stated in his witness statement:

> "*One of the most significant changes was with respect to job security. RH Consultores was offering contracts of only six months' duration. These contracts could be renewed for a further six months, and then for a third period of six months. After this, there was a prospect of being hired as an employee under a contract of unlimited duration. Thus, it was as if the workers had a series of trial periods during which they were to be employed by the outsourcing company without the same job security and benefits. Although the basic salary was the same, there were some important differences in terms of benefits. I recall that the workers employed through RH Consultores only received an annual bonus of 15 days' salary (the minimum required by law). They received no performance-based bonus. They had their salary increased when required by law but there were no performance-based increases, and I remember hearing complaints that these increases were not even suffi-*

---

[119] The second reason was that SGMC Venezuela owned 100% of Carburo Del Caroni, a newly acquired company, whose former owner still had significant liabilities to some third parties, including employees, and it was considered that there was some risk that some of the former owner's creditors might sue Carburo del Caroni "*potentially implicating its mother company SGMC Venezuela*" in case of failure of the former owner to pay the liabilities. **Exhibit C-057**.

[120] **Exhibit C-057**.

[121] Counter-Memorial, ¶ 14, note 14. Outsourcing was made illegal in 2012, *cf.* Article 48 of Decree No. 8,938, with Rank, Value and Force of Organic Labor and Workers Law, published in the Official Gazette No. 6,076 (Extraordinary), dated 7 May 2012. **Exhibit R-12**. *See also* ¶ 209 below.

[122] Counter-Memorial, ¶ 15; Rondón, ¶ 10.

> *cient to keep up with inflation. Although the approximately 30-40 workers to whom this new policy was applied were unhappy about it, they accepted the new arrangement because it was made clear to them by Oswaldo Luna* [head of HR] *that this was the only way that they would keep their jobs.*"[123]

201. In the course of 2008, Norpro Venezuela recruited further workers that were employed through RH Consultores; according to Mr. Rondón's recollection, by the end of 2008, there were close to 70 workers who had contracts with this outsourcing company.[124]

202. Mr. Rondón further stated in his witness statement:

> "*Early in 2009, rumblings began among the Plant workers about the possibility of trying to get organized to form a union. The main complaint expressed by the workers was the outsourcing contracts, and the consequent lack of job security. […] The proponents of the union were employees that were very active among the operations and maintenance personnel at the Plant.*"[125]

203. Before the labor union had been formed, some of the workers who, according to Mr. Rondón, "[p]*lant management identified as being the main union agitators,*"[126] had their contracts terminated. Norpro Venezuela also terminated its relationship with RH Consultores and, on 16 June 2009, entered into an agreement with Outstaffing Corporation, a different outsourcing company in Venezuela.[127] As a consequence, the workers were told that their contracts with RH Consultores would be liquidated, meaning that the remaining time under their six-month contract would be paid out, and that they would have to sign new contracts with Outstaffing Corporation.[128]

204. The change of outsourcing companies led to growing discontent among the workers at the plant. Mr. Rondón described the situation in his witness statement as follows:

> "*The Plant workers saw this move* [*i.e.*, that they had to sign new contracts with Outstaffing Corporation] *as evidence that their contracts could be manipulated and even terminated at any time, with no justification whatsoever. […] some of the workers were on their third 6-month contract with RH Consultores and, with this move, their hopes that their next contract would be direct and of unlimited duration vanished because Outstaffing Corporation was offering only 6 month contracts again. The workers began to realize that the prospect of a direct contract of unlimited duration with Norpro Venezuela was not realistic.*

---

[123] Rondón, ¶ 11.
[124] Rondón, ¶ 13.
[125] Rondón, ¶ 14.
[126] Rondón, ¶ 15.
[127] **Exhibit ER-2**; Rondón, ¶ 15; Counter-Memorial, ¶ 16.
[128] Counter-Memorial, ¶ 16; Rondón, ¶ 17.

> *Although eventually all of the Plant workers signed the new contracts with Outstaffing Corporation, this move led more workers to be sympathetic to the idea of forming a union.*"[129]

205. A few months later, union organizers managed to obtain the required signatures to form a labor union and created the *Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares* ("**SINPROTRAC**").[130]

206. On 15 September 2009, Norpro Venezuela terminated the contract of Mr. Luna, head of HR, who had been employed directly by Norpro Venezuela.[131] By letter of 10 October 2009, Norpro Venezuela also terminated the contract with Outstaffing Corporation, effective 13 November 2009, resulting in the termination of the contracts of approximately 70 workers at the plant.[132] In the termination letter, Norpro Venezuela confirmed that it "*assume*[d] *the costs derived from the termination of the Agreement that may be billed by OUTSTAFFING CORPORATION, C.A after November 13, 2009.*"[133]

207. According to Respondent, the "*mass dismissal of workers*" was the true reason for the shutdown of the plant in November 2009 that lasted well into January 2010, not the "*series of mechanical improvements*" that Mr. Larry referred to in his witness statement;[134] Respondent acknowledges, however, that "*Norpro Venezuela did make use of the November 2009 Plant shutdown to carry out certain repairs and improvements.*"[135]

208. Following the termination of its contract with Outstaffing Corporation, Norpro Venezuela entered into contracts with three new outsourcing companies: Gestión Industrial Bolivar, C.A., Gerencia de Personal Guayana, C.A. and Guayana Internacional Cargo, C.A.

---

[129] Rondón, ¶ 17.

[130] Counter-Memorial, ¶ 17; Rondón, ¶ 18.

[131] Mr. Luna later brought a claim for wrongful dismissal against Norpro Venezuela, which was upheld by the Court of First Instance of Labor Trials, State of Bolivar, territorial extension Puerto Ordaz, dated 14 October 2010. **Exhibit ER-3**. The appeal filed against the decision was held to be meritless, and the decision of 14 Octoboer 2010 was upheld, by the Third Superior Labor Tribunal, State of Bolivar, territorial extension, dated 13 July 2011. **Exhibit ER-4**. Rondón, ¶ 18.

[132] Counter-Memorial, ¶ 17. Rondón, ¶ 19; **Exhibit ER-6**.

[133] **Exhibit ER-6**. Thirteen workers whose contracts were terminated in this context, filed a request for reinstallation and payment of accrued wages before the Chamber of Jurisdictions (*Sala de Fueros*) of the Office of the Work Inspector "*Alfredo Maneiso*" on 14 December 2009. In the administrative decision of 15 April 2010, Outstaffing Corporation was ordered to perform the immediate reinstallation of all thirteen workers and to pay their accrued wages since the date of their dismissal on 12 December 2009 until the final reinstallation of their work positions, based on the grounds that "*the dismissals were performed with no authorization for such purpose resulting from a fault qualification proceeding.*" **Exhibit ER-8**. On 29 July 2010, the same workers filed claims against Outstaffing Corporation before the Judge of First Instance of Substantiation, Mediation and Execution of Labor, State of Bolívar, claiming that the motive for their dismissal was the fact that they had been in the process of negotiating a draft collective bargaining agreement on behalf of the SINPROTRAC union. **Exhibit ER-7**.

[134] Larry, ¶ 31.

[135] Counter-Memorial, ¶ 18; Rondón, ¶ 20.

Through these companies, half of the plant workers were re-hired. According to Mr. Rondón, the other half joined with the SINPROTRAC union leaders, "*and began staging daily protests in front of the Norpro Venezuela Plant.*"[136]

209. The tension between Norpro Venezuela's management and the SINPROTRAC labor union was not an isolated case in the area, but rather the Ciudad Guayana industrial sector in general was experiencing labor unrest at that time. Workers employed in the iron, steel and aluminum industries were publicly demanding an end to unfair labor practices, one of their main complaints being the outsourcing labor arrangements. In addition, there was a nationwide political initiative to retain control of Venezuela's natural resources and related downstream manufacturing and refining processes in order to ensure that Venezuela would gain from the potential economic and social benefits of those sectors. As a consequence, in mid-2009, working groups were formed who developed and executed the *Plan Guayana Socialista*, aimed at involving the workers in the management and administration of basic industries and, *inter alia*, improving the working conditions.[137]

210. In Claimant's 18 March 2010 presentation on the 2011-2015 Strategic Plan, one of the issues was the "*Heavy focus on safety of away team* [referring to the SURGE team that was to address operational issues]": (i) "*All team members at Mara Inn*"; (ii) "*Restrictions on activities outside hotel*"; (iii) "*Travel to/from plant controlled*"; and (iv) "*Guidelines issued for worker conflicts.*"[138]

## IX. TEMPORARY TAKEOVER OF THE PLANT ON 24 MARCH 2010

211. On 24 March 2010, approximately 40 individuals, a group of former workers from an outsourcing company Norpro Venezuela had used, assembled outside the plant, then gained access to it and occupied the operation area of the plant for approximately four hours.[139] Among those individuals were, *inter alia*, Mr. Angel Marcano, a member of the Venezuelan National Assembly, and Mr. Asdrúbal López, a member of the Bolívar State Legislative Assembly and of President Chávez's ruling party.[140] Their role within the group is disputed between the Parties.[141]

212. Also present were Mr. Vicent Acosta Williams Jose, General Secretary of SINPROTRAC, and other leading members of the labor union. In the Request for Judicial Inspection filed by Norpro Venezuela on the same date, Mr. Jose is also listed as the first of five people who were identified to be in control of the takeover; Mr. Marcano and Mr. López

---

[136] Rondón, ¶ 21.
[137] Counter-Memorial, ¶ 20, note 57; Rondón, ¶ 25; **Exhibits C-14** and **ER-9**.
[138] **Exhibits CLEX-80** and **R-9**.
[139] Larry, ¶ 41; Rondón, ¶ 24.
[140] Memorial, ¶ 69.
[141] *Cf.* Memorial, ¶¶ 69, 71; Rejoinder, ¶ 10.

were not among those five people.[142] One of the pictures taken by the judicial inspector shows a banner which states: "*The community of workers (la masa obrera) united in support of our comrades who were fired for a non-justified cause. Norpro, we demand that they are re-hired immediately.*"[143]

213.  When the leader of the union took a megaphone and called out to the workers inside the plant to stop their work, Norpro Venezuela's management shut down the plant's major equipment and put the kiln into idle mode. They regained control of the plant the next day, but the Parties are in dispute as to the time it took to get the production the plant up and running again.[144] According to Claimant, the group also damaged the main gate of the plant, destroyed its lock and blocked the entrance; they further prevented employees from carrying out normal plant activities and forcefully removed Norpro Venezuela employees from the plant production areas.[145] The National Guard that Norpro Venezuela had engaged to provide security for the plant did not intervene.[146]

214.  In response to the takeover, Norpro Venezuela requested a judicial inspection, during which the judge documented the names of the individuals participating in the takeover, identified the leaders of the takeover, and detailed the damages inflicted.[147] After the confrontation with the judge, the group left the plant, but several members remained outside and continued to partially block the entrance.[148]

215.  In its 4 May 2010 presentation on the 2011-2015 Strategic Plan, Claimant noted that "*Black Union outsource contract expires May 21*": (i) "*Expect unstable work situation for 2nd half of May*"; and (ii) "*Operator and maintenance experience will again be an issue.*" With regard to the "*Key Issue*" "*Work Force (Unstable => high turnover => influenced by external forces*," the Plan set out the following actions: (i) "*Unionize the site - Create 2 unions: One for SG employees, another for outsourced labor => use the unions to reduce external pressure and promote some stability*"; (ii) "*Keep the strategy of outsourcing from more than one source*"; (iii) "*Lengthen the labor contract from 6 months to 1-3 years*"; (iv) "*Study the introduction of an affordable benefit plan to reduce turnover and labor tension*"; and (v) "*Promote stability through improved communication with workforce.*"[149]

---

[142] **Exhibits C-15** and **R-14**.
[143] **Exhibits C-15** and **R-14**.
[144] Memorial, ¶ 73; Millot, ¶ 23; Rondón, ¶ 24.
[145] Memorial, ¶ 69.
[146] Memorial, ¶ 70.
[147] **Exhibit C-15**.
[148] Memorial, ¶ 72; **Exhibit C-15**.
[149] **Exhibits CLEX-80** and **R-10**.

## X.   FINAL TAKEOVER OF THE PLANT ON 15 MAY 2010

216.  On 15 May 2010, the findings of the *Plan Guayana Socialista* working groups were pre-
sented to President Chávez during a public ceremony, which was also broadcast live on
television and radio. During the presentation, President Chávez read and approved certain
proposals made by the working groups, *inter alia*, with regard to Norpro Venezuela. The
official transcript of the radio broadcast reads in relevant part:

> "*Discuss with PDVSA the purchase of the Proppants produced and
> commercialized by the company Norpro Venezuela, a product produced
> with bauxite, Cornstarch and water, used for mud and drilling. It is
> suggested here* [in the document] *that should it become necessary, this
> company should become state-controlled and transferred to the hands
> of PDVSA. Let the company Norpro Venezuela become state controlled
> and transfer it to the hands of Petróleos de Venezuela.*"[150]

217.  On the same day, a local group arrived at the Plant, coming directly from the event at
which President Chávez had spoken.[151] The group again included Messrs. Marcano and
López,[152] as well as members of the SINPROTRAC union.[153] Oscar Cid, Pierre Gramond
and Eric Dixon of Norpro Venezuela also arrived on site, removed some personal items
as well as their laptops and documents and, even though the group tried to stop them,
eventually left the plant.[154] Approximately 4,000 tons of finished proppants that were
stored on site remained inside the plant; a shipment scheduled for 17 May 2010 had to be
cancelled.[155]

218.  Norpro Venezuela again requested a judicial inspection to document the events, which
took place on 17 May 2010. The local judiciary noted that (i) when Norpro Venezuela's
employees arrived for work on Monday, 17 May 2010, they were denied access to the
plant; (ii) the judicial inspector and Norpro Venezuela officials were refused access to the
plant by Messrs. Marcano and López, who stated that they were acting for the *Plan
Guayana Socialista*, under instructions given by President Chávez; (iii) a SINPROTRAC
banner hung from the main entrance of the plant; and (iv) the group orchestrating the

---

[150] English translation submitted by Respondent. Counter-Memorial, ¶ 24. The original Spanish version reads:
"*Consultar con PDVSA sobre la compra de Propan*[ts] *producido y comercializado por empresa Norpro de Ve-
nezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario
– aquí se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de
Venezuela y pásese a manos de Petróleos de Venezuela.*" **Exhibit R-15**.
[151] Memorial, ¶ 77; Rondón, ¶28.
[152] **Exhibit C-20**
[153] Rondón, ¶ 28.
[154] Rondón, ¶¶ 28-29.
[155] Memorial, ¶¶ 78-79; Larry, ¶ 44.

takeover refused to accept a memorandum from Norpro Venezuela requesting, *inter alia*, the appointment of a representative with whom to negotiate.[156]

219. On 18 May 2010, the *Oficina de Comunicación y Relaciones Institucionales* published a summary of national and international press stories, including a story from *El Nacional* reporting that:

> "*Contracted workers of the Norpro Venezuela company took over the factory after the nationalization announcement of President Hugo Chávez. With the National Guard and a commission presided over by the National Assembly Representative Angel Marcano, the workers prevented the legal representative of the enterprise from entering the facilities.*"[157]

220. By letters of 19 and 27 May 2010, Mr. Páez informed Mr. Rafael Ramírez, President of PDVSA and Minister of Hydrocarbons (Ministry of Oil and Mining), and Mr. José Khan, President of CVG and Minister of MIBAM, that Claimant's investment had been taken on 15 May 2010 and offered technical assistance to ensure the proper use of the equipment and the safety of the workers on site. He further requested that an official interlocutor be appointed with whom Claimant could discuss the expropriation.[158]

221. On 24 and 27 May 2010, officials from PDVSA, PDVSA Exploration and Production East and PDVSA Industrial visited the plant.[159] According to a press report in the *Prensa Unete*, these officials acted under direct instructions of Minister Ramírez.[160]

222. In May and June 2010, the following reports and presentations were prepared by PDVSA:

- "*EVALUACIÓN GLOBAL DE LA SITUACIÓN ACTUAL DE LA EMPRESA NORPRO VENEZUELA C.A.,*" dated May 2010 (preliminary report prepared by PDVSA E&P);[161]

- "*Sector Hidrocarburos – PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO DE VENEZUELA, C.A.,*" dated May 2010 (PowerPoint Presentation prepared by PDVSA Industrial);[162]

- "*DIAGNÓSTICO SITUACIÓN ACTUAL Y PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO VENEZUELA,*

---

[156] Memorial, ¶ 81; **Exhibit C-20**.
[157] **Exhibit C-114**.
[158] Memorial, ¶¶ 82, 84, 89, 95. **Exhibit C-22; Exhibit C-23**.
[159] Memorial, ¶ 84; Counter-Memorial, ¶ 28.
[160] **Exhibit C-123**.
[161] **Exhibit C-141**.
[162] **Exhibit C-111**.

*C.A.,*" dated June 2010 (PowerPoint Presentation prepared by PDVSA Industrial);[163] and

- "*SITUACIÓN ACTUAL DE PROCESO DE ESTATIZACIÓN EMPRESA NORPRO DE VENEZUELA, C.A. (NORPRO)*," dated 2 June 2010 (internal memorandum prepared by PDVSA Industrial).[164]

223. On 2 and 8 June 2010, meetings took place between Norpro Venezuela, PDVSA and others. The meeting minutes are entitled: "*PROCESO DE NACIONALIZACION NORPRO VENEZUELA, C.A.*"[165]

224. On 8 June 2010, Mr. Guy Rolli wrote to Mr. Temir Porras, Vice-Minister for Foreign Relations for Europe, referring to press reports according to which PDVSA was involved in the expropriation, and equipment of the plant had been damaged during the events on and after 15 May 2010. He further reiterated Claimant's request that an official interlocutor be appointed and Claimant's offer to provide technical assistance.[166]

225. By letter of 6 July 2010, addressed to Minister Ramírez, Mr. Páez reiterated Claimant's offer of technical assistance to ensure the proper use of the equipment and the safety of the workers on site.[167]

226. By letter of 3 August 2010, Mr. Patrick Dupin, Claimant's President, addressed Mr. Eulogio del Pino, Vice-President of Exploration and Production of PDVSA, reiterating Claimant's concern about damage that might occur to workers at the plant and assets of Norpro Venezuela. Mr. Dupin referred to press reports pursuant to which the plant's kiln was out of order and PDVSA was planning to initiate repairs shortly. He further reiterated Claimant's requests that "*an authorized interlocutor be promptly appointed to determine the next steps necessary to complete the nationalization of the Facility and its assignment of PDVSA, as ordered by President Chávez.*" Apart from requesting a meeting with PDVSA, Mr. Dupin confirmed Claimant's willingness to "*analyze the possibility of providing PDVSA with the technical assistance required to properly start and operate the Facility.*"[168]

227. On 5 August 2010, Norpro Venezuela requested another judicial inspection, which documented that a red "*PDVSA*" flag was flying over the plant and that the gate of the plant

---

[163] **Exhibit C-142**.
[164] **Exhibit C-143**.
[165] **Exhibit C-25**.
[166] Memorial, ¶ 97; **Exhibit C-26**.
[167] **Exhibit C-28**.
[168] **Exhibit C-30**.

had been painted bright red. Court officials and Norpro Venezuela management were again denied entry into the plant on this day.[169]

228. Shortly after the takeover on 15 May 2010, Norpro Venezuela began notifying its contractual partners in Venezuela, including INPSASEL and CVG EDELCA, that a *causa extraña no imputable* had occurred.[170] In August 2010, Norpro Venzuela published notifications of *force majeure* in Venezuelan newspapers including in *Ciudadanos Nacional* (a sub-section of *El Nacional*) and in *Correo del Caroní*.[171] Around the same time, Norpro Venezuela officially terminated the majority of its workforce, only retaining certain individuals who would enable Claimant to provide technical assistance in case the Venezuelan Government would accept that offer.[172]

## XI.   NEGOTIATIONS AFTER THE TAKEOVER OF THE PLANT

### 1.   The 30 August 2010 Meeting

229. On 30 August 2010, a meeting was held between PDVSA Industrial, Compagnie de Saint-Gobain and the French Embassy in Venezuela.[173] According to the minutes of that meeting, PDVSA Industrial made the following declarations and presented the following issues:[174]

- PDVSA Industrial had received specific instructions from President Chávez to carry out the transfer of Norpro Venezuela to State control and would comply with such order as promptly as possible;

- An expropriation decree was being prepared and, although PDVSA Industrial had no knowledge of the precise date of its publication, it would be desirable if it was published before 15 November 2010, the date on which the six-month term provided in Article 8(1) of the Treaty would expire;

- Norpro Venezuela and its shareholders were free to commence legal proceedings to safeguard their rights under the applicable law and, especially, for labor and workplace safety purposes;

---

[169] **Exhibit C-31**; Memorial, ¶ 86.
[170] Memorial, ¶ 98; **Exhibit C-21**; **Exhibit C-27**.
[171] Memorial, ¶ 98; **Exhibit C-32**; **Exhibit C-33**.
[172] Memorial, ¶ 98; Millot, ¶ 25.
[173] Memorial, ¶ 99; Counter-Memorial, ¶ 29.
[174] **Exhibit C-34**. Quotations from the English translation submitted by Respondent with **Exhibit R-17**. While the submitted document bears the note "*BORRADOR PARA DISCUSIÓN*," it appears to be undisputed that the meeting minutes were executed during the following meeting on 14 October 2010. **Exhibit C-36**.

- Without prejudice to the instruction that Norpro Venezuela was to become State-controlled, PDVSA Industrial was "*open to considering any proposal that the shareholders from Norpro may wish to present with the objective of bringing about this change in control and the transfer of Norpro's assets to PDVSA, in an amicable and mutually agreeable fashion,*" but PDVSA Industrial required a written statement of willingness from the shareholders in order to obtain the necessary authorizations "*to consider any mechanism other than expropriation which might lead to the amicable resolution of the dispute*";

- Until the publication of the expropriation decree, PDVSA Industrial could not act or intervene in Norpro Venezuela and its presence at the plant "*is in response to the necessity to enter into possession formally, once the Decree is published.*"

230. Compagnie de Saint-Gobain made the following declarations and presented the following issues at the meeting:[175]

- Compagnie de Saint-Gobain thanked PDVSA Industrial's representatives for having responded to its written request for a meeting and recalled that the project had always been carried out "*with the support and sponsorship*" from MIBAM and various other governmental Venezuelan authorities;

- Compagnie de Saint-Gobain ratified what had been expressed in various communications since 15 May 2010 relating to the occupation of the plant and confirmed its "*intention to cooperate with the authorities in respect to the transfer of Norpro to State control, for the purpose of resolving any controversy in a* [sic] *amicable fashion, pursuant to the Treaty*";

- Compagnie de Saint-Gobain reiterated its readiness to provide technical assistance to PDVSA Industrial regarding product quality control and standardization of process, if PDVSA Industrial so required, and proposed to conduct a thorough technical inspection of the plant with the aim of restarting its production and to assemble a technical commission for the purpose of studying the form that the technical assistance may take;

- Compagnie de Saint-Gobain "*expressed its interest to consider an eventual 'Take Off Agreement' or purchase agreement for the products that PDVSA may produce in Norpro's plant after its expropriation, subject to conditions that must be detailed and agreed at a convenient time, including product specs, technical characteristics, and quality standards. This proposal that may not exceed half of the plant's capacity due*

---

[175] **Exhibit C-34**. Quotations from the English translation submitted by Respondent with **Exhibit R-17**.

*to the loss of clients who could not be satisfied since the transfer of the company to State control was ordered in 2010*";

- Compagnie de Saint-Gobain reiterated its interest in "*clarifying the legal situation of the investment made by* [Claimant] *in Venezuela, through its subsidiary Norpro, over whose plant it has no control since the date of the presidential announcement on May 15, 2010*" and requested PDVSA Industrial to clarify when the expropriation decree would be published, in light of the expiration of the six-month term under Article 8(1) of the Treaty on 15 November 2010;

- Compagnie de Saint-Gobain was interested in reaching a framework agreement with PDVSA Industrial over the basic issues related to the transfer of Norpro Venezuela to State control and would "*analyze with PDVSA mechanisms that would allow for the resolution of the dispute in an amicable manner, pursuant to the terms of the Treaty, such as, for example, the purchase of the shares in substitution for an expropriation proceeding.*"

231. PDVSA Industrial and Compagnie de Saint-Gobain agreed at the 30 August 2010 meeting: (i) to draft and execute minutes of the meeting; (ii) to "[h]*old regular meetings for the purpose of analyzing issues of common interest related to the transfer of Norpro to State control*"; (iii) to keep an open communication between the parties; and (iv) to hold a meeting of the technical commission on 13 September 2010.[176]

## 2. The 14 October 2010 Meeting

232. On 14 October 2010, the joint technical commission, which was attended by representatives from PDVSA Industrial and Norpro Venezuela on behalf of Compagnie de Saint-Gobain, held its first meeting.[177]

233. According to the draft minutes of that meeting, Norpro Venezuela made the following declarations and presented the following issues:[178]

- Norpro Venezuela asked whether PDVSA Industrial had any information on the status of the drafting of the expropriation decree and its possible publication date (PDVSA Industrial answered in the negative, but stated that it had received its instructions pursuant to the declarations of President Chávez on 15 May 2010);

---

[176] **Exhibit C-34**. Quotations from the English translation submitted by Respondent with **Exhibit R-17**.
[177] Memorial, ¶ 100; Counter-Memorial, ¶ 30.
[178] **Exhibit C-36**. Quotations from the English translation submitted by Respondent with **Exhibit R-70**. While it appears from the record that these meeting minutes were never executed, their content seems to be undisputed between the Parties.

- Norpro Venezuela gave an electronic presentation, described as "*Virtual tour of the Plant*," described its proposal for technical assistance and explained the need for quality control of operations and the performance of an evaluation and diagnosis of the actual plant conditions.

234. PDVSA Industrial made the following declarations and presented the following issues at the meeting:[179]

- PDVSA Industrial clarified that "*the scope and purpose of the meeting is of a technical nature*" and "*legal issues of the process of transfer to State control shall be analyzed with the Legal Counsel of PDVSA*";

- PDVSA Industrial requested additional information on the proposal for technical assistance (questions were answered by Norpro Venezuela) and suggested the "*exploration of other structures*" besides the technical assistance proposal that would allow them to bring about the transfer, referring to other cases in which PDVSA Industrial and the respective owners of the transferred assets had created mixed companies, in which PDVSA Industrial maintained control and a majority shareholding;

- PDVSA Industrial asked about the environmental situation of the plant which was explained by Norpro Venezuela as being "*very clean*" and in compliance with all applicable laws and the permits issued by the Ministry for the Popular Power of Environment;

- PDVSA Industrial requested information about the production capacity of the plant, which Norpro Venezuela provided with an explanation of the development in two phases, the first of which "*was totally executed*" with 70,000 tons per year and the second of which was intended to start shortly, in order to double the capacity.

235. PDVSA Industrial and Norpro Venezuela agreed at the 14 October 2010 meeting: (i) to execute the minutes of the 30 August meeting; (ii) to draft and sign minutes of this meeting; and (iii) to set 8 November 2010 as a tentative date for a new meeting.[180]

**3.    Further Correspondence and Meeting on 26 October 2010**

236. By e-mail of 22 October 2010, Gabriel Rojas from PDVSA Industrial's Legal Department wrote to Luis Páez (President of Norpro Venezuela) and proposed the following agreement:

---

[179] **Exhibit C-36**. Quotations from the English translation submitted by Respondent with **Exhibit R-70**.
[180] **Exhibit C-36**; **Exhibit R-70**.

"1)    *NORPRO shall yield to PDVSA Industrial the plant, its existing products and raw material;*

2)    *PDVSA Industrial shall assume the control, responsibility and operations of the plant, its products and raw materials;*

3)    *PDVSA Industrial shall assume the responsibility of hiring the necessary personnel for operating the plant;*

4)    *NORPRO shall help and assure that PDVSA Industrial puts into full operation the plant and complies with every safety standard;*

5)    *Information regarding the state and actual operability conditions of the facilities shall be gathered, in order to determine the fair value of such infrastructure, its products and raw materials.*"[181]

237.    Mr. Rojas clarified that this proposal was made "*without prejudice to the possible incorporation of a state company of mixed capital*," and invited Norpro Venezuela to hold a meeting to discuss the proposal.[182]

238.    On 26 October 2010, a meeting was held between Mr. Armando Giraud, the General Counsel of PDVSA, representatives of PDVSA Industrial, Norpro Venezuela and the French Embassy. At that meeting, Mr. Giraud outlined the possibility that Norpro Venezuela enter into a mixed company (*empresa mixta*) arrangement with PDVSA, whereby the latter would retain a 60% interest in the venture.[183] The Parties are in dispute as to whether Mr. Giraud presented a "*sufficiently advanced proposal*"[184] or rather a mere suggestion, which would have had to be supported by concrete documents following the meeting in order to be given serious consideration by Claimant.[185]

239.    In his follow-up e-mail of 1 November 2010 to Mr. Giraud, Mr. Paúl noted that Claimant expected to receive the documents that PDVSA had promised to provide, including draft bylaws and an agreement for the suggested *empresa mixta*.[186]

---

[181] **Exhibit C-121**. Quotation from the English translation submitted by Respondent with **Exhibit R-71**.
[182] **Exhibit C-121**. Quotation from the English translation submitted by Respondent with **Exhibit R-71**.
[183] Memorial, ¶ 102; Counter-Memorial, ¶ 31.
[184] Respondent's Post-Hearing Brief, note 101.
[185] Claimant's Second Post-Hearing Submission, § 23. When asked during his cross-examination whether Mr. Giraud had made a proposal during that meeting, Mr. Millot stated: "*I would not call it a proposal. This is, I said, a suggestion, which means some consideration. A proposal would have been different.* […] *I think Mr. Giraud made a suggestion. I don't know how documented would have been the proposal. What I know is we received nothing concrete after this meeting.*" Transcript (Day 2), p. 419 lines 1-9. *See also* Millot, ¶ 31.
[186] **Exhibit C-151**.

240. In his letter dated 18 November 2010, Mr. Páez informed Mr. Giraud that, on 2 November 2010, two PDVSA officials, escorted by armed members of the National Guard, had approached Oscar Cid and Pierre-Yves Grammond of Norpro Venezuela and had demanded that they turn over their company vehicles because the PDVSA officials claimed to have instructions to reunite Norpro Venezuela's assets for a judicial inspection of the company. Mr. Páez requested that Mr. Giraud present the documents pursuant to which those PDVSA officials were authorized to confiscate Norpro Venezuela's assets, considering in particular that the parties had agreed during the meeting of 26 October 2010 to analyze alternatives to the expropriation of Norpro Venezuela. Mr. Páez then reiterated Claimant's offer to provide technical assistance to PDVSA.[187]

241. In a further e-mail to Mr. Giraud dated 19 November 2010, Mr. Paúl attached Mr. Páez' letter of 18 November 2010 as well as pictures taken of the confiscated company vehicles and copies of the identification cards of the two PDVSA officials. He further noted that Claimant had still not received the promised documents in relation to the suggested *empresa mixta*.[188]

242. In his letter to Mr. Giraud dated 19 January 2011, Mr. Páez stated that Claimant remained willing to analyze the alternatives to the expropriation that Mr. Giraud had suggested during the meeting on 26 October 2010 and noted that Claimant had still not received the documents that Mr. Giraud had promised to provide for Claimant's consideration of his *empresa mixta* proposal. He emphasized that Claimant was disposed to meet with PDVSA in order to discuss the mentioned alternatives.[189]

243. In his letter to Mr. Giraud dated 3 March 2011, Mr. Páez stated that he had not received any response to the letters that he had sent following the meeting on 26 October 2010 and reiterated that Claimant had still not received the documents in relation to the suggested *empresa mixta*. Mr. Páez concluded by requesting a meeting to discuss the alternatives that Mr. Giraud had proposed during the 26 October 2010 meeting.[190]

244. In his letter to Mr. del Pino dated 21 March 2011, Mr. Páez stated that there had been no communication with PDVSA after the 26 October 2010 meeting as he had not received any response to his follow-up letters. Mr. Páez noted that almost one year had passed since the expropriation of Norpro Venezuela had been announced and, to his surprise, the negotiations that started in August 2010 had stalled. Finally, he reiterated his request for a meeting to solve the dispute in an amicable manner.[191]

---

[187] **Exhibit C-122**.
[188] **Exhibit C-151.**
[189] **Exhibit C-37**.
[190] **Exhibit C-38**.
[191] **Exhibit C-39**.

## XII. THE EXPROPRIATION DECREE AND FOLLOW-UP CORRESPONDENCE

245. On 29 March 2011, Respondent published Decree No. 8,133 in the Official Gazette No. 39,644 (the "**Expropriation Decree**"):[192]

> "[…] *pursuant to the authorities conferred by Articles 115, 226 and 236 Numeral 2 of the Constitution of the Bolivarian Republic of Venezuela, in accordance with the provisions set forth in Article 4 of the Organic Law on Hydrocarbons, Article 4 of the Decree with Rank, Value and Force of Law of the Organic Law on Gaseous Hydrocarbons, Article 5 of the Law on Expropriations in the Public or Social Interest, and Article 6 of the Law for the Defense of Persons in Access to Goods and Services, in the Council of Ministers,*

> ### WHEREAS

> *It is the duty of the State to strengthen the Oil and Gas Industry, and to adopt measures conducive to guaranteeing the operational stability of that industry, and the fulfillment of the plans and goals of Petróleos de Venezuela, S.A. (PDVSA) and its subsidiaries;*

> ### WHEREAS

> *Activities relating to hydrocarbons and gaseous hydrocarbons, and the projects required in order to undertake them, are of public utility and social interest;*

> ### WHEREAS

> *Considering that the timely availability of ceramic proppants is of key importance in raising the output of oil and gas fields;*

> ### WHEREAS

> *That the compulsory acquisition by the State of the moveable and immoveable property and other assets that belong to or are held by the business corporation NORPRO VENEZUELA, C.A. and of any and all related companies or persons, is indispensable for execution of the project "INDUSTRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROPPANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS."*

> ### DECREES

> ***Article 1****. The compulsory acquisition is hereby ordered of the moveable and immoveable property and other assets including land, improvements, construction, facilities, industrial and office equipment, work implements and materials, inventories, licenses, means of transportation and rights necessary for the execution of the project indicated in*

---

[192] Quotation from the English translation submitted by Claimant with **Exhibit C-40**.

*this article, or for the marketing or distribution of the products set forth therein, that are owned by or possessed by the firm of NORPRO VEN-EZUELA, C.A. and those of any and all related companies or persons that might be indispensable for the execution of the project "INDUS-TRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROP-PANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS."*

**Article 2**. *The project "INDUSTRIAL PRODUCTION OF HIGH PER-FORMANCE CERAMIC PROPPANTS IN ORDER TO ENHANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS" shall be executed by the company of PDVSA Industrial, S.A. or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA) as it may designate under the Ministry of Popular Power of Energy and Petroleum, as the expropri-ating entity, or such subsidiary as it may designate.*

**Article 3**. *Pursuant to Article 12 of the Law on Expropriations in the Public or Social Interest, the firm of PDVSA Industrial, S.A., or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA), as it may designate, is hereby authorized to conduct the procedures neces-sary to acquire the immoveable assets and other goods set forth in Ar-ticle 1 of the this Decree, with all rights and obligations thereof being assumed by the Bolivarian Republic of Venezuela, until the total and definitive transfer of the ownership of said assets.*

**Article 4**. *The expropriated assets shall be conveyed free of encum-brances or restrictions to the Venezuelan State, through PDVSA Indus-trial, S.A., or any such other subsidiary of Petróleos de Venezuela, S.A. (PDVSA) as it may designate, in accordance with provisions of Article 11 of the Law on Expropriations in Public or Social Interest.*

**Article 5**. *PDVSA Industrial, S.A., or any such other subsidiary of Pe-tróleos de Venezuela, S.A. (PDVSA) as may be designated by it, shall conduct the negotiations and expropriation procedures as provided by law, until the total and definitive transfer of the assets referred to in this Decree.*

**Article 6**. *In the enforcement of this Decree, special care must be taken to safeguard the guarantees and rights of workers employed at NORPRO VENEZUELA, C.A., or any other related firm or persons af-fected by the provisions of this Decree.*

**Article 7**. *Execution of the project "INDUSTRIAL PRODUCTION OF HIGH PERFORMANCE CERAMIC PROPPANTS IN ORDER TO EN-HANCE THE PRODUCTIVITY OF OIL AND GAS FIELDS" is hereby qualified as urgent, placing into operating, utilization, and benefit of the goods indicated in Article 1 of this Decree, in order to ensure func-tional continuity of production and distribution of high performance ceramics required by the oil and gas industry. To this end, the measures referred to in Article 6 of the Law for the Defense of Persons in Access to Goods and Services, may be resorted to, upon due compliance with current regulations.*

*Article 8. The Ministry of Popular Power for Energy and Petroleum is charged with executing this Decree.*

*Article 9. This Decree shall be in force upon being published in the Official Gazette of the Bolivarian Republic of Venezuela.*

[…]"

246.   On 14 April 2011, Mr. Páez wrote to Minister Ramírez and made reference to the expropriation of Norpro Venezuela's assets ordered by the Expropriation Decree, "*confirm*[ing] *President Chávez's decision, publicly announced on 15 May 2010, to transfer Norpro to the State's control.*" He further stated that it had regrettably been impossible "*to move forward in a process leading to the effective expropriation of Norpro,*" and expressed his hope that the publication of the Expropriation Decree would allow the parties to "*promptly advance in the definition of the terms of an amicable resolution of this controversy, which will guarantee the payment of a compensation determined on the basis of the just value of the investment made in Norpro*" by Claimant. Mr. Páez reiterated Claimant's offer of technical assistance and requested that PDVSA Industrial as the expropriating entity pursuant to the Expropriation Decree "*appoint an authorized speaker to analyze, together with Norpro's representaives, matters related to the future steps of the expropriation process.*"[193]

247.   According to press reports in *Correo del Caroní* on 13 and 15 April 2011 and in *Nueva Prensa de Guayana* on 15 April 2011, 25,000 tons of bauxite were removed from the plant to cover an emergency of CVG Bauxilum.[194] On 25 April 2011, Norpro Venezuela wrote to the President of PDVSA Industrial noting that "*Norpro, in its role as legitimate proprietor of all the goods that are located inside the facilities, has not authorized or ratified these actions.*"[195]

### XIII. THE ADMINISTRATIVE EXPROPRIATION PROCEDURE AND CLAIMANT'S NOTICE OF DISPUTE

248.   On 24 June 2011, PDVSA Industrial published the following notifications in *Últimas Noticias* and *Nueva Prensa de Guayana*:

"*1)* […]*; 2) To declare as existent the precautionary order of temporary occupation and operation of the personal property, real estate and other assets including the intangible assets that are the property of or in possession of the company NORPRO VENEZUELA, C.A., and of any other related companies or people, pursuant to the provisions of subsection 1 of article 112 of the People's Defense in the Access to Property*

---

[193] **Exhibit C-41**. Quotation from the English translation submitted by Respondent with **Exhibit R-16**.
[194] **Exhibit C-124**; **Exhibit C-125**; **Exhibit C-126**; Memorial, ¶ 110.
[195] **Exhibit C-127**.

*and Services Law; (3) to give notice to the aforementioned people through the publishing of this newspaper notice, simultaneously and for one time, in the newspapers 'Última Noticias' and 'Nueva Prensa de Guayana' in order for them to appear at the headquarters of this Company, located in […], within the terms of thirty (30) continuous days following the publishing of this notifications in business days and in the time schedule between […] 8:30 am and […] 4:30 pm, proving evidence, in each case, of their rights upon the aforementioned affected assets.*

*Also, the interested parties are given notice that 1) […]; 2) that they can exercise the remedy which is prescribed in article 113 of the People's Defense in the Access to Property and Services Law against the precautionary order; and (3) that in the event that no party appears on their own behalf or through a legal representative in the corresponding authority, this proceeding will be declared as exhausted and the expropriation of the affected assets will be judicially requested.*

*This notice is given pursuant to article 22 of the Law on Expropriation for Reasons of Public or Social Purposes.*"[196]

249. On 4 July 2011, Claimant notified Respondent of a dispute under the Treaty and requested that "*adequate compensation equal to the fair value of its investment in Norpro prior to May 15, 2010, be promptly paid by Venezuela pursuant to Article 5.*" Claimant referred to the meetings held on 30 August, 14 October and 26 October 2010 and stated that "*Saint-Gobain has made its best efforts to meet and discuss with Venezuelan authorities the terms of an amicable resolution of the current controversy, in accordance with the France-Venezuela Treaty. However, no response has been provided to Saint-Gobain by PDVSA, PDVSAI*[ndustrial] *or any other competent Venezuelan authority.*" Claimant reiterated its willingness to resolve the dispute amicably in accordance with the provisions of the Treaty and stated that it was "*prepared to meet immediately with an authorized representative of Venezuela with the objective of reaching a fair and adequate resolution for both parties.*" Claimant concluded the letter by emphasizing that "*in the event that this dispute is not settled amicably within the term of six (6) months starting from the date hereof, Saint-Gobain may refer this matter to arbitration.*"[197]

250. On 26 July 2011, PDVSA Industrial published a notice declaring the amicable settlement proceeding terminated, "[c]*onsidering that on June 24, 2011 the press notifications provided for by article 22 of the Law on Expropriation for Reasons of Public or Social Purposes were published, and taking into consideration that the corresponding term expires as of this day, without the appearance of any party or third party, on their own or through a legal representative,*" and instructed the Legal Department to commence the judicial

---

[196] Quotation from the English translation submitted by Respondent with **Exhibit R-20**.
[197] **Exhibit C-42**.

proceedings under the Expropriation Law for Reasons of Public or Social Purposes (the "**Expropriation Law**").[198]

## XIV. FURTHER NEGOTIATIONS BETWEEN THE PARTIES

251. On 26 October 2011, Mr. Carmelo Ursaneta, General Counsel to the Oil and Energy Ministry, wrote to Claimant, seeking to schedule a meeting for 3 November 2011 to discuss the expropriation of Norpro Venezuela.[199] Claimant responded to Mr. Urdaneta by letter dated 3 November 2011.[200] On the same day, a meeting was held during which the Ministry again proposed to form a mixed company to run the plant in Venezuela; Claimant agreed to consider this proposal.[201]

252. As acknowledged by Mr. Páez in his follow-up letter of 20 December 2011, Claimant was further requested to prepare a communication including a brief presentation of Norpro Venezuela and the business objectives that had led to its establishment in Venezuela and a summary of the terms of a possible agreement pursuant to which the parties would pursue a joint investment project resulting in an *empresa mixta* in which PDVSA would hold a majority share. In his 20 December 2011 letter, Mr. Páez explained that the group was still in the process of analyzing the general conditions and specification of the proposed joint investment project, as well as the modalities and the scope of the technical assistance and training of personnel that the group may be able to provide; they would send the requested communication once this analysis was concluded, which he expected to occur in the first weeks of January 2012.[202] According to Respondent, Claimant never provided the requested information to the Ministry.[203]

253. By letter to Respondent dated 17 January 2012, Claimant reiterated the existence of a dispute under the Treaty, stating that "[d]*espite several meeting and communications between representatives of Saint-Gobain and PDVSA to review the status of Norpro's expropriation and future actions to be undertaken by the Government of Venezuela (including the payment of an appropriate compensation in accordance with the Treaty's provisions) during the six-month 'cooling-off' period as required by the Treaty, no friendly agreement in relation to this dispute with Venezuela has been reached.*" Claimant confirmed its acceptance of Respondent's offer provided in Article 8(2) of the Treaty to settle the dispute by arbitration before ICSID and, although it expressed its hope to "*reach an*

---

[198] Quotation from the English translation submitted by Respondent with **Exhibit R-21**. *Ley de Expropiación por Causa de Utilidad Pública o Social*, published in the Official Gazette No. 37.475, dated 1 July 2002. **Exhibit R-4**.
[199] **Exhibit C-130**.
[200] **Exhibit C-43**.
[201] Memorial, ¶ 113; **Exhibit C-131**.
[202] **Exhibit C-131**; Counter-Memorial, ¶¶ 38-39.
[203] Counter-Memorial, ¶ 40.

*amicable agreement with the Government of Venezuela*," it announced that, if such agreement failed, it would, "*very promptly*," initiate arbitration proceedings before ICSID.[204]

254.  On 24 January 2012, Respondent denounced the ICSID Convention.[205] The denunciation became effective on 25 July 2012.

## XV. THE JUDICIAL EXPROPRIATION PROCEDURE AND PARALLEL NEGOTIATIONS

255.  On 18 April 2012, PDVSA Industrial initiated the judicial expropriation procedure pursuant to Articles 22-24 of the Expropriation Law (the "**Expropriation Procedure**") by submitting a claim against Norpro Venezuela before the First Court of First Instance in Civil, Corporate and Agrarian Matter of the Second Circuit of the Judicial Circumscription of the State of Bolívar (the "**Court**").[206] PDVSA Industrial requested that the Court "*decree the expropriation*" of Norpro Venezuela's assets and that the interim measure, *i.e.*, the temporary occupation of the plant based on Article 112(1) of the People's Defense in the Access to Property and Services Law (*see* PDVSA's notification of 24 June 2011 above), be upheld. In addition, it requested that Norpro Venezuela, in the person of its legal representative Dr. Jorge Paúl, be summoned.[207]

256.  On 25 May 2012, Claimant initiated the present arbitration proceedings by filing its Request for Arbitration under the France-Venezuela Treaty with ICSID.

257.  On 20 June 2012, the Court issued a public notice ordering "*to summon […] the alleged owners, holders, tenants, creditors and, in general, any other person who might have any right over the assets owned by NORPRO VENEZUELA, C.A.*" The Court stated that the public notice would be published three times in the newspapers *Primicia* and *Correo del Orinoco*, in an interval of ten calendars between the publications, in order for the interested parties to appear within ten business days following the date of the last publication or, in case no person appeared within the specified term, the Court would appoint a public defendant in Norpro Venezuela's favor.[208] On 10 July 2012, the notice of summons was personally served to the secretary at the office of Dr. Paúl.[209]

258.  By e-mail of 17 July 2012, Mr. Carmelo Urdaneta (General Director of PDVSA Industrial's Legal Department Office) sought to schedule a meeting with Dr. Paúl, who replied by e-mail of 20 July 2012; the meeting took place on 15 August 2012.[210]

---

[204] **Exhibit C-44**. Quotations from the English translation submitted by Respondent with **Exhibit R-22**.
[205] Memorial, ¶ 114.
[206] Counter-Memorial, ¶ 41; **Exhibit R-23**.
[207] **Exhibit R-23**.
[208] **Exhibit R-24**.
[209] **Exhibit R-25**.
[210] **Exhibit R-26**; **Exhibit R-27**; **Exhibit R-29**.

259. On 23 August 2012, Mr. Urdaneta sent a draft confidentiality agreement to Dr. Paúl as it had been discussed during the meeting.[211] The agreement was to be concluded with Respondent, "*by means of its Ministry for the Popular Power of Petroleum and Mining,*" and included the following passage: "*the **PARTIES** and their respective affiliates have maintained and shall continue to maintain negotiations in order to reach an agreement in connection with the provisions of the **DECREE**, including without limitation any compensation to which **xxxxxx** or its affiliates may be entitled.*"[212]

260. By letter of 4 September 2012, Dr. Paúl inquired whether the Ministry had begun the selection of the experts who would undertake the valuation of Claimant's investment in Venezuela, as Mr. Urdaneta had stated during the 15 August 2012 meeting, and attached a revised version of the confidentiality agreement.[213]

261. On 26 September 2012, the Court issued a second public notice again summoning the interested parties on the part of Norpro Venezuela under the same terms as in the 20 June 2012 notice; the notice was published on 2, 12 and 22 November 2012 in the newspapers *Primicia* and *Vea*.[214]

262. Approximately one year later, on 11 October 2013, the judicial inspection pursuant to Article 57 of the Expropriation Law was carried out,[215] and on 13 November 2013, the Court issued a public notice ordering, pursuant to Articles 19, 56 and 57 of the Expropriation Law and "*taking notice that the relevant proceedings for summoning the defendant have been duly taken,*" that the appointment of the Valuators forming the Valuation Committee shall take place five business days later.[216]

263. On the same day, PDVSA Industrial requested that the Court appoint a public defender in accordance with Article 27 of the Expropriation Law to represent Norpro Venezuela in the Expropriation Procedure.[217] Two days later, on 15 November 2013, the Court issued a public notice appointing Mr. José Neptali Blanco as Judicial Defender for Norpro Venezuela in the Expropriation Procedure and ordering him to appear before the Court on the third business day following his notification to accept or refuse his appointment.[218] On 22 November 2013, the Court noted that the Expropriation Procedure was "*currently at a stage of notification to the appointed Judicial Defender*" and thus decided that the order

---

[211] **Exhibit R-30**.
[212] **Exhibit R-31**.
[213] **Exhibit R-29**.
[214] Counter-Memorial, ¶ 44, note 122; **Exhibit R-32**.
[215] **Exhibit R-33**.
[216] **Exhibit R-34**.
[217] **Exhibit R-35**.
[218] **Exhibit R-36**.

of 13 November 2013 was "*left without effect*" until Mr. Neptali had been duly notified and his summon had been incorporated into the record.[219]

264. On 3 February 2014, Mr. Neptali formally accepted his appointment as judicial defender for Norpro Venezuela.[220] On the next day, 4 February 2014, Norpro Venezuela, represented by its Venezuelan counsel Dr. Paúl, appeared for the first time before the Court, requesting the Stay, Suspension and Extinction of the Judicial Expropriation Proceeding and challenging the Court's jurisdiction based on the fact that Claimant had begun the present ICSID arbitration proceedings.[221] On 12 March 2014, the Court dismissed Norpro Venezuela's request.[222]

## E.    PARTIES' POSITIONS

265. In the following, the positions of the Parties as argued in their written submissions and during the Hearing will be briefly summarized.

## I.    SUMMARY OF CLAIMANT'S POSITION AND RELIEF SOUGHT

266. Claimant submits that Respondent committed several breaches of the Treaty and therefore claims compensation in the amount of the higher of the Fair Market Value of Norpro Venezuela as of the date of the award (calculated at USD 90.3 million as of 31 August 2015), or the Fair Market Value of Norpro Venezuela as of the date of the expropriation (calculated at USD 99.5 million) plus pre-award interest, as well as post-award interest.

### 1.  Admissibility

267. Claimant submits that Respondent's admissibility objections regarding (i) the claims related to the bauxite price increase; and (ii) the claim for breach of Article 5(1) subparagraph 1 of the Treaty, should be dismissed.

268. With regard to the claims related to the bauxite price increase, Claimant emphasizes that its claims are not based on the Bauxite Contract as such, but they are rather based on the fact that Respondent sanctioned or could have prevented CVG Bauxilum's conduct and thereby breached the Treaty.[223]

---

[219] **Exhibit R-37**.
[220] **Exhibit R-38**.
[221] Counter-Memorial, ¶ 45; **Exhibit R-39**.
[222] **Exhibit R-40**.
[223] Reply, ¶¶ 67-68.

269. As to its claim for breach of Article 5(1) subparagraph 1 of the Treaty that it raised for the first time during the Hearing, Claimant submits that this claim was informed by Respondent's statement in its Rejoinder "*that what happened between May of 2010 and March of 2011 was not the expropriation, and that the expropriation only occurred in* [March] *of 2011.*"[224] Claimant further claims that its claim is "*neither new nor untimely*" because the argument that the expropriation was not carried out in a fair and equitable manner and failed to accord Claimant due process was raised from the outset of the proceedings.[225]

## 2. Breach of the Treaty

270. Claimant submits that Respondent committed breaches of

- Article 5(1) of the Treaty with respect to its obligations regarding expropriation (**a**));
- Article 3(1) of the Treaty with respect to its obligation to accord fair and equitable treatment (**b**)); and
- Article 3(2) of the Treaty with respect to its obligation to grant full protection and security (**c**)).

### a) Expropriation (Article 5(1) of the Treaty)

271. Claimant submits that Respondent was in breach of Article 5(1) subparagraph 1 of the Treaty (**aa**)) as well as subparagraphs 2 and 3 of the same provision (**bb**)).

### aa) Breach of Article 5(1) Subparagraph 1 of the Treaty

272. Claimant contends that Respondent's conduct prior to the publication of the Expropriation Decree in March 2011 amounted to an "*expropriation*" within the meaning of Article 5(1) of the Treaty. During the Hearing,[226] Claimant raised the argument that this conduct was in conflict with Respondent's obligations under Article 5(1) subparagraph 1 of the Treaty. In particular, Claimant contends, first, that the expropriation was not carried out with a formal expropriation instrument and hence not pursuant to a "*measure*" ("*mesures*"/"*medidas*").[227] Second, Claimant argues that the physical taking of the plant prior to March 2011 was not conducted following due process and granting full protection to Claimant's investment, contrary to Respondent's obligations under Article 3(1) and Article 3(2) of

---

[224] Transcript (Day 3), p. 881 lines 18-21.
[225] Claimant's Second Post-Hearing Submission, ¶¶ 30, 44-45 referring to Memorial, ¶¶ 180-184 and Reply, ¶¶ 89-95, 125-130.
[226] Transcript (Day 1), p. 83 line 16 – p. 84 line 21.
[227] Claimant's Post-Hearing Submission, ¶¶ 38-39.

the Treaty, and therefore violated a "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*") within the meaning of Article 5(1) subparagraph 1 of the Treaty.[228]

### bb)   Breach of Article 5(1) Subparagraphs 2 and 3 of the Treaty

273. In addition, Claimant contends that Respondent is in breach of its obligation to provide prompt and adequate compensation and to specify the amount of compensation on the date of the expropriation pursuant to Article 5(1) subparagraphs 2 and 3 of the Treaty.

274. It is Claimant's position that Respondent expropriated Claimant's investment with respect to the plant on 15 May 2010 or shortly thereafter.[229] Claimant submits that, in view of the law, the takeover by the SINPROTRAC union following President Chávez' announcement and the subsequent active management of the plant by the state-owned PDVSA amounted to an "*expropriation*" within the meaning of Article 5(1) of the Treaty.[230] Claimant emphasizes that it constantly asserted its rights with regard to the plant, *i.e.*, that it attempted to re-enter it but was denied access.[231]

275. With regard to the specification requirement pursuant to Article 5(1) subparagraph 3 of the Treaty, Claimant submits that, despite the clear wording of the Treaty, Respondent was far from having determined compensation at the time of the expropriation, given that Respondent has never communicated the amount or method of payment to be made to Claimant and has yet to offer any compensation for the expropriation, despite numerous attempts by Claimant to negotiate.[232] In particular, Claimant contends that the specification requirement is not met by the mere existence of, or reference to, a procedure in domestic law.[233]

276. With respect to the promptness requirement pursuant to Article 5(1) subparagraph 2 of the Treaty, Claimant similarly contends that the Treaty is very specific about the requirement that an expropriation be accompanied by "*prompt*" compensation and that the Contracting Parties left no room for doubt as to the interpretation of the prompt compensation requirement: The Treaty provides that "*the amount and method of payment of compensation should be specified on the date of expropriation at the latest*" and "*payments shall be made without delay.*"[234] Claimant argues that, over four years after the expropriation, such

---

[228] Claimant's Post-Hearing Submission, ¶¶ 40-47.
[229] Reply, ¶ 25.
[230] Reply, ¶¶ 21-24; Claimant's Post-Hearing Submission, ¶¶ 19-32.
[231] Claimant's Post-Hearing Submission, ¶ 32.
[232] Memorial, ¶ 140; Reply, ¶ 75; Claimant's Post-Hearing Submission, ¶¶ 50-54.
[233] Reply, ¶ 83.
[234] Memorial, ¶ 137. Emphasis added by Claimant. *See also* Reply, ¶ 75.

compensation is long overdue and can in no way be considered "*prompt*" in accordance with the Treaty language.[235]

277. Assuming *arguendo* that Article 5(1) of the Treaty did not require Respondent to make an offer of compensation on the date of the expropriation, Claimant submits that for two separate reasons, Respondent may not invoke, with recourse to its domestic law, that it "*acknowledge*[d] *its compensation obligation*" and provided a mechanism for the determination of compensation in the Expropriation Decree.[236]

278. First, Claimant argues that Respondent cannot rely on municipal law to excuse its obligations under international law;[237] in any event, Claimant considers the domestic rules on expropriation followed by Respondent "*a State-instigated generic procedure*" which Respondent "*takes no steps to effectuate.*"[238]

279. Second, Claimant contends that Respondent's conduct was not in line with the provisions of its own domestic laws on expropriation. In particular, Claimant argues that neither the administrative occupation of the plant by PDVSA on 4 April 2011 nor the judicial occupation issued on 20 June 2012 was conducted in accordance with Article 56 of the Expropriation Law. This provision allows for "*anticipatory occupation*" only in cases involving urgent circumstances and only after the (probable) amount of the compensation, as determined by an evaluation commission, has been deposited with the expropriation court. Moreover, Claimant submits that the measures taken by Respondent could not properly be based on Articles 6 and 112(1) of the Law on the Defense of Access to Goods and Services (the "**Law on Access**").[239]

280. In the event that, due to the provisions of its domestic expropriation law, Respondent was not required under Article 5(1) subparagraphs 2 and 3 of the Treaty to make a prompt compensation offer on the date of the expropriation, Claimant contends that Respondent is nevertheless in breach of the Treaty because it failed to make any attempt to negotiate compensation for the expropriation with Claimant in good faith.[240] In particular, Claimant submits that (i) it received "*no direct word from Venezuela concerning the expropriation during the entire period between the President's announcement on 15 May 2010 and the issuance of the Expropriation Decree on 29 March 2011*"; (ii) Respondent never

---

[235] Reply, ¶ 76.
[236] Reply, ¶ 84.
[237] Reply, ¶¶ 85-86.
[238] Reply, ¶ 83.
[239] Reply, ¶ 87; Brewer-Carías II, ¶¶ 14-26; Claimant's Post-Hearing Submission, ¶¶ 64-68. *Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios*, published in the Official Gazette No. 39.358 dated 1 February 2010. **Exhibit R-76**.
[240] Reply, ¶ 89.

acknowledged an obligation to pay compensation; and (iii) Respondent refused to engage in good faith negotiations even after the publication of the Expropriation Decree.[241]

281. Claimant submits that Respondent's failure to meet the specification and/or promptness requirements pursuant to Article 5(1) subparagraphs 2 and 3 of the Treaty renders its expropriation unlawful, and claims that the belated issuance of the Expropriation Decree did not rectify the violation of Article 5(1) subparagraphs 2 and 3 of the Treaty.[242] In support of this submission, Claimant cites several commentators as well as a number of arbitral decisions as authorities (*see* in more detail below).

282. In its Reply, Claimant also submitted that there was an expropriation with regard to the Bauxite Contract and the VAT credits it had accrued, and claimed that this expropriation also has to be compensated.[243] During the Hearing and in its Post-Hearing Submission, however, Claimant no longer dealt with this issue as a matter of expropriation, but rather focused on the argument that Respondent's conduct with respect to the Bauxite Contract and the VAT credits was in conflict with its obligations to ensure fair and equitable treatment ("**FET**") and to grant full protection and security ("**FPS**") under Article 3(1) and (2) of the Treaty.[244]

### b) Fair and Equitable Treatment (Article 3(1) of the Treaty)

283. Claimant submits that the FET standard provided for in Article 3(1) of the Treaty refers to the prevailing concepts of FET in international law – and not only to the minimum standard of treatment –, including "*contemporary notions of due process, good faith, and legitimate expectations*," and that Respondent breached its obligations thereunder with respect to both the takeover of the plant and the Bauxite Contract, in light of any reading of Article 3(1) of the Treaty.[245]

284. With regard to the union takeover of the plant following President Chávez' statement on 15 May 2010 and Respondent's conduct thereafter, Claimant asserts that Respondent failed to follow due process in the expropriation and thereby violated its FET obligation.[246] Claimant contends that the expropriation was effectively carried out "*overnight,*" with a "*public and sudden announcement*" on TV, and that despite Claimant's attempts to negotiate in good faith on the terms of the expropriation, Respondent "*gave Saint-Gobain*

---

[241] Claimant's Post-Hearing Submission, ¶¶ 34-37.
[242] Memorial, ¶ 141; Reply, ¶¶ 77-83; Claimant's Post-Hearing Submission, ¶¶ 58-63.
[243] Reply, ¶¶ 96-100.
[244] Transcript (Day 1), p. 93 line 1 – p. 95 line 18; Claimant's Post-Hearing Submission, ¶¶ 79-88.
[245] Reply, ¶ 112.
[246] Memorial, ¶¶ 180-184; Reply, ¶¶ 125-130.

*no indication of what process would be followed to ensure that Saint-Gobain would re-ceive adequate compensation*" and even "*failed to follow its own expropriation proce-dure.*"[247]

285.   During the Hearing and in its Post-Hearing Submission, Claimant included this FET claim in the expropriation claim relating to Article 5(1) subparagraph 1 of the Treaty.[248] The Tribunal notes, however, that Claimant thereby did not intend to abandon its separate FET claim relating to the taking of the plant, given that it maintains in its relief sought the request for a separate declaration that Respondent has breached Article 3(1) of the Treaty.[249]

286.   With respect to the Bauxite Contract between Norpro Venezuela and CVG Bauxilum, Claimant submits, on the one hand, that CVG Bauxilum was acting as a State organ within the meaning of the International Law Commission's Draft Articles on Responsibility of States for Internationally Wrongful Acts ("**ILC Draft Articles**") and, on the other hand, that Respondent, through MIBAM and other organs, made "*specific promises*" and "*com-mitments*" and thereby "*created specific expectations,*" which Claimant relied on in mak-ing its investments.[250] It is Claimant's position that Respondent (through CVG Bauxilum) breached the Bauxite Contract and "*repudiated these expectations, failing to address* […] *CVG Bauxilum's actions in raising the bauxite price.*"[251]

### c)   Full Protection and Security (Article 3(2) of the Treaty)

287.   Claimant further submits that Respondent failed to protect and secure Claimant's invest-ment and hence violated Article 3(2) of the Treaty with regard to the takeover of the plant and the bauxite price increase.

288.   As an alternative argument with regard to its expropriation claim, Claimant submits that if Respondent's conduct prior to 29 March 2011 did not amount to an "*expropriation*" within the meaning of Article 5(1) of the Treaty, PDVSA's control of the plant and failure to return it to Claimant before that date must be considered a breach of the obligation to provide Claimant with full protection and security pursuant to Article 3(2) of the Treaty.[252]

---

[247] Memorial, ¶ 183; Claimant's Post-Hearing Submission, ¶ 42 (with note 116); Reply, ¶ 126.
[248] Transcript (Day 1), p. 82 line 13; p. 93 lines 5-7. Claimant's Post-Hearing Submission, ¶¶ 40-47.
[249] Claimant's Second Post-Hearing Submission, ¶ 116. This is confirmed by the cross-reference in Claimant's Post-Hearing Submission (¶ 42 with note 116) to the relevant section in the Memorial (¶¶ 180-184) and Claimant's submission of its FET arguments in its Second Post-Hearing Submission (¶¶ 30-45).
[250] Memorial, ¶¶ 173-176; Reply, ¶ 120; Claimant's Post-Hearing Submission, ¶ 80.
[251] Memorial, ¶ 169; Reply, ¶ 120. *Cf.* Claimant's Post-Hearing Submission, ¶¶ 79-82.
[252] Claimant's Post-Hearing Submission, ¶¶ 48-49.

289.   As to the bauxite price increase, Claimant submits that, after Respondent was notified of breaches of the Bauxite Contract, it failed to act and accord Claimant's investment legal security. In this context, Claimant asserts that the FPS standard requires the State to take all reasonable measures "*to ensure a secure investment environment,*" including not only physical but also commercial and legal security.[253] Claimant contends that, contrary to this standard, Respondent made no attempt to investigate or take action to protect Claimant's rights under the Bauxite Contract, despite Claimant's repeated calls for action.[254]

### 3.   Quantum

#### a)   Compensation standard and valuation date

290.   It is Claimant's submission that the appropriate remedy for an unlawful expropriation is the customary international law standard of restitution, *i.e.*, the higher compensation as between that valued at the date of expropriation and the date of the award.[255]

291.   In support of its approach, Claimant emphasizes that Article 5(1) of the Treaty provides for the appropriate standard of compensation only in case all of the conditions for a lawful expropriation are met. As this is not the case here, the appropriate standard of compensation, including the appropriate date at which the value is to be assessed, is set by customary international law.[256]

292.   In support of its argumentation, Claimant refers to the *Chorzów Factory* judgment rendered by the Permanent Court of International Justice ("**PCIJ**") as well as several arbitral awards (*see* in more detail below).

#### b)   Calculation of damages

##### aa)   Valuation Method

293.   Claimant submits that Respondent must pay full compensation for the expropriated plant and refers to the World Bank Guidelines on the Treatment of Foreign Direct Investment of 1992[257] and the commentary on the ILC Draft Articles.[258]

294.   Claimant refers to its expert on quantum, Prof. Spiller, who suggests that a third-party buyer would pay the lower of (i) the net present value of the cash flows that a willing

---

[253] Memorial, ¶ 186.
[254] Reply Memorial, ¶¶ 131-142.
[255] Claimant's Post-Hearing Submission, ¶ 73.
[256] Memorial, ¶ 197; Reply-Memorial, ¶ 152.
[257] Memorial, ¶¶ 203-204 referring to The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), p. 11.
[258] Reply, ¶ 154 quoting from James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), p. 225.

buyer could obtain from acquiring a 100% stake in Norpro Venezuela; and (ii) the opportunity cost that a willing buyer would incur if it constructed a similar plant outside Venezuela, which consists of the sum of contruction costs plus the foregone cash flows during the construction period.[259]

295. According to the calculation of Prof. Spiller as of 15 May 2010, the opportunity cost for the construction of a similar plant in the US would be lower than the net present value of Norpro Venezuela's future cash flows (USD 99.5 million compared to USD 115.1 million). Consequently, Claimant is of the view that the Tribunal should determine the fair market value of the expropriated plant based on the construction cost approach.[260] In any event, Claimant made the following submissions with regard to the DCF calculation.

### bb)  Discount Rate

296. Claimant submits that Respondent's experts Mr. Brailovsky and Dr. Flores applied "*an absurdly high discount rate of 26%*," which results in a value that implies that "*no reasonable investor would invest in a new proppant plant, or add capacity to an existing proppant plant.*"[261]

297. In particular, Claimant argues that the "*exorbitant*" country risk premium of 13.92% that Mr. Brailovsky and Dr. Flores applied for Venezuela is a "*desperate way for a State to try to evade responsibility for its actions.*" According to Claimant, this spike reflects President Chávez's threats to expropriate all foreign investments in Venezuela without compensation.[262] Claimant argues, however, that a State "*may not use its own propensity to violate the law to reduce the value of compensation for the expropriation.*"[263] It therefore takes the position that the "*generalized threat of confiscation*" has to be eliminated from the calculation of the fair market value because Respondent would otherwise be rewarded for the unlawful conduct that this arbitration is meant to remedy.[264]

298. Claimant claims that Prof. Spiller has excluded only the confiscation risk in his calculation but appropriately took into account "*other risks of investing in Venezuela, such as the risks of a volatile economy, civil disorder, less developed infrastructure, and other issues.*" Claimant submits that Prof. Spiller took the average spread of sovereign bonds

---

[259] Reply, ¶¶ 155-156 referring to Prof. Spiller's Second Damages Assessment dated 18 June 2014 ("**Spiller II**"), ¶ 5; Claimant's Post-Hearing Submission, ¶ 90.
[260] Reply, ¶¶ 157, 187 and 196; Claimant's letter to the Tribunal dated 6 November 2015; Spiller II, Table 12.
[261] Reply, ¶ 158 quoting from Spiller II, ¶ 28.
[262] Reply, ¶ 161; Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing Submission, ¶ 55.
[263] Reply, ¶ 162 quoting from *Occidental v. Ecuador* (**CLA-061**), ¶ 564; Claimant's Post-Hearing Submission, ¶ 110 referring in particular to *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841.
[264] Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing submission, ¶ 56 and ¶ 59.

of countries with a B1 rating such as Venezuela, which includes many developing countries with "*significant country risk, including political risks*."[265]

299.  Claimant further contends that it also took Venezuela's "*heightened country risk*" into account when it assigned a discount rate of 15% to the project in 2006 and undertook significant efforts to secure meaningful support of the Venezuelan Government, in reliance on the fact that the France-Venezuela Treaty had entered into force in 2004.[266] Claimant emphasizes that the "*high risk*" discount rate of 12%, which included a country risk premium of 4%, was not assigned by the members of the project team (they even added a further 3% "*to be conservative*"), but rather served as a "*company-wide objective measure to consider the potential risks and rewards of proposed ventures in various locations*."[267]

### cc)  Future Cash Flows

300.  With regard to the calculation of the future cash flows, Claimant considers it "*baseless*" to split the profits that a willing buyer would generate from Norpro Venezuela's exports to account for internal cost allocation. In Claimant's view, the fair market valuation is "*not dependent on idiosyncratic qualities of the buyer or seller*"; therefore, it must be assumed that the highest-bidding willing buyer would most likely be a strategic investor that already has a distribution and marketing network similar to that of Saint-Gobain and is thus in a position to accrue 100% of the profits.[268]

301.  Claimant further notes that Mr. Brailovsky and Dr. Flores assumed in their calculation that CVG Bauxilum would supply bauxite at the increased price that it unilaterally imposed on Norpro Venezuela in September 2008. According to Claimant, this price increase was unlawful and therefore must not be taken into account based on the principle that "*a party may not reduce its liability for one wrongful act (here, the expropriation) on the basis of another (the price increase)*."[269]

---

[265] Claimant's Post-Hearing Submission, ¶¶ 105-106; Claimant's Second Post-Hearing Submission, ¶ 60 and ¶ 67. Claimant argues that one way to "*check*" this is to look at the CDS spreads outstanding on countries' sovereign debts and notes that on Prof. Damodaran's list of 63 countries as of January 2014, Prof. Spiller's proposed premium of 4.5% would rank as the fourth-highest after Argentina (14.73%), Venezuela (10.8%) and Tunisia (4.57%) and thus "*far above the typical country risk premium in a developing country*." Claimant's Second Post-Hearing Submission, ¶¶ 61-62 referring to **App. BF-66**, pp. 23-25.
[266] Claimant's Post-Hearing Submission, ¶ 107, ¶ 116 and ¶ 130.
[267] Claimant's Post-Hearing Submission, ¶¶ 131-134 referring to the oral testimony of its witness Patrick Millot. Transcript (Day 2), p. 428 lines 14-17 and p. 438 lines 13-16.
[268] Reply, ¶¶ 170-172; Claimant's Post-Hearing Submission, ¶¶ 174-175 referring to Prof. Spiller's oral testimony during the Hearing. Transcript (Day 4), p. 1249 lines 11-14, p. 950 line 12 – p. 951 line 9 and p. 948 lines 8-22. See also Claimant's Second Post-Hearing Submission, ¶¶ 89-90.
[269] Reply, ¶ 176; Claimant's Second Post-Hearing Submission, ¶¶ 96-97.

302. As to the transportation costs, Claimant claims that (i) Prof. Spiller's estimate of the transportation costs is based on an actual shipment in March 2010 and confirmed by Saint-Gobain's contemporaneous transportation contracts; and (ii) the average price applied by Prof. Spiller for shipping costs within the US accurately accounts for the various locations and contractual arrangements with Claimant's ultimate customers.[270]

303. Claimant further asserts that Mr. Brailovsky and Dr. Flores fail to distinguish between the concepts of (i) maintenance capex aimed at "*maintain*[ing] *the plant in the condition to continue functioning at its current levels*"; and (ii) investment capex aimed at "*increas*[ing] *plant production through efficiency and technological improvements.*"[271] According to Claimant, only the maintenance capex should be included in the calculation of capital expenditures.[272]

304. In respect of the working capital required to operate the plant, Claimant refers to Prof. Spiller's assumptions that (i) the outstanding balance of VAT credits as of 2009 would have been paid in 2010; and (ii) going forward, it would have taken 60 days to monetize the VAT certificates and Norpro Venezuela would have recovered 80% of their value. As to the administrative delays invoked by Respondent, Claimant notes that such delays have been found to be in breach of the FET standard and claims that it had a legitimate expectation that Respondent would follow its own VAT credit procedure, given that this issue was specifically discussed with the Venezuelan Government before Claimant invested in Venezuela.[273]

### 4. Claimant's Relief Sought

305. Claimant requests that the Tribunal:[274]

(i)     DECLARE that: (A) Venezuela has breached Article 5 of the Treaty by unlawfully expropriating Saint-Gobain's investment in Venezuela; and (B) Venezuela has breached Articles 3(1) and 3(2) of the Treaty by failing to accord Saint-Gobain's

---

[270] Reply, ¶ 179; Claimant's Post-Hearing Submission, ¶ 166 and ¶¶ 169-171 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), p. 10; Claimant's Second Post-Hearing Submission, ¶¶ 91-92 referring to Spiller II, Table 7 and ¶¶ 83-85.

[271] Reply, ¶ 180 referring to Larry II, ¶¶ 21-23.

[272] Reply, ¶ 181.

[273] Reply, note 381 referring to Spiller II, ¶ 93 and ¶¶ 115-116 and *Impregilo S.p.A. v. Argentina*, Concurring and Dissenting Opnion of Judge Charles N. Brower (**CLA-127**), ¶ 9; Claimant's Post-Hearing Submission, ¶¶ 158-161.

[274] Claimant's Second Post-Hearing Submission, ¶ 116. The fair market value that Claimant claims Norpro Venezuela had as of the date of the award has been updated in Claimant's Valuation Update submitted on 22 October 2015. Given that as of the Valuation Update, the date-of-the-award valuation yields a value that is lower than the date-of-the-expropriation valuation, Claimant now claims compensation in the amount of the value Norpro Venezuela had as of the date of the expropriation. *See* Claimant's letter dated 6 November 2015.

investment in Venezuela fair and equitable treatment, and full protection and security;

(ii) ORDER Venezuela to pay Saint-Gobain the higher of the Fair Market Value of Norpro Venezuela as of the date of the award (calculated at USD 90.3 million as of 31 August 2015), or the Fair Market Value of Norpro Venezuela as of the date of the expropriation (calculated at USD 99.5 million) plus pre-award interest at the rate of 13.04%, or, subsidiarily, 9.08% per annum until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(iii) ORDER Venezuela to pay post-award interest at the rate of 9.08% per annum from the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(iv) DECLARE that: (A) the award of damages and interest is made net of applicable Venezuelan taxes; and (B) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest;

(v) ORDER Venezuela to indemnify Saint-Gobain in respect of any double taxation liability that would arise in France or elsewhere that would not have arisen but for Venezuela's adverse measures;

(vi) AWARD such other relief as the Tribunal considers appropriate; and

(vii) ORDER Venezuela to pay all of the costs and expenses of this Arbitration, including Saint-Gobain's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and ICSID's additional costs.

## II. SUMMARY OF RESPONDENT'S POSITION AND RELIEF SOUGHT

306. It is Respondent's position that it fully complied with its Treaty obligations, in particular with respect to the expropriation of the plant, and that Claimant is merely entitled to compensation based on Article 5(1) of the Treaty in the amount of USD 9.5 million, the fair market value of the plant as of 15 May 2010, plus pre-award simple interest at a rate equal to the rate of a three-month US Treasury Bill plus 1.1 percentage points.[275] To the extent that Claimant's claim exceeds this amount, Respondent submits that it should be dismissed.

---

[275] Respondent's Post-Hearing Reply Brief, ¶ 64. This position has remained unchanged following the submission of Respondent's Valuation Update on 22 October 2015.

**1.    Admissibility Objections**

307.  Respondent contends that (i) the claims relating to the Bauxite Contract; and (ii) the claims relating to Article 5(1) subparagraph 1 of the Treaty are inadmissible.

308.  With respect to the Bauxite Contract, Respondent argues that, even if Claimant could establish that the bauxite prices were increased in breach of the Bauxite Contract, this could not, in itself, give rise to a responsibility of Respondent under international law because CVG Bauxilum, an entity legally distinct from Respondent, is party to the Bauxite Contract.[276] Respondent maintains that Claimant is unable to identify any legal instrument entered into with the State, or any relevant act on the part of the State, on which it can base its claims regarding bauxite pricing.[277]

309.  As regards the alleged breach of the Article 5(1) subparagraph 1 of the Treaty, Respondent submits that this claim should be dismissed as Claimant never raised its "*new theory*" with regard to Article 5(1) subparagraph 1 of the Treaty prior to the Hearing. Respondent further contends that Claimant's change of position is in conflict with Rule 31(3) of the ICSID Arbitration Rules.[278]

**2.    No Breach of the Treaty**

310.  With respect to the merits of the claims, Respondent submits that it did not breach any of its obligations under the Treaty.

**a)    Expropriation (Article 5(1) of the Treaty)**

311.  It is Respondent's position that it acted in full conformity with the requirements of both Article 5(1) subparagraph 1 of the Treaty (**aa**)) and of subparagraphs 2 and 3 of the same provision (**bb**)).

**aa)    No Breach of Article 5(1) Subparagraph 1 of the Treaty**

312.  Respondent submits that the claim relating to the Article 5(1) subparagraph 1 of the Treaty is without legal merit as (i) the term "*measure*" has a "*far broader meaning than that suggested by Claimant*"; and (ii) the reference to a "*particular agreement*" ("*engagement particulier*"/"*compromiso especial*") is "*not intended to mean the Treaty itself, but rather an agreement external to the Treaty,*" as evidenced by the use of the same term in Article 10 of the Treaty.[279]

---

[276] Counter-Memorial, ¶¶ 73-74; Respondent's Post-Hearing Brief, ¶¶ 125-126.
[277] Rejoinder, ¶ 78.
[278] Respondent's Post-Hearing Brief, ¶¶ 21-23.
[279] Respondent's Post-Hearing Brief, ¶¶ 25-26; Respondent's Post-Hearing Reply Brief, ¶ 7.

### bb)   No Breach of Article 5(1) Subparagraphs 2 and 3 of the Treaty

313. Respondent further contends that its conduct was in conformity with the requirements of Article 5(1) subparagraph 2 and 3 of the Treaty.

314. Respondent submits that the "*date of expropriation*" within the meaning of Article 5(1) subparagraph 3 of the Treaty was 29 March 2011, *i.e.*, the date of the issuance of the Expropriation Decree, which triggered the procedures under the Venezuelan Expropriation Law.[280] With regard to the takeover of the plant on 15 May 2010 and the events thereafter, Respondent contends, first, that it was the labor union SINPROTRAC, not the State, which occupied the plant, and, second, that PDVSA's presence at the plant thereafter was a "*responsible and necessary action pending the expropriation decree to assure the safety and security of the plant*" after Norpro Venezuela's management had effectively abandoned it.[281]

315. With regard to the first point, Respondent denies the existence of an intrinsic causal link between President Chávez's "*announcement*" and the takeover of the plant, because the President "*did not order the takeover of the Plant.*"[282]

316. With respect to the second aspect, Respondent maintains that PDVSA's presence prior to the publication of the expropriation decree was arranged for the purpose of ensuring plant safety and stability, as a "*caretaker.*" Respondent asserts that, with the plant under the control of the union, and in the absence of supervision by Norpro Venezuela's management staff, there were legitimate grounds for concern regarding worker safety and the proper operation of the plant's equipment.[283]

317. In this context, Respondent alleges that Claimant neither challenged the legal foundation of PDVSA's presence nor demanded return of the plant nor requested access to it after 15 May 2010.[284]

318. At the same time, Respondent does not contest that, in the aftermath of 15 May 2010, "*there was a 'process of nationalization' to the extent that, as everyone recognized, the Plant had not been expropriated but that it would be transferred to State control in the future.*" Respondent submits that the Parties also recognized (i) that a formal expropriation decree was being drafted at that time; (ii) that the decree was supposed to mark the starting point of the expropriation procedure under Venezuelan law; and (iii) that the Par-

---

[280] Respondent's Post-Hearing Brief, ¶ 87 (with note 187).
[281] Counter-Memorial, ¶ 26 (with note 68); Respondent's Post-Hearing Brief, ¶¶ 60-65.
[282] Respondent's Post-Hearing Brief, ¶¶ 30-31.
[283] Rejoinder, ¶¶ 20-22; Respondent's Post-Hearing Reply Brief, ¶ 25.
[284] Rejoinder, ¶ 23; Post-Hearing Brief, ¶ 60 (with note 108), ¶¶ 42-51.

ties would consider, in the meantime, alternatives to expropriation, including the formation of a mixed company ("*empresa mixta*"), with PDVSA as a majority shareholder and the Claimant holding a minority stake.[285]

319. As regards the precise content of the specification requirement in Article 5(1) subparagraph 3 of the Treaty, Respondent rejects Claimant's interpretation pursuant to which the provision requires not only an acknowledgment that an amount equivalent to that specified in the second paragraph of Article 5(1) will be paid, but also that the precise figure constituting that "*amount*" be determined on the date an intention to expropriate is announced. In particular, Respondent submits that, on the basis of a good faith interpretation of Article 5(1) of the Treaty pursuant to Article 31(1) of the Vienna Convention on the Law of Treaties ("**Vienna Convention**"), asking for a specified figure on the date of expropriation is "*not a good faith interpretation and cannot be correct, as it would establish an obligation that the Contracting States could not satisfy except by pure chance.*"[286]

320. Respondent points out that the Treaty does not require that the State "*must, before it announces an expropriation, engage in discussions with the expropriated entity to obtain the facts necessary to determine the precise figure*" of compensation, and that "*without such information, it would be impossible […] to determine that figure in good faith.*" For this reason, Respondent suggests a, in its view, more reasonable interpretation of the word "*amount*" that does not refer to a "*precise dollar or Euro figure, but rather to the required concept (i.e., a 'sum* […] *equal to the actual value of the investments').*"[287]

321. With respect to the promptness requirement, Respondent submits that Article 5(1) of the Treaty does not require the State to pay compensation to the investor on the date of the expropriation: While subparagraph 2 provides that "*[a]ll measures of expropriation which could be taken must result in payment of a prompt and adequate compensation,*" it is only subparagraph 3, which requires that, after compensation has been determined, "*payments shall be made without delay.*"[288]

322. It is Respondent's position that it fully complied with these requirements. First, Respondent submits that Decree No. 8.133 and the Venezuelan Expropriation Law indeed provided the mechanism for the determination and payment of compensation in the event of an expropriation, consistent with Respondent's obligations under Article 5(1) of the Treaty and international law.[289]

---

[285] Respondent's Post-Hearing Brief, ¶ 61.
[286] Respondent's Post-Hearing Brief, ¶¶ 83-84.
[287] Respondent's Post-Hearing Brief, ¶ 83.
[288] Rejoinder, ¶ 155.
[289] Rejoinder, ¶¶ 36-39, 169-170, 172.

323. Moreover, contrary to Claimant's contentions, Respondent asserts that it has been duly following the mandatory procedures required by the national laws on expropriation to determine compensation, namely Article 56 of the Expropriation Law and the provision of the Law on Access. Respondent contends that the fact that those procedures are yet to come to a close and Claimant is yet to receive payment of compensation is largely due to Claimant's own failure to participate in those procedures and Claimant's attempts to have them discontinued.[290]

324. Finally, Respondent also rejects Claimant's good faith argument and submits that, apart from its continued efforts to determine compensation in accordance with the Expropriation law, it met regularly with Claimant to negotiate compensation, including the option of forming an "*empresa mixta.*"[291]

325. In any event, it is Respondent's submission that the mere fact that compensation is yet to be paid does not render the expropriation unlawful, taking into account that Respondent acknowledged its obligation to pay compensation and commenced the expropriation procedure in consistency with its domestic law.[292] Respondent refers to several commentators and decisions rendered by arbitral tribunals in order to substantiate its submission (*see* in more detail below).

### b)     Fair and Equitable Treatment (Article 3(1) of the Treaty)

326. Respondent submits that Article 3(1) of the Treaty calls only for the minimum standard of treatment under customary international law. In any event, Respondent contends that even under more expansive formulations, there would be no FET violation.

327. With regard to the Bauxite Contract, Respondent submits that it did not give any "*guarantee*" or "*commitments*" to Saint-Gobain regarding bauxite supply or price and claims that Claimant is "*unable to identify a single legal instrument or document containing any so-called State guarantees and commitments regarding bauxite supply or price.*"[293] In Respondent's view, Claimant refers to CVG Bauxilum's commercial decision to accomplish an increase in the bauxite price under the Bauxite Contract, even though CVG Bauxilum's conduct is not attributable to Respondent under international law.[294]

328. In response to Claimant's contention that Respondent did not accord Saint Gobain due process in the expropriation, Respondent emphasizes that PDVSA established a presence on the plant after 15 May 2010 only in a caretaker capacity and pending the publication

---

[290] Rejoinder, ¶¶ 171, 173-187.
[291] Rejoinder, ¶¶ 44-56, 188.
[292] Counter-Memorial, ¶¶ 161-173; Rejoinder, ¶¶ 159-168.
[293] Rejoinder, ¶¶ 127, 131.
[294] Rejoinder, ¶¶ 132-134; Counter-Memorial, ¶¶ 77-81.

of the formal Expropriation Decree, which was in full accordance with Venezuelan law. Respondent further points out that, after the takeover of the plant, PDVSA met with Claimant for negotiations as soon as possible.[295]

329. Finally, Respondent argues that due process does not require discussions with the expropriated party prior to the expropriation announcement and that due process is fully satisfied if there is access to the judiciary to be heard – which is the case in Venezuela. Again, Respondent contends that Claimant could have challenged the occupation of the plant by the union or PDVSA prior to the issuance of the Expropriation Decree before Venezuelan courts. It is Respondent's position that "*the fact that Claimant chose not to avail itself of remedies in the Venezuelan courts does not equate with a denial of due process.*"[296]

### c)     Full Protection and Security (Article 3(2) of the Treaty)

330. It is Respondent's position that an analysis of a breach of the FPS standard requires consideration of whether the investment has been physically interfered with or harmed and whether the State complied with its due diligence obligation, and that the FPS standard does not entail the concept of "*legal security.*"[297] In any event, Respondent rejects Claimant's FPS claims with regard to both the Bauxite Contract and the plant takeover.

331. Respondent emphasizes that it was not responsible for CVG Bauxilum's price increases under the Bauxite Contract. Moreover, Respondent contends that an investor, "*by communicating its discontent with the behavior of a commercial partner to a government representative,*" cannot create an obligation of the State under international law "*to investigate the merits of its commercial complaint and make the government responsible for any damages*" if the investor's commercial partner continues its unpleasant behavior.[298]

332. With respect to the plant takeover, Respondent submits that it fully complied with its FPS obligations prior to the issuance of the Expropriation Decree. Respondent emphasizes that, had it "*not established a presence through PDVSA Industrial pending the issuance of Decree No. 8.133, and had the assets been destroyed or stolen or had people been injured, Venezuela very well may have been subject to a claim for non-compliance with its FPS obligations.*"[299]

### 3.   Quantum

---

[295] Counter-Memorial, ¶ 140; Rejoinder, ¶ 136.
[296] Respondent's Post-Hearing Reply Brief, ¶ 11.
[297] Counter-Memorial, ¶ 149; Rejoinder, ¶ 143.
[298] Rejoinder, ¶¶ 141-142.
[299] Respondent's Post-Hearing Reply Brief, ¶ 11 (note 42).

**a)      Compensation Standard and Valuation Date**

333.   Respondent submits that, irrespective of whether or not Venezuela complied with the
       requirements of Article 5(1) subparagraph 2 and 3 of the Treaty, the proper valuation date
       is the "*date prior to the threat of expropriation*," as required by Article 5(1) subparagraph
       2 of the Treaty.[300]

334.   Respondent refers to the wording of Article 5(1) subparagraph 2 of the Treaty, according
       to which the value of the expropriated asset is to "*be assessed in relation to the normal
       economic situation prevailing before any threat of expropriation was of public
       knowledge.*" It is Respondent's position that this standard relates to both lawful and un-
       lawful expropriations and is not limited to expropriations that comply with the require-
       ments set out in Article 5(1) subparagraph 1 of the Treaty.[301]

335.   Moreover, Respondent contends that, in case of a mere failure of the State to promptly
       specify and pay compensation, even the compensation standard under customary interna-
       tional law does not allow for calculating damages by way of "*constructing a 'but-for'
       world in which the possibility of expropriation is excluded until the date of the award.*"[302]

**b)      Calculation of Damages**

**aa)      Valuation Method**

336.   Respondent agrees that the amount of compensation to be paid should reflect the fair
       market value of the plant, *i.e.*, "*the amount that a willing buyer would pay to a willing
       seller.*"[303]

337.   Respondent sees no need to consider Prof. Spiller's approach to compare the DCF-based
       valuation with the opportunity costs of constructing a similar plant in any detail because
       according to its experts on quantum, Mr. Brailovsky and Dr. Flores, those costs would
       exceed the price that a willing buyer would pay for Claimant's plant (USD 43.7 million
       plus foregone cash flows of USD 1.3 million as of 15 May 2010 compared to USD 9.5
       million).[304]

338.   In any event, Respondent emphasizes that the asset to be evaluated in the present case is
       a stand-alone plant in Venezuela, not in the United States, and therefore argues that the

---

[300] Transcript (Day 1), p. 241 lines 7-8.
[301] Rejoinder, ¶ 190; Counter-Memorial, ¶¶ 174 *et seq.*
[302] Respondent's Post-Hearing Brief, ¶ 109.
[303] Counter-Memorial, ¶¶ 185-187; Respondent's Post-Hearing Brief, ¶ 137.
[304] Counter-Memorial, ¶ 188; Rejoinder, ¶ 201; Respondent's Post-Hearing Brief, ¶ 138 and ¶ 204-208; Respond-
ent's Post-Hearing Reply Brief, ¶ 63; Mr. Brailovsky and Dr. Flores' Second Expert Report on Quantum ("**Brailov-
sky/Flores II**"), ¶¶ 227 and 242.

only appropriate way of assessing the compensation to be paid to Claimant is to apply a DCF analysis, including a discount rate that accounts for the fact that the plant is located in Venezuela.[305]

339. With regard to the DCF calculation, Respondent made the following submissions.

### bb)   Discount Rate

340. Respondent submits that the discount rate calculated by Prof. Spiller would be "*low even for a company such as Norpro Venezuela operating in a mature economy.*" Respondent argues that (i) Prof. Spiller deviated from the risk-free-rate suggested by Ibbotson/Morningstar for long-term projects, *i.e.*, the 20-year US Treasury bond yield as of the valuation date; (ii) he deviated from the general market risk premium (MRP) calculated by Ibbotson/Morningstar; and (iii) he "*ignore*[d] *the empirical evidence establishing that the CAPM tends to underestimate the cost of equity for financial assets,*" which is corrected by the *alpha* coefficient.[306]

341. According to Respondent, the biggest difference between the experts' estimates concerns the applicable country risk premium. Respondent claims that this premium is "*far higher*" than the 4.5% applied by Prof. Spiller, which in fact does not reflect Venezuelan country risk but rather the default risk on US corporate bonds.[307] Respondent refers to the calculations of its experts Mr. Brailovsky and Dr. Flores who primarily relied on the Country Risk Rating Model (CRRM) compiled by Ibbotson/Morningstar and cross-checked their results by using the so-called "*bludgeon method*" devised by Prof. Damodaran.[308]

342. While acknowledging that the valuation must exclude the impact of the actual expropriation of the Plant, Respondent argues that this "*should not be confused with the expropriation risk inherent in any project from its very inception,*" which is part of the "*normal economic situation prevailing*" prior to the announcement of the expropriation of the Plant and therefore also a risk that a willing buyer would take into account in its assessment of the purchase price it would be willing to pay for the Plant.[309]

343. Respondent argues that the country risk premium must be based on the buyer's perception of risk; the elimination of the risks inherent to an investment in Venezuela would result

---

[305] Rejoinder, ¶¶ 202-203.
[306] Counter-Memorial, ¶¶ 234-236; Rejoinder, ¶ 206. For an overview of the diffences regarding the US cost of equity components, *see* also the table in Respondent's Post-Hearing Brief, following ¶ 140.
[307] Counter-Memorial, ¶ 240; Rejoinder, ¶ 207 and ¶ 228. In Respondent's view, Prof. Spiller should at least have used corporate bonds from other emerging countries with the same rating as Venezuela, which would have resulted on a spread of about 9%. Rejoinder, ¶ 221; Respondent's Post-Hearing Brief, ¶ 169.
[308] Respondent submits that its experts used the same methodology to determine the appropriate discount rate for both valuation dates. Counter-Memorial, ¶ 259.
[309] Rejoinder, ¶ 227.

in "*the use of a discount rate that a willing buyer would not use and derive a value that a willing buyer would not pay, thereby granting Claimant a windfall that it could never achieve in an arm's-length transaction.*" In Respondent's view, this would further be punitive to Venezuela and thus "*impermissible under any theory of compensation in international law.*"[310]

344. In any event, Respondent claims that "*there is no way to isolate, and thus quantify*" the risk of uncompensated expropriation. According to Respondent, Prof. Spiller did not propose any method to do so in his expert reports but argued only at the Hearing that one could take the difference between the EMBI spread for Venezuela and his 4.5% country risk premium.[311]

345. As to Claimant's emphasis during the Hearing on the 15% discount rate reflected in its 23 October 2006 DAC, Respondent notes that the significance and purpose of this rate remains unclear and further argues that at that time, Venezuela's default risk was "*at one of its all-time lowest points,*" with the yield of its sovereign bonds being only 2.18% higher than US Treasury bonds. At that point, Respondent submits, the 3% country risk premium could have been justified. More importantly, however, Respondent emphasizes that Claimant took Venezuelan default risk into account in its assessment of the country risk, just like a buyer would in its assessment of an appropriate discount rate for determining the fair market value of the Plant. In Respondent's view, there is then no reason for excluding such risk when such risk increased with the passage of time.[312]

### cc) Future Cash Flows

346. Respondent submits that it is undisputed between the Parties that prior to the expropriation Norpro Venezuela received only 27% of the profits, while the remaining 73% were allocated to Claimant's US affiliate SGCP.[313] Consequently, Respondent rejects Prof. Spiller's assumption that Norpro Venezuela would retain 100% of the profits as of the valuation date. It claims that a willing buyer would not pay for 100% of the profits because it would not be acquiring the capabilities of SGCP and would not be willing to

---

[310] Respondent's Post-Hearing Brief, ¶ 157.

[311] Respondent's Post-Hearing Brief, ¶¶ 163-164, 171.

[312] Respondent's Post-Hearing Brief, ¶¶ 158-162. Respondent further notes that the same documents reflect that Claimant was willing to invest in Venezuela at an internal rate of return of 26.4%. Therefore, Respondent argues that, while still being 3% higher than Prof. Spiller's discount rate, the 15% discount rate is not relevant in this case. Respondent's Post-Hearing Reply Brief, note 132.

[313] Counter-Memorial, ¶¶ 198-199 and ¶ 256 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**); Rejoinder, ¶¶ 238-242; Respondent's Post-Hearing Brief, ¶ 182.

transfer the profits it expects to earn through its own existing marketing, logistics and distribution network.[314]

347. Respondent therefore refers to the assumption of its experts that a buyer of the Plant would achieve "*at the very most*" 75% of the profits as Claimant itself concluded in its transfer pricing study that the 25% portion of "*marketing intangibles*" was contributed 100% by SGCP.[315]

348. As to the bauxite price to be paid by Norpro Venezuela to CVG Bauxilum, Respondent submits that there is no basis for Claimant's instruction to Prof. Spiller to reduce the agreed price of USD 33.8 per MT to the original contract price, given that Norpro Venezuela agreed to the increased price as long as there would be no further increase throughout 2009. Therefore, Respondent instructed its experts to base their calculation on the increased price, escalated by the US PPI-Commodities.[316]

349. With regard to the transportation costs, Respondent submits that Claimant's own budgeted cost for transportation from Venezuela to Alice, Texas amount to EUR 110 (converted to USD 154) per MT. According to Respondent, this figure is also supported by Claimant's transfer pricing study.[317] Respondent further rejects Prof. Spiller's estimate for the shipping costs within the US and claims that Claimant's budgeted cost and the Halliburton SPA reflect a "*significantly higher*" cost, which is why its experts based their estimate on the budgeted cost.[318]

350. In relation to the capital expenditures, Respondent agrees with Prof. Spiller's assumption up to and including 2018 but argues that annual capital expenditures would significantly increase "*as the Plant aged and equipment reached the end of its useful life.*"[319] While Prof. Spiller included only maintenance expenditures, Respondent claims that expendi-

---

[314] Counter-Memorial, ¶¶ 200-202. *See also* Rejoinder, ¶ 244. Respondent emphasizes that, while such a buyer might achieve 100% of the revenues from the ultimate sale of the proppants, it would not benefit from 100% of the profits because "*a substantial portion of the profits* " would be tied to the marketing, distribution and logistics functions that were not part of the transfer from Claimant in consideration for the purchase price. Respondent's Post-Hearing Brief, ¶¶ 184-185.

[315] Counter-Memorial, ¶ 203 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 5; Rejoinder, ¶ 243; Respondent's Post-Hearing Reply Brief, ¶ 54.

[316] Counter-Memorial, ¶ 210 and ¶ 256; Rejoinder, ¶ 251 quoting from the letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit R-52**).

[317] Counter-Memorial, ¶ 214 and ¶ 256 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), pp. 10 and 42 and Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 1; Respondent's Post-Hearing Brief, ¶¶ 195-198; Respondent's Post-Hearing Reply Brief, ¶¶ 58-59.

[318] Counter-Memorial, ¶¶ 215-216 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 1.

[319] Counter-Memorial, ¶¶ 217-218 and ¶ 256.

tures for "*health and safety, technology or improvements to reduce breakdowns and process disruptions*" are also required to assume operation in perpetuity and therefore takes the position that all four capexes as foreseen for the claimant's Fort Smith plant should be included in the calculation.[320]

351.  In respect of the working capital, Respondent agrees with Prof. Spiller's calculation except for the VAT credits. Respondent contends that as of 15 May 2010 Norpro Venezuela had not even applied for the tax recovery certificates and claims that the recovery procedure is usually a "*lengthy and complex*" process. Respondent submits that its experts therefore assumed that the outstanding VAT credits as of 15 May 2010 would have been monetized in 2013 and further VAT credits accumulated thereafter would have been monetized on a two-year rolling basis and thus been part of working capital that a buyer would not separately value.[321]

### 4.  Respondent's Relief Sought

352.  Respondent concludes that the Tribunal should declare that the expropriation of the plant was lawful and award Claimant compensation based on Article 5(1) of the Treaty in the amount of USD 9.5 million, the fair market value of the plant as of May 15, 2010, plus pre-award simple interest at a rate equal to the rate of a three-month US Treasury Bill plus 1.1 percentage points. The claims based on the bauxite price increase should be declared inadmissible, or, if they were to be entertained, dismissed on the facts and the law. All other claims should be dismissed on the facts and the law. The costs of these proceedings incurred by Respondent (including legal fees and disembursements) should be deducted from the amount of compensation awarded to Claimant.[322]

## F.  THE TRIBUNAL'S REASONING

## I.  JURISDICTION

353.  It is undisputed between the Parties that the Tribunal's jurisdiction derives from Article 25(1) of the ICSID Convention and Article 8(2) of the Treaty. Article 25(1) of the ICSID Convention provides in relevant part:

---

[320] Rejoinder, ¶ 262.
[321] Rejoinder, ¶¶ 269-271; Respondent's Post-Hearing Brief, ¶ 201.
[322] Respondent's Post-Hearing Reply Brief, ¶ 64. Respondent's relief sought has not changed through its Valuation Update submitted on 22 October 2015 because this submission related exclusively to the date-of-the-award valuation of the Plant, which was updated to 31 August 2015. Respondent, however, maintains its position that the Plant's value must be assessed as of the date of the first threat of expropriation, in accordance with Article 5(1) subparagraph 2 of the Treaty. *Cf.* Respondent's Post-Hearing Brief, ¶ 137.

"*The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State […] and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.*"

354.  Article 8(2) of the Treaty provides:

"*If such a dispute* [between a national or a company of a Contracting Party and the other Contracting Party, regarding an obligation of the latter relating to an investment under the terms of the present Agreement] *cannot be settled within six months from the time it was raised by either of the parties to the dispute, at the request of the national or the company in question it shall be submitted to either the competent court of the State in which the investment was made or to arbitration by the International Center for Settlement of Investment Disputes (ICSID), pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965. This decision is the choice of the national or the company concerned. Once the decision has been made to pursue arbitration, the decision becomes final.*"[323]

355.  Pursuant to Article 25(1) of the ICSID Convention, the following four requirements have to be satisfied: (i) there must be a legal dispute between the Parties; (ii) the dispute must arise directly out of an investment; (iii) the Parties must be a Contracting State and a national of another Contracting State; and (iv) both Parties must have given their consent in writing to submit the dispute to ICSID.

356.  There is no dispute between the Parties that all four requirements are met in the present case.[324] First, there is a legal dispute between the Parties because Claimant seeks reparation for Respondent's alleged breaches of Articles 5(1), 3(1) and (2) of the Treaty.[325]

357.  Second, this dispute arises directly out of an investment within the meaning of Article 1(1) of the Treaty, which includes "*all assets, such as the property rights and interests of any nature*" and, in particular, "[s]*hareholdings* […] *in companies incorporated in the territory of one of the Contracting Parties,*" "*rights in rem such as mortgages*" and "*all entitlements having an economic value.*"[326] In this case, Claimant submits that (i) it holds 99.99% of the shares in Norpro Venezuela, a company organized and existing under the

---

[323] Free translation submitted as **Exhibit C-1**. The original French and Spanish texts have been quoted in paragraph 12 above.
[324] Respondent has not raised any objections to the jurisdiction of this Tribunal. During the Hearing, Respondent stated in this regard: "*Now we're here. Now this Tribunal will have to determine compensation as well. That's fine.*" Transcript (Day 1), p. 160 lines 17-18.
[325] *Cf.* Memorial, ¶ 123; RfA, ¶ 69.
[326] Article 1(1)(a), (b) and (c) of the Treaty. Free translation submitted as **Exhibit C-1**.

laws of Venezuela; (ii) it provided debt financing to Norpro Venezuela, which was se-cured by a mortgage on Norpro Venezuela; and (iii) it held property, contractual rights with local suppliers and rights pursuant to the law such as licenses and permits.[327] None of these submissions was contested by Respondent. Therefore, the dispute between the Parties arises directly out of Claimant's investment in Norpro Venezuela.

358. Third, Respondent does not dispute that, even though Venezuela denounced the ICSID Convention on 24 January 2012,[328] it was a Contracting State within the meaning of Ar-ticle 25(1) of the ICSID Convention for the purposes of these proceedings. Claimant notes that the ICSID Convention entered into force for Venezuela on 1 June 1995 and Vene-zuela was therefore a Contracting State at the time (i) it consented to ICSID Arbitration under the Treaty on 2 July 2001; (ii) Claimant sent its notices of dispute to Respondent on 4 July 2011 and 17 January 2012; and (iii) Claimant filed its Request for Arbitration on 25 April 2012, given that Venezuela's denunciation of the ICSID Convention only took effect on 25 July 2012.[329] Further, Claimant is a national, *i.e.*, a juridical person within the meaning of Article 25(2)(b) of the ICISD Convention, of another Contracting State because Claimant is a corporation incorporated and organized under the laws of France, for which the ICSID Convention entered into force on 20 September 1967.[330]

359. Finally, both Parties gave their consent in writing to submit this dispute to ICSID. Re-spondent' consent is comprised in Article 8(2) of the Treaty. The requirements of this provision have also been satisfied: (i) The dispute was raised by a national or a company of a Contracting Party to the Treaty (company incorporated in France) against the other Contracting Party (Venezuela); (ii) a notice of dispute (4 July 2011) was sent at least six months before submission of the dispute to arbitration (25 April 2012) and no amicable settlement has been reached during that time period; and (iii) the dispute under the Treaty has not been submitted to Venezuelan courts by the national or company.[331]

360. Claimant gave its consent in its notice of dispute dated 4 July 2011, which was, *inter alia*, addressed to the President of Venezuela, and reiterated this consent in its second letter to the President dated 17 January 2012.[332]

361. As a result, the Tribunal concludes that the requirements of Article 25(1) ICSID Conven-tion have been satisfied and that it has jurisdiction to decide over the dispute submitted to it.

---

[327] Memorial, ¶¶ 117-118; RfA, ¶ 66.
[328] Memorial, ¶ 114.
[329] Memorial, ¶¶ 126, 128.
[330] Memorial, ¶ 126; RfA, ¶ 69.
[331] *Cf.* Memorial, ¶¶ 120-121; RfA, ¶¶ 72-73.
[332] Memorial, ¶ 127; RfA, ¶ 69. **Exhibits C-42** and **C-44**.

## II. ADMISSIBILITY

362. Respondent raises objections with regard to the admissibility of the following two claims raised by Claimant in these proceedings: (i) that, by virtue of the increase of the bauxite price that had initially been agreed upon in the Bauxite Contract between Claimant and CVG Bauxilum, Respondent failed to accord to Claimant fair and equitable treatment pursuant to Article 3(1) of the Treaty and to protect and secure Claimant's investment pursuant to Article 3(2) of the Treaty (the "**Bauxite Claims**");[333] and (ii) that Respondent acted "*contrary to a particular agreement*" within the meaning of Article 5(1) subparagraph 1 of the Treaty.[334]

### 1. Bauxite Claims

#### a) Summary of Respondent's Position

363. Respondent submits that the Bauxite Claims are inadmissible. Even if Claimant could establish that the bauxite prices were increased in breach of the Bauxite Contract, this could not, in itself, give rise to the responsibility of Respondent under international law given that it is not party to the Bauxite Contract.[335] Respondent claims that Claimant is unable to identify any legal instrument entered into with the State, or any relevant act on the part of the State, on which it can base its Bauxite Claims.[336]

364. In particular, Respondent contends that the price increases invoked by CVG Bauxilum are not attributable to Respondent under the ILC Draft Articles.[337] Respondent argues that CVG Bauxilum, which has a legal personality distinct from that of Respondent and does not wield any executive power under Venezuelan law, cannot be considered as a State organ within the meaning of Article 4 of the ILC Draft Articles. Respondent further submits that CVG Bauxilum did not exercise governmental authority pursuant to Article 5 of the ILC Draft Articles because, while acting as a commercial company in the mining sector for the benefit of Respondent, it neither possesses nor exercises governmental authority when carrying out its activities.[338]

365. Finally, Respondent argues that CVG Bauxilum did not act on the instructions, or under the direction or control, of Respondent within the meaning of Article 8 of the ILC Draft Articles; even though CVG Bauxilum is ultimately subject to the administrative oversight

---

[333] Memorial, ¶¶ 165-177; 190-194.
[334] Claimant's Post-Hearing Submission, ¶¶ 38-47.
[335] Counter-Memorial, ¶¶ 73-74; Respondent's Post-Hearing Brief, ¶¶ 125-126.
[336] Rejoinder, ¶ 78.
[337] Counter-Memorial, ¶¶ 76-106; Respondent's Post-Hearing Brief, ¶¶ 125-126.
[338] Counter-Memorial, ¶¶ 84, 89.

("*tutela*") of MIBAM, this is not sufficient for establishing direct State control within the meaning of Article 8 of the ILC Draft Articles.[339]

### b)      Summary of Claimant's Position

366.   Claimant submits that the arguments raised by Respondent do not affect the admissibility of the Bauxite Claims, but are rather related to the merits of the case. Claimant contends that admissibility merely concerns "*whether the claim, as presented, can or should be resolved by an international tribunal, which otherwise has found jurisdiction.*"[340] Claimant emphasizes that its Bauxite Claims are not based on the Bauxite Contract as such, but rather on Respondent's breaches of the Treaty, and are therefore "*analytically distinct*" from any claim that Norpro Venezuela could have brought under the Bauxite Contract.[341]

367.   Claimant refers to its position that during the negotiation of the Bauxite Contract, Venezuela made it clear that "*it controlled CVG Bauxilum and that all material decisions concerning the conduct of CVG Bauxilum would be made at the ministerial level.*" Claimant submits that its Bauxite Claims are based on the fact that CVG Bauxilum's conduct was either sanctioned or could have been prevented by the competent ministry; therefore, they are claims for breach of the Treaty.[342]

### c)      The Tribunal's Analysis

368.   On the admissibility level, the Tribunal's analysis is limited to the question whether "*it cannot be ruled out, at least prima facie,*" that the alleged conduct of Respondent with respect to Claimant's rights under the Bauxite Contract is, "*if proven,*" capable of falling within the scope of Respondent's obligations under the Treaty.[343]

369.   The Tribunal notes that Respondent's objections to the admissibility of the Bauxite Claims are related, to a certain extent, to the common and important distinction between treaty claims and contract claims. This distinction is particularly relevant in cases where the investor enters into contractual relations directly with the State; in these cases, the investor's contractual rights may very well fall within the scope of a bilateral investment treaty. However, the same distinction may also play a role in case such a contractual relationship has been entered into with a State-owned entity, as is the case here.

---

[339] Counter-Memorial, ¶¶ 104-105.
[340] Reply, ¶ 67, citing from V. Heiskanen, *Jurisdiction, Admissibility, and Competence in Investment Treaty Arbitration*, ICSID Review (2013), **CLA-126**, p. 237.
[341] Reply, ¶ 67.
[342] Reply, ¶ 68.
[343] Citations from *Bayindir v. Pakistan,* ¶ 246. **Exhibit CLA-009**. Arbitrator Bottini would favor a broader definition of admissibility, under which the Bauxite Claims could be dealt with as an admissibility matter. Yet given the Tribunal's decision on these claims, he thinks that nothing turns on this observation.

370. Tribunals in investment treaty disputes are often called upon to clearly distinguish between mere contract violations and treaty violations. In this regard, Respondent correctly pointed to the holding of the tribunal in *Bayindir v. Pakistan*:

> "[B]*ecause a treaty breach is different from a contract violation, the Tribunal considers that the Claimant must establish a breach different in nature from a simple contract violation, in other words one which the State commits in the exercise of its sovereign power.*"[344]

371. While Claimant does contend in the present case that, *inter alia*, CVG Bauxilum was acting in breach of the Bauxite Contract and that such conduct is attributable to Respondent,[345] it does not claim that the alleged breach of contract as such constituted, at the same time, a breach of the Treaty. Claimant rather argues that Respondent had a monopoly over the production and sale of bauxite in Venezuela, which is why Norpro Venezuela did not have a choice but to accept the newly imposed terms.[346] In addition, Claimant claims that Respondent made "*specific promises*" and "*commitments*" and thereby "*created specific expectations,*" which Claimant relied on in making its investments, and further claims that Respondent "*repudiated these expectations, failing to address* […] *CVG Bauxilum's actions in raising the bauxite price.*"[347]

372. Based on these allegations, Claimant contends that Respondent breached its obligations under Article 3(1) of the Treaty (Fair and Equitable Treatment) and Article 3(2) of the Treaty (Full Protection and Security).[348]

373. For the purpose of deciding on the admissibility of the Bauxite Claims, the Tribunal will "*accept pro tem the facts as alleged"* by Claimant "*to be true,*"[349] *i.e.*, that Respondent indeed made specific promises and commitments to Claimant with regard to the Bauxite Contract, which went beyond general incentives offered in order to promote a general investor-friendly environment. On this basis, the Tribunal finds that, *prima facie*, the alleged conduct of Respondent does fall within the scope of its obligations to ensure fair and equitable treatment under Article 3(1) of the Treaty and to grant full protection and security under Article 3(2) of the Treaty. Whether or not the Respondent in fact made any such promises or commitments will be discussed in the merits section of the present decision.

---

[344] Respondent's Post-Hearing Brief, ¶ 135 (note 288). *Bayindir v. Pakistan,* ¶ 180. **Exhibit CLA-009**.
[345] Memorial, ¶ 169 and ¶¶ 173 *et seq.*
[346] Memorial, ¶ 171.
[347] Reply-Memorial, ¶ 120; Claimant's Post-Hearing Submission, ¶ 80.
[348] Reply-Memorial, ¶¶ 122, 137-142.
[349] Citations from *Case Concerning Oil Platforms (Islamic Republic of Iran v US)*, Separate Opinion of Judge Higgins on Preliminary Objections of 12 December 1996, (1996) ICJ Reports, 847 (856). **Exhibit CLA-017**.

## 2. Claim Relating to Article 5(1) Subparagraph 1 of the Treaty

374. During the Hearing and in its Post-Hearing Submissions, Claimant argues that Respondent was in breach not only of the Article 5(1) subparagraphs 2 and 3 of the Treaty, but also of subparagraph 1. Specifically, Claimant contends, first, that the expropriation was not pursuant to a "*measure*" ("*mesures*"/"*medidas*") and, second, that it violated a "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*").[350]

### a)  Summary of Respondent's Position

375. Respondent submits that the claim relating to Article 5(1) subparagraph 1 of the Treaty should be dismissed. Respondent argues that Claimant never raised its "*new, untimely, theory*" with regard to subparagraph 1 prior to the Hearing – neither in its Memorial, nor in its Reply, nor during the pre-hearing conference or in any pre-hearing request. Respondent contends that Claimant's change of position is therefore in conflict with Rule 31(3) of the ICSID Arbitration Rules.[351]

376. In particular, Respondent contests that this claim has been triggered by a change of position in its Rejoinder and emphasizes that, already in its Counter-Memorial, it took the position that the expropriation took place when the Decree was issued on 29 March 2011, as Claimant recognized in its summary of the "*Facts in Dispute*" in its Reply.[352]

### b)  Summary of Claimant's Position

377. Claimant argues that its arguments relating to Article 5(1) subparagraph 1 of the Treaty were informed by the fact that, for the first time in its Rejoinder, Respondent raised the argument "*that what happened between May of 2010 and March of 2011 was not the expropriation, and that the expropriation only occurred in* [March] *of 2011.*"[353]

378. Claimant further claims that its claim is "*neither new nor untimely*" because Claimant never limited its expropriation claim to the argument that there was a lack of compensation. Rather, Claimant had raised the argument that the expropriation was not carried out in fair and equitable manner and failed to accord Claimant due process from the outset of the proceedings.[354]

---

[350] Transcript (Day 1), p. 22 line 19 – p. 23 line 8; p. 309 line 17 – p. 311 line 21; Claimant's Post-Hearing Submission, ¶¶ 38-47.
[351] Respondent's Post-Hearing Brief, ¶¶ 4, 21-23.
[352] Respondent's Post-Hearing Brief, ¶ 6 referring to Counter-Memorial, ¶ 2 and Reply, ¶ 9(c).
[353] Transcript (Day 3), p. 881 lines 18-21.
[354] Claimant's Second Post-Hearing Submission, ¶¶ 30, 44-45 referring to Memorial, ¶¶ 180-184 and Reply, ¶¶ 89-95, 125-130.

379. Finally, Claimant argues that even if it had raised a new claim during the Hearing, Respondent failed to establish "*why this is problematic.*" According to Claimant, Rule 31(3) of the ICSID Arbitration Rules "*assumes some natural evolution of argument*" in the course of the proceedings. In addition, Claimant notes that Respondent had the opportunity to present its views in its opening statement and throughout the Hearing as well in its two Post-Hearing Briefs.[355]

### c) The Tribunal's Analysis

380. The Tribunal is aware that the provisions relating to written submissions contained in Rule 31 of the ICSID Arbitration Rules are closely related to a party's fundamental procedural right to be heard. Rule 31(3) provides in this regard:

> "*A memorial shall contain: a statement of the relevant facts; a statement of law; and the submissions. A counter-memorial, reply or rejoinder shall contain an admission or denial of the facts stated in the last previous pleading; any additional facts, if necessary; observations concerning the statement of law in the last previous pleading; a statement of law in answer thereto; and the submissions.*"

381. In this case, each of the Parties claims that the other Party raised, at an advanced stage of the proceedings, a new issue which was not part of the other Party's earlier submissions, and that it should have the opportunity to duly respond to the new issue.

382. In order to give full effect to the Parties' procedural rights, the Tribunal suggested, at the end of the Hearing, that there should be two rounds of post-hearing submissions.[356] This way, both Parties had the opportunity to react to what they considered to be a new position of the other Party, and to respond to the other Party's reaction. The Tribunal also suggested that there should be no fixed page limits for the post-hearing submissions so that each Party could elaborate on the issues as they saw fit, but both Parties preferred to have, and agreed on, page limits for both submissions.[357]

383. For this reason, the Tribunal finds that, even though it may have been rather late for Claimant to raise a claim relating to Article 5(1) subparagraph 1 of the Treaty at the Hearing, both Parties had sufficient opportunity to react to, and elaborate on, the positions of the other Party as part of their post-hearing submissions. Therefore, the Tribunal does not consider it appropriate to reject this claim without considering whether it has legal merit.

## III. BREACH OF THE TREATY

---

[355] Claimant's Second Post-Hearing Submission, ¶¶ 46-48.
[356] Transcript (Day 4), p. 1267 line 17 – p. 1268 line 4.
[357] Transcript (Day 4) p. 1268 line 15 – p. 1269 line 21.

384. In the following, the Tribunal will consider whether or not Respondent was in breach of the Treaty. Claimant submits that Respondent committed breaches of

- Article 5(1) of the Treaty with respect to its obligations regarding expropriation (**1.**);
- Article 3(1) of the Treaty with respect to its obligation to fair and equitable treatment (**2.**); and
- Article 3(2) of the Treaty with respect to its obligation to grant full protection and security (**3.**).

## 1.    Expropriation (Article 5(1) of the Treaty)

385. Claimant submits that Respondent was in breach of the Article 5(1) subparagraph 1 of the Treaty (**a)**) as well as subparagraphs 2 and 3 of the same provision (**b)**).

### a)    Breach of Article 5(1) Subparagraph 1 of the Treaty

#### aa)    Summary of Claimant's Position

386. Claimant's argumentation with respect to its claim relating to Article 5(1) subparagraph 1 of the Treaty is twofold:

387. First, Claimant submits that the expropriation was not pursuant to a "*measure.*" According to Claimant, a "*measure*" of expropriation or nationalization within the meaning of Article 5(1) subparagraph 1 of the Treaty has to consist of "*any type of administrative, legislative or judicial act, taken by any of the powers that form the Bolivarian Republic,*" and that there was no such formal act in the present case until Respondent issued the Expropriation Decree in March 2011. According to Claimant, a State that takes property without any legal instrument supporting such expropriation is not expropriating pursuant to a measure, and thus not in accordance with any notion of due process.[358]

388. Second, Claimant contends that the expropriation of the plant was not in line with Respondent's obligation under Article 3(1) of the Treaty to treat Claimant's investment fairly and equitably and hence violated a "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*") within the meaning of Article 5(1) subparagraph 1 of the Treaty.[359] In particular, Claimant submits that Respondent "*took the Plant in direct violation of Saint-Gobain's due process rights*" and "*without a measure of any kind establishing a legal framework for the expropriation or an effort to engage in good faith*

---

[358] Claimant's Post-Hearing Submission, ¶ 39, citing from *OI European Group v. Venezuela* ¶ 324. **Exhibit CLA-156** (free translation).
[359] Claimant's Post-Hearing Submission, ¶¶ 40-47.

*negotiations concerning compensation.*" Claimant contends that the expropriation was hence unlawful.[360]

### bb)   Summary of Respondent's Position

389.   Respondent submits that the claim relating to Article 5(1) subparagraph 1 of the Treaty is without legal merit. With regard to Claimant's argument relating to the term "*measure*," Respondent argues that the term "*has a far broader meaning than that suggested by Claimant*" and alleges that even if, contrary to Respondent's position, President Chávez' TV announcement were to constitute the expropriation, it would constitute a "*measure*" under the Treaty and international law.[361]

390.   Respondent further argues that the reference to a "*particular agreement*" ("*engagement particulier*"/"*compromiso especial*") is "*not intended to mean the Treaty itself, but rather an agreement external to the Treaty.*" In this regard, Respondent notes that Claimant did not cite any legal precedent for its position and emphasizes that in the sole case cited by Claimant in this regard, the tribunal had to decide on a treaty provision, which – unlike Article 5(1) subparagraph 1 of the Treaty – explicitly included the requirement that the expropriation be "*carried out under due process of law*" as a condition of the lawfulness of an expropriation.[362]

391.   In support of its position, Respondent further refers to: (i) the use of the term "*agreement*" ("*accord*"/"*accuerdo*") where the Treaty refers to itself; (ii) the distinct use of the term "*particular agreement*" ("*engagement particulier*"/"*compromiso particuliar*") for an external agreement in Article 10 of the Treaty; and (iii) the language of other investment treaties, which state explicitly that the expropriation has to be carried out in accordance with other substantive provisions of the treaty in question.[363]

### cc)   The Tribunal's Analysis

392.   In deciding on this first claim for breach of the Treaty, the Tribunal will examine Article 5(1) subparagraph 1 of the Treaty in light of its wording and its context within the Treaty. In the French and Spanish original versions, the provision reads as follows:

---

[360] Claimant's Post-Hearing Submission, ¶ 42 citing the tribunal in *Kardassopoulos v. Georgia*, ¶ 396. **Exhibit CLA-046.**

[361] Respondent's Post-Hearing Brief, ¶ 29 (note 40); Respondent's Post-Hearing Reply Brief, ¶ 7.

[362] Respondent's Post-Hearing Reply Brief, ¶¶ 8-9 referring to *Kardassopoulos v. Georgia*, ¶ 386. **Exhibit CLA-46.**

[363] Respondent's Post-Hearing Brief, ¶¶ 25-27.

> "*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*"[364]

> "*Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*"[365]

393. The English translation submitted by Claimant reads:

> "*The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement.*"[366]

394. With regard to the first argument advanced by Claimant, the Tribunal is of the view that the term "*measures*" ("*mesures*"/"*medidas*") of expropriation or nationalization referred to in Article 5(1) subparagraph 1 of the Treaty does not in itself constitute any requirement as to the lawfulness of the expropriation or nationalization, but is rather meant to include all acts or omissions by the State that could amount to expropriatory conduct. The Tribunal agrees with the description given by the ICJ in the Fisheries Jurisdiction Case:

> "[I]*n its ordinary sense the word is wide enough to cover any acts, step or proceedings, and imposes no particular limit on their material content or on the aim pursued thereby.*"[367]

395. As a result, the Tribunal considers that a breach of Article 5(1) subparagraph 1 of the Treaty cannot result from a State's failure to act in the form of a "*measure*," but only from a failure to observe the three substantive requirements of that subparagraph, *i.e.*, that the

---

[364] *Journal Officiel de la République Française n°102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.
[365] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.
[366] Free translation submitted in **Exhibit C-1**.
[367] Cited in *Saluka v. Czech Republic*, ¶ 459. **Exhibit CLA-071**.

measure must be justified by a public purpose, be non-discriminatory and not be in conflict with any particular undertaking or agreement.

396. With respect to the meaning of the term "*particular agreement*" or "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*"),[368] the Tribunal is not convinced by Claimant's interpretation pursuant to which the term includes undertakings both external and internal to the Treaty. Pursuant to Article 31(1) of the Vienna Convention, which both Parties refer to in relation to the interpretation of the Treaty provisions, Article 5(1) of the Treaty should "*be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[369] In the Tribunal's view, the ordinary meaning of the attributes "*particulier*" and "*especial*" in connnection with an "*engagement*" or "*compromiso*" entails a reference to obligations arising from agreements distinct from, or external to, the Treaty.

397. As correctly pointed out by Respondent, this understanding is confirmed by the language used in Article 10 of the Treaty (which forms part of the context of Article 5(1), in accordance with Article 31(2) of the Vienna Convention):

| | |
|---|---|
| "*Les investissements ayant fait l'objet d'un engagement particulier de l'une des Parties contractantes à l'égard des nationaux et sociétés de l'autre Partie contractante sont régis, sans préjudice des dispositions du présent accord, par les termes de cet engagement dans la mesure où celui-ci comporte des dispositions plus favorable que celles qui sont prévues par le présent accord.*"[370] | "*Las inversiones que hubiesen sido objeto de un compromiso particular de una de las Partes Contratantes referente a nacionales y sociedades de la otra Parte Contratante serán administradas, sin perjuicio de las disposiciones del presente Convenio, por los términos de este compromiso en caso que este incluya disposiciones más favorables que las previstas por el presente Convenio.*"[371] |

---

[368] The Parties agree that a more precise translation of the terms used in the Spanish and French texts would be "*particular undertaking,*" "*specific undertaking*" or "*specific commitment.*" Claimant's Post-Hearing Submission, ¶ 38 (note 109); Respondent's Post-Hearing Brief, ¶ 24 (note 35). However, none of the Parties has made an argument that any of these translation would have resulted in a different meaning of the term. In fact, Claimant stated at the Hearing and again in its Post-Hearing Submission that "*it's a distinction without a difference.*" Transcript (Day), p. 147 line 10; Claimant's Post-Hearing Submission, ¶ 40 (note 113).

[369] **Exhibit CLA-086**, Article 31(1).

[370] *Journal Officiel de la République Française n°102 du 30 avril 2004.* **Exhibit C-1**, p. 7776.

[371] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004.* **Exhibit C-1**, p. 332.354.

398. While the Tribunal notes that the wording of Article 5(1) subparagraph 1 and that of Article 10 of the Treaty are not entirely identical in the Spanish version because Article 10 refers to "*compromiso particular*" instead of "*compromiso especial,*" the wording of the French version is indeed identical ("*engagement particulier*"). In the context of Article 10, these terms clearly refer to an agreement external to the Treaty, which applies to the investment if the agreement contains more favorable provisions than the Treaty itself, the Treaty being referred to as "*présent accord*" and "*presente Convenio*." In the Tribunal's view, there is no reason in this case to assume that the Contracting Parties to the Treaty intended to assign different meanings to the same (or in the Spanish text, very similar) term in the two provisions.

399. Finally, Respondent correctly pointed out that Contracting States that wish to make the lawfulness of an expropriation subject to the satisfaction of other substantive provisions of the BIT, in particular the requirement to carry out the expropriation in accordance with due process, usually include an explicit requirement to this effect in the expropriation provision. For example, in the case cited by Claimant, *Kardassopoulos v. Georgia*, the tribunal's finding was based on Article 13 of the Energy Charter Treaty, which states:

> "*Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subject to a measure or measures having effect equivalent to nationalization or expropriation* [...] *except where such Expropriation is:* [...] *(c) carried under due process of law.*"[372]

400. In the present case, the Contracting Parties did not include such a requirement in Article 5(1) subparagraph 1 of the Treaty (or any other subparagraph or paragraph of Article 5); thus, there is no indication that the contracting Parties nevertheless intended to make the lawfulness of an expropriation subject to the compliance with due process. It rather appears that any breach of an investor's right to be accorded due process, which is included in the FET standard (*see* in more detail below), was to be addressed within the context of Article 3(1) of the Treaty, but was not meant to affect the lawfulness of the expropriation.

401. Therefore, the Tribunal finds that the term "*particular agreement*" or "*particular undertaking*" ("*engagement particulier*"/"*compromiso especial*") does not include a reference to other substantive provisions of the Treaty itself, but only to agreements, which are distinct from the Treaty. Given that Claimant does not invoke a breach of any such agreement, apart from the Treaty provisions itself,[373] the Tribunal concludes that Respondent has not breached Article 5(1) subparagraph 1 of the Treaty.

---

[372] *Kardassopoulos v. Georgia*, ¶ 386. **Exhibit CLA-046**.
[373] Transcript (Day 1), p. 312 lines 20-22.

**b)    Breach of Article 5(1) Subparagraphs 2 and 3 of the Treaty**

402.    The Tribunal will now turn to the second claim for breach of the Treaty. It is Claimant's position that Respondent violated its obligations under Article 5(1) subparagraphs 2 and 3 of the Treaty with respect to the requirement of prompt compensation and the specification of the amount and method of payment. In its analysis, the Tribunal will first determine the precise scope and content of Respondent's Treaty obligations (**aa**)); the Tribunal will then assess whether or not Repondent complied with these requirements (**bb**)) and finally determine whether its finding has any impact on the lawfulness of the expropriation (**cc**)).

**aa)    The Scope of Respondent's Obligation to Pay "*Prompt*" Compensation and to Specify the "*Amount and Method of Payment*" for Compensation**

**(i)    Summary of Claimant's Position**

403.    It is Claimant's position that the requirements of Article 5(1) subparagraphs 2 and 3 of the Treaty must be accorded their plain meaning.[374] Claimant contends that the Treaty is very specific about the requirement that an expropriation be accompanied by "*prompt*" compensation, given that it provides that "*the amount and method of payment for compensation should be specified on the date of expropriation at the latest*" and "*payments shall be made without delay.*"[375] In Claimant's view, this leaves no room for doubt as to the interpretation of the prompt compensation requirement.[376]

404.    Claimant refers to the decisions of other international tribunals in order to demonstrate that the promptness requirement is a well-established principle of international law. For example, in *Norwegian Shipowners*, the tribunal spoke of "*the right of the claimants to receive immediate and full compensation,*" holding that "*full compensation should have been paid, including loss of progress payments, etc., at the latest on the day of the effective taking* [...]."[377] In *Goldenberg,* the tribunal held that, while international law authorizes the State to interfere with private property when the public interest so requires, "*it does so on the condition sine qua non that fair payment shall be made for the expropriated or requisitioned property as quickly as possible.*"[378]

405.    Claimant therefore submits that payment of compensation should be "*contemporaneous with a taking*" or should at least "*follow it as quickly as possible,*" and that "*the passage*

---

[374] Claimant's Post-Hearing Submission, ¶ 51.
[375] Memorial, ¶ 137; **Exhibit C-1**.
[376] Reply, ¶ 75.
[377] Memorial, ¶ 138; **Exhibit CLA-057**.
[378] Memorial, ¶ 139; **Exhibit CLA-040**.

*of several months after the taking without the furnishing by the State of any real indication that compensation would shortly be forthcoming would raise serious doubt that the State intended to make prompt compensation at all.*"[379]

406. In particular, Claimant contends that the specification requirement is not met by the mere existence of, or reference to, a certain expropriation procedure in domestic law.[380] Claimant further rejects the proposition that "*a sovereign's obligation to make adequate provision for just compensation in due time*" can be satisfied under international law "*by its mere willingness to discuss the possibility of a compromise. To so rule is to deprive the obligation of any meaning.*"[381]

407. In relation to the discussion of an *empresa mixta* arrangement, Claimant contends that this "*lacked sufficient details to be considered adequate negotiation of compensation terms.*" Claimant refers to Mr. Millot's testimony during the Hearing that Claimant understood this to be a "*suggestion*" rather than a "*concrete proposal*" because it was unsupported by documentation that Claimant never received, in particular as regards any compensation for the loss of Claimant's 100% ownership in Norpro Venezuela.[382]

### (ii)    Summary of Respondent's Position

408. With regard to the specification requirement, it is Respondent's position that the provisions contained in Article 5(1) subparagraphs 2 and 3 of the Treaty have to be read in conjunction and should be interpreted to mean that "*compensation shall be assessed so that the amount is equal to the* 'actual value' *of the investments as of the date set forth in the second sentence of the second paragraph of Article 5(1) and that as of the* 'date of expropriation at the latest,' *the expropriating party shall acknowledge its obligation to make payment in such equivalent amount and establish the modalities of payment.*"[383]

409. Respondent contends that clauses such as Article 5(1) of the Treaty merely require that "*the law or the expropriation decision mention the criteria and procedures that will allow to assess compensation.*"[384]

---

[379] Memorial, ¶ 139, citing from L. B. Sohn and R. R. Baxter, *Responsibility of States for Injuries to the Economic Interests of Aliens*, 55 AMERICAN JOURNAL OF INTERNATIONAL LAW 545, 558 (1961), **Exhibit CLA-079**.

[380] Reply-Memorial, ¶ 83.

[381] Claimant's Post-Hearing Submission, ¶ 55, citing from *Amoco v. Iran*, p. 83 (concurring, J. Brower). **Exhibit CLA-004.**

[382] Claimant's Post-Hearing Submission, ¶ 56 citing from Transcript (Day 2) p. 418 line 13 – p. 419 line 9, p. 420 lines 5-9.

[383] Repondent's Post-Hearing Brief, ¶ 82.

[384] Rejoinder, ¶ 156, citing from J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, p. 207, **Exhibit RL-155**.

410. With regard to Claimant's interpretation of Article 5(1) subparagraphs 2 and 3 of the Treaty that the precise figure constituting the "*amount*" must be determined on the date an intention to expropriate is announced, Respondent makes two arguments. First, Respondent refers to Article 31(1) of the Vienna Convention and alleges that asking for a specified figure on the date of expropriation is "*not a good faith interpretation and cannot be correct, as it would establish an obligation that the Contracting States could not satisfy except by pure chance.*" Respondent further points out that the Treaty does not require that the State "*must, before it announces an expropriation, engage in discussions with the expropriated entity to obtain the facts necessary to determine the precise figure that equates to the actual value of the assets in question*" and that "*without such information, it would be impossible [...] to determine that figure in good faith.*"[385]

411. Second, Respondent contends that an interpretation as proposed by Claimant would lead to "*manifestly absurd or unreasonable*" results and hence would conflict with Article 32 lit. b) of the Vienna Convention, as neither French nor Venezuelan expropriation law requires compensation to be determined at the time the expropriation process is initiated – which would place each of the Contracting States in breach of their Treaty obligations.[386]

412. Against this background, Respondent suggests what is, in its view, more reasonable interpretation of the word "*amount,*" which does not refer to a "*precise dollar or Euro figure, but rather to the required concept (i.e., a 'sum [...] equal to the actual value of the investments').*"[387]

413. With respect to the promptness requirement, Respondent submits that neither the case law cited by Claimant nor, by its clear terms, Article 5(1) of the Treaty require the State to pay compensation to the investor on the date of the expropriation. While subparagraph 2 provides that "[a]*ll measures of expropriation which could be taken must result in payment of a prompt and adequate compensation,*" it is only subparagraph 3, which requires that, after compensation has been determined, "*payments shall be made without delay.*"[388] In determining whether or not payment of "*prompt and adequate compensation*" is made "*without delay,*" "*the particularities of each national legislation, the eventual delays caused by internal remedies, and the specificity of each situation*" are to be taken into account.[389] Further, Respondent argues that it should be taken into consideration whether

---

[385] Respondent's Post-Hearing Brief, ¶¶ 83-84.
[386] Respondent's Post-Hearing Brief, ¶ 87.
[387] Respondent's Post-Hearing Brief, ¶ 83.
[388] Counter-Memorial, ¶ 167; Rejoinder, ¶ 155.
[389] Rejoinder, ¶ 157, citing from J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, p. 207, **Exhibit RL-155**.

the "*State has made good faith efforts to comply with its obligation to pay compensation.*"[390]

### (iii)   The Tribunal's Analysis

414.   The Tribunal has considered all arguments made by the Parties in their submissions, in particular, but not exclusively, the arguments summarized above. In determining the precise requirements with respect to compensation under Article 5(1) subparagraphs 2 and 3 of the Treaty, the Tribunal will first and foremost take into account the wording of the Treaty provisions and their systematic context.

415.   In the French and Spanish original versions, Article 5(1) subparagraphs 2 and 3 of the Treaty read:

"*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié.*"[391]

"*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación econonómica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropriación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropriación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado.*"[392]

---

[390] Rejoinder, ¶ 158, citing from S. Ripinsky, DAMAGES IN INTERNATIONAL INVESTMENT LAW 68 (2008), pp. 68-69, **Exhibit CLA-140**.

[391] *Journal Officiel de la République Française nº102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.

[392] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

416.  The English translation from the French text submitted by Claimant reads as follows:

> *"All measures of expropriation which could be taken must result in pay-*
> *ment of a prompt and adequate compensation. The sum of this compen-*
> *sation should be equal to the actual value of the investments concerned,*
> *and must be assessed in relation to the normal economic situation pre-*
> *vailing before any threat of expropriation was of public knowledge.*
>
> *The amount and method of payment for compensation should be speci-*
> *fied on the date of expropriation at the latest. This compensation is in-*
> *deed realizable, payments shall be made without delay and shall be*
> *freely transferable. The compensation will accrue interest calculated at*
> *the appropriate market interest rate until the date of payment."*[393]

417.  The Tribunal notes that the Treaty requires not only the payment of "*prompt"* compensa-
tion, but according to the unusually strict wording of subparagraph 3, that the amount for
compensation ("[c]*ette indemnité, son montant"*/"[e]*sa indemnización, su monto"*) be
specified – or more precisely: fixed ("*fixés"*/"*fijados"*) – on the date of expropriation at
the latest. The ordinary meaning of the language used in subparagraph 3 suggests that the
expropriating State indeed has to indicate a specified figure constituting the amount of
compensation at the time of the expropriation; there is no indication that the term
"*amount"* ("*montant"*/"*monto"*) refers only to a certain concept or method of calculation.
The sole reference to "*method"* ("*modalités"*/"*modalidades"*) in subparagraph 3 is made
with respect to "*payment"* ("*versement"*/"*pago"*), implying that "*payment of a prompt and*
*adequate compensation"* ("*paiement d'une indemnité prompte et adéquate"*/"*pago de una*
*pronta y adecuada indemnización"*) as referred to in subparagraph 2 does not require
payment to be made to the investor on the very date of the expropriation.

418.  While the Tribunal agrees with Respondent that subparagraph 3 has to be read in con-
junction with subparagraph 2, which indeed provides more details as to the calculation of
the compensation ("*d'une indemnité prompte et adéquate dont le montant […]"*/"*una*
*pronta y adecuada indemnización cuyo monto […]"*), this connection does not imply in
any way that the term "*amount"* ("*montant"*/"*monto"*) in subparagraph 3 has to be inter-
preted restrictively in terms of requiring only an acknowledgment of the applicable con-
cept of compensation. Rather, subparagraph 3 contains a more precise specification fur-
ther to the widely used term "*prompt"* ("*prompte"*/"*pronta"*) in subparagraph 2.

419.  In light of the unambiguous wording and structure of Article 5(1) subparagraphs 2 and 3
of the Treaty, the Tribunal finds that, *prima facie*, subparagraph 3 required Respondent
to specify a precise figure constituting the "*amount"* ("*montant"*/"*monto"*) of compensa-
tion at the time of the expropriation. Subsequently, the amount of compensation as fixed

---

[393] **Exhibit C-1**, p. 7775.

("*fixés*"/"*fijados*") on the date of expropriation had to be paid "*without delay*" ("*sans re-tard*"/"*sin retraso*"). Only if both of these requirements were satisfied, the compensation could be considered "*prompt*" within the specific meaning intended by the Contracting Parties in to Article 5(1) subparagraph 2 of the Treaty.

420.  As indicated above, Respondent raised objections to this interpretation of Article 5(1) of the Treaty. The Tribunal considers, however, that none of these objections is compelling. In particular, to require the State to specify a certain figure constituting the amount of compensation on the date of the expropriation neither contravenes the principle of good faith interpretation as set out in Article 31(1) of the Vienna Convention, nor does it lead to "*manifestly absurd or unreasonable*" results within the meaning of Article 32 lit. b) of the Vienna Convention.

421.  The requirement of fixing the exact amount of compensation on the date of expropriation is not an absurd ambition, as Respondent intends to demonstrate. While the Tribunal agrees with Respondent that the date of the expropriation (*i.e.*, the formal expropriation decision and/or seizure of the asset) does not (necessarily) correspond to the date on which the expropriation procedure is initiated,[394] this does not mean that the State may *de facto* take the property of the investor in the meantime and thereby circumvent the provision of the Treaty. In many jurisdictions, including France and Venezuela as Re-spondent correctly pointed out, the formal expropriation decision and the taking of the asset do not commence but rather occur only at the end of the expropriation procedure. In the course of such an expropriation procedure, the State usually asserts and ensures that the requirements of a lawful expropriation are met, including the verification of a sufficient public purpose as well as the fixation of an adequate amount for compensation, based on a proper valuation of the asset.

422.  In the Tribunal's view, it is apparent that the drafters of Article 5(1) subparagraph 3 of the Treaty indeed envisaged such a design of the expropriation procedure as it is in place in both Contracting States. This does not mean, however, that the term "*amount*" refers only to the concept to be applied in the course of such an expropriation procedure, but rather that the expropriation procedure has to be carried out prior to the taking of the asset.

423.  The fact that the Treaty does not provide for detailed procedural rules as to how the ex-propriating State shall obtain the facts necessary to determine the precise figure to be fixed on the date of the expropriation does not conflict with the proposed interpretation of Article 5(1) of the Treaty. Subparagraphs 2 and 3 merely stipulate the fundamental requirements, which have to be met in case of an expropriation. The Treaty is not designed to establish a detailed expropriation procedure. Rather, it is up to the Contracting States

---

[394] *Cf.* Respondent's Post-Hearing Brief, ¶ 87 (with note 187).

to ensure that the expropriation proceedings are conducted in conformity with the fundamental Treaty requirements.

424. In this regard, the Tribunal is of the view that it does not have to examine whether Venezuelan law actually implements a standard expropriation procedure as set out in Article 5(1) of the Treaty. First, Claimant has not raised a claim that the Expropriation Law does not conform to the requirements of the Treaty. In addition, any agreement in bilateral investment treaties would be redundant if the Parties were only to agree on protection standards which are already part of their respective legal systems. Interpreting Article 5(1) of the Treaty as providing stricter expropriation standards than the Venezuelan Expropriation Law (and possibly also the French equivalent) would therefore not produce "*manifestly absurd or unreasonable*" results within the meaning of Article 32 lit. b) of the Vienna Convention.

425. In conclusion, the Tribunal finds that the compensation requirements set out in Article 5(1) subparagraphs 2 and 3 required the Respondent to specify a precise figure constituting the amount of compensation on the date of the expropriation.

### bb)   Compliance with, or breach of, the Compensation Requirements

426. Whether or not Respondent complied with the requirements set out in Article 5(1) subparagraphs 2 and 3 of the Treaty depends, to a certain extent, on the date on which the expropriation of the plant took place, *i.e.*, the date of expropriation within the meaning of subparagraph 3. This question will hence be examined first **(i)**. On this basis, Respondent's conduct will then be assessed **(ii)**.

### (i)   Date of Expropriation of the Plant

427. The Parties' positions differ as to the date on which the expropriation of the plant occurred. In particular, it is in dispute whether the expropriation was effected only once the Expropriation Decree was formally issued or whether the takeover of the plant on 15 May 2010 already amounted to an expropriation within the meaning of the Treaty. Although the Parties exclusively deal with this issue as a matter of facts, it appears that it also involves questions of law.

### (1)   Summary of Claimant's Position

428. It is Claimant's position that the expropriation with respect to the plant was effected on 15 May 2010. Claimant submits that the takeover following President Chávez' announcement and the subsequent active management of the plant by PDVSA amounted to an expropriation within the meaning of Article 5(1) of the Treaty.[395]

429. Claimant submits that, following the one-day takeover of the plant on 24 March 2010, it was President Chávez' announcement that caused local workers to take over the plant on 15 May 2010, the effect of which was to force out Norpro Venezuela's management. Further, Claimant submits that there were politicians among those who effected the plant takeover – National Assemblyman Ángel Marcano, the President of the Sub-commission on Basic Industries, and Representative Asdrúbal López, the President of the Commission on Social Development – acting on behalf of the State and pursuant to the instructions of the President. Therefore it was President Chávez who practically "*commanded the takeover of the Plant by union members and sympathizers*" on 15 May 2010.[396] As Claimant never regained control of its investment after that date, the Expropriation Decree published on 29 March 2011 simply formally notified what the Government had already effected.[397]

430. With respect to the status of the plant after these events, Claimant contends that PDVSA took control over the plant in order to "*coordinate the expropriation process.*"[398] In this context, Claimant refers to various circumstances of PDVSA's occupation of the plant, including *inter alia*:

- documents authored by PDVSA reflecting that PDVSA was carrying out the ongoing expropriation process on behalf of Respondent, in particular the minutes of meetings between PDVSA and Norpro Venezuela dated 2 and 8 June 2010 which were entitled "*Proceso de Nacionalización Norpro Venezuela, C.A.*";[399]

- changes in the appearance of the plant and its personnel, with the PDVSA flag flying in tandem with the Venezuelan flag over the plant and workers wearing PDVSA uniforms;[400] and

---

[395] Reply, ¶¶ 21-25.
[396] Reply, ¶¶ 21-22; Claimant's Post-Hearing Submission, ¶¶ 19-22.
[397] Memorial, ¶ 134.
[398] Reply, ¶ 30; Claimant's Post-Hearing Submission, ¶¶ 23-32.
[399] Claimant's Post-Hearing Submission, ¶ 24. Minutes of Meetings among Norpro Venezuela, C.A., Petróleos de Venezuela, S.A. and others, 2 June and 8 June 2010. **Exhibit C-25**.
[400] Claimant's Post-Hearing Submission, ¶ 27, referring to Request by Norpro Venezuela, C.A. for Judicial Inspection, 5 August 2010. **Exhibit C-119**, p. 14.

- PDVSA's efforts to get the plant back into operation, *e.g.*, its attempt to ready the plant to produce so-called green proppants.[401]

431. Claimant therefore contests Respondent's submission that PDVSA stepped in as a "*care-taker*" and adds that, if that had actually been the case, PDVSA should have returned the plant to Claimant. In Claimant's view, the burden should not be on the foreign company after having "*witnessed the President's order and been denied access to its property, to do more in order to preserve its rights.*"[402]

432. Finally, Claimant emphasizes that it constantly asserted its rights with regard to the plant, *i.e.*, that it attempted to re-enter the plant but was denied access, as evidenced by the judicial inspections it initiated on 17 May 2010 and again on 5 August 2010 as well as the letters that Norpro Venezuela's President sent to PDVSA's General Counsel on 18 November 2010 and to the President of PDVSA Industrial on 25 April 2011.[403]

### (2)    Summary of Respondent's Position

433. Respondent submits that the date of expropriation within the meaning of Article 5(1) of the Treaty was 29 March 2011, *i.e.*, the date of the issuance of the Expropriation Decree, which triggered the procedures under the Venezuelan Expropriation Law.[404] In response to Claimant's assertions with respect to the takeover of the plant on 15 May 2010 and the events thereafter, Respondent contends, first, that it was the labor union SINPROTRAC, not the State, which occupied the Claimant's plant both on 24 March and on 15 May 2010, and, second, that PDVSA's presence at the plant thereafter was a "*responsible and neces-sary action pending the expropriation decree to assure the safety and security of the plant*" after Norpro Venezuela's management had effectively abandoned it.[405]

434. With regard to the first point, Respondent denies that there was an intrinsic causal link between President Chávez' "*announcement*" and the takeover of the plant. Respondent emphasizes that it was union discontent, which caused Norpro Venezuela's name to ap-pear in the *Plan Guayana Socialista 2009-2019*, ultimately leading to the proposal that Norpro Venezuela pass to State control, which President Chávez read live on television on 15 May 2010. Moreover, Respondent contends that it was actually a phone call from shift workers at the plant to SINPROTRAC's leadership reporting that Plant management was removing laptops and documents from the premises, which prompted union officials and Norpro Venezuela's ex-workers to act on 15 May 2010. Against this background,

---

[401] Post-Hearing Submission, ¶ 27, referring to Rondón, ¶ 33.
[402] Claimant's Post-Hearing Submission, ¶¶ 29, 31.
[403] Claimant's Post-Hearing Submission, ¶ 32 referring to **Exhibit C-20**, **Exhibit C-119**, **Exhibit C-122** and **Exhibit C-127**.
[404] Respondent's Post-Hearing Brief, ¶ 87 (with note 187).
[405] Counter-Memorial, ¶ 26 (with note 68); Respondent's Post-Hearing Brief, ¶¶ 60-65.

Respondent argues that the 15 May 2010 plant takeover cannot be considered as an act of the State.[406]

435. Furthermore, Respondent contests Claimant's allegations that certain individuals among those that effected the plant takeover were actually acting on behalf or under the instructions of Respondent. Respondent argues that the mere fact that politicians sympathetic to the plight of the workers were present does not mean that Respondent itself took over the plant.[407]

436. With respect to the second point, *i.e.*, PDVSA's presence on the plant after the events of 15 May 2010, Respondent maintains that PDVSA's presence prior to the publication of the expropriation decree was arranged for the purpose of ensuring plant safety and stability, as a "*caretaker.*" Respondent contends that Norpro Venezuela effectively abandoned the plant after 15 May 2010, and that the plant was "*in the hands of the union and the workers who took over on May 15, without supervision.*" Respondent asserts that these were legitimate grounds for concern regarding worker safety and the proper operation of the plant's equipment.[408]

437. In this context, Respondent emphasizes that Claimant neither challenged the legal foundation of PDVSA's presence nor did it demand return of the plant or request access to it after 15 May 2010.[409] In particular, Respondent contends that "*none of the other letters that were sent on May 17, 2010 or thereafter demanded the return of the Plant,*" and that Claimant never raised such a claim during the meetings of 30 August 2010 and of 14 October 2010 between Claimant and PDVSA. It is therefore Respondent's position that "*PDVSA Industrial was at the Plant because Norpro Venezuela was not present and the Plant posed risks to the workers and community.*"[410]

438. At the same time, Respondent does not contest that, in the aftermath of 15 May 2010, "*there was a 'process of nationalization' to the extent that, as everyone recognized, the Plant had not been expropriated but that it would be transferred to State control in the future.*" Respondent submits that the Parties also recognized (i) that a formal expropriation decree was being drafted at that time; (ii) that the decree was supposed to mark the starting point of the expropriation procedure under Venezuelan law; and (iii) that the Par-

---

[406] Rejoinder, ¶¶ 12-13.
[407] Rejoinder, ¶ 16; Counter-Memorial, note 68.
[408] Rejoinder, ¶¶ 20-22; Respondent's Post-Hearing Brief, ¶ 60; Respondent's Post-Hearing Reply Brief, ¶ 25.
[409] Rejoinder, ¶ 23; Respondent's Post-Hearing Brief, ¶¶ 60 (with note 108), 42-51.
[410] Respondent's Post-Hearing Brief, ¶¶ 45-50.

ties would consider, in the meantime, alternatives to expropriation, including the formation of a mixed company, with PDVSA as a majority shareholder and the Claimant holding a minority stake.[411]

439.  It is Respondent's position that this ongoing nationalization process was not in conflict with PDVSA's "*caretaker*" role. Respondent points out that PDVSA had "*instructions from the President of the Bolivarian Republic of Venezuela to carry out the transfer of Norpro to State control,*" but "*until the publication of the Decree, it may not act or intervene in Norpro. Its presence at the plant is in response to the necessity to enter into possession formally, once the Decree is published.*"[412]

### (3)    The Tribunal's Analysis

440.  Before addressing the individual circumstances of the case related to the events of 15 May 2010 (**b**) and thereafter (**c**), the Tribunal wishes to recall the legal standard as to whether and when an "*expropriation*" within the meaning of Article 5(1) of the Treaty has occurred (**a**).

### (a)    Legal Standard as to Whether and When an "*Expropriation*" Has Occurred

441.  As the tribunal in *SD Myers v. Canada* noted, the term "*expropriation*" has to be interpreted "*in light of the whole body of state practice, treaties and judicial interpretations of that term in international law cases.*" The tribunal went on to find that, in general,

> "*the term* 'expropriation' *carries with it the connotation of a* 'taking' *by a governmental-type authority of a person's* 'property' *with a view to transferring ownership of that property to another person, usually the authority that exercised its de jure or de facto power to do the* 'taking'."[413]

442.  These considerations are confirmed, for example, by the tribunal in *Rumeli v. Kazakhstan*, which described (direct) expropriation as "*resulting from a deliberate formal act of taking*"[414] and referred to the reasoning of the tribunal in *Generation Ukraine v. Ukraine*,

---

[411] Respondent's Post-Hearing Brief, ¶ 61. Emphasis in the original.

[412] Rejoinder, ¶ 32 (note 135), citing from Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated August 30, 2010, **Exhibit R-017**, pp. 2-3:
> "*PDVSA Industrial, S.A. ('PDVSA') mencionó que ha recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro.* […] *PDVSA informó que mientras no se haya publicado el Decreto, no puede actuar o intervenir en Norpro. Su presencia en la planta corresponde a la necesidad de prepararse para la futura toma formal de posesión, una vez que se realice la publicación del Decreto.*"

[413] *SD Myers v. Canada* ¶ 280. **Exhibit RL-119**.

[414] *Rumeli v. Kazakhstan*, ¶ 700. **Exhibit CLA-069**.

which in turn stated that a direct expropriation is characterized by a "*transfer* [of the investor's] *proprietary rights in its investment to the State or to a third party.*"[415]

443.  Against this background, the term "*expropriation*" is clearly characterized by a number of elements, including: (i) the act of a State; (ii) in relation to a person's property; (iii) consisting in a *de jure* or *de facto* taking of the property; and (iv) to the benefit of the State or of a third party.

444.  There is no dispute between the Parties as to the applicable standard with regard to the definition of the legal term "*expropriation,*" as they did not deal with this issue in their submissions. On the contrary, the Parties agree that, at some point, Claimant was expropriated within the meaning of Article 5(1) of the Treaty. Rather, the Parties' disagreement relates to the exact point in time at which the expropriation occurred.

445.  With respect to the elements of an expropriation referred to above in paragraph 443, Claimant contends that all those criteria were already fulfilled when the plant was taken over on 15 May 2010 or, at least, shortly thereafter.[416] Respondent, in contrast, argues that: (i) the takeover on 15 May 2010 was not an act of State; and (ii) the subsequent occupation of the plant by PDVSA was not a taking of the asset to the benefit of Respondent but rather a compelling necessity imposed on Respondent by Claimant's abandonment of the plant, which required PDVSA's presence in order to restore and ensure safety on the plant, as a "*caretaker,*" not as the "*owner*" of the plant.[417] In this context, Respondent emphasizes that PDVSA had instructions "*not* [to] *act or intervene in Norpro*" ("*no puede actuar o intervenir en Norpro*").[418] In conclusion, it is Respondent's position that the criteria of an "*expropriation*" were not fulfilled until the expropriation decree was formally issued on 29 March 2011.[419]

446.  In light of the foregoing, the Tribunal will now consider the evidence presented by the Parties and determine whether or not the conduct of Respondent before 29 March 2011 amounted to an "*expropriation*" within the meaning of Article 5(1) of the Treaty.

**(b)    Takeover on 15 May 2010 Following President Chávez' "*Expropriation Directive*"**

447.  With regard to President Chávez' announcement of 15 May 2010 and the subsequent takeover of the plant carried out by members of the SINPROTRAC union, the Tribunal considers that this takeover as such cannot be attributed to Respondent.

---

[415] *Generation Ukraine v. Ukraine*, ¶ 20.21. **Exhibit CLA-039**.
[416] *Cf.* Claimant's Post-Hearing Submission, ¶¶ 19-22.
[417] *Cf.* Respondent's Post-Hearing Brief, ¶ 60.
[418] Rejoinder, ¶ 32 (note 135), citing from Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated August 30, 2010, **Exhibit R-017**, pp. 2-3.
[419] Respondent's Post-Hearing Brief, note 187.

448. It is uncontested by Claimant that the plant takeover was not directly carried out by organs of the State in their official capacity but rather "*by union members and sympathizers.*"[420] At the same time, it is a well-established principle under international law that, in general, the conduct of private persons or entities is not attributable to the State. This general principle is clearly reflected, *inter alia*, in Article 8 of the ILC Draft Articles which states that, as an exception from that principle, the

> "*conduct of a person or group of persons shall* [only] *be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct.*"[421]

449. The Tribunal considers it plausible that there was a certain causal link between President Chávez' TV announcement on 15 May 2010 and the plant takeover. As Mr. Eduardo Rondón testified, the "*members of the SINPROTRAC union*" who took over the plant on 15 May 2010 "*came directly from the event at which President Chávez had spoken.*"[422] While the takeover may have further been triggered by Norpro Venezuela management's removal of documents and computers from the plant and the tensions between the management of the plant and the unions,[423] the Tribunal is of the view that the union members and sympathizers would most probably not have taken over the plant on 15 May 2010 if President Chávez had not stated on this very day that the plant would eventually be handed over to PDVSA. The President's announcement of this prospect therefore appears to have been *conditio sine qua non* of (and therefore a causal factor in relation to) the plant takeover.

450. Plain causality, however, does not establish State responsibility under international law. Conduct of private persons can be attributed to the State only if there exists "*a specific factual relationship between the person or entity engaging in the conduct and the State.*"[424] The Tribunal is of the view that there was no such specific factual relationship between President Chávez' announcement and the takeover of the plant carried out by union members and sympathizers.

451. During the broadcast on 15 May 2010, President Chávez read out and approved a number of proposals prepared by the *Plan Guayana Socialista* working groups, an association of

---

[420] Claimant's Post-Hearing Submission, ¶ 21.
[421] International Law Commission, *Responsibility of States for Internationally Wrongful Acts* (2001), **Exhibit CLA-044**. *Cf.* J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Exhibit CLA-119** and **Exhibit RL-021**, p. 110.
[422] Rondón, ¶ 28.
[423] Counter-Memorial, ¶¶ 15, 137, 140 (note 352); Rejoinder, ¶¶ 8 *et seq.*, 14.
[424] J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Exhibit CLA-119** and **Exhibit RL-021**, p. 110.

unions in the Guayana region.[425] One of these recommendations was related to Norpro Venezuela. President Chávez read out and approved this proposal as follows:

> "*Discuss with PDVSA the purchase of the Proppants produced and commercialized by the company Norpro Venezuela, a product produced with Bauxite, Cornstarch and water, used for mud and drilling. It is suggested here [in the document] that should it become necessary, this company should become state-controlled and transferred to the hands of PDVSA. Let the company Norpro Venezuela become state controlled and transfer it to the hands of Petróleos de Venezuela.*"[426]

452. Without context, the President's statement "*Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela*"[427] could indeed be understood as an invitation, or even a command, addressed to all listeners, including the members of the union and sympathizers, to take over the plant. Taking into account the aforementioned circumstances, however, it appears that the language used by President Chávez was meant to express and emphasize his general approval and affirmation of the working groups' proposals. President Chávez' statements, including the approval of the union proposal related to the nationalization of Norpro Venezuela and "*similar announcements regarding other foreign-owned businesses,*"[428] implied a promise to the people that the State would nationalize the businesses referred to in the statement in the future; the President did not, however, actually give specific orders or instructions for an immediate physical takeover of the plant.

453. Considering the foregoing, President Chávez did not empower the unions to take over the businesses concerned with governmental authority by virtue of his announcements. Moreover, even though members of the SINPROTRAC union may have actually taken President Chávez "*at his word,*"[429] the Tribunal considers that they did not act "*on the instructions of, or under the direction or control of*" President Chávez within the meaning of Article 8 of the ILC Draft Articles.

---

[425] Claimant's Post-Hearing Submission, ¶ 19; Counter-Memorial, ¶ 24.

[426] *Record and Transcript of Opinion Programs and Special Transmissions of Venezuelan Tv*, TVRADIO 2021, C. A., May 15, 2010 (English translation), **Exhibit R-15**. The original announcement was made in Spanish, *see Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Exhibit R-15**, p.14. In relevant parts, the announcement reads as follows:
> "*Consultar con PDVSA sobre la compra de Propan producido y comercializado por empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario –aquí se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela.*"

[427] *Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Exhibit R-15**, p.14.

[428] Claimant's Post-Hearing Submission, ¶ 19.

[429] Memorial, ¶ 77.

454. The fact that national and/or local politicians were sympathizing with the union members and may have been participating in the takeover of 15 May 2010 is not sufficient in itself to establish Respondent's responsibility for these actions. Assuming that the individuals referred to by Claimant actually did participate in the takeover of 15 May 2010,[430] the Tribunal finds that there is not sufficient evidence that they were acting on behalf, or under the instructions, of Respondent. Moreover, as to the presence of the Venezuelan National Guard, which was, as Claimant contends, involved in the occupation of the plant on and after 15 May 2010,[431] the Tribunal cannot exclude that it was present at the plant "*in order to preserve order and public safety,*" as Respondent asserts.[432]

### (c)    PDVSA's Conduct and Presence on the Plant after 15 May 2010

455. The Tribunal is convinced, however, that the subsequent conduct of PDVSA and its presence on the plant after 15 May 2010 did amount to an "*expropriation*" within the meaning of Article 5(1) of the Treaty. In particular, the Tribunal finds that, first, by means of the conduct of the State-owned PDVSA, the Respondent took effective control of the plant on 15 May 2010 or shortly thereafter **(aa)**. Second, the Tribunal holds that PDVSA's conduct constituted a taking of the plant to the benefit of Respondent as required by the term "*expropriation*" within the meaning of Article 5(1) of the Treaty; the Tribunal is not convinced by Respondent's argumentation that there was no taking of the plant to the benefit of the State because PDVSA was merely acting as a "*caretaker*" **(bb)**.

### (aa)   Respondent's Effective Control of the Plant

456. With regard to the first point, the Tribunal finds that, by means of its conduct after the plant takeover of 15 May 2010 carried out by the members of the SINPROTRAC union, PDVSA acknowledged and adopted the union's actions as its own. On the basis of the applicable principles of customary international law on State responsibility as reflected in Article 11 of the ILC Draft Articles, the plant takeover on 15 May 2010 therefore has to be considered as an act of Respondent. In any event, PDVSA took effective control over the plant and started the expropriation process shortly after 15 May 2010, as confirmed by its internal memoranda and reports of early June 2010.

---

[430] *Cf.* Memorial, ¶ 77; Reply, ¶ 22.
[431] Reply, ¶ 23, citing from Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**, p. 5; Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**, p. 3.
[432] Rejoinder, ¶ 13 (note 73).

**(1)    Attribution of PDVSA's Conduct to Respondent**

457.   Before examining PDVSA's conduct relating to the plant more closely, the Tribunal notes
       that, although PDVSA is a State-owned company with distinct legal personality, its con-
       duct is attributable to Respondent pursuant to Article 5 of the ILC Draft Articles, which
       states that the

> "*conduct of a person or entity which is not an organ of the State under
> article 4 but which is empowered by the law of that State to exercise
> elements of the governmental authority shall be considered an act of
> the State under international law, provided the person or entity is acting
> in that capacity in the particular instance.*"[433]

458.   Both in its alleged function as a "*caretaker*" and in its capacity as supervisor and promoter
       of the nationalization of the plant, PDVSA was vested with governmental authority. This
       is not contested by Respondent; on the contrary, Respondent emphasizes in the context
       of the negotiations that took place in late 2010 that PDVSA "*had been instructed to carry
       out the transition of the Plant to a State-controlled operation.*"[434] This is further con-
       firmed by PDVSA's contemporaneous statement during the meeting on 30 August 2010
       that "*it had received specific instructions from the President of the Bolivarian Republic
       of Venezuela to carry out the transfer of Norpro to State control.*"[435]

459.   In an internal memorandum prepared by PDVSA, entitled "*Situación actual del proceso
       de estatización empresa Norpro de Venezuela, C.A. (Norpro)*" dated 2 June 2010, refer-
       ence was also made to the instructions of the President:

> "**En fecha Martes 25 de Mayo,** *personal de PDVSA bajo instrucciones
> de la Gerencia General EyP División Oriente y en el marco del orde-
> namiento emitido por el Comandante Presidente de la República, se
> presentó en las instalaciónes de la empresa NORPRO Venezuela C.A.
> con miras a iniciar la fase de levantamiento y verificación de toda la
> información asociada a dicha empresa.*
> […]
> **27 de mayo 2010**, *se incorpora al proceso de estatización de la empresa
> NORPRO Venezuela,C.A., el equipo multidisciplinario de PDVSA In-
> dustrial, S.A. por instrucciones de nuestro Ministro-Presidente.*"[436]

460.   The Tribunal is of the view that in light of PDVSA's undisputed mandate from the Presi-
       dent of Venezuela to carry out the nationalization of Norpro Venezuela, there should and
       cannot be a distinction between PDVSA's conduct aimed at carrying out its mandate and

---

[433] International Law Commission, *Responsibility of States for Internationally Wrongful Acts* (2001), **Exhibit CLA-044**.
[434] Counter-Memorial, ¶ 29.
[435] Quotation from the English translation submitted by Respondent with **Exhibit R-17**.
[436] **Exhibit C-143**.

conduct that was possibly aimed at ensuring the safety of workers and maintenance of the equipment at the plant in the meantime. Rather, all of PDVSA's actions with regard to the plant can and have to be attributed to Respondent.

**(2)    Adoption of the Union's Actions by PDVSA as its Own**

461.   As a rule of customary international law, laid down in Article 11 of the ILC Draft Articles, "[c]*onduct which is not attributable to a State*" at the time of its commission "*shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.*"[437] In contrast to cases of mere State support, endorsement or general acknowledgment of a factual situation created by private individuals, attribution under this rule requires that the State clearly and unequivocally "*identifies the conduct in question and makes it its own.*"[438]

462.   In the present case, PDVSA has acknowledged and adopted the plant takeover of 15 May 2010 carried out by union members as its own. In a number of internal notes and reports, PDVSA made clear that the union's plant takeover was not only in line with Respondent's intentions with regard to the expropriation of the plant, but was subsequently made an integral part of the process of nationalizing Norpro Venezuela within the framework of the "*Plan Guayana Socialista*" to be implemented by the "*Ejecutivo Nacional*," *i.e.*, the national executive power.[439] The above referenced internal memorandum of 2 June 2010 contains a chronology of the steps within the course of the nationalization of the Norpro plant, including President Chávez' "*order*" of 15 May 2010 and the subsequent plant takeover:

> "*PROPÓSITO*:
>
> lnformar al Sr. Luis Pulido Director Interno de enlace de PDVSA Industrial, S.A., sobre la situación actual del proceso de Estatización de la Empresa NORPRO de Venezuela, C.A., (NORPRO).
>
> ANTECEDENTES:
>
> • **En fecha 15 de Mayo del 2010**, el Presidente de la República Bolivariana de Venezuela, Hugo Rafael Chávez Frías ordenó la estatización de la empresa productora de proppants la cual utiliza como materia prima la Bauxita de nombre 'NORPRO Venezuela C. A.', informando que la misma pasaría a manos de Petróleos de Venezuela S.A.

---

[437] International Law Commission, *Responsibility of States for Internationally Wrongful Acts* (2001), **Exhibit CLA-044**; J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), **Exhibit RL-021**, p. 121.

[438] J. Crawford, *The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries* (2002), **Exhibit RL-021**, p. 123.

[439] Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**, p. 4.

*El mismo día 15 de Mayo los trabajadores de NORPRO asumieron el control productivo de la planta y el personal Gerencial tomó la decisión de abandonar las instalaciones de la misma, la cual quedó en custodia de los trabajadores con apoyo de la Guardia Nacional Bolivariana.*

*• **En fecha Martes 25 de Mayo**, personal de PDVSA bajo instrucciones de la Gerencia General EyP División Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciones de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*

*• **26 de mayo 2010**, el personal de PCP de PDVSA Industrial, S.A., realiza visita e inspección a las instalaciones de la empresa NORPRO Venezuela, C.A.*

*• **27 de mayo 2010**, se incorpora al proceso de estatización de la empresa NORPRO Venezuela,C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente.*

*• **28 de mayo 2010**, vista la empresa NORPRO Venezuela, C.A., el Gerente del Sector Hidrocarburos de PDVSA Industrial S.A., donde se realizó reunión de trabajo con el grupo multidisciplinario conformado por PDVSA Industrial, S.A. y PDVSA EyP División Oriente. Durante esta actividad, se dictan los próximos paso a seguir: […]*

*• **31 de mayo de 2010**, siguiendo lineamientos emanados desde la Dirección del Sector Hidrocarburos de PDVSA Industrial S.A., realiza vista a la instalaciones de la empresa NORPRO Venezuela, C.A., el Gerente ( E ) del Sector Hidrocarburos Región Oriente de PDVSA Industrial S.A., con el fin de presentar el Plan Maestro de Abordaje a la Estatización de la empresa NORPRO Venezuela, C.A. […]"*[440]

463.  Similar (but less detailed) statements and descriptions of the steps of the implementation of the *Plan Guayana Socialista* by Respondent can be found, in particular, in:

-   a preliminary report prepared by PDVSA's "*Comisión de Evaluación*" dated May 2010 on the assessment of the current situation of Norpro Venezuela ("*Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*");[441]

---

[440] Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**, p. 1.
[441] Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**, p. 4.

- a report prepared by PDVSA's "*Comisión de Evaluación*" dated 4 June 2010 on the progress of the restructuring process of Norpro Venezuela ("*Informe de avance 'Re-structuración empresa Norpro'*");[442]

- PDVSA's "*Diagnostic of the Current Situation and Restructuring Plan*" dated June 2010;[443]

- a memorandum from PDVSA to Respondent's Minister of Energy and Petroleum dated 9 June 2010 on the current situation and the strategic plan for the administrative and operational control of Norpro Venezuela ("*Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo y Operacional de la Empresa NORPRO VENEZUELA, C.A.*");[444] and

- Mr. José Carrasco's final technical report dated 15 July 2010 ("*Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*").[445]

464. In view of these facts, the Tribunal concludes that PDVSA built upon the situation created by the union members in order to carry out the nationalization process as "*ordered*" ("*or-denó*") by President Chávez on 15 May 2010. After the plant takeover of 15 May 2010, PDVSA was able, without any disturbance, to assess the current situation of the plant and to determine how it could be restructured and operated by PDVSA.[446] Respondent further acknowledges that, in June and July 2010, PDVSA established "*a permanent presence, as it had been assigned responsibility for ensuring Plant safety and stability pending the determination of the precise mechanism and timing by which State control of the Plant was to be achieved.*"[447]

---

[442] Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**, pp. 2-3.

[443] Diagnostic of the Current Situation and Restructuring Plan for Optimization of the Productive Processes of Norpro Venezuela, C.A., June 2010, **Exhibit C-142**, p. 5 ("*Antecedentes*").

[444] Memorandum from PDVSA Dirección Ejecutiva de Producción to Rafael Ramírez Carreño (Minister of Energy and Petroleum), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 June 2010, **Exhibit C-145**, pp. 1-2.

[445] Final Technical Report, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 July 2010, **Exhibit C-148**, p. 3.

[446] *Cf.* Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**; Diagnostic of the Current Situation and Restructuring Plan for Optimization of the Productive Processes of Norpro Venezuela, C.A., June 2010, **Exhibit C-142**; Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**.

[447] Counter-Memorial, ¶ 28.

465. According to Respondent's witness Mr. Rondón, later in October 2010, PDVSA installed Mr. Ángel Salvarría as Plant General Manager, and Mr. Salvarría "*reorganized the supervisory structure which had been in place at the Plant since the union takeover, and began readying the Plant to re-start production*"; finally, in November 2010, plant workers officially became employees of PDVSA.[448]

466. While Respondent may not have anticipated or intended that the plant would be taken over by the members of the SINPROTRAC union on 15 May 2010, it is apparent that PDVSA immediately availed itself of this situation for the purpose of carrying out the nationalization process, thereby acknowledging and adopting the union members' conduct as its own. In any event, even if PDVSA's conduct were not to be considered as an acknowledgment and adoption of the union's plant takeover as its own action, Respondent effectively took control of the plant in June and July 2010 when it established "*a permanent presence*" at the plant, as Respondent acknowledges.[449] In the Tribunal's view, the 2 June 2010 memorandum prepared by PDVSA, entitled "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro),*"[450] as well as the 4 June 2010 prepared by PDVSA's "*Comisión de Evaluación*", entitled "*Informe de avance 'Restructuración empresa Norpro',*"[451] confirm that the expropriation process started at least shortly after 15 May 2010.

**(bb)  Nature and Purpose of Respondent's Presence at the Plant**

467. With regard to the second point, the Tribunal notes that a State's *de facto* control of assets does not necessarily entail expropriation. In this context, Respondent maintains that PDVSA's presence at the plant was arranged for the purpose of ensuring plant safety and stability, as a "*caretaker,*" not as an owner.[452] Furthermore, Respondent contends that, although PDVSA was instructed at the same time "*to carry out the transfer of Norpro to State control,*" it was not allowed to "*act or intervene in Norpro*" ("*no puede actuar o intervenir en Norpro*") until the publication of the formal expropriation decree.[453] However, as the reasoning relating to the plant takeover above indicates, the Tribunal finds that PDVSA actually did, in Respondent's own words, "*act*" and "*intervene in Norpro*"

---

[448] Rondón, ¶ 33; Transcript (Day 3), p. 712 lines 15-18; p. 714 line 19 – p. 725 line 8.

[449] Counter-Memorial, ¶ 28.

[450] *Cf.* Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143.**

[451] Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**.

[452] Counter-Memorial, ¶¶ 29 and 140; Rejoinder, ¶¶ 3, 18, 22 (note 101) and 32 (note 135); Post Hearing Brief, ¶ 20, citing from Transcript (Day 1), p. 213 lines 20-22; Respondent's Post-Hearing Reply Brief, ¶¶ 11 (note 42), 35.

[453] Rejoinder, ¶¶ 20-22, 32 (note 135), citing from Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated August 30, 2010, **Exhibit R-017**, pp. 2-3.

and hence took control of the plant, not as a "*caretaker,*" but to the benefit of Respondent, thereby excluding Norpro Venezuela as the owner of the plant.

468. In its defense, Respondent maintains that PDVSA's presence at the plant was aimed at "*ensuring Plant safety and stability,*"[454] more specifically "*the safety and security of the personnel and the assets*" at the plant.[455] Respondent refers in particular to the "*substantial*" and "*escalating tension*" between Norpro Venezuela and union representatives and to the "*industrial action*" that ultimately resulted in the takeover on 15 May 2010.[456] Further, Respondent submits that the "*operation of the Plant without proper supervision*" posed a substantial "*risk to the safety of Plant personnel*" and emphasizes that the "*dangers associated with the Plant*" were recognized by both the Norpro management and the French Embassy.[457] Most importantly, Respondent contends that the Norpro management "*abandoned*" the plant on 15 May 2010, leaving it in the hands of the union, and claims that Claimant "*never attempted to regain possession*" or "*be granted access to the Plant*" and also never claimed after 15 May 2010 that PDVSA's presence was "*without legal foundation.*"[458]

469. While the temporary occupation of an asset for reasons of public safety does not amount to an "*expropriation*" within the meaning of Article 5(1) of the Treaty, the Tribunal finds that the taking of Norpro Venezuela's plant by Respondent was essentially carried out for reasons connected to the impending expropriation process.

470. As stated above in (**aa**), the taking of the plant on or after 15 May 2010 was made an integral part of the undisputed "*process of nationalization*"[459] of Norpro Venezuela within the framework of the "*Plan Guayana Socialista*" to be implemented by the national executive power.[460] Within this framework, it was upon PDVSA "*to carry out*" the nationalization of Norpro ("*de llevar a cabo la estatización de Norpro*").[461] The Tribunal finds that carrying out this task was the main purpose of PDVSA's presence on the plant and outweighed any other purposes, including safety reasons.

471. Most importantly, the Tribunal refers to the numerous internal memoranda and reports prepared by PDVSA on the assessment of the current economic situation of the plant and

---

[454] Counter-Memorial, ¶ 28; Respondent's Post-Hearing Brief, ¶ 7.
[455] Respondent's Post Hearing Brief, ¶ 8. *See also* Rejoinder, ¶¶ 3, 18; Respondent's Post Hearing Brief, ¶ 60.
[456] Counter-Memorial, ¶¶ 137-138; Rejoinder, ¶¶ 8, 18.
[457] Rejoinder, ¶ 20; Respondent's Post-Hearing Brief, ¶ 20.
[458] Rejoinder, ¶¶ 20, 23. *Cf.* Post-Hearing Brief 60.
[459] Post-Hearing Brief 61.
[460] *Cf.* Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**, p. 4.
[461] Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, dated 30 August 2010, **Exhibit C-34** and **Exhibit R-17**, p. 2.

on determining how the plant could be restructured and operated by PDVSA in the future,[462] including *inter alia* assessments of the plant's inventory, payment obligations and equipment and its overall financial situation.[463] In the Tribunal's view, this work was not the conduct of a mere "*caretaker.*"

472. The purpose of PDVSA's presence on the plant after 15 May 2010 was also reflected by certain changes in the appearance of the plant and its personnel. By August 2010, the PDVSA flag was flying together with the Venezuelan flag over the plant and the workers were wearing PDVSA uniforms.[464] As detailed above in (**aa**), later in October 2010, PDVSA's Ángel Salvarría was installed as Plant General Manager and "*reorganized the supervisory structure which had been in place at the Plant since the union takeover, and began readying the Plant to re-start production.*" In November 2010, plant workers officially became employees of PDVSA. Finally, between November 2010 and March 2011, "*after operations re-started, the Plant produced and stockpiled green proppants.*"[465] Again, these measures are not typical for ensuring safety and stability; they illustrate that PDVSA was making the plant ready for operation and production under the *aegis* of Respondent.

473. The Tribunal considers that, contrary to Respondent's submissions, it is not relevant whether or not the formal expropriation decree was still being drafted at that time and property rights were yet to be formally transferred, and whether or not Claimant took

---

[462] *Cf.* Memorandum, PDVSA E&P, Preliminary Report from the Valuation Committee, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, May 2010, **Exhibit C-141**; Diagnostic of the Current Situation and Restructuring Plan for Optimization of the Productive Processes of Norpro Venezuela, C.A., June 2010, **Exhibit C-142**; Internal Memorandum, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 June 2010, **Exhibit C-143**; Report, PDVSA Valuation Committee, *Informe de avance 'Restructuración empresa Norpro'*, 4 June 2010, **Exhibit C-144**; Memorandum from PDVSA Dirección Ejecutiva de Producción to Rafael Ramírez Carreño (Minister of Energy and Petroleum), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NOR-PRO VENEZUELA, C.A.*, 9 June 2010, **Exhibit C-145**; PDVSA Evaluation Committee Report, *Reestructuración Empresa Norpro*, 11 June 2010, **Exhibit C-146**; PDVSA Evaluation Committee Report, *Reestructuración Empresa Norpro*, 2 July 2010, **Exhibit C-147**; Final Technical Report, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 July 2010, **Exhibit C-148**; Memorandum from Ower Manrique to Eulogio del Pino, *Situación actual de la empresa Norpro Venezuela C.A. (plan estratégico para la puesta en operación)*, 27 July 2010, **Exhibit C-149**; PDVSA Evaluation Committee Report, *Reestructuración Empresa Norpro*, 3 August 2010, **Exhibit C-150**.

[463] Memorandum from PDVSA Dirección Ejecutiva de Producción to Rafael Ramírez Carreño (Minister of Energy and Petroleum), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 June 2010, **Exhibit C-145**, p. 3; Final Technical Report, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 July 2010, **Exhibit C-148**, pp. 9-10.

[464] Request by Norpro Venezuela, C.A. for Judicial Inspection, 5 August 2010, **Exhibit C-119**, p. 11; María Ramírez Cabello, *Norpro de Venezuela inicia fase de prearranque*, Correo del Caroní, 23 July 2010, **Exhibit C-117**.

[465] Rondón, ¶¶ 33-34; Transcript (Day 3), p. 712 lines 15-18; p. 714 line 19 – p. 715 line 8.

legal steps in order to regain control.[466] The fact that the expropriation decree was "*being drafted*" at that time "*by the competent governmental authorities, within the process provided for in the applicable laws*" ("*El Decreto que ordena la expropiación de Norpro y sus activos industriales está siendo elaborado por las autoridades gubernamentales competentes, dentro del proceso previsto en las leyes aplicables.*")[467] does not exclude a finding that Claimant had already been expropriated within the meaning of Article 5(1) of the Treaty.

474.  The concepts and formalities of domestic law and compliance with its rules are not decisive for the purpose of determining whether or not an expropriation within the meaning of international law has occurred. Rather, it is decisive under Article 5(1) of the Treaty that Respondent had *de facto* control of the plant on or shortly after 15 May 2010, with no prospect of giving it back to its owners, and used it to prepare and restart operation and production of proppants. While the assessment of the plant's economic situation, including its inventory and payment obligations, was also relevant for preparing the (formal) expropriation decree and determining the fair compensation as required under Article 5(1) of the Treaty, Respondent did not collect this data within the framework of a formal administrative procedure. Rather, it availed itself of the plant takeover carried out by the union, established a permanent presence on the plant and started the nationalization process without providing for any significant participation of Claimant or the Norpro management at that time.

475.  With respect to the second point, *i.e.*, whether Claimant attempted to regain control of the plant after the takeover on 15 May 2010, the Tribunal notes that Norpro Venezuela filed two requests for judicial inspection of the plant on 17 May 2010 and on 5 August 2010.[468] Moreover, Norpro Venezuela and Claimant repeatedly attempted to enter into negotiations with Respondent concerning the nationalization of the plant, requested the assignment of an interlocutor, offered technical assistance and reserved their right to indemnification, starting with a letter from Norpro's former president Luis Páez to Rafael Ramírez, dated 19 May 2010:

> "*Considerando el interés que posee el Grupo Saint-Gobain en preservar la seguridad del personal de la planta y la condición de los activos de Norpro nos permitimos solicitar que PDVSA, en caso de ser desig-*

---

[466] Respondent's Post-Hearing Brief, ¶¶ 60-61.
[467] Draft Minutes of a Meeting among PDVSA Industrial S.A., Compagnie de Saint-Gobain and the French Embassy in Venezuela, 30 August 2010, **Exhibit C-34** and **Exhibit R-17**,
[468] Request by Norpro Venezuela, C.A. for Judicial Inspection, 17 May 2010, **Exhibit C-20**; Request by Norpro Venezuela, C.A. for Judicial Inspection, 5 August 2010, **Exhibit C-119**.

> *nado como ente que llevará a cabo la estatización, designe a un inter-locutor válido para analizar con los representantes del Grupo Saint-Gobain, la forma bajo la cual la misma se desea llevar a cabo.*
>
> *Debe destacarse que el Grupo Saint-Gobain sin prejuicio* [sic] *a sus derechos en materia de indemnización está abierto a proporcionar a corto y mediano plazo asistencia técnica una vez que lleve a cabo la estatización, a los fines de preservar la seguridad del personal y evitar la degradación del estado de los activos de Norpro.*"[469]

476. Other letters from Claimant and Norpro Venezuela, written in the course of 2010, contain similar statements.[470] These messages do not convey the impression that Claimant and Norpro Venezuela, still being the rightful owners of the plant, had access to the plant at any time, but had decided "*to disclaim responsibility for anything that happened at the Plant*" and to leave the plant to the State, as alleged by Respondent.[471] It rather appears that, in view of President Chávez' announcement of 15 May 2010 and the subsequent takeover of the plant, Claimant accepted as a fact that the plant was *de facto* nationalized and tried to make the best of the situation by cooperating with Respondent rather than exhausting its legal remedies, such as, *e.g.*, an "*amparo*" in order to preserve its constitutional rights.[472] This cooperative attitude does not, however, preclude Claimant from asserting that an "*expropriation*" within the meaning of Article 5(1) of the Treaty occurred already at that time.

477. In conclusion, the Tribunal has no doubt that on, or at least shortly after, 15 May 2010, Respondent obtained at least *de facto* control of the plant, with the aim of ultimately carrying out the expropriation process. This conduct amounts to an "*expropriation*" within the meaning of Article 5(1) of the Treaty and is therefore decisive for the expropriation date within the meaning of subparagraph 3.

### (ii) Respondent's Compliance with, or Breach of, its Treaty Obligations after the Expropriation Date

478. From the findings made above in **aa)** with regard to the requirements as to the specification and promptness of the compensation under Article 5(1) subparagraph 2 and 3 of the Treaty and in **(i)** with regard to the "*date of expropriation*" within the meaning of subparagraph 3, it follows that Respondent did not comply with its Treaty obligations under Article 5(1) subparagraphs 2 and 3 after 15 May 2010.

---

[469] Letter from Luis E. Páez to Rafael Ramírez, 19 May 2010, **Exhibit C-22**, pp. 1-2.

[470] *Cf.* Letter from Luis E. Páez to José Khan, 27 May 2010, **Exhibit C-23**; Letter from Guy Rolli to Temir Porras, 8 June 2010, **Exhibit C-26**; Letter from Luis E. Páez to Rafael Ramírez, 6 July 2010, **Exhibit C-28**; Letter from Patrick Dupin to Eulogio del Pino, 3 August 2010, **Exhibit C-30**.

[471] Respondent's Post-Hearing Brief, ¶ 60.

[472] Rejoinder ¶ 23.

479. Respondent has never communicated the amount of payment to be made to Claimant and has yet to offer any compensation for the expropriation, despite the aforementioned attempts by Claimant to negotiate the terms of the nationalization. The Tribunal is aware that it is Respondent's position that it offered compensation in the context of its offer to form an "*empresa mixta*," in which PDVSA would become the major shareholder.[473] However, regardless of whether Respondent's offer was sufficiently concrete in order for Claimant to be considered,[474] Respondent did in any event not specify any amount that it would pay to Claimant in consideration for its acquisition of a majority stake in the mixed company. Therefore Respondent failed to specify the amount of compensation within the meaning of Article 5(1) subparagraph 3 of the Treaty and thus also failed to pay prompt compensation as required under subparagraph 2.

**c) Conclusion**

480. In conclusion, the Tribunal finds that the expropriation of the plant was not carried out in accordance with the compensation requirements set out in Article 5(1) subparagraphs 2 and 3. As to the consequences of this finding, *i.e.*, the question whether this breach renders the expropriation unlawful, the Tribunal notes that the dispute between the Parties is focused on the question of which compensation standard is to be applied in this case. The Tribunal will thus address this issue in the section on quantum (*see* below in **III.1.**).

**2. Fair and Equitable Treatment (Article 3(1) of the Treaty)**

481. The Tribunal now turns to the FET claims. After briefly defining the applicable FET standard **(a)**, the Tribunal will assess the FET claims with respect to the plant **(b)** and the Bauxite Contract **(c)**. As to the additional claims based on Respondent's failure to provide VAT refunds that it allegedly owed to Claimant under Venezuelan law and on Respondent's alleged arbitrary restriction of the proppants production through the 24 March 2010 takeover of the plant,[475] the Tribunal notes that Claimant has not continued to pursue these arguments as independent FET claims following its Memorial. Therefore, the Tribunal will also refrain from addressing these arguments in the present section.[476]

---

[473] Respondent's Post-Hearing Brief, ¶¶ 53-54 referring to the letter from Gabriel Rojas to Luis Páez, dated 22 October 2010. **Exhibit R-071.** Respondent also refers to the meeting between PDVSA and Claimant on 26 October 2010 discussed by Claimant's witness Mr. Millot in his witness statement. Millot, ¶ 31.

[474] The Parties are in dispute as to whether the offer corresponded to a concrete proposal that Claimant agreed to consider or whether it was a mere "*suggestion*" that PDVSA promised to substantiate before it would have been for Claimant to consider it. Claimant's Post-Hearing Submission, ¶ 35; Millot, ¶ 31; Transcript (Day 2), p. 418 line 9 – p. 419 line 9; Respondent's Post-Hearing Brief, ¶ 54 (with note 101).

[475] *Cf.* Memorial, ¶¶ 162-164 and ¶¶ 178-179.

[476] The argument relating to the VAT refunds will be discussed in the section on quantum at paragaphs 824 *et seq.* below.

a)    **Applicable FET Standard**

    aa)    **Summary of Claimant's Position**

482.   Claimant submits that the FET standard provided for in Article 3(1) of the Treaty refers, in a broad sense, to the prevailing concepts of FET in international law – and not only to the minimum standard of treatment –, including the following:[477]

-   The ensurance of a "*stable legal and business environment,*" with treatment "*in a manner that is consistent, predictable, and transparent*";

-   The creation of an "*appropriate legal, administrative, and regulatory framework, the legal environment that modern investment theory has come to recognize as a conditio sine qua non of the success of private enterprise*";

-   "*due process*" to the exclusion of a "*lack of transparency and candor in an adminis-trative process*";

-   The absence of "*arbitrary or discriminatory conduct*"; and

-   A conduct "*in accordance with the principle of good faith.*"

483.   Claimant submits that the reference in Article 3(1) of the Treaty to the "*rules and princi-ples of international law*" does not constitute a cap but rather the baseline for the treatment to be accorded to foreign investors.[478]

    bb)    **Summary of Respondent's Position**

484.   Respondent submits that, by virtue of the reference to the "*rules and principles of inter-national law,*" Article 3(1) of the Treaty calls only for the minimum standard of treatment under customary international law. For the purpose of defining this restrictive FET stand-ard, Respondent refers to an early decision of the tribunal in *Neer v. Mexico* (1926), which held that, to violate this standard, the treatment of an alien

> "*should amount to an outrage, to bad faith, to willful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily rec-ognize its insufficiency.*"[479]

---

[477] Memorial, ¶¶ 152-156.
[478] Reply, ¶ 104.
[479] Counter-Memorial, ¶ 125, citing from *Neer v. Mexico*, Mexico-US General Claims Commission, Docket No. 136, Opinion dated October 15, 1926, 21 THE AMERICAN JOURNAL OF INTERNATIONAL LAW 555 (1927), p. 556, **Exhibit RL-79**.

485. Respondent further cites several FET provisions contained in more recent investment law frameworks such as the draft EU-Canada Free Trade Agreement ("**CETA**"), which specifies the FET standard as to cover, for example: "*Fundamental breach of due* process, *including a fundamental breach of transparency, in judicial and administrative proceedings*" as well as "*breach of legitimate expectations*", "*limited to situations where the investment took place only because of a promise made by the State that was subsequently not honoured.*"[480]

### cc)   The Tribunal's Analysis

486. The FET clause contained in Article 3(1) of the Treaty reads as follows:

"*Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et équitable, conformément aux règles et principes du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de moyens de production et d'exploitation de tout type, toute entrave à la vente et au transport des produits à l'intérieur du pays et à l'étranger, ainsi que toutes autres*

"*Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así*

---

[480] Rejoinder, ¶ 121, citing from European Commission, *Investment Provisions in the EU–Canada Free Trade Agreement*, dated December 3, 2013, **Exhibit RL-142**; European Commission, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text,"* dated August 5, 2014, **Exhibit RL-143**.

> *mesures ayant un effet ana-
> logue.*"[481]

> *como cualquier otra medida que
> pueda tener un efecto análogo.*"[482]

487. The English translation submitted by Claimant reads:

> "*Each of the Contracting Parties will ensure fair and equitable treat-
> ment for investments by nationals and companies of the other Party in
> its territory and in its maritime area, in accordance with the rules and
> principles of international law, and will ensure that the exercise of this
> right thus recognized shall have no impediments either in law or in fact.
> In particular, although not exclusively, impediments to fair and equita-
> ble treatment in law or in fact are any arbitrary or discriminatory re-
> strictions to the purchase and transport of raw and ancillary materials,
> of energy and fuels, as well as to any means of production and exploi-
> tation, or any impediment to the sale and transport of products within
> the country and overseas, along with all other measures having a sim-
> ilar effect.*"[483]

488. The Tribunal notes that the reference to the "*rules and principles of international law*"
("*conformément aux règles et principes du droit international*"/"*conforme a las reglas y
principios del Derecho Internacional*") and the non-exhaustive enumeration ("*En par-
ticulier, bien que non exclusivement*"/"*En particular, aunque no exclusivamente*") of cer-
tain aspects of FET in the second part of the provision might, in principle, raise doubts as
to the correct interpretation of the FET clause. However, the Tribunal does not have to
make a finding in this regard because, as discussed in the following paragraphs, at least
certain aspects of Respondent's involvement in the price increases under the Bauxite Con-
tract and the expropriation of the plant as alleged by Claimant could, if proven, also be in
breach of the more restrictive FET concept as described by Respondent in this case.

489. With regard to the takeover of the plant, Claimant argues that Respondent failed to follow
due process in the expropriation procedure. As Respondent's reference to the FET stand-
ard under the draft CETA illustrates, Respondent apparently accepts that a "[f]*undamen-
tal breach of due process, including a fundamental breach of transparency, in judicial
and administrative proceedings*" forms part of the FET standard contained in Article 3(1)
of the Treaty.[484]

---

[481] Journal Officiel de la République Française n°102 du 30 avril 2004, **Exhibit C-1**, p. 7775.
[482] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Exhibit C-1**, p. 332.354.
[483] Free English translation submitted by Claimant as **Exhibit C-1**.
[484] Rejoinder 121, citing from European Commission, *Investment Provisions in the EU–Canada Free Trade Agree-ment*, dated December 3, 2013, **Exhibit RL-142**; European Commission, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text,"* dated August 5, 2014, **Exhibit RL-143**.

490. As to the price increases under the Bauxite Contract, it is Claimant's position that Respondent made, through MIBAM and other State organs, "*specific promises*" and "*commitments*" and thereby "*created specific expectations,*" which Claimant relied on in making its investments, and which were subsequently frustrated.[485] Respondent advances that the FET standard includes protection of "*legitimate expectations,*" "*limited to situations where the investment took place only because of a promise made by the State that was subsequently not honoured.*"[486]

491. In light of the Parties' positions in this case, the Tribunal will consider "*due process*" and protection of "*legitimate expectations*" as being, in principle, undisputed elements of the FET under Article 3(1) of the Treaty. If necessary, the Tribunal will further detail the precise scope of these two elements below.

**b)    Due Process in the Expropriation**

   **aa)    Summary of Claimant's Position**

492. Claimant submits that Respondent failed to treat Claimant's investment fairly and equitably because its actions in relation to the expropriation were not transparent and did not satisfy the standard of good faith under the Treaty. Claimant argues that its investment was "*effectively expropriated overnight*" without any forewarning and its employees were "*kicked out the same day*" as a result of the "*public and sudden announcement*" on television by President Chávez on 15 May 2010.[487]

493. Claimant claims that the tribunal in *Middle East Cement v. Egypt* confirmed that the manner in which the investment was expropriated can in itself violate the FET standard and further refers to the tribunal's finding in *Tecmed v. Mexico* that a failure to consult with the claimant prior to the expropriatory action gave rise to a breach of the FET obligation.[488] In addition, Claimant relies on the tribunal's statement in *OI European Group v. Venezuela* that it is difficult to imagine an unlawful direct expropriation, which does not at the same time imply a violation of the FET standard.[489]

---

[485] Reply, ¶ 120; Claimant's Post-Hearing Submission, ¶ 80.
[486] Rejoinder, ¶ 121, citing from European Commission, *Investment Provisions in the EU–Canada Free Trade Agreement*, dated December 3, 2013, **Exhibit RL-142**; European Commission, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text,"* dated August 5, 2014, **Exhibit RL-143**.
[487] Memorial, ¶¶ 180-181; Reply, ¶ 127.
[488] Memorial, ¶ 182 referring to *Middle East Cement v. Egypt* (**CLA-053**), ¶ 143 and *Tecmed v. Mexico* (**CLA-082**), ¶¶ 173-174.
[489] Claimant's Post-Hearing Submission, ¶ 47 referring to *OI European Group v. Venezuela* (**CLA-156**), ¶ 501.

494. According to Claimant, it repeatedly approached Respondent in order to negotiate the amount of compensation to be paid under the Treaty but its efforts were to no avail. Respondent failed to make any offer and further failed to give any indication as to the process it intended to follow in order to ensure the payment of adequate compensation. Claimant refers to the tribunal's statement in *ADC v. Hungary* that the claimant's legitimate expectation included to receive fair treatment and just compensation.[490] By contrast, Claimant claims, Respondent took the plant without establishing a legal framework for the expropriation or an effort to engage in any good faith negotiations on compensation for a period of over ten months.[491]

495. Claimant argues that due process requires that the affected investor be granted "*a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard.*" In Claimant's view, the "*significant delays*" and the "*opaque process*" together with Respondent's insistence on continuing with its domestic expropriation proceedings despite Claimant's choice to pursue its claims before an ICSID tribunal constitute a violation of Respondent's obligation to accord Claimant due process during the expropriation.[492]

496. Claimant maintains that Respondent did not respect "*anyone's understanding of due process*" when it (i) "*abruptly declared the Plant national property in a television announcement*"; (ii) failed to take "*any legal measure, decree or procedure*" for almost a year and could not even outline a timeframe for the start of the process; (iii) failed to provide any authority for PDVSA's "*occupation and control*" of the plant; (iv) refused to negotiate in good faith despite Claimant's repeated efforts and made "*only unsubstantiated 'suggestions' of a mixed enterprise,*" which cannot be considered a good-faith offer given that the suggestion did not include any compensation for the loss of the 60% ownership that would be taken by PDVSA; (v) did not offer any compensation as required by both the Treaty and its domestic Expropriation Law; and (vi) failed to act in accordance with the terms of the Expropriation Law as confirmed by its legal expert Dr. Brewer-Carías who states that under Venezuelan law, compensation has to be paid prior to expropriation.[493]

### bb)  Summary of Respondent's Position

497. Respondent rejects Claimant's claim that the expropriation was not carried out following due process and argues that there is no requirement under international law to give prior

---

[490] Memorial, ¶¶ 183-184 referring to *ADC v. Hungary* (**CLA-001**), ¶ 424.
[491] Claimant's Post-Hearing Submission, ¶ 42.
[492] Reply, ¶¶ 128-130.
[493] Claimant's Post-Hearing Submission, ¶¶ 45-46; Claimant's Second Post-Hearing Submission, ¶¶ 22-29; Reply, ¶ 126 referring to Brewer-Carías II, ¶¶ 14-17.

warning of its intention to announce an expropriation because this would effectively undermine the State's sovereign right to expropriate.[494] Respondent submits that when PDVSA had established a caretaker presence at the plant, it met with Claimant as soon as possible to negotiate the formation of an *empresa mixta* and, even before the Expropriation Decree was issued, PDVSA "*took active steps to engage with Claimant, to collaborate with Claimant, and ensure that Claimant was aware of the available legal remedies.*"[495]

498. In response to Claimant's argument that Respondent failed to abide by its domestic Expropriation Law, Respondent maintains that PDVSA was authorized to enter into provisional possession of the plant under Venezuelan law and, in any event, not every failure of the host State to "*comply strictly with the requirements of its laws*" constitutes a breach of its FET obligation under international law.[496]

499. Respondent emphasizes that after the Decree was issued, PDVSA initiated the administrative amicable expropriation procedure required by the Expropriation Law, which is aimed at determining the compensation to be paid. According to Respondent, Claimant was well aware of the Expropriation Decree and its role in resolving the question of compensation; nevertheless, it chose not to participate in the amicable settlement procedure and to ignore the subsequent judicial procedure. In Respondent's view, the present case is therefore not comparable to the cases cited by Claimant because it neither challenged the expropriation nor did it participate in the determination of just compensation and therefore cannot complain about the resulting delays.[497]

500. Specifically with regard to *OI European Group v. Venezuela*, Respondent notes that the applicable expropriation provision in that case included an explicit requirement to carry out the expropriation "*under due process of law*" and emphasizes that the tribunal rejected all but one of the claimant's due process arguments. In particular, Respondent emphasizes that the tribunal found that due process does not require prior discussions with the expropriated party and is fully satisfied if the party is subsequently granted the right to be heard before the judiciary.[498] Respondent maintains that this possibility would have been open to Claimant at any time and concludes that "*the fact that Claimant chose not to avail itself of remedies in the Venezuelan courts does not equate with a denial of due process.*"[499]

---

[494] Rejoinder, ¶ 137.
[495] Counter-Memorial, ¶¶ 139-140.
[496] Rejoinder, ¶ 136 (with note 469).
[497] Counter-Memorial, ¶¶ 141-142; Rejoinder, ¶¶ 138-139.
[498] Respondent's Post-Hearing Reply Brief, ¶¶ 10-11 referring to *OI European Group v. Venezuela* (CLA-156), ¶ 322 and ¶¶ 388, 392.
[499] Respondent's Post-Hearing Reply Brief, ¶ 11.

501. Finally, Respondent is of the view that Claimant's argument that the ongoing judicial procedure ignores Claimant's choice to initiate ICSID arbitration is rendered moot by the Tribunal's decision to deny Claimant's request for provisional measures that was based on the same argument.[500]

502. In any event, Respondent submits that Claimant did not suffer any damage during the ten-and-a-half-month period until the Expropriation Decree was issued that is not already included in the calculation of the compensation for the expropriation as of 15 May 2010. According to Respondent, even a finding of an FET violation would not give rise to any change in the manner in which compensation is to be calculated in the present case.[501]

### cc)   The Tribunal's Analysis

503.  During the Hearing and in its Post-Hearing Submission, Claimant included this FET claim in the expropriation claim relating to Article 5(1) subparagraph 1 of the Treaty.[502] The Tribunal notes, however, that Claimant thereby did not intend to abandon its separate FET claim relating to the taking of the plant, given that it maintains in its relief sought the request for a separate declaration that Respondent has breached Article 3(1) of the Treaty.[503]

504. The Tribunal notes the Parties' positions on Claimant's claim for breach of due process during the expropriation process. However, as correctly pointed out by Respondent, Claimant does not allege that it suffered any damage from the alleged breach that would not be included in the compensation for the expropriation itself. Therefore, the Tribunal does not have to make a finding on whether the FET has indeed been breached in this regard because it would not alter the amount of compensation to which Claimant will be entitled pursuant to the Award.

### c)   Price Increases under the Bauxite Contract

### aa)   Summary of Claimant's Position

### (i)   CVG Bauxilum's Conduct Is Attributable to Respondent

505. Claimant claims that CVG Bauxilum's actions are attributable to Respondent because it is "*wholly-owned by, and subject to the direction and oversight of CVG*," which is an

---

[500] Rejoinder, ¶ 139.
[501] Respondent's Post-Hearing Brief, ¶¶ 108, 112; Respondent's Post-Hearing Reply Brief, note 32
[502] Transcript (Day 1), p. 82 line 13; p. 93 lines 5-7. Claimant's Post-Hearing Submission, ¶¶ 40-47.
[503] Claimant's Second Post-Hearing Submission, ¶ 116. This is confirmed by the cross-reference in Claimant's Post-Hearing Submission (¶ 42 with note 116) to the relevant section in the Memorial (¶¶ 180-184) and Claimant's submission of its FET arguments in its Second Post-Hearing Submission (¶¶ 30-45).

autonomous institute under Venezuelan law and thus forms part of the "*functionally de-centralized*" public entities of Respondent. Claimant adds that CVG enjoys the same priv-ileges and prerogatives as the State, is subject to the coordination of the President of Ven-ezuela and was "*ascribed*" to MIBAM. Consequently, Claimant argues that the same ap-plies to its subsidiary CVG Bauxilum whose activities and services have been declared of public utility and public interest under Venezuela's Mining Law.[504]

506. Claimant therefore argues that (i) CVG Bauxilum should be considered an organ of the State under Article 4 of the ILC Draft Articles; and even if this were not the case, (ii) its conduct would be attributable under Article 5 as it is "*empowered by the law of [the] State to exercise elements of governmental authority*" and "*was acting in that capacity in the particular instance*" because it contracted with Norpro Venezuela on the basis of the State-granted monopoly.[505]

507. To the extent that CVG Bauxilum is considered an organ of the State, Claimant argues that its breach of the Bauxite Contract in itself amounts to an internationally wrongful act rising to the level of a Treaty breach because Claimant is entitled to the same treatment afforded to third-party nationals under the most-favored nation clause in the Treaty. Ac-cording to Claimant, the scope of the MFN clause includes umbrella clauses found in other treaties such as the UK-Venezuela BIT.[506]

508. Claimant also refers to Article 8 of the ILC Draft Articles and notes that this provision does not even require governmental activity.[507] In addition, Claimant claims that Re-spondent, through MIBAM, adopted the Bauxite Contract as its own and then "*sanctioned the contractual breach by refusing to address it when approached directly by Norpro Venezuela*," which creates its responsibility under Article 11 of the ILC Draft Articles.[508]

### (ii)   Respondent's Conduct (Through MIBAM) Created Legitimate Ex-pectations

509. Claimant further submits that, even if CVG Bauxilum's conduct were not attributable un-der the ILC Draft Articles, Respondent's State officials gave "*specific promises*" and thus created "*specific expectations*," which they then repudiated by failing to address CVG

---

[504] Memorial, ¶¶ 173-174; Reply, ¶ 14.
[505] Memorial, ¶¶ 176-177 referring to International Law Commission, Responsibility of States for Internationally Wrongful Acts (2001) (**CLA-044**), Articles 4 and 5.
[506] Memorial, note 340; Reply, note 253.
[507] Reply, note 252.
[508] Reply, ¶ 118.

Bauxilum's actions in raising the bauxite price in violations of the terms of the Bauxite Contract.[509]

510. In Claimant's view, Respondent "*induced*" its investment through "*a series of promises,*" including a guarantee that its State-owned entities would enter into long-term supply contracts for the required inputs (gas, electricity and bauxite). According to Claimant, the "*long-term supply of bauxite at a competitive price*" was "*of critical importance*" to Claimant, which is why it discussed the supply of bauxite directly with MIBAM in 2005.[510]

511. Claimant contends that Respondent "*regularly discussed and promoted the Bauxite Contract*" and that MIBAM gave "*express assurances […] that it had directed CVG Bauxilum to fulfill Norpro Venezuela's bauxite needs on the terms agreed.*"[511] In this regard, Claimant refers, *inter alia*, to a meeting on 10 May 2005 in which the Vice-Minister "[c]*onfirmed the terms that will guide the bauxite and gas supply*" as well as a meeting on 20 October 2005 in which the Vice-Minister confirmed that he had asked "*the president of* [CVG] *Bauxilum to finalize the contract asap.*"[512]

512. According to Claimant, the Government was aware of the importance to secure bauxite supply and therefore "*directly committed to Saint-Gobain that it would secure such a supply at the Bauxite Contract price.*" Claimant claims that CVG Bauxilum entered into the Bauxite Contract "[a]*t MIBAM's direction,*" as confirmed by the fact that the Contract was concluded "*under the auspices of the Ministry of Basic and Mining Industries (MIBAM) and the Corporación Venezolana de Guayana (CVG)*" and embossed with "*Ministry of Basic Mining Industries*" in the header.[513] Consequently, Claimant argues that its legitimate expectations, as "*memorialized*" in the Bauxite Contract with CVG Bauxilum, were created by MIBAM prior to the signing given that it "*controlled and orchestrated*" the negotiations on the supply of bauxite and confirmed the parameters of the contract.[514]

513. Claimant alleges that even though the Bauxite Contract provides that the bauxite price can be increased only (i) by an automatic annual adjustment by the US PPI for commod-

---

[509] Reply, ¶ 120.
[510] Memorial, ¶ 165; Reply, ¶ 114.
[511] Claimant's Post-Hearing Submission, ¶¶ 79-80 referring to the oral testimony of its witness Mr. Pedersen. Transcript (Day 2), pp. 499-501 and pp. 567-577.
[512] Memorial, ¶¶ 165-166 referring to Minutes of a Meeting among Saint-Gobain, MIBAM and CVG Bauxilum (**Exhibit C-3**) and a Memo from Michel Boyer-Chammard to Guy Rolli, et al., 20 October 2005 (**Exhibit C-074**).
[513] Memorial, ¶¶ 167-168; Purchase and Sale Agreement between CVG Bauxilum, C.A. and Proppants Venezuela, C.A., 27 January 2006 (**Exhibit C-6**).
[514] Reply, ¶¶ 116-117 and ¶ 123.

ities (Article 10.1); and (ii) in the event of increased transportation costs by a jointly re-
viewed price adjustment (Article 10.2), CVG Bauxilum unilaterally increased the price
in violation of these terms. Claimant notes that it objected to the price increase by separate
letters to both MIBAM and CVG Bauxilum, as confirmed by its witness Mr. Millot during
his oral testimony.[515]

514. In response to Respondent's argument that the price increase was based on the increased
transportation costs, in particular the raised tariffs for navigating the Orinoco River, and
thus justified under Article 10.2, Claimant submits that, despite "*extensive efforts*" from
Norpro Venezuela's management, CVG Bauxilum failed to adequately document the al-
leged reasons for the price increase, several of which were "*inadequate on their face*."[516]

515. Claimant argues that Respondent's conduct does not merely amount to a breach of con-
tract but a violation of its legitimate expectation that Respondent would ensure compli-
ance with the contract. In this regard, Claimant claims that the tribunal in *Nykomb v.
Latvia* "*clearly established the relevance of market-dominance for attribution pur-
poses.*"[517] Claimant argues that, in light of Respondent's monopoly over the bauxite pro-
duction in Venezuela, MIBAM and CVG Bauxilum could impose their terms on Norpro
Venezuela, knowing that bauxite was the critical raw material for the production of
Claimant's ceramic proppants. While emphasizing that it protested against the increase,
Claimant submits that it therefore "*simply had no other choice*" than to pay the increased
price.[518]

516. Contrary to what Respondent suggests, Claimant submits that it could not change the
supplier of bauxite because the process had been calibrated to the quality of the raw baux-
ite required for the production proppants and delivery was scheduled only once a year.
According to Claimant, the availability of bauxite in sufficient quantities at prices that
made the proppants production economically feasible was the entire reason for choosing
Venezuela as its investment location. Under these circumstances, Claimant argues that
the unilateral price increase was "*antithetical to the transparent and stable legal environ-
ment Saint-Gobain was promised*" and thus "*eviscerated*" its legitimate expectations.[519]

---

[515] Memorial, ¶¶ 169-170; Reply, ¶ 15 referring to the letter from Luis Páez to MIBAM, 4 September 2008 (**Exhibit C-096**) and the letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit C-12**); Claimant's Post-Hearing Submission, ¶ 82 referring to Transcript (Day 2), pp. 373-381.
[516] Claimant's Post-Hearing Submission, ¶¶ 83-85.
[517] Reply, ¶ 123 (note 251).
[518] Memorial, ¶ 171; Reply, ¶ 124 (with note 251 referring to *Nykomb v. Latvia* (CLA-058), Section 4.2); Claim-ant's Post-Hearing Submission, ¶ 82.
[519] Memorial, ¶ 172; Reply, note 49; Claimant's Post-Hearing Submission, ¶¶ 86-87.

**bb) Summary of Respondent's Position**

517. Respondent rejects Claimant's claim and emphasizes that neither Claimant nor Venezuela was party to the Bauxite Contract, which was rather a "*purely commercial arrangement*" between CVG Bauxilum and Norpro Venezuela and cannot give rise to any obligations of Respondent under international law.

**(i)  CVG Bauxilum's Conduct Is Not Attributable to Respondent**

518. Respondent contests that the actions of CVG Bauxilum are attributable to the State under the ILC Draft Articles because these provisions apply only to "*internationally wrongful acts.*" As there is no allegation that the conclusion of the Bauxite Contract in itself was an internationally wrongful act, Respondent contends that the ILC Draft Articles do not apply.[520]

519. Respondent submits that, even if the ILC Draft Articles were applicable, CVG Bauxilum cannot be considered an organ of the State under Article 4 because CVG is an autonomous institute and its subsidiary, CVG Bauxilum, is a State-owned company. According to Respondent, neither of them has any executive power but they are decentralized entities of the Public Administration and thus separate and distinct legal persons under Venezuelan commercial law.[521] Respondent argues that if the status is as clearly defined under internal law as is the case here, the internal law is decisive for the classification as an "*organ*" under Article 4.[522]

520. Respondent further takes the position that CVG Bauxilum's conduct is not attributable under Article 5. In Respondent's view, the exercise of "*governmental authority*" means the "*authority to exercise sovereign prerogatives*" and cannot be equated with "*activities of a commercial character that are routinely carried out by State companies for the benefit of the State.*" Respondent submits that, while CVG Bauxilum is a commercial company acting for the benefit of Respondent in the mining sector, it does not possess or exercise any governmental authority in carrying out its activities.[523]

521. While acknowledging that CVG Bauxilum indeed has a State-granted monopoly in Venezuela, Respondent notes that Claimant had identified three alternative sources in Guayana and the Dominican Republic and was "*perfectly free*" to import the bauxite from any of those countries. According to Respondent, CVG Bauxilum's monopoly is irrelevant because CVG Bauxilum's decision to increase the price due to the fact that its own

---

[520] Counter-Memorial, ¶¶ 131-132 and ¶¶ 74-81; Rejoinder, ¶ 80.
[521] Counter-Memorial, ¶¶ 82-85; Rejoinder, ¶ 84 and ¶¶ 89-90.
[522] Rejoinder, ¶¶ 85-86.
[523] Counter-Memorial, ¶¶ 86-90 referring to *Hamester v. Ghana* (RL-27), ¶¶ 251-255.

performance had become unviable is not a sovereign act, but rather a "*quintessentially*" commercial act.[524]

522. Respondent is further of the view that CVG Bauxilum's conduct cannot be attributed to Respondent under Article 8 of the ILC Draft Articles because Claimant cannot show a particular act that was internationally wrongful and the result of the State's "*instructions, directions or control*."[525] Respondent refers to the commentary to the ILC Draft Articles in which Prof. Crawford states:

> "*Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled. If such corporations act inconsistently with the international obligations of the State concerned the question arises whether such conduct is attributable to the State. In discussing this issue it is necessary to recall that international law acknowledges the general separateness of corporate entities at the national level, except in those cases where the* 'corporate veil' *is a mere device or a vehicle for fraud or evasion. The fact that the State initially establishes a corporate entity, whether by a special law or otherwise, is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity. Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, prima facie their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority within the meaning of article 5.*"[526]

523. With regard to Claimant's argument that CVG (and therefore effectively also CVG Bauxilum) is under the administrative guardianship and oversight (*tutela*) of MIBAM, Respondent notes that under Venezuelan law, *control de tutela* is a form of "*general oversight*" to ensure that the activities of decentralized entities or State-owned companies are carried out in line with State policy, but argues that it cannot make the State responsible for the commercial decisions of a State-owned company.[527]

524. Finally, Respondent contends that Claimant's reference to Article 11 of the ILC Draft Articles contradicts its previous arguments related to Article 4, 5 and 8 because Article 11 is premised on the absence of any governmental or sovereign conduct. In addition, Respondent submits that Claimant has not identified any "*clear and unequivocal*" statement or act of adoption on the part of Respondent and still cannot overcome the hurdle of an internationally wrongful conduct.[528]

---

[524] Counter-Memorial, ¶¶ 91-98; Rejoinder, ¶ 96.
[525] Counter-Memorial, ¶¶ 99-101.
[526] *James Crawford*, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (**RL-21**), Article 8, p. 112.
[527] Counter-Memorial, ¶¶ 102-106.
[528] Rejoinder, ¶¶ 99-102.

### (ii)  Claimant's Claim is Factually Inaccurate

525. In any event, Respondent claims that Norpro Venezuela was not forced to accept any price increase but, after initial protest, "*appreciated the underlying reasons*" given by CVG Bauxilum for the increase, *i.e.*, the new tariffs for navigation on the Orinoco River and the significant variation of extraction, transport and unloading costs at the Matanzas plant. According to Respondent, Norpro Venezuela made a business decision to agree to the price increase, subject to its request that the price be maintained at that level through 2009. Respondent emphasizes that CVG Bauxilum honored that request and did not seek a further price increase until 2010.[529] Respondent further claims that none of the documents invoked by Claimant reflect its alleged request that additional reasons or documentation of such reasons be provided.[530]

526. Respondent argues that Norpro Venezuela could have decided not to purchase any bauxite from CVG Bauxilum and could instead have imported bauxite from any of the three alternative resources it had identified in Guayana and the Dominican Republic. Alternatively, Respondent notes, it could have resorted to arbitration proceedings under the Bauxite Contract against CVG Bauxilum.[531]

527. Respondent further rejects Claimant's submission that its investment hinged on the expectation that it would receive a stable supply of bauxite from CVG Bauxilum at the same price. According to Respondent, Claimant "*certainly never received any guarantee from the Republic regarding supply or price*" but even advised its parent company in 2005 that there were considerable risks associated with the supply of bauxite, which they could mitigate by securing multiple viable alternative sources. Respondent notes that Claimant therefore stated internally that they were in need of an "*alternative supply of bauxite from Guayana if tomorrow CVG no longer supplies us with any.*"[532]

528. Respondent argues that in the absence of any specific promises or guarantees from the State, Claimant's "*expectations*" are not protected and claims that even the cases relied on by Claimant support this. According to Respondent, none of the documents referred to by Claimant with regard to the alleged commitments of the State show any involvement "*beyond support of a general nature for the proppant plant project*," which does not suffice to give rise to legitimate expectations, or that Respondent "*sanctioned*" CVG Bauxilum's decision to increase the bauxite price.[533] In Respondent's view, this is confirmed by Mr.

---

[529] Counter-Memorial, ¶ 133; Rejoinder, ¶ 132; Respondent's Post-Hearing Brief, ¶ 124 referring to letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit R-52**).
[530] Respondent's Post-Hearing Reply Brief, ¶ 28.
[531] Counter-Memorial, ¶ 134; Respondent's Post-Hearing Brief, ¶ 125.
[532] Counter-Memorial, ¶ 135 referring to February 2005 DAC (**Exhibit R-5**), p. 5 and quoting from Email from Guy Rolli to Jorgen Pedersen, 16 February 2005 (**Exhibit C-059**); Rejoinder, ¶ 127.
[533] Rejoinder, ¶¶ 128-133; Respondent's Post-Hearing Brief, ¶ 127.

Pedersen's oral testimony because he could not point to any specific documents or communications in which the alleged guarantees or commitments were made. In particular, Respondent notes that Mr. Pedersen could not identify a specific meeting in which the wording "*under the auspices of* […] *MIBAM*" was discussed and given the meaning that Claimant now alleges.[534]

529. Consequently, Respondent maintains that the Government "*did nothing more than to facilitate the discussions with CVG Bauxilum*" and made no commitments regarding the supply or price of bauxite to Norpro Venezuela. Therefore and apart from the fact that it considers the price increase justified under the Bauxite Contract, Respondent is of the view that it had no obligation to intervene and assist in the resolution of the dispute between CVG Bauxilum and Norpro Venezuela.[535]

### cc) The Tribunal's Analysis

530. In the Tribunal's view, Claimant's argument on the bauxite price increase is twofold: First, Claimant argues that at the time it made the decision to invest in Venezuela in 2005, Respondent (through its own State officials, in particular from MIBAM) created a legitimate expectation that CVG Bauxilum would supply Norpro Venezuela with bauxite at stable prices in the long term, but then failed to intervene when CVG Bauxilum unilaterally increased the price in 2008 and thus breached those expectations. Second, Claimant argues that CVG Bauxilum's conduct in breach of the Bauxite Contract can be attributed to Respondent in accordance with the ILC Draft Articles and, in light of its State-granted monopoly over the supply of bauxite in Venezuela, amounts to a violation of Respondent's international obligations.

531. As to the first argument, the Tribunal notes that there is common ground between the Parties that, while Respondent generally supported Claimant's investment in 2005 and 2006, this alone cannot give rise to Respondent's liability under international law. Rather, a legitimate expectation can be created only by specific promises or commitments made by the State. The dispute between the Parties relates to whether Respondent has made such specific promises in relation to the supply of bauxite at stable prices.

532. In the Tribunal's view, the evidence presented by Claimant in this regard does not establish that the State (through MIBAM) made any specific commitments in relation to the terms of the Bauxite Contract and in particular the prices at which CVG Bauxilum would supply the bauxite. In his written witness statement, Mr. Pedersen described that MIBAM

---

[534] Respondent's Post-Hearing Brief, ¶¶ 128-132 referring to Transcript (Day 2), pp. 500-510 and pp. 576-579. See also Respondent's Post-Hearing Reply Brief, ¶ 28.
[535] Respondent's Post-Hearing Brief, ¶¶ 129 and 134.

was very involved in the negotiations with CVG Bauxilum and repeatedly voiced its sup-
port for the project.[536] Mr. Pedersen did not, however, make reference to any specific
commitment made by MIBAM in relation to the bauxite price. When he was asked about
this during the Hearing, Mr. Pedersen clarified:

> "*I don't think, frankly, it was—if you look at it from that way, was the
> bauxite price negotiated with MIBAM. No, it was not, but the support
> to get a contract with Bauxilum was discussed and agreed with MIBAM.
> And then later on there are, of course, commercial negotiations be-
> tween us and Bauxilum.*"[537]

533. Mr. Pedersen's oral testimony confirms the Tribunal's impression from the record that
MIBAM indeed facilitated and supervised the negotiations with CVG Bauxilum and even
approved the general terms that would govern the supply of bauxite. However, Respond-
ent correctly pointed out that none of the statements made can be qualified as a commit-
ment that the State would guarantee CVG Bauxilum's compliance with the pricing terms
of the Bauxite Contract.

534. Claimant further argues that the term "*bajo el auspicio del […] MIBAM*"[538] can be
equated to an "*express assurance*" that CVG Bauxilum would supply Norpro Venezuela
with bauxite at the agreed terms.[539] When asked about this term at the Hearing, Mr. Peder-
sen testified that it was discussed in the meetings with MIBAM that "*they were basically
standing behind this contract and standing behind Bauxilum in agreeing this with us.*"
Mr. Pedersen could not, however, identify a concrete meeting at which, or a concrete
person by whom, such statement was made.[540] The Tribunal is therefore not convinced
that the term was subject to any discussion before the Bauxite Contract was signed and,
more importantly, there is no indication that it was to be assigned such a far-reaching
meaning as to ensure compliance with the Bauxite Contract and/or to guarantee stable
prices in the long term.

535. In sum, the Tribunal finds that Claimant has not established that there were any promises
or commitments made by Respondent (through MIBAM) specifically in relation to the
supply of bauxite at the price agreed with CVG Bauxilum under the Bauxite Contract.
Consequently, MIBAM's conduct did not give rise to a legitimate expectation of Claimant
that it would guarantee CVG Bauxilum's compliance with the Bauxite Contract.

---

[536] Pedersen, ¶¶ 21-33.
[537] Transcript (Day 2), p. 504 lines 11-17.
[538] Purchase and Sale Agreement between CVG Bauxilum, C.A. and Proppants Venezuela, C.A., 27 January 2006
(**Exhibit C-6**), Preamble.
[539] Claimant's Post-Hearing Submission, ¶ 79.
[540] Transcript (Day 2), p. 577 line 5 – p. 579 line 1.

536. As to Claimant's second argument, the Tribunal does not have to decide whether CVG Bauxilum's conduct is attributable to Respondent under the ILC Draft Articles and whether a breach of contract could give rise to Respondent's liability under international law in light of CVG Bauxilum's State-granted monopoly over the supply of bauxite in Venezuela. Even if this were the case, Claimant has not established that the price increase in September 2008 amounted to a breach of contract.

537. CVG Bauxilum based the increase on Article 10.2 of the Bauxite Contract, which provides:

> "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será aplicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior.*"[541]

538. During the first meeting in which the price increase was discussed, CVG Bauxilum invoked the following reasons: (i) increase in the Orinoco River toll by 600%; (ii) impact of the extraction and production cost that were higher than the selling price; (iii) increase of the freight costs due to increased labor costs; (iv) international market analysis according to which CVG Bauxilum's price was lower than in the international market.[542]

539. While the Tribunal agrees with Claimant that not all of those reasons justified a price increase under the terms of the Bauxite Contract, the letter of 2 September 2008 by which CVG Bauxilum informed Claimant about the price increase to USD 33.8 per MT relies on "*las nuevas tarifas del canal de Navegación del Río Orinoco*" and "*la apreciable variación que ha experimentado el costo de extracción, transporte y descarga de la bauxita en nuestra Planta de Matanzas*."[543] These reasons are explicitly provided for in Article 10.2 of the Bauxite Contract and would therefore, if proven, justify an increase of the bauxite price.

540. Claimant does not dispute that the tariffs on the Orinoco River were indeed raised by 600% by decree of 31 July 2008.[544] Neither does it dispute that the extraction, transportation and unloading fees at the Matanza plant had increased. Claimant rather argues, as

---

[541] Purchase and Sale Agreement between CVG Bauxilum, C.A. and Proppants Venezuela, C.A., 27 January 2006 (**Exhibit C-6**), Article 10.2.
[542] Email from Oscar Cid to Jorgen Pedersen, 30 July 2008 (**Exhibit C-093**).
[543] Letter from Carlos Acosta Pérez to Oscar Cid, 2 September 2008 (**Exhibit C-11**).
[544] Decreto No. 6.220 con Rango, Valor y Fuerza de Ley de Canalización y Mantenimiento de la Vías dee Navegación), published in the Official Gazette No. 5.891 (Extraordinary), 31 July 2008 (**Exhibit R-50**).

repeatedly confirmed by Mr. Pedersen during the Hearing,[545] that it was never provided with documentation or a calculation for the price increase. While it claims that it repeatedly requested to receive such information, Claimant has not identified any occasion on which it ever voiced such a specific request but only refers to requests for "*further discussion of the proposed price increase*," its emphasis on the applicability of Article 10.2 to any price increase and its protests against the increase which they considered to be outside the terms of the Bauxite Contract.[546] When Mr. Pedersen was asked during the Hearing whether Claimant had ever requested to receive such documentation, he stated:

> "*Yes. I don't know if it was in here, but I mean, yeah, I mean in the meetings with them, we certainly asked for to let us know.*
>
> *Arbitrator Brower: So, did that company refuse to provide such information, or it just did not provide it, and you moved on?*
>
> *The Witness: Yeah, I mean, we never got something, I mean, which was unfortunate. Every now and then it's difficult to get information. This is also back to why it took 15 months to actually sign the Contract* […]."[547]

541. In light of this rather vague testimony, the Tribunal is not convinced that Claimant ever expressly voiced the request to be provided with documentation for the reasons invoked by CVG Bauxilum. From the record, in particular Claimant's letter of 17 September 2008, it rather appears that Norpro Venezuela made the decision to accept the price increase, albeit under protest, under the condition that it would remain at that level throughout the following year, *i.e.*, until 31 December 2009.[548] It is undisputed between the Parties, and confirmed by CVG Bauxilum's invoices to Claimant in 2009,[549] that CVG Bauxilum adhered to this request and did not request a further price increase until early 2010. While Claimant emphasized in its letter that this should not be considered a tacit acceptance of the price increase, the Tribunal notes that Norpro Venezuela never took action against CVG Bauxilum in this regard under the dispute resolution clause provided for in the Bauxite Contract.

542. In light of the above, the Tribunal finds that Claimant has not established that the price increase of September 2008 was not justified under Article 10.2 of the Bauxite Contract. In the absence of a breach of contract on the part of CVG Bauxilum, in the circumstances

---

[545] Transcript (Day 2), p. 526 line 14 – p. 527 line 1; p. 530 lines 14-19; p. 532 line 21 – p. 533 line 12; p. 585 lines 13-18; p. 587 lines 15-18.
[546] Cf. Claimant's Post-Hearing Submission, ¶ 84.
[547] Transcript (Day 2), p. 596 lines 2-15.
[548] Letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit C-12**).
[549] CVG Bauxilum Invoices, Doc. R Bates numbers 0041 – 0046 (**Exhibit CLEX-83**).

of this case it can therefore be left open whether Respondent could be held liable for such breach under international law.

### 3. Full Protection and Security (Article 3(2) of the Treaty)

543. Finally, the Tribunal will address Claimant's claim based on the full protection and security provision contained in Article 3(2) of the Treaty. Following a brief analysis of the applicable FPS standard ((**a**)), the Tribunal will turn to Claimant's FPS claims as regards the Bauxite Contract ((**b**)) and the takeover of the plant ((**c**)).

### a) Applicable FPS Standard

#### aa) Summary of Claimant's Position

544. Claimant submits that the FPS standard imposes an obligation of "*due diligence*" and "*vigilance*" on the host State, which requires "*reasonable measures of prevention" that a "well-administered government could be expected to exercise in similar circumstances.*"[550]

545. Claimant submits that, in the "*modern commercial and business context*," investment treaty tribunals have not confined the FPS standard to physical security, but rather extended it to encompass legal security.[551] Claimant argues that the FPS standard has evolved to include "*more generally, the rights of investors*" and applies "*at least in situations* 'involving either physical violence or the discard of legal rights.'"[552]

546. Even if Article 3(2) were to be limited to physical security, Claimant submits that it would still benefit from the "*full legal protection*" that Respondent granted to third-party nationals in the Uruguay-Venezuela BIT on the basis of the most-favored nation clause contained in Article 4 of the Treaty.[553]

#### bb) Summary of Respondent's Position

547. It is Respondent's position that an analysis of a breach of the FPS standard requires consideration of whether the investment has been physically interfered with or harmed and whether the State complied with its due diligence obligation.[554] According to Respondent, this limitation is required in order "*to maintain a meaningful distinction*" between the

---

[550] Memorial, ¶ 185 quoting from *AAPL v. Sri Lanka* (**CLA-005**), ¶ 77.
[551] Reply, ¶ 133 citing various legal authorities.
[552] Reply, ¶ 134 quoting from *Vannessa Ventures v. Venezuela.* **Exhibit CLA-150**, ¶ 223.
[553] Memorial, note 379 referring to the Agreement between the Oriental Republic of Uruguay and the Government of the Republic of Venezuela for zhe Promotion and Protection of Investments (20 May 1997, in force on 18 January 2002) (**Exhibit C-050**), Article 4; Reply, ¶ 135.
[554] Counter-Memorial, ¶ 149.

FPS standard and other protection standards set out in the Treaty, in particular the FET standard.[555]

548. While acknowledging that it has a duty of diligence under the FPS standard, Respondent claims that a breach of this duty requires "*a degree of negligence, defective administration or bad faith*" that reflects the relationship between the FPS standard and the international minimum standard of treatment.[556]

549. Respondent rejects Claimant's argument that the FPS standard entails the concept of "*legal security*" and claims that international case law is rather in favor of the view that the FPS obligation "*relates primarily, and perhaps exclusively, to the physical integrity of the investment.*"[557] Respondent emphasizes that unlike other treaties, which expressly refer to "*full protection and legal security,*" the present Treaty does not make reference to legal security and is therefore not designed to turn contract breaches into treaty claims.[558]

### cc)   The Tribunal's Analysis

550. Article 3(2) of the Treaty provides:

> "*Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières.*"[559]

> "*Las inversiones efectuadas por nacionales o sociedades de una o otra de las Partes Contratantes gozarán, en el territorio y en la zona marítima de la otra Parte contratante, de una protección y de una seguridad plenas y completas.*"[560]

552. The English translation submitted by Claimant reads:

> "*Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security.*"[561]

---

[555] Rejoinder, ¶ 144 referring to various legal authorities.
[556] Rejoinder, ¶ 145.
[557] Counter-Memorial, ¶¶ 146-148 referring to various legal authorities; Rejoinder, ¶ 143.
[558] Counter-Memorial, ¶¶ 152, 156.
[559] Journal Officiel de la République Française n°102 du 30 avril 2004, **Exhibit C-1**, p. 7775.
[560] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Exhibit C-1**, pp. 332-353-332.354.
[561] Free translation submitted as **Exhibit C-1**.

553. The Tribunal notes that while there is common ground between the Parties that Article 3(2) of the Treaty imposes a duty of due diligence on Respondent, there is a dispute as to (i) the exact scope of such duty; and (ii) whether the FPS standard extends to legal security. These issues can be left open if Claimant's two claims based on the FPS standard in Article 3(2) are to be dismissed in any event, *i.e.*, even under the broader standard advanced by Claimant. Therefore, the Tribunal will make a decision on the exact scope of Article 3(2) only if and to the extent necessary to make a finding on Claimant's claims.

### b)   Claimant's Rights under the Bauxite Contract

### aa)   Summary of Claimant's Position

554. Claimant submits that in light of MIBAM's involvement in the negotiations and conclusion of the Bauxite Contract, it considered MIBAM as a "*key interlocutor capable of addressing any concerns they might have with the Government.*" For that reason, Claimant contends, Norpro Venezuela first wrote to MIBAM and copied MIBAM on its correspondence to CVG Bauxilum when it was faced with the price increase in 2008. However, Claimant notes that MIBAM ignored Claimant's requests to intervene and Respondent thus failed to protect Claimant's investment from CVG Bauxilum's actions in spite of its FPS obligation.[562]

555. According to Claimant, the tribunal in *Nykomb v. Latvia* found "*in similar circumstances*" that Latvia's failure to protect the foreign investor against contractual breaches of a State-owned entity, despite being fully aware of them, constituted a breach of the FPS obligation.[563] Claimant further refers to the tribunal's emphasis in *CME v. Czech Republic* on the obligation to "*ensure that neither by amendment of its laws nor by actions of its administrative bodies is the agreed and approved security and protection of the foreign investor's investment withdrawn or devalued.*"[564]

556. Claimant therefore argues that Respondent's failure to act upon notification of CVG Bauxilum's breaches of the Bauxite Contract constitutes a violation of its obligation to accord Claimant's investment legal security under Article 3(2) of the Treaty.[565]

### bb)   Summary of Respondent's Position

557. Respondent submits that Claimant's allegation pursuant to which the price increase was not in accordance with the Bauxite Contract, despite the fact that it was accepted by

---

[562] Memorial, ¶¶ 190-192; Reply, ¶ 138.
[563] Memorial, ¶ 193 referring to *Nykomb v. Latvia* (**CLA-058**), Section 4.2.
[564] Memorial, ¶ 188 referring to *CME v. Czech Republic*, (**CLA-019**), ¶ 613.
[565] Reply, ¶ 142.

Norpro Venezuela, "*does not even come close to triggering a State's duty of due diligence.*"[566]

558. Respondent maintains that it is not responsible for CVG Bauxilum's decision to increase the price under the Bauxite Contract. In response to Claimant's argument that it wrote to MIBAM to seek its intervention, Respondent argues that Claimant thereby attempts to create an obligation of the State by "*communicating its discontent with the behavior of a commercial partner to a government representative,*" which Respondent considers clearly untenable. In Respondent's view, Claimant's position would render the dispute resolution clause in the Bauxite Contract pointless and in any event the dispute was resolved amicably by the parties to the Contract when CVG Bauxilum explained the reasons for the price increase and Norpro Venezuela accepted the increase on the condition that the price would remain at the same level until the end of 2009.[567]

### cc) The Tribunal's Analysis

559. The Tribunal has already determined above in the context of Claimant's FET claim that Claimant has not established that Respondent (through MIBAM) made any specific commitments in relation to the supply of bauxite at the price agreed with CVG Bauxilum under the Bauxite Contract. The Tribunal has also found that CVG Bauxilum's conduct in relation to the price increase in September 2008 did not amount to a breach of contract.

560. Therefore, the Tribunal does not have to decide whether the FPS standard contained in Article 3(2) of the Treaty extends to the concept of "*legal security,*" as alleged by Claimant. In any event, Respondent did not have an obligation to intervene in relation to the bauxite price increase and thus has not breached its obligation to accord Claimant's investment full protection and security in the manner invoked by Claimant.

### c) Takeover of the Plant

#### aa) Summary of Claimant's Position

561. In the alternative that the Tribunal should follow Respondent's position that the expropriation occurred only on 29 March 2011 when the Expropriation Decree was issued, Claimant further claims that Respondent has breached its FPS obligation because PDVSA took over and remained in control of the plant between the takeover on 15 May 2010 and the issuance of the Expropriation Decree.[568]

---

[566] Counter-Memorial, ¶ 150.
[567] Rejoinder, ¶¶ 140-142 and ¶ 150. *See* also Respondent's Post-Hearing Brief, ¶¶ 124-126.
[568] Claimant's Post-Hearing Submission, ¶ 48; Claimant's Second Post-Hearing Submission, note 3.

562. Claimant argues that if there was no expropriation on 15 May 2010, PDVSA had no right to occupy the plant on any date prior to 29 March 2011 and thus should have contacted Claimant "[t]*he minute it obtained control*" and should have allowed it to reoccupy the plant. Instead, Claimant contends that its personnel was barred by the National Guard from re-entering the plant and PDVSA started production for its own benefit. According to Claimant, this conduct amounts to a clear breach of Respondent's FPS obligation under Article 3(2) of the Treaty.[569]

### bb)  Summary of Respondent's Position

563. Respondent maintains that the expropriation occurred when the Expropriation Decree was issued on 29 March 2011. Respondent acknowledges that PDVSA was present during the time period prior to that date but argues that this was "*both appropriate and necessary given the dangers associated with the Plant.*" Respondent further submits that there was no contemporaneous evidence of any complaints about PDVSA's role and claims that not only did Claimant never ask for the return of the plant but it even encouraged PDVSA's presence at the plant and the appointment of an interlocutor, precisely because it was not present and the plant was "*a dangerous facility in the hand of unsupervised workers.*"[570]

564. Therefore, Respondent is of the view that it complied with its FPS obligation and adds that, by contrast, if it had not established a presence at the plant and the equipment had been damaged or workers had been issued, Claimant may well have had a claim for non-compliance with Respondent's FPS obligation.[571]

### cc)  The Tribunal's Analysis

565. The Tribunal notes that Claimant has raised this claim in the alternative that the Tribunal should find that the expropriation did not occur on or shortly after 15 May 2010, but only on 29 March 2011 when the Expropriation Decree was issued. Given the Tribunal's finding at paragraph 477 above that PDVSA's presence at the plant and its memos in early June 2010 mark the start of the expropriation process, there is thus no need to decide on this alternative claim.

## IV.  THE PRINCIPLES OF QUANTUM

566. The Tribunal will now turn to the principles of quantum applicable as a result of the expropriation and Respondent's non-compliance with Article 5(1) subparagraphs 2 and 3 of the Treaty. The Parties' positions differ significantly as to the applicable compensation

---

[569] Claimant's Post-Hearing Submission, ¶ 49.
[570] Respondent's Post-Hearing Brief, ¶ 20; Respondent's Post-Hearing Reply Brief, note 42.
[571] Respondent's Post-Hearing Reply Brief, note 42.

standard, in particular with respect to the appropriate valuation date (**1.**), and the criteria for the calculation of damages (**2.**).

## 1.    Compensation Standard and Valuation Date

567.    One of the key legal questions in dispute between the Parties is the applicable compensation standard and, in this context, particularly the applicable valuation date. As noted above, the Tribunal finds that Respondent did not comply with the compensation requirements set out in Article 5(1) subparagraphs 2 and 3 of the Treaty. Whether this finding renders the expropriation unlawful and whether this would have any impact on the compensation standard to be applied in the present case is therefore going to be addressed first in this section.

### a)    Summary of Claimant's Position

### aa)    Unlawfulness of the Expropriation

568.    Claimant submits that Respondent's failure to meet the specification and/or promptness requirements renders the expropriation unlawful.[572]

569.    Claimant contends that several awards rendered by the Iran-United States Claims Tribunal "*recognize the payment of prompt compensation to be a consideration relevant to the lawfulness of a taking under customary international law.*"[573]

570.    In the investment treaty context, Claimant submits that the tribunal in *Unglaube v. Costa Rica* found an expropriation to be unlawful when compensation was not paid "*within a reasonable period of time after the State declare*[s] *its intention to expropriate.*"[574]

571.    Similarly, the tribunal in *Burlington v. Ecuador* confirmed that, in a case where a State has expropriated a foreign investor's property and "*has neither paid nor offered compensation* […] *the Tribunal cannot but conclude that* [the] *expropriation was unlawful.*"[575]

572.    Claimant further refers to the tribunal in *ConocoPhillips v. Venezuela*, which recently found that while "*payment is not required at the precise moment of expropriation* […] [p]*arties must engage in good faith negotiations to fix the compensation in terms of the standard set* […] *if a payment satisfactory to the investor is not proposed at the outset.*" In that case, the tribunal found that "*the Respondent breached its obligation to negotiate*

---

[572] Memorial, ¶ 141; Reply, ¶¶ 77-83.
[573] Memorial, ¶ 141; **Exhibit CLA-014**.
[574] Memorial, ¶ 141; **Exhibit CLA-051**.
[575] Memorial, ¶ 141; **Exhibit CLA-015**.

*in good faith for compensation for its taking"* and thus, that the expropriation was unlawful.[576]

573. Moreover, Claimant submits that in *Siemens v. Argentina*, the arbitral tribunal stated:

> "[C]*ompensation has never been paid on grounds that […] the Tribunal finds that are lacking in justification. For these reasons, the expropriation did not meet the requirements of Article 4(2)* [of the Argentina-Germany BIT] *and therefore was unlawful.*"[577]

574. Similarly, in *Vivendi v. Argentina II*, the tribunal reasoned:

> "*If we conclude that the challenged measures are expropriatory, there will be violation of Article 5(2) of the Treaty, even if the measures might be for a public purpose and non-discriminatory, <u>because no compensation has been paid.</u>*"[578]

575. Finally, Claimant contends that, in *Gemplus v. Mexico*, the tribunal concluded:

> "[T]*hese expropriations were unlawful under the BITs and international law, given the facts found by the Tribunal and <u>the further fact that the Respondent did not meet the condition required by Article 5 of both treaties regarding the payment of adequate compensation.</u>*"[579]

**bb)   Compensation Standard to Be Applied**

576. It is Claimant's submission that the appropriate remedy for an unlawful expropriation is the customary international law standard of restitution, *i.e.*, the higher compensation as between that valued at the date of expropriation and the date of the award.[580]

577. In support of its approach, Claimant emphasizes that Article 5(1) of the Treaty provides for the appropriate standard of compensation only in case all of the conditions for a lawful expropriation are met. As this is not the case here, the appropriate standard of compensation, including the appropriate date at which the value is to be assessed, is set by customary international law.[581]

578. Claimant initially argued that Respondent must either return the plant to Claimant – which is impossible here – or pay the cash equivalent of such a return, both of which would therefore have to occur as of the date of the award.[582] During the Hearing and in its Post-Hearing Submission, Claimant emphasized, however, that, in case the Tribunal were to

---

[576] Memorial, ¶ 141; **Exhibit CLA-025**.
[577] Reply, ¶ 78; **Exhibit CLA-077**.
[578] Reply, ¶ 78; **Exhibit CLA-024**. Emphasis added by Claimant.
[579] Reply, ¶ 78; **Exhibit CLA-125**. Emphasis added by Claimant.
[580] Claimant's Post-Hearing Submission, ¶ 73.
[581] Memorial, ¶ 197; Reply, ¶ 152.
[582] Memorial, ¶¶ 199, 208; Reply, ¶ 152.

find that the value as of the date of the expropriation is higher than the value as of the date of the award, the Tribunal should determine the compensation based on the value as of the date of expropriation.[583]

579.  According to Claimant's Valuation Update, Norpro Venezuela's value as of 31 August 2015 (the assessment date for the date-of-the-award valuation that the Tribunal is ulti- mately to take into account for its decision) is lower than the value as of 15 May 2010.[584] Therefore, Claimant now claims that it is entitled to compensation in the amount of Norpro Venezuela's value as of 15 May 2010.[585]

580.  According to Claimant, the *rationale* behind the investor's right of selecting the valuation date is the aim to award full compensation to the investor who was deprived of making the choice whether to retain the investment and enjoy the fruits derived therefrom or whether to sell it at the optimal moment. As a result, the investor "*must be accorded the upside since that time, but cannot be forced to shoulder the downside*."[586]

581.  Claimant submits that this argumentation is consistent with the approach taken by the Permanent Court of International Justice in the landmark *Chorzów Factory* decision.[587] In support of its argumentation, Claimant particularly refers, in its written submissions,[588] to the cases *Biwater v. Tanzania,*[589] *Siemens v. Argentina,*[590] *ADC v. Hungary,*[591] *Kar- dassopoulos v. Georgia,*[592] *Unglaube v. Costa Rica,*[593] *ConocoPhillips v. Venezuela,*[594] *Texaco v. Libya,*[595] *CMS v. Argentina,*[596] *Vivendi v. Argentina II,*[597] *Siag v. Egypt,*[598] *Sai- pem v. Bangladesh,*[599] *Funnekotter v. Zimbabwe*[600] and *Yukos v. Russia.*[601]

  **b)   Summary of Respondent's Position**

---

[583] Transcript (Day 1), p. 30 line 22 – p. 31 line 14; Claimant's Post-Hearing Submission, ¶ 77.
[584] Claimant's Valuation Update, Table 1.
[585] Claimant's letter dated 6 November 2015.
[586] Claimant's Post-Hearing Submission, ¶¶ 75-76.
[587] Memorial, ¶ 209; Claimant's Post-Hearing Submission, ¶ 73. **Exhibit CLA-033**.
[588] Memorial, ¶¶ 210-212 (with notes 408, 409); Reply, ¶ 146 (note 302); Claimant's Post-Hearing Submission, ¶¶ 74-75.
[589] **Exhibit CLA-013**.
[590] **Exhibit CLA-077**.
[591] **Exhibit CLA-001**.
[592] **Exhibit CLA-046**.
[593] **Exhibit CLA-051**.
[594] **Exhibit CLA-025**.
[595] **Exhibit CLA-083**.
[596] **Exhibit CLA-021**.
[597] **Exhibit CLA-024**.
[598] **Exhibit CLA-144**.
[599] **Exhibit CLA-070**.
[600] **Exhibit CLA-036**.
[601] **Exhibit CLA-153**.

### aa) Lawfulness of the Expropriation

582. Respondent submits that the mere fact that compensation is yet to be paid does not render the expropriation unlawful, taking into account that Respondent acknowledged its obligation to pay compensation and commenced the expropriation procedure in consistency with its domestic law.[602]

583. Respondent points out that, in his separate opinion in *Sedco v. Iran*, Judge Brower noted:

> "*Likewise I must express doubt as to whether, under customary international law, a State's mere failure, in the end, actually to have compensated in accordance with the international law standard set forth herein necessarily renders the underlying taking ipso facto wrongful. If, for example, contemporaneously with the taking the expropriating State provides a means for the determination of compensation which on its face appears calculated to result in the required compensation, but which ultimately does not, or if compensation is immediately paid which, though later found by a tribunal to fall short of the standard, was not on its face unreasonable, it would appear appropriate not to find that the taking itself was unlawful but rather only to conclude that the independent obligation to compensate has not been satisfied.*"[603]

584. Moreover, in *Mondev v. USA*, the tribunal found:

> "[F]or a taking to be lawful under Article 1110 [NAFTA], at least the obligation to compensate must be recognised by the taking State at the time of the taking, or a procedure must exist at that time which the claimant may effectively and promptly invoke in order to ensure compensation."[604]

585. Further, Respondent contends that in *CDSE v. Costa Rica*, the fact that Costa Rica had expropriated the property and had not paid compensation for 20 years did not render the expropriation unlawful.[605] In *Amoco*, the tribunal held that there was no unlawful expropriation even though there was no payment of compensation at the time of the taking.[606]

586. Respondent also submits that, in *American International Group v. Iran*, the tribunal held that the nationalization of shares in an Iranian insurance company was lawful where Iran

---

[602] Counter-Memorial, ¶¶ 161-173; Rejoinder, ¶¶ 159-168.

[603] Counter-Memorial, ¶ 162; **Exhibit RL-099**. Judge Brower further noted: "*If, on the other hand, no provision for compensation is made contemporaneously with the taking, or one is made which clearly cannot produce the required compensation, or unreasonably insufficient compensation is paid at the time of taking, it would seem appropriate to deem the taking itself wrongful. It is in such cases that restitutio in integrum may be appropriate as a remedy that, in addition to that, or to a monetary award of damages, should that alternative be selected, a tribunal might consider an award of punitive damages.*"

[604] Counter-Memorial, ¶ 162; **Exhibit RL-100**.

[605] Counter-Memorial, ¶ 162; **Exhibit RL-102**.

[606] Counter-Memorial, ¶ 162; **Exhibit CLA-004**.

had recognized the obligation to compensate, even though no compensation had been paid.[607]

587. In *Southern Pacific Properties v. Egypt*, the tribunal did not consider the expropriation of the claimant unlawful, although no compensation had been paid for 13 years.[608]

588. Moreover, Respondent contends that in *LIAMCO v. Libya*, the tribunal held that even though no compensation had been paid, the nationalization of the claimant's concession interests was lawful because Libya had recognized its obligation to compensate.[609]

589. Similarly, in *Aminoil v. Kuwait*, the tribunal held that the nationalization of Aminoil's concession was lawful despite the fact that compensation had not been paid.[610]

590. Finally, Respondent observes that, analyzing Article 5(2) of the France-Poland Treaty, which is in material respects similar to Article 5(1) of the France-Venezuela Treaty, the tribunal in *Servier v. Poland* specifically found that the question whether the expropriation was legal or not did not turn on whether compensation had been paid.[611]

### bb)    Compensation Standard to Be Applied

591. Respondent submits that, regardless of whether the expropriation was lawful or unlawful, the proper valuation date is prior to the *"threat of expropriation*," as set out in Article 5(1) subparagraph 2 of the Treaty.[612] During the Hearing, Respondent emphasized that, while it maintains its position that the expropriation occurred only on 29 March 2011, it nevertheless considers 15 May 2010 to be the correct valuation date because the expropriation was announced by President Chávez on that date.[613]

592. Respondent refers to the, in its view, clear and unambiguous wording of Article 5(1) subparagraph 2 of the Treaty, according to which the value of the expropriated asset is to "*be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*"[614] It is Respondent's submission that the reference to "[t]*outes les mesures d'expropriation qui pourraient être prises*", "[t]*odas las medidas de expropiación que pudieran tomarse*" ("[a]*ll measures of expropriation which could be*

---

[607] Counter-Memorial, ¶ 162; **Exhibit RL-104**.
[608] Counter-Memorial, ¶ 162; **Exhibit CLA-80**.
[609] Counter-Memorial, ¶ 162; **Exhibit RL-105**.
[610] Counter-Memorial, ¶ 162; **Exhibit RL-106**.
[611] Rejoinder, ¶ 159; **Exhibit RL-165**.
[612] Respondent's Post-Hearing Brief, ¶¶ 96, 100.
[613] Transcript (Day 1), p. 239 line 17 – p. 241 line 8, p. 243 lines 1-4.
[614] Counter-Memorial, ¶ 174; Rejoinder, ¶ 190.

taken") comprises both lawful and unlawful expropriations and is, in particular, not limited to expropriations in compliance with the requirements set out in Article 5(1) subparagraph 1 of the Treaty.

593. Respondent argues that any delay in payment of compensation can be fully compensated by an award of interest and claims that an evaluation of the asset as of the date of the award would impose a pecuniary penalty on Respondent.[615] In particular, Respondent contends that Claimant has not established that it suffered any damage that could not be compensated in full by an amount determined as of 15 May 2010.[616]

594. Moreover, it is Respondent's position that, in case of a mere failure of the State to promptly specify and pay compensation, even the compensation standard under customary international law does not allow for calculating damages by way of "*constructing a 'but-for' world in which the possibility of expropriation is excluded until the date of the award,*" as Claimant contends. Respondent refers to the "*fundamental distinction*" between a situation in which the expropriation is prohibited no matter how it is carried out and the situation in which the expropriation as such is permitted but the manner in which it is carried out fails to comply with the conditions set out in the treaty.[617] According to Respondent, this position is in line with the PCIJ's *Chorzów Factory* decision, which also distinguishes between those two situations.[618]

595. In support of its argumentation, Respondent refers in its written submissions,[619] in particular, to the cases *Middle East Cement v. Egypt,*[620] *Tecmed v. Mexico,*[621] *Wena Hotels v. Egypt,*[622] *CME v. Czech Republic,*[623] *Metalclad v. Mexico,*[624] *Phillips v. Iran,*[625] *LIAMCO v. Lybia,*[626] *Servier v. Poland,*[627] *Merrill & Ring v. Canada,*[628] *Funnekotter v. Zimbabwe,*[629] *Norwegian Shipowners v. USA*[630] and *Gemplus v. Mexico.*[631]

---

[615] Rejoinder, ¶ 190; Counter-Memorial, ¶¶ 175 and 180.
[616] Respondent's Post-Hearing Brief, ¶ 112.
[617] Respondent's Post-Hearing Brief, ¶ 109.
[618] Counter-Memorial, ¶¶ 177-179; Rejoinder, ¶ 193; Respondent's Post-Hearing Brief, ¶ 110. **Exhibit CLA-033**.
[619] Counter-Memorial, ¶ 176 (note 467); Rejoinder, ¶¶ 189-191, 195; Respondent's Post-Hearing Brief, ¶¶ 101-102, 106-107, 110.
[620] **Exhibit CLA-053**.
[621] **Exhibit CLA-082**.
[622] **Exhibit CLA-089**.
[623] **Exhibit CLA-020**.
[624] **Exhibit CLA-052**.
[625] **Exhibit CLA-065**.
[626] **Exhibit RL-105**.
[627] **Exhibit RL-165**.
[628] **Exhibit RL-184**.
[629] **Exhibit RL-036**.
[630] **Exhibit CLA-057**.
[631] Rejoinder, ¶ 196; **Exhibit CLA-125**.

### c) The Tribunal's Analysis

596. In determining the applicable compensation standard and the relevant valuation date, the Tribunal will first consider whether the expropriation was unlawful and whether this has any impact on the compensation standard to be applied in the present case (**aa**)). Subsequently, the Tribunal will assess the applicable compensation standard and in particular the applicable valuation date (**bb**)).

### aa) Relevance of a Finding of Unlawfulness

597. The Tribunal notes that the existing case law referred to by the Parties in relation to the question whether or not a breach of the requirement to specify and/or promptly pay compensation renders the expropriation unlawful, appears to be inconsistent. This indicates that the individual circumstances of each case as well as the individual BIT standard played a decisive role for the respective tribunal's finding.

598. In the present case, it could be argued, on the one hand, that Respondent's failure to carry out the expropriation in accordance with the compensation requirements set out in Article 5(1) subparagraphs 2 and 3 of the Treaty renders the expropriation unlawful, *i.e.*, in violation of Respondent's obligations under the Treaty. If the Tribunal were to follow this argument, the label of "*unlawfulness*" would not entail any indication that Respondent was precluded from expropriating Norpro Venezuela *per se*; it would simply serve as a synonym for an expropriation that was carried out in breach of a provision that the Contracting Parties agreed on in relation to the manner in which the expropriation was supposed to be carried out.

599. On the other hand, it must be noted that Article 5(1) subparagraph 1 of the Treaty explicitly stipulates certain conditions under which an expropriation is permitted, *i.e.*, the existence of a public purpose as well as the absence of discriminatory treatment and of a conflict with a particular agreement. This subparagraph does not, however, make any reference to compensation, which is rather addressed in two separate subparagraphs. As a result, it could be argued that there should be a difference between the conditions set out in subparagraph 1, in the absence of which Respondent would have been precluded from expropriating Norpro Venezuela *per se*, and the requirements set out in subparagraphs 2 and 3, which relate to the manner in which the expropriation has to be carried out.

600. At this point, the Tribunal wishes to emphasize that the distinction between a lawful and an unlawful expropriation should not be an end in itself, but the question whether an expropriation is labelled "*unlawful*" should rather be considered in light of the consequences resulting from such a finding.

601. As noted above, the dispute between the Parties as to these consequences is focused on the question of which compensation standard has to be applied: While a lawful expropriation undisputedly results in an obligation to pay compensation, which is calculated pursuant to the standard set out in Article 5(1) of the Treaty, the Parties are in dispute as to whether the same compensation standard also applies in case the Tribunal finds that the expropriation was unlawful.

602. Considering the foregoing, the Tribunal is of the view that it is not appropriate to make a finding on whether the label "*unlawfulness*" should be attributed to the expropriation of Norpro Venezuela, without at the same time taking into account the consequences that such a finding would have for the compensation standard to be applied. Moreover, this question can be left open if, due to the recent developments on the proppants market, both compensation standards advanced by the Parties would result in the same amount of compensation to be paid to Claimant.

603. Therefore, the Tribunal will now turn to the question whether the compensation standard set out therein also applies in case of a breach of the compensation requirements set out in its subparagraphs 2 and 3.

### bb)   Analysis of Article 5(1) of the Treaty

604. Article 5(1) of the Treaty provides in its original French and Spanish versions:

> "*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*
>
> *Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont*

> "*Las Partes Contratantes no adoptarán medidas de expropriación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*
>
> *Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, deber se tasado con*

*le montant, égal à leur valeur ré-elle des investissements concernés, doit être évalué par rapport à la si-tuation économique normale pré-valant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropria-tion. Cette indemnité est effective-ment réalisable, versée sans retard et librement transférable. Elle pro-duit, jusqu'à la date de versement, des intérêts calculés au taux d'inté-rêt de marché approprié."[632]*

*relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expro-piación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calcula-dos a la adecuada tasa de interés del mercado."[633]*

606.  The Tribunal notes that Article 5(1) of the Treaty has a clear structure: Systematically, subparagraph 1 prohibits expropriatory measures in principle. However, such measures can be justified if: (i) they are based on a sufficient public purpose; (ii) they are not dis-criminatory; and (iii) they are not contrary to a particular agreement. Subparagraphs 2 and 3 provide for additional requirements and/or consequences of an expropriation, namely prompt and adequate compensation (subparagraph 2) as well as specification of the amount and effectiveness of compensation (subparagraph 3).

607.  Whether or not the compensation standard contained in Article 5(1) subparagraphs 2 and 3 of the Treaty applies only to an expropriation that is in conformity with the requirements set out in subparagraph 1 and/or the additional requirements set out in the very same subparagrahs 2 and 3 depends in particular on the interpretation of the terms "[t]*outes les mesures d'expropriation qui pourraient être prises*"/"[t]*odas las medidas de expropiación que pudieran tomarse.*"

608.  On the one hand, the organization of Article 5(1) with three unnumbered subparagraphs suggests that they must be read to be compatible with each other. While subparagraph 1 contains the requirements "*in the public interest*" and "*neither discriminatory, nor con-trary to a particular agreement,*" it does not make reference to compensation, which is

---

[632] *Journal Officiel de la République Française n°102 du 30 avril 2004*, **Exhibit C-1**, p. 7775.
[633] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Exhibit C-1**, p. 332.354.

addressed in subparagraphs 2 and 3. It could be argued that "[a]*ll measures of expropria-tion which could be taken*" refers to all "*lawful*" measures, *i.e.*, those taken within the terms laid out in Article 5(1) as a whole. This view could further be supported by the fact that the requirements set out in subparagraph 3 are tied, by the words "[c]*ette indem-nité*"/"[e]*sa indemnización*," to the valuation as set out in subparagraph 2. As a result, a failure to fix the amount and payment method of the value as calculated according to subparagraph 2 not later than on the date of expropriation could result in the inapplicabil-ity of the compensation standard contained in Article 5(1) because the compensation was not "*prompt*" and therefore in breach of this very same provision.

609.  On the other hand, the structure of Article 5(1) could also be interpreted to distinguish between (substantive) requirements set out in subparagraph 1, in the absence of which the expropriation would be precluded *per se* and thus be "*unlawful*," and (additional) com-pensation requirements set out in subparagraphs 2 and 3, which do not relate to the law-fulness of the expropriation. It could be argued that "[a]*ll measures of expropriation which could be taken*" refers to any measures, whether in compliance with Article 5(1) or not, *i.e*, without adding any qualifications extraneous to the text itself. The fact that sub-paragraphs 2 and 3 are linked by the words "[c]*ette indemnité*"/"[e]*sa indemnización*" could also indicate that the absence of such an explicit link between subparagraphs 1 and 2 should be interpreted to mean that the compensation requirements apply to all expro-priations.

610.  Considering the foregoing, the Tribunal is faced with competing interpretations of Article 5(1) of the Treaty. In particular, the phrase "[a]*ll measures of expropriation which could be taken*" and more specifically, the word "*could*," is equally susceptible to two interpre-tations: either it includes all measures that the State is permitted to take, or it includes all measures that the State could possibly take.

611.  However, the question of the precise relationship between the three subparagraphs of Ar-ticle 5(1) and the compensation standard to be applied need not be decided if, as noted above, both compensation standards advanced by the Parties would result in the same amount of compensation to be paid to Claimant. In this regard, it has to be emphasized that both Parties are in agreement that, in case the date-of-expropriation valuation yields a higher value than the date-of-the-award valuation, the Tribunal should determine the amount of compensation to be paid to Claimant based on the value as of the date of ex-propriation.[634]

612.  As per the Tribunal's request dated 13 August 2015, both Parties instructed their experts to update their date-of-the-award valuations and to evaluate the plant as of 31 August

---

[634] *Cf.* Claimant's Post-Hearing Submission, ¶ 77; Respondent's Post-Hearing Brief, ¶ 106.

2015. These Valuation Updates were simultaneously submitted on 22 October 2015,[635] and both Parties had the opportunity to simultaneously submit comments on the opposing Party's Valuation Update.[636] As per this date, both experts calculated a value of the plant that was lower than the value they had calculated for the plant as of the date of expropriation. Specifically, Claimant's expert Prof. Spiller calculated the value of the plant as of 31 August 2015 at USD 90.3 million (compared to USD 99.5 million as of 15 May 2010).[637] According to Respondent's experts Mr. Brailovsky and Dr. Flores, the plant had a negative value of USD 27.6 million as of 31 August 2015 (compared to a positive value of USD 9.5 million as of 15 May 2010).[638]

613. In light of these developments, Claimant explicitly requested in its letter dated 6 November 2015 that it be awarded compensation in the amount of USD 99.5 million plus pre-award interest, *i.e.*, the value that it claims Norpro Venezuela had as of 15 May 2010.[639]

614. As a result, the Tribunal does not have to make a finding in this context as to whether the compensation standard to be applied is the standard contained in Article 5(1) subparagraphs 2 and 3 of the Treaty or rather the customary international law standard of restitution. In any event, the amount of compensation to be paid to Claimant will be based on the valuation of Norpro Venezuela as of the date of expropriation, *i.e.*, 15 May 2010.

### 2. Criteria for the Calculation of Damages

615. The Tribunal will now turn to the criteria for the calculation of Claimant's damages. In this context, the Tribunal will first determine the relevant valuation method (**a**)), then determine the criteria for assessing the value of Norpro Venezuela based on that method (**b**)) and finally deal with the alleged historical losses associated with the increase of the bauxite price (**c**)).

### a) Valuation Approach

### aa) Summary of Claimant's Position

---

[635] *See* Claimant's Valuation Update and Respondent's Valuation Update, both dated 22 October 2015.

[636] *See* Claimant's letter and Respondent's letter, both dated 6 November 2015.

[637] Given Prof. Spiller's approach to consider the lower of (i) the DCF-based value including historical but-for cash flows (if applicable); and (ii) the construction costs for a comparable plant including lost cash flows during the construction period, as the value to be compensated by Respondent, the figure as of 15 May 2010 reflects the construction costs (compared to a DCF-based value of USD 116.4 million including the bauxite price increase). By contrast, the value as of 31 August 2015 reflects the DCF-based value (compared to construction costs of USD 94.8 million). *See* Claimant's Valuation Update, Table 1.

[638] In Dr. Flores and Mr. Brailovsky's calculation, both figures reflect the DCF-based value of the plant including historical but-for cash flows (if applicable). Respondent's Valuation Update, Table 1 and ¶ 8 (note 18).

[639] Claimant's letter dated 6 November 2015, p. 3.

616. Claimant submits that Respondent must pay full compensation for the expropriated plant and refers to the World Bank Guidelines on the Treatment of Foreign Direct Investment of 1992 (the "**World Bank Guidelines**") pursuant to which compensation for expropriation "*will be deemed* 'adequate' *if it is based on the fair market value of the taken asset*."[640]

617. While Claimant maintains that the compensation standard in Article 5(1) of the Treaty is not applicable in the present case, but that compensation must rather be determined in line with the standard of full reparation standard of customary international law, Claimant emphasizes that the Treaty itself reflects the "*fair market value*" principle in its standard for calculating the compensation for a lawful expropriation.[641]

618. Claimant also refers to the commentary on the ILC Draft Articles pursuant to which "[c]*ompensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the* 'fair market value' *of the property lost*."[642]

619. Claimant further refers to the definition of fair market value in *Starret Housing Corp v. Iran*:

> "*the price that a willing buyer would buy given goods at and the price at which a willing seller would sell it in on the condition that none of the parties* [is] *under any kind of duress and that both parties have good information about all relevant circumstances involved in the purchase*."[643]

620. As the investment was a "*going concern*," Claimant argues that the assessment of the fair market value must take into account the plant's future profitability and prospects. In this regard, Claimant refers to its expert on quantum, Prof. Spiller, who suggests that a third-party buyer would pay the lower of (i) the net present value of the cash flows that a willing buyer could obtain from acquiring a 100% stake in Norpro Venezuela; and (ii) the opportunity cost that a willing buyer would incur if it constructed a similar plant outside Venezuela, which consists of the sum of construction costs plus the foregone cash flows during the construction period.[644]

621. As to the second approach, Claimant submits that the "*most accurate information available*" is the actual construction costs of Claimant's ceramic proppants plant in Little Rock,

---

[640] Memorial, ¶¶ 203-204 referring to The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), p. 11.

[641] Memorial, ¶¶ 197-198 and ¶ 206; Reply, ¶¶ 143-146.

[642] Reply, ¶ 154 quoting from James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), p. 225.

[643] Memorial, ¶ 105 quoting from *Starrett Housing Corp. v. Iran* (**CLA-081**), ¶ 18.

[644] Reply, ¶¶ 155-156 referring to Prof. Spiller's Second Damages Assessment dated 18 June 2014 ("**Spiller II**"), ¶ 5; Claimant's Post-Hearing Submission, ¶ 90.

Arkansas (United States) finished in late 2013 which – like Norpro Venezuela – produces the highest quality bauxite-based ceramic proppants by means of a dry-process technology.[645] Claimant argues that apart from the fact that there is no comparable plant in Venezuela, the costs are the same regardless of whether the similar plant is built in the US or in Venezuela because "*the plants have similar risk-adjusted cost structures*" and "*the cost advantages and disadvantages associated with a particular location can offset one another.*"[646]

622. According to the calculation of Prof. Spiller as of 15 May 2010, the opportunity cost for the construction of a similar plant in the US would be lower than the net present value of Norpro Venezuela s future cash flows (USD 99.5 million compared to USD 115.1 million). Consequently, Claimant is of the view that the Tribunal should determine the fair market value of the expropriated plant based on the construction cost approach.[647]

### bb)   Summary of Respondent's Position

623. Respondent agrees that the amount of compensation to be paid should reflect the fair market value of the plant as a going concern, *i.e.*, "*the amount that a willing buyer would pay to a willing seller.*" Respondent further agrees that this figure can be determined by assessing the "*projected cash flows* [...] *based on reasonable assumptions as of May 15, 2010 and discounted to their net present value as of that date using an appropriate discount rate.*"[648]

624. In response to Claimant's reliance on the full reparation standard of customary international law, Respondent claims that the standard set out in Article 5(1) of the Treaty is "*consistent with both traditional and contemporary notions of* '*full*' *or* '*adequate*' *compensation.*"[649]

625. Respondent sees no need to consider Prof. Spiller's approach to compare the DCF-based valuation with the opportunity costs of constructing a similar plant in any detail because according to its experts on quantum, Mr. Brailovsky and Dr. Flores, those costs would exceed the price that a willing buyer would pay for Claimant's plant (USD 43.7 million plus foregone cash flows of USD 1.3 million as of 15 May 2010 compared to USD 9.5 million).[650]

---

[645] Reply, ¶¶ 189-191; Claimant's Post-Hearing Submission, ¶¶ 92 and 93.
[646] Claimant's Post-Hearing Submission, ¶¶ 91 and 95.
[647] Reply, ¶¶ 157, 187 and 196; Claimant's letter to the Tribunal dated 6 November 2015; Spiller II, Table 12.
[648] Counter-Memorial, ¶¶ 185-187; Respondent's Post-Hearing Brief, ¶ 137.
[649] Rejoinder, ¶ 197.
[650] Counter-Memorial, ¶ 188; Rejoinder, ¶ 201; Respondent's Post-Hearing Brief, ¶ 138 and ¶¶ 204-208; Respondent's Post-Hearing Reply Brief, ¶ 63; Mr. Brailovsky and Dr. Flores' Second Expert Report on Quantum ("**Brailovsky/Flores II**"), ¶¶ 227 and 242.

626. In any event, Respondent emphasizes that the asset to be evaluated in the present case is a stand-alone plant in Venezuela, not in the United States, and therefore argues that the only appropriate way of assessing the compensation to be paid to Claimant is to apply a DCF analysis, including a discount rate that accounts for the fact that the plant is located in Venezuela.[651] If one were to assess the construction costs, Respondent argues that one would have to assess the costs in Venezuela (not in the US) and based on assumptions "*consistent with the DCF analysis that is being used for comparative purposes.*"[652]

### cc)   The Tribunal's Analysis

627. At the outset, the Tribunal notes the Parties' agreement that the compensation to be paid by Respondent for the expropriation of Norpro Venezuela should reflect the fair market value of the plant as a going concern as of 15 May 2010.[653] First, this value reflects the compensation standard contained in Article 5(1) subparagraphs 2 and 3 of the Treaty, which provides that compensation must be equal to the "*actual value*" ("*valeur réelle*" / "*valor real*") of the going concern Norpro Venezuela. Second, the fair market value also reflects the compensation standard under customary international law as reflected in the ILC Draft Articles and the World Bank Guidelines. While Article 35 of the ILC Draft Articles provides that, primarily, the State has to make restitution for the damage caused, Article 36 states that, subsidiarily ("*insofar as such damage is not made good by restitution*"), the State  has to pay compensation, which "*shall cover any financially assessable damage including loss of profits insofar as it is established.*"[654] As correctly pointed out by Claimant, the ILC states in the Commentary to Article 36 that "[c]*ompensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the* 'fair market value' *of the property lost*."[655] The World Bank Guidelines similarly provide with regard to expropriations that "[c]omp*ensation will be deemed* 'adequate' *if it is based on the fair market value of the taken asset.*"[656] Consequently, the Tribunal again does not have to decide on the applicable compensation standard in the present case because both standards require the determination of Norpro Venezuela's fair market value as of 15 May 2010.

---

[651] Rejoinder, ¶¶ 202-203.

[652] Respondent's Post-Hearing Brief, ¶¶ 138 and 202.

[653] The Tribunal notes that both Parties repeatedly refer to "*the Plant*" as the expropriated asset. As Respondent correctly stated in its Counter-Memorial (¶ 188), however, the asset to be valued in the present case is "*the Plant being operated as a going concern.*" The Tribunal will thus refer to the expropriated asset as "*Norpro Venezuela*" or "*the going concern.*"

[654] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Article 36.

[655] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Article 36, ¶ 22.

[656] The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Section IV, ¶ 3.

628. The Parties further agree that the fair market value is equal to the amount that a willing buyer would pay to a willing seller, provided that the buyer is informed about all relevant circumstances and none of the parties is under any kind of duress to sell or to acquire the asset.[657] This is confirmed by the World Bank Guidelines, which also refer to the "*amount that a willing buyer would normally pay to a willing seller*" taking into account all relevant circumstances.[658]

629. Finally, the Parties are in agreement that, as the plant was a going concern prior to its expropriation, its fair market value can be assessed by calculating the net present value of Norpro Venezuela's future cash flows. Consequently, both Parties' experts have calculated the future cash flows of the going concern and then applied a discount rate to those cash flows in order to obtain their net present value.

630. However, Claimant's expert Prof. Spiller has advanced a further approach to calculate the value, *i.e.*, by assessing the opportunity cost of constructing a comparable plant in the US (consisting, of the construction cost plus lost cash flows during the construction period). According to Prof. Spiller, a willing buyer would pay only the lower of the amounts obtained by applying the DCF-method on the one hand and the construction cost approach on the other hand. Therefore, he has compared the two values and concluded that the construction cost value as of 15 May 2010 (USD 99.5 million) is lower than the DCF value as of that date (USD 115.1 million) and thus reflects the value to be compensated by Respondent.[659]

631. It appears to the Tribunal that Respondent does not contest Prof. Spiller's approach to compare the two values as such but rather (i) claims that the comparison would have to be made to a plant located in Venezuela and consistent with the assumptions applied in the DCF calculation; and (ii) in any event considers the construction cost approach irrelevant in light of its experts' conclusion that the DCF value of Norpro Venezuela (USD 9.5 million) is lower than the opportunity costs of a similar plant in the US (USD 43.7 million plus foregone cash flows of USD 1.3 million as of 15 May 2010).[660]

632. At this point, the Tribunal wishes to express its doubts as to the general applicability of the approach to determine the fair market value of a particular asset, such as the going concern in this case, by assessing the opportunity cost of constructing a different plant. In particular, the Tribunal is not convinced that, even if the opportunity costs were to be

---

[657] *Cf.* the definition provided by the tribunal in *Starrett Housing Corp. v. Iran,* which has been quoted in paragraph 619 above.
[658] The World Bank Group, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Section IV, ¶ 5.
[659] Spiller II, ¶ 5 and Table 12.
[660] Respondent's Post-Hearing Brief, ¶¶ 138 and 202; Brailovsky/Flores II, ¶¶ 227 and 242.

lower than the DCF-based value of Norpro Venezuela, this would result in a lower fair market value of Claimant's investment under any of the compensation standards advanced in this case.

633.  However, the Tribunal does not have to form a definite opinion on the general suitability of this approach because, in any event, the Tribunal considers that the calculations of the opportunity cost performed by the Parties' experts are inconclusive under the present circumstances. Specifically, the Tribunal agrees with Respondent that a plant located in Little Rock, Arkansas, cannot be compared to the going concern to be evaluated in this arbitration. The same must apply to the comparison made by Respondent's experts to an average of other plants located in the US.

634.  Claimant itself acknowledges that there are "*cost advantages and disadvantages associated with a particular location*" but argues that these "*can offset one another.*"[661] The Tribunal is aware that Prof. Spiller explained during the Hearing that he applied an adjustment factor to account for "*Economies of Scale and Scope Differences,*" which in his view offset one another.[662] However, the Tribunal is not convinced that this adjustment factor accounts for all differences to be taken into account when looking at highly specialized production facilities in two markets, which are as different as the mature US market and the emerging Venezuelan market.

635.  As neither Party alleges that there exists a comparable plant in Venezuela, the Tribunal will therefore disregard the construction cost approach and determine the criteria for assessing the fair market value of Norpro Venezuela on a going concern basis, *i.e.*, based on the DCF calculation performed by the experts of both Parties for the valuation date of 15 May 2010.

### b)      DCF-Based Fair Market Value of Norpro Venezuela

636.  While the Parties agree that the discounted cash flow analysis is in principle an appropriate method to determine the value of Norpro Venezuela, their experts arrive at significantly differing results for such value as of 15 May 2010, *i.e.*, between USD 115.1 million as calculated by Claimant's expert Prof. Spiller and USD 9.5 million as calculated by Respondent's experts Dr. Flores and Mr. Brailovsky. The biggest point of disagreement between the experts relates to the discount rate to be applied to the future cash flows; therefore, the Tribunal will address this issue first (**aa**)). In a second step, the Tribunal will address the additional points of disagreement regarding the calculation of Norpro Venezuela's future cash flows (**bb**)). As determined above, the Tribunal will assess both

---

[661] Claimant's Post-Hearing Submission, ¶ 91.
[662] Prof. Spiller's Opening Presentation, slide 32.

the applicable discount rate and the future cash flows from the perspective of a willing buyer as of 15 May 2010.

### aa)   Discount Rate

#### (i)   Summary of Claimant's Position

637. Claimant submits that Respondent's experts Mr. Brailovsky and Dr. Flores applied "*an absurdly high discount rate of 26%*," which results in a value that implies that "*no reasonable investor would invest in a new proppant plant, or add capacity to an existing proppant plant.*"[663]

638. Claimant claims that the 26% discount rate is unprecedented and more than double the discount rate that tribunals typically adopt in ICSID arbitrations. According to Claimant, the US cost of equity they propose is "*entirely afield of any other estimate found in the record*" and further inconsistent with Claimant's own calculation for the project in 2006, considering that interest rates have fallen since then.[664]

639. In particular, Claimant rejects Mr. Brailovsky's and Dr. Flores' use of a 2.66% "*size premium*" because (i) literature is "*inconclusive*" as regards the applicability to foreign investments; (ii) Prof. Damodaran has rejected it as duplicative; and (iii) its application would double count the country risk in Venezuela where Norpro Venezuela cannot be classified as a small company.[665] Claimant further rejects the use of a risk-free rate based on the spot yield to maturity of 20-year US Treasury bonds on the valuation date and notes that the 10-year bond used by Prof. Spiller is recommended by Prof. Damodaran and reflects the fact that majority of cash flows in the experts' models are received in ten years or less.[666]

640. With regard to the market risk premium (MRP), Claimant alleges that the average historical premium used by Mr. Brailovsky and Dr. Flores is not appropriate in light of the proximity of the 2008-2009 financial crisis, which "*distorts the MRP from historical returns.*" According to Claimant, this development led Prof. Damodaran to replace this

---

[663] Reply, ¶ 158 quoting from Spiller II, ¶ 28.
[664] Reply, ¶ 160; Claimant's Post-Hearing Submission, ¶ 103 referring to Prof. Spiller's Opening Presentation, slide 5; Claimant's Second Post-Hearing Submission, ¶ 73.
[665] Reply, ¶ 165; Claimant's Post-Hearing Submission, ¶ 103 referring to Prof. Spiller's Opening Presentation, slide 22, which quotes the following statement of Prof. Damodaran: "*Adding a small cap premium strikes me as not only a sloppy (and high error) way of adjusting expected returns but also an abdication of the mission in intrinsic valuation, which is to build up your numbers from fundamentals.*" **Exhibit CLEX-114**, p. 2. *See also* Claimant's Second Post-Hearing Submission, ¶ 81.
[666] Reply, ¶ 166; Claimant's Second Post-Hearing Submission, ¶ 82.

method by a recommendation that is based on "*an extensive study of methods*," which still includes the historical average as the highest premium.[667]

641. Claimant further argues that the "*exorbitant*" country risk premium of 13.92% that Mr. Brailovsky and Dr. Flores applied for Venezuela is a "*desperate way for a State to try to evade responsibility for its actions."* According to Claimant, this spike reflects President Chávez's threats to expropriate all foreign investments in Venezuela without compensation.[668] Claimant argues, however, that a State "*may not use its own propensity to violate the law to reduce the value of compensation for the expropriation.*"[669] It therefore takes the position that the "*generalized threat of confiscation*" has to be eliminated from the calculation of the fair market value because Respondent would otherwise be rewarded for the unlawful conduct that this arbitration is meant to remedy.[670]

642. Claimant emphasizes that this logic should apply for both lawful and unlawful expropriations because both the Treaty standard and the customary international law standard require that "*any valuation of the asset taken eliminate the State's threats to confiscate the asset taken.*" While acknowledging that the tribunals in *Tidewater v. Venezuela, Mobil v. Venezuela* and *Venezuela Holdings v. Venezuela* have chosen not to follow this approach in case of a lawful expropriation, Claimant claims that no tribunal has done the same in case of a treaty breach and refers in particular to the tribunal's finding in *Gold Reserve v. Venezuela* that "*it is not appropriate to increase the country risk premium to reflect the market's perception that a State may have a propensity to expropriate investments in breach of BIT obligations.*"[671] In Claimant's view, a country would otherwise be allowed to "*benefit from a regime of committing to fair treatment in order to attract foreign investors, and then subsequently revoking those commitments across the board*."[672]

643. Claimant claims that, unlike the claimant's expert in *Tidewater v. Venezuela*, Prof. Spiller has excluded only the confiscation risk from the country risk premium but appropriately took into account "*other risks of investing in Venezuela, such as the risks of a volatile*

---

[667] Claimant's Second Post-Hearing Submission, ¶¶ 76-77 referring to Spiller II, Table 15

[668] Reply, ¶ 161; Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing Submission, ¶ 55.

[669] Reply, ¶ 162 quoting from *Occidental v. Ecuador* (**CLA-061**), ¶ 564; Claimant's Post-Hearing Submission, ¶ 110 referring in particular to *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841.

[670] Claimant's Post-Hearing Submission, ¶ 104 and ¶ 111; Claimant's Second Post-Hearing submission, ¶ 56 and ¶ 59.

[671] Claimant's Post-Hearing Submission, ¶ 113 and ¶ 117 quoting from *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841. Claimant notes that the tribunal in that cause ultimately applied a country risk premium of 4% for Venezuela. Claimant also refers to the tribunal in *OI European v. Venezuela* who agreed with the claimant that the country risk premium had to exclude the effect of the "*negative messages in the business environment about potential expropriations*" put out by Venezuela, but found no evidence that the 6% premium proposed by Venezuela was affected by these negative messages. Claimant's Second Post-Hearing Submission, ¶ 57 and note 87 referring to *OI European v. Venezuela* (**CLA-156**), ¶ 782.

[672] Claimant's Post-Hearing Submission, ¶ 114. *See also* Claimant's Second Post-Hearing Submission, ¶ 64.

*economy, civil disorder, less developed infrastructure, and other issues.*" Claimant submits that Prof. Spiller took the average spread of sovereign bonds of countries with a B1 rating such as Venezuela, which includes many developing countries with "*significant country risk, including political risks.*"[673]

644. Claimant alleges that Mr. Brailovsky's and Dr. Flores' approach based on the Country Risk Rating Model (CRRM), on the other hand, "*by definition incorporates* [institutional] *investors' perception of the risk of investing in Venezuela under the current politico-economic conditions, including that of uncompensated expropriations.*" Similarly, Claimant contends that the "*extremely high*" Venezuelan sovereign bond spread pursuant to the EMBI Index does not reflect Venezuela's lack of capacity to pay (as reflected in its B1 rating) but rather its lack of willingness to pay.[674]

645. In relation to the CRRM, Claimant submits that it is not only "*inherently unreliable*" but particularly inapt in the present "*complex politico-economic situation*" in Venezuela. In response to the argument that the CRRM has produced "*constant*" rates over the last twenty years, Claimant argues that this is inconsistent with Respondent's argument that the country risk has increased since 2005 when Claimant invested in Venezuela and the EMBI was around 2%.[675] Claimant also rejects Respondent's argument that the EMBI has been at an average of 10% over the same time period because this time horizon includes a number of "*outliers*" in the country's history, which had "*extreme effect*" on the government but not on private investors, and therefore renders the EMBI an "*artificial rate that reflects political expectations rather than economic assessments.*"[676]

---

[673] Claimant's Post-Hearing Submission, ¶¶ 105-106; Claimant's Second Post-Hearing Submission, ¶ 60 and ¶ 67. Claimant argues that one way to "*check*" this is to look at the CDS spreads outstanding on countries' sovereign debts and notes that on Prof. Damodaran's list of 63 countries as of January 2014, Prof. Spiller's proposed premium of 4.5% would rank as the fourth-highest after Argentina (14.73%), Venezuela (10.8%) and Tunisia (4.57%) and thus "*far above the typical country risk premium in a developing country.*" Claimant's Second Post-Hearing Submission, ¶¶ 61-62 referring to **App. BF-66**, pp. 23-25.

[674] Claimant's Post-Hearing Submission, ¶ 118; Claimant's Second Post-Hearing Submission, ¶ 63.

[675] Claimant's Post-Hearing Submission, ¶¶ 120-121.

[676] Claimant's Post-Hearing submission, ¶ 122. Claimant argues that Venezuela is approaching default and refers to the tribunal's finding in *EDF International v. Argentina* that the country debt spread approach becomes "*an unrealistic measure for a cost of equity calculation*" when countries approach "*default-like situations*" as Argentina did in 2001. Claimant's Post-Hearing Submission, ¶ 126 quoting from *EDF International v. Argentina* (**CLA-122**), ¶¶ 634, 1264, 1266-1268. Claimant further refers to the tribunal in *Sempra Energy v. Argentina*, which found that in 2001, "*the country risk premium required by an investor in a private company in Argentina was significantly lower than the Governments' credit risk premium during the same period.*" Claimant's Post-Hearing Submission, ¶ 128 quoting from *Sempra Energy v. Argentina* (**Exhibit CLEX-106**), ¶ 433.

646. Therefore, Claimant concludes that the difference between the country risk premia calculated by Prof. Spiller and Mr. Brailovsky, respectively, is "*largely attributable to Venezuela's confiscation threats.*"[677] It emphasizes that in *OI European v. Venezuela*, Venezuela's own experts calculated a 2010 country risk premium of 6%.[678]

647. Claimant further contends that it also took Venezuela's "*heightened country risk*" into account when it assigned a discount rate of 15% to the project in 2006 and undertook significant efforts to secure meaningful support of the Venezuelan Government, in reliance on the fact that the France-Venezuela Treaty had entered into force in 2004.[679] Claimant emphasizes that the "*high risk*" discount rate of 12%, which included a country risk premium of 4%, was not assigned by the members of the project team (they even added a further 3% "*to be conservative*"), but rather served as a "*company-wide objective measure to consider the potential risks and rewards of proposed ventures in various locations.*"[680]

648. In Claimant's view, an investor like Saint-Gobain is "*immune from the vast majority of risk factors*" that are included in Mr. Brailovsky and Dr. Flores' country risk premium. Claimant contends that (i) the proppants produced by Norpro Venezuela's activity were to be exported under a long-term take-or-pay contract; (ii) Norpro Venezuela had concluded long-term supply contracts for bauxite and energy; and (iii) Venezuela's sovereign credit risk, which forms the basis for Mr. Brailovsky's and Dr. Flores' calculation, is influenced by its risk of entering into default and therefore does not accurately reflect the country risk of Claimant's long-term, non-speculative investment in Venezuela.[681]

649. In Claimant's view, particularly the fact that Norpro Venezuela derived more than 80% of its revenues from exports made it subject to a lower country risk than the average Venezuelan company, which has to face the stagnant consumer demand. Claimant refers to a statement made by Prof. Damodaran that "[t]*he most obvious determinant of a company's risk exposure to country risk is how much of the revenues it derives from the country.*"[682] Claimant further emphasizes that Norpro Venezuela was not a natural resources company but a manufacturing company "*twice removed from the oil industry*" and thus was not affected by the "*typical reasons for political risk*" affecting oil companies.[683] As to the further risks invoked by Mr. Brailovsky and Dr. Flores, Claimant claims that they

---

[677] Claimant's Post-Hearing Submission, ¶ 119.
[678] Claimant's Second Post-Hearing Submission, ¶ 65 referring to *OI European v. Venezuela* (**CLA-156**), ¶¶ 772-773.
[679] Claimant's Post-Hearing Submission, ¶ 107, ¶ 116 and ¶ 130.
[680] Claimant's Post-Hearing Submission, ¶¶ 131-134 referring to the oral testimony of its witness Patrick Millot. Transcript (Day 2), p. 428 lines 14-17 and p. 438 lines 13-16.
[681] Reply, ¶¶ 163-164.
[682] Claimant's Post-Hearing Submission, ¶¶ 136-139 quoting from **Exhibit CLEX-108**.
[683] Claimant's Post-Hearing Submission, ¶¶ 140-141.

either do not apply to Norpro Venezuela or they were already taken into account in the country risk premium as derived by Prof. Spiller from the sovereign bond rating.[684]

### (ii) Summary of Respondent's Position

650. Respondent submits that the discount rate calculated by Prof. Spiller would be "*low even for a company such as Norpro Venezuela operating in a mature economy*." Respondent argues that (i) Prof. Spiller deviated from the risk-free-rate suggested by Ibbotson/Morningstar for long-term projects, *i.e.*, the 20-year US Treasury bond yield as of the valuation date; (ii) he deviated from the general market risk premium (MRP) calculated by Ibbotson/Morningstar; and (iii) he "*ignore*[d] *the empirical evidence establishing that the CAPM tends to underestimate the cost of equity for financial assets*," which is corrected by the *alpha* coefficient.[685]

651. First, Respondent argues that it is appropriate to use the 20-year US Treasury bond as the risk-free rate in this case, given the "*perpetuity*" nature of the cash flows that are being valued.[686] Second, Respondent claims that the view of Prof. Damodaran as to the appropriate MRP that Prof. Spiller relies on "*fluctuates from year to year and sometimes even within the same year, is not based on an analysis of the underlying empirical data, and cannot be replicated*."[687] Respondent further refers to the tribunal in *Tidewater v. Venezuela*, which determined that an equity risk premium of 6.5% was reasonable in a valuation as of May 2009.[688] Third, Respondent rejects Claimant's argument that the *alpha* coefficient is a size premium and notes that this coefficient, while "*more pronounced in small companies (which is why it attracts the* 'size premium' *label)*," applies to companies of all sizes. In any event, Respondent claims that Norpro Venezuela would indeed qualify as a small company in the US, which is why the *alpha* coefficient should be added to the US cost of equity.[689]

652. Respondent contends that these differences cause Prof. Spiller's estimate of the cost of equity in the US to be considerably lower than "*a range of independent results for SIC Code 1381, using the basic CAPM and variations thereon*," which are very similar to the cost of equity estimated by Respondent's experts and in fact almost equal to the total discount rate applied by Prof. Spiller.[690]

---

[684] Claimant's Post-Hearing Submission, ¶¶ 142-144.
[685] Counter-Memorial, ¶¶ 234-236; Rejoinder, ¶ 206. For an overview of the differences regarding the US cost of equity components, *see* also the table in Respondent's Post-Hearing Brief, following ¶ 140.
[686] Respondent's Post-Hearing Brief, ¶ 146.
[687] Respondent's Post-Hearing Brief, ¶ 141; Respondent's Post-Hearing Reply Brief, note 118.
[688] Respondent's Post-Hearing Brief, ¶ 142 quoting from *Tidewater v. Venezuela* (**RL-207**), ¶ 181.
[689] Respondent's Post-Hearing Brief, ¶ 145; Respondent's Post-Hearing Reply Brief, note 120.
[690] Counter-Memorial, ¶ 237 referring to Brailovsky/Flores I, Table 10; Rejoinder, ¶ 204 referring to Brailovsky/Flores II, Table 15 and ¶ 205; Respondent's Post-Hearing Brief, ¶ 147; Respondent's Post-Hearing Reply Brief,

653. According to Respondent, the biggest difference between the experts' estimates, however, concerns the applicable country risk premium. Respondent claims that this premium is "*far higher*" than the 4.5% applied by Prof. Spiller, which in fact does not reflect Venezuelan country risk but rather the default risk on US corporate bonds.[691] Respondent refers to the calculations of its experts Mr. Brailovsky and Dr. Flores who primarily relied on the Country Risk Rating Model (CRRM) compiled by Ibbotson/Morningstar and cross-checked their results by using the so-called "*bludgeon method*" devised by Prof. Damodaran.[692]

654. In response to Claimant's criticism on the CRRM, Respondent refers to Prof. Ibbotson who stated that the CRRM has the following advantages over other cost of equity models: "*1. Breadth of coverage; 2. Reasonable results; 3. Stability of results.*"[693] Respondent further refers to its experts who demonstrate that the results the CRRM has produced over the last 20 years for Venezuela are stable and in line with Prof. Damodaran's methodology.[694]

655. With regard to Claimant's criticism on the EMBI spread that Respondent's experts used to derive the yield on Venezuela's sovereign debt over the US treasury bond yield, Respondent acknowledges that the spread is indeed "*very high*" but argues that it is in no way comparable to an actual default situation as Argentina experienced in 2001 through 2003 when the EMBI increased to 50% and more.[695]

656. By contrast, Respondent claims that the 4.5% premium applied by Prof. Spiller does not reflect Prof. Damodaran's methodology because Prof. Damodaran's interactive spreadsheet demonstrates that his "*best estimate*" is actually based on the "*bludgeon method,*" including the application of the 1.5 multiplier, and is thus in line with the estimate of Respondent's experts.[696] According to Respondent, Prof. Damodaran establishes in his

---

¶¶ 32-35. As to the numbers presented by Prof. Spiller during the Hearing, Respondent contends that the source he relies on are "irrelevant to the determination of the discount rate in this case," as Claimant's internal estimate dates of 2005 and the round figures derived from two analyst reports indicate that they were not the result of detailed calculations but simply part of a "buy" recommendation and further relate to the market for financial instruments, which is "entirely different" from the market for physical assets. Respondent's Post-Hearing Reply Brief, ¶ 36.

[691] Counter-Memorial, ¶ 240; Rejoinder, ¶ 207 and ¶ 228. In Respondent's view, Prof. Spiller should at least have used corporate bonds from other emerging countries with the same rating as Venezuela, which would have resulted on a spread of over 9%. Rejoinder, ¶ 221; Respondent's Post-Hearing Brief, ¶ 169.

[692] Respondent submits that its experts used the same methodology to determine the appropriate discount rate for both valuation dates. Counter-Memorial, ¶ 259.

[693] Rejoinder, ¶ 212 quoting from Ibbotson/Morningstart, SBBI 2013 Valuation Yearbook (**App. BF-44**), pp. 136-137.

[694] Rejoinder, ¶ 213 referring to Brailovsky/Flores, Figure 19.

[695] Rejoinder, ¶¶ 216-217 referring to Brailovsky/Flores, Figure 20.

[696] Counter-Memorial, ¶¶ 243-244 referring to the spreadsheet from June 2013 (**App. BF-65**); Rejoinder, ¶ 210 referring to Brailovsky/Flore II, Table 10 and the spreadsheet from January 2014 (**App. BF-66**).

writings "*a hierarchy of methods to derive a country default spread*" and states that if a country has USD-denominated bonds, the default spread should be derived by looking at the yield of those bonds over the risk-free bond in the same currency or the spread in the CDS market. Respondent further claims that Prof. Damodaran suggests the alternative approach based on comparably rated US corporate bonds ("*synthetic spread*") only "*as a last resort*," in case the country in question – unlike Venezuela – does not have USD-denominated bonds.[697]

657. Respondent claims that Prof. Damodaran's preferred method is an "*obvious first choice*" because "*specific data for the country in question is undoubtedly a better indicator of [the market's perception of] risk than a synthetic indicator.*" According to Respondent, both Venezuela's EMBI spread and its spread in the CDS market would have yielded a default spread of about 10%, to be converted into an equity risk premium of about 15%. According to Respondent, the same applies to the second method advanced by Prof. Damodaran, *i.e.*, the "*Average (Normalized) spread on bond,*" as the average spread on Venezuela's sovereign bonds over the entire life of the EMBI since 1993 was 10%.[698]

658. Respondent further rejects Claimant's allegation that Norpro Venezuela was immune from the majority of risk factors reflected in the country risk premium and claims that none of the arguments advanced by Claimant materially influences Norpro Venezuela's risk exposure. As to the exporter argument, Respondent refers to its experts' statement that "[c]*ountry risk is a much larger concept than exposure to domestic demand, involving taxation, regulation and other government actions in the economy, especially in the hydrocarbon sector*" and adds "*the disproportionate effect of natural phenomena such as storms, floods and droughts.*"[699] Respondent further notes that the invoked long-term contracts expire in 2016 (gas and electricity) and 2018 (bauxite) without any automatic right of renewal or a guaranteed price under a renewal and, in any event, they would not protect Norpro Venezuela from a disruptions in supply. Finally, Respondent alleges that the existence of the France-Venezuela BIT has "*no discernible impact on the country risk assessment*" as confirmed by political risk insurers.[700]

659. In Respondent's view, there are therefore no factors specific to Norpro Venezuela that would reduce its country risk exposure compared to the average Venezuelan company but, "*if anything, the factors relating to Norpro Venezuela would increase it.*" Respondent

---

[697] Counter-Memorial, ¶ 246; Rejoinder, ¶ 208 referring to *Aswath Damodaran*, Equity Risk Premiums (ERP): Determinants, Estimation and Implications – The 2013 Edition, updated: March 2013 (**App. BF-64**), pp. 53, 55; Respondent's Post-Hearing Brief, ¶ 168; Respondent's Post-Hearing Reply Brief, ¶¶ 45-47.
[698] Respondent's Post-Hearing Brief, ¶¶ 164-166; Respondent's Post-Hearing Reply Brief, ¶ 47.
[699] Rejoinder, ¶ 226 quoting from Brailovsky/Flores, ¶ 201; Respondent's Post-Hearing Brief, ¶ 175.
[700] Rejoinder, ¶ 226 referring to Brailovsky/Flores, Figure 23 and **App. BF-166;** Respondent's Post-Hearing Brief, ¶¶ 177-179.

refers to the possibility of exchange controls on the export of raw materials and further to Prof. Damodaran's statement that "[a] *company can be exposed to country risk, even if it derives no revenues from that country, if its production facilities are in that country*."[701] Respondent quotes from the oral testimony of Mr. Brailovsky, who stated that "*natural resource projects, particularly oil or oil-related, bear more Country Risk than the average company*" and cited as an example the suspension of bauxite supply combined with import restrictions.[702]

660.   While acknowledging that the valuation must exclude the impact of the actual expropriation of the plant, Respondent argues that this "*should not be confused with the expropriation risk inherent in any project from its very inception*," which is part of the "*normal economic situation prevailing*" prior to the announcement of the expropriation of the plant and therefore also a risk that a willing buyer would take into account in its assessment of the purchase price it would be willing to pay for the plant.[703]

661.   Respondent emphasizes that Article 5(1) of the Treaty requires compensation to be equal to the "*actual value*," *i.e.*, the fair market value, of the plant, which takes into account "*all of the generalized risks associated with an investment in Venezuela*," including "*the risk that after the acquisition is completed, Venezuela might expropriate and either not compensate at all or compensate only in an amount and in a manner that the buyer might deem unfair*."[704]

662.   Contrary to what Claimant appeared to suggest during the Hearing, Respondent is of the view that the determination of fair market value does not change depending on whether the expropriation is lawful or unlawful. According to Respondent, the willing buyer would be indifferent to the lawfulness or unlawfulness of the expropriation because the particular expropriation is to be excluded from the buyer's consideration. Respondent adds that the buyer would, however, take into account the underlying risks, including the risk of expropriation without compensation that the buyer deems adequate.[705]

663.   Respondent refers to the tribunal's finding in *Tidewater v. Venezuela* that the claimant's expert, who had advanced the same argument as in the present case, "*conflates two separate elements in a legal claim of this kind*," *i.e.*, the question of liability and the economic

---

[701] Respondent's Post-Hearing Brief, ¶¶ 172-175 quoting from *Aswath Damodaran*, Measuring Company Exposure to Country Risk: Theory and Practice, September 2003 (**App. BF-55**), p. 18.
[702] Respondent's Post-Hearing Brief, ¶ 176 quoting from Transcript (Day 4), p. 1142.
[703] Rejoinder, ¶ 227.
[704] Respondent's Post-Hearing Brief, ¶ 148. In Respondent's view, Claimant's position on the risk of "*uncompensated expropriation*" remains unclear because it could either include each case in which the obligation to compensate or the amount to be paid is in dispute, i.e., every case litigated under bilateral investment treaties, or it could be limited to cases in which the State refuses to acknowledge its compensation obligation and to participate in the determination of the amount due – which is not the case here. Respondent's Post-Hearing Brief, ¶ 149.
[705] Respondent's Post-Hearing Brief, ¶¶ 150-152.

question as to the value that the market would attribute to the investment in question; the tribunal then referred to the World Bank Guidelines, which "*specifically invite a consideration of* 'the risk associated with such cash flow under realistic circumstances'."[706] Respondent further quotes the tribunal's following statement:

> "*This is not a matter of permitting a respondent State to profit from its own wrong. On the contrary, the damages that the Tribunal is empowered by virtue of the Treaty to award are designed to ensure that the private investor is compensated for the loss of its investment. But, in determining the amount of that compensation by reference to a discounted cash flow analysis, the Tribunal should consider the value that a willing buyer would have placed on the investment. In determining this value, one element that a buyer would consider is the risk associated with investing in a particular country. Such a factor is not specific to the particular State measure that gives rise to the claim. […] Rather the country risk premium quantifies the general risks, including political risks, of doing business in the particular country, as they applied on that date and as they might then reasonably have been expected to affect the prospects, and thus the value to be ascribed to the likely cash flow of the business going forward*."[707]

664. Respondent argues that the country risk premium must be based on the buyer's perception of risk; the elimination of the risks inherent to an investment in Venezuela would result in "*the use of a discount rate that a willing buyer would not use and derive a value that a willing buyer would not pay, thereby granting Claimant a windfall that it could never achieve in an arm's-length transaction*." In Respondent's view, this would further be punitive to Venezuela and thus "*impermissible under any theory of compensation in international law*."[708]

665. As to Claimant's emphasis during the Hearing on the 15% discount rate reflected in its 23 October 2006 DAC, Respondent notes that the significance and purpose of this rate remains unclear and further argues that at that time, Venezuela's default risk was "*at one of its all-time lowest points*," with the yield of its sovereign bonds being only 2.18% higher than US Treasury bonds. At that point, Respondent submits, the 3% country risk premium could have been justified. More importantly, however, Respondent emphasizes that Claimant took Venezuelan default risk into account in its assessment of the country risk,

---

[706] Respondent's Post-Hearing Brief, ¶¶ 153-155 quoting from *Tidewater v. Venezuela* (**RL-207**), ¶¶ 184-185. Respondent notes that the tribunal found in that case that the failure to pay compensation did not render the expropriation unlawful.

[707] *Tidewater v. Venezuela* (**RL-207**), ¶ 186. Respondent submits that the Tidewater tribunal then adopted the approach by Dr. Flores and Mr. Brailovsky who also acted as Venezuela's experts in that case and used the same approach as in this case, i.e., the CRRM benchmarked against Prof. Damodaran's bludgeon method, and thus concludes that a country risk premium of 14.75% was a "*reasonable, indeed conservative, premium*." Respondent's Post-Hearing Brief, ¶ 156 quoting from *Tidewater v. Venezuela* (**RL-207**), ¶ 190.

[708] Respondent's Post-Hearing Brief, ¶ 157.

just like a buyer would in its assessment of an appropriate discount rate for determining the fair market value of the plant. In Respondent's view, there is then no reason for excluding such risk when the risk increased with the passage of time.[709]

666. Respondent further claims that "*there is no way to isolate, and thus quantify*" the risk of uncompensated expropriation. According to Respondent, Prof. Spiller did not propose any method to do so in his expert reports but argued only at the Hearing that one could take the difference between the EMBI spread for Venezuela and his 4.5% country risk premium. Respondent takes the position that Prof. Spiller's argument is based on his flawed understanding of Prof. Damodaran's hierarchy of methods and argues that "*country risk is composed of elements that are mutually interrelated and influence one another, and therefore are not separable.*"[710]

667. In response to Claimant's allegation that Venezuela's sovereign spread was too wide because it openly declared that it would not comply with its international obligations, Respondent notes that Claimant cannot cite any evidence for those "*incredible propositions*" and claims that "*Venezuela has not defaulted on any of its sovereign debt obligations, and Venezuela has paid compensation in its expropriation cases.*"[711]

668. Respondent further rejects Claimant's argument that Prof. Spiller took into account country-specific risks except for the risk of uncompensated expropriation and claims that he just applied an assumption that every country with a B1 rating could be assigned a 4.5% yield spread, without doing any analysis whether this actually reflected the average sovereign bond spread of other countries with the same rating.[712] In particular, Respondent emphasizes that Prof. Spiller did not assess the yield on developing countries with the same rating that Claimant refers to but simply accepted Prof. Damodaran's 4.5% spread applied to all B1-rated countries on the assumption that their sovereign ratings are comparable to US corporate ratings. According to Respondent, however, the yields for those 15 countries according to the CRRM were actually around 15%, just like the yield for Venezuela.[713]

---

[709] Respondent's Post-Hearing Brief, ¶¶ 158-162. Respondent further notes that the same document reflects that Claimant was willing to invest in Venezuela at an internal rate of return of 26.4%. Therefore, Respondent argues that, while still being 3% higher than Prof. Spiller's discount rate, the 15% discount rate is not relevant in this case. Respondent's Post-Hearing Reply Brief, note 132.
[710] Respondent's Post-Hearing Brief, ¶¶ 163-164, 171.
[711] Respondent's Post-Hearing Reply Brief, ¶¶ 39-42.
[712] Respondent's Post-Hearing Reply Brief, ¶¶ 43-44.
[713] Respondent's Post-Hearing Reply Brief, ¶¶ 48-51.

### (iii)   The Tribunal's Analysis

669. At the outset, the Tribunal notes that there is common ground between the Parties and their experts that the discount rate is derived by (i) determining the cost of equity for a proppants plant in the US using the Capital Asset Pricing Model (CAPM), consisting of the risk-free rate plus a market risk premium; (ii) adding a country risk premium for Venezuela; and (iii) taking into account the debt-to-equity ratio of the cost of capital.[714]

670. The Tribunal will therefore follow this structure in the present analysis and determine in a first step the cost of equity for a company in the same business as Norpro Venezuela in the US by assessing the risk-free rate in the US ((**1**)); and the market risk premium in the US, consisting of a general market risk premium, a *beta* coefficient and, possibly, an *alpha* coefficient ((**2**)). In a second step, the Tribunal will determine the applicable country risk premium to account for the fact that the plant is not located in the US but rather in Venezuela ((**3**)). Finally, the Tribunal will convert the so derived equity risk premium into the discount rate for the weighted average cost of capital (WACC) on the basis of Norpro Venezuela's debt-to-equity ratio ((**4**)).

### (1)   Risk-Free Rate in the US

671. The first element of the cost of equity for a company operating in the US is the risk-free rate. Claimant's expert Prof. Spiller used the average yield on the 10-year US Treasury bond rate during the 12 months preceding the valuation date, which amounted to 3.6% as of 15 May 2010.[715] Respondent's experts Mr. Brailovsky and Dr. Flores relied on the 20-year US Treasury bond rate prevailing on the valuation date, *i.e.*, on 15 May 2010, which amounted to 4.1%.[716] The experts thus agree on the use of the US Treasury bond but differ as to the appropriate maturity and the point in time or term over which the yield is to be taken into account.

672. Prof. Spiller explained his choice by stating that the 10-year bond is more liquid and less sensitive to unexpected changes in inflation than bonds with a longer maturity and thus avoids "*a non-risk-based upward bias*" to the cost of capital. He added that the use of the 10-year bond is recommended by academics and practitioners for long-term valuation purposes "*fundamentally, but not exclusively, because of duration matching*." Prof. Spiller further stated that he used the 12-month average yield because it smoothes out

---

[714] Spiller I, Appendix C; Spiller II, ¶ 31 and ¶ 139; Counter-Memorial, ¶ 235 referring to Brailovsky/Flores I, ¶¶ 179-180; Brailovsky/Flores II, ¶¶ 154-155.
[715] Spiller I, ¶ 156; Spiller II, ¶ 148.
[716] Brailovsky/Flores I, ¶ 184; Brailovsky/Flores II, ¶ 221.

volatilities resulting from short-term fluctuations and is thus more stable and reliable than the spot yield on the valuation date.[717]

673. Mr. Brailovsky and Dr. Flores stated that the 20-year bond on the valuation date is recommended by Ibbotson/Morningstar for long-term projects and is thus appropriate for a DCF valuation of cash flows that continue in perpetuity. As to their choice of the yield on the valuation date, they stated that it gives credit to the notion of fair market value, which requires a valuation "*immediately before the time at which the taking occurred,*" and the fact that an actual transaction cannot be based on a 365-day average.[718]

674. The Tribunal notes that in their second report, Mr. Brailovsky and Dr. Flores did not respond to Prof. Spiller's statement that the 10-year bond is the more commonly recommended measure of the risk-free rate, which is particularly due to duration matching. While the Tribunal is aware of Respondent's argument that the 20-year bond reflects the duration because the present valuation assumes that cash flows will be generated in perpetuity,[719] it must be noted that this is usually the case in DCF valuations and therefore does not justify a deviation from a commonly recommended measure. In addition, Claimant correctly points out that the majority of Norpro Venezuela's expected future cash flows would have been generated in the next ten years and thus within the duration of the 10-year bond.[720]

675. The Tribunal further agrees with Prof. Spiller that the use of a spot yield on a certain date is less reliable than a 12-month average because it may reflect short-term or even daily fluctuations. The Tribunal is not convinced by the argument that the recommendation contained in the World Bank Guidelines to determine fair market value "*immediately*" prior to the expropriation makes it necessary to consider only the spot yield on the valuation date. While it is of course the purpose of this valuation to determine the purchase price that a willing buyer would have paid on that date, the Tribunal considers it doubtful that a willing buyer would have based its assessment of the risk-free rate exclusively on data from that day, given that the buyer would be interested to obtain a reliable result for its long-term investment.

676. Consequently, the Tribunal follows Prof. Spiller's approach to determine the risk-free rate based on the 12-year average yield of the 10-year US Treasury bond rate, which results in a risk-free rate of 3.6% as of 15 May 2010.

---

[717] Spiller I, ¶ 156; Spiller II, ¶¶ 149-151 referring to **Exhibits CLEX-180**, **CLEX-181** and **CLEX-17**.

[718] Brailovsky/Flores I, ¶¶ 184-185 referring to **App. BF-42**, p. 5 and quoting from the World Bank Guidelines (**App. BF-43**), Chapter 4, ¶ 3.

[719] Respondent's Post-Hearing Brief, ¶ 146.

[720] *Cf.* Reply, ¶ 166.

### (2)    Market Risk Premium in the US

677.  The second element to be determined for the US cost of equity is the market risk premium, which consists of a general market risk premium multiplied by an industry-specific *beta* coefficient. It is in dispute between the Parties and their experts whether this premium should then be increased by a further *alpha* coefficient.

### General Market Risk Premium

678.  As for the general market risk premium, Prof. Spiller relied on the recommendation of a prominent scholar in the field, Prof. Damodaran, to apply a premium of 4.5% for the year 2010.[721] Mr. Brailovsky and Dr. Flores relied on Ibbotson/Morningstar's use of the arithmetic mean over historical market risk premia as from 1926, which resulted in a general market risk premium of 6.7% as of 15 May 2010.[722]

679.  While acknowledging that the market risk premium is "*commonly estimated from historical data using the largest historical period available*," Prof. Spiller explained that the financial crisis in 2008-2009 tends to distort the results of this method in light of the large negative returns suffered during this period, which made the historical average fall, which is why Prof. Damodaran suspended his practice of using historical returns and replaced it with the above recommendation.[723] Prof. Spiller further referred to various scholars taking the position that the discount factor for long-term projects should be determined by using the geometric mean rather than the arithmetic mean applied by Respondent's experts.[724] Finally, he noted that market risk premium derived by Respondent's experts is not supported by any recent research, which yielded much lower results, *e.g.*, a 2011 study conducted by Dimson *et al.* that resulted in a world-wide market risk premium of 3-3.5% on a geometric mean basis and 4-4.5% on an arithmetic mean basis.[725]

680.  Mr. Brailovsky and Dr. Flores stated that they used the historic average to "*reduce as much as possible the variability of the mean estimate*," while Prof. Spiller simply relied on the opinion of Prof. Damodaran. They further noted that, for the US, Dimson *et al.* actually estimated an arithmetic market risk premium of 6.4-7.2% for 2011, which is in line with their estimate for 2010.[726] Finally, they stated that the scholars referred to by

---

[721] Spiller I, ¶¶ 157-158; Spiller II, ¶ 152.
[722] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221.
[723] Spiller I, ¶ 157 referring to **Exhibits CLEX-71** and **CLEX-72**; Spiller II, ¶ 152 referring to **Exhibit CLEX-72**.
[724] Spiller II, ¶¶ 153-156 quoting from **Exhibits CLEX-184**, **CLEX-181**, **CLEX-185** and **CLEX-72**.
[725] Spiller II, ¶ 157-158 referring to **Exhibit CLEX-186**. Prof. Spiller's other references concern market risk premia for 2014, which are in the range of 4.14-6.18%. *Cf.* Spiller II, ¶¶ 158-161 and Table 15.
[726] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221 referring to **App. BF-170**, p. 169.

Prof. Spiller do not generally favor the geometric mean over the arithmetic mean and referred to further scholars who prefer the arithmetic mean.[727]

681.  The Tribunal notes that Prof. Spiller in principle acknowledged the approach used by Mr. Brailovsky and Dr. Flores as a recognized and commonly used method to determine the market risk premium. While the Tribunal is of course aware that the financial crisis in 2008-2009 had a serious impact on the US stock market, it is not convinced by Prof. Spiller's argument that falling returns in the stock market have necessarily rendered the historic average unreliable. In particular, the Tribunal notes that, while falling returns may indeed have led to a suggestion that investors were willing to invest at lower returns and thus lower risk premia, this does not explain why the risk premium derived by Respondent's experts from the historical average is higher than the recommendation provided by Prof. Damodaran.

682.  In addition, the Tribunal considers the data from proven market developments over a time period of more than 80 years more reliable than the recommendation of one scholar. While it is undisputed that Prof. Damodaran is a highly accomplished authority in this regard, this does not elevate his recommendation above the necessity for an evidentiary basis supporting Prof. Spiller's choice. In the document that Prof. Spiller relied on, Prof. Damodaran simply states that "[a]*s risk premiums came down in 2009, I moved back to using a 4.5% equity risk premium for mature markets in 2010.*"[728] In the Tribunal's view, this statement cannot be considered sufficient to justify a deviation from an established method.

683.  While Prof. Spiller did refer to additional sources in his second report, there is only one document, the study of Dimson *et al.* dating from 2011, which can provide relevant information for the valuation date of 15 May 2010. In this regard, Mr. Brailovsky and Dr. Flores correctly pointed out, however, that the figures presented by Prof. Spiller (3-3.5% geometric mean; 4-4.5% arithmetic mean) do not relate to the US market but rather to a world-wide analysis of different markets.[729] They further pointed to a different document authored by the same scholars dating from the same year, which reports higher figures for the US market (4.4-5.3% geometric mean; 6.4-7.2% arithmetic mean).[730] Therefore, the Tribunal does not have any evidence before it that would support Prof. Damodaran's estimate for 2010.

684.  As to the dispute between the Parties relating to the question whether it is appropriate to use the geometric mean or rather the arithmetic mean of a certain method, it appears to

---

[727] Brailovsky/Flores II, ¶ 221 referring to **App. BF-171**, p. 156, **BF-172**, p. 56 and **BF-173**, p. 159.
[728] **Exhibit CLEX-72**, p. 77.
[729] **Exhibit CLEX-186**.
[730] **App. BF-170**.

the Tribunal that this is a disputed issue among scholars. The Tribunal notes that it has not been provided with the geometric mean of the historical premia for the valuation date of 15 May 2010. However, the Ibbotson/Morningstar report on which Respondent's experts relied as a source for their 6.7% premium provides for different premia for short-term, mid-term and long-term horizons, with 6.7% being the premium for the long-term horizon. In light of the fact that both Parties's experts rely on data from Ibbotson/Morningstar in relation to various aspects of their calculation, the Tribunal has no reason to consider Ibbotson/Morningstar's choice to derive the equity risk premium on the basis of the arithmetic mean unwarranted.

685. Consequently, the Tribunal follows Mr. Brailovsky's and Dr. Flores' approach to derive the general market risk premium for the US from the arithmetic mean of the historical premia since 1926, which results in a premium of 6.7% for the valuation as of 15 May 2010.

### Industry-specific *Beta* Coefficient

686. There is common ground between the Parties and their experts that the general market risk premium has to be multiplied by an industry-specific component, *i.e.*, the *beta* coefficient. They further agree that the appropriate raw *beta* for Norpro Venezuela is to be derived from SIC Code 1381 Drilling Oil and Gas Wells, as calculated by Ibbotson/Morningstar.[731] The Parties' experts also use the same method for adjusting and levering the raw *beta* in order to arrive at the final *beta* to be used for the present purposes.[732]

687. The Tribunal notes that there is a difference between the Parties' experts with regard to the particular raw *beta* they chose from the Ibbotson/Morningstar data. While Prof. Spiller used the 5-year average of the composite company,[733] Mr. Brailovsky and Dr. Flores relied on the median raw *beta*.[734] However, the Tribunal does not have to express an opinion on this issue because both the composite and the median raw *beta* as reported by Ibbotson/Morningstar for March 2010 amount to 1.3, which results in an adjusted levered *beta* of 1.2.[735]

688. For its valuation of Norpro Venezuela as of 15 May 2010, the Tribunal will thus multiply the general market risk premium by an industry-specific factor of 1.2.

---

[731] Counter-Memorial, ¶ 236; Spiller I, ¶ 161; Brailovsky/Flores I, note 318 and ¶ 190.
[732] Spiller I, ¶¶ 162-164; Brailovsky/Flores I, ¶ 191.
[733] Spiller II, ¶¶ 146-147.
[734] Brailovsky/Flores I, ¶ 190.
[735] Spiller II, ¶ 147; Brailovsky/Flores II, Table 8; Ibbotson/Morningstar, Statistics for SIC Code 1381, Drilling Oil and Gas Wells, 31 March 2010 (**App. BF-37**).

### *Alpha* Coefficient

689. Finally, the Tribunal has to deal with the question whether the industry-specific market risk premium has to be increased by a further *alpha* coefficient, as alleged by Respondent.

690. Mr. Brailovsky and Dr. Flores explain that the CAPM tends to underestimate the cost of capital for financial assets and therefore has to be adjusted to capture the actual performance of the stocks of publicly traded companies, *i.e.*, the *alpha* coefficient. Despite their view that Norpro Venezuela qualifies as a small company within the industry captured in SIC Code 1381, Mr. Brailovsky and Dr. Flores emphasized that they used the *alpha* for the median company, as reported by Ibbotson/Morningstar for March 2010, *i.e.*, 1.3%.[736] They explained that the *alpha* accounts for "*systemic volatilities of companies both large and small*" and noted that, even though "*many practitioners, including Prof. Spiller, forget this finding*," the *alpha* is routinely reported by financial data services providers such as Bloomberg.[737] While acknowledging that the *alpha* is greater in smaller companies, which is why it is also labelled "*size premium*", *e.g.*, by Ibbotson/Morningstar, they stated that large companies may also have a significant *alpha*, which is why it should be added to the market risk premium.[738]

691. Prof. Spiller considered it inappropriate to add a "*size premium*" to the market risk premium and noted that it is contested among financial practitioners and academics, including Prof. Damodaran. With reference to various scholars, he further stated that the *alpha* has been found to be "*empirically unreliable across regions and time periods*" and is understood to reflect underlying market risk factors rather than the inherent effect of size.[739] In addition, Prof. Spiller took the view that the addition of a "*size premium*" would potentially be duplicative of the country risk premium because Venezuelan firms are smaller than firms in the US and Norpro Venezuela cannot be qualified as a small or even medium company within Venezuela.[740]

692. The Tribunal notes that there are two issues to be distinguished with regard to the *alpha* coefficient: (i) whether it reflects in general an established phenomenon to be accounted for the cost of equity; and (ii) whether it would in this particular case be duplicative of country risk to be determined in the next section.

693. As to the second argument, the Tribunal is not convinced that the *alpha* coefficient amounts to a size premium for smaller companies, which would be double-counting the

---

[736] Brailovsky/Flores I, ¶¶ 192-193; Brailovsky/Flores II, ¶¶ 206-207; Ibbotson/Morningstar, Statistics for SIC Code 1381, Drilliing Oil and Gas Wells, 31 March 2010 (**App. BF-37**).
[737] Brailovsky/Flores II, ¶¶ 209-213.
[738] Brailobsky/Flores I, ¶ 192; Brailovsky/Flores II, ¶ 214.
[739] Spiller II, ¶¶ 48-49 referring to **Exhibits CLEX-113** through **CLEX-119**,
[740] Spiller II, ¶¶ 50-52 and Table 6.

fact that companies in Venezuela are in general smaller than US companies. While it is apparent from the Ibbotson/Morningstar data and also acknowledged by Respondent's experts that the *alpha* is greater for smaller companies than for larger companies, Prof. Spiller also recognized that the *alpha* does not capture an inherent size effect but rather underlying market risk factors. These factors may be more pronounced for smaller companies but they do exist for larger companies as well. Contrary to what Claimant appears to suggest, Mr. Brailovsky and Dr. Flores did not apply the *alpha* for the small composite but rather chose the median. In the Tribunal's view, Claimant thus has failed to establish that the application of the median *alpha* would be duplicative of the country risk for Norpro Venezuela.

694. However, the Tribunal is aware of Prof. Spiller's general criticism of the *alpha*, which is supported by various references to scholars and practitioners. The Tribunal also notes that Mr. Brailovsky and Dr. Flores even acknowledged that "*many practitioners* […] *forget*" to apply the *alpha* coefficient to the market risk premium. It therefore appears to be undisputed that the *alpha* cannot be considered a well-established element of determining the market risk premium. On the balance of the evidence, the Tribunal is thus not convinced that the *alpha* coefficient should be added to the US cost of equity rate.

### Conclusion on Cost of Equity for a Company in the US

695. In sum, the Tribunal's findings result in the following cost of equity for a company in the US as of 15 May 2010: (i) a risk-free rate of 3.6%; plus (ii) a market risk premium of 8%, consisting of the general market risk premium of 6.7%, to be multiplied by the industry-specific *beta* coefficient of 1.2. For the reasons laid out above, the Tribunal does not make any further addition in relation to an *alpha* coefficient.

696. Consequently, the Tribunal finds that the US cost of equity to be used to determine the applicable discount rate in this case amounts to 11.6%.

### (3) Country Risk Premium for Venezuela

697. The Parties agree that the cost of equity as determined above for a company in the US operating in the same business as Norpro Venezuela has to be increased by a country risk premium to account for the fact that the plant is located in Venezuela. However, the Parties' experts have applied different methods to determine this country risk premium, which lead to significantly differing results.

698. Prof. Spiller relied on a method devised by Prof. Damodaran, which is based on the local currency sovereign rating assigned to Venezuela by Moody's (B1 as of 15 May 2010), converted into a default spread pursuant to Prof. Damodaran's estimate for the B1 rating

class (4.5% in 2010). Prof. Spiller applied this default spread as the country risk premium without making any further adjustments for equity risk.[741]

699. Mr. Brailovsky and Dr. Flores primarily relied on the Country Risk Rating Model (CRRM) compiled by Ibbotson/Morningstar, which is based on an ongoing survey of 75-100 bankers conducted every six months by the publication *Institutional Investor*. In this survey, the bankers are asked to rate 170 countries on a scale of 0 to 100 and the editors of *Institutional Investor* weigh the responses based on their perception of the banks' level of global performance and sophistication of their credit research methods. These country risk ratings are then converted into equity discount rates based on a study conducted by Erb, Harvey and Viskanta, which is updated on a regular basis. For Venezuela, the CRRM resulted in a country equity risk premium of 14.3% as of 15 May 2010.[742]

700. For cross-checking purposes, Mr. Brailovsky and Dr. Flores further used the so-called "*bludgeon method*" devised by Prof. Damodaran, which is based on the spread on Venezuela's sovereign bond denominated in US Dollars. They chose JP Morgan's Emerging Market Bond Index (EMBI), which measures the difference between the USD-nominated sovereign bond yields of Venezuela and those of the US and amounted to 10.26% as of 15 May 2010. Mr. Brailovsky and Dr. Flores then applied the global multiplier (1.5) suggested by Prof. Damodaran to account for the fact that investment in equity is riskier than investment in bonds and arrived at a country risk premium of 15.4% as of 15 May 2010.[743]

701. While acknowledging that experts may disagree on data and methodology, Prof. Spiller stated that Mr. Brailovsky's and Dr. Flores' choice does not reflect Norpro Venezuela's country risk exposure because they failed to take into account three factors specific for its business: (i) Norpro Venezuela exported its products and was therefore not subject to domestic demand conditions and risks; (ii) it had secured the supply of its key production inputs through long-term contracts with State-owned companies; and (iii) it was protected by a bilateral investment treaty, which requires that risks related to expropriation and "*crisis conditions*" be excluded from the present valuation.[744] According to Prof. Spiller, Venezuela's current "*very high*" EMBI spreads reflect the possibility of it entering into default due to its lack of willingness to pay its obligations, but not the company-specific risks faced by a private long-term investor that is not subject to the Government's willingness or ability to pay. He added that Mr. Brailovsky's and Dr. Flores' choice to use the EMBI spread of only one day amplifies the contrast between their short-term measure of

---

[741] Spiller I, ¶¶ 165-166; Spiller II, ¶ 33 relying on **Exhibit CLEX-75**.
[742] Brailovsky/Flores I, ¶¶ 197-199.
[743] Brailovsky/Flores I, ¶¶ 201-204.
[744] Spiller II, ¶¶ 35-36 and ¶¶ 40-44.

risk and Norpro Venezuela's long-investment.[745] Prof. Spiller took the view that, by contrast, his own assessment of the country risk captures the "*long-term impact of country risk on Norpro Venezuela's operations*" consistent with Prof. Damodaran's assessment.[746] Prof. Spiller further took the position that it is "*neither necessary under the CAPM nor advisable*" to calculate a separate country risk for equity because the equity risk converges to debt risk in the long term, which is why Prof. Damodaran recommends the application of a mutiplier only for the short term.[747] As to the CRRM, Prof. Spiller raised several points of criticism, including (i) a lack of transparency; (ii) the subjective and qualitative nature of the ratings; (iii) claims that the surveys are biased towards specific regions of the world; (iv) a lack of statistical or economic explanations; and (v) unreliability for small or illiquid stock exchanges with unreliable stock market data, such as Venezuela.[748]

702. Mr. Brailovsky and Dr. Flores pointed out that Prof. Spiller's country risk premium is in fact equal to a 10-year B-rated generic US bond over the corresponding US Treasury bond and therefore reflects US corporation debt risk but not Venezuelan country risk.[749] They further stated that, contrary to what he suggested, Prof. Spiller did not apply Prof. Damodaran's method because Prof. Damodaran has a hierarchy of methods: his first choice is to use the spread on sovereign bonds denominated in "*strong currencies*" such as the US Dollar or Euro (*i.e.*, the "*bludgeon method*") and only for those countries that do not issue such bonds, he suggests an alternative approach of assuming that sovereign ratings are comparable to corporate ratings.[750] In any event, Mr. Brailovsky and Dr. Flores considered it necessary to scale the default spread by a multiplier because their analysis of both the US and Venezuelan market over a period of 20 years did not support a convergence of the risk but rather yielded volatilities of 2.05 and 2.74, respectively, as of 15 May 2010.[751] Finally, they took the view that Norpro Venezuela is not less exposed to country risk than other companies operating in Venezuela because (i) country risk is a much larger concept than exposure to domestic demand, involving taxation, regulations and other government actions such as currency controls; (ii) the invoked long-term contracts expire in 2016 and 2018, respectively, and do not contain any renewal option; and (iii) the risk of expropriation forms part of fair market value and would be taken into account by any willing buyer; in any event, bilateral treaties do not have a discernible impact on country

---

[745] Spiller II, ¶¶ 37, 46 and 140-141.
[746] Spiller II, ¶ 47.
[747] Spiller II, ¶¶ 142 and 144.
[748] Spiller II, ¶ 143.
[749] Brailovsky/Flores I, ¶¶ 213, 215.
[750] Brailovsky/Flores I, ¶¶ 210, 216 referring to **App. BF-64**, pp. 51, 53; Brailovsky/Flores II, ¶¶ 161, 182. According to Mr. Brailovsky and Dr. Flores, Prof. Damodaran's best estimate of the equity country risk premium is in fact in line with their own estimate. Brailovsky/Flores I, ¶ 212; Brailovsky/Flores II, ¶¶ 185, 190.
[751] Brailovsky/Flores II, ¶ 199 and Table 14. Mr. Brailovsky and Dr. Flores emphasize that they nevertheless use (only) Prof. Damodaran's generic multiplier of 1.5 as a benchmark for their calculation.

risk according to political risk insurers.[752] As to Prof. Spiller's criticism on the CRRM, Mr. Brailovsky and Dr. Flores acknowledged that the criteria are subjective (albeit based on economic fundamentals) but stated that their consequences are objective, given that they form the basis for banks' lending practices. In addition, they pointed out that the model has produced stable results over the last 25 years.[753] They further took the position that the EMBI spread on 15 May 2010 was not out of the ordinary but rather "*almost exactly in the middle of the distribution of the daily data since 1993 – a total of 5,336 observations.*"[754]

703. The Tribunal notes that there are several points of disagreement between the Parties' experts in relation to the determination of an appropriate country risk premium for Norpro Venezuela as of 15 May 2010. However, it appears that a large portion of them depends on a fundamental issue that the Tribunal will therefore address at the outset, *i.e.*, whether the risk of being expropriated without the payment of (sufficient) compensation as required by the Treaty should be excluded from the country risk premium applicable to Venezuela.

704. At the outset, the Tribunal wishes to emphasize that, in principle, it agrees with Respondent that the country risk premium to be applied in the present case should be a realistic estimate of the premium that a willing buyer would have applied in May 2010. At the same time, the Tribunal understands Claimant's position that the risk of being expropriated with no or insufficient compensation should be excluded from the valuation of Norpro Venezuela in the context of this arbitration.

705. In this context, Claimant's expert Prof. Spiller stated in his second expert report that protections from the France-Venezuela BIT served as "*an additional mitigation of country risk*";[755] however, he neither quantified the impact of such mitigation nor did he present any evidence in support of this statement. By contrast, Respondent's experts presented a study conducted by Lauge N. Skovgaard Poulson, who has examined whether political risk insurers placed any weight on the possiblity whether bilateral investment treaties reduce risk and concluded that "[bilateral investment] *treaties have very little impact on political risk insurance (PRI) providers' coverage and pricing policies.*"[756] While the Tribunal would not go as far as to consider that Respondent has thereby established that protection of investments by bilateral investment treaties has "*no discernible impact on country risk,*"[757] it must be noted that Claimant never addressed the evidence presented

---

[752] Brailovsky/Flores II, ¶¶ 200-205 referring to **App. BF-166**.
[753] Brailovsky/Flores II, ¶¶ 169, 174-179 and Figure 19.
[754] Brailovsky/Flores II, ¶¶ 166, 172.
[755] Spiller II, ¶ 41.
[756] Brailovsky/Flores II, ¶ 205 quoting from **App. BF-166**, p. 1.
[757] *Cf.* Respondent's Post-Hearing Brief, ¶ 179.

by Respondent's experts, nor has it, or its expert Prof. Spiller, presented any evidence to the contrary of its own. Against this background, the majority of the Tribunal cannot conclude that the existence of the France-Venezuela BIT would have had a quantifiable impact on the risk assessment of a willing buyer – from a strictly economical point of view.

706. Nevertheless, it could be argued that if the Tribunal were not to make any adjustment as regards the risk of expropriation with no or insufficient compensation, this would allow Respondent to benefit from its own internationally wrongful conduct, *i.e.*, not only the breach of Article 5(1) of the Treaty, but its alleged general policy to expropriate investments without paying adequate compensation. As compensation is a crucial aspect of Respondent's obligations in connection with an expropriation and Respondent would be responsible for its alleged failure to comply with this obligation, the risk of expropriation without (sufficient) compensation should be eliminated from the country risk. The Tribunal notes that this argument is no longer based on a strictly economic perspective, but includes a normative element reflecting the ambition that treaty protection should be respected and enforced. According to this argument, the notion of fair market value under the Treaty would thus have to be interpreted in the context of its own protection standards.

707. In the Tribunal's view, this rationale would apply not only to expropriation-related risks, but also to risks related to other provisions of the Treaty, such as the risk of unfair regulation, adoption of arbitrary measures, serious due process violations, etc. According to Claimant's rationale, all of these risks should be excluded from the country risk because they emerge from Respondent's alleged tendency not to live up to its international obligations.

708. This position is supported in particular by the tribunal in *Gold Reserve v. Venezuela*, which held that the country risk premium should not reflect "*the market's perception that a State might have the propensity to expropriate in breach of BIT obligations.*"[758] While the tribunal found in that case that no expropriation had occurred, it nevertheless considered that risks related to expropriation should be excluded from the country risk for the purposes of determining the compensation to be paid to the claimant. At the same time, the tribunal emphasized that political risks other than the expropriation risk must be reflected in the country risk premium. As it considered that these risks were not reflected in the 1.5% country risk premium applied by the claimant's expert, it relied on the 4% premium used in an analyst report instead, without however giving any further reasons for its choice.[759]

---

[758] *Gold Reserve v. Venezuela* (**CLA-152**), ¶ 841.
[759] *Gold Reserve v. Venezuela* (**CLA-152**), ¶¶ 841-842.

709. On the other hand, the Tribunal notes that there are also arguments in favor of Respondent's position that the country risk premium should include all political risk associated with investing in Venezuela, including the alleged general risk of expropriation with no or insufficient compensation.

710. First, the Tribunal recalls that both Parties agree that, regardless of the compensation standard to be applied, the Tribunal has to determine Norpro Venezuela's fair market value, *i.e.*, the amount that a willing buyer would pay to a willing seller. Taking into account this definition, it could be in accordance with the economic notion of fair market value to maintain the risk of expropriation without (sufficient) compensation as one of the risks that a willing buyer would realistically take into account.

711. In addition, as noted by the ILC in the commentary to Article 36 of its Draft Articles, "*the function of compensation is to address the actual losses incurred as a result of the internationally wrongful act*" and is thus "*purely compensatory*"; "[i]*t is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character.*"[760] It could be argued that if one were to exclude the risk of uncompensated expropriation from the present valuation, Claimant would be granted a windfall because it would receive compensation in an amount that it would not have been able to obtain as a purchase price if it had actually sold Norpro Venezuela to a willing buyer in 2010, and thus more than "*the actual losses incurred*" as a result of Respondent's breach of Article 5(1) subparagraphs 2 and 3 of the Treaty.

712. As correctly pointed out by Respondent, this position is supported in particular by the tribunal in *Tidewater v. Venezuela*, which concluded based on these arguments that, while the particular State measure giving rise to the claim must of course be excluded from the valuation, the country risk premium reflects "*the general risks, including political risks, of doing business in the particular country, as they applied on that date.*"[761] The tribunal concluded that a country risk premium of 14.75% was appropriate under the circumstances.[762]

713. In the Tribunal's view, the fundamental issue to be resolved in this regard is thus whether in its determination of the compensation to be paid to Claimant, the Tribunal should disregard only the impact of the particular breach of Article 5(1) that it has found under the present Treaty, or whether it should also eliminate the risk of further potential breaches

---

[760] **CLA-027**, Article 36, ¶ 4.
[761] *Tidewater v. Venezuela* (**RL-207**), ¶ 186.
[762] *Tidewater v. Venezuela* (**RL-207**), ¶ 190.

of international law that generally reduce the value of all investments in Venezuela be-
cause Respondent would otherwise be allowed to take advantage of its alleged policy not
to respect its international obligations.

714. This question cannot be answered without taking into account the circumstances prevail-
ing when Claimant made its decision to invest in Venezuela. Specifically, the Tribunal
considers it relevant whether the risk, which Claimant now seeks to be excluded from the
country risk premium, already existed in 2006 or whether there was an apparent change
of policy since the investment was made, *i.e.*, from an investor-friendly environment to-
wards establishing a tendency to expropriate foreigners without adequate compensation
as alleged by Claimant.

715. In this context, it is undisputed that when the team surrounding Patrick Millot sought
approval of the project from Claimant's mother company Compagnie de Saint-Gobain in
2006, a discount rate of 15% was used, consisting of the 12% rate usually assigned within
Claimant's group to "*high risk*" countries plus a 3% premium to account for "*additional
risks by conservatism.*"[763] While this rate cannot simply be equated to an objective as-
sessment that a willing buyer might have conducted, it serves as an indication that Claim-
ant already considered Venezuela a "*high risk*" country and even added 3% for additional
risk when it made its investment decision in 2006. In its own words, Claimant invested
"*during the height of the Bolivarian Revolution.*"[764] In the Tribunal's view, this demon-
strates that, already in 2006, Claimant factored in certain risks that are not covered by the
usual risk of investing in "*high risk*" countries and most probably relate to a risk of being
expropriated with no or insufficient compensation.

716. It must further be noted that it is undisputed between the Parties that the country risk has
increased since 2006.[765] The question is whether such increased risk must, or rather must
not, be taken into account in the present valuation of Norpro Venezuela because the in-
crease is due to Respondent's alleged practice to expropriate investments without (suffi-
cient) compensation and would thus allow it to benefit from its own wrongful conduct.

717. In this regard, the majority of the Tribunal agrees with the tribunal in *Tidewater v. Vene-
zuela* that Claimant's argument "*conflates two separate elements in a legal claim of this
kind*," *i.e.*, (i) the question of liability where the Tribunal has found that Respondent failed
to carry out the expropriation in accordance with the compensation requirements of the
Treaty; and (ii) the quantum stage where the Tribunal must determine the fair market

---

[763] Claimant's Post-Hearing Submission, ¶¶ 130-133; DAC: Grains and Powders – Venezuela 70 kt Greenfield
proppants update 38 M$ revised capex, 23 October 2006 (**Exhibit C-082**) and Financial Mopdel for DAC #3
(**Exhibit CLEX-166**).

[764] Memorial, ¶ 2.

[765] Claimant's Post-Hearing Submission, ¶ 121; Respondent's Post-Hearing Brief, ¶¶ 159-162.

value of Claimant's investment. As the *Tidewater* tribunal has found, "*the second element in the claim is in essence an economic question. It depends upon the value that the market would attribute to the investment in question.*"[766] The tribunal further held:

> "*This is not a matter of permitting a respondent State to profit from its own wrong. On the contrary, the damages that the Tribunal is empowered by virtue of the Treaty to award are designed to ensure that the private investor is compensated for the loss of its investment. But, in determining the amount of that compensation by reference to a discounted cash flow analysis, the Tribunal should consider the value that a willing buyer would have placed on the investment. In determining this value, one element that a buyer would consider is the risk associated with investing in a particular country. Such a factor is not specific to the particular State measure that gives rise to the claim.* [...] *Rather the country risk premium quantifies the general risks, including political risks, of doing business in the particular country, as they applied on that date and as they might then reasonably have been expected to affect the prospects, and thus the value to be ascribed to the likely cash flow of the business going forward.*"[767]

718. The majority of the Tribunal agrees with this finding and therefore cannot follow Claimant's argument that a failure to exclude the risk of expropriation with no or insufficient expropriation would allow Respondent to benefit from its own wrongful conduct. In the Tribunal's view, Claimant's own risk assessment in 2006 shows that, from an economic perspective, any "*additional risks*" associated with investing in Venezuela would be taken into account by an investor or a willing buyer – irrespective of the existence of the present Treaty.

719. The notion of fair market value, which the Tribunal has identified above as the applicable compensation standard,[768] requires the elimination of the specific measure that was subject of the Tribunal's finding on liability, *i.e.*, in this case Respondent's failure to comply with its obligation to pay prompt and adequate compensation to Claimant. However, it does not require, and in fact does not allow for, a correction of the economic willing-buyer perspective on the basis of normative considerations. In particular, the majority of the Tribunal is of the view that the Treaty and this arbitration do not serve the purpose of insuring Claimant against the general risks of investing in Venezuela that a willing buyer would take into account in its assessment of the purchase price it would pay for Norpro Venezuela.

---

[766] *Tidewater v. Venezuela* (**RL-207**), ¶¶ 184-185.
[767] *Tidewater v. Venezuela* (**RL-207**), ¶ 186.
[768] *See* paragraph 627 above.

720.  In any event, the Tribunal notes that, while acknowledging the increased country risk, Respondent strongly contests Claimant's allegation that it is making generalized threats to expropriate all foreign investments in Venezuela and/or public statements that it does not intend to honor its obligations under international law. Respondent emphasizes that Claimant has not presented any evidence with regard to these allegations and claims that "*Venezuela has not defaulted on any of its sovereign obligations, and Venezuela has paid compensation in its expropriation cases*."[769] In its letter of 6 November 2015, Respondent again contested that there is any divergence between Venezuela's willingness to pay and its ability to pay and referred to the director of the Venezuelan economic consulting firm Ecoanalítica who stated on 28 October 2015 that PDVSA's debt payments in the total amount of USD 5 billion over the last 15 days confirmed "*Venezuela's strong willingness to pay*."[770]

721.  Consequently, it is very much in dispute between the Parties whether there is a general risk of uncompensated expropriation in Venezuela. While Respondent correctly pointed out that Claimant has not presented any specific evidence in support of its allegation, in the Tribunal's view the high country risk in Venezuela may be due, at least in part, to the uncertain situation surrounding certain of Respondent's expropriation measures. Respondent does not contest that it is involved in several disputes with investors that relate to the payment of adequate compensation.

722.  However, in light of its finding above that the determination of fair market value has to be made in accordance with economic principles and thus factor in all risks that a willing buyer would take into account, the Tribunal does not have to make a decision on Respondent's expropriation measures in general (assuming it had jurisdiction to adopt such a finding).

723.  Consequently, the majority of the Tribunal agrees with Respondent that the country risk premium must reflect all political risks associated with investing in Venezuela, including the alleged general risk of being expropriated without payment of (sufficient) compensation.

724.  Accordingly, the Tribunal does not have to decide the further question whether it is possible to quantify and thus eliminate the expropriation risk from the country risk, without at the same time excluding other country-specific risks that undisputedly have to be accounted for in the country risk premium. Instead, the Tribunal must assess from the per-

---

[769] Respondent's Post-Hearing Reply Brief, ¶¶ 39-42.
[770] Respondent's letter dated 6 November 2015; **Exhibit R-131**.

spective of the willing buyer, which of the various methods presented by the Parties' experts adequately reflects the country risk to which Norpro Venezuela was in fact exposed as of 15 May 2010.

725. At this point, the Tribunal notes that it is in dispute between the Parties whether the difference between the approach applied by Prof. Spiller and the two approaches applied by Respondent's experts is due (exclusively) to the risk of uncompensated expropriation. While Respondent claims that it is not possible to isolate and thus quantify the risk of uncompensated expropriation,[771] Claimant contends that Prof. Spiller's method based on Venezuela's local currency rating excludes the risk of uncompensated expropriation but includes "*other risks of investing in Venezuela, such as the risks of a volatile economy, civil disorder, less developed infrastructure, and other issues.*"[772] Claimant explicitly states that, as Venezuela's "*extremely high*" USD-denominated bond spread reflects its lack of willingness to pay, the difference between the country risk premia computed by the Parties' experts is "*largely attributable to Venezuela's confiscation threats.*"[773] It is thus apparently Claimant's position that the approach selected by Prof. Spiller does not include the alleged general risk of uncompensated expropriation and thus does not capture the actual country risk that a willing buyer would take into account in its valuation of Norpro Venezuela.

726. The Tribunal notes that Prof. Spiller did not state at the Hearing that Prof. Damodaran's local currency rating method is in fact designed to eliminate the risk of uncompensated expropriation from the country risk premium. However, he gave the following explanation for the fact that the alternative approach selected by Mr. Brailovsky and Dr. Flores based on Venezual's EMBI spread renders much higher results than the rating-based method:

> "*The investors in Venezuelan bonds all the way up to December 2013 were assessing that although the fundamental economics of Venezuela were comparable to B1 credit-rating countries, they were fearing that Venezuela may not be willing to uphold its international obligations, not dissimilar to, what for example, Ecuador did when it defaulted recently on its debt, which was based on willingness to pay to uphold the international obligations rather than economic fundamentals, as may be the case now with Greece, which cannot repay the debt.*"[774]

727. Prof. Spiller thus confirms Claimant's position that the divergence between the results yielded by the two methods is due to Venezuela's alleged unwillingness to live up to its

---

[771] Respondent's Post-Hearing Brief, ¶ 163.
[772] Claimant's Post-Hearing Submission, ¶¶ 105-106.
[773] Claimant's Post-Hearing Submission, ¶¶ 118-119.
[774] Transcript (Day 4), p. 903 lines 5-16.

international obligations. Prof. Spiller further argues that in the case of Venezuela, there is a significant discrepancy between the country's ability to pay (reflected in its local currency rating) and its willingness to pay (reflected in its USD-denominated bond spreads). Prof. Damodaran's spreadsheet as of 1 July 2013[775] indeed shows that the divergence between the two methods amounted to 7.62% for Venezuela, but less than 1% for most other countries. The only other countries with a divergence of more than 2% are Tunisia (2.22%) and Argentina (31.72%).[776]

728.   In the Tribunal's view, the unusual divergence between the results yielded by the two methods supports Prof. Spiller's explanation that the CDS spreads (just like the EMBI spread) might reflect a risk that is not usually associated with countries that are assigned a B1 rating. While this additional risk could indeed be the risk associated with Venezuela's alleged policy not to live up to its international obligations, the Tribunal has already found above that it is beyond the scope of this arbitration to make a finding on Venezuela's general policy towards foreign investors and to make any corresponding adjustment to the country risk premium in this regard.

729.   Respondent further pointed out in its Post-Hearing Reply Brief that Prof. Spiller did not analyze the spreads on USD-denominated bonds of countries with the same rating as Venezuela but rather took the 4.5% spread that Prof. Damodaran applied to all B1-rated countries on the assumption that sovereign ratings are comparable to US corporate ratings, without making any analysis on market data relating to these countries.[777] Already in its Rejoinder, Respondent raised the argument that, instead of relying on the spreads of US corporate bonds, Prof. Spiller should at least have analyzed corporate bonds from emerging countries and referred to the analysis of Mr. Brailovsky and Dr. Flores, which yielded an average debt spread of 9%.[778]

730.   Even though Respondent's argument was again raised by Mr. Brailovsky during the Hearing,[779] Claimant did not respond to it in its Post-Hearing Submission, but argued for the first time in its Second Post-Hearing Submission that the accuracy of Prof. Spiller's measure of country risk could be checked by looking at the CDS spreads outstanding on other countries' sovereign debts. Claimant noted that pursuant to Prof. Damodaran's list as of

---

[775] While Prof. Damodaran's excel sheet for 2010 is on file as **App. BF-62**, it does not contain a calculation of the country risk premium based on the CDS spreads. For comparison purposes, the Tribunal therefore refers to the excel sheet as of July 2013.
[776] **Exhibit CLEX-75**, pp. 5-6 and **App. BF-65**, pp. 3-4.
[777] Respondent's Post-Hearing Reply Brief, ¶¶ 44-45 and ¶ 48.
[778] Rejoinder, ¶ 221 referring to Brailovsky/Flores II, ¶¶ 194-195 and Table 12.
[779] Trascript (Day 4), p. 1210 line 21 to p. 1211 line 3.

January 2014, the 4.5% premium applied by Prof. Spiller would rank as the fourth-highest, "*far above the typical country risk premium in a developing country.*"[780]

731. Respondent replied to this argument by a separate letter pointing out that (i) Prof. Spiller had never referred to CDS spreads in the context of the method he applied; (ii) more than half of the countries with CDS spreads in Prof. Damodaran's list could not be classified as "*developing countries*"; and (iii) "*typicality*" was not a valid concept for the valuation of a project in particular country for which country-specific data was readily available, *i.e.*, in the case of Venezuela, a CDS spread of 10.8%.[781]

732. In the Tribunal's view, it would indeed have been helpful to have a comprehensive analysis of market data from other countries with the same B1 rating that Venezuela was assigned as of 15 May 2010. In particular, Claimant should have raised the argument relating to CDS spreads of other countries at an earlier stage of the proceedings, which would have allowed Respondent and its experts an adequate opportunity to respond to this argument. In addition, the Tribunal could have consulted the Parties' experts on this issue during the Hearing. In the absence of a proper discussion on this issue, the Tribunal does not consider it fair to rely on the data that Claimant pointed to, which in any event relates to 2014 and not to the valuation date in 2010.

733. In addition, the Tribunal recalls Mr. Brailovsky's and Dr. Flores' analysis of corporate bond spreads in emerging markets based on data from Merrill Lynch, which they converted into a generic emerging market corporate bond yield of 9.11% as of May 2014.[782] While they did not provide a figure for the valuation date of 15 May 2010, this undisputed calculation raises doubts as to whether the 4.5% premium calculated by Prof. Spiller reflects even the country risks typically associated with a B-1 rated country that should undisputedly be taken into account in the present valuation – apart from the issue of the expropriation risk.

734. The Tribunal will therefore now turn to the two alternative approaches that Respondent's experts relied on, *i.e.*, the CRRM and the "*bludgeon method,*" which both undisputedly include any risk of uncompensated expropriation and yielded a country risk premium of 14.3% and 15.4% respectively.

735. As to the "*bludgeon method,*" which is based on USD-denominated sovereign spreads, Respondent's experts have chosen to rely on data from the EMBI. While Prof. Spiller criticized in his second report that it is not appropriate to rely on the EMBI in the present

---

[780] Claimant's Second Post-Hearing Submission, ¶¶ 61-62 referring to **App. BF-66**, pp. 23-25.
[781] Respondent's letter dated 2 June 2015, pp. 1-2. The Tribunal admitted Respondent's submission relating to the CDS spreads into the record by letter of 19 June 2015.
[782] Brailovsky/Flores II, ¶¶ 191-197.

case because Venezuela's sovereign credit risk does not reflect Norpro Venezuela's country risk exposure, he did not contest the choice of this particular index as such. Prof. Spiller did challenge the use of the spot index on the valuation date rather than a long-term average; however, he did not provide the Tribunal with an alternative figure that would reflect any such average.[783]

736. The Tribunal is of course aware that Mr. Brailovsky and Dr. Flores have applied Prof. Damodaran's "*bludgeon method*" only to cross-check their primary calculation, which is based on the CRRM. The Tribunal is also aware that Prof. Spiller has raised various points of criticism in relation to this method, in particular as regards a lack of transparency of the method and a lack of reliability in the results it yields,[784] and that Mr. Brailovsky and Dr. Flores have addressed these points of criticism in detail in their second expert report.[785] The Tribunal is of the view that there is no need to express an opinion as to the reliability of the CRRM as both Parties' positions are reflected in one of the methods devised by Prof. Damodaran, who appears to be recognized as a leading authority by both Parties' experts. The Tribunal will therefore focus on the methods that he recommends.

737. Respondent and its experts have taken the position that Prof. Spiller has ignored Prof. Damodaran's hierarchy of methods and that Prof. Damodaran's best estimate is the result yielded by the "*bludgeon method*."[786] While neither Claimant nor its expert has explicitly addressed this argument, the Tribunal notes that the record does not clearly establish that Prof. Damodaran indeed provides for a ranking of his methods. Contrary to what Respondent and its experts suggest, Prof. Damodaran does not state in his writing on equity risk premiums that the rating-based synthetic approach should be applied only for countries that do not have USD-denominated sovereign bonds. By contrast, he states that the default spread "*can be estimated in three ways*," one of which is the synthetic spread.[787] While noting that the other two ways are available only for countries with USD-denominated bonds, he does not state that those ways should be preferred over the synthetic spread. He refers to the assumption that sovereign ratings are comparable to corporate ratings as an "*alternative approach*" and, after laying out the three possible approaches, concludes that one "*could choose one of these approaches and stay consistent over time or average across them.*"[788]

738. In his spreadsheet that formed the basis for Prof. Spiller's choice of the 4.5% premium for 2013, Prof. Damodaran also states that to "[e]*stimate the default spread for the country*

---

[783] Spiller II, ¶¶ 32-36 and ¶¶ 140-141.
[784] Spiller II, ¶¶ 142-143.
[785] Brailovsky/Flores II, ¶ 169 and ¶¶ 174-179.
[786] Brailovsky/Flores I, ¶ 212 and ¶ 216.
[787] **App. BF-64**, pp. 53-55.
[788] **App. BF-64**, pp. 55, 57 and Figure 8.

*in question,*" he "*offer*[s] *two choices, one based upon the local currency sovereign rating for the country from Moody's and the other is the CDS spread for the country (if one exists).*"[789] Again, he does not state that one should prefer the CDS spread approach over the rating approach. Finally, the Tribunal notes that in his spreadsheet for 2010, Prof. Damodaran does not even provide for the CDS spread approach but simply states that "[t]*o estimate the long term country risk premium, I start with the country rating (from Moody's: www.moodys.com) and estimate the default spread for that rating (U.S. corporate and country bonds) over the treasury rate. This becomes a measure of the added country risk premium for that country.*"[790]

739. In light of these statements, the Tribunal is not convinced that there is a hierarchy of methods that Prof. Spiller failed to observe in his choice to rely on the local currency rating model instead of the USD-denominated bond spreads. However, the Tribunal recalls that (i) according to Claimant's own submissions, Prof. Spiller's approach aims to exclude the risk of uncompensated expropriation and therefore does not reflect the actual country risk that a willing buyer would take into account; and (ii) it remains unclear whether it includes even the country risks that are typically associated with a B-1 rated country, as demonstrated by Mr. Brailovsky's and Dr. Flores' analysis of corporate bond spreads in emerging markets.

740. By contrast, the Tribunal has no reason to doubt that Prof. Damodaran's "*bludgeon method*" includes both the risk of uncompensated expropriation and the typical country risks that should undisputedly form part of the present valuation. While the Tribunal is not necessarily convinced that the difference between the results yielded by the two methods is attributable in its entirety to the risk of uncompensated expropriation, Claimant has not presented any evidence that the "*bludgeon method*" includes any risk that would not be taken into account by a willing buyer in its valuation of Norpro Venezuela. Therefore, the Tribunal follows Respondent's experts in this regard and finds that the country risk premium should be determined on the basis of Venezuela's USD-denominated bond spreads as reflected in the EMBI.

741. However, there remains one question to be assessed in this regard, *i.e.*, whether the Tribunal should apply Prof. Damodaran's generic multiplier of 1.5 for its determination of the country equity risk premium on the assumption that investment in equity is riskier than investment in bonds, as stated by Respondent's experts,[791] or whether it should refrain from applying any multiplier on the assumption that equity and debt risk converge

---

[789] **Exhibit CLEX-75**, p. 1 and **App. BF-65**, p. 1.
[790] **App. BF-62**, p. 3.
[791] Brailovsky/Flores I, ¶¶ 202-205; Brailovsky/Flores II, ¶¶ 198-199 and Table 14.

for a long-term investment, as stated by Claimant's expert.[792] The Tribunal notes that both sides relied in particular on Prof. Damodaran's statements in this regard. Dr. Flores and Mr. Brailovsky pointed to the fact that Prof. Damodaran states in his spreadsheet:

> "*You can estimate an adjusted country risk premium by multiplying the default spread by the relative equity market volatility for that market (Std dev in country equity market/Std dev in country bond). In this spreadsheet, I have used the global average of equity to bond market volatility of 1.5 to estimate the country equity risk premium.*"[793]

742. The Tribunal notes, however, that this statement is preceded by the sentence: "*In the short term especially, the equity country risk premium is likely to be greater than the country's default spread.*"[794] Prof. Spiller also relies on the following statement from Prof. Damodaran:

> "[T]*he differences between standard deviations in equity and bond prices narrow over longer periods and the resulting relative volatility will generally be smaller[795]. Thus, the equity risk premium will converge to the country bond default spread as we look at longer term expected returns.*"[796]

743. In response, Mr. Brailovsky and Dr. Flores presented the results of their own analysis on the relative volatilities of the bond and equity markets in the US and in Venezuela over a 20-year/5-year period[797] preceding 15 May 2010, which yielded a ratio of 2.05 and 2.74, respectively.[798] The Tribunal notes that, in their first expert report, they stated in a footnote that Prof. Damodaran had calculated a volatility ratio of 0.69 for Venezuela over two years through February 2012, but then a volatility ratio of 1.77 for two years through March 2013.[799] Mr. Brailovsky and Dr. Flores criticized Prof. Damodaran for not having converted the Venezuelan Stock Market Index, which is denominated in bolivars, into US Dollars, which is the currency of the Venezuelan bond index. In addition, as they quoted in the same footnote, Prof. Damodaran notes that "*the relative standard deviation of equity is a volatile number, both across countries (ranging from 2.48 for Czech Republic*

---

[792] Spiller II, ¶ 144.
[793] **App. BF-62**, p. 3.
[794] **App. BF-62**, p. 3. Prof. Spiller refers to he same sentence in Prof. Damodaran's spreadsheet fro 2012. Spiller II, ¶ 144 referring to Exhibit CLEX-178, p. 1.
[795] [Internal citation:] *Jeremy Siegel reports on the standard deviation in equity markets in his book* 'Stocks for the very long run' *and notes that they tend to decrease with time horizon.*
[796] **Exhibit CLEX-108 / App. BF-55**, p. 12.
[797] Even though Mr. Brailovsky and Dr. Flores refer only to the 20-year period in their second report, it is apparent from **App. BF-105**, Table 7 that they relied on data from 6 May 2005 through 10 May 2010 for Venezuela, *i.e.*, a 5-year period. This corresponds to what they state in their first report. Brailovsky/Flores I, ¶ 205.
[798] Brailovsky/Flores II, ¶ 199 and Table 14. They emphasize that for their benchmark calculation, they used Prof. Damodaran's generic multiplier of 1.5.
[799] Brailovsky/Flores I, note 352.

*and 0.69 for Venezuela) and across time (Brazil's relative volatility numbers have ranged from close to one to well above 2.*"[800]

744.  However, it appears to the Tribunal that the two calculations cannot be compared directly, as Prof. Damodaran has calculated the relative volatility to the US market (with the US market being assigned a volatility of 1.00), whereas Mr. Brailovsky and Dr. Flores have calculated the relative volatility to the bond market for both the US and Venezuela.

745.  Finally, the Tribunal notes that, contrary to what Respondent and its experts suggest, it does not appear from Prof. Damodaran's writings that he actually recommends the use of the equity multiplier. Rather, the following statement can be found in one his writings dating from 2010: "*Some analysts believe that the equity risk premiums of markets should reflect the differences in equity risk, as measured by the volatilities of equities in these markets.*"[801] Similar statements can be found in other writings.[802] From his spreadsheet, it also appears that he leaves it to the user to decide whether to apply a multiplier, given that he offers two choices: "*Choice 1: Use the default spread as the measure of the additional country risk premium. To make this choice, go into the ERP worksheet and set cell E5 to 1.00*"; and "*Choice 2: Scale the default spread up to reflect the higher risk of equity in the market, relative to the default spread. You can see the relative ratios for individual countries in the worksheet* 'Equity vs. Govt Bond' *in this spreadsheet. Set cell E5 in the ERP worksheet to that number.*"[803] For June 2013 and January 2014, Prof. Damodaran presented a relative standard deviation (to the US market) of 0.69 for Venezuela; for May 2010, the Tribunal has not been provided with the relevant data.[804]

746.  In the absence of sufficient clarity on the appropriate multiplier to be applied for Venezuela, the Tribunal is not convinced that the generic 1.5 multiplier would adequately reflect the risk of an equity investment in Venezuela. Given the undisputed long-term nature of the investment to be valued in the present case, it further remains in dispute whether any multiplier should be applied at all or whether it can be assumed that debt and equity risk will converge. While Mr. Brailovsky and Dr. Flores took the position that this theory is dispelled by their analysis on the relative volatilities of the equity and bond markets in the US and in Venezuela, the Tribunal notes that the ratio they calculated indeed appears to depend to a large extent on the maturity of the bonds selected in comparison to the stock market. While Mr. Brailovsky and Dr. Flores did not present figures for different

---

[800] **App. BF-63**, p. 60.
[801] **App. BF-61**, p. 178.
[802] **App. BF-63**, p. 50; **App. BF-64**, p. 52.
[803] **Exhibit CLEX-75**, p. 1; **App. BF-65**, p. 1.
[804] **Exhibit CLEX-75**, p. 21; **App. BF-65**, p. 22; **App. BF-66**, p. 27.

bond maturities for the Venezuelan market, the ratio for the US market differs between 1.55 for 20-year bonds and 2.81 for 5-year bonds as of May 2010.[805]

747. Andrew Smithers and Stephen Wright on whom Mr. Brailovsky and Dr. Flores relied in support of their argument that equity is riskier than debt, confirm that the volatility of bond returns is "*distinctly lower*" than that of stocks, but also state that long-term bonds are riskier than short-term bonds.[806] Jeremy Siegel, however, who has also been cited by Respondent's experts, makes the following statement:

> "*As was noted previously, stocks are riskier than fixed-income invest-ments over short-term holding periods. But once the holding period in-creases to between 15 and 20 years, the standard deviation of average annual returns, which is the measure of the dispersions of returns used in portfolio theory, become lower than the standard deviation of aver-age bond or bill returns. Over 30-year periods, equity risk falls to only two-thirds that of bonds or bills. As the holding period increases, the standard deviation of average stock returns falls nearly twice as fast as that of fixed-income assets.*"[807]

748. In light of this evidence, the Tribunal considers it plausible that the risk of investment in equity and the risk of investment in bonds converge in the long term. As the subject of this valuation, *i.e.*, Claimant's investment in Norpro Venezuela, was undisputedly made as a long-term investment according to the standards applied by Prof. Damodaran, Messrs. Smithers and Wright, and Mr. Siegel, Respondent and its experts have not estab-lished that a multiplier should be applied to the default spread for the computation of the equity risk premium. Consequently, the Tribunal will apply the country risk premium calculated by Mr. Brailovsky and Dr. Flores on the basis of Prof. Damodaran's "*bludgeon method*", excluding the 1.5 multiplier. As of 15 May 2010, they determined a sovereign bond spread of 10.26% based on data from the EMBI, which in the absence of a multiplier to be applied in the present case is equal to the country equity risk premium.

749. The Parties and their experts have further debated certain factors specific to Norpro Ven-ezuela as a result of which its country risk exposure might deviate from the average Ven-ezuelan company.[808] Apart from the factor of protection under a bilateral investment treaty, which has been discussed in detail above, the debate focused on two further issues: (i) the fact that Norpro Venezuela exported more than 80% of the produced proppants,

---

[805] **App. BF-105**, Table 9.
[806] **App. BF-60**, p. 176.
[807] **App. BF-70**, p. 32.
[808] Cf. Claimant's Post-Hearing Submission, ¶¶ 136-144; Respondent's Post-Hearing Brief, ¶¶ 172-180.

most of it to North America, *i.e.,* a mature market, and (ii) the fact that it had concluded long-term supply contracts for its key inputs such as energy and bauxite.[809]

750. As to the second issue, Mr. Brailovsky and Dr. Flores correctly pointed out that the long-term contracts were set to expire in 2016 and 2018, respectively, and did not provide for a renewal term, let alone a renewal at the same or similar prices.[810] Therefore, the Tribunal is not convinced that this factor would cause a willing buyer to lower his assessment of Norpro Venezuela's country risk exposure.

751. With regard to the first issue, Claimant relied on Prof. Damodaran's statement that "[t]*he most obvious determinant of a company's risk exposure to country risk is how much of the revenues it derives from the country*."[811] However, Respondent pointed out that Prof. Damodaran further stated in the same writing that "[a] *company can be exposed to country risk, even if it derives no revenues from that country, if its production facilities are in that country*."[812] In this context, Respondent and its experts argue that country risk is a much larger concept than exposure to domestic demand.[813] Mr. Brailovsky further stated at the Hearing that "[t]*here is a substantial amount of literature showing that natural resource projects, particularly oil or oil-related, bear more Country Risk than the average company*."[814]

752. The Tribunal notes that Claimant never argued that Norpro Venezuela is not subject to Venezuelan country risk at all but only that it is less exposed to Venezuelan country risk than the average Venezuelan company.[815] In response to Mr. Brailovsky's comment at the Hearing, Claimant submits that Norpro Venezuela was not a natural resource company and claims that, in any event, resource-based companies are typically assigned a better rating than companies in other industries.[816]

753. While the Tribunal considers it plausible that Norpro Venezuela's country risk exposure may indeed be different from that of the average Venezuelan company, Mr. Brailovsky and Dr. Flores correctly pointed out that Prof. Spiller never quantified the impact of the factors invoked by Claimant on the country risk to which Norpro Venezuela was in fact exposed.[817] As explained by Prof. Damodaran, the fact that Norpro Venezuela exports most of its products could have been factored in as part of a *lambda* approach pursuant to

---

[809] Spiller II, ¶ 35, ¶¶ 41-43; Brailovsky/Flores II, ¶¶ 200-202.
[810] Brailovsky/Flores II, ¶ 202.
[811] Claimant's Post-Hearing Submission, ¶ 139 quoting from **Exhibit CLEX-108**, p. 18.
[812] Respondent's Post-Hearing Brief, ¶ 175 quoting from **Exhibit CLEX-108**, p. 18.
[813] Respondent's Post-Hearing Brief, ¶ 175; Brailovsky/Flroes II, ¶ 201.
[814] Transcript (Day 4), p. 1142 lines 9-12.
[815] Claimant's Post-Hearing Submission, ¶ 136.
[816] Claimant's Post-Hearing submission, ¶¶ 140-141.
[817] Brailovsky/Flores, ¶ 160 and ¶ 200.

which the country risk premium as derived for the average Venezuelan company could have been multiplied by a certain *lambda* coefficient.[818] However, given that none of the Parties' experts have included such a coefficient in their calculations, the Tribunal will not give any further consideration to this approach. In the absence of any quantification of Norpro Venezuela's specific country risk exposure, the Tribunal will thus apply the country risk premium of 10.26% as yielded by the "*bludgeon method*" devised by Prof. Damodaran (excluding any equity risk multiplier).

### (4) Conclusion on Equity Risk Premium and Conversion Into Discount Rate

754. In conclusion, the Tribunal, by majority, finds that the equity risk premium to be applied to an investment in Norpro Venezuela as of 15 May 2010 consists of the following elements: (i) the cost of equity for a company operating in the US in the amount of 11.6%, *i.e.*, a risk-free rate of 3.6% plus a market risk premium of 8%, consisting of the general market risk premium of 6.7%, to be multiplied by the industry-specific *beta* coefficient of 1.2; and a country risk premium for Venezuela in the amount of 10.26%. This results in a total equity risk premium of 21.86%.

755. As a final step, the Tribunal must determine the applicable debt-to-equity ratio in order to calculate the weighted average cost of capital (WACC) and thus the nominal discount rate to be applied to Claimant's investment. The Parties' experts used similar but not identical debt-to-equity ratios in their calculations as of 15 May 2010. Prof. Spiller applied a ratio of 18.0% debt to 82.0% equity, representing a 5-year average of the ratio reported by Ibbotson/Morningstar for the composite company of SIC Code 1381;[819] Mr. Brailovsky and Dr. Flores applied a ratio of 15.7% debt to 84.3% equity, representing a 1-year average as reported by Ibbotson/Morningstar for the median company of SIC Code 1381.[820]

756. While Prof. Spiller states that a single-year average is biased because it may be affected by particular events that occurred during that year,[821] the Tribunal notes that this issue has not been subject to any further debate between the Parties or their experts. As Ibbotson/Morningstar reports both the "*latest*" figures and the 5-year average, the Tribunal does not consider it established that it should prefer one over the other. The same applies to the choice of the composite company or the median company. Therefore, the Tribunal will not give preference to the choices of either expert, but will rather apply the average

---

[818] **Exhibit CLEX-108**, pp. 17-23.
[819] Spiller II, ¶ 162; **Exhibit CLEX-81**, p. 29.
[820] Brailovsky/Flores II, Table 8; **App. BF-37**.
[821] Spiller II, ¶ 163.

between the ratios in its assessment of the nominal discount rate, *i.e.*, a ratio of 16.85% debt to 83.15% equity.

757. For the determination of the cost of debt (after tax), the Tribunal refers to Table 8 of Mr. Brailovsky and Dr. Flores' second expert report, pursuant to which the cost of debt (after tax) is equal to the US risk-free rate (3.6%) plus the country debt risk premium (10.26%) plus an industry risk premium (set by both Parties' experts at 1.5% for 2010)[822] multiplied by one minus the applicable tax rate (34%). According to the majority of the Tribunal, this results in the following calculation:

$$(3.6\% + 10.26\% + 1.5\%) * (1 - 34\%) = 10.14\%.$$

758. On the basis of the above determined average debt-to-equity ratio of 16.85/83.15, the majority of the Tribunal arrives at a nominal discount rate of 19.88%.[823]

### bb) Future Cash Flows

759. In the following section, the Tribunal will turn to the discrepancies between the Parties and their experts in the determination of Norpro Venezuela's future cash flows.

### (i)   Summary of Claimant's Position

760. With regard to the calculation of the future cash flows, Claimant considers it "*baseless*" to split the profits that a willing buyer would generate from Norpro Venezuela's exports to account for internal cost allocation. In Claimant's view, the fair market valuation is "*not dependent on idiosyncratic qualities of the buyer or seller*"; therefore, it must be assumed that the highest-bidding willing buyer would most likely be a strategic investor that already has a distribution and marketing network similar to that of Saint-Gobain and is thus in a position to accrue 100% of the profits.[824] Claimant argues that the marketing costs is a fixed cost of the buyer that does not change through the acquisition, but the buyer can rather leverage its existing resources to take full advantage of the incremental value of the acquired asset just like Saint-Gobain internalized 100% of the profits. Finally, Claimant notes that both experts' estimates already include marketing and distribution costs in the amount of 7%.[825]

---

[822] Brailovsky/Flores II, Tables 8 and 9; **Exhibits CLEX-81**, p. 29 and **CLEX-192**; **App. BF-156**.

[823] 10.1376% * 0.1685 + 21.86% * 0.8315 = 19.8847756%.

[824] Reply, ¶¶ 170-172; Claimant's Post-Hearing Submission, ¶¶ 174-175 referring to Prof. Spiller's oral testimony during the Hearing. Transcript (Day 4), p. 1249 lines 11-14, p. 950 line 12 – p. 951 line 9 and p. 948 lines 8-22. *See* also Claimant's Second Post-Hearing Submission, ¶¶ 89-90.

[825] Claimant's Post-Hearing Submission, ¶¶ 176-178 referring to Prof. Spiller's Opening Presentation, slide 15 and the oral testimony of Prof. Spiller and Dr. Flores. Transcript (Day 4), p. 918 lines 13-14, p. 1190 lines 7-8 and p. 1192 line 18 – p. 1193 line 4.

761. Claimant further notes that Mr. Brailovsky and Dr. Flores assumed in their calculation that CVG Bauxilum would supply bauxite at the increased price that it unilaterally imposed on Norpro Venezuela in September 2008. According to Claimant, this price increase was unlawful and therefore must not be taken into account based on the principle that "*a party may not reduce its liability for one wrongful act (here, the expropriation) on the basis of another (the price increase).*"[826] According to Claimant, the bauxite price should reflect the agreement under the Bauxite Contract and thus amount to USD 25.5 per MT.[827]

762. As to the transportation costs, Claimant refers to its witness Jack Larry who testified that, contrary to Mr. Brailovsky's and Dr. Flores' assumption, proppants were not usually shipped from Corpus Christi to Alice (both in Texas) for storage, but the majority was rather shipped directly from the port in Corpus Christi to the customer, which is why the budgeted cost to Alice in the 2011-2015 Strategic Plan was "*merely for illustrative purposes.*"[828] Claimant claims that (i) Prof. Spiller's estimate of the transportation costs is based on an actual shipment in March 2010 and confirmed by Saint-Gobain's contemporaneous transportation contracts; and (ii) the average price applied by Prof. Spiller for shipping costs within the US accurately accounts for the various locations and contractual arrangements with Claimant's ultimate customers.[829]

763. Claimant further asserts that Mr. Brailovsky and Dr. Flores fail to distinguish between the concepts of (i) maintenance capex aimed at "*maintain*[ing] *the plant in the condition to continue functioning at its current levels*"; and (ii) investment capex aimed at "*increas*[ing] *plant production through efficiency and technological improvements.*"[830] According to Claimant, only the maintenance capex should be included in the calculation of capital expenditures.[831]

764. In respect of the working capital required to operate the plant, Claimant refers to Prof. Spiller's assumptions that (i) the outstanding balance of VAT credits as of 2009 would have been paid in 2010; and (ii) going forward, it would have taken 60 days to monetize the VAT certificates and Norpro Venezuela would have recovered 80% of their value. As

---

[826] Reply, ¶ 176; Claimant's Second Post-Hearing Submission, ¶¶ 96-97.

[827] Reply, ¶ 177.

[828] Reply, ¶ 179 referring to Larry II, ¶ 13; Claimant's Post-Hearing Submission, ¶ 167 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), p. 42 and Mr. Larry's oral testimony during the Hearing. Transcript (Day 3), p. 701 lines 11-18. With regard to the budgeted cost of EUR 110 in the 2011-2015 Strategic Plan, Mr. Larry further stated that "*the overall for freight, including the delivery of the customer, was in this €110-per-metric-tonne range.*" Transcript (Day 3), p. 696 lines 6-8.

[829] Reply, ¶ 179; Claimant's Post-Hearing Submission, ¶ 166 and ¶¶ 169-171 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), p. 10; Claimant's Second Post-Hearing Submission, ¶¶ 91-92 referring to Spiller II, Table 7 and ¶¶ 83-85.

[830] Reply, ¶ 180 referring to Larry II, ¶¶ 21-23.

[831] Reply, ¶ 181.

to the administrative delays invoked by Respondent, Claimant notes that such delays have been found to be in breach of the FET standard and claims that it had a legitimate expectation that Respondent would follow its own VAT credit procedure, given that this issue was specifically discussed with the Venezuelan Government before Claimant invested in Venezuela.[832] In addition, Claimant claims that the invoked two-year delay is "*purely speculative*" as all documents invoked by Respondent date from several years prior to 2010 and are further "*without legal basis*" as the Venezuelan law provides that the tax authority must issue its decision within 30 days.[833]

### (ii)   Summary of Respondent's Position

765.   Respondent submits that it is undisputed betweem the Parties that prior to the expropriation Norpro Venezuela received only 27% of the profits, while the remaining 73% were allocated to Claimant's US affiliate SGCP. Respondent notes that this is based on Claimant's transfer pricing study, which distinguished between four equally weighted categoried: functions, risks, manufacturing intangibles and marketing intangibles. According to Respondent, the contribution of the plant and SGCP to the first three categories were split; the fourth category "*marketing intangibles*," however, was assigned 100% to SGCP. Respondent argues that 25% of the plant's profits were directly tied to the marketing, logistics and distribution capabilities of SGCP, which were not expropriated together with the plant.[834]

766.   In response to Claimant's argument that the study was only an internal accounting mechanism, Respondent notes that under Venezuelan law, taxpayers conducting transactions with related parties must "*determine their income, costs and deductions resulting from those transactions considering the prices and amounts that would have been used with or between independent parties in comparable transactions*." Therefore, Respondent maintains its presumption that the agreement between Norpro Venezuela and SGCP reflected an arm's-length transaction.[835]

---

[832] Reply, note 381 referring to Spiller II, ¶ 93 and ¶¶ 115-116 and *Impregilo S.p.A. v. Argentina*, Concurring and Dissenting Opnion of Judge Charles N. Brower (**CLA-127**), ¶ 9; Claimant's Post-Hearing Submission, ¶¶ 158-161.

[833] Claimant's Post-Hearing Submission, ¶ 154 and note 348. Claimant further considers it contradictory that, on the one hand, Respondent's witness Eduardo Rondón acknowledges that the request for a special tax recovery certificate had been submitted to the authorities but, on the other hand, Respondent alleges that Norpro Venezuela was still collecting documentation for its first recovery request. Claimant's Post-Hearing Submission, ¶ 156 and Claimant's Second Post-Hearing Submission, ¶ 95 referring to Mr. Rondón's oral testimony. Transcript (Day 3), p. 775 lines 10-19.

[834] Counter-Memorial, ¶¶ 198-199 and ¶ 256 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**); Rejoinder, ¶¶ 238-242; Respondent's Post-Hearing Brief, ¶ 182.

[835] Respondent's Post-Hearing Brief, ¶ 183 quoting from the *Ley de Impuesto sobre la Renta* (**App. BF-113**), Article 111.

767. Consequently, Respondent rejects Prof. Spiller's assumption that Norpro Venezuela would retain 100% of the profits as of the valuation date. It claims that a willing buyer would not pay for 100% of the profits because it would not be acquiring the capabilities of SGCP and would not be willing to transfer the profits it expects to earn through its own existing marketing, logistics and distribution network. If the buyer were not to have such network itself, Respondent notes that it would even have to pay for acquiring these capabilities or for the services of a third party. In short, Respondent claims, "*no buyer would pay for something that it was not getting in the transaction.*"[836]

768. According to Respondent, the willing buyer would "*value the Plant, not the assets in the full value chain, and would only take into account the profits that could be realized by the Plant itself.*"[837]

769. Respondent therefore refers to the assumption of its experts that a buyer of the plant would achieve "*at the very most*" 75% of the profits, as Claimant itself concluded in its transfer pricing study that the 25% portion of "*marketing intangibles*" was contributed 100% by SGCP.[838]

770. As to the bauxite price to be paid by Norpro Venezuela to CVG Bauxilum, Respondent submits that there is no basis for Claimant's instruction to Prof. Spiller to reduce the agreed price of USD 33.8 per MT to the original contract price, given that Norpro Venezuela agreed to the increased price as long as there would be no further increase throughout 2009. Therefore, Respondent instructed its experts to base their calculation on the increased price, escalated by the US PPI-Commodities.[839]

771. With regard to the transportation costs, Respondent submits that Prof. Spiller's estimate of the shipping costs to the US is apparently based on a single shipment in March 2010 and notes that the same document on which Prof. Spiller relies includes Claimant's own budgeted cost for transportation from Venezuela to Alice, Texas of EUR 110 (converted to USD 154) per MT. According to Respondent, this figure is also supported by Claimant's transfer pricing study.[840] As to the contemporaneous transportation documents relied

---

[836] Counter-Memorial, ¶¶ 200-202. *See also* Rejoinder, ¶ 244. Respondent emphasizes that, while such a buyer might achieve 100% of the revenues from the ultimate sale of the proppants, it would not benefit from 100% of the profits because "*a substantial portion of the profits*" would be tied to the marketing, distribution and logistics functions that were not part of the transfer from Claimant in consideration for the purchase price. Respondent's Post-Hearing Brief, ¶¶ 184-185.

[837] Respondent's Post-Hearing Brief, ¶ 186.

[838] Counter-Memorial, ¶ 203 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 5; Rejoinder, ¶ 243; Respondent's Post-Hearing Reply Brief, ¶ 54.

[839] Counter-Memorial, ¶ 210 and ¶ 256; Rejoinder, ¶ 251 quoting from the letter from Oscar Cid to CVG Bauxilum, 17 September 2008 (**Exhibit R-52**).

[840] Counter-Memorial, ¶ 214 and ¶ 256 referring to the 4 May 2010 Presentation, 2011-2015 Strategic Plan (**Exhibit R-10 / CLEX-80**), pp. 10 and 42 and Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009

on by Prof. Spiller in his second report, Respondent submits that these documents do not reflect actual costs incurred in connection with transportation, which is why its experts maintained their original estimate.[841]

772. Respondent further rejects Prof. Spiller's estimate for the shipping costs within the US and claims that Claimant's budgeted cost and the Halliburton SPA reflect a "*significantly higher*" cost, which is why its experts based their estimate on the budgeted cost.[842] Respondent notes that, even though Claimant did not provide any data in support of Prof. Spiller's assumption that 30% of the proppants would be sold *ex works* and the remaining 70% would be sold in equal volumes to each of the three distribution areas, Respondent's experts have applied that assumption together with the price provided for in the Halliburton SPA, which results in costs that are even higher than the costs they estimated.[843]

773. In relation to the capital expenditures, Respondent agrees with Prof. Spiller's assumption up to and including 2018 but argues that annual capital expenditures would significantly increase "*as the Plant aged and equipment reached the end of its useful life.*"[844] While Prof. Spiller included only maintenance expenditures, Respondent claims that expenditures for "*health and safety, technology or improvements to reduce breakdowns and process disruptions*" are also required to assume operation in perpetuity and therefore takes the position that all four capexes as foreseen for Claimant's Fort Smith Plant should be included in the calculation.[845]

774. In respect of the working capital, Respondent agrees with Prof. Spiller's calculation except for the VAT credits. Respondent contends that as of 15 May 2010 Norpro Venezuela had not even applied for the tax recovery certificates and claims that the recovery procedure is usually a "*lengthy and complex*" process. Respondent submits that its experts therefore assumed that the outstanding VAT credits as of 15 May 2010 would have been monetized in 2013 and further VAT credits accumulated thereafter would have been monetized on a two-year rolling basis and thus been part of working capital that a buyer would not separately value.[846]

---

(**Exhibit CLEX-35**), p. 1; Respondent's Post-Hearing Brief, ¶¶ 195-198; Respondent's Post-Hearing Reply Brief, ¶¶ 58-59.

[841] Rejoinder, ¶ 255; Respondent's Post-Hearing Brief, ¶ 194. Respondent notes that its experts did adjust their estimate based on the new information that some of the proppants were shipped directly from Corpus Christi to the customer and assumed that only half of the shipment was first shipped to Alice for storage. Rejoinder, ¶¶ 255-256.

[842] Counter-Memorial, ¶¶ 215-216 referring to Saint-Gobain-NorPro, Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**), p. 1.

[843] Rejoinder, ¶¶ 257-258.

[844] Counter-Memorial, ¶¶ 217-218 and ¶ 256.

[845] Rejoinder, ¶ 262.

[846] Rejoinder, ¶¶ 269-271; Respondent's Post-Hearing Brief, ¶ 201.

775. In support of its position, Respondent refers to (i) newspaper articles reporting delays of several years in 2000 and 2003; (ii) the witness testimony of Eduardo Rondón that the "*procedure to recover VAT in Venezuela lasts at least two years from the initial filing of the request*"; and (iii) Claimant's statement in its June 2009 DAC that "[r]*ecovering the VAT from the tax treasury has become a very lengthy and complex process.*"[847]

### (iii)  The Tribunal's Analysis

776. The Tribunal will now address the various points of disagreement regarding Norpro Venezuela's future cash flows in turn.

### (1)  Proppants Prices

777. As to the projections for proppants prices to be applied, the Tribunal notes that the dispute between the Parties has focused primarily on the impact of recent developments on the oil market on price projections in a date-of-the-award valuation. It is undisputed between the Parties that this development could not have been foreseen as of 15 May 2010 and therefore does not have be taken into account in the present valuation. However, the Parties' experts also applied different assumptions with regard to the proppants prices in their 15 May 2010 valuations.

778. Prof. Spiller stated in his Updated Valuation Model, submitted together with his second expert report, that he based the prices for exports to the US: (i) for 2010, on historical sales in Venezuela for 2010; (ii) for 2011-2012, on historical sales in the US; (iii) for 2013, on the growth rate of Norpro Venezuela's average prices between 2012 and 2013; (iv) for 2014-2015, on the average growth rate of analyst reports and Claimant's forecasts; and (v) for 2016-2018, on the increase of the US PPI. Prof. Spiller's prices for exports to South America and local sales within Venezuela are based: (i) for 2010, on Claimant's April 2010 Business Plan; (ii) for 2011, on the growth rate of Versaprop and Interprop sales in the US between 2010 and 2011; and (iii) for 2012-2017, on the same assumptions as exports to the US.[848]

779. Mr. Brailovsky and Dr. Flores based the prices for sales to North America, South America and Venezuela (i) for 2010-2015, on the projections contained in Claimant's April 2010 Business Plan; and (ii) for the time period thereafter, on long-term inflation forecasts as of 2010.[849]

---

[847] Respondent's Post-Hearing Brief, ¶ 200 referring to *Pedro García, Exportaciones crecieron 4% en el trimestre*, 3 April 2000 (**App. BF-34**), *Eduardo Camel, Contracción de 35% en las exportaciones de la Nación*, 28 August 2003 (**App. BF-35**), Rondón, ¶ 38 and the 8 June 2009 Update to the 23 October 2006 DAC (**Exhibit R-7**), p. 6.
[848] **Exhibit CLEX-81**, p. 36.
[849] Brailovsky/Flores I, ¶¶ 50-51 and Table 4; Brailovsky/Flores II, ¶ 40; **Exhibit CLEX-40**, pp. 13-14.

780. The Tribunal agrees with Mr. Brailovsky and Dr. Flores that it is inaccurate for a valuation as of 15 May 2010 to use actual sales prices beyond April 2010 because those could not be known at the valuation date. Mr. Brailovsky and Dr. Flores further pointed out that Prof. Spiller's price projections are higher than Claimant's own projections for Norpro Venezuela as of April 2010.[850] The Tribunal is of the view that, while a willing buyer may have decided not to rely exclusively on the seller's projections but to take into account further data, *e.g.*, based on analyst reports, it would certainly have given considerable weight to the projections in the April 2010 Business Plan. If Prof. Spiller considered that there was a reason to deviate from the Business Plan, he could have explained his choice, but he did not even address the discrepancy between the Business Plan and his own projections for the May 2010 valuation in his expert report.

781. Consequently, the Tribunal has no reason to doubt the reasonableness of Claimant's own price projections as of April 2010 and thus follows the approach of Respondent's experts in this regard.

### (2)   Profit Split for Marketing Part

782. As to the question of whether there should be a profit split for the export sales, there is common ground between the Parties that, prior to the expropriation, Norpro Venezuela in fact retained 27% of the profits from the sales of proppants; the remaining 73% were allocated to Claimant's US affiliate Saint-Gobain Ceramics & Plastics (SGCP) that was responsible, *inter alia*, for the marketing and distribution of the proppants.[851] There is a dispute as to whether a willing buyer would have assumed a profit split in its calculation of the purchase price to account for the fact that Norpro Venezuela itself did not have the marketing and distribution network required to sell the proppants to the customer.

783. Prof. Spiller assumed that a willing buyer would have included 100% of the profits in its calculation of the purchase price on the assumption that the highest bidder would have been a company with marketing and distribution capabilities similar to those of SGCP. According to Prof. Spiller, this assumption is compatible with fair market value because it is not based on "*unique synergies*" that could be realized only by a specific buyer, but rather on the reasonable consideration that there are several potential buyers with these capabilities in the market; therefore, Claimant would have sold to a buyer that could realize 100% of the profits and would be willing to factor this synergy into its offer for Norpro Venezuela. Prof. Spiller emphasized that he did not value any revenues or costs associated with a network outside the plant, but simply valued the additional profits that

---

[850] Brailovsky/Flores II, ¶¶ 44-45 and Table 5.
[851] Spiller I, ¶ 112 and note 55; Brailovsky/Flores I, ¶¶ 52-58; Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**).

a buyer with access to such a network could obtain from adding Norpro Venezuela's capacity to its own capacity.[852]

784. Mr. Brailovsky and Dr. Flores took the position that Prof. Spiller incorrectly made specific assumptions regarding the characteristics of the willing buyer and ignored the fact that the marketing and distribution network was not expropriated. Even if the buyer indeed had such a network, Mr. Brailovsky and Dr. Flores argued, it would not have been willing to pay for, and give away the profits associated with, such network, precisely because it already had the network and did not acquire one in the transaction.[853] According to Mr. Brailovsky and Dr. Flores, the asset to be valued is only the going concern Norpro Venezuela and not the marketing and distribution network of SGCP. Therefore, they referred to Claimant's transfer pricing study that both Parties relied on for the historical profits and noted that 25% of the profits were allocated to "*Market Intangibles.*" As Norpro Venezuela could not provide any of the services under this heading, they assumed that it could have retained "*at most*" 75% of the entire profits.[854]

785. As correctly pointed out by Claimant, both Parties' experts further included a cost item of 7% labelled "*Selling/R&D/Admin.*" in their calculations.[855] Claimant and Prof. Spiller refer to this cost item as marketing and distribution costs and argue that a further deduction would double count the marketing part.[856] Respondent takes the position, however, that this cost covered only the local marketing costs in Venezuela and notes that it existed already under the transfer pricing document, which also made a further deduction of 25% for marketing in the US.[857] In response to the question whether the 7% should not at least be deducted from the 25%, Dr. Flores explained the correlation between the two items at the Hearing as follows:

> "*7 percent is an operating cost, so it goes in the cost line. 25 percent is not a cost. It comes from the profit line. You calculate the entire profit, which means all the revenue coming from final consumers paying for proppants, minus all the costs at any level—like cost in Venezuela, cost of transportation, cost inside the U.S. And then that 7 percent is one of the costs. Then you do the deduction, and you get a total profit. That is 100 percent of the profit.* […] *So as of that,* [Norpro Venezuela] *captured at most, and we think that's a generous assumption, at most, 75*

---

[852] Spiller II, ¶¶ 64-68.
[853] Brailovsky/Flores I, ¶¶ 59-63; Brailovsky/Flores II, ¶ 49 and ¶ 60.
[854] Brailovsky/Flores I, ¶¶ 69-71; Brailovsky/Flores II, ¶¶ 50-55 and Figure 3 referring to the Transfer Pricing Document, 21 August 2009 (**Exhibit CLEX-35**).
[855] **Exhibit CLEX-81**, p. 37; **App. BF-101**, Tables 4A, 4B and 4C.
[856] Prof. Spiller's Opening Presentation, slide15; Claimant's Post-Hearing Submission, ¶ 178.
[857] Respondent's Post-Hearing Brief, note 385.

> *percent of the entire profit. So, you cannot compare the 25 and 7; they are different concepts.*"[858]

786. The Tribunal considers Dr. Flores' explanation convincing and will therefore analyze the question of whether any profit split should be made independently of the fact that Norpro Venezuela already incurred 7% in "*Selling/R&D/Admin.*" expenses. In the view of the majority of the Tribunal, Dr. Flores' explanation is further confirmed by the transfer pricing study that allocated 25% of the profits to "*Marketing Intangibles*" because the same document in fact includes the 7% cost item in its preliminary price calculation.[859] The fact that pursuant to the transfer pricing study all of the services under the heading "*Marketing Intangibles*" are performed by SGCP demonstrates that these services had to be performed in addition to any services for which Norpro Venezuela incurred costs under the 7% cost item.[860]

787. As to the question whether any deduction should be made, the Tribunal considers it plausible that the highest bidder would indeed have been a company with access to a marketing and distribution network that could have internalized 100% of the profits from the sale of proppants. However, this does not answer the question whether the buyer would have factored in 100% of these profits in its calculation of the purchase price for Norpro Venezuela. While the plant would produce the finished proppants, this alone did not enable the buyer to realize 100% of the profits, but this would be possible only by contributing its own marketing and distribution capabilities.

788. It is indeed plausible to assume that the buyer would be able to realize cost synergies by adding Norpro Venezuela's capacities to its own capacities and factor those synergies into its calculation of the purchase price for the plant. However, the majority of the Tribunal is not convinced by the assumption that the buyer would have been willing to pay the same amount as if Norpro Venezuela had been able to market and distribute the proppants on its own. The buyer would have at least deducted the additional costs it would incur by marketing and distributing the additional capacities it acquired.

789. While the amount of these additional costs factored in by the buyer is of course not known, the Tribunal recalls that Prof. Spiller assumed that the buyer would have a network similar to that of SGCP. Therefore, it appears reasonable to refer to Claimant's transfer pricing study in this regard. While the Tribunal is aware that the buyer's additional costs may not be equal to the portion of profits that Claimant allocated to "*Marketing Intangibles,*" it also has to be noted that Norpro Venezuela undisputedly retained only 27% of the profits prior to the expropriation. Against this background, to the majority of

---

[858] Transcript (Day 4), p. 1190 line 7 – p. 1191 line 5.
[859] **Exhibit CLEX-35**, p. 1.
[860] *Cf.* As**Exhibit CLEX-35**, p. 5.

the Tribunal it appears to be a rather conservative assumption that the buyer would have factored in additional costs for the marketing and distribution of the proppants in an amount that is at least equal to 25% of the profits.

790. Consequently, the majority of the Tribunal follows the approach of Mr. Brailovsky and Dr. Flores to deduct 25% of the profits on export sales from Norpro Venezuela's future cash flows.

### (3) Foreign Exchange Rate and Inflation

791. As to the applicable foreign exchange rate at which Norpro Venezuela could have converted US Dollars into bolivars and *vice versa*, the Tribunal notes that in their 15 May 2010 valuations, both Parties' experts used the forecasts for the official CADIVI exchange rate throughout the entire valuation period.[861] As neither Party argues that the introduction of the more favorable SICAD II exchange rate in early 2014 was foreseeable in May 2010, the Tribunal thus does not have to express an opinion on the applicability of this exchange rate from 2014 onwards.

792. However, there appears to be a difference with regard to the devaluation assumptions after 15 May 2010 caused by the fact that the Parties' experts relied on exchange rate forecasts from different sources. While Prof. Spiller relied on the forecast of Ecoanalítica, a private, Venezuela-based macroeconomic consulting firm,[862] Mr. Brailovsky and Dr. Flores projected the evolution of the exchange rate based on forecasts of the International Monetary Fund.[863] As pointed out by Prof. Spiller during the Hearing, the IMF does not directly project the development of the USD-bolivar exchange rate but rather inflation rates in the US and in Venezuela.[864] Mr. Brailovsky and Dr. Flores stated in response that the IMF projects the gross domestic product for Venezuela in US Dollars and in bolivars and explained that they derived the exchange rate from the ratio of the two figures.[865]

793. While the Parties' experts further debated whether the IMF makes any separate assumptions about devaluation or simply assumes that the exchange rate will develop in line with inflation,[866] the Tribunal considers that it does not have to make a decision in this regard. There is no dispute between the Parties' experts that Econalítica directly projects the development of the USD-bolivars exchange rate. Mr. Brailovsky and Dr. Flores further did not question the reliability of Ecoanalítica's forecasts; to the contrary, they cite

---

[861] Spiller II, note 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, note 167.
[862] Spiller I, note 68; **Exhibit CLEX-81**, p. 57.
[863] Brailovsky/Flores I, ¶ 98; App.BF-33 and BF-101, Table 12; Dr. Flores' Opening Presentation, slide 24.
[864] Transcript (Day 4), p. 1217 lines 4-8.
[865] Transcript (Day 4), p. 1218 line 18 – p. 1219 line 11.
[866] *Cf.* Transcript (Day 4), p. 1217 line 8 – p. 1218 line 15 and p. 1219 line 12 – p. 1222 line 7.

Ecoanalítica's director, Mr. Asdrúbal Oliveros, as authority for their assumption regarding a unified exchange rate that does not play a role in the 15 May 2010 valuation.[867]

794. As Ecoanalítica is a Venezuela-based economic consulting firm, the Tribunal has no reason to doubt that it is familiar with the particularities of the Venezuelan foreign exchange market and thus in a position to provide reliable forecasts for the exchange rate. Therefore, the Tribunal will follow Prof. Spiller's approach to rely on the contemporaneous projections of Ecoanalítica with regard to the evolution of the foreign exchange rate after 15 May 2010. In any event, the Tribunal notes that Respondent referred to a "*slight difference*" with regard to devaluation assumptions and did not even quantify such difference.[868] Consequently, the Tribunal considers it safe to assume that the difference is in any event negligible.

### (4)  Bauxite Costs

795. As to the applicable bauxite price that Norpro Venezuela would have had to pay to CVG Bauxilum under the Bauxite Contract after 15 May 2010, the Parties' experts were provided with differing instructions from the Parties. Consistent with Claimant's position that the bauxite price increase of September 2008 amounts to a violation of the FET standard, Prof. Spiller was instructed to eliminate the price increase from his calculation and to apply the original contract price instead, increased by the US PPI as provided for in Clause 10. 1 of the Bauxite Contract.[869] Mr. Brailovsky and Dr. Flores on the other hand were instructed by Respondent to apply the increased price that Norpro Venezuela actually paid as of September 2008 and throughout 2009, increased as of 2010 by the US PPI.[870]

796. The Tribunal notes that apart from the dispute about the justification of the September 2008 price increase, Mr. Brailovsky and Dr. Flores also stated that Prof. Spiller had failed to take into account two former, undisputed, price increases for transportation in August 2007 and January 2008.[871] Prof. Spiller did not address the two price increases, but noted that pursuant to his adjustment of the price for inflation, his price for 2008 was identical to the price referred to in the document relied on by Mr. Brailovsky and Dr. Flores, *i.e.*, USD 25.5 per MT.[872] While it is not entirely clear to the Tribunal why the prices are

---

[867] *Cf.* Brailovsky/Flores II, ¶ 82; Transcript (Day 4), p. 1221 lines 15-22.
[868] Respondent's Post-Hearing Brief, note 389.
[869] Spiller I, ¶ 126 and Figure 20; Spiller II, ¶¶ 124-125.
[870] Brailovsky/Flores I, ¶¶ 103, 105; Brailovsky/Flores II, ¶ 99.
[871] Brailosvky/Flores I, ¶ 102 referring to **Exhibit C-100**, slide 13; Brailovsky/Flores II, ¶ 95. In August 2007, the original contract price of USD 23.5/MT was increased to USD 25.0/MT based on Clause 10.2 of the Bauxite Contract, and in January 2008, the price was increased to USD 25.5/MT, consisting of an adjustment for inflation based on Clause 10.1 (USD 0.23/MT) and an increase based on Clause 10.2 (USD 0.27/MT).
[872] Spiller II, ¶ 125.

indeed the same for 2008 even though Prof. Spiller made adjustments only for inflation but not for the increased transportation costs, the Tribunal notes that Prof. Spiller's argument is not valid for 2007 (he applied a price of USD 23.8/MT despite the increase to USD 25.0/MT in August 2007).[873] In the present context, however, the Tribunal needs to assess the applicable prices for the time period following 15 May 2010 so that an incorrect price for 2007 is irrelevant as long as the price as of 2008 is correct.

797. As to the main dispute between the Parties, *i.e.*, whether the calculation should include the price increase of September 2008, Prof. Spiller correctly identified the dispute about the legality of the price increase as a legal matter on which he did not express a professional opinion.[874] Mr. Brailovsky and Dr. Flores noted that it was in any event unreasonable to assume that a willing buyer would not have taken into account the actual price Norpro Venezuela was paying as of 2008.[875] The Tribunal agrees with Mr. Brailovsky and Dr. Flores that the starting point must be the perspective of the willing buyer in May 2010. Even if the price increase constituted a breach of contract, the buyer would have taken into account that Norpro Venezuela was paying the increased price and had not undertaken any legal action for breach of contract before the dispute resolution forum provided for in the Bauxite Contract. Therefore, the Tribunal considers that the alleged illegality of the price increase would not be sufficient justification to eliminate the price increase from the present valuation.

798. If, on the other hand, the Tribunal were convinced that the price increase was indeed illegal and Respondent was responsible for the increase under the FET standard or the FPS standard (either because CVG Bauxilum's conduct is attributable to the State or because MIBAM was obliged to intervene), this internationally wrongful conduct would indeed have to be eliminated from the valuation. However, the Tribunal refers to its finding above that Claimant has not established that the price increase of September 2008 amounted to a breach of contract on the part of CVG Bauxilum. Therefore: (i) it can be left open whether Respondent could be held liable for such contractual breach – even if it had been established – under the FET standard; and (ii) Respondent did not have an obligation to intervene in relation to the bauxite price increase under the FPS standard.[876]

799. In the absence of any internationally wrongful conduct in connection with the bauxite price increase, Claimant is not entitled to any compensation in this regard. Consequently, there is no reason to eliminate the price increase from the present valuation. As to the

---

[873] *Compare* **Exhibit CLEX-81**, p. 40 *to* **Exhibit C-100**, slide 13.
[874] Spiller II, ¶ 124.
[875] Brailovsky/Flores II, ¶ 96.
[876] *See* paragraphs 542 and 559-560 above.

additional issue raised by Mr. Brailovsky and Dr. Flores regarding the exchange rate applied by Prof. Spiller who assumed that Norpro Venezuela would have paid the USD price in bolivars,[877] the Tribunal recalls that both Parties' experts used the CADIVI exchange rate in their May 2010 valuations.[878] Therefore, no decision is required in this regard.

### (5) Transportation Costs

800. The next issue concerns the transportation costs that Norpro Venezuela would have incurred for shipping the finished proppants to the customers. Both Parties' experts distinguished between three categories of transportation costs: (i) for all proppants, local shipping costs within Venezuela to transport the proppants from the plant to the port of Puerto Ordaz; (ii) for North and South American exports, shipping costs from the port of Puerto Ordaz to the port of Corpus Christi, Texas (and possibly on to the warehouse in Alice, Texas); and (iii) for North American exports, shipping costs from Texas to the ultimate customer.

### Local Shipping Costs in Venezuela

801. As for the local shipping costs within Venezuela for all proppants, Mr. Brailovsky and Dr. Flores adopted Prof. Spiller's projection that these costs amounted to VEF 50.5 per MT, increased in accordance with the (projected) Venezuelan PPI. While the Parties' experts disagree as to the applicable exchange rate in their date-of-the-award valuations, they both apply the official CADIVI exchange rate in their May 2010 valuations, which results in costs of USD 11.9 per MT as of 2010.[879]

### Shipping Costs from Venezuela to the US

802. As to the shipping costs from Venezuela to the US for all proppants to be exported, Prof. Spiller relied on an actual shipment in March 2010 from Puerto Ordaz to Corpus Christi, Texas at a cost of USD 99.0 per MT.[880] He cross-checked that figure on the basis of several contractual documents provided to him by Claimant, which yielded a charge of USD 91.43 per MT.[881] Based on the information from Claimant's witness Mr. Larry that some of the proppants were shipped directly from the port of Corpus Christi to the customer while others were first shipped on to Claimant's warehouse in Alice, Texas, Prof. Spiller also calculated the shipping costs from Corpus Christi to Alice at USD 17.6 per

---

[877] Brailovsky/Flores II, ¶¶ 97-99 and Figure 9.
[878] Spiller II, note 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, note 167.
[879] Spiller II, Figure 8; **Exhibit CLEX-81**, p. 38; Brailovsky/Flores I, ¶¶ 116-117; Brailovsky/Flores II, ¶ 102.
[880] Spiller II, ¶ 81 relying on CLEX-80, slide 10.
[881] Spiller II, ¶ 82 and Table 7 referring to **Exhibit CLEX-152**.

MT and concluded that the average between the total costs to Alice (USD 109.03 per MT) and the costs to Corpus Christi (USD 91.43 per MT) were in line with his estimate of USD 99.0 per MT.[882]

803. Mr. Brailovsky and Dr. Flores relied on Claimant's budgeted transportation costs for 2010, which amounted to EUR 110 per MT (converted to USD 154 per MT). They assumed that this cost included the local shipping costs of USD 11.9 per MT, thus resulting in a cost of USD 142.1 per MT for the second category of shipping costs.[883] Mr. Brailovsky and Dr. Flores further noted that Norpro Venezuela's transfer pricing study showed a cost for freight to the US in 2009 of USD 0.072 per pound, which translates into USD 158.7 per MT.[884] Finally, they adopted Prof. Spiller's assumption that only half of the finished proppants were shipped to Alice and his estimate of the shipping costs between Corpus Christi and Alice (USD 17.6 per MT). Consequently, they estimated average transportation costs of USD 133.3 per MT.[885]

804. The Tribunal notes that both Parties' experts relied on Claimant's 2011-2015 Strategic Plan as the primary source for their respective estimates. While Prof. Spiller applied the costs for one actual shipment in March 2010, Mr. Brailovsky and Dr. Flores referred to the budgeted costs for 2010.[886] In principle, the Tribunal considers it reasonable to rely on Claimant's own estimate for its 2010 budgeted costs. Claimant's witness Mr. Larry, who was involved in the creation of this slide,[887] confirmed during the Hearing that this estimate included the shipping costs to Alice, Texas.[888] With regard to the divergence between the numbers relied on by the Parties, Mr. Larry further explained:

> "So, if we look, we have an actual cost per shipment in March, dollars per metric tonne, and then we were constantly trying to optimize the shipment to the customer. So, if we're placing material in the Permian Basin, we wouldn't send it to Alice, Texas. We would take it from the warehouse, ship it, with as much efficiency as possible, directly to the Permian Basin. And you can see that actual number for March, which was a number of—which was a month of strong sales in the Permian Basin, was actually $37 per pound."[889]

805. In the Tribunal's view, Mr. Larry's testimony not only supports the assumption adopted by both Parties' experts that half of the proppants were shipped to Alice and the other half

---

[882] Spiller II, ¶ 81 and ¶¶ 83-85 referring to Larry I, ¶ 35.
[883] Brailovsky/Flores II, ¶¶ 118-119; Brailovsky/Flores II, ¶¶ 104 and 106 and Figure 11 referring to **Exhibit CLEX-80**, slide 42.
[884] Brailovsky/Flores I, ¶ 120; Brailovsky/Flores II, ¶ 106 referring to **Exhibit CLEX-35**, p. 1.
[885] Brailovsky/Flores II, ¶ 117.
[886] *Compare* **Exhibit CLEX-80**, slide 10 *to* slide 42.
[887] Transcript (Day 3), p. 685 lines 15-20.
[888] Transcript (Day 3), p. 701 lines 11-18.
[889] Transcript (Day 3), p. 605 lines 6-16.

was shipped directly from Corpus Christi to the customer.[890] More importantly, Mr. Larry explained that the divergence between the costs for the actual shipment in March 2010 and the budgeted costs for 2010 resulted, at least in part, from the fact that the shipment in March did not go to Alice but directly from Corpus Christi to the customer in the Permian Basin.

806.  Mr. Larry further testified that "*the overall cost for freight, including the delivery of the customer, was in this €110-per-metric-tonne range*."[891] Prof. Spiller also stated that "[his] *understanding is that the 110 euros includes all the expenses from Puerto Ordaz to the customer*."[892] However, the Tribunal notes that the slide from the 2011-2015 Strategic Plan states "*Supply to Alice, Texas*." Therefore, the Tribunal is not entirely convinced by Mr. Larry and Prof. Spiller's statements and will therefore also look at the subsidiary sources that the Parties' experts presented in support of their respective estimates.

807.  As to the costs for "*Freight to U.S.*" set out in the transfer pricing study that Mr. Brailovsky and Dr. Flores translated into USD 158.7 per MT, the Tribunal notes that there is no separate cost item for local freight costs within Venezuela so that it can again be assumed that the costs of USD 11.9 per MT are included in that amount. However, there is a separate costs item for "*U.S. Inland freight+handling*" so that it can also be assumed that the shipping costs to the customer are not included in that amount.[893] As the amount of USD 146.8 per MT (excluding local shipping costs) is even higher than Mr. Brailovsky and Dr. Flores' estimate, the study supports the accuracy of the 2010 budgeted costs.

808.  As to Prof. Spiller's cross-check of the costs to Corpus Christi on various contractual documents provided to him by Claimant, which resulted in an amount that is even lower than the costs of the actual shipment in March 2010 (USD 91.43 per MT to Corpus Christi), the Tribunal notes that Mr. Brailovsky and Dr. Flores questioned this cross-check in various aspects. In particular, they pointed out that the documents included an undated memorandum of understanding and an offer transmitted by e-mail in 2008; (ii) the service contract dating from 2008 was set to expire in August 2010 and would have been in the process of re-negotiation in May 2010; and (iii) Prof. Spiller made various assumptions pursuant to which the shipping costs in 2010 were lower than in 2008 when the documents were signed or transmitted.[894]

809.  While the Tribunal considers that these points of criticism do not render the documents and Prof. Spiller's cross-check entirely unreliable, they also do not provide conclusive

---

[890] *See* also Larry I, ¶ 35 and Larry II, ¶ 13.
[891] Transcript (Day 3), p. 696 lines 6-8.
[892] Transcript (Day 4), p. 972 lines 15-17.
[893] *See* **Exhibit CLEX-35**, p. 1.
[894] Brailovsky/Flores II, ¶¶ 111-115.

evidence on the transportation costs. The resulting costs of USD 91.43 per MT are even lower than the costs of the actual shipment in March 2010, which according to Mr. Larry also did not include any costs to Alice.

810. On the balance of the evidence, the Tribunal therefore considers it appropriate to base its conclusion on the average of all four figures presented by the Parties' experts, *i.e.*, USD 99.0 per MT, USD 124.5 per MT,[895] USD 129.2 per MT,[896] and USD 91.43 per MT (all excluding the undisputed shipping costs of USD 17.6 per MT from Corpus Christi to Alice). This results in an average of USD 111.03 per MT to Corpus Christi and an average of USD 128.63 to Alice. As the Parties' experts agreed to take the average between the costs to the two possible locations in Texas, this results in an overall average of USD 119.83 per MT.

### Shipping Costs from Texas to Customers

811. Finally, the Parties' experts apply differing assumptions to estimate the shipping costs from Corpus Christi or Alice to the ultimate customer. Prof. Spiller again relied on the costs of an actual shipment in March 2010, which amounted to USD 37.0 per MT. He assumed that 30% of the proppants were sold *ex works* and the remaining 70% were evenly distributed between Claimant's geographic sales areas in the US and thus considered the costs of a shipment to a location in Texas a reasonable proxy.[897]

812. Mr. Brailovsky and Dr. Flores again relied on Claimant's budgeted costs for 2010; however, as there was no budget for costs from Corpus Christi or Alice to the customer, they referred to the costs for transportation from Claimant's Fort Smith Plant, Arkansas, to Alice, which amounted to EUR 31.0 per MT (converted to USD 43.4 per MT). Mr. Brailovsky and Dr. Flores assumed that the distance between Fort Smith and Alice represented a good estimate of average transportation costs to locations throughout the entire US.[898] While noting that Claimant delivers not only within the US but also to Canada, Mr. Brailovsky and Dr. Flores stated that, even on the assumption that Prof. Spiller's estimate of the sales distribution were correct, this would result in an average cost of USD 51 per MT if applied to the prices per pound set out in the Halliburton Master Agreement.[899] By including the sales to Canada, they calculated average costs of USD 54 per MT.[900]

---

[895] USD 154.0 – USD 11.9 (local shipping costs) – USD 17.6 (shipping costs to Alice) = USD 124.5 per MT.
[896] USD 158.7 – USD 11.9 (local shipping costs) – USD 17.6 (shipping costs to Alice) = USD 129.2 per MT.
[897] Spiller II, ¶ 86; **Exhibit CLEX-81**, p. 37; **Exhibit CLEX-80**, slide 10.
[898] Brailovsky/Flores I, ¶¶ 124-126; Brailovsky/Flores II, ¶¶ 118-119.
[899] Brailovsky/Flores II, ¶¶ 120-122 and Table 6.
[900] Brailovsky/Flores II, ¶ 123 and Table 7.

813. The Tribunal is of the view that neither approach is sufficiently substantiated. The approach of Mr. Brailovsky and Dr. Flores based on the transportation costs from Fort Smith to Alice appear rather speculative because those costs relate to a different plant and a different route. As to Prof. Spiller's approach, the Tribunal notes that he was not provided with any actual sales data but rather stated that he understood that approximately 30% of proppants were sold *ex works* and assumed that the rest would be evenly distributed between Claimant's three US geographic sales regions. However, apart from the fact that Mr. Brailovsky and Dr. Flores pointed out that Claimant also sells proppants to locations in Canada, there is no evidence in the record that Prof. Spiller made a realistic assumption. The Tribunal agrees with Respondent that it would have been for Claimant to disclose the actual ratio of Norpro Venezuela's sales in North America.

814. In addition, the Tribunal is not convinced by Prof. Spiller's assumption that the costs of an actual shipment to a location within Texas is a good proxy for the sales throughout the US. In particular, the fact that Mr. Brailovsky and Dr. Flores applied Prof. Spiller's sales assumption to the prices under the Halliburton Master Agreement and arrived at a weighted average of USD 51 per MT, creates doubt as to the reliability of Prof. Spiller's costs estimate of USD 37 per MT.

815. In light of the fact that Claimant failed to disclose conclusive evidence in this regard and further taking into account that Mr. Brailovsky and Dr. Flores' estimate of USD 43.4 per MT is still considerably lower than the cost they calculated under the Halliburton Master Agreement, the Tribunal considers it appropriate to adopt their estimate for shipping costs within North America.

### Conclusion on Transportation Costs

816. In sum, the Tribunal finds that the present valuation should include (i) USD 11.9 per MT of local shipping costs within Venezuela for all sales; (ii) USD 119.83 per MT of shipping costs from Venezuela to Corpus Christi or Alice, Texas for all export sales; and (iii) USD 43.4 per MT of shipping costs within North America for all North American export sales.

### (6) Capital Expenditures

817. As to the capital expenditures, the Tribunal notes that there is agreement between the Parties with regard to the time horizon 2010-2018. For this time period, Mr. Brailovsky and Dr. Flores adopted Prof. Spiller's approach to rely on the figures estimated in Claimant's April 2010 Business Plan for 2010-2015 (USD 1.4 million in 2010; USD 1.0 million in 2011; USD 1.5 million in 2012; USD 5.0 million in 2013; and USD 0.5 million *per*

*annum* in 2014-2015) and to assume that the amount of USD 0.5 million *per annum* (inflated in accordance with the US PPI) would also be required in 2016-2018.[901]

818.   However, the Parties' experts have applied differing figures for the time period after 2018. Prof. Spiller assumed that the long-term capex would amount to USD 0.6 million in perpetuity and noted that this was in line with the estimate of the maintenance capex of Claimant's 30-year old Fort Smith Plant for 2010-2018.[902]

819.   Mr. Brailovsky and Dr. Flores considered that it was unreasonable to assume that Norpro Venezuela would have the same capex over its entire life cycle and ultimately relied on the four capexes of the Fort Smith Plant: (i) Health, Safety and Environmental (HSE); (ii) Maintenance of Business (MOB); (iii) Technology (TECH); and (iv) World Class Manufacturing (WCM). They calculated that adjusted to the size of Norpro Venezuela, this resulted in a capex of USD 1.6 million in perpetuity.[903]

820.   Prof. Spiller argued that apart from the MOB capex, the other three capexes were not related to maintenance, but rather to efficiency and technological improvements, which could be included in the valuation only if one were to account for increased production or efficiency gains as well. However, both Parties' experts assumed that Norpro Venezuela's efficiency factors would remain constant in the long term.[904]

821.   Mr. Brailovsky and Dr. Flores noted that the three "*non-maintenance*" capexes included items such as roof repairs and improvements to prevent slide, trips and falls (HSE), replacements of old technology (TECH) and improvements to reduce breakdowns and process disruptions (WCM). They concluded that all of these components were necessary to keep the plant running in perpetuity and remain competitive.[905]

822.   In principle, the Tribunal agrees with Prof. Spiller that the inclusion of expenditures that are not related to maintenance but improvements of technology or efficiency would make it necessary to account for the corresponding added value as well. However, as the first example cited by Mr. Brailovsky and Dr. Flores under the "*Health, Safety and Environmental*" capex shows, maintenance cannot necessarily be reduced to capex labelled "*Maintenance of Business*." Maintenance in terms of keeping the plant running at the same techonological and efficiency level also includes expenditures for, *e.g.*, adapting to new regulatory requirements or safety improvements.

---

[901] Spiller I, ¶ 137; **Exhibit CLEX-81**, p. 50; Brailovsky/Flores I, ¶¶ 128-130; Brailovsky/Flores II, ¶ 128.
[902] Spiller II, ¶¶ 88-90 and Figures 9 and 10; **Exhibit CLEX-81**, p. 50.
[903] Brailovsky/Flores II, ¶¶ 130-136; **App. BF-104**, Table 8.
[904] Spiller II, ¶ 89.
[905] Brailovsky/Flores II, ¶¶ 134-135 referring to **Exhibit CLEX-91**, slides 142, 144 and 145.

823. Therefore, the Tribunal agrees with Mr. Brailovsky and Dr. Flores that Prof Spiller's distinction between one "*maintenance*" capex and three "*non-maintenance*" capexes is not quite accurate. In particular, the Tribunal's understanding of maintenance includes several of the items that form part of the "*Health, Safety and Environmental*" capex. As for the "*Technology*" and "*World Class Manufacturing*" capexes, however, the Tribunal considers that they primarily relate to technology and efficiency improvements, which cannot be taken into account without at the same time accounting for the resulting efficiency gains (which Mr. Brailovsky and Dr. Flores did not do). Consequently, the Tribunal finds that the long-term capex for Norpro Venezuela should reflect the expenditures foreseen for the Fort Smith Plant under the MOB and the HSE capexes, but not the TECH and WCM capexes.

### (7)  Working Capital – VAT Credits

824. As to the working capital required to operate the plant, Mr. Brailovsky and Dr. Flores agreed with Prof. Spiller's modelling in his second expert report, except for his approach to the VAT credits.[906] Mr. Brailovsky and Dr. Flores further did not question Prof. Spiller's calculation pursuant to which as of April 2010 Norpro Venezuela had a balance of outstanding VAT credits in the amount of VEF 12.3 million (converted to USD 2.9 million).[907] The approaches of the Parties' experts differ, however, as regards the time period it would have taken to monetize those VAT credits.

825. As per instruction from counsel, Prof. Spiller relied on Venezuelan administrative law pursuant to which claims for tax credits must be decided within 30 days and therefore assumed that the balance of VEF 12.3 million would have been collected in the course of 2010. He modeled a working capital requirement on the assumption that (i) it would have taken 60 days from the date of filing the request for reimbursement to monetize the VAT certificates; and (ii) Norpro Venezuela would have recovered 80% of the VAT receivables.[908]

826. Mr. Brailovsky and Dr. Flores noted that Norpro Venezuela had not obtained its export license and had not started the VAT recovery process as of May 2010 and assumed that it would submit its first VAT recovery requests in late 2010 or 2011. According to Mr. Brailovsky and Dr. Flores, Norpro Venezuela would therefore have received its first recovery certificates only approximately two years later, *i.e*., in 2013 due to the well-known long delays in the recovery procedure. They further assumed that until then, Norpro Venezuela would have acquired additional inputs and supplies, which would have resulted in

---

[906] Brailovsky/Flores II, ¶ 145.
[907] **Exhibit CLEX-81**, p. 53.
[908] Spiller II, ¶¶ 92-93.

new VAT credits and thus a continuous outstanding balance of VAT credits. Conse-
quently, they did not include VAT-related cash flows in their model.[909]

827. The Tribunal considers that there are two issues to be discussed in this regard: (i) whether
Respondent may rely on delays in its own administrative procedure for the purposes of
the present valuation; and (ii) whether Respondent has established that exporters were in
fact facing delays of approximately two years in the recovery procedure.

828. As to the first issue, the Tribunal notes that from the strictly economic perspective of a
willing buyer, administrative delays resulting in delayed cash flows would certainly have
to be taken into account – provided that the delays actually exist. However, Claimant
argues that if Venezuela had acted in good faith, it would have followed its own admin-
istrative law to decide on the VAT credits within 30 days. While it initially raised a sep-
arate FET claim in this regard,[910] Claimant no longer pursued this argument in its subse-
quent pleadings or at the Hearing but referred to the VAT credits only in its discussion
on quantum and noted that "*lengthy administrative delays have, in themselves, been found
to violate the FET standard.*"[911] According to Claimant, it would be "*inequitable for the
State to use its own time lag in processing legal obligations as a way to avoid the obliga-
tion altogether.*"[912]

829. While the Tribunal is not inclined to allow Respondent to invoke its own administrative
deficiencies to lower the amount of Claimant's compensation, Claimant's argument could
be successful only if it were established that the delays either did not exist when Claimant
made the decision to invest in Venezuela or if Claimant was assured that it would not be
subject to such delays. The evidence shows that administrative delays in the VAT recov-
ery procedure have been a rather well-known issue in Venezuela already back in the early
2000s when Claimant considered investing in Venezuela. A news article dating from
2000 reports that VAT refunds in the amount of VEF 100 billion were due since 1993.[913]
A further news article dating from 2003 reported that since 2001, VEF 170 billion were
owed in VAT refunds.[914] Finally, a news article dating from 2007 reported the issuance
of recovery certificates in the amount of up to VEF 3.1 billion following delays of several
months.[915]

830. Claimant does not contest that exporters were facing considerable delays in obtaining
VAT recovery when it made the decision to invest in Venezuela, but claims that it was

---

[909] Brailovsky/Flores I, ¶¶ 170-175; Brailovsky/Flores II, ¶¶ 148-150.
[910] *Cf.* Memorial, ¶ 162-164.
[911] Reply, note 381.
[912] Claimant's Post-Hearing Submission, ¶ 159.
[913] **App. BF-34**.
[914] **App. BF-35**.
[915] **App. BF-36**.

assured that Venezuela would follow its own VAT credit procedure.[916] Claimant relies in particular on Article 43 of the VAT Law, which provides that the tax administration shall render its decision on the recovery request within thirty business days "*counted from the date in which the request is definitely received, so long as all of the requirements set forth to that end in the Rules, have been met.*"[917] According to this language, the 30-day period starts only once the tax administration has received all of the supporting documentation required under the VAT Law, which is not necessarily equal to the date on which it has received the request because it is not unusual that the administration requests further documentation or information on certain issues, as Mr. Rondón explained in his written witness statement.[918]

831.  In any event, the Tribunal does not consider it established that Claimant indeed received specific assurances that Venezuela would comply with this provision. In particular, Claimant could not point to any statement from a Government official that it would not be subject to the same delays that exporters were generally facing in Venezuela at the time. Mr. Pedersen testified in his written statement that based on meetings with CVG in 2005 they anticipated that they would receive "*beneficial VAT and import tax treatment,*" without stating, however, that any specific assurances were made with regard to the VAT recovery procedure.[919]

832.  The contemporaneous documents that Claimant relies on in this regard explicitly refer to exemptions from VAT and import duties pursuant to a Presidential Decree granted in 2006, but not to the VAT recovery procedure for materials that were not exempted from VAT duty.[920] As explained by Mr. Brailovsky and Dr. Flores in their first expert report, the VAT exemptions and the VAT recovery procedure concerned different materials, as under an exemption, Norpro Venezuela did not have to pay any VAT in the first place and could thus not be entitled to any refunds.[921] As Norpro Venezuela was in fact granted an Exemption for Capital Goods Certificate by MILCO on 25 October 2007 that covered 29 specific types of equipment, it appears that the company actually received the "*beneficial VAT treatment*" that it had been promised. As there is no specific reference to the VAT recovery procedure for materials that were not covered by this certificate, the Tribunal finds that there is no legal basis under international law to exclude delays in the recovery procedure, provided that they are established, from the present valuation.

---

[916] Claimant's Post-Hearing Submission, ¶ 159.
[917] English translation submitted by Respondent as **Exhibit R-41**.
[918] Rondón, ¶ 38.
[919] Pedersen, ¶ 24.
[920] *See* in particular **Exhibits C-079**, **C-082, p. 4** and **C-084**.
[921] Brailovsky/Flores I, ¶ 163.

Case 1:18-cv-01963-RC Document 9-3 Filed 12/19/18 Page 21 of 39 PageID #: 288

833. The Tribunal therefore has to assess whether Respondent has established that there were indeed delays of approximately two years in the VAT recovery procedure in 2010. As to the three news articles referred to above, Claimant correctly pointed out that they all date from three to ten years earlier.[922] While they thus serve as evidence that delays were an issue when Claimant invested in Venezuela, they do not establish that the same delays still existed in 2010.

834. Mr. Brailovsky and Dr. Flores further pointed to a statement in Claimant's 8 June 2009 update to the DAC:

> "*Partially linked to the export issues, recovering the VAT from the tax treasury has become a very lengthy and complex process. […] The main causes for the delay are related to the legal requirements that have to be fulfilled before being granted an export license. Every single requirement has been identified and assigned a plan.*"[923]

835. While the DAC update confirms that the VAT recovery still took a considerable amount of time, the main reasons for the delays were seen in obtaining the export license, which had not been obtained as of June 2009. Apart from the fact that it was reported that every legal requirement was being tackled, Respondent's witness Mr. Rondón stated in his written witness statement that by the time of the expropriation "*Norpro Venezuela had notified the tax authorities of its intention to start the process to recover VAT credits by applying for a special tax recovery certificate based upon export sales.*"[924] During the Hearing, Mr. Rondón clarified that Norpro Venezuela had actually submitted its application for a special tax recovery certificate and thus started the recovery process.[925] As explained by Mr. Brailovsky and Dr. Flores in their first expert report, the company first had to obtain the export license before it could submit a tax recovery request.[926] As Mr. Rondón's testimony confirms that Norpro Venezuela had initiated the second step by May 2010, it must have completed the first step by that time, which had been described as the main cause for delays in the DAC update.

836. At the same time, the Tribunal notes that Mr. Rondón stated in his written witness statement:

> "*We were conscious that, even after a request for a special tax recovery certificate was initially submitted, the process would be lengthy and tedious and would involve verification of all related transactions. We also knew that it would be typical as part of the process for the tax authorities to seek additional documentation. I understand that this procedure*

---

[922] Claimant's Post-Hearing Submission, note 348.
[923] **Exhibit R-7**, p. 6.
[924] Rondón, ¶ 38.
[925] Transcript (Day 3), p. 775 lines 10-19.
[926] Brailovsky/Flores I, ¶ 168.

> *to recover VAT in Venezuela lasts at least two years from the initial filing of the request.*"[927]

837. As correctly pointed out by Respondent, Mr. Rondón was not cross-examined on his statement on the VAT recovery procedure.[928] The Tribunal also noted above that the 30-day period in Article 43 of the VAT Law starts only once the tax authority has received all documentation that it deems necessary for its decision on the recovery request. Apart from this provision, Claimant has not presented any indication that the statement made by Mr. Rondón was inaccurate or that the situation had changed since the news articles dating from 2000, 2003 and 2007.

838. Consequently, the Tribunal follows the approach of Respondent's experts that the recovery procedure took considerable time during which new VAT credits were accumulating, thus creating a continuous balance of outstanding VAT credits. As Norpro Venezuela could not operate without continuously accumulating new VAT credits while waiting for the recovery of the initial balance, the Tribunal considers it plausible to assume that they form part of Norpro Venezuela's working capital as a going concern. As both Parties' experts assumed that production would have increased until 2014,[929] – and with it the annual amount of newly accumulated VAT credits – the Tribunal further follows Respondent's experts in that Norpro Venezuela would have had a continuing outstanding balance of VAT credits equal to at least the amount outstanding in April 2010. As such amount would have continuously been locked in the operating business, it does not present any separate value that a willing buyer would pay for in addition to Norpro Venezuela's value as a going concern.

### (8)    New Taxes Introduced after the Expropriation

839. Finally, there has been a debate between the Parties and their experts as to the point in time from which Norpro Venezuela would have been subject to a contribution of 1% of the annual income to be made by companies with more than 50 employees under the Organic Law on Drugs. However, as explicitly noted by Respondent, Mr. Brailovsky and Dr. Flores did not include this contribution in their 15 May 2010 valuation because it was not applicable to Norpro Venezuela as of 2010 due to the use of its outsourcing model.[930]

840. There is further common ground that a second contribution of 1% of the annual income under the Organic Law on Sports, Physical Activity and Physical Education is not to be

---

[927] Rondón, ¶ 38.
[928] Respondent's Post-Hearing Brief, note 412. The clarification referred to in paragraph 835 was made in response to a question from the Tribunal.
[929] *Cf.* Spiller I, ¶¶ 52 et seq. and Figure 4; Barilovsky/Flores I, ¶ 174.
[930] Counter-Memorial, ¶ 256; Brailovsky/Flores I, ¶ 243.

included in the 15 May 2010 valuation because this law was enacted only in 2011 and thus not known to a willing buyer in 2010.[931]

841. As there is agreement between the Parties that neither contribution could be foreseen as of 15 May 2010, the Tribunal finds that the two contributions cannot be included in the DCF calculation evaluating Norpro Venezuela as of that date.

### c) Historical Losses Associated with the Increase of the Bauxite Price

#### aa) Summary of Claimant's Position

842. In addition to the fair market value of the plant, Claimant claims that it is entitled to compensation for the losses it has incurred for the supply of bauxite under the Bauxite Contract due to the price increase in violation of Article 3(1) and (2) of the Treaty. In Claimant's view, Respondent is liable for the overpayment of USD 1.3 million as of 15 May 2010.[932]

843. Claimant argues that its "*legal right to bauxite at the designated contractual price*" of USD 25.5 per MT in 2008, inflated to USD 24.3 per MT in 2009, was part of the rights that were expropriated by Respondent. According to Claimant, Norpro Venezuela could otherwise have pursued its legal claims under the Bauxite Contract against CVG Bauxi-lum; thus, Claimant must be compensated for the taking of this intangible right.[933]

#### bb) Summary of Respondent's Position

844. Respondent submits that Claimant's claim for damages is meritless because (i) Norpro Venezuela agreed to the bauxite price increase as long as there would be no further price increase throughout 2009; and (ii) the claim is inadmissible, as Norpro Venezuela should have pursued this claim for an alleged breach of the Bauxite Contract in an arbitration proceeding in Caracas, as provided for in the Contract.[934]

845. In response to Claimant's argument that it expropriated Norpro Venezuela's legal right to vindicate its alleged claim against CVG Bauxilum, Respondent argues that Norpro Ven-ezuela's contractual claims against CVG Bauxilum, even if it had any, were not expropri-ated.[935]

---

[931] Counter-Memorial, ¶ 256; Brailovsky/Flores I, ¶ 243.
[932] Claimant's Post-Hearing Submission, ¶¶ 162-163; Spiller II, Table 12.
[933] Reply, ¶¶ 198-199; Memorial, ¶ 221.
[934] Counter-Memorial, ¶ 266.
[935] Rejoinder, note 857.

### cc)   The Tribunal's Analysis

846.   The Tribunal notes that this claim again relates to Claimant's FET and FPS claims regarding the bauxite price increase in September 2008. Similar to the Tribunal's finding above that there is no basis to exclude the price increase from the valuation of Norpro Venezuela's future cash flows as of 15 May 2010, it also finds that there is no basis for Claimant's separate claim to be compensated for the payment of the increased price prior to 15 May 2010.

847.   This finding is independent of the question whether any contractual claims of Norpro Venezuela against CVG Bauxilum would have formed part of the expropriated rights for which Claimant is to be compensated. In any event, the Tribunal found that Claimant has not established that the price increase was not justified under the Bauxite Contract and is therefore not convinced that Norpro Venezuela had any claims for breach of contract against CVG Bauxilum that could have been expropriated.

848.   Consequently, Claimant is not entitled to compensation for the fact that it paid the increased price of USD 33.8 per MT between September 2008 and May 2010 that was quantified by Prof. Spiller at USD 1.3 million as of May 2010.[936]

### d)   Conclusion on the Calculation of Damages

849.   In conclusion, the Tribunal has found that the calculation of the compensation to be paid by Respondent has to be based on the net present value of Norpro Venezuela's future cash flows as of 15 May 2010. The net present value is to be determined by applying a nominal discount rate of 19.88%.

850.   As to the future cash flows of Norpro Venezuela, the Tribunal has found that (i) the assumptions on proppants prices should be based on the projections in Claimant's April 2010 Business Plan; (ii) a deduction of 25% should be made on the profits on export sales to account for the fact that Norpro Venezuela did not have its own marketing and distribution network; (iii) as to the foreign exchange rate to be applied, the devaluation assumptions after 15 May 2010 should be based on the exchange rate forecasts made by Ecoanalítica; (iv) the bauxite costs should be calculated on the basis of the increased price of USD 33.8 per MT that Norpro Venezuela in fact paid as of September 2008; (v) the transportation costs should include USD 11.9 per MT of local shipping costs within Venezuela for all sales, plus USD 119.83 per MT of shipping costs from Venezuela to Corpus Christi or Alice, Texas for all export sales, plus USD 43.4 per MT of shipping costs within North America for all North American export sales; (vi) the long-term capex for Norpro

---

[936] Spiller II, Table 12.

Venezuela should reflect the expenditures foreseen for the Fort Smith Plant under the MOB and the HSE capexes, but not the TECH and WCM capexes; and (vii) it should be assumed that the VAT credits form part of the working capital required for the continuous operation of Norpro Venezuela and thus do not present any separate value in addition to Norpro Venezuela's value as a going concern.

851. Finally, the Tribunal has found that Claimant is not entitled to any compensation for historic losses associated with the increase of the bauxite price in September 2008 because the price increase was justified under Article 10.2 of the Bauxite Contract.

### 3. Interest

852. As a final step, the Tribunal has to decide on Claimant's claim for pre-award interest as of 15 May 2010 and its claim for post-award interest until the date of payment by Venezuela.

### a) Summary of Claimant's Position

853. Claimant claims that it is entitled to both pre-award interest and post-award interest. According to Claimant, it must be brought in the position it would have been in if the expropriation had not occurred; thus, the interest rate should be equal to the return it expected to earn from its investment in Venezuela, *i.e.*, its opportunity cost.[937]

854. Claimant relies on the tribunal in *Vivendi v. Argentina*, which ordered interest at the claimant's cost of capital, finding that the interest rate should be "*a reasonable proxy for the return the Claimants could otherwise have earned on the amounts invested and lost in the [...] concession.*"[938] Claimant further refers to the tribunal in *France Telecom v. Lebanon*, which awarded interest at a rate of 10% as the reasonable profitability of capital of which the claimant had been deprived by the State's unlawful actions.[939] Claimant also relies on the tribunal in *Alpha Projektholding v. Ukraine*, which awarded pre-award interest at the risk-free rate plus the market risk premium on the assumption that "*this rate better reflects the opportunity costs associated with Claimant's losses, adjusted for the risks of investing in the Ukraine.*"[940] In addition, Claimant refers to the ICC tribunal in

---

[937] Memorial, ¶¶ 230, 232; Reply, ¶ 202.
[938] Memorial, ¶ 232; Claimant's Post-Hearing Submission, note 406 quoting from *Vivendi v. Argentina* (**CLA-024**), ¶ 9.2.8.
[939] Memorial, ¶ 232; Claimant's Post-Hearing Submission, note 406 referring to *France Telecom v. Lebanon* (**CLA-034**), ¶ 209.
[940] Memorial, ¶ 233; Claimant's Post-Hearing Submission, note 406 quoting from *Alpha Prjektholding v. Ukraine* (**CLA-002**), ¶¶ 514, 518.

*ConocoPhillips v. PDVSA*, which granted interest at a rate corresponding to an investor's cost of equity in Venezuela.[941]

855.    Claimant argues that if they had re-invested the cash flows generated by Norpro Venezuela, they would have earned returns at its cost of equity. Therefore, Claimant claims that it should also be awarded both pre-award interest and post-award interest at a rate equivalent to Norpro Venezuela's cost of equity.[942] Claimant takes the position that there is no reason to distinguish between the pre-award interest rate and the post-award interest rate except that the post-award interest rate should capture the present-day cost of equity figure (14.53% as of 31 August 2015).[943]

856.    In addition, Claimant is of the view that any other interest rate would lead to an unjust enrichment of Respondent because it had free access to the expropriated funds. Claimant contends that the reasonable cost that PDVSA would have incurred if it had to borrow the amount in question is equal to the yields on its bullet bonds, which was close to 9% in 2013.[944] According to Claimant, this would also be the minimum "*appropriate*" market interest rate under Article 5(1) of the Treaty, but maintains that under the standard of customary international law, it is entitled to Norpro Venezuela's cost of equity.[945]

857.    In Claimant's view, the interest rate cannot be based on the risk-free rate in the present case because Venezuela has trouble paying its debts and has to pay the Award in US dollars, *i.e.*, a currency other than its own so that it cannot print money to satisfy the Award. Claimant argues that for more than five years it was forced to lend money to Venezuela despite the risk that it might not pay, which is why the market interest rate must reflect the costs of a mid- to long-term loan to Venezuela.[946]

858.    In particular with regard to the post-award interest rate, Claimant argues that otherwise Respondent would have no interest in paying the Award before it has paid all of its other

---

[941] Memorial, ¶ 234; Claimant's Post-Hearing Submission, note 406 referring to *ConocoPhillips v. PDVSA* (**CLA-064**), ¶¶ 294-296; Reply, ¶ 203 quoting from ¶ 295(ii).
[942] Memorial, ¶ 235; Reply, ¶ 204.
[943] Reply, ¶ 207; Prof. Spiller's Valuation Update, Table 6; **Exhibit CLEX-198**, p. 2. Norpro Venezuela's cost of equity as of 15 May 2010 was calculated by Prof. Spiller at 13.56%. **Exhibit CLEX-81**, p. 32.
[944] Reply, ¶¶ 205-206. According to Claimant, this rate is "*quite conservative*" because Respondent's long-term borrowing rate is close to 13%. Claimant's Post-Hearing Submission, ¶ 182.
[945] Claimant's Post-Hearing Submission, ¶¶ 180-181, 183.
[946] Claimant's Post-Hearing Submission, ¶¶ 184-186, Claimant's Second Post-Hearing Submission, ¶¶ 111, 114-115. In support of its position that the interest rate should reflect Respondent's risk, Claimant relies on a paper written by Fisher and Romaine, which discusses pre-judgment interest for damages awarded in US litigation. Claimant's Second Post-Hearing Submission, ¶ 110 quoting from **App. BF-96**, p. 147. However, Respondent clarified that Fisher and Romaine ultimately "*retain the position that prejudgment interest should be awarded at the risk-free rate.*" Respondent's letter dated 2 June 2015, ¶ 4 quoting from **App. BF-96**, pp. 147-148. This submission was admitted into the record by the Tribunal on 19 June 2015. The paper was also discussed with Respondent's expert during the Hearing. Transcript (Day 4), p. 1113.

debts to its creditors. In Claimant's view, this would not serve the purpose of post-award interest to serve as an effective incentive to comply with the terms of the Award.[947]

859. In any event, Claimant asserts that the interest rate advanced by Respondent is not a market interest rate but rather equivalent to an inter-bank rate and refers to the tribunal in *Tidewater v. Venezuela*, which rejected Venezuela's suggestion on that basis. In addition, Claimant submits that none of the tribunals relied on by Respondent has applied a 3-month treasury bond but considers it "*well settled*" that the pre-award interest rate should reflect a mid- to long-term interest rate.[948]

860. In Claimant's view, the Tribunal should award interest on an annual compounding basis in order to fully reflect the time value of its losses and thus give effect to the standard of full reparation under customary international law.[949] Claimant argues that "*nearly all real-life transactions and financial operations*" involve compound interest and notes that the tribunals in the five most recent ICSID decisions involving Venezuelan expropriations have awarded compound interest.[950]

### b) Summary of Respondent's Position

861. Respondent rejects Claimant's claim that it should be awarded interest in the amount of Norpro Venezuela's cost of equity and argues that this does not qualify as an "*appropriate market interest rate*" under Article 5(1) of the Trreaty. In addition, Respondent considers it "*absurd*" to update past cash flows at a higher rate than the discount rate that Prof. Spiller calculated for the purposes of discounting future cash flows, even though the risks and uncertainties of the future do not apply.[951]

862. In Respondent's view, Claimant's alternative argument of applying the rate applicable to PDVSA's debt is equally inappropriate because interest as a form of compensation should focus on Claimant's loss caused by the fact that it did not receive payment on a fixed date. As Claimant no longer bore any risk associated with its investment as of 15 May 2010, Respondent claims that the appropriate interest rate is the risk-free-rate.[952]

863. According to Respondent, market interest rates in the commercial context are "*almost always*" based on a base rate, such as the LIBOR or the short term US Treasury bill rate, to be increased by a certain spread depending on the creditworthiness of the borrower, *i.e.*, in this case Claimant's ultimate parent company Compagnie de Saint-Gobain. In light

---

[947] Claimant's Post-Hearing submission, ¶¶ 188, 190.
[948] Claimant's Second Post-Hearing Submission, ¶ 109 quoting from *Tidewater v. Venezuela* (**CLA-155**), ¶ 206.
[949] Memorial, ¶¶ 236-237; Reply, ¶ 208; Claimant's Post-Hearing Submission, ¶¶ 191-194.
[950] Claimant's Second Post-Hearing Submission, ¶ 112.
[951] Counter-Memorial, ¶ 250; Rejoinder, ¶ 273.
[952] Respondent's Post-Hearing Brief, ¶¶ 114-115 and ¶ 121.

of the integrity issue raised with regard to the LIBOR, Respondent takes the view that the interest rate should be based on the US Treasury bills; it selects the 3-month bills to compensate Claimant for any "*short-term borrowing*" it may have required pending the issuance of the present Award.[953]

864. Respondent refers to the tribunal in *Siemens v. Argentina*, which awarded pre-award interest based on the average 6-month US Treasury bills (2.66%).[954] Respondent further relies on the cases of *LG&E* and *BG Group* in which the tribunals applied short-term US Treasury bill rates.[955] Respondent also refers to the tribunal in *Occidental v. Ecuador*, which applied the monthly rate on US Treasury bills stating that it "*reflect*[ed] *a prudent, risk-free and conservative re-investment practice.*"[956] Finally, Respondent relies on the tribunal in *Yukos v. Russia*, which awarded pre-award interest based on the average yield of the 10-year US Treasury bond.[957] According to Respondent, various tribunals explicitly refused to apply the claimant's cost of capital as the basis for the pre-award interest rate.[958]

865. Respondent submits that the average yield on debt with a 3-month maturity carrying the same rating as that of Compagnie de Saint-Gobain (BBB) was 1.09%, while the yield on short-term US Treasury bills was 0.08%. Respondent concludes that the applicable market interest rate to be applied to the net present value of the cash flows as of 15 May 2010 should thus be the 3-month US Treasury bill rate plus 1.01%.[959]

866. Finally, Respondent submits that interest should be calculated on a simple basis because compound interest is prohibited under Venezuelan law.[960] In this regard, Respondent relies in particular on the tribunal in *Yukos v. Russia*, which held that simple interest was "*just and reasonable.*"[961] Respondent further contests Claimant's suggestion that awarding compound interest is the norm in international arbitration and refers to various decisions in which simple interest was applied.[962]

---

[953] Counter-Memorial, ¶ 251; Rejoinder, ¶ 274; Respondent's Post-Hearing Brief, note 242.
[954] Respondent's Post-Hearing Brief, ¶ 117 referring to *Siemens v. Argentina* (**CLA-77**), ¶ 396.
[955] Respondent's Post-Hearing Brief, ¶ 117 referring to *LG&E* (**CLA-48**), ¶¶ 102, 105 and *BG Group* (**CLA-113**), ¶ 455.
[956] Respondent's Post-Hearing Brief, ¶ 117 quoting from *Occidental v. Ecuador* (**CLA-61**), ¶ 842.
[957] Respondent's Post-Hearing Brief, ¶ 117 referring to *Yukos v. Russia* (**CLA-153**), ¶¶ 1685-1687.
[958] Respondent's Post-Hearing Brief, ¶¶ 118-120 referring to PSEG (RL-86), ¶ 345, Guaracachi (RL-125), ¶ 615 and Tza Yap Shum (RL-173), ¶¶ 288, 290.
[959] Counter-Memorial, ¶ 251 and ¶ 260; Rejoinder, ¶ 274; Respondent's Post-Hearing Brief, note 242. In its request for relief, however, Respondent requests that 1.1% be added to the 3-month US Treasury bill rate. Respondent's Post-Hearing Brief, ¶ 209; Respondent's Post-Hearing Reply Brief, ¶ 64.
[960] Counter-Memorial, ¶ 252.
[961] Respondent's Post-Hearing Brief, ¶ 122 quoting from *Yukos v. Russia* (**CLA-153**), ¶ 1689.
[962] Respondent's Post-Hearing Brief, note 244 referring to *RosInvestCo* (**RL-172**), ¶¶ 687-692, *Desert Line* (**RL-88**) ¶ 295, *CME* (**CLA-20**), ¶ 647 and *SPP* (**CLA-80**), ¶ 236.

### c)    The Tribunal's Analysis

867.  The Tribunal will first determine the applicable pre-award interest rate (**aa**)) and then assess whether there is any reason to apply a differing rate for post-award interest (**bb**)). Finally, the Tribunal will address the issue of simple versus compound interest (**cc**)).

### aa)    Pre-Award Interest Rate

868.  As the value of Norpro Venezuela and thus the amount of compensation to be paid to Claimant is to be assessed as of 15 May 2010, it is undisputed between the Parties that Claimant is further entitled to payment of pre-award interest as from this date.

869.  The Tribunal notes that Prof. Spiller did not discuss pre-award interest (or the update of historical cash flows to be made in the alternative date-of-the-award valuation) but simply applied Norpro Venezuela's cost of equity based on an instruction from Claimant's counsel.[963] In his 15 May 2010 valuation, he calculated pre-award interest on the basis of Norpro Venezuela's cost of equity (estimated at 13.04% as of 2014) and in the alternative based on PDVSA's cost of debt as the average yield of seven USD bullet bonds during 2013 (estimated at 9.08%), but again he did not discuss either alternative.[964]

870.  Mr. Brailovsky and Dr. Flores took the position that "*from a strict economic point of view*" the pre-award interest rate should be the risk-free rate. However, they recognized that it is common in arbitration to apply "*some sort of* 'normal' *commercial rate.*" Therefore, they adopted two criteria: (i) a short-term maturity of three months as the date of the award is not known and the loan required as a result of the delay in payment must thus be renewed constantly; and (ii) Claimant's risk measured as the yield of debt with a BBB rating, *i.e.*, the rating that Compagnie de Saint-Gobain carries. According to Mr. Brailovsky and Dr. Flores, the yield on BBB bonds with a 3-month maturity issued by industrial companies in the US was on average 1.09%, *i.e.*, a spread of 1.01% over the US 3-month US Treasury bills.[965]

871.  As to the approach applied by Prof. Spiller, Mr. Brailovsky and Dr. Flores considered it incorrect to use 2013 and 2014 interest rates for a period starting on 15 March 2010 instead of a certain average over the time period in question. In addition, they note that only

---

[963] Spiller I, note 73; **Exhibit CLEX-01**, ¶ 3(d).
[964] Spiller II, ¶ 138 (with note 217) and Table 13.
[965] Brailovsky/Flores I, ¶¶ 248-250; Brailovsky/Flores II, ¶¶ 252-254 and Table 19. Mr. Brailovsky and Dr. Flores also note that, while the LIBOR rate has often been used as a benchmark in the past, it might be inappropriate to use it in the present case given that its integrity as suitable interest rate benchmark has recently been challenged. Brailovsky/Flores I, note 445.

two of the PDVSA bonds used by Prof. Spiller had a short-term maturity – they yielded an average of 3.6% three months before maturity.[966]

872. The Tribunal recalls that Article 5(1) subparagraph 3 of the Treaty provides that interest shall accrue at an "*appropriate market interest rate*" ("*taux d'intérêt de marché appro-prié*" / "*adecuada tasa de interés del mercado*").[967] As to the standard under customary international law, Article 38 of the ILC Draft Articles provides that "[t]*he interest rate and mode of calculation shall be set so as to achieve* [the] *result* [of ensuring full repara-tion].*"[968] While the Tribunal is aware that an appropriate market interest rate is not nec-essarily the same as an interest rate that ensures full reparation of the damage Claimant incurred, it appears possible under the present circumstances to settle on a rate that satis-fies both standards.

873. Claimant takes the position that under the standard of full reparation it would be entitled to interest at the rate of Norpro Venezuela's cost of equity as being equal to the return Claimant expected to earn from its investment.[969] However, the Tribunal notes that, re-gardless of whether the expropriation would be labelled as "*lawful*" or "*unlawful*," this is not a case in which Respondent was not permitted to expropriate Norpro Venezuela *per se.* The Tribunal rather found that Respondent failed to comply with the requirements concerning the payment of compensation that should have accompanied the expropria-tion. Consequently, Claimant is not to be brought in the position it would have been in if it were still the owner of Norpro Venezuela, but rather in the position it would have been in if Respondent had paid compensation on or shortly after 15 May 2010.

874. Under these circumstances, the Tribunal agrees with Respondent that it would not be ac-curate to award Claimant interest at a rate that accounts for the risks of investing in a company located in Venezuela even though Claimant was no longer bearing these risks and, more importantly, would also not have been bearing these risks if it had been com-pensated on 15 May 2010. Therefore, the Tribunal will not award interest at Norpro Ven-ezuela's cost of equity.

875. Alternatively, Claimant claims that the appropriate market interest rate would be PDVSA' cost of debt, arguing that it was forced to grant a loan to Respondent in the amount of the compensation owed to it as of 15 May 2010.[970]

---

[966] Brailovsky/Flores II, ¶ 259.
[967] **Exhibit C-1**, Article 5(1) subparagraph 2.
[968] **CLA-027**, Article 38(1).
[969] Memorial, ¶ 232; Reply, ¶ 202.
[970] Claimant's Post-Hearing Submission, ¶¶ 180-186.

876. There is no indication that the determination of an appropriate market interest rate should account for the State's cost of debt. Claimant has not cited any decision from an international tribunal in support of its submission but refers to a paper from Fisher and Romaine on pre-judgment interest in US litigation and a statement from Prof. Damodaran. However, as Respondent correctly pointed out in its letter of 2 June 2015, Fisher and Romaine considered that the risks associated with the particular defendant resulted from litigation rather than the violation itself and thus ultimately did not justify a deviation from the application of the risk-free rate.[971] As to the statement made by Prof. Damodaran, the Tribunal notes that this statement did not concern the determination of an appropriate interest rate but was rather made as part of the requirements for an investment to be risk-free.[972] Therefore, the Tribunal considers that none of the authorities cited by Claimant supports its position that the "*appropriate market interest rate*" should reflect Respondent's cost of debt.

877. In principle, the Tribunal agrees with Respondent and its experts (reyling on Fisher and Romaine) that the loss to be compensated by awarding interest on the principal amount is the time value of money, without factoring in any risks that Claimant did not bear.[973] However, this does not render it completely irrelevant that, if Claimant had received the compensation on or shortly after 15 May 2010, it would have had the opportunity to re-invest this amount and earn a return considerably above the return of the risk-free rate. Therefore, the Tribunal considers that, in the circumstances of this case, both the customary international law standard of full reparation and the standard in Article 5(1) of the Treaty require the application of what Mr. Brailovsky and Dr. Flores described as "*some sort of* 'normal' *commercial rate*" that is commonly applied in arbitrations.[974]

878. While Mr. Brailovsky and Dr. Flores therefore added Claimant's cost of debt for short-term loans to the risk-free rate, the Tribunal is not convinced that this appropriately captures Claimant's loss of investment opportunity in the present case. The Tribunal wishes to re-emphasize that it does not intend to award interest at a rate equal to the opportunity cost of Claimant's investment in Norpro Venezuela (nor in any hypothetical alternative investment), primarily because Claimant in fact did not bear the risk associated with such a rate of return. At the same time, the Tribunal is of the view that Claimant's own cost of debt does not adequately reflect the fact that, over a period of several years, Claimant was deprived of the opportunity to dispose of the money it should have received in connection with the expropriation of its investment in Venezuela.

---

[971] Respondent's letter dated 2 June 2015, ¶ 4 quoting from **App. BF-96**, pp. 147-148. This portion of the letter was admitted into the record by Tribunal on 19 June 2015.
[972] **Exhibit C-158**, p. 6.
[973] Brailovsky/Flores II, ¶ 251 quoting from **App. BF-96**, p. 146.
[974] Brailovsky/Flores I, ¶ 248; Brailovsky/Flores II, 252.

879. Under these circumstances, the interest rate to be applied in the present case should there-
fore achieve a balance between, on the one hand, avoiding the granting of a rate of return
that would not have been achievable without considerable risk, and on the other hand,
acknowledging that Claimant would have been in a position to use its funds for more than
just a risk-free investment if it had been paid on or shortly after 15 May 2010. In the
Tribunal's view, this applies in particular in times where the risk-free interest rates are
close to zero as they were for almost the entire time period between the date of the expro-
priation and the date of the Award.

880. Consequently, the Tribunal exercises the discretion it has under either Article 5(1) of the
Treaty and under customary international law and awards an interest rate that qualifies as
both an "*appropriate market interest rate*" and a rate that "*ensure*[s] *full reparation*" in
terms of a reasonable opportunity to invest the principal amount in the market. Taking up
the concerns raised by Respondent and its experts regarding the integrity of the LIBOR
rate as a reliable benchmark for interest rates, the Tribunal will instead refer to the US
Treasury bill rate, which both Parties' experts have relied on in various aspects of their
valuations. As to the appropriate maturity, the Tribunal notes that, while Mr. Brailovsky
and Dr. Flores applied the 3-month rate, this choice is not supported by any of the cases
relied on by Respondent in the context of its submissions on interest. It rather appears
that the 6-month rate is a rate that is commonly applied by investment treaty tribunals.[975]

881. The Tribunal sees no reason to deviate from this practice and therefore finds that the pre-
award interest rate should be based on the 6-month US Treasury bill rate. In order to
reflect the above mentioned considerations relating to the balance between risk and re-
investment opportunity, the Tribunal considers it appropriate to add a spread of 2% to this
risk-free rate.

882. In sum, the Tribunal finds that Claimant is entitled to pre-award interest at a rate equal to
2% over the average 6-month US Treasury bill rate.

### bb)   Post-Award Interest Rate

883. The Tribunal notes that Claimant explicitly takes the position that there is no reason to
distinguish between pre-award interest and post-award interest.[976] However, the Tribunal
is aware that Claimant makes this statement in the context of its argument that it should

---

[975] *See, e.g., Siemens v. Argentina* (**CLA-077**), ¶ 396; *LG&E Energy Corp. et al. v. Argentina* (**CLA-048**), ¶ 105;
*BG Group Plc. v. Argentina* (**CLA-113**), ¶ 455; *Occidental Petroleum Corporation et al. v. Ecuador* (**CLA-061**),
¶¶ 841-842. Tribunals that applied the LIBOR rate also commonly referred to the 6-month rate, *see, e.g., Lemire
v. Ukraine* (**RL-122**), ¶ 353; *PSEG Global Inc. et al. v. Turkey* (**RL-86**), ¶ 348.
[976] Reply, ¶ 207.

be awarded pre-award interest at a rate at least equal to Respondent's cost of debt. Specifically with regard to post-award interest, Claimant argues that if the interest rate were lower than Respondent's cost of debt, Venezuela would have no incentive to comply with the Award – contrary to the very purpose of awarding post-award interest.[977]

884. Neither Respondent nor its expert makes any explicit statement as to what they consider to be the applicable post-award interest rate in the present case. They also do not address Claimant's argument that post-award interest should serve as an incentive to comply with the Award.

885. The Tribunal notes that both Article 5(1) of the Treaty and Article 38(2) of the ILC Draft Articles provide that interest shall continue to accrue until the date on which the actual payment is made.[978] Therefore, the Tribunal will award post-award interest on the amount to be paid pursuant to the Award.

886. As to the applicable rate, the Tribunal agrees with Claimant that, in principle, there is no reason to apply differing rates for pre-award interest and post-award interest. The Tribunal further sees no reason to deviate from this general rule because it has found above that the applicable pre-award interest rate might be lower than Respondent's (alleged) cost of debt. In the Tribunal's view, post-award interest serves the same purpose as pre-award interest, *i.e.*, to compensate Claimant for the time value of money and the fact that it cannot dispose of the amount until the date of actual payment; however, it is not meant to ensure compliance with the Award. Therefore, the Tribunal again considers that Respondent's cost of debt is not the appropriate benchmark to determine the applicable interest rate; rather, interest shall accrue at the same rate both prior to and following the Award.

### cc) Simple / Compound Interest

887. Finally, the Tribunal has to determine whether interest shall be calculated on a simple basis, as advanced by Respondent, or compounded annually, as claimed by Claimant.

888. The Tribunal is aware of Respondent's argument that compound interest is prohibited pursuant to Article 530 of the Venezuelan Commercial Code and its reliance on the case of *Autopista Concesionada de Venezuela v. Venezuela*, in which the tribunal did not

---

[977] Claimant's Post-Hearing Submission, ¶ 188 referring to Irmgard Marboe, Calculation of Compensation and Damages in International Investment Law, 2009, (**RL-97**), ¶¶ 6.245-6.246.
[978] **Exhibit C-1**, Article 5(1) subparagraph 2; **CLA-027**, Article 38(2).

award compound interest based on the combined fact that this was not allowed by Vene-zuelan law and not required by international law.[979]

889. However, the Tribunal notes that this decision, which is the only one cited by Respondent in this regard, dates from 2003. As correctly pointed out by Claimant, several more recent decisions involving Venezuela included an award of compound interest, in particular *Tidewater*, *OI European* and *Venezuela Holdings* dating from 2015 and 2014 respec-tively.[980]

890. In the Tribunal's view, the fact that compound interest is not allowed under Venezuelan law does not prevent this Tribunal from awarding compound interest because the legal basis for Claimant's claim for interest is either Article 5(1) of the Treaty or customary international law. This finding is not in contradiction with the tribunal's finding in *Auto-pista v. Venezuela* because the tribunal in that case did not hold that Article 530 of the Venezuelan Commercial Code prevented it from awarding compound interest *per se* but rather noted this fact in addition to its finding that compound interest was not an estab-lished principle under, and therefore not required by, international law.

891. As more than a decade has passed since the *Autopista* award was rendered, the Tribunal considers it appropriate to re-assess the finding whether compound interest can be con-sidered a well-established principle under international law. Upon review of the cases cited by the Parties in connection with interest, the Tribunal notes that a majority of them awarded compound interest.[981] While Respondent did cite several cases in which interest was awarded on a simple basis, it appears that this was either due to the particular cir-cumstances prevailing in the respective case or not supported by any reasoning for the tribunal's decision.

892. In particular, the tribunal in *Yukos v. Russia* on which Respondent relies explicitly recog-nized that "*the awarding of compound interest under international law now represents a form of* 'jurisprudence constante' *in investor-state expropriation cases*" but deviated from

---

[979] Counter-Memorial, ¶ 252 referring to **Exhibit R-55**, Article 530 and *Autopista Concesionada de Venezuela v. Venezuela* (**RL-124**), ¶¶ 396-397.

[980] Claimant's Second Post-Hearing Submission, ¶ 112 referring to *Tidewater v. Venezuela* (**CLA-155**), ¶¶ 208-209, *OI European v. Venezuela* (**CLA-156**), ¶¶ 946, 952 and *Venezuela Holdings v. Venezuela* (**CLA-154**), ¶¶ 394, 399.

[981] *Alpha Projektholding v. Ukraine* (**CLA-002**), ¶ 514; *Compañia de Aguas v. Argentina* (**CLA-024**), ¶ 9.2.8; *France Telecom v. Lebanon* (**CLA-034**), ¶ 209; *LG&E v. Argentina* (**CLA-048**), ¶¶ 102-105; *Unglaube v. Costa Rica* (**CLA-051**), ¶¶ 319, 325; *Occidental v. Ecuador* (**CLA-061**), ¶¶ 842, 845; *Phillips v. Petróleos de Venezuela* (**CLA-64**), ¶¶ 294 et seq.; *Siemens v. Argentina* (**CLA-077**), ¶¶ 396, 401; *Wena v. Egypt* (**CLA-089**), ¶ 129; *BG Group v. Argentina* (**CLA-113**), ¶¶ 454-457; *PSEG v. Turkey* (**RL-86**), ¶¶ 345, 348; *Lemire v. Ukraine* (**RL-122**), ¶¶ 353, 356, 361; *Guaracachi v. Bolivia* (**RL-125**), ¶¶ 615-617; *Tza Yap Shum v. Peru* (**RL-173**), ¶¶ 289-292.

this practice in light of the "*significant amount of damages*" owed by Russia.[982] In *RosIn-vest v. Russia*, the tribunal recognized that "*recent investment treaty arbitration have awarded compound interest*" but also noted that "*this practice is by no means unanimous*" and held that "*in light of the speculative nature of the investment*" it would be unjust to award compound interest.[983] The tribunal in *Desert Line v. Yemen* did not give any reasons for its decision to award simple interest rather than compound interest as requested by the claimants in that case.[984]

893.   In *CME v. Czech Republic*, the tribunal again recognized that "*in recent years interna-tional arbitral tribunals, particularly those acting under bilateral investment treaties, have increasingly have* [sic] *awarded compound interest essentially in recognition of the prevalent contemporary commercial reality that companies that borrow pay compound interest*." The tribunal found, however, that the claimant had not established that it actu-ally had paid compound interest on loans it had borrowed from banks and therefore did not find "*particular circumstances*" that would justify to award compound interest.[985] The Tribunal notes that, while the *CME* tribunal apparently considered it necessary to find "*particular circumstances*" that justified compound interest, this decision again dates from 2003 and might therefore not be representative of recent developments in both mar-ket lending and international investment arbitration.

894.   Finally, the tribunal in *SPP v. Egypt* again decided that interest was not to be compounded without giving any specific reasons for its decision.[986] As the decision dates from 1992, the Tribunal in any event considers that it does not provide useful guidance as to recent developments in international investment arbitration.

895.   In sum, the majority of investment tribunals have in recent years decided to award com-pound interest and even most of those tribunals that decided to award simple interest for a particular reason, recognized that compound interest represents what the *CME* tribunal described as the "*prevalent contemporary commercial reality*." The Tribunal would not go as far as saying that it would thus be for Respondent to establish particular circum-stances that would justify not awarding compound interest. However, since the Tribunal has decided to award an appropriate market rate, it does not see any reason in the present case not to follow the majority of tribunals, which have decided to award compound in-terest on the principal amount.

---

[982] *Yukos v. Russia* (**CLA-153**), ¶¶ 1689, 1691.
[983] *RosInvest v. Russia* (**RL-172**), ¶¶ 689-690.
[984] *Desert Line v. Yemen* (**RL-88**), ¶¶ 295-298.
[985] *CME v. Czech Republic* (**CLA-020**), ¶¶ 645-647.
[986] *SPP v. Egypt* (**CLA-080**), ¶ 236.

896. Consequently, the Tribunal finds that both pre-award interest and post-award interest shall be subject to compounding. As to the periodicity, the Tribunal follows Claimant's argument that interest should be compounded annually.

### 4. Taxation Liabilities

897. Finally, Claimant requests in its two post-hearing submissions a declaration that (i) the award of damages and interest be made net of applicable Venezuelan taxes; and (ii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest. In addition, Claimant requests that Respondent be ordered to indemnify Claimant in respect of any double taxation liabilities that would arise in France or elsewhere that would not have arisen but for Venezuela's adverse measures.[987]

898. Respondent did not comment on this request in its Post-Hearing Reply Brief.

899. The Tribunal notes that Claimant has raised its claim regarding taxation liabilities only after the hearing, *i.e.*, in its relief sought as set out in its Post-Hearing Submission and its Second Post-Hearing Submission. In addition, besides failing to provide any justification for its decision to raise this claim only at such a late point in time, Claimant has not made any submissions on the claim outside its relief sought.

900. Nevertheless, the Tribunal considers that it needs to distinguish between the first two claims relating to taxation of the awarded compensation within Venezuela on the one hand and the additional claim relating to potential double taxation liabilities that might arise outside of Venezuela on the other.

901. As to the first two claims, the Tribunal notes that the Parties' experts have both taken an income tax rate of 34% into account as part of their respective valuation of the compensation to which Claimant is entitled.[988] The Tribunal further notes that, while the experts initially disagreed on a specific aspect of Claimant's expert Prof. Spiller's determination of the taxable income, *i.e.*, the aspect of depreciation as modeled by Prof. Spiller in his first report,[989] Prof. Spiller adopted the method of Respondents' experts Dr. Brailovsky and Dr. Flores in his second report.[990] This was acknowledged by Respondents' experts in their second report.[991] It therefore appears to the Tribunal that the Parties' experts are in agreement as to the treatment of income taxes and depreciation in their calculations.

---

[987] Claimant's Post-Hearing Submission, ¶ 195; Claimant's Second Post-Hearing Submission, ¶ 116.
[988] Spiller I, ¶ 138; Brailovsky/Flores I, ¶ 136.
[989] Brailovsky/Flores I, ¶¶ 136-147.
[990] Spiller II, ¶ 101.
[991] Brailovsky/Flores II, ¶ 139.

902. In light of the above, the Tribunal considers it justified to assume that the valuation method agreed on by the Parties adequately accounts for income taxes that would have had to be paid by Norpro Venezuela in the future in the but-for scenario.[992] Any further taxation by Venezuela of the compensation to be paid to Claimant would therefore amount to a double-taxation of this amount. Consequently, the Tribunal holds that Claimant's request that (i) the award of damages and interest be made net of applicable Venezuelan taxes; and (ii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest, is justified. In fact, it logically results from the valuation method selected by the Parties' experts and in particular their agreement on how to deal with income taxes in their calculations. In the Tribunal's view, no further elaboration on Claimant's part was necessary to grant this declaratory request and, moreover, it is unproblematic that Claimant included this request in its relief sought only as of its Post-Hearing Submission.

903. Consequently, Claimant's request relating to the taxation of the awarded compensation with Venezuela is granted.

904. As to the additional claim for an indemnification in respect of any hypothetical future double taxation liabilities that might arise in any third country, the Tribunal considers that such claim would have required at least some elaboration by Claimant in order to be considered substantiated. Claimant has specified neither the legal basis for eventual taxation, nor the tax rate nor the grounds based on which Respondent should compensate it for incurring such liability. In addition, there is no indication that any such liability towards third-party States was included in the calculations of the Parties' experts and, thus, that a failure to grant Claimant's request in this regard would lead to a double-taxation of the awarded amount. Finally, the relief Claimant is seeking would have required at least a certain degree of probability that a third-party State will indeed impose taxes on the awarded compensation, which has not been alleged by Claimant.

905. In the absence of any submissions on this request outside Claimant's relief sought, the Tribunal considers that such request is speculative and unfounded;[993] the Tribunal therefore sees no basis for ordering an indemnification against foreign taxation liabilities as requested by Claimant. Consequently, Claimant's claim that Respondent be ordered to indemnify Claimant in respect of any double taxation liabilities that would arise in France or elsewhere that would not have arisen but for Venezuela's adverse measures is denied.

## V.  DECISION ON COSTS

---

[992] *See* also *Venezuela Holdings v. Venezuela* (**CLA-154**), ¶ 389.
[993] *See Venezuela Holdings v. Venezuela* (**CLA-154**), ¶ 388.

906.  In accordance with Article 61(2) of the ICSID Convention, the Tribunal's decision on costs will form part of its Award.

## G.    THE TRIBUNAL'S DECISION

907.  The present decision reflects the Tribunal's findings on liability and the principles of quantum as set out above. Subsequent to the notification of this decision to the Parties, the Tribunal will, by separate order, invite the Parties to attempt to seek agreement on the final amount of compensation to be paid by Respondent to Claimant in respect of the expropriation of Norpro Venezuela – based on the findings contained in the present decision. Failing agreement reached between the Parties within two months from the notification of this decision, the Tribunal will, following consultation with the Parties, fix a calendar for submissions of the Parties on the remaining quantum issues to be decided.

908.  Based on the above, the Tribunal renders the following

### DECISION ON LIABILITY AND THE PRINCIPLES OF QUANTUM

1.  **Respondent has breached Article 5(1) subparagraphs 2 and 3 of the Treaty by failing to specify the amount of compensation and to pay prompt compensation for the expropriation of Claimant's investment in Venezuela.**

2.  **Respondent shall pay to Claimant the amount of compensation to be calculated on the basis of the Tribunal's findings summarized at paragraphs 849 through 851 above, plus pre-award interest as of 15 May 2010 until the date of the Award at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually.**

3.  **Respondent shall pay to Claimant post-award interest on the amount of compensation under 2 as of the date of the Award until the date of payment at a rate equal to 2% over the average 6-month US Treasury bill rate, compounded annually. Post-award interest is to be paid only on the principal amount of compensation, and not on the pre-award interest awarded.**

4.  **The award of damages and interest is made net of applicable Venezuelan taxes, and Respondent may not deduct taxes in respect of the payment of the award of damages and interest.**

5.  **The decision on costs is reserved for the Award.**

6.  **All other claims and requests are dismissed.**

The Honorable Charles N. Brower
Arbitrator
Date: 21 DECEMBER 2016
Subject to the attached Concurring
and Dissenting Opinion

Mr. Gabriel Bottini
Arbitrator
Date: 9 December 2016

Professor Dr. Klaus Sachs
President
Date: 2 December 2016

**CONCURRING AND DISSENTING OPINION OF JUDGE CHARLES N. BROWER**

1.       I agree with the Tribunal's finding (paragraph 908(1)) that Respondent is responsible for a breach of Article 5(1), subparagraphs 2 and 3 of the Agreement between the Government of the French Republic and the Government of the Bolivarian Republic of Venezuela on Reciprocal Encouragement and Protection of Investments (hereinafter "the BIT") in expropriating Claimant's 99.99%-owned Venezuelan subsidiary Norpro Venezuela C.A. (hereinafter "Norpro"), as well as with most of the Tribunal's detailed analysis of the correct elements to guide the discounted cashflow calculation of the compensation to be awarded to Claimant.  I must dissent, however, from two aspects of that analysis that, both as an economic matter as well as a matter of the applicable law, deprive the Claimant of much of that to which it is entitled, whether under the BIT or under international law generally.  *See Case Concerning the Factory at Chorzów (Claim for Indemnity) (Germany v. Poland)*, P.C.I.J. Series A No. 17 (1928).  Specifically, the Tribunal has failed to enforce the BIT and international law generally in that it:

(a)       Has included in the country risk portion of the percentage by which the projected cash flow of Norpro is to be discounted (i.e., 10.26% as per paragraph 753) precisely the risk of uncompensated expropriation, as well as other violations of the BIT (paragraphs 713-714), from which this Tribunal has been constituted to rescue Claimant, and which in the instant Decision on Liability and the Principles of Quantum (hereinafter "the Decision") the Tribunal professes to accomplish, resulting in a country risk factor that is 5.76 points above, hence 228% of, 4.5%, the only country risk factor number either Party has placed before the Tribunal as excluding the risk of BIT violations; and

(b)       Has excluded 25% of Norpro's export sales profits on the ground that the Claimant, Norpro's 99.99% owner, has by tax-related intercompany transfer pricing or other bookkeeping choices charged Norpro approximately that amount of its profits for Claimant's contributions to Norpro's marketing.

The vices of these two reductions of Claimant's entitlement under the BIT and general international law should be obvious.

2.      The first problem, under 1(a) just above, arises from the misunderstanding by the Tribunal of Article 5(1), paragraph 2, which specifies that compensation for an expropriation must be "equal to the actual value of the investment[] concerned," and of general international law, which as per *Chorzów* (page 47 of the Judgment), requires "that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed." The Decision has morphed the applicable law into applying a compensation standard of "fair market value," which, as applied by the Decision, unfortunately has led to injustice to the Claimant.

3.      By increasing the country risk factor to include precisely the risk against which the Decision undertakes to insulate the Claimant, whom the Tribunal has found to have been injured by the expropriatory breach of the BIT by the Respondent, the Tribunal does an injustice to the Claimant. It takes away with one hand what it has purported to give the Claimant with the other. To reduce the recovery to the injured Claimant by applying a "fair market value" that incorporates the very risk of which the Claimant purportedly is being relieved by the Tribunal is to deny the Claimant the full compensation to which it is entitled. It is like undertaking to restore to the owner of a severely damaged automobile a perfectly repaired and restored vehicle but then leaving parts of it missing because it just might be damaged again in the future. The obvious logic of this was recognized by a very distinguished tribunal in *Gold Reserve, Inc. v. Venezuela*, ICSID Case No. ARB(AF)/09/1, Award (22 Sept. 2014) ¶ 841, which should have persuaded my colleagues not to follow the misguided precedent of *Tidewater Investment SRL v. Venezuela*, ICSID Case No. ARB/10/5, Award (13 Mar. 2015). Significantly, the necessity of excluding from the country risk factor the very treaty risk of which a claimant is found to have been a victim was underscored already 27 years ago, in 1989, by the Iran-United States Claims Tribunal in *Phillips Petroleum Company Iran* v. *The Islamic Republic of Iran, et al.*, Award No. 425-39-2 (29 June 1989) ¶¶ 111, 152, *reprinted in* 21 Iran-U.S. C.T.R. 79, and ten years later, in 1999 by the UNCITRAL Rules Tribunal in *Himpurna California Energy Ltd. v. PT. (Persero) Perusahaan Listruik Negara*, Final Award (4 May 1999) ¶ 357, *in* YEARBOOK COMMERCIAL ARBITRATION, VOL. XXV (A. Jan van den Berg ed., Kluwer 2000).

4.      Apart from the fact that the majority's position deprives the Claimant of the compensation to which it is entitled, it fails to adhere to the Parties' agreement as to what constitutes "fair market value."  In paragraph 628 of the Decision the Tribunal points out that "[t]he Parties agree that the fair market value is equal to the amount that a willing buyer would pay to a willing seller, *provided that the buyer is informed about all relevant circumstances and none of the parties is under any kind of duress to sell or to acquire the asset*."  (Emphasis added.)  If a willing buyer is, for example, a national of France (Party to the BIT here), or of another State that has equivalent treaty protection as did and should the Claimant here, is that not a part of the buyer being "informed about all relevant circumstances"?  Might not such status possibly lead the purchaser to pay more for the expropriated asset than would a potential buyer that lacks such protection?  "Fair market value" cannot as, the Parties to this case have agreed, be determined devoid of "all the relevant circumstances."

5.      As to paragraph 1(b) above, awarding the 99.99%-owner of the expropriated concern, namely the Claimant, which is entitled to 99.99% of the profits of Norpro, only the lesser compensation derived from 99.99% minus 25% of Norpro's export sales profits means that to that extent the Claimant is deprived of the compensation to which it is entitled.  The intercompany bookkeeping practiced by the parent and the subsidiary has no effect whatsoever on the actual profit created for the parent by the subsidiary.  Assuming, as an example, that 25% of Norpro's export sales profits adds up to 10% of Norpro's total profits, then the parent Claimant, which in fact has lost 99.99% of Norpro's profits, receives as compensation, not that 99.99% of which it was deprived, but instead only 89.99%.  How can that be considered to lead to "fair market value" by whatever standard?

For the reasons, and to the extent, stated above I respectfully dissent from the Decision.

4

Charles N. Brower

The Honorable Charles N. Brower
Arbitrator
Date: 21 DECEMBER 2016

Case 1:20-cv-09120-RC   Document 9-3   Filed 04/24/19   Page 319 of 703

# Exhibit 4

**Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/12/13**

Application of the Tribunal's Award

| | | |
|---|---|---|
| [a] | Compensation for the Expropriation | $29,600,000.00 |
| [b] | Pre-Award Interest from 15 May 2010 until 31 March 2017 | $4,800,000.00 |
| [c] | Pre-Award Interest from 1 April 2017 until 3 November 2017 | $542,189.80 |
| [d] | Post-Award Interest from 3 December 2017 until 7 December 2018 | $1,218,115.14 |
| [e] | **Compensation as of 7 December 2018** | **$36,160,304.94** |
| [f] | Cost Reimbursement - Arbitration | $1,303,189.99 |
| [g] | Cost Reimbursement - Claimant | $4,634,532.05 |
| [h] | Total Costs | $5,937,722.04 |
| [i] | Interest from 3 December 2017 until 7 December 2018 | $244,352.34 |
| [j] | **Costs as of 7 December 2018** | **$6,182,074.38** |
| [k] | **Total** | **$42,342,379.31** |

Notes
[a]   Award, ¶72.1
[b]   Award, ¶72.1
[c]   Award, ¶72.2. Interest on USD 29.6 million at average 6-month US Treasury bill rate plus 2% (3.1%) between 1 April 2017 until the date of the Award (3 November 2017)
[d]   Award, ¶72.3. Interest on USD 29.6 million at average 6-month US Treasury bill rate plus 2% (4.1%) between 30th day following the date of the Award (3 December 2017) until the date of payment (7 December 2018)
[e]   [a]+[b]+[c]+[d]
[f]   Award, ¶72.5
[g]   Award, ¶72.6
[h]   [f]+[g]
[i]   Award, ¶72.7. Interest on costs at average 6-month US Treasury bill rate plus 2% (4.1%) between 30th day following the date of the Award (3 December 2017) until the date of payment (7 December 2018)
[j]   [h]+[i]
[j]   [e]+[j]

Case 1:20-cv-09120-RC   Document 9-3   Filed 04/24/19   Page 321 of 703

# Federal Reserve – Treasury Yields

Case 1:30-cv-69129-RC Document 19-3 Filed 04/24/19 Page 322 of 703
Case 1:18-cv-01965-JMF Document 34 Filed 12/13/18 Page 4 of 8 PageID #: 314
12/7/2018
Page 1

| Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/12/13 |
| :--- |
| Application of the Tribunal's Award |

**Federal Reserve - Treasury Yields**

| Date | 6-Month |
| :--- | :--- |
| 04/03/2017 | 0.92 |
| 04/04/2017 | 0.92 |
| 04/05/2017 | 0.93 |
| 04/06/2017 | 0.94 |
| 04/07/2017 | 0.95 |
| 04/10/2017 | 0.97 |
| 04/11/2017 | 0.94 |
| 04/12/2017 | 0.95 |
| 04/13/2017 | 0.94 |
| 04/17/2017 | 0.94 |
| 04/18/2017 | 0.94 |
| 04/19/2017 | 0.94 |
| 04/20/2017 | 0.93 |
| 04/21/2017 | 0.92 |
| 04/24/2017 | 0.96 |
| 04/25/2017 | 0.98 |
| 04/26/2017 | 0.99 |
| 04/27/2017 | 0.98 |
| 04/28/2017 | 0.99 |
| 05/01/2017 | 0.98 |
| 05/02/2017 | 0.99 |
| 05/03/2017 | 1.00 |
| 05/04/2017 | 1.00 |
| 05/05/2017 | 1.01 |
| 05/08/2017 | 1.02 |
| 05/09/2017 | 1.04 |
| 05/10/2017 | 1.04 |
| 05/11/2017 | 1.04 |
| 05/12/2017 | 1.03 |
| 05/15/2017 | 1.02 |
| 05/16/2017 | 1.04 |
| 05/17/2017 | 1.00 |
| 05/18/2017 | 1.02 |
| 05/19/2017 | 1.03 |
| 05/22/2017 | 1.05 |
| 05/23/2017 | 1.08 |
| 05/24/2017 | 1.07 |
| 05/25/2017 | 1.08 |
| 05/26/2017 | 1.08 |
| 05/30/2017 | 1.07 |
| 05/31/2017 | 1.08 |
| 06/01/2017 | 1.07 |
| 06/02/2017 | 1.06 |
| 06/05/2017 | 1.06 |
| 06/06/2017 | 1.08 |
| 06/07/2017 | 1.09 |
| 06/08/2017 | 1.11 |
| 06/09/2017 | 1.13 |
| 06/12/2017 | 1.09 |
| 06/13/2017 | 1.12 |
| 06/14/2017 | 1.12 |
| 06/15/2017 | 1.13 |
| 06/16/2017 | 1.13 |
| 06/19/2017 | 1.13 |
| 06/20/2017 | 1.14 |
| 06/21/2017 | 1.12 |
| 06/22/2017 | 1.10 |
| 06/23/2017 | 1.10 |
| 06/26/2017 | 1.10 |
| 06/27/2017 | 1.13 |
| 06/28/2017 | 1.12 |
| 06/29/2017 | 1.14 |
| 06/30/2017 | 1.14 |
| 07/03/2017 | 1.13 |
| 07/05/2017 | 1.15 |
| 07/06/2017 | 1.14 |
| 07/07/2017 | 1.14 |
| 07/10/2017 | 1.13 |
| 07/11/2017 | 1.14 |
| 07/12/2017 | 1.13 |
| 07/13/2017 | 1.14 |
| 07/14/2017 | 1.12 |
| 07/17/2017 | 1.10 |
| 07/18/2017 | 1.11 |
| 07/19/2017 | 1.12 |
| 07/20/2017 | 1.12 |
| 07/21/2017 | 1.10 |
| 07/24/2017 | 1.12 |
| 07/25/2017 | 1.15 |
| 07/26/2017 | 1.14 |
| 07/27/2017 | 1.13 |
| 07/28/2017 | 1.13 |
| 07/31/2017 | 1.13 |
| 08/01/2017 | 1.15 |
| 08/02/2017 | 1.15 |
| 08/03/2017 | 1.13 |
| 08/04/2017 | 1.14 |
| 08/07/2017 | 1.14 |
| 08/08/2017 | 1.16 |
| 08/09/2017 | 1.15 |
| 08/10/2017 | 1.14 |
| 08/11/2017 | 1.14 |
| 08/14/2017 | 1.13 |
| 08/15/2017 | 1.16 |
| 08/16/2017 | 1.13 |
| 08/17/2017 | 1.11 |
| 08/18/2017 | 1.13 |
| 08/21/2017 | 1.11 |
| 08/22/2017 | 1.13 |

| Start Date | End Date | T-Bill+2% | Years | Factor |
| :--- | :--- | :--- | :--- | :--- |
| March 31, 2017 | November 03, 2017 | 3.1% | 0.59 | 1.02 |
| December 03, 2017 | December 07, 2018 | 4.1% | 1.01 | 1.04 |

**Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/12/13**

Application of the Tribunal's Award

**Federal Reserve - Treasury Yields**

| Date | Yield |
|---|---|
| 08/23/2017 | 1.11 |
| 08/24/2017 | 1.11 |
| 08/25/2017 | 1.11 |
| 08/28/2017 | 1.12 |
| 08/29/2017 | 1.13 |
| 08/30/2017 | 1.11 |
| 08/31/2017 | 1.08 |
| 09/01/2017 | 1.10 |
| 09/05/2017 | 1.13 |
| 09/06/2017 | 1.17 |
| 09/07/2017 | 1.15 |
| 09/08/2017 | 1.14 |
| 09/11/2017 | 1.16 |
| 09/12/2017 | 1.16 |
| 09/13/2017 | 1.16 |
| 09/14/2017 | 1.17 |
| 09/15/2017 | 1.17 |
| 09/18/2017 | 1.18 |
| 09/19/2017 | 1.19 |
| 09/20/2017 | 1.20 |
| 09/21/2017 | 1.19 |
| 09/22/2017 | 1.19 |
| 09/25/2017 | 1.19 |
| 09/26/2017 | 1.19 |
| 09/27/2017 | 1.20 |
| 09/28/2017 | 1.18 |
| 09/29/2017 | 1.20 |
| 10/02/2017 | 1.22 |
| 10/03/2017 | 1.21 |
| 10/04/2017 | 1.21 |
| 10/05/2017 | 1.21 |
| 10/06/2017 | 1.22 |
| 10/10/2017 | 1.26 |
| 10/11/2017 | 1.25 |
| 10/12/2017 | 1.27 |
| 10/13/2017 | 1.26 |
| 10/16/2017 | 1.24 |
| 10/17/2017 | 1.25 |
| 10/18/2017 | 1.24 |
| 10/19/2017 | 1.25 |
| 10/20/2017 | 1.27 |
| 10/23/2017 | 1.25 |
| 10/24/2017 | 1.27 |
| 10/25/2017 | 1.27 |
| 10/26/2017 | 1.29 |
| 10/27/2017 | 1.28 |
| 10/30/2017 | 1.24 |
| 10/31/2017 | 1.28 |
| 11/01/2017 | 1.30 |
| 11/02/2017 | 1.29 |
| 11/03/2017 | 1.31 |
| 11/06/2017 | 1.30 |
| 11/07/2017 | 1.33 |
| 11/08/2017 | 1.35 |
| 11/09/2017 | 1.36 |
| 11/10/2017 | 1.37 |
| 11/13/2017 | 1.37 |
| 11/14/2017 | 1.40 |
| 11/15/2017 | 1.39 |
| 11/16/2017 | 1.42 |
| 11/17/2017 | 1.42 |
| 11/20/2017 | 1.46 |
| 11/21/2017 | 1.45 |
| 11/22/2017 | 1.45 |
| 11/24/2017 | 1.45 |
| 11/27/2017 | 1.41 |
| 11/28/2017 | 1.46 |
| 11/29/2017 | 1.45 |
| 11/30/2017 | 1.44 |
| 12/01/2017 | 1.45 |
| 12/04/2017 | 1.45 |
| 12/05/2017 | 1.48 |
| 12/06/2017 | 1.48 |
| 12/07/2017 | 1.47 |
| 12/08/2017 | 1.45 |
| 12/11/2017 | 1.47 |
| 12/12/2017 | 1.49 |
| 12/13/2017 | 1.47 |
| 12/14/2017 | 1.48 |
| 12/15/2017 | 1.48 |
| 12/18/2017 | 1.51 |
| 12/19/2017 | 1.51 |
| 12/20/2017 | 1.51 |
| 12/21/2017 | 1.54 |
| 12/22/2017 | 1.54 |
| 12/26/2017 | 1.52 |
| 12/27/2017 | 1.53 |
| 12/28/2017 | 1.54 |
| 12/29/2017 | 1.53 |
| 01/02/2018 | 1.61 |
| 01/03/2018 | 1.59 |
| 01/04/2018 | 1.60 |
| 01/05/2018 | 1.58 |
| 01/08/2018 | 1.60 |
| 01/09/2018 | 1.60 |
| 01/10/2018 | 1.59 |
| 01/11/2018 | 1.58 |
| 01/12/2018 | 1.59 |
| 01/16/2018 | 1.63 |
| 01/17/2018 | 1.63 |
| 01/18/2018 | 1.63 |

| Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/12/13 |
| --- |
| Application of the Tribunal's Award |

**Federal Reserve - Treasury Yields**

| | |
| --- | --- |
| 01/19/2018 | 1.62 |
| 01/22/2018 | 1.65 |
| 01/23/2018 | 1.63 |
| 01/24/2018 | 1.63 |
| 01/25/2018 | 1.64 |
| 01/26/2018 | 1.64 |
| 01/29/2018 | 1.66 |
| 01/30/2018 | 1.66 |
| 01/31/2018 | 1.66 |
| 02/01/2018 | 1.64 |
| 02/02/2018 | 1.65 |
| 02/05/2018 | 1.67 |
| 02/06/2018 | 1.69 |
| 02/07/2018 | 1.73 |
| 02/08/2018 | 1.73 |
| 02/09/2018 | 1.73 |
| 02/12/2018 | 1.82 |
| 02/13/2018 | 1.80 |
| 02/14/2018 | 1.81 |
| 02/15/2018 | 1.82 |
| 02/16/2018 | 1.83 |
| 02/20/2018 | 1.87 |
| 02/21/2018 | 1.85 |
| 02/22/2018 | 1.84 |
| 02/23/2018 | 1.85 |
| 02/26/2018 | 1.87 |
| 02/27/2018 | 1.87 |
| 02/28/2018 | 1.86 |
| 03/01/2018 | 1.85 |
| 03/02/2018 | 1.86 |
| 03/05/2018 | 1.86 |
| 03/06/2018 | 1.87 |
| 03/07/2018 | 1.87 |
| 03/08/2018 | 1.89 |
| 03/09/2018 | 1.89 |
| 03/12/2018 | 1.89 |
| 03/13/2018 | 1.90 |
| 03/14/2018 | 1.94 |
| 03/15/2018 | 1.95 |
| 03/16/2018 | 1.96 |
| 03/19/2018 | 1.99 |
| 03/20/2018 | 1.97 |
| 03/21/2018 | 1.95 |
| 03/22/2018 | 1.95 |
| 03/23/2018 | 1.92 |
| 03/26/2018 | 1.94 |
| 03/27/2018 | 1.93 |
| 03/28/2018 | 1.95 |
| 03/29/2018 | 1.93 |
| 04/02/2018 | 1.92 |
| 04/03/2018 | 1.92 |
| 04/04/2018 | 1.90 |
| 04/05/2018 | 1.93 |
| 04/06/2018 | 1.91 |
| 04/09/2018 | 1.93 |
| 04/10/2018 | 1.93 |
| 04/11/2018 | 1.95 |
| 04/12/2018 | 1.95 |
| 04/13/2018 | 1.97 |
| 04/16/2018 | 1.98 |
| 04/17/2018 | 2.02 |
| 04/18/2018 | 2.01 |
| 04/19/2018 | 2.01 |
| 04/20/2018 | 2.01 |
| 04/23/2018 | 2.04 |
| 04/24/2018 | 2.05 |
| 04/25/2018 | 2.03 |
| 04/26/2018 | 2.02 |
| 04/27/2018 | 2.02 |
| 04/30/2018 | 2.04 |
| 05/01/2018 | 2.05 |
| 05/02/2018 | 2.03 |
| 05/03/2018 | 2.02 |
| 05/04/2018 | 2.03 |
| 05/07/2018 | 2.05 |
| 05/08/2018 | 2.05 |
| 05/09/2018 | 2.05 |
| 05/10/2018 | 2.05 |
| 05/11/2018 | 2.06 |
| 05/14/2018 | 2.09 |
| 05/15/2018 | 2.09 |
| 05/16/2018 | 2.09 |
| 05/17/2018 | 2.10 |
| 05/18/2018 | 2.09 |
| 05/21/2018 | 2.14 |
| 05/22/2018 | 2.13 |
| 05/23/2018 | 2.11 |
| 05/24/2018 | 2.09 |
| 05/25/2018 | 2.07 |
| 05/29/2018 | 2.06 |
| 05/30/2018 | 2.08 |
| 05/31/2018 | 2.08 |
| 06/01/2018 | 2.10 |
| 06/04/2018 | 2.13 |
| 06/05/2018 | 2.13 |
| 06/06/2018 | 2.13 |
| 06/07/2018 | 2.12 |
| 06/08/2018 | 2.12 |
| 06/11/2018 | 2.11 |
| 06/12/2018 | 2.10 |
| 06/13/2018 | 2.09 |

Case 1:20-cv-00129-RC   Document 1-3   Filed 04/24/19   Page 325 of 703
Case 1:18-cv-01965-JMF   Document 34-9   Filed 12/13/18   Page 7 of 8   PageID #: 317
12/7/2018
Page 4

| Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/12/13 |
| --- |
| Application of the Tribunal's Award |

**Federal Reserve - Treasury Yields**

| | |
| --- | --- |
| 06/14/2018 | 2.07 |
| 06/15/2018 | 2.07 |
| 06/18/2018 | 2.13 |
| 06/19/2018 | 2.13 |
| 06/20/2018 | 2.14 |
| 06/21/2018 | 2.12 |
| 06/22/2018 | 2.11 |
| 06/25/2018 | 2.13 |
| 06/26/2018 | 2.14 |
| 06/27/2018 | 2.10 |
| 06/28/2018 | 2.11 |
| 06/29/2018 | 2.11 |
| 07/02/2018 | 2.14 |
| 07/03/2018 | 2.12 |
| 07/05/2018 | 2.11 |
| 07/06/2018 | 2.13 |
| 07/09/2018 | 2.15 |
| 07/10/2018 | 2.15 |
| 07/11/2018 | 2.14 |
| 07/12/2018 | 2.17 |
| 07/13/2018 | 2.16 |
| 07/16/2018 | 2.19 |
| 07/17/2018 | 2.19 |
| 07/18/2018 | 2.17 |
| 07/19/2018 | 2.16 |
| 07/20/2018 | 2.16 |
| 07/23/2018 | 2.19 |
| 07/24/2018 | 2.19 |
| 07/25/2018 | 2.20 |
| 07/26/2018 | 2.19 |
| 07/27/2018 | 2.20 |
| 07/30/2018 | 2.21 |
| 07/31/2018 | 2.21 |
| 08/01/2018 | 2.22 |
| 08/02/2018 | 2.22 |
| 08/03/2018 | 2.23 |
| 08/06/2018 | 2.23 |
| 08/07/2018 | 2.23 |
| 08/08/2018 | 2.24 |
| 08/09/2018 | 2.25 |
| 08/10/2018 | 2.23 |
| 08/13/2018 | 2.22 |
| 08/14/2018 | 2.25 |
| 08/15/2018 | 2.23 |
| 08/16/2018 | 2.24 |
| 08/17/2018 | 2.24 |
| 08/20/2018 | 2.25 |
| 08/21/2018 | 2.25 |
| 08/22/2018 | 2.24 |
| 08/23/2018 | 2.23 |
| 08/24/2018 | 2.25 |
| 08/27/2018 | 2.25 |
| 08/28/2018 | 2.28 |
| 08/29/2018 | 2.28 |
| 08/30/2018 | 2.28 |
| 08/31/2018 | 2.28 |
| 09/04/2018 | 2.29 |
| 09/05/2018 | 2.30 |
| 09/06/2018 | 2.30 |
| 09/07/2018 | 2.30 |
| 09/10/2018 | 2.32 |
| 09/11/2018 | 2.31 |
| 09/12/2018 | 2.33 |
| 09/13/2018 | 2.33 |
| 09/14/2018 | 2.33 |
| 09/17/2018 | 2.35 |
| 09/18/2018 | 2.36 |
| 09/19/2018 | 2.36 |
| 09/20/2018 | 2.37 |
| 09/21/2018 | 2.38 |
| 09/24/2018 | 2.38 |
| 09/25/2018 | 2.38 |
| 09/26/2018 | 2.37 |
| 09/27/2018 | 2.37 |
| 09/28/2018 | 2.36 |
| 10/01/2018 | 2.40 |
| 10/02/2018 | 2.41 |
| 10/03/2018 | 2.41 |
| 10/04/2018 | 2.42 |
| 10/05/2018 | 2.41 |
| 10/09/2018 | 2.46 |
| 10/10/2018 | 2.45 |
| 10/11/2018 | 2.44 |
| 10/12/2018 | 2.44 |
| 10/15/2018 | 2.47 |
| 10/16/2018 | 2.46 |
| 10/17/2018 | 2.47 |
| 10/18/2018 | 2.47 |
| 10/19/2018 | 2.48 |
| 10/22/2018 | 2.49 |
| 10/23/2018 | 2.48 |
| 10/24/2018 | 2.47 |
| 10/25/2018 | 2.47 |
| 10/26/2018 | 2.47 |
| 10/29/2018 | 2.49 |
| 10/30/2018 | 2.48 |
| 10/31/2018 | 2.49 |
| 11/01/2018 | 2.49 |
| 11/02/2018 | 2.50 |
| 11/05/2018 | 2.51 |
| 11/06/2018 | 2.52 |

Case 1:20-cv-09129-PC   Document 9-3   Filed 04/24/19   Page 326 of 703
Case 1:18-cv-01965-LNA   Document 34   Filed 12/13/18   Page 8 of 8   PageID #: 318
12/7/2018
Page 5

| Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/12/13 |
| --- |
| Application of the Tribunal's Award |

**Federal Reserve - Treasury Yields**

| | |
| --- | --- |
| 11/07/2018 | 2.51 |
| 11/08/2018 | 2.52 |
| 11/09/2018 | 2.52 |
| 11/13/2018 | 2.53 |
| 11/14/2018 | 2.52 |
| 11/15/2018 | 2.51 |
| 11/16/2018 | 2.50 |
| 11/19/2018 | 2.52 |
| 11/20/2018 | 2.51 |
| 11/21/2018 | 2.52 |
| 11/23/2018 | 2.52 |
| 11/26/2018 | 2.54 |
| 11/27/2018 | 2.53 |
| 11/28/2018 | 2.53 |
| 11/29/2018 | 2.52 |
| 11/30/2018 | 2.52 |
| 12/03/2018 | 2.56 |
| 12/04/2018 | 2.58 |

Source:
Federal Reserve Board. 6-Month Treasury
Constant Maturity Rate (series DGS6MO)

Case 1:20-cv-09120-PC   Document 9-3   Filed 04/24/19   Page 327 of 703

# Exhibit 5

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

**Saint-Gobain Performance Plastics Europe**
Respondent on Annulment

**v.**

**Bolivarian Republic of Venezuela**
Applicant on Annulment

**(ICSID Case No. ARB/12/13) – Annulment Proceeding**

## PROCEDURAL ORDER No. 2

*Members of the Committee*
Prof. Ricardo Ramirez Hernandez, President of the *ad hoc* Committee
Ms. Olufunke Adekoya, Member of the *ad hoc* Committee
Prof. Lawrence Boo, Member of the *ad hoc* Committee

*Secretary of the Committee*
Mr. Francisco Grob

October 24, 2018

*Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*
(ICSID Case No. ARB/12/13) – Annulment Proceeding

## I. INTRODUCTION

1.    Pursuant to ICSID Arbitration Rules 19 and 53, this procedural order addresses the place of arbitration, the stay of enforcement of the Award and the suspension of the proceedings.

## II. BACKGROUND TO THIS ORDER

2.    Venezuela submitted its Application for Annulment on March 5, 2018. It requested simultaneously that enforcement of the Award be stayed until the Application is decided.

3.    On March 12, 2018, the Acting Secretary-General registered Venezuela's Application and notified the parties that enforcement of the Award was provisionally stayed pursuant to Rule 54(2) of the ICSID Arbitration Rules.

4.    The Committee was constituted on June 7, 2018, and, on June 13, 2018, the Secretariat requested that the Applicant make a first advance payment of US$250,000, due thirty days later.

5.    On June 14, 2018, the Respondent on Annulment (Saint-Gobain) sent a letter arguing that, unless the Applicant (Venezuela) establish the circumstances that require the continuation of the stay of enforcement, the stay should terminate automatically within 30 days of the constitution of the Committee, i.e., by July 7, 2018.

6.    On June 27, 2018, Venezuela notified the Committee that it opposed Saint-Gobain's position and that it would seek to continue the stay of enforcement of the Award.

7.    By letter dated July 5, 2018, the Committee confirmed that the First Session was to be held at the World Bank Facilities in Paris on August 21, 2018; invited the parties to try to agree on a procedural timetable by July 9, 2018; and as contemplated by Arbitration Rule 54(2), decided to maintain the provisional stay on the enforcement of the Award until it had an opportunity to review the parties' submissions and to issue a further decision on the matter.

8.    On July 6, 2018, the parties notified the Committee of their agreed procedural calendar whereby the Applicant would file its Memorial in Support of a Continued Stay by July 25, 2018, and the Respondent on Annulment would file its Counter-Memorial by August 13, 2018.

9.    On July 11, 2018 and by instructions of the Committee, the Secretary of the Committee sent the parties a draft agenda for the First Session and a draft Procedural Order No. 1.

10.   On July 25, 2018, pursuant to the parties' agreed procedural calendar, the Applicant filed its Memorial in Support of a Continued Stay. On the same day, the parties were notified that ICSID had not yet received the first advance payment of US$250,000 as requested in its letter of June 13, 2018. The President of the Committee invited the Applicant to inform the Committee by July 30, 2018 of (a) the steps that it had taken in order to make the payment and (b) the estimated date by which ICSID should expect to receive it.

*Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*
(ICSID Case No. ARB/12/13) – Annulment Proceeding

11.  On July 30, 2018, counsel for the Applicant notified the Committee that it was seeking instructions from Venezuela and that it would revert as soon as it had an answer.

12.  On August 1, 2018, the Committee urged Venezuela to provide additional information with regard to the steps taken to pay the first advance requested by ICSID in its letter of June 13, 2018. Unless payment was received by August 10, 2018, the First Session would have to be postponed.

13.  On the same day, Saint-Gobain requested that should Venezuela fail to make the payment before the deadline imposed by the Committee, the provisional stay of enforcement of the Award should be automatically lifted.

14.  On August 10, 2018, the Committee invited Venezuela to submit proof of having transferred the funds, as soon as possible and no later than by August 13th. In the same communication, the Committee informed the parties that the Hearing date in Paris was vacated until further notice.

15.  On August 13, 2018, Venezuela informed the Committee that the advance payment had not yet been made due to administrative reasons, and that the payment was being processed. On the same day, the Committee granted Venezuela's request to respond to Saint-Gobain's letter of August 1st. Also, on the same day, Saint-Gobain filed its Counter-Memorial in Opposition to a Continued Stay of Enforcement of the Award.

16.  On August 15, 2018, Venezuela filed a reply to Saint-Gobain's letter of August 1st. On August 17, 2018, Saint-Gobain submitted a response to Venezuela's letter. On August 20, 2018, Venezuela filed a response to Saint-Gobain's letter of August 17th, and reiterated its position detailed in its letter of August 15th.

17.  On August 21, 2018, the Committee held its first session via teleconference among its members in accordance with ICSID Arbitration Rule 13(1). The Committee discussed various procedural matters, which the parties have argued over in their written submissions. The Committee invited the parties to make a further submission addressing the stay of enforcement and each Party's proposal concerning the place of arbitration pursuant to section 10 of the draft Procedural Order No. 1. On the same day, ICSID invited either party to pay the outstanding amount of US$250,000, noting that failing to do so would lead to the suspension of the proceedings.

18.  On September 5, 2018, Venezuela filed a reply in Support of a Continued Stay of Enforcement. It also elaborated upon the reasons to propose Paris as the place of the proceedings.

19.  On September 14, 2018, Saint-Gobain filed a rejoinder in further opposition to a Continued Stay of Enforcement. It also discussed the reasons underlying its preference for Washington D.C. as the place of the proceedings.

*Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*
(ICSID Case No. ARB/12/13) – Annulment Proceeding

20.   On September 28, 2018, the Committee issued Procedural Order No. 1 concerning various aspects of the organization of the proceedings.

21.   As no payment was received, on October 23 the Secretary-General of ICSID moved that this Committee stay the proceedings in the present case pursuant to Regulation 14 of the Centre's Administrative and Financial Regulations.

### III.   PLACE OF ARBITRATION

22.   Venezuela proposes that Paris, France should be the place of the proceedings. Paris is a world-renowned place of arbitration and is ideally located taking into account the geographical location of the parties and members of the *ad hoc* Committee. In addition, these considerations are relevant to cost implications and may impact the advance payments required, for which Venezuela would be responsible.

23.   Saint-Gobain submits that Washington, D.C. should be the place of the proceedings. The hearings in the underlying arbitration took place in Washington, D.C., which is also the presumptive place of ICSID proceedings absent agreement otherwise. Venezuela's decision to engage new counsel based in Paris provides no reason to increase Saint-Gobain's costs in this regard.

24.   The Committee notes that under Article 62 of the Convention, the proceedings "*shall* be held at the seat of the Centre" (emphasis added), which applies *mutatis mutandis* to the present annulment proceedings under Article 52(4).  Although Article 63 provides an exception permitting the Committee to hold its proceedings on other places (*e.g.*, at the Permanent Court of Arbitration or elsewhere), this exception applies only "if the parties so agree".  No such agreement has been reached in this case. The proceedings will be held, accordingly, at the seat of the Centre in Washington, D.C

### IV.   STAY OF THE AWARD'S ENFORCEMENT

25.   Having reviewed the parties' arguments and deliberated by different means, the Committee is of the view that there are no circumstances that require the stay of enforcement of the Award. The stay is therefore lifted.

26.   The Committee will provide its reasons in writing after payment of the outstanding advance is received.

### V.   SUSPENSION OF THE ANNULMENT PROCEEDINGS

27.   In accordance with Rule 14(3)(e) of ICSID's Administrative and Financial Regulations, an applicant on annulment bears sole responsibility for making advance payments for costs (without prejudice to a later decision by the Committee regarding the allocation of costs as between the parties). Such advance payments are necessary to defray the costs incurred by the Centre and to pay the fees and expenses of Committee members.

*Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*
(ICSID Case No. ARB/12/13) – Annulment Proceeding

28.   In the present case, Venezuela has been asked to provide updates regarding the status of the advance payment. Venezuela has reiterated its disposition to make payment, but no funds have been received. Meanwhile, the Committee has held a First Session and issued two procedural orders including this one.

29.   The payment is now 14 weeks overdue, and the Secretary-General of ICSID has moved that this Committee stay the proceedings. The Applicant, on the other hand, has given no specific indication on which payment can be expected.

30.   Until payment is received, the Committee will therefore suspend the proceedings as provided for in Regulation 14 of the Centre's Administrative and Financial Regulations. It is not appropriate for the Centre to continue to incur costs and for the Committee members to continue to accrue fees under these circumstances.

## VI.   ORDER

31.   Accordingly, the Committee hereby selects Washington, D.C. as the place of the proceedings; lifts the stay of enforcement of the Award, effective today, October 24, 2018, and stays the proceedings until payment of the advance requested on June 13, 2018, is received.

On behalf of the Committee,

_____
Ricardo Ramírez Hernández
President of the Committee

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

       Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF
VENEZUELA; PETRÓLEOS DE
VENEZUELA, S.A.,

       Defendants.

Civil Action No.: 18-cv-1963-UNA

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Civil Procedure 7.1, Plaintiff Saint-Gobain

Performance Plastics Europe ("Saint-Gobain" or "Plaintiff") is a company incorporated under

the laws of the French Republic.  Saint-Gobain is wholly-owned by Société de Participations

Financières et Industrielles, which is in turn wholly-owned by Compagnie de Saint-Gobain.  No

other corporation owns 10% or more of Saint-Gobain's stock.

Dated: December 13, 2018                    PACHULSKI STANG ZIEHL & JONES LLP

                                            */s/ Laura Davis Jones*
                                            Laura Davis Jones (Bar No. 2436)
                                            Peter J. Keane (Bar No. 5503)
                                            919 N. Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE 19899-8705 (Courier 19801)
                                            Telephone: (302) 652-4100
                                            Facsimile: (302) 652-4400
                                            E-mail: ljones@pszjlaw.com
                                                        pkeane@pszjlaw.com

                                            – and –

                                            Alex Yanos, *pro hac vice pending*
                                            Carlos Ramos-Mrosovsky, *pro hac vice pending*
                                            Rajat Rana, *pro hac vice pending*
                                            ALSTON & BIRD LLP
                                            90 Park Avenue
                                            New York, NY 10016
                                            Tel:    202-210-9400
                                            Fax:    212-210-9444
                                            Email:  alex.yanos@alston.com
                                                    carlos.ramos-mrosovsky@alston.com
                                                    rajat.rana@alston.com

                                            *Counsel for Plaintiff Saint-Gobain Performance
                                            Plastics Europe*

OFFICE OF THE CLERK
**UNITED STATES DISTRICT COURT**
DISTRICT OF DELAWARE

John A. Cerino
CLERK OF COURT

844 North King Street, Unit 18
Wilmington, DE 19801-3570
www.ded.uscourts.gov
(302) 573-6170

# DISTRICT OF DELAWARE
# LOCAL RULE 73.1
### Magistrate Judges; Trial by Consent

Where the parties consent, the Magistrate Judge may conduct a jury or nonjury trial in any civil action and order the entry of final judgment in accordance with 28 U.S.C. § 636 (c) and Fed. R. Civ. P. 73-76. In the course of conducting proceedings in any civil action upon the consent of the parties, a Magistrate Judge may hear and determine any an all pretrial and post-trial motions including case dispositive motions.

(a) The Clerk shall notify the parties in all cases that they may consent to have a Magistrate Judge conduct any or all proceedings in the case and order the entry of final judgment.

(b) **The Clerk shall not accept a consent form for filing unless it has been signed by all parties in a case.** Plaintiff shall be responsible for securing execution and filing of such a consent form. No consent form will be made available, nor will its contents be made known to any District Judge or Magistrate Judge, unless all stated parties have consented to the reference to a Magistrate Judge.

(c) The consent form shall be filed with the Clerk not later than the final pretrial conference, unless otherwise ordered.

(d) After the consent form has been executed and filed, the Clerk shall so advise the District Court Judge to whom the case has been assigned. At the discretion of the District Judge, the Clerk shall prepare, for the District Judge's signature, an order referring the case to the Magistrate Judge. Once the case has been referred, the Magistrate Judge shall have the authority to conduct any and all proceedings to which the parties have consented and to direct the Clerk to enter a final judgment in the same manner as if a District Judge presided.

AO 85 (Rev. 01/09)  Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
District of Delaware

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

### Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date:  _____

_____
*District Judge's signature*

_____
*Printed name and title*

Note:  Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

AO 85A  (Rev. 01/09) Notice, Consent, and Reference of a Dispositive Motion to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
District of Delaware

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A DISPOSITIVE MOTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.*  A United States magistrate judge of this court is available to conduct all proceedings and enter a final order dispositive of each motion.  A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have motions referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences.  The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's consideration of a dispositive motion.*  The following parties consent to have a United States magistrate judge conduct any and all proceedings and enter a final order as to each motion identified below *(identify each motion by document number and title).*

**Motions:** _____  _____  _____  _____

_____  _____  _____

_____  _____  _____  __

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |

## Reference Order

**IT IS ORDERED:** The motions are referred to a United States magistrate judge to conduct all proceedings and enter a final order on the motions identified above in accordance with 28 U.S.C. § 636(c).

Date:  _____

_____
*District Judge's signature*

_____
*Printed name and title*

Note:  Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge.  Do not return this form to a judge.

# SPANISH VERSION

# ALSTON & BIRD

90 Park Avenue
Nueva York, NY 10016
212-210-9400 | Fax: 212-210-9444

Carlos Ramos-Mrosovsky          Numero directo:      Email: carlos.ramos-mrosovsky@alston.com
                                212-210-9585

14 de Diciembre del 2018

Eulalia Tabares Roldán
Directora General de la Oficina de Relaciones Consulares
Ministerio del Poder Popular para Relaciones Exteriores
Oficina de Relaciones Consulares
Avenida Urdaneta
Esquina Carmelitas a Puente Llaguno
Torre Anexo a Torre MRE Piso 1
Caracas, 1010
República Bolivariana de Venezuela

Re:    Diligencia de Emplazamiento de acuerdo al Convenio de la Haya relativo a
       la Notificación o Traslado en el Extranjero de Documentos Judiciales y
       Extrajudiciales en Materia Civil o Comercial (1965) y el artículo 28 U.S.C.
       § 1608

Directora General Sra. Roldán:

Adjunto, encontrará las Peticiones de notificación del proceso de conformidad con el relativo a la
Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia
Civil o Comercial (1965) y el artículo 28 U.S.C. § 1608 en relación con una acción judicial que
ha presentado Saint-Gobain Performance Plastics Europe contra la República Bolivariana de
Venezuela y Petróleos de Venezuela S.A (PDVSA) ante el Tribunal de Distrito de los Estados
Unidos, Distrito de Delaware. *Véase Saint-Gobain Performance Plastics Europe v. República
Bolivariana de Venezuela, Petróleos de Venezuela, S.A.*, No. 1: 18-cv-01963-UNA (D. Del.
Presentado el 12 de diciembre de 2018). Se adjuntan copias duplicadas en su original en inglés y
en su traducción al español para tanto la República como PDVSA.

Le agradecería nos confirme el recibo de estos documentos y su cooperación.

Respetuosamente,

Carlos Ramos-Mrosovsky
*Abogado de Saint-Gobain Performance Plastics Europe*

Adjunto (8)

Alston & Bird LLP                                                    www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

# PETICIÓN
## A LOS FINES DE NOTIFICACIÓN O TRASLADO EN EL EXTRANJERO DE UN DOCUMENTO JUDICIAL O EXTRAJUDICIAL

REQUEST FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

*DEMANDE AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER*
*D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

**Convenio relativo a la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia Civil o Comercial, firmado en La Haya, el 15 de noviembre de 1965.**

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965.
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965.*

| Identidad y dirección del requirente | Dirección de la autoridad destinataria |
|---|---|
| Identity and address of the applicant | Address of receiving authority |
| *Identité et adresse du requérant* | *Adresse de l'autorité destinataire* |
| Carlos Ramos-Mrosovsky | Ministerio del Poder Popular para Relaciones |
| ALSTON & BIRD | Exteriores |
| 90 Park Avenue | Oficina de Relaciones Consulares |
| Nueva York, | Avenida Urdaneta |
| NY 10016 | Esquina Carmelitas a Puente Llaguno |
| EE.UU | Torre Anexo a Torre MRE Piso 1 |
| Tel: +1-212-210-9585 | Caracas, 1010 |
| | República Bolivariana de Venezuela |
| | Tel: +58 (0) 212 806 4449/802-800, Ext. 6701-6704-6709-6713 |

**El requirente infrascrito tiene el honor de remitir – en doble ejemplar – a la autoridad destinataria los documentos enumerados, rogándole, conforme al artículo 5 del Convenio antes citado, haga remitir sin demora un ejemplar al destinatario, a saber:**

The undersigned applicant has the honour to transmit – in duplicate – the documents listed below and, in conformity with Article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.:

*Le requérant soussigné a l'honneur de faire parvenir – en double exemplaire – à l'autorité destinataire les documents ci-dessous énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, à savoir :*

**(identidad y dirección)**
(identity and address) / *(identité et adresse)*

República Bolivariana de Venezuela
Ministerio del Poder Popular para Relaciones Exteriores
Oficina de Relaciones Consulares
Avenida Urdaneta,
Esquina de Carmelitas a Puente Llaguno,
Torre Anexo a Torre MRE Piso 1
Caracas, 1010
República Bolivariana de Venezuela

| | | |
|---|---|---|
| ☒ | a) | **Según las formas legales (artículo 5, párrafo primero, letra *a*)\*** <br> in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention\* <br> *selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ☐ | b) | **Según la forma particular siguiente (artículo 5, párrafo primero, letra *b*)\*** <br> in accordance with the following particular method (sub-paragraph *b)* of the first paragraph of Article 5)\*: <br> *selon la forme particulière suivante (article 5, alinéa premier, lettre b)\* :* <br> _____ |
| ☐ | c) | **En su caso, por simple entrega al interesado (artículo 5, párrafo segundo)\*** <br> by delivery to the addressee, if he accepts it voluntarily (second paragraph of Article 5) \* <br> *le cas échéant, par remise simple (article 5, alinéa 2) \** |

**Se ruega a esa autoridad envíe o haga enviar al requirente un ejemplar del documento – y de sus anexos\* – con el certificado adjunto.**

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes\* - with the attached certificate

*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes\*- avec l'attestation ci-jointe.*

### Enumeración de los documentos
List of documents / *Énumération des pièces*

- Citatorio en una Accion Civil
- Demanda para Registrar y Ejecutar el Laudo Arbitral del CIADI como Sentencia Extranjera
- Declaración de Alexander A. Yanos
- Anexos Nos. 1 al 5
- Regla 7.1 Declaracion de Divulgacion Corporativa
- Notificación de Derecho a Prestar Consentimiento para Juicio ante un Juez Magistrado

\* Si procede
*If appropriate / s'il y a lieu*

| Hecho en Nueva York | Firma y / o sello |
|---|---|
| Done at / *Fait à* | Signature and/or stamp / *Signature et / ou cachet* |
| el 14 de Diciembre de 2018 | |
| the / *le* | Carlos Ramos Mrosovsky |

# CERTIFICADO
## CERTIFICATE
### *ATTESTATION*

**La autoridad infrascrita tiene el honor de certificar, conforme al artículo 6 de dicho Convenio,**
The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

☐ **1. que la petición ha sido ejecutada\***
  that the document has been served \*
  *que la demande a été exécutée\**

| — el (fecha): <br> the (date) / le (date) : | _____ |
|---|---|
| — en (localidad, calle, número): <br> at (place, street, number) / à (localité, rue, numéro) : | _____ |

| — en una de las formas siguientes previstas en el artículo 5: <br> in one of the following methods authorised by Article 5: <br> *dans une des formes suivantes prévues à l'article 5 :* | | |
|---|---|---|
| ☐ | a) | **según las formas legales (artículo 5, párrafo primero, letra a)\*** <br> in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention\* <br> *selon les formes légales (article 5, alinéa premier, lettre a)\** |
| ☐ | b) | **según la forma particular siguiente\*:** <br> in accordance with the following particular method\*: <br> *selon la forme particulière suivante\* :* <br> _____ |
| ☐ | c) | **por simple entrega\*** <br> by delivery to the addressee, if he accepts it voluntarily\* <br> *par remise simple\** |

**Los documentos mencionados en la petición han sido entregados a:**
The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à :*

| **Identidad y calidad de la persona:** <br> identity and description of person : <br> *identité et qualité de la personne :* | _____ |
|---|---|
| **Vínculos de parentesco, subordinación u otros, con el destinatario del documento:** <br> Relationship to the addressee (family, business or other): <br> *Liens de parenté, de subordination ou autres, avec le destinataire de l'acte :* | _____ |

☐ **2. que la petición no ha sido ejecutada, en razón a los hechos siguientes\*:**
  that the document has not been served, by reason of the following facts\*:
  *que la demande n'a pas été exécutée, en raison des faits suivants\* :*

| _____ |
|---|

☐ **Conforme al artículo 12, párrafo 2, de dicho Convenio, se ruega al requirente el pago o reembolso de los gastos cuyos detalles figuran en la declaración adjunta\*.**
  In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.
  *Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.*

### Anexos
*Annexes / Annexes*

| **Documentos reenviados:** <br> Documents returned: <br> *Pièces renvoyées :* | Citatorio en una Accion Civil; Demanda para Registrar y Ejecutar el Laudo Arbitral del CIADI como Sentencia Extranjera; Declaración de Alexander A. Yanos; Anexos Nos. 1 al 5; Regla 7.1 Declaracion de Divulgacion Corporativa y; Notificación de Derecho a Prestar Consentimiento para Juicio ante un Juez Magistrado |
|---|---|
| **En su caso, los documentos justificativos de la ejecución:** <br> In appropriate cases, documents establishing the service: <br> *Le cas échéant, les documents justificatifs de l'exécution :* | _____ |

\* Si procede
*if appropriate / s'il y a lieu*

| **Hecho en** _____ <br> Done at / Fait à <br><br> **el** _____ <br> the / le | **Firma y / o sello** <br> Signature and/or stamp / Signature et / ou cachet <br><br> _____ |
|---|---|

# AVISO
## WARNING
### *AVERTISSEMENT*

**Identidad y dirección del destinatario**
Identity and address of the addressee
*Identité et adresse du destinataire*

República Bolivariana de Venezuela
Ministerio del Poder Popular para Relaciones Exteriores
Oficina de Relaciones Consulares
Avenida Urdaneta,
Esquina de Carmelitas a Puente Llaguno,
Torre Anexo a Torre MRE Piso 1
Caracas, 1010
República Bolivariana de Venezuela

## IMPORTANTE

**EL DOCUMENTO ADJUNTO ES DE NATURALEZA JURÍDICA Y PUEDE AFECTAR SUS DERECHOS Y OBLIGACIONES. LOS "ELEMENTOS ESENCIALES DEL DOCUMENTO" LE PROPORCIONAN INFORMACIÓN SOBRE SU NATURALEZA Y OBJETO. NO OBSTANTE, ES INDISPENSABLE LEER ATENTAMENTE EL TEXTO DEL DOCUMENTO. PUEDE REQUERIR ASISTENCIA JURÍDICA.**

**SI SUS RECURSOS SON INSUFICIENTES, INFÓRMESE SOBRE LA POSIBILIDAD DE OBTENER ASISTENCIA JUDICIAL O ASESORAMIENTO JURÍDICO EN SU PAÍS O EN EL PAÍS DE ORIGEN DEL DOCUMENTO.**

**LAS SOLICITUDES DE INFORMACIÓN SOBRE LA POSIBILIDAD DE OBTENER ASISTENCIA JUDICIAL O ASESORAMIENTO JURÍDICO EN EL PAÍS DE ORIGEN DEL DOCUMENTO PUEDEN DIRIGIRSE A:**

### IMPORTANT

THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.

IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.

ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:

### *TRÈS IMPORTANT*

*LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.*

*SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE SOIT DANS VOTRE PAYS SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.*

*LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :*

COLEGIO DE ABOGADOS DEL ESTADO DE DELAWARE
405 North King Street
Suite 100
Wilmington, DE 19801
Tel: (302) 658-5279

**Se recomienda que las menciones impresas en esta nota se redacten en francés y en inglés y, en su caso, además, en otra lengua o en otra de las lenguas oficiales del Estado de origen del documento. Los espacios en blanco podrían completarse en la lengua del Estado al que deba remitirse el documento, en francés o en inglés.**

It is recommended that the standard terms in the notice be written in English and French and where appropriate also in the official language, or in one of the official languages of the State in which the document originated. The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.

*Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les blancs pourraient être remplis soit dans la langue de l'État où le document doit être adressé, soit en langue française, soit en langue anglaise.*

## ELEMENTOS ESENCIALES DEL DOCUMENTO
SUMMARY OF THE DOCUMENT TO BE SERVED
*ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Convenio relativo a la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en materia Civil o Comercial,**
**firmado en La Haya, el 15 de noviembre de 1965 *(artículo 5, párrafo cuarto)*.**
Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965
(Article 5, fourth paragraph).
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en*
*matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).*

| | |
|---|---|
| **Nombre y dirección de la autoridad requirente:** <br> Name and address of the requesting authority: <br> *Nom et adresse de l'autorité requérante :* | Carlos Ramos-Mrosovsky <br> ALSTON & BIRD <br> 90 Park Avenue <br> Nueva York, <br> NY 10016 <br> EE. UU <br> Tel: +1-212-210-95855 |
| **Identidad de las partes*:** <br> Particulars of the parties*: <br> *Identité des parties* :* | Saint-Gobain Performance Plastics Europe, Demandante <br> c. <br> República Bolivariana de Venezuela: Petróleos De Venezuela, S. A., Demandadas <br><br> Case presentado ante la Corte de Distrito de los Estados Unidos de Delaware (Numero de Caso: 1:18-cv-01963-UNA) |

\* Si procede, identidad y dirección de la persona interesada en la remisión del documento.
*if appropriate, identity and address of the person interested in the transmission of the document*
*s'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*

☒ **DOCUMENTO JUDICIAL \*\***
JUDICIAL DOCUMENT\*\*
*ACTE JUDICIAIRE\*\**

| | |
|---|---|
| **Naturaleza y objeto del documento:** <br> Nature and purpose of the document: <br> *Nature et objet de l'acte :* | Una demanda civil que busca reconocer y ejecutar el laudo arbitral contra la República Bolivariana de Venezuela y Petróleos de Venezuela, S. A., debido a que se ha instituido una sentencia extranjera en el Tribunal de Distrito de los EE. UU. Para el Distrito de Delaware. Respuesta debida dentro de los 60 días a partir de la recepción de la citación. |
| **Naturaleza y objeto del procedimiento y, en su caso, cuantía del litigio:** <br> Nature and purpose of the proceedings and, when appropriate, the amount in dispute: <br> *Nature et objet de l'instance, le cas échéant, le montant du litige :* | Saint-Gobain busca el reconocimiento y ejecución del laudo CIADI contra los Demandados, por un monto de US$ 42.342.379,31 (al 7 de diciembre de 2018). |
| **Fecha y lugar de comparecencia\*\*:** <br> Date and Place for entering appearance\*\*: <br> *Date et lieu de la comparution\*\* :* | 60 días desde la recepción de la citación: Lugar: EE. UU. Tribunal de Distrito para el Distrito de Delaware |
| **Autoridad judicial que ha dictado la decisión\*\*:** <br> Court which has given judgment\*\*: <br> *Juridiction qui a rendu la décision\*\* :* | N/A |
| **Fecha de la decisión\*\*:** <br> Date of judgment\*\*: <br> *Date de la décision\*\* :* | N/A |
| **Indicación de los plazos que figuran en el documento\*\*:** <br> Time limits stated in the document\*\*: <br> *Indication des délais figurant dans l'acte\*\* :* | 60 días desde la recepción del presente citatorio para presentarse ante el Tribunal de EE. UU, Corte de Distrito de Delaware |

\*\* Si procede
*if appropriate / s'il y a lieu*

☐ **DOCUMENTO EXTRAJUDICIAL \*\***
EXTRAJUDICIAL DOCUMENT\*\*
*ACTE EXTRAJUDICIAIRE\*\**

| **Naturaleza y objeto del documento:** <br> Nature and purpose of the document: <br> *Nature et objet de l'acte :* | <u>N/A</u> |
|---|---|
| **Indicación de los plazos que figuran en el documento**\*\*:** <br> Time-limits stated in the document\*\*: <br> *Indication des délais figurant dans l'acte\*\* :* | <u>N/A</u> |

\*\* Si procede
   If appropriate / s'il y a lieu

AO 440 (Rev. 06/12) Citatorio en una Acción Civil

# TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS

para el
Distrito de Delaware

| | |
|---|---|
| SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE<br><br>_____<br>*Demandante(s)*<br>c.<br><br>REPÚBLICA BOLIVARIANA DE VENEZUELA; PETRÓLEOS DE VENEZUELA, S.A.,<br>_____<br>*Demandada(s)* | )<br>)<br>)<br>)<br>)  Acción Civil No. 18-cv-1963-UNA<br>)<br>)<br>)<br>)<br>) |

## CITATORIO EN UNA ACCIÓN CIVIL

A: *(Nombre y dirección de la Demandada)*

> República Bolivariana de Venezuela
> Ministerio del Poder Popular para Relaciones Exteriores
> Oficina de Relaciones Consulares
> Avenida Urdaneta, Esquina de "Carmelitas" a "Puente Llaguno,"
> Piso 1 del Edificio Anexo a la Torre "MRE,"
> Caracas, 1010, República Bolivariana de Venezuela

Se ha radicado una demanda en su contra.

Dentro de los 21 días posteriores a la notificación de este citatorio (sin contar el día en que lo recibió) — o 60 días si es los Estados Unidos o una agencia de los Estados Unidos, o un funcionario o empleado de los Estados Unidos descrito en la Fed. R. Civ. P. 12 (a)(2) o (3), o un estado extranjero, una subdivisión política del mismo, o una agencia o instrumento de un estado extranjero, en el sentido del 28 U.S.C. § 1608 d) — usted debe presentar a la demandante una respuesta a la demanda adjunta o una moción conforme a la Regla 12 de las Reglas Federales de Procedimiento Civil. La respuesta o la moción deberá notificarse a la demandante o al abogado de ésta, cuyo nombre y dirección son:

| | |
|---|---|
| Laura Davis Jones (Bar No. 2436)<br>Peter J. Keane (Bar No. 5503)<br>Pachulski Stang Ziehl & Jones LLP<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 (Courier 19801) | Alex Yanos, *pro hac vice pendiente*<br>Carlos Ramos-Mrosovsky, *pro hac vice pendiente*<br>Rajat Rana, *pro hac vice pendiente*<br>ALSTON & BIRD LLP<br>90 Park Avenue<br>New York, NY 10016 |

Si no responde, se emitirá una sentencia por defecto en su contra por la indemnización exigida en la demanda. También deberá radicar su respuesta o moción ante el tribunal.

*SECRETARIO(A) DEL TRIBUNAL*

Fecha:  13 de diciembre de 2018

_____
[firma]
*Firma del Secretario(a) o Secretario(a) Adjunto(a)*

DOCS_DE:222275.2 76899/001

AO 440 (Rev. 06/12)  Citatorio en una Acción Civil (Página 2)

Acción Civil No.

## PRUEBA DE NOTIFICACIÓN
### *(Esta sección no debe radicarse ante el tribunal a menos que así lo requiera la Fed. R. Civ. P. 4 (l))*

Este citatorio para *(nombre del individuo y título, si lo tiene)*_____

fue recibido por me el día *(fecha)* _____

> • Notifiqué personalmente el citatorio al individuo en *(lugar)*_____

_____ el día *(fecha)*_____ ; o

> • Dejé el citatorio en la residencia o sitio habitual de morada del individuo, a cargo de *(nombre)*_____

_____, una persona de edad y discreción apropiadas quien reside allí, el día

*(fecha)*_____, y envié una copia por correo a la última dirección conocida del individuo; o

> • Notifiqué el citatorio a *(nombre del individuo)*_____, quien ha sido

designado por ley para aceptar notificaciones de citatorios a nombre *(nombre de la organización)*_____

_____ el día *(fecha)*_____; o

> • Devolví el citatorio sin ejecutar debido a _____; u

> • Otro *(especifique):*

Mis costos son $_____ por desplazamiento y $ _____ por servicios, para un total de $ _____ .

Declaro so pena de perjurio que esta información es verdadera.


Date: _____        _____
                                                                        *Firma del Notificador Oficial*


                                                                        _____
                                                                        *Nombre y Título en Letra de Imprenta*


                                                                        _____
                                                                        *Dirección del Notificador Oficial*


Información adicional sobre el intento de notificación, etc.:

AO 85 (Rev. 01/09) Aviso, Consentimiento y Remisión de una Acción Civil a un Juez de Instancia

# TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
para el
Distrito de Delaware

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Demandante* | ) | **Acción Civil No.** |
| c. | ) | |
| _____ | ) | |
| *Demandada* | ) | |

## AVISO, CONSENTIMIENTO Y REMISIÓN DE UNA ACCIÓN CIVIL A UN JUEZ DE INSTANCIA

*Aviso de la disponibilidad de un juez de instancia.* Un juez de instancia de los Estados Unidos de este tribunal está disponible para llevar a cabo todos los procedimientos en esta acción civil (incluido un juicio con jurado o sin jurado) y para ordenar el dictado de una sentencia definitiva. La sentencia puede ser apelada directamente ante el tribunal de apelaciones de los Estados Unidos como cualquier otra sentencia de este tribunal. Un juez de instancia puede ejercer esta autoridad solo si todas las partes consiente voluntariamente.

Usted puede dar su consentimiento para que su caso sea remitido a un juez de instancia, o puede negar su consentimiento sin consecuencias sustantivas adversas. El nombre de cualquier parte que retenga el consentimiento no se revelará a ningún juez que, de lo contrario, esté involucrado en su caso.

*Consentimiento a la autoridad de un juez de instancia.* Las siguientes partes aceptan que un juez de instancia de los Estados Unidos lleve a cabo todos los procedimientos en este caso, incluyendo el juicio, la sentencia definitiva y todos los procedimientos posteriores al juicio.

| *Nombres de las partes en letra de imprenta* | *Firmas de las partes o abogados* | *Fechas* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

### Orden de Remisión

**SE ORDENA QUE:** Este caso sea remitido a un juez de instancia de los Estados Unidos para llevar a cabo todos los procedimientos y ordenar el dictado de una sentencia definitiva de conformidad con 28 U.S.C. 636(c) y Fed. R. Civ. P. 73.

Fecha:_____          _____
                                                          *Firma del Juez de Distrito*

                                                          _____
                                                          *Nombre en letra de imprenta y título*

Nota: Devuelva este formulario al secretario del tribunal solo si está consintiendo al ejercicio de la jurisdicción por un juez de instancia de los Estados Unidos. No devuelva este formulario a un juez.

AO 85A (Rev. 01/09) Aviso, Consentimiento y Remisión de una Moción Dispositiva a un Juez de Instancia

# TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS

para el
Distrito de Delaware

| | ) | |
|---|---|---|
| _____ | ) | |
| *Demandante* | ) | Acción Civil No. |
| c. | ) | |
| _____ | ) | |
| *Demandada* | ) | |

## AVISO, CONSENTIMIENTO Y REMISIÓN DE UNA MOCIÓN DISPOSITIVA A UN JUEZ DE INSTANCIA

*Aviso de la disponibilidad de un juez de instancia*. Un juez de instancia de los Estados Unidos de este tribunal está disponible para llevar a cabo todos los procedimientos y para dictar una orden final para cada moción. Un juez de instancia puede ejercer esta autoridad solo si todas las partes consiente voluntariamente.

Usted puede dar su consentimiento para que su caso sea remitido a un juez de instancia, o puede negar su consentimiento sin consecuencias sustantivas adversas. El nombre de cualquier parte que retenga el consentimiento no se revelará a ningún juez que, de lo contrario, esté involucrado en su caso.

*Consentimiento a la consideración de una moción dispositiva por un juez de instancia*. Las siguientes partes aceptan que un juez de instancia de los Estados Unidos lleve a cabo todos los procedimientos y dicte una orden definitiva en lo que respecta a cada moción identificada a continuación *(identificar cada moción por número de documento y título)*.

**Mociones:** _____

_____

_____

*Nombres de las partes en letra de imprenta*      *Firmas de las partes o abogados*      *Fechas*

_____      _____      _____

_____      _____      _____

_____      _____      _____

## Orden de Remisión

**SE ORDENA QUE:** Este caso sea remitido a un juez de instancia de los Estados Unidos para llevar a cabo todos los procedimientos y dictar una orden definitiva sobre las mociones antes indicadas, de conformidad con 28 U.S.C. 636(c).

Fecha:_____      _____

*Firma del Juez de Distrito*

_____

*Nombre en letra de imprenta y título*

Nota: Devuelva este formulario al secretario del tribunal solo si está consintiendo al ejercicio de la jurisdicción por un juez de instancia de los Estados Unidos. No devuelva este formulario a un juez.

**EN EL TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS
PARA EL DISTRITO DE DELAWARE**

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

    Demandante,

  c.

REPÚBLICA BOLIVARIANA DE
VENEZUELA; PETRÓLEOS DE
VENEZUELA, S.A.,

    Demandadas.

Acción Civil No.: _____

## DEMANDA PARA REGISTRAR Y EJECUTAR EL LAUDO ARBITRAL DEL CIADI COMO SENTENCIA EXTRANJERA

Saint-Gobain Performance Plastics Europe ("Demandante" o "Saint-Gobain"), por medio de su abogado abajo firmante, para su demanda (la "Demanda") solicita a este Tribunal que emita una orden de conformidad con el Título 22, Sección 1650a del Código de los Estados Unidos [22 U.S.C. § 1650a] y el Título 28, Sección 1738 del Código de los Estados Unidos [28 U.S.C. § 1738], registrando como sentencia extranjera un laudo arbitral ("el Laudo"), fechado el 3 de noviembre de 2017 (Declaración Yanos, Anexo 1),[1] y emitido según el Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, 18 de marzo de 1965, 17 U.S.T. 1270 (el "Convenio del CIADI" o el "Convenio") a favor de Saint-Gobain y en contra de la Demandada, la República Bolivariana de Venezuela ("Venezuela"), en una disputa derivada de la expropiación de la inversión de Saint-Gobain por parte de Venezuela. De conformidad con 22 U.C.S. § 1650a, las obligaciones pecuniarias creadas por los laudos emitidos de conformidad con el Convenio del CIADI "se ejecutarán y se les otorgará la misma plena fe y crédito como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general

---

[1] Tal y como se usa en esta Demanda, la "Declaración Yanos" se refiere a la Declaración de Alexander A. Yanos del __ de diciembre de 2018 en Apoyo a la Demanda de Saint-Gobain para Registrar y Hacer Cumplir el Laudo Arbitral del CIADI como Sentencia Extranjera.

de uno de los varios Estados," mientras que "[l]a Ley Federal de Arbitraje (9 U.S.C. 1 *et seq*) no se aplicará a la ejecución de los laudos dictados de conformidad con el convenio".

Por lo tanto, el 28 U.S.C. § 1738 exige que el Laudo sea registrado como una sentencia extranjera y que se le otorgue plena fe y crédito en este distrito. Ya que esta acción involucra a una soberanía extranjera, el registro del Laudo como una sentencia extranjera debe proceder después de la notificación de conformidad con la Ley de Inmunidades Soberanías Extranjeras (Foreign Sovereign Immunities Act – "FSIA"), 28 U.S.C. §§ 1602 *et seq.*

En respaldo a su Demanda, Saint-Gobain alega además lo siguiente:

**Partes, Jurisdicción y Fuero**

1.      La Demandante Saint-Gobain es una corporación constituida y existente bajo las leyes de Francia. Es una subsidiaria indirecta y de propiedad absoluta de Compagnie de Saint-Gobain, y un miembro del grupo de compañías Compagnie de Saint-Gobain.

2.      La Demandada Venezuela es un Estado extranjero en el sentido de la ley FSIA.

3.      La Demandada Petróleos de Venezuela S.A. ("PDVSA") es, como este Tribunal ya ha descubierto, un alter ego de Venezuela. *Véase Crystallex Int'l Corp. c. República Bolivariana de Venezuela*, 1:17-mc-00151, 2018 U.S. Dist. LEXIS 138978, *71 (D. Del., 9 de agosto de 2018) (hallando que "PDVSA puede ser considerada el alter ego de Venezuela…"). PDVSA es un instrumento de Venezuela en el sentido del 28 U.S.C. § 1603(b), y hace negocios en Delaware a través de su subsidiaria de propiedad absoluta, PDV Holding, Inc. ("PDVH"), una corporación de Delaware. *Id.*

4.      El Tribunal tiene jurisdicción sobre las Demandadas de conformidad con el 28 U.S.C. §§ 1330(a) y 1605(a), y el 22 U.S.C. § 1650a. En particular, según el 28 U.S.C. § 1605(a)(1), al hacerse parte del Convenio del CIADI y del Tratado, Venezuela renunció a su inmunidad de la jurisdicción de este Tribunal. Venezuela también está sujeta a la jurisdicción de este Tribunal según el 28 U.S.C. § 1605(a)(6)(B) porque esta acción busca la confirmación de un laudo regido por un tratado en vigencia en los Estados Unidos que exige el reconocimiento y la ejecución de

2

laudos arbitrales, a saber, el Convenio del CIADI. Además, el Tribunal tiene jurisdicción sobre la materia de conformidad con el 22 U.S.C. § 1650a porque esta Demanda busca hacer cumplir una obligación pecuniaria creada por un laudo arbitral emitido en virtud del Convenio del CIADI.

5.    El fuero en este Distrito es apropiado según el 28 U.S.C. § 1391(f)(3) porque la Demandada PDVSA es un instrumento de Venezuela que hace negocios en Delaware a través de PDVH. El fuero también es apropiado según el 28 U.S.C. § 1738 porque la sentencia definitiva de un tribunal de jurisdicción general de uno de los varios Estados tiene derecho a la "plena fe y crédito" en "todos los tribunales dentro de los Estados Unidos," mientras que el 22 U.S.C. § 1650a requiere que un laudo del CIADI debe "recibir la misma plena fe y crédito" que "una sentencia definitiva de un tribunal de jurisdicción general de uno de los varios Estados".

6.    De acuerdo con el 28 U.S.C. § 1330(b), el Tribunal puede ejercer jurisdicción en razón de la persona sobre Venezuela y su alter ego PDVSA.

### El Convenio del CIADI y el Tratado

7.    El Convenio del CIADI establece un marco para el arbitraje de diferencias sobre inversiones entre "Estados Contratantes" y nacionales de otros "Estados Contratantes". *Véase* Declaración Yanos, Anexo 2 (el Convenio del CIADI). El Convenio también establece el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones ("CIADI"), una parte del Banco Mundial, para administrar los procedimientos arbitrales que se rigen por el Convenio del CIADI, incluyendo el arbitraje que otorga el Laudo.

8.    El artículo 25(1) del Convenio del CIADI otorga a los tribunales que actúan dentro del marco del CIADI jurisdicción sobre "diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado  Contratante … y un nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro".

9.    El Convenio del CIADI también obliga a los Estados Contratantes a hacer cumplir los laudos del CIADI. El artículo 54(1) de Convenio dispone que:

> Todo Estado Contratante reconocerá al laudo dictado conforme a este Convenio como de carácter obligatorio y hará ejecutar dentro de sus territorios las obligaciones pecuniarias impuestas por el laudo como si se tratare de una sentencia firme dictada por un tribunal existente en dicho Estado. El Estado Contratante que se rija por una constitución federal podrá hacer que se ejecuten los laudos a través de sus tribunales federales y podrá disponer que dichos tribunales reconozcan al laudo la misma eficacia que a las sentencias firmes dictadas por los tribunales de cualquiera de los estados que lo integran.

10.    Los Estados Unidos ha sido un Estado Contratante del Convenio del CIADI desde 1966. Las obligaciones de los Estados Unidos bajo el Artículo 54(1) del Convenio está implementadas en las leyes de los Estados Unidos en el 28 U.S.C. § 1650a(a) [sic], que en sus parte relevantes establece que:

> El laudo de un tribunal arbitral dictado de conformidad con el capítulo IV del Convenio creará un derecho que surge en virtud de un tratado de los Estados Unidos. Las obligaciones pecuniarias impuestas por tal laudo se ejecutarán y se les otorgará la misma plena fe y crédito como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general de uno de los varios Estados.

11.    Los laudos dictados en virtud del Convenio del CIADI no están sujetos a la misma revisión en virtud de la Ley Federal de Arbitraje que otros laudos de arbitraje internacional y no requieren confirmación en la forma prescrita por la Ley de Arbitraje Federal. Esto se encuentra claramente establecido en el 28 U.S.C. § 1650a [sic], el cual establece que "[l]a Ley Federal de Arbitraje (9 U.S.C. 1 *et seq*) no se aplicará a la ejecución de los laudos dictados de conformidad con el Convenio". *Véase también Mobil Cerro Negro, Ltd. c. República Bolivariana de Venezuela*, 863 F.3d 96, 102 (2d Cir. 2017) ("A los tribunales de los Estados miembros … no se les permite examinar los méritos de un laudo del CIADI, su cumplimiento con el derecho internacional o la jurisdicción del tribunal del CIADI para otorgar el laudo; según los términos del Convenio, no pueden hacer más que examinar la autenticidad de la sentencia y hacer cumplir las obligaciones impuestas por el laudo.").

12.    En lugar de ello, y por diseño, la revisión de los laudos del CIADI se encapsula dentro del marco procesal del propio Convenio del CIADI. Los Laudos del CIADI pueden ser anulados o dejarse sin efecto solo por comités *ad hoc* especialmente constituidos y designados por el Presidente del

Consejo Administrativo del CIADI (*ex officio* el Presidente del Banco Mundial) por motivos específicos enumerados en el Convenio del CIADI. *Véase* Declaración Yanos, Anexo 2 Arts. 52-53.

13.    El Convenio del CIADI entró en efecto para Venezuela el día 1 de junio 1995. Venezuela se retiró formalmente del Convenio del CIADI el día 25 de enero de 2012, con efecto a partir del 25 de julio de 2012. La retirada de Venezuela del Convenio del CIADI no guarda relación alguna con este caso. Según el artículo 72 del Convenio del CIADI, la notificación de retiro del Convenio por parte de un Estado "no afectará a los derechos y obligaciones, conforme a[l] Convenio, de dicho Estado … nacido del consentimiento a la jurisdicción del [CIADI] dado … con anterioridad al recibo de dicha notificación." *Id*., Anexo 2.

14.    En este caso, en el Artículo 8 del Tratado Bilateral de Inversión Francia-Venezuela, fechado el 30 de abril de 2004, Francia y Venezuela aceptaron someter al CIADI las controversias que surgieren con inversionistas de cada uno de ellos en virtud del Tratado. Saint-Gobain aceptó la oferta de Venezuela de arbitrar las controversias del Tratado mediante notificaciones de controversia enviadas a Venezuela el 4 de julio 2011 y el 17 de enero de 2012. *Véase Id*., Anexo 1 ¶¶ 249, 253. Por lo tanto, ambas partes consintieron en arbitrar esta controversia antes de la denuncia de Venezuela del Convenio del CIADI.

15.    De hecho, Venezuela nunca ha disputado la jurisdicción del Tribunal sobre las reclamaciones de expropiación de Saint-Gobain en virtud del Tratado o el Convenio del CIADI.

### El Arbitraje y el Laudo

16.    El 29 de marzo de 2011, el Presidente de Venezuela, Hugo Chávez, decretó la expropiación del 99.99% de la participación de Saint-Gobain en NorPro Venezuela C.A., una empresa que fabricaba apuntalantes de cerámica utilizados durante la fracturación (*fracking*) para mantener "abiertas" las fracturas hidráulicas inducidas. *Véase* Declaración Yanos, Anexo 1 ¶¶ 245-47.

17.    El 25 de mayo de 2012, Saint-Gobain presentó ante el CIADI una solicitud de arbitraje contra Venezuela. En su Solicitud, Saint-Gobain buscaba una indemnización por la expropiación ilegal de su inversión en Venezuela por parte de Venezuela. *Id*. ¶¶ 5, 266.

5

18.     La solicitud de arbitraje de Saint-Gobain fue registrada el 15 de junio de 2012 como Caso CIADI Número ARB/12/13.

19.     De conformidad con el Convenio del CIADI y las Reglas de Arbitraje, se constituyó un Tribunal de tres miembros para el caso. Tres abogados internacionales eminentes constituyeron el Tribunal: el juez Charles N. Brower, ciudadano estadounidense y ex juez del Tribunal de Reclamaciones Irán-EE.UU., designado por Saint-Gobain; el Sr. Gabriel Bottini, ciudadano argentino y ex Director de Asuntos Internacionales y Controversias de la Fiscalía General de Argentina, designado por Venezuela; y el Prof. Dr. Klaus Sachs, ciudadano alemán y destacado árbitro internacional, seleccionado conjuntamente por las partes como Presidente del Tribunal.

20.     Luego de intercambiar voluminosas presentaciones escritas, el Tribunal celebró una audiencia oral de cuatro días en el Banco Mundial del 2 al 5 de febrero de 2015.

21.     El 30 de diciembre de 2016, el Tribunal emitió una Decisión sobre Responsabilidad y los Principios de Quantum ("Decisión sobre Responsabilidad"). *Véase* Declaración Yanos, Anexo 3 (Decisión sobre Responsabilidad). En la Decisión sobre Responsabilidad, el Tribunal determinó que Venezuela había infringido el Artículo 5 del Tratado al expropiar la inversión de Saint-Gobain sin pagar una indemnización. *Véase id*. ¶ 908.

22.     La Decisión sobre Responsabilidad también discutió en detalle los principios sobre los cuales el Tribunal evaluaría el monto (*quantum*) de la indemnización que se pagaría a Saint-Gobain. *Véase id*. ¶¶ 566-905. El Tribunal luego dio a las partes dos meses para intentar llegar a un acuerdo sobre el monto de la indemnización a pagársele a Saint-Gobain, en caso contrario, escucharía más presentaciones sobre cuestiones pendientes relacionadas al monto. *Véase id*. ¶ 907.

23.     Venezuela y Saint-Gobain no lograron llegar a un acuerdo sobre el monto de la indemnización a pagarse. En consecuencia, las partes presentaron nuevos alegatos y testimonios de

expertos extensos sobre la cantidad apropiada de indemnización por la expropiación ilegal de la inversión de Saint-Gobain en Venezuela.

24.     Posteriormente, el 3 de noviembre de 2017, el Tribunal emitió su Laudo de conformidad con el Capítulo IV (Artículos 48-49) del Convenio del CIADI. El Tribunal ordenó a Venezuela pagar a Saint-Gobain una indemnización de la siguiente manera:

(i)     US$ 29,6 millones como monto principal de indemnización por la expropiación de la inversión de Saint-Gobain en Venezuela;

(ii)     US$ 4,8 millones como intereses previos al laudo desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017, con intereses adicionales previos al laudo hasta el 3 de noviembre de 2017 a calcularse a una tasa equivalente al 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente;

(iii)     Intereses posteriores al laudo sobre la suma principal de la indemnización a una tasa igual al 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente;

(iv)     Los costos del arbitraje, por una suma de US$ 1.303.189,99;

(v)     Dos tercios de los honorarios y gastos legales de Saint-Gobain por un monto de US$ 4.634.532,05; y

(vi)     Intereses posteriores al laudo sobre los costos a una tasa igual al 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente.

*Véase* Declaración Yanos, Anexo 1 ¶ 72.

25.     Un cálculo detallado de las cantidades pagaderas según el Laudo (US$ 42.342.379,31 al 7 de diciembre de 2018) se encuentra adjunto. *Véase* Declaración Yanos, Anexo 4.

26.     El Laudo es vinculante para Venezuela y su alter ego PDVSA. De conformidad con el Artículo 53 del Convenio del CIADI, Venezuela y su alter ego PDVSA están obligados a "acatar y

cumplir con los términos del laudo" a menos que y "salvo en la medida en que su ejecución se vea suspendida" por un comité *ad hoc* constituido en virtud del artículo 52 del Convenio del CIADI.

27.    El Laudo no ha sido sobreseído. Por el contrario, un comité *ad hoc* del CIADI constituido el 7 de junio de 2018 a solicitud de Venezuela se ha negado expresamente a sobreseer el Laudo.

28.    En una Providencia dictada el 24 de octubre de 2018 (la "Providencia"), el comité *ad hoc* no halló "ninguna circunstancia que requiera el sobreseimiento de la ejecución del Laudo." *Véase* Declaración Yanos, Anexo 5 (Providencia, fechada el 24 de octubre de 2018) ¶ 25. El comité *ad hoc* también anunció la suspensión de sus procedimientos debido a la repetida falta de pago de los anticipos obligatorios de los costos por parte de Venezuela. *Véase id.* ¶¶ 27-30.

29.    Ni Venezuela ni su alter ego PDVSA han pagado ninguna de las sumas adeudadas en virtud del Laudo.

## PRIMER CARGO

### Para el Registro del Laudo como Sentencia Extranjera de Conformidad con 22 U.S.C. § 1650a

30.    La Demandante Saint-Gobain reitera y reincorpora todos los párrafos anteriores de esta Demanda como si a la letra se insertasen.

31.    El Laudo fue emitido por un tribunal arbitral de conformidad con el Convenio del CIADI.

32.    El Artículo 54(1) del Convenio del CIADI exige que los Estados Contratantes "reconozcan un laudo dictado conforme al Convenio [del CIADI] como de carácter obligatorio y hagan ejecutar dentro de sus territorios las obligaciones pecuniarias impuestas por el laudo como si se tratare de una sentencia firme dictada por un tribunal existente en dicho Estado."

33.    El Artículo 54(1) se encuentra incorporado en las leyes de los Estados Unidos por el 22 U.S.C. § 1650a, el cual requiere que el Laudo "se le otorgue la misma plena fe y crédito como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general de uno de los varios Estados."

34.    Finalmente, el 28 U.S.C. § 1738 exige que este Tribunal otorgue plena fe y crédito a las sentencias de los diversos Estados.

35.    Por todos estos motivos, el Tribunal debe registrar el Laudo como una Sentencia Extranjera.

## SEGUNDO CARGO

### Para la Ejecución del Laudo de Conformidad con 22 U.S.C. § 1650a

36.    La Demandante Saint-Gobain reitera y reincorpora todos los párrafos anteriores de esta Demanda como si a la letra se insertasen.

37.    El 22 U.S.C. § 1650a, exige que "[l]as obligaciones pecuniarias impuestas por" el Laudo "se ejecutarán como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general de uno de los varios Estados."

38.    Por todos estos motivos, el Tribunal debe hacer cumplir las obligaciones pecuniarias del Laudo.

## PETITORIO

POR LO TANTO, Saint-Gobain respetuosamente solicita que el Laudo sea registrado en este Tribunal y que dicha Sentencia se convierta en una sentencia personal firme de este Tribunal a favor de Saint-Gobain y en contra de Venezuela y su alter ego, PDVSA, instruyendo lo siguiente:

A. Ordenar a Venezuela y PDVSA pagar a Saint-Gobain un monto igual a las obligaciones pecuniarias del Laudo (calculadas en US$ 42.342.379,31 al 7 de diciembre de 2018), compuesto de:

   a. US$ 29,6 millones como monto principal de indemnización por la expropiación de la inversión de Saint-Gobain en Venezuela; más US$ 4,8 millones como intereses previos al laudo desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017, con intereses

9

adicionales previos al laudo hasta el 3 de noviembre de 2017, por la cantidad de US$ 542.189,80, y tasa de interés posterior al laudo del 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente (igual a US$ 1.218.115,14 al 7 de diciembre de 2018);

b. US$ 1.303.189,99 por concepto de costos del arbitraje; y US$ 4.634.532,05 que representan las dos terceras partes de los honorarios y gastos legales de Saint-Gobain, estando ambas cantidades sujetas a intereses posteriores al laudo acumulados hasta la fecha de satisfacción del Laudo a una tasa del 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente (igual a US$ 244.352,32 al 7 de diciembre de 2018); y

B. Otorgar cualquier otro recurso en contra de Venezuela y PDVSA que el Tribunal considere justo y adecuado.

Fecha: 11 de diciembre de 2018          PACHULSKI STANG ZIEHL & JONES LLP

*/f/ Laura Davis Jones*
Laura Davis Jones (No. Colegio de Abogados 2436)
Peter J. Keane (No. Colegio de Abogados 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Teléfono: (302) 652-4100
Fax: (302) 652-4400
E-mail: ljones@pszjlaw.com
            pkeane@pszjlaw.com

– y –

Alex Yanos, *pro hac vice pendiente*
Carlos Ramos-Mrosovsky, *pro hac vice pendiente*
Rajat Rana, *pro hac vice pendiente*
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: 202-210-9400
Fax: 212-210-9444
Email:  alex.yanos@alston.com
            carlos.ramos-mrosovsky@alston.com
            rajat.rana@alston.com

*Abogados de la Demandante, Saint-Gobain
Performance Plastics Europe*

[forma no traducida]

**ANTE EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
PARA EL DISTRITO DE DELAWARE**

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

        Demandante,             Procedimiento Civil nro.: 18-cv-1963-UNA

  c.

REPÚBLICA BOLIVARIANA DE
VENEZUELA; PETRÓLEOS DE
VENEZUELA, S.A.,

        Demandadas

## DECLARACIÓN DE ALEXANDER A. YANOS EN APOYO DE LA DEMANDA PARA REGISTRAR Y EJECUTAR EL LAUDO ARBITRAL DEL CIADI COMO UNA SENTENCIA DICTADA EN EL EXTRANJERO

De conformidad con el título 28 del Código de los Estados Unidos (U.S.C.), § 1746, yo, Alexander A. Yanos, por medio de la presente, declaro lo siguiente:

1.      Soy abogado en Alston & Bird, LLP. Represento a Saint-Gobain Performance Plastics Europe ("Saint-Gobain" o "Demandante") en relación del caso arriba mencionado.

2.      Realizo esta declaración en apoyo de la Demanda para Registrar y Ejecutar el Laudo Arbitral del CIADI como una sentencia dictada en el extranjero, presentada por Saint-Gobain el 12 de diciembre de 2018.

3.      Adjunto al presente documento como Documento de prueba 1 figura una copia fiel y auténtica del Laudo certificado, dictado el 3 de noviembre de 2017 a favor de Saint-Gobain por el tribunal arbitral en el marco del arbitraje entre Saint-Gobain y la República Bolivariana de Venezuela ("Venezuela" o "Demandada") con arreglo al Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, de 18 de marzo de 1965, 17 U.S.T. 1270 (el "Convenio CIADI" o el "Convenio").

4.      Se adjunta al presente, como Documento de prueba 2, una copia fiel y auténtica del Convenio CIADI.

1

5.      Se adjunta al presente, como <u>Documento de prueba 3</u>, una copia fiel y auténtica de la "Decisión sobre la Responsabilidad y los Principios del Monto (*Quantum*)", dictada por el tribunal arbitral el 30 de diciembre de 2016 en el marco del arbitraje entre Saint-Gobain y Venezuela.

6.      Se adjunta al presente, como <u>Documento de prueba 4</u>, una hoja que contiene el cálculo de la indemnización y los costos concedidos a Saint-Gobain por el tribunal arbitral el 7 de diciembre de 2018.

7.      Se adjunta al presente, como <u>Documento de prueba 5</u>, una copia fiel y auténtica de la "Orden de Procedimiento nro. 2", dictada por el tribunal arbitral el 24 de octubre de 2018.

Declaro, so pena de incurrir en falso testimonio con arreglo a la legislación de los Estados Unidos de América, que lo que antecede es veraz y correcto.

Fecha: Nueva York, Nueva York
         13 de diciembre de 2018

_____
Alex Yanos
ALSTON & BIRD LLP
90 Park Avenue
Nueva York, NY 10016
Tel.: 202-210-9400
Fax: 212-210-9444
alex.yanos@alston.com

# Anexo 1

### Centro Internacional de Arreglo de Diferencias Relativas a Inversiones

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

DEMANDANTE

c.

REPÚBLICA BOLIVARIANA DE VENEZUELA

DEMANDADA

**Laudo**

Dictado por un Tribunal compuesto por:

Profesor Dr. Klaus M. Sachs, Presidente
El Honorable Charles N. Brower, Árbitro
Sr. Gabriel Bottini, Árbitro

Secretario del Tribunal
Sra. Natalí Sequeira (hasta 7 de agosto de 2017)
Sr. Francisco Grob

**Fecha de envío a las Partes: 3 de noviembre de 2017**

# ÍNDICE DE CONTENIDOS

A.    LAS PARTES..........................................................................................................5

    I.    Demandante ....................................................................................................5

    II.   Demandada......................................................................................................5

B.    EL TRIBUNAL DE ARBITRAJE ......................................................................5

    I.    El Honorable Charles N. Brower ...................................................................6

    II.   Sr. Gabriel Bottini .........................................................................................6

    III.  Prof. Dr. Klaus Sachs ...................................................................................6

C.    SÍNTESIS DE LOS ANTECEDENTES PROCESALES .....................................7

D.    ANTECEDENTES FÁCTICOS ........................................................................11

E.    POSTURAS DE LAS PARTES.........................................................................12

    I.    Monto acordado de cuantía de daños y propuesta conjunta..................12

    II.   Síntesis de las posturas de las partes sobre los costos...........................13

F.    RAZONAMIENTO DEL TRIBUNAL ..............................................................19

    I.    El acuerdo de las Partes sobre cuantía de daños ...................................19

    II.   Decisión sobre costos....................................................................................20

G.    DECISIÓN DEL TRIBUNAL ...........................................................................24

# ÍNDICE DE ABREVIACIONES

| | |
|---|---|
| CLA- | Autoridades Legales de la Demandante |
| Presentación sobre Costos de la Demandante | Presentación sobre Costos de la Demandante de fecha 30 de junio de 2015. |
| Primera Presentación Actualizada sobre Costos de la Demandante | Presentación Actualizada sobre Costos de la Demandante de fecha 23 de noviembre de 2015 |
| Segunda Presentación Actualizada sobre Costos de la Demandante | Presentación Actualizada sobre Costos de la Demandante de fecha 28 de julio de 2017 |
| Segunda Presentación Posterior a la Audiencia de la Demandante | Presentación simultánea de la Demandante posterior a la Audiencia en la segunda ronda, 22 de mayo de 2015 |
| Memorial de Contestación | Memorial de Contestación de la Demandada de fecha 21 de marzo de 2014 |
| CVG Bauxilum | CVG Bauxilum, C.A. |
| TJE | Trato Justo y Equitativo |
| TBI Francia-Venezuela o "el Tratado" | Acuerdo para el Estímulo y la Protección Recíproca de las Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela |
| CIADI | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| Reglas de Arbitraje CIADI | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI |
| Convenio CIADI | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados |
| Reglas de Iniciación del CIADI | Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje |

| | |
|---|---|
| Dúplica | Dúplica sobre el Fondo de la Demandada de fecha 18 de septiembre de 2014 |
| Solicitud | Solicitud de Arbitraje contra la Demandada de fecha 25 de mayo de 2012 |
| Presentación Adicional de Costos de la Demandada | Presentación Adicional sobre Costos de la Demandada de fecha 28 de julio de 2017 |
| Secretariado | Secretariado del CIADI |
| Secretaria General | Secretaria General del CIADI |
| Las "Reclamaciones sobre la Bauxita" | Las reclamaciones de la Demandante de que, como consecuencia del aumento del precio de la bauxita inicialmente pactado en el Contrato de Bauxita entre la Demandante y CVG Bauxilum, la Demandada no brindó a la Demandante un trato justo y equitativo conforme al Artículo 3(1) del Tratado, ni protegió o aseguró la inversión de la Demandante con arreglo a lo dispuesto en el Artículo 3(2) del Tratado. |
| El "Contrato de Bauxita" | El contrato suscrito por CVG Bauxilum y Saint-Gobain Proppants Venezuela C.A. el 25 de octubre de 2005 |
| La "Decisión" | La Decisión sobre Responsabilidad y Principios en Materia de Cuantía de Daños, emitida por el Tribunal en este arbitraje el 30 de diciembre de 2016 |

## A.    LAS PARTES

### I.    DEMANDANTE

1.    Saint-Gobain Performance Plastics Europe (en adelante, la "**Demandante**" o "**Saint-Gobain**"), representada en este arbitraje por sus abogados debidamente autorizados Sr. Alexander A. Yanos de Alston & Bird LLP, 90 Park Avenue, 15th Floor, Nueva York, NY 10016-1387, Estados Unidos de América; la Sra. Elizabeth C. Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, Estados Unidos de América y la Sra. Noiana Marigo, de la firma Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, 31st Floor, Nueva York, NY 10022, Estados Unidos de América.

### II.    DEMANDADA

2.    La República Bolivariana de Venezuela (en adelante, la "**Demandada**" o "**Venezuela**"), representada en este arbitraje por el Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas, República Bolivariana de Venezuela. La Demandada también se encuentra representada por sus abogados debidamente autorizados, el Sr. Benard V. Preziosi, Jr. de Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, Nueva York, NY 10178, Estados Unidos de América, y el Sr. Eloy Barbará de Parres, la Sra. Gabriela Álvarez Ávila y la Sra. Kate Brown de Vejar Dori Yoldi de la firma Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Ciudad de México, Estados Unidos Mexicanos.

3.    En lo sucesivo, se hará referencia a la Demandante y la Demandada indistintamente como la "**Parte**" y, en conjunto, las "**Partes**".

## B.    EL TRIBUNAL DE ARBITRAJE

4.    El Tribunal de Arbitraje se constituyó del siguiente modo:

## I.    EL HONORABLE CHARLES N. BROWER

(designado por la Demandante)

20 Essex Street Chambers
20 Essex Street
Londres WC2R 3AL
GRAN BRETAÑA
Tel: +44 (0)20 7842 1200
Fax: +44 (0)20 7842 1270
Correo electrónico: cbrower@20essexst.com

## II.    SR. GABRIEL BOTTINI

(designado por la Demandada)

Paraná 580- Piso 5° "J"
C1017AAL- Buenos Aires
ARGENTINA
Tel.: + 54 11 4371-3165
Fax: + 54 11 4372-7974
Correo electrónico: gbottini@outlook.com

## III.    PROF. DR. KLAUS SACHS

(designado por las Partes)

Nymphenburger Str. 12
D-80335 Múnich
ALEMANIA
Tel.: +49 89 23 807-109
Fax: + 49 89 23 807-40 621
Correo electrónico: Klaus.Sachs@cms-hs.com

## C.    SÍNTESIS DE LOS ANTECEDENTES PROCESALES

5.    Este arbitraje versa sobre una controversia legal entre Saint-Gobain y Venezuela que surge de la supuesta negativa por parte de Venezuela a indemnizar a Saint-Gobain en virtud de la expropiación de la inversión de Saint-Gobain en su subsidiaria 99,99%[1] Norpro Venezuela C.A. ("**Norpro Venezuela**" o "**Norpro**"), luego de un discurso televisado del Presidente de Venezuela Hugo Chávez del 15 de mayo de 2010. La Demandante alega que la Demandada violó el *Acuerdo para el Estímulo y la Protección Recíproca de las Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela* (el "**TBI Francia-Venezuela**" o el "**Tratado**"), el cual entró en vigor el 15 de abril de 2004, al negarse a ofrecer una indemnización por la expropiación de la planta de *proppants* de Norpro Venezuela ubicada en Puerto Ordaz, Estado de Bolívar, así como al sancionar o no intervenir en el aumento del precio del suministro de bauxita supuestamente violatorio de un contrato celebrado con un ente Estatal, por lo cual no se concedió un trato justo y equitativo a la Demandante ni se brindó seguridad y protección plena a su inversión, en violación de los artículos 5(1) y 3(1) y (2) del Tratado.

6.    El 25 de mayo de 2012, la Demandante presentó una Solicitud de Arbitraje contra la Demandada (la "**Solicitud**") ante la Secretaria General del CIADI, de conformidad con el Artículo 36 del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados (el "**Convenio CIADI**") y las Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje (las "**Reglas de Iniciación del CIADI**").

7.    El 29 de mayo de 2012, el Secretariado del CIADI (el "**Secretariado**") remitió la Solicitud a la Demandada.

8.    El 15 de junio de 2012, la Secretaria General registró la Solicitud de la Demandante de conformidad con el Artículo 36 del Convenio CIADI y las Reglas 6 y 7 de las Reglas de Iniciación del CIADI, y notificó dicho registro a las Partes. El caso quedó registrado bajo el número ARB/12/13.

9.    El 28 de septiembre de 2012, la Demandante designó al Juez Charles N. Brower, nacional de los Estados Unidos de América, como árbitro.

---

[1] El Sr. Luis Páez, ciudadano de Venezuela y Presidente de Norpro Venezuela, es tenedor de una única acción, la cual suscribió al momento de la constitución de Norpro Venezuela. La transferencia planificada de la acción del Sr. Páez a Saint-Gobain no se ha formalizado aún. Solicitud, ¶ 4, nota 4.

10.   El 3 de octubre de 2012, la Demandada designó al Sr. Gabriel Bottini, nacional de la República Argentina, como árbitro.

11.   El 4 de octubre de 2012, el Juez Brower aceptó su designación en calidad de árbitro por parte de la Demandante, luego de presentar una declaración debidamente firmada al Secretariado, de conformidad con la Regla 6(2) de las Reglas Procesales Aplicables a los Procedimientos de Arbitraje (las "**Reglas de Arbitraje CIADI**").

12.   El 25 de octubre de 2012, el Sr. Bottini aceptó su designación en calidad de árbitro por parte de la Demandada, luego de presentar una declaración debidamente firmada al Secretariado, de conformidad con la Regla 6(2) de las Reglas de Arbitraje CIADI.

13.   El 12 de noviembre de 2012, la Secretaria General informó al Prof. Dr. Klaus Sachs que las Partes acordaron su designación como Presidente del Tribunal. Mediante carta de fecha 14 de noviembre de 2012, el Prof. Sachs aceptó su designación, luego de presentar una declaración debidamente firmada al Secretariado de conformidad con la Regla 6(2) de las Reglas de Arbitraje CIADI.

14.   El 26 de noviembre de 2012, la Secretaria General informó a las Partes que el Prof. Sachs, el Juez Brower y el Sr. Bottini habían aceptado sus designaciones en calidad de árbitros y que, en consecuencia, en virtud de la Regla 6(1) de las Reglas de Arbitraje CIADI, se entendía que el Tribunal se había constituido y que el procedimiento se había iniciado en dicha fecha. Asimismo, la Sra. Natalí Sequeira fue designada para actuar como Secretaria del Tribunal (la "**Secretaria**").

15.   Luego de un intercambio de presentaciones escritas y de una audiencia oral llevada a cabo en Washington, D.C., EE. UU. del 2 al 6 de febrero de 2015, el Tribunal emitió su Decisión sobre Responsabilidad y Principios en Materia de Cuantía de Daños el 30 de diciembre de 2016 (la "**Decisión**"), la cual forma parte integral del Laudo. Para una síntesis de los antecedentes procesales que resultaron en el dictado de la Decisión, puede verse la Sección C. de la Decisión.

16.   En la parte dispositiva de la Decisión, el Tribunal concluyó que:

    1.    La Demandada violó el Artículo 5(1) incisos 2 y 3 del Tratado al no especificar el monto de la compensación y al no pagar una indemnización pronta por la expropiación de la inversión de la Demandante en Venezuela.

    2.    La Demandada deberá pagarle a la Demandante el monto de la compensación calculado sobre la base de las conclusiones del Tribunal sintetizadas en los párrafos 849 a 851 [de la Decisión]*,* más los intereses

previos al laudo a partir del día 15 de mayo de 2010 hasta la fecha del Laudo a una tasa igual al 2% sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

3.   La Demandada deberá pagarle a la Demandante los intereses posteriores al laudo sobre el monto de la compensación dispuesto en el punto 2 a partir de la fecha del laudo hasta la fecha del pago a una tasa igual al 2% sobre la tasa promedio de letras del Tesoro de los EE.UU. a seis meses, capitalizados en forma anual. Los intereses posteriores al laudo se pagarán sólo sobre el capital de la compensación, y no sobre los intereses otorgados previos al laudo.

4.   La compensación y los intereses se fijan en montos netos de los impuestos venezolanos aplicables, y la Demandada no podrá deducir impuestos en relación con el pago de la compensación y los intereses.

5.   La decisión sobre costos se reserva para el Laudo.

6.   Se desestiman todas las demás pretensiones y petitorios.

17.  El 11 de enero de 2017, el Tribunal emitió la Resolución Procesal No. 4, en la cual ordenó lo siguiente:

Se invita a las Partes a ponerse en contacto en un intento de llegar a un acuerdo sobre el monto final de la indemnización que debe pagar la Demandada a la Demandante con respecto a la expropiación de Norpro Venezuela – sobre la base de las conclusiones del Tribunal, resumidas en los párrafos 849 a 851 de la Decisión sobre Responsabilidad y Principios en Materia de Cuantificación de Daños del Tribunal.

Las Partes deberán informar al Tribunal dentro de un plazo de dos meses contados a partir de la notificación de la Decisión, es decir, a más tardar, el miércoles 1 de marzo de 2017, si han logrado llegar a un acuerdo sobre la cuestión expuesta en el párrafo 3 *supra*, y en qué medida.

En caso de que las Partes no hubieran logrado llegar a un acuerdo sobre el monto final de la indemnización que debe pagar la Demandada a la Demandante al día 1 de marzo de 2017, el Tribunal invitará a las Partes a convenir sobre un calendario para sus presentaciones sobre las cuestiones

de cuantificación de daños pendientes de resolución o, de no lograrse un acuerdo, a presentar sus respectivas propuestas de dicho calendario.

18. Mediante correo electrónico de fecha 17 de febrero de 2017, las Partes solicitaron conjuntamente una prórroga del plazo del 1 de marzo de 2017, dispuesto en el párrafo 4 de la Resolución Procesal No. 4, hasta el 31 de marzo de 2017. Mediante correo electrónico de fecha 18 de febrero de 2017, el Tribunal concedió la solicitud de prórroga de las Partes.

19. Mediante carta de fecha 30 de marzo de 2017, la Demandada presentó su escrito sobre el monto definitivo de la indemnización a otorgarse a la Demandante sobre la base de las conclusiones del Tribunal en su Decisión. En concreto, la Demandada presentó cuatro cifras calculadas por los peritos de las Partes en función de sus respectivos modelos de FFD y propuso que las Partes se pongan de acuerdo con respecto a la segunda cifra más elevada de esas cuatro, es decir, el monto obtenido por los peritos de la Demandada sobre la base de su propio modelo económico.

20. Mediante carta de fecha 31 de marzo de 2017, la Demandante informó al Tribunal que consideraba que el resultado de la aplicación del método FFD, basado en los parámetros establecidos en la Decisión del Tribunal, era incompatible con el estándar de indemnización establecido en el Tratado y el derecho internacional consuetudinario, y le solicitó que ordenara a las Partes dialogar y proponer un calendario para los escritos sobre las cuestiones de cuantía de daños que debían resolverse.

21. Luego de un intercambio de escritos entre las Partes sobre la necesidad de hacer nuevas presentaciones sobre cuantía de daños, y debido a las solicitudes de reconsideración y rectificación de la Demandante relativas a la Decisión, el Tribunal emitió una Decisión sobre las Solicitudes de la Demandante de Reconsideración y Rectificación el día 28 de junio de 2017 (la "**Decisión sobre Reconsideración**"). Para una síntesis de los escritos intercambiados con anterioridad a la emisión de dicha decisión que resultaron en el dictado de la Decisión sobre Reconsideración, puede verse la Sección A de la Decisión sobre Reconsideración.

22. En su carta de transmisión de fecha 28 de junio de 2017, enviada a las Partes junto con la Decisión sobre Reconsideración, el Tribunal hizo referencia al párrafo 89 de dicha Decisión sobre Reconsideración, en donde expresaba su postura acerca de que aún no se encontraba en condiciones de calcular el monto definitivo de indemnización que la Demandada debería pagarle a la Demandante por la expropiación de la inversión de la Demandante, sin permitirle a esta expresar sus comentarios sobre el contenido de la carta de la Demandada de fecha 30 de marzo de 2017. Por lo tanto, el Tribunal invitó a la Demandante a presentar sus

comentarios, en particular sobre la propuesta de la Demandada de adoptar un monto definitivo de indemnización acorde a la segunda cifra más elevada de los cuatro montos calculados por los peritos de las Partes en función de las conclusiones del Tribunal en su Decisión, a más tardar, el 12 de julio de 2017.

23.   Mediante carta de fecha 12 de julio de 2017, la Demandante presentó sus comentarios acerca de la carta de la Demandada de fecha 30 de marzo de 2017 y, en particular y sin perjuicio de sus presentaciones anteriores realizadas en el contexto de su solicitud de reconsideración y rectificación, aceptó la propuesta de la Demandada de adoptar la segunda cifra más elevada de los cuatro montos. La Demandante luego solicitó permiso para corregir su presentación sobre costos en virtud de los honorarios y gastos adicionales irrogados con posterioridad a la última actualización de costos de noviembre de 2015.

24.   En su carta de fecha 14 de julio de 2017, el Tribunal invitó a las Partes a presentar cualquier actualización sobre costos que desearan que se considerase en la decisión sobre costos del Tribunal, la cual sería incluida en el Laudo, a más tardar, el 28 de julio de 2017.

25.   El 28 de julio de 2017, la Demandante envió una presentación actualizada sobre costos ("**Presentación Actualizada sobre Costos de la Demandante**"). Ese mismo día, la Demandada envió una presentación adicional sobre costos ("**Presentación Adicional de Costos de la Demandada**").

26.   El 7 de agosto de 2017, el Centro informó a las Partes y al Tribunal que el Sr. Francisco Grob, Consejero Jurídico del CIADI, reemplazaría a la Sra. Sequeira como Secretario del Tribunal.

27.   El 20 de septiembre de 2017, el Tribunal declaró cerrado el procedimiento de conformidad con la Regla 38(1) de las Reglas de Arbitraje CIADI.


**D.    ANTECEDENTES FÁCTICOS**

28.   En la Sección D de la Decisión, se ofrece una síntesis detallada de los antecedentes fácticos que no se encuentran controvertidos entre las Partes o que de algún otro modo han quedado demostrados por las pruebas presentadas en este procedimiento a satisfacción del Tribunal.

## E.  POSTURAS DE LAS PARTES

29.  Las Secciones E y F de la Decisión contienen una síntesis detallada de las posturas de las Partes acerca de la cuestiones relativas a la responsabilidad y cuantía de daños, tal como se ventilaron en las presentaciones escritas de las Partes y durante la Audiencia.

30.  Aparte de la Decisión del Tribunal, que examinó la cuestión de la responsabilidad de la Demandada según el Tratado y de los principios de cuantía de daños aplicables a la determinación del monto de indemnización, las cuestiones pendientes que deben abordarse en este Laudo son las siguientes: (i) el monto exacto de la indemnización que debe pagar la Demandada a la Demandante por la expropiación de su inversión sobre la base de las conclusiones del Tribunal en su Decisión; y (ii) la distribución de los costos del arbitraje y de los honorarios legales y costos incurridos por las Partes en relación con este arbitraje.

## I.  MONTO ACORDADO DE CUANTÍA DE DAÑOS Y PROPUESTA CONJUNTA

31.  En su carta del 30 de marzo de 2017, la Demandada presentó los resultados que habían arrojado los cálculos de los peritos de las Partes, cada uno de los cuales utilizó tanto su propio modelo económico como también el del perito de la otra Parte, sobre la base de las conclusiones del Tribunal en su Decisión, y que fueron intercambiados entre las Partes el 7 de marzo de 2017. Estos resultados fueron los siguientes:

| | Cálculos del perito de la Demandada | |
| | Mediante Modelo de FFD de la Demandante | Mediante Modelo de FFD de la Demandada |
| --- | --- | --- |
| | (millones de USD) | |
| 1. Valor al 15 de mayo de 2010 | $ 25.6 | $ 29.6 |
| 2. Intereses hasta el 31 de marzo de 2017 | $ 4.1 | $ 4.8 |
| **3. Total** | $ 29.8 | $ 34.4 |

| | Cálculos del perito de la Demandante | |
| | Mediante Modelo de FFD de la Demandante | Mediante Modelo de FFD de la Demandada |
| --- | --- | --- |
| | (millones de USD) | |
| 4. Valor al 15 de mayo de 2010 | $ 23.0 | $ 30.6 |
| 5. Intereses hasta el 6 de marzo de 2017 | $ 3.6 | $ 4.7 |
| **6. Total** | $ 26.6 | $ 35.3 |

32.    Sobre esa base, la Demandada propuso que las Partes acordaran un monto definitivo de indemnización conforme a aquel obtenido por su perito mediante su propio modelo económico, es decir, un monto de USD 34,4 millones (que incluye intereses hasta el 31 de marzo de 2017).

33.    Por invitación del Tribunal a comentar sobre la carta de la Demandada de fecha 30 de marzo de 2017 y, especialmente, sobre la propuesta mencionada más arriba luego de que se dictara la Decisión de Reconsideración del Tribunal de 28 de junio de 2017, la Demandante manifestó, en su carta de fecha 12 de julio de 2017, que: (i) la carta de la Demandada reflejaba correctamente los cuatro montos calculados por los expertos de las Partes sobre la base de los parámetros establecidos en la Decisión del Tribunal; y (ii) sin perjuicio de sus escritos anteriores realizados en el contexto de su solicitud de reconsideración y rectificación de la Decisión del Tribunal, aceptó la propuesta de la Demandada de adoptar la segunda cifra más elevada de los cuatro montos, es decir, USD 34,4 millones, incluidos los intereses hasta el 31 de marzo de 2017.

## II.    SÍNTESIS DE LAS POSTURAS DE LAS PARTES SOBRE LOS COSTOS

34.    Ambas Partes solicitan que el Tribunal ordene a la otra Parte reembolsar los costos en los que cada una ha incurrido durante este arbitraje.  En los siguientes párrafos, se realiza una síntesis de las posturas de las Partes en materia de costos, tal como se alegaron en sus presentaciones escritas.

### 1.    Síntesis de la postura de la Demandante sobre los costos

35.    La Demandante afirma que, a la luz de la conclusión del Tribunal en su Decisión de que la Demandada violó el Artículo 5(1), incisos 2 y 3, del Tratado, se debe condenar a la Demandada a pagar todos los costos de la Demandante más los intereses compuestos correspondientes calculados anualmente desde la fecha del Laudo hasta la fecha de pago por parte de Venezuela[2].

36.    La Demandada sostiene que la autoridad del Tribunal para calcular y distribuir los costos entre las Partes surge del Artículo 61(2) del Convenio CIADI que, interpretado en sentido amplio, incluiría: (i) honorarios, previsiones y otros gastos de abogados y peritos; y (ii) todos

---

[2] Presentación Actualizada sobre Costos de la Demandante, pág. 1.

los costos de viaje y costos en que hubiesen incurrido los testigos, asesores y representantes de las Partes[3].

37.    La Demandante alega, además, que el tribunal debe ejercer su autoridad para asignar los costos y aplicar la regla según la cual "*la parte vencida paga*", sobre todo en casos en que el Estado demandado no ha cumplido con obligaciones establecidas en un tratado. Según la Demandante, en tales circunstancias, los tribunales "*han condenado, de manera uniforme, a la totalidad o parte de los costos a la parte demandante*". La Demandante hace referencia a los casos *ADC c. Hungría* y *Gold Reserve*, en los que los tribunales vincularon sus condenas en costos al principio de reparación íntegra establecido en *Chorzów*[4]. La Demandante cita, asimismo, otra autoridad que considera que "*existen fundamentos para considerar que los costos del arbitraje en que incurre una demandante que sufrió daños como resultado del accionar de un Estado (o viceversa) se encuentran incluidos entre las* 'consecuencias naturales, normales y previsibles del daño causado'"[5]. [Traducción del Tribunal]

38.    La Demandante alega que no es necesario que la parte demandante resulte vencedora en todas sus pretensiones para poder obtener el reintegro de sus costos razonables, y cita la decisión del tribunal de *Hochtief c. Argentina*, para el cual bastaría con que "*se hubiera acogido la esencia de la pretensión*" y que la demandante "*tuviera derecho a indemnización por las pérdidas resultantes de la violación por parte de la Demandada de los derechos de la Demandante en virtud del TBI*"[6]. Según la Demandante, la lógica de una reparación íntegra indica que "*siempre que la demandante se vea obligada a acudir al arbitraje porque se violaron sus derechos en virtud de un tratado, es indispensable una adjudicación de costos que coloque a la demandante en la posición en que habría estado, como si nunca se hubiesen vulnerado tales derechos*"[7]. [Traducción del Tribunal]

39.    La Demandante sostiene que los tribunales de *OI European c. Venezuela* y *Flughafen Zürich c. Venezuela* aplicaron este enfoque al exigirle a Venezuela el pago de los costos del procedimiento y una parte importante de las costas legales de la demandante,

---

[3] Presentación sobre Costos de la Demandante, ¶ 4.
[4] Presentación sobre Costos de la Demandante, ¶¶ 5-7, con cita de *ADC c. Hungría* (**CLA-001**), ¶¶ 531, 533 y *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 860.
[5] Presentación sobre Costos de la Demandante, ¶ 8, con cita de Bienvenu, Pierre y Valasek, Martin J., "*Compensation for Unlawful Expropriation, and Other Recent Manifestations of the Principle of Full Reparation in International Investment Law*", en Albert Jan van den Berg (ed.), *50 Years of the New York Convention: ICCA International Arbitration Conference*, 14 ICCA Congress Series 231 (2009) (**CLA-011**).
[6] Presentación sobre Costos de la Demandante, ¶ 9, con cita de *Venoklim Holding c. Venezuela* (**CLA-160**), ¶ 330.
[7] Presentación sobre Costos de la Demandante, ¶ 9.

respectivamente[8]. Asimismo, la Demandante hace referencia al caso *Tidewater c. Venezuela*, en el que el tribunal resolvió que la expropiación era lícita pero, no obstante ello, condenó en costas a las demandantes, para lo cual señaló que "*[l]as Demandantes […] tuvieron que invertir mucho tiempo, dinero y preocupación a fin de obtener la indemnización que Venezuela se había comprometido a pagar en virtud de los términos del TBI con Barbados y debería haber ofrecido en el año 2009*"[9].

40.    La Demandante advierte que la Demandada no cuestiona la autoridad del Tribunal para condenar a una parte en costas, sino que solicita una condena en su favor con base en la falta de participación de la Demandante en los procedimientos que establece la ley venezolana para el cálculo de la indemnización adeudada a la Demandante. En respuesta a ese argumento, la Demandante destaca que no habría tenido que participar en dichos procedimientos si la Demandada hubiese cumplido con sus obligaciones en virtud del Tratado y la ley venezolana, y hubiese otorgado a la Demandante una indemnización adecuada al momento de la expropiación. Como resultado de dicho incumplimiento de la Demandada, la Demandante sostiene que tuvo que iniciar acciones legales, que ocasionaron demoras que le significaron mucho tiempo y recursos financieros[10].

41.    En opinión de la Demandante, el hecho de que no prosperaran su recusación y su solicitud de medidas provisionales no es motivo para ignorar el principio de reparación íntegra, y sostiene que "*una conducta procesal de buena fe que genera un pequeño retraso*" no justifica una condena en costas en favor de la parte contraria. La Demandante alude al caso *Poštová Banka c. República Helénica*, en el que el tribunal no se pronunció en materia de costas, a pesar de fallar a favor de la demandada en jurisdicción, y sostuvo que "*la cuestión no estaba bien definida y comprendía un contexto fáctico y jurídico complejo. Cada lado planteó argumentos válidos en sustento de su respectiva postura, y actuó de manera justa y profesional*"[11]. [Traducción del Tribunal]

42.    Por otro lado, la Demandante alega que se podría justificar un ajuste en la asignación de las costas "*ante una conducta extrema o abuso de proceso de las partes, incluida una obstrucción intencional del procedimiento*", que considera que es lo que ocurre en este caso

---

[8] Presentación sobre Costos de la Demandante, ¶ 10, en referencia a *OI European Group c. Venezuela* (**CLA-156**), ¶¶ 969-976 y *Flughafen Zürich c. Venezuela* (**CLA-161**), ¶¶ 994-995, 997, 1000-1001.
[9] Presentación sobre Costos de la Demandante, ¶ 11, en referencia a *Tidewater c. Venezuela* (**CLA-155**), ¶ 213.
[10] Presentación sobre Costos de la Demandante, ¶¶ 13-14. *Véase, también,* Primera Presentación sobre Costos de la Demandante, pág. 1.
[11] Presentación sobre Costos de la Demandante, ¶ 16, con cita de *Poštová Banka c. República Helénica* (**CLA-163**), ¶ 377.

dada la negativa de la Demandada a pagar su porción de los adelantos de costas, tal como exige la Regla 14(3)(d) del Reglamento del CIADI. Por lo tanto, alega la Demandante, la Demandada "*puso en peligro la continuidad del proceso*" y la obligó a pagar la porción de la Demandada para evitar interrumpir el proceso. La Demandante hace referencia a la decisión de *Venoklim c. Venezuela*, en que el tribunal tomó nota de una conducta similar de Venezuela y la obligó a reintegrar a la demandante su porción impaga del adelanto de costos[12]. [Traducción del Tribunal]

43.    En función de lo anterior, y conforme a la Regla 28 de las Reglas de Arbitraje CIADI, la Demandante solicita el reintegro de: (i) los adelantos de honorarios y gastos de los miembros del Tribunal y los gastos administrativos del CIADI; (ii) los costos de viaje y gastos de testigos y representantes de la Demandante; y (iii) los costos de su representación legal, peritos independientes y consultores[13]. Según la Presentación Actualizada sobre Costos de la Demandante, agregada el 28 de julio de 2017, la Demandante incurrió en los siguientes costos[14]:

| Descripción | Total actualizado al 28 de julio de 2017 (USD) |
|---|---|
| Costos del Tribunal y del CIADI | 1.425.000[15] |
| Viáticos y gastos de testigos y representantes | 85.227,27 |
| Honorarios y gastos de abogados | 5.214.398,70 |
| Honorarios y gastos de peritos valuadores | 1.652.172,11 |
| **Total de costos reclamados** | **8.376.798,08** |

[12] Presentación sobre Costos de la Demandante, ¶ 18, en referencia a *Venoklim c. Venezuela* (**CLA-165**), ¶¶ 163-165.
[13] Presentación sobre Costos de la Demandante, ¶ 19.
[14] Segunda Presentación Actualizada sobre Costos de la Demandante, pág. 2.
[15] Este monto incluye el adelanto final de costos solicitado por el CIADI mediante carta de fecha 17 de agosto de 2017, pagado por la Demandante y recibido por el CIADI el 6 de septiembre de 2017.

### 2. Petitorio de la Demandante

44. La Demandante solicita que el Tribunal[16]:

    (a) ORDENE a Venezuela reintegrar a Saint-Gobain los siguientes gastos y costos, con más sus intereses compuestos calculados anualmente a una tasa comercial desde la fecha del Laudo hasta la fecha de pago por parte de Venezuela:

        (i) USD 1.425.000,00 en concepto de adelantos de honorarios y gastos del Tribunal y gastos administrativos del CIADI en que hubiese incurrido Saint-Gobain;

        (ii) USD 85.227,27 en concepto de viáticos y gastos de otra índole razonables en que hubiesen incurrido los testigos y representantes de Saint-Gobain;

        (iii) USD 5.214.398,70 en concepto de honorarios y gastos de los abogados de Saint-Gobain de Freshfields Bruckhaus Deringer US LLP, Hughes Hubbard & Reed LLP, LEC Partners LLC y Sosa & Martínez Estudio Jurídico (que incluye USD 53.374,49, correspondientes a los honorarios y gastos del Dr. Brewer-Carías, perito jurídico de Saint-Gobain, y USD 15.512,26, correspondientes a los honorarios y gastos de FTI Consulting e Immersion Legal Graphics, LCC, consultoras en materia de tecnología de Saint-Gobain); y

        (iv) USD 1.652.172,11 en concepto de honorarios y gastos de Compass Lexecon, perito valuador de Saint-Gobain.

    (b) OTORGUE cualquier otro resarcimiento que considere apropiado.

### 3. Síntesis de la postura de la Demandada sobre los costos

45. La Demandada está de acuerdo con la Demandante en que el Artículo 61(2) del Convenio CIADI faculta al Tribunal para evaluar quién sufragará los gastos de las Partes, así como los honorarios y gastos del Tribunal, y los derechos devengados por la utilización de las instalaciones del CIADI[17].

---

[16] Presentación sobre Costos de la Demandante, ¶ 30, con cifras actualizadas de la Segunda Presentación sobre Costos de la Demandante, pág. 2.
[17] Memorial de Contestación, ¶ 271; Dúplica, ¶ 280.

46.    La Demandada señala que los tribunales del CIADI suelen hacer uso de sus facultades discrecionales al asignar los costos a la parte vencedora en el arbitraje y sostiene que ella debe ser considerada como tal en este caso. La Demandada hace referencia a la solicitud de la Demandante de reconsiderar la Decisión del Tribunal, rechazada de manera unánime, y a las cifras obtenidas por los peritos de las Partes en función de las conclusiones del Tribunal. La Demandada advierte que todas estas cifras, que van de USD 23 a 30 millones (sin incluir los intereses anteriores al laudo) son "*mucho más bajas que las sumas groseramente desmesuradas que las Demandantes exigieron a lo largo del arbitraje*" [Traducción del Tribunal], a saber, USD 99,5 millones al 15 de mayo de 2010 o USD 120,5 millones al 31 de mayo de 2014[18].

47.    La Demandada invoca, asimismo, la negativa de la Demandante a participar en los procedimientos para calcular la indemnización con arreglo a la legislación venezolana y su solicitud de medidas provisionales contra tales procedimientos que, conforme la opinión de la Demandada, "*frustraron su implementación*". Según la Demandada, no hubiera sido necesario incurrir en los gastos de este arbitraje si la Demandante hubiese "*adoptado una postura razonable*" al respecto[19]. [Traducción del Tribunal]

48.    La Demandada alega que "*a la luz de la decisión estratégica de la Demandante de no participar en los procedimientos que establece la legislación venezolana para el cálculo de la justa compensación y, en cambio, utilizar tácticas para demorar dicho cálculo, y ante el monto indemnizatorio tan excesivo que exige la Demandante en este caso*" [Traducción del Tribunal], se debería condenar a la Demandante al pago de todos los costos incurridos por las Partes, como también los costos del arbitraje[20].

49.    Según la Presentación Adicional de Costos de la Demandada, agregada el 28 de julio de 2017, la Demandada incurrió en los siguientes costos:

| Concepto | Monto (USD) |
| --- | --- |
| Honorarios de Curtis, Mallet-Prevost, Colt & Mosle, LLP hasta el 23 de noviembre de 2015 | 4.144.946,25 |
| Honorarios de los Asesores Legales venezolanos | 162.637,00 |

---

[18] Presentación Adicional de Costos de la Demandada, pág. 2.
[19] Presentación Adicional de Costos de la Demandada, pág. 2.
[20] Memorial de Contestación, ¶ 272; Dúplica, ¶ 281.

| Concepto | Monto (USD) |
|---|---|
| Perito económico: Vladimir Brailovsky | 340.565,63 |
| Perito económico: Econ One (Daniel Flores) hasta el 23 de noviembre de 2015 | 1.415.833,74 |
| Gastos de transporte y viáticos | 199.955,50 |
| Exhibición de documentos/Duplicado y Procesamiento de texto | 126.876,84 |
| Servicio de mensajería | 9.390,96 |
| Honorarios y gastos de Curtis, Mallet-Prevost, Colt & Mosle, LLP después del 23 de noviembre de 2015 | 127.468,75 |
| Honorarios y gastos del perito económico de la Demandada, Econ One (Daniel Flores) después del 23 de noviembre de 2015 | 61.370,11 |
| **Total de costos reclamados** | **6.589.044,78** |

### 4. Petitorio de la Demandada

50.  La Demandada solicita que el Tribunal condene en costas a la Demandante y que, de ser así, implemente esa decisión mediante la deducción de todos los costos de la Demandada indicados en la Presentación Actualizada sobre Costos de fecha 23 de noviembre de 2015 y en la Presentación Adicional de Costos del monto definitivo de la indemnización según sea calculada por el Tribunal [21].

## F.  RAZONAMIENTO DEL TRIBUNAL

### I.  EL ACUERDO DE LAS PARTES SOBRE CUANTÍA DE DAÑOS

51.  Tal como se señalara más arriba, las Partes llegaron a un acuerdo sobre el monto definitivo de la indemnización que la Demandada deberá abonar a la Demandante por la expropiación de Norpro Venezuela, en línea con las conclusiones contenidas en la Decisión del Tribunal.

---

[21] Presentación Adicional de Costos de la Demandada, pág. 2.

Este consentimiento se expresa en la carta de la Demandada de fecha 30 de marzo de 2017 y en la carta de la Demandante de fecha 12 de julio de 2017.

52. En función de este acuerdo logrado entre las Partes, el Tribunal resuelve que el monto final de la indemnización que la Demandada deberá pagar a la Demandante por la expropiación de su inversión, calculado sobre la base de las conclusiones del Tribunal resumidas en los párrafos 849 a 851 de su Decisión, asciende a USD 34,4 millones. Este monto incluye intereses anteriores al laudo desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017 por la suma de USD 4,8 millones.

53. La Demandada abonará, asimismo, a la Demandante intereses anteriores al laudo, calculados a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual, desde el 1 de abril de 2017 hasta la fecha de este Laudo.

54. Por último, la Demandada deberá pagar a la Demandante los intereses posteriores al laudo que especificó el Tribunal en su Decisión. Dichos intereses comenzarán a computarse a partir del trigésimo día siguiente a la fecha de este Laudo.

## II. DECISIÓN SOBRE COSTOS

55. Las Partes coinciden en que la facultad del Tribunal para decidir sobre la distribución de costos se basa en el Artículo 61(2) del Convenio CIADI, que establece:

> "*En el caso de procedimiento de arbitraje, el Tribunal determinará, salvo acuerdo contrario de las partes, los gastos en que estas hubieren incurrido en el procedimiento, y decidirá la forma de pago y la manera de distribución de tales gastos, de los honorarios y gastos de los miembros del Tribunal y de los derechos devengados por la utilización del Centro. Tal fijación y distribución formarán parte del laudo*".

56. Asimismo, están de acuerdo en que la discreción del Tribunal para "*determinar los gastos en que* [las partes] *hubieren incurrido*" abarca todos los gastos de las Partes en relación con el arbitraje, es decir, incluso los honorarios de sus representantes legales y peritos valuadores.

57. Por lo tanto, el Tribunal ejercerá la discreción que le confiere el Artículo 61(2) del Convenio CIADI y decidirá sobre la distribución de: (i) los costos del arbitraje, que incluyen los gastos administrativos que cobra el CIADI, como también los honorarios y gastos de los miembros del Tribunal; y (ii) los honorarios y gastos en que hubiesen incurrido las Partes en relación con este arbitraje.

### 1. Los costos del arbitraje

58.    En primer lugar, el Tribunal se ocupará de la cuestión que consiste en determinar quién soportará los costos del arbitraje. En cuanto a los adelantos pagados en tal sentido, el Tribunal advierte que, de acuerdo con la Regla 14(3)(d) del Reglamento Administrativo y Financiero del CIADI, el CIADI solicitó a las Partes que pagaran cada uno de los respectivos adelantos de costos en partes iguales. Sin embargo, durante este procedimiento, la Demandada no pagó su parte correspondiente del 50% de los adelantos que solicitó el CIADI. Previa solicitud, la Demandante pagó tanto su propia parte de los adelantos de costos como también la parte de la Demandada, cuyo total asciende a USD 1.425.000.

59.    El Tribunal está de acuerdo con la Demandante que la negativa de la Demandada a pagar su parte de los adelantos de costos constituye una violación del marco procesal del CIADI, que el Tribunal contemplará al momento de expedirse sobre la distribución de los costos del arbitraje.

60.    El Tribunal recuerda, asimismo, su conclusión en la Decisión de que la Demandada violó el Artículo 5(1), incisos 2 y 3, del Tratado al no especificar el monto de indemnización ni pagar indemnización pronta por la expropiación de la inversión de la Demandante[22]. Al mismo tiempo, el Tribunal advierte que no se prununció acerca de si la Demandada incumplió sus propias leyes nacionales con respecto al proceso de expropiación y si tal incumplimiento constituyó una violación del debido proceso, tal como alega la Demandante en este arbitraje[23].

61.    En cualquier caso, sin perjuicio de si la conducta de la Demandada se ajustó o no a sus propias leyes en materia de expropiación, el Tribunal advierte que, a su entender, la Demandada, hasta la fecha, es decir, luego de transcurridos  más de siete años de la fecha de expropiación, no pagó ninguna indemnización a la Demandante ni depositó ninguna suma por concepto de indemnización preliminar ante algún tribunal competente de Venezuela—pese al hecho de que siempre reconoció que una expropiación requiere el pago de justa indemnización. En este contexto, el Tribunal no puede seguir el argumento de la Demandada de que la solicitud de medidas provisionales de la Demandante frustró la implementación de los procedimientos venezolanos para calcular la indemnización[24], puesto que el Tribunal decidió, en su Resolución Procesal No. 3, denegar la solicitud de la Demandante en su

---

[22] Decisión, ¶ 480 y Resolución No. 1.
[23] Decisión, ¶ 504.
[24] *Véase* Presentación Adicional de Costos de la Demandada, pág. 2.

totalidad y, de esa manera, se abstuvo de ordenar que la Demandada discontinuara todo proceso local relacionado con la expropiación de Norpro Venezuela.

62.   En este contexto y teniendo en cuenta la inobservancia por parte de la Demandada de los requisitos del Artículo 5(1), incisos 2 y 3, del Tratado, el Tribunal coincide con la Demandante en que esta se vio obligada por la conducta de la Demandada a iniciar este arbitraje con el fin de obtener indemnización adecuada por la expropiación de su inversión en Venezuela[25]. En consecuencia, el Tribunal considera apropiado que la Demandada soporte los costos del arbitraje, los cuales ascienden a (USD):[26] .

|  |  |
|---|---|
| Honorarios y Gastos de los Árbitros | |
| Prof. Dr. Klaus Sachs | 508,122.79 |
| El Honorable Charles N. Brower | 256,489.47 |
| Sr. Gabriel Bottini | 229,089.47 |
| Gastros Administrativas del CIADI | 160,000 |
| Gastos Directos[27] | 149,488.26 |
| **Total** | **1,303,189.99** |

63.   Por tanto, el Tribunal ordena a la Demandada pagar a la Demandante la suma de USD 1.303.189,99 equivalentes a la parte que ha sido gastada de los anticipos al CIADI.[28]

**2.   Los costos en que hubiesen incurrido las Partes en relación con este arbitraje**

64.   En segundo lugar, el Tribunal analizará la cuestión que consiste en determinar quién sufragará los honorarios y gastos en que incurrieron las Partes en relación con este arbitraje. Ante todo, el Tribunal advierte que ninguna de las Partes planteó una objeción respecto de la razonabilidad de los costos en que incurrió la otra Parte y que, de hecho, los costos totales en que incurrió cada una de ellas se encuentran dentro de un rango similar de aproximadamente USD 6,5-7 millones.

---

[25] *Véase* Presentación sobre Costos de la Demandante, ¶¶ 13-14.
[26] El Secretariado del CIADI proporcionará a las Partes un Estado Financiero detallado de las cuentas del caso.
[27] Este monto incluye cargos relacionados con el envío del Laudo (servicio de mensajería internacional o *courier*, impresión y copias).
[28] El saldo restante de los anticipos será devuelto a la Demandante.

65.   Por los motivos que anteceden, en particular, dado que la Demandante tuvo que iniciar el presente arbitraje para obtener indemnización, el Tribunal considera apropiado que la Demandada soporte cierta parte de los costos en que incurrió la Demandante en relación con este proceso. Para calcular la parte específica que debería soportar la Demandada, el Tribunal tuvo en cuenta, en especial, las siguientes consideraciones.

66.   En primer lugar, el Tribunal recuerda que, si bien resolvió que se había violado el Artículo 5(1), incisos 2 y 3, del Tratado y dejó abierta la cuestión de si hubo violación del debido proceso en el procedimiento de expropiación, rechazó las Reclamaciones sobre la Bauxita de la Demandante, es decir, sus reclamaciones de que la Demandada violó el Artículo 3(1) y 3(2) del Tratado al aumentar el precio de la bauxita inicialmente pactado en el Contrato de Bauxita, celebrado entre la Demandante y CVG Bauxilum[29].

67.   En segundo lugar, en cuando a la cuantía de los daños, el Tribunal recuerda que, si bien la Demandante solicitó en su presentación final una indemnización de USD 99,5 millones más intereses anteriores al laudo al 15 de mayo de 2010[30], la Demandada solicitó que se establezca una indemnización de USD 9,5 millones, sin incluir intereses anteriores al laudo[31]. La Demandada arguye que, en vista del monto acordado por las Partes sobre la base de las conclusiones del Tribunal en su Decisión, es decir, USD 29,6 millones, sin incluir los intereses anteriores al laudo, se la debe considerar parte vencedera en este arbitraje[32]. El Tribunal no está de acuerdo con esa caracterización. Además de la decisión del Tribunal sobre responsabilidad de que la Demandada incumplió sus obligaciones según el Tratado, el Tribunal advierte que, como resultado de sus conclusiones sobre los principios de cuantía de daños, la Demandante tiene derecho a aproximadamente el 30% de lo que solicitó o más del 300% de la indemnización que la Demandada consideró justa en el contexto de este arbitraje.

68.   Tal como señalara la Demandada[33], la Demandante inició otros tres procesos incidentales, a saber: (i) una solicitud de recusación del árbitro Bottini; (ii) una solicitud de medidas provisionales para discontinuar todos los procesos nacionales en Venezuela en relación con la expropiación de Norpro Venezuela; y (iii) una solicitud de reconsideración y rectificación de la Decisión del Tribunal. El Tribunal no considera necesario en esta etapa expresar su opinión acerca de si cada una de estas tres solicitudes era "*sustancial y requería la consideración y determinación adecuada del Tribunal*", como ocurrió en el caso *Tidewater*

---

[29] Decisión, ¶¶ 542 y 560.
[30] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116.
[31] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 64.
[32] Presentación Adicional de Costos de la Demandada, pág. 2.
[33] Presentación Adicional de Costos de la Demandada, pág. 2.

*c. Venezuela* que invoca la Demandante en tal sentido[34]. En opinión del Tribunal, a los efectos del presente Laudo, basta con señalar que ninguna de las tres solicitudes prosperó.

69.   Teniendo en cuenta todas las consideraciones vertidas previamente, el Tribunal no encuentra motivo alguno para resolver que la Demandada soporte todos los costos en que incurrió la Demandante en relación con este arbitraje. El Tribunal considera que lo correcto es que la Demandada soporte dos tercios de los costos de la Demandante. En consecuencia, la Demandada deberá reembolsar a la Demandante la suma de USD 4.634.532,05.

### 3.   Intereses sobre costos

70.   Por último, la Demandante solicita que se ordene a la Demandada reintegrarle sus gastos, con más los intereses compuestos correspondientes, calculados anualmente, a una tasa comercial desde la fecha del Laudo hasta la fecha de pago por parte de Venezuela.

71.   El Tribunal considera apropiado otorgar intereses sobre el monto de los costos que la Demandante deberá reembolsar, a la misma tasa de intereses posteriores al laudo que la que se aplica sobre el capital de la indemnización, es decir, 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual. Dichos intereses comenzarán a devengarse a partir del trigésimo día siguiente a la fecha de este Laudo.

## G.   DECISIÓN DEL TRIBUNAL

72.   Por las razones expuestas, el Tribunal[35] resuelve lo siguiente:

### LAUDO

**1.   La Demandada deberá pagar a la Demandante dentro de los 30 días siguientes a la fecha de este Laudo: (i) USD 29.6 millones por concepto de capital en forma de indemnización por la expropiación de la inversión de la Demandante en Venezuela; y (ii) USD 4.8 millones por concepto de intereses anteriores al laudo,**

---

[34] Presentación sobre Costos de la Demandante, ¶ 17, con cita de *Tidewater c. Venezuela* (**CLA-155**), ¶ 212.

[35] El árbitro Bottini considera que, siempre que un tribunal CIADI ejerza su discreción conforme al Artículo 61(2) del Convenio CIADI y dicte una resolución sobre costos ajustada (es decir, una resolución por la que ordene a una parte pagar los costos de la otra o los costos del tribunal, en todo o en parte), dos factores importantes a ser considerados son: en qué medida se hizo lugar al reclamo de indemnización de la demandante y qué parte resultó vencedora en los procesos incidentales resueltos en el arbitraje. El árbitro Bottini considera que la decisión del Tribunal sobre costos no refleja ninguno de estos dos factores.

desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017.

2.   La Demandada deberá pagar, asimismo, dentro los 30 días siguientes a la fecha de este Laudo, intereses anteriores al laudo sobre el monto de capital de la indeminzación según el párrafo 1 precedente; a saber, USD 29.6 millones, desde el 1 de abril de 2017 hasta la fecha de este Laudo, a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

3.   Sujeto a la limitación de que sólo se pagarán intereses posteriores al laudo sobre el capital de la indemnización, y no sobre los intereses anteriores al laudo otorgados, la Demandada deberá pagar a la Demandante intereses posteriores al laudo sobre el monto de capital de la indemnización especificado en número 1 precedente, a saber, USD 29.6 millones, desde la fecha del Laudo hasta la fecha de pago, a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

4.   La compensación y los intereses se fijan en montos netos de los impuestos venezolanos aplicables, y la Demandada no podrá deducir impuestos en relación con el pago de la compensación y los intereses.

5.   La Demandada soportará los costos del arbitraje, es decir, los honorarios y gastos de los miembros del Tribunal como también los derechos devengados por la utilización de las instalaciones del CIADI, en su totalidad. Por lo tanto, la Demandada deberá reintegrar a la Demandante la suma de USD 1.303.189,99 en un plazo de 30 días desde la fecha de este Laudo.

6.   La Demandada se hará cargo, asimismo, de dos tercios de los costos en que haya incurrido la Demandante en relación con el arbitraje y, por lo tanto, reintegrará a la Demandante la suma de USD 4.634.532,05 en un plazo de 30 días desde la fecha de este Laudo.

7.   La Demandada deberá pagar a la Demandante intereses posteriores al Laudo sobre el monto de costos objeto de reembolso, especificado en los números 5 y 6 precedentes, desde el trigésimo día siguiente a la fecha de este Laudo hasta la fecha de pago, a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

8.   Se desestiman todas las demás pretensiones y petitorios.

_____          _____

El Honorable Charles N. Brower                    Sr. Gabriel Bottini
          Árbitro                                          Árbitro
Fecha: 28 de Septiembre de           Fecha: 9 de octubre de 2017
                          2017

_____

Profesor Dr. Klaus Sachs
Presidente
Fecha: 25 de Octubre de 2017

# Anexo 2

**Convenio**

# CONVENIO SOBRE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES ENTRE ESTADOS Y NACIONALES DE OTROS ESTADOS

# CONVENIO SOBRE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES ENTRE ESTADOS Y NACIONALES DE OTROS ESTADOS

## Indice de Materias

**Convenio**

| Capítulo | Sección | | Artículo | Página |
|----------|---------|---|----------|--------|
| | | **Preámbulo** | | **11** |
| **I** | | **Centro Internacional de Arreglo de Diferencias Relativas a Inversiones** | **1-24** | **12** |
| | 1 | Creación y Organización | 1-3 | 12 |
| | 2 | El Consejo Administrativo | 4-8 | 12 |
| | 3 | El Secretariado | 9-11 | 14 |
| | 4 | Las Listas | 12-16 | 15 |
| | 5 | Financiación del Centro | 17 | 16 |
| | 6 | Status, inmunidades y privilegios | 18-24 | 16 |
| **II** | | **Jurisdicción del Centro** | **25-27** | **18** |
| **III** | | **La Conciliación** | **28-35** | **19** |
| | 1 | Solicitud de conciliación | 28 | 19 |
| | 2 | Constitución de la Comisión de conciliación | 29-31 | 20 |
| | 3 | Procedimiento de conciliación | 32-35 | 21 |
| **IV** | | **El Arbitraje** | **36-55** | **22** |
| | 1 | Solicitud de arbitraje | 36 | 22 |
| | 2 | Constitución del Tribunal | 37-40 | 22 |
| | 3 | Facultades y funciones del Tribunal | 41-47 | 23 |
| | 4 | El laudo | 48-49 | 23 |
| | 5 | Aclaración, revisión y anulación del laudo | 50-52 | 26 |
| | 6 | Reconocimiento y ejecución del laudo | 53-55 | 28 |
| **V** | | **Sustitución y recusación de Conciliadores y Arbitros** | **56-58** | **29** |
| **VI** | | **Costas del procedimiento** | **59-61** | **30** |
| **VII** | | **Lugar del procedimiento** | **62-63** | **30** |

| VIII | Diferencias entre Estados Contratantes | 64 | 31 |
|------|------|------|------|
| IX | Enmiendas | 65-66 | 31 |
| X | Disposiciones finales | 67-75 | 32 |
| | Cláusula relativa a la firma | | 33 |

**Convenio**

# CONVENIO SOBRE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES ENTRE ESTADOS Y NACIONALES DE OTROS ESTADOS

## Preámbulo

**Los Estados Contratantes**

**Considerando** la necesidad de la cooperación internacional para el desarrollo económico y la función que en ese campo desempeñan las inversiones internacionales de carácter privado;

**Teniendo en cuenta** la posibilidad de que a veces surjan diferencias entre Estados Contratantes y nacionales de otros Estados Contratantes en relación con tales inversiones;

**Reconociendo** que aun cuando tales diferencias se someten corrientemente a sistemas procesales nacionales, en ciertos casos el empleo de métodos internacionales de arreglo puede ser apropiado para su solución;

**Atribuyendo particular importancia** a la disponibilidad de medios de conciliación o arbitraje internacionales a los que puedan los Estados Contratantes y los nacionales de otros Estados Contratantes, si lo desean, someter dichas diferencias;

**Deseando** crear tales medios bajo los auspicios del Banco Internacional de Reconstrucción y Fomento;

**Reconociendo** que el consentimiento mutuo de las partes en someter dichas diferencias a conciliación o a arbitraje a través de dichos medios constituye un acuerdo obligatorio, lo que exige particularmente que se preste la debida consideración a las recomendaciones de los conciliadores y que se cumplan los laudos arbitrales; y

**Declarando** que la mera ratificación, aceptación o aprobación de este Convenio por parte del Estado Contratante, no se reputará que constituye una obligación de someter ninguna diferencia determinada a conciliación o arbitraje, a no ser que medie el consentimiento de dicho Estado;

**Han acordado** lo siguiente:

Convenio

11

# Capítulo I
# Centro Internacional de Arreglo de
# Diferencias Relativas a Inversiones

## Sección 1
## Creación y organización

### Artículo 1

(1) Por el presente Convenio se crea el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (en lo sucesivo llamado Centro).

(2) El Centro tendrá por objeto facilitar la sumisión de las diferencias relativas a inversiones entre Estados Contratantes y nacionales de otros Estados Contratantes a un procedimiento de conciliación y arbitraje de acuerdo con las disposiciones de este Convenio.

### Artículo 2

La sede del Centro será la oficina principal del Banco Internacional de Reconstrucción y Fomento (en lo sucesivo llamado el Banco). La sede podrá trasladarse a otro lugar por decisión del Consejo Administrativo adoptada por una mayoría de dos terceras partes de sus miembros.

### Artículo 3

El Centro estará compuesto por un Consejo Administrativo y un Secretariado, y mantendrá una Lista de Conciliadores y una Lista de Árbitros.

## Sección 2
## El Consejo Administrativo

### Artículo 4

(1) El Consejo Administrativo estará compuesto por un representante de cada uno de los Estados Contratantes. Un suplente podrá actuar con carácter de representante en caso de ausencia del titular de una reunión o de incapacidad del mismo.

(2) Salvo en caso de designación distinta, el gobernador y el gobernador suplente del Banco nombrados por un Estado Contratante serán *ex officio* el representante y el suplente de ese Estado, respectivamente.

### Artículo 5

El Presidente del Banco será *ex officio* Presidente del Consejo Administrativo (en lo sucesivo llamado el Presidente) pero sin derecho a voto. En caso de ausencia o incapacidad para actuar y en caso de vacancia del cargo de Presidente del Banco, la persona que lo sustituya en el Banco actuará como Presidente del Consejo Administrativo.

### Artículo 6

(1) Sin perjuicio de las demás facultades y funciones que le confieren otras disposiciones de este Convenio, el Consejo Administrativo tendrá las siguientes:

> (a) adoptar los reglamentos administrativos y financieros del Centro;
>
> (b) adoptar las reglas de procedimiento a seguir para iniciar la conciliación y el arbitraje;
>
> (c) adoptar las reglas procesales aplicables a la conciliación y al arbitraje (en lo sucesivo llamadas Reglas de Conciliación y Reglas de Arbitraje);
>
> (d) aprobar los arreglos con el Banco sobre la utilización de sus servicios administrativos e instalaciones;
>
> (e) fijar las condiciones del desempeño de las funciones del Secretario General y de los Secretarios Generales Adjuntos;
>
> (f) adoptar el presupuesto anual de ingresos y gastos del Centro;
>
> (g) aprobar el informe anual de actividades del Centro.

Para la aprobación de lo dispuesto en los incisos (a), (b), (c) y (f) se requerirá una mayoría de dos tercios de los miembros del Consejo Administrativo.

(2) El Consejo Administrativo podrá nombrar las Comisiones que considere necesarias.

(3) Además, el Consejo Administrativo ejercerá todas las facultades y realizará todas las funciones que a su juicio sean necesarias para llevar a efecto las disposiciones del presente Convenio.

### Artículo 7

(1) El Consejo Administrativo celebrará una reunión anual, y las demás que sean acordadas por el Consejo, o convocadas por el Presidente, o por el Secretario General cuando lo soliciten a este último no menos de cinco miembros del Consejo.

**Convenio**

13

(2) Cada miembro del Consejo Administrativo tendrá un voto, y, salvo disposición expresa en contrario de este Convenio, todos los asuntos que se presenten ante el Consejo se decidirán por mayoría de votos emitidos.

(3) Habrá quórum en las reuniones del Consejo Administrativo cuando esté presente la mayoría de sus miembros.

(4) El Consejo Administrativo podrá establecer, por mayoría de dos tercios de sus miembros, un procedimiento mediante el cual el Presidente pueda pedir votación del Consejo sin convocar a una reunión del mismo. Sólo se considerará válida esta votación si la mayoría de los miembros del Consejo emiten el voto dentro del plazo fijado en dicho procedimiento.

### Artículo 8

Los miembros del Consejo Administrativo y el Presidente desempeñarán sus funciones sin remuneración por parte del Centro.

## Sección 3
## El Secretariado

### Artículo 9

El Secretariado estará constituido por un Secretario General, por uno o más Secretarios Generales Adjuntos y por el personal del Centro.

### Artículo 10

(1) El Secretario General y los Secretarios Generales Adjuntos serán elegidos, a propuesta del Presidente, por el Consejo Administrativo por mayoría de dos tercios de sus miembros por un período de servicio no mayor de seis años, pudiendo ser reelegidos. Previa consulta a los miembros del Consejo Administrativo, el Presidente presentará uno o más candidatos para cada uno de esos cargos.

(2) Los cargos de Secretario General y de Secretario General Adjunto serán incompatibles con el ejercicio de toda función política. Ni el Secretario General ni ningún Secretario General Adjunto podrán desempeñar cargo alguno o dedicarse a otra actividad, sin la aprobación del Consejo Administrativo.

(3) Durante la ausencia o incapacidad del Secretario General y durante la vacancia del cargo, el Secretario General Adjunto actuará como Secretario General. Si hubiere más de un Secretario General Adjunto, el Consejo Administrativo determinará anticipadamente el orden en que deberán actuar como Secretario General.

14

**Artículo 11**

El Secretario General será el representante legal y el funcionario principal del Centro y será responsable de su administración, incluyendo el nombramiento del personal, de acuerdo con las disposiciones de este Convenio y los reglamentos dictados por el Consejo Administrativo, desempeñará la función de registrador, y tendrá facultades para autenticar los laudos arbitrales dictados conforme a este convenio y para conferir copias certificadas de los mismos.

## Sección 4
## Las Listas

**Artículo 12**

La Lista de Conciliadores y la Lista de Arbitros estarán integradas por los nombres de las personas calificadas, designadas tal como se dispone más adelante, y que estén dispuestas a desempeñar sus cargos.

**Artículo 13**

(1) Cada Estado Contratante podrá designar cuatro personas para cada Lista quienes podrán ser, o no, nacionales de ese Estado.

(2) El Presidente podrá designar diez personas para cada Lista, cuidando que las personas así designadas sean de diferente nacionalidad.

**Artículo 14**

(1) Las personas designadas para figurar en las Listas deberán gozar de amplia consideración moral, tener reconocida competencia en el campo del Derecho, del comercio, de la industria o de las finanzas e inspirar plena confianza en su imparcialidad de juicio. La competencia en el campo del Derecho será circunstancia particularmente relevante para las personas designadas en la Lista de Arbitros.

(2) Al hacer la designación de las personas que han de figurar en las Listas, el Presidente deberá además tener presente la importancia de que en dichas Listas estén representados los principales sistemas jurídicos del mundo y los ramos más importantes de la actividad económica.

**Artículo 15**

(1) La designación de los integrantes de las Listas se hará por períodos de seis años, renovables.

(2) En caso de muerte o renuncia de un miembro de cualquiera de las Listas, la autoridad que lo hubiere designado tendrá derecho a nom-

Convenio

brar otra persona que le reemplace en sus funciones por el resto del período para el que aquél fue nombrado.

(3) Los componentes de las Listas continuarán en las mismas hasta que sus sucesores hayan sido designados.

### Artículo 16

(1) Una misma persona podrá figurar en ambas Listas.

(2) Cuando alguna persona hubiere sido designada para integrar una Lista por más de un Estado Contratante o por uno o más Estados Contratantes y el Presidente, se entenderá que lo fue por la autoridad que lo designó primero; pero si una de esas autoridades es el Estado de que es nacional, se entenderá designada por dicho Estado.

(3) Todas las designaciones se notificarán al Secretario General y entrarán en vigor en la fecha en que la notificación fue recibida.

## Sección 5
## Financiación del Centro

### Artículo 17

Si los gastos del Centro no pudieren ser cubiertos con los derechos percibidos por la utilización de sus servicios, o con otros ingresos, la diferencia será sufragada por los Estados Contratantes miembros del Banco en proporción a sus respectivas subscripciones de capital del Banco, y por los Estados Contratantes no miembros del Banco de acuerdo con las reglas que el Consejo Administrativo adopte.

## Sección 6
## Status, inmunidades y privilegios

### Artículo 18

El Centro tendrá plena personalidad jurídica internacional. La capacidad legal del Centro comprende, entre otras, la de:

     (a) contratar,

     (b) adquirir bienes muebles e inmuebles y disponer de ellos,

     (c) comparecer en juicio.

### Artículo 19

Para que el Centro pueda dar cumplimiento a sus fines, gozará, en los territorios de cada Estado Contratante, de las inmunidades y privilegios que se señalan en esta Sección.

**Convenio**

**Artículo 20**

El Centro, sus bienes y derechos, gozarán de inmunidad frente a toda acción judicial, salvo que renuncie a ella.

**Artículo 21**

El Presidente, los miembros del Consejo Administrativo, las personas que actúen como conciliadores o árbitros o como miembros de una Comisión designados de conformidad con lo dispuesto en el apartado (3) del Artículo 52, y los funcionarios y empleados del Secretariado:

> (a) gozarán de inmunidad frente a toda acción judicial respecto de los actos realizados por ellos en el ejercicio de sus funciones, salvo que el Centro renuncie a dicha inmunidad;
>
> (b) cuando no sean nacionales del Estado donde ejerzan sus funciones, gozarán de las mismas inmunidades en materia de inmigración, de registro de extranjeros y de obligaciones, derivadas del servicio militar u otras prestaciones análogas, y asimismo gozarán de idénticas facilidades respecto a régimen de cambios e igual tratamiento respecto a facilidades de desplazamiento, que los Estados Contratantes concedan a los representantes, funcionarios y empleados de rango similar de otros Estados Contratantes.

**Artículo 22**

Las disposiciones del Artículo 21 se aplicarán a las personas que comparezcan en los procedimientos promovidos conforme a este Convenio como partes, apoderados, consejeros, abogados, testigos o peritos, con excepción de las contenidas en el párrafo (b) del mismo, que se aplicarán solamente en relación con su desplazamiento hacia y desde el lugar donde los procedimientos se tramiten y con su permanencia en dicho lugar.

**Artículo 23**

(1) Los archivos del Centro, dondequiera que se encuentren, serán inviolables.

(2) Respecto de sus comunicaciones oficiales, el Centro recibirá de cada Estado Contratante un trato no menos favorable que el acordado a otras organizaciones internacionales.

**Artículo 24**

(1) El Centro, su patrimonio, sus bienes y sus ingresos y las operaciones y transacciones autorizadas por este Convenio estarán exentos de toda clase de impuestos y de derechos arancelarios. El Centro quedará

también exento de toda responsabilidad respecto a la recaudación o pago de tales impuestos o derechos.

(2) No estarán sujetas a impuestos las cantidades pagadas por el Centro al Presidente o a los miembros del Consejo Administrativo por razón de dietas, ni tampoco los sueldos, dietas y demás emolumentos pagados por el Centro a los funcionarios o empleados del Secretariado, salvo la facultad del Estado de gravar a sus propios nacionales.

(3) No estarán sujetas a impuestos las cantidades recibidas a título de honorarios o dietas por las personas que actúen como conciliadores o árbitros o como miembros de una Comisión designados de conformidad con lo dispuesto en el apartado (3) del Artículo 52, en los procedimientos promovidos conforme a este Convenio, por razón de servicios prestados en dichos procedimientos, si la única base jurisdiccional de imposición es la ubicación del Centro, el lugar donde se desarrollen los procedimientos o el lugar de pago de los honorarios o dietas.

# Capítulo II
## Jurisdicción del Centro

**Artículo 25**

(1) La jurisdicción del Centro se extenderá a las diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado Contratante (o cualquiera subdivisión política u organismo público de un Estado Contratante acreditados ante el Centro por dicho Estado) y el nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro. El consentimiento dado por las partes no podrá ser unilateralmente retirado.

(2) Se entenderá como "nacional de otro Estado Contratante":

(a) toda persona natural que tenga, en la fecha en que las partes consintieron someter la diferencia a conciliación o arbitraje y en la fecha en que fue registrada la solicitud prevista en el apartado (3) del Artículo 28 o en el apartado (3) del Artículo 36, la nacionalidad de un Estado Contratante distinto del Estado parte en la diferencia; pero en ningún caso comprenderá las personas que, en cualquiera de ambas fechas, también tenían la nacionalidad del Estado parte en la diferencia; y

(b) toda persona jurídica que, en la fecha en que las partes prestaron su consentimiento a la jurisdicción del Centro para la diferencia en cuestión, tenga la nacionalidad de un Estado Contratante distinto del Estado parte en la diferencia, y las personas jurídicas que, teniendo en la referida fecha la nacionalidad del Estado parte en la diferencia, las partes

hubieren acordado atribuirle tal carácter, a los efectos de este Convenio, por estar sometidas a control extranjero.

(3) El consentimiento de una subdivisión política u organismo público de un Estado Contratante requerirá la aprobación de dicho Estado, salvo que éste notifique al Centro que tal aprobación no es necesaria.

(4) Los Estados Contratantes podrán, al ratificar, aceptar o aprobar este Convenio o en cualquier momento ulterior, notificar al Centro la clase o clases de diferencias que aceptarían someter, o no, a su jurisdicción. El Secretario General transmitirá inmediatamente dicha notificación a todos los Estados Contratantes. Esta notificación no se entenderá que constituye el consentimiento a que se refiere el apartado (1) anterior.

### Artículo 26

Salvo estipulación en contrario, el consentimiento de las partes al procedimiento de arbitraje conforme a este Convenio se considerará como consentimiento a dicho arbitraje con exclusión de cualquier otro recurso. Un Estado Contratante podrá exigir el agotamiento previo de sus vías administrativas o judiciales, como condición a su consentimiento al arbitraje conforme a este Convenio.

### Artículo 27

(1) Ningún Estado Contratante concederá protección diplomática ni promoverá reclamación internacional respecto de cualquier diferencia que uno de sus nacionales y otro Estado Contratante hayan consentido en someter o hayan sometido a arbitraje conforme a este Convenio, salvo que este último Estado Contratante no haya acatado el laudo dictado en tal diferencia o haya dejado de cumplirlo.

(2) A los efectos de este Artículo, no se considerará como protección diplomática las gestiones diplomáticas informales que tengan como único fin facilitar la resolución de la diferencia.

# Capítulo III
# La Conciliación

## Sección 1
## Solicitud de conciliación

### Artículo 28

(1) Cualquier Estado Contratante o nacional de un Estado Contratante que quiera incoar un procedimiento de conciliación, dirigirá, a tal

*Convenio*

19

efecto, una solicitud escrita al Secretario General quien enviará copia de la misma a la otra parte.

(2) La solicitud deberá contener los datos referentes al asunto objeto de la diferencia, a la identidad de las partes y al consentimiento de éstas a la conciliación, de conformidad con las reglas de procedimiento a seguir para iniciar la conciliación y el arbitraje.

(3) El Secretario General registrará la solicitud salvo que, de la información contenida en dicha solicitud, encuentre que la diferencia se halla manifiestamente fuera de la jurisdicción del Centro. Notificará inmediatamente a las partes el acto de registro de la solicitud, o su denegación.

### Sección 2
### Constitución de la
### Comisión de Conciliación

#### Artículo 29

(1) Una vez registrada la solicitud de acuerdo con el Artículo 28, se procederá lo antes posible a la constitución de la Comisión de Conciliación (en lo sucesivo llamada la Comisión).

- (2) (a) La Comisión se compondrá de un conciliador único o de un número impar de conciliadores, nombrados según lo acuerden las partes.
  - (b) Si las partes no se pusieren de acuerdo sobre el número de conciliadores y el modo de nombrarlos, la Comisión se constituirá con tres conciliadores designados, uno por cada parte y el tercero, que presidirá la Comisión, de común acuerdo.

#### Artículo 30

Si la Comisión no llegare a constituirse dentro de los 90 días siguientes a la fecha del envío de la notificación del acto de registro, hecho por el Secretario General conforme al apartado (3) del Artículo 28, o dentro de cualquier otro plazo que las partes acuerden, el Presidente, a petición de cualquiera de éstas y, en lo posible, previa consulta a ambas partes, deberá nombrar el conciliador o los conciliadores que aún no hubieren sido designados.

#### Artículo 31

(1) Los conciliadores nombrados podrán no pertenecer a la Lista de Conciliadores, salvo en el caso de que los nombre el Presidente conforme al Artículo 30.

(2) Todo conciliador que no sea nombrado de la Lista de Conciliadores deberá reunir las cualidades expresadas en el apartado (1) del Artículo 14.

## Sección 3
## Procedimiento de conciliación

### Artículo 32

(1) La Comisión resolverá sobre su propia competencia.

(2) Toda alegación de una parte que la diferencia cae fuera de los límites de la jurisdicción del Centro, o que por otras razones la Comisión no es competente para oírla, se considerará por la Comisión, la que determinará si ha de resolverla como cuestión previa o conjuntamente con el fondo de la cuestión.

### Artículo 33

Todo procedimiento de conciliación deberá tramitarse según las disposiciones de esta Sección y, salvo acuerdo en contrario de las partes, de conformidad con las Reglas de Conciliación vigentes en la fecha en que las partes prestaron su consentimiento a la conciliación. Toda cuestión de procedimiento no prevista en esta Sección, en las Reglas de Conciliación o en las demás Reglas acordadas por las partes, será resuelta por la Comisión.

### Artículo 34

(1) La Comisión deberá dilucidar los puntos controvertidos por las partes y esforzarse por lograr la avenencia entre ellas, en condiciones aceptables para ambas. A este fin, la Comisión podrá, en cualquier estado del procedimiento y tantas veces como sea oportuno, proponer a las partes fórmulas de avenencia. Las partes colaborarán de buena fe con la Comisión al objeto de posibilitarle el cumplimiento de sus fines y prestarán a sus recomendaciones la máxima consideración.

(2) Si las partes llegaren a un acuerdo, la Comisión levantará un acta haciéndolo constar y anotando los puntos controvertidos. Si en cualquier estado del procedimiento la Comisión estima que no hay probabilidades de lograr un acuerdo entre las partes, declarará concluso el procedimiento y redactará un acta, haciendo constar que la controversia fue sometida a conciliación sin lograrse la avenencia. Si una parte no compareciere o no participare en el procedimiento, la Comisión lo hará constar así en el acta, declarando igualmente concluso el procedimiento.

### Artículo 35

Salvo que las partes acuerden otra cosa, ninguna de ellas podrá invocar, en cualquier otro procedimiento, ya sea arbitral o judicial o ante cualquier otra autoridad, las consideraciones, declaraciones, admisión de hechos u ofertas de avenencia, hechas por la otra parte dentro del procedimiento de conciliación, o el informe o las recomendaciones propuestas por la Comisión.

# Capítulo IV
# El Arbitraje

## Sección 1
## Solicitud de arbitraje

### Artículo 36

(1) Cualquier Estado Contratante o nacional de un Estado Contratante que quiera incoar un procedimiento de arbitraje, dirigirá, a tal efecto, una solicitud escrita al Secretario General quien enviará copia de la misma a la otra parte.

(2) La solicitud deberá contener los datos referentes al asunto objeto de la diferencia, a la identidad de las partes y al consentimiento de éstas al arbitraje, de conformidad con las reglas de procedimiento a seguir para iniciar la conciliación y el arbitraje.

(3) El Secretario General registrará la solicitud salvo que, de la información contenida en dicha solicitud, encuentre que la diferencia se halla manifiestamente fuera de la jurisdicción del Centro. Notificará inmediatamente a las partes el acto de registro de la solicitud, o su denegación.

## Sección 2
## Constitución del Tribunal

### Artículo 37

(1) Una vez registrada la solicitud de acuerdo con el Artículo 36, se procederá lo antes posible a la constitución del Tribunal de Arbitraje (en lo sucesivo llamado el Tribunal).

(2) (a) El Tribunal se compondrá de un árbitro único o de un número impar de árbitros, nombrados según lo acuerden las partes.

(b) Si las partes no se pusieren de acuerdo sobre el número de árbitros y el modo de nombrarlos, el Tribunal se constituirá con tres árbitros designados, uno por cada parte y el tercero, que presidirá el Tribunal, de común acuerdo.

**Artículo 38**

Si el Tribunal no llegare a constituirse dentro de los 90 días siguientes a la fecha del envío de la notificación del acto de registro, hecho por el Secretario General conforme al apartado (3) del Artículo 36, o dentro de cualquier otro plazo que las partes acuerden, el Presidente, a petición de cualquiera de éstas y, en lo posible, previa consulta a ambas partes, deberá nombrar el árbitro o los árbitros que aún no hubieren sido designados. Los árbitros nombrados por el Presidente conforme a este Artículo no podrán ser nacionales del Estado Contratante parte en la diferencia, o del Estado Contratante cuyo nacional sea parte en la diferencia.

**Artículo 39**

La mayoría de los árbitros no podrá tener la nacionalidad del Estado Contratante parte en la diferencia, ni la del Estado a que pertenezca el nacional del otro Estado Contratante. La limitación anterior no será aplicable cuando ambas partes, de común acuerdo, designen el árbitro único o cada uno de los miembros del Tribunal.

**Artículo 40**

(1) Los árbitros nombrados podrán no pertenecer a la Lista de Arbitros, salvo en el caso de que los nombre el Presidente conforme al Artículo 38.

(2) Todo árbitro que no sea nombrado de la Lista de Arbitros deberá reunir las cualidades expresadas en el apartado (1) del Artículo 14.

## Sección 3
## Facultades y funciones
## del Tribunal

**Artículo 41**

(1) El Tribunal resolverá sobre su propia competencia.

(2) Toda alegación de una parte que la diferencia cae fuera de los límites de la jurisdicción del Centro, o que por otras razones el Tribunal no es competente para oírla, se considerará por el Tribunal, el que

**Convenio**

determinará si ha de resolverla como cuestión previa o conjuntamente con el fondo de la cuestión.

### Artículo 42

(1) El Tribunal decidirá la diferencia de acuerdo con las normas de derecho acordadas por las partes. A falta de acuerdo, el Tribunal aplicará la legislación del Estado que sea parte en la diferencia, incluyendo sus normas de derecho internacional privado, y aquellas normas de derecho internacional que pudieren ser aplicables.

(2) El Tribunal no podrá eximirse de fallar so pretexto de silencio u oscuridad de la ley.

(3) Las disposiciones de los precedentes apartados de este Artículo no impedirán al Tribunal, si las partes así lo acuerdan, decidir la diferencia *ex aequo et bono.*

### Artículo 43

Salvo que las partes acuerden otra cosa, el Tribunal en cualquier momento del procedimiento, podrá, si lo estima necesario:

>   (a) solicitar de las partes la aportación de documentos o de cualquier otro medio de prueba;
>   (b) trasladarse al lugar en que se produjo la diferencia y practicar en él las diligencias de prueba que considere pertinentes.

### Artículo 44

Todo procedimiento de arbitraje deberá tramitarse según las disposiciones de esta Sección y, salvo acuerdo en contrario de las partes, de conformidad con las Reglas de Arbitraje vigentes en la fecha en que las partes prestaron su consentimiento al arbitraje. Cualquier cuestión de procedimiento no prevista en esta Sección, en las Reglas de Arbitraje o en las demás reglas acordadas por las partes, será resuelta por el Tribunal.

### Artículo 45

(1) El que una parte no comparezca en el procedimiento o no haga uso de su derecho, no supondrá la admisión de los hechos alegados por la otra parte ni allanamiento a sus pretensiones.

(2) Si una parte dejare de comparecer o no hiciere uso de su derecho, podrá la otra parte, en cualquier estado del procedimiento, instar del Tribunal que resuelva los puntos controvertidos y dicte el laudo. Antes de dictar laudo el Tribunal, previa notificación, concederá un período de gracia a la parte que no haya comparecido o no haya hecho

uso de sus derechos, salvo que esté convencido que dicha parte no tiene intenciones de hacerlo.

### Artículo 46

Salvo acuerdo en contrario de las partes, el Tribunal deberá, a petición de una de ellas, resolver las demandas incidentales, adicionales o reconvencionales que se relacionen directamente con la diferencia, siempre que estén dentro de los límites del consentimiento de las partes y caigan además dentro de la jurisdicción del Centro.

### Artículo 47

Salvo acuerdo en contrario de las partes, el Tribunal, si considera que las circunstancias así lo requieren, podrá recomendar la adopción de aquellas medidas provisionales que considere necesarias para salvaguardar los respectivos derechos de las partes.

## Sección 4
## El laudo

### Artículo 48

(1) El Tribunal decidirá todas las cuestiones por mayoría de votos de todos sus miembros.

(2) El laudo deberá dictarse por escrito y llevará la firma de los miembros del Tribunal que hayan votado en su favor.

(3) El laudo contendrá declaración sobre todas las pretensiones sometidas por las partes al Tribunal y será motivado.

(4) Los árbitros podrán formular un voto particular, estén o no de acuerdo con la mayoría, o manifestar su voto contrario si disienten de ella.

(5) El Centro no publicará el laudo sin consentimiento de las partes.

### Artículo 49

(1) El Secretario General procederá a la inmediata remisión a cada parte de una copia certificada del laudo. Este se entenderá dictado en la fecha en que tenga lugar dicha remisión.

(2) A requerimiento de una de las partes, instado dentro de los 45 días después de la fecha del laudo, el Tribunal podrá, previa notificación a la otra parte, decidir cualquier punto que haya omitido resolver en dicho laudo y rectificar los errores materiales, aritméticos o similares del mismo. La decisión constituirá parte del laudo y se notificará en igual forma que éste. Los plazos establecidos en el apartado (2) del Artí-

culo 51 y apartado (2) del Artículo 52 se computarán desde la fecha en que se dicte la decisión.

## Sección 5
### Aclaración, revisión y
### anulación del laudo

### Artículo 50

(1) Si surgiere una diferencia entre las partes acerca del sentido o alcance del laudo, cualquiera de ellas podrá solicitar su aclaración mediante escrito dirigido al Secretario General.

(2) De ser posible, la solicitud deberá someterse al mismo Tribunal que dictó el laudo. Si no lo fuere, se constituirá un nuevo Tribunal de conformidad con lo dispuesto en la Sección 2 de este Capítulo. Si el Tribunal considera que las circunstancias lo exigen, podrá suspender la ejecución del laudo hasta que decida sobre la aclaración.

### Artículo 51

(1) Cualquiera de las partes podrá pedir, mediante escrito dirigido al Secretario General, la revisión del laudo, fundada en el descubrimiento de algún hecho que hubiera podido influir decisivamente en el laudo, y siempre que, al tiempo de dictarse el laudo, hubiere sido desconocido por el Tribunal y por la parte que inste la revisión y que el desconocimiento de ésta no se deba a su propia negligencia.

(2) La petición de revisión deberá presentarse dentro de los 90 días siguientes al día en que fue descubierto el hecho y, en todo caso, dentro de los tres años siguientes a la fecha de dictarse el laudo.

(3) De ser posible, la solicitud deberá someterse al mismo Tribunal que dictó el laudo. Si no lo fuere, se constituirá un nuevo Tribunal de conformidad con lo dispuesto en la Sección 2 de este Capítulo.

(4) Si el Tribunal considera que las circunstancias lo exigen, podrá suspender la ejecución del laudo hasta que decida sobre la revisión. Si la parte pidiere la suspensión de la ejecución del laudo en su solicitud, la ejecución se suspenderá provisionalmente hasta que el Tribunal decida sobre dicha petición.

### Artículo 52

(1) Cualquiera de las partes podrá solicitar la anulación del laudo mediante escrito dirigido al Secretario General fundado en una o más de las siguientes causas:

(a) que el Tribunal se hubiere constituido incorrectamente;

26

(b) que el Tribunal se hubiere extralimitado manifiestamente en sus facultades;

(c) que hubiere habido corrupción de algún miembro del Tribunal;

(d) que hubiere quebrantamiento grave de una norma de procedimiento; o

(e) que no se hubieren expresado en el laudo los motivos en que se funde.

(2) Las solicitudes deberán presentarse dentro de los 120 días a contar desde la fecha de dictarse el laudo. Si la causa alegada fuese la prevista en la letra (c) del apartado (1) de este Artículo, el referido plazo de 120 días comenzará a computarse desde el descubrimiento del hecho pero, en todo caso, la solicitud deberá presentarse dentro de los tres años siguientes a la fecha de dictarse el laudo.

(3) Al recibo de la petición, el Presidente procederá a la inmediata constitución de una Comisión *ad hoc* integrada por tres personas seleccionadas de la Lista de Arbitros. Ninguno de los miembros de la Comisión podrá haber pertenecido al Tribunal que dictó el laudo, ni ser de la misma nacionalidad que cualquiera de los miembros de dicho Tribunal; no podrá tener la nacionalidad del Estado que sea parte en la diferencia ni la del Estado a que pertenezca el nacional que también sea parte en ella, ni haber sido designado para integrar la Lista de Arbitros por cualquiera de aquellos Estados ni haber actuado como conciliador en la misma diferencia. Esta Comisión tendrá facultad para resolver sobre la anulación total o parcial del laudo por alguna de las causas enumeradas en el apartado (1).

(4) Las disposiciones de los Artículos 41-45, 48, 49, 53, 54 y de los Capítulos VI y VII se aplicarán, *mutatis mutandis,* al procedimiento que se tramite ante la Comisión.

(5) Si la Comisión considera que las circunstancias lo exigen, podrá suspender la ejecución del laudo hasta que decida sobre la anulación. Si la parte pidiere la suspensión de la ejecución del laudo en su solicitud, la ejecución se suspenderá provisionalmente hasta que la Comisión dé su decisión respecto a tal petición.

(6) Si el laudo fuere anulado, la diferencia será sometida, a petición de cualquiera de las partes, a la decisión de un nuevo Tribunal que deberá constituirse de conformidad con lo dispuesto en la Sección 2 de este Capítulo.

**Convenio**

## Sección 6
## Reconocimiento y
## ejecución del laudo

**Artículo 53**

(1) El laudo será obligatorio para las partes y no podrá ser objeto de apelación ni de cualquier otro recurso, excepto en los casos previstos en este Convenio. Las partes lo acatarán y cumplirán en todos sus términos, salvo en la medida en que se suspenda su ejecución, de acuerdo con lo establecido en las correspondientes cláusulas de este Convenio.

(2) A los fines previstos en esta Sección, el término "laudo" incluirá cualquier decisión que aclare, revise o anule el laudo, según los Artículos 50, 51 o 52.

**Artículo 54**

(1) Todo Estado Contratante reconocerá al laudo dictado conforme a este Convenio carácter obligatorio y hará ejecutar dentro de sus territorios las obligaciones pecuniarias impuestas por el laudo como si se tratare de una sentencia firme dictada por un tribunal existente en dicho Estado. El Estado Contratante que se rija por una constitución federal podrá hacer que se ejecuten los laudos a través de sus tribunales federales y podrá disponer que dichos tribunales reconozcan al laudo la misma eficacia que a las sentencias firmes dictadas por los tribunales de cualquiera de los estados que lo integran.

(2) La parte que inste el reconocimiento o ejecución del laudo en los territorios de un Estado Contratante deberá presentar, ante los tribunales competentes o ante cualquier otra autoridad designados por los Estados Contratantes a este efecto, una copia del mismo, debidamente certificada por el Secretario General. La designación de tales tribunales o autoridades y cualquier cambio ulterior que a este respecto se introduzca será notificada por los Estados Contratantes al Secretario General.

(3) El laudo se ejecutará de acuerdo con las normas que, sobre ejecución de sentencias, estuvieren en vigor en los territorios en que dicha ejecución se pretenda.

**Artículo 55**

Nada de lo dispuesto en el Artículo 54 se interpretará como derogatorio de las leyes vigentes en cualquier Estado Contratante relativas a la inmunidad en materia de ejecución de dicho Estado o de otro Estado extranjero.

28

# Capítulo V
## Sustitución y recusación
## de conciliadores y arbitros

**Artículo 56**

(1)  Tan pronto quede constituida una Comisión o un Tribunal y se inicie el procedimiento, su composición permanecerá invariable. La vacante por muerte, incapacidad o renuncia de un conciliador o árbitro será cubierta en la forma prescrita en la Sección 2 del Capítulo III y Sección 2 del Capítulo IV.

(2)  Los miembros de una Comisión o un Tribunal continuarán en sus funciones aunque hayan dejado de figurar en las Listas.

(3)  Si un conciliador o árbitro, nombrado por una de las partes, renuncia sin el consentimiento de la Comisión o Tribunal de que forma parte, el Presidente nombrará, de entre los que integran la correspondiente Lista, la persona que deba sustituirle.

**Artículo 57**

Cualquiera de las partes podrá proponer a la Comisión o Tribunal correspondiente la recusación de cualquiera de sus miembros por la carencia manifiesta de las cualidades exigidas por el apartado (1) del Artículo 14. Las partes en el procedimiento de arbitraje podrán, asimismo, proponer la recusación por las causas establecidas en la Sección 2 del Capítulo IV.

**Artículo 58**

La decisión sobre la recusación de un conciliador o árbitro se adoptará por los demás miembros de la Comisión o Tribunal, según los casos, pero, si hubiere empate de votos o se tratare de recusación de un conciliador o árbitro único, o de la mayoría de los miembros de una Comisión o Tribunal, corresponderá resolver al Presidente. Si la recusación fuere estimada, el conciliador o árbitro afectado deberá ser sustituido en la forma prescrita en la Sección 2 del Capítulo III y Sección 2 del Capítulo IV.

Convenio

# Capítulo VI
# Costas del procedimiento

Convenio

### Artículo 59

Los derechos exigibles a las partes por la utilización del Centro serán fijados por el Secretario General de acuerdo con los aranceles adoptados por el Consejo Administrativo.

### Artículo 60

(1) Cada Comisión o Tribunal determinará, previa consulta al Secretario General, los honorarios y gastos de sus miembros, dentro de los límites que periódicamente establezca el Consejo Administrativo.

(2) Sin perjuicio de lo dispuesto en el apartado (1) de este Artículo, las partes podrán acordar anticipadamente con la Comisión o el Tribunal la fijación de los honorarios y gastos de sus miembros.

### Artículo 61

(1) En el caso de procedimiento de conciliación las partes sufragarán por partes iguales los honorarios y gastos de los miembros de la Comisión así como los derechos devengados por la utilización del Centro. Cada parte soportará cualquier otro gasto en que incurra, en relación con el procedimiento.

(2) En el caso de procedimiento de arbitraje el Tribunal determinará, salvo acuerdo contrario de las partes, los gastos en que estas hubieren incurrido en el procedimiento, y decidirá la forma de pago y la manera de distribución de tales gastos, de los honorarios y gastos de los miembros del Tribunal y de los derechos devengados por la utilización del Centro. Tal fijación y distribución formarán parte del laudo.

# Capítulo VII
# Lugar del procedimiento

### Artículo 62

Los procedimientos de conciliación y arbitraje se tramitarán, sin perjuicio de lo dispuesto en el Artículo siguiente, en la sede del Centro.

### Artículo 63

Si las partes se pusieran de acuerdo, los procedimientos de conciliación y arbitraje podrán tramitarse:

(a) en la sede de la Corte Permanente de Arbitraje o en la de cualquier otra institución apropiada, pública o privada, con la que el Centro hubiere llegado a un acuerdo a tal efecto; o

(b) en cualquier otro lugar que la Comisión o Tribunal apruebe, previa consulta con el Secretario General.

# Capítulo VIII
## Diferencias entre
## Estados Contratantes

**Artículo 64**

Toda diferencia que surja entre Estados Contratantes sobre la interpretación o aplicación de este Convenio y que no se resuelva mediante negociación se remitirá, a instancia de una u otra parte en la diferencia, a la Corte Internacional de Justicia, salvo que dichos Estados acuerden acudir a otro modo de arreglo.

# Capítulo IX
## Enmiendas

**Artículo 65**

Todo Estado Contratante podrá proponer enmiendas a este Convenio. El texto de la enmienda propuesta se comunicará al Secretario General con no menos de 90 días de antelación a la reunión del Consejo Administrativo a cuya consideración se ha de someter, y aquél la transmitirá inmediatamente a todos los miembros del Consejo Administrativo.

**Artículo 66**

(1) Si el Consejo Administrativo lo aprueba por mayoría de dos terceras partes de sus miembros, la enmienda propuesta será circulada a todos los Estados Contratantes para su ratificación, aceptación o aprobación. Las enmiendas entrarán en vigor 30 días después de la fecha en que el depositario de este Convenio despache una comunicación a los Estados Contratantes notificándoles que todos los Estados Contratantes han ratificado, aceptado o aprobado la enmienda.

(2) Ninguna enmienda afectará los derechos y obligaciones, conforme a este Convenio, de los Estados Contratantes, sus subdivisiones políticas u organismos públicos, o de los nacionales de dichos Estados

Convenio

31

nacidos del consentimiento a la jurisdicción del Centro dado con anterioridad a la fecha de su entrada en vigor.

# Capítulo X
# Disposiciones finales

### Artículo 67

Este Convenio quedará abierto a la firma de los Estados miembros del Banco. Quedará también abierto a la firma de cualquier otro Estado signatario del Estatuto de la Corte Internacional de Justicia al que el Consejo Administrativo, por voto de dos tercios de sus miembros, hubiere invitado a firmar el Convenio.

### Artículo 68

(1) Este Convenio será ratificado, aceptado o aprobado por los Estados signatarios de acuerdo con sus respectivas normas constitucionales.

(2) Este Convenio entrará en vigor 30 días después de la fecha del depósito del vigésimo instrumento de ratificación, aceptación o aprobación. Entrará en vigor respecto a cada Estado que con posterioridad deposite su instrumento de ratificación, aceptación o aprobación, 30 días después de la fecha de dicho depósito.

### Artículo 69

Los Estados Contratantes tomarán las medidas legislativas y de otro orden que sean necesarias para que las disposiciones de este Convenio tengan vigencia en sus territorios.

### Artículo 70

Este Convenio se aplicará a todos los territorios de cuyas relaciones internacionales sea responsable un Estado Contratante salvo aquellos que dicho Estado excluya mediante notificación escrita dirigida al depositario de este Convenio en la fecha de su ratificación, aceptación o aprobación, o con posterioridad.

### Artículo 71

Todo Estado Contratante podrá denunciar este Convenio mediante notificación escrita dirigida al depositario del mismo. La denuncia producirá efecto seis meses después del recibo de dicha notificación.

**Artículo 72**

Las notificaciones de un Estado Contratante hechas al amparo de los Artículos 70 y 71 no afectarán a los derechos y obligaciones, conforme a este Convenio, de dicho Estado, sus subdivisiones políticas u organismos públicos, o de los nacionales de dicho Estado nacidos del consentimiento a la jurisdicción del Centro dado por alguno de ellos con anterioridad al recibo de dicha notificación por el depositario.

**Artículo 73**

Los instrumentos de ratificación, aceptación o aprobación de este Convenio y sus enmiendas se depositarán en el Banco, quien desempeñará la función de depositario de este Convenio. El depositario transmitirá copias certificadas del mismo a los Estados miembros del Banco y a cualquier otro Estado invitado a firmarlo.

**Artículo 74**

El depositario registrará este Convenio en el Secretariado de las Naciones Unidas de acuerdo con el Artículo 102 de la Carta de las Naciones Unidas y el Reglamento de la misma adoptado por la Asamblea General.

**Artículo 75**

El depositario notificará a todos los Estados signatarios lo siguiente:

- (a) las firmas, conforme al Artículo 67;
- (b) los depósitos de instrumentos de ratificación, aceptación y aprobación, conforme al Artículo 73;
- (c) la fecha en que este Convenio entre en vigor, conforme al Artículo 68;
- (d) las exclusiones de aplicación territorial, conforme al Artículo 70;
- (e) la fecha en que las enmiendas de este Convenio entren en vigor, conforme al Artículo 66; y
- (f) las denuncias, conforme al Artículo 71.

**HECHO** en Washington, en los idiomas español, francés e inglés, cuyos tres textos son igualmente auténticos, en un solo ejemplar que quedará depositado en los archivos del Banco Internacional de Reconstrucción y Fomento, el cual ha indicado con su firma su conformidad con el desempeño de las funciones que se le encomiendan en este Convenio.

Convenio

# Anexo 3

**Centro Internacional de Arreglo de Diferencias Relativas a Inversiones**

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

DEMANDANTE

c.

REPÚBLICA BOLIVARIANA DE VENEZUELA

DEMANDADA

**Decisión sobre Responsabilidad y Principios en Materia de Cuantificación de Daños**

Dictado por un tribunal compuesto por:

Profesor Dr. Klaus M. Sachs, Presidente
El Honorable Charles N. Brower, Árbitro
Sr. Gabriel Bottini, Árbitro

Secretaria del Tribunal
Sra. Natalí Sequeira

**Fecha de envío a las Partes: 30 de diciembre de 2016**

# ÍNDICE DE CONTENIDOS

**A.  LAS PARTES** ...................................................................................**10**

    I.  Demandante ...........................................................................10

    II.  Demandada ...........................................................................10

**B.  EL TRIBUNAL DE ARBITRAJE** .......................................................**10**

    I.  El Honorable Charles N. Brower ..................................................10

    II.  Sr. Gabriel Bottini .................................................................11

    III.  Prof. Dr. Klaus Sachs ...........................................................11

**C.  SÍNTESIS DE LOS ANTECEDENTES PROCESALES** ..................................**11**

    I.  Acuerdo de arbitraje e inicio del procedimiento .............................11

    II.  El procedimiento de arbitraje .................................................18

**D.  ANTECEDENTES FÁCTICOS** ...........................................................**30**

    I.  Demandante ...........................................................................30

    II.  La decisión de la Demandante de ampliar la capacidad de producción y buscar un terreno para su expansión en Sudamérica ..................................32

    III.  La decisión de la Demandante de invertir en Venezuela ...............36

    IV.  Créditos de IVA .....................................................................37

    V.  Construcción de la Planta .......................................................40

    VI.  Aumentos en el precio de la bauxita .........................................40

    VII.  Producción y venta de *proppants* antes de la toma de control de la Planta ...45

    VIII.  Tensión laboral ....................................................................48

    IX.  La toma de control temporal de la planta de fecha 24 de marzo de 2010 ......52

    X.  La toma de control definitiva de la Planta de fecha 15 de mayo de 2010 ......53

    XI.  Negociaciones posteriores a la toma de control de la planta .........................57

XII.  El Decreto de Expropiación y la correspondencia de seguimiento ...............63

XIII. El procedimiento administrativo de la expropiación y la notificación de controversia de la Demandante ......................................................................66

XIV. Negociaciones adicionales entre las Partes ....................................................67

XV.  El procedimiento judicial de expropiación y negociaciones paralelas...........69

E.   POSTURAS DE LAS PARTES .......................................................................**71**

I.    Síntesis de la Postura de la Demandante y Petitorio ......................................71

II.   Síntesis de la Postura de la Demandada y Petitorio ......................................83

F.   RAZONAMIENTO DEL TRIBUNAL ...........................................................**94**

I.    Jurisdicción......................................................................................................94

II.   Admisibilidad ..................................................................................................97

III.  Violación del Tratado ...................................................................................103

IV.  Los Principios en Materia de Cuantificación de Daños ...............................159

V.   Decisión sobre costos ...................................................................................259

G.   DECISIÓN DEL TRIBUNAL .......................................................................**259**

# ÍNDICE DE ABREVIATURAS

| | |
|---|---|
| Actualización de la Valuación de la Demandada | Presentación por parte de la Demandada de las actualizaciones solicitadas de las valuaciones de sus peritos el día 22 de octubre de 2015 |
| Actualización de la Valuación de la Demandante | Presentación por parte de la Demandante de las actualizaciones solicitadas de las valuaciones de sus peritos el día 22 de octubre de 2015 |
| AECG | Tratado de Libre Comercio UE-Canadá |
| AMC con Halliburton | Acuerdo Marco de Compraventa con Halliburton firmado por Norpro Venezuela, junto con otras dos plantas de *proppants* de Saint-Gobain el día 1 de abril de 2009 |
| Anexo C- | Anexos Documentales de la Demandante |
| Anexo CLEX- | Anexos que acompañan la Evaluación de Daños sobre las Inversiones de Saint-Gobain en Venezuela por parte del Profesor Pablo T. Spiller de la firma Compass Lexecon |
| Anexo ER- | Anexos que acompañan la Declaración Testimonial del Sr. Eduardo Rondón |
| Anexo R- | Anexos Documentales de la Demandada |
| Anexo RL- | Autoridades Legales de la Demandada |
| Ap. BF- | Apéndices que acompañan al Dictamen Pericial sobre la Cuantía de Daños confeccionado por el Sr. Vladimir Brailovsky y el Dr. Daniel Flores |
| Brailovsky/Flores I | Primer Dictamen Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores de fecha 21 de marzo de 2014 |

| | |
|---|---|
| Brailovsky/Flores II | Segundo Dictamen Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores de fecha 18 de setiembre de 2014 |
| CIADI | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| CLA- | Autoridades Legales de la Demandante |
| Convención de Viena | Convención de Viena sobre el Derecho de los Tratados |
| CPJI | Corte Permanente de Justicia Internacional |
| *CVG* | Corporación Venezolana de Guyana |
| *CVG Bauxilum* | CVG Bauxilum, C.A. |
| *CVG EDELCA* | CVG Electrificación del Caroní, C.A. |
| DAC | *Demandé d'Autorisation Compagnie* |
| Decisión sobre Recusación | Decisión dictada por el Prof. Sachs y el Juez Brower sobre la Propuesta de la Demandante de Recusación contra el Sr. Bottini del Tribunal de fecha 27 de febrero de 2013 |
| Declaración | Nueva Declaración del Sr. Bottini en virtud de la Regla 6(2) de las Reglas de Arbitraje CIADI remitida a la Secretaria General el día 1 de marzo de 2013, de fecha 28 de febrero de 2013 |
| Dúplica | Dúplica sobre el Fondo de la Demandada de fecha 18 de setiembre de 2014 |
| El "Contrato de Bauxita" | Contrato de compraventa suscrito entre CVG Bauxilum y la empresa Saint-Gobain Proppants Venezuela C.A. |
| El "Decreto de Expropiación" | Decreto N.º 8.133 publicado por Venezuela en la Gaceta Oficial N.º 39.644 el día 29 de marzo de 2011 |

| | |
|---|---|
| El "Juzgado" | Juzgado Primero de Primera Instancia en lo Civil, Mercantil y Agrario del Segundo Circuito de la Circunscripción Judicial del Estado de Bolívar, Venezuela |
| El "Procedimiento de Expropiación" | Procedimiento judicial de expropiación iniciado por PDVSA Industrial de conformidad con los Artículos 22-24 de la Ley de Expropiación el día 18 de abril de 2012 |
| El Convenio CIADI | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados |
| Escrito Posterior a la Audiencia de la Demandada | Escrito Posterior a la Audiencia Presentado por la Demandada el día 2 de abril de 2015 |
| La "Ley de Acceso" | Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios |
| La "Ley de Expropiación" | Ley de Expropiación por Causa de Utilidad Pública o Social |
| La "Planta de Fort Smith" | La planta de *proppants* de Saint-Gobain en Fort Smith, Estado de Arkansas |
| Larry I | Primera Declaración Testimonial del Sr. Larry de fecha 28 de octubre de 2013 |
| Larry II | Segunda Declaración Testimonial del Sr. Larry de fecha 17 de junio de 2014 |
| Las "Directrices del Banco Mundial" | *Directrices sobre el Trato de la Inversión Extranjera Directa* del año 1992 |
| Las "Reclamaciones sobre la Bauxita" | Alegato de la Demandante de conformidad con el cual en virtud del aumento de precio de la bauxita acordado inicialmente mediante el Contrato de Bauxita celebrado entre la Demandante y CVG Bauxilum, la Demandada no brindó a la Demandante un trato justo y equitativo de conformidad con el Artículo 3(1) del Tratado y no proporcionó protección y seguridad a la inversión de la Demandante conforme al Artículo 3(2) del Tratado |

| Memorial | Memorial de la Demandante [Saint-Gobain Performance Plastics Europe] de fecha 28 de octubre de 2013 |
| Memorial de Contestación | Memorial de Contestación de la Demandada [Venezuela] de fecha 21 de marzo de 2014 |
| *MIBAM* | Ministerio del Poder Popular para las Industrias Básicas y Minería |
| MILCO | Ministerio de Industrias Ligeras y Comercio |
| Millot | Declaración Testimonial del Sr. Millot de fecha 28 de octubre de 2013 |
| PDVSA Gas | PDVSA Gas, S.A. |
| Pedersen | Declaración Testimonial del Sr. Pedersen de fecha 25 de octubre de 2013 |
| Presentación Actualizada sobre Costos de la Demandada | Presentación de la Presentación Actualizada sobre Costos de la Demandada el día 23 de noviembre de 2015 |
| Presentación Actualizada sobre Costos de la Demandante | Presentación de la Presentación Actualizada sobre Costos de la Demandante el día 23 de noviembre de 2015 |
| Presentación Posterior a la Audiencia de la Demandante | Escrito Posterior a la Audiencia Presentado por la Demandante el día 2 de abril de 2015 |
| Presentación sobre Costos de la Demandada | Presentación sobre Costos de la Demandada simultáneamente con la otra Parte el día 30 de junio de 2015 |
| Presentación sobre Costos de la Demandante | Presentación sobre Costos de la Demandante simultáneamente con la otra Parte el día 30 de junio de 2015 |
| Procedimientos Judiciales Entablados en Venezuela | Procedimientos judiciales en curso en Venezuela relacionados con la expropiación de Norpro Venezuela, C.A. |
| Propuesta de la Demandante | Propuesta de Recusación contra el Sr. Gabriel Bottini presentada por la Demandante el 29 de octubre de 2012 |

| | |
|---|---|
| Proyecto de Artículos de la CDI | Proyecto de Artículos de la Comisión de Derecho Internacional sobre Responsabilidad del Estado por Hechos Internacionalmente Ilícitos |
| PSP | Protección y seguridad plenas |
| Reglas de Arbitraje CIADI | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI |
| Reglas de Iniciación CIADI | Reglas Procesales Aplicables a la Iniciación de Procedimientos de Conciliación y Arbitraje |
| Reglas de la IBA | Reglas de la Asociación Internacional de Abogados (IBA, por su sigla en inglés) sobre la Práctica de Prueba en el Arbitraje Internacional (2010) |
| Réplica | Memorial de Réplica de la Demandante de fecha 18 de junio de 2014 |
| Resolución de Confidencialidad | Resolución de Confidencialidad contenida en la Resolución Procesal N.° 2 emitida por el Tribunal el día 10 de junio de 2014 |
| Rondón | Declaración Testimonial del Sr. Rondón de fecha 17 de marzo de 2014 |
| Secretaria General | Secretaria General del CIADI |
| Secretariado | Secretariado del CIADI |
| Segunda Presentación Posterior a la Audiencia de la Demandante | Segunda ronda de Escritos Posteriores a la Audiencia Presentados por la Demandante simultáneamente con la otra Parte el día 22 de mayo de 2015 |
| Segundo Escrito Posterior a la Audiencia de la Demandada | Segunda ronda de Escritos Posteriores a la Audiencia Presentados por la Demandada simultáneamente con la otra Parte el día 22 de mayo de 2015 |

| | |
|---|---|
| SINPROTRAC | Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares |
| Solicitud | Solicitud de Arbitraje contra la Demandada de fecha 25 de mayo de 2012 |
| Spiller I | Evaluación de Daños sobre las Inversiones de Saint-Gobain en Venezuela por parte del Prof. Pablo T. Spiller de la firma Compass Lexeconde fecha 28 de octubre de 2013 |
| Spiller II | Segunda Valuación de Daños del Prof. Spiller de fecha 18 de junio de 2014 |
| TBI – Francia-Venezuela o "el Tratado" | Acuerdo sobre Promoción y Protección Recíproca de Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela |
| TJE | Trato justo y equitativo |

## A.    LAS PARTES

### I.    DEMANDANTE

1.    Saint-Gobain Performance Plastics Europe, en adelante, la "**Demandante**" o "**Saint-Gobain**", representada en el presente arbitraje por sus abogados debidamente autorizados, el Sr. Alexander A. Yanos de la firma Hughes Hubbard & Reed LLP, One Battery Park Plaza, Nueva York, NY 10004-1482, Estados Unidos de América, la Sra. Elizabeth Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, Estados Unidos de América, y la Sra. Noiana Marigo de la firma Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, Piso 31, Nueva York, NY 10022, Estados Unidos de América..

### II.    DEMANDADA

2.    La República Bolivariana de Venezuela, en adelante, la "Demandada" o "Venezuela", representada en el presente arbitraje por el Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República and Dr. Felipe Andrés Daruiz Ferro, Coordinador Integral del Despacho del Procurador, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas, República Bolivariana de Venezuela. La Demandada también se encuentra representada por sus abogados debidamente autorizados, el Sr. Benard V. Preziosi, Jr. de la firma  Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, Nueva York, NY 10178, Estados Unidos de América, y el Sr. Eloy Barbará de Parres, la Sra. Gabriela Álvarez Ávila, la Sra. Kate Brown de Vejar, y la Sra. Dori Yoldi de la firma Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Ciudad de México,, Estados Unidos Mexicanos.

3.    En lo sucesivo, se hará referencia a la Demandante y la Demandada indistintamente como la "**Parte**" y conjuntamente como las "**Partes**".

## B.    EL TRIBUNAL DE ARBITRAJE

4.    El Tribunal de Arbitraje ha sido constituido de la siguiente manera:

### I.    EL HONORABLE CHARLES N. BROWER

(designado por la Demandante)

20 Essex Street Chambers
20 Essex Street

Londres WC2R 3AL

GRAN BRETAÑA

Tel: +44 (0)20 7842 1200

Fax: +44 (0)20 7842 1270

Correo electrónico: cbrower@20essexst.com

## II.  SR. GABRIEL BOTTINI

(designado por la Demandada)

Paraná 580- Piso 5° "J"

C1017AAL- Buenos Aires

Argentina

Tel.: + 54 11 4371-3165

Fax: + 54 11 4372-7974

Correo electrónico gbottini@outlook.com

## III.  PROF. DR. KLAUS SACHS

(designado por las Partes)

Nymphenburger Str. 12

D-80335 Munich

ALEMANIA

Tel.: +49 89 23 807-109

Fax: + 49 89 23 807-40 621

Correo electrónico: Klaus.Sachs@cms-hs.com

## C.  SÍNTESIS DE LOS ANTECEDENTES PROCESALES

### I.  ACUERDO DE ARBITRAJE E INICIO DEL PROCEDIMIENTO

5.  El presente procedimiento de arbitraje versa sobre una controversia legal entre Saint-Gobain y Venezuela que surge de la supuesta negativa de Venezuela a indemnizar a Saint-Gobain en virtud de la expropiación de la inversión de Saint-Gobain en su subsidiaria 99.99%[1] Norpro Venezuela C.A ("**Norpro Venezuela**" o "**Norpro**") luego de un discurso televisado del presidente de Venezuela Hugo Chávez el día 15 de mayo de 2010. La Demandante alega que la Demandada violó el *Acuerdo sobre Promoción y Protección*

---

[1] El Sr. Luis Páez, ciudadano de Venezuela y presidente de Norpro Venezuela, es tenedor de una única acción, la cual suscribió al momento de la constitución de Norpro Venezuela. La transferencia planificada de la acción del Sr. Páez a Saint-Gobain no ha ocurrido aún. Solicitud, ¶ 4, nota 4.

*Recíproca de Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela* (el "**TBI Francia-Venezuela**" o el "**Tratado**"), que entró en vigor el día 15 de abril de 2004, al negarse a ofrecer una indemnización en virtud de la expropiación de la planta de proppants de Norpro Venezuela ubicada en Puerto Ordaz, Estado Bolívar, así como al sancionar o no intervenir en el aumento del precio del suministro de bauxita supuestamente violatorio de un contrato celebrado con un ente estatal, por lo cual no se concedió un trato justo y equitativo a la Demandante ni se brindó seguridad y protección plena a su inversión en violación de los Artículos 5(1) y 3(1) y (2) del Tratado.

6. El Artículo 5(1) del TBI Francia-Venezuela dispone en sus versiones auténticas en idioma español y francés[2]:

"*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause*

"*Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y*

---

[2] La traducción libre al idioma inglés del texto en francés publicado en la Gaceta Oficial de la República Francesa N.º 102, de fecha 30 de abril de 2004, que ha sido presentada por la Demandante como **Anexo C-1** y no ha sido objetada por la Demandada, reza lo siguiente:

"*1. The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement.*

*All measures of expropriation which could be taken must result in the payment of prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*

*The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment.*"

*d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié"*[3].

*siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado"*[4].

9.    El Artículo 3(1) y (2) del Tratado dispone lo siguiente[5]:

---

[3] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[4] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

[5] La traducción libre al inglés presentada por la Demandante como **Anexo C-1** establece:

*"1. Each of the Contracting Parties will ensure fair and equitable treatment for investments by nationals and companies of the other Party in its territory and in its maritime area, in accordance with the rules and principles of international law, and will ensure that the exercise of this right thus recognized shall have no impediments either in law or in fact. In particular, although not exclusively, impediments to fair and equitable treatment in law or in fact are any arbitrary or discriminatory restrictions to the purchase and transport of raw and ancillary materials, of energy and fuels, as well as to any means of production and exploitation, or any impediment to the sale and transport of products within the country and overseas, along with all other measures having a similar effect.*

"*1.    Chacune    des    Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et équitable,    conformément    aux règles   et   principe   du   droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de miyens   de   production   et d'exploitation de tout type, tout entrave à la vente et au transport des produits à l'intérieur du pays à l'étranger, ainsi que toutes autres mesures ayant un effet analogue.*

*2. Les investissements effectués par des nationaux ou des sociétés de l'une   l'autre   des   Parties contractantes bénéficient, sur le territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières*"[6].

"*1. Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y equitativo, conforme a las reglas y principios    del    Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra   Parte   Contratante   y   a garantizar que el ejercicio del derecho   así   adquirido   no   sea obstaculizado,   de   hecho   ni   de derecho. En particular, aunque no exclusivamente,                  serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo,   cualquier   restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación   de   todo   tipo,   todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así como cualquier otra medida que pueda tener un efecto análogo.*

*2. Las inversiones efectuadas por nacionales o sociedades de una u otra de las Partes Contratantes gozarán, en el territorio y en la zona marítima de la otra Parte Contratante, de una protección y de*

---

*2. Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security.*"

[6] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

> *una    seguridad    plenas    y*
> *completas*"[7].

12.    La Demandante ha invocado las disposiciones sobre arbitraje del Artículo 8 del TBI Francia-Venezuela que disponen la aplicabilidad de un arbitraje ante el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (**"CIADI"**). El Artículo 8 del Tratado dispone lo siguiente[8]:

> "*1. Tout différend qui survient entre un national ou une société d'une Partie contractante et l'autre Partie contractante, au sujet d'une obligation de cette dernière relative à un investissement en vertu du présent Accord, est réglé à l'amiable entre les deux parties concernées.*
>
> *2. Si un tel différend n'a pas pu être réglé dans un délai de six mois à partir de moment où il a été soulevé par l'une ou l'autre des parties au*

> "*1. Cualquier controversia que surja entre un nacional o una sociedad de una Parte Contratante y la otra Parte Contratante en lo concerniente a una obligación de esta última en relación con una inversión en virtud del presente Acuerdo, será resuelta amistosamente entre las dos partes interesadas.*
>
> *2. Si dicha controversia no pudiese ser resuelta en un plazo de seis meses a partir del momento en que*

---

[7] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332-353-332.354.

[8] La traducción libre al inglés presentada por la Demandante como **Anexo C-1** establece lo siguiente:

> "*1. Any dispute which arises between a national or a company of a Contracting Party and the other Contracting Party, regarding an obligation of the latter relating to an investment under the terms of the present Agreement, shall be settled amicably between the two party concerned.*
>
> *2. If such a dispute cannot be settled within six months from the time it was raised by either of the parties to the dispute, at the request of the national or the company in question it shall be submitted to either the competent court of the State in which the investment was made or to arbitration by the International Center* [sic] *for the Settlement of Investment Disputes (ICSID), pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965. This decision is the choice of the national or the company concerned. Once the decision has been made to pursue arbitration, the decision becomes final.*
>
> *3. The arbitral tribunal shall determine if the Contracting Party to the dispute has met their obligations under the terms of the provisions of this agreement. If this is not the case, the court* [sic] *will set the amount of compensation for the national or company party to the dispute.*
>
> *4. The arbitral award is final and binding to the parties to the dispute.*"

*différend, il es soumis à la demande du national ou de la société en question soit à la juridiction compétente de l'Etat dans lequel l'investissement a été réalisé soit à l'arbitrage du Centre international pour le règlement des différends relatifs aux investissements (CIRDI), créé par la Convention entre Etats et ressortissants d'autres Etats, signée à Washington le 18 mars 1965. Cette option relève du choix du national ou de la société intéressé. Une fois l'option effectuée en faveur de l'arbitrage, celle-ci devient définitive.*

*3. Le tribunal arbitral détermine si la Partie contractante partie au différend a respecté ses obligations en vertu des dispositions du présent accord. Si tel n'est pas le cas, le tribunal fixera le montant de l'indemnisation du national ou de la société partie au différend.*

*4. La sentence arbitrale est définitive et obligatoire pour les parties au différend*""[9].

*ha sido identificada por una u otra de las partes en controversia, se someterá, a pedido del nacional o de la sociedad en cuestión, a la jurisdicción competente del estado en el cual se ha efectuado la inversión o bien al arbitraje del Centro Internacional para el Arreglo de Diferencias relativas a Inversiones (C.I.A.D.I.) creado por la Convención para el arreglo de diferencias relativas a las inversiones entre Estados y nacionales de otros Estados, firmado en Washington el 18 de marzo de 1965. Dicha opción queda a elección del nacional o de la sociedad interesada. Una vez ejercida la opción de arbitraje, esta […] definitiva.*

*3. El tribunal arbitral determinará si la Parte Contratante, parte en la controversia, ha cumplido sus obligaciones en virtud de lo dispuesto en el presente Acuerdo. Si ese no fuera el caso, el tribunal fijará el monto de la indemnización del nacional o de la sociedad parte en la controversia.*

*4. El laudo arbitral es definitivo y obligatorio para las partes en controversia*"[10].

17.    El día 25 de mayo de 2012, la Demandante presentó una Solicitud de Arbitraje contra la Demandada (**"Solicitud"**), junto con los Anexos Documentales C-001 a C-047, ante la Secretaria General del CIADI (la "**Secretaria General**") de conformidad con el Artículo

---

[9] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, págs. 7775-7776.
[10] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

36 del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de otros Estados (el **"Convenio CIADI"**) y las Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje (las "**Reglas de Iniciación CIADI**").

18. El día 29 de mayo de 2012, el Secretariado del CIADI (el "**Secretariado**") remitió la Solicitud a la Demandada.

19. El día 15 de junio de 2012, la Secretaria General registró la Solicitud de la Demandante de conformidad con el Artículo 36 del Convenio CIADI y las Reglas 6 y 7 de las Reglas de Iniciación CIADI y notificó dicho registro a las Partes. El caso quedó registrado bajo el Caso CIADI N.° ARB/12/13.

20. El día 28 de septiembre de 2012, la Demandante nombró árbitro al Juez Charles N. Brower, nacional de los Estados Unidos de América.

21. El día 3 de octubre de 2012, la Demandada nombró árbitro al Sr. Gabriel Bottini, nacional de la República Argentina.

22. El día 4 de octubre de 2012, el Juez Brower aceptó su nombramiento en calidad de árbitro por parte de la Demandante, luego de presentar una declaración debidamente suscripta al Secretariado, conforme a la Regla 6(2) de las Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI (las "**Reglas de Arbitraje CIADI**").

23. El día 25 de octubre de 2012, el Sr. Bottini aceptó su nombramiento en calidad de árbitro por parte de la Demandada, luego de presentar una declaración debidamente suscripta al Secretariado conforme a la Regla 6(2) de las Reglas de Arbitraje CIADI.

24. El día 29 de octubre de 2012, la Demandante presentó una Propuesta de Recusación en contra del Sr. Gabriel Bottini en virtud de los Artículos 57 y 58 del Convenio CIADI y la Regla 9 de las Reglas de Arbitraje CIADI (**"Propuesta de la Demandante"**), junto con los Anexos Documentales A a H. El Secretariado acusó recibo de la Propuesta de la Demandante el día 30 de octubre de 2012.

25. El día 12 de noviembre de 2012, la Secretaria General informó al Prof. Dr. Klaus Sachs que las Partes acordaban su nombramiento en calidad de Presidente del Tribunal. Mediante una carta de fecha 14 de noviembre de 2012, el Prof. Sachs aceptó su nombramiento, luego de presentar una declaración debidamente firmada al Secretariado de conformidad con la Regla 6(2) de las Reglas de Arbitraje CIADI.

26. El día 26 de noviembre de 2012, la Secretaria General informó a las Partes que el Prof. Sachs, el Juez Brower y el Sr. Bottini habían aceptado sus nombramientos en calidad de árbitros y que, en consecuencia, en virtud de la Regla 6(1) de las Reglas de Arbitraje CIADI, se entendía que el Tribunal se había constituido y que el procedimiento se había

iniciado en dicha fecha. Asimismo, la Sra. Natalí Sequeira fue designada para actuar como Secretaria del Tribunal (la "**Secretaria**"). Tal como dispone la Regla 9(2) de las Reglas de Arbitraje CIADI, ese mismo día, la Secretaría les remitió la Propuesta de la Demandante a los tres miembros del Tribunal.

## II.    EL PROCEDIMIENTO DE ARBITRAJE

27.    En virtud de la Regla 9(6) de las Reglas de Arbitraje CIADI, el día 27 de noviembre de 2012, el Secretariado informó a las Partes de la suspensión del procedimiento hasta que se arribara a una decisión respecto de la Propuesta de la Demandante.

28.    Mediante una carta de fecha 28 de noviembre de 2012, el Prof. Sachs y el Juez Brower establecieron un cronograma para las presentaciones de escritos respecto de la Propuesta de la Demandante.

29.    El día 7 de diciembre de 2012, la Demandada presentó sus Observaciones a la Propuesta de la Demandante de Recusación en contra del Sr. Bottini, junto con los Anexos Documentales R-001 a R-003 y las Autoridades Legales RL-001 a RL-013.

30.    Mediante una carta de fecha 14 de diciembre de 2012, el Sr. Bottini ofreció explicaciones al Tribunal, acompañadas por el Anexo Documental 1, conforme a la Regla 9(3) de las Reglas de Arbitraje CIADI.

31.    Mediante una carta de fecha 21 de diciembre de 2012, la Demandante comentó sobre las Observaciones de la Demandada de fecha 7 de diciembre de 2012 y la carta del Sr. Bottini de fecha 14 de diciembre de 2012 y presentó los Anexos I a L.

32.    Ese mismo día, la Demandada presentó sus Observaciones a la Propuesta de la Demandante de Recusación respecto del Sr. Bottini.

33.    El día 27 de febrero de 2013, el Prof. Sachs y el Juez Brower dictaron una Decisión sobre la Propuesta de la Demandante de Recusación contra el Sr. Bottini del Tribunal en virtud del Artículo 57 del Convenio CIADI ("**Decisión sobre Recusación**"), y rechazaron la Propuesta de la Demandante de Recusación con la condición de que el Sr. Bottini completara, firmara y remitiera a la Secretaria General del CIADI una nueva Declaración conforme a la Regla 6(2) de las Reglas de Arbitraje CIADI dentro de un plazo de 10 días a partir de la fecha de la Decisión sobre Recusación.

34.  De conformidad con la Regla 9(6) de las Reglas de Arbitraje CIADI, el procedimiento se reanudó el día 27 de febrero de 2013.

35.  El día 1 de marzo de 2013, de acuerdo con la Decisión sobre Recusación, el Sr. Bottini le remitió a la Secretaria General una nueva Declaración en virtud de la Regla 6(2) de las Reglas de Arbitraje CIADI, de fecha 28 de febrero de 2013 ("**Declaración**").

36.  Mediante una carta dirigida a la Secretaria General de fecha 7 de marzo de 2013, la Demandante se refirió a la Declaración del Sr. Bottini y solicitó que "*notificara a las partes sobre su aceptación de cualquier mandato del Gobierno de Argentina que implicara proporcionar asesoramiento en relación con un tratado bilateral de inversión o cualquier controversia relacionada a dicho tratado*"[Traducción del Tribunal]. La Demandante hizo reserva de sus derechos a renovar las objeciones respecto del Sr. Bottini.

37.  El día 13 de marzo de 2013, el Sr. Bottini realizó una divulgación de conformidad con su Declaración de fecha 28 de febrero de 2013.

38.  Mediante una carta de fecha 14 de marzo de 2013, el Tribunal brindó a las Partes un borrador de agenda para la primera sesión y un borrador de resolución procesal, para recibir sus comentarios y revisión. El Tribunal también propuso la designación del Sr. Felix Lautenschlager de la firma de abogados del Prof. Sachs como Asistente del Tribunal.

39.  Mediante una carta de fecha 20 de marzo de 2013, la Demandante confirmó su disponibilidad para la primera sesión, a realizarse por vía telefónica o videoconferencia, y aceptó la designación del Sr. Lautenschlager como Asistente del Tribunal.

40.  Mediante un correo electrónico de fecha 20 de marzo de 2013, la Demandada sostuvo que consideraba que la primera sesión debía realizarse en persona, y confirmó que estaría disponible en las fechas de los meses de junio o julio indicadas en la carta del Tribunal de fecha 14 de marzo de 2013.

41.  Mediante un correo electrónico de fecha 28 de marzo de 2013, las Partes propusieron de manera conjunta un borrador de resolución procesal a la consideración del Tribunal.

42.  Mediante un correo electrónico de fecha 3 de abril de 2013, la Demandante informó al Tribunal de su disponibilidad para una primera sesión presencial a realizarse en las fechas de los meses de junio y julio propuestas por el Tribunal en su carta de fecha 14 de marzo de 2013.

43.  Mediante una carta de fecha 4 de abril de 2013, la Demandante solicitó que se le brindara más información sobre la divulgación del Sr. Bottini de fecha 12 de marzo de 2013.

44.  Mediante una carta de fecha 5 de abril de 2013, el Tribunal invitó a la Demandante a que preste su consentimiento, en virtud de la Regla 13(1) de las Reglas de Arbitraje CIADI, para una audiencia presencial a realizarse en París el día 6 de junio de 2013.

45.  Mediante un correo electrónico de fecha 9 de abril de 2013, la Demandante indicó que aún estaba disponible para una primera sesión presencial en la fecha propuesta.

46.  Mediante una carta de fecha 11 de abril de 2013, el Tribunal confirmó a las Partes que la primera sesión se llevaría a cabo en París el día 6 de junio de 2013.

47.  Mediante una carta de fecha 13 de abril de 2013, el Sr. Bottini respondió a la carta de la Demandante del día 4 de abril de 2013.

48.  El día 6 de junio de 2013, el Tribunal celebró su primera sesión con las Partes en París, Francia.

49.  Mediante un correo electrónico de fecha 8 de junio de 2013, el Sr. Bottini realizó una nueva divulgación con arreglo a su Declaración de fecha 28 de febrero de 2013.

50.  Mediante un correo electrónico de fecha 11 de junio de 2013, el CIADI brindó a las Partes un borrador revisado de la Resolución Procesal N° 1 e invitó a las Partes a que confirmen o presenten cualquier comentario sobre su contenido con anticipación al día 14 de junio de 2013.

51.  Mediante un correo electrónico de fecha 13 de junio de 2013, la Demandante presentó sus comentarios sobre el borrador revisado de la Resolución Procesal N.° 1.

52.  Mediante un correo electrónico de fecha 13 de junio de 2013, la Demandada señaló que no tenía comentarios sobre el borrador revisado de la Resolución Procesal N.° 1.

53.  El día 18 de junio de 2013, el Tribunal emitió la Resolución Procesal N.° 1, que incluye las Reglas Procesales que rigen el presente arbitraje.

54.  Mediante una carta de la misma fecha, la Demandante solicitó que se le brinde más información en relación con el Sr. Bottini a la luz de su divulgación de fecha 8 de junio de 2013.

55.  Mediante una carta de fecha 27 de junio de 2013, el Sr. Bottini respondió a la carta de la Demandante de fecha 18 de junio de 2013.

56.   Mediante un correo electrónico de fecha 6 de agosto de 2013, la Secretaria remitió a las Partes la versión en idioma español de la Resolución Procesal N.° 1.

57.   Mediante un correo electrónico de fecha 13 de agosto de 2013, el Sr. Bottini informó a los otros miembros del Tribunal y a las Partes que había sido nombrado árbitro por parte de la República Bolivariana de Venezuela en el caso *Venezuela US, S.R.L. (Barbados) c. La República Bolivariana de Venezuela*, Caso CPA N.º AA494.

58.   Mediante un correo electrónico de fecha 5 de septiembre de 2013, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

59.   Mediante una carta de fecha 27 de septiembre de 2013, la Demandante informó al CIADI y al Tribunal del acuerdo de las Partes para solicitar que el calendario procesal establecido en el Artículo 13 de la Resolución Procesal N.° 1 fuera modificado en relación con el Calendario de Presentación de Escritos y Producción de Documentos. Mediante un correo electrónico de la misma fecha, la Demandada confirmó su acuerdo al respecto.

60.   Mediante una carta de fecha 4 de octubre de 2013, el Tribunal confirmó a las Partes que no tenía objeciones al calendario procesal propuesto por las Partes el día 27 de septiembre de 2013.

61.   Mediante carta introductoria de fecha 28 de octubre de 2013, recibida el día 29 de octubre de 2013, la Demandante presentó su Memorial ("**Memorial**") junto con los Anexos Documentales C-048 a C-136 y las Autoridades Legales CLA-001 a CLA-090**,** las Declaraciones Testimoniales del Sr. Jack Larry, el Sr. Jorgen Pedersen y el Sr. Patrick Millot, la Evaluación de Daños sobre las Inversiones de Saint-Gobain en Venezuela por parte del Prof. Pablo T. Spiller de la firma Compass Lexecon y los anexos que la acompañan CLEX-1 a CLEX-79, más los Anexos Documentales C-001 a C-047 que se adjuntaron a la Solicitud de Arbitraje, según fueran modificados para incluir la traducción de dos anexos en idioma extranjero (tal como lo requiere la Resolución Procesal N.° 1).

62.   Mediante una carta de fecha 31 de octubre de 2013, el CIADI presentó la Resolución Procesal N.° 1 revisada a las Partes.

63.   Mediante un correo electrónico de fecha 30 de noviembre de 2013, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

64.   Mediante una carta de fecha 12 de febrero de 2014, la Demandante informó a la Demandada y al Tribunal de un error involuntario en el Dictamen Pericial del Prof. Spiller, a saber, que el anexo documental CLEX-80 había sido omitido, y que todas las referencias a CLEX-07 debería leerse como referencias a CLEX-80. La Demandante

adjuntó a su carta una lista actualizada de los anexos documentales y el anexo documental CLEX-80.

65.    Mediante una carta introductoria de fecha 21 de marzo de 2014, la Demandada presentó su Memorial de Contestación ("**Memorial de Contestación**"), junto con los Anexos Documentales R-004 a R-071 y las Autoridades Legales RL-014 a RL-125, la Declaración Testimonial del Sr. Eduardo Rondón y su traducción al idioma inglés con los anexos que la acompañan ER-001 a ER-010, y el Dictamen Pericial sobre la Cuantía de Daños confeccionado por el Sr. Vladimir Brailovsky y el Dr. Daniel Flores con los apéndices que lo acompañan BF-001 a BF-099.

66.    El día 4 de abril de 2014, de conformidad con la Resolución Procesal N.° 1, las Partes intercambiaron solicitudes para la producción de documentos.

67.    El día 5 de mayo de 2014, las Partes presentaron los documentos solicitados a los cuales no objetaron, e intercambiaron objeciones respecto de las restantes solicitudes.

68.    Mediante una carta de fecha 12 de mayo de 2014, la Demandante

       a)    presentó su Calendario Redfern, en el cual expuso sus respuestas a las objeciones de la Demandada relacionadas con las solicitudes de documentos por parte de la Demandante; y

       b)    presentó una solicitud, de acuerdo con el Artículo 9(4) de las Reglas de la Asociación Internacional de Abogados (IBA, por sus siglas en inglés) sobre Práctica de Prueba en el Arbitraje Internacional (2010) ("**Reglas de la IBA**"), para que se ordene la protección de los documentos presentados en este arbitraje y aquellos que la Demandante considere comercialmente y técnicamente confidenciales tal como prevé el Artículo 9(2)(e) de las Reglas de la IBA.

69.    Mediante un correo electrónico de fecha 12 de mayo de 2014, la Demandada presentó su Calendario Redfern, en el cual expuso sus respuestas a las objeciones de la Demandante relacionadas con las solicitudes de documentos por parte de la Demandada.

70.    Mediante una carta de fecha 15 de mayo de 2014, el Tribunal requirió aclaraciones de las Partes respecto de sus solicitudes de documentos e invitó a la Demandada a que responda a la solicitud de una resolución de confidencialidad por parte de la Demandante, a más tardar, el día 19 de mayo de 2014.

71.    El día 15 de mayo de 2014, la Demandante presentó una Solicitud de Medidas Provisionales de acuerdo con el Artículo 47 del Convenio CIADI y la Regla 39 (1) de las Reglas de Arbitraje CIADI, junto con el Anexo Documental A y las Autoridades Legales

CLA-091 a CLA-102, mediante la cual requirió que el Tribunal ordene a la Demandada que desista de los procedimientos judiciales en curso en Venezuela relacionados con la expropiación de Norpro Venezuela, C.A (los **Procedimientos Judiciales Entablados en Venezuela**").

72. Mediante una carta de fecha 18 de mayo de 2014, la Demandada contestó a la carta del Tribunal de fecha 15 de mayo de 2014, en relación con la solicitud de documentos de la Demandante, y brindó sus comentarios objetando a la solicitud de la Demandante de una resolución de confidencialidad.

73. Mediante una carta de fecha 19 de mayo de 2014, la Demandante contestó a la carta del Tribunal de fecha 15 de mayo de 2014, en relación con la solicitud de documentos de la Demandada.

74. Mediante una carta de fecha 27 de mayo de 2014, el Tribunal invitó a la Demandante a brindar más detalles respecto de la Solicitud N.° 10 de la Demandada presente en sus solicitudes de documentos, relacionada con un "*privilegio contador-cliente*", como así también a que incluya sus comentarios sobre el escrito de la Demandada que establecía que la Demandante había renunciado a cualquier privilegio.

75. Mediante una carta de fecha 28 de mayo de 2014, la Demandante brindó más detalles sobre su afirmación de la presencia del privilegio contador-cliente respecto de la Solicitud N.° 10 de la Demandada, junto con los Anexos A, B y C de su carta.

76. El día 28 de mayo de 2014, la Demandada presentó su Contestación a la Solicitud de Medidas Provisionales de la Demandante, junto con el Anexo Documental R-072 y las Autoridades Legales RL-126 a RL-132. Se remitieron copias impresas de la Contestación y de los anexos adjuntos al CIADI dentro del plazo de dos días hábiles, en cumplimiento de lo previsto en la Resolución Procesal N.° 1.

77. Mediante un correo electrónico de fecha 30 de mayo de 2014, la Demandada ofreció comentarios relacionados con su Solicitud N.° 10, adicionalmente a la carta de la Demandante de fecha 28 de mayo de 2014.

78. Mediante una carta de fecha 3 de junio de 2014, el Tribunal invitó a las Partes a que intercambien una segunda ronda de escritos en relación con la Solicitud de Medidas Provisionales de la Demandante, el día 10 de junio de 2014, o con anterioridad a dicha fecha, en el caso de la Demandante y, el día 17 de junio de 2014, o con anterioridad a dicha fecha, en el caso de la Demandada.

79. El día 10 de junio de 2014, el Tribunal emitió su Resolución Procesal N.° 2, la cual contenía una resolución de confidencialidad ("**Resolución de Confidencialidad**"), y su Decisión sobre las solicitudes de las Partes de producción de documentos.

80. El día 10 de junio de 2014, la Demandante presentó su Réplica sobre la Solicitud de Medidas Provisionales, junto con el Anexo Documental C-137 y las Autoridades Legales CLA-103 a CLA-107, y el Dictamen Jurídico Pericial del Dr. Allan R. Brewer Carías con los apéndices A, B y C que lo acompañan.

81. Mediante una carta de fecha 12 de junio de 2014, la Demandante informó al Tribunal que las Partes habían acordado intercambiar documentos respecto de los cuales no se hubieran planteado objeciones al día 25 de junio de 2014.

82. Mediante una carta de fecha 16 de junio de 2014, la Demandada otorgó al Tribunal una lista de personas designadas por la Demandada para acceder a los Documentos Altamente Confidenciales sujetos a la Resolución de Confidencialidad del Tribunal contenida en la Resolución Procesal N.° 2.

83. Mediante una carta de fecha 17 de junio de 2014, la Demandante objetó a la inclusión del Sr. Eduardo José Rondón Cedeño en la lista de las personas designadas por la Demandada y solicitó que se exija a la Demandada que identifique una persona de reemplazo. La Demandante también destacó que se basaría en determinados documentos que serían presentados la semana siguiente en su Memorial de Réplica como Documentos Altamente Confidenciales y solicitó que la Demandada confirme que, hasta el momento en el que el Tribunal aprobara la lista de personas designadas de la Demandada, los Documentos Altamente Confidenciales no serían compartidos más allá de los individuos identificados como los asesores legales externos de Venezuela y sus peritos externos, en ausencia de la cual la Demandante solicitaría que el Tribunal emita una orden al mismo efecto.

84. El día 17 de junio de 2014, la Demandada presentó su Contestación Adicional a la Solicitud de Medidas Provisionales de la Demandante, junto con los Anexos Documentales R-073 a R-077.

85. El día 18 de junio de 2014, el Tribunal invitó a la Demandada a que formule comentarios sobre la carta de la Demandante de fecha 17 de junio de 2014 relativa a la lista de personas designadas de la Demandada, a más tardar, el día 20 de junio de 2014.

86. Mediante carta introductoria de fecha 18 de junio de 2014, la Demandante presentó su Memorial de Réplica ("**Réplica**"), junto con los Anexos Documentales C-138 a C-156 y las Autoridades Legales CLA-108 a CLA-151, la Segunda Declaración Testimonial del Sr. Jack Larry, y el Segundo Dictamen Jurídico Pericial del Dr. Allan R. Brewer Carías con los apéndices D a L que lo acompañan, y el Dictamen Complementario del Prof.

Spiller de Compass Lexecon con los anexos documentales CLEX-81 a CLEX-195 que lo acompañan.

87. Mediante una carta de fecha 20 de junio de 2014, la Demandada señaló que no estaba de acuerdo con el contenido de la carta de la Demandante de fecha 17 de junio de 2014, pero que, no obstante, procedería a la remoción del Sr. Rondón Cedeño de la lista de personas designadas, y lo reemplazaría con el Sr. Luis Govanny Cárdenas Rodríguez.

88. El día 23 de junio de 2014, el Tribunal invitó a la Demandante a declarar si tenía alguna objeción respecto de la designación del Sr. Cárdenas Rodríguez. Mediante un correo electrónico de la misma fecha, la Demandante confirmó que no tenía objeciones.

89. Mediante un correo electrónico de fecha 24 de junio de 2014, la Demandada remitió a la Secretaria los compromisos de confidencialidad suscriptos correspondientes a las 22 personas designadas por la Demandada para que tengan acceso a los Documentos Altamente Confidenciales.

90. Mediante una carta de fecha 25 de junio de 2014, el Tribunal aprobó la lista de la Demandada de Destinatarios de los Documentos Altamente Confidenciales tal como se describe en la carta de la Demandada de fecha 16 de junio de 2014 y según fuera modificada por la carta de fecha 20 de junio de 2014. La Secretaria luego remitió los compromisos suscriptos al Tribunal.

91. Mediante un correo electrónico de fecha 22 de julio de 2014, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

92. Mediante una carta de fecha 8 de agosto de 2014, el Tribunal informó a las Partes que había finalizado sus deliberaciones sobre la Solicitud de Medidas Provisionales de la Demandante y decidido, por voto de la mayoría, que la Solicitud sería denegada. Los motivos para tal decisión serían oportunamente transmitidos a las Partes a través de una Resolución Procesal, que también estaría acompañada por la opinión en disidencia.

93. El día 9 de septiembre de 2014, se emitió la Resolución Procesal N.° 3 en nombre de la mayoría del Tribunal, que incluía los fundamentos para la Decisión sobre la Solicitud de Medidas Provisionales de la Demandante, y se adjuntó la Opinión Disidente del Juez Brower.

94. Mediante carta introductoria de fecha 18 de septiembre de 2014, la Demandada presentó su Dúplica sobre el Fondo ("**Dúplica**"), junto con los Anexos Documentales R-78 a R-125, y las Autoridades Legales RL-133 a RL-189 y el Segundo Dictamen Pericial sobre la Cuantía de Daños del Sr. Vladimir Brailovsky y del Dr. Daniel Flores con los apéndices BF-100 a BF-177 que lo acompañan.

95.     Mediante un correo electrónico de fecha 30 de septiembre de 2014, el Sr. Bottini realizó una nueva divulgación de conformidad con su Declaración de fecha 28 de febrero de 2013.

96.     Mediante una carta de fecha 14 de noviembre de 2014, el Tribunal invitó a las Partes a que propusieran cualquier punto procesal sobre el cual desearan debatir durante la Audiencia Preliminar por vía de Teleconferencia el día 10 de diciembre de 2014 y a que indicaran si habían logrado alcanzar un acuerdo sobre dichos puntos, a más tardar, el día 25 de noviembre de 2014.

97.     El día 25 de noviembre de 2014, las Partes presentaron sus Propuestas Procesales al Tribunal, e identificaron los puntos respecto de los cuales llegaron a un acuerdo, así como aquellos que deberían debatirse durante la Audiencia Preliminar por vía de Teleconferencia.

98.     Mediante correos electrónicos de fechas 3 y 4 de diciembre de 2014, de acuerdo con el Artículo 9 de la Resolución Procesal N.º 1, ambas Partes acordaron celebrar la audiencia en Washington, D.C., EE. UU.

99.     Mediante una carta de fecha 5 de diciembre de 2014, el CIADI informó a las Partes y al Tribunal que la Sra. Sequeira se tomaría licencia por maternidad y que la Sra. Giuliana Canè se desempeñaría como Secretaria del Tribunal durante su ausencia.

100.    Mediante una carta de la misma fecha, el Tribunal informó a las Partes que el Sr. Lautenschlager dejaría de trabajar para la firma de abogados del Presidente hacia fines de ese año y, por consiguiente, dejaría de actuar en su carácter de Asistente del Tribunal en el presente caso. El Presidente propuso a las Partes que su asociada, la Sra. Susanne Häusler, fuera designada en calidad de futura Asistente del Tribunal y, salvo que las Partes tuvieran cualquier objeción, asistiera a la Audiencia Preliminar por vía de Teleconferencia en lugar del Sr. Lautenschlager.

101.    Mediante correos electrónicos de fechas 8 y 9 de diciembre de 2014, las Partes informaron al Tribunal que no tenían objeciones respecto de la designación de la Sra. Häusler como Asistente del Tribunal.

102.    El día 10 de diciembre de 2014 a las 12 p.m. hora estándar del Este, el Tribunal celebró la Audiencia Preliminar por vía de Teleconferencia con las Partes, durante la cual escuchó las posiciones respectivas de las Partes en relación con las cuestiones sobre las que no habían podido alcanzar un acuerdo conforme a sus Propuestas Procesales de fecha 25 de noviembre de 2014.

103. Mediante una carta de fecha 12 de diciembre de 2014, el Tribunal notificó a las Partes su Decisión sobre las Propuestas Procesales de las Partes de fecha 25 de noviembre de 2014.

104. Mediante correos electrónicos de fecha 22 de diciembre de 2014, cada Parte notificó al Tribunal y a la Parte contraria los nombres de los testigos de hecho y a los peritos testigos que deseaba someter a contrainterrogatorio durante la Audiencia.

105. Mediante correo electrónico de fecha 19 de enero de 2015, la Demandante notificó al Tribunal y a la Demandada el orden en el cual pretendía presentar a sus testigos en la Audiencia.

106. El día 23 de enero de 2015, la Demandada presentó correcciones al Segundo Dictamen Pericial sobre la Cuantía de Daños del Sr. Vladimir Brailovsky y el Dr. Daniel Flores, junto con los apéndices corregidos BF-100A a BF-103A.

107. Mediante una carta de fecha 26 de enero de 2015, la Demandada presentó una solicitud para que el Tribunal admitiera anexos documentales de hecho adicionales en el expediente. Ese mismo día, la Demandante presentó autoridades legales adicionales de CLA-152 a CLA-154 y la Demandada presentó autoridades legales adicionales, RL-190 y RL-191.

108. Mediante una carta de fecha 29 de enero de 2015, la Demandante presentó sus comentarios sobre la solicitud para que el Tribunal admitiera anexos documentales de hecho adicionales en el expediente y se opuso a ella. Mediante una carta de esa misma fecha, la Demandada respondió a los comentarios de la Demandante.

109. El día 30 de enero de 2015, el Tribunal admitió la solicitud de la Demandada, siempre que dichas pruebas fueran presentadas, a más tardar, el día 2 de febrero de 2015, y concedió a la Demandante autorización para que presente pruebas de refutación, a más tardar, el día 4 de febrero de 2015.

110. El día 31 de enero de 2015, la Demandada presentó los Anexos Documentales R-126 a R-129 al Tribunal. El día 1 de febrero de 2015, la Demandante presentó los Anexos Documentales C-159 a C-162 como pruebas de refutación.

111. Desde el día 2 al 6 de febrero de 2015, el Tribunal celebró la Audiencia con las Partes en las instalaciones del CIADI en Washington, D.C., EE. UU.

112. El día 11 de febrero de 2015, el Tribunal transmitió a las Partes una lista de preguntas para que sean abordadas en sus Escritos Posteriores a la Audiencia.

113.  Mediante correo electrónico de fecha 11 de marzo de 2015, la Demandante solicitó que cualquier Laudo dictado en este procedimiento no fuera publicado conforme al Artículo 18.1 de la Resolución Procesal N.° 1, a la espera de la revisión de la Demandante y su supresión de la información comercial confidencial, reservada.

114.  El día 16 de marzo de 2015, el Tribunal confirmó que, tal como se refleja en el Artículo 18.1 de la Resolución Procesal N.° 1, las resoluciones procesales, las decisiones o laudos que se emitan en el presente procedimiento no serían publicados sin que las Partes prestaren su consentimiento.

115.  El día 2 de abril de 2015, las Partes presentaron simultáneamente sus escritos posteriores a la audiencia ("**Presentación Posterior a la Audiencia de la Demandante**"; "**Escrito Posterior a la Audiencia de la Demandada**").

116.  El día 22 de mayo de 2015, las Partes presentaron simultáneamente su segunda ronda de escritos posteriores a la audiencia ("**Segunda Presentación Posterior a la Audiencia de la Demandante**"; "**Segundo Escrito Posterior a la Audiencia de la Demandada**").

117.  El día 2 de junio de 2015, la Demandada presentó sus comentarios sobre supuestos nuevos argumentos planteados en la Segunda Presentación Posterior a la Audiencia de la Demandante.

118.  El día 12 de junio de 2015, la Demandante contestó a los comentarios de la Demandada de fecha 2 de junio de 2015.

119.  El día 19 de junio de 2015, el Tribunal decidió admitir las Secciones 1 y 4 de la carta de la Demandada de fecha 2 de junio de 2015 como escritos de respuesta en relación con los nuevos argumentos planteados en la Segunda Presentación Posterior a la Audiencia de la Demandante; el Tribunal también consideró que las Secciones 2 y 3 de la carta de la Demandada eran presentaciones adicionales inadmisibles que debían eliminarse del expediente.

120.  El día 30 de junio de 2015, las Partes presentaron simultáneamente sus presentaciones sobre costos ("**Presentación sobre Costos de la Demandante**"; "**Presentación sobre Costos de la Demandada**").

121.  El día 3 de agosto de 2015, el CIADI informó a las Partes y al Tribunal que la Sra. Sequeira había reanudado sus funciones como Secretaria del Tribunal.

122.  El día 13 de agosto de 2015, el Tribunal solicitó que las Partes entregaran una actualización de la valuación de Norpro Venezuela, S.A. realizada por sus peritos a la fecha del laudo, tomando como fecha de la valuación el día 31 de agosto de 2015. El

Tribunal resaltó que solicitaba dicha actualización a los efectos de realizar una comparación, sin perjuicio de la decisión final del Tribunal sobre la fecha de valuación aplicable al presente caso. Por último, el Tribunal solicitó a las Partes que consultaran con sus peritos si la actualización requerida podía ser presentada, a más tardar, el día 30 de septiembre de 2015.

123.   El día 15 de agosto de 2015, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

124.   Mediante correo electrónico de fecha 21 de agosto de 2015, la Demandada solicitó una prórroga del plazo propuesto para la presentación de las valuaciones actualizadas de los peritos hasta el día 15 de octubre de 2015.

125.   Mediante correo electrónico de fecha 25 de agosto de 2015, la Demandante confirmó que no tenía objeciones respecto de la prórroga de la fecha límite solicitada por la Demandada. Mediante correo electrónico de la misma fecha, el Tribunal aceptó la prórroga del plazo propuesto hasta el día 15 de octubre de 2015.

126.   El día 14 de octubre de 2015, la Demandante informó al Tribunal que su perito requería tiempo adicional para redactar el dictamen actualizado requerido por el Tribunal y, por consiguiente, solicitó que el plazo para su presentación se prorrogara al día 22 de octubre de 2015. Asimismo, la Demandante destacó que la Demandada no se opuso a la prórroga propuesta.

127.   El día 15 de octubre de 2015, el Tribunal concedió la solicitud de la Demandante y prorrogó el plazo para la presentación de los dictámenes actualizados de los peritos de ambas Partes hasta el día 22 de octubre de 2015.

128.   El día 22 de octubre de 2015, las Partes presentaron simultáneamente las actualizaciones solicitadas de las valuaciones de sus peritos ("**Actualización de la Valuación de la Demandante**"; "**Actualización de la Valuación de la Demandada**").

129.   El día 30 de octubre de 2015, la Demandada pidió autorización al Tribunal para presentar una carta de no más de tres páginas para abordar determinadas cuestiones planteadas en la Actualización de la Valuación de la Demandante.

130.   El día 3 de noviembre de 2015, el Tribunal admitió la solicitud de la Demandada y permitió que ambas Partes presentaran breves comentarios sobre la Actualización de la Valuación de la Parte contraria, a más tardar, el día 6 de noviembre de 2015.

131.   El día 6 de noviembre de 2015, las Partes presentaron simultáneamente sus comentarios sobre la Actualización de la Valuación de la Parte contraria; la Demandada también

presentó el Anexo Documental R-131. En su correo electrónico enviado al Tribunal, la Demandante hizo reserva de su derecho a modificar su Presentación sobre Costos a la luz de los honorarios y costos adicionales incurridos en relación con su Actualización de la Valuación y sus comentarios sobre la Actualización de la Valuación de la Demandada.

132. El día 9 de noviembre de 2015, el Tribunal invitó a ambas Partes a que presentaran cualquier modificación que desearan realizar a sus respectivas Presentaciones sobre Costos, a más tardar, el día 23 de noviembre de 2015.

133. El día 23 de noviembre de 2015, las Partes presentaron simultáneamente sus presentaciones actualizadas sobre costos ("**Presentación Actualizada sobre Costos de la Demandante**"; "**Presentación Actualizada sobre Costos de la Demandada**").

## D.    ANTECEDENTES FÁCTICOS

134. A continuación, se sintetizan los antecedentes no controvertidos entre las Partes o que, de algún otro modo, el Tribunal queda satisfecho de que quedaron demostrados mediante las pruebas presentadas en este procedimiento. La siguiente síntesis tiene por objeto brindar una visión general de la presente y no debe considerase como una lista taxativa de todos los hechos relevantes. Tales hechos adicionales podrán ser abordados en el análisis del Tribunal *infra*.

## I.    DEMANDANTE

135. Saint-Gobain es una sociedad constituida de conformidad con las leyes de la República Francesa e inscripta el día 28 de marzo de 1995[11]. Es una filial indirecta y de propiedad exclusiva de Compagnie de Saint Gobain, e integra el grupo empresarial Compagnie de Saint-Gobain[12].

136. Norpro Venezuela es una filial de propiedad exclusiva de Saint-Gobain, constituida de acuerdo con las leyes de Venezuela[13].

---

[11] Memorial, ¶ 1; **Anexo C-46**.

[12] Memorial, ¶ 1. Saint-Gobain es de propiedad absoluta de Société de Participations Financières et Industrielles, que a su vez es de propiedad absoluta de Compagnie de Saint-Gobain. Solicitud, ¶ 11.

[13] Solicitud, ¶ 4. La inversión extranjera directa de Saint-Gobain en Norpro Venezuela se registró ante la Superintendencia de Inversiones Extranjeras de Venezuela. **Anexo C-9**. Norpro Venezuela se registró inicialmente el día 25 de octubre de 2005, bajo el nombre Saint-Gobain Proppants Venezuela, C.A., ante el Registro Mercantil Quinto del Distrito Capital y el Estado Bolivariano de Miranda. **Anexo C-4**. Por acuerdo de accionistas, la empresa cambió su nombre por Proppants Venezuela, C.A. y se mudó de Caracas a Puerto Ordaz, Estado Bolívar, Venezuela. El día 19 de diciembre de 2005, Proppants Venezuela C.A. se inscribió ante el Registro Mercantil del Estado Bolívar en Puerto Ordaz, Venezuela. **Anexo C-5**. El día 15 de diciembre de 2008, los accionistas acordaron cambiar el nombre de la empresa de Proppants Venezuela a Norpro Venezuela, C.A.; este cambio de nombre se registró oficialmente el día 26 de diciembre de 2008. **Anexo C-13**. Una de las acciones en Norpro Venezuela

137. A través de su filial venezolana, la Demandante construyó y operó una planta en Puerto Ordaz, Estado Bolívar, Venezuela, con el fin de producir *proppants* cerámicos— pequeñas cuentas de cerámica hechas con bauxita, utilizadas como parte del proceso de fracturación hidráulica para "*apuntalar*" las fisuras abiertas en pozos, inducidas en las formaciones rocosas de los yacimientos, a fin de acelerar y aumentar la recuperación de hidrocarburos en cada formación[14].

138. La Demandante (a través de sus filiales) fabricó *proppants* cerámicos para sustentar la industria de gas y petróleo durante 30 años aproximadamente[15]. Hacia fines de la década de los noventa, Saint-Gobain ya ocupaba una sólida posición en el mercado norteamericano, en particular, con respecto a *proppants* cerámicos de calidad superior[16].

139. En su Memorial, la Demandante describió la reciente evolución del negocio de los *proppants*, *inter alia*, de la siguiente manera:

> "[E]*l mercado de proppants se desarrolló y expandió, de manera considerable, durante los últimos diez años y el principal factor determinante de este desarrollo y expansión fue el avance tecnológico en la industria del petróleo y el gas. En concreto, los avances permitieron a los productores de gas y petróleo: (a) realizar perforaciones más profundas; (b) perforar en dirección horizontal; y (c) utilizar la fracturación hidráulica para la extracción de hidrocarburos de fuentes no convencionales, como formaciones de esquisto. La fracturación hidráulica es una técnica que permite inyectar fluidos a alta presión en un pozo perforado en formaciones de esquisto impermeables. Los fluidos crean grietas en el esquisto para liberar el petróleo y el gas atrapado en el interior. Los* proppants *entran en las pequeñas fisuras creadas mediante la inyección de fluidos a alta presión y las mantienen abiertas, lo que permite aumentar la producción*. […]*
>
> De esta forma, en una industria cada vez más caracterizada por pozos horizontales más profundos y fracturación, los* proppants *permiten una extracción más eficaz de hidrocarburos.*
>
> *Asimismo, al estimular el pozo, los* proppants *no sólo mejoran las tasas de extracción de petróleo y gas natural, sino que también contribuyen a una mayor productividad y longevidad del pozo.*
>
> *Hay cuatro clases de* proppants. *Según el grado de resistencia, de mayor a menor, incluyen: (a) de arena; (b) de arena con revestimiento de resina; (c) cerámicos; y (d) cerámicos con revestimiento de resina.*

---

pertenece a Luis Páez, ciudadano venezolano y Presidente de Norpro Venezuela. La transferencia planificada de la acción del Sr. Páez a Saint-Gobain no ha ocurrido aún.

[14] Solicitud, ¶ 4. Memorial, ¶ 2.
[15] Memorial, ¶ 5; **Anexo C-133**.
[16] Memorial, ¶ 8.

*La elección del tipo de* proppant *para un determinado pozo depende de la tensión de cierre de ese pozo. Saint-Gobain fabrica* proppants *cerámicos, ideales para pozos más profundos de alta tensión de cierre, comunes en formaciones de esquisto en los Estados Unidos. Otros tipos de* proppants—*en especial, los de arena—no pueden soportar tales condiciones"*[17]. [Traducción del Tribunal]

## II. LA DECISIÓN DE LA DEMANDANTE DE AMPLIAR LA CAPACIDAD DE PRODUCCIÓN Y BUSCAR UN TERRENO PARA SU EXPANSIÓN EN SUDAMÉRICA

140. En vista de la creciente industria de los *proppants* en Norteamérica, y a nivel internacional, el Grupo Saint-Gobain comenzó, a partir del año 2000, a investigar opciones para aumentar su capacidad de producción[18]. En ese entonces, no había muchos yacimientos de bauxita de eficacia comprobada en los EE. UU., ya sea para ampliación de la planta de *proppants* de Saint-Gobain en Fort Smith, Estado de Arkansas (la "**Planta de Fort Smith**") o para un nuevo establecimiento en Norteamérica. Como consecuencia, en 2004, Saint-Gobain comenzó a buscar un sitio para la producción de *proppants* en Sudamérica, previendo que un 70-80% de los *proppants* producidos allí se venderían al mercado norteamericano, en tanto el resto se reservaría para el mercado sudamericano[19].

141. La Demandante identificó como los principales requisitos para la producción de *proppants* a los siguientes:

"*(a) insumos constantes de bauxita* [es decir, la materia prima principal para la producción de *proppants*]*, gas y electricidad (a precios competitivos); (b) proximidad al mercado estadounidense a fin de acceder al más grande mercado (actual) de* proppants *con costos de transporte razonables; (c) acceso a mano de obra calificada, capaz de lidiar con los aspectos técnicos de la producción de* proppants*; y (d) la capacidad de construir una planta y producir a corto plazo para atender las crecientes necesidades de los clientes"*[20]. [Traducción del Tribunal]

142. De estos requisitos, el acceso a la bauxita y la proximidad al mercado objetivo se consideraron los principales factores de la ubicación de la inversión[21].

143. Inicialmente, la Demandante contempló cuatro países—Brasil, Guyana, Trinidad y Venezuela—como posibles ubicaciones para la nueva planta de *proppants*. Sin embargo, al cabo de varios viajes de empleados del Grupo Saint-Gobain con fines de exploración

---

[17] Memorial, ¶¶ 5-7. Citas internas omitidas.
[18] Memorial, ¶ 8.
[19] Memorial, ¶ 10; Pedersen, ¶¶ 9, 11, 44.
[20] Memorial, ¶ 12. Citas internas omitidas. *Véase, también,* Pedersen, ¶ 15; Larry, ¶¶ 17, 22; **Anexos C-069** y **C-107**.
[21] Memorial, ¶ 12.

para desarrollo comercial, las ubicaciones de Guyana, Trinidad y Brasil se descartaron por considerarse inviables a corto plazo o anticompetitivas desde el punto de vista económico[22].

144. La Demandante consideró a Venezuela como un posible sitio interesante para la construcción de una planta de *proppants* dada la disponibilidad de bauxita, electricidad y gas natural[23] y, según la Demandante, la posibilidad de celebrar contratos favorables con entidades estatales para el suministro de esos recursos y beneficios logísticos, como la disponibilidad de una ruta de envío conocida desde el puerto local de Puerto Ordaz hasta Corpus Christi, Estado de Texas, donde los *proppants* terminados se despacharían para su distribución en el mercado norteamericano. Además, Saint-Gobain tuvo experiencia en Venezuela y en la región de Puerto Ordaz, y esperaba contar con apoyo del Gobierno para concluir el proyecto a tiempo y dentro de lo presupuestado[24].

145. En el año 2004, representantes del Grupo Saint-Gobain se reunieron con funcionarios del Ministerio del Poder Popular para las Industrias Básicas y Minería ("**MIBAM**") y con representantes de las empresas estatales CVG Bauxilum, C.A. ("***CVG Bauxilum***"), a cargo del suministro de bauxita, CVG Electrificación del Caroní, C.A. ("***CVG EDELCA***"), a cargo del suministro eléctrico, y PDVSA Gas, S.A. ("***PDVSA Gas***"), a cargo del suministro de gas, para debatir sobre una posible inversión[25]. Las Partes están de acuerdo en que, durante esas reuniones, los funcionarios venezolanos se mostraron a favor del proyecto; no obstante, discrepan en cuanto a si tales funcionarios aseguraron que, si Saint-Gobain aceptaba invertir en Venezuela, Venezuela garantizaría la celebración de contratos favorables a largo plazo para la entrega de bauxita, gas y electricidad a Saint-Gobain[26].

146. En el mes de septiembre de 2004, Jorgen Pedersen, Vicepresidente y Gerente General de Saint-Gobain NorPro, se reunió con funcionarios de la Corporación Venezolana de Guayana ("**CVG**"), de propiedad estatal, y su filial, CVG Bauxilum, para seguir investigando sobre la posibilidad de invertir en Venezuela. Según la Demandante, CVG describió en esta ocasión la posibilidad de celebrar contratos favorables a largo plazo para el suministro de bauxita a la Demandante. De nuevo, las Partes discrepan en cuanto a lo

---

[22] Memorial, ¶ 11. Pedersen, ¶¶ 16, 17. La Demandante alega que Guyana no tenía suministros de gas disponibles, además de que los costos de electricidad eran altos y las opciones de envío bastante limitadas. En Trinidad, Saint-Gobain habría tenido que importar bauxita de Guyana, cuyo suministro continuo no podía asegurarse, y no habría tierra disponible por muchos años en la ubicación industrial preferida. Por último, en Brasil, ya se estaba vendiendo bauxita local a productores y extractores de aluminio y, además, Saint-Gobain habría tenido que extraer y transportar bauxita por su cuenta. Memorial, ¶¶ 13-15; **Anexos C-063** y **C-071.**
[23] Memorial, ¶ 16; Solicitud, ¶ 12.
[24] Memorial, ¶ 16.
[25] Memorial, ¶ 17.
[26] Memorial, ¶ 17; Dúplica, ¶¶ 62 y ss.

debatido con respecto a la posibilidad y las condiciones de los contratos a largo plazo para la compra de bauxita[27].

147. El día 3 de febrero de 2005, el equipo responsable de identificar la ubicación para la nueva inversión de la Demandante presentó a la alta gerencia de Compagnie de Saint-Gobain un *Demande d'Autorisation Compagnie* ("**DAC**") con respecto a la nueva inversión propuesta en Venezuela con una capacidad de producción anual de 50.000 toneladas métricas de *proppants* cerámicos[28]. El DAC, que sirvió como solicitud oficial a los accionistas para recibir la aprobación de una inversión, se aprobó el día 7 de febrero de 2005[29].

148. Alrededor de la misma época, Jorgen Pedersen y Guy Rolli, director de la Delegación de Saint-Gobain que abarca Colombia, México y Venezuela, "*entre otros*"[30], comenzaron a reunirse con altos funcionarios del Gobierno venezolano, en particular, del MIBAM y del Ministerio de Industrias Ligeras y Comercio ("**MILCO**"). Según la Demandante, el MIBAM—el ministerio que supervisó la actividad de la CVG—fue "*la motivación dentro del Gobierno venezolano no sólo para obtener la aprobación del proyecto, en general, sino también específicamente para cerrar un contrato de suministro de bauxita a largo plazo*"; así, consideró que las reuniones con el MIBAM eran de "*suma importancia y determinantes con respecto a su evaluación de viabilidad de su inversión*"[31]. [Traducción del Tribunal]

149. El día 27 de abril de 2005, representantes de Saint-Gobain se reunieron con Valmore Vásquez, Viceministro de Promoción de Inversiones del MIBAM, y con representantes de PDVSA Gas y CADAFE (Compañía Anónima de Administración y Fomento Eléctrico) para analizar el futuro proyecto[32]. Según la Demandante, el MIBAM admitió en la reunión que la disponibilidad de producción y suministro de *proppants* a nivel local sería muy valioso para Venezuela[33].

150. Según recuerda el Sr. Pedersen, el día 6 de mayo de 2005, Carmen Velásquez, Coordinadora de Promoción de Inversiones del MIBAM, le comunicó informalmente a representantes de la Demandante que "*la Viceministra Raiza Molina recomendaría al Ministro Álvarez conceder la solicitud de suministro de bauxita de Saint-Gobain*"[34]. En

---

[27] Memorial, ¶ 18; Pedersen, ¶ 21.
[28] Memorial, ¶ 19; Memorial de Contestación, ¶ 6; **Anexo C-057**.
[29] Memorial, ¶ 19; Memorial de Contestación, ¶ 6; **Anexo C-058**.
[30] No se especifíca en el Memorial de la Demandante ni en la declaración testimonial presentada por el Sr. Pedersen a quién hace referencia la expresión "*otros*" participantes. *Cfr.* Memorial, ¶ 20; Pedersen, ¶ 24.
[31] Memorial, ¶ 20; Pedersen, ¶ 24.
[32] Memorial, ¶ 22; **Anexo C-2**.
[33] Memorial, ¶ 22.
[34] Pedersen, ¶ 27; Memorial, ¶ 23.

una reunión de fecha 10 de mayo de 2005, a la que asistieron, entre otros, la Viceministra del MIBAM Raiza Molina y el Presidente Jesús Imery de CVG Bauxilum, el MIBAM volvió a destacar su estrategia para aumentar las exportaciones de productos no derivados del petróleo y para desarrollar producción local futura a través de la transferencia de tecnología[35]. La Demandante alega que la Srta. Molina "*confirmó los términos de los contratos de suministro a largo plazo propuestos, celebrados con CVG Bauxilum y PDVSA Gas para el suministro de bauxita y gas, respectivamente, para toda inversión que a futuro realice Saint-Gobain*"[36]. [Traducción del Tribunal]

151. Según las notas del Sr. Pedersen sobre una reunión de fecha 11 de junio de 2005 con Jesús Imery,  Presidente de CVG Bauxilum, el Sr. Imery señaló que había recibido el apoyo del Presidente Chávez y del Ministro Víctor Álvarez del MIBAM para la inversión de *proppants* de Saint-Gobain[37]. Luego, en una reunión de alto nivel entre representantes de los Gobiernos de Francia y Venezuela, realizada el día 20 de octubre de 2005, el representante de la Demandante en la reunión dejó constancia en un memorando que el Viceministro Vásquez del MIBAM confirmó que le había encomendado al presidente de CVG Bauxilum resolver el contrato lo antes posible[38].

152. El día 25 de octubre de 2005, la Demandante inscribió a Saint-Gobain Proppants Venezuela, C.A., predecesora de Norpro Venezuela[39]. Tres meses después, el día 27 de enero de 2006, CVG Bauxilum, actuando "**bajo el auspicio del** […] MIBAM y la […] CVG", suscribió un contrato de compraventa con la empresa Saint-Gobain Proppants Venezuela C.A. (el "**Contrato de Bauxita**")[40].

153. Durante el transcurso del año 2005, la Demandante también negoció con CVG EDELCA y PDVSA Gas en relación con contratos a largo plazo para el suministro de electricidad y gas, respectivamente. Según la Demandante, el MIBAM acordó en una reunión de fecha 2 de marzo de 2006 garantizar que CVG EDELCA y PDVSA Gas celebrarían contratos de suministro a largo plazo con Norpro Venezuela a favor del proyecto de *proppants* de Saint-Gobain[41].

154. El día 22 de agosto de 2006, el MIBAM solicitó que la CVG designara (en nombre del Ministerio) un interlocutor con sede en Puerto Ordaz como contacto diario para Saint-Gobain[42]. Así, el día 29 de agosto de 2006, se notificó a Saint-Gobain la designación de

---

[35] Memorial, ¶ 23; **Anexo C-3**.
[36] Memorial, ¶ 23.
[37] **Anexo C-068**.
[38] **Anexo C-074**.
[39] **Anexo C-9**. *Cfr.* nota 3 *supra*.
[40] **Anexo C-6**.
[41] Memorial, ¶ 26; **Anexo C-077**.
[42] Memorial, ¶ 27; **Anexo C-080**.

Manuel Henriquez como interlocutor para ayudar a Saint-Gobain a obtener los permisos necesarios para dar curso a su inversión en Venezuela, entre otras cosas[43].

155.   Tras otras reuniones con representantes de las dos compañías estatales, el día 16 de agosto de 2006, Norpro Venezuela celebró un contrato de suministro eléctrico a largo plazo con CVG EDELCA y, el día 10 de octubre de 2006, celebró otro contrato de suministro eléctrico a largo plazo con PDVSA Gas[44].

## III.   LA DECISIÓN DE LA DEMANDANTE DE INVERTIR EN VENEZUELA

156.   El día 7 de febrero de 2006, el equipo responsable de la inversión en Venezuela presentó una adenda al DAC sobre la capacidad ampliada para la nueva planta de *proppants* en Venezuela, en la cual se contemplaba una mayor capacidad de 70.000 toneladas métricas por año[45]. Este DAC se aprobó el día 20 de febrero de 2006[46]; el día 23 de octubre de 2006, se presentó una actualización del DAC, con costos proyectados por encima de los previstos en la adenda, que se aprobó el día 9 de noviembre de 2006[47].

157.   Una vez recibidas las aprobaciones internas requeridas, Saint-Gobain procedió a finalizar la adquisición de tierras en Puerto Ordaz en las que planeaba construir su planta de *proppants*[48]. La Demandante aduce que había elegido Puerto Ordaz por los siguientes motivos:

> "[O]frecía buenas opciones de transporte y servía como terminal para los suministros necesarios de gas y electricidad, además de tener una población de trabajadores capacitados. En especial, CVG Bauxilum, proveedor de bauxita de Saint-Gobain, estaba ubicada en Puerto Ordaz. EDELCA—proveedor de electricidad—también se encontraba instalada allí"[49]. [Traducción del Tribunal]

158.   Tras la compra de tierras en Puerto Ordaz, los empleados de Saint-Gobain con experiencia en Venezuela ayudaron a determinar los requisitos del personal y los costos de la nueva inversión[50]. Jack Larry, Gerente General de Saint-Gobain Proppants (a cargo de la administración del negocio de los *proppants* a nivel mundial), participó en el desarrollo de la presentación del proyecto como también en el análisis de las cuestiones técnicas de cómo abrir una planta en Venezuela[51].

---

[43] **Anexo C-081**.
[44] Memorial, ¶ 28; **Anexos C-8** y **C-10**.
[45] Memorial, ¶ 29; Memorial de Contestación, ¶ 6; **Anexo C-075**.
[46] **Anexo C-076**.
[47] **Anexos C-082** y **C-083**.
[48] Memorial, ¶ 30; Pedersen, ¶¶ 38, 39.
[49] Memorial, ¶ 30. Citas internas omitidas. *Véase, también,* Pedersen, ¶ 39.
[50] Pedersen, ¶ 41.
[51] Memorial, ¶ 31; Larry, ¶ 21.

159. También en el año 2006, Saint-Gobain designó a Dominique Objois, ex Gerente General de una planta de Saint-Gobain en Corea, para liderar el esfuerzo de construcción con su equipo. El Sr. Objois contó con la colaboración *in situ* de varios empleados experimentados de la Planta de Fort Smith[52].

160. Luego, la Demandante se centró en los requisitos técnicos de los *proppants*, en especial, en las características de la bauxita, es decir, la materia prima principal que proveería CVG Bauxilum[53].

161. Para ello, el día 28 de febrero de 2006 y a fines de marzo de 2007, representantes de Saint-Gobain visitaron las instalaciones de CVG Bauxilum en Puerto Ordaz a fin de desarrollar los requisitos técnicos de la bauxita que se suministraría en virtud del Contrato de Bauxita e informarse mejor sobre las actividades y la producción de CVG Bauxilum[54]. Aunque advirtieron que CVG Bauxilum no estaba "*actualmente dispuesta a suministrar niveles de aluminio/hierro específicos para cada cliente*", los representantes de la Demandante determinaron que CVG Bauxilum estaba "*muy bien manejada*"[55]. [Traducción del Tribunal]

162. A principios del mes de abril de 2007, Saint-Gobain realizó una nueva presentación ante CVG Bauxilum y se reunió con su Presidente "*para conversar sobre las posibilidades de suministro de otras clases de bauxita y posibles desarrollos futuros*"[56]. Al poco tiempo, en mayo de 2007, Saint-Gobain presentó a CVG Bauxilum una solicitud de insumos de bauxita conforme al Contrato de Bauxita[57]. En junio de 2007, Norpro Venezuela informó, de manera interna, que CVG Bauxilum había confirmado que "*suministraría hasta un 30% de bauxita con alto contenido de aluminio*", lo que confirmaba a la Demandante que CVG Bauxilum suministraría el tipo de bauxita requerido para producir *proppants* cerámicos en Venezuela[58].[Traducción del Tribunal]

## IV.  CRÉDITOS DE IVA

163. La legislación de Venezuela exige que las empresas venezolanas paguen IVA por los bienes y servicios que adquieren y cobren IVA a los compradores venezolanos, no extranjeros, de sus bienes y servicios, con lo cual excluye del cobro de IVA a los exportadores de bienes fabricados en Venezuela. Cuando una empresa paga IVA por la compra de bienes y servicios, acumula créditos de IVA y, al cobrar IVA al comprador,

---

[52] Memorial, ¶ 32; Pedersen, ¶ 40; Larry, ¶ 28.
[53] Memorial, ¶ 36.
[54] Memorial, ¶ 37; **Anexos C-078** y **C-087**.
[55] Memorial, ¶ 37; **Anexo C-087**.
[56] **Anexos C-089** y **C-088**.
[57] Memorial, ¶ 38; **Anexo C-090**.
[58] Memorial, ¶ 38; **Anexo C-091**.

acumula débitos de IVA que se compensan con los créditos de manera mensual. Si la empresa paga más IVA del que cobra, traslada el saldo neto al mes siguiente[59].

164. Norpro Venezuela era, en gran medida, exportadora de bienes fabricados en Venezuela y, por lo tanto, no cobraba IVA a sus clientes extranjeros, pero sí debía pagar IVA en la mayoría de sus compras porque casi todos los equipos adquiridos para la planta durante la fase de construcción, como también las materias primas (como la bauxita) utilizadas en la producción de *proppants* y la mano de obra de las empresas tercerizadoras, se adquirieron en Venezuela y, como tales, estaban sujetos al pago de IVA. Como consecuencia de este desequilibrio entre sus pagos y cobros de IVA, al 31 de diciembre de 2009, Norpro Venezuela había acumulado en su balance general VEF 11,7 millones en concepto de créditos de IVA[60].

165. Si bien los bienes importados, como los equipos de una planta de producción, suelen estar sujetos al IVA, el día 19 de octubre de 2006, la Demandada emitió el Decreto 4908, que estableció un procedimiento que podía resultar en la exoneración de ciertos equipos importados del pago de impuestos sobre las importaciones e IVA[61]. Si una empresa quería obtener dicha exoneración, tenía que solicitar un certificado de exoneración al Ministerio de Industrias Ligeras y Comercio (MILCO)[62].

166. A fines del mes de marzo de 2005, Jorgen Pedersen se reunió con William Cañas, Director General de Bienes de Capital de MILCO, para hablar sobre la planta de *proppants* propuesta y, más específicamente, la exoneración del pago de IVA y del impuesto de importación para que el proyecto fuera económicamente sostenible[63]. Mediante un correo electrónico de fecha 1 de junio de 2006, el Sr. Pedersen informó al Sr. Patrick Millot, Vicepresidente de Planificación Corporativa, Estrategia y Finanzas del Sector de Materiales de Alto Rendimiento de Saint-Gobain, que, en una reunión realizada el día 26 de mayo de 2006, MIBAM había acordado ayudar a Saint-Gobain a obtener las correspondientes exenciones del pago de derechos e impuestos de importación[64].

167. En su actualización del DAC de fecha 23 de octubre de 2006, la Demandante informó internamente que el Presidente Chávez acababa de anunciar en una conferencia de prensa la sanción del Decreto Presidencial mediante el cual se otorgaría una amplia exoneración del pago de IVA y derechos de importación aplicables a bienes de capital importados que en ese entonces no se producían en Venezuela, como equipos, maquinaria y repuestos,

---

[59] Memorial de Contestación, ¶¶ 48-49.
[60] Memorial, ¶ 162; Memorial de Contestación, ¶ 51.
[61] **Anexo R-43**.
[62] Memorial de Contestación, ¶ 52.
[63] Memorial, ¶ 21; Pedersen, ¶ 24.
[64] **Anexo C-079**.

con el fin de promover el desarrollo del sector industrial. En el mismo documento, la Demandante señaló que "*el Ministro de Industrias Básicas y Minería (MIBAM) nos ayudó a obtener una exoneración*"[65]. En un mensaje de correo electrónico enviado a los Sres. Rolli y Millot el día 2 de noviembre de 2006, el Sr. Pedersen escribió que "*es probable que el nuevo decreto de exoneración nos permita exonerarnos y simplifique el proceso*"[66]. [Traducción del Tribunal]

168. La Demandante solicitó, y se le concedió el día 25 de octubre de 2007, una Exención para Bienes de Capital, que cubría el IVA y los derechos de importación para maquinaría y otros materiales, en total 29 tipos específicos de equipos, que la Demandante necesitaba para la instalación y manejo de la planta[67]; así, cuando se importaron los equipos, no se cobraron derechos de importación ni IVA. Para el resto de las compras, la Demandante tuvo que pagar los impuestos de importación habituales y el IVA, lo que arrojó el saldo crediticio neto de VEF 11,7 millones[68].

169. Los créditos de IVA no crean *per se* una obligación de pago a cargo del Estado, sino que la ley venezolana sobre IVA establece un proceso por el cual los exportadores de bienes pueden obtener un beneficio financiero si presentan una solicitud mensual para la recuperación de los créditos de IVA en función del monto de las exportaciones del mes. Si las autoridades fiscales conceden la solicitud, se emite un certificado especial de reintegro tributario que el contribuyente puede utilizar para pagar sus impuestos venezolanos o vender a un tercero, quien a su vez puede utilizarlo para pagar sus propios impuestos[69].

170. El día 15 de mayo de 2010, Norpro Venezuela había, según recuerda el Sr. Rondón:

> "*comunicado a las autoridades su intención de iniciar el proceso de reintegro de créditos de IVA mediante la solicitud de un certificado especial de reintegro tributario basado en las ventas de exportación, de acuerdo con la legislación pertinente,* [pero] *aún estaba compilando la documentación necesaria para fundar su solicitud*"[70]. [Traducción del Tribunal]

---

[65] **Anexo C-082**.
[66] **Anexo C-084**.
[67] Memorial, ¶ 21; **Anexo C-092**.
[68] *Cfr.* Memorial de Contestación, ¶¶ 53-54.
[69] Memorial de Contestación, ¶¶ 57-58 y nota 159 en referencia a los Artículos 43 y 44 del Decreto con rango, valor y fuerza de ley de reforma parcial del decreto N.° 5.189 con rango, valor y fuerza de ley que establece el impuesto al valor agregado, publicado en la Gaceta Oficial el día 26 de febrero de 2007 (Decreto N.° 5212**)** y Artículo 1 del Decreto No. 611, Reforma Parcial del Reglamento Parcial No. 1 de la Ley que Establece el Impuesto al Valor Agregado, en Materia de Recuperación de Créditos Fiscales, publicado en la Gaceta Oficial N.° 37794 el día 10 de octubre de 2003. **Anexos R-41** y **R-47**.
[70] Rondón, ¶ 38. Durante la Audiencia, el Sr. Rondón confirmó que se había solicitado a las autoridades un certificado especial de reintegro tributario. Transcripción (Día 3), pág. 771 línea 21 – pág. 772 línea 8. *Véase,*

## V.   CONSTRUCCIÓN DE LA PLANTA

171.  En el año 2007, la Demandante comenzó a construir la planta de *proppants* en Puerto Ordaz. La mayoría de los equipos necesarios arribaron al sitio en el mes de septiembre de 2007[71]. Con vistas a incrementar la capacidad de producción en el futuro, se diseñó una construcción escalonada: primero, se construyó una línea de producción, a la que se agregaría otra más adelante, "*una vez que las instalaciones funcionaran correctamente y resultaran redituables*"[72]. La Demandante previó que la segunda línea de producción planificada, básicamente, se "*copiaría y pegaría*" de la primera línea de producción y, por ende, llevaría menos tiempo pasar de la fase de inicio al aumento pleno de la producción, hasta duplicar la capacidad de la planta[73]. [Traducción del Tribunal]

172.  La primera línea de producción se diseñó para comenzar con dos mezcladoras, una capacidad total de aproximadamente 4.500 toneladas por mes, con un espacio reservado para incorporar una tercera mezcladora, que aumentaría la capacidad total a aproximadamente 6.000 toneladas por mes[74]. Una vez construida la primera línea de producción con dos mezcladoras, la producción de *proppants* comenzó en el mes de septiembre de 2008. A pesar de los planes iniciales de principios del año 2010, la tercera mezcladora, programada para entrar en funcionamiento a principios del año 2013, nunca se instaló[75].

## VI.   AUMENTOS EN EL PRECIO DE LA BAUXITA

## 1.   Primer aumento de precios en el mes de septiembre de 2008

173.  El día 15 de julio de 2008, el entonces Presidente de CVG Bauxilum, el Sr. Carlos Acosta Pérez, convocó a una reunión a representantes de la Demandante y de Norpro Venezuela para un "*análisis abierto de la relación contractual con respecto al precio de la bauxita*"[76]. Las Partes discrepan en cuanto a si el objeto de la reunión, celebrada el día 29 de julio de 2008, fue "*debatir sobre la situación*"[77] o simplemente informar a la Demandante sobre el aumento de precios previsto como *fait accompli*[78]. [Traducción del Tribunal]

---

*también,* Presentación Posterior a la Audiencia de la Demandante, ¶ 156; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 204.
[71] Memorial, ¶ 39; Pedersen ¶ 42.
[72] Pedersen, ¶ 46; *Cfr.* Larry, ¶ 33; **Anexo C-057**.
[73] Memorial, ¶ 40; Pedersen, ¶ 46.
[74] Memorial, ¶ 40.
[75] Larry, ¶ 32.
[76] Memorial, ¶ 46; **Anexo C-093**. *Cfr.* Memorial de Contestación, ¶ 64.
[77] Memorial de Contestación, ¶ 64.
[78] Memorial, ¶¶ 46-47.

174. El día 30 de julio de 2008, el Sr. Oscar Cid, Gerente General de Norpro Venezuela, informó al Sr. Pedersen que CVG Bauxilum había presentado los siguientes motivos con respecto al aumento en el precio de la bauxita: (i) aumento de 600% en el Peaje del Río Orinoco; (ii) ajuste en el costo de extracción y producción hasta lograr un punto de equilibrio; (iii) aumento en los costos de transporte desde Jobal Mine hasta el puerto ACBL como consecuencia de un aumento en el contrato de trabajo con los trabajadores sindicalizados de ACBL; y (iv) un análisis del mercado internacional a fin de comparar los precios de la bauxita de diversos proveedores, a partir del cual se pudo comprobar que el precio acordado en virtud del Contrato de Bauxita era inferior al del mercado internacional[79]. El Sr. Cid señaló, además, en su mensaje de correo electrónico que, "*a* [su] *entender, el aumento* [en el precio de la bauxita] *es un hecho y ocurrirá en muy poco tiempo, quizá 1 mes*" y que CVG Bauxilum "*ofrec*[*ió*] *el derecho a presentar una réplica escrita, a más tardar, para fines de esta semana, con toda alegación, reclamación y cualquier otro comentario en relación con el impacto del aumento en* [Norpro Venezuela]"[80]. [Traducción del Tribunal]

175. El día 31 de julio de 2008, se publicó en la Gaceta Oficial el Decreto N.° 6220 con Rango, Valor y Fuerza de Ley de Canalización y Mantenimiento de las Vías de Navegación, mediante el cual se sancionaron legalmente los aumentos de precio previstos de 600% para el Peaje del Río Orinoco[81].

176. Mediante carta de fecha 1 de agosto de 2008, el Presidente de Norpro Venezuela, Luís Páez, escribió al Sr. Pérez:

> "*Considerando que, conforme a las políticas del MPPIBAM, Bauxilum ha asegurado a* [Norpro Venezuela] *un suministro a largo plazo de bauxita bajo el Contrato y, toda vez que cualquier ajuste del precio de venta de la bauxita se encuentra regido por lo dispuesto en la Cláusula 10 del Contrato, deseamos discutir con ustedes el impacto negativo que cualquier modificación de los términos y condiciones del Contrato podría implicar para el Proyecto Proppants y consecuentemente, para los planes de sustitución de importaciones de Petróleos de Venezuela, S.A. (PDVSA), las políticas de promoción de inversiones del MPPIBAM y el acuerdo de cooperación entre Venezuela y Francia*"[82].

177. En la misma carta, el Sr. Páez también solicitó una reunión con CVG Bauxilum para debatir sobre los posibles efectos que podría tener el aumento de precios en la inversión de la Demandante[83]. Según la Demandante, CVG Bauxilum informó a Norpro Venezuela

---

[79] **Anexo C-093**. *Cfr.* Memorial de Contestación, ¶ 64.
[80] **Anexo C-093**.
[81] **Anexo R-50**.
[82] **Anexo C-095**.
[83] Memorial, ¶ 47; **Anexo C-095**; Memorial de Contestación, ¶ 65.

en la reunión, celebrada el día 21 de agosto de 2008, que el precio de la bauxita aumentaría de USD 25,50 a USD 33,80 por tonelada métrica con efecto inmediato[84].

178.    En una carta remitida al Sr. Cid bajo el membrete combinado del MIBAM, CVG y CVG Bauxilum, con fecha 2 de septiembre de 2008, el Sr. Pérez confirmó claramente que USD 33,80 por tonelada métrica sería el nuevo precio durante el resto del año 2008; invocó la disposición de revisión de precios de la Cláusula 10.2 del Contrato de Bauxita, en función de las nuevas tarifas de navegación por el Río Orinoco y "*la variación significativa que sufrieron los costos de extracción, transporte y descarga de la bauxita en nuestra planta de Matanzas*"[85]. Para concluir, el Sr. Pérez señaló que el nuevo precio seguía siendo favorable porque "*correspondía al precio de venta franco a bordo para el año 2007 y, por otro lado, a un ajuste gradual* [del precio por encima del] *aplicable al ejercicio fiscal actual*"[86]. [Traducción del Tribunal]

179.    En su carta de fecha 4 de septiembre de 2008, dirigida a la Viceministra del MIBAM, la Srta. Isabel Cristina Delgado, el Presidente de Norpro Venezuela, el Sr. Páez, afirmó que Norpro Venezuela y el MIBAM habían "*acorda*[do] *que los diversos contratos de suministro que requiriera el Proyecto, incluyendo el Contrato* [de Bauxita]*, se estructurarían como contratos a largo plazo*". El Sr. Páez señaló que Norpro Venezuela deseaba discutir el impacto negativo del incremento del precio en la planta y, como consecuencia, en los planes de PDVSA de sustituir las importaciones por productos nacionales, las políticas de inversiones del MIBAM y el TBI entre Venezuela y Francia[87].

180.    El día 9 de septiembre de 2008, representantes de Norpro Venezuela volvieron a reunirse con CVG Bauxilum[88]. Según la Demandante, se manifestaron en contra del aumento de precio por considerarlo *ultra vires*, pero —en aras de mantener condiciones comerciales estables— solicitaron mantener el nuevo precio hasta, al menos, el día 31 de diciembre de 2009[89]. En su carta remitida a CVG Bauxilum el día 17 de septiembre de 2008, el Sr. Cid escribió:

---

[84] Memorial, ¶ 48. En relación con un aumento de precio anterior, el precio del contrato original de USD 23,50 por tonelada métrica había ascendido a USD 25,50. Pedersen, ¶ 50, nota 9; Memorial de Contestación, ¶ 63.

[85] La Cláusula 10.2 del Contrato de Bauxita establece: "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será aplicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior*". **Anexo C-6**, Cláusula 10.2.

[86] **Anexo C-11**. *Cfr.* Memorial de Contestación, ¶ 65.

[87] **Anexo C-096**.

[88] Memorial de Contestación, ¶ 66.

[89] Memorial, ¶ 50.

"*Aunque* [Norpro Venezuela] *no comparte la opinión que Bauxilum expresa en el Oficio, con respecto a la interpretación y aplicación del numeral 10.2 de la Cláusula Décima del Contrato a los fines de justificar el incremento del Precio indicado en el Oficio,* [Norpro Venezuela] *reitera su disposición a discutir alternativas con Bauxilum que garanticen, a largo plazo, el cumplimiento efectivo de las obligaciones de ambas partes bajo el Contrato.*

*Considerando que el interés principal de* [Norpro Venezuela] *es mantener condiciones estables y claras que rijan el suministro a largo plazo de bauxita bajo el Contrato, de acuerdo a lo discutido con el Sr. Carlos Acosta Pérez y sus asesores durante nuestra reunión* [de fecha 9 de septiembre de 2008], [Norpro Venezuela] *formalmente solicita a Bauxilum que considere la posibilidad de garantizar que el precio de* [...] *USD 33,80 por tonelada de bauxita, indicado en el Oficio, se mantengan sin variación alguna hasta el 31 de diciembre de 2009.*

[…]

*En todo caso, mientras se desarrollen las discusiones que amerite la revisión de estos planteamientos,* [Norpro Venezuela] *desea aclarar que la emisión de cualquier orden de compra de bauxita bajo el Contrato, el pago de cualquier suma debida por* [Norpro Venezuela] *a Bauxilum por tales conceptos o el envío de cualquier correspondencia o comunicación a Bauxilum, con posterioridad a la fecha del Oficio, no se entenderá como una aceptación expresa o tácita por parte de* [Norpro Venezuela] *del aumento de Precio señalado en el Oficio o de cualquier hecho, afirmación, declaración, circunstancia o argumento expuesto por Bauxilum en el Oficio*"[90].

181. La Demandante alega que no recibió respuesta a su solicitud de mantener el nuevo precio, al menos, hasta el 31 de diciembre de 2009[91]; la Demandada simplemente sostiene que el precio se mantuvo en USD 33,80 por tonelada métrica hasta el año 2009[92].

182. Para recibir los envíos requeridos de bauxita durante el resto del año 2008 y todo el año 2009, Norpro Venezuela tenía que presentar la orden de compra a CVG Bauxilum hasta el día 17 de octubre de 2008[93]. Norpro Venezuela la presentó y programó las entregas al precio aumentado a fin de asegurarse un suministro continuo de bauxita para su planta; no obstante, según el Sr. Pedersen, se reservó ciertos derechos[94]. En una presentación de PowerPoint de fecha 11 de octubre de 2008, la Demandante también informó al MIBAM

---

[90] **Anexo C-12**.
[91] Memorial, ¶ 50.
[92] Memorial de Contestación, ¶ 68.
[93] Memorial, ¶ 52; **Anexo C-101**.
[94] Memorial, ¶ 52; Pedersen, ¶ 53.

acerca del aumento de precios del día 2 de septiembre de 2008, y lo calificó como "*injustificado*"[95].

183.  En un mensaje de correo electrónico de fecha 21 de noviembre de 2008, el Sr. Pedersen les informó a los Sres. Rolli y Larry que se había reunido con el nuevo Presidente de CVG Bauxilum, el Sr. Jesús Calvo, el día anterior y conversaron, en particular, sobre el aumento de precios. El Sr. Pedersen escribió:

> "*Le expliqué la situación actual que tenemos con las propuestas de precios provenientes del contrato firmado con el presidente anterior y de qué manera esto afectaba nuestro negocio.*
> *Le pedí que reconsiderara su propuesta y recordara la obligación contractual que tenemos juntos.*
>
> *Primero, explicaron el aumento del peaje del río que tuvieron y cómo subieron sus costos. Luego, expliqué que obviamente pagaremos el aumento contractual en los costos de transporte, que entendemos que responde a la cláusula de inflación del contrato. El presidente entendió mi postura y me sugirió presentarle una propuesta escrita para considerarla*"[96]. [Traducción del Tribunal]

184.  El día 8 de junio de 2009, en una actualización del DAC de fecha 23 de octubre de 2006, Norpro Venezuela informó lo siguiente:

> "*El costo de la bauxita de nuestro principal proveedor, Bauxilum, aumentó un 34% a mediados del año 2008. Este aumento estuvo fuera del alcance de las disposiciones de nuestro contrato vigente. Bauxilum citó aumentos en los costos de transporte en barcaza (Peaje de Ríos), junto con el aumento en los costos mineros [sic] aumentos de precios. El día 15 de enero de 2009, se celebró una reunión con el presidente de Bauxilum para solicitar una reducción en el aumento impuesto. A pesar de los intentos permanentes por seguir tratando el tema, todavía esperamos su respuesta*"[97]. [Traducción del Tribunal]

185.  Norpro Venezuela nunca invocó el mecanismo de resolución de controversias de la Cláusula Décima Sexta del Contrato de Bauxita, es decir, el procedimiento arbitral ante el Centro de Conciliación y Arbitraje de la Cámara de Comercio de Caracas en relación con el aumento en el precio de la bauxita[98].

## 2.  Segundo Aumento de Precios en el Mes de Marzo de 2010

---

[95] Memorial, ¶ 53; **Anexo C-100**.
[96] **Anexo C-102**.
[97] **Anexo C-107**.
[98] **Anexo C-6**. Memorial de Contestación, ¶ 68, nota 185.

186. En una reunión llevada a cabo el día 10 de marzo de 2010, CVG Bauxilum le informó a Norpro Venezuela que pretendía aumentar el precio de la bauxita suministrada en el año 2010 a USD 51,28 por tonelada métrica[99]. Mediante una carta enviada al Sr. Cid el día 12 de abril de 2010, bajo el membrete del MIBAM, CVG y CVG Bauxilum, el Sr. Calvo confirmó el aumento de precio, nuevamente invocando la Cláusula Décima del Contrato de Bauxita[100]. La Demandante alega que se manifestó en contra de este aumento de precio, tanto en la reunión del día 10 de marzo de 2010 como en comunicaciones posteriores con CVG Bauxilum[101]. Otra reunión entre la Demandante y CVG Bauxilum programada para el día 18 de marzo de 2010 se canceló debido a una visita del Presidente Chávez al área[102]. Las partes del Contrato de Bauxita nunca se reunieron para seguir debatiendo sobre esta propuesta de aumento de precio y Norpro Venezuela nunca pagó este precio por la bauxita que compró a CVG Bauxilum[103].

## VII.  PRODUCCIÓN Y VENTA DE *PROPPANTS* ANTES DE LA TOMA DE CONTROL DE LA PLANTA

187. Finalizada la construcción y obtenidos los permisos necesarios, la planta de *proppants* pasó a la fase de arranque. El día 26 de septiembre de 2008, la planta produjo sus primeros *proppants* comerciales y, el día 13 de diciembre de 2008, arribó a los Estados Unidos el primer envío de 1500 toneladas de *proppants* producidos en Venezuela[104].

188. Durante la primera parte del año 2009, la Demandante se centró en garantizar una cartera de clientes a largo plazo para su primera producción de *proppants* venezolanos. En el mercado norteamericano, si bien los operadores del campo del gas y el petróleo participan en la selección del tipo, cantidad, etc. de *proppants*, las empresas de servicios petroleros son las que compran los *proppants* al proveedor y luego los inyectan en los pozos perforados[105]. Es por eso que la Demandante quiso asegurarse un contrato de suministro a largo plazo con su mayor cliente—Halliburton, un importante proveedor de servicios petroleros—y diversificar su cartera de clientes en Norteamérica y Sudamérica[106].

189. El día 1 de abril de 2009, Norpro Venezuela, junto con otras dos plantas de *proppants* de Saint-Gobain, firmaron un Acuerdo Marco de Compraventa con Halliburton ("**AMC con Halliburton**")[107]. Conforme a este acuerdo, Halliburton acordó un arreglo de "*toma o paga*", comenzando con 40 millones de libras de *proppants* durante el segundo trimestre

---

[99] Memorial, ¶ 67; *Cfr.* Memorial de Contestación, ¶ 69.
[100] **Anexo C-16**.
[101] Memorial, ¶ 68; *Cfr.* Larry, ¶ 39, nota 7.
[102] Memorial, ¶ 68; **Anexo C-108**.
[103] Memorial de Contestación, ¶ 69.
[104] Memorial, ¶¶ 54-55; Pedersen, ¶ 45; Larry, ¶ 26.
[105] Memorial, ¶ 57.
[106] Millot, ¶ 17; Memorial, ¶ 58.
[107] Memorial, ¶ 59; **Anexo C-106**.

del año 2009, que aumentaría periódicamente hasta alcanzar un pico de 100 millones por cada trimestre del año 2011 y el primer trimestre del año 2012[108].

190. Los *proppants* que Norpro Venezuela produjo en Puerto Ordaz se almacenaron en la planta o en un depósito externo cerca del puerto venezolano. Además de los *proppants* que se vendieron en el mercado sudamericano (en general, de 60 a 100 toneladas por mes), se enviaban *proppants* de Venezuela a Corpus Christi, Estado de Texas. Una vez suscrito el AMC con Halliburton, la gran mayoría de los envíos de proppants se vendieron a Halliburton en virtud del contrato[109].

191. Antes de comenzar la producción, la Demandante trajo un grupo de fabricantes de Venezuela a su planta de proppants de Fort Smith, Estado de Arkansas, y los capacitó en los procesos de la planta. Los gerentes de Norpro Venezuela fueron enviados a Fort Smith para recibir capacitación adicional, además de la capacitación que se les brindó *in situ* en Puerto Ordaz[110]. La Demandante también envió operadores y personal de mantenimiento y control de calidad de Fort Smith a Puerto Ordaz para colaborar durante la fase de arranque que, según la Demandante, duró hasta el mes de agosto de 2009[111].

192. Norpro Venezuela utilizaba el método de producción "eficiencia general de los equipos" (*OEE*, por sus siglas en inglés). Este método calcula la eficiencia de la planta en función de su capacidad general. Según la Demandante, una planta que opera con una OEE de 85% se considera de primera clase, y su planta de *proppants* suele operar en un 80-87%[112].

193. Con respecto a la planta venezolana durante la fase de arranque, el Sr. Larry indicó en su primera declaración testimonial:

> "[L]os ajustes son siempre necesarios durante la fase de arranque y, en una planta nueva, siempre hay un proceso de aprendizaje para empleados y gerentes. Ergo, como era de esperarse, la calidad y la cantidad de proppants producidos en Norpro Venezuela mejoraron durante la fase de arranque a medida que se perfeccionaban los procesos de producción de la planta en relación con el tiempo y la temperatura. Concretamente, para el mes de julio de 2009, la planta operaba con eficacia de manera continua. Según recuerdo, en función de las cifras de OEE, es claro que había aumentado la producción.

---

[108] El Artículo 6, Tabla 1, del AMC con Halliburton establece que Halliburton debía tomar esas cantidades "*o 45% del total de compras de* proppants *cerámicos por parte del Comprador a todos sus proveedores, lo que sea inferior*". **Anexo C-106**. Según la Demandante, de esa manera, Halliburton tenía la opción de comprar el 45% del total de sus compras de *proppants* cerámicos de todos sus proveedores previa notificación fehaciente conforme al Artículo 6(b) del AMC con Halliburton. Memorial, ¶ 59, nota 126.

[109] Memorial, ¶ 60; Larry, ¶¶ 34-36.

[110] Larry, ¶ 27.

[111] Larry, ¶ 28; Memorial, ¶ 56.

[112] Memorial, ¶ 69; Larry, ¶ 29.

*Para el mes de septiembre de 2009 […], ya se habían afrontado todas las cuestiones técnicas relacionadas con la puesta en marcha de una planta nueva. Asimismo, Norpro Venezuela había capacitado una importante masa de trabajadores a fin de operar la planta de manera eficaz*"[113]. [Traducción del Tribunal]

194. En la actualización del DAC de fecha 8 de junio de 2009, se señaló que "[e]*l proyecto demoró tanto al principio como durante la fase de puesta en marcha en alcanzar los niveles de producción previstos*"[114]. [Traducción del Tribunal]

195. En el mes de noviembre de 2009, la planta se cerró temporalmente por razones controvertidas entre las Partes[115]. Dado que toda planta de *proppants* debe funcionar durante seis meses seguidos para alcanzar un "*equilibrio dinámico*", es decir, un OEE de 85% o, en el caso de la planta venezolana, una producción de aproximadamente 53.000 toneladas por año, la planta nunca alcanzó su capacidad de producción plena con dos mezcladoras. Para el mes de mayo de 2010, la planta producía 3400 toneladas de *proppants* por mes, lo que habría resultado en una producción anual de aproximadamente 42.000 toneladas[116].

196. En una presentación del Plan Estratégico 2011-2015, de fecha 18 de marzo de 2010, la Demandante expuso un "Plan de Acción de Venezuela" y señaló que "*se estaba enviando un equipo 'SURGE' a Venezuela para resolver ciertos problemas críticos*": (i) "*estabilidad de procesos*"; (ii) "*aditivos*"; (iii) "*enfoque en el mantenimiento preventivo*"; y (iv) "*formación de operadores*", y que el "*objetivo principal del equipo*" era "*auditar todos los procesos para garantizar la congruencia con los sistemas de control*" y "*Estabilizar, estabilizar, estabilizar*"[117]. [Traducción del Tribunal]

197. En otra presentación del Plan Estratégico 2011-2015, de fecha 4 de mayo de 2011, la Demandante señaló que "*La producción de la planta de Venezuela cayó desde mediados de marzo. Hay problemas relacionados con varias cuestiones esenciales*": (i) "*eliminación de la nueva fase de calcinación para mantener los niveles de producción*"; (ii) "*deterioro importante de los sistemas y controles dentro de la planta*" como consecuencia, entre otras cosas, de "*cuestiones laborales que hicieron que disminuyeran la cooperación y la productividad de los trabajadores*"; (iii) "*estabilidad de lotes afectada por cambios críticos*"; y (iv) "*alto nivel de fallas eléctricas durante el mes de*

---

[113] Larry, ¶ 30.
[114] **Anexo C-107**.
[115] Memorial, ¶ 65; Larry, ¶ 31; Memorial de Contestación, ¶ 18; Rondón, ¶ 20. *Véase, también*, ¶ 206 *infra*.
[116] Larry, ¶ 31; Memorial, ¶ 65.
[117] **Anexo CLEX-80**; **Anexo R-9**.

abril debido a tareas de mantenimiento de EDELCA en Puerto Ordaz"[118]. [Traducción del Tribunal]

## VIII. TENSIÓN LABORAL

198.  Al momento de la puerta en marcha operativa de la planta, la mayoría de los trabajadores de la planta no eran empleados directos de Norpro Venezuela (o cualquiera de las filiales de la Demandante), sino de empresas tercerizadoras. Ya en el DAC de fecha 3 de febrero de 2005, la Demandante propuso la creación de una nueva filial en Venezuela en lugar de utilizar SGMC Venezuela (una de las filiales venezolanas de la Demandante), entre otros motivos, para "*evitar la creación de un sindicato*"[119]. En el DAC, se manifestó lo siguiente:

> "*En Venezuela, los empleados de cualquier empresa tienen derecho a crear un sindicato si la empresa tienen más de 25 empleados en total. Con los proyectos de* Proppants*, SGMC Venezuela tendría más de 25 empleados y la creación de un sindicato sería inevitable. Con una empresa nueva, limitaríamos la cantidad de empleados permanentes a 24 y emplearíamos terceros para el suministro de mano de obra temporal para mantener el equilibrio de nuestro empleo, una práctica habitual en Venezuela. Es por eso que proponemos crear una nueva empresa*"[120]. [Traducción del Tribunal]

199.  El modelo de tercerización laboral al que se alude en el DAC se utilizó en Venezuela en ese entonces y se lo denominó precisamente "*tercerización*"[121].

200.  Cuando el personal de operaciones y mantenimiento de Norpro Venezuela regresó de su capacitación en Fort Smith, Estado de Arkansas en el año 2008, se les informó que debían renunciar a sus cargos en Norpro Venezuela y que los volvería a contratar RH Consultores, una empresa tercerizadora de mano de obra[122]. En cuanto a las condiciones de los nuevos contratos, el Sr. Eduardo Rondón, testigo de la Demandada, indicó lo siguiente en su declaración testimonial:

---

[118] **Anexo CLEX-80**; **Anexo R-10**.

[119] La segunda razón consistía en que SGMC Venezuela era propietaria 100% de Carburo Del Caroni, un empresa adquirida recientemente, cuyo propietario anterior tenía importantes deudas con algunos terceros, incluso empleados, y se consideraba que existía el riesgo de que algunos acreedores del anterior propietario demandaran a Carburo del Caroni "*y se viera potencialmente afectada su controlante SGMC Venezuela*" ante la falta de pago por parte del propietario anterior. **Anexo C-057**.

[120] **Anexo C-057**.

[121] Memorial de Contestación, ¶ 14, nota 14. La tercerización se tornó ilícita en el año 2012, *Cfr*. Artículo 48 del Decreto N.º 8938, con Rango, Valor y Fuerza de Ley Orgánica del Trabajo, los Trabajadores y las Trabajadoras, publicado en la Gaceta Oficial N.º 6076 (extraordinario) el día 7 de mayo de 2012. **Anexo R-12**. *Véase, también,* ¶ 208 *infra*.

[122] Memorial de Contestación, ¶ 15; Rondón, ¶ 10.

"*Uno de los cambios más importantes fue en materia de seguridad laboral. RH Consultores ofrecía contratos de sólo seis meses de duración. Estos contratos se renovaban por otros seis meses y, luego, por un tercer período de seis meses. Al cabo de esto, cabía la posibilidad de ser contratado como empleado mediante un contrato de duración ilimitada. De esta manera, los trabajadores atravesaban una suerte de períodos de prueba durante los cuales la empresa tercerizadora los empleaba sin la misma seguridad laboral y sin los mismos beneficios. Aunque el salario básico era el mismo, había ciertas diferencias importantes en cuanto a los beneficios. Recuerdo que los trabajadores empleados a través de RH Consultores sólo recibían un aguinaldo equivalente a medio salario mensual (el mínimo exigido por ley). No recibían ningún premio por desempeño. Gozaban de los aumentos salariales dispuestos por ley pero no había aumentos basados en el desempeño. Recuerdo oír algunas quejas de que estos aumentos ni siquiera alcanzaban para mantenerse a la par de la inflación. Aunque los 30-40 trabajadores afectados por la nueva política no se mostraron satisfechos, aceptaron el nuevo arreglo ya que Oswaldo Luna* [director de RR. HH.] *les había dejado en claro que esa era la única manera de conservar sus empleos*"[123]. [Traducción del Tribunal]

201. En el transcurso del año 2008, Norpro Venezuela contrató más trabajadores que se emplearon a través de RH Consultores; según el relato del Sr. Rondón, hacia fines del año 2008, había unos 70 trabajadores contratados por esta empresa tercerizadora[124].

202. El Sr. Rondón indicó, asimismo, en su declaración:

"*A principios del año 2009, comenzaron a circular rumores entre los trabajadores de la Planta acerca de la posibilidad de intentar organizarse y formar un sindicato. La principal queja de los trabajadores eran los contratos de tercerización y la falta de seguridad laboral resultante.* […] *Los partidarios del sindicato eran empleados con mucha participación entre los miembros del personal de operaciones y mantenimiento de la Planta*"[125]. [Traducción del Tribunal]

203. Antes de crearse el sindicato, a algunos de estos trabajadores que, según el Sr. Rondón, "*la gerencia de la planta identificó como los principales agitadores del sindicato*"[126] [Traducción del Tribunal], se les rescindió el contrato. Norpro Venezuela también puso fin a su relación con RH Consultores y, el día 16 de junio de 2009, suscribió un nuevo acuerdo con la firma Outstaffing Corporation, otra empresa tercerizadora de

---

[123] Rondón, ¶ 11.
[124] Rondón, ¶ 13.
[125] Rondón, ¶ 14.
[126] Rondón, ¶ 15.

Venezuela[127]. En consecuencia, se comunicó a los trabajadores que se liquidarían sus contratos con RH Consultores, es decir, se les pagaría el tiempo remanente de sus contratos de seis meses, y que tendrían que firmar un nuevo contrato con Outstaffing Corporation[128].

204.  El cambio de empresas tercerizadoras fue causa de una creciente disconformidad entre los trabajadores de la planta. El Sr. Rondón describió la situación en su declaración testimonial de la siguiente manera:

> "*Los trabajadores de la Planta consideraron esta maniobra* [es decir, el hecho de tener que firmar nuevos contratos con Outstaffing Corporation] *como prueba de que sus contratos se podían manipular e incluso rescindir en cualquier momento, sin ningún tipo de justificación.* […] *algunos de los trabajadores ya iban por el tercer contrato semestral con RH Consultores y, con esta maniobra, sus esperanzas de que el siguiente contrato sería directo y de duración ilimitada se desvanecieron, ya que Outstaffing Corporation sólo ofrecía contratos de 6 meses nuevamente. Los trabajadores se dieron cuenta de que las probabilidades de tener contratos directos, de duración ilimitada, con Norpro Venezuela no eran realistas. Si bien todos los trabajadores de la Planta terminaron suscribiendo los nuevos contratos con Outstaffing Corporation, esta medida hizo que más trabajadores apoyaran la idea de crear un sindicato*"[129]. [Traducción del Tribunal]

205.  Pocos meses después, los organizadores del sindicato lograron obtener las firmas necesarias para formar un sindicato y así crearon el Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares ("**SINPROTRAC**")[130].

206.  El día 15 de septiembre de 2009, Norpro Venezuela rescindió el contrato con el Sr. Luna, director de RR. HH., a quien Norpro Venezuela había empleado de manera directa[131]. Mediante carta de fecha 10 de octubre de 2009, Norpro Venezuela también rescindió el contrato con Outstaffing Corporation, con efecto a partir del día 13 de noviembre de 2009, lo que significó la rescisión de contratos de aproximadamente 70 trabajadores de la planta[132]. En la carta de rescisión, Norpro Venezuela confirmó que "*asum[ía] los costos*

---

[127] **Anexo ER-2**; Rondón, ¶ 15; Memorial de Contestación, ¶ 16.

[128] Memorial de Contestación, ¶ 16; Rondón, ¶ 17.

[129] Rondón, ¶ 17.

[130] Memorial de Contestación, ¶ 17; Rondón, ¶ 18.

[131] Más tarde, el Sr. Luna inició una demanda por despido injustificado contra Norpro Venezuela, ratificada por el Tribunal de Primera Instancia de Juicio del Trabajo, Estado Bolívar, Extensión Territorial Puerto Ordaz, el día 14 de octubre de 2010. **Anexo ER-3**. La apelación del fallo se consideró infundada y la decisión de fecha 14 de octubre de 2010 fue ratificada por el Tribunal Superior Tercero del Trabajo, Estado Bolívar, Extensión Territorial, el día 13 de julio de 2011. **Anexo ER-4**. Rondón, ¶ 18.

[132] Memorial de Contestación, ¶ 17; Rondón, ¶ 19; **Anexo ER-6**.

*[derivados] de la rescisión del Acuerdo que [fueran] facturados por OUTSTAFFING CORPORATION, C.A con posterioridad al 13 de noviembre de 2009*"[133].

207. Según la Demandada, el "*despido masivo de trabajadores*" fue el verdadero motivo del cierre de la planta en el mes de noviembre de 2009, que duró hasta el mes de enero de 2010, no la "*serie de mejoras mecánicas*" que el Sr. Larry mencionó en su declaración testimonial[134]; la Demandada admite, no obstante, que "*Norpro Venezuela sí utilizó el cierre de la Planta del mes de noviembre de 2009 para llevar a cabo ciertas reparaciones y mejoras*"[135]. [Traducción del Tribunal]

208. Tras la rescisión de su contrato con Outstaffing Corporation, Norpro Venezuela suscribió nuevos contratos con otras tres empresas tercerizadoras: Gestión Industrial Bolívar, C.A., Gerencia de Personal Guayana, C.A. y Guayana Internacional Cargo, C.A. A través de estas empresas, se volvió a contratar a la mitad de los trabajadores de la planta. Según el Sr. Rondón, la otra mitad se unió a los líderes sindicales de SINPROTRAC "*y comenzó a realizar manifestaciones diarias frente a la Planta de Norpro Venezuela*"[136]. [Traducción del Tribunal]

209. La tensión entre la gerencia de Norpro Venezuela y SINPROTRAC no fue un caso aislado en el área, sino que, en ese momento, se experimentaba tensión laboral en todo el sector industrial de Ciudad Guayana. Los trabajadores de las industrias del hierro, el acero y el aluminio exigieron públicamente poner fin a las prácticas laborales injustas. Una de sus principales quejas eran los acuerdos laborales de tercerización. Además, había una iniciativa nacional para retener el control de los recursos naturales de Venezuela y procesos posteriores de fabricación y refinamiento vinculados, a fin de que Venezuela pudiera gozar de los potenciales beneficios económicos y sociales de esos sectores. En consecuencia, a mediados del año 2009, se formaron grupos de trabajo que desarrollaron y ejecutaron el Plan Guayana Socialista, cuyo objeto era lograr la participación de los

---

[133] **Anexo ER-6**. Trece trabajadores con contratos rescindidos en este contexto presentaron una solicitud de reenganche y pago de salarios caídos ante la Sala de Fueros de la Inspectoría del Trabajo "Alfredo Maneiro" el día 14 de diciembre de 2009. Mediante decisión administrativa de fecha 15 de abril de 2010, se ordenó a Outstaffing Corporation reenganchar de inmediato a los trece trabajadores y pagar sus salarios caídos desde la fecha de despido el día 12 de diciembre de 2009 hasta la fecha de reincorporación definitiva a sus puestos de trabajo, dado que "*se efectuaron los despidos sin que estuviese autorizado para ello mediante proceso de calificación de falla*". **Anexo ER-8**. El día 29 de julio de 2010, los mismos trabajadores presentaron una demanda contra Outstaffing Corporation ante el Juez de Primera Instancia de Sustanciación, Mediación y Ejecución, Estado Bolívar, mediante la cual alegaban que el motivo de su despido fue el hecho de haber intentado negociar un convenio colectivo de trabajo en nombre de SINPROTRAC. **Anexo ER-7**.
[134] Larry, ¶ 31.
[135] Memorial de Contestación, ¶ 18; Rondón, ¶ 20.
[136] Rondón, ¶ 21.

trabajadores gerenciales y administrativos de las industrias básicas y, entre otras cosas, mejorar las condiciones laborales[137].

210. En la presentación de la Demandante de fecha 18 de marzo de 2010 sobre el Plan Estratégico 2011-2015, una de las principales cuestiones fue "*El intenso enfoque en la seguridad del equipo externo* [en referencia al equipo SURGE que atendería las cuestiones operacionales]": (i) "*Todos los miembros del equipo de Mara Inn*"; (ii) "*Las restricciones sobre las actividades fuera del hotel*"; (iii) "*Traslado hacia/desde la planta controlada*"; y (iv) "*Directivas emitidas sobre conflictos de trabajadores*"[138]. [Traducción del Tribunal]

## IX.    LA TOMA DE CONTROL TEMPORAL DE LA PLANTA DE FECHA 24 DE MARZO DE 2010

211. El día 24 de marzo de 2010, alrededor de 40 personas, un grupo de ex trabajadores de una empresa tercerizadora que había utilizado Norpro Venezuela, se reunieron fuera de la planta, lograron ingresar y ocuparon el área operativa de la planta durante aproximadamente cuatro horas[139]. Entre esas personas, estaban el Sr. Ángel Marcano, miembro de la Asamblea Nacional de Venezuela, y el Sr. Asdrúbal López, miembro de la Asamblea Legislativa del Estado Bolívar y del partido gobernantes del Presidente Chávez[140]. Su rol dentro del grupo es objeto de controversia entre las Partes[141].

212. También estuvieron presentes el Sr. Vicent Acosta Williams Jose, Secretario General de SINPROTRAC, y otros miembros líderes del sindicato. En la Solicitud de Inspección Judicial que presentó Norpro Venezuela ese mismo día, el Sr. Jose también aparece como el primero de los cinco individuos identificados al frente de la toma de control; el Sr. Marcano y el Sr. López no estaban entre esos cinco individuos[142]. En una de las fotografías que tomó el inspector judicial, se puede apreciar un anuncio que decía: "*La masa obrera unidos en apoyo a nuestros compañeros despedidos por causa injustificada. Norpro, exigimos reenganche ya*"[143].

213. Cuando el líder del sindicato tomó un megáfono y pidió a los trabajadores de la planta que interrumpieran su labor, la gerencia de Norpro Venezuela apagó los equipos principales de la planta y colocó el horno en modo inactivo. Aunque retomaron el control de la planta al día siguiente, las Partes discrepan en cuanto al tiempo que llevó volver a

---

[137] Memorial de Contestación, ¶ 20, nota 57; Rondón, ¶ 25; **Anexos C-14** y **ER-9**.
[138] **Anexos CLEX-80** y **R-9**.
[139] Larry, ¶ 41; Rondón, ¶ 24.
[140] Memorial, ¶ 69.
[141] *Cfr.* Memorial, ¶¶ 69, 71; Dúplica, ¶ 10.
[142] **Anexos C-15** y **R-14**.
[143] **Anexos C-15** y **R-14**.

poner en marcha la producción de la planta[144]. Según la Demandante, el grupo también dañó la puerta de ingreso principal de la planta, destrozó el candado y bloqueó la entrada; también impidió que los empleados desarrollaran sus actividades habituales en la planta y obligó a los empleados de Norpro Venezuela a abandonar las áreas de producción de la planta[145]. La Guardia Nacional que Norpro Venezuela había contratado para brindar seguridad a la planta no intervino[146].

214. En respuesta a la toma de control, Norpro Venezuela solicitó una inspección judicial durante la cual el juez documentó los nombres de los individuos que participaron en la toma de control, identificó a los líderes de la toma y detalló los daños causados[147]. Tras confrontarse con el juez, el grupo abandonó la planta, pero varios miembros permanecieron afuera y siguieron bloqueando, de manera parcial, parte de la entrada[148].

215. En su presentación de fecha 4 de mayo de 2010 sobre el Plan Estratégico 2011-2015, la Demandante señaló que "*El contrato de tercerización con Black Union vence el día 21 de mayo*": (i) "*Se prevé una situación de inestabilidad laboral para la segunda mitad de mayo*"; y (ii) "*Nuevamente, la experiencia de los operadores y del personal de mantenimiento será un problema*". Con respecto a la "*Cuestión clave*" "*Personal (Inestable => rotación frecuente => a causa de factores externos*", se establecieron las siguientes medidas en el Plan: (i) "*Sindicalizar el sitio mediante la creación de 2 sindicatos: uno para los empleados de SG, otro para la mano de obra tercerizada => utilizar los sindicatos para reducir la presión externa y promover cierta estabilidad*"; (ii) "*mantener la estrategia de tercerización de más de una fuente*"; (iii) "*extender los contratos laborales de 6 meses a 1-3 años*"; (iv) "*estudiar la introducción de un plan de beneficios asequible para reducir la rotación del personal y la tensión laboral*"; y (v) "*promover la estabilidad a través de una mejor comunicación con los empleados*"[149]. [Traducción del Tribunal]

## X.   LA TOMA DE CONTROL DEFINITIVA DE LA PLANTA DE FECHA 15 DE MAYO DE 2010

216. El día 15 de mayo de 2010, se presentaron las conclusiones de los grupos de trabajo del Plan Guayana Socialista al Presidente Chávez durante una ceremonia pública, que también se transmitió en vivo por televisión y radio. Durante la presentación, el Presidente Chávez leyó y aprobó ciertas propuestas de los grupos de trabajo, entre ellas, las

---

[144] Memorial, ¶ 73; Millot, ¶ 23; Rondón, ¶ 24.
[145] Memorial, ¶ 69.
[146] Memorial, ¶ 70.
[147] **Anexo C-15**.
[148] Memorial, ¶ 72; **Anexo C-15**.
[149] **Anexos CLEX-80** y **R-10**.

relacionadas con Norpro Venezuela. A continuación, se proporciona la transcripción oficial de las partes relevantes de la radiodifusión:

> "*Consultar con PDVSA sobre la compra de Propan*[ts] *producido y comercializado por la empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario – aquí* [en el documento] *se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela*"[150].

217.  Ese mismo día, llegó un grupo local a la Planta, que venía directamente del evento en el que había hablado el Presidente Chávez[151]. De nuevo, el grupo incluía a los Sres. Marcano y López[152], además de miembros de SINPROTRAC[153]. Oscar Cid, Pierre Gramond y Eric Dixon de Norpro Venezuela también llegaron al lugar, tomaron algunos objetos personales, sus computadoras portátiles y documentos y, aunque el grupo intentó detenerlos, finalmente abandonaron la planta[154]. Alrededor de 4.000 toneladas de *proppants* terminados, almacenados *in situ*, permanecieron dentro de la planta; había un envío programado para el día 17 de mayo de 2010 que se debió cancelar[155].

218.  Norpro Venezuela solicitó una nueva inspección judicial que dejara constancia de los hechos, la cual se llevó a cabo el día 17 de mayo de 2010. El poder judicial local señaló que (i) cuando los empleados de Norpro Venezuela fueron a trabajar el lunes 17 de mayo de 2010, se les negó acceso a la planta; (ii) los Sres. Marcano y López también impidieron el acceso del inspector judicial y directivos de Norpro Venezuela, y manifestaron actuar para el Plan Guayana Socialista, bajo instrucciones del Presidente Chávez; (iii) había un anuncio de SINPROTRAC colgado de la puerta principal de la planta; y (iv) el grupo que organizó la toma de control se rehusó a aceptar el memorando de Norpro Venezuela en el que se le solicitaba, entre otras cosas, la designación de un representante para llevar a cabo las negociaciones pertinentes[156].

219.  El día 18 de mayo de 2010, la Oficina de Comunicación y Relaciones Institucionales publicó un resumen de medios nacionales e internacionales, incluida una noticia de *El Nacional* según la cual:

> "*Trabajadores contratados de la empresa Norpro de Venezuela tomaron la fábrica después del anuncio de nacionalización del*

---

[150] **Anexo R-15**.
[151] Memorial, ¶ 77; Rondón, ¶28.
[152] **Anexo C-20**.
[153] Rondón, ¶ 28.
[154] Rondón, ¶¶ 28-29.
[155] Memorial, ¶¶ 78-79; Larry, ¶ 44.
[156] Memorial, ¶ 81; **Anexo C-20**.

*presidente Hugo Chávez. Con la Guardia Nacional y una comisión presidida por el diputado de la Asamblea Nacional, Ángel Marcano, los trabajadores impidieron al apoderado legal de la empresa privada entrar a las instalaciones*"[157].

220.  Mediante cartas de fechas 19 y 27 de mayo de 2010, el Sr. Páez le comunicó al Sr. Rafael Ramírez, Presidente de PDVSA y Ministro de Hidrocarburos (Ministerio de Petróleo y Minería), y al Sr. José Khan, Presidente de CVG y Ministro del MIBAM, que el día 15 de mayo de 2010 se había expropiado la inversión de la Demandante, y ofreció asistencia técnica para garantizar el uso correcto de los equipos y la seguridad del personal *in situ*. También solicitó la designación de un interlocutor oficial con quien la Demandante pudiera debatir sobre la expropiación[158].

221.  Los días 24 y 27 de mayo de 2010, directivos de PDVSA, PDVSA Exploration and Production East y PDVSA Industrial visitaron la planta[159]. Según un comunicado de prensa publicado en *Prensa Unete*, estos directivos actuaron bajo instrucciones directas del Ministro Ramírez[160].

222.  En los meses de mayo y junio de 2010, PDVSA preparó los siguientes informes y presentaciones:

-  "*EVALUACIÓN GLOBAL DE LA SITUACIÓN ACTUAL DE LA EMPRESA NORPRO VENEZUELA C.A.*", mayo de 2010 (informe preliminar preparado por PDVSA E&P)[161];

-  "*Sector Hidrocarburos – PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO DE VENEZUELA, C.A.*", mayo de 2010 (presentación de PowerPoint preparada por PDVSA Industrial)[162];

-  "*DIAGNÓSTICO SITUACIÓN ACTUAL Y PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO VENEZUELA, C.A.*", junio de 2010 (presentación de PowerPoint preparada por PDVSA Industrial)[163]; y

---

[157] **Anexo C-114**.
[158] Memorial, ¶¶ 82, 84, 89, 95. **Anexo C-22; Anexo C-23**.
[159] Memorial, ¶ 84; Memorial de Contestación, ¶ 28.
[160] **Anexo C-123**.
[161] **Anexo C-141**.
[162] **Anexo C-111**.
[163] **Anexo C-142**.

- "*SITUACIÓN ACTUAL DE PROCESO DE ESTATIZACIÓN EMPRESA NORPRO DE VENEZUELA, C.A. (NORPRO)*", 2 de junio de 2010 (memorando interno preparado por PDVSA Industrial)[164].

223. Los días 2 y 8 de junio de 2010, se celebraron reuniones entre Norpro Venezuela, PDVSA y otros. Las actas de reuniones se titulan: "*PROCESO DE NACIONALIZACIÓN NORPRO VENEZUELA, C.A.*"[165].

224. El día 8 de junio de 2010, el Sr. Guy Rolli le escribió al Sr. Temir Porras, Viceministro de Relaciones Exteriores para Europa, en referencia a los comunicados de prensa según los cuales PDVSA estaba involucrada en la expropiación y los equipos de la planta se habían dañado durante los hechos del 15 de mayo de 2010 y con posterioridad. Asimismo, reiteró la solicitud de la Demandante de designarse un interlocutor oficial y la oferta de asistencia técnica de la Demandante[166].

225. Mediante carta de fecha 6 de julio de 2010, dirigida al Ministro Ramírez, el Sr. Páez reiteró la oferta de asistencia técnica de la Demandante, a fin de garantizar el uso correcto de los equipos y la seguridad del personal *in situ*[167].

226. Mediante carta del 3 de agosto de 2010, dirigida al Sr. Eulogio del Pino, Vicepresidente del área de Exploración y Producción de PDVSA, el Sr. Patrick Dupin, Presidente de la Demandante, reiteró la inquietud de la Demandante con respecto a los daños que podrían sufrir los trabajadores de la planta y los bienes de Norpro Venezuela. El Sr. Dupin aludió a los comunicados de prensa en los que se dejaba constancia que el horno de la planta no funcionaba y que PDVSA planeaba repararlo en breve. Asimismo, reiteró las solicitudes de la Demandante en relación con la "*designación inmediata de un interlocutor autorizado que determine cuáles son los pasos a seguir para completar el proceso de nacionalización de la Planta y su cesión de PDVSA, tal como ordenó el Presidente Chávez*". Además de solicitar una reunión con PDVSA, el Sr. Dupin confirmó la predisposición de la Demandante para "*analizar la posibilidad de brindar a PDVSA la asistencia técnica necesaria para poner en marcha y operar la Planta de manera correcta*"[168]. [Traducción del Tribunal]

227. El día 5 de agosto de 2010, Norpro Venezuela solicitó otras inspección judicial, en la que se dejó constancia que había una bandera roja de "*PDVSA*" flameando arriba de la planta y que la puerta de la planta se había pintado de color rojo brillante. Otra vez más, ese día,

---

[164] **Anexo C-143**.
[165] **Anexo C-25.**
[166] Memorial, ¶ 97; **Anexo C-26**.
[167] **Anexo C-28**.
[168] **Anexo C-30**.

se impidió el acceso a la planta de funcionarios judiciales y gerentes de Norpro Venezuela[169].

228. Poco después de la toma de control del día 15 de mayo de 2010, Norpro Venezuela comenzó a notificar a sus socios contractuales de Venezuela, incluso a INPSASEL y CVG EDELCA, que había ocurrido una causa extraña no imputable[170]. En el mes de agosto de 2010, Norpro Venezuela publicó notificaciones de fuerza mayor en periódicos venezolanos, como *Ciudadanos Nacional* (una sub-sección de *El Nacional*) y *Correo del Caroní*[171]. Por esa fecha, Norpro Venezuela despidió oficialmente a la mayor parte de sus empleados, y sólo retuvo a ciertos individuos que le permitirían a la Demandante brindar asistencia técnica en caso de que el Gobierno venezolano aceptase dicha oferta[172].

## XI. NEGOCIACIONES POSTERIORES A LA TOMA DE CONTROL DE LA PLANTA

### 1. La reunión de fecha 30 de agosto de 2010

229. El día 30 de agosto de 2010, se celebró una reunión entre PDVSA Industrial, Compagnie de Saint-Gobain y la Embajada de la República Francesa en Venezuela[173]. Según la minuta de dicha reunión, PDVSA Industrial realizó las siguientes afirmaciones y planteó los siguientes temas[174]:

- PDVSA Industrial había recibido instrucciones precisas del Presidente Chávez de llevar a cabo la estatización de Norpro Venezuela y acataría dicha orden con la mayor diligencia;

- Se estaba preparando un decreto de expropiación y, si bien PDVSA Industrial no tenía conocimiento de la fecha exacta de su publicación, sería conveniente que se publicara con anterioridad al día 15 de noviembre de 2010, fecha en la que expiraría el plazo de seis meses previsto en el Artículo 8(1) del Tratado;

- Norpro Venezuela y sus accionistas tenían la libertad de entablar acciones legales en aras de salvaguardar sus derechos en virtud del derecho aplicable y, en particular, en materia laboral y de seguridad en el trabajo;

---

[169] **Anexo C-31**; Memorial, ¶ 86.

[170] Memorial, ¶ 98; **Anexo C-21**; **Anexo C-27**.

[171] Memorial, ¶ 98; **Anexo C-32**; **Anexo C-33**.

[172] Memorial, ¶ 98; Millot, ¶ 25.

[173] Memorial, ¶ 99; Memorial de Contestación, ¶ 29.

[174] **Anexo C-34**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-17**. Aunque el documento presentado lleva la nota "*BORRADOR PARA DISCUSIÓN*", no parece estar discutido que la minuta de la reunión se firmó durante la siguiente reunión en el día 14 de octubre de 2010. **Anexo C-36**.

- Sin perjuicio de la instrucción de llevar a cabo la estatización de Norpro Venezuela, PDVSA Industrial se encontraba "*abierta a considerar cualquier propuesta que los accionistas de Norpro t*[uvieran] *a bien presentar con el objeto de llevar a cabo la toma de control y transferencia a PDVSA de los activos pertenecientes a Norpro, de forma amistosa y concertada*", pero PDVSA Industrial les exigió una manifestación de voluntad escrita a los accionistas a fin de obtener las autorizaciones necesarias "*para considerar cualquier mecanismo alterno a la expropiación que permita la resolución amistosa de la controversia*";

- Mientras no se hubiera publicado el decreto de expropiación, PDVSA Industrial no podía actuar o intervenir en Norpro Venezuela, y su presencia en la planta "*corresponde a la necesidad de prepararse para la futura toma formal de posesión, una vez que se realice la publicación del Decreto*".

230. Compagnie de Saint-Gobain realizó las siguientes afirmaciones y planteó los siguientes temas durante la reunión[175]:

- Compagnie de Saint-Gobain agradeció a los representantes de PDVSA Industrial por haber respondido a su solicitud escrita de reunión y recordó que el proyecto siempre se había llevado a cabo "*con el apoyo y auspicio*" del MIBAM y diversas otras autoridades gubernamentales venezolanas;

- Compagnie de Saint-Gobain ratificó lo expuesto en las diversas comunicaciones enviadas desde el día 15 de mayo de 2015 relativas a la ocupación de la planta y confirmó su "*intención de cooperar con las autoridades en lo relacionado con la estatización de Norpro, con el fin de solucionar cualquier controversia de forma amistosa, conforme a las disposiciones del Acuerdo*";

- Compagnie de Saint-Gobain reiteró su disposición para prestarle asistencia técnica a PDVSA Industrial con respecto al control de calidad de los productos y a la estandarización del proceso si PDVSA Industrial lo requería, y propuso realizar una minuciosa inspección técnica de la planta con el propósito de reiniciar su producción y formar una comisión técnica a efectos de estudiar la forma que puede adoptar la asistencia técnica;

- Compagnie de Saint-Gobain "*expresó su interés en considerar su eventual '*Take Off Agreement*' o acuerdo de compra de los productos que PDVSA llegue a fabricar en la planta de Norpro con posterioridad a su expropiación, sujeto a condiciones que deberán precisarse y acordarse oportunamente, incluyendo especificaciones,*

---

[175] **Anexo C-34**. Citas del original en español. Ver también traducción al inglés presentadas por la Demandada como **Anexo R-17**.

*características técnicas y estándares de calidad de los productos. Esta propuesta no podría exceder la mitad de la capacidad de la planta debido a la pérdida de clientes que no han podido ser atendidos a partir del 15 de mayo de 2010 al ordenarse la estatización de la empresa*";

- Compagnie de Saint-Gobain reiteró su interés en "*que se aclare la situación jurídica de la inversión realizada en Venezuela por* [la Demandante]*, por medio de su subsidiaria Norpro, sobre cuya planta no posee control desde la fecha del anuncio presidencial del 15 de mayo de 2010*" y le pidió a PDVSA Industrial que aclarara cuándo se publicaría el decreto de expropiación, a la luz del vencimiento del plazo de seis meses en virtud del Artículo 8(1) del Tratado el día 15 de noviembre de 2010;

- Compagnie de Saint-Gobain tenía interés en llegar a un acuerdo marco con PDVSA Industrial sobre los puntos básicos relacionados con la estatización de Norpro Venezuela y en "*analizar con PDVSA mecanismos que permitan resolver de forma amistosa la controversia, conforme a lo previsto bajo el Acuerdo, como por ejemplo la compraventa de acciones en sustitución de un procedimiento de expropiación*".

231. Durante la reunión de fecha 30 de agosto de 2010, PDVSA Industrial y Compagnie de Saint-Gobain acordaron lo siguiente: (i) redactar y suscribir una minuta de la reunión; (ii) "[s]*ostener reuniones periódicas con el objeto de analizar temas de común interés relacionados con la estatización de Norpro*"; (iii) mantener una comunicación abierta entre las partes; y (iv) celebrar una reunión de la comisión técnica el día 13 de septiembre de 2010[176].

## 2. La reunión de fecha 14 de octubre de 2010

232. El día 14 de octubre de 2010, la comisión técnica conjunta, a la que asistieron representantes de PDVSA Industrial y Norpro Venezuela en nombre de Compagnie de Saint-Gobain, celebró su primera reunión[177].

233. Según el borrador de la minuta de dicha reunión, Norpro Venezuela realizó las siguientes afirmaciones y planteó los siguientes temas[178]:

- Norpro Venezuela preguntó si PDVSA Industrial tenía información acerca del estado de la redacción del decreto de expropiación y su posible fecha de publicación (la respuesta de PDVSA Industrial fue negativa, pero afirmó que había recibido sus

---

[176] **Anexo C-34**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-17**
[177] Memorial, ¶ 100; Memorial de Contestación, ¶ 30.
[178] **Anexo C-36**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-70**. Aunque parece surgir del expediente que esta minuta de reunión nunca se suscribió, su contenido no parece ser objeto de debate entre las Partes.

instrucciones de conformidad con las declaraciones efectuadas por el Presidente Chávez el día 15 de mayo de 2010);

- Norpro Venezuela brindó una presentación electrónica, denominada "*Tour Virtual de la Planta*", describió su propuesta de asistencia técnica y explicó la necesidad de disponer de un control operacional de calidad, así como de realizar una evaluación y un diagnóstico de las condiciones reales de la planta.

234. PDVSA Industrial realizó las siguientes afirmaciones y planteó los siguientes temas durante la reunión[179]:

- PDVSA Industrial aclaró que "*el alcance y propósito de la reunión es de índole técnico*" y "*todo lo referente a aspectos legales del proceso de estatización deberá analizarse con la Consultoría Jurídica de PDVSA*";

- PDVSA Industrial solicitó información adicional sobre la propuesta de asistencia técnica (las preguntas fueron contestadas por Norpro Venezuela) y sugirió que, además de la propuesta de asistencia técnica, "*se explor*[aran] *otras estructuras*" que les permitieran ejecutar la estatización, haciendo referencia a otros casos en los que PDVSA Industrial y los respectivos propietarios de los bienes estatizados habían creado empresas mixtas, respecto de las cuales PDVSA Industrial mantenía el control y una participación mayoritaria;

- PDVSA Industrial preguntó por la situación ambiental de la planta que fue descripta por Norpro Venezuela como "*muy limpia*" y en cumplimiento de todas las leyes aplicables y los permisos emitidos por el Ministerio del Poder Popular para el Ambiente;

- PDVSA Industrial solicitó información sobre la capacidad de producción de la planta, que Norpro Venezuela proporcionó con una explicación del desarrollo en dos fases, la primera de las cuales "*se ejecutó en su totalidad*" con 70.000 toneladas por año y la segunda de las cuales estaba destinada a iniciarse en breve, a fin de duplicar la capacidad.

235. Durante la reunión de fecha 14 de octubre de 2010, PDVSA Industrial y Norpro Venezuela acordaron lo siguiente: (i) firmar la minuta de la reunión de fecha 30 de agosto; (ii) redactar y suscribir una minuta de esta reunión; y (iii) fijar el día 8 de noviembre de 2010 como fecha tentativa para una nueva reunión[180].

---

[179] **Anexo C-36**. Citas del original en español. Ver también traducción al inglés presentada or la Demandada como **Anexo R-70**

[180] **Anexo C-36**; **Anexo R-70**.

**3.      Correspondencia adicional y reunión de fecha 26 de octubre de 2010**

236.  Mediante un correo electrónico de fecha 22 de octubre de 2010, Gabriel Rojas de la Consultoría Jurídica de PDVSA Industrial le escribió a Luis Páez (Presidente de Norpro Venezuela) y propuso el siguiente acuerdo:

> "*1)    NORPRO hará entrega material a PDVSA Industrial* [de] *la planta, productos existentes y materia prima;*
>
> *2)     PDVSA Industrial asumirá el control y la responsabilidad sobre la planta, productos, materia prima y de las operaciones;*
>
> *3)     PDVSA Industrial asumirá la responsabilidad de contratar al personal necesario para la operación de la planta;*
>
> *4)     NORPRO acompañará y asegurará a PDVSA Industrial la puesta en pleno funcionamiento de la planta, atendiendo a todos los parámetros de seguridad;*
>
> *5)     Se realizará un levantamiento de información sobre el estado de las instalaciones y sus condiciones de operatividad actuales, a los fines de determinar el valor justo de dicha infraestructura, productos y materias primas*"[181].

237.  El Sr. Rojas aclaró que esta propuesta se realizaba "*sin menoscabo de la posible constitución de una empresa estatal de capital mixto*" e invitó a Norpro Venezuela a celebrar una reunión en aras de analizar la propuesta[182].

238.  El día 26 de octubre de 2010, se celebró una reunión entre el Sr. Armando Giraud, el Consejero General de PDVSA, representantes de PDVSA Industrial, Norpro Venezuela y la Embajada de la República Francesa. En esa reunión, el Sr. Giraud describió brevemente la posibilidad de que Norpro Venezuela celebrara un acuerdo de empresa mixta con PDVSA, en virtud del cual la última conservaría una participación del 60 % en el emprendimiento[183]. Las Partes disienten en cuanto a si el Sr. Giraud presentó una "*propuesta suficientemente avanzada*"[184][Traducción del Tribunal], o, más bien, una mera sugerencia, que tendría que haber sido sustentada con documentos concretos luego de la reunión a fin de que la Demandante la considerara seriamente[185].

---

[181] **Anexo C-121**. Citas del original en español. Ver también traducción al inglés presentado por la Demandada como **Anexo R-71**.

[182] **Anexo C-121**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-71**.

[183] Memorial, ¶ 102; Memorial de Contestación, ¶ 31.

[184] Escrito Posterior a la Audiencia de la Demandada, nota 101.

[185] Segunda Presentación Posterior a la Audiencia de la Demandante, § 23. Cuando durante su contrainterrogatorio le preguntaron si el Sr. Giraud había realizado una propuesta en esa reunión, el Sr. Millot afirmó lo siguiente: "*No es una propuesta sino una sugerencia. Yo no la llamaría una propuesta, una propuesta habría sido distinta.* […]

239. En su correo electrónico de seguimiento de fecha 1 de noviembre de 2010 dirigido al Sr. Giraud, el Sr. Paúl destacó que la Demandante pretendía recibir los documentos que PDVSA había prometido proporcionar, incluido el borrador de estatuto y un acuerdo a efectos de la empresa mixta sugerida[186].

240. En su carta de fecha 18 de noviembre de 2010, el Sr. Páez informó al Sr. Giraud de que, el día 2 de noviembre de 2010, dos funcionarios de PDVSA, escoltados por miembros armados de la Guardia Nacional, habían abordado a Oscar Cid y Pierre-Yves Grammond de Norpro Venezuela y les habían exigido que entregaran los vehículos de la empresa, dado que los funcionarios de PDVSA decían tener instrucciones de reunir los bienes de Norpro Venezuela para la inspección judicial de la compañía. El Sr. Páez solicitó que el Sr. Giraud presentara los documentos en virtud de los cuales esos funcionarios de PDVSA estaban autorizados a confiscar los bienes de Norpro Venezuela, considerando, en particular, que, durante la reunión de fecha 26 de octubre de 2010, las partes habían acordado analizar alternativas a la expropiación de Norpro Venezuela. Por ende, el Sr. Páez reiteró el ofrecimiento de la Demandante de prestarle asistencia técnica a PDVSA[187].

241. En otro correo electrónico dirigido al Sr. Giraud de fecha 19 de noviembre de 2010, el Sr. Paúl adjuntó la carta del Sr. Páez de fecha 18 de noviembre de 2010, así como fotografías tomadas a los vehículos de la empresa confiscados y copias de las identificaciones de los dos funcionarios de PDVSA. Asimismo, resaltó que la Demandante todavía no había recibido los documentos prometidos en relación con la empresa mixta sugerida[188].

242. En su carta al Sr. Giraud de fecha 19 de enero de 2011, el Sr. Páez afirmó que la Demandante seguía estando dispuesta a analizar las alternativas a la expropiación que el

Sr. Giraud había sugerido durante la reunión el día 26 de octubre 2010 y subrayó que la Demandante aún no había recibido los documentos que el Sr. Giraud había prometido entregar a la Demandante para que esta última considerase la propuesta de empresa mixta realizada por el Sr. Giraud. El Sr. Páez resaltó que la Demandante estaba dispuesta a reunirse con PDVSA a fin de analizar las alternativas mencionadas[189].

243. En su carta al Sr. Giraud de fecha 3 de marzo de 2011, el Sr. Páez aseveró que no había recibido respuesta alguna a las cartas que había enviado luego de la reunión el día 26 de octubre de 2010 y reiteró que la Demandante todavía no había recibido los documentos

---

*Creo que el señor Giraud hizo una sugerencia, no sé qué tan bien documentada estuvo esa propuesta. Nosotros, según me acuerdo, no recibimos nada en concreto después de esa reunión*". Transcripción (Día 2), pág. 414, líneas 9-17. *Véase* también Millot, ¶ 31.
[186] **Anexo C-151**.
[187] **Anexo C-122**.
[188] **Anexo C-151.**
[189] **Anexo C-37**.

en relación con la empresa mixta sugerida. El Sr. Páez finalizó solicitando una reunión para analizar las alternativas que el Sr. Giraud había propuesto durante la reunión de fecha 26 de octubre de 2010[190].

244. En su carta al Sr. del Pino de fecha 21 de marzo de 2011, el Sr. Páez afirmó que no había habido ninguna comunicación con PDVSA después de la reunión de fecha 26 de octubre de 2010, en tanto no había recibido respuesta alguna a sus cartas de seguimiento. El Sr. Páez destacó que había pasado casi un año desde que se había anunciado la expropiación de Norpro Venezuela y, para su sorpresa, las negociaciones que habían comenzado en el mes de agosto de 2010 se habían estancado. Por último, reiteró su solicitud de reunión en aras de resolver la controversia de manera amistosa[191].

## XII. EL DECRETO DE EXPROPIACIÓN Y LA CORRESPONDENCIA DE SEGUIMIENTO

245. El día 29 de marzo de 2011, la Demandada publicó el Decreto N.º 8.133 en la Gaceta Oficial N.º 39.644 (el "**Decreto de Expropiación**")[192]:

> "[…] *en ejercicio de las atribuciones que le confieren los artículos 115, 226 y 236 numeral 2 de la Constitución de la República Bolivariana de Venezuela, en concordancia con lo dispuesto en los artículos 4º de la Ley Orgánica de Hidrocarburos, 4º del Decreto con Rango, Valor y Fuerza de Ley Orgánica de Hidrocarburos Gaseosos, 5º de la Ley de Expropiación por Causa de Utilidad Pública o Social y 6º de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios, en el Consejo de Ministros,*
>
> ### CONSIDERANDO
>
> *Que es obligación del Estado fortalecer a la Industria Petrolera y Gasífera, así como adoptar las medidas conducentes para garantizar la estabilidad operativa de dicha industria y el cumplimiento de los planes y metas de producción de Petróleos de Venezuela, S.A. (PDVSA) y sus filiales;*
>
> ### CONSIDERANDO
>
> *Que las actividades relativas a los hidrocarburos e hidrocarburos gaseosos, así como las obras que su manejo requiera, son de utilidad pública e interés social;*

---

[190] **Anexo C-38**.
[191] **Anexo C-39**.
[192] **Anexo C-40**.

### CONSIDERANDO

*Que la disposición oportuna de agentes expansivos cerámicos es de importancia medular para elevar la productividad de los yacimientos gasíferos y petrolíferos;*

### CONSIDERANDO

*Que la adquisición forzosa por parte del Estado de los bienes muebles e inmuebles y demás activos, que pertenezcan o que se encuentren en posesión de la sociedad mercantil NORPRO VENEZUELA, C.A. y de cualesquiera otras empresas o personas relacionadas, resulta indispensable para la ejecución de la obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS".*

### DECRETA

*Artículo 1º. Se ordena la adquisición forzosa de los bienes muebles e inmuebles y demás activos incluyendo terrenos, bienhechurías, construcciones, instalaciones, equipos industriales, de oficina, implementos y materiales de trabajo, inventarios, licencias, medios de transporte o derechos necesarios para la ejecución de la obra señalada en este artículo, o a la comercialización o distribución de los productos en ella elaborados, que pertenezcan o se encuentren en posesión de la sociedad mercantil NORPRO VENEZUELA, C.A. y de cualesquiera otras empresas o personas relacionadas, que resulten indispensables para la ejecución de la obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS".*

*Artículo 2º. La obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS", será ejecutada por la empresa PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, adscrita al Ministerio del Poder Popular para la Energía y Petróleo, como ente expropiante, o la filial que ésta designe.*

*Artículo 3º. De conformidad con lo previsto en el artículo 12 de la Ley de Expropiación por Causa de Utilidad Pública o Social, se autoriza a la empresa PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, a fin que realice los trámites necesarios para la adquisición de los inmuebles y demás bienes a que se contrae el artículo 1º del presente Decreto, subrogándose en todos los derechos y obligaciones que correspondan a la República Bolivariana de Venezuela por tales conceptos, hasta la transferencia total y definitiva de la propiedad de dichos bienes.*

> *Artículo 4º. Los bienes expropiados pasarán libres de gravámenes o limitaciones al Estado venezolano, a través de PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, de conformidad con lo dispuesto en el artículo 11 de la Ley de Expropiación por Causa de Utilidad Pública o Social.*

> *Artículo 5º. PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, efectuará las negociaciones y tramitará el procedimiento de expropiación previsto en la ley, hasta la transferencia total y definitiva de los bienes a que se refiere el presente Decreto.*

> *Artículo 6º. En la ejecución del presente Decreto, deberán resguardarse de manera especial los derechos y garantías de los trabajadores y trabajadoras que laboran en la empresa NORPRO VENEZUELA, C.A. y en cualesquiera otras empresas o personas relacionadas, afectadas por lo dispuesto en el presente Decreto.*

> *Artículo 7º. Se califica de urgente realización la ejecución de la obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS", mediante la puesta en funcionamiento, uso y aprovechamiento de los bienes indicados en el artículo 1º del presente Decreto, con el objeto de garantizar la continuidad de las fases de la cadena de producción y distribución de los agentes cerámicos de alto desempeño, necesarios para la industria gasífera y petrolífera, pudiendo para ello adoptarse las medidas a las que se refiere el artículo 6 de la Ley para la Defensa de las Personas en el Acceso de los Bienes y Servicios, y previo cumplimiento de la normativa vigente.*

> *Artículo 8º. El Ministro del Poder Popular para la Energía y Petróleo queda encargado de la ejecución del presente Decreto.*

> *Artículo 9º. El presente Decreto entrará en vigencia a partir de su publicación en la Gaceta Oficial de la República Bolivariana de Venezuela.*

> [...]".

246. El día 14 de abril de 2011, el Sr. Páez le escribió al Ministro Ramírez e hizo referencia a la expropiación de los bienes de Norpro Venezuela dispuesta por el Decreto de Expropiación, "*confirm*[ando] *la decisión del Presidente Chávez, anunciada públicamente el día 15 de mayo de 2010, de estatizar Norpro*". También afirmó que, lamentablemente, había sido imposible "*avanzar en un proceso que llevara a la efectiva expropiación de Norpro*" y manifestó su esperanza de que la publicación del Decreto de Expropiación les permitiera a las partes "*avanzar sin demora en la definición de los términos de una resolución amistosa de esta controversia, que garantice el pago de una indemnización determinada sobre la base del valor justo de la inversión realizada en Norpro*" por parte de la Demandante. El Sr. Páez reiteró el ofrecimiento de asistencia

técnica de la Demandante y solicitó que PDVSA Industrial en calidad de ente expropiante conforme al Decreto de Expropiación "*nombrara a un vocero autorizado a fin de que analizara, junto con los representantes de Norpro, cuestiones vinculadas a los pasos futuros del proceso de expropiación*"[193]. [Traducción del Tribunal]

247. Según los informes de prensa publicados en *Correo del Caroní* los días 13 y 15 de abril de 2011 y en *Nueva Prensa de Guayana* el día 15 de abril de 2011, 25.000 toneladas de bauxita se extrajeron de la planta para cubrir una emergencia de CVG Bauxilum[194]. El día 25 de abril de 2011, Norpro Venezuela le escribió al Presidente de PDVSA Industrial subrayando que "*Norpro, en su rol de propietaria legítima de todos los bienes que se encuentran dentro de las instalaciones, no ha autorizado ni ratificado estas acciones*"[195]. [Traducción del Tribunal]

## XIII. EL PROCEDIMIENTO ADMINISTRATIVO DE LA EXPROPIACIÓN Y LA NOTIFICACIÓN DE CONTROVERSIA DE LA DEMANDANTE

248. El día 24 de junio de 2011, PDVSA Industrial publicó las siguientes notificaciones en *Últimas Noticias* y *Nueva Prensa de Guayana*:

> "*1*) […]*; 2) Declarar constituida la medida preventiva de ocupación y operatividad temporal de los bienes muebles, inmuebles y otros activos incluyendo los inmateriales que estén en propiedad o posesión de la empresa NORPRO VENEZUELA, C. A., y de cualesquiera otras empresas o personas relacionadas, de conformidad con lo establecido en el numeral 1 del artículo 112 de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios; 3°) notificar a las personas arriba señaladas, mediante la publicación del presente aviso de prensa, de manera simultánea y por una sola vez, en los diarios "Últimas Noticias" y "Nueva Prensa de Guayana", a los fines que se sirvan concurrir dentro del lapso de los treinta (30) días continuos siguientes a la publicación del presente aviso, a la sede de esta Empresa, ubicada en la Avenida Francisco Solano López, Centro Empresarial Sabana Grande, piso 16, Municipio Libertador, Parroquia El Recreo, Caracas; en días hábiles y en el horario comprendido entre las […] 8:30 a.m. y las […] 4:30 p.m., acreditando, en todo caso, la prueba de sus respectivos derechos sobre los precitados bienes objeto de afectación.*
>
> *Asimismo, se informa a los interesados que 1°) […] 2°) que pueden ejercer contra la medida preventiva acordada la defensa descrita en el artículo 113 de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios; y 3°) que de no concurrir en la oportunidad*

---

[193] **Anexo C-41**. Ver también **Anexo R-16**.
[194] **Anexo C-124**; **Anexo C-125**; **Anexo C-126**; Memorial, ¶ 110.
[195] **Anexo C-127**.

*prevista persona alguna, por sí o por medio de representante o apoderado, se dará por agotado el presente procedimiento y se procederá a solicitar la expropiación de los bienes afectados por la vía judicial.*

*Notificación ésta que se hace, de conformidad con lo previsto en el artículo 22 de la Ley de Expropiación por Causa de Utilidad Pública o Social*"[196].

249. El día 4 de julio de 2011, la Demandante notificó a la Demandada de una controversia en virtud del Tratado y solicitó que "*Venezuela pague una indemnización adecuada equivalente al valor justo de su inversión en Norpro con anterioridad al día 15 de mayo de 2010 de conformidad con el Artículo 5*". La Demandante hizo referencia a las reuniones celebradas los días 30 de agosto, 14 de octubre y 26 de octubre de 2010, y aseveró que "*Saint-Gobain ha empleado sus mayores esfuerzos para reunirse con las autoridades venezolanas y analizar los términos de una resolución amistosa de la controversia actual, con arreglo al Tratado Francia-Venezuela. Sin embargo, Saint-Gobain no ha recibido respuesta alguna de PDVSA, PDVSAI*[ndustrial] *o cualquier otra autoridad venezolana competente*". La Demandante reiteró su voluntad de resolver la controversia de manera amistosa conforme a las disposiciones del Tratado y afirmó que estaba "*preparada para reunirse de inmediato con un representante autorizado de Venezuela con el objeto de arribar a una resolución justa y adecuada para ambas partes*". La Demandante finalizó la carta resaltando que "*en el supuesto de que esta diferencia no se resolviera de manera amistosa dentro del plazo de seis (6) meses a partir de la fecha de la presente carta, Saint-Gobain podrá someter esta cuestión a arbitraje*"[197]. [Traducción del Tribunal]

250. El día 26 de julio de 2011, PDVSA Industrial publicó una notificación declarando cerrado el procedimiento de arreglo amigable, "[c]*onsiderando que, el día 24 de junio de 2011, se publicaron los avisos de prensa previstos en el artículo 22 de la Ley de Expropiación por Causa de Utilidad Pública o Social y teniendo en cuenta que el plazo correspondiente vence el día de la fecha, sin la comparecencia de cualquier parte o tercero, por sí o por medio de un representante legal*" [Traducción del Tribunal], y le ordenó a la Consejería Jurídica que iniciara el procedimiento judicial en virtud de la Ley de Expropiación por Causa de Utilidad Pública o Social (la "**Ley de Expropiación**")[198].

## XIV. NEGOCIACIONES ADICIONALES ENTRE LAS PARTES

---

[196] **Anexo R-20**.
[197] **Anexo C-42**.
[198] Ley de Expropiación por Causa de Utilidad Pública o Social, publicada en la Gaceta Oficial N.º 37.475, de fecha 1 de julio de 2002. **Anexo R-4**. Ver también traducción al inglés presentada por la Demandada como **Anexo R-21**.

251. El día 26 de octubre de 2011, el Sr. Carmelo Ursaneta, Consejero General del Ministerio de Energía y Petróleo, le escribió a la Demandante, con el objeto de programar una reunión para el día 3 de noviembre de 2011 a fin de analizar la expropiación de Norpro Venezuela[199]. La Demandante le respondió al Sr. Urdaneta mediante una carta de fecha 3 de noviembre de 2011[200]. Ese mismo día, se celebró una reunión durante la cual el Ministerio, una vez más, propuso formar una empresa mixta en aras de operar la planta en Venezuela; la Demandante se comprometió a considerar esta propuesta[201].

252. Tal como reconociera el Sr. Páez en su carta de seguimiento de fecha 20 de diciembre de 2011, a la Demandante también se le pidió que preparara una comunicación que incluyera una breve presentación de Norpro Venezuela y los objetivos comerciales que habían derivado en su establecimiento en Venezuela, al igual que un resumen de los términos de un eventual acuerdo en virtud del cual las partes se embarcarían en un proyecto de inversión conjunta que tendría como resultado una empresa mixta en la que PDVSA sería titular de una participación mayoritaria. En su carta de fecha 20 de diciembre de 2011, el Sr. Páez explicó que el grupo todavía estaba analizando las especificaciones y condiciones generales del proyecto de inversión conjunta propuesto, así como las modalidades y el alcance de la asistencia técnica y capacitación del personal que el grupo puede ser capaz de ofrecer; ellos enviarían la comunicación solicitada una vez que se concluyera este análisis, lo que se esperaba para las primeras semanas del mes de enero de 2012[202]. Según la Demandada, la Demandante nunca le proporcionó la información solicitada al Ministerio[203].

253. Mediante una carta a la Demandada de fecha 17 de enero de 2012, la Demandante reiteró la existencia de una controversia en virtud del Tratado, al afirmar que "[a] *pesar de las diversas reuniones y comunicaciones entre los representantes de Saint-Gobain y PDVSA, para revisar el estado de la expropiación de Norpro y las acciones futuras a ser emprendidas por el Gobierno de Venezuela (incluyendo el pago de una indemnización adecuada conforme a lo dispuesto en el Tratado), durante los seis meses del período de 'enfriamiento' como establece el Tratado, no se ha alcanzado ningún acuerdo amistoso en relación con esta disputa con Venezuela*". La Demandante confirmó su aceptación del ofrecimiento de la Demandada previsto en el Artículo 8(2) del Tratado de resolver la controversia por vía de arbitraje ante el CIADI y, si bien manifestó su esperanza de "*alcanzar un acuerdo amistoso con el Gobierno de Venezuela*", anunció que, si dicho

---

[199] **Anexo C-130**.
[200] **Anexo C-43**.
[201] Memorial, ¶ 113; **Anexo C-131**.
[202] **Anexo C-131**; Memorial de Contestación, ¶¶ 38-39.
[203] Memorial de Contestación, ¶ 40.

acuerdo fracasaba, "*con prontitud*" iniciaría un procedimiento de arbitraje ante el CIADI[204].

254. El día 24 de enero de 2012, la Demandada denunció el Convenio CIADI[205]. La denuncia se hizo efectiva el día 25 de julio de 2012.

## XV. EL PROCEDIMIENTO JUDICIAL DE EXPROPIACIÓN Y NEGOCIACIONES PARALELAS

255. El día 18 de abril de 2012, PDVSA Industrial inició el procedimiento judicial de expropiación de conformidad con los Artículos 22-24 de la Ley de Expropiación (el "**Procedimiento de Expropiación**") mediante la presentación de una reclamación en contra de Norpro Venezuela ante el Juzgado Primero de Primera Instancia en lo Civil, Mercantil y Agrario del Segundo Circuito de la Circunscripción Judicial del Estado de Bolívar (el "**Juzgado**")[206]. PDVSA Industrial solicitó que el Juzgado "*ordenara la expropiación*" de los bienes de Norpro Venezuela y que se ratificara la medida preventiva, es decir, la ocupación temporal de la planta sobre la base del Artículo 112(1) de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios (*véase* notificación de PDVSA de fecha 24 de junio de 2011 *supra*). Además, solicitó que se emplazara a Norpro Venezuela, en la persona de su representante legal, el Dr. Jorge Paúl[207].

256. El día 25 de mayo de 2012, la Demandante inició el presente procedimiento de arbitraje mediante la presentación de su Solicitud de Arbitraje ante el CIADI de conformidad con el Tratado Francia-Venezuela.

257. El día 20 de junio de 2012, el Juzgado emitió un edicto ordenando "*citar a* […] *los supuestos propietarios, titulares, locatarios, acreedores y, en general, cualquier otra persona que pudiera tener algún derecho respecto de los bienes de propiedad de NORPRO VENEZUELA, C.A.*" [Traducción del Tribunal]. El Juzgado afirmó que el edicto sería publicado tres veces en los periódicos *Primicia* y *Correo del Orinoco*, con un intervalo de diez días corridos entre las publicaciones, de modo que las partes interesadas comparecieran dentro de los diez días hábiles luego de la fecha de la última publicación o, en el caso de que nadie compareciera dentro del plazo especificado, el Juzgado nombraría a un defensor de oficio en favor de Norpro Venezuela[208]. El día 10 de julio de 2012, la citación fue entregada personalmente al secretario en la oficina del Dr. Paúl[209].

---

[204] **Anexo C-44**. Ver también traducción al inglés presentada por la Demandada con **Anexo R-22**.
[205] Memorial, ¶ 114.
[206] Memorial de Contestación, ¶ 41; **Anexo R-23**.
[207] **Anexo R-23**.
[208] **Anexo R-24**.
[209] **Anexo R-25**.

258. Mediante un correo electrónico de fecha 17 de julio de 2012, el Sr. Carmelo Urdaneta (Director General de la Consejería Jurídica de PDVSA Industrial) intentó programar una reunión con el Dr. Paúl, que respondió mediante un correo electrónico de fecha 20 de julio de 2012; la reunión tuvo lugar el día 15 de agosto de 2012[210].

259. El día 23 de agosto de 2012, el Sr. Urdaneta le envió un borrador de acuerdo de confidencialidad al Dr. Paúl, tal como se había conversado durante la reunión[211]. El acuerdo había de celebrarse con la Demandada, "*por órgano del Ministerio del Poder Popular de Petróleo y Minería*" e incluía el siguiente fragmento: "*las **PARTES** y sus respectivas afiliadas han sostenido y continuarán sosteniendo negociaciones para procurar alcanzar un acuerdo con relación a lo previsto en el **DECRETO**, incluyendo sin limitación cualquier compensación que pudiera corresponderle a **xxxxxx** o sus afiliadas*"[212].

260. Mediante una carta de fecha 4 de septiembre de 2012, el Dr. Paúl preguntó si el Ministerio había comenzado la selección de los peritos que procederían a la valuación de la inversión de la Demandante en Venezuela, tal como había aseverado el Sr. Urdaneta en ocasión de la reunión de fecha 15 de agosto de 2012, y adjuntó una versión revisada del acuerdo de confidencialidad[213].

261. El día 26 de septiembre de 2012, el Juzgado emitió un segundo edicto emplazando nuevamente a las partes interesadas de parte de Norpro Venezuela en los mismos términos que el edicto de fecha 20 de junio de 2012; el edicto fue publicado los días 2, 12 y 22 de noviembre de 2012 en los periódicos *Primicia* y *Vea*[214].

262. Aproximadamente un año más tarde, el día 11 de octubre de 2013, se llevó a cabo la inspección judicial con arreglo al Artículo 57 de la Ley de Expropiación[215] y, el día 13 de noviembre de 2013, el Juzgado emitió un edicto mediante el cual disponía que, de conformidad con los Artículos 19, 56 y 57 de la Ley de Expropiación y "*cumplido como han sido los pasos relativos a la notificación de la demandada*", la designación de los Avaluadores que formarían la Comisión de Avalúos debía tener lugar cinco días hábiles después[216].

263. Ese mismo día, PDVSA Industrial solicitó que el Juzgado nombrara a un defensor de oficio conforme al Artículo 27 de la Ley de Expropiación a fin de que representara a

---

[210] **Anexo R-26**; **Anexo R-27**; **Anexo R-29**.
[211] **Anexo R-30**.
[212] **Anexo R-31**.
[213] **Anexo R-29**.
[214] Memorial de Contestación, ¶ 44, nota 122; **Anexo R-32**.
[215] **Anexo R-33**.
[216] **Anexo R-34**.

Norpro Venezuela en el marco del Procedimiento de Expropiación[217]. Dos días más tarde, el día 15 de noviembre de 2013, el Juzgado emitió un edicto mediante el cual nombraba al Sr. José Neptali Blanco Defensor Judicial de Norpro Venezuela en el Procedimiento de Expropiación y le ordenaba que compareciera ante el Juzgado el tercer día hábil posterior a su notificación en aras de que aceptara o rechazara su nombramiento[218]. El día 22 de noviembre de 2013, el Juzgado destacó que el Procedimiento de Expropiación se encontraba "*en estado de notificación del Defensor Judicial designado*" y, por ende, decidió que la resolución de fecha 13 de noviembre de 2013 "*se deja*[ra] *sin efecto*" hasta tanto el Sr. Neptali hubiera sido debidamente notificado y su citación se hubiera incorporado al expediente[219].

264. El día 3 de febrero de 2014, el Sr. Neptali aceptó formalmente su nombramiento como defensor judicial de Norpro Venezuela[220]. Al día siguiente, el 4 de febrero de 2014, Norpro Venezuela, representada por su consejero venezolano, el Dr. Paúl, compareció por primera vez ante el Juzgado a efectos de solicitar la Suspensión y Extinción del Procedimiento Judicial de Expropiación, al igual que impugnar la jurisdicción del Juzgado en función del hecho de que la Demandante había iniciado el procedimiento de arbitraje CIADI que nos ocupa[221]. El día 12 de marzo de 2014, el Juzgado desestimó la solicitud de Norpro Venezuela[222].

## E.   POSTURAS DE LAS PARTES

265. A continuación, se sintetizarán brevemente las posturas de las Partes tal como fueron planteadas en sus presentaciones escritas y durante la Audiencia.

## I.   SÍNTESIS DE LA POSTURA DE LA DEMANDANTE Y PETITORIO

266. La Demandante alega que la Demandada incurrió en varios incumplimientos del Tratado y, por lo tanto, reclama una compensación equivalente al monto que sea mayor de los siguientes: el Valor Justo de Mercado de Norpro Venezuela a la fecha del laudo (calculado en USD 90,3 millones al día 31 de agosto de 2015) o el Valor Justo de Mercado de Norpro Venezuela a la fecha de la expropiación (calculado en USD 99,5 millones) con más intereses anteriores al laudo, así como intereses posteriores al laudo.

### 1.   Admisibilidad

---

[217] **Anexo R-35**.
[218] **Anexo R-36**.
[219] **Anexo R-37**.
[220] **Anexo R-38**.
[221] Memorial de Contestación, ¶ 45; **Anexo R-39**.
[222] **Anexo R-40**.

267. La Demandante argumenta que deberían desestimarse las excepciones de admisibilidad de la Demandada en cuanto a lo siguiente: (i) las reclamaciones relativas al aumento del precio de la bauxita, y (ii) la reclamación por violación del inciso 1 del Artículo 5(1) del Tratado.

268. Con respecto a las reclamaciones relativas al aumento del precio de la bauxita, la Demandante destaca que sus reclamaciones no se basan en el Contrato de Bauxita en sí mismo, sino en el hecho de que la Demandada sancionó la conducta de CVG Bauxilum o podría haberla impedido y, por consiguiente, violó el Tratado[223].

269. En cuanto a su reclamación por violación del inciso 1 del Artículo 5(1) del Tratado que planteó por primera vez durante la Audiencia, la Demandante alega que esta reclamación se vio influenciada por la afirmación de la Demandada en su Dúplica de "*que lo que sucedió entre mayo 2010 y marzo 2011 no era la expropiación, que la expropiación ocurrió recién en* [marzo] *de 2011*"[224]. La Demandante también asevera que su reclamación no es "*ni novedosa ni extemporánea*"[Traducción del Tribunal], dado que el argumento de que la expropiación no se llevó a cabo de manera justa y equitativa y no le concedió un debido proceso a la Demandante se planteó desde el comienzo del procedimiento[225].

## 2. Violación del Tratado

270. La Demandante alega que la Demandada incumplió las siguientes disposiciones:

- Artículo 5(1) del Tratado con respecto a sus obligaciones relativas a la expropiación **a)**;
- Artículo 3(1) del Tratado con respecto a su obligación de otorgar trato justo y equitativo **b)**; y
- Artículo 3(2) del Tratado con respecto a su obligación de otorgar protección y seguridad plenas **c)**.

### a)    Expropiación (Artículo 5(1) del Tratado)

271. La Demandante argumenta que la Demandada violó el inciso 1 del Artículo 5(1) del Tratado (**aa**), así como los incisos 2 y 3 de esa misma disposición (**bb**).

#### aa)    Violación del inciso 1 del Artículo 5(1) del Tratado

---

[223] Réplica, ¶¶ 67-68.
[224] Transcripción (Día 3), pág. 876 líneas 19-21.
[225] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 30, 44-45, que hace referencia al Memorial, ¶¶ 180-184, y a la Réplica, ¶¶ 89-95, 125-130.

272. La Demandante alega que la conducta de la Demandada con anterioridad a la publicación del Decreto de Expropiación en el mes de marzo de 2011 constituyó una "*expropiación*" en los términos del Artículo 5(1) del Tratado. Durante la Audiencia[226], la Demandante planteó el argumento de que esta conducta era contraria a las obligaciones de la Demandada en virtud del inciso 1 del Artículo 5(1) del Tratado. En particular, la Demandante argumenta, primero, que la expropiación no se llevó a cabo con un instrumento de expropiación formal y, en consecuencia, no de conformidad con una "*medida*" ("*mesures*"/"*measures*")[227]. Segundo, la Demandante alega que la toma física de la planta con anterioridad al mes de marzo de 2011 no se realizó siguiendo el debido proceso y con la protección plena de la inversión de la Demandante, contrariamente a las obligaciones de la Demandada en virtud del Artículo 3(1) y (2) del Tratado y, por consiguiente, violó un "*compromiso especial*" ("*engagement particulier*"/"*particular undertaking*") en el sentido del inciso 1 del Artículo 5(1) del Tratado [228].

**bb)  Violación de los incisos 2 y 3 del Artículo 5(1) del Tratado**

273. Asimismo, la Demandante alega que la Demandada incumple su obligación de proporcionar una pronta y adecuada indemnización y de fijar el monto de indemnización a la fecha de la expropiación con arreglo a los incisos 2 y 3 del Artículo 5(1) del Tratado.

274. Según plantea la Demandante, la Demandada expropió la inversión de la Demandante con respecto a la planta el día 15 de mayo de 2010 o poco tiempo después[229]. La Demandante argumenta que, en vista de la ley, la toma de control por parte del SINPROTRAC luego del anuncio del Presidente Chávez y la posterior gestión activa de la planta por parte de la empresa estatal PDVSA constituyeron una "*expropiación*" en los términos del Artículo 5(1) del Tratado[230]. La Demandante resalta que constantemente hizo valer sus derechos en relación con la planta, esto es, que intentó reingresar en ella, pero le denegaron el acceso[231].

275. Con respecto al requisito de fijación conforme al inciso 3 del Artículo 5(1) del Tratado, la Demandante alega que, a pesar de la clara redacción del Tratado, la Demandada estaba lejos de haber determinado la indemnización al momento de la expropiación, en tanto la Demandada nunca ha comunicado el monto o la modalidad del pago a realizarse a la Demandante y todavía no ha ofrecido indemnización alguna por la expropiación, pese a

---

[226] Transcripción (Día 1), pág. 86 línea10 – pág. 87 línea 15.
[227] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 38-39.
[228] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.
[229] Réplica, ¶ 25.
[230] Réplica, ¶¶ 21-24; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 19-32.
[231] Presentación Posterior a la Audiencia de la Demandante, ¶ 32.

los numerosos intentos de negociar de la Demandante[232]. En particular, la Demandante argumenta que el requisito de fijación no se cumple por la mera existencia de un procedimiento en el derecho interno o la referencia a él[233].

276.  En cuanto al requisito de prontitud conforme al inciso 2 del Artículo 5(1) del Tratado, de modo similar, la Demandante alega que el Tratado es muy específico acerca del requisito de que toda expropiación sea acompañada de una "*pronta*" indemnización y que las Partes Contratantes no dejaron lugar a dudas respecto de la interpretación del requisito de pronta indemnización: El Tratado dispone que "[e]*sa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación*" y "[d]*icha indemnización será* [...] *pagada sin retraso alguno*"[234]. La Demandante alega que, más de cuatro años después de la expropiación, esa indemnización es exigible hace mucho tiempo y, de ninguna manera, puede considerarse "*pronta*" de conformidad con la redacción del Tratado[235].

277.  Asumiendo hipotéticamente que el Artículo 5(1) del Tratado no exigiera que la Demandada realice una oferta de indemnización a la fecha de la expropiación, la Demandante argumenta que, por dos razones separadas, la Demandada no puede argumentar, con referencia a su derecho interno, que "*reconocí*[a] *su obligación de compensación*" [Traducción del Tribunal] y proporcionaba un mecanismo para la determinación de la indemnización en el Decreto de Expropiación[236].

278.  Primero, la Demandante alega que la Demandada no puede invocar el derecho local para excusar sus obligaciones en virtud del derecho internacional[237]; en cualquier caso, la Demandante considera las normas nacionales en materia de expropiación seguidas por la Demandada "*un procedimiento genérico instigado por el Estado*" que la Demandada "*no adopta medidas para implementar*"[238]. [Traducción del Tribunal]

279.  Segundo, la Demandante argumenta que la conducta de la Demandada no era acorde a las disposiciones de sus propias leyes internas en materia de expropiación. En particular, la Demandante alega que ni la ocupación administrativa de la planta por parte de PDVSA el día 4 de abril de 2011 ni la ocupación judicial dispuesta el día 20 de junio de 2012 se llevaron a cabo con arreglo al Artículo 56 de la Ley de Expropiación. Esta disposición admite la "*ocupación previa*" exclusivamente en casos que involucran circunstancias urgentes y sólo después de que el (probable) monto de la indemnización, determinado por

---

[232] Memorial, ¶ 140; Réplica, ¶ 75; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 50-54.
[233] Réplica, ¶ 83.
[234] Memorial, ¶ 137. Énfasis agregado por la Demandante. *Véase* también Réplica, ¶ 75.
[235] Réplica, ¶ 76.
[236] Réplica, ¶ 84.
[237] Réplica, ¶¶ 85-86.
[238] Réplica, ¶ 83.

una comisión de avalúos, se haya depositado en el juzgado de expropiación. Además, la Demandante argumenta que las medidas adoptadas por la Demandada no podrían basarse correctamente en los Artículos 6 y 112(1) de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios (la "**Ley de Acceso**")[239].

280.    En el supuesto de que, en vista de las disposiciones de su derecho interno en materia de expropiación, en virtud del Artículo 5(1), incisos 2 y 3 del Tratado, la Demandada no tuviera que ofrecer una pronta indemnización a la fecha de la expropiación, la Demandante alega que, sin embargo, la Demandada ha incurrido en una violación del Tratado, en tanto no hizo ningún intento de negociar una indemnización por la expropiación con la Demandante de buena fe[240]. En particular, la Demandante argumenta lo siguiente: (i) que no recibió "*ninguna palabra directa de Venezuela en relación con la expropiación durante todo el período comprendido entre el anuncio del Presidente el día 15 de mayo de 2010 y la emisión del Decreto de Expropiación el día 29 de marzo de 2011*" [Traducción del Tribunal]; (ii) que la Demandada nunca reconoció la obligación de pagar indemnización; y (iii) que la Demandada se rehusó a participar en negociaciones de buena fe incluso después de la publicación del Decreto de Expropiación[241].

281.    La Demandante alega que el hecho de que la Demandada no haya cumplido con los requisitos de fijación y/o prontitud de conformidad con los incisos 2 y 3 del Artículo 5(1) del Tratado torna la expropiación ilícita, y afirma que la emisión tardía del Decreto de Expropiación no rectificó la violación de los incisos 2 y 3 del Artículo 5(1) del Tratado[242]. En sustento de esta alegación, la Demandante cita no sólo como autoridades a varios comentaristas, sino también una serie de decisiones arbitrales (*véase* en más detalle *infra*).

282.    En su Réplica, la Demandante también argumentó que hubo una expropiación con respecto al Contrato de Bauxita y a los créditos fiscales IVA que había devengado, y alegó que esta expropiación también debe ser compensada[243]. No obstante, durante la Audiencia y en su Presentación Posterior a la Audiencia, la Demandante ya no abordó este asunto como cuestión de expropiación, sino que se concentró en el argumento de que la conducta de la Demandada con respecto al Contrato de Bauxita y a los créditos fiscales IVA era

---

[239] Réplica, ¶ 87; Brewer-Carías II, ¶¶ 14-26; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 64-68. Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios, publicada en la Gaceta Oficial N.º 39.358 de fecha 1 de febrero de 2010. **Anexo R-76**.
[240] Réplica, ¶ 89.
[241] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 34-37.
[242] Memorial, ¶ 141; Réplica, ¶¶ 77-83; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 58-63.
[243] Réplica, ¶¶ 96-100.

contraria a sus obligaciones de garantizar el trato justo y equitativo ("**TJE**") y de otorgar protección y seguridad plenas ("**PSP**") en virtud del Artículo 3(1) y (2) del Tratado[244].

**b)    Trato justo y equitativo (Artículo 3(1) del Tratado)**

283.  La Demandante alega que el estándar TJE previsto en el Artículo 3(1) del Tratado se refiere a los conceptos imperantes de TJE en el contexto del derecho internacional – y no sólo al estándar mínimo de trato –, incluidas "*los conceptos contemporáneos de debido proceso, buena fe y expectativas legítimas*" [Traducción del Tribunal], y que la Demandada incumplió sus obligaciones en virtud de él con respecto tanto a la toma de control de la planta como al Contrato de Bauxita, a la luz de cualquier lectura del Artículo 3(1) del Tratado[245].

284.  En lo que respecta a la toma de control de la planta por parte del sindicato luego de la declaración del Presidente Chávez el día 15 de mayo de 2010 y a la conducta de la Demandada a partir de ese momento, la Demandante afirma que la Demandada no siguió el debido proceso en la expropiación y, por ende, violó su obligación TJE[246]. La Demandante argumenta que la expropiación efectivamente se llevó a cabo "*de la noche a la mañana*", con un "*anuncio público y repentino*" en televisión, y que, a pesar de los intentos de la Demandante de negociar de buena fe los términos de la expropiación, la Demandada "*no le dio a Saint-Gobain indicio alguno de qué proceso se seguiría a fin de garantizar que Saint-Gobain recibiera una indemnización adecuada*" e incluso "*no siguió su propio procedimiento de expropiación*"[247]. [Traducción del Tribunal]

285.  Durante la Audiencia y en su Presentación Posterior a la Audiencia, la Demandante incluyó esta reclamación TJE en la reclamación de expropiación relativa al inciso 1 del Artículo 5(1) del Tratado[248]. El Tribunal destaca, sin embargo, que, en consecuencia, la Demandante no tenía intención de abandonar su reclamación TJE separada relativa a la toma de la planta, en tanto mantiene en su petitorio la solicitud de una declaración separada de que la Demandada ha incumplido el Artículo 3(1) del Tratado[249].

---

[244] Transcripción (Día 1), pág. 94 línea 21 – pág. 97 línea 21; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 79-88.

[245] Réplica, ¶ 112.

[246] Memorial, ¶¶ 180-184; Réplica, ¶¶ 125-130.

[247] Memorial, ¶ 183; Presentación Posterior a la Audiencia de la Demandante, ¶ 42 (con nota 116); Réplica, ¶ 126.

[248] Transcripción (Día 1), pág. 85 línea 3 – pág. 95 líneas 4-9. Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.

[249] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116. Esto es confirmado por la referencia cruzada en la Presentación Posterior a la Audiencia de la Demandante (¶ 42 con nota 116) a la sección pertinente del Memorial (¶¶ 180-184) y el planteo de la Demandante de sus argumentos TJE en su Segunda Presentación Posterior a la Audiencia (¶¶ 30-45).

286. Con respecto al Contrato de Bauxita entre Norpro Venezuela y CVG Bauxilum, la Demandante alega, por un lado, que CVG Bauxilum actuaba como órgano del Estado en el sentido del Proyecto de Artículos de la Comisión de Derecho Internacional sobre Responsabilidad del Estado por Hechos Internacionalmente Ilícitos ("**Proyecto de Artículos de la CDI**") y, por el otro, que la Demandada, a través del MIBAM y otros órganos, hizo "*promesas específicas*" y asumió "*compromisos*" y, por lo tanto, "*creó expectativas particulares*", en las que la Demandante confió al momento de realizar sus inversiones[250]. Según plantea la Demandante, la Demandada (a través de CVG Bauxilum) incumplió el Contrato de Bauxita y "*desconoció estas expectativas al no tener en cuenta […] las acciones de CVG Bauxilum al momento de aumentar el precio de la bauxita*"[251]. [Traducción del Tribunal]

### c)    Protección y seguridad plenas (Artículo 3(2) del Tratado)

287. La Demandante también alega que la Demandada no garantizó la protección y seguridad de la inversión de la Demandante y, por consiguiente, violó el Artículo 3(2) del Tratado con respecto a la toma de control de la planta y al aumento del precio de la bauxita.

288. Como argumento alternativo en cuanto a su reclamación de expropiación, la Demandante asevera que, si la conducta de la Demandada con anterioridad al día 29 de marzo de 2011 no constituyó una "*expropiación*" en los términos del Artículo 5(1) del Tratado, el control de la planta por parte de PDVSA y el hecho de que no se la restituyera a la Demandante antes de esa fecha deben considerarse un incumplimiento de la obligación de otorgarle a la Demandante protección y seguridad plenas de conformidad con el Artículo 3(2) del Tratado[252]. [Traducción del Tribunal]

289. En relación con el aumento del precio de la bauxita, la Demandante alega que, una vez notificada de los incumplimientos del Contrato de Bauxita, la Demandada no actuó a fin de otorgarle seguridad jurídica a la inversión de la Demandante. En este contexto, la Demandante afirma que el estándar PSP requiere que el Estado adopte todas las medidas razonables "*para garantizar un entorno de inversión seguro*" [Traducción del Tribunal], incluidas no sólo la seguridad física, sino también la seguridad comercial y jurídica[253]. La Demandante argumenta que, contrariamente a este estándar, la Demandada no hizo intento alguno de investigar o actuar en aras de proteger los derechos de la Demandante

---

[250] Memorial, ¶¶ 173-176; Réplica, ¶ 120; Presentación Posterior a la Audiencia de la Demandante, ¶ 80.
[251] Memorial, ¶ 169; Réplica, ¶ 120. *Cfr.* Presentación Posterior a la Audiencia de la Demandante, ¶¶ 79-82.
[252] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 48-49.
[253] Memorial, ¶ 186.

en virtud del Contrato de Bauxita, a pesar de las reiteradas llamadas a la acción de la Demandante[254].

### 3. Cuantía de daños

### a) Estándar de compensación y fecha de valuación

290. La Demandante alega que la reparación apropiada para el supuesto de una expropiación ilícita es el estándar de restitución del derecho internacional consuetudinario, es decir, la compensación más elevada entre aquella calculada a la fecha de expropiación y a la fecha del laudo[255].

291. En sustento de su enfoque, la Demandante subraya que el Artículo 5(1) del Tratado prevé el estándar de compensación adecuado sólo cuando se cumplan todas las condiciones de una expropiación lícita. Como esto no ocurre aquí, el estándar de compensación adecuado, que incluye la fecha adecuada en que ha de determinarse el valor, es establecido por el derecho internacional consuetudinario[256].

292. En sustento de su argumentación, la Demandante alude al fallo *Chorzów Factory* dictado por la Corte Permanente de Justicia Internacional ("**CPJI**"), así como a varios laudos arbitrales (*véase* en más detalle *infra*).

### d) Cálculo de daños

### aa) Método de valuación

293. La Demandante alega que la Demandada debe pagar una compensación íntegra por la planta expropiada y hace referencia a las *Guidelines on the Treatment of Foreign Direct Investment* del Banco Mundial del año 1992[257] y al comentario del Proyecto de Artículos de la CDI[258].

294. La Demandante se refiere a su experto en cuantía de daños, el Prof. Spiller, que sugiere que un tercero comprador pagaría el monto más reducido de los siguientes: (i) el valor actual neto de los flujos de fondos que un comprador interesado podría obtener de la adquisición de una participación del 100 % en Norpro Venezuela; y (ii) el costo de oportunidad en que un comprador interesado incurriría si construyera una planta similar

---

[254] Memorial de Réplica, ¶¶ 131-142.
[255] Presentación Posterior a la Audiencia de la Demandante, ¶ 73.
[256] Memorial, ¶ 197; Memorial de Réplica, ¶ 152.
[257] Memorial, ¶¶ 203-204, que hace referencia a El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), pág. 11.
[258] Réplica, ¶ 154, que cita a James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), pág. 225.

fuera de Venezuela, que está compuesto por la suma de los costos de construcción y los flujos de fondos de los que se vio privado durante el período de construcción[259].

295.  Según el cálculo del Prof. Spiller al día 15 de mayo de 2010, el costo de oportunidad por la construcción de una planta similar en los EE. UU. sería inferior al valor actual neto de los flujos de fondos futuros de Norpro Venezuela (USD 99,5 millones en comparación con USD 115,1 millones). Por consiguiente, la Demandante opina que el Tribunal debería determinar el valor justo de mercado de la planta expropiada sobre la base del enfoque de los costos de construcción[260]. En cualquier caso, la Demandante efectuó las siguientes alegaciones con respecto al cálculo FFD.

### bb)   Tasa de descuento

296.  La Demandante alega que los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores, aplicaron "*una tasa de descuento absurdamente elevada del 26 %*", que tiene como resultado un valor que implica que "*ningún inversionista razonable invertiría en una nueva planta de proppant o le agregaría capacidad a una planta de proppant existente*"[261]. [Traducción del Tribunal]

297.  En particular, la Demandante argumenta que la "*exorbitante*" prima de riesgo país del 13,92 % que el Sr. Brailovsky y el Dr. Flores aplicaron en nombre de Venezuela es una "*medida desesperada para que el Estado trate de evitar hacerse cargo de sus acciones*". Según la Demandante, este salto refleja las amenazas del Presidente Chávez de expropiar todas las inversiones extranjeras en Venezuela sin compensación alguna[262]. Sin embargo, la Demandante afirma que un Estado "*no puede utilizar su propia tendencia a violar la ley para reducir el valor de la indemnización por expropiación*"[263]. Por lo tanto, adopta la postura según la cual la "*amenaza generalizada de confiscación*" [Traducción del Tribunal] debe eliminarse del cálculo del valor justo de mercado, ya que, de otro modo, la Demandada sería recompensada por la conducta ilícita que el presente arbitraje está destinado a subsanar[264].

---

[259] Réplica, ¶¶ 155-156, que hace referencia a la Segunda Valuación de Daños del Prof. Spiller de fecha 18 de junio de 2014 ("**Spiller II**"), ¶ 5; Presentación Posterior a la Audiencia de la Demandante, ¶ 90.
[260] Réplica, ¶¶ 157, 187 y 196; Carta de la Demandante al Tribunal de fecha 6 de noviembre de 2015; Spiller II, Tabla 12.
[261] Réplica, ¶ 158, que cita a Spiller II, ¶ 28.
[262] Réplica, ¶ 161; Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 55.
[263] Réplica, ¶ 162, que cita *Occidental c. Ecuador* (**CLA-061**), ¶ 564; Presentación Posterior a la Audiencia de la Demandante, ¶ 110, que hace referencia, en particular, a *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841.
[264] Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 56 y ¶ 59.

298.  La Demandante asevera que el Prof. Spiller ha excluido sólo el riesgo de confiscación en su cálculo, pero tuvo en cuenta correctamente "*otros riesgos de invertir en Venezuela, tales como los riesgos de una economía volátil, desorden civil, una infraestructura subdesarrollada y otras cuestiones*" [Traducción del Tribunal]. La Demandante alega que el Prof. Spiller consideró el diferencial promedio de bonos soberanos de países con una calificación B1, tales como Venezuela, que incluye a muchos países en desarrollo con "*un riesgo país considerable, incluso riesgos políticos*"[265].

299.  Asimismo, la Demandante asevera que también tuvo en cuenta el "*acentuado riesgo país*" de Venezuela cuando le asignó una tasa de descuento del 15 % al proyecto en el año 2006 e hizo esfuerzos considerables para obtener el apoyo significativo del Gobierno venezolano, en función del hecho de que el Tratado Francia-Venezuela había entrado en vigor en el año 2004[266]. La Demandante subraya que la tasa de descuento "*de alto riesgo*" del 12 %, que incluía una prima de riesgo país del 4 %, no fue asignada por los miembros del equipo del proyecto (ellos incluso agregaron un 3 % adicional "*para ser conservadores*"), sino que sirvió de "*medida objetiva a nivel compañía para considerar los posibles riesgos y recompensas de emprendimientos propuestos en diversas ubicaciones*"[267]. [Traducción del Tribunal]

### cc)   Flujos de Fondos Futuros

300.  Con respecto al cálculo de los flujos de fondos futuros, la Demandante considera "*injustificado*" dividir las ganancias que un comprador interesado obtendría de las exportaciones de Norpro Venezuela a fin de dar cuenta de la distribución interna de costos. Según la Demandante, la valuación justa de mercado "*no depende de las cualidades idiosincráticas del comprador o vendedor*" [Traducción del Tribunal]; en consecuencia, debe asumirse que lo más probable sería que el comprador interesado que realizó la oferta más elevada fuera un inversionista estratégico que ya tiene una red de

---

[265] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 105-106; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 60 y ¶ 67. La Demandante argumenta que una manera de "*verificar*" esto consiste en analizar los diferenciales de swap de riesgo crediticio (CDS, por sus siglas en inglés) pendientes respecto de las deudas soberanas de los países y resalta que, en la lista de 63 países del Prof. Damodaran al mes de enero de 2014, la prima propuesta por el Prof. Spiller del 4,5 % calificaría como la cuarta más elevada después de Argentina (14,73 %), Venezuela (10,8 %) y Túnez (4,57 %) y, por ende, se encuentra "*muy por encima de la prima de riesgo país típica de un país en desarrollo*" [Traducción del Tribunal]. Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 61-62, que hace referencia al **Ap. BF-66**, págs. 23-25.

[266] Presentación Posterior a la Audiencia de la Demandante, ¶ 107, ¶ 116 y ¶ 130.

[267] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 131-134, que hace referencia al testimonio oral de su testigo Patrick Millot. Transcripción (Día 2), pág. 423, líneas 7-9, y pág. 433, líneas 17-20.

distribución y comercialización similar a la de Saint-Gobain y, por lo tanto, está en condiciones de percibir el 100 % de las ganancias[268].

301. La Demandante también destaca que el Sr. Brailovsky y el Dr. Flores asumieron en su cálculo que CVG Bauxilum suministraría bauxita al precio incrementado que le impuso unilateralmente a Norpro Venezuela en el mes de septiembre de 2008. Según la Demandante, este aumento de precios era ilícito y, por ende, no debe tenerse en cuenta sobre la base del principio en virtud del cual "*una parte no puede reducir su responsabilidad por un acto ilícito (aquí, la expropiación) en función de otro (el aumento de precios)*"[269]. [Traducción del Tribunal]

302. En cuanto a los costos de transporte, la Demandante alega lo siguiente: (i) que la estimación de los costos de transporte por parte del Prof. Spiller se basa en el embarque real en el mes de marzo de 2010 y es confirmada por los contratos de transporte contemporáneos de Saint-Gobain; y (ii) que el precio promedio que el Prof. Spiller le aplica a los costos de embarque dentro de los EE. UU. refleja exactamente las diversas ubicaciones y los arreglos contractuales con los clientes finales de la Demandante[270].

303. La Demandante también afirma que el Sr. Brailovsky y el Dr. Flores no establecen una distinción entre los siguientes conceptos: (i) los gastos de capital de mantenimiento destinados a "*manten*[er] *la planta en condiciones para seguir funcionando en sus niveles actuales*"; y (ii) los gastos de capital de inversión destinados a "*aument*[ar] *la producción de la planta a través de eficacia y mejoras tecnológicas*"[271] [Traducción del Tribunal]. Según la Demandante, sólo los gastos de capital de mantenimiento deberían incluirse en el cálculo de los gastos de capital[272].

304. Con respecto al capital de trabajo necesario para operar la planta, la Demandante alude a los siguientes supuestos del Prof. Spiller: (i) el saldo pendiente de los créditos fiscales IVA al año 2009 se habría pagado en el año 2010; y (ii) en lo sucesivo, habría tomado 60 días monetizar los certificados IVA, y Norpro Venezuela habría recuperado el 80 % de su valor. En cuanto a las demoras administrativas invocadas por la Demandada, la Demandante resalta que se ha concluido que tales demoras violan el estándar TJE y

---

[268] Réplica, ¶¶ 170-172; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 174-175, que hace referencia al testimonio oral del Prof. Spiller durante la Audiencia. Transcripción (Día 4), pág. 1233, líneas 1-3; pág. 948, línea 11 – pág. 949, línea 9, y pág. 946, líneas 6-19. Véase también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 89-90.

[269] Réplica, ¶ 176; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 96-97.

[270] Réplica, ¶ 179; Presentación Posterior a la Audiencia de la Demandante, ¶ 166 y ¶¶ 169-171, que hace referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), pág. 10; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 91-92, que hace referencia a Spiller II, Tabla 7 y ¶¶ 83-85.

[271] Réplica, ¶ 180, que hace referencia a Larry II, ¶¶ 21-23.

[272] Réplica, ¶ 181.

asevera que tenía una expectativa legítima de que la Demandada siguiera su propio procedimiento de créditos fiscales IVA, dado que esta cuestión se analizó específicamente con el Gobierno venezolano antes de que la Demandante invirtiera en Venezuela[273].

### 4. Petitorio de la Demandante

305. La Demandante solicita que el Tribunal haga lo siguiente[274]:

i)   DECLARE que: (A) Venezuela ha violado el Artículo 5 del Tratado mediante la expropiación ilícita de la inversión de Saint-Gobain en Venezuela; y (B) Venezuela ha violado el Artículo 3(1) y (2) del Tratado al no otorgarle a la inversión de Saint-Gobain en Venezuela ni trato justo y equitativo ni protección y seguridad plenas;

ii)  ORDENE a Venezuela pagarle a Saint-Gobain el monto más elevado de los siguientes: el Valor Justo de Mercado de Norpro Venezuela a la fecha del laudo (calculado en USD 90,3 millones al día 31 de agosto de 2015) o el Valor Justo de Mercado de Norpro Venezuela a la fecha de la expropiación (calculado en USD 99,5 millones) con más intereses anteriores al laudo a la tasa del 13,04 % o, en subsidio, del 9,08 %, anual hasta la fecha del Laudo del Tribunal, capitalizados en forma anual, o a cualquier otra tasa y período de capitalización que, según el Tribunal, garanticen la reparación íntegra;

iii) ORDENE a Venezuela pagar intereses posteriores al laudo a la tasa del 9,08 % anual desde la fecha del Laudo del Tribunal, capitalizados en forma anual, o a cualquier otra tasa y período de capitalización que, según el Tribunal, garanticen la reparación íntegra;

iv)  DECLARE que: (A) el otorgamiento de la indemnización y los intereses se fija en montos netos de los impuestos venezolanos aplicables; y (B) Venezuela no podrá deducir impuestos en relación con el pago de la indemnización y los intereses;

v)   ORDENE a Venezuela mantener indemne a Saint-Gobain de cualquier posible responsabilidad derivada de una doble imposición en Francia o en cualquier otro

---

[273] Réplica, nota 381, que hace referencia a Spiller II, ¶ 93 y ¶¶ 115-116, e *Impregilo S.p.A. c. Argentina*, Opinión Concurrente y Disidente del Juez Charles N. Brower (**CLA-127**), ¶ 9; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 158-161.

[274] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116. El valor justo de mercado que, según la Demandante, Norpro Venezuela tenía a la fecha del laudo ha sido actualizado en la Actualización de la Valuación de la Demandante presentada el día 22 de octubre de 2015. En vista de que, a la Actualización de la Valuación, la valuación a la fecha del laudo produce un valor que es inferior a la valuación a la fecha de la expropiación, la Demandante ahora reclama una compensación por el monto del valor que Norpro Venezuela tenía a la fecha de la expropiación. *Véase* Carta de la Demandante de fecha 6 de noviembre de 2015.

país, que no se hubiera verificado de no haber sido por las medidas adversas de Venezuela;

vi)   OTORGUE cualquier otro resarcimiento que el Tribunal considere apropiado; y

vii)  ORDENE a Venezuela pagar todos los costos y gastos de este Arbitraje, incluidos los honorarios de abogados y peritos de Saint-Gobain, los honorarios y gastos de los peritos designados por el Tribunal, los honorarios y gastos del Tribunal, y los costos adicionales del CIADI.

## II.  SÍNTESIS DE LA POSTURA DE LA DEMANDADA Y PETITORIO

306. La Demandada sostiene que cumplió plenamente con sus obligaciones en virtud del Tratado, en particular aquellas relacionadas con la expropiación de la planta, y que a la Demandante la asiste meramente el derecho a recibir una indemnización en base al Artículo 5(1) del Tratado por una suma de USD 9,5 millones, el valor justo de mercado de la planta al día 15 de mayo de 2010, más los intereses simples anteriores al laudo calculados a una tasa de Letras del Tesoro de EE.UU. a tres meses, más 1,1 en puntos porcentuales[275]. En la medida en la que la reclamación de la Demandante exceda dicha suma, la Demandada sostiene que debería desestimarse.

## 1.  Excepciones a la admisibilidad

307. La Demandada afirma que (i) las reclamaciones en relación con el Contrato de Bauxita y (ii) las reclamaciones respecto del inciso 1 del Artículo 5(1) del Tratado son inadmisibles.

308. Respecto del Contrato de Bauxita, la Demandada argumenta que, aún si la Demandante pudiera establecer que los precios de la bauxita se incrementaron en violación del Contrato de Bauxita, ello no podría, por sí solo, dar lugar a la responsabilidad de la Demandada en virtud del derecho internacional dado que CVG Bauxilum, entidad jurídicamente independiente de Demandada, es una parte respecto del Contrato de Bauxita[276]. La Demandada sostiene que la Demandante no logra identificar algún instrumento jurídico celebrado con el Estado, o cualquier acto relevante por parte del Estado, sobre la cual pueda basar sus reclamaciones relacionadas a la fijación de precio de la bauxita[277].

309. En relación con la presunta violación del inciso 1 del Artículo 5(1) del Tratado, la Demandada arguye que tal reclamación debería ser desestimada debido a que la

---

[275] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 64. Esta posición no ha sido modificada luego de la presentación de la Actualización de la Valuación de la Demandada de fecha 22 de octubre de 2015.
[276] Memorial de Contestación, ¶¶ 73-74; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 125-126.
[277] Dúplica, ¶ 78.

Demandante nunca planteó su "*nueva teoría*" respecto del inciso 1 del Artículo 5(1) del Tratado con anticipación a la Audiencia. Asimismo, la Demandada afirma que el cambio de postura de la Demandante es incompatible con la Regla 31(3) de las Reglas de Arbitraje CIADI[278].

## 2. No existió una violación del Tratado

310. En relación con el fondo de las reclamaciones, la Demandada sostiene que no violó ninguna de sus obligaciones en virtud del Tratado.

### a) Expropiación (Artículo 5(1) del Tratado)

311. La Demandada sostiene que actuó de conformidad plena con los requisitos del inciso 1 del Artículo 5(1) del Tratado (**aa**)) y los incisos 2 y 3 de esa misma disposición (**bb**)).

#### aa) No existió una violación del Inciso 1 del Artículo 5(1) del Tratado

312. La Demandada afirma que la reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado carece de mérito jurídico ya que (i) la expresión "*medida*" posee un significado "*mucho más amplio que el que sugiere la Demandante*"; y (ii) la referencia a un "*compromiso especial*" ("*engagement particulier*"/"*particular agreement*") "*no pretende significar el Tratado en sí mismo, sino un acuerdo externo al Tratado*"[Traducción del Tribunal] tal como lo evidencia el uso del mismo término del Artículo 10 del Tratado[279].

#### bb) No existió una violación de los incisos 2 y 3 del Artículo 5(1) del Tratado

313. Asimismo, la Demandada señala que su conducta fue acorde a los requisitos de los incisos 2 y 3 del Artículo 5(1) del Tratado.

314. La Demandada sostiene que la "*fecha de expropiación*" dentro del sentido del inciso 3 del Artículo 5(1) del Tratado era el día 29 de marzo de 2011, es decir, la fecha de emisión del Decreto de Expropiación, que desencadenó los procedimientos en virtud de la Ley de Expropiación de Venezuela[280]. Con relación a la toma de control de la planta el día 15 de mayo de 2010 y los eventos subsiguientes, la Demandada afirma, en primer lugar, que fue el sindicato SINPROTRAC, no el Estado, el que ocupó la planta y, en segundo lugar, que la subsiguiente presencia de PDVSA en la planta fue una "*acción responsable y necesaria a la espera del decreto de expropiación para garantizar la seguridad de la*

---

[278] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 21-23.
[279] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 25-26. Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 7.
[280] Escrito Posterior a la Audiencia de la Demandada, ¶ 87 (con nota 187).

*planta*"[Traducción del Tribunal] luego de que la dirección de Norpro Venezuela la abandonara efectivamente[281].

315. Respecto del primer punto, la Demandada niega la existencia de un vínculo causal intrínseco entre el "*anuncio*" del Presidente Chávez y la toma de control de la planta, dado que el presidente "*no ordenó la toma de control de la planta*"[282]. [Traducción del Tribunal]

316. En relación con el segundo aspecto, la Demandada sostiene que la presencia de PDVSA previa a la publicación del decreto de expropiación fue programada con el objetivo de garantizar la seguridad y estabilidad de la planta, en calidad de "*cuidadores*". La Demandada afirma que, con la planta controlada por el sindicato, y ante la ausencia de supervisión por el personal gerencial de Norpro Venezuela, existían causales legítimas de preocupación respecto de la seguridad de los trabajadores y la operación adecuada de los equipos de la planta[283].

317. En este contexto, la Demandada alega que la Demandante no negó el fundamento legal de la presencia de PDVSA, no exigió la devolución de la planta ni solicitó que se le brindara acceso a ella luego del día 15 de mayo de 2010[284].

318. Asimismo, la Demandada no niega que, luego del 15 de mayo 2010, "*existió un 'proceso de nacionalización' en la medida en que, como todos lo reconocían, la Planta no había sido expropiada, sino que en el futuro sería transferida al control del Estado*" [Traducción del Tribunal]. La Demandada señala que las Partes también reconocieron (i) que en ese momento se redactaba un decreto de expropiación; (ii) que se suponía que el decreto debía indicar el punto de partida del procedimiento de expropiación en virtud del derecho venezolano; y (iii) que las Partes considerarían, mientras tanto, alternativas a la expropiación, incluida la constitución de una empresa mixta, con PDVSA como accionista mayoritario y la Demandante como titular de una participación minoritaria[285].

319. En relación con el contenido preciso del requisito de especificación del inciso 3 del Artículo 5(1) del Tratado, la Demandada rechaza la interpretación de la Demandante de acuerdo con la cual la disposición requiere no sólo el reconocimiento de que se abonará un monto equivalente al especificado en el segundo inciso del Artículo 5(1), sino también que la cifra exacta que constituye dicho "*monto*" sea determinada en la fecha en que se anuncia la intención de expropiar. En particular, la Demandada señala que, sobre la base

---

[281] Memorial de Contestación, ¶ 26 (con nota 68); Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60-65.
[282] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 30-31.
[283] Dúplica, ¶¶ 20-22; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 25.
[284] Dúplica, ¶ 23; Escrito Posterior a la Audiencia de la Demandada, ¶ 60 (con nota108), ¶¶ 42-51.
[285] Escrito Posterior a la Audiencia de la Demandada, ¶ 61.

de una interpretación *bona fide* del Artículo 5(1) del Tratado de acuerdo con el Artículo 31(1) de la Convención de Viena sobre el Derecho de los Tratados ("**Convención de Viena**"), requerir una cifra exacta a la fecha de la expropiación "*no es una interpretación de buena fe y no puede ser correcta, ya que plantearía una obligación que los Estados Contratantes no podrían satisfacer salvo de pura casualidad*"[286]. [Traducción del Tribunal]

320.  La Demandada subraya que el Tratado no dispone que el Estado "*debe, antes de anunciar una expropiación, participar en conversaciones con la entidad expropiada en aras de obtener los hechos necesarios para determinar la cifra exacta*" de indemnización, y que "*sin dicha información, sería imposible* […] *determinar dicha cifra de buena fe*". Por ello, la Demandada sugiere que se realice, en su opinión, una interpretación más razonable de la palabra "*monto*" que no se refiere a una "*cifra exacta en dólares o euros, sino al concepto requerido (es decir, una 'suma* […] *equivalente al valor real de las inversiones')*"[287]. [Traducción del Tribunal]

321.  En relación con el requisito de prontitud, la Demandada señala que el Artículo 5(1) del Tratado no exige que el Estado abone una indemnización al inversor en la fecha de la expropiación: Si bien el inciso 2 establece que "*[t]odas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización*", es el inciso 3 el que exige que, luego de la determinación de la indemnización, ella sea "*pagada sin retraso alguno*"[288].

322.  La Demandada sostiene que cumplió plenamente con tales requisitos. Primero, la Demandada señala que el Decreto N.° 8.133 y la Ley de Expropiación de Venezuela, de hecho, plasmaron el mecanismo aplicable para la determinación y el pago de una indemnización en el caso de una expropiación, congruente con las obligaciones de la Demandada en virtud del Artículo 5(1) del Tratado y del derecho internacional[289].

323.  Además, contrariamente a las afirmaciones de la Demandante, la Demandada afirma que ha cumplido debidamente con los procedimientos obligatorios exigidos por las leyes nacionales sobre expropiación para determinar la indemnización, a saber, el Artículo 56 de la Ley de Expropiación y la disposición de la Ley de Acceso. La Demandada sostiene que el hecho de que dichos procedimientos no hayan sido cerrados aún y que la Demandante aún deba recibir el pago de la indemnización se debe básicamente a la no

---

[286] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 83-84.
[287] Escrito Posterior a la Audiencia de la Demandada, ¶ 83.
[288] Dúplica, ¶ 155.
[289] Dúplica, ¶¶ 36-39, 169-170, 172.

participación de la propia Demandante en tales procedimientos y a los intentos de la Demandante de extinguirlos[290].

324. Por último, la Demandada también rechaza el argumento sobre buena fe de la Demandante y señala que, además de sus esfuerzos continuos para determinar la indemnización con arreglo a la Ley de Expropiación, se reunía regularmente con la Demandante en pos de negociar la indemnización, incluida la opción de constituir una "*empresa mixta*"[291].

325. En cualquier caso, la Demandada sostiene que el mero hecho que la indemnización no se ha pagado aún no convierte a la expropiación en ilícita, si se considera que la Demandada reconoció su obligación de abonar una indemnización e inició el proceso de expropiación conforme a la ley nacional[292]. La Demandada se refiere a numerosos comentaristas y decisiones dictadas por tribunales arbitrales en pos de fundamentar su argumento (*véase* en más detalle a continuación).

**b)    Trato justo y equitativo (Artículo 3(1) del Tratado)**

326. La Demandada arguye que el Artículo 3(1) del Tratado sólo exige el estándar mínimo de trato en virtud del derecho internacional consuetudinario. En cualquier caso, la Demandada sostiene que aún bajo formulaciones más expansivas, no existiría una violación del TJE.

327. Con respecto al Contrato de Bauxita, la Demandada señala que no asumió ninguna "*garantía*" o "*compromisos*" frente a Saint-Gobain respecto del suministro o los precios de la bauxita y señala que la Demandante "*no logra identificar un único instrumento jurídico o documento que contenga cualquiera de las supuestas garantías o los compromisos relacionados con el suministro o precio de la bauxita*"[293] [Traducción del Tribunal]. Según la Demandada, la Demandante se refiere a la decisión comercial de CVG Bauxilum de plasmar un aumento en los precios de la bauxita en virtud del Contrato de Bauxita, aun cuando la conducta de CVG Bauxilum no es atribuible a la Demandada de conformidad con el derecho internacional[294].

328. En contestación a la declaración de la Demandante de que la Demandada no concedió a Saint Gobain el debido proceso respecto de la expropiación, la Demandada resalta que PDVSA estableció su presencia en la planta luego del día 15 de mayo de 2010 exclusivamente en calidad de cuidador y en espera de la publicación del Decreto de

---

[290] Dúplica, ¶¶ 171, 173-187.
[291] Dúplica, ¶¶ 44-56, 188.
[292] Memorial de Contestación, ¶¶ 161-173; Dúplica, ¶¶ 159-168.
[293] Dúplica, ¶¶ 127, 131.
[294] Dúplica, ¶¶ 132-134; Memorial de Contestación, ¶¶ 77-81.

Expropiación formal, lo cual estaba en plena conformidad con la legislación venezolana. Asimismo, la Demandada subraya que, con posterioridad a la toma de control de la planta, PDVSA se reunió con la Demandante para comenzar las negociaciones lo antes posible[295].

329. Por último, la Demandada arguye que el debido proceso no requiere que se entablen conversaciones con la parte expropiada previo al anuncio de la expropiación y que el debido proceso se satisface plenamente si se otorga acceso al poder judicial para ser oído, que es el caso de Venezuela. Una vez más, la Demandada sostiene que la Demandante podría haber objetado a la ocupación de la planta por parte del sindicato o PDVSA antes de la emisión del Decreto de Expropiación ante los tribunales de Venezuela. La Demandada entiende que "*el hecho de que la Demandante decidiera no hacer uso de los recursos de los tribunales de Venezuela no equivale a una denegación del debido proceso*"[296]. [Traducción del Tribunal]

**c)  Protección y Seguridad Plenas (Artículo 3(2) del Tratado)**

330. La Demandada sostiene que el análisis de la violación del estándar de Protección y Seguridad Plenas (PSP) exige que se considere si se ha dañado o interferido físicamente la inversión y si el Estado cumplió con su obligación de diligencia debida, y que el estándar de PSP no implica el concepto de "*seguridad jurídica*"[297] [Traducción del Tribunal]. En cualquier caso, la Demandada rechaza las reclamaciones de la Demandante relacionadas con el estándar de PSP respecto del Contrato de Bauxita y la toma de control de la planta.

331. La Demandada enfatiza que no fue responsable de los aumentos de precio aplicados por CVG Bauxilum en virtud del Contrato de Bauxita. Asimismo, la Demandada sostiene que un inversor, "*al comunicar su descontento relacionado con la conducta de un socio comercial a un representante del gobierno*", no puede crear la obligación del Estado en virtud del derecho internacional "*de investigar el fondo de su reclamo comercial ni responsabilizar al gobierno por cualquier daño*" [Traducción del Tribunal] en el caso de que el socio comercial del inversor mantenga su conducta indeseada[298].

332. En relación con la toma de control de la planta, la Demandada afirma que cumplió plenamente con sus obligaciones de PSP con anticipación a la emisión del Decreto de Expropiación. La Demandada resalta que si "*no hubiera establecido una presencia a través de PDVSA Industrial en espera de la emisión del Decreto N.º 8.133, y si se*

hubieran destruido o robado los activos o si se hubieran lastimado las personas, *Venezuela claramente habría quedado sujeta a una demanda por incumplimiento con sus obligaciones de SPP*"[299]. [Traducción del Tribunal]

### 3. Cuantía de Daños

#### a) Estándar de Indemnización y Fecha de Valuación

333. La Demandada afirma que, independientemente de si Venezuela cumplió con los requisitos de los incisos 2 y 3 del Artículo 5(1) del Tratado, la fecha correcta de valuación es "*la fecha anterior a la amenaza de expropiación*" tal como exige el inciso 2 del Artículo 5(1) del Tratado[300].

334. La Demandada se refiere a la redacción del inciso 2 del Artículo 5(1) del Tratado, de acuerdo con la cual el valor del activo expropiado "*debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación*". La Demandada sostiene que este estándar se relaciona con expropiaciones tanto lícitas como ilícitas y que no se limita a las expropiaciones que cumplen con los requisitos descriptos en el inciso 1 del Artículo 5(1) del Tratado[301].

335. Además, la Demandada sostiene que, en el caso de un mero incumplimiento del Estado con la pronta especificación y el pago de la indemnización, el estándar de indemnización en virtud del derecho internacional consuetudinario no permite que se calcule el monto indemnizatorio mediante "*la construcción de un escenario 'contrafáctico' en el cual la posibilidad de expropiación sea excluida hasta la fecha del laudo*"[302]. [Traducción del Tribunal]

#### b) Cálculo del Monto Indemnizatorio

#### aa) Método de Valuación

336. La Demandada concuerda en que el monto indemnizatorio a ser abonado debe reflejar el valor justo de mercado de la planta, es decir, "*el monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado*"[303]. [Traducción del Tribunal]

---

[299] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 11 (nota 42).
[300] Transcripción (Día 1), pág. 240 líneas 20-21.
[301] Dúplica, ¶ 190; Memorial de Contestación, ¶¶ 174 *y ss*.
[302] Escrito Posterior a la Audiencia de la Demandada, ¶ 109.
[303] Memorial de Contestación, ¶¶ 185-187; Escrito Posterior a la Audiencia de la Demandada, ¶ 137.

337. La Demandada no cree necesario considerar el enfoque del Prof. Spiller para comparar la valuación basada en el modelo DCF con los costos de oportunidad de construir una planta similar en detalle dado que conforme a sus expertos en cuantía de daños, el Sr. Brailovsky y el Dr. Flores, tales costos excederían el precio que un comprador interesado estaría dispuesto a pagar por la planta de la Demandante (USD 43,7 millones más los flujos de efectivo no percibidos de USD 1,3 millones al día 15 de mayo de 2010 frente a USD 9,5 millones)[304].

338. En cualquier caso, la Demandada enfatiza que el activo a ser evaluado en el presente caso es una planta autónoma ubicada en Venezuela, no en los Estados Unidos y, por consiguiente, arguye que la única manera adecuada de evaluar la indemnización pagadera a la Demandante es mediante la aplicación de un análisis FFD, incluida una tasa de descuento que toma en cuenta el hecho de que la planta está ubicada en Venezuela[305].

339. En relación con el cálculo FFD, la Demandada esgrimió los siguientes argumentos.

### bb) Tasa de descuento

340. La Demandada afirma que la tasa de descuento calculada por el Prof. Spiller sería "*baja incluso para una empresa como Norpro Venezuela que opera en una economía madura*". La Demandada argumenta que el Prof. Spiller (i) se apartó de la tasa libre de riesgo sugerida por Ibbotson/Morningstar para proyectos a largo plazo, es decir, el rendimiento del bono del Tesoro de EE. UU. a 20 años a la fecha de valuación; (ii) se desvió de la prima general de riesgo del mercado (PRM) calculada por Ibbotson/Morningstar; e (iii) "*ignoró la evidencia empírica que establecía que el Modelo de Valoración de Activos Financieros (CAPM, por sus siglas en inglés) tiende a subestimar el costo de capital propio en el caso de los activos financieros*" [Traducción del Tribunal], el cual se corrige mediante el coeficiente *alfa*[306].

341. Según la Demandada, la mayor diferencia entre los cálculos de los peritos versa sobre la prima de riesgo país aplicable. La Demandada afirma que esta prima es "*mucho más alta*" que el 4,5% aplicado por el Prof. Spiller, que de hecho no refleja el riesgo país de Venezuela sino más bien el riesgo de cesación de pago sobre los bonos empresariales de

---

[304] Memorial de Contestación, ¶ 188; Dúplica, ¶ 201; Escrito Posterior a la Audiencia de la Demandada, ¶ 138 y ¶ 204-208; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 63; Segundo Informe Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores ("**Brailovsky/Flores II**"), ¶¶ 227 y 242.

[305] Dúplica, ¶¶ 202-203.

[306] Memorial de Contestación, ¶¶ 234-236; Dúplica, ¶ 206. Para obtener una visión general de las diferencias con respecto al costo de capital propio de EE. UU., *véase*, también, la tabla del Escrito Posterior a la Audiencia de la Demandada, posterior a ¶ 140.

EE. UU.[307]. La Demandada se refiere a los cálculos de sus peritos, el Sr. Brailovsky y el Dr. Flores, quienes principalmente se basaron en el Modelo de Calificación de Riesgo País (*CRRM*, por sus siglas en inglés) compilado por Ibbotson/Morningstar y realizaron una verificación cruzada de sus resultados mediante el método *bludgeon* diseñado por el Prof. Damodaran[308].

342. Si bien reconoce que la valuación debe excluir el impacto de la expropiación real de la Planta, la Demandada afirma que ello "*no debería confundirse con el riesgo de expropiación inherente a cualquier proyecto desde su mismo inicio*", que es parte de la "*situación económica normal imperante*" [Traducción del Tribunal] con anticipación al anuncio de expropiación de la Planta y, por ende, también es un riesgo que un comprador interesado tendría en cuenta en la evaluación del precio de compra que estaría dispuesto a pagar por la Planta[309].

343. La Demandada arguye que la prima de riesgo país debe basarse en la percepción de riesgo del comprador; la eliminación de riesgos inherentes a una inversión en Venezuela resultaría en "*el uso de una tasa de descuento que un comprador interesado no estaría dispuesto a aplicar y derivaría en un valor que el comprador interesado no abonaría, concediendo así a la Demandante un golpe de suerte que nunca podría lograr en una transacción en condiciones de libre competencia*". Según la Demandada, ello podría ser punitivo para Venezuela y, por consiguiente, "*no permisible en virtud de ninguna teoría sobre indemnización del derecho internacional*"[310]. [Traducción del Tribunal]

344. En cualquier caso, la Demandada sostiene que "*no hay manera de aislar y, por lo tanto, cuantificar*" [Traducción del Tribunal] el riesgo de una expropiación no indemnizada. Según la Demandada, el Prof. Spiller no propuso ningún método en sus dictámenes periciales para llevarlo a cabo, sino que sólo argumentó durante la Audiencia que podría aplicarse la diferencia entre el margen EMBI correspondiente a Venezuela y el valor de prima de riesgo país del 4,5% calculado por él[311].

345. En cuanto al énfasis de la Demandante colocado durante la Audiencia sobre la tasa de descuento del 15% reflejada en su DAC de fecha 23 de octubre de 2006, la Demandada observa que el significado y el objetivo de dicha tasa continúan siendo poco claros y

---

[307] Memorial de Contestación, ¶ 240; Dúplica, ¶ 207 y ¶ 228. Según la Demandada, el Prof. Spiller debería al menos haber utilizado bonos empresariales de otros países emergentes con la misma calificación que Venezuela, lo cual hubiese resultado en un margen de aproximadamente el 9%. Dúplica, ¶ 221; Escrito Posterior a la Audiencia de la Demandada, ¶ 169.

[308] La Demandada sostiene que sus peritos utilizaron la misma metodología para determinar la tasa de descuento adecuada para ambas fechas de valuación. Memorial de Contestación, ¶ 259.

[309] Dúplica, ¶ 227.

[310] Escrito Posterior a la Audiencia de la Demandada, ¶ 157.

[311] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 163-164, 171.

también sostiene que, en ese momento, el riesgo de cesación de pagos de Venezuela se encontraba "*en uno de los puntos más bajos de todos los tiempos*", con el rendimiento de sus bonos soberanos tan solo un 2,18% más alto que los bonos del Tesoro de EE.UU. La Demandada afirma que, en ese punto, la prima de riesgo país del 3% podría haberse justificado. Lo que es más importante, sin embargo, es que la Demandada enfatiza que la Demandante tomó en cuenta el riesgo de cesación de pagos de Venezuela al evaluar el riesgo país, tal como lo haría un comprador en su evaluación de una tasa de descuento adecuada para determinar el valor justo de mercado de la Planta. Según la Demandada, no existen entonces razones para excluir tal riesgo cuando este se incrementó con el transcurso del tiempo[312].

### cc)    Flujos de Fondos Futuros

346.  La Demandada sostiene que no es objeto de controversia entre las Partes que antes de la expropiación, Norpro Venezuela recibía sólo el 27% de las ganancias, mientras que el 73% restante era destinado a la empresa filial de la Demandante en EE. UU., SGCP[313]. En consecuencia, la Demandada rechaza la hipótesis del Prof. Spiller de que Norpro Venezuela retendría el 100% de las ganancias a la fecha de valuación. Sostiene que un comprador interesado no pagaría por el 100% de las ganancias ya que no estaría adquiriendo las capacidades de SGCP y no estaría dispuesto a transferir las ganancias que espera obtener a través de su propia red de comercialización, logística y distribución[314].

347.  Por ende, la Demandada se refiere a la hipótesis de sus peritos de que un comprador de la Planta obtendría "*a lo sumo*" el 75% de las ganancias ya que la propia Demandante concluyó en su estudio de precios de transferencia que SGCP aportó el 100% de la porción del 25% de los "*bienes intangibles de comercialización*"[315]. [Traducción del Tribunal]

---

[312] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 158-162. Asimismo, la Demandada observa que los mismos documentos reflejan que la Demandante estaba dispuesta a invertir en Venezuela a una tasa interna de retorno del 26,4%. Por ende, la Demandada arguye que, sin dejar de ser un 3% más alta que la tasa de descuento del Prof. Spiller, la tasa de descuento del 15% no es relevante en este caso. Segundo Escrito Posterior a la Audiencia de la Demandada, nota 132.

[313] Memorial de Contestación, ¶¶ 198-199 y ¶ 256 en referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**); Dúplica, ¶¶ 238-242; Escrito Posterior a la Audiencia de la Demandada, ¶ 182.

[314] Memorial de Contestación, ¶¶ 200-202. *Véase,* asimismo, Dúplica, ¶ 244. La Demandada enfatiza que, si bien un comprador podría obtener el 100% de los ingresos de la última venta de proppants, no se beneficiaría del 100% de las ganancias debido a que "*una gran parte de las ganancias*" estaría ligada a las funciones de comercialización, distribución y logística que no eran parte de la transferencia de la Demandante en contraprestación por el precio de compra. Escrito Posterior a la Audiencia de la Demandada, ¶¶ 184-185.

[315] Memorial de Contestación, ¶ 203 que hace referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 5; Dúplica, ¶ 243; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 54.

348. En relación con el precio de la bauxita a ser abonado por Norpro Venezuela a CVG Bauxilum, la Demandada afirma que no existen fundamentos para que la Demandante haya ordenado al Prof. Spiller que reduzca el precio acordado de USD 33,8 por TM al precio original del contrato, dado que Norpro Venezuela había aceptado el precio incrementado en la medida en que no hubiera más aumentos durante el año 2009. Por ende, la Demandada ordenó a sus peritos que basen su cálculo en el precio incrementado, aumentado por el IPP-Materias Primas de EE. UU.[316].

349. Respecto de los costos de transporte, la Demandada señala que el propio costo presupuestado por la Demandante para el transporte desde Venezuela a Alice, Estado de Texas equivalía a EUR 110 (convertido a USD 154) por TM. De acuerdo con la Demandada, esta cifra también está respaldada por el estudio de precios de transferencia de la Demandante[317]. Asimismo, la Demandada rechaza el cálculo del Prof. Spiller de los costos de envío dentro de EE. UU. y afirma que el costo presupuestado por la Demandante y el CCA de Halliburton reflejan un costo "*significativamente más alto*" [Traducción del Tribunal], por lo que sus peritos basaron su cálculo en el costo presupuestado[318].

350. En relación con los gastos de capital, la Demandada concuerda con la teoría del Prof. Spiller hasta el año 2018 inclusive, pero arguye que los gastos de capital anuales aumentarían significativamente "*a medida que la Planta envejecía y los equipos alcanzaban el final de su vida útil*"[319]. Si bien el Prof. Spiller incluyó sólo los gastos de mantenimiento, la Demandada sostiene que los gastos relativos a "*la salud y la seguridad, la tecnología y las mejoras para reducir las averías e interrupciones del proceso*" [Traducción del Tribunal] también son necesarios para asumir la operación de manera indefinida y, por consiguiente, afirma que deberían incluirse en el cálculo los cuatros gastos de capital tal como fueron previstos para la planta de la demandante ubicada en Fort Smith[320].

351. Respecto del capital de trabajo, la Demandada acepta el cálculo del Prof. Spiller salvo en relación con los créditos fiscales por el Impuesto al Valor Agregado (IVA). La Demandada sostiene que al día 15 de mayo de 2010 Norpro Venezuela no había siquiera solicitado los certificados de recuperación de impuestos y señala que el proceso de

---

[316] Memorial de Contestación, ¶ 210 y ¶ 256; Dúplica, ¶ 251 que cita parte de la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo R-52**).
[317] Memorial de Contestación, ¶ 214 y ¶ 256 que hace referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), págs. 10 y 42 y Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 195-198; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 58-59.
[318] Memorial de Contestación, ¶¶ 215-216 que hace referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1.
[319] Memorial de Contestación, ¶¶ 217-218 y ¶ 256.
[320] Dúplica, ¶ 262.

recuperación es usualmente un proceso "*extenso y complejo*". La Demandada afirma que, por ende, sus peritos asumieron que los créditos fiscales IVA pendientes al día 15 de mayo de 2010 hubieran sido monetizados en 2013 y que los demás créditos fiscales IVA acumulados a partir de entonces habrían sido monetizados a dos años de manera progresiva y, por lo tanto, habrían sido parte del capital de trabajo que un comprador no valuaría por separado[321].

### 4. Petitorio de la Demandada

352. La Demandada concluye que el Tribunal debería declarar que la expropiación de la planta fue lícita y otorgar a la Demandante una indemnización con base en el Artículo 5(1) del Tratado por la suma de USD 9,5 millones, el valor justo de mercado de la planta al día 15 de mayo de 2010, más los intereses simples anteriores al laudo calculados a una tasa de Letras del Tesoro de EE. UU. a tres meses, más 1,1 en puntos porcentuales. Las reclamaciones basadas en el aumento del precio de la bauxita deberían declararse inadmisibles, o, si se decidiera entender en ellas, deberían desestimarse sobre los hechos y el derecho. Todas las demás reclamaciones deberían desestimarse sobre los hechos y el derecho. Los costos de dichos procedimientos en los que hubiere incurrido la Demandada (incluidos los honorarios legales y desembolsos) deberían deducirse del monto indemnizatorio otorgado a la Demandante[322].

## F.    RAZONAMIENTO DEL TRIBUNAL

### I.    JURISDICCIÓN

353. Las Partes no han controvertido que la jurisdicción del Tribunal deriva del Artículo 25(1) del Convenio CIADI y del Artículo 8(2) del Tratado. El Artículo 25(1) del Convenio CIADI dispone lo siguiente en su parte pertinente:

> "*La jurisdicción del Centro se extenderá a las diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado Contratante* […] *y el nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro*".

354. El Artículo 8(2) del Tratado dispone lo siguiente:

---

[321] Dúplica, ¶¶ 269-271; Escrito Posterior a la Audiencia de la Demandada, ¶ 201.

[322] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 64. El petitorio de la Demandada no se ha modificado a través de la Actualización de la Valuación presentada el día 22 de octubre de 2015 debido a que dicha presentación se relacionaba exclusivamente con la valuación de la Planta a la fecha del laudo, que fue actualizada al día 31 de agosto de 2015. La Demandada, no obstante, mantiene su posición de que el valor de la Planta debe evaluarse a la fecha de la primera amenaza de expropiación con arreglo al inciso 2 del Artículo 5(1) del Tratado. *Cfr.* Escrito Posterior a la Audiencia de la Demandada, ¶ 137.

"*Si dicha controversia* [entre un nacional o una sociedad de una Parte Contratante y la Otra Parte Contratante en lo concerniente a una obligación de esta última en relación con una inversión en virtud del presente Acuerdo] *no pudiese ser resuelta en un plazo de seis meses a partir del momento en que ha sido identificada por una u otra de las partes en controversia, se someterá, a pedido del nacional o de la sociedad en cuestión, a la jurisdicción competente del estado en el cual se ha efectuado la inversión o bien al arbitraje del Centro Internacional para el Arreglo de Diferencias relativas a Inversiones (C.I.A.D.I.)creado por la Convención para el arreglo de diferencias relativas a las inversiones entre Estados y nacionales de otros Estados, firmado en Washington el 18 de marzo de 1965. Dicha opción queda a elección del nacional o de la sociedad interesada. Una vez ejercida la opción de arbitraje, esta será definitiva*"[323].

355. De conformidad con el Artículo 25(1) del Convenio CIADI, deben satisfacerse los siguientes cuatro requisitos: (i) debe existir una diferencia de naturaleza jurídica entre las Partes; (ii) la diferencia debe surgir directamente de una inversión; (iii) las Partes deben ser un Estado Contratante y un nacional de otro Estado Contratante; y (iv) ambas partes deben haber consentido por escrito en someter la diferencia al CIADI.

356. Las Partes no discrepan en que los cuatro requisitos se cumplen en el presente caso[324]. En primer lugar, existe una diferencia de naturaleza jurídica entre las Partes debido a que la Demandante pretende obtener una reparación por los supuestos incumplimientos por parte de la Demandada con los Artículos 5(1), 3(1) y (2) del Tratado[325].

357. En segundo lugar, esta controversia surge directamente de una inversión en el sentido del Artículo 1(1) del Tratado, que incluye "*todos los haberes, tales como los bienes, derechos e intereses de cualquier índole*" y, en particular, "*acciones* […] *en las sociedades constituidas en el territorio de una de las Partes Contratantes*", "*derechos reales tales como hipotecas*" y "*los derechos a cualquier prestación con valor económico*"[326]. En este caso, la Demandante sostiene que (i) es tenedora del 99,99% de las acciones de Norpro Venezuela, sociedad constituida y existente en virtud de las leyes de Venezuela; (ii) proporcionó financiación de la deuda a Norpro Venezuela, que fue garantizada a través de una hipoteca sobre Norpro Venezuela; y (iii) fue propietaria de bienes y titular de derechos contractuales en relación con proveedores locales y derechos de acuerdo con la

---

[323] La traducción libre al inglés presentada como **Anexo C-1**. Los textos originales en idioma español y francés han sido citados en el párrafo 12 *supra*.
[324] La Demandada no ha planteado ninguna excepción a la jurisdicción del Tribunal. Durante la Audiencia, la Demandada afirmó en tal sentido: "*[Y] ahora por eso nos encontramos aquí y este Tribunal tendrá que determinar la indemnización también. De eso no hay -- no tenemos problema*". Transcripción (Día 1), pág. 159 líneas 16-19.
[325] *Cfr.* Memorial, ¶ 123; RfA, ¶ 69.
[326] Artículo 1(1)(a), (b) y (c) del Tratado. Traducción libre al inglés presentada como **Anexo C-1**.

legislación, tales como licencias y permisos[327]. La Demandada no objetó a ninguna de dichas afirmaciones. Por ende, la controversia entre las Partes surge directamente de la inversión de la Demandante en Norpro Venezuela.

358. En tercer lugar, a pesar de que Venezuela denunció el Convenio CIADI el día 24 de enero de 2012[328], la Demandada no controvierte que era un Estado Contratante con arreglo al sentido del Artículo 25(1) del Convenio CIADI a los efectos de este procedimiento. La Demandante observa que el Convenio CIADI entró en vigor para Venezuela el día 1 de junio de 1995 y que, por ende, Venezuela era un Estado Contratante cuando (i) consintió al Arbitraje CIADI en virtud del Tratado el día 2 de julio de 2001; (ii) la Demandante cursó sus notificaciones de controversia a la Demandada los días 4 de julio de 2011 y 17 de enero de 2012; y (iii) la Demandante presentó su Solicitud de Arbitraje el día 25 de abril de 2012, dado que la denuncia de Venezuela del Convenio CIADI sólo entró en vigencia el día 25 de julio de 2012[329]. Asimismo, la Demandante es un nacional, es decir, una persona jurídica en el sentido del Artículo 25(2)(b) del Convenio CIADI, de otro Estado Contratante debido a que la Demandante es una sociedad constituida en virtud de la legislación de Francia, para la cual el Convenio CIADI entró en vigor el día 20 de septiembre de 1967[330].

359. Por último, ambas Partes prestaron su consentimiento por escrito a someter esta controversia al CIADI. El consentimiento de la Demandada está receptado en el Artículo 8(2) del Tratado. Los requisitos de tal disposición también han sido satisfechos: (i) La controversia fue planteada por un nacional o una sociedad de una Parte Contratante del Tratado (sociedad constituida en Francia) contra la otra Parte Contratante (Venezuela); (ii) se cursó una notificación de la controversia (4 de julio de 2011) con una anticipación de al menos seis meses previo al sometimiento de la controversia al arbitraje (25 de abril de 2012) y no se alcanzó un arreglo amistoso durante tal período; y (iii) la controversia en virtud del Tratado no ha sido sometida a los tribunales de Venezuela por parte del nacional o la sociedad[331].

360. La Demandante prestó su consentimiento en su notificación de la controversia de fecha 4 de julio de 2011, que fue, *inter alia*, cursada al Presidente de Venezuela, y reiteró su consentimiento en su segunda carta remitida al Presidente de fecha 17 de enero de 2012[332].

---

[327] Memorial, ¶¶ 117-118; RfA, ¶ 66.
[328] Memorial, ¶ 114.
[329] Memorial, ¶¶ 126, 128.
[330] Memorial, ¶ 126; RfA, ¶ 69.
[331] *Cfr.* Memorial, ¶¶ 120-121; RfA, ¶¶ 72-73.
[332] Memorial, ¶ 127; RfA, ¶ 69. **Anexos C-42** y **C-44**.

361. Como resultado, el Tribunal concluye que los requisitos del Artículo 25(1) del Convenio CIADI han sido satisfechos y que goza de competencia para entender en la controversia que le fue planteada.

## II.  ADMISIBILIDAD

362. La Demandada plantea excepciones en relación con la admisibilidad de las siguientes dos reclamaciones planteadas por la Demandante en este procedimiento: (i) que, en virtud del aumento de precio de la bauxita que se había acordado inicialmente mediante el Contrato de Bauxita celebrado entre la Demandante y CVG Bauxilum, la Demandada no brindó a la Demandante un trato justo y equitativo de conformidad con el Artículo 3(1) del Tratado y no proporcionó protección y seguridad a la inversión de la Demandante conforme al Artículo 3(2) del Tratado (las "**Reclamaciones sobre la Bauxita**")[333]; y (ii) que las medidas de la Demandada fueron "*contrarias a un compromiso especial*" en el sentido del inciso 1 del Artículo 5(1) del Tratado[334].

## 1.  Reclamaciones sobre la bauxita

### a)    Síntesis de la Postura de la Demandada

363. La Demandada afirma que las Reclamaciones sobre la Bauxita son inadmisibles. Aún si la Demandante pudiera establecer que los precios de la bauxita se incrementaron en violación del Contrato de Bauxita, ello no podría, por sí solo, dar lugar a la responsabilidad de la Demandada en virtud del derecho internacional dado que no es una parte en el Contrato de Bauxita[335]. La Demandada afirma que la Demandante no logra identificar algún instrumento jurídico celebrado con el Estado, o cualquier acto relevante por parte del Estado, sobre el cual pueda basar sus Reclamaciones sobre la Bauxita[336].

364. En particular, la Demandada sostiene que los aumentos de precio invocados por CVG Bauxilum no son atribuibles a la Demandada en virtud del Proyecto de Artículos de la Comisión de Derecho Internacional[337]. La Demandada arguye que CVG Bauxilum, que posee una personalidad jurídica distinta de la correspondiente a la Demandada y no ejerce ninguna facultad ejecutiva en virtud del derecho venezolano, no puede considerarse un órgano del Estado en el sentido del Artículo 4 del Proyecto de Artículos de la CDI. Asimismo, la Demandada sostiene que CVG Bauxilum no ejerció autoridad gubernamental conforme al Artículo 5 del Proyecto de Artículos de la CDI dado que, al

---

[333] Memorial, ¶¶ 165-177; 190-194.
[334] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 38-47.
[335] Memorial de Contestación, ¶¶ 73-74; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 125-126.
[336] Dúplica, ¶ 78.
[337] Memorial de Contestación, ¶¶ 76-106; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 125-126.

actuar en su carácter de sociedad comercial del sector minero en beneficio de la Demandada, no posee ni ejerce facultades gubernamentales al llevar a cabo tales actividades[338].

365.  Por último, la Demandada señala que CVG Bauxilum no actuó siguiendo instrucciones de la Demandada, ni bajo su dirección o control, en el sentido de los términos del Artículo 8 del Proyecto de Artículos de la CDI; a pesar de que CVG Bauxilum en última instancia se encuentra sujeta a la tutela administrativa del MIBAM, ello no es suficiente para establecer un control directo del Estado conforme a los términos del Artículo 8 del Proyecto de Artículos de la CDI[339].

### b)   Síntesis de la Postura de la Demandante

366.  La Demandante afirma que los argumentos planteados por la Demandada no afectan la admisibilidad de las Reclamaciones sobre la Bauxita, pero que están relacionados con el fondo del caso. La Demandante sostiene que la admisibilidad meramente versa sobre "*si la reclamación, en la manera en que fue planteada, puede o debería ser resuelta por un tribunal internacional, que de otro modo ha determinado su jurisdicción*"[340] [Traducción del Tribunal]. La Demandante hace hincapié en que sus Reclamaciones sobre la Bauxita no se basan en el Contrato de Bauxita como tal, sino en las violaciones por parte de la Demandada del Tratado, y por ende son "*analíticamente distintas*" de cualquier reclamación que Norpro Venezuela podría haber planteado en virtud del Contrato de Bauxita[341].

367.  La Demandante se refiere a su posición de que durante la negociación del Contrato de Bauxita, Venezuela señaló claramente que "*controlaba CVG Bauxilum y que todas las decisiones relevantes respecto de la conducta de CVG Bauxilum serían tomadas a nivel ministerial*" [Traducción del Tribunal]. La Demandante sostiene que sus Reclamaciones sobre la Bauxita se basan en el hecho de que la conducta de CVG Bauxilum fue sancionada o puedo haberse evitado por el ministerio competente; por ende, constituyen reclamaciones por violación del Tratado[342].

### c)   El Análisis del Tribunal

368.  En relación con la admisibilidad, el análisis del Tribunal se limita a la cuestión que consiste en determinar si "*no puede descartarse, al menos prima facie*", que la supuesta

---

[338] Memorial de Contestación, ¶¶ 84, 89.
[339] Memorial de Contestación, ¶¶ 104-105.
[340] Réplica, ¶ 67, con cita a V. Heiskanen, *Jurisdiction, Admissibility, and Competence in Investment Treaty Arbitration*, ICSID Review (2013), **CLA-126**, p. 237.
[341] Réplica, ¶ 67.
[342] Réplica, ¶ 68.

conducta de la Demandada respecto de los derechos de la Demandante en virtud del Contrato de Bauxita puede, "*si se demuestra*", estar comprendida dentro del alcance de las obligaciones de la Demandada en virtud del Tratado[343].

369. El Tribunal observa que las excepciones planteadas por la Demandada a la admisibilidad de las Reclamaciones sobre la Bauxita están relacionadas, en cierta medida, con la distinción común y relevante entre las reclamaciones que surgen de los tratados y aquellas que surgen de los contratos. Dicha distinción es particularmente importante en los casos en que el inversor ingresa en relaciones contractuales directas con el Estado; en tales casos, los derechos contractuales del inversor pueden muy posiblemente encontrarse dentro del alcance de un tratado bilateral de inversión. No obstante, la misma distinción puede también jugar un rol en caso de que dicha relación contractual haya sido entablada con un ente estatal, como en el presente caso.

370. Los tribunales que entienden en controversias relacionadas con tratados de inversión son frecuentemente convocados para distinguir claramente entre meros incumplimientos contractuales y violaciones de tratados. En tal sentido, la Demandada se refirió correctamente a la decisión del tribunal del caso *Bayindir c. Pakistán*:

> "[D]ebido a que una violación de un tratado es diferente de un incumplimiento contractual, el Tribunal considera que la Demandante debe establecer que existe una violación de naturaleza diferente a un simple incumplimiento contractual, es decir, una violación que el Estado comete en el ejercicio de su poder soberano"[344]. [Traducción del Tribunal]

371. Si bien la Demandante afirma en este caso que, *inter alia*, CVG Bauxilum actuaba en violación del Contrato de Bauxita y que dicha conducta es atribuible a la Demandada[345], no sostiene que el supuesto incumplimiento del contrato como tal constituyó, al mismo tiempo, una violación del Tratado. Por el contrario, la Demandante arguye que la Demandada era propietaria de un monopolio sobre la producción y la venta de la bauxita en Venezuela, por lo cual Norpro Venezuela no tuvo otra opción más que aceptar los nuevos términos impuestos[346]. Además, la Demandante afirma que la Demandada hizo "*promesas específicas*" y asumió "*compromisos*" y que de ese modo "*creó expectativas específicas*", sobre las cuales se basó la Demandante al realizar sus inversiones; asimismo,

---

[343] Citas de *Bayindir c. Pakistán,* ¶ 246. **Anexo CLA-009**. El árbitro Bottini prefiere un concepto más amplio de admisibilidad, bajo el cual las Reclamaciones sobre la Bauxita podrían ser abordadas. Sin embargo, dada la decisión del Tribunal respecto de estas reclamaciones, entiende que la presente observación no modificaría el resultado en este caso.

[344] Escrito Posterior a la Audiencia de la Demandada, ¶ 135 (nota 288). *Bayindir c. Pakistán,* ¶ 180. **Anexo CLA-009**.

[345] Memorial, ¶ 169 y ¶¶ 173 *y ss*.

[346] Memorial, ¶ 171.

señala que la Demandada "*repudió tales expectativas, al no abordar* […] *las medidas de CVG Bauxilum relacionadas con el aumento del precio de la bauxita*"[347]. [Traducción del Tribunal]

372. Con base en dichas alegaciones, la Demandante sostiene que la Demandada violó sus obligaciones en virtud del Artículo 3(1) del Tratado (Trato Justo y Equitativo) y el Artículo 3(2) del Tratado (Protección y Seguridad Plenas)[348].

373. A los efectos de decidir sobre la admisibilidad de las Reclamaciones sobre la Bauxita, el Tribunal "*aceptará pro tem los hechos alegados*" por la Demandante "*como ciertos*"[349], es decir, que la Demandada hizo efectivamente promesas específicas y asumió compromisos frente a la Demandante en relación con el Contrato de Bauxita, las cuales excedieron los incentivos generales ofrecidos en aras de promocionar un ambiente ampliamente atractivo para los inversores. Sobre esta base, el Tribunal considera que, *prima facie*, la supuesta conducta de la Demandada se encuentra dentro del alcance de sus obligaciones de garantizar un trato justo y equitativo en virtud del Artículo 3(1) del Tratado y de proporcionar protección y seguridad plenas con arreglo al Artículo 3(2) del Tratado. La cuestión que consiste en determinar si la Demandada efectivamente hizo tales promesas o asumió dichos compromisos se analizará en la sección sobre el fondo de esta decisión.

## 2.   Reclamación relacionada con el Inciso 1 del Artículo 5(1) del Tratado

374. Durante la Audiencia y mediante sus Presentaciones Posteriores a la Audiencia, la Demandante sostiene que la Demandada no sólo violó los incisos 2 y 3 del Artículo 5(1) del Tratado, sino también el inciso 1. Específicamente, la Demandante afirma, en primer lugar, que la expropiación no se debió a una "*medida*" ("*mesures*"/"*measures*") y, en segundo lugar, que violó un "*compromiso especial*" ("*engagement particulier*"/"*particular undertaking*")[350].

## a)   Síntesis de la Postura de la Demandada

375. La Demandada señala que la reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado debería desestimarse. La Demandada arguye que la Demandante nunca planteó su "*nueva e inoportuna teoría*" respecto del inciso 1 con anticipación a la

---

[347] Memorial de Réplica, ¶ 120; Presentación Posterior a la Audiencia de la Demandante, ¶ 80.

[348] Memorial de Réplica, ¶¶ 122, 137-142.

[349] Citas de *Caso Relativo a Plataformas Petrolíferas (República Islámica de Irán c. EE.UU.)*, Opinión Separada de la Jueza Higgins sobre Excepciones Preliminares de fecha 12 de diciembre de 1996, (1996) Informes de la CIJ, 847 (856). **Anexo CLA-017**.

[350] Transcripción (Día 1), pág. 25 líneas 1-14; pág. 307 línea 15 – pág. 310 línea 18; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 38-47.

Audiencia, ya sea mediante su Memorial, o su Réplica, o durante la conferencia previa a la audiencia o en cualquier solicitud previa a la audiencia. La Demandada afirma que la posición de la Demandante es, por consiguiente, incompatible con la Regla 31(3) de las Reglas de Arbitraje CIADI[351].

376. En particular, la Demandada niega que esta reclamación haya sido provocada por una cambio de posición en su Dúplica y resalta que, ya en su Memorial de Contestación, adoptó la posición de que la expropiación se llevó a cabo cuando se emitió el Decreto el día 29 de marzo de 2011, tal como lo reconoció la Demandante en su resumen de los "*Hechos Controvertidos*" de su Réplica[352].

### b) Síntesis de la Postura de la Demandante

377. La Demandante señala que sus argumentos relacionados con el inciso 1 del Artículo 5(1) del Tratado fueron informados por el hecho de que, por primera vez en su Dúplica, la Demandada planteó el argumento de "*que lo que sucedió entre mayo 2010 y marzo 2011 no era la expropiación, que la expropiación ocurrió recién en* [marzo de] *2011*"[353].

378. Asimismo, la Demandante afirma que su reclamación no es "*ni novedosa ni extemporánea*" dado que la Demandante nunca limitó su reclamación sobre expropiación al argumento de que existía una falta de indemnización. Por el contrario, la Demandante había planteado el argumento de que la expropiación no se realizó de manera justa y equitativa y que no se concedió a la Demandante el debido proceso desde el inicio del procedimiento[354].

379. Finalmente, la Demandante arguye que aún si hubiera planteado una nueva reclamación durante la Audiencia, la Demandada no logró establecer "*por qué ello es problemático*". Según la Demandante, la Regla 31(3) de las Reglas de Arbitraje CIADI "*asume una evolución natural del argumento*" [Traducción del Tribunal] durante el transcurso del procedimiento. Además, la Demandante observa que la Demandada tuvo la oportunidad de presentar sus opiniones durante su alegato de apertura y a lo largo de la Audiencia, como así también mediante sus dos Escritos Posteriores a la Audiencia[355].

---

[351] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 4, 21-23.
[352] Escrito Posterior a la Audiencia de la Demandada, ¶ 6 que hace referencia al Memorial de Contestación, ¶ 2 y Réplica, ¶ 9(c).
[353] Transcripción (Día 3), pág. 876 líneas 19-21.
[354] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 30, 44-45 que hace referencia al Memorial, ¶¶ 180-184 y la Réplica, ¶¶ 89-95, 125-130.
[355] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 46-48.

### c)    El Análisis del Tribunal

380. El Tribunal tiene conocimiento de que las disposiciones relativas a las presentaciones escritas contenidas en la Regla 31 de las Reglas de Arbitraje CIADI están estrechamente relacionadas con el derecho procesal fundamental de las partes a ser oídas. La Regla 31(3) dispone en tal sentido que:

> "*Los memoriales deberán contener: una relación de los hechos pertinentes, una declaración del derecho aplicable, y las peticiones. Los memoriales de contestación, la réplica o la dúplica contendrán la aceptación o negación de los hechos declarados en el último escrito presentado; cualesquiera hechos adicionales, en caso necesario; las observaciones concernientes a la declaración del derecho aplicable contenida en el último escrito presentado; una declaración de derecho en respuesta al mismo; y las peticiones".*

381. En este caso, cada una de las Partes afirma que la otra Parte planteó, en una etapa avanzada del procedimiento, una nueva cuestión que no era parte de las anteriores presentaciones de la otra Parte, y que deberá contar con la oportunidad de responder debidamente a la nueva cuestión.

382. En aras de otorgar pleno efecto a los derechos procesales de las Partes, el Tribunal sugirió, al final de la Audiencia, que deberían realizarse dos rondas de presentaciones posteriores a la audiencia[356]. De esta manera, ambas Partes tuvieron la oportunidad de reaccionar a lo que consideraban una nueva posición de la otra Parte, y de responder a la reacción de la otra Parte. El Tribunal también sugirió que no debería haber un límite fijo de páginas para las presentaciones posteriores a la audiencia de manera que cada Parte pudiera proporcionar sus consideraciones sobre las cuestiones según les pareciera adecuado, pero ambas Partes prefirieron contar con un límite de páginas para ambas presentaciones y así lo acordaron[357].

383. Por este motivo, el Tribunal concluye que, a pesar de que puede haber sido un poco tarde para que la Demandante plantee una reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado en ocasión de la Audiencia, ambas Partes tuvieron suficientes oportunidades para reaccionar ante las posiciones de la otra parte y brindar sus consideraciones al respecto como parte de sus presentaciones posteriores a la audiencia. Por ende, el Tribunal no considera apropiado rechazar esta reclamación sin proceder a analizar si tiene fundamento jurídico.

---

[356] Transcripción (Día 4), pág. 1251 líneas 11-19.
[357] Transcripción (Día 4) pág. 1252 líneas 8 – pág. 1253 línea 11.

## III.   VIOLACIÓN DEL TRATADO

384. A continuación, el Tribunal procederá a analizar si la Demandada violó el Tratado. La Demandante alega que la Demandada incumplió las siguientes disposiciones:

- Artículo 5(1) del Tratado con respecto a sus obligaciones relativas a la expropiación (**1.**);
- Artículo 3(1) del Tratado con respecto a su obligación de otorgar trato justo y equitativo (**2.**); y
- Artículo 3(2) del Tratado con respecto a su obligación de otorgar protección y seguridad plenas (**3.**).

### 1.   Expropiación (Artículo 5(1) del Tratado)

385. La Demandante argumenta que la Demandada violó el inciso 1 del Artículo 5(1) del Tratado (**a)**) así como los incisos 2 y 3 de la esa misma disposición (**b)**).

### a)   Violación del Inciso 1 del  Artículo 5(1) del Tratado

### aa)   Síntesis de la Postura de la Demandante

386. El argumento de la Demandante en relación con su reclamación respecto del inciso 1 del Artículo 5(1) del Tratado tiene dos aspectos:

387. En primer lugar, la Demandante alega que la expropiación no se realizó en virtud de una "*medida*". Según la Demandante, una "*medida*" de expropiación o nacionalización en el sentido del inciso 1 del Artículo 5(1) del Tratado consiste en "*todo tipo de actos administrativos, legislativos o judiciales, realizados por cualquiera de los Poderes que integran la República Bolivariana*", y que no existió dicho acto formal en el presente caso hasta que la Demandada emitió el Decreto de Expropiación en el mes de marzo de 2011. Según la Demandante, un Estado que toma el control de bienes sin el respaldo de algún instrumento jurídico para dicha expropiación no realiza una expropiación conforme a una medida y, por ende, no lo hace de acuerdo con ningún concepto del debido proceso[358].

388. En segundo lugar, la Demandante afirma que la expropiación de la planta no se llevó a cabo en consonancia con la obligación de la Demandada en virtud del Artículo 3(1) del Tratado de otorgar a la inversión de la Demandante un trato justo y equitativo y, por consiguiente, se violó un "*compromiso especial*" ("*engagement particulier*"/"*particular*

---

[358] Presentación Posterior a la Audiencia de la Demandante, ¶ 39, con cita de *OI European Group c. Venezuela* ¶ 324. **Anexo CLA-156** (traducción libre).

*undertaking*") en los términos del inciso 1 del Artículo 5(1) del Tratado[359]. En particular, la Demandante alega que la Demandada "*tomó el control de la Planta en violación directa de los derechos de debido proceso de Saint-Gobain*" y "*sin una medida de cualquier tipo que estableciera un marco legal para la expropiación ni un esfuerzo para entablar negociaciones de buena fe sobre la indemnización*". La Demandante afirma que la expropiación fue, por consiguiente, ilícita[360]. [Traducción del Tribunal]

### bb) Síntesis de la Postura de la Demandada

389. La Demandada alega que la reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado carece de mérito jurídico. En relación con el argumento de la Demandante relacionado al término "*medida*", la Demandada sostiene que dicho término "*tiene un significado mucho más amplio que el sugerido por la Demandante*" [Traducción del Tribunal] y alega que, contrariamente a la posición de la Demandada, aún en el caso de que el anuncio por televisión del Presidente Chávez constituyera la expropiación, ello representaría una "*medida*" en virtud del Tratado y el derecho internacional[361].

390. Asimismo, la Demandada sostiene que la referencia a un "*compromiso especial*" ("*engagement particulier*"/"*particular agreement*") "*no pretende significar el Tratado en sí mismo, sino un acuerdo externo al Tratado*". En tal sentido, la Demandada observa que la Demandante no citó ningún precedente jurídico para respaldar su posición y resalta que en el único caso citado por la Demandante al respecto, el tribunal tuvo que decidir sobre una disposición del tratado que – a diferencia del inciso 1 del Artículo 5(1) del Tratado – incluía explícitamente el requisito de que la expropiación "*se llevara a cabo bajo el debido proceso del derecho*" [Traducción del Tribunal] como condición de la licitud de una expropiación[362].

391. En sustento de su postura, la Demandada también se refiere a: (i) el uso del término "*acuerdo*" ("*accord*"/"*agreement*") en los casos en los que el Tratado se refiere a sí mismo; (ii) el uso distinto del término "*compromiso particular*" ("*engagement particulier*"/"*particular agreement*") para un acuerdo externo en el Artículo 10 del Tratado; y (iii) la redacción de otros tratados de inversión, que disponen explícitamente

---

[359] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.
[360] Presentación Posterior a la Audiencia de la Demandante, ¶ 42 con cita al tribunal de *Kardassopoulos c. Georgia*, ¶ 396. **Anexo CLA-046**.
[361] Escrito Posterior a la Audiencia de la Demandada, ¶ 29 (nota 40); Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 7.
[362] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 8-9 en referencia a *Kardassopoulos c. Georgia*, ¶ 386. **Anexo CLA-46**.

que la expropiación debe realizarse de acuerdo con otras disposiciones sustantivas del Tratado en cuestión[363].

### cc)    El Análisis del Tribunal

392.   Al decidir sobre esta primera reclamación por violación del Tratado, el Tribunal procederá a examinar el inciso 1 del Artículo 5(1) del Tratado a la luz de su redacción y su contexto dentro del marco del Tratado. En las versiones originales en idioma español y francés, la disposición reza lo siguiente:

> "*Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier*"[364].

> "*Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial*"[365].

393.   La traducción en idioma inglés presentada por la Demandante dispone lo siguiente:

> "*The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement*"[366].

394.   Con respecto al primer argumento presentado por la Demandante, el Tribunal considera que el término "*medidas*" ("*mesures*"/"*measures*") relacionado con la expropiación o

---

[363] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 25-27.
[364] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française n°102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.
[365] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.
[366] Traducción al inglés presentada como **Anexo C-1**.

nacionalización a las que se refiere el inciso 1 del Artículo 5(1) del Tratado no constituye por sí solo un requisito relacionado con la licitud de la expropiación o nacionalización, sino que pretende incluir todos los actos o las omisiones del Estado que podrían ser equivalentes a una conducta expropiatoria. El Tribunal concuerda con la descripción brindada por la CIJ en el Caso *Fisheries Jurisdiction*:

> "*[E]n su sentido ordinario, la palabra as lo suficientemente amplia como para cubrir cualquier acto, paso o procedimiento, y no impone ningún límite particular sobre su contenido material o la finalidad que se persigue mediante su uso*"[367]. [Traducción del Tribunal]

395. Como resultado, el Tribunal considera que una violación del inciso 1 del Artículo 5(1) del Tratado no puede derivar de la omisión de un Estado de actuar en la forma de una "*medida*", sino sólo del incumplimiento de los tres requisitos sustanciales de dicho inciso, es decir, que la medida esté justificada por causa de utilidad pública, no sea discriminatoria y no sea contraria a cualquier acuerdo o compromiso particular.

396. En relación con el significado del término "*compromiso especial*" o "*compromiso particular*" ("*engagement particulier*"/"*particular agreement*")[368], al Tribunal no lo convence la interpretación de la Demandante, según la cual el término incluye compromisos externos e internos respecto del Tratado. De acuerdo con el Artículo 31(1) de la Convención de Viena, al cual ambas Partes hacen referencia en relación con la interpretación de las disposiciones del Tratado, el Artículo 5(1) del Tratado debería "*interpretarse de buena fe conforme al sentido corriente que haya de atribuirse a los términos del tratado en el contexto de estos y teniendo en cuenta su objeto y fin*"[369]. Según el Tribunal, el significado común de los adjetivos "*particulier*" y "*especial*" en relación con un "*engagement*" o"*compromiso*" implican una referencia a obligaciones que surgen de acuerdos distintos del Tratado o externos a él.

397. Tal como lo ha señalado correctamente la Demandada, esta interpretación se confirma por la redacción empleada en el Artículo 10 del Tratado (que forma parte del contexto del Artículo 5(1), conforme al Artículo 31(2) de la Convención de Viena):

---

[367] Citado en *Saluka c. República Checa*, ¶ 459. **Anexo CLA-071**.
[368] Las Partes convienen en que una traducción más precisa de los términos utilizados en los textos en idioma español y francés constituiría "*particular undertaking,*" "*specific undertaking*" o "*specific commitment*". Presentación Posterior a la Audiencia de la Demandante, ¶ 38 (nota 109); Escrito Posterior a la Audiencia de la Demandada, ¶ 24 (nota 35). No obstante, ninguna de las Partes ha argumentado que cualquiera de estas traducciones habría resultado en un significado diferente del término. De hecho, la Demandante sostuvo en la Audiencia y una vez más en su Presentación Posterior a la Audiencia que "*es una distinción que no influye mucho*". Transcripción (Día 1), pág. 146 línea 14; Presentación Posterior a la Audiencia de la Demandante, ¶ 40 (nota 113).
[369] **Anexo CLA-086**, Artículo 31(1).

| | |
|---|---|
| "*Les investissements ayant fait l'objet d'un engagement particulier de l'une des Parties contractantes à l'égard des nationaux et sociétés de l'autre Partie contractante sont régis, sans préjudice des dispositions du présent accord, par les termes de cet engagement dans la mesure où celui-ci comporte des dispositions plus favorable que celles qui sont prévues par le présent accord*"[370]. | "*Las inversiones que hubiesen sido objeto de un compromiso particular de una de las Partes Contratantes referente a nacionales y sociedades de la otra Parte Contratante serán administradas, sin prejuicio de las disposiciones del presente Convenio, por los términos de este compromiso en case que este incluya disposiciones más favorables que las previstas por el presente Convenio*"[371]. |

398. Si bien el Tribunal observa que la redacción del inciso 1 del Artículo 5(1) y del Artículo 10 del Tratado no son completamente idénticas en la versión en idioma español dado que el Artículo 10 se refiere a un "*compromiso particular*" en lugar de un "*compromiso especial*", la redacción de la versión en idioma francés es efectivamente idéntica ("*engagement particulier*"). Dentro del contexto del Artículo 10, estos términos claramente se refieren a un acuerdo externo al Tratado, lo cual es aplicable a la inversión si el acuerdo contiene disposiciones más favorables que el propio Tratado, al cual se hace referencia como el "*présent accord*" y el "*presente Convenio*". El Tribunal considera que no existen motivos para asumir que las Partes Contratantes del Tratado pretendieron asignar diferentes significados al mismo término (o en el caso del texto en español, a términos muy similares) en las dos disposiciones.

399. Por último, la Demandada señaló correctamente que los Estados Contratantes que desean sujetar la licitud de una expropiación al cumplimiento con otras disposiciones sustanciales del TBI, en especial el requisito de llevar a cabo la expropiación de acuerdo con el debido proceso, usualmente incluyen un requisito explícito a tal efecto en la disposición relativa a la expropiación. Por ejemplo, en el caso citado por la Demandante, *Kardassopoulos c. Georgia*, la decisión del tribunal se basó en el Artículo 13 del Tratado sobre la Carta de Energía, que dispone lo siguiente:

> "*Las inversiones de los inversores de una Parte Contratante en el territorio de otra Parte Contratante no serán objeto de*

---

[370] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*]. **Anexo C-1**, pág. 7776.
[371] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*. **Anexo C-1**, págs. 332,354.

*nacionalización, expropiación o medida o medidas de efecto equivalente a la nacionalización o a la expropiación* [...], *excepto si dicha expropiación se lleva a cabo:* [...] *(c) con arreglo al debido procedimiento lega*l"[372].

400. En este caso, las Partes Contratantes no incluyeron dicho requisito en el inciso 1 del Artículo 5(1) del Tratado (o en cualquier otro inciso o sub-inciso del Artículo 5); por ende, no hay indicios de que las Partes Contratantes de todos modos desearan condicionar la licitud de una expropiación al cumplimiento con el debido proceso. Por el contrario, pareciera que cualquier violación del derecho al debido proceso que le asiste a un inversor, incluido en el estándar TJE (*véase* en mayor detalle *infra*), debía abordarse dentro del contexto del Artículo 3(1) del Tratado, pero no pretendía afectar la licitud de la expropiación.

401. Por ende, el Tribunal concluye que los términos "*acuerdo particular*" o "*compromiso específico*" ("*engagement particulier*"/"*particular agreement*" o "*particular undertaking*") no incluyen una referencia a otras disposiciones sustanciales del mismo Tratado, sino sólo a acuerdos que son distintos del Tratado. Dado que la Demandante no invoca la violación de un compromiso de tal índole, aparte de las disposiciones del Tratado en sí mismas[373], el Tribunal resuelve que la Demandada no ha violado el inciso 1 del Artículo 5(1) del Tratado.

**b)     Violación de los Incisos 2 y 3 del Artículo 5(1)  del Tratado**

402. El Tribunal ahora abordará la segunda reclamación respecto de la violación del Tratado. La Demandante sostiene que la Demandada no cumplió con sus obligaciones en virtud de los incisos 2 y 3 del Artículo 5(1) del Tratado respecto del requisito de una pronta indemnización y la fijación del monto y la modalidad de pago. En su análisis, el Tribunal primero determinará con precisión el alcance y el contenido de las obligaciones de la Demandada en virtud del Tratado (**aa**)); luego el Tribunal procederá a evaluar si la Demandada cumplió con tales requisitos (**bb**)) y, por último, procederá a  determinar si su conclusión afecta de alguna manera la licitud de la expropiación (**cc**)).

**aa)   El alcance de la obligación de la Demandada de pagar una "pronta" indemnización y de fijar el "monto y la modalidad de pago" de la indemnización**

**(i)     Síntesis de la Postura de la Demandante**

---

[372] *Kardassopoulos c. Georgia*, ¶ 386. **Anexo CLA-046**.
[373] Transcripción (Día 1), pág. 309 líneas 8-19.

403. Según la postura de la Demandante, debe concederse a los incisos 2 y 3 del Artículo 5(1) del Tratado su sentido corriente[374]. La Demandante afirma que el Tratado es muy específico en lo que respecta al requisito de que una expropiación esté acompañada por una "*pronta*" indemnización, ya que establece que "*su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación*" y que será "*pagada sin retraso alguno*"[375]. Según la Demandante, ello no deja lugar a dudas sobre la interpretación del requisito de una pronta indemnización[376].

404. La Demandante se refiere a las decisiones de otros tribunales internacionales en aras de demostrar que el requisito de prontitud es un principio con pleno arraigo en el derecho internacional. Por ejemplo en el caso *Norwegian Shipowners*, el tribunal habló "*del derecho de los demandantes a recibir una indemnización total e inmediata*" al resolver que "*debería haberse abonado la indemnización total, incluida la pérdida de pagos a cuenta, etc., a más tardar, el día de la toma de control efectiva [...].*"[377] En el caso *Goldenberg,* el tribunal concluyó que, si bien el derecho internacional autoriza al Estado a interferir con bienes privados en los casos que así lo requiera el interés público, "*lo hace con la condición sine qua non de que se lleve a cabo el pago justo de los bienes expropiados o requisados lo más rápido posible*"[378]. [Traducción del Tribunal]

405. Por consiguiente, la Demandante alega que el pago de la indemnización debería ser "*contemporáneo a la toma de control*" o debería al menos "*sucederla lo antes posible*" y que "*el transcurso de varios meses luego de la toma de control sin que el Estado presente ningún indicio real de que se otorgará la indemnización en breve plantearía serias dudas de que el Estado pretendía abonar una pronta indemnización en absoluto*"[379]. [Traducción del Tribunal]

406. En particular, la Demandante argumenta que el requisito de fijación no se cumple por la mera existencia de un determinado procedimiento de expropiación en el derecho interno o la referencia a él[380]. Asimismo, la Demandante rechaza la afirmación de que "*la obligación de un estado soberano de tomar las medidas adecuadas para brindar una indemnización justa de manera oportuna*" puede satisfacerse en el derecho internacional "*por su mera voluntad de debatir sobre la posibilidad de que exista un compromiso.*

---

[374] Presentación Posterior a la Audiencia de la Demandante, ¶ 51.
[375] Memorial, ¶ 137; **Anexo C-1**.
[376] Réplica, ¶ 75.
[377] Memorial, ¶ 138; **Anexo CLA-057**.
[378] Memorial, ¶ 139; **Anexo CLA-040**.
[379] Memorial, ¶ 139, con cita de L. B. Sohn y R. R. Baxter, *Responsibility of States for Injuries to the Economic Interests of Aliens*, 55 AMERICAN JOURNAL OF INTERNATIONAL LAW 545, 558 (1961), **Anexo CLA-079**.
[380] Memorial de Réplica, ¶ 83.

*Decidir tal cosa sería privar a la obligación de todo sentido*"[381]. [Traducción del Tribunal]

407. En relación con el debate sobre el arreglo de una *empresa mixta*, la Demandante afirma que ello "*careció de detalles suficientes para considerarse una negociación adecuada de los términos de la indemnización*" [Traducción del Tribunal]. La Demandante se refiere a la declaración del Sr. Millot durante la Audiencia de que la Demandante entendió que ello era una "*sugerencia*" en lugar de una "*propuesta firme*" ya que no estaba respaldada por documentación que la Demandante hubiera recibido, en especial respecto de cualquier indemnización por la pérdida de la titularidad de la Demandante del 100% de Norpro Venezuela[382].

### (ii)    Síntesis de la Postura de la Demandada

408. En relación con el requisito de fijación, la Demandada sostiene que las disposiciones contenidas en los incisos 2 y 3 del Artículo 5(1) del Tratado deben leerse en conjunto y que deberían interpretarse en el sentido de que "*debe evaluarse la indemnización de modo tal que el monto sea equivalente al* 'valor real' *de las inversiones a la fecha determinada en la segunda oración del segundo inciso del Artículo 5(1) y que* 'a más tardar a la fecha de la expropiación', *la parte expropiadora deberá reconocer su obligación de realizar el pago de dicho monto equivalente y de establecer las modalidades de pago*"[383]. [Traducción del Tribunal]

409. La Demandada afirma que cláusulas tales como el Artículo 5(1) del Tratado requieren meramente que "*la ley o la decisión de expropiación mencionen los criterios y los procedimientos que permitirán que se evalúe la indemnización*"[384]. [Traducción del Tribunal]

410. La Demandada brinda dos argumentos respecto de su interpretación de los incisos 2 y 3 del Artículo 5(1) del Tratado de que la cifra exacta que constituye el "*monto*" debe determinarse en la fecha en la que se anuncia una intención de expropiar. Primero, la Demandada se refiere al Artículo 31(1) de la Convención de Viena y alega que requerir una cifra exacta a la fecha de la expropiación "*no es una interpretación de buena fe y no puede ser correcta, ya que plantearía una obligación que los Estados Contratantes no podrían satisfacer salvo de pura casualidad*". La Demandada también señala que el

---

[381] Presentación Posterior a la Audiencia de la Demandante, ¶ 55, con cita de *Amoco c. Irán*, pág. 83 (opinión concurrente de J. Brower). **Anexo CLA-004.**
[382] Presentación Posterior a la Audiencia de la Demandante, ¶ 56 con cita de la Transcripción (Día 2) pág. 413 líneas 20 – pág. 414 línea 17, pág. 415 líneas 9-12.
[383] Escrito Posterior a la Audiencia de la Demandada, ¶ 82.
[384] Dúplica, ¶ 156, con cita de J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, pág. 207, **Anexo RL-155**.

Tratado no dispone que el Estado "*debe, antes de anunciar una expropiación, participar en conversaciones con la entidad expropiada en aras de obtener los hechos necesarios para determinar la cifra exacta que equivalga al valor real de los bienes en cuestión*" y que "*sin dicha información, sería imposible* […] *determinar dicha cifra de buena fe*"[385]. [Traducción del Tribunal]

411. Segundo, la Demandada afirma que una interpretación tal como la propone la Demandante daría lugar a resultados "*manifiestamente absurdos o irrazonables*" y, por lo tanto, estaría en conflicto con el Artículo 32 lit. b) de la Convención de Viena, ya que las leyes sobre expropiaciones de Francia y de Venezuela no requieren que se determine la indemnización en el momento en que se inicia el proceso expropiatorio, lo cual posicionaría a cada uno de los Estados Contratantes ante una violación de sus obligaciones en virtud del Tratado[386].

412. En este contexto, la Demandada sugiere que se utilice, en su opinión, lo que representa una interpretación más razonable de la palabra "*monto*", que no se refiere a una "*cifra exacta en dólares o euros, sino al concepto requerido (es decir, una 'suma* […] *equivalente al valor real de las inversiones')*"[387]. [Traducción del Tribunal]

413. En relación con el requisito de prontitud, la Demandada señala que ni la jurisprudencia citada por la Demandante ni el Artículo 5(1) del Tratado, mediante sus términos claros, exigen que el Estado abone una indemnización al inversor en la fecha de la expropiación. Si bien el inciso 2 establece que "*[t]odas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización*", es el inciso 3 exclusivamente el que exige que, luego de la determinación de la indemnización, ella sea "*pagada sin retraso alguno*"[388]. Al determinar si el pago de "*una pronta y adecuada indemnización*" se realiza "*sin retraso alguno*", deben tomarse en cuenta "*las particularidades de cada legislación nacional, las posibles demoras causadas por los recursos internos y la especificidad de cada situación*"[389]. Asimismo, la Demandada sostiene que debería considerarse si el "*Estado ha realizado esfuerzos de buena fe para cumplir con su obligación de pagar una indemnización*"[390]. [Traducción del Tribunal]

[385] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 83-84.
[386] Escrito Posterior a la Audiencia de la Demandada, ¶ 87.
[387] Escrito Posterior a la Audiencia de la Demandada, ¶ 83.
[388] Memorial de Contestación, ¶ 167; Dúplica, ¶ 155.
[389] Dúplica ¶ 157, con cita de J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, pág. 207, **Anexo RL-155**.
[390] Dúplica, ¶ 158, con cita de S. Ripinsky, DAMAGES IN INTERNATIONAL INVESTMENT LAW 68 (2008), págs. 68-69, **Anexo CLA-140**.

### (iii)   El Análisis del Tribunal

414.   El Tribunal ha considerado, en particular, todos los argumentos presentados por las Partes en sus escritos y, no exclusivamente, los argumentos sintetizados *supra*. Al determinar los requisitos precisos en relación con la indemnización en virtud de los incisos 2 y 3 del Artículo 5(1) del Tratado, el Tribunal, ante todo, tomará en cuenta la redacción de las disposiciones del Tratado y su contexto sistemático.

415.   En las versiones originales en idioma español y francés, los incisos 2 y 3 del Artículo 5(1) del Tratado rezan lo siguiente:

> "*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*
>
> *Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié*"[391].

> "*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuio monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*
>
> *Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado*"[392].

416.   La traducción al idioma inglés del texto en francés presentada por la Demandante dispone lo siguiente:

---

[391] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[392] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

> "*All measures of expropriation which could be taken must result in payment of a prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*
>
> *The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment*"[393].

417. El Tribunal observa que el Tratado no sólo requiere el pago de una "*pronta"* indemnización, sino que también requiere de acuerdo con la redacción inusualmente estricta del inciso 3 que *"esa indemnización, su monto"* ("[c]*ette indemnité, son montant*"/"[t]*he amount [...] for compensation*") sean especificados – o más precisamente fijados ("*fixés*"/"*fixed*") – a más tardar a la fecha de la expropiación. El sentido corriente de la redacción empleada en el inciso 3 sugiere que el Estado expropiante, de hecho, debe indicar una cifra específica que constituya el monto de la indemnización al momento de la expropiación; no hay indicios de que el término "*monto*" ("*montant*"/"*amount*") se refiera exclusivamente a un determinado concepto o método de cálculo. La única referencia a las "*modalidades*" ("*modalités*"/"*method*") en el inciso 3 se realiza respecto del "*pago*" ("*versement*"/"*payment*"), lo cual implica que el "*pago de una pronta y adecuada indemnización*" ("*paiement d'une indemnité prompte et adéquate*"/"*payment of a prompt y adequate compensation*") como se menciona en el inciso 2 no requiere que el pago se realice al inversor en la misma fecha que la expropiación.

418. Si bien el Tribunal concuerda con la Demandada en que el inciso 3 debe ser interpretado en conjunto con el inciso 2, que efectivamente brinda más detalles en relación con el cálculo de la indemnización ("*d'une indemnité prompte et adéquate dont le montant […]*"/"*una pronta y adecuada indemnización cuyo monto […]*"), tal conexión no implica de ningún modo que el término "*monto*" ("*montant*"/"*amount*") del inciso 3 deba interpretarse de manera restrictiva en el sentido de que sólo exige un reconocimiento del concepto aplicable de la indemnización. Por el contrario, el inciso 3 contiene una especificación más precisa adicional al término "*pronta*" ("*prompte*"/"*prompt*") ampliamente utilizado en el inciso 2.

419. A la luz de la redacción y la estructura inequívocas de los incisos 2 y 3 del Artículo 5(1) del Tratado, el Tribunal concluye que, *prima facie*, el inciso 3 exigía que la Demandada especifique una cifra que represente el "*monto*" ("*montant*"/"*amount*") indemnizatorio al

---

[393] **Anexo C-1**, pág. 7775.

momento de la expropiación. Subsiguientemente, esa indemnización y su monto, tal como fueran fijados ("*fixés*"/"*fixed*") en la fecha de la expropiación debían abonarse "*sin retraso*" ("*sans retard*"/"*without delay*"). Sólo si ambos requisitos se hubieran cumplido, la indemnización podría haberse considerado "*pronta*" en el sentido específico previsto por las Partes Contratantes en el inciso 2 del Artículo 5(1) del Tratado.

420.    Tal como se indica *supra*, la Demandada planteó objeciones a esta interpretación del Artículo 5(1) del Tratado. El Tribunal considera, no obstante, que ninguna de estas objeciones es convincente. En particular, requerir a un Estado la fijación de una determinada cifra que represente el monto indemnizatorio a la fecha de la expropiación no se contrapone con el principio de interpretación de buena fe conforme al Artículo 31(1) de la Convención de Viena, ni da lugar a resultados "*manifiestamente absurdos o irrazonables*" en el sentido del Artículo 32 lit. b) de la Convención de Viena.

421.    El requisito de fijar el monto exacto de indemnización a la fecha de la expropiación no es una ambición absurda, como pretende demostrar la Demandada. Si bien el Tribunal concuerda con la Demandada que la fecha de la expropiación (es decir, la decisión formal de expropiación y/o la toma del bien) no corresponde (necesariamente) a la fecha en la cual se inicia el proceso de expropiación[394], ello no significa que el Estado puede, mientras tanto, tomar *de facto* los bienes del inversor y de ese modo eludir la disposición del Tratado. En numerosas jurisdicciones, incluidas Francia y Venezuela tal como lo señaló correctamente la Demandada, la decisión formal de expropiación y la toma del bien no dan inicio sino que ocurren solo al final del procedimiento de expropiación. En el transcurso de dicho procedimiento, el Estado usualmente afirma y asegura que se cumple con los requisitos de una expropiación lícita, incluida la verificación de una utilidad pública suficiente, así como la fijación de un monto adecuado de indemnización, con base en una correcta valuación del activo.

422.    El Tribunal entiende que es evidente que los redactores del inciso 3 del Artículo 5(1) del Tratado efectivamente previeron un diseño del procedimiento de expropiación tal como se encuentra vigente en ambos Estados Contratantes. Sin embargo, esto no significa que el término "*monto*" se refiere únicamente al concepto que debe aplicarse a lo largo del procedimiento de expropiación, sino que también implica que el procedimiento de expropiación debe realizarse previo a la toma de control del activo.

423.    El hecho de que el Tratado no contemple reglas procesales detalladas sobre el modo en que el Estado expropiante debe obtener los elementos necesarios para determinar la cifra exacta que debe fijarse a la fecha de la expropiación no contraviene la interpretación propuesta del Artículo 5(1) del Tratado. Los incisos 2 y 3 meramente disponen los

---

[394] *Cfr*. Escrito Posterior a la Audiencia de la Demandada, ¶ 87 (con nota 187).

requisitos fundamentales que deben cumplirse en el caso de una expropiación. El Tratado no fue diseñado para establecer un procedimiento de expropiación detallado. Por el contrario, corresponde a los Estados Contratantes garantizar que los procedimientos expropiatorios sean llevados a cabo de acuerdo con los requisitos fundamentales del Tratado.

424. En tal sentido, el Tribunal considera que no debe analizar si la legislación venezolana realmente implementa un procedimiento expropiatorio estándar tal como se dispone en el Artículo 5(1) del Tratado. En primer lugar, la Demandante no ha planteado una reclamación de que la Ley de Expropiación no cumple con los requisitos del Tratado. Además, cualquier acuerdo en tratados bilaterales de inversión sería redundante si las Partes fueran a ponerse de acuerdo exclusivamente sobre los estándares de protección que ya son parte de sus respectivos ordenamientos jurídicos. Por consiguiente, la interpretación de que el Artículo 5(1) del Tratado proporciona normas de expropiación más estrictas que la Ley de Expropiación de Venezuela (y posiblemente que su equivalente en Francia) no produciría resultados "*manifiestamente absurdos o irrazonables*" en el sentido del Artículo 32 lit. b) de la Convención de Viena.

425. En conclusión, el Tribunal resuelve que los requisitos indemnizatorios establecidos en los incisos 2 y 3 del Artículo 5(1) exigían a la Demandada que fije una cifra exacta que constituya el monto de indemnización a la fecha de la expropiación.

### bb) Cumplimiento o incumplimiento respecto de los requisitos indemnizatorios

426. El hecho de que la Demandada haya cumplido o no con los requisitos establecidos en los incisos 2 y 3 del Artículo 5(1) del Tratado depende, en cierta medida, de la fecha en la cual se realizó la expropiación de la planta, es decir, la fecha de la expropiación en el sentido que le otorga el inciso 3. Por ende, esta cuestión será examinada en primer lugar **(i)**. Sobre esta base, se evaluará entonces la conducta de la Demandada **(ii)**.

### (i)    Fecha de la expropiación de la Planta

427. Las posturas de las Partes difieren respecto de la fecha en la cual se llevó a cabo la expropiación de la planta. Particularmente, es objeto de controversia si la expropiación se efectuó recién luego de la emisión formal del Decreto de Expropiación o si la toma de control formal de la planta el día 15 mayo de 2010 ya representaba una expropiación en el sentido del Tratado. A pesar de que las Partes abordan exclusivamente este asunto como una cuestión de hecho, parece implicar también cuestiones de derecho.

### (1)    Síntesis de la Postura de la Demandante

428. La Demandante sostiene que la expropiación relacionada con la planta fue llevada a cabo el día 15 de mayo de 2010. La Demandante alega que la toma de control luego del anuncio del Presidente Chávez y la posterior gestión activa de la planta por parte de PDVSA constituyeron una expropiación en los términos del Artículo 5(1) del Tratado[395].

429. La Demandante alega que, luego de la toma de control de un día de la planta efectuada el día 24 de marzo de 2010, fue el anuncio del Presidente Chávez el que generó que los trabajadores locales se hicieran cargo de la planta el día 15 de mayo de 2010, cuyo efecto fue forzar la salida de los directores de Norpro Venezuela. Además, la Demandante afirma que hubo políticos entre aquellos que llevaron a cabo la toma de control de la planta: el diputado de la Asamblea Nacional Ángel Marcano, el presidente de la Subcomisión de Industrias Básicas y Diputado Asdrúbal López, el presidente de la Comisión de Desarrollo Social, quienes actuaban en nombre del Estado y de acuerdo con las instrucciones del Presidente. Por ende, fue el Presidente Chávez quien prácticamente "*ordenó la toma de control de la Planta por parte de los miembros y simpatizantes del sindicato*" el día 15 de mayo de 2010[396]. Dado que la Demandante nunca recuperó el control de su inversión luego de tal fecha, el Decreto de Expropiación publicado el día 29 de marzo de 2011 sólo notificó formalmente lo que el Gobierno ya había llevado a cabo[397].

430. Respecto del estado de la planta luego de dichos acontecimientos, la Demandante afirma que PDVSA tomó el control de la planta en pos de "*coordinar el proceso de expropiación*"[398]. En este contexto, la Demandante se refiere a varias circunstancias de la ocupación de la planta por parte de PDVSA, que incluye *inter alia*:

- documentos confeccionados por PDVSA que reflejan que PDVSA llevaba a cabo el procedimiento de expropiación en curso en nombre de la Demandada; en particular, las actas de las reuniones celebradas entre PDVSA y Norpro Venezuela los días 2 y 8 de junio de 2010 intitulados "*Proceso de Nacionalización Norpro Venezuela, C.A.*"[399];

- modificaciones en el aspecto de la planta y su personal, la bandera de PDVSA flameando junto con la bandera de Venezuela por encima de la planta y los trabajadores vistiendo uniformes de PDVSA[400]; y

---

[395] Réplica, ¶¶ 21-25.
[396] Réplica, ¶¶ 21-22; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 19-22.
[397] Memorial, ¶ 134.
[398] Réplica, ¶ 30; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 23-32.
[399] Presentación Posterior a la Audiencia de la Demandante, ¶ 24. Actas de las Reuniones celebradas entre Norpro Venezuela, C.A., Petróleos de Venezuela, S.A. y otros, 2 de junio y 8 de junio de 2010. **Anexo C-25**.
[400] Presentación Posterior a la Audiencia de la Demandante, ¶ 27, en referencia a la Solicitud de Norpro Venezuela, C.A. de una Inspección Judicial, 5 de agosto de 2010. **Anexo C-119**, pág. 14.

- los esfuerzos de PDVSA para conseguir que la planta vuelva a entrar en funcionamiento, por ejemplo, su intento de preparar la planta para que produzca los llamados apuntalantes ecológicos[401].

431. Por ende, la Demandante objeta a la declaración de la Demandada de que PDVSA intervino como "*cuidador*" y añade que, si ese hubiera sido el caso, PDVSA debería haber devuelto la planta a la Demandante. Según la Demandante, la sociedad extranjera no debe soportar la carga, luego de "*haber presenciado la orden del Presidente y de que se le denegara el acceso a su propiedad, de tomar más medidas en pos de preservar sus derechos*"[402]. [Traducción del Tribunal]

432. Por último, la Demandante resalta que constantemente hizo valer sus derechos relacionados con la planta, es decir, que intentó reingresar a la planta pero se le negó el acceso, tal como lo demuestran las inspecciones judiciales que inició el día 17 de mayo de 2010 y una vez más el día 5 de agosto de 2010, así como las cartas que el presidente de Norpro Venezuela remitió al Abogado General de PDVSA el día 18 de noviembre de 2010 y al presidente de PDVSA Industrial el día 25 de abril de 2011[403].

### (2)    Síntesis de la Postura de la Demandada

433. La Demandada sostiene que la fecha de expropiación en el sentido del Artículo 5(1) del Tratado era el día 29 de marzo de 2011, es decir, la fecha de emisión del Decreto de Expropiación, que desencadenó los procedimientos en virtud de la Ley de Expropiación de Venezuela[404]. En contestación a las afirmaciones de la Demandante respecto de la toma de control de la Planta el día 15 de mayo de 2010 y los eventos subsiguientes, la Demandada afirma, en primer lugar, que fue el sindicato SINPROTRAC, no el Estado, el que ocupó la planta de la Demandante los días 24 de marzo y 15 de mayo de 2010 y, en segundo lugar, que la subsiguiente presencia de PDVSA en la planta fue una "*acción responsable y necesaria a la espera del decreto de expropiación para garantizar la seguridad de la planta*" [Traducción del Tribunal] luego de que la dirección de Norpro Venezuela efectivamente la abandonara[405].

434. Con respecto al primer punto, la Demandada niega la existencia de una relación de causalidad intrínseca entre el "*anuncio*" del Presidente Chávez y la toma de control de la planta. La Demandada hace hincapié en que fue el descontento del sindicato lo que causó que el nombre de Norpro Venezuela apareciera en el *Plan Guayana Socialista 2009-2019*,

---

[401] Presentación Posterior a la Audiencia de la Demandante, ¶ 27, en referencia a Rondón, ¶ 33.
[402] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 29, 31.
[403] Presentación Posterior a la Audiencia de la Demandante, ¶ 32 en referencia al **Anexo C-20**, **Anexo C-119**, **Anexo C-122** y **Anexo C-127**.
[404] Escrito Posterior a la Audiencia de la Demandada, ¶ 87 (con nota 187).
[405] Memorial de Contestación, ¶ 26 (con nota 68); Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60-65.

que en última instancia llevó a la propuesta de que Norpro Venezuela pase al control del Estado, lo cual fue leído por el Presidente Chávez en directo por televisión el día 15 de mayo de 2010. Asimismo, la Demandada afirma que en realidad fue una llamada telefónica realizada por los trabajadores de turno de la planta a los líderes de SINPROTRAC la que informó que los directivos de la Planta retiraban ordenadores portátiles y documentos de las instalaciones y, a su vez, provocó que los funcionarios del sindicato y ex trabajadores de Norpro Venezuela tomaran medidas el día 15 de mayo de 2010. En este contexto, la Demandada sostiene que la toma de control de la planta del día 15 de mayo de 2010 no puede considerarse un acto del Estado[406].

435. Además, la Demandada niega las alegaciones de la Demandante de que ciertos individuos entre aquellos que llevaron a cabo la toma de control de la planta actuaban en realidad en nombre de la Demandada, o bajo sus instrucciones. La Demandada sostiene que el mero hecho de que políticos que simpatizan con la difícil situación de los trabajadores estuvieran presentes no significa que la propia Demandada tomara el control de la planta[407].

436. En relación con el segundo aspecto, es decir, la presencia de PDVSA en la planta luego de los sucesos del día 15 de mayo de 2010, la Demandada señala que la presencia de PDVSA previo a la publicación del decreto de expropiación fue programada con el objetivo de garantizar la seguridad y estabilidad de la planta, en calidad de *"cuidadores"*. La Demandada afirma que Norpro Venezuela abandonó efectivamente la planta luego del día 15 de mayo de 2010, y que la planta estaba "*en manos del sindicato y de los trabajadores que tomaron el control el día 15 de mayo, sin supervisión*" [Traducción del Tribunal]. La Demandada sostiene que estos constituyeron motivos legítimos de preocupación sobre la seguridad de los trabajadores y el correcto funcionamiento de los equipos de la planta[408].

437. En este contexto, la Demandada resalta que la Demandante no negó el fundamento legal de la presencia de PDVSA, no exigió la devolución de la planta ni solicitó que se le brindara acceso a ella luego del día 15 de mayo de 2010[409]. En especial, la Demandada afirma que "*ninguna de las demás cartas enviadas el día 17 de mayo de 2010, o luego de ello, exigía la devolución de la Planta*" y que la Demandante nunca planteó dicha reclamación durante las reuniones celebradas los días 30 de agosto de 2010 y 14 de octubre de 2010 entre la Demandante y PDVSA. Por consiguiente, la Demandada señala

---

[406] Dúplica, ¶¶ 12-13.
[407] Dúplica, ¶ 16; Memorial de Contestación, nota 68.
[408] Dúplica, ¶¶ 20-22; Escrito Posterior a la Audiencia de la Demandada, ¶ 60; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 25.
[409] Dúplica, ¶ 23; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60 (con nota 108), 42-51.

que "*PDVSA Industrial se encontraba en la Planta dado que Norpro Venezuela no estaba presente y que la Planta planteaba riesgos para los trabajadores y la comunidad*"[410]. [Traducción del Tribunal]

438. A su vez, la Demandada no niega que, luego del 15 de mayo 2010, *"existió un 'proceso de nacionalización' en la medida en que, como todos lo reconocían, la Planta no había sido expropiada, sino que en el futuro sería transferida al control del Estado"* [Traducción del Tribunal]. La Demandada señala que las Partes también reconocieron (i) que en ese momento se redactaba un decreto de expropiación; (ii) que se suponía que el decreto debía indicar el punto de partida del procedimiento de expropiación en virtud del derecho venezolano; y (iii) que las Partes considerarían, mientras tanto, alternativas a la expropiación, incluida la constitución de una empresa mixta, con PDVSA como accionista mayoritario y la Demandante como titular de una participación minoritaria[411].

439. La Demandada considera que este proceso de nacionalización en curso no entraba en conflicto con el rol de "*cuidador*" de PDVSA. La Demandada señala que PDVSA "*ha[bía] recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro*", pero que "*mientras no se [hubiera] publicado el Decreto, no p[odía] actuar o intervenir en Norpro. Su presencia en la planta correspond[ía] a la necesidad de prepararse para la futura toma formal de posesión, una vez que se reali[zara] la publicación del Decreto*"[412].

### (3)    El Análisis del Tribunal

440. Antes de proceder a analizar las circunstancias individuales de cada caso en relación con los acontecimientos del día 15 de mayo de 2010 (**b**) y subsiguientes (**c**), el Tribunal desea recordar la norma jurídica respecto de si se ha llevado a cabo una "*expropiación*" en el sentido del Artículo 5(1) del Tratado y, en tal caso, cuándo ha ocurrido (**a**).

### (a)    Norma legal respecto a si se llevó a cabo una "*expropiación*" y cuándo

441. Tal como lo observara el tribunal en el caso *SD Myers c. Canadá*, el término "*expropiación*" debe interpretarse "*a la luz de todo el cuerpo de la práctica del Estado,*

---

[410] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 45-50.

[411] Escrito Posterior a la Audiencia de la Demandada, ¶ 61. Énfasis en el original.

[412] Dúplica, ¶ 32 (nota 135), con cita del Acta Borrador de la Reunión celebrada entre PDVSA Industrial, S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo R-017**, págs. 2-3.

   "*PDVSA Industrial, S.A. ('PDVSA') mencionó que ha recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro. [...] PDVSA informó que mientras no se haya publicado el Decreto, no puede actuar o intervenir en Norpro. Su presencia en la planta corresponde a la necesidad de prepararse para la futura toma formal de posesión, una vez que se realice la publicación del Decreto*".

*de los tratados y de las interpretaciones judiciales del término en los casos de derecho internacional*". El tribunal concluyó luego que, en general,

> "*el término* 'expropiación' *lleva consigo la connotación de una* 'toma de control' *por parte de una autoridad de tipo gubernamental de los* 'bienes' *de una persona con el fin de transferir la titularidad a otra persona, usualmente a la misma autoridad que ejerció su facultad de jure o de facto para llevar a cabo la* 'toma de control'"[413]. [Traducción del Tribunal]

442. Por ejemplo, estas consideraciones fueron ratificadas por el tribunal del caso *Rumeli c. Kazajstán*, que describió a la expropiación (directa) como el "*resultado del acto formal deliberado de una toma de control*"[414] y se refirió al razonamiento del tribunal en *Generation Ukraine c. Ucrania* que, a su vez, afirmó que la expropiación directa se caracteriza por una "*transferencia de los derechos de propiedad* [del inversor] *sobre su inversión al Estado a un tercero*"[415]. [Traducción del Tribunal]

443. En este contexto, el término "*expropiación*" está claramente caracterizado por una cantidad de elementos, que incluyen: (i) el acto de un Estado; (ii) en relación con los bienes de una persona; (iii) que consiste en la toma de control *de jure* o *de facto* de dichos bienes; y (iv) en beneficio del Estado.

444. No existe una controversia entre las Partes en relación con la norma aplicable a la definición del término jurídico "*expropiación*" ya que no abordaron esta cuestión en sus escritos. Por el contrario, las Partes convienen en que, en determinado punto, la Demandante fue expropiada en el sentido del Artículo 5(1) del Tratado. El desacuerdo de las Partes, en cambio, versa sobre el momento exacto en el que ocurrió la expropiación.

445. Respecto de los elementos de una expropiación que se mencionan *supra* en el párrafo 443, la Demandante afirma que todos esos criterios ya habían sido satisfechos cuando se tomó el control de la planta el día 15 de mayo de 2010 o, al menos, poco después[416]. La Demandada, por su parte, sostiene que: (i) la toma de control del día 15 de mayo de 2010 no constituyó un acto del Estado; y (ii) la subsiguiente ocupación de la planta por parte de PDVSA no fue una toma del bien para el beneficio de la Demandada sino una necesidad apremiante que se le impuso a la Demandada debido al abandono de la planta por parte de la Demandante, que requirió la presencia de PDVSA en aras de restaurar y garantizar la seguridad en la planta, en calidad de "*cuidadores*", no como "*propietarios*" de dicha planta[417]. En este contexto, la Demandada resalta que PDVSA recibió órdenes

---

[413] *SD Myers c. Canadá* ¶ 280. **Anexo RL-119**.
[414] *Rumeli c. Kazajstán*, ¶ 700. **Anexo CLA-069**.
[415] *Generation Ukraine c. Ucrania*, ¶ 20.21. **Anexo CLA-039**.
[416] *Cfr.* Presentación Posterior a la Audiencia de la Demandante, ¶¶ 19-22.
[417] *Cfr.* Escrito Posterior a la Audiencia de la Demandada, ¶ 60.

de "*no* [...] *actuar o intervenir en Norpro*" ("*not* [to] *act or intervene in Norpro*")[418]. En conclusión, la Demandada sostiene que los criterios de una "*expropiación*" no fueron satisfechos hasta la emisión formal del decreto de expropiación el día 29 de marzo de 2011[419].

446. A la luz de lo que antecede, el Tribunal procederá ahora a analizar las pruebas presentadas por las Partes y determinar si la conducta de la Demandada con anticipación al día 29 de marzo de 2011 constituyó una "*expropiación*" en el sentido del Artículo 5(1) del Tratado.

**(b)   Toma de control el día 15 de mayo de 2010 luego de la "*Directiva de Expropiación*" del Presidente Chávez**

447. Con respecto al anuncio del Presidente Chávez de fecha 15 de mayo de 2010 y a la posterior toma de control de la planta llevada a cabo por los miembros del sindicato SINPROTRAC, el Tribunal considera que esta toma de control en sí misma no puede atribuirse a la Demandada.

448. La Demandante no cuestiona el hecho de que la toma de control de la planta no fue llevada a cabo directamente por órganos del Estado en su calidad oficial, sino "*por simpatizantes y miembros del sindicato*"[420] [Traducción del Tribunal]. Al mismo tiempo, un principio consolidado del derecho internacional postula que, en general, la conducta de particulares o entidades privadas no es atribuible al Estado. Este principio general se encuentra claramente reflejado, *inter alia*, en el Artículo 8 del Proyecto de Artículos de la CDI que, como excepción a dicho principio, establece lo siguiente:

> "[Sólo] *se considerará hecho del Estado según el derecho internacional el comportamiento de una persona o de un grupo de personas si esa persona o ese grupo de personas actúa de hecho por instrucciones o bajo la dirección o el control de ese Estado al observar ese comportamiento*"[421].

449. El Tribunal considera factible que hubiera un nexo causal determinado entre el anuncio televisivo realizado por el Presidente Chávez el día 15 de mayo de 2010 y la toma de control de la planta. Tal como declarara el Sr. Eduardo Rondón, los "*miembros del sindicato SINPROTRAC*" que tomaron el control de la planta el día 15 de mayo de 2010

---

[418] Dúplica, ¶ 32 (nota 135), con cita del Acta Borrador de la Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo R-017**, págs. 2-3.

[419] Escrito Posterior a la Audiencia de la Demandada, nota 187.

[420] Presentación Posterior a la Audiencia de la Demandante, ¶ 21.

[421] Comisión de Derecho Internacional, *Responsabilidad del Estado por hechos internacionalmente ilícitos* (2001), **Anexo CLA-044**. *Cfr.* J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Anexo CLA-119** y **Anexo RL-021**, pág. 110.

"*vinieron directamente del evento en que había hablado el Presidente Chávez*"[422] [Traducción del Tribunal]. Si bien puede que la toma de control también haya sido generada tanto por la remoción por parte de la dirección de Norpro Venezuela de documentos y computadoras de la planta como por las tensiones entre la dirección de la planta y los sindicatos[423], el Tribunal considera que los simpatizantes y miembros del sindicato no habrían asumido el control de la planta el día 15 de mayo de 2010 si el Presidente Chávez no hubiera afirmado ese mismo día que la planta eventualmente sería entregada a PDVSA. Por ende, el anuncio de esta posibilidad por parte del Presidente parece haber sido *conditio sine qua non* de la toma de control de la planta (y, en consecuencia, un factor causal en relación con ella).

450. La mera causalidad, sin embargo, no establece la responsabilidad del Estado en virtud del derecho internacional. La conducta de los particulares puede atribuirse al Estado sólo si existe "*una relación de hecho específica entre la persona o entidad que observa el comportamiento y el Estado*"[424] [Traducción del Tribunal]. El Tribunal considera que no hubo una relación de hecho específica semejante entre el anuncio del Presidente Chávez y la toma de control de la planta llevada a cabo por simpatizantes y miembros del sindicato.

451. Durante la transmisión emitida el día 15 de mayo de 2010, el Presidente Chávez leyó en voz alta y aprobó una serie de propuestas preparadas por los grupos de trabajo del Plan Guayana Socialista, asociación de sindicatos de la región de Guayana[425]. Una de estas recomendaciones se relacionaba con Norpro Venezuela. El Presidente Chávez leyó en voz alta y aprobó esta propuesta en los siguientes términos:

> "*Consultar con PDVSA sobre la compra de Propan producido y comercializado por empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario –aquí se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela*"[426].

452. Fuera de contexto, la declaración del Presidente "*Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela*"[427] podría efectivamente interpretarse como una invitación, o incluso una orden, dirigida a todos los oyentes,

---

[422] Rondón, ¶ 28.
[423] Memorial de Contestación, ¶¶ 15, 137, 140 (nota 352); Dúplica, ¶¶ 8 y *ss*, 14.
[424] J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Anexo CLA-119** y **Anexo RL-021**, pág. 110.
[425] Presentación Posterior a la Audiencia de la Demandante, ¶ 19; Memorial de Contestación, ¶ 24.
[426] *Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Anexo R-15**, pág.14.
[427] *Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Anexo R-15**, pág.14.

incluidos los miembros del sindicato y sus simpatizantes, a fin de que tomaran el control de la planta. No obstante, teniendo en cuenta las circunstancias mencionadas *supra*, parece que el lenguaje empleado por el Presidente Chávez pretendía manifestar y subrayar su aprobación y ratificación general de las propuestas de los grupos de trabajo. Las declaraciones del Presidente Chávez, incluida la aprobación de la propuesta del sindicato relativa a la nacionalización de Norpro Venezuela y "*anuncios similares vinculados a otras empresas de propiedad extranjera*"[428] [Traducción del Tribunal], suponían una promesa al pueblo de que el Estado nacionalizaría las empresas mencionadas en la declaración en el futuro; el Presidente, sin embargo, no impartió órdenes o instrucciones específicas a efectos de la toma física inmediata de la planta.

453. En vista de lo que antecede, el Presidente Chávez no facultó a los sindicatos a tomar el control de las empresas vinculadas al poder público en virtud de sus anuncios. Asimismo, aunque puede que los miembros del sindicato SINPROTRAC hayan tomado la declaración del Presidente Chávez "*al pie de la letra*"[429] [Traducción del Tribunal], el Tribunal opina que no actuaron "*por instrucciones o bajo la dirección o el control de*[l]" Presidente Chávez en los términos del Artículo 8 del Proyecto de Artículos de la CDI.

454. El hecho de que políticos nacionales y/o locales simpatizaran con los miembros del sindicato y pudieran haber participado en la toma de control de fecha 15 de mayo de 2010 no basta en sí mismo para establecer la responsabilidad de la Demandada por estas acciones. Suponiendo que los individuos mencionados por la Demandante efectivamente hubieran participado en la toma de control de fecha 15 de mayo de 2010[430], el Tribunal concluye que no hay pruebas suficientes de que estuvieran actuando en nombre o por instrucciones de la Demandada. Además, en cuanto a la presencia de la Guardia Nacional de Venezuela, que, según la Demandante, participó en la ocupación de la planta a partir del día 15 de mayo de 2010[431], el Tribunal no puede descartar la posibilidad de que estuviera presente en la planta "*en aras de preservar el orden y la seguridad pública*" [Traducción del Tribunal], tal como afirma la Demandada[432].

**(c)  La conducta de PDVSA y su presencia en la planta con posterioridad al día 15 de mayo de 2010**

---

[428] Presentación Posterior a la Audiencia de la Demandante,  ¶ 19.

[429] Memorial, ¶ 77.

[430] *Cfr.* Memorial, ¶ 77; Réplica, ¶ 22.

[431] Réplica, ¶ 23, que cita Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**, pág. 5; Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144**, pág. 3.

[432] Dúplica, ¶ 13 (nota 73).

455.  No obstante, el Tribunal está convencido de que la conducta posterior de PDVSA y su presencia en la planta con posterioridad al día 15 de mayo de 2010 sí constituyeron una "*expropiación*" en el sentido de los términos del Artículo 5(1) del Tratado. En particular, el Tribunal concluye, primero, que, por medio de la conducta de la empresa estatal PDVSA, la Demandada tomó el control efectivo de la planta el día 15 de mayo de 2010 o poco tiempo después (**aa**). Segundo, el Tribunal sostiene que la conducta de PDVSA constituyó una toma de la planta en beneficio de la Demandada tal como lo requería el término "*expropiación*" en el sentido del Artículo 5(1) del Tratado; al Tribunal no lo convence la argumentación de la Demandada de que no hubo toma de la planta en beneficio del Estado en tanto PDVSA actuaba simplemente como "*cuidador*" (**bb**).

**(aa)  Control efectivo de la planta por parte de la Demandada**

456.  Con respecto al primer punto, el Tribunal concluye que, a través de su conducta luego de la toma de control de la planta de fecha 15 de mayo de 2010 llevada a cabo por los miembros del sindicato SINPROTRAC, PDVSA reconoció y adoptó las acciones del sindicato como propias. Sobre la base de los principios aplicables del derecho internacional consuetudinario en materia de responsabilidad del Estado que se reflejan en el Artículo 11 del Proyecto de Artículos de la CDI, por consiguiente, la toma de control de la planta el día 15 de mayo de 2010 debe considerarse un acto de la Demandada. En cualquier caso, PDVSA tomó el control efectivo de la planta e inició el proceso de expropiación poco tiempo después del día 15 de mayo de 2010, tal como lo confirman sus informes y memorandos internos de principios del mes de junio de 2010.

**(1) Atribución de la conducta de PDVSA a la Demandada**

457.  Antes de proceder a examinar más minuciosamente la conducta de PDVSA en relación con la planta, el Tribunal destaca que, si bien PDVSA es una empresa estatal con personalidad jurídica independiente, su conducta es atribuible a la Demandada de conformidad con el Artículo 5 del Proyecto de Artículos de la CDI, que dispone lo siguiente:

> "[s]*e considerará hecho del Estado según el derecho internacional el comportamiento de una persona o entidad que no sea órgano del Estado según el artículo 4, pero esté facultada por el derecho de ese Estado para ejercer atribuciones del poder público, siempre que, en el caso de que se trate, la persona o entidad actúe en esa capacidad*"[433].

458.  Tanto en su presunta función de "*cuidador*" como en su carácter de supervisora y promotora de la nacionalización de la planta, a PDVSA se le otorgaron atribuciones del

---

[433] Comisión de Derecho Internacional, *Responsabilidad del Estado por hechos internacionalmente ilícitos* (2001), **Anexo CLA-044**.

poder público. Esto no es cuestionado por la Demandada; por el contrario, la Demandada resalta en el contexto de las negociaciones que tuvieron lugar a fines del año 2010 que a PDVSA "*se le había ordenado llevar a cabo la transición de la Planta a una operación estatal*"[434] [Traducción del Tribunal]. Esto es, asimismo, confirmado por la declaración contemporánea realizada por PDVSA durante la reunión de fecha día 30 de agosto de 2010 de que "*había recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro*"[435].

459.   En un memorando interno preparado por PDVSA intitulado "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*" de fecha 2 de junio de 2010, también se hacía referencia a las instrucciones del Presidente:

> "**En fecha Martes 25 de Mayo,** *personal de PDVSA bajo instrucciones de la Gerencia General EyP Division Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciones de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*
> *[…]*
> **27 de mayo 2010**, *se incorpora al proceso de estatización de la empresa NORPRO Venezuela,C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente*"[436].

460.   El Tribunal opina que, a la luz del mandato indiscutido que PDVSA recibió del Presidente de Venezuela a fin de que llevara a cabo la nacionalización de Norpro Venezuela, no debería ni podría establecerse una distinción entre la conducta de PDVSA destinada a cumplir con su mandato y la conducta que posiblemente estaba destinada a garantizar la seguridad de los trabajadores y el mantenimiento de los equipos en la planta mientras tanto, sino que todas las acciones de PDVSA con respecto a la planta pueden y deben atribuirse a la Demandada.

### (2) Adopción por parte de PDVSA de las acciones del sindicato como propias

461.   Como regla de derecho internacional consuetudinario, establecida en el Artículo 11 del Proyecto de Artículos de la CDI, "[e]*l comportamiento que no sea atribuible al Estado*" al momento de su encargo "*se considerará, no obstante, hecho de ese Estado según el derecho internacional en el caso y en la medida en que el Estado reconozca y adopte ese comportamiento como propio*"[437]. A diferencia de los casos de mero apoyo, respaldo o

---

[434] Memorial de Contestación, ¶ 29.
[435] **Anexo R-17**.
[436] **Anexo C-143**.
[437] Comisión de Derecho Internacional, *Responsabilidad del Estado por Hechos Internacionalmente Ilícitos* (2001), **Anexo CLA-044**; J. Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002), **Anexo RL-021**, pág. 121.

reconocimiento general por parte del Estado de una situación de hecho creada por particulares, la atribución en virtud de esta regla requiere que el Estado en forma clara e inequívoca "*identifique la conducta en cuestión y la haga propia*"[438]. [Traducción del Tribunal]

462. En el presente caso, PDVSA ha reconocido y adoptado la toma de control de la planta de fecha 15 de mayo de 2010 llevada a cabo por miembros del sindicato como propia. En una serie de notas e informes internos, PDVSA dejó en claro que la toma de control de la planta por parte del sindicato no sólo fue congruente con las intenciones de la Demandada con respecto a la expropiación de la planta, sino que posteriormente se convirtió en parte integrante del proceso de nacionalización de Norpro Venezuela en el marco del "*Plan Socialista Guayana*" que había de ser implementado por el "*Ejecutivo Nacional*"[439]. El memorando interno de fecha 2 de junio de 2010 mencionado *supra* contiene una cronología de los pasos en el curso de la nacionalización de la planta de Norpro, incluida la "*orden*" del Presidente Chávez de fecha 15 de mayo de 2010 y la posterior toma de control de la planta:

> "*PROPÓSITO:*
>
> *Informar al Sr. Luis Pulido Director Interno de enlace de PDVSA Industrial, S.A., sobre la situación actual del proceso de Estatización de la Empresa NORPRO de Venezuela, C.A., (NORPRO).*
>
> *ANTECEDENTES:*
>
> • *En fecha 15 de Mayo del 2010, el Presidente de la República Bolivariana de Venezuela, Hugo Rafael Chávez Frías ordenó la estatización de la empresa productora de proppants la cual utiliza como materia prima la Bauxita de nombre 'NORPRO Venezuela C. A.', informando que la misma pasaría a manos de Petróleos de Venezuela S.A.*
>
> *Ese mismo día 15 de Mayo los trabajadores de NORPRO asumieron el control productivo de la planta y el personal Gerencial tomó la decisión de abandonar las instalaciones de la misma, la cual quedó en custodia de los trabajadores con apoyo de la Guardia Nacional Bolivariana.*
>
> • *En fecha Martes 25 de Mayo, personal de PDVSA bajo instrucciones de la Gerencia General EyP División Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciones de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*

---

[438] J. Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002), **Anexo RL-021**, pág. 123.

[439] Memorando, PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**, pág. 4.

> • *26 de mayo 2010*, *el personal de PCP de PDVSA Industrial, S.A., realiza visita e inspección a las instalaciones de la empresa NORPRO Venezuela, C.A.*
>
> • *27 de mayo 2010*, *se incorpora al proceso de estatización de la empresa NORPRO Venezuela, C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente.*
>
> • *28 de mayo 2010*, *vista la empresa NORPRO Venezuela, C.A., el Gerente del Sector Hidrocarburos de PDVSA Industrial S.A., donde se realizó reunión de trabajo con el grupo multidisciplinario conformado por PDVSA Industrial, S.A. y PDVSA EyP División Oriente. Durante esta actividad, se dictan los próximos paso a seguir:* […]
>
> • *31 de mayo de 2010*, *siguiendo lineamientos emanados desde la Dirección del Sector Hidrocarburos de PDVSA Industrial S.A., realiza vista a la instalaciones de la empresa NORPRO Venezuela, C.A., el Gerente ( E ) del Sector Hidrocarburos Región Oriente de PDVSA Industrial S.A., con el fin de presentar el Plan Maestro de Abordaje a la Estatización de la empresa NORPRO Venezuela, C.A.* […]"[440].

463. Afirmaciones y descripciones similares (pero menos detalladas) de los pasos de la implementación del Plan Guayana Socialista por parte de la Demandada pueden encontrarse, en particular, en los siguientes documentos:

- un informe preliminar preparado por la "*Comisión de Evaluación*" de PDVSA del mes de mayo de 2010 sobre la evaluación de la situación actual de Norpro Venezuela ("*Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*")[441];

- un informe preparado por la "*Comisión de Evaluación*" de PDVSA de fecha 4 de junio de 2010 sobre el avance de la restructuración de Norpro Venezuela ("*Informe de avance 'Restructuración empresa Norpro'*")[442];

- el "*Diagnóstico de la situación actual y plan de restructuración*" de PDVSA del mes de junio de 2010[443]; [Traducción del Tribunal]

- un memorando de PDVSA al Ministro de Energía y Petróleo de la Demandada de fecha 9 de junio de 2010 sobre la situación actual y el plan estratégico para el control administrativo y operacional de Norpro Venezuela ("*Diagnóstico Situación Actual y*

---

[440] Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**, pág. 1.
[441] Memorando, PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**, pág. 4.
[442] Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144**, págs. 2-3.
[443] Diagnóstico de la situación actual y plan de reestructuración para la optimización de los procesos productivos de Norpro Venezuela, C.A., junio de 2010, **Anexo C-142**, pág. 5 ("*Antecedentes*").

*el Plan Estratégico para el Control Administrativo y Operacional de la Empresa NORPRO VENEZUELA, C.A.*")[444]; y

- el informe técnico definitivo del Sr. José Carrasco de fecha 15 de julio de 2010 ("*Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*")[445].

464. En vista de estos hechos, el Tribunal concluye que PDVSA se basó en la situación creada por los miembros del sindicato a fin de llevar a cabo el proceso de nacionalización tal como "*ordenó*" el Presidente Chávez el día 15 de mayo de 2010. Luego de la toma de control de la planta de fecha 15 de mayo de 2010, PDVSA pudo, sin perturbación alguna, evaluar la situación actual de la planta y determinar la manera en que podría ser reestructurada y operada por PDVSA[446]. La Demandada también reconoce que, en los meses de junio y julio de 2010, PDVSA estableció "*una presencia permanente, dado que se le había asignado la responsabilidad de garantizar la seguridad y estabilidad de la Planta en el curso de la determinación de la oportunidad y del mecanismo precisos a través de los cuales había de lograrse la estatización de la Planta*"[447]. [Traducción del Tribunal]

465. Según el testigo de la Demandada, el Sr. Rondón, más adelante, en el mes de octubre de 2010, PDVSA instauró al Sr. Ángel Salvarría como Gerente General de la Planta, y el Sr. Salvarría "*reorganizó la estructura de supervisión que se había implementado en la Planta a partir de la toma de control del sindicato y comenzó a preparar la Planta para el reinicio de la producción*"; por último, en el mes de noviembre de 2010, los trabajadores de la planta se convirtieron oficialmente en empleados de PDVSA[448]. [Traducción del Tribunal]

466. Si bien puede que la Demandada no haya anticipado o pretendido que el control de la planta fuera asumido por los miembros del sindicato SINPROTRAC el día 15 de mayo de 2010, es evidente que PDVSA inmediatamente se valió de esta situación a efectos de

---

[444] Memorando de la Dirección Ejecutiva de Producción de PDVSA a Rafael Ramírez Carreño (Ministro de Energía y Petróleo), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 de junio de 2010, **Anexo C-145**, págs. 1-2.
[445] Informe Técnico Definitivo, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 de julio de 2010, **Anexo C-148**, pág. 3.
[446] *Cfr.* Memorando PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**; Diagnóstico de la situación actual y plan de reestructuración para la optimización de los procesos productivos de Norpro Venezuela, C.A., junio de 2010, **Anexo C-142**; Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**.
[447] Memorial de Contestación, ¶ 28.
[448] Rondón, ¶ 33; Transcripción (Día 3), pág. 708 línea 21 – pág. 709 línea 2, pág. 711 línea 3 – pág. 711 línea 20.

llevar a cabo el proceso de nacionalización, reconociendo y adoptando de ese modo la conducta de los miembros del sindicato como propia. En cualquier caso, incluso si la conducta de PDVSA no se considerara un reconocimiento o una adopción de la toma de control de la planta por parte del sindicato como su propia acción, la Demandada efectivamente tomó el control de la planta en los meses de junio y julio de 2010 cuando estableció "*una presencia permanente*" en la planta, tal como admite la Demandada[449] [Traducción del Tribunal]. En opinión del Tribunal, el memorando de fecha 2 de junio de 2010 preparado por PDVSA, denominado "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*"[450], así como el memorando de fecha 4 de junio de 2010 preparado por la "*Comisión de Evaluación*" de PDVSA, denominado "*Informe de avance 'Restructuración empresa Norpro'*"[451], confirman que el proceso de expropiación comenzó, al menos, poco tiempo después del día 15 de mayo de 2010.

**(bb) Naturaleza y propósito de la presencia de la Demandada en la planta**

467. Con respecto al segundo punto, el Tribunal destaca que el control *de facto* de bienes por parte del Estado no supone necesariamente una expropiación. En este contexto, la Demandada sostiene que la presencia de PDVSA en la planta se concertó a efectos de garantizar la seguridad y estabilidad de la planta, en calidad de "*cuidador*" y no de propietaria[452]. Asimismo, la Demandada alega que, si bien a PDVSA se le ordenó al mismo tiempo "[que] *llev*[ara] *a cabo la estatización de Norpro*", "*no p*[odía] *actuar o intervenir en Norpro*" hasta la publicación del decreto de expropiación formal[453]. Sin embargo, tal como indica el razonamiento vinculado a la toma de control de la planta *supra*, el Tribunal concluye que, en los propios términos de la Demandada, PDVSA efectivamente "*actu*[ó]" e "*interv*[ino] *en Norpro*" y, por ende, tomó el control de la planta, no como "*cuidador*", sino en beneficio de la Demandada, excluyendo de esa manera a Norpro Venezuela como propietaria de la planta.

468. En su defensa, la Demandada sostiene que la presencia de PDVSA en la planta estaba destinada a "*garantizar la seguridad y estabilidad de la Planta*"[454], más específicamente,

---

[449] Memorial de Contestación, ¶ 28.

[450] *Cfr.* Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143.**

[451] Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144**.

[452] Memorial de Contestación, ¶¶ 29 y 140; Dúplica, ¶¶ 3, 18, 22 (nota 101) y 32 (nota 135); Escrito Posterior a la Audiencia, ¶ 20, que cita Transcripción (Día 1), pág. 212, líneas 11-12; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 11 (nota 42), 35.

[453] Dúplica, ¶¶ 20-22, 32 (nota 135), que cita al Borrador de Minuta de Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo R-017**, págs. 2-3.

[454] Memorial de Contestación, ¶ 28; Escrito Posterior a la Audiencia de la Demandada, ¶ 7.

"*la seguridad del personal y de los bienes*" en la planta[455]. La Demandada se refiere, en particular, a la "*tensión creciente*" y "*sustancial*" entre Norpro Venezuela y los representantes del sindicato, así como a la "*acción industrial*" que finalmente derivó en la toma de control el día 15 de mayo de 2010[456]. Además, la Demandada argumenta que la "*operación de la Planta sin supervisión adecuada*" planteó un "*riesgo* [sustancial] *a la seguridad del personal de la Planta*" y subraya que los "*peligros asociados a la Planta*" fueron reconocidos tanto por la dirección de Norpro como por la Embajada de la República Francesa[457]. Lo más importante es que la Demandada alega que la dirección de Norpro "*abandonó*" la planta el día 15 de mayo de 2010, dejándola en manos del sindicato, y afirma que la Demandante "*nunca intentó recuperar la posesión*" u "*obtener acceso a la Planta*" y, con posterioridad al día 15 de mayo de 2010, tampoco aseveró que la presencia de PDVSA "*careci*[era] *de fundamento jurídico*"[458]. [Traducción del Tribunal]

469. Aunque la ocupación temporal de un bien por razones de seguridad pública no constituye una "*expropiación*" en los términos del Artículo 5(1) del Tratado, el Tribunal concluye que la toma de la planta por parte de la Demandada no se llevó a cabo principalmente por razones de seguridad, sino que estaba destinada a utilizar la planta para los propios fines de la Demandada y a excluir tanto a la Demandante como a Norpro de su propiedad.

470. Tal como se estableciera en (**aa**) *supra*, la toma de la planta a partir del día 15 de mayo de 2010 se convirtió en parte integrante del indiscutible "*proceso de nacionalización*"[459] [Traducción del Tribunal] de Norpro Venezuela en el marco del "*Plan Socialista Guayana*" que había de ser implementado por el poder ejecutivo nacional[460]. En este contexto, dependía de PDVSA "[ ] *llevar a cabo la estatización de Norpro*"[461]. El Tribunal concluye que llevar a cabo esta tarea era el objetivo principal de la presencia de PDVSA en la planta y tenía más peso que cualquier otro objetivo, incluidas las razones de seguridad.

471. Aún más importantes en opinión del Tribunal son los numerosos informes y memorandos internos preparados por PDVSA sobre la evaluación de la situación económica actual de la planta y sobre la determinación de la manera en que la planta podría ser reestructurada

---

[455] Escrito Posterior a la Audiencia de la Demandada, ¶ 8. *Véanse también* Dúplica, ¶¶ 3, 18; Escrito Posterior a la Audiencia de la Demandada, ¶ 60.
[456] Memorial de Contestación, ¶¶ 137-138; Dúplica, ¶¶ 8, 18.
[457] Dúplica, ¶ 20; Escrito Posterior a la Audiencia de la Demandada, ¶ 20.
[458] Dúplica, ¶¶ 20, 23. *Cfr.* Escrito Posterior a la Audiencia 60.
[459] Escrito Posterior a la Audiencia 61.
[460] *Cfr.* Memorando, PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**, pág. 4.
[461] Borrador de Minuta de Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo C-34** y **Anexo R-17**, pág. 2.

y operada por PDVSA en el futuro[462], incluidas, *inter alia*, evaluaciones del inventario de la planta, de las obligaciones de pago y los equipos, al igual que su situación financiera general[463]. El Tribunal opina que este trabajo no era la conducta de un simple "*cuidador*"; era el trabajo de la nueva propietaria de la planta.

472. El objetivo de la presencia de PDVSA en la planta con posterioridad al día 15 de mayo de 2010 también se vio reflejado en determinados cambios en la apariencia de la planta y su personal. Ya en el mes de agosto de 2010, la bandera de PDVSA flameaba junto con la bandera venezolana sobre la planta, y los obreros vestían uniformes de PDVSA[464]. Tal como se detallara en (**aa**) *supra*, más adelante, en el mes de octubre de 2010, Ángel Salvarría de PDVSA fue instaurado como Gerente General de la Planta y "*reorganizó la estructura de supervisión que se había implementado en la Planta a partir de la toma de control del sindicato y comenzó a preparar la Planta para el reinicio de la producción*" [Traducción del Tribunal]. En el mes de noviembre de 2010, los trabajadores de la planta se convirtieron oficialmente en empleados de PDVSA. Por último, entre los meses de noviembre de 2010 y marzo de 2011, "*una vez que se reiniciaron las operaciones, la Planta produjo y almacenó proppants verdes*"[465] [Traducción del Tribunal]. Una vez más, estas medidas no son habituales a fin de garantizar la seguridad y estabilidad; ilustran que

---

[462] *Cfr.* Memorando PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**; Diagnóstico de la situación actual y plan de reestructuración para la optimización de los procesos productivos de Norpro Venezuela, C.A., junio de 2010, **Anexo C-142**; Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**; Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144**; Memorando de la Dirección Ejecutiva de Producción de PDVSA a Rafael Ramírez Carreño (Ministro de Energía y Petróleo), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 de junio de 2010, **Anexo C-145**; Informe de la Comisión de Evaluación de PDVSA, *Reestructuración Empresa Norpro*, 11 de junio de 2010, **Anexo C-146**; Informe de la Comisión de Evaluación de PDVSA, *Reestructuración Empresa Norpro*, 2 de julio de 2010, **Anexo C-147**; Informe Técnico Definitivo, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 de julio de 2010, **Anexo C-148**; Memorando de Ower Manrique a Eulogio del Pino, *Situación actual de la empresa Norpro Venezuela C.A. (plan estratégico para la puesta en operación)*, 27 de julio de 2010, **Anexo C-149**; Informe de la Comisión de Evaluación de PDVSA, *Reestructuración Empresa Norpro*, 3 de agosto de 2010, **Anexo C-150**

[463] Memorando de la Dirección Ejecutiva de Producción de PDVSA a Rafael Ramírez Carreño (Ministro de Energía y Petróleo), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 de junio de 2010, **Anexo C-145**, pág. 3; Informe Técnico Definitivo, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 de julio de 2010, **Anexo C-148**, págs. 9-10.

[464] Solicitud de Inspección Judicial de Norpro Venezuela, C.A., 5 de agosto de 2010, **Anexo C-119**, pág. 11; María Ramírez Cabello, *Norpro de Venezuela inicia fase de prearranque*, Correo del Caroní, 23 de julio de 2010, **Anexo C-117**.

[465] Rondón, ¶¶ 33-34; Transcripción (Día 3), pág. 708 línea 21 – pág. 709 línea 2, pág. 711 línea 3 – pág. 711 línea 20.

PDVSA estaba preparando la planta para la operación y la producción bajo la mirada de la Demandada.

473. El Tribunal considera que, contrariamente a las alegaciones de la Demandada, la cuestión que consiste en determinar si el decreto de expropiación formal todavía se estaba redactando en ese momento y los derechos de propiedad aún tenían que transferirse formalmente, y si la Demandante siguió los pasos legales en aras de recuperar el control, carece de relevancia[466]. El hecho de que el decreto de expropiación "*est*[uviera] *siendo elaborado*" en ese momento "*por las autoridades gubernamentales competentes, dentro del proceso previsto en las leyes aplicables*"[467] no excluye la conclusión de que la Demandante ya había sido expropiada en el sentido del Artículo 5(1) del Tratado.

474. Los conceptos y formalidades del derecho interno y el cumplimiento de sus reglas no son decisivos a efectos de determinar si ha tenido lugar una expropiación en el sentido del derecho internacional. Por el contrario, lo decisivo en virtud del Artículo 5(1) del Tratado es que la Demandada asumió el control *de facto* de la planta el día 15 de mayo de 2010 o poco tiempo después, sin perspectiva de restituírsela a sus propietarios, y la utilizó para sus propios fines, a saber, preparar y reiniciar la operación y producción de proppants. Si bien la evaluación de la situación económica de la planta, incluidos su inventario y sus obligaciones de pago, también era relevante para elaborar el decreto de expropiación (formal) y determinar la compensación justa requerida en virtud del Artículo 5(1) del Tratado, la Demandada no reunió estos datos en el marco de un procedimiento administrativo formal. En su lugar, se valió de la toma de control de la planta llevada a cabo por el sindicato, estableció una presencia permanente en la planta e inició el proceso de nacionalización sin prever participación significativa alguna de la Demandante o la dirección de Norpro en ese momento.

475. Con respecto al segundo punto, es decir, si la Demandante intentó recuperar el control de la planta luego de la toma de control el día 15 de mayo de 2010, el Tribunal destaca que la Demandante y Norpro Venezuela no le dejaron la planta a PDVSA en forma deliberada, tal como sugiere la Demandada. Por el contrario, Norpro Venezuela presentó dos solicitudes de inspección judicial de la planta los días 17 de mayo de 2010 y 5 de agosto de 2010[468]. Asimismo, Norpro Venezuela y la Demandante intentaron, en reiteradas oportunidades, entablar negociaciones con la Demandada en relación con la nacionalización de la planta, solicitaron la designación de un interlocutor, ofrecieron

---

[466] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60-61.
[467] Borrador de Minuta de Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, 30 de agosto de 2010, **Anexo C-34** y **Anexo R-17**.
[468] Solicitud de Inspección Judicial de Norpro Venezuela, C.A., 17 de mayo de 2010, **Anexo C-20**; Solicitud de Inspección Judicial de Norpro Venezuela, C.A., 5 de agosto de 2010, **Anexo C-119**.

asistencia técnica e hicieron reserva de su derecho de indemnización, comenzando por una carta del expresidente de Norpro Luis Páez a Rafael Ramírez, de fecha 19 de mayo de 2010:

> "*Considerando el interés que posee el Grupo Saint-Gobain en preservar la seguridad del personal de la planta y la condición de los activos de Norpro nos permitimos solicitar que PDVSA, en caso de ser designado como ente que llevará a cabo la estatización, designe a un interlocutor válido para analizar con los representantes del Grupo Saint-Gobain, la forma bajo la cual la misma se desea llevar a cabo.*
>
> *Debe destacarse que el Grupo Saint-Gobain sin prejuicio a sus derechos en materia de indemnización está abierto a proporcionar a corto y mediano plazo asistencia técnica una vez que lleve a cabo la estatización, a los fines de preservar la seguridad del personal y evitar la degradación del estado de los activos de Norpro*"[469].

476. Otras cartas de la Demandante y Norpro Venezuela, escritas en el curso del año 2010, contienen afirmaciones similares[470]. Estos mensajes no dan la impresión de que la Demandante y Norpro Venezuela, que todavía eran las propietarias legítimas de la planta, tuvieran acceso a la planta en cualquier momento y que habían decidido "*exonerarse de responsabilidad por todo lo que ocurriera en la Planta*" y dejarle la planta al Estado, tal como argumentara la Demandada[471] [Traducción del Tribunal]. En cambio, parece que, en vista del anuncio del Presidente Chávez de fecha 15 de mayo de 2010 y la posterior toma de control de la planta, la Demandante aceptó como un hecho que la planta estaba nacionalizada *de facto* e intentó aprovechar al máximo la situación cooperando con la Demandada en lugar de agotar sus recursos legales, tales como, un "*amparo*" a fin de preservar sus derechos constitucionales[472]. No obstante, esta actitud cooperativa no impide que la Demandante afirme que una "*expropiación*" en los términos del Artículo 5(1) del Tratado ya tenía lugar en ese momento.

477. En conclusión, el Tribunal no tiene dudas de que, el día 15 de mayo de 2010 o al menos poco tiempo después, la Demandada obtuvo como mínimo el control *de facto* de la planta, con el propósito de utilizarla para sus propios fines y excluir a la Demandante de su propiedad. Esta conducta supone una "*expropiación*" en los términos del Artículo 5(1) del Tratado y, por lo tanto, es decisiva a fin de determinar la fecha de expropiación en el sentido del inciso 3.

---

[469] Carta de Luis E. Páez a Rafael Ramírez, 19 de mayo de 2010, **Anexo C-22**, págs. 1-2.
[470] *Cfr.* Carta de Luis E. Páez a José Khan, 27 de mayo de 2010, **Anexo C-23**; Carta de Guy Rolli a Temir Porras, 8 de junio de 2010, **Anexo C-26**; Carta de Luis E. Páez a Rafael Ramírez, 6 de julio de 2010, **Anexo C-28**; Carta de Patrick Dupin a Eulogio del Pino, 3 de agosto de 2010, **Anexo C-30**.
[471] Escrito Posterior a la Audiencia de la Demandada, ¶ 60.
[472] Dúplica, ¶ 23.

### (ii)    El Cumplimiento o Incumplimiento por parte de la Demandada de sus Obligaciones en virtud del Tratado luego de la Fecha de Expropiación

478. Las conclusiones a las que se arribara en (**aa**) con respecto a los requisitos en cuanto a la fijación y prontitud de la indemnización en virtud de los incisos 2 y 3 del Artículo 5(1) del Tratado y en **i)** con respecto a la "*fecha de la expropiación*" en los términos del inciso 3 indican que la Demandada no cumplió con sus obligaciones en virtud del Tratado con arreglo a los incisos 2 y 3 del Artículo 5(1) con posterioridad al día 15 de mayo de 2010.

479. La Demandada nunca ha comunicado el monto del pago que ha de realizarse a la Demandante y aún no ha ofrecido indemnización alguna por la expropiación, a pesar de los intentos de la Demandante de negociar los términos de la nacionalización mencionados *supra*. El Tribunal está al tanto de que, según la Demandada, ella ofreció una indemnización en el contexto de su ofrecimiento de formar una "*empresa mixta*" en la que PDVSA se convertiría en accionista mayoritaria[473]. Sin embargo, independientemente de si el ofrecimiento de la Demandada fue suficientemente concreto para que la Demandante lo considerara[474], en cualquier caso, la Demandada no fijó el monto que le pagaría a la Demandante en contraprestación de su adquisición de una participación mayoritaria en la empresa mixta. En consecuencia, la Demandada no fijó el monto de la indemnización en el sentido del inciso 3 del Artículo 5(1) del Tratado y, por ende, tampoco pagó una indemnización pronta tal como se exige con arreglo al inciso 2.

### c)    Conclusión

480. En conclusión, el Tribunal determina que la expropiación de la planta no se llevó a cabo de conformidad con los requisitos de indemnización establecidos en los incisos 2 y 3 del Artículo 5(1). En cuanto a las consecuencias de esta conclusión, es decir, si este incumplimiento torna la expropiación ilícita, el Tribunal resalta que la controversia entre las Partes se concentra en la cuestión que consiste en determinar qué estándar de compensación ha de aplicarse en el presente caso. Por lo tanto, el Tribunal procederá a abordar esta cuestión en la sección sobre cuantía de daños (*véase* **III.1.** *infra*).

---

[473] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 53-54, que hace referencia a la carta de Gabriel Rojas a Luis Páez, de fecha 22 de octubre de 2010, **Anexo R-071.** La Demandada también se refiere a la reunión celebrada entre PDVSA y la Demandante el día 26 de octubre de 2010 analizada por el testigo de la Demandante, el Sr. Millot, en su declaración testimonial. Millot, ¶ 31.

[474] Las Partes disienten en cuanto a si el ofrecimiento constituyó una propuesta concreta que la Demandante se comprometió a considerar o si fue una mera "*insinuación*" que PDVSA prometió sustanciar antes de que a la Demandante le hubiera correspondido considerarla [Traducción del Tribunal]. Presentación Posterior a la Audiencia de la Demandante, ¶ 35; Millot, ¶ 31; Transcripción (Día 2), pág. 413 línea 16 – pág. 414 línea 17; Escrito Posterior a la Audiencia de la Demandada, ¶ 54 (con nota 101).

**2.  Trato justo y equitativo (Artículo 3(1) del Tratado)**

481.  El Tribunal procede a abordar las reclamaciones TJE. Luego de definir brevemente el estándar TJE aplicable (**a**), el Tribunal evaluará las reclamaciones TJE con respecto a la planta (**b**) y al Contrato de Bauxita (**c**). En cuanto a las reclamaciones adicionales basadas en el hecho de que la Demandada no proporcionara las devoluciones del IVA que supuestamente le adeudaba a la Demandante en virtud del derecho venezolano y en la presunta restricción arbitraria por parte de la Demandada de la producción de proppants mediante la toma de control de la planta de fecha 24 de marzo de 2010[475], el Tribunal destaca que la Demandante no ha seguido planteando estos argumentos como reclamaciones TJE independientes después de su Memorial. Por ende, el Tribunal también se abstendrá de abordar estos argumentos en la presente sección[476].

**a)  Estándar TJE aplicable**

**aa)  Síntesis de la Postura de la Demandante**

482.  La Demandante alega que el estándar TJE previsto en el Artículo 3(1) del Tratado se refiere, en sentido amplio, a los conceptos de TJE imperantes en el derecho internacional – y no sólo al estándar mínimo de trato –, incluidos los siguientes[477]:

- La garantía de un "*entorno jurídico y comercial estable*" con un trato "*de manera que sea consistente, predecible y transparente*";

- La creación de un "*marco jurídico, administrativo y regulatorio adecuado, el entorno jurídico que la teoría de inversión moderna ha llegado a reconocer como* conditio sine qua non *del éxito de la empresa privada*";

- El "*debido proceso*" con exclusión de la "*falta de transparencia y franqueza en el proceso administrativo*";

- La ausencia de "*conducta arbitraria o discriminatoria*"; y

- Una conducta "*de conformidad con el principio de buena fe*". [Traducción del Tribunal]

---

[475] *Cfr.* Memorial, ¶¶ 162-164 y ¶¶ 178-179.
[476] El argumento relativo a las devoluciones del IVA se analizará en la sección sobre cuantía de daños en los párrafos 824 y ss. *infra*.
[477] Memorial, ¶¶ 152-156.

483. La Demandante afirma que la referencia contenida en el Artículo 3(1) del Tratado a las "*reglas y principios del Derecho Internacional*" no constituye un techo, sino la base del trato que ha de otorgarse a los inversionistas extranjeros[478].

### bb)   Síntesis de la Postura de la Demandada

484. La Demandada argumenta que, en virtud de la referencia a las "*reglas y principios del Derecho Internacional*", el Artículo 3(1) del Tratado requiere exclusivamente el estándar mínimo de trato al amparo del derecho internacional consuetudinario. A efectos de definir este estándar TJE restrictivo, la Demandada alude a una decisión temprana del tribunal en el caso *Neer c. México* (1926), que sostenía que, para violar este estándar, el trato de un extranjero

> "*debería constituir un ultraje, mala fe, un incumplimiento voluntario del deber o una insuficiencia de acción gubernamental tan alejada de los estándares internacionales que todo hombre razonable e imparcial reconocería fácilmente*"[479]. [Traducción del Tribunal]

485. Asimismo, la Demandada cita varias disposiciones TJE contenidas en instrumentos de derecho de inversión más recientes, tales como el borrador del Tratado de Libre Comercio UE-Canadá ("**AECG**"), que especifica que el estándar TJE comprende, por ejemplo, lo siguiente: "*Violación fundamental del debido proceso, incluida una violación fundamental de la transparencia, en el contexto de procedimientos judiciales y administrativos*" así como "*incumplimiento de las expectativas legítimas*", "*limitados a situaciones en las que la inversión tuvo lugar sólo debido a una promesa efectuada por el Estado que posteriormente no se cumplió*"[480]. [Traducción del Tribunal]

### cc)   Análisis del Tribunal

486. La cláusula TJE contenida en el Artículo 3(1) del Tratado reza lo siguiente:

> "*Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et*

> "*Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y*

---

[478] Réplica, ¶ 104.

[479] Memorial de Contestación, ¶ 125, que cita *Neer c. México*, Comisión General de Reclamaciones México-EE.UU., Expediente N.º 136, Dictamen de fecha 15 de octubre de 1926, 21 THE AMERICAN JOURNAL OF INTERNATIONAL LAW 555 (1927), pág. 556, **Anexo RL-79**.

[480] Dúplica, ¶ 121, que cita Comisión Europea, *Investment Provisions in the EU–Canada Free Trade Agreement*, de fecha 3 de diciembre de 2013, **Anexo RL-142**; Comisión Europea, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text"*, de fecha 5 de agosto de 2014, **Anexo RL-143**.

*équitable, conformément aux règles et principes du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de moyens de production et d'exploitation de tout type, toute entrave à la vente et au transport des produits à l'intérieur du pays et à l'étranger, ainsi que toutes autres mesures ayant un effet analogue"[481].*

*equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así como cualquier otra medida que pueda tener un efecto análogo"[482].*

487.  La traducción al inglés presentada por la Demandante reza lo siguiente:

*"Each of the Contracting Parties will ensure fair and equitable treatment for investments by nationals and companies of the other Party in its territory and in its maritime area, in accordance with the rules and principles of international law, and will ensure that the exercise of this right thus recognized shall have no impediments either in law or in fact. In particular, although not exclusively, impediments to fair and equitable treatment in law or in fact are any arbitrary or discriminatory restrictions to the purchase and transport of raw and ancillary materials, of energy and fuels, as well as to any means of production and exploitation, or any impediment to the sale and transport of*

---

[481] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[482] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Anexo C-1**, pág. 332.354.

    *products within the country and overseas, along with all other measures having a similar effect*"[483].

488.  El Tribunal subraya que la referencia a "*conforme a las reglas y principios del Derecho Internacional*" ("*conformément aux règles et principes du droit international*"/"*rules and principles of international law*") y la enumeración no taxativa ("*En particular, aunque no exclusivamente*"/"*En particulier, bien que non exclusivement*") de ciertos aspectos del TJE en la segunda parte de la disposición podrían, en principio, plantear dudas en cuanto a la interpretación correcta de la cláusula TJE. Sin embargo, no es necesario que el Tribunal arribe a una conclusión en este aspecto, dado que, tal como se analizará en los siguientes párrafos, la supuesta participación de la Demandada en los aumentos de precios en virtud del Contrato de Bauxita y la expropiación de la planta, si se demostrara, también podría violar el concepto más restrictivo de TJE descripto por la Demandada en el caso que nos ocupa.

489.  Con respecto a la toma de control de la planta, la Demandante argumenta que la Demandada no siguió el debido proceso en el procedimiento de expropiación. Tal como ilustra la referencia de la Demandada al estándar TJE en virtud del borrador del AECG, en apariencia, la Demandada acepta que la "[v]*iolación fundamental del debido proceso, incluida una violación fundamental de la transparencia, en el contexto de procedimientos judiciales y administrativos*" forma parte del estándar TJE contenido en el Artículo 3(1) del Tratado[484]. [Traducción del Tribunal]

490.  En cuanto a los aumentos de precios en virtud del Contrato de Bauxita, según la Demandante, la Demandada, a través del MIBAM y otros órganos del Estado, efectuó "*promesas específicas*", asumió "*compromisos*" y, en consecuencia, "*creó expectativas específicas*", en las que la Demandante confió al momento de realizar sus inversiones y que, posteriormente, se vieron frustradas[485]. Una vez más, la Demandada reconoce que el TJE incluye la protección de las "*expectativas legítimas*", "*limitada a situaciones en las que la inversión tuvo lugar sólo debido a una promesa efectuada por el Estado que posteriormente no se cumplió*"[486].[Traducción del Tribunal]

491.  A la luz de lo que antecede, el Tribunal considerará el "*debido proceso*" y la protección de las "*expectativas legítimas*", en principio, elementos indiscutidos del TJE en virtud del

---

[483] Traducción libre al inglés presentada por la Demandante como **Anexo C-1**.

[484] Dúplica, ¶ 121, que cita Comisión Europea, *Investment Provisions in the EU–Canada Free Trade Agreement*, de fecha 3 de diciembre de 2013, **Anexo RL-142**; Comisión Europea, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text",* de fecha 5 de agosto de 2014, **Anexo RL-143**.

[485] Réplica, ¶ 120; Presentación Posterior a la Audiencia de la Demandante, ¶ 80.

[486] Dúplica, ¶ 121, que cita Comisión Europea, *Investment Provisions in the EU–Canada Free Trade Agreement*, de fecha 3 de diciembre de 2013, **Anexo RL-142**; Comisión Europea, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text",* de fecha 5 de agosto de 2014, **Anexo RL-143**.

Artículo 3(1) del Tratado [Traducción del Tribunal]. En caso de ser necesario, el Tribunal proporcionará una descripción del alcance preciso de estos dos elementos *infra* con mayor grado de detalle.

**b)      Debido proceso en la expropiación**

### aa)    Síntesis de la Postura de la Demandante

492. La Demandante alega que la Demandada no le otorgó trato justo y equitativo a la inversión de la Demandante, en tanto sus acciones en relación con la expropiación no fueron transparentes y no cumplieron con el estándar de buena fe en virtud del Tratado. La Demandante argumenta que su inversión fue "*efectivamente expropiada de la noche a la mañana*" sin advertencia previa y sus empleados fueron "*echados ese mismo día*" como consecuencia del "*anuncio público y repentino*" en televisión realizado por el Presidente Chávez el día 15 de mayo de 2010[487]. [Traducción del Tribunal]

493. La Demandante afirma que el Tribunal en *Middle East Cement c. Egipto* confirmó que la manera en que la inversión fue expropiada puede en sí misma violar el estándar TJE y también hace referencia a la conclusión del tribunal en *Tecmed c. México* según la cual el hecho de no consultar a la demandante con anterioridad a la acción expropiatoria dio lugar a un incumplimiento de la obligación TJE[488]. Además, la Demandante invoca la afirmación del tribunal en el marco del caso *OI European Group c. Venezuela* de que cuesta imaginar una expropiación directa ilícita que, al mismo tiempo, no implique una violación del estándar TJE[489].

494. Según la Demandante, se acercó a la Demandada en reiteradas oportunidades a fin de negociar el monto de indemnización a pagarse en virtud del Tratado, pero sus esfuerzos fueron en vano. La Demandada no realizó ofrecimiento alguno y tampoco dio ningún indicio en cuanto al proceso que pretendía seguir en aras de garantizar el pago de una indemnización adecuada. La Demandante alude a la afirmación del tribunal en el caso *ADC c. Hungría* de que la expectativa legítima de la demandante incluía la de recibir trato justo y compensación justa[490]. Por el contrario, según la Demandante, la Demandada tomó la planta sin establecer un marco jurídico a efectos de la expropiación o hacer

---

[487] Memorial, ¶¶ 180-181; Réplica, ¶ 127.
[488] Memorial, ¶ 182, que hace referencia a *Middle East Cement c. Egipto* (**CLA-053**), ¶ 143, y *Tecmed c. México* (**CLA-082**), ¶¶ 173-174.
[489] Presentación Posterior a la Audiencia de la Demandante, ¶ 47, que hace referencia a *OI European Group c. Venezuela* (**CLA-156**), ¶ 501.
[490] Memorial, ¶¶ 183-184, que hace referencia a *ADC c. Hungría* (**CLA-001**), ¶ 424.

esfuerzos para entablar negociaciones de buena fe en materia de compensación durante un período de más de diez meses[491].

495. La Demandante argumenta que el debido proceso requiere que el inversionista afectado reciba "*una oportunidad razonable dentro de un tiempo razonable de hacer valer sus derechos legítimos y lograr que sus reclamaciones sean escuchadas*". La Demandante opina que, las "*demoras considerables*" y el "*proceso turbio*", junto con la insistencia de la Demandada en continuar su procedimiento de expropiación local a pesar de que la Demandante había elegido plantear sus reclamaciones ante un tribunal CIADI, constituyen un incumplimiento de la obligación de la Demandada de garantizarle a la Demandante el debido proceso durante la expropiación[492].

496. La Demandante sostiene que la Demandada no respetó "*la interpretación del debido proceso de cualquiera*" cuando hizo lo siguiente: (i) "*declaró abruptamente la Planta propiedad nacional en un anuncio televisivo*"; (ii) no adoptó "*ninguna medida, resolución o procedimiento legal*" durante casi un año y ni siquiera pudo delinear un plazo para el inicio del proceso; (iii) no proporcionó autoridad alguna en sustento de la "*ocupación y control*" de la planta por parte de PDVSA; (iv) se rehusó a negociar de buena fe a pesar de los esfuerzos reiterados de la Demandante e hizo "*sólo 'insinuaciones' carentes de sustento de una empresa mixta*", lo que no puede considerarse un ofrecimiento de buena fe, ya que la insinuación no incluía una compensación por la pérdida de la participación del 60 % que sería tomada por PDVSA; (v) no ofreció indemnización alguna, tal como lo requerían tanto el Tratado como su Ley de Expropiación local; y (vi) no actuó conforme a los términos de la Ley de Expropiación, tal como lo confirmara su perito jurídico, el Dr. Brewer-Carías, que establece que, en virtud del derecho venezolano, la indemnización debe pagarse con anterioridad a la expropiación[493].

### bb)   Síntesis de la Postura de la Demandada

497. La Demandada rechaza la alegación de la Demandante de que la expropiación no se llevó a cabo siguiendo el debido proceso y argumenta que el derecho internacional no contiene el requisito de advertencia previa de su intención de anunciar una expropiación, ya que esto efectivamente menoscabaría el derecho soberano del Estado de expropiar[494]. La

---

[491] Presentación Posterior a la Audiencia de la Demandante, ¶ 42.
[492] Réplica, ¶¶ 128-130.
[493] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 45-46; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 22-29; Réplica, ¶ 126, que hace referencia a Brewer-Carías II, ¶¶ 14-17.
[494] Dúplica, ¶ 137.

Demandada asevera que, una vez que PDVSA había establecido presencia de cuidadora en la planta, se reunió con la Demandante lo antes posible a fin de negociar la constitución de una empresa mixta e, incluso antes de que se emitiera el Decreto de Expropiación, PDVSA "*adoptó medidas activas para comprometerse con la Demandante, colaborar con la Demandante y garantizar que la Demandante estuviera al tanto de los recursos legales disponibles*"[495]. [Traducción del Tribunal]

498. En respuesta al argumento de la Demandante según el cual la Demandada no cumplió con su Ley de Expropiación local, la Demandada sostiene que PDVSA estaba autorizada a asumir la posesión provisional de la planta en virtud del derecho venezolano, y, en cualquier caso, no toda omisión por parte del Estado receptor de "*cumplir estrictamente con los requisitos de su legislación*" constituye un incumplimiento de su obligación TJE de conformidad con el derecho internacional[496].

499. La Demandada resalta que, luego de la emisión del Decreto, PDVSA inició el procedimiento administrativo de expropiación amigable requerido por la Ley de Expropiación, que tiene el propósito de determinar la indemnización que ha de pagarse. Según la Demandada, la Demandante tenía pleno conocimiento del Decreto de Expropiación y de su rol en la resolución de la cuestión de la compensación; no obstante, eligió no participar en el procedimiento de arreglo amigable e ignorar el procedimiento judicial posterior. Por consiguiente, según la Demandada, el presente caso no puede compararse con los casos citados por la Demandante, dado que ella ni impugnó la expropiación ni participó en la determinación de la compensación justa y, por lo tanto, no puede quejarse de las demoras resultantes[497].

500. Específicamente con respecto a *OI European Group c. Venezuela*, la Demandada destaca que la disposición aplicable en materia de expropiación en ese caso incluía un requisito explícito de llevar a cabo la expropiación "*en virtud del debido proceso legal*" y subraya que el tribunal rechazó todos argumentos de debido proceso de la demandante excepto uno. En particular, la Demandada resalta que el tribunal concluyó que el debido proceso no requiere debates previos con la parte expropiada y se satisface completamente si la parte recibe posteriormente el derecho a ser escuchada ante el poder judicial[498]. La Demandada sostiene que esta posibilidad habría estado a disposición de la Demandante en cualquier momento y concluye que "*el hecho de que la Demandante optara por no*

---

[495] Memorial de Contestación, ¶¶ 139-140.
[496] Dúplica, ¶ 136 (con nota 469).
[497] Memorial de Contestación, ¶¶ 141-142; Dúplica, ¶¶ 138-139.
[498] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 10-11, que hace referencia a *OI European Group c. Venezuela* (CLA-156), ¶ 322 y ¶¶ 388, 392.

*valerse de los recursos ante los tribunales venezolanos no equivale a una denegación del debido proceso*"[499]. [Traducción del Tribunal]

501. Por último, la Demandada opina que el argumento de la Demandante según el cual el procedimiento judicial en curso ignora la opción de la Demandante de iniciar un arbitraje CIADI se torna abstracto ante la decisión del Tribunal de rechazar la solicitud de medidas provisionales de la Demandante que se basaba en el mismo argumento[500].

502. En cualquier caso, la Demandada alega que la Demandante no sufrió ningún daño durante el período de diez meses y medio hasta la emisión del Decreto de Expropiación que no se encuentre ya incluido en el cálculo de la indemnización por expropiación al día 15 de mayo de 2010. Según la Demandada, ni siquiera la existencia de una violación TJE daría lugar a un cambio en la manera en que la compensación ha de calcularse en el caso que nos ocupa[501].

### cc)    El Análisis del Tribunal

503.  Durante la Audiencia y en su Presentación Posterior a la Audiencia, la Demandante incluyó esta reclamación TJE en la reclamación de expropiación relativa al inciso 1 del Artículo 5(1) del Tratado[502]. El Tribunal destaca, sin embargo, que, en consecuencia, la Demandante no tenía intención de abandonar su reclamación TJE separada relativa a la toma de la planta, en tanto mantiene en su petitorio la solicitud de una declaración separada de que la Demandada ha incumplido el Artículo 3(1) del Tratado[503].

504. El Tribunal subraya las posiciones de las Partes acerca de la reclamación de la Demandante de violación del debido proceso durante el proceso de expropiación. No obstante, tal como señalara correctamente la Demandada, la Demandante no alega haber sufrido daño alguno por el supuesto incumplimiento que no estaría incluido en la indemnización por la propia expropiación. Por lo tanto, no es necesario que el Tribunal se pronuncie respecto de la existencia de una violación del TJE en este aspecto, puesto que no alteraría el monto de compensación al que la Demandante tendrá derecho con arreglo al Laudo.

---

[499] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 11.

[500] Dúplica, ¶ 139.

[501] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 108, 112; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 32.

[502] Transcripción (Día 1), pág. 85 línea 3; pág. 95 líneas 4-9. Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.

[503] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116. Esto es confirmado por la referencia cruzada en la Presentación Posterior a la Audiencia de la Demandante (¶ 42 con nota 116) a la sección pertinente del Memorial (¶¶ 180-184) y por el planteo de la Demandante de sus argumentos TJE en su Segunda Presentación Posterior a la Audiencia (¶¶ 30-45).

c)    **Aumentos de precio en virtud del Contrato de Bauxita**

aa)    **Síntesis de la Postura de la Demandante**

(i)    **La Conducta de CVG Bauxilum es Atribuible a la Demandada**

505.    La Demandante alega que las acciones de CVG Bauxilum son atribuibles a la Demandada porque es de "*propiedad absoluta de la CVG y está sujeta a su dirección y supervisión*", la cual es un instituto autónomo conforme al derecho venezolano y, como tal, forma parte de las entidades públicas "*funcionalmente descentralizadas*" de la Demandada. La Demandante agrega que la CVG goza de los mismos privilegios y atribuciones que el Estado, está sujeta a la coordinación del Presidente de Venezuela y se encontraba "*asignada*" al MIBAM. En consecuencia, alega la Demandante, lo mismo rige para su subsidiaria CVG Bauxilum, cuyas actividades y servicios fueron declarados de utilidad pública e interés público conforme a la Ley de Minas de Venezuela[504]. [Traducción del Tribunal]

506.    Por lo tanto, la Demandante afirma que (i) CVG Bauxilum debería considerarse un órgano del Estado en virtud del Artículo 4 del Proyecto de Artículos de la CDI y que, de todas maneras, (ii) su conducta sería atribuible conforme al Artículo 5 ya que se encuentra "*facultada por ley estatal para ejercer elementos de autoridad gubernamental*" y "*actuó como tal en la instancia en particular*" [Traducción del Tribunal] al suscribir un contrato con Norpro Venezuela en función del monopolio otorgado por el Estado[505].

507.    En tanto CVG Bauxilum se considere un órgano del Estado, la Demandante alega que el incumplimiento del Contrato de Bauxita por parte de CVG Bauxilum constituye en sí un acto ilícito internacional que asciende al nivel de una violación del Tratado, ya que la Demandante tiene derecho a recibir el mismo trato que se concede a ciudadanos de terceros países en virtud de la cláusula de la nación más favorecida del Tratado. Según la Demandante, el alcance de la cláusula NMF incluye cláusulas paraguas que pueden encontrarse en otros tratados, tales como el TBI entre el Reino Unido y Venezuela[506].

508.    La Demandante también hace referencia al Artículo 8 del Proyecto de Artículos de la CDI y señala que esta disposición ni siquiera requiere actividad gubernamental[507]. Además, la Demandante alega que la Demandada, a través del MIBAM, adoptó el Contrato de Bauxita como propio y luego "*ratificó el incumplimiento contractual al negarse a hablar*

---

[504] Memorial, ¶¶ 173-174; Réplica, ¶ 14.
[505] Memorial, ¶¶ 176-177, en referencia la Comisión de Derecho Internacional, Responsabilidad del Estado por Hechos Internacionales Ilícitos (2001) (**CLA-044**), Artículos 4 y 5.
[506] Memorial, nota 340; Réplica, nota 253.
[507] Réplica, nota 252.

*sobre el tema cuando la contactó Norpro Venezuela*" [Traducción del Tribunal], lo que genera responsabilidad conforme al Artículo 11 del Proyecto de Artículos de la CDI[508].

### (ii)   La Conducta de la Demandada (a través del MIBAM) Generó Expectativas Legítimas

509.   La Demandante sostiene que, aun si la conducta de CVG Bauxilum no fuera atribuible conforme al Proyecto de Artículos de la CDI, funcionarios públicos de la Demandada efectuaron "*promesas concretas*" y crearon así "*expectativas concretas*", que luego repudiaron al no afrontar las acciones de CVG Bauxilum con respecto al aumento de precios en violación de las disposiciones del Contrato de Bauxita[509].

510.   En opinión de la Demandante, la Demandada "*indujo*" su inversión a través de "*una serie de promesas*", entre ellas, una garantía de que sus entidades estatales firmarían contratos de suministro a largo plazo para los insumos requeridos (gas, electricidad y bauxita). Según la Demandante, el "*suministro de bauxita a largo plazo a precios competitivos*" fue "*de suma importancia*" para la Demandante, lo que explica por qué planteó el tema del suministro de bauxita directamente al MIBAM en 2005[510]. [Traducción del Tribunal]

511.   La Demandante aduce que la Demandada "*debatía sobre el Contrato de Bauxita y lo promovía con regularidad*" y que el MIBAM ofreció "*garantías expresas […] de que le había ordenado a CVG Bauxilum atender las necesidades de suministro de bauxita de Norpro Venezuela en los términos acordados*"[511]. En este sentido, la Demandante alude, entre otras cosas, a una reunión de fecha 10 de mayo de 2005 en la cual el Viceministro "[c]*onfirmó los términos por los que se regirá el suministro de bauxita y gas*", y a una reunión de fecha 20 de octubre de 2005 en la cual el Viceministro confirmó que él le había solicitado "*al presidente de* [CVG] *Bauxilum concluir el contrato de inmediato*"[512]. [Traducción del Tribunal]

512.   Según la Demandante, el Gobierno era consciente sobre la importancia de garantizar el suministro de bauxita y, por lo tanto, "*directamente se comprometió con Saint-Gobain a garantizar dicho suministro al precio del Contrato de Bauxita*" [Traducción del Tribunal]. La Demandante alega que CVG Bauxilum celebró el Contrato de Bauxita "*[bajo] instrucciones del MIBAM*", tal como lo confirma el hecho de que el Contrato se

---

[508] Réplica, ¶ 118.
[509] Réplica, ¶ 120.
[510] Memorial, ¶ 165; Réplica, ¶ 114.
[511] Presentación posterior a la Audiencia de la Demandante, ¶¶ 79-80, que hace referencia al testimonio oral de su testigo, el Sr. Pedersen. Transcripción (Día 2), págs. 501-504 y págs. 565-575.
[512] Memorial, ¶¶ 165-166, en referencia al Acta de Reunión entre Saint-Gobain, el MIBAM y CVG Bauxilum (**Anexo C-3**) y Memorando de Michel Boyer-Chammard a Guy Rolli, *et al.*, 20 de octubre de 2005 (**Anexo C-074**).

concluyó "*bajo el auspicio del Ministerio de Industrias Básicas y Minería (MIBAM) y la Corporación Venezolana de Guayana (CVG)*" y se estampó con la leyenda "*Ministerio de Industrias Básicas y Minería*" en el encabezado[513]. En consecuencia, la Demandante alega que sus expectativas legítimas, "*plasmadas*" en el Contrato de Bauxita con CVG Bauxilum, fueron creadas por el MIBAM antes de la firma, el cual "*controlaba y coordinaba*" las negociaciones sobre el suministro de bauxita y confirmaba los parámetros del contrato[514].

513. La Demandante alega que, si bien el Contrato de Bauxita contempla la posibilidad de aumentar el precio de la bauxita sólo (i) mediante ajuste anual automático basado en el Índice de Precios al Productor (PPI) de los Estados Unidos para bienes industriales (Artículo 10.1); y (ii) en caso de aumentar los costos de transporte mediante un ajuste de precios realizado de forma conjunta (Artículo 10.2), CVG Bauxilum aumentó unilateralmente el precio en violación de estas disposiciones. La Demandante señala que se opuso al aumento de precios mediante el envío de cartas separadas al MIBAM y a CVG Bauxilum, tal como lo confirma su testigo, el Sr. Millot, durante su declaración oral[515].

514. En respuesta al argumento de la Demandada de que el aumento de precios se basó en el aumento de los costos de transporte, en particular, las mayores tarifas para navegar por el Río Orinoco y, por lo tanto, se encuentra justificado en virtud del Artículo 10.2, la Demandante afirma que, pese a los "*amplios esfuerzos*" de la gerencia de Norpro Venezuela, CVG Bauxilum no logró documentar, de manera suficiente, las supuestas razones del aumento de precios, varias de las cuales resultaron "*insuficientes a simple vista*"[516].

515. La Demandante alega que la conducta de la Demandada no constituye un mero incumplimiento contractual sino una violación de su expectativa legítima de que la Demandada garantizaría el cumplimiento del Contrato. En este sentido, la Demandante alega que el tribunal de *Nykomb c. Latvia* "*dejó en claro la importancia del dominio del mercado para fines de atribución*"[517]. La Demandante sostiene que, a raíz del monopolio de la Demandada sobre la producción de bauxita en Venezuela, el MIBAM y CVG Bauxilum podían imponer sus términos a Norpro Venezuela, ya que sabían que la bauxita

---

[513] Memorial, ¶¶ 167-168; Contrato de Compraventa entre CVG Bauxilum, C.A. y Proppants Venezuela, C.A., 27 de enero de 2006 (**Anexo C-6**).
[514] Réplica, ¶¶ 116-117 y ¶ 123.
[515] Memorial, ¶¶ 169-170; Réplica, ¶ 15, en referencia a la carta de Luis Páez al MIBAM, 4 de septiembre de 2008 (Anexo C-096) y la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (Anexo C-12); Presentación posterior a la Audiencia de la Demandante, ¶ 82, en referencia a Transcripción (Día 2), págs. 371-379.
[516] Presentación posterior a la Audiencia de la Demandante, ¶¶ 83-85.
[517] Réplica, ¶ 123 (nota 251)

era la principal materia prima para la producción de *proppants* cerámicos por parte de la Demandante. La Demandante, a la vez que recalca haber manifestado su disconformidad con el aumento, señala que es por eso que "*simplemente no tuvo otra opción*" [Traducción del Tribunal] que pagar el precio aumentado[518].

516. Contrariamente a lo que sugiere la Demandada, la Demandante afirma que no podía cambiar el proveedor de bauxita porque el proceso se había calibrado a la calidad de la bauxita en bruto requerida para la producción de *proppants* y la entrega era una sola vez por año. Según la Demandante, la única razón por la que se eligió Venezuela como lugar para invertir fue la disponibilidad de cantidades suficientes de bauxita a precios que permitieran una producción redituable de *proppants*. En estas circunstancias, la Demandante alega que el aumento unilateral del precio fue "*antitético respecto del entorno jurídico transparente y estable que se había prometido a Saint-Gobain*" [Traducción del Tribunal] y, en consecuencia, "*destruyó*" sus expectativas legítimas[519].

### bb)   Síntesis de la Postura de la Demandada

517. La Demandada rechaza la alegación de la Demandante y remarca que ni la Demandante ni Venezuela eran partes del Contrato de Bauxita, que era más bien "*un acuerdo puramente comercial*" [Traducción del Tribunal] entre CVG Bauxilum y Norpro Venezuela, y no puede generar obligaciones para la Demandada con arreglo al derecho internacional.

### (i)   La Conducta de CVG Bauxilum no es Atribuible a la Demandada

518. La Demandada niega que las acciones de CVG Bauxilum sean atribuibles al Estado conforme al Proyecto de Artículos de la CDI porque estas disposiciones sólo se aplican a "*hechos internacionalmente ilícitos*". Dado que no se alegó que la celebración del Contrato de Bauxita en sí importara un hecho internacionalmente ilícito, la Demandada sostiene que el Proyecto de Artículos de la CDI no resulta de aplicación[520].

519. La Demandada afirma que, aun si el Proyecto de Artículos de la CDI fuese aplicable, CVG Bauxilum no puede considerarse un órgano del Estado conforme al Artículo 4 porque CVG es una institución autónoma y su subsidiaria, CVG Bauxilum, es una

---

[518] Memorial, ¶ 171; Réplica, ¶ 124 (con nota 251 en referencia a *Nykomb c. Latvia* (CLA-058), Sección 4.2); Presentación posterior a la Audiencia de la Demandante, ¶ 82.
[519] Memorial, ¶ 172; Réplica, nota 49; Presentación posterior a la Audiencia de la Demandante, ¶¶ 86-87.
[520] Memorial de Contestación, ¶¶ 131-132 y ¶¶ 74-81; Dúplica, ¶ 80.

empresa pública. Según la Demandada, ninguna de ellas tiene facultades ejecutivas ya que son entidades descentralizadas de la Administración Pública y, por lo tanto, personas jurídicas separadas y distintas conforme al derecho mercantil venezolano[521]. Y alega que si la naturaleza se encuentra definida en el derecho interno con la claridad con la que está definida en este caso, el derecho interno es determinante para la clasificación como "*órgano*" conforme al Artículo 4[522].

520.  La Demandada alega, asimismo, que la conducta de CVG Bauxilum no es atribuible conforme al Artículo 5. En opinión de la Demandada, el ejercicio de "*autoridad gubernamental*" significa "*autoridad para ejercer facultades soberanas*" y no puede equipararse a las "*actividades de índole comercial que realizan habitualmente las empresas estatales en beneficio del Estado*" [Traducción del Tribunal]. La Demandada afirma que, si bien CVG Bauxilum es una empresa comercial que actúa en beneficio de la Demandada en el sector minero, carece de autoridad gubernamental al desarrollar sus actividades[523].

521.  Aunque, por un lado, reconoce que CVG Bauxilum tiene un monopolio otorgado por el Estado en Venezuela, la Demandada señala que la Demandante identificó tres fuentes alternativas en Guayana y la República Dominicana y era "*perfectamente libre*" para importar bauxita de cualquiera de esos países. Según la Demandada, el monopolio de CVG Bauxilum es irrelevante dado que la decisión de CVG Bauxilum de aumentar el precio por el hecho de que su propio desempeño se había vuelto inviable no es un acto soberano, sino un acto "*esencialmente*" comercial[524].

522.  La Demandada considera también que la conducta de CVG Bauxilum no puede atribuirse a la Demandada conforme al Artículo 8 del Proyecto de Artículos de la CDI porque la Demandante no puede demostrar un sólo hecho que fuera internacionalmente ilícito y el resultado de la "*instrucciones, directivas o control*" del Estado[525]. La Demandada hace referencia a los comentarios al Proyecto de Artículos de la CDI en los que el Prof. Crawford manifiesta lo siguiente:

> "*Se plantean cuestiones en relación con el comportamiento de sociedades o empresas de propiedad estatal o bajo control estatal. Si esas sociedades actúan de manera incompatible con las obligaciones internacionales del Estado interesado, cabe preguntarse si este comportamiento es atribuible al Estado. Al examinar esta cuestión es necesario recordar que el derecho internacional reconoce la identidad separada de las personas morales en*

---

[521] Memorial de Contestación, ¶¶ 82-85; Dúplica, ¶ 84 y ¶¶ 89-90.
[522] Dúplica, ¶¶ 85-86.
[523] Memorial de Contestación, ¶¶ 86-90, en referencia a *Hamester c. Ghana* (RL-27), ¶¶ 251-255.
[524] Memorial de Contestación, ¶¶ 91-98; Dúplica, ¶ 96.
[525] Memorial de Contestación, ¶¶ 99-101.

*el ámbito nacional, excepto en los casos en que el "velo societario" es un simple recurso o instrumento para el fraude o la evasión. El hecho de que originalmente el Estado haya creado una sociedad, ya sea por ley especial o de otro modo, no constituye base suficiente para atribuir al Estado el comportamiento ulterior de esa entidad. Dado que las sociedades, aunque sean de propiedad del Estado y en ese sentido estén sujetas a su control, se consideran entidades separadas, a primera vista su comportamiento en el curso de sus actividades no es atribuible al Estado, a menos que ejerzan atribuciones del poder público en el sentido del artículo 5*[526].

523. Con respecto al argumento de la Demandante de que la CVG (y, por lo tanto, efectivamente CVG Bauxilum también) se encuentra bajo la tutela administrativa del MIBAM, la Demandada señala que, según la ley venezolana, el control de tutela es una forma de "*tutela general*" para garantizar que las actividades de las entidades descentralizadas o empresas públicas cumplan con la política de Estado, pero alega que no se puede responsabilizar al Estado por las decisiones comerciales de una empresa pública[527].

524. Por último, la Demandada afirma que la referencia de la Demandante al Artículo 11 del Proyecto de Artículos de la CDI contradice sus anteriores argumentos relacionados con los Artículos 4, 5 y 8 porque el Artículo 11 se basa en la ausencia de toda conducta gubernamental o soberana. Además, la Demandada señala que la Demandante no identificó una sola declaración o acto de adopción "*claro e inequívoco*" de parte de la Demandada y aún no puede superar el obstáculo de la conducta internacionalmente ilícita[528].

### (ii) La Reclamación de la Demandante es Fácticamente Inexacta

525. En cualquier caso, la Demandada alega que Norpro Venezuela no se vio obligada a aceptar ningún aumento de precios sino que, tras la protesta inicial, "*pudo apreciar los motivos subyacentes*" en que CVG Bauxilum fundó el aumento, es decir, las nuevas tarifas del canal de navegación del Río Orinoco y la apreciable variación experimentada por el costo de extracción, transporte y descarga de la bauxita en la Planta de Matanzas. Según la Demandada, Norpro Venezuela tomó la decisión comercial de aceptar el aumento de precios, sujeto a su solicitud de mantener dicho precio durante todo el año 2009. La Demandada recalca que CVG Bauxilum atendió la solicitud y no pretendió imponer un nuevo aumento de precio hasta el año 2010[529]. La Demandada alega,

---

[526] *James Crawford*, "The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries" (**RL-21**), Artículo 8, pág. 112.
[527] Memorial de Contestación, ¶¶ 102-106.
[528] Dúplica, ¶¶ 99-102.
[529] Memorial de Contestación, ¶ 133; Dúplica, ¶ 132; Escrito posterior a la Audiencia de la Demandada, ¶ 124, en referencia a la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo R-52**).

asimismo, que ninguno de los documentos que invoca la Demandante refleja su supuesta solicitud de motivos o documentos adicionales en relación con dichos motivos[530].

526. La Demandada argumenta que Norpro Venezuela podría haber decidido no comprar más bauxita a CVG Bauxilum y, en su lugar, importarla de cualquiera de los tres recursos alternativos que había identificado en Guayana y la República Dominicana. En subsidio, la Demandada señala que podría haber iniciado un procedimiento de arbitraje contra CVG Bauxilum conforme al Contrato de Bauxita[531].

527. La Demandada rechaza también la afirmación de la Demandante de que su inversión se basó en la expectativa de que recibiría un suministro estable de bauxita por parte de CVG Bauxilum al mismo precio. Según la Demandada, la Demandante "*nunca recibió ningún tipo de garantía de la República con respecto al suministro o al precio de la bauxita*" sino que incluso advirtió a su sociedad controlante en el año 2005 acerca de importantes riesgos relacionados con el suministro de bauxita, que podían mitigar si lograban conseguir varias fuentes alternativas viables. La Demandada señala que, por ello, la Demandante dijo internamente que necesitaban un "*suministro alternativo de bauxita de Guayana si el día de mañana CVG decide cortarles el suministro*"[532]. [Traducción del Tribunal]

528. La Demandada alega que, ante la ausencia de promesas o garantías concretas por parte del Estado, las "*expectativas*" de la Demandante no se encuentran protegidas y que incluso los casos que invoca la Demandante justifican esto. Según la Demandada, ninguno de los documentos a los que alude la Demandante en relación con los supuestos compromisos del Estado demuestran participación alguna "*más allá del apoyo general para el proyecto de la planta de* proppants" [Traducción del Tribunal], que no basta para dar lugar a expectativas legítimas, o que la Demandada "*aprobó*" la decisión de CVG Bauxilum de aumentar el precio de la bauxita[533]. En opinión de la Demandada, esto queda confirmado mediante la declaración oral del Sr. Pedersen, ya que no pudo mencionar un solo documento o comunicado específico en el que se hayan efectuado las supuestas garantías o compromisos. En particular, la Demandada señala que el Sr. Pedersen no logró identificar ninguna reunión en que se hubiera debatido la frase "*bajo el auspicio del* […] *MIBAM*" y se le hubiera dado el significado que ahora alega la Demandante[534].

---

[530] Segundo Escrito posterior a la Audiencia de la Demandada, ¶ 28.
[531] Memorial de Contestación, ¶ 134; Escrito posterior a la Audiencia de la Demandada, ¶ 125.
[532] Memorial de Contestación, ¶ 135, en referencia al DAC del mes de febrero de 2005 (**Anexo R-5**), pág. 5 y con cita de mensaje de correo electrónico de Guy Rolli a Jorgen Pedersen, 16 de febrero de 2005 (**Anexo C-059**); Dúplica, ¶ 127.
[533] Dúplica, ¶¶ 128-133; Escrito posterior a la Audiencia de la Demandada, ¶ 127.
[534] Escrito posterior a la Audiencia de la Demandada, ¶¶ 128-132, en referencia a Transcripción (Día 2), págs. 502-512 y págs. 573-576. *Véase, también,* Segundo Escrito posterior a la Audiencia de la Demandada, ¶ 28.

529. En consecuencia, la Demandada sostiene que el Gobierno "*no hizo más que facilitar los debates con CVG Bauxilum*" [Traducción del Tribunal] y no asumió compromiso alguno ante Norpro Venezuela con respecto al suministro o precio de la bauxita. Por lo tanto, y además de considerar justificado el aumento de precio en virtud del Contrato de Bauxita, la Demandada opina que no tenía ninguna obligación de intervenir y colaborar en la resolución del conflicto entre CVG Bauxilum y Norpro Venezuela[535].

### cc)   El Análisis del Tribunal

530. En opinión del Tribunal, el argumento de la Demandante sobre el aumento de precio de la bauxita se divide en dos partes: En primer lugar, la Demandante alega que al momento en que adoptó la decisión de invertir en Venezuela en el año 2005, la Demandada (a través de sus funcionarios públicos, en particular, el MIBAM) creó una expectativa legítima de que CVG Bauxilum suministraría bauxita a Norpro Venezuela a precios estables a largo plazo, pero luego no intervino cuando CVG Bauxilum aumentó unilateralmente el precio en el año 2008 y, de esa manera, violó dichas expectativas. En segundo lugar, la Demandante alega que la conducta de CVG Bauxilum en violación del Contrato de Bauxita puede atribuirse a la Demandada de acuerdo con el Proyecto de Artículos de la CDI y, a la luz de su monopolio otorgado por el Estado sobre el suministro de bauxita en Venezuela, constituye una violación de las obligaciones internacionales de la Demandada.

531. En lo que respecta al primer argumento, el Tribunal advierte que las Partes están de acuerdo en que si bien, en términos generales, la Demandada apoyó la inversión de la Demandante en los años 2005 y 2006, esto solo no puede generarle responsabilidad a la Demandada en virtud del derecho internacional. Más bien, una expectativa legítima sólo se puede crear mediante promesas o compromisos específicos por parte del Estado. La controversia entre las Partes se refiere a si la Demandada realizó tales promesas específicas en relación con el suministro de bauxita a precios estables.

532. En opinión del Tribunal, las pruebas que presentó la Demandante en este sentido no demuestran que el Estado (a través del MIBAM) haya hecho compromisos específicos en relación con las cláusulas del Contrato de Bauxita y, en particular, los precios a los que CVG Bauxilum suministraría bauxita. En su declaración testimonial escrita, el Sr. Pedersen describió que el MIBAM estuvo ampliamente involucrado en las negociaciones con CVG Bauxilum y expresó su apoyo al proyecto en reiteradas ocasiones[536]. Sin embargo, el Sr. Pedersen no hizo referencia a ningún tipo de compromiso específico por

---

[535] Escrito posterior a la Audiencia de la Demandada, ¶¶ 129 y 134.
[536] Pedersen, ¶¶ 21-33.

parte del MIBAM en relación con el precio de la bauxita. Cuando se le preguntó sobre esto en la Audiencia, el Sr. Pedersen aclaró que:

> "*Francamente, si se lo encara de esa forma, el precio de la bauxita se negoció con el MIBAM, que brindó apoyo para obtener un contrato. Y eso fue acordado con el MIBAM. Y después hubo negociaciones con Bauxilum*"[537].

533.  El testimonio oral del Sr. Pedersen confirma la impresión del Tribunal a partir del expediente de este caso de que el MIBAM facilitó y supervisó las negociaciones con CVG Bauxilum e incluso aprobó los términos generales que regirían el suministro de bauxita. No obstante, la Demandada señaló correctamente que ninguna de las declaraciones realizadas reviste el carácter de compromiso de que el Estado garantizaría el cumplimiento por parte de CVG Bauxilum de las cláusulas sobre precio del Contrato de Bauxita.

534.  La Demandante alega, asimismo, que la expresión "*bajo el auspicio del* […] *MIBAM*"[538] puede equipararse con una "*garantía expresa*" de que CVG Bauxilum suministraría bauxita a Norpro Venezuela en los términos acordados[539]. Cuando se le preguntó sobre esta expresión en la Audiencia, el Sr. Pedersen testificó que en las reuniones con el MIBAM se discutió "*que básicamente apoyaban este contrato [...] y apoyaban a Bauxilum en sus convenios con nosotros*". Sin embargo, el Sr. Pedersen no pudo identificar ninguna reunión específica en la que se haya hecho esa declaración o ningún individuo concreto que la haya hecho[540]. Es por eso que el Tribunal no está convencido de que se haya discutido el término antes de firmarse el Contrato de Bauxita y, lo que es más importante, no hay indicios de que se le fuera a atribuir un significado tan amplio como para asegurar el cumplimiento del Contrato de Bauxita y/o garantizar precios estables a largo plazo.

535.  En síntesis, el Tribunal concluye que la Demandante no logró demostrar la existencia de promesas o compromisos por parte de la Demandada (a través del MIBAM) en relación con el suministro de bauxita al precio acordado con CVG Bauxilum en el Contrato de Bauxita. En consecuencia, la conducta del MIBAM no generó ninguna expectativa legítima de la Demandante de que garantizaría el cumplimiento de las disposiciones relativas al precio del Contrato de Bauxita por parte de CVG Bauxilum.

---

[537] Transcripción (Día 2), pág. 506, líneas 15-19.
[538] Contrato de Compraventa entre CVG Bauxilum, C.A. y Proppants Venezuela, C.A., 27 de enero de 2006 (**Anexo C-6**), Preámbulo.
[539] Presentación posterior a la Audiencia de la Demandante, ¶ 79.
[540] Transcripción (Día 2), pág. 573, línea 20 – pág. 576, línea 3.

536. En lo que respecta al segundo argumento de la Demandante, el Tribunal no tiene que decidir si la conducta de CVG Bauxilum es atribuible a la Demandada conforme al Proyecto de Artículos de la CDI y si un incumplimiento contractual generaría responsabilidad para la Demandada con arreglo al derecho internacional a la luz del monopolio otorgado por el Estado a CVG Bauxilum sobre el suministro de bauxita en Venezuela. Aún si este fuera el caso, la Demandante no demostró que el aumento de precios del mes de septiembre de 2008 constituyera un incumplimiento contractual.

537. CVG Bauxilum fundó el aumento en el Artículo 10.2 del Contrato de Bauxita, que establece lo siguiente:

> "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será aplicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior*"[541].

538. Durante la primera reunión en la que se debatió el aumento de precios, CVG Bauxilum invocó los siguientes motivos: (i) el aumento de 600% del peaje del Río Orinoco; (ii) el impacto de los costos de extracción y producción que eran superiores al precio de venta; (iii) el aumento de los costos de transporte debido al mayor costo de mano de obra; y (iv) el análisis del mercado internacional, que reflejaba que el precio de CVG Bauxilum era más bajo que en el mercado internacional[542].

539. Si bien el Tribunal está de acuerdo con la Demandante en que no todos estos motivos justificaban un aumento de precios en virtud del Contrato de Bauxita, la carta de fecha 2 de septiembre de 2008 por la que CVG Bauxilum informó a la Demandante acerca del aumento de precios a USD 33,8 por TM se basa en "*las nuevas tarifas del canal de Navegación del Río Orinoco*" y "*la apreciable variación que ha experimentado el costo de extracción, transporte y descarga de la bauxita en nuestra Planta de Matanzas*"[543]. Estos motivos se contemplan explícitamente en el Artículo 10.2 del Contrato de Bauxita y, por lo tanto, de probarse, justificarían el aumento de precios.

---

[541] Contrato de Compraventa entre CVG Bauxilum, C.A. y Proppants Venezuela, C.A., 27 de enero de 2006 (**Anexo C-6**), Artículo 10.2.
[542] Mensaje de correo electrónico de Oscar Cid a Jorgen Pedersen, 30 de julio de 2008 (**Anexo C-093**).
[543] Carta de Carlos Acosta Pérez a Oscar Cid, 2 de septiembre de 2008 (**Anexo C-11**).

540. La Demandante no cuestiona que las tarifas de navegación del río Orinoco hayan aumentado un 600% por decreto de fecha 31 de julio de 2008[544]. Tampoco cuestiona el aumento de los costos de extracción, transporte y descarga en la planta de Matanzas. Lo que argumenta la Demandante, tal como lo confirmó el Sr. Pedersen en reiteradas ocasiones durante la Audiencia[545], es que jamás se le proporcionó documentación o un cálculo en relación con el aumento de precios. Si bien alega que solicitó dicha información varias veces, la Demandante no logró identificar una sola ocasión en que haya expresado dicha solicitud, sino que simplemente hace referencia a solicitudes de "*un debate más a fondo del aumento de precios propuesto*" [Traducción del Tribunal], su énfasis en la aplicabilidad del Artículo 10.2 a cualquier aumento de precios y sus protestas contra el aumento que consideraron contrario a las disposiciones del Contrato de Bauxita[546]. Cuando se preguntó al Sr. Pedersen durante la Audiencia si la Demandante alguna vez había solicitado recibir dicha documentación, dijo:

> "*Sí. No sé si está aquí, pero sí en las reuniones que celebramos con ellos sí, se los pedimos. Absolutamente.*
>
> *Coárbitro Brower: ¿Y esa compañía se negó a suministrar esa información? ¿O simplemente no lo dieron y siguieron trabajando?*
>
> *Señor Pedersen: Nunca recibimos nada. Eso fue desafortunado y era muy difícil obtener información. Y por eso también se demoró quince meses en firmar el contrato*"[547].

541. A la luz de este testimonio algo vago, el Tribunal no está convencido de que la Demandante alguna vez haya solicitado documentación sobre los motivos invocados por CVG Bauxilum. En función del expediente, en particular, la carta de la Demandante de fecha 17 de septiembre de 2008, parece más bien que Norpro Venezuela decidió aceptar el aumento de precios, aunque bajo protesta, con la condición de que se mantuviese el precio en ese nivel durante todo el año siguiente, es decir, hasta el 31 de diciembre de 2009[548]. Es incuestionable entre las Partes, y queda confirmado con las facturas que envió CVG Bauxilum a la Demandante en el año 2009[549], que CVG Bauxilum adhirió a esta solicitud y no requirió ningún otro aumento hasta principios de 2010. Si bien la Demandante recalcó en su carta que esto no debería considerarse una aceptación tácita del aumento de precios, el Tribunal advierte que Norpro Venezuela nunca emprendió

---

[544] Decreto No. 6.220 con Rango, Valor y Fuerza de Ley de Canalización y Mantenimiento de la Vías de Navegación), publicado en la Gaceta Oficial N.º 5891 (Extraordinario), 31 de julio de 2008 (**Anexo R-50**).
[545] Transcripción (Día 2), pág. 527, líneas 12-21; pág. 531, líneas 6-10; pág. 533, líneas 8-21; pág. 582:21-583:4; pág. 585, líneas 1-4.
[546] *Cfr.* Presentación posterior a la Audiencia de la Demandante, ¶ 84.
[547] Transcripción (Día 2), pág. 593, líneas 8-20.
[548] Carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo C-12**).
[549] Facturas de CVG Bauxilum, Doc. R Bates números 0041 – 0046 (**Anexo CLEX-83**).

acciones contra CVG Bauxilum en este sentido conforme a la cláusula de resolución de controversias del Contrato de Bauxita.

542. A la luz de lo que antecede, el Tribunal resuelve que la Demandante no logró demostrar que el aumento de precios del mes de septiembre de 2008 no estuviera justificado en virtud del Artículo 10.2 del Contrato de Bauxita. Ante la ausencia de incumplimiento contractual por parte de CVG Bauxilum, no es necesario determinar si la Demandada es responsable por dicho incumplimiento en virtud del derecho internacional.

### 3.    Protección y Seguridad Plenas (Artículo 3(2) del Tratado)

543. Por último, el Tribunal procederá a analizar el alegato de la Demandante basado en la disposición sobre protección y seguridad plenas del Artículo 3(2) del Tratado. Tras un breve análisis del estándar PSP aplicable (**(a)**), el Tribunal considerará los alegatos de PSP de la Demandante en relación con el Contrato de Bauxita (**(b)**) y la toma de control de la planta (**(c)**).

### a)    Estándar PSP Aplicable

#### aa)    Síntesis de la Postura de la Demandante

544. La Demandante afirma que el estándar PSP impone una obligación de "*debida diligencia*" y "*vigilancia*" al Estado receptor, que exige tomar "*medidas razonables de prevención [...] similares a las que se esperarían de un Gobierno bien administrado en circunstancias similares*"[550]. [Traducción del Tribunal]

545. La Demandante alega que, en el "*contexto comercial y empresarial moderno*", los tribunales constituidos en virtud de tratados de inversión no limitan el estándar PSP a la seguridad física sino que lo extienden también a la seguridad jurídica[551]. La Demandante señala que el estándar PSP ha evolucionado y ahora comprende "*en términos más generales, los derechos del inversor*" y se aplica "*al menos, en situaciones de 'violencia física o violación de derechos legales'*"[552]. [Traducción del Tribunal]

546. Aún si el Artículo 3(2) se limitara a la seguridad física, la Demandante sostiene que gozaría del beneficio de la "*protección jurídica plena*" que la Demandada otorgó a

---

[550] Memorial, ¶ 185, con cita de *AAPL c. Sri Lanka* (**CLA-005**), ¶ 77.
[551] Réplica, ¶ 133, con cita de sendas autoridades legales.
[552] Réplica, ¶ 134, con cita de *Vannessa Ventures c. Venezuela.* **Anexo CLA-150,** ¶ 223.

ciudadanos de terceros países en el TBI entre Uruguay y Venezuela en función de la cláusula de la nación más favorecida receptada en el Artículo 4 del Tratado[553].

### bb)   Síntesis de la Postura de la Demandada

547. Según la Demandada, todo análisis de violación del estándar PSP requiere considerar si la inversión fue objeto de intervención o daño físico y si el Estado cumplió con su obligación de debida diligencia[554]. Según la Demandada, esta limitación es necesaria a fin de "*mantener una distinción significativa*" [Traducción del Tribunal] entre el estándar PSP y los estándares de protección establecidos en el Tratado, en particular, el estándar de TJE[555].

548. A la vez que reconoce su deber de diligencia en virtud del estándar PSP, la Demandada alega que toda violación de este deber requiere "*un grado de negligencia, administración defectuosa o mala fe*" [Traducción del Tribunal] que refleje la relación entre el estándar PSP y el estándar internacional mínimo de trato[556].

549. La Demandada rechaza el argumento de la Demandante de que el estándar PSP implica el concepto de "*seguridad jurídica*" y alega que la jurisprudencia internacional está bastante a favor de la opinión de que la obligación de PSP "*se relaciona principalmente, y quizá de manera exclusiva, con la integridad física de la inversión*"[557]. La Demandada recalca que, a diferencia de otros tratados, que contemplan expresamente la "*protección y seguridad jurídica plenas*", el presente Tratado no hace referencia a la seguridad jurídica y, por lo tanto, no está diseñado para convertir incumplimientos contractuales en reclamos sobre tratados[558] .

### cc)   El Análisis del Tribunal

550. El Artículo 3(2) del Tratado dispone lo siguiente:

| | |
|---|---|
| "*Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le* | "*Las inversiones efectuadas por nacionales o sociedades de una u otra de las Partes Contratantes gozarán, en el territorio y en la* |

---

[553] Memorial, nota 379, en referencia al Acuerdo entre la República Oriental del Uruguay y el Gobierno de la República de Venezuela para la Promoción y Protección de Inversiones (20 de mayo de 1997, en vigor desde el día 18 de enero de 2002) (**Anexo C-050**), Artículo 4; Réplica, ¶ 135.
[554] Memorial de Contestación, ¶ 149.
[555] Dúplica, ¶ 144, en referencia a sendas autoridades legales.
[556] Dúplica, ¶ 145.
[557] Memorial de Contestación, ¶¶ 146-148, en referencia a sendas autoridades  legales; Dúplica, ¶ 143.
[558] Memorial de Contestación, ¶¶ 152, 156.

> *territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières*"[559].

> *zona marítima de la otra Parte contratante, de una protección y de una seguridad plenas y completas*"[560].

552.  La traducción al inglés que presentó la Demandante reza lo siguiente:

> "*Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security*"[561].

553.  El Tribunal señala que, si bien las partes están de acuerdo en que el Artículo 3(2) del Tratado impone a la Demandada una obligación de debida diligencia, discrepan en cuanto a (i) el alcance exacto de dicha obligación y (ii) si el estándar PSP abarca la seguridad jurídica. Estas cuestiones pueden quedar sin resolver si se descartan las dos reclamaciones de la Demandante basadas en el estándar PSP del Artículo 3(2), incluso conforme al estándar más amplio que plantea la Demandante. Por lo tanto, el Tribunal determinará el alcance exacto del Artículo 3(2) en la medida que sea necesario para resolver las reclamaciones de la Demandante.

### b)    Los Derechos de la Demandante en virtud del Contrato de Bauxita

### aa)    Síntesis de la Postura de la Demandante

554.  La Demandante afirma que, en vista de la participación del MIBAM en las negociaciones y el celebración del Contrato de Bauxita, consideró al MIBAM "*un interlocutor clave capaz de afrontar cualquier inquietud que pudiera presentarse con el Gobierno*" [Traducción del Tribunal]. Por ese motivo, señala la Demandante, Norpro Venezuela primero escribió al MIBAM y copió al MIBAM en su correspondencia a CVG Bauxilum cuando se encontró ante el aumento de precios del año 2008. No obstante, la Demandante advierte que el MIBAM ignoró las solicitudes de la Demandante de intervenir y, de esa manera, la Demandada no protegió la inversión de la Demandante frente a las acciones de CVG Bauxilum, a pesar de su obligación de PSP[562].

---

[559] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº 102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.
[560] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Anexo C-1**, págs. 332-353-332.354.
[561] Traducción libre al inglés presentada como **Anexo C-1**.
[562] Me
morial, ¶¶ 190-192; Réplica, ¶ 138.

555.   Según la Demandante, el tribunal de *Nykomb c. Latvia* resolvió "*en circunstancias similares*" que la falta de protección por parte de Latvia del inversionista extranjero por incumplimiento contractual de una entidad pública, a pesar de tener conocimiento de ello, constituía una violación de la obligación de PSP[563]. La Demandante hace referencia, asimismo, al énfasis que coloca el tribunal de *CME c. República Checa* en la obligación de "*garantizar que la seguridad y protección acordadas y aprobadas para las inversiones de inversores extranjeros no se vean afectadas por ninguna reforma de ley o medida de órgano administrativo*"[564].[Traducción del Tribunal]

556.   La Demandante alega, por lo tanto, que la inacción de la Demandada ante la notificación de los incumplimientos del Contrato de Bauxita por parte de CVG Bauxilum constituye una violación de su obligación de otorgar seguridad jurídica a la inversión de la Demandante en virtud del Artículo 3(2) del Tratado[565].

### bb)   Síntesis de la Postura de la Demandada

557.   La Demandada afirma que la alegación de la Demandante de que el aumento de precios violó el Contrato de Bauxita, pese a la aceptación de Norpro Venezuela, "*ni siquiera se acerca a activar un deber del Estado de debida diligencia*"[566]. [Traducción del Tribunal]

558.   La Demandada afirma que no es responsable de la decisión de CVG Bauxilum de aumentar el precio en virtud del Contrato de Bauxita. En respuesta al argumento de la Demandante de que le escribió al MIBAM para solicitar su intervención, la Demandada alega que la Demandante intentó, por ese medio, crear una obligación para el Estado al "*comunicar a un representante del Gobierno su disconformidad frente a la conducta de un socio comercial*" [Traducción del Tribunal]*,* lo que la Demandada considera claramente insostenible. En opinión de la Demandada, la posición de la Demandante privaría de sentido a la cláusula de resolución de controversias del Contrato de Bauxita y, en cualquier caso, las partes del Contrato resolvieron su diferencia de manera amistosa cuando CVG Bauxilum explicó los motivos del aumento de precio y Norpro Venezuela aceptó el aumento con la condición de que se mantuviera el precio en el mismo nivel hasta fines del año 2009[567].

### cc)   El Análisis del Tribunal

[563] Memorial, ¶ 193, en referencia a *Nykomb c. Latvia* (**CLA-058**), Sección 4.2.
[564] Memorial, ¶ 188, en referencia a *CME c. República Checa*, (**CLA-019**), ¶ 613.
[565] Réplica, ¶ 142.
[566] Memorial de Contestación, ¶ 150.
[567] Dúplica, ¶¶ 140-142 y ¶ 150. *Véase, también,* Escrito posterior a la Audiencia de la Demandada, ¶¶ 124-126.

559. El Tribunal ya determinó *supra* en el contexto de la reclamación TJE de la Demandante que la Demandante no logró demostrar que la Demandada (a través del MIBAM) haya asumido compromiso alguno en relación con el suministro de bauxita al precio acordado con CVG Bauxilum en virtud del Contrato de Bauxita. El Tribunal también resolvió que la conducta de CVG Bauxilum en relación con el aumento de precios del mes de septiembre de 2008 no constituyó un incumplimiento contractual.

560. Por lo tanto, el Tribunal no tiene que decidir si el estándar PSP receptado en el Artículo 3(2) del Tratado se extiende al concepto de "*seguridad jurídica*", tal como alegara la Demandante. En cualquier caso, la Demandada no estaba obligada a intervenir en relación con el aumento del precio de la bauxita y, en consecuencia, no incumplió su obligación de otorgar protección y seguridad plenas a la inversión de la Demandante del modo invocado por ella.

**c)    Toma de control de la Planta**

**aa)    Síntesis de la Postura de la Demandante**

561. En el supuesto de que el Tribunal acepte la postura de la Demandada de que la expropiación recién ocurrió el día 29 de marzo de 2011 en oportunidad de la sanción del Decreto de Expropiación, la Demandante alega, asimismo, que la Demandada violó su obligación de PSP porque PDVSA tomó el control de la planta y permaneció al mando entre la toma de fecha 15 de mayo de 2010 y la sanción del Decreto de Expropiación[568].

562. La Demandante afirma que si no hubo expropiación el día 15 de mayo de 2010, PDVSA no tenía derecho a ocupar la planta antes del día 29 de marzo de 2011 y, por lo tanto, debería haberse puesto en contacto con la Demandante "[a]*l momento en que obtuvo el control*" [Traducción del Tribunal] y debería haberle permitido volver a ocupar la planta. En cambio, la Demandante explica que la Guardia Nacional, prohibió a su personal reingresar a la planta y PDVSA comenzó a producir para beneficio propio. Según la Demandante, esta conducta constituye un claro incumplimiento de la obligación de PSP de la Demandada en virtud del Artículo 3(2) del Tratado[569].

**bb)    Síntesis de la Postura de la Demandada**

563. La Demandada sostiene que la expropiación ocurrió el día 29 de marzo de 2011 con la sanción del Decreto de Expropiación. La Demandada admite que PDVSA estuvo presente durante el período anterior a dicha fecha pero alega que dicha presencia fue "*apropiada*

---

[568] Presentación posterior a la Audiencia de la Demandante, ¶ 48; Segunda Presentación posterior a la Audiencia de la Demandante, nota 3.
[569] Presentación posterior a la Audiencia de la Demandante,  ¶ 49.

*y necesaria ante los peligros relacionados con la Planta*". La Demandada afirma, además, que no hubo pruebas contemporáneas de denuncias acerca del rol de PDVSA y alega que la Demandante no sólo nunca solicitó la devolución de la planta sino que incluso alentó la presencia de PDVSA en la planta y la designación de un interlocutor, precisamente porque no estaba presente y la planta era "*un establecimiento peligroso en mano de trabajadores sin supervisión*"[570]. [Traducción del Tribunal]

564.  Por lo tanto, la Demandada considera que cumplió con su obligación de PSP y agrega que si, por el contrario, no hubiera estado presente en la planta y se hubieran dañado los equipos o los trabajadores, la Demandante habría tenido un buen fundamento para demandarla por incumplimiento de su obligación de PSP[571].

### cc)  El Análisis del Tribunal

565.  El Tribunal señala que la Demandante planteó su reclamación en subsidio de que el Tribunal resolviera que no hubo expropiación el día 15 de mayo de 2010 o poco tiempo después, sino recién el día 29 de marzo de 2011 con la sanción del Decreto de Expropiación. Dada la conclusión del Tribunal en el párrafo 477 *supra* de que la presencia de PDVSA en la planta y sus memorandos de principios del mes de junio de 2010 marcan el principio del proceso de expropiación, no es necesario resolver esta reclamación formulada en subsidio.

## IV.  LOS PRINCIPIOS EN MATERIA DE CUANTIFICACIÓN DE DAÑOS

566.  El Tribunal procederá a analizar los principios en materia de cuantificación de daños aplicables como consecuencia de la expropiación y del incumplimiento por parte de la Demandada de los incisos 2 y 3 del Artículo 5(1) del Tratado. Las posturas de las Partes difieren considerablemente en cuanto al estándar de compensación aplicable, en particular, con respecto a la fecha de valuación adecuada (**1.**) y a los criterios del cálculo del monto indemnizatorio (**2.**).

### 1.  Estándar de Compensación y Fecha de Valuación

567.  Una de las cuestiones jurídicas principales que es objeto de debate entre las Partes es el estándar de compensación aplicable y, en este contexto, en particular, la fecha de valuación aplicable. Tal como se destacara *supra*, el Tribunal concluye que la Demandada no cumplió con los requisitos de indemnización establecidos en los incisos 2 y 3 del

---

[570] Escrito posterior a la Audiencia de la Demandada, ¶ 20; Segundo Escrito posterior a la Audiencia de la Demandada, nota 42.
[571] Segundo Escrito posterior a la Audiencia de la Demandada, nota 42.

Artículo 5(1) del Tratado. Por lo tanto, la cuestión que consiste en determinar si esta conclusión torna la expropiación ilícita y si esto afectaría el estándar de compensación que ha de aplicarse en el presente caso se abordará en primer lugar en esta sección.

### a) Síntesis de la Postura de la Demandante

### aa) Ilicitud de la Expropiación

568. La Demandante alega que el incumplimiento por parte de la Demandada de los requisitos de fijación y/o prontitud torna la expropiación ilícita[572].

569. La Demandante argumenta que varios laudos dictados por el Tribunal de Reclamaciones Irán-Estados Unidos "*reconocen que el pago de una pronta indemnización es una consideración pertinente para la licitud de una confiscación en virtud del derecho internacional consuetudinario*"[573]. [Traducción del Tribunal]

570. En el contexto de los tratados de inversión, la Demandante alega que el tribunal en el marco del caso *Unglaube c. Costa Rica* concluyó que una expropiación era ilícita cuando no se pagaba compensación "*dentro de un plazo razonable luego de que el Estado declar*[e] *su intención de expropiar*"[574].

571. De modo similar, el tribunal en *Burlington c. Ecuador* confirmó que, en un caso en el que un Estado ha expropiado los bienes de un inversionista extranjero y "*no ha pagado ni ofrecido una indemnización* […] *el Tribunal concluye que* [la] *expropiación* [...] *fue ilegítima*"[575].

572. La Demandante también hace referencia al tribunal en el caso *ConocoPhillips c. Venezuela*, que recientemente concluyó que, si bien "*el pago no es necesario al momento preciso de la expropiación* […], [l]*as Partes deben participar en negociaciones de buena fe en aras de fijar la compensación en términos del estándar establecido* […] *si un pago satisfactorio para el inversor no se propone al comienzo*". En ese caso, el tribunal concluyó que "*la Demandada no cumplió con su obligación de negociar de buena fe a fin de determinar la compensación debida por su expropiación*" y, por ende, que la expropiación fue ilícita[576].

573. Asimismo, la Demandante alega que, en el marco del caso *Siemens c. Argentina*, el tribunal de arbitraje afirmó lo siguiente:

---

[572] Memorial, ¶ 141; Réplica, ¶¶ 77-83.
[573] Memorial, ¶ 141; **Anexo CLA-014**.
[574] Memorial, ¶ 141; **Anexo CLA-051**.
[575] Memorial, ¶ 141; **Anexo CLA-015**.
[576] Memorial, ¶ 141; **Anexo CLA-025**.

"[N]*unca se ha pagado compensación sobre causales que* […]*, según el Tribunal, carecen de justificación. Por estas razones, la expropiación no cumplió con los requisitos del Artículo 4(2)* [del TBI Argentina-Alemania] *y, por consiguiente, fue ilícita*"[577]. [Traducción del Tribunal]

574. En forma similar, en el contexto del caso *Vivendi c. Argentina II*, el tribunal adoptó el siguiente razonamiento:

"*Si concluimos que las medidas en disputa son expropiatorias, estas serán violatorias del Artículo 5(2) del Tratado, aunque pudieran obedecer a una causa de utilidad pública y no ser discriminatorias, <u>ya que no se ha pagado alguna indemnización</u>*"[578].

575. Por último, la Demandante argumenta que, en el marco del caso *Gemplus c. México*, el tribunal concluyó lo siguiente:

"[D]*ichas expropiaciones fueron ilegítimas en virtud de los TBI y el derecho internacional, con fundamento en los hechos determinados por el Tribunal y, <u>además, en el hecho de que la Demandada no satisfizo la condición establecida en el Artículo 5 de ambos tratados respecto del pago de una indemnización adecuada</u>*"[579].

### bb)   Estándar de Compensación Aplicable

576. La Demandante alega que la reparación apropiada para el supuesto de una expropiación ilícita es el estándar de restitución del derecho internacional consuetudinario, es decir, la compensación más elevada entre aquella calculada a la fecha de expropiación y a la fecha del laudo[580].

577. En sustento de su enfoque, la Demandante subraya que el Artículo 5(1) del Tratado prevé el estándar de compensación adecuado sólo cuando se cumplan todas las condiciones de una expropiación lícita. Como esto no ocurre aquí, el estándar de compensación adecuado, que incluye la fecha adecuada en que ha de determinarse el valor, es establecido por el derecho internacional consuetudinario[581].

578. Inicialmente, la Demandante argumentó que la Demandada debe devolverle la planta a la Demandante – lo que es imposible aquí – o pagarle el equivalente en efectivo de una devolución semejante, ambas de cuyas acciones, por ende, tendrían que realizarse a la fecha del laudo[582]. Sin embargo, durante la Audiencia y en su Presentación Posterior a la

---

[577] Réplica, ¶ 78; **Anexo CLA-077**.
[578] Réplica, ¶ 78; **Anexo CLA-024**. Énfasis agregado por la Demandante.
[579] Réplica, ¶ 78; **Anexo CLA-125**. Énfasis agregado por la Demandante.
[580] Presentación Posterior a la Audiencia de la Demandante,  ¶ 73.
[581] Memorial, ¶ 197; Réplica, ¶ 152.
[582] Memorial, ¶¶ 199, 208; Réplica, ¶ 152.

Audiencia, la Demandante resaltó que, en el supuesto de que el Tribunal concluyera que el valor a la fecha de la expropiación es más elevado que el valor a la fecha del laudo, el Tribunal debería determinar la compensación sobre la base del valor a la fecha de expropiación[583].

579. De conformidad con la Actualización de la Valuación de la Demandante, el valor de Norpro Venezuela al día 31 de agosto de 2015 (la fecha de cálculo a efectos de valuación a la fecha del laudo que, en definitiva, el Tribunal debe tener en cuenta en aras de adoptar su decisión) es inferior al valor al día 15 de mayo de 2010[584]. Por lo tanto, la Demandante ahora alega que tiene derecho a una indemnización por el monto del valor de Norpro Venezuela al día 15 de mayo de 2010[585].

580. Según la Demandante, el fundamento subyacente al derecho del inversionista de seleccionar la fecha de valuación es el propósito de otorgarle una compensación íntegra al inversionista que se vio privado de la posibilidad de optar por retener la inversión y gozar de los frutos derivados de ella o por venderla en el momento óptimo. En consecuencia, el inversionista "*debe recibir la ventaja a partir de ese momento, pero no puede ser obligado a asumir la desventaja*"[586]. [Traducción del Tribunal]

581. La Demandante asevera que esta argumentación es coherente con el enfoque adoptado por la Corte Permanente de Justicia Internacional en la decisión que sentó jurisprudencia emitida en el contexto del caso *Chorzów Factory*[587]. En sustento de su argumentación, en sus presentaciones escritas[588], la Demandante se refiere, en particular, a los casos *Biwater c. Tanzania*[589], *Siemens c. Argentina*[590], *ADC c. Hungría*[591], *Kardassopoulos c. Georgia*[592], *Unglaube c. Costa Rica*[593], *ConocoPhillips c. Venezuela*[594], *Texaco c.*

---

[583] Transcripción (Día 1), pág. 33 línea 14 – pág. 34 línea 4; Presentación Posterior a la Audiencia de la Demandante, ¶ 77.
[584] Actualización de la Valuación de la Demandante, Tabla 1.
[585] Carta de la Demandante de fecha 6 de noviembre de 2015.
[586] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 75-76.
[587] Memorial, ¶ 209; Presentación Posterior a la Audiencia de la Demandante, ¶ 73. **Anexo CLA-033**.
[588] Memorial, ¶¶ 210-212 (con notas 408, 409); Réplica, ¶ 146 (nota 302); Presentación Posterior a la Audiencia de la Demandante, ¶¶ 74-75.
[589] **Anexo CLA-013**.
[590] **Anexo CLA-077**.
[591] **Anexo CLA-001**.
[592] **Anexo CLA-046**.
[593] **Anexo CLA-051**.
[594] **Anexo CLA-025**.

*Libia*[595], *CMS c. Argentina*[596], *Vivendi c. Argentina II*[597], *Siag c. Egipto*[598], *Saipem c. Bangladesh*[599], *Funnekotter c. Zimbabwe*[600] y *Yukos c. Rusia*[601].

**b)    Síntesis de la Postura de la Demandada**

**aa)    Licitud de la Expropiación**

582.    La Demandada afirma que el mero hecho de que la indemnización es aún pagadera no convierte a la expropiación en ilícita, si se considera que la Demandada reconoció su obligación de abonar una indemnización e inició el proceso de expropiación conforme a la ley nacional[602].

583.    La Demandada señala que, en su opinión separada en el marco del caso *Sedco c. Irán*, el Juez Brower destacó lo siguiente:

> "*Del mismo modo, debo expresar dudas en cuanto a la cuestión que consiste en determinar si, en virtud del derecho internacional consuetudinario, al final, la mera falta de compensación por parte de un Estado con arreglo al estándar de derecho internacional aquí expuesto necesariamente torna la confiscación subyacente ilícita ipso facto. Si, por ejemplo, en forma contemporánea a la confiscación, el Estado expropiante ofrece un medio de determinación de la indemnización que prima facie parece calculada de manera de derivar en la compensación requerida, pero, en definitiva, no lo es, o si se paga de inmediato una indemnización que, aunque un tribunal concluya posteriormente que no satisfacía el estándar, no era irrazonable prima facie, parecería adecuado no concluir que la propia expropiación fue ilícita, sino que la obligación independiente de compensar no se ha cumplido*"[603]. [Traducción del Tribunal]

584.    Además, en el contexto del caso *Mondev c. EE. UU.*, el tribunal concluyó lo siguiente:

> "[P]*ara que una expropiación sea lícita en virtud del Artículo 1110 [TLCAN], al menos, el Estado expropiador debe reconocer la*

---

[595] **Anexo CLA-083**.
[596] **Anexo CLA-021**.
[597] **Anexo CLA-024**.
[598] **Anexo CLA-144**.
[599] **Anexo CLA-070**.
[600] **Anexo CLA-036**.
[601] **Anexo CLA-153**.
[602] Memorial de Contestación, ¶¶ 161-173; Dúplica, ¶¶ 159-168.
[603] Memorial de Contestación, ¶ 162; **Anexo RL-099**. El Juez Brower también subrayó lo siguiente: "*Si, por otro lado, no se prevé compensación alguna en forma contemporánea a la confiscación, o si la previsión claramente no puede dar lugar a la indemnización requerida, o se paga una compensación irrazonablemente insuficiente al momento de la confiscación, parecería adecuado declarar la propia expropiación ilícita. En esos casos, puede que la restitutio in integrum sea adecuada como reparación que, además de eso o del otorgamiento de una indemnización monetaria, en el supuesto de que se seleccionara esa alternativa, un tribunal podría considerar un otorgamiento de indemnización de daños punitorios*". [Traducción del Tribunal]

> *obligación de compensar al momento de la confiscación o debe existir*
> *un procedimiento en ese momento que la demandante pueda invocar de*
> *manera eficaz e inmediata en aras de garantizar la indemnización*"[604].
> [Traducción del Tribunal]

585. Asimismo, la Demandada alega que, en el caso *CDSE c. Costa Rica*, el hecho de que Costa Rica hubiera expropiado los bienes y no hubiera pagado compensación alguna durante 20 años no tornaba la expropiación ilícita[605]. En el marco del caso *Amoco*, el tribunal resolvió que no existió expropiación ilícita si bien no se pagó indemnización alguna al momento de la confiscación[606].

586. La Demandada también argumenta que, en el caso *American International Group c. Irán*, el tribunal resolvió que la nacionalización de las acciones en una compañía de seguros iraní era lícita una vez que Irán había reconocido la obligación de compensar, aunque no se había pagado indemnización alguna[607].

587. En el contexto del caso *Southern Pacific Properties c. Egipto*, el tribunal no consideró ilícita la expropiación de la demandante, si bien no se había pagado compensación alguna durante 13 años[608].

588. Además, la Demandada alega que, en el caso *LIAMCO c. Libia*, el tribunal resolvió que, aunque no se había pagado indemnización alguna, la nacionalización de los derechos de concesión de la demandante era lícita, dado que Libia había reconocido su obligación de compensar[609].

589. En forma similar, en el marco del caso *Aminoil c. Kuwait*, el tribunal resolvió que la nacionalización de la concesión de Aminoil era lícita a pesar del hecho de que no se había pagado indemnización[610].

590. Por último, la Demandada observa que, luego de analizar el Artículo 5(2) del Tratado Francia-Polonia, que, en su parte sustancial, es similar al Artículo 5(1) del Tratado Francia-Venezuela, el tribunal en el caso *Servier c. Polonía* concluyó específicamente que la cuestión que consistía de determinar si la expropiación era o no lícita no dependía del pago de compensación[611].

### bb)   Estándar de Compensación Aplicable

---

[604] Memorial de Contestación, ¶ 162; **Anexo RL-100**.
[605] Memorial de Contestación, ¶ 162; **Anexo RL-102**.
[606] Memorial de Contestación, ¶ 162; **Anexo CLA-004**.
[607] Memorial de Contestación, ¶ 162; **Anexo RL-104**.
[608] Memorial de Contestación, ¶ 162; **Anexo CLA-80**.
[609] Memorial de Contestación, ¶ 162; **Anexo RL-105**.
[610] Memorial de Contestación, ¶ 162; **Anexo RL-106**.
[611] Dúplica, ¶ 159; **Anexo RL-165**.

591. La Demandada alega que, independientemente de si la expropiación fue lícita o ilícita, la fecha de valuación apropiada es anterior a *"toda amenaza de medidas de expropiación"*, tal como se establece en el inciso 2 del Artículo 5(1) del Tratado[612]. Durante la Audiencia, la Demandada subrayó que, si bien mantiene su postura de que la expropiación tuvo lugar recién el día 29 de marzo de 2011, considera que la fecha de valuación correcta es el día 15 de mayo de 2010, en tanto el Presidente Chávez anunció la expropiación en esa fecha[613].

592. La Demandada se refiere a la redacción, en su opinión, clara e inequívoca, del inciso 2 del Artículo 5(1) del Tratado, de acuerdo con la cual el valor del activo expropiado "*debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación*"[614]. La Demandada afirma que la referencia a "[t]*outes les mesures d'expropriation qui pourraient être prises*", "[a]*ll measures of expropriation which could be taken*" ("[t]*odas las medidas de expropiación que pudieran tomarse*") comprende las expropiaciones tanto lícitas como ilícitas y, en particular, no se limita a las expropiaciones en cumplimiento de los requisitos establecidos en el inciso 1 del Artículo 5(1) del Tratado.

593. La Demandada argumenta que cualquier demora en el pago de indemnización puede ser compensada plenamente por un otorgamiento de intereses y asevera que la evaluación del activo a la fecha del laudo le impondría una sanción pecuniaria a la Demandada[615]. En particular, la Demandada alega que la Demandante no ha establecido que hubiera sufrido algún daño que no pudiera ser compensado plenamente por un monto determinado al día 15 de mayo de 2010[616].

594. Asimismo, la Demandada sostiene que, en el caso de un mero incumplimiento del Estado con la pronta especificación y el pago de la indemnización, el estándar de indemnización en virtud del derecho internacional consuetudinario no permite que se calcule el monto indemnizatorio mediante "*la construcción de un escenario 'contrafáctico' en el cual la posibilidad de expropiación sea excluida hasta la fecha del laudo*", tal como alega la Demandante. La Demandada alude a la "*distinción fundamental*" [Traducción del Tribunal] entre una situación en la que la expropiación está prohibida sin importar cómo se lleve a cabo y la situación en que la expropiación como tal está permitida, pero la manera en que se lleva a cabo no cumple con las condiciones impuestas en el tratado[617]. Según la Demandada, esta postura es acorde a la decisión adoptada por la CPJI en el

---

[612] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 96, 100.
[613] Transcripción (Día 1), pág. 239 línea 2 – pág. 240 línea 21, pág. 242 líneas 12-15.
[614] Memorial de Contestación, ¶ 174; Dúplica, ¶ 190.
[615] Dúplica, ¶ 190; Memorial de Contestación, ¶¶ 175 y 180.
[616] Escrito Posterior a la Audiencia de la Demandada, ¶ 112.
[617] Escrito Posterior a la Audiencia de la Demandada, ¶ 109.

marco del caso *Chorzów Factory*, que también establece una distinción entre esas dos situaciones[618].

595. En sustento de su argumentación, en sus presentaciones escritas[619], la Demandada se refiere, en particular, a los casos *Middle East Cement c. Egipto*[620], *Tecmed c. México*[621], *Wena Hotels c. Egipto*[622], *CME c. República Checa*[623], *Metalclad c. México*[624], *Phillips c. Irán*[625], *LIAMCO c. Libia*[626], *Servier c. Polonia*[627], *Merrill & Ring c. Canadá*[628], *Funnekotter c. Zimbabwe*[629], *Norwegian Shipowners c. EE. UU.*[630] y *Gemplus c. México*[631].

### c)    El Análisis del Tribunal

596. Al momento de determinar el estándar de compensación aplicable y la fecha de valuación pertinente, primero, el Tribunal procederá a considerar si la expropiación fue ilícita y si esto afecta el estándar de compensación que ha de aplicarse en el presente caso (**aa**). Posteriormente, el Tribunal evaluará el estándar de compensación aplicable y, en particular, la fecha de valuación aplicable (**bb**).

### aa)    Relevancia de un Hallazgo de Ilicitud

597. El Tribunal resalta que la jurisprudencia existente citada por las Partes en relación con la cuestión que consiste en determinar si un incumplimiento del requisito de fijación y/o pago de una pronta indemnización torna la expropiación ilícita no parece ser coherente. Esto indica que tanto las circunstancias particulares de cada caso como el estándar individual del TBI desempeñaron un rol decisivo en la conclusión del tribunal respectivo.

598. En el caso que nos ocupa, podría argumentarse, por un lado, que el hecho de que la Demandada no llevara a cabo la expropiación de conformidad con los requisitos de indemnización establecidos en los incisos 2 y 3 del Artículo 5(1) del Tratado torna la

---

[618] Memorial de Contestación, ¶¶ -177-179; Dúplica, ¶ 193; Escrito Posterior a la Audiencia de la Demandada, ¶ 110. **Anexo CLA-033**.
[619] Memorial de Contestación, ¶ 176 (nota 467); Dúplica, ¶¶ 189-191, 195; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 101-102, 106-107, 110.
[620] **Anexo CLA-053**.
[621] **Anexo CLA-082**.
[622] **Anexo CLA-089**.
[623] **Anexo CLA-020**.
[624] **Anexo CLA-052**.
[625] **Anexo CLA-065**.
[626] **Anexo RL-105**.
[627] **Anexo RL-165**.
[628] **Anexo RL-184**.
[629] **Anexo RL-036**.
[630] **Anexo CLA-057**.
[631] Dúplica, ¶ 196; **Anexo CLA-125**.

expropiación ilícita, es decir, en violación de las obligaciones de la Demandada en virtud del Tratado. Si el Tribunal siguiera este argumento, la calificación de "*ilicitud*" no sería indicio de que la Demandada se vio impedida de expropiar Norpro Venezuela *per se*; simplemente serviría como sinónimo de una expropiación que se llevó a cabo en violación de una disposición que las Partes Contratantes acordaron en relación con la forma en que debía llevarse a cabo la expropiación.

599. Por otro lado, cabe destacar que el inciso 1 del Artículo 5(1) del Tratado impone expresamente determinadas condiciones en las cuales se permite una expropiación, a saber, la existencia de una causa de utilidad pública, así como la ausencia de trato discriminatorio y de conflicto con un compromiso especial. Sin embargo, este inciso no hace referencia alguna a la indemnización, que se aborda en dos incisos separados. Por consiguiente, podría argumentarse que debería haber una diferencia entre las condiciones establecidas en el inciso 1, en cuya ausencia la Demandada se habría visto impedida de expropiar Norpro Venezuela *per se*, y los requisitos establecidos en los incisos 2 y 3, que se relacionan con la forma en que debe llevarse a cabo la expropiación.

600. A esta altura, al Tribunal desea subrayar que la distinción entre una expropiación lícita y una expropiación ilícita no debería ser un fin en sí mismo, sino que la cuestión que consiste en determinar si una expropiación se califica como "*ilícita*" debería considerarse a la luz de las consecuencias derivadas de dicha conclusión.

601. Tal como se advirtiera *supra*, la controversia entre las Partes en cuanto a estas consecuencias se concentra en la cuestión que consiste en determinar el estándar de compensación que debe aplicarse: si bien una expropiación lícita indiscutiblemente deriva en una obligación de pagar indemnización, que se calcula con arreglo al estándar establecido en el Artículo 5(1) del Tratado, las Partes disienten en cuanto a si el mismo estándar de compensación también es aplicable en el caso de que el Tribunal concluya que la expropiación fue ilícita.

602. En vista de lo que antecede, el Tribunal opina que no corresponde arribar a una conclusión respecto de si la calificación de "*ilicitud*" debería atribuirse a la expropiación de Norpro Venezuela, sin tener en cuenta al mismo tiempo las consecuencias que una conclusión de tal naturaleza tendría para el estándar de compensación que ha de aplicarse. Asimismo, esta cuestión podría quedar abierta si, debido a los acontecimientos recientes en el mercado de *proppants*, ambos estándares de compensación planteados por las Partes derivarían en el mismo monto indemnizatorio pagadero a la Demandante.

603. Por lo tanto, el Tribunal procederá a analizar la cuestión que consiste en determinar si el estándar de compensación establecido en el Artículo 5(1) del Tratado también es aplicable en el caso de incumplimiento de los requisitos de indemnización establecidos en sus incisos 2 y 3.

**bb)   Análisis del Artículo 5(1) del Tratado**

604. El Artículo 5(1) del TBI Francia-Venezuela dispone en sus versiones auténticas en idiomas español y francés:

*"Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts*

*"Las Partes Contratantes no adoptarán medidas de expropriación o de nacionalisación ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona maritima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuio monto, igual al valor real de las inversiones en cuestión, deber se tasado con relación a la situación econonómica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropriación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tadar a la fecha de la expropriación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la*

> *calculés au taux d'intérêt de         adecuada tasa de interés del*
> *marché approprié*"[632].               mercado"[633].

606. El Tribunal subraya que el Artículo 5(1) del Tratado tiene una estructura clara: Estructuralmente, el inciso 1 prohíbe en principio las medidas expropiatorias. No obstante, dichas medidas pueden justificarse en los siguientes casos: (i) que se basen en una causa de utilidad pública suficiente; (ii) que no sean discriminatorias; y (iii) que no sean contrarias a un compromiso especial. Los incisos 2 y 3 prevén requisitos y/o consecuencias adicionales de una expropiación, a saber, pronta y adecuada indemnización (inciso 2) al igual que la fijación del monto y la efectividad de la indemnización (inciso 3).

607. La cuestión que consiste en determinar si el estándar de compensación contenido en los incisos 2 y 3 del Artículo 5(1) del Tratado es aplicable exclusivamente a una expropiación que cumple con los requisitos adicionales establecidos en los mismos incisos 2 y 3 depende, en particular, de la interpretación de los términos "[t]*outes les mesures d'expropriation qui pourraient être prises*"/"[t]*odas las medidas de expropiación que pudieran tomarse*".

608. Por otro lado, la organización del Artículo 5(1) con tres incisos sin numerar sugiere que deben interpretarse de manera compatible entre sí. Si bien el inciso 1 contiene los requisitos "*por causa de utilidad pública*" y que "*no sean discriminatorias ni contrarias a un compromiso especial*", no alude a la indemnización, que se aborda en los incisos 2 y 3. Podría argumentarse que "[t]*odas las medidas de expropiación que pudieran tomarse*" se refiere a todas las medidas "*lícitas*", esto es, aquellas tomadas conforme a los términos del Artículo 5(1) en su conjunto. Esta opinión también podría respaldarse con el hecho de que, mediante las palabras "[c]*ette indemnité*"/"[e]*sa indemnización*", los requisitos establecidos en el inciso 3 están sujetos a la valuación establecida en el inciso 2. En consecuencia, la ausencia de fijación del monto y de la modalidad de pago del valor calculado de conformidad con el inciso 2 a más tardar en la fecha de la expropiación podría resultar en la inaplicabilidad del estándar de compensación previsto en el Artículo 5(1), en tanto la compensación no habría sido "*pronta*" y, por lo tanto, fue violatoria de esta misma disposición.

---

[632] Gaceta Oficial de la República Francesa N.° 102 del 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.
[633] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

609.  Por otro lado, también podría interpretarse que la estructura del Artículo 5(1) establece una distinción entre los requisitos (sustantivos) establecidos en el inciso 1, en cuya ausencia la expropiación se vería impedida *per se* y, por ende, sería "*ilícita*", y los requisitos de indemnización (adicionales) establecidos en los incisos 2 y 3, que no se relacionan con la licitud de la expropiación. Podría argumentarse que "[t]*odas las medidas de expropiación que pudieran tomarse*" se refiere a cualquier medida, sea en cumplimiento del Artículo 5(1) o no, es decir, sin agregar limitaciones ajenas al propio texto. El hecho de que los incisos 2 y 3 se encuentren vinculados por las palabras "[c]*ette indemnité*"/"[e]*sa indemnización*" también podría señalar que debería interpretarse que la ausencia de un nexo explícito semejante entre los incisos 1 y 2 significa que los requisitos de indemnización son aplicables a todas las expropiaciones.

610.  En vista de lo que antecede, el Tribunal enfrenta interpretaciones contrarias del Artículo 5(1) del Tratado. En particular, la frase "[t]*odas las medidas de expropiación que pudieran tomarse*", y, más específicamente, la palabra "*pudieran*", también es susceptible de dos interpretaciones: o incluye todas las medidas que el Estado está autorizado a tomar o incluye todas las medidas que sería posible que tome el Estado.

611.  Sin embargo, la cuestión relativa a la relación precisa entre los tres incisos del Artículo 5(1) y al estándar de compensación que ha de aplicarse, no requiere una decisión si, tal como se destacara *supra*, ambos estándares de compensación planteados por las Partes derivaran en el mismo monto indemnizatorio pagadero a la Demandante. En este aspecto, cabe resaltar que ambas Partes coinciden en que, en el caso de que la valuación a la fecha de expropiación arrojara un valor más elevado que la valuación a la fecha del laudo, el Tribunal debería determinar el monto indemnizatorio pagadero a la Demandante sobre la base del valor a la fecha de expropiación[634].

612.  Conforme a la solicitud del Tribunal de fecha 13 de agosto de 2015, ambas Partes les ordenaron a sus peritos que actualizaran sus valuaciones a la fecha del laudo y evaluaran la planta al día 31 de agosto de 2015. Estas Actualizaciones de la Valuación se presentaron simultáneamente el día 22 de octubre de 2015[635], y ambas Partes tuvieron simultáneamente la oportunidad de realizar comentarios acerca de la Actualización de Valuación de la Parte contraria[636]. A esta fecha, ambos peritos calcularon un valor de la planta que era inferior al valor que habían calculado respecto de la planta a la fecha de expropiación. En particular, el perito de la Demandante, el Prof. Spiller, calculó el valor

---

[634] *Cfr.* Presentación Posterior a la Audiencia de la Demandante, ¶ 77; Escrito Posterior a la Audiencia de la Demandada, ¶ 106.
[635] *Véanse* Actualización de la Valuación de la Demandante y Actualización de la Valuación de la Demandada, ambas de fecha 22 de octubre de 2015.
[636] *Véanse* carta de la Demandante y carta de la Demandada, ambas de fecha 6 de noviembre de 2015.

de la planta al día 31 de agosto de 2015 en USD 90,3 millones (en comparación con USD 99,5 millones al día 15 de mayo de 2010)[637]. Según los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores, la planta tenía un valor negativo de USD 27,6 millones al día 31 de agosto de 2015 (en comparación con un valor positivo de USD 9,5 millones al día 15 de mayo de 2010)[638].

613. A la luz de estos acontecimientos, la Demandante solicitó expresamente en su carta de fecha 6 de noviembre de 2015 que se le otorgue una indemnización por el monto de USD 99,5 millones con más intereses anteriores al laudo, esto es, el valor que, según afirma, tenía Norpro Venezuela al día 15 de mayo de 2010[639].

614. Por consiguiente, no es necesario que el Tribunal arribe a una conclusión en este contexto en cuanto a la cuestión que consiste en determinar si el estándar de compensación que ha de aplicarse es el estándar contenido en los incisos 2 y 3 del Artículo 5(1) del Tratado o, en su lugar, el estándar de restitución en virtud del derecho internacional consuetudinario. En cualquier caso, el monto indemnizatorio pagadero a la Demandante se basará en la valuación de Norpro Venezuela a la fecha de expropiación, a saber, el día 15 de mayo de 2010.

## 2.   Criterios para el cálculo del Monto Indemnizatorio

615. El Tribunal procederá ahora a abordar los criterios para el cálculo del monto indemnizatorio de la Demandante. En este contexto, el Tribunal primero determinará el método de valuación pertinente (**a**); luego, determinará los criterios para calcular el valor de Norpro Venezuela sobre la base de ese método (**b**); y, por último, abordará las supuestas pérdidas históricas vinculadas al aumento del precio de la bauxita (**c**).

### a)   Método Valuatorio

#### aa)   Síntesis de la Postura de la Demandante

---

[637] Dado el enfoque adoptado por el Prof. Spiller en virtud del cual considera, como valor a ser compensado por la Demandada, el monto más reducido de los siguientes: (i) el valor basado en el modelo FFD, incluidos los flujos de fondos contrafácticos históricos (de corresponder); y (ii) los costos de construcción correspondientes a una planta comparable, incluidos los flujos de fondos perdidos durante el período de construcción, la cifra al día 15 de mayo de 2010 refleja los costos de construcción (en comparación con un valor basado en el modelo FFD de USD 116,4 millones, incluido el aumento del precio de la bauxita). Por el contrario, el valor al día 31 de agosto de 2015 refleja el valor basado en el modelo FFD (en comparación con los costos de construcción de USD 94,8 millones). *Véase* Actualización de la Valuación de la Demandante, Tabla 1.

[638] En el cálculo del Dr. Flores y del Sr. Brailovsky, ambas cifras reflejan el valor basado en el modelo FFD de la planta, incluidos los flujos de fondos contrafácticos históricos (de corresponder). Actualización de la Valuación de la Demandada, Tabla 1 y ¶ 8 (nota 18).

[639] Carta de la Demandante de fecha 6 de noviembre de 2015, pág. 3.

616.   La Demandante alega que la Demandada debe pagar una compensación íntegra por la planta expropiada y hace referencia a las *Directrices sobre el Trato de la Inversión Extranjera Directa* del año 1992 (las "***Directrices del Banco Mundial***") de conformidad con las cuales la indemnización por expropiación "*se considerará* 'adecuada' *si se basa en el valor justo de mercado del activo confiscado*"[640]. [Traducción del Tribunal]

617.   Si bien la Demandante sostiene que el estándar de compensación previsto en el Artículo 5(1) del Tratado no es aplicable en el presente caso, sino que dicha indemnización debe determinarse en consonancia con el estándar de reparación íntegra del derecho internacional consuetudinario, la Demandante subraya que el propio Tratado refleja el principio del "*valor justo de mercado*" en su estándar de cálculo de la indemnización por expropiación lícita[641]. [Traducción del Tribunal]

618.   La Demandante también alude al comentario del Proyecto de Artículos de la CDI en virtud del cual "[l]*a indemnización por el valor en capital del bien confiscado o destruido como consecuencia de un hecho internacionalmente ilícito generalmente se calcula con arreglo al* 'valor normal de mercado' *del bien perdido*"[642].

619.   La Demandante también se refiere a la definición de valor justo de mercado en el contexto del caso *Starret Housing Corp c. Irán*:

> "*el precio al que un comprador interesado compraría productos determinados y el precio al que un vendedor interesado los vendería con la condición de que ninguna de las partes* [se encuentre] *bajo algún tipo de coerción y que ambas partes tengan información suficiente acerca de todas las circunstancias pertinentes involucradas en la compra*"[643]. [Traducción del Tribunal]

620.   En tanto la inversión era una "*empresa en marcha*", la Demandante argumenta que el cálculo del valor justo de mercado debe tener en cuenta la rentabilidad y las perspectivas futuras de la planta. En este aspecto, la Demandante se refiere a su experto en cuantía de daños, el Prof. Spiller, que sugiere que un tercero comprador pagaría el monto más reducido de los siguientes: (i) el valor actual neto de los flujos de fondos que un comprador interesado podría obtener de la adquisición de una participación del 100 % en Norpro Venezuela; y (ii) el costo de oportunidad en que un comprador interesado incurriría si construyera una planta similar fuera de Venezuela, que está compuesto por

---

[640] Memorial, ¶¶ 203-204, que hace referencia a El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), pág. 11.
[641] Memorial, ¶¶ 197-198 y ¶206; Réplica, ¶¶ 143-146.
[642] Réplica, ¶ 154, que cita a James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), pág. 225.
[643] Memorial, ¶ 105, que cita *Starrett Housing Corp. c. Irán* (**CLA-081**), ¶ 18.

la suma de los costos de construcción y los flujos de fondos de los que se vio privado durante el período de construcción[644].

621. En lo que respecta al segundo enfoque, la Demandante afirma que la "*información más precisa disponible*" son los costos de construcción reales de la planta de *proppants* cerámicos de la Demandante ubicada en Little Rock, Estado de Arkansas (Estados Unidos) terminada a fines del año 2013 que – al igual que Norpro Venezuela – produce los *proppants* cerámicos a base de bauxita de la mejor calidad por medio de una tecnología de proceso seco[645]. La Demandante argumenta que, además del hecho de que no hay plantas comparables en Venezuela, los costos son los mismos independientemente de si la planta similar se construye en los EE. UU. o en Venezuela, ya que "*las plantas tienen estructuras de costos ajustadas por riesgos similares*" y "*las ventajas y desventajas en materia de costos vinculadas a un lugar en particular pueden compensarse entre sí*"[646]. [Traducción del Tribunal]

622. Según el cálculo del Prof. Spiller al día 15 de mayo de 2010, el costo de oportunidad para la construcción de una planta similar en los EE. UU. sería inferior al valor actual neto de los flujos de fondos futuros de Norpro Venezuela (USD 99,5 millones en comparación con USD 115,1 millones). Por consiguiente, la Demandante opina que el Tribunal debería determinar el valor justo de mercado de la planta expropiada sobre la base del enfoque de los costos de construcción[647].

### bb)    Síntesis de la Postura de la Demandada

623. La Demandada concuerda en que el monto indemnizatorio a ser abonado debe reflejar el valor justo de mercado de la planta como una empresa en marcha, es decir, "*el monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado*". La Demandada también coincide en que esta cifra puede determinarse mediante el cálculo de los "*flujos de fondos proyectados* […] *sobre la base de supuestos razonables al día 15 de mayo de 2010 y descontados a su valor actual neto a esa fecha a través de una tasa de descuento adecuada*"[648]. [Traducción del Tribunal]

624. En respuesta a la invocación por parte de la Demandante del estándar de reparación íntegra del derecho internacional consuetudinario, la Demandada asevera que el estándar establecido en el Artículo 5(1) del Tratado es "*coherente con los conceptos tanto*

---

[644] Réplica, ¶¶ 155-156, que hace referencia a la Segunda Valuación de Daños del Prof. Spiller de fecha 18 de junio de 2014 ("**Spiller II**"), ¶ 5; Escrito Posterior a la Audiencia de la Demandante, ¶ 90.

[645] Réplica, ¶¶ 189-191; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 92 y 93.

[646] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 91 y 95.

[647] Réplica, ¶¶ 157, 187 y 196; carta de la Demandante al Tribunal de fecha 6 de noviembre de 2015; Spiller II, Tabla 12.

[648] Memorial de Contestación, ¶¶ 185-187; Escrito Posterior a la Audiencia de la Demandada, ¶ 137.

*tradicional como contemporáneo de indemnización* 'íntegra' *o* 'adecuada'"[649]. [Traducción del Tribunal]

625. La Demandada no cree necesario considerar el enfoque del Prof. Spiller para comparar la valuación basada en el modelo FFD con los costos de oportunidad de construir una planta similar en detalle dado que conforme a sus expertos en cuantía de daños, el Sr. Brailovsky y el Dr. Flores, tales costos excederían el precio que un comprador interesado estaría dispuesto a pagar por la planta de la Demandante (USD 43,7 millones más los flujos de efectivo no percibidos de USD 1,3 millones al día 15 de mayo de 2010 frente a USD 9,5 millones)[650].

626. En cualquier caso, la Demandada enfatiza que el activo a ser evaluado en el presente caso es una planta autónoma ubicada en Venezuela, no en los Estados Unidos y, por consiguiente, arguye que la única manera adecuada de evaluar la indemnización pagadera a la Demandante es mediante la aplicación de un análisis FFD, incluida una tasa de descuento que tome en cuenta el hecho de que la planta está ubicada en Venezuela[651]. Si se evaluaran los costos de construcción, la Demandada alega que tendrían que calcularse los costos en Venezuela (no en los EE. UU.) y en función de supuestos "*coherentes con el análisis FFD que se utiliza a efectos comparativo*s"[652]. [Traducción del Tribunal]

### cc)    El Análisis del Tribunal

627. Inicialmente, el Tribunal destaca el acuerdo de las Partes según el cual la indemnización que la Demandada ha de pagar por la expropiación de Norpro Venezuela debería reflejar el valor justo de mercado de la planta como una empresa en marcha al día 15 de mayo de 2010[653]. Primero, este valor refleja el estándar de compensación previsto en los incisos 2 y 3 del Artículo 5(1) del Tratado, que dispone que la indemnización debe ser igual al "*valor real*" ("*valeur réelle*" / "*actual value*") de la empresa en marcha Norpro Venezuela. Segundo, el valor justo de mercado también refleja el estándar de compensación en virtud del derecho internacional consuetudinario reflejado en el Proyecto de Artículos de la CDI y en las *Directrices del Banco Mundial*. Mientras que el Artículo 35 del Proyecto de Artículos de la CDI establece, principalmente, que el Estado está obligado a la restitución

---

[649] Dúplica, ¶ 197.
[650] Memorial de Contestación, ¶ 188; Dúplica, ¶ 201; Escrito Posterior a la Audiencia de la Demandada, ¶ 138 y ¶¶ 204-208; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 63; Segundo Informe Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores ("**Brailovsky/Flores II**"), ¶¶ 227 y 242.
[651] Dúplica, ¶¶ 202-203.
[652] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 138 y 202.
[653] El Tribunal subraya que ambas Partes se refieren repetidamente a "*la Planta*" como el bien expropiado. Tal como acertadamente sostuviera la Demandada en su Memorial de Contestación (¶ 188), sin embargo, el bien a ser valuado en el presente caso es "*la Planta operada como una empresa en marcha*". El Tribunal, por consiguiente, se referirá al bien expropiado como "*Norpro Venezuela*" o "*la empresa en marcha*".

por el daño causado, el Artículo 36 dispone, en subsidio, que ("*en la medida en que dicho daño no sea reparado por la restitución*"), el Estado está obligado a pagar una indemnización que "*cubrirá todo daño susceptible de evaluación financiera, incluido el lucro cesante en la medida en que éste sea comprobado*"[654]. Tal como señala correctamente la Demandante, en el Comentario del Artículo 36, la CDI establece que "[l]*a indemnización por el valor del capital del bien confiscado o destruido como consecuencia de un hecho internacionalmente ilícito generalmente se calcula con arreglo al* 'valor normal de mercado' *del bien perdido*"[655]. De modo similar, con respecto a las expropiaciones, las *World Bank Guidelines* disponen que "[l]*a indemnización se considerará* 'adecuada' *si se basa en el valor justo de mercado del activo confiscado*"[656][Traducción del Tribunal]. En consecuencia, una vez más, no es necesario que el Tribunal se pronuncie respecto del estándar de compensación aplicable en el caso que nos ocupa, en tanto ambos estándares requieren la determinación del valor justo de mercado de Norpro Venezuela al día 15 de mayo de 2010.

628. Asimismo, las Partes coinciden en que el valor justo de mercado es igual al monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado, siempre que el comprador esté informado acerca de todas las circunstancias pertinentes y ninguna de las partes se encuentre bajo cualquier tipo de coacción para vender o adquirir el activo[657]. Esto es confirmado por las *Directrices del Banco Mundial*, que también se refieren al "*monto que un comprador interesado normalmente le pagaría a un vendedor interesado*" en vista de todas las circunstancias pertinentes[658]. [Traducción del Tribunal]

629. Por último, las Partes coinciden en que, dado que la planta era una empresa en marcha con anterioridad a la expropiación, su valor justo de mercado puede evaluarse mediante el cálculo del valor actual neto de los flujos de fondos futuros de Norpro Venezuela. Por consiguiente, los peritos de ambas Partes han calculado los flujos de fondos futuros de la empresa en marcha y, luego, aplicado una tasa de descuento a esos flujos de fondos en aras de obtener su valor actual neto.

630. Sin embargo, el perito de la Demandante, el Prof. Spiller, ha planteado un enfoque adicional a fin de calcular el valor, a saber, a través de la evaluación del costo de

---

[654] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Artículo 36.
[655] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Artículo 36, ¶ 22.
[656] El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Sección IV, ¶ 3.
[657] *Cfr.* la definición proporcionada por el tribunal en *Starrett Housing Corp. c. Irán,* que se ha citado en el párrafo 619 *supra*.
[658] El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Sección IV, ¶ 5.

oportunidad de construir una planta comparable en los EE. UU. (que está compuesto por el costo de construcción más los flujos de fondos perdidos durante el período de construcción). Según el Prof. Spiller, un comprador interesado pagaría sólo el monto más reducido de los obtenidos por medio de la aplicación del método FFD, por un lado, y del enfoque de los costos de construcción, por el otro. Por ende, ha comparado los dos valores y concluido que el valor de los costos de construcción al día 15 de mayo de 2010 (USD 99,5 millones) es inferior al valor FFD a esa fecha (USD 115,1 millones) y, en consecuencia, refleja el valor que ha de ser compensado por la Demandada[659].

631. Al Tribunal le parece que la Demandada no impugna el enfoque adoptado por el Prof. Spiller que consiste en comparar los dos valores en sí mismos, sino que hace lo siguiente: (i) afirma que la comparación debería hacerse con una planta ubicada en Venezuela y en consonancia con los supuestos aplicados en el cálculo FFD; y (ii) en cualquier caso, considera que el enfoque de los costos de construcción carece de relevancia a la luz de la conclusión de sus peritos según la cual el valor FFD de Norpro Venezuela (USD 9,5 millones) es inferior al costo de oportunidad de una planta similar ubicada en los EE. UU. (USD 43,7 millones más los flujos de fondos de los que se vio privada de USD 1,3 millones al día 15 de mayo de 2010)[660].

632. A esta altura, al Tribunal desea expresar sus dudas en cuanto a la aplicabilidad general del enfoque para determinar el valor justo de mercado de un activo específico, por ejemplo, en el presente caso, la empresa en marcha, mediante la evaluación del costo de oportunidad de construir una planta diferente. En particular, el Tribunal no está convencido de que, incluso si el costo de oportunidad fuera inferior al valor basado en el FFD de Norpro Venezuela, éste derivaría en un valor justo de mercado menor de la inversión de la Demandante en virtud de cualquiera de los estándares de compensación planteados en el caso que nos ocupa.

633. No obstante, no es necesario que el Tribunal forme una opinión definitiva acerca de la adecuación general de este enfoque, ya que, en cualquier caso, el Tribunal considera que los cálculos del costo de oportunidad realizados por los peritos de las Partes no son concluyentes en las circunstancias actuales. Específicamente, el Tribunal coincide con la Demandada en que una planta ubicada en Little Rock, Estado de Arkansas, no puede compararse con la empresa en marcha que ha de evaluarse en el marco del presente arbitraje. Lo mismo es aplicable a la comparación efectuada por los peritos de la Demandada con un promedio de otras plantas ubicadas en los EE. UU.

---

[659] Spiller II, ¶ 5 y Tabla 12.
[660] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 138 y 202; Brailovsky/Flores II, ¶¶ 227 y 242.

634. La propia Demandante reconoce que hay "*ventajas y desventajas en materia de costos vinculadas a un lugar en particular*", pero argumenta que estas "*pueden compensarse entre sí*"[661]. El Tribunal tiene conocimiento de que el Prof. Spiller explicó durante la Audiencia que aplicó un factor de ajuste a fin de dar cuenta de las "*Economías de Escala y Diferencias de Alcance*"[Traducción del Tribunal], que, en su opinión, se compensan entre sí[662]. Sin embargo, el Tribunal no está convencido de que este factor de ajuste refleje todas las diferencias que han de tenerse en cuenta al momento de analizar instalaciones de producción altamente especializadas en dos mercados que son tan diferentes como el mercado maduro de los EE. UU. y el mercado emergente de Venezuela.

635. Puesto que ninguna de las Partes alega que existe una planta comparable en Venezuela, el Tribunal ignorará el enfoque de los costos de construcción y determinará los criterios para evaluar el valor justo de mercado de Norpro Venezuela sobre la base de una empresa en marcha, es decir, en función del cálculo FFD realizado por los peritos de ambas Partes respecto de la fecha de valuación del día 15 de mayo de 2010.

### b) Valor Justo de Mercado Basado en el Método FFD de Norpro Venezuela

636. Si bien las Partes coinciden en que, en principio, el análisis del flujo de fondos descontados es un método adecuado a fin de determinar el valor de Norpro Venezuela, sus peritos arriban a resultados considerablemente diferentes respecto de dicho valor al día 15 de mayo de 2010, a saber, entre USD 115,1 millones según el cálculo del perito de la Demandante, el Prof. Spiller, y USD 9,5 millones según el cálculo de los peritos de la Demandada, el Dr. Flores y el Sr. Brailovsky. El mayor punto de desacuerdo entre los peritos se relaciona con la tasa de descuento que ha de aplicarse a los flujos de fondos futuros; por ende, el Tribunal procederá a abordar esta cuestión en primer lugar (**aa**). En una segunda etapa, el Tribunal abordará los demás puntos de desacuerdo relativos al cálculo de los flujos de fondos futuros de Norpro Venezuela (**bb**). Tal como se determinara *supra*, el Tribunal procederá a abordar tanto la tasa de descuento aplicable como los flujos de fondos futuros desde la perspectiva de un comprador interesado al día 15 de mayo de 2010.

### aa) Tasa de Descuento

### (i) Síntesis de la Postura de la Demandante

637. La Demandante alega que los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores, aplicaron "*una tasa de descuento absurdamente elevada del 26 %*", que tiene como

---

[661] Presentación Posterior a la Audiencia de la Demandante, ¶ 91.
[662] Presentación de Apertura del Prof. Spiller, diapositiva 32.

resultado un valor que implica que "*ningún inversionista razonable invertiría en una nueva planta de proppant o le agregaría capacidad a una planta de proppant existente*"[663]. [Traducción del Tribunal]

638. La Demandante alega que la tasa de descuento del 26 % no tiene precedentes y supone más del doble de la tasa de descuento que los tribunales adoptan por lo común en el marco de arbitrajes CIADI. Según la Demandante, el costo de capital propio de los EE. UU. que proponen se "*aleja completamente de cualquier otra estimación que obra en el expediente*" y, además, es incoherente con el propio cálculo de la Demandante respecto del proyecto en el año 2006, en vista de que las tasas de interés han caído desde entonces[664]. [Traducción del Tribunal]

639. En particular, la Demandante rechaza el uso por parte del Sr. Brailovsky y del Dr. Flores de una "*prima por tamaño*" del 2,66 %, por las siguientes razones: (i) la bibliografía "*no* [es] *concluyente*" en cuanto a su aplicabilidad a las inversiones extranjeras; (ii) el Prof. Damodaran la ha rechazado por considerarla una duplicación; y (iii) su aplicación contabilizaría dos veces el riesgo país en Venezuela donde Norpro Venezuela no puede clasificarse como una empresa pequeña[665]. [Traducción de Tribunal]. La Demandante también rechaza el uso de una tasa libre de riesgo basada en la tasa interna de retorno al contado de los bonos del Tesoro de los EE. UU. a 20 años a la fecha de valuación y destaca que el bono a 10 años utilizado por el Prof. Spiller es recomendado por el Prof. Damodaran y refleja el hecho de que la mayor parte de los flujos de fondos en los modelos de los peritos se perciben en diez años o menos[666].

640. Con respecto a la prima de riesgo de mercado (PRM), la Demandante asevera que la prima histórica promedio empleada por el Sr. Brailovsky y el Dr. Flores no es apropiada a la luz de la proximidad de la crisis financiera 2008-2009, que "*distorsiona la PRM proveniente de los rendimientos históricos*". Según la Demandante, este acontecimiento llevó al Prof. Damodaran a reemplazar este método por una recomendación que se basa en "*un amplio*

---

[663] Réplica, ¶ 158, que cita Spiller II, ¶ 28.

[664] Réplica, ¶ 160; Presentación Posterior a la Audiencia de la Demandante, ¶ 103, que hace referencia a la Presentación de Apertura del Prof. Spiller, diapositiva 5; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 73.

[665] Réplica, ¶ 165; Presentación Posterior a la Audiencia de la Demandante, ¶ 103, que hace referencia a la Presentación de Apertura del Prof. Spiller, diapositiva 22, que cita la siguiente afirmación del Prof. Damodaran: "*Agregar una prima máxima pequeña me parece una manera no sólo descuidada (y muy errónea) de ajustar los rendimientos esperados, sino también una renuncia a la misión de la valuación intrínseca, que consiste en desarrollar los números sobre la base de los principios fundamentales*". [Traducción del Tribunal] **Anexo CLEX-114**, pág. 2. *Véase* también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 81.

[666] Réplica, ¶ 166; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 82.

*estudio de los métodos*", que aún incluye el promedio histórico como la prima más elevada[667]. [Traducción del Tribunal]

641. La Demandante también argumenta que la "*exorbitant*e" prima de riesgo país del 13,92 % que el Sr. Brailovsky y el Dr. Flores aplicaron en nombre de Venezuela es una "*medida desesperada para que el Estado trate de evitar hacerse cargo de sus acciones*". Según la Demandante, este salto refleja las amenazas del Presidente Chávez de expropiar todas las inversiones extranjeras en Venezuela sin compensación alguna[668]. Sin embargo, la Demandante afirma que un Estado "*no puede utilizar su propia tendencia a violar la ley para reducir el valor de la indemnización por expropiación*"[669]. Por lo tanto, adopta la postura según la cual la "*amenaza generalizada de confiscación*" debe eliminarse del cálculo del valor justo de mercado, ya que, de otro modo, la Demandada sería recompensada por la conducta ilícita que el presente arbitraje está destinado a subsanar[670]. [Traducción del Tribunal]

642. La Demandante resalta que esta lógica debería aplicarse en el caso de expropiaciones tanto lícitas como ilícitas, puesto que tanto el estándar en virtud del Tratado como el estándar en virtud del derecho internacional consuetudinario requieren que "*cualquier valuación del activo expropiado elimine las amenazas del Estado de confiscar el activo expropiado*". Aunque reconoce que los tribunales en los casos *Tidewater c. Venezuela, Mobil c. Venezuela* y *Venezuela Holdings c. Venezuela* han optado por no seguir este enfoque en el supuesto de una expropiación lícita, la Demandante afirma que ningún tribunal ha hecho lo mismo en el caso de violación de un tratado y hace referencia específica a la conclusión del tribunal en el contexto del caso *Gold Reserve c. Venezuela* según la cual "*no corresponde aumentar la prima de riesgo país para reflejar la percepción del mercado de que un Estado puede tener tendencia a expropiar inversiones en violación de las obligaciones en virtud del TBI*"[671]. Según la Demandante, de otro modo, se permitiría que un país "*se beneficiara de un régimen de compromiso al trato*

---

[667] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 76-77, que hace referencia a Spiller II, Tabla 15.

[668] Réplica, ¶ 161; Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 55.

[669] Réplica, ¶ 162, que cita *Occidental c. Ecuador* (**CLA-061**), ¶ 564; Presentación Posterior a la Audiencia de la Demandante, ¶ 110, que hace referencia, en particular, a *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841.

[670] Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 56 y ¶ 59.

[671] Presentación Posterior a la Audiencia de la Demandante, ¶ 113 y ¶ 117, que cita *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841. La Demandante subraya que, en ese caso, el tribunal, en definitiva, aplicó una prima de riesgo del 4 % respecto de Venezuela. La Demandante también invoca al tribunal en el contexto del caso *OI European c. Venezuela* que coincidió con el demandante en que la prima de riesgo país debía excluir el efecto de los "*mensajes negativos en el entorno empresarial acerca de posibles expropiaciones*" expuestos por Venezuela, pero no encontró evidencia alguna de que la prima del 6 % propuesta por Venezuela se viera afectada por estos mensajes negativos. [Traducción del Tribunal] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 57 y nota 87, que hace referencia a *OI European c. Venezuela* (**CLA-156**), ¶ 782.

*justo a fin de atraer inversionistas extranjeros y posterior revocación general de tales compromisos*"[672]. [Traducción del Tribunal]

643. La Demandante asevera que, a diferencia del perito de la demandante en el caso *Tidewater c. Venezuela*, el Prof. Spiller ha excluido sólo el riesgo de confiscación de la prima de riesgo país, pero tuvo en cuenta correctamente "*otros riesgos de invertir en Venezuela, tales como los riesgos de una economía volátil, desorden civil, una infraestructura subdesarrollada y otras cuestiones*". La Demandante alega que el Prof. Spiller consideró el diferencial promedio de bonos soberanos de países con una calificación B1, tales como Venezuela, que incluye a muchos países en desarrollo con "*un riesgo país considerable, incluso riesgos políticos*"[673]. [Traducción del Tribunal]

644. Por otro lado, la Demandante alega que el enfoque del Sr. Brailovsky y del Dr. Flores basado en el Modelo de Calificación de Riesgo País (*CRRM*, por sus siglas en inglés), "*por definición, incorpora la percepción de los inversionistas* [institucionales] *del riesgo de invertir en Venezuela en las condiciones político-económicas actuales, incluido el de las expropiaciones sin compensación*". En forma similar, la Demandante asevera que el diferencial "*sumamente elevado*" de los bonos soberanos venezolanos de conformidad con el Índice *EMBI* no refleja la falta de capacidad de pago de Venezuela (tal como lo refleja su calificación B1), sino su falta de voluntad de pago[674]. [Traducción del Tribunal]

645. En relación con el *CRRM*, la Demandante alega que no sólo es "*intrínsecamente poco fiable*", sino especialmente inapropiado en la "*compleja situación político-económica*" actual de Venezuela. En respuesta al argumento de que el *CRRM* ha generado tasas "*constantes*" durante los últimos veinte años, la Demandante afirma que esto no es coherente con el argumento de la Demandada según el cual el riesgo país aumenta desde 2005, año en el que la Demandante invirtió en Venezuela y el EMBI rondaba el 2 %[675]. La Demandante también rechaza el argumento de la Demandada en virtud del cual el *EMBI* se ha ubicado en un promedio del 10 % durante el mismo período, en tanto este horizonte temporal incluye una serie de "*valores atípicos*" en la historia del país, lo que

---

[672] Presentación Posterior a la Audiencia de la Demandante, ¶ 114. *Véase* también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 64.

[673] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 105-106; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 60 y ¶ 67. La Demandante argumenta que una manera de "*verificar*" esto consiste en analizar los diferenciales de swap de riesgo crediticio (CDS, por sus siglas en inglés) pendientes respecto de las deudas soberanas de los países y resalta que, en la lista de 63 países del Prof. Damodaran al mes de enero de 2014, la prima propuesta por el Prof. Spiller del 4,5 % calificaría como la cuarta más elevada después de Argentina (14,73 %), Venezuela (10,8 %) y Túnez (4,57 %) y, por ende, se encuentra "*muy por encima de la prima de riesgo país típica de un país en desarrollo*". [Traducción del Tribunal] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 61-62, que hace referencia al **Ap. BF-66**, págs. 23-25.

[674] Presentación Posterior a la Audiencia de la Demandante, ¶ 118; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 63.

[675] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 120-121.

tuvo un "*efecto extremo*" en el gobierno, pero no en los inversionistas privados, y, en consecuencia, convierte al *EMBI* en una "*tasa artificial que refleja expectativas políticas y no evaluaciones económicas*"[676]. [Traducción del Tribunal]

646. Por lo tanto, la Demandante concluye que la diferencia entre las primas de riesgo país calculadas por el Prof. Spiller y el Sr. Brailovsky, respectivamente, es "*en gran medida atribuible a las amenazas de confiscación de Venezuela*"[677]. Destaca que, en el contexto del caso *OI European c. Venezuela*, los propios peritos de Venezuela calcularon una prima de riesgo país correspondiente al año 2010 del 6 %[678]. [Traducción del Tribunal]

647. Asimismo, la Demandante asevera que también tuvo en cuenta el "*acentuado riesgo país*" de Venezuela cuando le asignó una tasa de descuento del 15 % al proyecto en el año 2006 e hizo esfuerzos considerables para obtener el apoyo significativo del Gobierno venezolano, en función del hecho de que el Tratado Francia-Venezuela había entrado en vigor en el año 2004[679]. La Demandante subraya que la tasa de descuento "*de alto riesgo*" del 12 %, que incluía una prima de riesgo país del 4 %, no fue asignada por los miembros del equipo del proyecto (ellos incluso agregaron un 3 % adicional "*para ser conservadores*"), sino que sirvió de "*medida objetiva a nivel compañía para considerar los posibles riesgos y recompensas de emprendimientos propuestos en diversas ubicaciones*"[680]. [Traducción del Tribunal]

648. En opinión de la Demandante, un inversionista como Saint-Gobain es "*inmune a la amplia mayoría de los factores de riesgo*" que se incluyen en la prima de riesgo país del Sr. Brailovsky y del Dr. Flores. La Demandante alega lo siguiente: (i) que los *proppants* producidos por la actividad de Norpro Venezuela habían de exportarse en virtud de un contrato firme de compra a largo plazo; (ii) que Norpro Venezuela había celebrado contratos de suministro de bauxita y energía a largo plazo; y (iii) que el riesgo crediticio

---

[676] Presentación Posterior a la Audiencia de la Demandante, ¶ 122. La Demandante argumenta que Venezuela se está acercando a la cesación de pagos y alude a la conclusión del tribunal en el marco del caso *EDF International c. Argentina* según la cual el enfoque del diferencial de deuda del país se convierte en "*una medida irrealista para un cálculo del costo de capital propio*" cuando los países se acercan a "*situaciones similares a una cesación de pagos*", tal como ocurrió con Argentina en el año 2001. [Traducción del Tribunal] Presentación Posterior a la Audiencia de la Demandante, ¶ 126, que cita *EDF International c. Argentina* (**CLA-122**), ¶¶ 634, 1264, 1266-1268. La Demandante también hace referencia al tribunal en el caso *Sempra Energy c. Argentina*, que concluyó que, en el año 2001, "*la prima de riesgo que exigía quien realizara una inversión en una compañía privada en Argentina era considerablemente menor que la prima de riesgo del Gobierno en ese mismo período*". Presentación Posterior a la Audiencia de la Demandante, ¶ 128, que cita *Sempra Energy c. Argentina* (**Anexo CLEX-106**), ¶ 433.
[677] Presentación Posterior a la Audiencia de la Demandante, ¶ 119.
[678] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 65, que hace referencia a *OI European c. Venezuela* (**CLA-156**), ¶¶ 772-773.
[679] Presentación Posterior a la Audiencia de la Demandante, ¶ 107, ¶ 116 y ¶ 130.
[680] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 131-134, que hace referencia al testimonio oral de su testigo Patrick Millot. Transcripción (Día 2), pág. 423, líneas 7-9, y pág. 433, líneas 17-20.

soberano de Venezuela, que constituye el fundamento del cálculo del Sr. Brailovsky y del Dr. Flores, se ve influenciado por su riesgo de entrar en estado de cesación de pagos y, por consiguiente, no refleja con exactitud el riesgo país de la inversión no especulativa a largo plazo de la Demandante en Venezuela[681]. [Traducción del Tribunal]

649. En opinión de la Demandante, el hecho particular de que Norpro Venezuela obtuviera más del 80 % de sus ingresos de las exportaciones realizadas la sometía a un riesgo país inferior al de la empresa venezolana promedio, que tiene que enfrentar la demanda de consumo estancada. La Demandante se refiere a una afirmación realizada por el Prof. Damodaran en virtud de la cual "[e]*l determinante más evidente de la exposición de una compañía al riesgo país es qué cantidad de los ingresos obtiene del país*"[682]. La Demandante también resalta que Norpro Venezuela no era una empresa de recursos naturales, sino una compañía productora "*dos pasos alejada de la industria petrolera*" y, por ende, no se veía afectada por las "*razones de riesgo político típicas*" que afectaban a las empresas petroleras[683]. En cuanto a los demás riesgos invocados por el Sr. Brailovsky y el Dr. Flores, la Demandante asevera que o no son aplicables a Norpro Venezuela o ya fueron tenidos en cuenta en la prima de riesgo país que el Prof. Spiller dedujo de la calificación de los bonos soberanos[684]. [Traducción del Tribunal]

**(ii)    Síntesis de la Postura de la Demandada**

650. La Demandada afirma que la tasa de descuento calculada por el Prof. Spiller sería "*baja incluso para una empresa como Norpro Venezuela que opera en una economía madura*". [Traducción del Tribunal] La Demandada argumenta que el Prof. Spiller (i) se desvió de la tasa libre de riesgo sugerida por Ibbotson/Morningstar para proyectos a largo plazo, es decir, el retorno del bono del Tesoro de EE. UU. a 20 años a la fecha de valuación; (ii) se desvió de la prima general de riesgo de mercado (PRM) calculada por Ibbotson/Morningstar; e (iii) "*ignoró la evidencia empírica que establecía que el Modelo de Valoración de Activos Financieros (CAPM, por sus siglas en inglés) tiende a subestimar el costo de capital propio en el caso de los activos financieros*", el cual se corrige mediante el coeficiente *alfa*[685]. [Traducción del Tribunal]

651. En primer lugar, la Demandada argumenta que corresponde utilizar el bono del Tesoro de los EE. UU. a 20 años para definir la tasa libre de riesgo en el presente caso, dada la

---

[681] Réplica, ¶¶ 163-164.
[682] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 136-139, que cita **Anexo CLEX-108**.
[683] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 140-141.
[684] Presentación Posterior a la Audiencia de la Demandante,  ¶¶ 142-144.
[685] Memorial de Contestación, ¶¶ 234-236; Dúplica, ¶ 206. Para obtener una visión general de las diferencias con respecto al costo de capital propio de EE. UU., *véase*, asimismo, la tabla del Escrito Posterior a la Audiencia de la Demandada, posterior a ¶ 140.

naturaleza "*perpetua*" de los flujos de fondos sujetos a valuación[686]. En segundo lugar, la Demandada aduce que la visión del Prof. Damodaran respecto de la PRM adecuada a la que se refiere el Prof. Spiller "*fluctúa de año a año y a veces incluso dentro del mismo año, no se basa en un análisis de los datos empíricos subyacentes, y no se puede replicar*"[687] [Traducción del Tribunal]. Asimismo, la Demandada se refiere al tribunal en el caso *Tidewater c. Venezuela*, que determinó que una prima de riesgo de capital del 6,5 % era razonable en una valuación al mes de mayo de 2009[688]. En tercer lugar, la Demandada rechaza el argumento de la Demandante de que el coeficiente *alpha* sea una prima por tamaño y señala que si bien es "*más pronunciado en empresas pequeñas (por lo que atrae al rótulo de la* 'prima por tamaño'*)*," este coeficiente se aplica a empresas de todos los tamaños. En cualquier  caso, la Demandada aduce que en efecto Norpro Venezuela calificaría como una pequeña empresa en los EE. UU., y este es el motivo por el que el coeficiente *alpha* se debería agregar al costo de capital de los EE. UU.[689].

652. La Demandada asevera que estas diferencias redundan en que el cálculo del costo de capital en los EE. UU. del Prof. Spiller sea considerablemente menor que "*un rango de resultados independientes del SIC Code 1381, que utilicen el CAPM básico y sus variaciones*", que son muy similares al costo de capital estimado por los peritos de la Demandada y, de hecho, prácticamente iguales a la tasa de descuento total aplicada por el Prof. Spiller[690].

653. De acuerdo con la Demandada, la mayor diferencia entre los cálculos de los peritos versa, sin embargo, sobre la prima de riesgo país aplicable. La Demandada afirma que esta prima es "*mucho más alta*" que el 4,5 % aplicado por el Prof. Spiller, que de hecho no refleja el riesgo país de Venezuela sino más bien el riesgo de cesación de pago sobre los bonos empresariales de EE. UU.[691] [Traducción del Tribunal]. La Demandada se refiere a los

---

[686] Escrito Posterior a la Audiencia de la Demandada, ¶ 146.

[687] Escrito Posterior a la Audiencia de la Demandada, ¶ 141; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 118.

[688] Escrito Posterior a la Audiencia de la Demandada, ¶ 142, que cita *Tidewater c. Venezuela* (**RL-207**), ¶ 181.

[689] Escrito Posterior a la Audiencia de la Demandada, ¶ 145; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 120.

[690] Memorial de Contestación, ¶ 237, que hace referencia a Brailovsky/Flores I, Tabla 10; Dúplica, ¶ 204 que hace referencia a Brailovsky/Flores II, Tabla 15 y ¶ 205; Escrito Posterior a la Audiencia de la Demandada, ¶ 147; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 32-35. En cuanto a las cifras presentadas por el Prof. Spiller durante la Audiencia, la Demandada asevera que su fuente es "irrelevante para la determinación de la tasa de descuento en el caso que nos ocupa", puesto que los cálculos internos de la Demandante datan de 2005 y las cifras redondas derivadas de dos informes de analistas indican que no fueron el resultado de cálculos detallados, sino sólo parte de una recomendación de "compra", y que se relacionan con el mercado de los instrumentos financieros, que es "completamente distinto" del mercado de los activos físicos. [Traducción del Tribunal] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 36.

[691] Memorial de Contestación, ¶ 240; Dúplica, ¶ 207 y ¶ 228. Según la Demandada, el Prof. Spiller debería al menos haber utilizado bonos empresariales de otros países emergentes con la misma calificación que Venezuela,

cálculos de sus peritos, el Sr. Brailovsky y el Dr. Flores, quienes principalmente se basaron en el Modelo de Calificación de Riesgo País (CRRM, por sus siglas en inglés) compilado por Ibbotson/Morningstar y realizaron una verificación cruzada de sus resultados mediante el "*bludgeon method*" diseñado por el Prof. Damodaran[692].

654. En respuesta a las críticas de la Demandante acerca del CRRM, la Demandada se refiere al Prof. Ibbotson, que afirmó que el CRRM tiene las siguientes ventajas sobre otros modelos del costo de capital: "*1. Amplitud de la cobertura; 2. Razonabilidad de los resultados; 3. Estabilidad de los resultados*"[693]. Asimismo, la Demandada se refiere a sus peritos, que demuestran que los resultados que ha producido el CRRM para Venezuela durante los últimos 20 años son estables y están en línea con la metodología del Prof. Damodaran[694]. [Traducción del Tribunal]

655. En cuanto a las críticas de la Demandada acerca del diferencial EMBI del que los peritos de la Demandada solían derivar el retorno sobre la deuda soberana de Venezuela sobre el retorno de los bonos del Tesoro de los EE. UU., la Demandada reconoce que el diferencial es, en efecto, "*muy alto*", pero argumenta que de ningún modo es comparable a una situación de cesación de pagos real como la que experimentó la Argentina desde el año 2001 hasta el año 2003, cuando el EMBI subió al 50 % y más[695].

656. Por el contrario, la Demandada aduce que la prima del 4,5 % aplicada por el Prof. Spiller no refleja la metodología del Prof. Damodaran, porque la hoja de cálculo interactiva del Prof. Damodaran demuestra que su "*mejor cálculo*" se basa en realidad en el "*bludgeon method*", incluida la aplicación del multiplicador del 1,5, y por ende está en línea con el cálculo de los peritos de la Demandada[696]. De acuerdo con la Demandada, el Prof. Damodaran establece en sus escritos "*una jerarquía de métodos para derivar el margen de cesación de pagos de un país*" y afirma que si un país tiene bonos en USD, el diferencial de cesación de pagos debería derivarse analizando el retorno de aquellos bonos sobre el bono libre de riesgo en la misma moneda o el diferencial en el mercado CDS. La Demandada también sostiene que el Prof. Damodaran sugiere el enfoque alternativo sobre la base de bonos empresariales de EE. UU. con una calificación comparable ("*diferencial*

---

lo cual hubiese resultado en un diferencial de aproximadamente el 9 %. Dúplica, ¶ 221; Escrito Posterior a la Audiencia de la Demandada, ¶ 169.

[692] La Demandada sostiene que sus peritos utilizaron la misma metodología para determinar la tasa de descuento adecuada para ambas fechas de valuación. Memorial de Contestación, ¶ 259.

[693] Dúplica, ¶ 212 que cita a Ibbotson/Morningstart, *SBBI 2013 Valuation Yearbook* (**Anexo BF-44**), págs. 136-137.

[694] Dúplica, ¶ 213 que hace referencia a Brailovsky/Flores, Figura 19.

[695] Dúplica, ¶¶ 216-217 que hace referencia a Brailovsky/Flores, Figura 20.

[696] Memorial de Contestación, ¶¶ 243-244 que hace referencia a la hoja de cálculo del mes de junio de 2013 (**Apéndice BF-65**); Dúplica, ¶ 210 que hace referencia a Brailovsky/Flores II, Tabla 10 y a la hoja de cálculo del mes de enero de 2014 (**Apéndice BF-66**).

*sintético"*) solo *"como último recurso"* en el caso de que el país en cuestión – a diferencia de Venezuela – no tuviera bonos en USD[697]. [Traducción del Tribunal]

657. La Demandada aduce que el método preferido por el Prof. Damodaran es una "*primera elección evidente*" porque "*los datos específicos del país en cuestión son sin dudas un mejor indicador [de la percepción del mercado] del riesgo que un indicador sintético*". Según la Demandada, tanto el diferencial EMBI de Venezuela y su diferencial en el mercado CDS habrían arrojado un diferencial de cesación de pagos de aproximadamente el 10 %, que se convertiría en una prima de riesgo de capital de aproximadamente el 15 %. De acuerdo con la Demandada, lo mismo se aplica al segundo método propuesto por el Prof. Damodaran, es decir, el "*Diferencial promedio (Normalizado) de los bonos*", puesto que el diferencial promedio sobre los bonos soberanos venezolanos a lo largo del ciclo de vida de EMBI desde el año 1993 fue el 10 %[698]. [Traducción del Tribunal]

658. La Demandada rechaza también la alegación de que Norpro Venezuela fuera inmune a la mayoría de los factores de riesgo reflejados en la prima de riesgo país, y aduce que ninguno de los argumentos planteados por la Demandante influye considerablemente sobre la exposición al riesgo de Norpro Venezuela. En lo que concierne al argumento del exportador, la Demandada se refiere a la declaración de sus peritos de que "*[e]l riesgo país es un concepto mucho más amplio que la exposición a la demanda interna, que incluye a los impuestos, las regulaciones y las acciones del gobierno en la economía, en particular en el sector de los hidrocarburos*" y agrega "*el efecto desproporcionado de los fenómenos naturales como las tormentas, las inundaciones y las sequías*"[699]. La Demandada señala también que los invocados contratos a largo plazo vencen en el año 2016 (gas y electricidad) y el año 2018 (bauxita) sin derechos automáticos de renovación o un precio garantizado en caso de renovación y, en todo caso, no protegerían a Norpro Venezuela de una interrupción en el suministro. Por último, la Demandada alega que la existencia del TBI Francia-Venezuela "*no tiene un impacto discernible sobre la evaluación del riesgo país*", como lo confirman los aseguradores del riesgo político[700]. [Traducción del Tribunal]

---

[697] Memorial de Contestación, ¶ 246; Dúplica, ¶ 208 que hace referencia a *Aswath Damodaran*, *Equity Risk Premiums (ERP): Determinants, Estimation and Implications – The 2013 Edition*, actualizada: marzo de 2013 (**Apéndice BF-64**), págs. 53, 55; Escrito Posterior a la Audiencia de la Demandada, ¶ 168; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 45-47.
[698] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 164, -166; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 47.
[699] Dúplica, ¶¶ 226, donde se cita Brailovsky/Flores, ¶ 201; Escrito Posterior a la Audiencia de la Demandada, ¶ 175.
[700] Dúplica, ¶ 226 que hace referencia a Brailovsky/Flores, Figura 23 y **Apéndice BF-166;** Escrito Posterior a la Audiencia de la Demandada, ¶¶ 177-179.

659. En la opinión de la Demandada, no hay factores específicos relacionados a Norpro Venezuela que pudieran reducir su exposición al riesgo país en comparación con la empresa venezolana promedio, pero, "*en todo caso, los factores relacionados con Norpro Venezuela la aumentarían*". La Demandada se refiere a la posibilidad de los controles de cambio sobre la exportación de materia prima y a la declaración del Prof. Damodaran de que "[u]*na empresa se puede exponer al riesgo país, incluso si no deriva ganancias de ese país, si sus instalaciones de producción se encuentran en ese país*"[701]. La Demandada cita el testimonio oral del Sr. Brailovsky, que declaró que "*los proyectos de recursos naturales, en particular los petrolíferos o relacionados con el petróleo, conllevan un riesgo país mayor al de la empresa promedio*", y citó como ejemplo la suspensión del suministro de bauxita combinada con las restricciones a la importación[702]. [Traducción del Tribunal]

660. Si bien reconoce que la valuación debe excluir el impacto de la expropiación real de la planta, la Demandada afirma que ello "*no debería confundirse con el riesgo de expropiación inherente a cualquier proyecto desde su mismo inicio*", que es parte de la "*situación económica normal imperante*" con anticipación al anuncio de expropiación de la planta y, por ende, también es un riesgo que un comprador interesado tendría en cuenta en la evaluación del precio de compra que estaría dispuesto a pagar por la planta[703]. [Traducción del Tribunal]

661. La Demandada subraya que el Artículo 5(1) del Tratado exige que la indemnización sea equivalente al "*valor real*", es decir, el valor justo de mercado, de la planta, que tiene en cuenta "*todos los riesgos generalizados asociados con una inversión en Venezuela*", incluido "*el riesgo de que una vez que se complete la adquisición, Venezuela pueda expropiar y no indemnizar en absoluto o indemnizar solo en una cantidad y forma que el comprador considere injustas*"[704]. [Traducción del Tribunal]

662. Contrario a lo que la Demandante pareció sugerir durante la Audiencia, la Demandada considera que la determinación del valor justo de mercado no se modifica dependiendo de que la expropiación sea lícita o ilícita. Según la Demandada, el comprador interesado sería indiferente a la legalidad o ilegalidad de la expropiación, porque la expropiación en

---

[701] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 172-175 que cita *Aswath Damodaran*, *Measuring Company Exposure to Country Risk: Theory ad Practice*, septiembre de 2003 (**Apéndice BF-55**), pág. 18.
[702] Escrito Posterior a la Audiencia de la Demandada, ¶ 176, que cita la Transcripción (Día 4), pág. 1142.
[703] Dúplica, ¶ 227.
[704] Escrito Posterior a la Audiencia de la Demandada, ¶ 148. En la opinión de la Demandada, la postura de la Demandante acerca del riesgo de la "*expropiación sin compensación*" sigue careciendo de claridad, porque podría incluir todos los casos en los que la obligación de compensación o la suma por pagar estén controvertidos, es decir, todos los casos sujetos a litigios conforme a los tratados bilaterales de inversión; o se podría limitar a los casos en que el Estado se niegue a reconocer su obligación de pagar una compensación y a participar en la determinación de la suma exigible, que no es el caso del presente. Escrito Posterior a la Audiencia de la Demandada, ¶ 149.

particular se debe excluir de la consideración del comprador. La Demandada agrega que el comprador, sin embargo, tendría en cuenta los riesgos subyacentes, incluido el riesgo de expropiación sin compensación que el comprador considere adecuada[705].

663. La Demandada se refiere a la conclusión del tribunal en el marco del caso *Tidewater c. Venezuela* de que el perito de la demandante, que planteó los mismos argumentos que en el caso que nos ocupa, *"combina dos elementos separados en un reclamo jurídico de este tipo"*, es decir, la cuestión de la responsabilidad y la cuestión económica del valor que el mercado atribuiría a la inversión objeto de debate. Luego, el tribunal se refirió a las *Directrices del Banco Mundial*, que *"invitan a considerar, específicamente,* 'el riesgo asociado con este flujo de caja en circunstancias realistas"[706]. La Demandada también invoca la siguiente afirmación del tribunal:

> *"No se trata de una cuestión de permitir que un Estado demandado se aproveche de su propio acto ilícito. Por el contrario, los daños que el Tribunal tiene la facultad de otorgar en virtud del Tratado están diseñados para garantizar que el inversionista privado sea compensado por la pérdida de su inversión. No obstante, al momento de determinar el monto de dicha compensación por vía de referencia a un análisis de los flujos de caja descontados, el Tribunal debería considerar el valor que un comprador dispuesto a comprar le habría atribuido a la inversión. Al momento de determinar este valor, uno de los elementos que un comprador tendría en cuenta es el riesgo asociado a la inversión en un país en particular. Un factor semejante no es propio de la medida del Estado en particular que da lugar al reclamo. [...] En cambio, la prima de riesgo país cuantifica los riesgos generales, incluidos los riesgos políticos, de hacer negocios en el país en cuestión, tal como se aplicaban en dicha fecha y tal como podría razonablemente haberse esperado que afectaran las perspectivas y, por ende, el valor"[707].*

664. La Demandada arguye que la prima de riesgo país debe basarse en la percepción de riesgo del comprador; la eliminación de riesgos inherentes a una inversión en Venezuela resultaría en "*el uso de una tasa de descuento que un comprador interesado no estaría dispuesto a aplicar y derivaría en un valor que el comprador interesado no abonaría,*

---

[705] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 150-152.
[706] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 153-155, que cita *Tidewater c. Venezuela* (**RL-207**), ¶¶ 184-185. La Demandada señala que en ese caso el tribunal entendió que la falta del pago de una compensación no tornaba a la expropiación ilícita.
[707] *Tidewater c. Venezuela* (**RL-207**), ¶ 186. La Demandada sostiene que luego el tribunal en Tidewater adoptó el enfoque del Dr. Flores y el Sr. Brailovsky, que también se desempeñaron como peritos para Venezuela en ese caso y utilizaron el mismo enfoque que en el presente, es decir, el CRRM comparado con el *bludgeon method* del Prof. Damodaran; y así concluye que una prima de riesgo país del 14,75 % fue una "*prima razonable, en efecto, conservadora*" [Traducción del Tribunal]. Escrito Posterior a la Audiencia de la Demandada, ¶ 156, que cita *Tidewater c. Venezuela* (**RL-207**), ¶ 190.

concediendo así a la Demandante un golpe de suerte que nunca podría lograr en una transacción en condiciones de libre competencia". Según la Demandada, ello podría ser punitivo para Venezuela y, por consiguiente, "*no permisible en virtud de ninguna teoría sobre indemnización del derecho internacional*"[708]. [Traducción del Tribunal]

665. En cuanto al énfasis de la Demandante durante la Audiencia sobre la tasa de descuento del 15 % reflejada en su DAC de fecha 23 de octubre de 2006 , la Demandada observa que el significado y el objetivo de dicha tasa continúan siendo poco claros y también sostiene que, en ese momento, el riesgo de cesación de pagos de Venezuela se encontraba "*en uno de los puntos más bajos de todos los tiempos*", con el retorno de sus bonos soberanos tan sólo un 2,18 % más alto que los bonos del Tesoro de EE.UU. La Demandada afirma que, en ese punto, la prima de riesgo país del 3 % podría haberse justificado. Lo que es más importante, sin embargo, es que la Demandada enfatiza que la Demandante tomó en cuenta el riesgo de cesación de pagos de Venezuela al evaluar el riesgo país, tal como lo haría un comprador en su evaluación de una tasa de descuento adecuada para determinar el valor justo de mercado de la planta. Según la Demandada, no existen entonces razones para excluir dicho riesgo cuando éste se incrementó con el transcurso del tiempo[709].

666. La Demandada sostiene que "*no hay manera de aislar y, por lo tanto, cuantificar* " el riesgo de una expropiación sin compensación. De acuerdo con la Demandada, el Prof. Spiller no propuso ningún método en sus dictámenes periciales para llevarlo a cabo, sino que sólo argumentó durante la Audiencia que podría aplicarse la diferencia entre el diferencial EMBI correspondiente a Venezuela y el valor de prima de riesgo país del 4,5 % calculado por él. La Demandada asume la posición de que el argumento del Prof. Spiller se basa en una comprensión equivocada de la jerarquía de los métodos del Prof. Damodaran, y arguye que el "*riesgo país está compuesto de elementos que están mutuamente interrelacionados y que influyen unos sobre otros, y que por ende no se pueden separar*"[710]. [Traducción del Tribunal]

667. En respuesta a la alegación de la Demandante de que el diferencial soberano de Venezuela era demasiado amplio porque declaró abiertamente que no cumpliría con sus obligaciones internacionales, la Demandada señala que la Demandante no puede invocar pruebas de aquellas "*afirmaciones increíbles*"  y afirma que "*Venezuela no ha incumplido ninguna*

---

[708] Escrito Posterior a la Audiencia de la Demandada, ¶ 157.

[709] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 158-162. Asimismo, la Demandada observa que el mismo documento refleja que la Demandante estaba dispuesta a invertir en Venezuela a una tasa interna de retorno del 26,4 %. Por ende, la Demandada arguye que, sin dejar de ser un 3 % más alta que la tasa de descuento del Prof. Spiller, la tasa de descuento del 15 % no es relevante en este caso. Segundo Escrito Posterior a la Audiencia de la Demandada, nota 132.

[710] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 163-164, 171.

*de sus obligaciones de deuda soberana, y Venezuela ha pagado la indemnización en sus casos de expropiación*"[711]. [Traducción del Tribunal]

668. Asimismo, la Demandada rechaza el argumento de la Demandante de que el Prof. Spiller tomó en cuenta los riesgos específicos del país excepto el riesgo de expropiación sin compensación, y aduce que solo aplicó el supuesto de que a cualquier país con una calificación B1 se le podría asignar un diferencial de retorno del 4,5 %, sin realizar ningún análisis de que esto en verdad reflejara el diferencial promedio de los bonos soberanos de otros países con la misma calificación[712]. En particular, la Demandada destaca que el Prof. Spiller no evaluó el retorno sobre los países en vías de desarrollo con la misma calificación a la que se refiere la Demandante, sino que sencillamente aceptó el diferencial del Prof. Damodaran del 4,5 % aplicado a todos los países con calificación B1 sobre la base del supuesto de que sus calificaciones soberanas son comparables a las calificaciones empresariales de EE. UU. Según la Demandada, sin embargo, los retornos de aquellos 15 países, según el CRRM, eran en efecto cercanos al 15 %, al igual que en el caso de Venezuela[713].

### (iii)  El Análisis del Tribunal

669. En primer lugar, el Tribunal subraya que las Partes y sus peritos coinciden en que la tasa de descuento se deriva (i) determinando el costo del capital de una planta de *proppants* en los EE. UU. con el Modelo de  Fijación de Precios de Activos de Capital (CAPM, por sus siglas en inglés), que consiste de la tasa libre de riesgo más la prima de riesgo de mercado; (ii) sumando la prima de riesgo país de Venezuela; y (iii) tomando en cuenta la relación entre deuda y capital del costo de capital[714].

670. Por consiguiente, el Tribunal seguirá esta estructura en el presente análisis y en un primer paso determinará el costo del capital para una empresa que se dedique al mismo negocio que Norpro Venezuela en  los EE. UU., evaluando la tasa libre de riesgo en los EE. UU. ((**1**)); y la prima de riesgo de mercado en los EE. UU., que consiste de una prima de riesgo de mercado general, un coeficiente *beta* y, posiblemente, un coeficiente *alpha* ((**2**)). En un segundo paso, el Tribunal determinará la prima de riesgo país aplicable para ajustar por el hecho de que la planta no se encuentra en los EE. UU., sino en Venezuela ((**3**)). Por último, el Tribunal convertirá la prima de riesgo de capital así derivada en la tasa de

---

[711] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 39-42.
[712] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 43-44.
[713] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 48-51.
[714] Spiller I, Anexo C; Spiller II, ¶ 31 y ¶ 139; Memorial de Contestación, ¶ 235 que hace referencia a Brailovsky/Flores I, ¶¶ 179-180; Brailovsky/Flores II, ¶¶ 154-155.

descuento del promedio ponderado del costo de capital (WACC, por sus siglas en inglés) sobre la base de la relación de deuda a capital de Norpro Venezuela ((**4**)).

### (1)    Tasa Libre de Riesgo en los EE. UU.

671.   El primer elemento del costo de capital para una empresa que opere en los EE. UU. es la tasa libre de riesgo. El perito de la Demandante, el Prof. Spiller, utilizó el retorno promedio sobre la tasa de los bonos del Tesoro de los EE. UU. a 10 años durante el período de 12 meses anterior a la fecha de valuación, que ascendió al 3,6 % al día 15 de mayo de 2010[715]. Los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores se basaron en la tasa de los bonos del Tesoro de los EE. UU. a 20 años vigente a la fecha de valuación, es decir, al día 15 de mayo de 2010, que ascendió al 4,1 %[716]. Los peritos coinciden, entonces, respecto del uso de los bonos del Tesoro de los EE. UU.; pero difieren en cuanto al vencimiento adecuado y el tiempo o el plazo durante el cual se debe considerar el retorno.

672.   El Prof. Spiller explicó su decisión afirmando que el bono a 10 años es más líquido y menos sensible a los cambios inesperados en la inflación que los bonos con un vencimiento a mayor plazo, de modo que evitan "*un sesgo ascendente no basado en el riesgo*" en relación con el costo de capital. Agregó también que los eruditos y profesionales recomiendan el uso del bono a 10 años al efecto de la valuación a largo plazo, "*fundamental, pero no exclusivamente, por la coincidencia de la duración*". Asimismo, el Prof. Spiller afirmó que utilizó el promedio del retorno de 12 meses porque corrige la volatilidad resultante de las fluctuaciones a corto plazo y, por ende, es más estable y fiable que el retorno en efectivo a la fecha de valuación[717]. [Traducción del Tribunal]

673.   El Sr. Brailovsky y el Dr. Flores afirmaron que Ibbotson/Morningstar recomiendan utilizar el bono a 20 años a la fecha de valuación para los proyectos a largo plazo, que por ende corresponde para la valuación FFD de los flujos de fondos que continúan en perpetuidad. Respecto de la elección del retorno a la fecha de valuación, explican que acredita la noción del valor justo de mercado, que exige una valuación "*inmediatamente anterior al momento en que ocurrió la expropiación*" [Traducción del Tribunal], y el hecho de que una transacción real no se puede basar en un promedio de 365 días[718].

---

[715] Spiller I, ¶ 156; Spiller II, ¶ 148.
[716] Brailovsky/Flores I, ¶ 184; Brailovsky/Flores II, ¶ 221.
[717] Spiller I, ¶ 156; Spiller II, ¶¶ 149-151 que hace referencia a los **Anexos Documentales CLEX-180**, **CLEX-181** y **CLEX-17**.
[718] Brailovsky/Flores I, ¶¶ 184-185 que hace referencia al **Apéndice BF-42**, pág. 5, y que cita las *World Bank Guidelines* (**Apéndice BF-43**), Capítulo 4, ¶ 3.

674. El Tribunal observa que en su segundo dictamen, el Sr. Brailovsky y el Dr. Flores no respondieron a la afirmación del Prof. Spiller de que el bono a 10 años es la medida más comúnmente recomendada de la tasa libre de riesgo, en particular debido a la coincidencia de la duración. Si bien el Tribunal está al tanto del argumento de la Demandada de que el bono a 20 años refleja la duración porque la valuación presente supone que los flujos de fondos se generarán a perpetuidad[719], vale aclarar que este suele ser el caso de las valuaciones del FFD, por lo que no se justifica un desvío de una medida comúnmente recomendada. Además, la Demandante señala acertadamente que la mayor parte del flujo de fondos futuros esperados para Norpro Venezuela se habría generado en los próximos diez años, y por ende, dentro de la duración del bono a 10 años[720].

675. Asimismo, el Tribunal concuerda con el Prof. Spiller en que el uso del retorno en efectivo a cierta fecha es menos fiable que el promedio de los 12 meses, porque podría reflejar fluctuaciones a corto plazo o incluso diarias. El Tribunal no está convencido del argumento de que la recomendación de las *Directrices del Banco Mundial* de determinar el valor justo de mercado "*inmediatamente*" antes de la expropiación torne necesario considerar solo el retorno en efectivo a la fecha de valuación. Si bien el objeto de esta valuación es, por supuesto, determinar el precio de compra que un comprador interesado habría pagado en esa fecha, el Tribunal considera dudoso que un comprador interesado basara su evaluación de la tasa libre de riesgo solo en datos de esa fecha, puesto que el comprador estaría interesado en obtener un resultado fiable para su inversión a largo plazo.

676. En consecuencia, el Tribunal sigue el enfoque del Prof. Spiller para determinar la tasa libre de riesgo sobre la base del promedio de 12 años de la tasa de los bonos del Tesoro de los EE. UU. a 10 años, que resulta en una tasa libre de riesgo del 3,6 % al día 15 de mayo de 2010.

### (2)   Prima de Riesgo de Mercado en los EE. UU.

677. El segundo elemento que se debe determinar para el costo del capital en los EE. UU. es la prima de riesgo del mercado, que consiste en una prima de riesgo de mercado general multiplicada por un coeficiente *beta* específico para la industria. Las Partes y sus peritos no concuerdan acerca de si esta prima se debería luego aumentar por un coeficiente *alpha* adicional.

---

[719] Escrito Posterior a la Audiencia de la Demandada, ¶ 146.
[720] *Cf.* Réplica, ¶ 166.

## Prima de Riesgo de Mercado General

678. Respecto de la prima de riesgo de mercado general, el Prof. Spiller se basó en la recomendación de un erudito destacado en el campo, el Prof. Damodaran, para aplicar una prima del 4,5 % para el año 2010[721]. El Sr. Brailovsky y el Dr. Flores se basaron en el uso de Ibbotson/Morningstar de la media aritmética de las primas de riesgo del mercado históricas desde el año 1926, que resultó en una prima de riesgo de mercado general del 6,7 % al día 15 de mayo de 2010[722].

679. Mientras reconoce que la prima de riesgo de mercado "*se suele estimar a partir de los datos históricos del mayor período histórico disponible*", el Prof. Spiller explicó que la crisis financiera de los años 2008-2009 tiende a distorsionar los resultados de este método a la luz de los grandes resultados negativos sufridos durante este período, que hicieron caer el promedio histórico. Es por ello que el Prof. Damodaran suspendió su práctica de utilizar los retornos históricos y la reemplazó con la recomendación descrita *supra*[723]. El Prof. Spiller se refirió también a diversos eruditos que asumieron la postura de que el factor de descuento de los proyectos a largo plazo se debería determinar utilizando la media geométrica, más que la media aritmética aplicada por los peritos de la Demandada[724]. Por último, señaló que la prima de riesgo del mercado derivada por los peritos de la Demandada no tiene el respaldo de las investigaciones recientes, que arrojaron resultados mucho menores. Por ejemplo, un estudio realizado por Dimson y otros en el año 2011 resultó en una prima de riesgo de mercado mundial del 3-3,5 % sobre la base de la media geométrica y del 4-4,5 % sobre la base de la media aritmética[725].

680. El Sr. Brailovsky y el Dr. Flores afirmaron que utilizaron el promedio histórico para "*reducir tanto como fuera posible la variabilidad de la media del estimati*vo", mientras que el Prof. Spiller simplemente invocó la opinión del Prof. Damodaran. Asimismo, señalaron que para los EE. UU. Dimson y otros estimaron, en efecto, una prima de riesgo de mercado aritmética del 6,4-7,2 % para el año 2011, que está en línea con su cálculo para el año 2010[726]. Por último, establecieron que los eruditos a los que se refirió el Prof.

---

[721] Spiller I, ¶¶ 157-158; Spiller II, ¶ 152.
[722] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221.
[723] Spiller I, ¶ 157 que hace referencia a los **Anexos CLEX-71** y **CLEX-72;** Spiller II, ¶ 152 en referencia al **Anexo CLEX-72**.
[724] Spiller II, ¶¶ 153-156, que cita los **Anexos CLEX-184**, **CLEX-181**, **CLEX-185** y **CLEX-72**.
[725] Spiller II, ¶ 157-158 que hace referencia al **Anexo CLEX-186**. Las otras referencias del Prof. Spiller se relacionan con las primas de riesgo de mercado del año 2014, que oscilan entre el 4,14-6,18 %. *Cf.* Spiller II, ¶¶ 158-161 y Tabla 15.
[726] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221 que hace referencia al **Apéndice BF-170**, pág. 169.

Spiller no suelen favorecer la media geométrica sobre la media aritmética, y se refirieron a otros académicos que prefieren la media aritmética[727].

681. El Tribunal señala que el Prof. Spiller en principio reconoció el enfoque utilizado por el Sr. Brailovsky y el Dr. Flores como un método conocido y comúnmente utilizado para determinar la prima de riesgo de mercado. Si bien el Tribunal está, por supuesto, al tanto de que la crisis financiera de los años 2008-2009 tuvo un impacto grave sobre el mercado de valores de los EE. UU., no está satisfecho con el argumento del Prof. Spiller de que los retornos en disminución del mercado de valores necesariamente eliminen la fiabilidad del promedio histórico. En particular, el Tribunal subraya que, si bien los retornos en disminución pueden en efecto haber llevado a la sugerencia de que los inversores estaban interesados en invertir a menores retornos y, por ende, a menores primas de riesgo; esto no explica por qué la prima de riesgo derivada por los peritos de la Demandada a partir del promedio histórico es mayor a la recomendación del Prof. Damodaran.

682. Además, el Tribunal considera que los datos de los desarrollos del mercado comprobados a lo largo de un período de más de 80 años son más fiables que la recomendación de un erudito. Si bien no caben dudas de que el Prof. Damodaran es una autoridad destacada en este respecto, esto no eleva su recomendación por sobre la necesidad de pruebas que den sustento a la elección del Prof. Spiller. En el documento invocado por el Prof. Spiller, el Prof. Damodaran solo establece que "[c]*omo las primas de riesgo disminuyeron en el año 2009, volví a utilizar la prima de riesgo del capital del 4,5 % para los mercados maduros en el año 2010*"[728] [Traducción del Tribunal]. En la opinión del Tribunal, este enunciado no puede considerarse suficiente para justificar un desvío respecto de un método establecido.

683. Si bien el Prof. Spiller se refirió a fuentes adicionales en su segundo dictamen, solo un documento, el estudio de Dimson y otros del año 2011, puede proporcionar información pertinente para la fecha de valuación del 15 de mayo de 2010. En este respecto, el Sr. Brailovsky y el Dr. Flores señalan acertadamente, sin embargo, que las cifras presentadas por el Prof. Spiller (3-3,5 % a partir de la media geométrica; 4-4,5 % a partir de la media aritmética) no se relacionan con el mercado de los EE. UU., sino con un análisis global de distintos mercados[729]. También señalaron otro documento distinto confeccionado por los mismos académicos en el mismo año, que informa cifras mayores para el mercado estadounidense (4,4-5,3 % a partir de la media geométrica; 6,4-7,2 % a partir de la media

---

[727] Brailovsky/Flores II, ¶ 221 que hace referencia a los **Apéndices BF-171**, pág. 156, **BF-172**, pág. 56 y **BF-173**, pág. 159.
[728] **Anexo CLEX-72**, pág. 77.
[729] **Anexo CLEX-186**.

aritmética)[730]. Por ende, el Tribunal no tiene pruebas ante sí que sustenten el estimativo del Prof. Damodaran para el año 2010.

684. En lo que concierne a la diferencia entre las Partes acerca del uso adecuado de la media geométrica en lugar de la media aritmética de cierto método, el Tribunal entiende que se trata de una cuestión controvertida entre los eruditos. El Tribunal subraya que no se le ha presentado la media geométrica de las primas históricas para la fecha de valuación del 15 de mayo de 2010. No obstante, el informe de Ibbotson/Morningstar invocado por los peritos de la Demandada como fuente para su prima del 6,7 % proporciona diversas primas para los horizontes a corto, mediano y largo plazo; y el 6,7 % es la prima para el horizonte a largo plazo. A la luz del hecho de que los peritos de ambas Partes utilizan datos de Ibbotson/Morningstar en relación con diversos aspectos de sus cálculos, el Tribunal no tiene motivos para considerar que la elección de Ibbotson/Morningstar de derivar la prima de riesgo del capital sobre la base de la media aritmética carezca de justificación.

685. En consecuencia, el Tribunal sigue el enfoque del Sr. Brailovsky y el Dr. Flores para derivar la prima de riesgo del mercado general para los EE. UU. a partir de la media aritmética de las primas históricas desde el año 1926, que resulta en una prima del 6,7 % para la valuación al día 15 de mayo de 2010.

### Coeficiente *Beta* específico para la industria

686. Las Partes y sus peritos coinciden en que la prima de riesgo de mercado general se debe multiplicar por un componente específico para la industria, es decir, el coeficiente *beta*. Coinciden también en que el *beta* bruto adecuado para Norpro Venezuela se debe derivar de *SIC Code 1381 Drilling Oil and Gas Wells,* como lo calculan Ibbotson/Morningstar[731]. Los peritos de las Partes también usan el mismo método para ajustar y apalancar el *beta* bruto a fin de obtener el *beta* final para utilizarlo a los efectos del presente[732].

687. El Tribunal observa que existe una diferencia entre los peritos de las Partes en cuanto al *beta* bruto en particular que eligieron de los datos de Ibbotson/Morningstar. Mientras que el Prof. Spiller utilizó el promedio de 5 años de la empresa compuesta[733], el Sr. Brailovsky y el Dr. Flores tomaron la mediana del *beta* bruto[734]. Sin embargo, el Tribunal no debe expresarse acerca de esta cuestión, porque tanto la mediana del *beta* bruto como el

---

[730] **Apéndice BF-170**.
[731] Memorial de Contestación, ¶ 236; Spiller I, ¶ 161; Brailovsky/Flores I, nota 318 y ¶ 190.
[732] Spiller I, ¶¶ 162-164; Brailovsky/Flores I, ¶ 191.
[733] Spiller II, ¶¶ 146-147.
[734] Brailovsky/Flores I, ¶ 190.

compuesto, informados por Ibbotson/Morningstar para marzo de 2010, ascienden a 1,3, lo que resulta en un *beta* apalancado y ajustado de 1,2[735].

688. Por ello, para su valuación de Norpro Venezuela al día 15 de mayo de 2010, el Tribunal multiplicará la prima de riesgo de mercado general por un factor específico para la industria de 1,2.

### Coeficiente *Alpha*

689. Por último, el Tribunal debe analizar si la prima de riesgo de mercado específica de la industria debe aumentarse por un coeficiente *alpha* adicional, como arguye la Demandada.

690. El Sr. Brailovsky y el Dr. Flores explican que el CAPM tiende a subestimar el costo del capital de los activos financieros y, por ende, debe ajustarse para capturar el desempeño real de las acciones de las empresas que cotizan en bolsa, es decir, con el coeficiente *alpha*. A pesar de su opinión de que Norpro Venezuela califica como una empresa pequeña dentro de la industria capturada en *SIC Code 1381*, el Sr. Brailovsky y el Dr. Flores enfatizaron que utilizaron el *alpha* para la empresa mediana, como lo informaron Ibbotson/Morningstar para el mes de marzo de 2010, es decir, el 1,3%[736]. Explicaron que el *alpha* contabiliza las "*volatilidades sistémicas de empresas grandes y pequeñas*", y señalaron que, a pesar de que "*muchos profesionales, incluido el Prof. Spiller, olvidan esta conclusión*", los prestadores de servicios financieros como Bloomberg informan el *alpha* en forma rutinaria[737]. Si bien reconocen que el *alpha* es mayor en las empresas más pequeñas, por lo que también se la conoce como la "*prima por tamaño*", como la llaman por ej., Ibbotson/Morningstar, afirmaron que las empresas grandes también pueden tener un *alpha* considerable, por lo que se debe agregar a la prima de riesgo de mercado[738]. [Traducción del Tribunal]

691. El Prof. Spiller consideró que no correspondía agregar una "*prima por tamaño*" a la prima de riesgo de mercado, y señaló que es un punto sobre el que disienten los profesionales y los académicos, incluido el Prof. Damodaran. Con referencia a varios eruditos, afirmó también que se ha determinado que el *alpha* es "*empíricamente poco fiable entre distintas regiones y períodos*" y que se entiende que refleja los factores de riesgo de mercado subyacentes, más que el efecto inherente del tamaño[739]. Asimismo, el Prof. Spiller tomó

---

[735] Spiller II, ¶ 147; Brailovsky/Flores II, Tabla 8; Ibbotson/Morningstar, *Statistics for SIC Code 1381, Drilling Oil and Gas Wells,* 31 de marzo de 2010 (**Apéndice BF-37**).
[736] Brailovsky/Flores I, ¶¶ 192-193; Brailovsky/Flores II, ¶¶ 206-207; Ibbotson/Morningstar, *Statistics for SIC Code 1381, Drilliing Oil and Gas Wells,* 31 de marzo de 2010 (**Apéndice BF-37**).
[737] Brailovsky/Flores II, ¶¶ 209-213.
[738] Brailovsky/Flores I, ¶ 192; Brailovsky/Flores II, ¶ 214.
[739] Spiller II, ¶¶ 48-49 que hace referencia a los **Anexos Documentales CLEX-113** a **CLEX-119**.

la postura de que la adición de una "*prima por tamaño*" podría duplicar el riesgo país, porque las firmas venezolanas son más pequeñas que las estadounidenses, y Norpro Venezuela no puede describirse como una firma pequeña, o siquiera mediana, dentro de Venezuela[740]. [Traducción del Tribunal]

692. El Tribunal señala que se deben distinguir dos cuestiones en lo que concierne al coeficiente *alpha*: (i) si refleja en general un fenómeno establecido que debe tenerse en cuenta dentro del costo del capital; y (ii) si en este caso en particular duplicaría el riesgo país, que se determinará en la siguiente sección.

693. Respecto del segundo argumento, el Tribunal no está convencido de que el coeficiente *alpha* equivalga a una prima por tamaño para las empresas más pequeñas, lo que equivaldría a duplicar el hecho de que las empresas en Venezuela suelen ser más pequeñas que en los EE. UU. Si bien los datos de Ibbotson/Morningstar parecen sugerir y los peritos de la Demandada reconocen que el *alpha* es mayor para las empresas más pequeñas que para las más grandes, el Prof. Spiller también reconoció que el *alpha* no captura un efecto de tamaño inherente, sino los factores de riesgo de mercado subyacentes. Es posible que estos factores sean más pronunciados para las empresas más pequeñas, pero existen también para las empresas más grandes. Contrario a lo que la Demandante parece sugerir, el Sr. Brailovsky y el Dr. Flores no aplicaron el *alpha* para el compuesto pequeño, sino que optaron por la mediana. En la opinión del Tribunal, la Demandante no ha logrado establecer que la aplicación de la mediana del *alpha* duplicaría el riesgo país para Norpro Venezuela.

694. Sin embargo, el Tribunal está al tanto de las críticas generales del Prof. Spiller en relación con el *alpha*, respaldadas por diversas referencias a académicos y profesionales. El Tribunal señala también que el Sr. Brailovsky y el Dr. Flores reconocieron incluso que "*muchos profesionales* […] *olvidan*" aplicar el coeficiente *alpha* a la prima de riesgo de mercado. Por consiguiente, parece estar fuera de discusión que el *alpha* no se puede considerar un elemento bien establecido de la determinación de la prima de riesgo de mercado. Por ello, en consideración de las pruebas presentadas, el Tribunal no está convencido de que el coeficiente *alpha* debiera sumarse a la tasa del costo de capital en los EE. UU. [Traducción del Tribunal]

**Conclusión sobre el costo del capital para una empresa en los EE. UU.**

695. En resumen, las conclusiones del Tribunal resultan en el siguiente costo del capital para una empresa en los EE. UU. al día 15 de mayo de 2010: (i) una tasa libre de riesgo del

---

[740] Spiller II, ¶¶ 50-52 y Tabla 6.

3,6 %; más (ii) una prima de riesgo de mercado del 8 %, que consiste de la prima de riesgo de mercado general del 6,7%, que debe multiplicarse por el coeficiente *beta* específico para la industria de 1,2. Por los motivos expuestos, el Tribunal no realiza ninguna otra adición en relación con un coeficiente *alpha*.

696. En consecuencia, el Tribunal resuelve que el costo del capital en los EE. UU., que debe utilizarse para determinar la tasa de descuento aplicable en este caso, asciende al 11, 6 %.

### (3)    Prima de Riesgo País de Venezuela

697. Las Partes concuerdan en que el costo del capital determinado *supra* para una empresa en los EE. UU. que se dedique al mismo negocio que Norpro Venezuela debe aumentarse por una prima de riesgo país que refleje el hecho de que la planta se encuentra en Venezuela. Sin embargo, los peritos de las Partes han aplicado distintos métodos para determinar esta prima de riesgo país, y esto ha llevado a resultados con diferencias considerables.

698. El Prof. Spiller utilizó un método diseñado por el Prof. Damodaran, que se basa en la calificación soberana de la moneda local asignada a Venezuela por Moody's (B1 al día 15 de mayo de 2010), convertida en un diferencial por cesación de pagos conforme al cálculo del Prof. Damodaran para la calificación B1 (4,5 % en 2010). El Prof. Spiller aplicó este diferencial por cesación de pagos como la prima de riesgo país sin realizar otros ajustes adicionales por el riesgo de capital[741].

699. El Sr. Brailovsky y el Dr. Flores se refirieron principalmente al Modelo de Calificación de Riesgo País (CRRM) compilado por Ibbotson/Morningstar, que se basa en una encuesta realizada a 75-100 banqueros cada seis meses por la publicación *Institutional Investor*. En esta encuesta, se solicita a los banqueros que califiquen a 170 países en una escala del 0 al 100, y los editores de *Institutional Investor* ponderan las respuestas sobre la base de su percepción del nivel de desempeño global y la sofisticación de los métodos de investigación de crédito de los bancos. Luego, estas calificaciones del riesgo país se convierten en tasas de descuento del costo de capital sobre la base de un estudio realizado por Erb, Harvey y Viskanta, que se actualiza periódicamente. Para Venezuela, el CRRM resultó en una prima de riesgo de capital del país del 14,3 % al día 15 de mayo de 2010[742].

700. A modo de cotejo, el Sr. Brailovsky y el Dr. Flores utilizaron también el llamado "*bludgeon method*" desarrollado por el Prof. Damodaran, que se basa en el diferencial

---

[741] Spiller I, ¶¶ 165-166; Spiller II, ¶ 33 sobre la base del **Anexo CLEX-75**.
[742] Brailovsky/Flores I, ¶¶ 197-199.

sobre los bonos soberanos venezolanos en dólares estadounidenses. Eligieron el Indicador de Bonos de Mercados Emergentes de JP Morgan (EMBI), que mide la diferencia entre los retornos sobre los bonos soberanos en USD venezolanos y estadounidenses, que al día 15 de mayo de 2010 ascendía al 10,26 %. Luego, el Sr. Brailovsky y el Dr. Flores aplicaron el multiplicador global (1,5) sugerido por el Prof. Damodaran para contabilizar el hecho de que la inversión en capital es más riesgosa que la inversión en bonos, y obtuvieron una prima de riesgo país del 15,4 % al día 15 de mayo de 2010[743].

701. Si bien reconoce que los peritos pueden disentir en cuanto a los datos y la metodología, el Prof. Spiller aseveró que la elección del Sr. Brailovsky y el Dr. Flores no refleja la exposición al riesgo país de Norpro Venezuela, porque no tuvieron en cuenta tres factores específicos de su negocio: (i) Norpro Venezuela exportaba sus productos y, por ende, no estaba sujeta a las condiciones y los riesgos de la demanda local; (ii) había garantizado el suministro de sus insumos fundamentales para la producción a través de contratos a largo plazo con empresas estatales; y (iii) gozaba de la protección de un tratado bilateral de inversión, que exige que los riesgos relacionados con la expropiación y las "*condiciones de crisis*" se excluyan de la presente valuación[744]. Según el Prof. Spiller, los actuales márgenes de EMBI "*muy altos*" de Venezuela reflejan la posibilidad de que el país entrara en cesación de pagos a causa de su falta de voluntad de pago de las obligaciones, pero no los riesgos específicos para la empresa a los que se enfrenta un inversor a largo plazo que no está sujeto a la voluntad o capacidad de pago del Gobierno. Agregó que la elección del Sr. Brailovsky y del Dr. Flores de utilizar el diferencial EMBI de solo un día amplifica el contraste entre su medida del riesgo a corto plazo y la inversión a largo plazo de Norpro Venezuela[745]. El Prof. Spiller asumió la postura de que, en contraste, su propia evaluación del riesgo país captura el "*impacto a largo plazo del riesgo país sobre las operaciones de Norpro Venezuela*", en congruencia con la evaluación del Prof. Damodaran[746]. Asimismo, el Prof. Spiller asumió la postura de que "*no es ni necesario conforme al CAPM ni recomendable*" calcular un riesgo país separado para el capital, porque el riesgo de capital converge en el riesgo de deuda a largo plazo, por lo que el Prof. Damodaran recomienda la aplicación de un multiplicador sólo para el corto plazo[747]. Respecto del CRRM, el Prof. Spiller planteó varias críticas, tales como (i) la falta de transparencia; (ii) la naturaleza subjetiva y cualitativa de las calificaciones; (iii) los reclamos de que las encuestas tienen un sesgo respecto de ciertas regiones del mundo; (iv) una falta de explicaciones estadísticas o económicas; y (v) la falta de fiabilidad de las bolsas de valores pequeñas o

---

[743] Brailovsky/Flores I, ¶¶ 201-204.
[744] Spiller II, ¶¶ 35-36 y ¶¶ 40-44.
[745] Spiller II, ¶¶ 37, 46 y 140-141.
[746] Spiller II, ¶ 47.
[747] Spiller II, ¶¶ 142 y 144.

ilíquidas con datos del mercado de valores en los que no se puede confiar, como en el caso de Venezuela[748].

702. El Sr. Brailovsky y el Dr. Flores señalaron que la prima del riesgo país del Prof. Spiller es en efecto equivalente al bono estadounidense genérico con calificación B a 10 años sobre el bono del Tesoro de los EE. UU. correspondiente, por lo que refleja el riesgo de deuda de las empresas estadounidenses, pero no el riesgo país de Venezuela[749]. También afirmaron que, contrario a lo que sugirió, el Prof. Spiller no aplicó el método del Prof. Damodaran, porque el Prof. Damodaran tiene una jerarquía de métodos: su primera opción es utilizar el diferencial de los bonos soberanos en "*moneda fuerte*" como el dólar estadounidense o el euro (es decir, el "*bludgeon method*"); y solo sugiere un enfoque alternativo para los países que no emiten tales bonos, que consiste en suponer que las calificaciones soberanas son comparables a las calificaciones de las empresas[750]. En todo caso, el Sr. Brailovsky y el Dr. Flores consideraron que era necesario escalar el diferencial de cesación de pagos por un multiplicador, porque su análisis del mercado estadounidense y venezolano a lo largo de un período de 20 años no respaldó la convergencia del riesgo, sino que arrojó volatilidades de 2,05 y 2,74, respectivamente, al día 15 de mayo de 2010.[751] Por último, opinaron que Norpro Venezuela no está menos expuesta al riesgo país que otras empresas que operan en Venezuela porque (i) el riesgo país es un concepto mucho más amplio que la exposición a la demanda local, que incluye los impuestos, las regulaciones y otras acciones gubernamentales, como los controles de divisas; (ii) los citados contratos a largo plazo vencen en los años 2016 y 2018, respectivamente, y no contienen ninguna opción de renovación; y (iii) el riesgo de expropiación es parte del valor justo de mercado y cualquier comprador interesado lo tendría en cuenta; y en todo caso, los tratados bilaterales de inversión no tienen un impacto discernible sobre el riesgo país conforme a los aseguradores del riesgo político[752]. Respecto de las críticas del Prof. Spiller al CRRM, el Sr. Brailovsky y el Dr. Flores reconocieron que los criterios son subjetivos (aunque se basan en conceptos económicos fundamentales), pero afirmaron que sus consecuencias son objetivas, puesto que forman las bases de las prácticas bancarias para el otorgamiento de préstamos. También señalaron que el modelo ha producido resultados estables durante los últimos 25 años[753]. También tomaron la postura

---

[748] Spiller II, ¶ 143.
[749] Brailovsky/Flores I, ¶¶ 213, 215.
[750] Brailovsky/Flores I, ¶¶ 210, 216 que hace referencia al **Apéndice BF-64**, págs. 51, 53; Brailovsky/Flores II, ¶¶ 161, 182. El Sr. Brailovsky y el Dr. Flores sostienen que el mejor cálculo de la prima de riesgo país para el capital del Prof. Damodaran está, de hecho, en línea con su propio cálculo. Brailovsky/Flores I, ¶ 212; Brailovsky/Flores II, ¶¶ 185, 190.
[751] Brailovsky/Flores II, ¶ 199 y Tabla 14. El Sr. Brailovsky y el Dr. Flores destacan que de todos modos utilizan (sólo) el multiplicador genérico de 1,5 del Prof. Damodaran como referencia para sus cálculos.
[752] Brailovsky/Flores II, ¶¶ 200-205 que hace referencia al **Apéndice BF-166**.
[753] Brailovsky/Flores II, ¶¶ 169, 174-179 y Figura 19.

de que el diferencial EMBI al día 15 de mayo de 2010 no se encontraba en un valor inusual, sino "*casi exactamente al medio de la distribución de los datos diarios desde el año 1993; un total de 5.336 observaciones*"[754]. [Traducción del Tribunal]

703. El Tribunal subraya que hay varios puntos de desacuerdo entre los peritos de las Partes en lo que respecta a la determinación de una prima de riesgo país adecuada para Norpro Venezuela al 15 de mayo de 2010. No obstante, pareciera ser que una gran parte de estos desacuerdos dependen de una cuestión fundamental que, por ende, el Tribunal abordará en un primer lugar; a saber, si el riesgo de la expropiación sin compensación (suficiente), como lo requiere el Tratado, debe excluirse de la prima de riesgo país aplicable a Venezuela.

704. Para empezar, el Tribunal desea destacar que, en principio, concuerda con la Demandada en que la prima de riesgo país que debe aplicarse en el caso que nos ocupa debe ser un estimativo realista de la prima que un comprador interesado habría aplicado en mayo de 2010. Al mismo tiempo, el Tribunal comprende la postura de la Demandante de que el riesgo de expropiación sin compensación o sin compensación suficiente debe excluirse de la valuación de Norpro Venezuela en el contexto del presente arbitraje.

705. En este contexto, el Prof. Spiller, perito de la Demandante, declaró en su segundo dictamen pericial que las protecciones del TBI entre Francia y Venezuela sirvieron como "*una reducción adicional del riesgo país*"[755]; sin embargo, no cuantificó el impacto de dicha reducción ni proporcionó prueba alguna en sustento de esta afirmación. Por el contrario, los peritos de la Demandada presentaron un estudio llevado a cabo por Lauge N. Skovgaard Poulson, quien analizó si las aseguradoras de riesgo político le otorgan algún peso a la posibilidad de que los tratados bilaterales de inversión reduzcan el riesgo y concluyó que "*los tratados* [bilaterales de inversión] *tienen un impacto muy bajo en la cobertura y en las políticas de precios de los proveedores de seguros de riesgo político* (PRI, por sus siglas en inglés)"[756] [Traducción del Tribunal]. Si bien el Tribunal no iría tan lejos como para considerar que de esa manera la Demandada estableció que la protección de las inversiones proporcionada por los tratados bilaterales de inversión "*no posee un impacto visible sobre el riesgo país*"[757]*,* debe destacarse que la Demandante nunca abordó las pruebas presentadas por los peritos de la Demandada, ni tampoco la Demandante, ni su perito el Prof. Spiller, presentaron ninguna prueba propia que demostrara lo contrario. En este contexto, la mayoría del Tribunal no puede concluir que la existencia del TBI entre Francia y Venezuela hubiera tenido un impacto cuantificable

---

[754] Brailovsky/Flores II, ¶¶ 166, 172.
[755] Spiller II, ¶ 41.
[756] Brailovsky/Flores II, ¶ 205 cita de **Apéndice BF-166**, pág. 1.
[757] *Cfr.* Escrito Posterior a la Audiencia de la Demandada, ¶ 179.

en la evaluación de riesgo de un comprador interesado – desde un punto de vista estrictamente económico.

706.  Sin embargo, podría argumentarse que si el Tribunal no aplicara ajustes por el riesgo de expropiación sin compensación o compensación suficiente, esto permitiría que la Demandada se beneficiara de su propia conducta ilícita internacional, es decir, no solo de su violación del Artículo 5(1) del Tratado, sino también de su presunta política general de expropiar las inversiones sin pagar la compensación correspondiente. Dado que la compensación es un aspecto crucial de las obligaciones de la Demandada en relación con la expropiación, y que la Demandada sería responsable de su presunto incumplimiento de esta obligación, el riesgo de expropiación sin compensación (suficiente) debería eliminarse del riesgo país. El Tribunal observa que este argumento ya no se basa en una perspectiva exclusivamente económica, sino que incluye un elemento normativo que refleja la ambición de que la protección de los tratados se respete y aplique. Conforme a este argumento, la noción del valor justo de mercado con arreglo al Tratado debería interpretarse en el contexto de sus propios estándares de protección.

707.  En la opinión del Tribunal, este razonamiento no solo se aplicaría a los riesgos relacionados con la expropiación, sino también a los riesgos relacionados con otras disposiciones del Tratado, como los riesgos de regulaciones injustas, adopción de medidas arbitrarias, quebrantamientos graves al debido proceso, etc. Conforme al razonamiento de la Demandante, todos estos riesgos deberían excluirse del riesgo país, porque surgen de la presunta tendencia de la Demandada de no cumplir con sus obligaciones internacionales.

708.  Esta posición se ve respaldada en particular por el tribunal que entendió en el caso *Gold Reserve c. Venezuela*, que estableció que la prima de riesgo país no debería reflejar "*la percepción de un mercado de que un Estado pueda ser propenso a expropiar en violación a las obligaciones que surgen del TBI*"[758]. Si bien en ese caso el tribunal resolvió que no había existido expropiación, de todos modos consideró que los riesgos relacionados con la expropiación se deben excluir del riesgo país al efecto de determinar la compensación por pagar a la demandante. Al mismo tiempo, el tribunal destacó que los riesgos políticos distintos de la expropiación se deben reflejar en la prima de riesgo país. Como consideró que estos riesgos no estaban reflejados en la prima de riesgo país del 1,5 % aplicada por el perito de la demandante, se basó en la prima del 4 % utilizada en un informe de análisis, sin expresar los motivos adicionales de su elección[759]. [Traducción del Tribunal]

---

[758] *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841.
[759] *Gold Reserve c. Venezuela* (**CLA-152**), ¶¶ 841-842.

709.  Por otra parte, el Tribunal señala que también hay argumentos a favor de la postura de la Demandada de que la prima de riesgo país debería incluir todos los riesgos políticos asociados con la inversión en Venezuela, incluido el supuesto riesgo general de expropiación sin compensación o compensación suficiente.

710.  En primer lugar, el Tribunal recuerda que ambas Partes concuerdan en que, al margen del estándar de compensación que se aplique, el Tribunal debe determinar el valor justo de mercado de Norpro Venezuela, es decir, la suma que un comprador interesado pagaría a un vendedor interesado. Tomando en cuenta esta definición, podría ser coherente con la noción económica del valor justo de mercado mantener el riesgo de expropiación sin compensación (suficiente) como uno de los riesgos que un comprador interesado realísticamente tendría en cuenta.

711.  Asimismo, como lo observó la CDI en los comentarios al Artículo 36 de su Proyecto, "*la indemnización tiene por función remediar las pérdidas efectivas sufridas como consecuencia del hecho internacionalmente ilícito*" y por eso "*es puramente compensatorio* "; "[n]*o tiene por objeto castigar al Estado responsable ni tampoco tiene un carácter expresivo o ejemplar*"[760]. Podría alegarse que si se excluyera el riesgo de la expropiación sin compensación de la presente valuación, la Demandante recibiría un beneficio injustificado, puesto que recibiría una compensación que no podría haber obtenido como precio de compra si hubiera vendido Norpro Venezuela a un comprador interesado en el año 2010, y por ende recibiría más que *las pérdidas efectivas sufridas* como resultado de la violación de los incisos 2 y 3 del Artículo 5(1) del Tratado por parte de la Demandada.

712.  Tal como señalara correctamente la Demandada, esta posición tiene sustento, en especial, en la decisión del tribunal de *Tidewater c. Venezuela*, que concluyó en función de estos argumentos que, si bien la medida estatal que da lugar a la reclamación debe excluirse de la valuación, la prima de riesgo país refleja "*los riesgos generales, incluidos los riesgos políticos, de hacer negocios en el país en cuestión, tal como se aplicaban en dicha fecha*"[761]. El tribunal concluyó que una prima de riesgo país de 14,75% era apropiada en las circunstancias del caso[762].

713.  A criterio del Tribunal, la cuestión principal que debe resolverse en este sentido es si, al calcular la compensación de la Demandante, el Tribunal sólo debe omitir el impacto de la violación específica del Artículo 5(1) del Tratado en cuestión o si también debe eliminar el riesgo de otras posibles violaciones del derecho internacional que tienden a

---

[760] **CLA-027**, Artículo 36, ¶ 4.
[761] *Tidewater c. Venezuela* (**RL-207**), ¶ 186.
[762] *Tidewater c. Venezuela* (**RL-207**), ¶ 190.

reducir el valor de todas las inversiones en Venezuela porque, de lo contrario, se permitiría a la Demandada abusar de su supuesta política de no respetar sus obligaciones internacionales.

714. Este interrogante no puede responderse sin contemplar las circunstancias existentes al momento en que la Demandante decidió invertir en Venezuela. En concreto, para el Tribunal, es esencial determinar si el riesgo, que la Demandante ahora pretende excluir de la prima de riesgo país, ya existía en el año 2006 o si hubo un cambio de política desde que se realizó la inversión, es decir, de un entorno favorable para el inversor a una tendencia a expropiar a los extranjeros sin la correspondiente compensación, tal como alegara la Demandante.

715. En este contexto, es indiscutible que cuando el equipo que rodeaba a Patrick Millot solicitó la aprobación del proyecto a la controlante de la Demandante, Compagnie de Saint-Gobain, en el año 2006, se utilizó una tasa de descuento de 15%, que comprendía la tasa de 12% generalmente asignada dentro del grupo de la Demandante a los países de "*alto riesgo*" más una prima de 3% por "*riesgos adicionales por conservadurismo*"[763]. Si bien esta tasa no se puede equiparar a la evaluación objetiva que podría haber realizado un comprador interesado, sirve para indicar que la Demandante ya consideraba Venezuela un país de "*alto riesgo*" y, aun así, agregó un 3% por riesgos adicionales al decidir invertir en el año 2006. En sus propias palabras, la Demandante invirtió "*durante el apogeo de la Revolución Bolivariana*"[764]. A criterio del Tribunal, esto demuestra que, ya en el año 2006, la Demandante ponderaba ciertos riesgos que no están cubiertos por el riesgo habitual de invertir en países de "*alto riesgo*", sino que muy probablemente se relacionen con un riesgo de ser objeto de expropiación sin que medie compensación alguna o compensación suficiente.

716. Cabe destacar, asimismo, que es indiscutible entre las Partes que el riesgo país aumentó desde el año 2006[765]. La cuestión es si ese mayor riesgo debe o no tomarse en cuenta en la presente valuación de Norpro Venezuela, ya que el aumento se debe a la supuesta práctica de la Demandada de expropiar inversiones sin compensación (suficiente) y, de ese modo, le permitiría beneficiarse de su propia conducta ilícita.

717. En este sentido, la mayoría del Tribunal está de acuerdo con el tribunal de *Tidewater c. Venezuela* en que el argumento de la Demandante "combina dos elementos separados en

---

[763] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 130-133; *DAC: Grains and Powders – Venezuela 70 kt Greenfield proppants update 38 M$ revised capex*, 23 de octubre de 2006 (**Anexo C-082**) y *Financial Model for DAC #3* (**Anexo CLEX-166**).

[764] Memorial, ¶ 2.

[765] Presentación Posterior a la Audiencia de la Demandante, ¶ 121; Escrito Posterior a la Audiencia de la Demandada, ¶ 159-162.

un reclamo jurídico de este tipo", es decir, (i) la cuestión de responsabilidad por la que el Tribunal resolvió que la Demandada no llevó a cabo la expropiación de acuerdo con los requisitos de compensación establecidos en el Tratado, y (ii) la etapa de cuantificación, en que el Tribunal debe determinar el valor justo de mercado de la inversión de la Demandante. Tal como resolviera el tribunal de *Tidewater*, "*el segundo elemento del reclamo es una cuestión económica. Depende del valor que el mercado le atribuiría a la inversión objeto de debate*"[766]. El tribunal sostuvo, además, que:

> "*No se trata de una cuestión de permitir que un Estado demandado se aproveche de su propio acto ilícito. Por el contrario, los daños que el Tribunal tiene la facultad de otorgar en virtud del Tratado están diseñados para garantizar que el inversionista privado sea compensado por la pérdida de su inversión. No obstante, al momento de determinar el monto de dicha compensación por vía de referencia a un análisis de los flujos de caja descontados, el Tribunal debería considerar el valor que un comprador dispuesto a comprar le habría atribuido a la inversión. Al momento de determinar este valor, uno de los elementos que un comprador tendría en cuenta es el riesgo asociado a la inversión en un país en particular. Un factor semejante no es propio de la medida del Estado en particular que da lugar al reclamo. […] En cambio, la prima de riesgo país cuantifica los riesgos generales, incluidos los riesgos políticos, de hacer negocios en el país en cuestión, tal como se aplicaban en dicha fecha y tal como podría razonablemente haberse esperado que afectaran las perspectivas y, por ende, el valor que ha de asignarse al flujo de fondos probable del negocio en curso*"[767].

718. La mayoría del Tribunal está de acuerdo con esta decisión y, por lo tanto, no puede aceptar el argumento de la Demandante de que la falta de exclusión del riesgo de expropiación sin compensación o sin compensación suficiente permitiría a la Demandada beneficiarse de su propia conducta ilícita. En opinión del Tribunal, la propia evaluación de riesgos que realizó la Demandante en el año 2006 demuestra que, desde el punto de vista económico, cualquier inversor o comprador interesado contemplaría todos los "*riesgos adicionales*" relacionados con la inversión en Venezuela, sin perjuicio de la existencia del presente Tratado.

719. El concepto de valor justo de mercado, que el Tribunal ha identificado anteriormente como el estándar de compensación aplicable[768], requiere suprimir la medida específica que fue objeto de la decisión del Tribunal sobre responsabilidad, es decir, en este caso, el incumplimiento de la obligación de la Demandada de pagar pronta y adecuada

---

[766] *Tidewater c. Venezuela* (**RL-207**), ¶¶ 184-185.
[767] *Tidewater c. Venezuela* (**RL-207**), ¶ 186.
[768] Véase párrafo 627 supra

indemnización a la Demandante. Sin embargo, no requiere y, de hecho, no permite ningún tipo de corrección de la perspectiva económica del comprador interesado en función de consideraciones normativas. En particular, la mayoría del Tribunal considera que el Tratado y este arbitraje no cumplen la finalidad de asegurar a la Demandante frente a los riesgos generales de invertir en Venezuela que un comprador interesado tomaría en cuenta al evaluar el precio de compra que pagaría por Norpro Venezuela.

720. En cualquier caso, el Tribunal advierte que, aunque admite el mayor riesgo país, la Demandada cuestiona firmemente las alegaciones de la Demandante acerca de sus amenazas generalizadas de expropiar todas las inversiones extranjeras en Venezuela y/o declaraciones públicas de que no tiene intenciones de cumplir sus obligaciones en virtud del derecho internacional. La Demandada hace hincapié en que la Demandante no presentó ninguna prueba con respecto a estas alegaciones y aduce que "*Venezuela no violó ninguna de sus obligaciones soberanas y Venezuela siempre pagó indemnización en sus casos de expropiación*"[769]. En su carta de fecha 6 de noviembre de 2015, la Demandada volvió a cuestionar que existiera divergencia entre la voluntad y la capacidad de pago de Venezuela, y se remitió al director de la empresa consultora venezolana Ecoanalítica, quien, el día 28 de octubre de 2015 señaló que los pagos de deuda de PDVSA por un total de USD 5.000 millones durante los últimos 15 días confirmaban la "*gran voluntad de pago de Venezuela*"[770].

721. En consecuencia, las Partes firmemente disienten en cuanto a si hay un riesgo general de expropiación sin compensación en Venezuela. Si bien la Demandada señaló correctamente que la Demandante no presentó ninguna prueba específica que justificara su alegación, el Tribunal considera que el alto riesgo país de Venezuela puede deberse, al menos, en parte, a la situación incierta en torno a ciertas medidas expropiatorias de la Demandada. La Demandada no cuestiona el hecho de estar involucrada en varias causas con inversores en relación con el pago de una indemnización adecuada.

722. No obstante, a la luz de la conclusión de que el valor justo de mercado debe calcularse de acuerdo con principios económicos y ponderando todos los riesgos que tomaría en cuenta un comprador interesado, el Tribunal no tiene que pronunciarse sobre las medidas expropiatorias de la Demandada en general (suponiendo que tuviera jurisdicción para adoptar dicha resolución).

723. En consecuencia, la mayoría del Tribunal coincide con la Demandada en que la prima de riesgo país debe reflejar todos los riesgos políticos que implica invertir en Venezuela,

---

[769] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 39-42.
[770] Carta de la Demandada de fecha 6 de noviembre de 2015; **Anexo R-131**.

incluso el supuesto riesgo general de ser objeto de expropiación sin que medie el pago de una compensación (suficiente).

724. Por consiguiente, el Tribunal no tiene que decidir la otra cuestión de si es posible cuantificar y así eliminar el riesgo de expropiación del riesgo país, sin excluir al mismo tiempo otros riesgos específicos del país que sin lugar a dudas deben contemplarse en la prima de riesgo país. Al contrario, el Tribunal debe analizar, desde la perspectiva del comprador interesado, cuáles de los diversos métodos que presentaron los peritos de las Partes reflejan correctamente el riesgo país al que estuvo expuesta Norpro Venezuela hasta el día 15 de mayo de 2010.

725. A esta altura, el Tribunal advierte un desacuerdo entre las Partes en cuanto a si la diferencia entre el enfoque aplicado por el Prof. Spiller y los dos enfoques aplicados por los peritos de la Demandada se debe (exclusivamente) al riesgo de expropiación sin indemnización. Mientras la Demandada alega que no se puede aislar y, por ende, cuantificar el riesgo de expropiación sin indemnización[771], la Demandante sostiene que el método del Prof. Spiller basado en la calificación de la moneda local de Venezuela excluye el riesgo de expropiación sin indemnización pero incluye "*otros riesgos de invertir en Venezuela, tales como los riesgos de una economía volátil, desorden civil, una infraestructura menos desarrollada y otras cuestiones*"[772]. La Demandante afirma explícitamente que, dado que el diferencial "*sumamente elevado*" de los bonos venezolanos expresados en dólares refleja su falta de voluntad de pago, la diferencia entre las primas de riesgo país calculadas por los peritos de las Partes "*se atribuye, en gran medida, a las amenazas de confiscación de Venezuela*"[773]. Por lo tanto, según la Demandante, el enfoque que eligió el Prof. Spiller no incluye el supuesto riesgo general de expropiación sin indemnización y, por ende, no capta el verdadero riesgo país que tomaría en cuenta un comprador interesado al realizar el avalúo de Norpro Venezuela.

726. El Tribunal advierte que el Prof. Spiller no dijo en la Audiencia que el método de calificación de la moneda local del Prof. Damodaran se hubiera concebido para eliminar el riesgo de expropiación sin indemnización de la prima de riesgo país. No obstante, ofreció la siguiente explicación en relación con el hecho de que el enfoque alternativo que eligió el Sr. Brailovsky y el Dr. Flores basado en el diferencial EMBI de Venezuela da resultados mucho más altos que el método basado en calificaciones:

> "*[L]os inversionistas en bonos venezolanos hasta diciembre de 2013 estaban determinando que a pesar de que los aspectos fundamentales de la economía de Venezuela eran comparables con los de los países*

---

[771] Escrito Posterior a la Audiencia de la Demandada, ¶ 163.
[772] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 105-106.
[773] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 118-119.

*con una calificación de B1, temían que Venezuela no estuviera*
*dispuesta a cumplir estas obligaciones internacionales. De manera que*
*no difiere mucho de lo que pasó con Ecuador, cuando incumplió*
*recientemente los pagos de la deuda. Y eso se basó en la voluntad de*
*cumplir las obligaciones internacionales en vez de en aspectos*
*fundamentales de la economía, como podría ocurrir ahora con Grecia,*
*por ejemplo, que no puede pagar la deuda*"[774].

727. De esta manera, el Prof. Spiller confirma la posición de la Demandante de que la divergencia entre los resultados que arrojan los dos métodos se debe a la supuesta falta de voluntad de Venezuela de cumplir sus obligaciones internacionales. El Prof. Spiller también alega que, en el caso de Venezuela, hay una importante discrepancia entre la capacidad de pago del país (reflejada en la calificación de su moneda local) y su voluntad de pago (reflejada en los diferenciales de sus bonos en USD). La hoja de cálculo del Prof. Damodaran de fecha 1 de julio de 2013[775] de hecho demuestra que la divergencia entre los dos métodos fue de 7,62 % para Venezuela, pero menos de 1 % para la mayoría de otros países. Los únicos países con una divergencia de más de 2 % son Túnez (2,22 %) y Argentina (31,72 %)[776].

728. En opinión del Tribunal, esta divergencia atípica entre los resultados arrojados por los dos métodos respalda la explicación del Prof. Spiller de que los diferenciales de *swap* de riesgo crediticio (*CDS*, por sus siglas en inglés) (al igual que el diferencial EMBI) podrían reflejar un riesgo que no suele estar relacionado con países con calificación B1. Si bien este riesgo adicional podría ser concretamente el riesgo relacionado con la supuesta política de Venezuela de no cumplir sus obligaciones internacionales, el Tribunal ya resolvió *supra* que está fuera del ámbito de este arbitraje pronunciarse sobre la política general de Venezuela respecto de inversores extranjeros y ajustar la prima de riesgo país en este sentido.

729. La Demandada señaló, asimismo, en su Segundo Escrito posterior a la Audiencia, que el Prof. Spiller no analizó los diferenciales de bonos en dólares de países con la misma calificación que Venezuela, sino que tomó el diferencial de 4,5 % que aplicó el Prof. Damodaran a todos los países con calificación B1, suponiendo que las calificaciones soberanas son comparables a las calificaciones empresariales estadounidenses, sin analizar ningún dato de mercado en relación con estos países[777]. Ya en oportunidad de su Dúplica, la Demandada alegó que, en lugar de basarse en los diferenciales de bonos

---

[774] Transcripción (Día 4), pág. 902, líneas 5-18.

[775] Si bien la hoja de Excel del año 2010 del Prof. Damodaran se encuentra archivada como **Apéndice BF-62**, no contiene un cálculo de la prima de riesgo país basado en los diferenciales de CDS. A los efectos de comparación, el Tribunal se remite a la hoja de cálculo del mes de julio de 2013.

[776] **Anexo CLEX-75**, págs. 5-6 y **Apéndice BF-65**, págs. 3-4.

[777] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 44-45 y ¶ 48.

corporativos de los Estados Unidos, el Prof. Spiller debería, al menos, haber analizado los bonos corporativos de países emergentes y consultado el análisis del Sr. Brailovsky y el Dr. Flores, que generó un diferencial de deuda promedio de 9 %[778].

730. Si bien el Sr. Brailovsky reiteró el argumento de la Demandada durante la Audiencia[779], la Demandante no dijo nada al respecto en su Presentación Posterior a la Audiencia, sino que alegó por primera vez en su Segunda Presentación Posterior a la Audiencia que la precisión de la medición del riesgo país que realizó el Prof. Spiller se podía verificar en función de los diferenciales de CDS de las deudas soberanas de otros países. La Demandante señaló que, según la lista del Prof. Damodaran al mes de enero de 2014, la prima de 4,5 % aplicada por el Prof. Spiller ocuparía el cuarto lugar, "*muy por encima de la típica prima de riesgo país de un país en vías de desarrollo*"[780].

731. La Demandada respondió a este argumento mediante una carta separada en la cual señaló que (i) el Prof. Spiller nunca había consultado los diferenciales de CDS en el marco del método que utilizó; (ii) más de la mitad de los países con diferenciales de CDS de la lista del Prof. Damodaran no podrían clasificarse como "*países en vías de desarrollo*"; y (iii) la "*tipicidad*" no es un concepto válido para la valuación de un proyecto en un determinado país para el que había datos específicos de dicho país, es decir, en el caso de Venezuela, un diferencial de CDS de 10,8 %[781].

732. A criterio del Tribunal, hubiera sido útil contar con un análisis integral de datos de mercado de otros países con la misma calificación B1 que se asignó a Venezuela desde el día 15 de mayo de 2010. En particular, la Demandante debería haber planteado el argumento acerca de los diferenciales de CDS de otros países en una etapa anterior del proceso, algo que hubiera permitido a la Demandada y sus peritos contar con una oportunidad adecuada para presentar una respuesta. Además, el Tribunal podría haber consultado a los peritos de las Partes sobre esta cuestión durante la Audiencia. A falta de un debate apropiado al respecto, el Tribunal no considera justo basarse en los datos que menciona la Demandante que, en cualquier caso, corresponden al año 2014 y no a la fecha de valuación del año 2010.

733. Por otra parte, el Tribunal recuerda el análisis del Sr. Brailovsky y del Dr. Flores de los diferenciales de bonos corporativos en mercados emergentes, basado en datos de Merrill Lynch, que convirtieron en un rendimiento de bonos corporativos genéricos de mercados

---

[778] Dúplica, ¶ 221, en referencia a Brailovsky/Flores II, ¶¶ 194-195 y Tabla 12.

[779] Transcripción (Día 4), pág. 1195, líneas 16 a 21.

[780] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 61-62, en referencia al **Apéndice BF-66**, págs. 23-25.

[781] Carta de la Demandada de fecha 2 de junio de 2015, págs. 1-2. El Tribunal admitió la presentación de la Demandada relativa a los diferenciales de CDS en el expediente mediante carta de fecha 19 de junio de 2015.

emergentes de 9,11 % al mes de mayo de 2014[782]. Aunque no brindaron una cifra para la fecha de valuación del día 15 de mayo de 2010, este cálculo indiscutible suscita dudas en cuanto a si la prima del 4,5 % calculada por el Prof. Spiller refleja incluso los riesgos país generalmente asociados a un país con calificación B-1 que, sin duda, deberían incluirse en la presente valuación, además de la cuestión del riesgo de expropiación.

734.    Es por eso que el Tribunal procederá a analizar los dos métodos alternativos en que se basaron los peritos de la Demandada, es decir, el CRRM y el "*bludgeon method*", los cuales incluyen todo riesgo de expropiación sin indemnización y arrojaron una prima de riesgo país de 14,3 % y 15,4 %, respectivamente.

735.    Con respecto al "*bludgeon method*", basado en diferenciales soberanos denominados en USD, los peritos de la Demandada decidieron basarse en datos del EMBI. Si bien el Prof. Spiller criticó en su segundo dictamen que no es apropiado utilizar el EMBI en este caso porque el riesgo crediticio soberano de Venezuela no refleja la exposición de Norpro Venezuela al riesgo país, no cuestionó la elección de este índice como tal. El Prof. Spiller sí cuestionó el uso del índice *spot* en la fecha de valuación en lugar de un promedio a largo plazo; sin embargo, no proporcionó al Tribunal una cifra alternativa que reflejara dicho promedio[783].

736.    Desde luego, el Tribunal es consciente de que el Sr. Brailovsky y el Dr. Flores aplicaron el "*bludgeon method*" del Prof. Damodaran sólo para verificar su cálculo principal, que se basa en el CRRM. El Tribunal sabe también que el Prof. Spiller criticó este método en particular por su falta de transparencia y la poca confiabilidad de los resultados que produce, entre otras cuestiones[784], y que el Sr. Brailovsky y el Dr. Flores abordaron estas críticas en detalle en su segundo dictamen pericial[785]. El Tribunal considera que no necesita expresar su opinión acerca de la confiabilidad del CRRM, ya que las posiciones de las Partes se reflejan en uno de los métodos concebidos por el Prof. Damodaran, a quien los peritos de ambas Partes reconocen como una autoridad líder. Por lo tanto, el Tribunal se concentrará en los métodos que recomienda este último.

737.    La Demandada y sus peritos sostienen que el Prof. Spiller ignoró la jerarquía de métodos del Prof. Damodaran y que la mejor estimación del Prof. Damodaran es el resultado obtenido a partir del "*bludgeon method*"[786]. Pese a que ni la Demandante ni su perito consideraron este argumento, el Tribunal advierte que no obran pruebas claras en el expediente de que Prof. Damodaran ofrezca una jerarquía de sus métodos.

---

[782] Brailovsky/Flores II, ¶¶ 191-197.
[783] Spiller II, ¶¶ 32-36 y ¶¶ 140-141.
[784] Spiller II, ¶¶ 142-143.
[785] Brailovsky/Flores II, ¶ 169 y ¶¶ 174-179.
[786] Brailovsky/Flores I, ¶ 212 y ¶ 216.

Contrariamente a los que sugieren la Demandada y sus peritos, el Prof. Damodaran no afirma en su escrito sobre primas de riesgo de capital que el método sintético basado en calificaciones sólo deba utilizarse para países sin bonos soberanos denominados en USD. Al contrario, dice que el margen de incumplimiento "*se puede calcular de tres maneras*", entre ellas, el margen sintético[787]. Aunque señala que las otras dos maneras sólo están disponibles para países con bonos denominados en USD, no manifiesta que dichas maneras sean mejores que el margen sintético. Hace referencia a la hipótesis de que las calificaciones soberanas son equiparables a las calificaciones corporativas como "*método alternativo*" y, después de presentar los tres métodos posibles, concluye que "*podría optarse por uno de estos tres métodos y utilizar siempre el mismo o aplicar un promedio de ellos*"[788].

738. En su hoja de cálculo que constituyó la base de la decisión del Prof. Spiller de optar por la prima de 4,5 % para el año 2013, el Prof. Damodaran también afirma que para "[c]*alcular el margen de incumplimiento del país en cuestión*"*, "ofrece dos opciones: una basada en la calificación soberana de la moneda local de Moody's y la otra es el diferencial de CDS del país (si lo hubiese)*"[789]. De nuevo, no dice que el método del diferencial de CDS sea mejor que el método de calificaciones. Por último, el Tribunal advierte que en su hoja de cálculo del año 2010, el Prof. Damodaran ni siquiera contempla el método del diferencial de CDS sino que simplemente señala que "[p]*ara calcular la prima de riesgo país a largo plazo, comienzo con la calificación del país (de Moody's: www.moodys.com) y calculo el margen de incumplimiento correspondiente a esa calificación (bonos corporativos o soberanos de los Estados Unidos) sobre la tasa del tesoro. Este cálculo se convierte en una medición de la prima de riesgo país agregada de ese país*"[790]. [Traducción del Tribunal]

739. A la luz de estas declaraciones, el Tribunal no está convencido de que haya una jerarquía de métodos que el Prof. Spiller no haya advertido al decidir utilizar el modelo de calificación de moneda local en lugar de los diferenciales de bonos denominados en USD. No obstante, el Tribunal recuerda que (i) según las propias presentaciones de la Demandante, el método del Prof. Spiller apunta a excluir el riesgo de expropiación sin indemnización y, por lo tanto, no refleja el verdadero riesgo país que un comprador interesado tomaría en cuenta; y (ii) aún no queda claro si incluye los riesgos país típicamente asociados a un país con calificación B-1, tal como demostrara el análisis de

---

[787] **Apéndice BF-64**, págs. 53-55.
[788] **Apéndice BF-64**, págs. 55, 57 y Figura 8.
[789] **Anexo CLEX-75**, pág. 1 y **Apéndice BF-65**, pág. 1.
[790] **Apéndice BF-62**, pág. 3.

diferenciales de bonos corporativos en mercados emergentes del Sr. Brailovsky y del Dr. Flores.

740. En cambio, el Tribunal no tiene motivos para dudar de que el "*bludgeon method*" del Prof. Damodaran incluye tanto el riesgo de expropiación sin indemnización como los típicos riesgos del país que indiscutiblemente deberían formar parte de la presente valuación. Si ben el Tribunal no está necesariamente convencido de que la diferencia entre los resultados arrojados por los dos métodos se atribuya, en su totalidad, al riesgo de expropiación sin indemnización, la Demandante no presentó ninguna prueba de que el "*bludgeon method*" incluye riesgos que un comprador interesado no contemplaría en su valuación de Norpro Venezuela. Por lo tanto, el Tribunal coincide con los peritos de la Demandada en este sentido y resuelve que la prima de riesgo país debe calcularse en función de los diferenciales de bonos denominados en USD de Venezuela, tal como lo refleja el EMBI.

741. Sin embargo, aún queda por tratar una cuestión en este sentido, es decir, si el Tribunal debe aplicar el multiplicador genérico de 1,5 del Prof. Damodaran para calcular la prima de riesgo de capital suponiendo que la inversión en capital es más riesgosa que la inversión en bonos, tal como afirmaran los peritos de la Demandada[791], o si debe abstenerse de aplicar cualquier tipo de multiplicador suponiendo que las inversiones a largo plazo conllevan tanto riesgos de capital como de deuda, tal como explicara el perito de la Demandante[792]. El Tribunal advierte que ambos peritos se basaron en las declaraciones que realizó al respecto el Prof. Damodaran en este sentido. El Dr. Flores y el Sr. Brailovsky aludieron al hecho de que el Prof. Damodaran en su hoja de cálculo expresó lo siguiente:

> "*Se puede calcular una prima de riesgo país ajustada multiplicando el margen de incumplimiento por la volatilidad relativa del mercado bursátil correspondiente a ese mercado (desviación estándar del mercado bursátil del país/desviación estándar de los bonos soberanos del país). En esta hoja de cálculo, utilicé el promedio general de volatilidad del mercado bursátil y de bonos de 1,5 para calcular la prima de riesgo de capital*"[793]. [Traducción del Tribunal]

742. El Tribunal advierte, no obstante, que esta declaración es precedida por la oración: "*Sobre todo, a corto plazo, es probable que la prima de riesgo de capital sea mayor que el*

---

[791] Brailovsky/Flores I, ¶¶ 202-205; Brailovsky/Flores II, ¶¶ 198-199 y Tabla 14.
[792] Spiller II, ¶ 144.
[793] **Apéndice BF-62**, pág. 3.

*margen de incumplimiento del país*"[794]. El Prof. Spiller también se funda en la siguiente declaración del Prof. Damodaran:

> "[L]*as diferencias entre las desviaciones estándares en los precios de las acciones y los bonos se achican en períodos más prolongados y la resultante volatilidad relativa será, por lo general, menor*[795]. *De esta manera, si consideramos rentabilidades previstas en períodos más largos, la prima de riesgo de capital convergerá con el margen de incumplimiento de los bonos soberanos*"[796]. [Traducción del Tribunal]

743. En respuesta a ello, el Sr. Brailovsky y el Dr. Flores presentaron los resultados de su propio análisis de las volatilidades relativas de los mercados de bonos y capital de los Estados Unidos y Venezuela dentro de un período de 20 años/5 años[797] anterior al día 15 de mayo de 2010, mediante el cual obtuvieron un coeficiente de 2,05 y 2,74, respectivamente[798]. El Tribunal advierte que, en su primer dictamen pericial, indicaron en una nota al pie que el Prof. Damodaran había calculado un coeficiente de volatilidad de 0,69 para Venezuela para un período de dos años desde el mes de febrero de 2012, pero luego un coeficiente de volatilidad de 1,77 para dos años hasta el mes de marzo de 2013[799]. El Sr. Brailovsky y el Dr. Flores criticaron al Prof. Damodaran por no convertir el Índice Bursátil venezolano, denominado en bolívares, a dólares estadounidenses, que es la moneda del índice de bonos venezolano. Por otra parte, según citaron en la misma nota al pie, el Prof. Damodaran señala que "*la desviación estándar relativa del capital es una cifra volátil, tanto entre países (oscila de 2,48 para la República a 0,69 para Venezuela) como a través del tiempo (las cifras de volatilidad relativa de Brasil han oscilado de casi uno a más de 2*"[800]. [Traducción del Tribunal]

744. Sin embargo, el Tribunal considera que es imposible comparar directamente ambos cálculos, ya que el Prof. Damodaran calculó la volatilidad relativa al mercado estadounidense (asignando a este una volatilidad de 1,00), mientras que el Sr. Brailovsky y el Dr. Flores calcularon la volatilidad relativa al mercado de bonos tanto de los Estados Unidos como de Venezuela.

---

[794] **Apéndice BF-62**, pág. 3. El Prof. Spiller hace referencia a la misma oración de la hoja de cálculo del Prof. Damodaran del año 2012. Spiller II, ¶ 144, en referencia al Anexo CLEX-178, pág. 1.
[795] [Cita interna:] *Jeremy Siegel informa sobre la desviación estándar en los mercados de capital en su libro* 'Stocks for the very long run' *y señala que tienden a disminuir en el tiempo.*
[796] **Anexo CLEX-108 / Apéndice BF-55**, pág. 12.
[797] Aunque el Sr. Brailovsky y el Dr. Flores sólo aluden a un período de 20 años en su segundo informe, se desprende del **Apéndice BF-105**, Tabla 7, que se basaron en datos que comprendían desde el día 6 de mayo de 2005 hasta el día 10 de mayo de 2010 para Venezuela, es decir, un período de 5 años. Esto coincide con lo que declaran en su primer informe. Brailovsky/Flores I, ¶ 205.
[798] Brailovsky/Flores II, ¶ 199 y Tabla 14. Hacen hincapié en que para su cálculo comparativo, utilizaron el multiplicador genérico de 1,5 del Prof. Damodaran.
[799] Brailovsky/Flores I, nota 352.
[800] **Apéndice BF-63**, pág. 60.

745.  Por último, el Tribunal advierte que, contrariamente a lo que sugieren la Demandada y sus peritos, en vista de los escritos del Prof. Damodaran no parece que él de hecho recomiende el uso del multiplicador de capital. Más bien, se puede encontrar la siguiente declaración en uno de sus escritos que data del año 2010: "*Algunos analistas creen que las primas de riesgo de capital de los mercados deben reflejar las diferencias de riesgo de capital, medidas por las volatilidades de las acciones en estos mercados*"[801]. Aparecen declaraciones similares en otros escritos[802]. En su hoja de cálculo, también deja librado a la elección del usuario si aplicará un multiplicador o no, dado que ofrece dos opciones: "*Opción 1: Utilizar el margen de incumplimiento para medir la prima de riesgo país adicional. Para elegir esta opción, vaya a la ficha ERP y configure la celda E5 en 1,00*"; y "*Opción 2: Aumente el margen de incumplimiento para reflejar el mayor riesgo de capital del mercado, en relación con el margen de incumplimiento. Podrá ver los coeficientes relativos de cada país en la ficha* 'Equity vs. Govt Bond' [Capital v. Bonos del Gob.] *de esta hoja de cálculo. Configure la celda E5 de la ficha ERP con ese número*"[803] [Traducción del Tribunal]. Para los meses de junio de 2013 y enero de 2014, el Prof. Damodaran presentó una desviación estándar relativa (hacia el mercado estadounidense) de 0,69 para Venezuela; para el mes de mayo de 2010, no se presentó dato relevante alguno ante el Tribunal[804].

746.  A falta de claridad suficiente sobre el multiplicador adecuado que debe aplicarse para Venezuela, el Tribunal no está convencido de que el multiplicador genérico de 1,5 refleje, de manera suficiente, el riesgo de una inversión de capital en Venezuela. Dada la incuestionable naturaleza de largo plazo de la inversión objeto de valuación en el presente caso, aún falta resolver si debe aplicarse un multiplicador o si puede suponerse que la deuda y la prima de riesgo de capital convergerán. Aunque el Sr. Brailovsky y el Dr. Flores consideraron que esta teoría quedaría eliminada mediante su análisis de las volatilidades relativas de los mercados de capital y bonos en los Estados Unidos y Venezuela, el Tribunal advierte que el coeficiente que calcularon de hecho depende, en gran medida, del vencimiento de los bonos seleccionados en comparación con el mercado bursátil. Si bien el Sr. Brailovsky y el Dr. Flores no aportaron cifras con respecto a los distintos vencimientos de los bonos para el mercado venezolano, el coeficiente para el mercado estadounidense difiere entre 1,55 para bonos a 20 años y 2,81 para bonos a 5 años a partir del mes de mayo de 2010[805].

---

[801] **Apéndice BF-61**, pág. 178.

[802] **Apéndice BF-63**, pág. 50; **Apéndice BF-64**, pág. 52.

[803] **Anexo CLEX-75**, pág. 1 y **Apéndice BF-65**, pág. 1.

[804] **Anexo CLEX-75**, pág. 21 y **Apéndice BF-65**, pág. 22; **Apéndice BF-66**, pág. 27.

[805] **Apéndice BF-105**, Tabla 9.

747. Andrew Smithers y Stephen Wright, invocados por el Sr. Brailovsky y el Dr. Flores para respaldar su argumento de que el capital es más riesgoso que la deuda, confirman que la volatilidad de la rentabilidad del bono es "*claramente inferior*" a la de las acciones, pero también explican que los bonos a largo plazo son más riesgosos que los bonos a corto plazo[806]. Sin embargo, Jeremy Siegel, también citado por los peritos de la Demandada, afirma lo siguiente:

> "*Tal como se señalara anteriormente, las acciones son más riesgosas que las inversiones de renta fija en períodos de tenencia a corto plazo. Pero cuando el período de tenencia asciende a entre 15 y 20 años, la desviación estándar de las rentabilidades promedio anuales, que es la medición de las dispersiones de rentabilidades utilizada en la teoría de la cartera de valores, se vuelve menor que la desviación estándar de las rentabilidades promedio de los bonos o las letras. En períodos de 30 años, el riesgo de capital desciende a sólo dos tercios de los bonos o letras. A medida que aumenta el período de tenencia, la desviación estándar de las rentabilidades promedio de las acciones disminuye casi el doble de rápido que las de los activos de renta fija*"[807]. [Traducción del Tribunal]

748. A la luz de estas evidencias, el Tribunal considera que es plausible que el riesgo de inversión en capital y el riesgo de inversión en bonos converjan a largo plazo. Dado que el objeto de esta valuación —la inversión de la Demandante en Norpro Venezuela— se realizó indiscutiblemente como inversión a largo plazo de acuerdo con los estándares aplicados por el Prof. Damodaran, los Sres. Smithers y Wright, y el Sr. Siegel, la Demandada y sus peritos no demostraron que sea necesario aplicar un multiplicador al margen de incumplimiento para el cálculo de la prima de riesgo de capital. En consecuencia, el Tribunal aplicará la prima de riesgo país que calcularon el Sr. Brailovsky y el Dr. Flores en función del "*bludgeon method*" del Prof. Damodaran, salvo el multiplicador de 1,5. Al día 15 de mayo de 2010, calcularon un margen de bono soberano de 10,26 % basado en datos del EMBI que, ante la falta de un multiplicador aplicable en este caso, es igual a la prima de riesgo país para inversión en capital.

749. Las Partes y sus peritos han asimismo debatido sobre ciertos factores específicos de Norpro Venezuela como resultado de los cuales la exposición al riesgo país podría desviarse de la empresa venezolana promedio[808]. Además del factor de protección en virtud de un tratado bilateral de inversión, que se comentó en detalle *supra*, la discusión se centró en otras dos cuestiones: (i) el hecho de que Norpro Venezuela exportara más del 80 % de los *proppants* producidos, mayormente a Norteamérica, es decir, un mercado

---

[806] **Apéndice BF-60**, pág. 176.
[807] **Apéndice BF-70**, pág. 32.
[808] *Cf.* Presentación Posterior a la Audiencia de la Demandante, ¶¶ 136-144; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 172-180.

maduro, y (ii) el hecho de que hubiera suscrito contratos de suministro a largo plazo para sus insumos principales, como la energía y la bauxita[809].

750. En cuanto a la segunda cuestión, el Sr. Brailovsky y el Dr. Flores señalaron correctamente que los contratos a largo plazo permanecerían en vigencia hasta los años 2016 y 2018, respectivamente, y no contemplaban posibilidad alguna de renovación, mucho menos a precios idénticos o similares[810]. Por lo tanto, el Tribunal no considera que este factor haría que un comprador interesado disminuya su cálculo de exposición al riesgo país de Norpro Venezuela.

751. Con respecto a la primera cuestión, la Demandante se basó en la declaración del Prof. Damodaran de que "[e]*l factor determinante más obvio de la exposición de una empresa al riesgo país es qué parte de los ingresos se genera en el país*"[811]. Sin embargo, la Demandante señaló que el Prof. Damodaran también indicó en el mismo escrito que "[u]*na empresa puede estar expuesta al riesgo país aunque no genere ingresos en ese país, si su planta de producción se encuentra ubicada en ese país*"[812]. En este contexto, la Demandada y sus peritos alegan que el riesgo país es un concepto mucho más amplio que la exposición a la demanda local[813]. El Sr. Brailovsky señaló, asimismo, en la Audiencia que "[h]*ay muchísimas publicaciones que muestran que los proyectos basados en recursos naturales, particularmente aquellos de índole petrolera o relacionados con el petróleo, tienen un mayor riesgo país que la compañía promedio*"[814].

752. El Tribunal advierte que la Demandante nunca alegó que Norpro Venezuela no estuviera sujeta al riesgo país venezolano en absoluto, sino simplemente que está menos expuesta al riesgo país venezolano que la compañía venezolana promedio[815]. En respuesta al comentario del Sr. Brailovsky en ocasión de la Audiencia, la Demandante sostiene que Norpro Venezuela no era una compañía de recursos naturales y alega que, en cualquier caso, a las compañías basadas en recursos naturales se les suele asignar una mejor calificación que a las compañías pertenecientes a otras industrias[816].

753. Si bien el Tribunal considera que es plausible que la exposición al riesgo país de Norpro Venezuela sea diferente a la de cualquier compañía venezolana promedio, el Sr. Brailovsky y el Dr. Flores señalaron correctamente que el Prof. Spiller nunca cuantificó el impacto de los factores invocados por la Demandante en el riesgo país al que Norpro

---

[809] Spiller II, ¶ 35, ¶¶ 41-43; Brailovsky/Flores II, ¶¶ 200-202.
[810] Brailovsky/Flores II, ¶ 202.
[811] Presentación Posterior a la Audiencia de la Demandante, ¶ 139, que cita **Anexo CLEX-108**, pág. 18.
[812] Escrito Posterior a la Audiencia de la Demandada, ¶ 175, que cita **Anexo CLEX-108**, pág. 18.
[813] Escrito Posterior a la Audiencia de la Demandada, ¶ 175; Brailovsky/Flores II, ¶ 201.
[814] Transcripción (Día 4), pág. 1128, líneas 2-6.
[815] Presentación Posterior a la Audiencia de la Demandante, ¶ 136.
[816] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 140-141.

Venezuela estaba realmente expuesta[817]. Tal como explicara el Prof. Damodaran, el hecho de que Norpro Venezuela exportara la mayoría de sus productos pudo haber influido como parte de un enfoque *lambda* según el cual la prima de riesgo país calculada para la compañía venezolana promedio se podría haber multiplicado por un cierto coeficiente *lambda*[818]. Sin embargo, dado que ninguno de los peritos de las Partes incluyeron dicho coeficiente en sus cálculos, el Tribunal no procederá a seguir analizando este enfoque. Ante la falta de cuantificación de exposición al riesgo país específica de Norpro Venezuela, el Tribunal aplicará la prima de riesgo país de 10,26% obtenida a partir del "*bludgeon method*" concebido por el Prof. Damodaran (excluyendo cualquier tipo de multiplicador de riesgo de capital).

### (4)    Conclusión sobre la Prima de Riesgo de Capital y Conversión a la Tasa de Descuento

754.    En conclusión, el Tribunal, por mayoría, resuelve que la prima de riesgo de capital que debe aplicarse a una inversión en Norpro Venezuela al día 15 de mayo de 2010 consiste de los siguientes elementos: (i) el costo de capital de una empresa que opere en los EE. UU. por la suma del 11,6 %, es decir, una tasa libre de riesgo del 3,6 % más una prima de riesgo de mercado del 8 %, que consiste de la prima de riesgo de mercado general del 6,7 %, para multiplicarla por el coeficiente *beta* específico de la industria de 1,2; y una prima de riesgo país de Venezuela por la suma del 10,26 %. Esto resulta en una prima de riesgo de capital total del 21,86 %.

755.    Como último paso, el Tribunal debe determinar la relación de deuda a capital a fin de calcular el promedio ponderado del costo de capital (*WACC*, por sus siglas en inglés) y la tasa de descuento nominal por aplicar a la inversión de la Demandante. Los peritos de las Partes utilizaron relaciones de deuda a capital similares, pero no idénticas, en sus cálculos al día 15 de mayo de 2010. El Prof. Spiller aplicó una relación del 18,0 % de deuda al 82,0 % de capital, que representa un promedio de 5 años de la relación informada por Ibbotson/Morningstar para la empresa compuesta de *SIC Code 1381*[819]; el Sr. Brailovsky y el Dr. Flores aplicaron una relación del 15,7 % de deuda al 84,3 % de capital, que representa un promedio de 1 año, tal como informara Ibbotson/Morningstar para la empresa mediana de *SIC Code 1381*[820].

756.    Si bien el Prof. Spiller afirma que un promedio de un sólo año está segado porque puede estar afectado por acontecimientos acontecidos durante ese año en particular[821], el

---

[817] Brailovsky/Flores, ¶ 160 y ¶ 200.
[818] **Anexo CLEX-108**, págs. 17-23.
[819] Spiller II, ¶ 162; **Anexo  CLEX-81**, pág. 29.
[820] Brailovsky/Flores II, Tabla 8; **Apéndice BF-37**.
[821] Spiller II, ¶ 163.

Tribunal observa que esta cuestión no ha sido objeto de debate adicional entre las Partes o sus peritos. Como Ibbotson/Morningstar informan tanto las "*últimas*" cifras y el promedio de 5 años, el Tribunal no considera que se haya establecido que se deba preferir uno sobre el otro. Lo mismo se aplica a la elección de la empresa compuesta o la empresa mediana. Por consiguiente, el Tribunal no dará preferencia a las elecciones de ninguno de los peritos, sino que aplicará el promedio de las relaciones en su evaluación de la tasa de descuento nominal, es decir, una relación del 16,85 % de deuda al 83,15 % de capital.

757. Para la determinación del costo de deuda (después de impuestos), el Tribunal se refiere a la Tabla 8 del segundo dictamen pericial del Sr. Brailovsky y el Dr. Flores, conforme al cual el costo de deuda (después de impuestos) es equivalente a la tasa libre de riesgo de los EE. UU. (3,6 %) más la prima de riesgo de deuda del país (10,26 %) más una prima de riesgo industrial (que los peritos de ambas Partes fijaron en 1,5 % para el año 2010)[822] multiplicado por uno menos la alícuota fiscal aplicable (34 %). Según la mayoría del Tribunal, esto resulta en el siguiente cálculo: (3,6 % + 10,26 % + 1,5 %) * (1 – 34 %) = 10,14 %.

758. Sobre la base del promedio de la relación de deuda a capital de 16,85/83,15 determinado *supra,* la mayoría del Tribunal arriba a una tasa de descuento nominal del 19,88 %[823].

### bb)   Flujos de Fondos Futuros

759. En la siguiente sección, el Tribunal procederá a analizar las discrepancias entre las Partes y sus peritos en lo que concierne a la determinación de los flujos de fondos futuros de Norpro Venezuela.

### (i)   Síntesis de la Postura de la Demandante

760. Con respecto al cálculo de los flujos de fondos futuros, la Demandante considera "*injustificado*" dividir las ganancias que un comprador interesado obtendría de las exportaciones de Norpro Venezuela a fin de dar cuenta de la distribución interna de costos. Según la Demandante, la valuación justa de mercado "*no depende de las cualidades idiosincráticas del comprador o vendedor*"; en consecuencia, debe asumirse que lo más probable sería que el comprador interesado que realizó la oferta más elevada fuera un inversionista estratégico que ya tiene una red de distribución y comercialización

---

[822] Brailovsky/Flores II, Tablas 8 y 9; **Anexos  CLEX-81**, pág. 29 y **CLEX-192**; **Apéndice BF-156**.
[823] 10,1376 % * 0,1685 + 21,86 % * 0,8315 = 19,8847756 %.

similar a la de Saint-Gobain y, por lo tanto, está en condiciones de percibir el 100 % de las ganancias[824]. La Demandante arguye que los costos de comercialización son costos fijos del comprador que no cambian con la adquisición, pero que el comprador puede —en cambio— apalancar sus recursos existentes para sacar todo el beneficio del valor incremental del activo adquirido, así como Saint-Gobain internalizó el 100 % de las ganancias. Por último, la Demandante subraya que las estimaciones de ambos peritos ya incluyen los costos de comercialización y distribución por la suma del 7 %[825].

761. La Demandante también destaca que el Sr. Brailovsky y el Dr. Flores asumieron en su cálculo que CVG Bauxilum suministraría bauxita al precio incrementado que le impuso unilateralmente a Norpro Venezuela en el mes de septiembre de 2008. Según la Demandante, este aumento de precios era ilícito y, por ende, no debe tenerse en cuenta sobre la base del principio en virtud del cual "*una parte no puede reducir su responsabilidad por un acto ilícito (aquí, la expropiación) en función de otro (el aumento de precios)*"[826]. La Demandante asevera que el precio de la bauxita debería reflejar el acuerdo conforme al Contrato de Bauxita y, por consiguiente, ascender a USD 25,5 por TM[827].

762. En lo que concierne a los costos de transporte, la Demandante hace referencia a su testigo Jack Larry, quien declaró que, contrario a lo que supusieron el Sr. Brailovsky y el Dr. Flores, los *proppants* no se solían enviar de Corpus Christi a Alice (ambas en el Estado de Texas) para su almacenamiento, sino que la mayor parte se enviaba directamente del puerto de Corpus Christi al cliente, por lo que el costo presupuestado a Alice en el Plan Estratégico 2011-2015 era "*a meros fines ilustrativos*"[828][Traducción del Tribunal]. La Demandante alega lo siguiente: (i) que la estimación de los costos de transporte por parte del Prof. Spiller se basa en el embarque real en el mes de marzo de 2010 y es confirmada por los contratos de transporte contemporáneos de Saint-Gobain; y (ii) que el precio promedio que el Prof. Spiller le aplica a los costos de embarque dentro de los EE. UU.

---

[824] Réplica, ¶¶ 170-172; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 174-175, que hace referencia al testimonio oral del Prof. Spiller durante la Audiencia. Transcripción (Día 4), pág. 1233, líneas 1-3; pág. 948, línea 11 – pág. 949, línea 9, y pág. 946, líneas 6-19. *Véase* también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 89-90.

[825] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 176-178 que hace referencia a la Presentación de Apertura del Prof. Spiller, diapositiva 15, y al testimonio oral del Prof. Spiller y el Dr. Flores. Transcripción (Día 4), pág. 917, líneas 21-22; pág. 1175, líneas 1-3, pág. 1177, líneas 9-17.

[826] Réplica, ¶ 176; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 96-97.

[827] Réplica, ¶ 177.

[828] Réplica, ¶ 179 que hace referencia a Larry II, ¶ 13; Presentación Posterior a la Audiencia de la Demandante, ¶ 167 que hace referencia a la presentación del día 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), pág. 42 y al testimonio oral del Sr. Larry durante la Audiencia. Transcripción (Día 3), pág. 697, línea 22- pág. 698, línea 7. Respecto del costo presupuestado de EUR 110 en el Plan Estratégico 2011-2015, el Sr. Larry afirmó también que "*el costo de flete general incluyendo entrega al cliente está en 110 euros por tonelada, en esa gama por lo menos*". Transcripción (Día 3), pág. 692, líneas 20-22.

refleja exactamente las diversas ubicaciones y los arreglos contractuales con los clientes finales de la Demandante[829].

763.  La Demandante también afirma que el Sr. Brailovsky y el Dr. Flores no establecen una distinción entre los siguientes conceptos: (i) los gastos de capital de mantenimiento destinados a "*manten*[er] *la planta en condiciones para seguir funcionando en sus niveles actuales*"; y (ii) los gastos de capital de inversión destinados a "*aument*[ar] *la producción de la planta a través de eficacia y mejoras tecnológicas*"[830] [Traducción del Tribunal]. Según la Demandante, sólo los gastos de capital de mantenimiento deberían incluirse en el cálculo de los gastos de capital[831].

764.  Con respecto al capital de trabajo necesario para operar la planta, la Demandante alude a los siguientes supuestos del Prof. Spiller: (i) el saldo pendiente de los créditos fiscales IVA al año 2009 se habría pagado en el año 2010; y (ii) en lo sucesivo, habría tomado 60 días monetizar los certificados IVA, y Norpro Venezuela habría recuperado el 80 % de su valor. En cuanto a las demoras administrativas invocadas por la Demandada, la Demandante resalta que se ha concluido que tales demoras violan el estándar TJE y asevera que tenía una expectativa legítima de que la Demandada siguiera su propio procedimiento de créditos fiscales IVA, dado que esta cuestión se analizó específicamente con el Gobierno venezolano antes de que la Demandante invirtiera en Venezuela[832]. Asimismo, la Demandante aduce que la invocada demora de dos años es "*meramente especulativa*", puesto que todos los documentos en los que se basa la Demandada datan de varios años con anterioridad al año 2010 y además "*carecen de sustento legal*" [Traducción del Tribunal], ya que la legislación venezolana dispone que el fisco debe emitir su decisión dentro de los 30 días[833].

**(ii)    Síntesis de la Postura de la Demandada**

---

[829] Réplica, ¶ 179; Presentación Posterior a la Audiencia de la Demandante, ¶ 166 y ¶¶ 169-171, que hace referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), pág. 10; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 91-92, que hace referencia a Spiller II, Tabla 7 y ¶¶ 83-85.

[830] Réplica, ¶ 180, que hace referencia a Larry II, ¶¶ 21-23.

[831] Réplica, ¶ 181.

[832] Réplica, nota 381, que hace referencia a Spiller II, ¶ 93 y ¶¶ 115-116, e *Impregilo S.p.A. c. Argentina*, Opinión Concurrente y Disidente del Juez Charles N. Brower (**CLA-127**), ¶ 9; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 158-161.

[833] Presentación Posterior a la Audiencia de la Demandante, ¶ 154 y nota 348. Además, la Demandante considera que es contradictorio que, por una parte, el testigo de la Demandada Eduardo Rondón reconozca que se había solicitado a las autoridades un certificado especial de recuperación fiscal pero, por la otra, la Demandada alegue que Norpro Venezuela seguía recabando los documentos para su primera solicitud de recuperación. Presentación Posterior a la Audiencia de la Demandante, ¶ 156 y Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 95 que hace referencia al testimonio oral del Sr. Rondón. Transcripción (Día 3), pág. 771, línea 17 - pág. 772, línea 7.

765. La Demandada sostiene que no fue discutido entre las Partes que antes de la expropiación, Norpro Venezuela recibió sólo el 27 % de las ganancias, mientras que el 73 % restante fue destinado a la empresa filial de la Demandante en EE. UU., SGCP. La Demandante señala que esto se basa en el estudios de precios de transferencia de la Demandante, que distinguió entre cuatro categorías ponderadas de igual manera: funciones, riesgos, intangibles de fabricación e intangibles de comercialización. La Demandada asevera que la contribución de la planta y de SGCP a las primeras tres categorías fue dividida; mientras que la cuarta categoría, "*intangibles de comercialización*", sin embargo, se asignó en un 100 % a SGCP. La Demandada argumenta que el 25 % de las ganancias de la planta se vincularon directamente a las capacidades de distribución, logística y comercialización de SGCP, que no se expropiaron junto con la planta[834].

766. En respuesta al argumento planteado por la Demandante de que el estudio constituía un mero mecanismo de contabilidad interno, la Demandada subraya que conforme al derecho venezolano, los contribuyentes que realicen operaciones con partes relacionadas deben "*determinar sus ingresos, costos y deducciones resultantes de aquellas operaciones considerando los precios y las cantidades que se habrían aplicado entre partes independientes en operaciones comparables*"[Traducción del Tribunal]. Por consiguiente, la Demandada mantiene su supuesto de que el acuerdo entre Norpro Venezuela y SGCP reflejaba una operación entre partes independientes (*arm's-length transaction*)[835].

767. Consecuentemente, la Demandada rechaza la hipótesis del Prof. Spiller de que Norpro Venezuela retendría el 100 % de las ganancias a la fecha de valuación. Sostiene que un comprador interesado no pagaría por el 100 % de las ganancias ya que no estaría adquiriendo las capacidades de SGCP y no estaría dispuesto a transferir las ganancias que espera obtener a través de su propia red de comercialización, logística y distribución. Si el comprador no tuviera esta red propia, la Demandada subraya que incluso debería pagar por adquirir estas capacidades o por los servicios de un tercero. En síntesis, la Demandada aduce que "*ningún comprador pagaría por algo que no obtuviera de la operación*"[836]. [Traducción del Tribunal]

---

[834] Memorial de Contestación, ¶¶ 198-199 y ¶ 256 en referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**); Dúplica, ¶¶ 238-242; Escrito Posterior a la Audiencia de la Demandada, ¶ 182.

[835] Escrito Posterior a la Audiencia de la Demandada, ¶ 183 que cita la *Ley de Impuesto sobre la Renta* (**Apéndice BF-113**), Artículo 111.

[836] Memorial de Contestación, ¶¶ 200-202. *Véase*, asimismo, Dúplica, ¶ 244. La Demandada enfatiza que, si bien un comprador podría obtener el 100 % de los ingresos de la última venta de *proppants*, no se beneficiaría del 100 % de las ganancias debido a que "*una gran parte de las ganancias*" estaría ligada a las funciones de comercialización, distribución y logística que no eran parte de la transferencia de la Demandante en contraprestación por el precio de compra. [Traducción del Tribunal] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 184-185.

768. Según la Demandada, un comprador interesado "*tendría en cuenta la valuación de la Planta, no de los activos en la cadena completa de valor, y solo consideraría las ganancias que podría generar la propia Planta*"[837]. [Traducción del Tribunal]

769. Por ende, la Demandada se refiere a la hipótesis de sus peritos de que un comprador de la planta obtendría "*a lo sumo*" el 75 % de las ganancias, ya que la propia Demandante concluyó en su estudio de precios de transferencia que SGCP aportó el 100 % de la porción del 25 % de los "*bienes intangibles de comercialización*"[838]. [Traducción del Tribunal]

770. En relación con el precio de la bauxita a ser abonado por Norpro Venezuela a CVG Bauxilum, la Demandada afirma que no existen fundamentos para que la Demandante haya ordenado al Prof. Spiller que reduzca el precio acordado de USD 33,8 por TM al precio original del contrato, dado que Norpro Venezuela había aceptado el precio incrementado en la medida en que no hubiera más aumentos durante el año 2009. Por ende, la Demandada ordenó a sus peritos que basen su cálculo en el precio incrementado, aumentado por el IPP-Materias Primas de EE. UU.[839].

771. En lo que respecta a los costos de transporte, la Demandada afirma que la estimación del Prof. Spiller de los costos de embarque a los EE. UU. se basa, aparentemente, en un único envío del mes de marzo de 2010, y señala que el mismo documento que invoca el Prof. Spiller incluye el costo presupuestado por la propia Demandante para el transporte desde Venezuela hasta Alice, Texas, por EUR 110 (convertidos a USD 154) por TM. De acuerdo con la Demandada, esta cifra también está respaldada por el estudio de precios de transferencia de la Demandante[840]. En cuanto a los documentos de transporte contemporáneos que invoca el Prof. Spiller en su segundo dictamen, la Demandada sostiene que estos documentos no reflejan los costos reales contraídos en relación con el transporte, por lo que sus peritos mantuvieron su estimación original[841].

---

[837] Escrito Posterior a la Audiencia de la Demandada, ¶ 186.

[838] Memorial de Contestación, ¶ 203 en referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 5; Dúplica, ¶ 243; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 54.

[839] Memorial de Contestación, ¶ 210 y ¶ 256; Dúplica, ¶ 251 que cita la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo R-52**).

[840] Memorial de Contestación, ¶ 214 y ¶ 256 con referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), págs. 10 y 42 y Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 195-198; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 58-59.

[841] Dúplica, ¶ 255; Escrito Posterior a la Audiencia de la Demandada, ¶ 194. La Demandada subraya que sus peritos ajustaron su estimación sobre la base de la nueva información de que algunos *proppants* se enviaban directamente desde Corpus Christi al cliente y supusieron que sólo la mitad del embarque se enviaba primero a Alice para su almacenamiento. Dúplica, ¶¶ 255-256.

772. Asimismo, la Demandada rechaza el cálculo del Prof. Spiller de los costos de envío dentro de EE.UU. y afirma que el costo presupuestado por la Demandante y el SPA de Halliburton reflejan un costo "*significativamente más alto*", por lo que sus peritos basaron su cálculo en el costo presupuestado[842]. La Demandada subraya que, incluso a pesar de que la Demandante no proporcionó datos en sustento de la hipótesis del Prof. Spiller de que el 30 % de los *proppants* se venderían EXW y el 70 % restante se vendería en volúmenes equivalentes a cada una de las tres áreas de distribución, los peritos de la Demandada han aplicado esa hipótesis junto con el precio proporcionado en el SPA de Halliburton, que resulta en costos incluso mayores a los que ellos calcularon[843].

773. En relación con los gastos de capital, la Demandada concuerda con la teoría del Prof. Spiller hasta el año 2018 inclusive, pero arguye que los gastos de capital anuales aumentarían significativamente "*a medida que la Planta envejecía y los equipos alcanzaban el final de su vida útil*"[844]. Si bien el Prof. Spiller incluyó sólo los gastos de mantenimiento, la Demandada sostiene que los gastos relativos a "*la salud y la seguridad, la tecnología y las mejoras para reducir las averías e interrupciones del proceso*" [Traducción del Tribunal] también son necesarios para asumir la operativa de manera indefinida y, por consiguiente, afirma que deberían incluirse en el cálculo los cuatros gastos de capital tal como fueron previstos para la Planta de la Demandante en Fort Smith[845].

774. Respecto del capital de trabajo, la Demandada acepta el cálculo del Prof. Spiller salvo en relación con los créditos fiscales por el Impuesto al Valor Agregado (IVA). La Demandada sostiene que al día 15 de mayo de 2010 Norpro Venezuela no había siquiera solicitado los certificados de recuperación de impuestos y señala que el proceso de recuperación es usualmente un proceso "*largo y complejo*". La Demandada afirma que, por ende, sus peritos asumieron que los créditos fiscales IVA pendientes al día 15 de mayo de 2010 hubieran sido monetizados en el año 2013 y que los demás créditos fiscales IVA acumulados a partir de entonces habrían sido monetizados a dos años de manera progresiva y, por lo tanto, habrían sido parte del capital de trabajo que un comprador no valuaría por separado[846].

775. En sustento de su postura, la Demandada se refiere a (i) artículos periodísticos que informan la demoras de varios años en 2000 y 2003; (ii) la declaración testimonial de Eduardo Rondón de que el "*procedimiento para la recuperación del IVA en Venezuela*

---

[842] Memorial de Contestación, ¶¶ 215-216 que hace referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1.
[843] Dúplica, ¶¶ 257-258.
[844] Memorial de Contestación, ¶¶ 217-218 y ¶ 256.
[845] Dúplica, ¶ 262.
[846] Dúplica, ¶¶ 269-271; Escrito Posterior a la Audiencia de la Demandada, ¶ 201.

*lleva al menos dos años desde la presentación inicial de la solicitud*"; y (iii) la declaración de la Demandante en su DAC del mes de junio de 2009 de que "[r]*ecuperar el IVA del tesoro fiscal se ha vuelto un proceso muy largo y complejo*"[847]. [Traducción del Tribunal]

### (iii)   El Análisis del Tribunal

776. El Tribunal procederá ahora a analizar los diversos puntos de discusión respecto de los flujos de fondos futuros de Norpro Venezuela de a uno por vez.

### (1)   Los Precios de los *Proppants*

777. En lo que concierne a las proyecciones de los precios de los *proppants* que se deban aplicar, el Tribunal subraya que la controversia entre las Partes se ha centrado principalmente en el impacto de los recientes descubrimientos del mercado petrolífero sobre las proyecciones de los precios en una valuación a la fecha del laudo. Las Partes coinciden en que este desarrollo no se podría haber previsto al día 15 de mayo de 2010 y, por ende, no debe tomarse en cuenta en la presente valuación. Sin embargo, los peritos de las Partes también aplicaron distintos supuestos respecto de los precios de los *proppants* en sus valuaciones del día  15 de mayo de 2010.

778. El Prof. Spiller afirmó en su Modelo de Valuación Actualizado, presentado junto con su segundo dictamen pericial, que basó los precios de las exportaciones a los EE. UU.: (i) para el año 2010, en las ventas históricas en Venezuela durante el año 2010; (ii) para los años 2011-2012, en las ventas históricas en los EE. UU.; (iii) para el año 2013, en la tasa de crecimiento de los promedios de precios de Norpro Venezuela entre los años 2012 y 2013; (iv) para los años 2014-2015, en el promedio de la tasa de crecimiento de los informes de los analistas y las proyecciones de la Demandante; y (v) para los años 2016-2018, en el aumento del Índice de Precios al Productor (*PPI*, por sus siglas en inglés) de los EE. UU. Los precios del Prof. Spiller para las exportaciones a Sudamérica y las ventas locales dentro de Venezuela se basan: (i) para el año 2010, en el Plan de Negocios de la Demandante del mes de abril de 2010; (ii) para el año 2011, en la tasa de crecimiento de las ventas de Interprop y Versaprop en los EE. UU. entre los años 2010 y 2011; y (iii) para el período comprendido entre los años 2012-2017, en los mismos supuestos que las exportaciones a los EE. UU[848].

---

[847] Escrito Posterior a la Audiencia de la Demandada, ¶ 200 que hace referencia a *Pedro García, Exportaciones crecieron 4% en el trimestre*, 3 de abril de 2000 (**Apéndice BF-34**), *Eduardo Camel, Contracción de 35% en las exportaciones de la Nación*, 28 de agosto de 2003 (**Apéndice BF-35**), Rondón, ¶ 38 y Actualización de fecha 8 de junio de 2009 a la DAC de fecha 23 de octubre de 2006 (**Anexo  R-7**), pág. 6.

[848] **Anexo  CLEX-81**, pág. 36.

779. El Sr. Brailovsky y el Dr. Flores basaron los precios de las ventas a Norteamérica, Sudamérica y Venezuela (i) para el período comprendido entre los años 2010-2015, en las proyecciones contenidas en el Plan de Negocios de la Demandante del mes de abril de 2010; y (ii) para el período sucesivo, en las proyecciones de inflación a largo plazo del año 2010[849].

780. El Tribunal concuerda con el Sr. Brailovsky y el Dr. Flores en que es inexacto que una valuación al día 15 de mayo de 2010 utilice los precios de ventas reales posteriores al mes de abril de 2010, porque estos no se podrían haber conocido a la fecha de valuación. Asimismo, el Sr. Brailovsky y el Dr. Flores señalaron que las proyecciones de precios del Prof. Spiller son superiores a las propias proyecciones de la Demandante para Norpro Venezuela al mes de abril de 2010[850]. El Tribunal entiende que, si bien un comprador interesado podría haber decidido no basarse sólo en las proyecciones del vendedor, sino tomar en cuenta datos adicionales, tales como los informes de los analistas, sin dudas habría dado un valor considerable a las proyecciones del Plan de Negocios del mes de abril de 2010. Si el Prof. Spiller consideraba que había motivos para desviarse del Plan de Negocios, podría haber explicado su elección, pero ni siquiera abordó la discrepancia entre el Plan de Negocios y sus propias proyecciones para la valuación al mes de mayo de 2010 en su dictamen pericial.

781. Por consiguiente, el Tribunal no tiene motivos para dudar de la razonabilidad de las propias proyecciones de precios de la Demandante al mes de abril de 2010, y, por ende, sigue el enfoque de los peritos de la Demandada en este sentido.

### (2)    Ganancias Divididas para la Parte de Comercialización

782. En lo que concierne a la cuestión que consiste en determinar si debería existir una división de las ganancias por las ventas de exportación, las Partes concuerdan en que, antes de la expropiación, Norpro Venezuela retenía en efecto el 27 % de las ganancias de las ventas de *proppants;* y el 73 % restante se destinaba a la afiliada estadounidense de la Demandante, Saint-Gobain Ceramics & Plastics (SGCP), que tenía la responsabilidad, *inter alia*, de la comercialización y distribución de los *proppants*[851]. Es objeto de debate si un comprador interesado habría supuesto una división de ganancias en sus cálculos del

---

[849] Brailovsky/Flores I, ¶¶ 50-51 y Tabla 4; Brailovsky/Flores II, ¶ 40; **Anexo CLEX-40**, págs. 13-14.
[850] Brailovsky/Flores II, ¶¶ 44-45 y Tabla 5.
[851] Spiller I, ¶ 112 y nota 55; Brailovsky/Flores I, ¶¶ 52-58; Documento sobre precios de transferencia, 21 de agosto de 2009 (**Anexo CLEX-35**).

precio de compra para reflejar el hecho de que Norpro Venezuela no contaba por sí misma con la red de comercialización y distribución necesaria para vender los *proppants* al cliente.

783. El Prof. Spiller supuso que un comprador interesado habría incluido el 100 % de las ganancias en su cálculo del precio de compra, sobre la base de la hipótesis de que quien presentara la oferta más elevada habría sido una empresa con capacidades de comercialización y distribución similares a las de SGCP. Según el Prof. Spiller, esta hipótesis es compatible con el valor justo de mercado, porque no se basa en "*sinergias únicas*" que se podrían aplicar solo a un comprador específico, sino en la consideración razonable de que existen diversos compradores potenciales con estas capacidades en el mercado y, por consiguiente, la Demandante habría realizado la venta a un comprador que pudiera obtener el 100 % de las ganancias y estuviera dispuesto a considerar esta sinergia en su oferta por Norpro Venezuela. El Prof. Spiller subrayó que no valuó ganancias o costos asociados con una red externa a la planta, sino sólo las ganancias adicionales que un comprador con acceso a tal red podría obtener al sumar la capacidad de Norpro Venezuela a su propia capacidad[852].

784. El Sr. Brailovsky y el Dr. Flores tomaron la postura de que el Prof. Spiller hizo suposiciones específicas incorrectas acerca de las características del comprador interesado e ignoró el hecho de que la red de comercialización y distribución no se expropió. El Sr. Brailovsky y el Dr. Flores arguyeron que incluso si el comprador tuviera tal red, no habría estado dispuesto a pagar y ceder las ganancias asociadas a tal red, justamente porque ya contaba con la red y no adquiriría una con la transacción[853]. El Sr. Brailovsky y el Dr. Flores entienden que el activo sujeto a la valuación es sólo la empresa en marcha Norpro Venezuela, y no la red de comercialización y distribución de SGCP. Por ello, se refirieron al estudio de precios de transferencia que ambas Partes invocaron en relación con las ganancias históricas, y señalaron que un 25 % de las ganancias se asignaron a los "*Intangibles de Mercado*". Puesto que Norpro Venezuela no podía suministrar ninguno de los servicios incluidos en esta sección, supusieron que habría retenido "*a lo sumo*" el 75 % de las ganancias totales[854].

785. Tal como acertadamente destacara la Demandante, los peritos de ambas Partes incluyeron también un rubro de costo de un 7 % llamado "*Ventas/Investigación y Desarrollo/Admin.*" en sus cálculos[855]. La Demandante y el Prof. Spiller se refirieron a este rubro de costo

---

[852] Spiller II, ¶¶ 64-68.
[853] Brailovsky/Flores I, ¶¶ 59-63; Brailovsky/Flores II, ¶ 49 y ¶ 60.
[854] Brailovsky/Flores I, ¶¶ 69-71; Brailovsky/Flores II, ¶¶ 50-55 y Figura 3 que hace referencia al Documento de precios de transferencia, 21 de agosto de 2009 (**Anexo D CLEX-35**).
[855] **Anexo  CLEX-81**, pág. 37; **Apéndice BF-101**, Tablas 4A, 4B y 4C.

como los costos de comercialización y distribución, y arguyen que una deducción adicional contabilizaría dos veces la parte de comercialización[856]. Sin embargo, la Demandada adopta la postura de que este costo sólo cubría los costos de comercialización local en Venezuela y subraya que el mismo ya existía conforme al documento de precios de transferencia, que también aplicaba una deducción adicional del 25 % por comercialización en los EE. UU.[857]. En respuesta al planteo de que el 7 % al menos se debería deducir del 25 %, el Dr. Flores explicó la correlación entre los dos rubros de la siguiente manera durante la Audiencia:

> *"7 por ciento es un costo operativo. Entonces tiene que estar en el rubro costo, 25 por ciento no es un costo, está en el rubro de utilidades. Hay que calcular el beneficio total, es decir, todo el ingreso de los consumidores finales de proppants menos todos los costos a todo nivel, costo en Venezuela, costo de transporte, costo dentro de los Estados Unidos y luego ese 7 por ciento es uno de los costos. Se hace un descuento y así se tiene la ganancia total y ese es el cien por cien de las utilidades. […] Entonces, de eso,* [Norpro Venezuela] *a lo sumo tenía derecho y creemos que es un supuesto general, tenía derecho al 75 por ciento de esa utilidad total. Entonces, no puede comparar el 25 con el 7 porque son conceptos diferentes"*[858].

786. El Tribunal considera convincente la explicación del Dr. Flores y, en consecuencia, analizará la cuestión que consiste en determinar si cualquier división de ganancias debería realizarse independientemente del hecho de que Norpro Venezuela ya incurrió un 7 % en gastos de "*Ventas/Investigación y Desarrollo/Admin*". En la opinión de la mayoría del Tribunal, la explicación del Dr. Flores queda asimismo confirmada por el estudio de precios de transferencia, que asignó el 25 % de las ganancias a los "*Intangibles de Comercialización*", porque en efecto el mismo documento incluye el rubro de costos del 7 % en su cálculo preliminar del precio[859]. El hecho de que conforme al estudio de precios de transferencia SGCP proporcione todos los servicios incluidos bajo "*Intangibles de Mercado*" demuestra que estos servicios debían suministrarse además de los servicios para los que Norpro Venezuela incurría en los costos del rubro de costos del 7 %[860].

787. En lo que concierne a la cuestión que consiste en determinar si se deben hacer deducciones o no, el Tribunal considera que es plausible que quien presentara la oferta más elevada fuera, en efecto, una empresa con acceso a una red de comercialización y distribución que podría haber internalizado el 100 % de las ganancias de las ventas de

---

[856] Presentación de Apertura del Prof. Spiller, diapositiva 15; Escrito Posterior a la Audiencia de la Demandante, ¶ 178.
[857] Escrito Posterior a la Audiencia de la Demandada, nota 385.
[858] Transcripción (Día 4), pág. 1175, líneas 1–22.
[859] **Anexo CLEX-35**, pág. 1.
[860] *Cfr.* **Anexo CLEX-35**, pág. 5.

*proppants*. Sin embargo, esto no responde al interrogante de si el comprador habría incluido el 100 % de estas ganancias en sus cálculos del precio de compra de Norpro Venezuela. Si bien la planta produciría los *proppants* terminados, esto por sí sólo no permitiría que el comprador obtenga el 100 % de las ganancias, sino que esto sólo sería posible si aportara sus propias capacidades de comercialización y distribución.

788. De hecho, también es plausible suponer que el comprador pudiera producir sinergias de costos al sumar las capacidades de Norpro Venezuela a sus propias capacidades y considerar esas sinergias en su cálculo del precio de compra de la planta. No obstante, la mayoría del Tribunal no está convencida de la hipótesis de que el comprador habría estado dispuesto a pagar la misma suma que si Norpro Venezuela hubiera tenido la capacidad de comercializar y distribuir los *proppants* por su cuenta. El comprador habría al menos deducido los costos adicionales que contraería en la comercialización y distribución de las capacidades adicionales adquiridas.

789. Si bien la suma de estos costos adicionales que el comprador contemplaría es desconocida, el Tribunal destaca la hipótesis del Prof. Spiller de que el comprador tendría una red similar a la de SGCP. Por ello, parece razonable remitirse al estudio de precios de transferencia de la Demandante en este sentido. Mientras que el Tribunal entiende que los costos adicionales del comprador pueden no ser equivalentes a la porción de ganancias que la Demandante asignó a los "*Intangibles de Comercialización*", también se debe subrayar que el hecho de que Norpro Venezuela sólo retenía el 27 % de las ganancias antes de la expropiación no es objeto de debate. En este contexto, para la mayoría del Tribunal, la hipótesis de que el comprador habría considerado costos adicionales por la comercialización y distribución de los *proppants* por al menos el 25 % de las ganancias parece bastante conservadora.

790. En consecuencia, la mayoría del Tribunal adoptó el enfoque del Sr. Brailovsky y el Dr. Flores de deducir el 25 % de las ganancias por ventas de exportación de los flujos de fondos futuros de Norpro Venezuela.

### (3)    Tipo de Cambio e Inflación

791. En lo que concierne al tipo de cambio al que Norpro Venezuela podría haber convertido los dólares estadounidenses en bolívares y vice versa, el Tribunal subraya que en sus valuaciones al día 15 de mayo de 2010, los peritos de ambas Partes utilizaron las proyecciones del tipo de cambio oficial de CADIVI a lo largo de todo el período de valuación[861]. Como ninguna Parte aduce que la introducción del tipo de cambio más favorable de SICAD II a principios del año 2014 fuera previsible en el mes de mayo de

---

[861] Spiller II, nota 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, nota 167.

2010, no es necesario que el Tribunal se exprese sobre la aplicación de este tipo de cambio desde el año 2014.

792. Sin embargo, parece haber una diferencia respecto de los supuestos sobre la devaluación con posterioridad al día 15 de mayo de 2010, a causa de que los peritos de las Partes se basaron en proyecciones del tipo de cambio de distintas fuentes. Mientras que el Prof. Spiller se basó en las proyecciones de Ecoanalítica, consultora macroeconómica privada con sede en Venezuela[862], el Sr. Brailovsky y el Dr. Flores calcularon la evolución del tipo de cambio sobre la base de las proyecciones del Fondo Monetario Internacional[863]. Tal como subrayara el Prof. Spiller durante la Audiencia, el FMI no proyecta directamente el desarrollo del tipo de cambio del USD-bolívar, sino las tasas de inflación en los EE. UU. y en Venezuela[864]. El Sr. Brailovsky y el Dr. Flores respondieron que el FMI proyecta el producto interno bruto de Venezuela en dólares estadounidenses y en bolívares, y explicaron que derivaron el tipo de cambio a partir de la relación entre ambas cifras[865].

793. Aunque los peritos de las Partes continuaron el debate sobre si el FMI asume supuestos independientes acerca de la devaluación o sólo asume que el tipo de cambio se desarrollará junto con ella[866], el Tribunal considera que no debe adoptar una decisión en este respecto. No hay discusión entre los peritos de las Partes en el sentido de que Econalítica proyecta directamente el desarrollo del tipo de cambio USD-bolívar. Asimismo, el Sr. Brailovsky y el Dr. Flores no cuestionaron la fiabilidad de las proyecciones de Ecoanalítica; sino que por el contrario, citan al director de Ecoanalítica, el Sr. Asdrúbal Oliveros, como fuente para su hipótesis acerca de un tipo de cambio unificado que no tuvo un papel en la valuación al día 15 de mayo de 2010[867].

794. Como Ecoanalítica es una consultora económica con sede en Venezuela, el Tribunal no tiene motivos para dudar de que conoce las particularidades del mercado cambiario venezolano y, por ende, está en la posición de proporcionar proyecciones fiables del tipo de cambio. Por consiguiente, el Tribunal seguirá el enfoque del Prof. Spiller y se basará en las proyecciones contemporáneas de Ecoanalítica respecto de la evolución del tipo de cambio con posterioridad al día 15 de mayo de 2010. En cualquier caso, el Tribunal subraya que la Demandada se refirió a una "*leve diferencia*" respecto de los supuestos

---

[862] Spiller I, nota 68; **Anexo  CLEX-81**, pág. 57.
[863] Brailovsky/Flores I, ¶ 98; **Apéndices BF-33** y **BF-101**, Tabla 12; Presentación de Apertura del Dr. Flores, diapositiva 24.
[864] Transcripción (Día 4), pág. 1202, líneas 11-16.
[865] Transcripción (Día 4), pág. 1204, líneas 4–18.
[866] *Cfr.* Transcripción (Día 4), pág. 1202, línea 16 – pág. 1204, línea 1, y pág. 1204, línea 19 – pág 1207, línea 2.
[867] *Cfr.* Brailovsky/Flores II, ¶ 82; Transcripción (Día 4), pág. 1206, línea 15 - pág. 1207, línea 2.

sobre la devaluación, y ni siquiera cuantificó esa diferencia[868]. Por ello, el Tribunal considera que es sensato suponer que en cualquier caso se trata de una diferencia nimia.

### (4)   Los Costos de la Bauxita

795. Respecto del precio de la bauxita aplicable que Norpro Venezuela debería haber pagado a CVG Bauxilum conforme al Contrato de Bauxita con posterioridad al día 15 de mayo de 2010, los peritos de las Partes recibieron distintas instrucciones de las Partes. En concordancia con la postura de la Demandante de que el aumento del precio de la bauxita del mes de septiembre de 2008 equivalió a una violación al estándar TJE, al Prof. Spiller se le indicó que eliminara el aumento del precio de sus cálculos y que aplicara en su lugar el precio del contrato original, con un aumento conforme al PPI de los Estados Unidos, como se establece en la Cláusula 10.1 del Contrato de Bauxita[869]. Por otra parte, la Demandada indicó al Sr. Brailovsky y al Dr. Flores que aplicaran el precio aumentado que Norpro Venezuela pagaba, en efecto, al mes de septiembre de 2008 y a lo largo del año 2009, con el aumento conforme al PPI de los Estados Unidos a partir del año 2010[870].

796. El Tribunal subraya que aparte del debate acerca de la justificación del aumento de precios del mes de septiembre de 2008, el Sr. Brailovsky y el Dr. Flores afirmaron también que el Prof. Spiller no había considerado dos aumentos del precio del transporte previos y no sujetos a debate de los meses de agosto de 2007 y enero de 2008[871]. El Prof. Spiller no trató los dos aumentos de precios, pero señaló que conforme al ajuste del precio por inflación, su precio para el año 2008 fue idéntico al precio al que se refiere el documento invocado por el Sr. Brailovsky y el Dr. Flores, es decir, USD 25,5 por TM[872]. Si bien no queda totalmente en claro para el Tribunal por qué los precios son en efecto iguales para el año 2008, a pesar de que el Prof. Spiller sólo realizó ajustes por inflación, pero no por los mayores costos del transporte, el Tribunal subraya que el argumento del Prof. Spiller no es válido para el año 2007 (él aplicó el precio de USD 23,8/TM a pesar del aumento a USD 25,0/TM en el mes de agosto de 2007)[873]. En el presente contexto, sin embargo, el Tribunal debe evaluar los precios aplicables al período posterior al día 15 de mayo de 2010; de modo que un precio incorrecto para el año 2007 es irrelevante, mientras que el precio para el año 2008 sea correcto.

---

[868] Escrito Posterior a la Audiencia de la Demandada, nota 389.
[869] Spiller I, ¶ 126 y Figura 20; Spiller II, ¶¶ 124-125.
[870] Brailovsky/Flores I, ¶¶ 103, 105; Brailovsky/Flores II, ¶ 99.
[871] Brailsovky/Flores I, ¶ 102 que hace referencia al **Anexo C-100**, diapositiva 13; Brailovsky/Flores II, ¶ 95. En el mes de agosto de 2007, el precio del contrato original de USD 23,5/TM aumentó a USD 25,0/TM sobre la base de la Cláusula 10.2 del Contrato de Bauxita, y en el mes de enero de 2008, el precio aumentó á USD 25,5/TM, lo que consiste de un ajuste por inflación sobre la base de la Cláusula 10.1 (USD 0,23/TM) y de un aumento sobre la base de la Cláusula 10.2 (USD 0,27/TM).
[872] Spiller II, ¶ 125.
[873] *Compárese* **Anexo CLEX-81**, pág. 40 *con* **Anexo C-100**, diapositiva 13.

797.    Respecto de la principal controversia entre las Partes, es decir, si el cálculo debería incluir el aumento del precio del mes de septiembre de 2008, el Prof. Spiller identificó correctamente el debate sobre la legalidad del aumento del precio como una cuestión jurídica sobre la cual no expresó una opinión profesional[874]. El Sr. Brailovsky y el Dr. Flores señalaron que en cualquier caso era irrazonable suponer que un comprador interesado no habría tenido en cuenta el precio real que Norpro Venezuela estaba pagando al año 2008[875]. El Tribunal concuerda con el Sr. Brailovsky y el Dr. Flores en que el punto de partida debe ser la perspectiva de un comprador interesado en el mes de mayo de 2010. Aun si el aumento de precios fue una violación contractual, el comprador habría tenido en cuenta que Norpro Venezuela estaba pagando un precio mayor y no había iniciado acciones por incumplimiento contractual ante el foro de resolución de diferencias establecido en el Contrato de Bauxita. Por consiguiente, el Tribunal resuelve que la alegada ilegalidad del aumento del precio no sería suficiente justificación para eliminar el aumento del precio de la presente valuación.

798.    Si, por otra parte, el Tribunal estuviera convencido de que el aumento del precio fuera en efecto ilegal y de que la Demandada fuera responsable del aumento con arreglo al estándar TJE o al estándar PSP (fuera porque la conducta de CVG Bauxilum es atribuible al Estado o porque el MIBAM tenía la obligación de intervenir), este acto ilícito internacional debería de hecho, eliminarse de la valuación. Sin embargo, el Tribunal se remite a la conclusión a la que arribó *supra* de que la Demandante no ha demostrado que el aumento del precio del mes de septiembre de 2008 constituyera una violación contractual de CVG Bauxilum. Por ello: (i) si se puede responsabilizar a la Demandada por tal incumplimiento contractual –incluso en el supuesto de que se hubiere probado– bajo el estándar TJE es una cuestión que puede quedar abierta; y (ii) la Demandada no tenía la obligación de intervenir en relación con el aumento del precio de la bauxita con arreglo al estándar PSP[876].

799.    Ante la ausencia de un acto ilícito internacional en relación con el aumento del precio de la bauxita, la Demandante no tiene derecho a ninguna compensación en este sentido. Por consiguiente, no hay motivos para eliminar el aumento del precio de la presente valuación. En cuanto a la cuestión adicional planteada por el Sr. Brailovsky y el Dr. Flores acerca del tipo de cambio aplicado por el Prof. Spiller, que supuso que Norpro Venezuela habría pagado el precio en USD con bolívares[877], el Tribunal recuerda que los peritos de

---

[874] Spiller II, ¶ 124.
[875] Brailovsky/Flores II, ¶ 96.
[876] *Véanse* párrafos, *supra* 542 and 559-560 above.
[877] Brailovsky/Flores II, ¶¶ 97-99 y Figura 9.

ambas Partes utilizaron el tipo de cambio de CADIVI en sus valuaciones al mes de mayo de 2010[878]. Por ello, no se requiere una decisión en este sentido.

### (5)    Costos de Transporte

800.    El siguiente punto se refiere a los costos de transporte que Norpro Venezuela habría incurrido por el envío de los *proppants* terminados a los clientes. Los peritos de ambas Partes distinguieron tres categorías de costos de transporte: (i) para todos los *proppants,* los costos de envío local dentro de Venezuela para transportar a los *proppants* desde la planta a Puerto Ordaz; (ii) para las exportaciones a Norteamérica y Sudamérica, los costos de embarque desde Puerto Ordaz al puerto de Corpus Christi, Estado de Texas (y posiblemente también al depósito en Alice, Estado de Texas); y (iii) para las exportaciones a Norteamérica, los costos de envío desde el Estado de Texas al cliente final.

### Costos de Envío Local en Venezuela

801.    Respecto de los costos de envío local dentro de Venezuela para todos los *proppants,* el Sr. Brailovsky y el Dr. Flores adoptaron la proyección del Prof. Spiller de que estos costos ascendían a VEF 50,5 por TM, con un aumento conforme al PPI (proyectado) para Venezuela. A pesar de que los peritos de las Partes no concuerdan respecto del tipo de cambio aplicable en sus valuaciones a la fecha del laudo, ambos aplican el tipo de cambio oficial de CADIVI en sus valuaciones al mes de mayo de 2010, lo que resulta en costos de USD 11,9 por TM al año 2010[879].

### Costos de Envío desde Venezuela a los EE. UU.

802.    En cuanto a los costos de envío desde Venezuela a los EE. UU. para todos los *proppants* para exportación, el Prof. Spiller se basó en un embarque real del mes de marzo de 2010 desde Puerto Ordaz hasta Corpus Christi, Texas, a un costo de USD 99,0 por TM[880]. El Prof. Spiller corroboró esta cifra sobre la base de diversos documentos contractuales que le suministró la Demandante, y que arrojaron un cargo de USD 91,43 por TM[881]. Sobre la base de la información proporcionada por el testigo de la Demandante, el Sr. Larry, de que algunos de los *proppants* se enviaban directamente del puerto de Corpus Christi al cliente, mientras que otros se enviaban primero al depósito de la Demandante en Alice, Estado de Texas, el Prof. Spiller también calculó los costos de envío desde Corpus Christi a Alice en USD 17,6 por TM, y arribó a la conclusión de que el promedio entre los costos

[878] Spiller II, nota 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, nota 167.
[879] Spiller II, Figura 8; **Anexo  CLEX-81**, pág. 38; Brailovsky/Flores I, ¶¶ 116-117; Brailovsky/Flores II, ¶ 102.
[880] Spiller II, ¶ 81 que hace referencia a CLEX-80, diapositiva 10.
[881] Spiller II, ¶ 82 y Tabla 7 que hace referencia al **Anexo  CLEX-152**.

totales de envío a Alice (USD 109,03 por TM) y a Corpus Christi (USD 91,43 por TM) estaba en línea con su estimación de USD 99,0 por TM[882].

803. El Sr. Brailovsky y el Dr. Flores se basaron en los costos de transporte presupuestados por la Demandante para el año 2010, que ascendían a EUR 110 por TM (convertidos a USD 154 por TM). Supusieron que este costo incluía los costos de envío local de USD 11,9 por TM, lo que resultaría en un costo de USD 142,1 por TM para la segunda categoría de costos de envío[883]. El Sr. Brailovsky y el Dr. Flores señalaron también que el estudio sobre precios de transferencia de Norpro Venezuela mostraba un costo de fletes a los EE. UU. para el año 2009 de USD 0,072 por libra, lo que se traduce a USD 158,7 por TM[884]. Por último, adoptaron la hipótesis del Prof. Spiller de que sólo la mitad de los *proppants* terminados se enviaban a Alice y su estimación de los costos de envío entre Corpus Christi y Alice (USD 17,6 por TM). Por consiguiente, estimaron un promedio de costo de transporte de USD 133,3 por TM[885].

804. El Tribunal observa que los peritos de ambas Partes invocaron el Plan Estratégico 2011-2015 como la fuente principal para sus estimaciones respectivas. Mientras que el Prof. Spiller aplicó los costos de un envío real en el mes de marzo de 2010, el Sr. Brailovsky y el Dr. Flores se refirieron a los costos presupuestados para el año 2010[886]. En principio, el Tribunal considera que es razonable basarse en la propia estimación de la Demandante para sus costos presupuestados para el año 2010. El testigo de la Demandante, el Sr. Larry, que participó de la confección de la diapositiva[887], confirmó durante la Audiencia que esta estimación incluía los costos de envío a Alice, Estado de Texas[888]. Respecto de las diferencias entre las cifras invocadas por las Partes, el Sr. Larry explicó:

> "*Si vemos el costo en marzo, dólares por tonelada métrica, y constantemente tratábamos de optimizar el envío al cliente. Entonces, si el material estaba en la cuenca de premium, no lo enviaríamos a Alice, Texas. Lo enviaríamos con la mayor eficiencia directamente a la zona premium. Y pueden ver la cifra para marzo, y fue un mes de muchas ventas en esa zona. Fue de 37 dólares por libra*"[889].

805. En la opinión del Tribunal, el testimonio del Sr. Larry no solo sustenta la hipótesis de los peritos de ambas Partes de que la mitad de los *proppants* se enviaba a Alice y la otra

---

[882] Spiller II, ¶ 81 y ¶¶ 83-85 que hace referencia a Larry I, ¶ 35.
[883] Brailovsky/Flores II, ¶¶ 118-119; Brailovsky/Flores II, ¶¶ 104 y 106 y Figura 11 que hace referencia al **Anexo CLEX-80**, diapositiva 42.
[884] Brailovsky/Flores I, ¶ 120; Brailovsky/Flores II, ¶ 106 que hace referencia al **Anexo CLEX-35**, pág. 1.
[885] Brailovsky/Flores II, ¶ 117.
[886] *Compárese* **Anexo CLEX-80,** diapositiva 10 *con* diapositiva 42.
[887] Transcripción (Día 3), pág. 682, línea 12 - pág. 683, línea 2.
[888] Transcripción (Día 3), pág. 697, línea 21- pág. 698, línea 7.
[889] Transcripción (Día 3), pág. 691, línea 18 - pág. 692, línea 5.

mitad se enviaba directamente desde Corpus Christi al cliente[890]. Lo que es más importante aún, el Sr. Larry explicó que la diferencia entre los costos del envío real en el mes de marzo de 2010 y los costos presupuestados para el año 2010 resultó, al menos en parte, del hecho de que el envío de marzo no fue hacia Alice, sino directamente desde Corpus Christi al cliente en la zona premium.

806. Asimismo, el Sr. Larry declaró que "*el costo de flete general incluyendo entrega al cliente está en 110 euros por tonelada, en esa gama por lo menos*"[891]. El Prof. Spiller también aseveró que "*[s]egún mi entendimiento, estos 110 euros incluyen todos los gastos de Puerto Ordaz hasta el cliente*"[892]. Sin embargo, el Tribunal observa que la diapositiva del Plan Estratégico 2011-2015 dice "*Suministro a Alice, Estado de Texas*". Por ello, el Tribunal no está completamente convencido de las declaraciones del Sr. Larry y el Prof. Spiller, y por ello procederá a considerar también las fuentes complementarias que los peritos de las Partes presentaron en sustento de sus respectivas estimaciones.

807. En lo que concierne a los costos por "*Flete a los EE. UU.*" detallados en el estudio de precios de transferencia que el Sr. Brailovsky y el Dr. Flores tradujeron en USD 158,7 por TM, el Tribunal señala que no hay un rubro de costo separado para los costos de flete local dentro de Venezuela, por lo que nuevamente se puede suponer que los costos de USD 11,9 por TM están incluidos en la suma. Sin embargo, existe un rubro de costo separado para "*Flete y manipulación dentro de los EE. UU.*". por lo que también se puede suponer que los costos de envío al cliente no están incluidos[893]. Como la suma de USD 146,8 por TM (excluidos los costos de envío local) es incluso mayor que la estimación del Sr. Brailovsky y el Dr. Flores, el estudio sustenta la exactitud de los costos presupuestados para el año 2010.

808. En cuanto a la corroboración realizada por el Prof. Spiller sobre los costos de envío a Corpus Christi conforme a diversos documentos contractuales que le proporcionó la Demandante, que resultó en una suma aún menor que los costos del envío real de marzo de 2010 (USD 91,43 por TM a Corpus Christi), el Tribunal subraya que el Sr. Brailovsky y el Dr. Flores cuestionaron esta corroboración en diversos sentidos. En particular, señalaron que (i) estos documentos incluían un memorando de entendimiento sin fecha y una oferta transmitida por correo electrónico en el año 2008; (ii) el contrato de servicios del año 2008 vencía en el mes de agosto de 2010 y habría estado en proceso de renegociación en el mes de mayo de 2010; y (iii) el Prof. Spiller realizó varios supuestos

---

[890] *Véase* también Larry I, ¶ 35 y Larry II, ¶ 13.
[891] Transcripción (Día 3), pág. 692, líneas 20-22.
[892] Transcripción (Día 4), pág. 968, líneas 17-19.
[893] *Véase* **Anexo CLEX-35**, pág. 1

conforme a los que los costos de envío del año 2010 eran menores que en el año 2008, cuando los documentos se firmaron o transmitieron[894].

809. Si bien el Tribunal considera que estas tres críticas no descartan toda la fiabilidad de los documentos y la corroboración del Prof. Spiller, tampoco presentan pruebas concluyentes acerca de los costos de transporte. Los resultantes costos de USD 91,43 por TM son incluso menores que los costos del envío real efectuado en el mes de marzo de 2010, que según el Sr. Larry tampoco incluían costos de envío a Alice.

810. Por consiguiente, en consideración de todas las pruebas, el Tribunal considera que corresponde basar su conclusión en el promedio de las cuatro cifras presentadas por los peritos de las Partes, es decir, USD 99,0 por TM, USD 124,5 por TM[895], USD 129,2 por TM[896] y USD 91,43 por TM (todos sin incluir los costos de envío inobjetados de USD 17,6 por TM desde Corpus Christi a Alice). Esto arroja un promedio de USD 111,03 por TM a Corpus Christi y un promedio de USD 128,63 a Alice. Puesto que los peritos de las Partes acordaron tomar el promedio entre los costos de envío a los dos destinos posibles en el Estado de Texas, esto resulta en un promedio general de USD 119,83 por TM.

**Costos de Envío desde el Estado de Texas a los Clientes**

811. Por último, los peritos de las Partes aplican distintos supuestos para calcular los costos de envío desde Corpus Christi o Alice al cliente final. El Prof. Spiller invocó nuevamente los costos de un envío real efectuado en el mes de marzo de 2010, que ascendieron a USD 37,0 por TM. Supuso que el 30 % de los *proppants* se vendían EXW y el 70 % restante se distribuía en partes iguales entre las áreas de venta geográfica de la Demandante en los EE. UU., y por ende consideró que los costos de envío a un destino en Texas eran una buena representación[897].

812. Otra vez, el Sr. Brailovsky y el Dr. Flores se basaron en los costos presupuestados por la Demandante para el año 2010; pero como no existía un presupuesto de los costos de envío desde Corpus Christi o Alice al cliente, se refirieron a los costos de transporte desde la Planta de Fort Smith de la Demandante, Estado de Arkansas, hasta Alice, que ascendían a EUR 31,0 por TM (convertidos a USD 43,4 por TM). El Sr. Brailovsky y el Dr. Flores supusieron que la distancia entre Fort Smith y Alice representaba una buena estimación del promedio de los costos de transporte a destinos a lo largo de los EE. UU.[898]. El Sr. Brailovsky y el Dr. Flores destacaron que la Demandante no sólo hace envíos dentro de

---

[894] Brailovsky/Flores II, ¶¶ 111-115.
[895] USD 154,0 – USD 11,9 (costos de envío local) – USD 17,6 (costos de envío a Alice) = USD 124,5 por TM.
[896] USD 158,7 – USD 11,9 (costos de envío local) – USD 17,6 (costos de envío a Alice) = USD 129,2 por TM.
[897] Spiller II, ¶ 86; **Anexo  CLEX-81**, pág. 37; **Anexo  CLEX-80,** diapositiva 10.
[898] Brailovsky/Flores I, ¶¶ 124-126; Brailovsky/Flores II, ¶¶ 118-119.

los EE. UU., sino también a Canadá, y afirmaron que incluso si la estimación de la distribución de las ventas del Prof. Spiller fuera correcta, esto resultaría en un costo promedio de USD 51 por TM, si se aplicara a los costos por libra detallados en el Contrato Marco de Halliburton[899]. Al incluir las ventas a Canadá, calcularon un promedio de costos de USD 54 por TM[900].

813. El Tribunal considera que ninguno de los enfoques cuenta con suficiente sustento. El enfoque del Sr. Brailovsky y el Dr. Flores basado en los costos de transporte desde Fort Smith hasta Alice parece ser bastante especulativo, puesto que dichos costos se refieren a otra planta y a otra ruta. En relación con el enfoque del Prof. Spiller, el Tribunal subraya que el Profesor no recibió datos reales de ventas, sino que afirmó que entendía que aproximadamente un 30 % de los *proppants* se vendían EXW y supuso que el resto se distribuiría en partes iguales entre las tres regiones de venta geográficas dentro de los EE. UU. de la Demandante. Sin embargo, más allá del hecho de que el Sr. Brailovsky y el Dr. Flores señalaron que la Demandante también vende *proppants* a destinos en Canadá, no obran pruebas en el expediente de que el supuesto del Prof. Spiller fuera realista. El Tribunal concuerda con la Demandada en que la Demandante debería haber revelado la proporción real de las ventas de Norpro Venezuela en Norteamérica.

814. Además, el Tribunal no está convencido por la hipótesis del Prof. Spiller de que los costos de un envío real a un destino dentro del Estado de Texas sea una buena representación de las ventas en todos los EE. UU. En particular, el hecho de que el Sr. Brailovsky y el Dr. Flores aplicaran el supuesto de las ventas del Prof. Spiller a los precios en virtud del Contrato Marco de Halliburton y llegaran a un promedio ponderado de USD 51 por TM, genera dudas acerca de la fiabilidad de la estimación de costos del Prof. Spiller de USD 37 por TM.

815. A la luz del hecho de que la Demandante no presentó pruebas concluyentes en este sentido y tomando en cuenta también que la estimación del Sr. Brailovsky y el Dr. Flores de USD 43,4 por TM sigue siendo considerablemente menor que el costo que calcularon de conformidad con el   Contrato Marco de Halliburton, el Tribunal considera que corresponde adoptar su estimación de los costos de envío dentro de Norteamérica.

### Conclusión sobre los Costos de Transporte

816. En síntesis, el Tribunal arriba a la conclusión de que la presente valuación debe incluir (i) USD 11,9 por TM por costos de envío local dentro de Venezuela para todas las ventas; (ii) USD 119,83 por TM por costos de envío desde Venezuela a Corpus Christi o Alice,

---

[899] Brailovsky/Flores II, ¶¶ 120-122 y Tabla 6.
[900] Brailovsky/Flores II, ¶ 123 y Tabla 7.

Texas, para todas las ventas de exportación; y (iii) USD 43,4 por TM por costos de envío dentro de Norteamérica para todas las ventas de exportación a Norteamérica.

### (6)    Gastos de capital

817. En lo que concierne a los gastos de capital, el Tribunal señala que las Partes coinciden respecto del horizonte temporal para el período comprendido entre los años 2010-2018. Para este período, el Sr. Brailovsky y el Dr. Flores adoptaron el enfoque del Prof. Spiller de basarse en las cifras estimadas en el Plan de Negocios de la Demandante del mes de abril de 2010 (USD 1,4 millones en el año 2010; USD 1,0 millón en el año 2011; USD 1,5 millones en el año 2012; USD 5,0 millones en el año 2013; y USD 0,5 millón *por año* en 2014-2015) y suponer que la suma de USD 0,5 millón *por año* (incrementada conforme al PPI de los EE. UU.) también se requeriría en el período comprendido entre los años 2016-2018[901].

818. Sin embargo, los peritos de las Partes han aplicado distintas cifras para el período posterior al año 2018. El Prof. Spiller supuso que los gastos de capital a largo plazo ascenderían a USD 0,6 millón indefinidamente y señaló que esto coincidía con la estimación de los gastos de capital para el mantenimiento de la Planta de Fort Smith de la Demandada de 30 años de antigüedad para el período comprendido entre los años 2010-2018[902].

819. El Sr. Brailovsky y el Dr. Flores consideraron que no era razonable suponer que Norpro Venezuela tendría los mismos gastos de capital durante toda su vida útil, y en definitiva se basaron en cuatro gastos de capital de la Planta de Fort Smith: (i) salud, seguridad y medio ambiente (HSE, por sus siglas en inglés); (ii) mantenimiento del negocio (*MOB*, por sus siglas en inglés); (iii) tecnología (*TECH*, por sus siglas en inglés); y (iv) fabricación de primer nivel (*WCM*, por sus siglas en inglés). Calcularon que con un ajuste por el tamaño de Norpro Venezuela, esto resultaba en gastos de capital por USD 1,6 millones indefinidamente[903].

820. El Prof. Spiller aseveró que aparte de los gastos de capital de *MOB*, las otras tres categorías de gastos de capital no se relacionaban con el mantenimiento; sino con la eficacia y las mejoras tecnológicas, que sólo se podrían incluir en la valuación si también se tomaran en cuenta la mayor producción o las ganancias por eficacia también. Sin embargo, los peritos de ambas Partes supusieron que los factores de eficacia de Norpro Venezuela se mantendrían constantes a largo plazo[904].

---

[901] Spiller I, ¶ 137; **Anexo  CLEX-81**, pág. 50; Brailovsky/Flores I, ¶¶ 128-130; Brailovsky/Flores II, ¶ 128.
[902] Spiller II, ¶¶ 88-90 y Figuras 9 y 10; **Anexo  CLEX-81**, pág. 50.
[903] Brailovsky/Flores II, ¶¶ 130-136; **Apéndice BF-104**, Tabla 8.
[904] SpillerII, ¶ 89.

821. El Sr. Brailovsky y el Dr. Flores señalaron que las tres categorías de gastos de capital "*no relacionadas con el mantenimiento*" incluían rubros como las reparaciones de los techos y las mejoras para prevenir los resbalones, los tropiezos y las caídas (*HSE*), el reemplazo de la tecnología obsoleta (*TECH*) y las mejoras para reducir las averías y las interrupciones del proceso (*WCM*). Arribaron a la conclusión de que todos estos componentes eran necesarios para mantener la operación de la planta indefinidamente y para conservar la competitividad[905].

822. En principio, el Tribunal concuerda con el Prof. Spiller en que la inclusión de gastos que no se relacionan con el mantenimiento sino con mejoras a la tecnología o la eficacia exigirían que se tome en cuenta el valor agregado también. Sin embargo, tal como demuestra el primer ejemplo citado por el Sr. Brailovsky y el Dr. Flores bajo la categoría de gastos de capital en "*seguridad, salud y medio ambiente*", el mantenimiento no se puede reducir necesariamente a la categoría de gastos de capital por "*mantenimiento del negocio*". El mantenimiento del funcionamiento de la planta al mismo nivel de eficacia y tecnología también incluye gastos, por ejemplo, para la adaptación a los nuevos requisitos regulatorios o mejoras en materia de seguridad.

823. Por consiguiente, el Tribunal concuerda con el Sr. Brailovsky y el Dr. Flores en que la distinción del Prof Spiller entre una categoría de gastos de capital de "*mantenimiento*" y tres "*no relacionadas con el mantenimiento*" no es del todo exacta. En particular, el Tribunal entiende que el mantenimiento incluye varios de los rubros que forman parte de la categoría de gastos de capital en "*salud, seguridad y medio ambiente*". En cuanto a las categorías de gastos de capital en "*tecnología*" y "*fabricación de primer nivel*", sin embargo, el Tribunal considera que se relacionan principalmente con mejoras a la tecnología y eficacia, que no se pueden considerar sin tomar en cuenta también las resultantes ganancias de eficacia (lo que el Sr. Brailovsky y el Dr. Flores no hicieron). En consecuencia, el Tribunal resuelve que los gastos de capital a largo plazo de Norpro Venezuela deberían reflejar los gastos proyectados para la Planta de Fort Smith para los gastos de capital comprendidos por los rubros *MOB* y *HSE*, pero no por *TECH* y *WCM*.

### (7)    Capital de Trabajo – Créditos por IVA

824. En relación con el capital de trabajo necesario para operar la planta, el Sr. Brailovsky y el Dr. Flores coincidieron con el modelo planteado por el Prof. Spiller en su segundo dictamen pericial, excepto en cuanto a su tratamiento de los créditos fiscales IVA[906]. Además, el Sr. Brailovsky y el Dr. Flores no cuestionaron los cálculos del Prof. Spiller conforme a los cuales al mes de abril de 2010 Norpro Venezuela contaba con un saldo de

---

[905] Brailovsky/Flores II, ¶¶ 134-135 que hace referencia al **Anexo  CLEX-91**, diapositivas 142, 144 y 145.
[906] Brailovsky/Flores II, ¶ 145.

créditos fiscales IVA pendientes por la suma de VEF 12,3 millones (convertidos a USD 2,9 millones)[907]. Los enfoques de los peritos de las Partes difieren, sin embargo, respecto del tiempo que habría llevado monetizar los créditos fiscales por IVA.

825.  Conforme a las instrucciones de los letrados, el Prof. Spiller se basó en el derecho administrativo venezolano, que establece que los créditos fiscales se deben decidir dentro de los 30 días, y por ello supuso que el saldo de VEF 12,3 millones se habría cobrado durante el transcurso del año 2010. Confeccionó un modelo sobre los requisitos de capital de trabajo sobre la base de la hipótesis de que (i) la monetización de los certificados de IVA habría llevado 60 días a partir de la presentación de la solicitud de recuperación; y (ii) Norpro Venezuela habría recuperado el 80 % de las cuentas por cobrar en concepto de IVA[908].

826.  El Sr. Brailovsky y el Dr. Flores subrayaron que Norpro Venezuela no había obtenido su licencia para exportación y no había iniciado el proceso de recuperación de IVA al mes de mayo de 2010, y supusieron que presentaría sus primeras solicitudes de recuperación de IVA a fines del año 2010 o el año 2011. Según el Sr. Brailovsky y el Dr. Flores, Norpro Venezuela habría recibido, por ende, sus primeros certificados de recuperación sólo unos dos años después, es decir, en el año 2013, a causa de las bien conocidas largas demoras del proceso de recuperación. Asimismo, se basaron en el supuesto de que hasta ese entonces Norpro Venezuela habría adquirido insumos y suministros adicionales, que habrían resultado en nuevos créditos fiscales IVA, y por consiguiente en un saldo continuo de créditos fiscales IVA pendientes. En consecuencia, no incluyeron los flujos de fondos relacionados con el IVA en su modelo[909].

827.  El Tribunal considera que hay dos cuestiones que se deben analizar en este sentido: (i) si la Demandada puede invocar las demoras en su propio procedimiento administrativo a los efectos de la presente valuación; y (ii) si la Demandada ha demostrado que los exportadores se enfrentaban, de hecho, a demoras de dos años aproximadamente en el proceso de recuperación.

828.  En cuanto a la primera cuestión, el Tribunal observa que desde la perspectiva estrictamente económica de un comprador interesado, sin dudas se habrían tenido en cuenta las demoras administrativas que lleven a demoras en el flujo de fondos; suponiendo que las demoras existieran, en efecto. No obstante, la Demandante argumenta que si Venezuela hubiera actuado de buena fe, habría seguido su propio derecho administrativo para pronunciarse sobre los créditos fiscales IVA dentro de los 30 días. Si

---

[907] **Anexo CLEX-81**, pág. 53.
[908] Spiller II, ¶¶ 92-93.
[909] Brailovsky/Flores I, ¶¶ 170-175; Brailovsky/Flores II, ¶¶ 148-150.

bien en un principio la Demandante planteó una reclamación por TJE en este sentido[910], dejó de lado este argumento en sus escritos posteriores y en la Audiencia, y en cambio se refirió a los créditos fiscales IVA sólo en el debate acerca de la cuantía de los daños, y señaló que "*las propias demoras administrativas prolongadas se han considerado en violación del estándar TJE*"[911]. La Demandante arguye que sería "*inequitativo que el Estado utilizara sus propias demoras en el procesamiento de las obligaciones legales como una forma de evitarlas en su totalidad*"[912]. [Traducción del Tribunal]

829. Si bien el Tribunal no se inclina por permitir que la Demandada invoque sus propias deficiencias administrativas para disminuir el monto indemnizatorio por pagar a la Demandante, el argumento de la Demandante sólo podría prevalecer si quedara demostrado que las demoras no existían cuando la Demandante tomó la decisión de invertir en Venezuela o que a la Demandante se le garantizó que no sería sujeta a ellas. Las pruebas demuestran que las demoras administrativas en el procedimiento de recuperación de IVA han sido bien conocidas en Venezuela ya desde principios de la década del año 2000, cuando los Demandantes consideraron invertir en Venezuela. Un artículo periodístico del año 2000 informa sobre la existencia de recuperaciones de IVA por la suma de VEF 100 mil millones adeudados desde el año 1993[913]. Otro artículo del año 2003 informa que desde el año 2001 se adeudaban VEF 170 mil millones en concepto de recuperaciones de IVA[914]. Por último, un artículo periodístico del año 2007 informa sobre la emisión de certificados de recuperación por la suma de VEF 3,1 mil millones tras demoras de varios meses[915].

830. La Demandante no niega que los exportadores se enfrentaran a demoras considerables en la obtención de las recuperaciones de IVA cuando tomó la decisión de invertir en Venezuela, pero reclama que se le garantizó que Venezuela seguiría su propio procedimiento de recuperación de créditos fiscales IVA[916]. La Demandante cita en particular el Artículo 43 de la Ley que establece el Impuesto al Valor Agregado, que dispone que la Administración Tributaria deberá pronunciarse sobre la procedencia o no de la solicitud presentada en un lapso no mayor de treinta días hábiles "*contados a partir de la fecha de su recepción definitiva, siempre que se hayan cumplido todos los requisitos que para tal fin disponga el Reglamento*"[917]. Según esta redacción, el período de treinta días comienza una vez que la administración tributaria ha recibido todos los documentos

---

[910] *Cfr.* Memorial, ¶¶ 162-164.
[911] Réplica, nota 381.
[912] Presentación Posterior a la Audiencia de la Demandante, ¶ 159.
[913] **Apéndice BF-34**.
[914] **Apéndice BF-35**.
[915] **Apéndice BF-36**.
[916] Presentación Posterior a la Audiencia de la Demandante, ¶ 159.
[917] Traducción al inglés presentada por la Demandada con **Anexo R-41**.

de sustento exigidos por la Ley que establece el Impuesto al Valor Agregado, que no necesariamente es la misma fecha en la que ha recibido la solicitud, porque no es inusual que la administración exija documentación o información adicional sobre ciertas cuestiones, tal como explicara el Sr. Rondón en su declaración testimonial escrita[918].

831. En cualquier caso, el Tribunal no considera que haya quedado demostrado que la Demandante haya recibido, en efecto, garantías específicas de que Venezuela cumpliría con esta disposición. En particular, la Demandante no pudo señalar ninguna declaración de un funcionario del gobierno de que no estaría sujeta a las mismas demoras que todas las exportadoras experimentaban en general en Venezuela en ese momento. El Sr. Pedersen afirmó en su declaración por escrito que sobre la base de las reuniones con CVG en el año 2005 esperaban recibir un "*tratamiento beneficioso en materia de IVA y tratamiento fiscal*", sin establecer, sin embargo, que se hubieran dado garantías específicas respecto del procedimiento de recuperación de IVA[919]. [Traducción del Tribunal]

832. Los documentos contemporáneos que la Demandante cita en este sentido se refieren de forma explícita a las exenciones al IVA y los derechos de importación conforme al Decreto Presidencial del año 2006, pero no al procedimiento de recuperación de IVA por materiales que no se encontraban exentos del impuesto al IVA[920]. Como lo explicaron el Sr. Brailovsky y el Dr. Flores en su primer dictamen pericial, las exenciones al IVA y el procedimiento de recuperación de IVA se referían a distintos materiales, y conforme a una exención, Norpro Venezuela no debía pagar IVA desde el principio, por lo que no podría tener derecho a ninguna recuperación[921]. Como en efecto Norpro Venezuela recibió un Certificado de Exención para Bienes de Capital de MILCO el día 25 de octubre de 2007, que cubría 29 tipos específicos de equipos, aparentemente la empresa recibía un "*tratamiento beneficioso en materia de IVA*"[Traducción del Tribunal], como se le había prometido. Como no hay una referencia específica al procedimiento de recuperación de IVA en relación con los materiales no cubiertos por este certificado, el Tribunal arriba a la conclusión de que no hay sustento jurídico conforme al derecho internacional para excluir las demoras en el procedimiento de recuperación de la presente valuación, en el caso de que queden demostradas.

833. Por consiguiente, el Tribunal debe evaluar si la Demandada ha demostrado que en efecto hubiera demoras de aproximadamente dos años en el procedimiento de recuperación de IVA en el año 2010. En cuanto a los tres artículos periodísticos mencionados *supra,* la

---

[918] Rondón, ¶ 38.
[919] Pedersen, ¶ 24.
[920] *Véanse* en particular **Anexos  C-079, C-082, pág. 4 y C-084**.
[921] Brailovsky/Flores I, ¶ 163.

Demandante señaló correctamente que todos datan de tres a diez años antes[922]. Si bien sirven como prueba de que las demoras eran un problema al momento en que la Demandante invirtió en Venezuela, no establecen que las mismas demoras siguieran existiendo en el año 2010.

834. Asimismo, el Sr. Brailovsky y el Dr. Flores señalaron una declaración que figura en la actualización de la DAC de la Demandante de fecha 8 de junio de 2009:

> "*Relacionada en parte con las cuestiones de exportación, la recuperación del IVA del tesoro fiscal se ha vuelto un proceso muy largo y complejo* […] *Los principales motivos de la demora se relacionan con los requisitos legales que deben cumplirse para recibir la licencia de exportación. Se ha identificado y se ha asignado un plan a cada uno de los requisitos*"[923]. [Traducción del Tribunal]

835. Si bien la actualización de la DAC confirma que la recuperación del IVA aún llevaba un tiempo considerable, los principales motivos de las demoras se veían en la obtención de la licencia de exportación, que no se había obtenido al mes de junio de 2009. Aparte de que se informó que se estaban tratando todos los requisitos legales, el testigo de la Demandada, el Sr. Rondón, afirmó en su declaración testimonial escrita que para el momento de la expropiación "*Norpro Venezuela había notificado al fisco de su intención de iniciar el procedimiento de recuperación de créditos por IVA mediante la solicitud de un certificado especial de recuperación fiscal sobre la base de las ventas de exportación*"[924] [Traducción del Tribunal]. Durante la audiencia, el Sr. Rondón aclaró que Norpro Venezuela había presentado su solicitud de un certificado especial de recuperación fiscal, y por ende, había iniciado el proceso de recuperación[925]. Tal como explicaron el Sr. Brailovsky y el Dr. Flores en su primer dictamen pericial, primero la empresa debía obtener la licencia de exportación, para luego poder presentar la solicitud de recuperación de créditos fiscales[926]. Puesto que el testimonio del Sr. Rondón confirma que Norpro Venezuela había iniciado el segundo paso para el mes de mayo de 2010, debía haber completado el primer paso para esa fecha, y esto se ha descrito como el motivo principal de las demoras en la actualización de la DAC.

836. Al mismo tiempo, el Tribunal subraya que el Sr. Rondón afirmó lo siguiente en su declaración testimonial escrita:

> "*Estábamos al tanto de que, incluso después de la presentación inicial del certificado especial de recuperación de créditos fiscales, el proceso*

---

[922] Presentación Posterior a la Audiencia de la Demandante, nota 348.
[923] **Anexo R-7**, pág. 6.
[924] Rondón, ¶ 38.
[925] Transcripción (Día 3), pág. 771, línea 17 - pág. 772, línea 7.
[926] Brailovsky/Flores I, ¶ 168.

*sería extenso y tedioso e involucraría la verificación de todas las transacciones relacionadas. También sabíamos que sería típico como parte del proceso que el fisco solicitara documentación adicional. Entiendo que este procedimiento para la recuperación del IVA en Venezuela lleva al menos dos años a partir de la presentación de la solicitud inicial*"[927].

837. Tal como bien señalara la Demandada, no se realizó el interrogatorio cruzado del Sr. Rondón acerca de su declaración sobre el procedimiento de recuperación del IVA[928]. El Tribunal también señaló *supra* que el período de treinta días establecido en el Artículo 43 de la Ley que establece el Impuesto al Valor Agregado sólo comienza una vez que la administración tributaria haya recibido todos los documentos que considere necesarios para pronunciarse acerca de la solicitud de recuperación. Aparte de esta disposición, la Demandante no ha presentado ningún indicio de que la declaración del Sr. Rondón fuera inexacta o de que la situación hubiera cambiado desde la publicación de los artículos periodísticos de los años 2000, 2003 y 2007.

838. En consecuencia, el Tribunal sigue el enfoque de los peritos de la Demandada de que el procedimiento de recuperación llevó un tiempo considerable durante el cual los nuevos créditos fiscales IVA se acumularon, lo que creó un saldo continuo de créditos pendientes por IVA. Puesto que Norpro Venezuela no podría operar sin acumular continuamente nuevos créditos por IVA mientras esperaba que se recuperara el saldo inicial, el Tribunal considera que es plausible suponer que forman parte del capital de trabajo de Norpro Venezuela como empresa en marcha. Si bien los peritos de ambas Partes asumieron que la producción habría aumentado hasta el año 2014[929], –y con ella la suma anual de nuevos créditos por IVA acumulados– el Tribunal asimismo coincide con los peritos de la Demandada en que Norpro Venezuela hubiera tenido un saldo  continuo de créditos por IVA equivalente, al menos, a la suma del mes de abril de 2010.  Puesto que dicha suma habría estado continuamente subsumida en el negocio en operación, no presenta un valor independiente que un comprador interesado pagaría adicionalmente al valor de Norpro Venezuela como empresa en marcha.

### (8)   Nuevos Impuestos Introducidos después de la Expropiación

839. Por último, hubo un debate entre las Partes y sus peritos en cuanto al momento en que Norpro Venezuela habría estado sujeta a una contribución de 1% de los ingresos anuales de empresas con más de 50 empleados en virtud de la Ley Orgánica de Drogas. Sin embargo, tal como señalara explícitamente la Demandada, el Sr. Brailovsky y el Dr.

---

[927] Rondón, ¶ 38.
[928] Escrito Posterior a la Audiencia de la Demandada, nota 412. La aclaración a la que se refiere el párrafo 835 se hizo en respuesta a una pregunta formulada por el  Tribunal.
[929] *Cfr.* Spiller I, ¶¶ 52 y ss. y Figura 4; Barilovsky/Flores I, ¶ 174.

Flores no incluyeron esta contribución en su valuación de fecha 15 de mayo de 2010 porque no era aplicable a Norpro Venezuela en el año 2010 debido al uso de su modelo de tercerización[930].

840. Asimismo, las Partes están de acuerdo en que hay una segunda contribución de 1% de los ingresos anuales en virtud de la Ley Orgánica de Deportes, Actividad Física y Educación Física, que no se incluye en la valuación de fecha 15 de mayo de 2010 porque esta ley se sancionó recién en el año 2011 y, por lo tanto, ningún comprador interesado la conocía en el año 2010[931].

841.  Puesto que  las Partes están de acuerdo en que ninguna contribución podría preverse al día 15 de mayo de 2010, el Tribunal resuelve que ninguna de las dos contribuciones puede incluirse en el cálculo DCF para evaluar Norpro Venezuela a  esa fecha.

### c)     Pérdidas Históricas relacionadas con el Aumento en el Precio de la Bauxita

#### aa)     Síntesis de la Postura de la Demandante

842. Además del valor justo de mercado de la planta, la Demandante alega que tiene derecho a indemnización por las pérdidas sufridas por el suministro de bauxita en virtud del Contrato de Bauxita debido al aumento de precios en violación del Artículo 3(1) y (2) del Tratado. Según la opinión de la Demandante, la Demandada es responsable por el pago excesivo de USD 1,3 millones al día 15 de mayo de 2010[932].

843. La Demandante alega que su "*derecho legal a obtener bauxita al precio contractual estipulado*" de USD 25,5 por TM en el año 2008, inflado a USD 24,3 por TM en el año 2009, fue parte de los derechos que le expropió la Demandada. Según la Demandante, Norpro Venezuela pudo haber perseguido, de otro modo, sus reclamaciones legales conforme al Contrato de Bauxita contra CVG Bauxilum; es por eso que la Demandante debe ser indemnizada por la expropiación de este derecho intangible[933].

#### bb)     Síntesis de la Postura de la Demandada

844. La Demandada sostiene que la reclamación de daños de la Demandante es infundada porque (i) Norpro Venezuela acordó el aumento de precio de la bauxita siempre que no hubiera otro aumento durante el año 2009; y (ii) la reclamación es inadmisible, ya que Norpro Venezuela debió haber entablado su reclamación por supuesto incumplimiento

---

[930] Memorial de Contestación, ¶ 256; Brailovsky/Flores I, ¶ 243.
[931] Memorial de Contestación, ¶ 256; Brailovsky/Flores I, ¶ 243.
[932] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 162-163, Spiller II, Tabla 12.
[933] Réplica, ¶¶ 198-199; Memorial, ¶ 221.

del Contrato de Bauxita en un procedimiento arbitral en Caracas, tal como se establece en el Contrato[934].

845. En respuesta al argumento de la Demandante de que expropió el derecho legal de Norpro Venezuela de hacer valer su supuesta reclamación contra CVG Bauxilum, la Demandada alega que las reclamaciones contractuales de Norpro Venezuela contra CVG Bauxilum, aun si las hubiera tenido, no fueron objeto de expropiación[935].

### cc)    El Análisis del Tribunal

846. El Tribunal advierte que esta reclamación también se relaciona con las reclamaciones de TJE y PSC de la Demandante con respecto al aumento de precio de la bauxita en el mes de septiembre de 2008. De manera similar a la decisión del Tribunal *supra* de que no hay motivo para excluir el aumento de precio de la valuación de los flujos de fondos futuros de Norpro Venezuela al día 15 de mayo de 2010, el Tribunal considera que la reclamación por parte de la Demandante de indemnización por el pago del precio aumentado antes del día 15 de mayo de 2010 carece de fundamento.

847. Esta conclusión es independiente de la cuestión que consiste en determinar si las reclamaciones de Norpro Venezuela contra CVG Bauxilum habrían formado parte de los derechos expropiados por los que la Demandante solicita resarcimiento. En cualquier caso, el Tribunal concluyó que la Demandante no logró demostrar que el aumento de precios fuera injustificado en virtud del Contrato de Bauxita y, por lo tanto, no está convencido de que haya habido expropiación de reclamaciones de Norpro Venezuela contra CVG Bauxilum por incumplimiento contractual.

848. En consecuencia, la Demandante no tiene derecho a indemnización por el hecho de haver pagado el precio aumentado de USD 33,8 por TM entre los meses de septiembre de 2008 y mayo de 2010, que el Prof. Spiller cuantificó en USD 1,3 millones al mes de mayo de 2010[936].

### d)    Conclusión sobre el Cálculo de la Indemnización

849. En conclusión, el Tribunal considera que el cálculo de la indemnización que deberá pagar la Demandada debe basarse en el valor actual neto de los flujos de fondos futuros de Norpro Venezuela al día 15 de mayo de 2010. El valor actual neto se determinará mediante aplicación de una tasa de descuento nominal de 19,88%.

---

[934] Memorial de Contestación, ¶ 266.
[935] Dúplica, nota 857.
[936] Spiller II, Tabla 12.

850. En cuanto a los flujos de fondos futuros de Norpro Venezuela, el Tribunal resuelve que (i) las suposiciones sobre los precios de los *proppants* deben fundarse en las proyecciones contenidas en el Plan de Negocios de la Demandante del mes de abril de 2010; (ii) debe aplicarse una deducción de 25% a las ganancias provenientes de exportaciones dado que Norpro Venezuela no contaba con una red propia de marketing y distribución; (iii) con respecto al tipo de cambio de divisas aplicable, las suposiciones de devaluación con posterioridad al día 15 de mayo de 2010 deben basarse en los tipos de cambio previstos por Ecoanalítica; (iv) los costos de la bauxita deben calcularse en función del precio aumentado de USD 33,8 por TM que Norpro Venezuela, de hecho, pagó al mes de septiembre de 2008; (v) los costos de transporte deben incluir USD 11,9 por TM en concepto de costos de envío local dentro de Venezuela para todas las ventas, más USD 119,83 por TM en concepto de costos de envío desde Venezuela hasta Corpus Christi o Alice, Estado de Texas, para todas las exportaciones, más USD 43,4 por TM en concepto de costos de envío dentro de Norteamérica para todas las exportaciones norteamericanas; (vi) los gastos de capital a largo plazo para Norpro Venezuela deben reflejar los desembolsos previstos para la Planta de Fort Smith en las categorías de gastos de capital de *MOB* y *HSE*, pero no los gastos de *TECH* y *WCM*; y (vii) debe suponerse que los créditos de IVA forman parte del capital de trabajo requerido para el funcionamiento continuo de Norpro Venezuela y, por lo tanto, no presentan ningún otro valor además del valor de Norpro Venezuela como empresa en marcha.

851. Por último, el Tribunal resuelve que la Demandante no tiene derecho a indemnización por pérdidas históricas relacionadas con el aumento del precio de la bauxita en el mes de septiembre de 2008 porque el aumento de precio se encontraba justificado en virtud del Artículo 10.2 del Contrato de Bauxita.

### 3.    Intereses

852. Como último paso, el Tribunal debe resolver la pretensión planteada por  la Demandante de intereses anteriores al laudo al día 15 de mayo de 2010 e intereses posteriores al laudo hasta la fecha de pago por parte de Venezuela.

#### a)    Síntesis de la Postura de la Demandante

853. La Demandante alega que tiene derecho a cobrar intereses anteriores y posteriores al laudo. Según la Demandante, debe quedar en la situación en que habría estado si no hubiera habido expropiación; por lo tanto, la tasa de interés debe ser igual al retorno previsto al invertir en Venezuela, es decir, su costo de oportunidad[937].

---

[937] Memorial, ¶¶ 230, 232; Réplica, ¶ 202.

854.   La Demandante se ampara en la decisión del tribunal de *Vivendi c. Argentina*, que ordenó el pago de intereses sobre el costo de capital de la demandante y concluyó que la tasa de interés debe "*representar, de manera razonable, la rentabilidad que las Demandantes habrían obtenido sobre los montos invertidos y perdidos en la* [...] *concesión*"[938]. La Demandante alude, asimismo, al tribunal de *France Telecom c. Líbano*, que adjudicó intereses a una tasa del 10% en concepto de retorno razonable de capital que el Estado quitó a la Demandante mediante sus acciones ilícitas[939]. La Demandante invoca también la decisión de *Alpha Projektholding c. Ucrania*, en la cual el tribunal otorgó intereses anteriores al laudo a la tasa libre de riesgo más la prima de riesgo de mercado, ya que "*esta tasa refleja mejor los costos de oportunidad relacionados con las pérdidas de la Demandante, ajustados como consecuencia de los riesgos que conlleva invertir en Ucrania*"[940] [Traducción del Tribunal]. Por otra parte, la Demandante hace referencia a la decisión del tribunal de la CCI en *ConocoPhillips c. PDVSA*, que concedió intereses a una tasa correspondiente al costo de capital del inversor en Venezuela[941].

855.   La Demandante alega que si hubiera reinvertido los flujos de fondos generados por Norpro Venezuela, habría percibido retornos a su costo de capital. Por lo tanto, la Demandante reclama que se le paguen intereses anteriores y posteriores al laudo a una tasa equivalente al costo de capital de Norpro Venezuela[942]. La Demandante considera que no hay motivos para distinguir entre la tasa de intereses anteriores al laudo y la tasa de intereses posteriores al laudo, salvo por el hecho de que la tasa de intereses posteriores al laudo debe captar la cifra del costo actual de capital (14,53% al día 31 de agosto de 2015)[943].

856.   Además, la Demandante señala que cualquier otra tasa de interés daría lugar a un enriquecimiento ilícito de la Demandada, puesto que tenía libre acceso a los fondos expropiados. La Demandante sostiene que el costo razonable en que PDVSA habría incurrido si hubiera tenido que pedir prestado el monto en cuestión es igual a las rentabilidades sobre sus bonos *bullet* [aquellos cuyo capital se paga íntegramente al

---

[938] Memorial, ¶ 232; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *Vivendi c. Argentina* (**CLA-024**), ¶ 9.2.8.
[939] Memorial, ¶ 232; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *France Telecom c. Líbano* (**CLA-034**), ¶ 209.
[940] Memorial, ¶ 233; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *Alpha Prjektholding c. Ucrania* (**CLA-002**), ¶¶ 514, 518.
[941] Memorial, ¶ 234; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *ConocoPhillips c. PDVSA* (**CLA-064**), ¶¶ 294-296; Réplica, ¶ 203, con cita de ¶ 295(ii).
[942] Memorial, ¶ 235; Réplica, ¶ 204.
[943] Réplica, ¶ 207;    Actualización de la Valuación del Prof. Spiller, Tabla 6; **Anexo CLEX-198**, pág. 2. El Prof. Spiller calculó el costo de capital de Norpro Venezuela al día 15 de mayo de 2010 en 13,56%. **Anexo CLEX-81**, pág. 32.

vencimiento en un sólo pago], que eran cercanas al 9% en el año 2013[944]. Según la Demandante, esta también sería la "*adecuada*" tasa de interés del mercado conforme al Artículo 5(1) del Tratado, pero afirma que, de acuerdo con el derecho internacional consuetudinario, tiene derecho al costo de capital de Norpro Venezuela[945].

857. En la opinión de la Demandante, la tasa de interés no puede basarse en la tasa libre de riesgo en este caso porque Venezuela tiene dificultades para cancelar sus deudas y debe pagar el Laudo en dólares estadounidenses que, al tratarse de una moneda distinta a la suya, no puede emitir para saldar el Laudo. La Demandante alega que por más de cinco años se vio obligada a prestar dinero a Venezuela pese al riesgo de verse imposibilitada de pagar, por lo que la tasa de interés del mercado debe reflejar los costos de un préstamo de mediano a largo plazo para Venezuela[946].

858. En particular, con respecto a la tasa de intereses posteriores al laudo, la Demandante alega que, de lo contrario, la Demandada no tendría interés en pagar el Laudo antes de cancelar sus otras deudas con acreedores. En la opinión de la Demandante, esto no cumpliría el propósito de los intereses posteriores al laudo de servir de incentivo eficaz para cumplir los términos del Laudo[947].

859. En cualquier caso, la Demandante asevera que la tasa de interés que propone la Demandada no es una tasa de interés del mercado sino que equivale a una tasa interbancaria, y hace referencia a la decisión del tribunal de *Tidewater c. Venezuela*, que rechazó la sugerencia de Venezuela sobre esa base. Además, la Demandante afirma que ninguno de los tribunales que cita la Demandada aplicó un bono del Tesoro a tres meses, pero considera que "*tiene arraigo el hecho de [,,,]*" que la tasa de intereses anteriores al laudo debe reflejar una tasa de interés de mediano a largo plazo[948].

---

[944] Réplica, ¶¶ 205-206. Según la Demandante, esta tasa es "*bastante conservadora*" debido a que la tasa de préstamos a largo plazo de la Demandada se sitúa en torno al 13%. Presentación Posterior a la Audiencia de la Demandante, ¶ 182.

[945] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 180-181, 183.

[946] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 184-186, Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 111, 114-115. Para respaldar su postura de que la tasa de interés debe reflejar el riesgo de la Demandada, la Demandante cita un documento redactado por Fisher y Romaine acerca de los intereses anteriores al fallo por indemnización otorgada en juicios en los Estados Unidos. Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 110, con cita de **Apéndice BF-96**, pág. 147. Sin embargo, la Demandada aclaró que Fisher y Romaine, en el fondo, "*mantienen la postura de que los intereses anteriores al fallo deben adjudicarse a la tasa sin riesgo*". Carta de la Demandada de fecha 2 de junio 2015, ¶ 4, con cita de **Apéndice BF-96**, págs. 147-148. El Tribunal admitió esta presentación como parte del expediente el día 19 de junio de 2015. También se habló del documento con el perito de la Demandada durante la Audiencia. Transcripción, Día 4, págs. 1099-1100.

[947] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 188, 190.

[948] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 109, con cita de *Tidewater c. Venezuela* (**CLA-155**), ¶ 206.

860. En la opinión de la Demandante, el Tribunal debe adjudicar intereses sobre una base compuesta anual a fin de reflejar completamente el valor temporal de sus pérdidas y, de esa manera, dar efecto al estándar de reparación íntegra conforme al derecho internacional consuetudinario[949]. La Demandante alega que "*casi todas las transacciones y operaciones financieras de la vida real*" comprenden intereses compuestos y señala que los tribunales de las cinco decisiones más recientes en casos CIADI sobre expropiaciones venezolanas han adjudicado intereses compuestos[950].

### b)    Síntesis de la Postura de la Demandada

861. La Demandada rechaza el alegato de la Demandante de que se le deben otorgar intereses según el costo de capital de Norpro Venezuela y alega que esto no califica como "*adecuada tasa de interés del mercado*" conforme al Artículo 5(1) del Tratado. Además, la Demandada considera "*absurdo*" actualizar los flujos de fondos pasados a una tasa mayor que la tasa de descuento que calculó el Prof. Spiller a los fines de descontar flujos de fondos futuros, aunque no se apliquen los riesgos e incertidumbres del futuro[951].

862. En la opinión de la Demandada, el argumento alternativo de la Demandante de aplicar la tasa aplicable a la deuda de PDVSA es igualmente inapropiado porque el interés como forma de compensación debe centrarse en la pérdida de la Demandante ocasionada por el hecho de no haber recibido el pago en una fecha fija. Dado que la Demandante no corre riesgos relacionados con su inversión desde el día 15 de mayo de 2010, la Demandante alega que la tasa de interés adecuada es la tasa libre de riesgo[952].

863. Según la Demandada, las tasas de interés del mercado en el ámbito comercial se basan "*casi siempre*" en una tasa de base, como la tasa LIBOR o la tasa de letras del Tesoro de los EE. UU. a corto plazo, que se aumentan mediante un cierto margen según la solvencia del prestatario, es decir, en este caso, la principal controlante de la Demandante, Compagnie de Saint-Gobain. En vista de la cuestión de la integridad que se planteó con respecto a la tasa LIBOR, la Demandada considera que la tasa de interés debe basarse en las letras del Tesoro de los EE. UU., y escoge las letras a tres meses para compensar a la Demandante por cualquier "*préstamo a corto plazo*" que pudo haber requerido hasta el dictado del presente Laudo[953].

864. La Demandada hace referencia a la decisión del tribunal de *Siemens c. Argentina* que otorgó intereses anteriores al laudo basados en el promedio de las letras del Tesoro de los

[949] Memorial, ¶¶ 236-237; Réplica, ¶ 208; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 191-194.
[950] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 112.
[951] Memorial de Contestación, ¶ 250; Dúplica, ¶ 273.
[952] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 114-115 y ¶ 121.
[953] Memorial de Contestación, ¶ 251; Dúplica, ¶ 274; Escrito Posterior a la Audiencia de la Demandada, nota 242.

EE. UU. a seis meses (2,66%)[954]. La Demandada cita, asimismo, los casos *LG&E* y *BG Group* en que los tribunales aplicaron tasas de letras del Tesoro de los EE. UU. a corto plazo[955]. La Demandada alude también a la decisión del tribunal de *Occidental c. Ecuador*, que aplicó la tasa mensual de las letras del Tesoro de los EE. UU. ya que "*refleja*[ban] *una práctica de reinversión prudente, libre de riesgos y conservadora*"[956] [Traducción del Tribunal]. Por último, la Demandada invoca el caso *Yukos c. Rusia*, en que el tribunal otorgó intereses anteriores al laudo basados en la rentabilidad promedio de los bonos del Tesoro de los EE. UU. a 10 años[957]. Según la Demandada, varios tribunales se rehusaron explícitamente a aplicar el costo de capital de la demandante como base de la tasa de intereses anteriores al laudo[958].

865.  La Demandada afirma que el rendimiento promedio de deuda con vencimiento a tres meses con la misma calificación que Compagnie de Saint-Gobain (BBB) era de 1,09%, mientras que el rendimiento de las letras del Tesoro de los EE. UU. a corto plazo era de 0,08%. Por lo tanto, la Demandada concluye que la tasa de interés de mercado aplicable al valor actual neto de los flujos de fondos al día 15 de mayo de 2010 debe ser la tasa de las letras del Tesoro de los EE. UU. a tres meses más 1,01%[959].

866.  Por último, la Demandada afirma que los intereses deben calcularse sobre una base simple porque la legislación venezolana prohíbe los intereses compuestos[960]. En este sentido, la Demandada se basa en el tribunal de *Yukos c. Rusia*, que resolvió que los intereses simples eran "*justos y razonables*"[961]. La Demandada cuestiona, asimismo, la sugerencia de la Demandante de que la norma en el arbitraje internacional es adjudicar intereses compuestos y alude a varias decisiones en las que se aplicaron intereses simples[962].

### c)    El Análisis del Tribunal

---

[954] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, en referencia a *Siemens c. Argentina* (**CLA-77**), ¶ 396.

[955] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, en referencia a *LG&E* (**CLA-48**), ¶¶ 102, 105 y *BG Group* (**CLA-113**), ¶ 455.

[956] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, con cita de *Occidental c. Ecuador* (**CLA-61**), ¶ 842.

[957] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, en referencia a *Yukos c. Rusia* (**CLA-153**), ¶¶ 1685-1687.

[958] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 118-120, en referencia a PSEG (RL-86), ¶ 345, Guaracachi (RL-125), ¶ 615 y Tza Yap Shum (RL-173), ¶¶ 288, 290.

[959] Memorial de Contestación, ¶ 251 y ¶ 260; Dúplica, ¶ 274; Escrito Posterior a la Audiencia de la Demandada, nota 242. En su petitorio, no obstante, la Demandada solicita que se agregue 1,1% a la tasa de letras del Tesoro de los EE. UU. a tres meses. Escrito posterior a la Audiencia de la Demandada, ¶ 209; Segundo Escrito posterior a la Audiencia de la Demandada, ¶ 64.

[960] Memorial de Contestación, ¶ 252.

[961] Escrito Posterior a la Audiencia de la Demandada, ¶ 122, con cita de *Yukos c. Rusia* (**CLA-153**), ¶ 1689.

[962] Escrito Posterior a la Audiencia de la Demandada, nota 244, en referencia a *RosInvestCo* (**RL-172**), ¶¶ 687-692, *Desert Line* (**RL-88**) ¶ 295, *CME* (**CLA-20**), ¶ 647 y *SPP* (**CLA-80**), ¶ 236.

867. El Tribunal primero procederá a determinar la tasa de intereses anteriores al laudo aplicable (**aa**) y luego evaluará si existen motivos para aplicar una tasa diferente para los intereses posteriores al laudo (**bb**). Por último, el Tribunal abordará la cuestión de los intereses simples frente a los intereses compuestos (**cc**).

### aa)   Tasa de Intereses Anteriores al Laudo

868. Dado que el valor de Norpro Venezuela y, por lo tanto, el monto de compensación a pagar a la Demandante deberá calcularse al día 15 de mayo de 2010, no es objeto de debate entre las Partes que la Demandante tiene derecho a percibir intereses anteriores al laudo a partir de dicha fecha.

869. El Tribunal advierte que el Prof. Spiller no analizó los intereses anteriores al laudo (o la actualización de los flujos de fondos históricos que se realizará en la valuación alternativa en la fecha del laudo), sino que simplemente aplicó el costo de capital de Norpro Venezuela en respuesta a una instrucción del abogado de la Demandante[963]. En su valuación de fecha 15 de mayo de 2010, calculó los intereses anteriores al laudo en función del costo de capital de Norpro Venezuela (calculado en 13,04% hasta el año 2014) y, en subsidio, en función del costo de deuda de PDVSA como rendimiento promedio de siete bonos *bullet* en USD durante el año 2013 (calculado en 9,08%), pero tampoco analizó ninguna de las dos alternativas[964].

870. El Sr. Brailovsky y el Dr. Flores consideraron que "*desde el punto de vista estrictamente económico*" la tasa de intereses anteriores al laudo debe ser la tasa libre de riesgo. Sin embargo, reconocieron que en el arbitraje es común aplicar "*algún tipo de tasa comercial 'normal'*". Por lo tanto, adoptaron dos criterios: (i) un vencimiento a corto plazo de tres meses, dado que la fecha del laudo se desconoce y el préstamo requerido como resultado de la mora en el pago debe renovarse constantemente; y (ii) el riesgo de la Demandante medido como el rendimiento de la deuda con calificación BBB, es decir, la calificación de Compagnie de Saint-Gobain. Según el Sr. Brailovsky y el Dr. Flores, el rendimiento de los bonos BBB con vencimiento a tres meses emitidos por compañías industriales en los EE. UU. fue, en promedio, 1,09%, es decir, un margen de 1,01% sobre las letras del Tesoro de los EE. UU. a tres meses[965].

871. En cuanto al método aplicado por el Prof. Spiller, el Sr. Brailovsky y el Dr. Flores consideraron incorrecto utilizar las tasas de interés de los años 2013 y 2014 durante un

---

[963] Spiller I, nota 73; **Anexo CLEX-01**, ¶ 3(d).
[964] Spiller II, ¶ 138 (con nota 217) y Tabla 13.
[965] Brailovsky/Flores I, ¶¶ 248-250; Brailovsky/Flores II, ¶¶ 252-254 y Tabla 19. El Sr. Brailovsky y el Dr. Flores también señalan que, si bien la tasa LIBOR se utilizó asiduamente como parámetro en el pasado, quizá no sea apropiada en este caso dado que recientemente se cuestionó su integridad como parámetro adecuado de tasa de interés. Brailovsky/Flores I, nota 445.

período que comenzará el día 15 de marzo de 2010 en lugar de un cierto promedio durante el período en cuestión. Además, advierten que sólo dos de los bonos de PDVSA utilizados por el Prof. Spiller tenían un vencimiento a corto plazo—dieron un rendimiento de 3,6% tres meses antes del vencimiento[966].

872.  El Tribunal recuerda que el inciso 3 del Artículo 5(1) del Tratado establece que se devengarán intereses a la "*adecuada tasa de interés del mercado*" ("*taux d'intérêt de marché approprié*")[967]. En cuanto al estándar del derecho internacional consuetudinario, el Artículo 38 del Proyecto de Artículos de la CDI establece que "[e]*l tipo interés y el modo de cálculo se fijarán de manera que se alcance* [el] *resultado* [asegurar la reparación íntegra]"[968]. Si bien el Tribunal sabe que una adecuada tasa de interés del mercado no necesariamente es una tasa de interés que asegura la reparación íntegra del daño sufrido por la Demandante en las circunstancias del caso, pareciera posible bajo las circunstancias actuales definir una tasa que cumpla con ambos estándares.

873.  La Demandante considera que, conforme al estándar de reparación íntegra, tendría derecho a cobrar intereses a la tasa del costo de capital de Norpro Venezuela equivalente a la rentabilidad prevista por la Demandante al realizar su inversión[969]. No obstante, el Tribunal advierte que, sin perjuicio de si la expropiación sea considerada "*lícita*" o "*ilícita*", este no es un caso en que la Demandada tenía prohibido expropiar Norpro Venezuela. Más bien, el Tribunal considera que la Demandada no cumplió los requisitos relativos al pago de indemnización que debió seguir a la expropiación. En consecuencia, no se debe colocar a la Demandante en la posición en que habría estado si aún fuera propietaria de Norpro Venezuela, sino en la posición en que habría estado si la Demandada hubiera pagado la indemnización correspondiente el día 15 de mayo de 2010 o poco tiempo después.

874.  En estas circunstancias, el Tribunal coincide con la Demandada en que no sería preciso otorgar intereses a la Demandante a una tasa que contemple los riesgos de invertir en una empresa ubicada en Venezuela, aunque la Demandante ya no estuviera corriendo tales riesgos y, lo que es más importante aún, no habría estado corriendo estos riesgos si se la hubiera indemnizado el día 15 de mayo de 2010. Por lo tanto, el Tribunal no adjudicará intereses al costo de capital de Norpro Venezuela.

875.  En subsidio, la Demandante alega que la adecuada tasa de interés del mercado sería el costo de deuda de PDVSA, y explica que se vio obligada a otorgar un préstamo a la

---

[966] Brailovsky/Flores II, ¶ 259.
[967] **Anexo C-1**, Artículo 5(1), subpárrafo 2.
[968] **CLA-027**, Artículo 38(1).
[969] Memorial, ¶ 232; Réplica, ¶ 202.

Demandada en el monto de la indemnización adeudada a la Demandante al día 15 de mayo de 2010[970].

876. No hay indicios de que el cálculo de una adecuada tasa de interés del mercado deba incluir el costo de deuda del Estado. La Demandante no citó ninguna decisión pronunciada por ningún tribunal internacional en sustento de su alegato sino que alude a un documento de Fisher y Romaine sobre intereses anteriores al fallo en un litigio estadounidense y a una declaración del Prof. Damodaran. Sin embargo, según señalara correctamente la Demandada en su carta de fecha 2 de junio de 2015, Fisher y Romaine consideraban que los riesgos relacionados con la demandada en cuestión resultaban del litigio y no de la violación en sí y, por lo tanto, en definitiva no justificaban la no aplicación de la tasa libre de riesgo[971]. En cuanto a la declaración del Prof. Damodaran, el Tribunal advierte que esta declaración no versaba sobre el cálculo de una tasa de interés adecuada sino que se efectuó como parte de los requisitos de una inversión libre de riesgo[972]. En consecuencia, el Tribunal considera que ninguna de las autoridades que cita la Demandante respalda su postura de que la "*adecuada tasa de interés del mercado*" debe reflejar el costo de deuda de la Demandada.

877. En principio, el Tribunal coincide con la Demandada y sus peritos (basándose en Fisher y Romaine) que la pérdida que debe indemnizarse mediante intereses sobre el capital es el valor temporal del dinero, sin contemplar los riesgos que la Demandante no corrió[973]. Sin embargo, esto no resta importancia al hecho de que, si la Demandante hubiera recibido la indemnización el día 15 de mayo de 2010 o poco tiempo después, habría tenido la oportunidad de reinvertir este monto y percibir una rentabilidad muy por encima de la rentabilidad de la tasa libre de riesgo. Por lo tanto, el Tribunal considera que, en las circunstancias de este caso, tanto el estándar del derecho internacional consuetudinario de reparación íntegra como el estándar del Artículo 5(1) del Tratado requieren la aplicación de lo que el Sr. Brailovsky y el Dr. Flores describieron como "*un cierto tipo de tasa comercial* 'normal'" comúnmente aplicada en los arbitrajes[974].

878. Si bien el Sr. Brailovsky y el Dr. Flores en consecuencia agregaron a la tasa libre de riesgo el costo de deuda de la Demandante para préstamos a corto plazo, el Tribunal no está convencido de que capte correctamente la pérdida de oportunidad de inversión de la Demandante en el presente caso. De nuevo, el Tribunal desea hacer hincapié nuevamente en que no pretende otorgar intereses a una tasa equivalente al costo de oportunidad de la

---

[970] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 180-186.
[971] Carta de la Demandada de fecha 2 de junio 2015, ¶ 4, con cita de **Apéndice BF-96**, págs. 147-148. El día 19 de junio de 2015 esta porción de la carta fue admitida como parte del expediente por el Tribunal.
[972] **Anexo C-158**, pág. 6.
[973] Brailovsky/Flores II, ¶ 251, con cita de **Apéndice BF-96**, pág. 146.
[974] Brailovsky/Flores I, ¶ 248; Brailovsky/Flores II, 252.

inversión de la Demandante en Norpro Venezuela (ni en ninguna otra inversión alternativa hipotética), principalmente porque la Demandante, de hecho, no corrió el riesgo asociado con dicha tasa de retorno. Al mismo tiempo, el Tribunal considera que el propio costo de deuda de la Demandante no refleja, de manera suficiente, el hecho de que, durante varios años, se privó a la Demandante de la oportunidad de disponer del dinero que debería haber recibido en relación con la expropiación de su inversión en Venezuela.

879. En estas circunstancias, la tasa de interés aplicable en este caso debe lograr un equilibrio entre, por un lado, evitar el otorgamiento de una tasa de retorno que habría sido imposible de conseguir sin importantes riesgos y, por otro lado, reconocer que la Demandante habría podido utilizar sus fondos para algo más que una inversión libre de riesgo si se le hubiera pagado el día 15 de mayo de 2010 o poco tiempo después. En opinión del Tribunal, esto rige para ciertos casos en que las tasas de interés libre de riesgo son cercanas a cero durante casi todo el período entre la fecha de la expropiación y la fecha del Laudo.

880. En consecuencia, el Tribunal, mediante la facultad que le concede el Artículo 5(1) del Tratado y el derecho internacional consuetudinario, otorga una tasa de interés que reúne las condiciones de una "*adecuada tasa de interés del mercado*" y una tasa que "*asegura la reparación íntegra*" en términos de oportunidad razonable de invertir el monto de capital en el mercado. Teniendo en cuenta las inquietudes que plantearon la Demandada y sus peritos acerca de la integridad de la tasa LIBOR como parámetro confiable para las tasas de interés, el Tribunal se remitirá a la tasa de las letras del Tesoro de los EE. UU. que los peritos de ambas Partes utilizaron en varios aspectos de sus valuaciones. En cuanto al vencimiento apropiado, el Tribunal advierte que, si bien el Sr. Brailovsky y el Dr. Flores optaron por aplicar la tasa a tres meses, esta decisión no está avalada por ninguno de los casos que invoca la Demandada en el contexto de sus presentaciones sobre intereses. Resulta que la tasa a seis meses es una tasa comúnmente aplicada por los tribunales en materia de tratados de inversiones[975].

881. El Tribunal no encuentra motivos para apartarse de su práctica y, por lo tanto, considera que la tasa de intereses anteriores al laudo debe basarse en la tasa de las letras del Tesoro de los EE. UU. a seis meses. A fin de reflejar las consideraciones mencionadas *supra* en relación con el equilibrio entre el riesgo y la oportunidad de reinversión, el Tribunal estima apropiado agregar un margen de 2% a su tasa libre de riesgo.

---

[975] *Véase, por ejemplo, Siemens c. Argentina* (**CLA-077**), ¶ 396; *LG&E Energy Corp. et al. c. Argentina* (**CLA-048**), ¶ 105; *BG Group Plc. c. Argentina* (**CLA-113**), ¶ 455; *Occidental Petroleum Corporation et al. c. Ecuador* (**CLA-061**), ¶¶ 841-842. En general, los tribunales que aplicaron la tasa LIBOR también hicieron referencia a la tasa a seis meses; *véase, por ejemplo, Lemire c. Ucrania* (**RL-122**), ¶ 353; *PSEG Global Inc. y otros c. Turquía* (**RL-86**), ¶ 348.

882. En síntesis, el Tribunal resuelve que la Demandante tiene derecho a percibir intereses anteriores al laudo a una tasa igual a 2% sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses.

### bb)   Tasa de Intereses Posteriores al Laudo

883. El Tribunal advierte que, según la Demandante, no hay motivos para distinguir entre intereses anteriores al laudo e intereses posteriores al laudo[976]. No obstante, el Tribunal sabe que la Demandante asevera esto en el contexto de su argumento de que tiene derecho a cobrar intereses anteriores al laudo a una tasa, al menos, igual al costo de deuda de la Demandada. Específicamente con respecto a los intereses posteriores al laudo, la Demandante alega que si la tasa de interés fuese inferior al costo de deuda de la Demandada, Venezuela no tendría ningún incentivo para cumplir con el Laudo—al contrario del objeto que se persigue al otorgar intereses posteriores al laudo[977].

884. Ni la Demandada ni su perito especifican qué tasa de intereses posteriores al laudo debería aplicarse en este caso. Tampoco hacen referencia al argumento de la Demandante de que los intereses posteriores al laudo deben servir de incentivo para cumplir con el Laudo.

885. El Tribunal advierte que tanto el Artículo 5(1) del Tratado como el Artículo 38(2) del Proyecto de Artículos de la CDI establecen que se seguirán devengando intereses hasta la fecha efectiva de pago[978]. Por lo tanto, el Tribunal otorgará intereses posteriores al laudo en la suma pagadera conforme al Laudo.

886. En cuanto a la tasa aplicable, el Tribunal coincide con la Demandante que, en principio, no hay motivo para aplicar tasas diferentes para los intereses anteriores y posteriores al laudo. El Tribunal considera, asimismo, que no existe ninguna razón para apartarse de esta regla general, dado que ya resolvió que la tasa de intereses anteriores al laudo aplicable puede ser inferior al (supuesto) costo de deuda de la Demandada. A criterio del Tribunal, los intereses posteriores al laudo cumplen el mismo objetivo que los intereses anteriores al laudo, es decir, indemnizar a la Demandante por el valor temporal del dinero y el hecho de no poder disponer de la suma hasta la fecha efectiva de pago; sin embargo, no aseguran el cumplimiento del Laudo. Por lo tanto, el Tribunal una vez más considera que el costo de deuda de la Demandada no es parámetro apropiado para calcular la tasa de interés aplicable; al contrario, se devengarán intereses a la misma tasa tanto antes como después de dictarse el Laudo.

---

[976] Réplica, ¶ 207.

[977] Presentación Posterior a la Audiencia de la Demandante, ¶ 188, en referencia a Irmgard Marboe, *Calculation of Compensation and Damages in International Investment Law*, 2009, (**RL-97**), ¶¶ 6.245-6.246.

[978] **Anexo C-1**, Artículo 5(1), subpárrafo 2; **CLA-027**, Artículo 38(2).

### cc) Interés Simple/Compuesto

887. Por último, el Tribunal debe decidir si los intereses se calcularán de manera simple, como propone la Demandada, o capitalizados anualmente, como pretende la Demandante.

888. El Tribunal tiene presente el argumento de la Demandada de que el interés compuesto se encuentra prohibido por el Artículo 530 del Código de Comercio de Venezuela y su invocación del caso *Autopista Concesionada de Venezuela c. Venezuela*, en que el tribunal no otorgó intereses compuestos por no estar permitidos en la legislación venezolana ni requeridos en virtud del derecho internacional[979].

889. Sin embargo, el Tribunal advierte que esta decisión, que es la única que cita la Demandada en este sentido, data del año 2003. Como bien señalara la Demandante, en varias decisiones de casos más recientes en los que Venezuela fue parte se adjudicaron intereses compuestos, como ocurrió en los casos *Tidewater*, *OI European* y *Venezuela Holdings*, que datan de los años 2015 y 2014, respectivamente[980].

890. A criterio del Tribunal, el hecho de que la ley venezolana prohíba los intereses compuestos no impide que el Tribunal los otorgue si la base legal del reclamo de intereses de la Demandante es el Artículo 5(1) del Tratado o el derecho internacional consuetudinario. Esta decisión no se contradice con la decisión del tribunal de *Autopista c. Venezuela*, porque este último no consideró que el Artículo 530 del Código de Comercio de Venezuela le impidiera otorgar intereses compuestos propiamente dichos, sino que advirtió este hecho además de decidir que los intereses compuestos no eran un principio consolidado en virtud del derecho internacional y, por lo tanto, tampoco se exigía ese pago en virtud del derecho internacional.

891. Dado que ha transcurrido más de una década desde que el laudo *Autopista* fue emitido, el Tribunal considera apropiado volver a considerar la decisión de si los intereses compuestos pueden considerarse un principio consolidado del derecho internacional. Tras analizar los casos citados por las Partes en relación con los intereses, el Tribunal advierte que, en la mayoría de ellos, se otorgaron intereses compuestos[981]. Si bien la Demandada

---

[979] Memorial de Contestación, ¶ 252, en referencia a **Anexo R-55**, Artículo 530 y *Autopista Concesionada de Venezuela c. Venezuela* (**RL-124**), ¶¶ 396-397.

[980] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 112, en referencia a *Tidewater c. Venezuela* (**CLA-155**), ¶¶ 208-209, *OI European c. Venezuela* (**CLA-156**), ¶¶ 946, 952 y *Venezuela Holdings c. Venezuela* (**CLA-154**), ¶¶ 394, 399.

[981] *Alpha Projektholding c. Ucrania* (**CLA-002**), ¶ 514; *Compañía de Aguas c. Argentina* (**CLA-024**), ¶ 9.2.8; *France Telecom c. Líbano* (**CLA-034**), ¶ 209; *LG&E c. Argentina* (**CLA-048**), ¶¶ 102-105; *Unglaube c. Costa Rica* (**CLA-051**), ¶¶ 319, 325; *Occidental c. Ecuador* (**CLA-061**), ¶¶ 842, 845; *Phillips c. Petróleos de Venezuela* (**CLA-64**), ¶¶ 294 y ss.; *Siemens c. Argentina* (**CLA-077**), ¶¶ 396, 401; *Wena c. Egipto* (**CLA-089**), ¶ 129; *BG Group c. Argentina* (**CLA-113**), ¶¶ 454-457; *PSEG c. Turquía* (**RL-86**), ¶¶ 345, 348; *Lemire c. Ucrania* (**RL-122**), ¶¶ 353, 356, 361; *Guaracachi c. Bolivia* (**RL-125**), ¶¶ 615-617; *Tza Yap Shum c. Perú* (**RL-173**), ¶¶ 289-292.

citó varios casos en que se concedieron intereses simples, esto se debió a las circunstancias particulares del caso en cuestión o bien no estuvo justificado en ninguno de los fundamentos de la decisión del tribunal.

892. En particular, el tribunal del caso *Yukos c. Rusia*, que cita la Demandada, reconoció explícitamente que "*el otorgamiento de intereses compuestos conforme al derecho internacional representa una forma de* 'jurisprudence constante' *en casos sobre expropiación entre estados e inversores*", pero se apartó de su práctica en vista del "*significativo monto indemnizatorio*" adeudado por Rusia[982]. En *RosInvest c. Rusia*, el tribunal reconoció que "*en arbitrajes recientes sobre tratados de inversiones, se otorgaron intereses compuestos*" pero también señaló que "*esta práctica no es para nada unánime*" y sostuvo que "*dada la naturaleza especulativa de la inversión*" [Traducción del Tribunal], sería injusto otorgar intereses compuestos[983]. El tribunal de *Desert Line c. Yemen* no expresó por qué decidió otorgar intereses simples y no compuestos como habían solicitado las demandantes en ese caso[984].

893. En *CME c. República Checa*, el tribunal volvió a reconocer que "*en los últimos años, fueron cada vez más los tribunales arbitrales internacionales, en especial en virtud de tratados bilaterales de inversión, que otorgaron intereses compuestos dada la realidad comercial contemporánea predominante que las empresas prestatarias pagan intereses compuestos*" [Traducción del Tribunal]. Sin embargo, el tribunal decidió que la demandante no logró demostrar que haya pagado intereses compuestos por préstamos otorgados por bancos y, en consecuencia, no encontró "*circunstancias particulares*" que justificaran la adjudicación de intereses compuestos[985]. El Tribunal advierte que, si bien el tribunal de *CME* consideró necesario encontrar "*circunstancias particulares*" que justificaran los intereses compuestos, esta decisión data del año 2003 y es probable que no sea representativa de los recientes desarrollos en materia de préstamos de mercado y arbitraje internacional en materia de inversión.

894. Por último, el tribunal de *SPP c. Egipto* también decidió que el interés no debía capitalizarse sin dar ningún fundamento específico para su decisión[986]. Dado que la decisión data del año 1992, el Tribunal, en cualquier caso, considera que no resulta útil en cuanto a los recientes desarrollos en el arbitraje internacional en materia de inversión.

895. En síntesis, durante los últimos años, la mayoría de los tribunales intervinientes en casos sobre inversiones decidieron adjudicar intereses compuestos e incluso la mayoría de los

---

[982] *Yukos c. Rusia* (**CLA-153**), ¶¶ 1689, 1691.
[983] *RosInvest c. Rusia* (**RL-172**), ¶¶ 689-690.
[984] *Desert Line c. Yemen* (**RL-88**), ¶¶ 295-298.
[985] *CME c. República Checa* (**CLA-020**), ¶¶ 645-647.
[986] *SPP c. Egipto* (**CLA-080**), ¶ 236.

que decidieron otorgar intereses simples por algún motivo en particular reconocieron que los intereses compuestos representan lo que el tribunal de *CME* describió como la "*realidad comercial contemporánea predominante*" [Traducción del Tribunal]. El Tribunal se limitará a afirmar que corresponde a la Demandada demostrar que existen circunstancias particulares que justifican la denegación de intereses compuestos. Sin embargo, dado que el Tribunal ha decidido otorgar una adecuada tasa del mercado, no ve por qué no seguir el razonamiento de la mayoría de los tribunales que han decidido otorgar intereses compuestos sobre el monto del capital.

896. En consecuencia, el Tribunal resuelve que tanto los intereses anteriores al laudo como los intereses posteriores al laudo estarán sujetos a capitalización. En cuanto a la periodicidad, el Tribunal coincide con la Demandante en que los intereses se deben capitalizar de forma anual.

### 4. Obligaciones Tributarias

897. Por último, la Demandante solicita en sus dos presentaciones posteriores a la audiencia una declaración de que (i) el otorgamiento de la indemnización y los intereses se fije en montos netos de los impuestos venezolanos aplicables; y (ii) Venezuela no pueda deducir impuestos en relación con el pago de la indemnización y los intereses. Además, la Demandante solicita que se ordene a la Demandada mantener indemne a la Demandante respecto de toda responsabilidad derivada de una doble imposición en Francia o en cualquier otro país, que no se hubiera verificado de no haber sido por las medidas adversas de Venezuela[987].

898. La Demandada no realizó ningún comentario sobre esta solicitud en su Segundo Escrito Posterior a la Audiencia.

899. El Tribunal destaca que la Demandante ha planteado su reclamación respecto de las obligaciones tributarias recién después de la audiencia, es decir, en el petitorio incluido en su Presentación Posterior a la Audiencia y en su Segunda Presentación Posterior a la Audiencia. Asimismo, sumado a no proporcionar justificación alguna sobre su decisión de plantear esta reclamación en un momento tan tardío, la Demandante no ha formulado argumento alguno relativo a esta reclamación más allá de su petitorio.

900. No obstante, el Tribunal considera necesario trazar una distinción entre las dos primeras reclamaciones relativas a la imposición de impuestos de la compensación recibida dentro

---

[987]Presentación Posterior a la Audiencia de la Demandante, ¶ 195; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116.

de Venezuela, por un lado, y la reclamación adicional relativa a la eventual doble tributación que pudiera surgir afuera de Venezuela, por el otro.

901. Con respecto a las dos primeras reclamaciones, el Tribunal destaca que los peritos de ambas Partes han tomado en consideración una alícuota del impuesto sobre rentas del 34 % como parte de sus respectivas valoraciones de la compensación a la que la Demandante tiene derecho[988]. El Tribunal además destaca que, si bien inicialmente los peritos estaban en desacuerdo sobre un aspecto específico de la determinación de la renta imponible realizada por el Prof. Spiller, perito de la Demandante, es decir, el aspecto de la depreciación tal como fuera modelado por el Prof. Spiller en su primer dictamen[989], el Prof. Spiller adoptó el método de los peritos de la Demandada, Dr. Brailovsky y Dr. Flores, en su segundo dictamen[990]. Lo anterior fue reconocido por los peritos de la Demandada en su segundo dictamen[991]. Por consiguiente, el Tribunal entiende que los peritos de las Partes están de acuerdo en lo relativo al tratamiento de los impuestos a las rentas y de la depreciación en sus cálculos.

902. A la luz de lo que antecede, el Tribunal considera justificado asumir que el método de valoración acordado por las Partes adecuadamente considera impuestos a las rentas que hubieran tenido que ser pagados por Norpro Venezuela en el futuro en el escenario contrafáctico[992]. Cualquier impuesto adicional por parte de Venezuela sobre la compensación pagadera a la Demandante, por ende, importaría una doble imposición para ese monto. En consecuencia, el Tribunal resuelve que la solicitud de la Demandante para que (i) el pago de daños y perjuicios e intereses se dicte neto de los impuestos aplicables en Venezuela, y (ii) Venezuela no pueda deducir impuestos respecto del pago de la condena en daños y perjuicios e intereses, está justificada. De hecho, es el resultado lógico del método de valoración elegido por los peritos de las Partes y, en particular, de su consenso sobre el tratamiento de los impuestos a las rentas en sus cálculos. En la opinión del Tribunal, no fue necesaria mayor elaboración por parte de la Demandante para otorgar esta solicitud declaratoria y, más aún, no es problemático que la Demandante incluyera esta solicitud en su petitorio recién al momento de su Presentación Posterior a la Audiencia.

903. En consecuencia, la solicitud de la Demandante relativa a los impuestos de Venezuela sobre la compensación concedida es otorgada.

---

[988] Spiller I, ¶ 138; Brailovsky/Flores I, ¶ 136.
[989] Brailovsky/Flores I, ¶¶ 136-147.
[990] Spiller II, ¶ 101.
[991] Brailovsky/Flores II, ¶ 139.
[992] *Véase* también *Venezuela Holdings c. Venezuela* (**CLA-154**), ¶ 389.

904. En cuanto a la reclamación adicional sobre una indemnidad respecto de toda doble obligación impositiva hipotética que pudiera surgir en cualquier tercer país, el Tribunal considera que dicha reclamación hubiera requerido una elaboración mínima por parte de la Demandante en pos de ser considerada sustanciada. La Demandante no ha especificado ni los fundamentos jurídicos para el pago de posibles impuestos, ni la alícuota o los fundamentos sobre los cuales la Demandada debería compensarla por haber incurrido en dicha obligación. Asimismo, no existen indicios de que tal obligación con respecto a terceros Estados fuera incluida en los cálculos de los peritos de las Partes y, por ende, que el no otorgar la solicitud de la Demandante en este aspecto redundaría en una doble imposición sobre el monto otorgado. Por último, la compensación que la Demandante persigue hubiera requerido al menos un cierto grado de probabilidad de que un tercer Estado impondría, en efecto, impuestos sobre la compensación recibida, lo que no ha sido alegado por la Demandante.

905. Ante la falta de argumento alguno respecto de esta solicitud fuera del petitorio de la Demandante, el Tribunal considera que dicha solicitud es especulativa e infundada[993]; el Tribunal, por lo tanto, no encuentra fundamentos para ordenar una indemnización contra obligaciones impositivas extranjeras tal como solicita la Demandante. En consecuencia, la reclamación de la Demandante tendiente a que se le ordene a la Demandada que indemnice a la Demandante respecto de cualquier obligación por doble imposición que surja en Francia o en cualquier otro lugar, que no hubiera surgido de no haber sido por las medidas adversas que adoptó Venezuela, es denegado.

## V.    DECISIÓN SOBRE COSTOS

906. Conforme a lo establecido en el Artículo 61(2) del Convenio CIADI, la decisión del Tribunal respecto de los costos formará parte del Laudo.

## G.    DECISIÓN DEL TRIBUNAL

907. La presente decisión refleja las conclusiones del Tribunal sobre responsabilidad y los principios en materia de cuantificación de daños tal como se expusieron anteriormente. Posteriormente a la notificación de esta decisión a las Partes, el Tribunal invitará a las Partes, por separado, a que intenten llegar a un acuerdo sobre el monto final de la compensación a ser pagada por la Demandada a la Demandante con respecto a la expropiación de Norpro Venezuela –basada en las conclusiones contenidas en la presente decisión. Si las Partes no llegaran a un acuerdo dentro de los dos meses a partir de la notificación de esta decisión, el Tribunal, previa consulta con las Partes, fijará un

---

[993] *Véase Venezuela Holdings c. Venezuela* (**CLA-154**), ¶ 388.

calendario para las presentaciones de las Partes sobre las cuestiones de cuantificación de daños restantes que hubieren de resolverse.

908. En función de lo que antecede, el Tribunal resuelve lo siguiente:

### DECISIÓN SOBRE RESPONSABILIDAD Y PRINCIPIOS EN MATERIA DE CUANTIFICACIÓN DE DAÑOS

1. **La Demandada violó el Artículo 5(1) incisos 2 y 3 del Tratado al no especificar el monto de la compensación y al no pagar una indemnización pronta por la expropiación de la inversión de la Demandante en Venezuela.**

2. **La Demandada deberá pagarle a la Demandante el monto de la compensación calculado sobre la base de las conclusiones del Tribunal sintetizadas en los párrafos 850 a 852 *supra*, más los intereses previos al laudo a partir del día 15 de mayo de 2010 hasta la fecha del Laudo a una tasa igual al 2 % sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.**

3. **La Demandada deberá pagarle a la Demandante intereses posteriores al laudo sobre el monto de la compensación dispuesto en el punto 2 a partir de la fecha del Laudo hasta la fecha del pago a una tasa igual al 2 % sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual. Los intereses posteriores al laudo se pagarán solo sobre el capital de la compensación, y no sobre los intereses otorgados previos al laudo.**

4. **La compensación y los intereses se fijan en montos netos de los impuestos venezolanos aplicables, y la Demandada no podrá deducir impuestos en relación con el pago de la compensación y los intereses.**

5. **La decisión sobre costos se reserva para el Laudo.**

6. **Se desestiman todas las demás pretensiones y petitorios.**

El Honorable Charles N. Brower
Árbitro
Fecha: 21 DICIEMBRE DE 2016
Sujeto a la Opinión Concurrente
y Disidente adjunta

Sr. Gabriel Bottini
Árbitro
Fecha: 9 de diciembre de 2016

Profesor Dr. Klaus Sachs
Presidente
Fecha: 6 December 2016

**Opinión Concurrente y Disidente del Juez Charles N. Brower**

1.      Coincido con la conclusión del Tribunal (párrafo 908(1)) de que la Demandada es responsable de un incumplimiento de los incisos 2 y 3 del Artículo 5(1) del Acuerdo entre el Gobierno de la República Bolivariana de Venezuela y el Gobierno de la República Francesa para la Promoción y la Protección Recíprocas de Inversiones (en adelante, "el TBI") al expropiar la subsidiaria venezolana propiedad de la Demandante en un 99,99 %, Norpro Venezuela C.A. (en adelante, "Norpro"), así como con la mayor parte del análisis detallado del Tribunal de los elementos correctos que deben guiar el cálculo en virtud del método de flujos de fondos descontados de la compensación que ha de otorgarse a la Demandante.  Sin embargo, me veo obligado a disentir de dos aspectos de dicho análisis que, como cuestión económica al igual que como cuestión de derecho aplicable, privan a la Demandante de mucho de aquello a lo que tiene derecho, sea de conformidad con el TBI, sea con arreglo al derecho internacional en general.  *Véase Case Concerning the Factory at Chorzów (Claim for Indemnity) (Germany v. Poland)*, P.C.I.J. Series A No. 17 (1928).  En particular, el Tribunal no ha ejecutado ni el TBI ni el derecho internacional en general en tanto ha hecho lo siguiente:

(a)      Ha incluido en la porción correspondiente al riesgo país del porcentaje por el cual ha de descontarse el flujo de fondos proyectado de Norpro (es decir, 10,26% según el párrafo 753) precisamente el riesgo de expropiación sin compensación, así como otras violaciones del TBI (párrafos 713-714), respecto a las cuales este Tribunal ha sido constituido para rescatar a la Demandante y que, en la presente Decisión sobre Responsabilidad y los Principios de Cuantificación de Daños (en adelante, "la Decisión"), el Tribunal dice cumplir, lo que deriva en un factor de riesgo país que se encuentra 5,76 puntos por encima del 4,5 %, el único número del factor de riesgo país que cualquiera de las Partes ha planteado ante el Tribunal como excluyente del riesgo de violaciones del TBI, y representa un 228 % respecto de ese número; y

(b)      Ha excluido el 25 % de las ganancias en concepto de ventas de exportación de Norpro con fundamento en que la Demandante, propietaria del 99,99 % de Norpro, mediante la fijación de precios de transferencia entre compañías sujetos a tributación u otras opciones de teneduría de libros, le ha cobrado a Norpro

> aproximadamente dicho monto de sus ganancias a efectos de los aportes de la
> Demandante a la comercialización de Norpro.

Los vicios de estas dos reducciones de los derechos de la Demandante de conformidad con el
TBI y con arreglo al derecho internacional general deberían ser evidentes.

2.      El primer problema, en virtud del punto 1(a) *supra*, surge de la interpretación errónea
por parte del Tribunal tanto del inciso 2 del Artículo 5(1), que especifica que la compensación
por expropiación debe ser "igual al valor real de la[] inversión[] en cuestión", como del derecho
internacional general que, conforme al caso *Chorzów* (página 47 del Fallo) dispone que "el
resarcimiento debe, en la medida de lo posible, eliminar todas las consecuencias del acto ilícito
y restablecer la situación que muy probablemente habría existido si este acto no se hubiere
perpetrado" [Traducción del Tribunal]. La Decisión ha transformado el derecho aplicable en
la aplicación de un estándar de compensación de "valor justo de mercado", que, tal como lo
aplica la Decisión, desafortunadamente ha redundado en una injusticia para la Demandante.

3.      Al aumentar el factor de riesgo país a fin de incluir precisamente el riesgo del que la
Decisión se compromete a proteger a la Demandante, que, según el Tribunal, ha sufrido un
daño como consecuencia del incumplimiento expropiatorio del TBI por parte de la Demandada,
el Tribunal no le hace justicia a la Demandante. Le quita con una mano lo que ha pretendido
darle a la Demandante con la otra. Reducir la recuperación en favor de la Demandante
perjudicada aplicando un "valor justo de mercado" que incorpora el propio riesgo del que el
Tribunal está liberando supuestamente a la Demandante equivale a negarle a la Demandante la
compensación íntegra a que tiene derecho. Es como comprometerse a restituirle al dueño de
un automóvil muy dañado un vehículo perfectamente reparado y restaurado, pero luego dejarlo
sin algunas partes simplemente porque podría dañarse otra vez en el futuro. La lógica
manifiesta subyacente fue reconocida por un tribunal muy distinguido en el marco del caso
*Gold Reserve, Inc. c. Venezuela*, Caso CIADI N.° ARB(AF)/09/1, Laudo (22 de septiembre de
2014), ¶ 841, que debería haber persuadido a mis colegas de no seguir el precedente equivocado
del caso *Tidewater Investment SRL c. Venezuela*, Caso CIADI N.° ARB/10/5, Laudo (13 de
marzo de 2015). Cabe destacar que la necesidad de excluir del factor de riesgo país el propio
riesgo previsto en un tratado del que se concluye que un demandante ha sido víctima fue
subrayada hace ya 27 años, en el año 1989, por el Tribunal de Reclamaciones Irán-Estados
Unidos en el contexto del caso *Phillips Petroleum Company Iran* c. *La República Islámica de
Irán, et al.*, Laudo N.° 425-39-2 (29 de junio de 1989) ¶¶ 111, 152, *reimpreso en* 21 Iran-U.S.

C.T.R. 79, y diez años después, en el año 1999, por el Tribunal en virtud del Reglamento CNUDMI en el caso *Himpurna California Energy Ltd. c. PT. (Persero) Perusahaan Listruik Negara*, Laudo Definitivo (4 de mayo de 1999) ¶ 357, *en* YEARBOOK COMMERCIAL ARBITRATION, VOL. XXV (A. Jan van den Berg ed., Kluwer 2000).

4.      Además del hecho de que la postura de la mayoría priva a la Demandante de la compensación a que tiene derecho, no adhiere al acuerdo de las Partes en cuanto a lo que constituye "valor justo de mercado". En el párrafo 628 de la Decisión, el Tribunal señala que "[l]as Partes coinciden en que el valor justo de mercado es igual al monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado, *siempre que el comprador esté informado acerca de todas las circunstancias pertinentes y ninguna de las partes se encuentre bajo cualquier tipo de violencia para vender o adquirir el activo*" (énfasis agregado). Si un comprador interesado es, por ejemplo, un nacional de Francia (Parte en el TBI que nos ocupa) o de otro Estado que goza de una protección equivalente en virtud de un tratado tal como fue o debería ser la Demandante aquí, ¿eso no forma parte del concepto de que el comprador esté "informado acerca de todas las circunstancias pertinentes"? ¿Dicha condición no podría inducir al comprador a pagar más por el bien expropiado que un posible comprador que carece de dicha protección? Tal como han coincidido las Partes en el presente caso, el "valor justo de mercado" no puede determinarse sin tener en cuenta "todas las circunstancias pertinentes".

5.      En cuanto al párrafo 1(b) *supra*, otorgarle al propietario del 99,99 % de la empresa expropiada, a saber, la Demandante, que tiene derecho al 99,99 % de las ganancias de Norpro, exclusivamente la compensación inferior resultante del 99,99 % menos el 25 % de las ganancias en concepto de ventas de exportación de Norpro implica que, en esa medida, la Demandante se ve privada de la compensación a que tiene derecho. La teneduría de libros entre compañías practicada por la sociedad controlante y la subsidiaria no tiene efecto alguno en la ganancia real que la subsidiaria generó en favor de la sociedad controlante. Suponiendo, a modo de ejemplo, que el 25 % de las ganancias en concepto de ventas de exportación de Norpro representa el 10 % de las ganancias totales de Norpro, la Demandante controlante que, de hecho, ha perdido el 99,99 % de las ganancias de Norpro, recibe en concepto de compensación, no ese 99,99 % del que fue privada, sino sólo el 89,99 %. ¿Cómo puede considerarse que eso redunda en un "valor justo de mercado" bajo cualquier parámetro?

        Por las razones expuestas *supra* y en esa medida, disiento respetuosamente de la Decisión.

4

_Charles N. Brower_

El Honorable Charles N. Brower
Árbitro
Fecha: 21 DICIEMBRE DE 2016

# Anexo 4

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

| | | |
|---|---|---|
| [a] | Compensación por Expropiación | $29,600,000.00 |
| [b] | Interés previo al laudo del 15 de mayo de 2010 hasta el 31 de marzo de 2017 | $4,800,000.00 |
| [c] | Interés previo al laudo del 1 de abril del 2017 al 3 de noviembre del 2017 | $542,189.80 |
| [d] | Interés posterior al laudo del 3 de diciembre de 2017 al 7 de diciembre de 2018 | $1,218,115.14 |
| [e] | **Compensación al 7 de diciembre de 2018.** | **$36,160,304.94** |
| [f] | Reembolso de costos - Arbitraje | $1,303,189.99 |
| [g] | 29/5000<br>Reembolso de costos - Demandante | $4,634,532.05 |
| [h] | Costos Totales | $5,937,722.04 |
| [i] | Interés del 3 de Diciembre al 7 de Diciembre del 2018 | $244,352.34 |
| [j] | **Compensación al 7 de diciembre de 2018** | **$6,182,074.38** |
| [k] | **Total** | **$42,342,379.31** |

Notas
| | |
|---|---|
| [a] | Laudo, ¶72.1 |
| [b] | Laudo, ¶72.1 |
| [c] | Laudo, ¶72.2. Intereses sobre USD 29.6 millones a una tasa promedio de bonos del Tesoro de EE. UU a 6 meses más 2% (3.1%) entre el 1 de abril de 2017 y la fecha del laudo (3 de noviembre de 2017) |
| [d] | Laudo, ¶72.3. Intereses sobre USD 29.6 millones a una tasa promedio de bonos del Tesoro de EE. UU a 6 meses más 2% (4.1%) entre los 30 días posteriores a la fecha del laudo (3 de diciembre de 2017) hasta la fecha de pago (7 de diciemb |
| [e] | [a]+[b]+[c]+[d] |
| [f] | Laudo, ¶72.5 |
| [g] | Laudo, ¶72.6 |
| [h] | [f]+[g] |
| [i] | Laudo, ¶72.7. Intereses sobre costos a una tasa promedio de bonos del Tesoro de EE. UU a 6 meses más 2% (4.1%) entre los 30 días posteriores a la fecha del laudo (3 de diciembre de 2017) hasta la fecha de pago (7 de diciembre de 2018) |
| [j] | [h]+[i] |
| [j] | [e]+[j] |

# Reserva Federal – Rendimientos del Tesoro

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| Fecha | 6-Meses |
|---|---|
| 04/03/2017 | 0.92 |
| 04/04/2017 | 0.92 |
| 04/05/2017 | 0.93 |
| 04/06/2017 | 0.94 |
| 04/07/2017 | 0.95 |
| 04/10/2017 | 0.97 |
| 04/11/2017 | 0.94 |
| 04/12/2017 | 0.95 |
| 04/13/2017 | 0.94 |
| 04/17/2017 | 0.94 |
| 04/18/2017 | 0.94 |
| 04/19/2017 | 0.94 |
| 04/20/2017 | 0.93 |
| 04/21/2017 | 0.92 |
| 04/24/2017 | 0.96 |
| 04/25/2017 | 0.98 |
| 04/26/2017 | 0.99 |
| 04/27/2017 | 0.98 |
| 04/28/2017 | 0.99 |
| 05/01/2017 | 0.98 |
| 05/02/2017 | 0.99 |
| 05/03/2017 | 1.00 |
| 05/04/2017 | 1.00 |
| 05/05/2017 | 1.01 |
| 05/08/2017 | 1.02 |
| 05/09/2017 | 1.04 |
| 05/10/2017 | 1.04 |
| 05/11/2017 | 1.04 |
| 05/12/2017 | 1.03 |
| 05/15/2017 | 1.02 |
| 05/16/2017 | 1.04 |
| 05/17/2017 | 1.00 |
| 05/18/2017 | 1.02 |
| 05/19/2017 | 1.03 |
| 05/22/2017 | 1.05 |
| 05/23/2017 | 1.08 |
| 05/24/2017 | 1.07 |
| 05/25/2017 | 1.08 |
| 05/26/2017 | 1.08 |
| 05/30/2017 | 1.07 |
| 05/31/2017 | 1.08 |
| 06/01/2017 | 1.07 |
| 06/02/2017 | 1.06 |
| 06/05/2017 | 1.06 |
| 06/06/2017 | 1.08 |
| 06/07/2017 | 1.09 |
| 06/08/2017 | 1.11 |
| 06/09/2017 | 1.13 |
| 06/12/2017 | 1.09 |
| 06/13/2017 | 1.12 |
| 06/14/2017 | 1.12 |
| 06/15/2017 | 1.13 |
| 06/16/2017 | 1.13 |
| 06/19/2017 | 1.13 |
| 06/20/2017 | 1.14 |
| 06/21/2017 | 1.12 |
| 06/22/2017 | 1.10 |
| 06/23/2017 | 1.10 |
| 06/26/2017 | 1.10 |
| 06/27/2017 | 1.13 |
| 06/28/2017 | 1.12 |
| 06/29/2017 | 1.14 |
| 06/30/2017 | 1.14 |
| 07/03/2017 | 1.13 |
| 07/05/2017 | 1.15 |
| 07/06/2017 | 1.14 |
| 07/07/2017 | 1.14 |
| 07/10/2017 | 1.13 |
| 07/11/2017 | 1.14 |
| 07/12/2017 | 1.13 |
| 07/13/2017 | 1.14 |
| 07/14/2017 | 1.12 |
| 07/17/2017 | 1.10 |
| 07/18/2017 | 1.11 |
| 07/19/2017 | 1.12 |
| 07/20/2017 | 1.12 |
| 07/21/2017 | 1.10 |
| 07/24/2017 | 1.12 |
| 07/25/2017 | 1.15 |
| 07/26/2017 | 1.14 |
| 07/27/2017 | 1.13 |
| 07/28/2017 | 1.13 |
| 07/31/2017 | 1.13 |
| 08/01/2017 | 1.15 |
| 08/02/2017 | 1.15 |
| 08/03/2017 | 1.13 |
| 08/04/2017 | 1.14 |
| 08/07/2017 | 1.14 |
| 08/08/2017 | 1.16 |
| 08/09/2017 | 1.15 |
| 08/10/2017 | 1.14 |
| 08/11/2017 | 1.14 |
| 08/14/2017 | 1.13 |
| 08/15/2017 | 1.16 |
| 08/16/2017 | 1.13 |
| 08/17/2017 | 1.11 |
| 08/18/2017 | 1.13 |
| 08/21/2017 | 1.11 |
| 08/22/2017 | 1.13 |

| Fecha Inicio | Fecha de Finalización | T-Bill+2% | Años | Factor |
|---|---|---|---|---|
| March 31, 2017 | November 03, 2017 | 3.1% | 0.59 | 1.02 |
| December 03, 2017 | December 07, 2018 | 4.1% | 1.01 | 1.04 |

| Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13 |
| Aplicación del Laudo del Tribunal |

**Reserva Federal - Rendimientos del Tesoro**

| | |
|---|---|
| 08/23/2017 | 1.11 |
| 08/24/2017 | 1.11 |
| 08/25/2017 | 1.11 |
| 08/28/2017 | 1.12 |
| 08/29/2017 | 1.13 |
| 08/30/2017 | 1.11 |
| 08/31/2017 | 1.08 |
| 09/01/2017 | 1.10 |
| 09/05/2017 | 1.13 |
| 09/06/2017 | 1.17 |
| 09/07/2017 | 1.15 |
| 09/08/2017 | 1.14 |
| 09/11/2017 | 1.16 |
| 09/12/2017 | 1.16 |
| 09/13/2017 | 1.16 |
| 09/14/2017 | 1.17 |
| 09/15/2017 | 1.17 |
| 09/18/2017 | 1.18 |
| 09/19/2017 | 1.19 |
| 09/20/2017 | 1.20 |
| 09/21/2017 | 1.19 |
| 09/22/2017 | 1.19 |
| 09/25/2017 | 1.19 |
| 09/26/2017 | 1.19 |
| 09/27/2017 | 1.20 |
| 09/28/2017 | 1.18 |
| 09/29/2017 | 1.20 |
| 10/02/2017 | 1.22 |
| 10/03/2017 | 1.21 |
| 10/04/2017 | 1.21 |
| 10/05/2017 | 1.21 |
| 10/06/2017 | 1.22 |
| 10/10/2017 | 1.26 |
| 10/11/2017 | 1.25 |
| 10/12/2017 | 1.27 |
| 10/13/2017 | 1.26 |
| 10/16/2017 | 1.24 |
| 10/17/2017 | 1.25 |
| 10/18/2017 | 1.24 |
| 10/19/2017 | 1.25 |
| 10/20/2017 | 1.27 |
| 10/23/2017 | 1.25 |
| 10/24/2017 | 1.27 |
| 10/25/2017 | 1.27 |
| 10/26/2017 | 1.29 |
| 10/27/2017 | 1.28 |
| 10/30/2017 | 1.24 |
| 10/31/2017 | 1.28 |
| 11/01/2017 | 1.30 |
| 11/02/2017 | 1.29 |
| 11/03/2017 | 1.31 |
| 11/06/2017 | 1.30 |
| 11/07/2017 | 1.33 |
| 11/08/2017 | 1.35 |
| 11/09/2017 | 1.36 |
| 11/10/2017 | 1.37 |
| 11/13/2017 | 1.37 |
| 11/14/2017 | 1.40 |
| 11/15/2017 | 1.39 |
| 11/16/2017 | 1.42 |
| 11/17/2017 | 1.42 |
| 11/20/2017 | 1.46 |
| 11/21/2017 | 1.45 |
| 11/22/2017 | 1.45 |
| 11/24/2017 | 1.45 |
| 11/27/2017 | 1.41 |
| 11/28/2017 | 1.46 |
| 11/29/2017 | 1.45 |
| 11/30/2017 | 1.44 |
| 12/01/2017 | 1.45 |
| 12/04/2017 | 1.45 |
| 12/05/2017 | 1.48 |
| 12/06/2017 | 1.48 |
| 12/07/2017 | 1.47 |
| 12/08/2017 | 1.45 |
| 12/11/2017 | 1.47 |
| 12/12/2017 | 1.49 |
| 12/13/2017 | 1.47 |
| 12/14/2017 | 1.48 |
| 12/15/2017 | 1.48 |
| 12/18/2017 | 1.51 |
| 12/19/2017 | 1.51 |
| 12/20/2017 | 1.51 |
| 12/21/2017 | 1.54 |
| 12/22/2017 | 1.54 |
| 12/26/2017 | 1.52 |
| 12/27/2017 | 1.53 |
| 12/28/2017 | 1.54 |
| 12/29/2017 | 1.53 |
| 01/02/2018 | 1.61 |
| 01/03/2018 | 1.59 |
| 01/04/2018 | 1.60 |
| 01/05/2018 | 1.58 |
| 01/08/2018 | 1.60 |
| 01/09/2018 | 1.60 |
| 01/10/2018 | 1.59 |
| 01/11/2018 | 1.58 |
| 01/12/2018 | 1.59 |
| 01/16/2018 | 1.63 |
| 01/17/2018 | 1.63 |
| 01/18/2018 | 1.63 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| | |
|---|---|
| 01/19/2018 | 1.62 |
| 01/22/2018 | 1.65 |
| 01/23/2018 | 1.63 |
| 01/24/2018 | 1.63 |
| 01/25/2018 | 1.64 |
| 01/26/2018 | 1.64 |
| 01/29/2018 | 1.66 |
| 01/30/2018 | 1.66 |
| 01/31/2018 | 1.66 |
| 02/01/2018 | 1.64 |
| 02/02/2018 | 1.65 |
| 02/05/2018 | 1.67 |
| 02/06/2018 | 1.69 |
| 02/07/2018 | 1.73 |
| 02/08/2018 | 1.73 |
| 02/09/2018 | 1.73 |
| 02/12/2018 | 1.82 |
| 02/13/2018 | 1.80 |
| 02/14/2018 | 1.81 |
| 02/15/2018 | 1.82 |
| 02/16/2018 | 1.83 |
| 02/20/2018 | 1.87 |
| 02/21/2018 | 1.85 |
| 02/22/2018 | 1.84 |
| 02/23/2018 | 1.85 |
| 02/26/2018 | 1.87 |
| 02/27/2018 | 1.87 |
| 02/28/2018 | 1.86 |
| 03/01/2018 | 1.85 |
| 03/02/2018 | 1.86 |
| 03/05/2018 | 1.86 |
| 03/06/2018 | 1.87 |
| 03/07/2018 | 1.87 |
| 03/08/2018 | 1.89 |
| 03/09/2018 | 1.89 |
| 03/12/2018 | 1.89 |
| 03/13/2018 | 1.90 |
| 03/14/2018 | 1.94 |
| 03/15/2018 | 1.95 |
| 03/16/2018 | 1.96 |
| 03/19/2018 | 1.99 |
| 03/20/2018 | 1.97 |
| 03/21/2018 | 1.95 |
| 03/22/2018 | 1.95 |
| 03/23/2018 | 1.92 |
| 03/26/2018 | 1.94 |
| 03/27/2018 | 1.93 |
| 03/28/2018 | 1.95 |
| 03/29/2018 | 1.93 |
| 04/02/2018 | 1.92 |
| 04/03/2018 | 1.92 |
| 04/04/2018 | 1.90 |
| 04/05/2018 | 1.93 |
| 04/06/2018 | 1.91 |
| 04/09/2018 | 1.93 |
| 04/10/2018 | 1.93 |
| 04/11/2018 | 1.95 |
| 04/12/2018 | 1.95 |
| 04/13/2018 | 1.97 |
| 04/16/2018 | 1.98 |
| 04/17/2018 | 2.02 |
| 04/18/2018 | 2.01 |
| 04/19/2018 | 2.01 |
| 04/20/2018 | 2.01 |
| 04/23/2018 | 2.04 |
| 04/24/2018 | 2.05 |
| 04/25/2018 | 2.03 |
| 04/26/2018 | 2.02 |
| 04/27/2018 | 2.02 |
| 04/30/2018 | 2.04 |
| 05/01/2018 | 2.05 |
| 05/02/2018 | 2.03 |
| 05/03/2018 | 2.02 |
| 05/04/2018 | 2.03 |
| 05/07/2018 | 2.05 |
| 05/08/2018 | 2.05 |
| 05/09/2018 | 2.05 |
| 05/10/2018 | 2.05 |
| 05/11/2018 | 2.06 |
| 05/14/2018 | 2.09 |
| 05/15/2018 | 2.09 |
| 05/16/2018 | 2.09 |
| 05/17/2018 | 2.10 |
| 05/18/2018 | 2.09 |
| 05/21/2018 | 2.14 |
| 05/22/2018 | 2.13 |
| 05/23/2018 | 2.11 |
| 05/24/2018 | 2.09 |
| 05/25/2018 | 2.07 |
| 05/29/2018 | 2.06 |
| 05/30/2018 | 2.08 |
| 05/31/2018 | 2.08 |
| 06/01/2018 | 2.10 |
| 06/04/2018 | 2.13 |
| 06/05/2018 | 2.13 |
| 06/06/2018 | 2.13 |
| 06/07/2018 | 2.12 |
| 06/08/2018 | 2.12 |
| 06/11/2018 | 2.11 |
| 06/12/2018 | 2.10 |
| 06/13/2018 | 2.09 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| | |
|---|---|
| 06/14/2018 | 2.07 |
| 06/15/2018 | 2.07 |
| 06/18/2018 | 2.13 |
| 06/19/2018 | 2.13 |
| 06/20/2018 | 2.14 |
| 06/21/2018 | 2.12 |
| 06/22/2018 | 2.11 |
| 06/25/2018 | 2.13 |
| 06/26/2018 | 2.14 |
| 06/27/2018 | 2.10 |
| 06/28/2018 | 2.11 |
| 06/29/2018 | 2.11 |
| 07/02/2018 | 2.14 |
| 07/03/2018 | 2.12 |
| 07/05/2018 | 2.11 |
| 07/06/2018 | 2.13 |
| 07/09/2018 | 2.15 |
| 07/10/2018 | 2.15 |
| 07/11/2018 | 2.14 |
| 07/12/2018 | 2.17 |
| 07/13/2018 | 2.16 |
| 07/16/2018 | 2.19 |
| 07/17/2018 | 2.19 |
| 07/18/2018 | 2.17 |
| 07/19/2018 | 2.16 |
| 07/20/2018 | 2.16 |
| 07/23/2018 | 2.19 |
| 07/24/2018 | 2.19 |
| 07/25/2018 | 2.20 |
| 07/26/2018 | 2.19 |
| 07/27/2018 | 2.20 |
| 07/30/2018 | 2.21 |
| 07/31/2018 | 2.21 |
| 08/01/2018 | 2.22 |
| 08/02/2018 | 2.22 |
| 08/03/2018 | 2.23 |
| 08/06/2018 | 2.23 |
| 08/07/2018 | 2.23 |
| 08/08/2018 | 2.24 |
| 08/09/2018 | 2.25 |
| 08/10/2018 | 2.23 |
| 08/13/2018 | 2.22 |
| 08/14/2018 | 2.25 |
| 08/15/2018 | 2.23 |
| 08/16/2018 | 2.24 |
| 08/17/2018 | 2.24 |
| 08/20/2018 | 2.25 |
| 08/21/2018 | 2.25 |
| 08/22/2018 | 2.24 |
| 08/23/2018 | 2.23 |
| 08/24/2018 | 2.25 |
| 08/27/2018 | 2.25 |
| 08/28/2018 | 2.28 |
| 08/29/2018 | 2.28 |
| 08/30/2018 | 2.28 |
| 08/31/2018 | 2.28 |
| 09/04/2018 | 2.29 |
| 09/05/2018 | 2.30 |
| 09/06/2018 | 2.30 |
| 09/07/2018 | 2.30 |
| 09/10/2018 | 2.32 |
| 09/11/2018 | 2.31 |
| 09/12/2018 | 2.33 |
| 09/13/2018 | 2.33 |
| 09/14/2018 | 2.33 |
| 09/17/2018 | 2.35 |
| 09/18/2018 | 2.36 |
| 09/19/2018 | 2.36 |
| 09/20/2018 | 2.37 |
| 09/21/2018 | 2.38 |
| 09/24/2018 | 2.38 |
| 09/25/2018 | 2.38 |
| 09/26/2018 | 2.37 |
| 09/27/2018 | 2.37 |
| 09/28/2018 | 2.36 |
| 10/01/2018 | 2.40 |
| 10/02/2018 | 2.41 |
| 10/03/2018 | 2.41 |
| 10/04/2018 | 2.42 |
| 10/05/2018 | 2.41 |
| 10/09/2018 | 2.46 |
| 10/10/2018 | 2.45 |
| 10/11/2018 | 2.44 |
| 10/12/2018 | 2.44 |
| 10/15/2018 | 2.47 |
| 10/16/2018 | 2.46 |
| 10/17/2018 | 2.47 |
| 10/18/2018 | 2.47 |
| 10/19/2018 | 2.48 |
| 10/22/2018 | 2.49 |
| 10/23/2018 | 2.48 |
| 10/24/2018 | 2.47 |
| 10/25/2018 | 2.47 |
| 10/26/2018 | 2.47 |
| 10/29/2018 | 2.49 |
| 10/30/2018 | 2.48 |
| 10/31/2018 | 2.49 |
| 11/01/2018 | 2.49 |
| 11/02/2018 | 2.50 |
| 11/05/2018 | 2.51 |
| 11/06/2018 | 2.52 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| | |
|---|---|
| 11/07/2018 | 2.51 |
| 11/08/2018 | 2.52 |
| 11/09/2018 | 2.52 |
| 11/13/2018 | 2.53 |
| 11/14/2018 | 2.52 |
| 11/15/2018 | 2.51 |
| 11/16/2018 | 2.50 |
| 11/19/2018 | 2.52 |
| 11/20/2018 | 2.51 |
| 11/21/2018 | 2.52 |
| 11/23/2018 | 2.52 |
| 11/26/2018 | 2.54 |
| 11/27/2018 | 2.53 |
| 11/28/2018 | 2.53 |
| 11/29/2018 | 2.52 |
| 11/30/2018 | 2.52 |
| 12/03/2018 | 2.56 |
| 12/04/2018 | 2.58 |

Fuente:
Consejo de la Reserva Federal. Tesoro de 6 meses
Tipo de vencimiento constante (serie DGS6MO)

# Anexo 5

**CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES**

**Saint-Gobain Performance Plastics Europe**
Demandada en Anulación

**c.**

**República Bolivariana de Venezuela**
Demandante en Anulación

**(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación**

---

### ORDEN DE PROCEDIMIENTO NRO. 2

*Miembros del Comité*
Prof. Ricardo Ramírez Hernández, presidente de la Comité *ad hoc*
Sra. Olufunke Adekoya, miembro de la Comité *ad hoc*
Prof. Lawrence Boo, miembro de la Comité *ad hoc*

*Secretario del Comité*
Sr. Francisco Grob

---

24 de octubre de 2018

*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

## I. INTRODUCCIÓN

1. De conformidad con las Reglas de Arbitraje 19 y 53 del CIADI, esta orden de procedimiento aborda la sede del arbitraje, la suspensión de la ejecución del Laudo y la suspensión del procedimiento.

## II. ANTECEDENTES DE ESTA ORDEN

2. Venezuela presentó su Solicitud de Anulación el 5 de marzo de 2018. Al mismo tiempo, Venezuela pidió que la ejecución del Laudo quedara suspendida hasta que la Solicitud fuera resuelta.

3. El 12 de marzo de 2018, el Secretario General en funciones registró la Solicitud de Venezuela y notificó a las partes que la ejecución del Laudo quedaba suspendida provisionalmente, de conformidad con la Regla 54(2) de las Reglas de Arbitraje del CIADI.

4. El Comité se constituyó el 7 de junio de 2018 y el 13 de junio de 2018 la Secretaría solicitó que la Demandante efectuara el primer pago anticipado de US$ 250.000 que vencía en 30 días.

5. El 14 de junio de 2018, la Demandada en Anulación (Saint-Gobain) envió una carta en la que alegaba que, salvo que la Demandante (Venezuela) demostrara que se daban las circunstancias que exigían la continuación de la suspensión de la ejecución, la suspensión debería levantarse automáticamente en un plazo de 30 días desde la constitución del Comité; esto es, llegado el día 7 de julio de 2018.

6. El 27 de junio de 2018, Venezuela notificó al Comité que se oponía a la postura adoptada por Saint-Gobain y que pediría la continuación de la suspensión de la ejecución del Laudo.

7. Mediante carta de fecha 5 de julio de 2018, el Comité confirmó que la Primera Sesión se celebraría en las instalaciones del Banco Mundial en París, el 21 de agosto de 2018, e invitó a las partes a que acordaran un calendario procesal antes del 9 de julio de 2018, y, conforme a lo previsto en la Regla de Arbitraje 54(2) del CIADI, decidió mantener la suspensión provisional de la ejecución del Laudo hasta que tuviera la oportunidad de examinar las posturas alegadas por las partes y de adoptar la resolución pertinente.

8. El 6 de julio de 2018, las partes presentaron al Comité el calendario procesal acordado, conforme al cual la Demandante presentaría su Memorial en Apoyo de la Continuación de la Suspensión antes del 25 de julio de 2018, y la Demandada en Anulación presentaría su Contramemorial antes del 13 de agosto de 2018.

9. El 11 de julio de 2018, y en virtud de las instrucciones recibidas del Comité, el Secretario del Comité envió a las partes un borrador del orden del día relativo a la Primera Sesión y un borrador de la Orden de Procedimiento nro. 1.

10. El 25 de julio de 2018, de conformidad con el calendario procesal acordado por las partes, la Demandante presentó su Memorial en Apoyo de la Continuación de la Suspensión. Ese mismo día, se les informó a las partes de que el CIADI todavía no había recibido el primer pago anticipado de US$ 250.000, conforme a lo solicitado en su carta de 13 de junio de 2018. El Presidente del Comité propuso a la Demandante que informara al Comité antes del 30 de julio de 2018 sobre (a) los actos que había realizado para efectuar el pago y (b) la fecha estimada en la que el CIADI podría esperar recibir dicho pago.

Case 1:20-cv-00129-RC    Document 9-3    Filed 04/24/19    Page 694 of 703
*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

11.  El 30 de julio de 2018, el abogado de la Demandante notificó al Comité que estaba a la espera de recibir las instrucciones de Venezuela y que contestaría en cuanto tuviera la respuesta.

12.  El 1 de agosto de 2018, el Comité instó a Venezuela a que proporcionara información adicional en relación con los actos realizados para efectuar el pago anticipado, solicitado por el CIADI en su carta de 13 de junio de 2018. Salvo que el pago fuera recibido antes del 10 de agosto de 2018, la Primera Sesión tendría que ser aplazada.

13.  Ese mismo día, Saint-Gobain solicitó que si Venezuela no efectuaba el pago antes de la fecha límite impuesta por el Comité, la suspensión provisional de la ejecución del Laudo tendría que ser levantada automáticamente.

14.  El 10 de agosto de 2018, el Comité instó a Venezuela a que aportara pruebas de haber transferido los fondos tan pronto como le fuera posible, pero a más tardar antes del 13 de agosto. En esa misma comunicación, el Comité informó a las partes de que la fecha de la Audiencia en París quedaba anulada hasta nuevo aviso.

15.  El 13 de agosto de 2018, Venezuela informó al Comité de que el pago anticipado todavía no se había efectuado debido a motivos de carácter administrativo, y que el pago se estaba procesando. Ese mismo día, el Comité estimó la solicitud de Venezuela de contestar a la carta de Saint-Gobain de 1 de agosto. Asimismo, ese mismo día, Saint-Gobain presentó su Contramemorial de Oposición a la Continuación de la Suspensión de la Ejecución del Laudo.

16.  El 15 de agosto de 2018, Venezuela presentó una contestación a la carta de Saint-Gobain del 1 de agosto. El 17 de agosto de 2018, Saint-Gobain envió una contestación a la carta de Venezuela. El 20 de agosto de 2018, Venezuela presentó una contestación a la carta de Saint-Gobain de 17 de agosto y reiteró su postura que figuraba en su carta de 15 de agosto.

17.  El 21 de agosto de 2018, el Comité celebró su primera sesión a través de una teleconferencia con la participación con sus miembros, de conformidad con la Regla de Arbitraje 13(1) del CIADI. El Comité debatió sobre varias cuestiones procesales abordadas por las partes en sus escritos presentados. El Comité instó a las partes a que presentaran sus posturas en la que abordaran la suspensión de la ejecución y la propuesta de cada Parte en relación con la sede del arbitraje de conformidad con el apartado 10 del borrador de la Orden de Procedimiento nro. 1. Ese mismo día, el CIADI instó a cualquiera de las partes a que pagara el monto pendiente de US$ 250.000, y señaló que si el pago no se efectuaba, el procedimiento quedaría suspendido.

18.  El 5 de septiembre de 2018, Venezuela presentó una contestación en Apoyo de la Continuación de la Suspensión de la Ejecución. También detalló los motivos para proponer París como la sede de celebración del procedimiento.

19.  El 14 de septiembre de 2018, Saint-Gobain presentó una dúplica para reafirmarse en su oposición a la Continuación de la Suspensión de la Ejecución. También expuso los motivos que subyacían en su preferencia por Washington D.C. como la sede de celebración del procedimiento.

*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

20.    El 28 de septiembre de 2018, el Comité dictó la Orden de Procedimiento nro. 1 relativa a varios aspectos organizativos del procedimiento.

21.    Puesto que no se había recibido ningún pago, el 23 de octubre el Secretario General del CIADI solicitó que este Comité suspendiera el procedimiento relativo a este caso, de conformidad con la Regla 14 del Reglamento Administrativo y Financiero del Centro.

III.    **S**EDE DE CELEBRACIÓN DEL ARBITRAJE

22.    Venezuela propone que la sede de celebración del procedimiento sea París (Francia). París es una sede de celebración de arbitrajes mundialmente conocida y la ciudad tiene una ubicación ideal teniendo en cuenta la localización geográfica de las partes y de los miembros del Comité *ad hoc*. Además, dichas consideraciones son relevantes de cara a los costos y podrían influir en los pagos anticipados necesarios, que constituyen la responsabilidad de Venezuela.

23.    Saint-Gobain sostiene que Washington, D.C. debería ser la sede de celebración del procedimiento. La audiencia relativa al arbitraje subyacente tuvo lugar en Washington, D.C. que es el lugar por defecto de celebración de procedimientos del CIADI en ausencia de acuerdo en contrario. La decisión de Venezuela de contratar a un nuevo abogado en París no constituye ningún motivo para incrementar los costos de Saint-Gobain en este sentido.

24.    El Comité observa que de conformidad con el artículo 62 del Convenio, los procedimientos *se tramitarán* en la sede del Centro (el subrayado es nuestro), lo cual se aplica *mutatis mutandis* al presente procedimiento de anulación en virtud del artículo 52(4). Aunque el artículo 63 permite una excepción conforme a la cual el Comité podrá tramitar sus procedimientos en otra sede *(por ejemplo,* en la sede de la Corte Permanente de Arbitraje o en cualquier otro lugar), dicha excepción solo sería aplicable "si las partes se pusieran de acuerdo". En el caso que nos ocupa, no se ha llegado a ningún acuerdo en este sentido. En consecuencia, el procedimiento se tramitará en la sede del Centro en Washington, D.C.

IV.    **S**USPENSIÓN DE LA EJECUCIÓN DEL **L**AUDO

25.    Vistos los argumentos de las partes y habiendo deliberado por varios medios, el Comité considera que no existe ninguna circunstancia que justifique la suspensión de la ejecución del Laudo. En consecuencia, la suspensión se levanta.

26.    El Comité proporcionará su razonamiento por escrito una vez recibido el anticipo pendiente de pago.

V.    **S**USPENSIÓN DEL **P**ROCEDIMIENTO DE **A**NULACIÓN

27.    De conformidad con la Regla 14(3)(e) del Reglamento Administrativo y Financiero del CIADI, un demandante en anulación asume plena responsabilidad de efectuar los pagos anticipados relativos a los costos (sin perjuicio de una decisión posterior adoptada por el Comité en relación con la asignación de los costos entre las partes). Dichos pagos anticipados son necesarios para sufragar los costos en los que incurra el Centro y para pagar los honorarios y gastos de los miembros del Comité.

*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

28.     En el caso que nos ocupa, a Venezuela se le solicitó que proporcionara información actualizada con respecto a la situación del pago anticipado. Venezuela ha reiterado su disposición de efectuar el pago, si bien los fondos no se han recibido. Mientras tanto, el Comité ha celebrado la Primera Sesión y adoptado dos órdenes de procedimiento, incluida la presente.

29.     En este momento, el pago lleva un retraso de 14 semanas y el Secretario General del CIADI ha solicitado que este Comité suspenda el procedimiento. Por otro lado, la Demandante no ha proporcionado ninguna indicación específica en cuanto a la fecha prevista para recibir el pago.

30.     En consecuencia, hasta que se reciba el pago, el Comité suspenderá el procedimiento conforme a lo dispuesto en la Regla 14 del Reglamento Administrativo y Financiero del Centro. No sería adecuado que en las circunstancias actuales el Centro continuara incurriendo en costos y que los miembros del Comité siguieran devengando honorarios.

## VI.   ORDEN

31.     En consecuencia, por medio de la presente el Comité elige Washington, D.C. como la sede de celebración del procedimiento; desde hoy, 24 de octubre de 2018, levanta la suspensión de la ejecución del Laudo, y suspende el procedimiento hasta que se reciba el pago anticipado solicitado el 13 de junio de 2018.


En nombre del Comité,


_____
Ricardo Ramírez Hernández
Presidente del Comité

# ANTE EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
# PARA EL DISTRITO DE DELAWARE

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

        Demandante,

    c.

REPÚBLICA BOLIVARIANA
DE VENEZUELA; PETRÓLEOS
DE VENEZUELA, S.A.,

        Demandadas.

Procedimiento Civil Nro.: 18-cv-1963-UNA

---

## DECLARACIÓN DE DIVULGACIÓN CORPORATIVA

De conformidad con la regla 7.1 de la Ley federal de enjuiciamiento civil (*Federal Rule of Civil Procedure*), la Demandante, Saint-Gobain Performance Plastics Europe ("Saint-Gobain" o "Demandante") es una sociedad constituida con arreglo a la legislación de la República Francesa. Saint-Gobain es propiedad al 100 % de Societé de Participations Financières et Industrielles, que a su vez es propiedad al 100 % de Compagnie de Saint-Gobain. Ninguna otra sociedad tiene una participación societaria del 10 % o mayor en las acciones de Saint-Gobain.

Fecha: 13 de diciembre de 2018          PACHULSKI STANG ZIEHL & JONES LLP

*/firmado/ Laura Davis Jones* _____
Laura Davis Jones (nro. de colegiación: 2436)
Peter J. Keane (nro. de colegiación: 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Teléfono: (302) 652-4100
Fax: (302) 652-4400
Correo electrónico: ljones@pszjlaw.com
                                    pkeane@pszjlaw.com


- y -

Alex Yanos, *pro hac vice pendiente*
Carlos Ramos-Mrosovsky, *pro hac vice pendiente*
Rajat Rana, *pro hac vice pendiente*
ALSTON & BIRD LLP
90 Park Avenue
Nueva York, NY 10016
Tel.: 202-210-9400
Fax: 212-210-9444
Correo electrónico: alex.yanos@alston.com
         carlos.ramos-mrosovsky@alston.com
         rajat.rana@alston.com

*Abogada de la Demandante, Saint-Gobain Performance Plastics Europe*

OFICINA DEL SECRETARIO
**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS**
DISTRITO DE DELAWARE

John A. Cerino
SECRETARIO DEL TRIBUNAL

844 North King Street, Unit 18
Wilmington, DE 19801-3570
www.ded.uscourts.gov
(302) 573-6170

# DISTRITO DE DELAWARE
# REGLA LOCAL 73.1
**Jueces de Instancia (*Magistrate Judges*); juicio por consentimiento**

Previo consentimiento de las partes, el Juez de Instancia (*Magistrate Judge*) podrá celebrar un juicio con o sin jurado en el marco de cualquier demanda civil, y ordenar que se dicte sentencia definitiva de conformidad con el § 636 (c) del título 28 del Código de los Estados Unidos (U.S.C.), y los artículos 73 a 76 de la Ley Federal de Enjuiciamiento Civil *(Fed. R. Civ. P.)*. En el curso de la tramitación del procedimiento en el marco de una demanda civil en virtud del consentimiento de las partes, un Juez de Instancia podrá conocer y resolver sobre la totalidad de las mociones anteriores y posteriores al juicio, incluidas las mociones dispositivas.

(a) El Secretario notificará a las partes en todos los casos que podrán aceptar que un Juez de Instancia tramite la totalidad de los procedimientos relativos al caso y que ordene que se dicte sentencia definitiva.

(b) **El Secretario no aceptará ningún formulario de consentimiento a efectos de la presentación, salvo que este haya sido firmado por la totalidad de las partes del caso**. El Demandante será el responsable de asegurar la formalización y la presentación de dicho formulario de consentimiento. No se facilitará ningún formulario de consentimiento, ni se dará a conocer su contenido, a ningún Juez de Distrito ni a Juez de Instancia, salvo que la totalidad de las partes mencionadas hayan consentido en que el procedimiento se remita a un Juez de Instancia.

(c) El formulario de consentimiento se presentará al Secretario antes de la audiencia preliminar como máximo, salvo que se disponga otra cosa.

(d) Una vez formalizado y presentado el formulario de consentimiento, el Secretario se lo comunicará al Juez del Tribunal de Distrito al que se le haya asignado el caso. A discrecionalidad del Juez de Distrito, el Secretario preparará una orden, para que el Juez de Distrito la firme, por medio de la cual el caso será remitido al Juez de Instancia. Una vez remitido el caso, el Juez de Instancia será competente para tramitar cualquier procedimiento con respecto al cual las partes hayan prestado su consentimiento, y para dar instrucciones al Secretario a efectos de dictar sentencie definitiva, como si el procedimiento lo presidiera un Juez de Distrito.

# T<small>RIBUNAL DE</small> D<small>ISTRITO DE LOS</small> E<small>STADOS</small> U<small>NIDOS</small>

para el

Distrito de Delaware

| | | |
|---|---|---|
| _____ | ) | |
| *Demandante* | ) | |
| c. | ) | Procedimiento civil nro.: |
| _____ | ) | |
| *Demandado* | ) | |

## NOTIFICACIÓN, CONSENTIMIENTO Y REMISIÓN DE UN PROCEDIMIENTO CIVIL A UN JUEZ DE INSTANCIA

*Notificación de disponibilidad de un Juez de Instancia.* Un juez federal de Instancia está disponible para presidir en todas las actuaciones en este procedimiento civil (incluido un juicio con jurado o sin jurado) y para ordenar que se dicte una sentencia definitiva. La sentencia podrá ser apelada directamente ante el Tribunal de Apelaciones de los Estados Unidos al igual que cualquier otra sentencia de este tribunal. Un Juez de Instancia puede ejercer su competencia únicamente si todas las partes dan su consentimiento para ello de forma voluntaria.

Usted podrá dar su consentimiento para que su caso sea remitido a un Juez de Instancia, o podrá negarse a dar su consentimiento sin sufrir consecuencias negativas sustantivas. El nombre de las partes que no accedan a dar su consentimiento no le será revelado a ningún juez que de algún modo pudiese ocuparse de su caso.

*Consentimiento relativo a la competencia de un Juez de Instancia.* Las siguientes partes dan su consentimiento para que un juez federal de instancia realice todas las actuaciones en esta causa, lo que incluye celebrar el juicio, dictar la sentencia definitiva y realizar todas las actuaciones posteriores al juicio.

*Nombres de las partes con letra de imprenta*      *Firmas de las partes o de los abogados*      *Fechas*

_____      _____      _____

_____      _____      _____

_____      _____      _____

### Orden de remisión

**SE ORDENA**: que esta causa sea remitida a un juez federal de instancia para que lleve a cabo todas las actuaciones y ordene que se dicte una sentencia definitiva de conformidad con el § 636(c) del título 28 U.S.C. y el artículo 73 Fed. R. Civ. P.

Fecha:_____      _____

*Firma del Juez de Distrito*

_____

*Nombre y cargo en letra de imprenta*

Nota: entréguele este formulario al secretario del tribunal únicamente si accede a que un juez federal de instancia ejerza su competencia en su caso. No le entregue este formulario a ningún juez.

AO 85A (Rev. 01/09) Notificación, consentimiento y remisión de una moción dispositiva a un Juez de Instancia

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
para el
Distrito de Delaware

| | | |
|---|---|---|
| _____ ) | | |
| **Demandante** ) | | |
| c. ) | Procedimiento civil nro.: | |
| _____ ) | | |
| **Demandado** ) | | |

### NOTIFICACIÓN, CONSENTIMIENTO Y REMISIÓN DE UNA MOCIÓN DISPOSITIVA A UN JUEZ DE INSTANCIA

*Notificación de disponibilidad de un Juez de Instancia*. Un juez federal de instancia de este tribunal está disponible para tramitar todas las actuaciones y disponer que se dicte una orden definitiva dispositiva de cada moción. Un Juez de Instancia puede ejercer su competencia únicamente si todas las partes dan su consentimiento para ello de forma voluntaria.

Usted podrá dar su consentimiento para que sus mociones sean remitidas a un Juez de Instancia, o podrá negarse a dar su consentimiento sin sufrir consecuencias negativas sustantivas. El nombre de las partes que no accedan a dar su consentimiento no le será revelado a ningún juez que de algún modo pudiese ocuparse de su caso.

*Consentimiento a efectos de que un Juez de Instancia examine mociones dispositivas*. Las siguientes partes dan su consentimiento para que un juez federal de instancia realice todas las actuaciones y dicte una orden definitiva en relación con cada moción que se menciona abajo *(identifique cada moción con número de documento y título).*

**Mociones:** _____

_____

_____

| *Nombres de las partes con letra de imprenta* | *Firmas de las partes o de los abogados* | *Fechas* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Orden de remisión

SE ORDENA: que las mociones sean remitidas a un juez federal de instancia para que realice todas las actuaciones y dicte una orden definitiva sobre las mociones arriba mencionadas, de conformidad con el § 636(c) del título 28 U.S.C.

Fecha: _____           _____

                                                                    *Firma del Juez de Distrito*

                                                          _____

                                                                    *Nombre y cargo en letra de imprenta*

Nota: entréguele este formulario al secretario del tribunal únicamente si accede a que un juez federal de instancia ejerza su competencia en su caso. No le entregue este formulario a ningún juez.




**T** 718 384 8040
**F** 718 388 3516
**E** info@targemtranslations.com
**W** TargemTranslations.com

**TRADUCCIÓN CERTIFICADA**

Yo, Seth Candland, en Targem Translations, Inc., ubicada en 143 Rodney Street en Brooklyn, Nueva York, una empresa de servicios lingüísticos con un historial de más de 50 años en brindar servicios lingüísticos expertos a la comunidad empresarial y jurídica, y con fluidez en los idiomas español e inglés, certifico por la presente, que nuestro equipo de traductores, editores y correctores están capacitados profesionalmente y tienen amplia experiencia en el suministro de traducciones profesionales, del inglés al español y viceversa; y que, bajo mi supervisión, han traducido de manera precisa y completa los documentos a los que se hace referencia como —(1) una citación judicial en una acción civil – PDVSA; (2) una citación judicial en una acción civil – Venezuela; (3) Demanda solicitando el registro y la ejecución de un laudo del CIADI como una sentencia extranjera; (4) Declaración de Alexander A. Yanos; (5) los Anexos 4 y 5; (6) Regla 7.1 Declaración Corporativa; y (7) Notificación de Derecho a Prestar Consentimiento para Juicio ante un Juez Magistrado— desde el inglés hasta el idioma español hasta el mejor de sus conocimientos y experiencia.

Fecha: 14 de diciembre de 2018

_____
Seth Candland

_____
Signature of Notary

ROCHAL WEISS
NOTARY PUBLIC-STATE OF NEW YORK
No 01WE6293785
Qualified in Kings County
My Commission Expires 12-16-2021



**TARGEM**
**TRANSLATIONS**

718 384 8040
718 388 3516
info@targemtranslations.com
TargemTranslations.com

## CERTIFIED TRANSLATION

I, Seth Candland, at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language service firm with a track record of providing expert language services to the business and legal community of more than 50 years, and being fluent in the Spanish and English languages, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from English to Spanish and vice versa; and that they have under my supervision accurately and completely translated the documents referenced as — (1) Judicial Summons in a Civil Action – PDVSA; (2) Judicial Summons in a Civil Action – Venezuela; (3) Complaint Seeking Registration and Enforcement of an ICSID Award as a Foreign Judgment; (4) Declaration of Alexander A. Yanos; (5) Exhibits 4 & 5 thereto; (6) Rule 7.1 Corporate Disclosure Statement; and (7) Notice of Right to Consent to Proceedings before a Magistrate Judge — from English into the Spanish language to the best of their expertise and experience.

Date: December 14, 2018

_____
Seth Candland

_____
Signature of Notary

ROCHAL WEISS
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WE6293785
Qualified in Kings County
My Commission Expires 12-16-2021

**TARGEM TRANSLATIONS | Headquarters**
143 Rodney Street, Brooklyn, NY 11211

**OFFICES** | New York, California, and Asia

