IN THE UNITED STATES DISTRICT COURT
                    IN AND FOR THE DISTRICT OF DELAWARE

CRYSTALLEX INTERNATIONAL CORP.,
                                    :      CIVIL ACTION
            Plaintiff,              :
v                                   :
                                    :
PETRÓLEOS DE VENEZUELA, S.A.;       :
PDV HOLDING, INC.; and CITGO HOLDING,:
INC., f/k/a PDV America, Inc.,      :
                                    :      NO. 15-1082-LPS
            Defendants.             :
----------------------------------------
CONOCOPHILLIPS PETROZUATA B.V.,     :
PHILLIPS PETROLEUM COMPANY VENEZUELA :    CIVIL ACTION
LIMITED, CONOCOPHILLIPS GULF OF PARIA:
B.V. and CONOCOPHILLIPS HAMACA B.V., :
                                    :
            Plaintiffs,             :
v                                   :
                                    :
PETRÓLEOS DE VENEZUELA, S.A.; PDV    :
HOLDING, INC.; CITGO HOLDING, INC.,  :
and CITGO PETROLEUM CORPORATION,     :
                                    :      NO. 16-904-LPS
            Defendants.             :
----------------------------------------
CRYSTALLEX INTERNATIONAL CORP.,
                                    :      CIVIL ACTION
            Plaintiff,              :
v                                   :
                                    :
PDV HOLDING, INC.; PETRÓLEOS DE      :
VENEZUELA, S.A.; ROSNEFT TRADING     :
S.A.; and GLAS AMERICAS, LLC,        :
                                    :      NO. 16-1007-LPS
            Defendants.
                                        - - -

                        Wilmington, Delaware
                      Wednesday, November 13, 2019
                      *In-Court Status Conference*


                              - - -

BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

                              - - -

(Captions continued on page 2)

```
--------------------------------------
CONOCOPHILLIPS PETROZUATA B.V.,        :
PHILLIPS PETROLEUM COMPANY VENEZUELA   :    CIVIL ACTION
LIMITED, CONOCOPHILLIPS GULF OF PARIA  :
B.V. and CONOCOPHILLIPS HAMACA B.V.,   :
                                       :
          Plaintiffs,                  :
v                                      :
                                       :
PETRÓLEOS DE VENEZUELA, S.A., PDVSA     :
PETRÓLEO, S.A., PDV HOLDING, INC.,      :
and ROSNEFT TRADING S.A.,               :
                                       :    NO. 17-28-LPS
          Defendants                   :
--------------------------------------
CONOCOPHILLIPS PETROZUATA B.V.,        :
PHILLIPS PETROLEUM COMPANY VENEZUELA   : MISCELLANEOUS ACTION
LIMITED, CONOCOPHILLIPS GULF OF PARIA  :
B.V. and CONOCOPHILLIPS HAMACA B.V.,   :
                                       :
          Plaintiffs,                  :
v                                      :
                                       :
PETRÓLEOS DE VENEZUELA, S.A., PDVSA     :
PETRÓLEO, S.A., PDV HOLDING, INC.,      :
and ROSNEFT TRADING S.A.,               :
                                       :    NO. 17-151-LPS
          Defendants                   :
--------------------------------------
SAINT-GOBAIN PERFORMANCE PLASTICS      :
EUROPE,                                :   MISCELLANEOUS ACTION
          Petitioner,                  :
v                                      :
                                       :
BOLIVARIAN REPUBLIC OF VENEZUELA;      :
PETRÓLEOS DE VENEZUELA, S.A.,           :
                                       :    NO. 18-343-LPS
          Respondents.                 :
--------------------------------------
SAINT-GOBAIN PERFORMANCE PLASTICS      :
EUROPE,                                :    CIVIL ACTION
          Petitioner,                  :
v                                      :
                                       :
BOLIVARIAN REPUBLIC OF VENEZUELA;      :
PETRÓLEOS DE VENEZUELA, S.A.,           :
                                       :    NO. 18-1963-LPS
          Respondents.                 :
--------------------------------------
(Captions continued on next page)
```

```
---------------------------------------
OI EUROPEAN GROUP B.V.,              :
                                     :   CIVIL ACTION
          Plaintiff,                 :
v                                    :
                                     :
BOLIVARIAN REPUBLIC OF VENEZUELA;    :
PETRÓLEOS DE VENEZUELA, S.A.; PDV    :
HOLDING, INC.; CITGO HOLDING, INC.;  :
CITGO PETROLEIM CORPORATION; GLAS    :
AMERICAS LLC, in its capacity as     :
collateral trustee; MUFG UNION BANK, :
N.A., in its capacity as indenture   :
trustee; and ROSNEFT TRADING, S.A.,  :
ORLANDO CHACIN; JESUS LUONGO; ANTON  :
CASTILLO; EULOGIO DEL PINO;          :
and MARIA DEL CARMEN MARTINEZ;       :
                                     :   NO. 19-290-LPS
          Defendants.                :
---------------------------------------
OI EUROPEAN GROUP B.V.,              :
                                     :   MISCELLANEOUS ACTION
          Plaintiff,                 :
v                                    :
                                     :
BOLIVARIAN REPUBLIC OF VENEZUELA;    :
                                     :   NO. 19-290-LPS
          Defendant.                 :
---------------------------------------

APPEARANCES:


          RICHARDS LAYTON & FINGER, P.A.
          BY:  JEFFREY L. MOYER, ESQ.

               and

          GIBSON, DUNN & CRUTCHER, LLP
          BY:  ROBERT L. WEIGEL, ESQ.,
               JASON MYATT, ESQ., and
               RAHIM MOLOO, ESQ.
               (New York, New York)

               and


                         Brian P. Gaffigan
                         Registered Merit Reporter
```

APPEARANCES:   (Continued)


            GIBSON, DUNN & CRUTCHER, LLP
            BY:  LUCAS C. TOWNSEND, ESQ.
                 (Washington, District of Columbia)

                    Counsel for Crystallex
                    International Corp.


            ABRAMS & BAYLISS
            BY:  A. THOMPSON BAYLISS, ESQ.

                 and

            MUNGER TOLLES & OLSON, LLP
            BY:  DONALD B. VERRILLI, JR., ESQ.
                 (Washington, District of Columbia)

                 and

            ARNOLD & PORTER
            BY:  KENT A. YALOWITZ, ESQ.
                 (New York, New York)

                 and

            ARNOLD & PORTER
            BY:  ELI WHITNEY DEBEVOISE, II, ESQ.
                 STEPHEN K. WIRTH, ESQ., and
                 SAMUEL F. CALLAHAN, ESQ.
                 (Washington, District of Columbia)

                 and

            SULLIVAN & CROMWELL, LLP
            BY:  JOSEPH E. NEUHAUS, ESQ., and
                 JAMES L. BROMLEY, ESQ.
                 (New York, New York)

                    Counsel for Bolivarian Republic of
                    Venezuela


            MORRIS JAMES, LLP
            BY:  CARL N. KUNZ, III, ESQ.

                    Counsel for Blackrock bondholder

APPEARANCES:   (Continued)


                    MORRIS NICHOLS ARSHT & TUNNELL, LLP
                    BY:   ALEXANDRA CUMINGS, ESQ.

                          and

                    EIMER STAHL, LLP
                    BY:   NATHAN P. EIMER, ESQ.,
                          RYAN J. WALSH, ESQ., and
                          GREGORY M. SCHWEIZER, ESQ.
                          (Chicago, Illinois)

                              Counsel for PDV Holdings, Inc.,
                              CITGO Holding, Inc., and CITGO
                              Petroleum Corporation


                    HEYMAN ENERIO GATTUSO & HIRZEL, LLP
                    BY:   SAMUEL T. HIRZEL, II, ESQ.

                          and

                    CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
                    BY:   JOSEPH D. PIZZURRO, ESQ., and
                          JULIA B. MOSSE, ESQ.
                          (New York, New York)

                              Counsel for Petroleos de Venezuela, S.A.


                    ROSS ARONSTAM & MORITZ, LLP
                    BY:   GARRETT MORITZ, ESQ.

                          and

                    KOBRE & KIM, LLP
                    BY:   MARCUS A. GREEN, ESQ.
                          (New York, New York)

                              Counsel for ConocoPhillips Petrozuata B.V.,
                              Phillips Petroleum Company Venezuela
                              Limited, ConocoPhillips Gulf of Paria
                              B.V., and ConocoPhillips Hamaca B.V.

APPEARANCES:   (Continued)


                DLA PIPER (US), LLP
                BY:  AMY EVANS, ESQ.


                      and


                DLA PIPER (US), LLP
                BY:  JOHN VULKELJ, ESQ.
                     (New York, New York)


                      and


                NORTON ROSE FULBRIGHT
                BY:  MARK THOMAS OAKES, ESQ.
                     (Austin, Texas)


                        Counsel on behalf of Rosneft Trading S.A.


                PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
                BY:  DANIEL A. MASON, ESQ.


                      and


                PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
                BY:  WALTER RIEMAN, ESQ.
                     (New York, New York)


                        Counsel on behalf of MUFG Union Bank
                        and Glas Americas LLC


                PACHULSKI STANG ZIEHL YOUNG & JONES, LLP
                BY:  LAURA DAVIS JONES, ESQ.


                      and


                ALSTON & BIRD
                BY:  CARLOS RAMOS-MROSOVSKY, ESQ.
                     (New York, New York)


                        Counsel for Saint-Gobain Performance
                        Plastics Europe

APPEARANCES:   (Continued)


            MORGAN LEWIS & BOCKIUS, LLP
            BY:   JODY C. BARILLARE, ESQ.

                  and

            MORGAN LEWIS & BOCKIUS, LLP
            BY:   P. SABIN WILLETT, ESQ., and
                  CHRISTOPHER L. CARTER, ESQ.
                  (Boston, Massachusetts)

                       Counsel on behalf of
                       OI European Group B.V.


            HOGAN LOVELLS
            BY:   SCOTT R. HAIBER, ESQ.
                  (Baltimore, Maryland)

                  and

            HOGAN LOVELLS
            BY:   DENNIS H. TRACEY, III, ESQ., and
                  ROBIN L. MUIR, ESQ.
                  (New York, New York)

                       Counsel on behalf of PDVSA

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following status conference was held in chambers, beginning at 4:12 p.m.)

THE COURT:  Good afternoon, everyone.

(The attorneys respond, "Good afternoon, Your Honor.)

THE COURT:  All right.  So I know we are here on many actions, and there are many of you here.  First I apologize for the late start.  There were various matters, including a trial, that ran longer than I had anticipated.

I do want to, though, take the time and have you all formally indicate on the record which actions you are in so let's start with what I'm calling the Crystallex asset proceeding.  It's the 17-151, whoever wants to make an appearance in that case.

MR. MOYER:  Good afternoon, Your Honor.  Jeff Moyer of Richards Layton & Finger on behalf of Crystallex. Your Honor, I have with me my co-counsel, Robert Weigel and Jason Myatt from Gibson, Dunn & Crutcher.  With the Court's permission, Mr. Myatt will speak on behalf of Crystallex today.

THE COURT:  That's fine.  In that action, whoever else is making an appearance.

MR. BAYLISS:  Good afternoon, Your Honor.  Tom

Bayliss on behalf of the Bolivarian Republic of Venezuela. It's my pleasure to Donald Verilli of Munger Tolles & Olson. He is prepared to speak to the issues at the Third Circuit level and above.

It's also my pleasure to introduce Kent Yalowitz of Arnold & Porter. He is here to address the potential 60(b) application at the District Court level.

THE COURT: Okay.

MR. BAYLISS: Thank you, Your Honor.

THE COURT: Thank you.

MR. HIRZEL: Good afternoon, Your Honor.

THE COURT: Good afternoon.

Mr. HIRZEL: Sam Hirzel from Heyman Enerio. I'm here on behalf of PDVSA; and with me at counsel table is Joseph Pizzurro from Curtis Mallet. Your Honor may remember him from prior proceedings.

THE COURT: I do. Thank you.

Good afternoon.

MS. CUMINGS: Good morning, Your Honor. Alexandra Cumings of Morris Nichols here on behalf of PDV Holdings, and Citgo Petroleum. With me at counsel table is Nate Eimer from Eimer Stahl.

THE COURT: Okay.

MR. EIMER: Good afternoon, Your Honor.

THE COURT: Okay. Is there anyone else who

wants to make an appearance in this first action?

Good afternoon.

MS. EVANS:  Good afternoon Your Honor.  Amy Evans from DLA Piper on behalf of Rosneft Trading, potential intervenor; and with me from Norton Rose Fulbright is Mark Oakes.

A RECORDED VOICE:  ... has left the conference.

MS. EVANS:  -- Mr. Oakes has been admitted pro hac.

THE COURT:  I'm sorry.  That was Mr. Oakes; is that right?

MS. EVANS:  Yes.

THE COURT:  Okay.  Thank you.

Good afternoon.

MR. OAKES:  Good afternoon.

THE COURT:  All right.  Anyone else in the Crystallex asset proceeding?

Good afternoon.

MR. MASON:  Good afternoon Your Honor.  Dan Mason of Paul Weiss, Wilmington for a nonparty potential intervenor MUFG Union Bank, NA as indenture trustee under the indenture for PDVSA's 2020 senior secured debt, as well as Glas Americas LLC as collateral agent under the indenture and pledge and security agreement for the same note.  And I'm joined by my colleague from the New York office, Walter

Rieman.

THE COURT:  What was his last name?

MR. MASON:  Walter Rieman.

THE COURT:  Thank you.

MR. MASON:  Thank you, Your Honor.

THE COURT:  Thank you.  Anyone else?

Okay.  Then we have what we call Crystallex I and II, 15-1082 and 16-1007.

Same counsel for Crystallex?

MR. WEIGEL:  Yes, Your Honor.

THE COURT:  Who else?

MR. BAYLISS:  Yes, Your Honor.

THE COURT:  Same?

MR. BAYLISS:  Same counsel.

THE COURT:  Okay.

MR. HIRZEL:  And, Your Honor, Sam Hirzel and Joseph Pizzurro of Curtis Mallet for PDVSA.

THE COURT:  Okay.

MS. EVANS:  Same thing for Rosneft Trading.

THE COURT:  Okay.

MS. CUMINGS:  Same thing for PDV Holdings.

THE COURT:  Okay.

MR. MASON:  And the same thing for the trustee and collateral agents.

THE COURT:  Okay.  Thank you.

Then we have ConocoPhillips I and II, 16-094 and 17-28.

Good afternoon.

MR. MORITZ:  Good afternoon, Your Honor. Garrett Moritz from Ross Aronstam & Moritz on behalf of the ConocoPhillips plaintiffs.  I'm joined by Marcus Green from Kobre & Kim.  And Mr. Green will be addressing the Court today.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

MS. EVANS:  Different co-counsel on this one, Your Honor.  With me is from DLA Piper in New York is John Vukelj; and we will also about representing Rosneft Trading.

THE COURT:  Same Rosneft?

MS. EVANS:  Yes.

Mr. VUKELJ:  Good afternoon.

THE COURT:  Who else?

MR. HIRZEL:  Your Honor, same cast of characters for PDVSA.

THE COURT:  Okay.

MS. CUMINGS:  Same, Your Honor.

THE COURT:  Okay, for PDVH.

Anyone else?

All right.  Then we have OI European Group B.V. versus Bolivarian Republic of Venezuela 19-290.

Good afternoon.

MR. BARILLARE:  Good afternoon, Your Honor. Jody Barillare from Morgan Lewis on behalf of OI European Group, BV.  With me today is Sabin Willett from the Boston office.

MR. WILLETT:  Good afternoon.

MR. BARILLARE:  And Christopher Carter, also from our Boston office.

THE COURT:  Okay.  Good afternoon.

Thank you.

MR. BARILLARE:  Thank you, Your Honor.

MS. EVANS:  Good afternoon again, Your Honor. Amy Evans from DLA Piper on behalf of Rosneft Trading; and this one will also be Mark Oakes from Norton Rose Fulbright. He is been admitted pro hac vice.

THE COURT:  Okay.  Thank you.

MR. BAYLISS:  Your Honor, Tom Bayliss on behalf of the Republic and Joe Neuhaus of Sullivan & Cromwell. Thank you very much.

THE COURT:  Thank you.  Is everyone on that one? No?

MR. MASON:  Your Honor, Dan Mason of Paul Weiss, and my colleague Walter Rieman of Paul Weiss for the trustee and collateral agent.

THE COURT:  Okay.  Thank you.

All right.  And then we have another OI European

Group BV v Bolivarian Republic of Venezuela, 19-mc-290.  Is that all the same folks?

MR. BARILLARE:  Same for OI European, Your Honor.

THE COURT:  Is anybody any different from the last 19-290, which is just a filing coincidence as far as I know?

Okay.  Is there a difference?

MS. CUMINGS:  Not a difference, but just wanted to note our appearance.

THE COURT:  Well, thank you for all that. Obviously, there is a lot of balls being juggled in the air here.  It is my thought it would be helpful to get you all together.

Really, my agenda today is to find out what it is that each of you hope that I do or not do in your particular case and what case that I do it or don't do it.

I'm going to call on you basically in the order that we just went through.  We'll start with the Crystallex asset proceeding and I am happy to hear, although relatively briefly, from everyone who has entered an appearance if they wish.

Yes?

MS. JONES:  Excuse me, Your Honor.  Laura Davis Jones of Pachulski Stang zeal an Jones.  Your Honor, there

was one matter that I don't think Your Honor called, and that was in the Saint-Gobain Performance Plastics, Europe. I may have missed that, Your Honor.  It was Civil Action No. 18-01963.

THE COURT:  18?

MS. JONES:  01963.

THE COURT:  Is that here in the District Court?

MS. JONES:  Yes, sir.

THE COURT:  1963?

MS. JONES:  Yes, sir.

THE COURT:  And I apologize.  I only have limited documents in front of me.  Did we have you on the order for that as well?

MS. JONES:  You did Your Honor.

THE COURT:  All right.  And you are here in that matter for whom?

MS. JONES:  For Saint-Gobain Performance Plastic, Europe.  And I am here with Carlos Ramos-Mrosovsky from Austin & Bird who is here at counsel table.

MR. RAMOS-MROSOVSKY:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. JONES:  Thank you, Your Honor.

THE COURT:  Who else is entering an appearance in that case?

MR. BAYLISS:  Your Honor, it's Tom Bayliss for the Republic; and Mr. Yalowitz, also on behalf of the Republic in that matter.

THE COURT:  Okay.  Thank you.

MR. HAIBER:  Good afternoon, Your Honor.  Scott Haiber of Hogan Lovells for PDVSA.  And with me are my colleagues Dennis Tracey, Robin Muir; and Mr. Tracey will be presenting our argument today.  He has been admitted pro hac vice.

THE COURT:  Okay.  Thank you.  Anyone else in that matter?

Okay.  I have also been reminded we have folks on the phone.  Is anyone -- is there anyone on the phone that is here to make an appearance?

A RECORDED VOICE:  ... has joined the conference.

THE COURT:  I'm going to take that as a no.

All right.  Let's hear from Crystallex, please.

MR. WEIGEL:  Thank you, Your Honor.  Robert Weigel from Gibson Dunn.

Since we have last been before you, Your Honor, we went up to the Third Circuit.  We prevailed.  As you know, the Third Circuit had issued its own stay barely a week before we asked you to impose a stay based upon the fact that we had reached a settlement.  Now, our settlement

blew up very quickly because it required Venezuela to drop its appeal.  It didn't and it filed its appeal papers.  So the Venezuela appeal went forward, PDVSA and Venezuela.

In September, I believe, after the Court had, the Third Circuit ruled in our favor, the appellants or appellees had moved for rehearing, or appellants moved for rehearing.  The brief had been filed.  We had moved to lift the stay in the Third Circuit, and the Third Circuit lifted the stay.

I don't think it is coincidental that Your Honor's stay, which you issued a week after the Third Circuit, was worded identical to the Third Circuit except for the fact that there was also a provision in there about Venezuela making a payment, so there is no reason for this stay to stay in place at this point in time.

The Third Circuit lifted its stay.  All of the arguments that are raised in the joint status report and all the arguments that can be raised I'm sure here today were made to the Third Circuit to lift the identical stay barely a month ago.

THE COURT:  Is the request for reconsideration en banc still pending in the Third Circuit?

MR. WEIGEL:  It is still pending, Your Honor. They asked for briefing from us, and we have heard nothing since.

THE COURT:  And I believe that one or more.

Parties that were interested parties have indicated they don't intend necessarily to stop at the Third Circuit so there may well be further litigation in the Supreme Court.  How do I factor that possibility into whether I --

A RECORDED VOICE:  ... has left the conference.

THE COURT:  (Continuing) -- with my stay?

MR. WEIGEL:  Your Honor, they raise those exact same arguments to the Third Circuit.  All the appeals going forward from here are completely discretionary.  You know, I'm not going to handicap it, but historical averaging would suggest they're not likely to prevail on the rehearing, and that most cases don't get a rate of certiori.

If this one does, we can deal with it at that point in time, but I don't think there is any reason to maintain a stay.  The Third Circuit did not think there was a reason to do a stay in the face of an identical argument. They certainly told the Third Circuit, the Third Circuit had a rehearing petition.  They certainly told the Third Circuit that if they lost, they were going to try to go up to the Court today, the Supreme Court.

So there is some urgency here, too, Your Honor. You know, listening to the cast of characters, one of them is 2020, the bondholders.

Since we were last in front of you, Your Honor, those bonds have gone into default.  There was a payment due of roughly $900 million at the end of October.  It was not made.

Those bonds have a lien on 50.1 percent of the shares of Citgo Holdings.  As Your Honor may recollect, the only asset that we are aware of PDVH, the entity whose shares we have a writ of attachment over, are the shares of Citgo Holdings which then in turn own Citgo Petroleum down the line.  They have a UCC lien on those 50.1 shares.

Currently, the U.S. Government issued an executive order basically staying their ability to proceed until January 22nd of 2020, but if there is no settlement between the 2020s and Venezuela or PDVSA and indeed I would maintain the uncertainty of who is going to ultimately own this whole structure makes the very difficult for someone to commit to pay $900 million to the 2020s if you don't know at the end of the day that you are going to be the person who benefits from this.

So we're in a situation where after all the hard work of this Court and the Third Circuit, more than half the value, and I would suggest that a controlling interest, which is 50.1 percent, is worth more, well more than 50 percent of the value of PDVSA could be lost.  They could conduct a nonjudicial UCT sale.  The only requirement

that they have is that it has to be in commercially reasonable fashion and so that can be done extrajudicially. There is a lawsuit challenging it pending, but, you know, in my experience anyway, challenging UCT liens is very hard to do.

But in any event, there's a very real risk that we will be prejudiced severely if this case stalls and doesn't go anywhere after the Third Circuit has ruled.

And we have no bond, Your Honor, you may remember. Citgo has something like, as of March, I think it was $1.8 billion in cash at the Citgo level. There has been no assertion they can't post a bond to protect us. They just don't wish to do so.

And so we would ask that the stay can be lifted. We would ask that there was -- the writ was never answered. The statute provides that there's 20 days to respond to the writ. On the 19th day, PDVH came in and asked for an extension of time. That motion was never addressed, never got to argument in front of Your Honor. The stays were put in place, but they've had the writ now for something like 14 months.

At bottom, the writ is essentially a simple interrogatory asking them, you know, what property of PDVSA do you have, and we all know that they own a hundred percent of Citgo Holdings -- I'm sorry, that PDVSA owns a hundred

percent of PDVH Holdings.  We know that because it's in securities filings.  We know that because that's what we've been litigating about in the Third Circuit and in this court.

But we're concerned, Your Honor, that they have not answered this writ because it seems to us there's only two possibilities.  One is that it's just a naked attempt at delay because we need that writ answered to then make our motion for a sale, and if it's not just make a delay, we're concerned that there might be some shenanigans going on because, frankly, they engaged in shenanigans before, as Your Honor is well aware.

There was this $2 billion dividend that was paid trying to get money out of the country, so it's a simple matter.  They don't really assert any burden at all and there can be no burden.  They know how many shares.

THE COURT:  All right.  You want me to lift the stay.  You want me to order them to answer the writ.  Are you also asking me to consider imposing a bond?

MR. WEIGEL:  If there's any stay, Your Honor, yes.  Otherwise, we would ask that we be given -- that we set a briefing schedule for our motion to conduct the sale, which we think we can do in a fairly short order.

I would propose, Your Honor, that they answer

this writ by 11/18, which is Monday, that we would file our opening brief on 12/9, December 9th, that they file their opposition on January 10th, and that we would file our reply on January 31st.  So it's basically four weeks for the opposition and three weeks for the reply.

They discussed making a 60(d) motion, Your Honor, and the Third Circuit did say that if they had a legitimate basis for doing so, they could do it.  They expressed some skepticism about whether they should do it or not, but they did say in the order they could.

We would propose -- they want to do it sequentially.  They want to brief the 60(d) motion.  They want to get that to the end and then decide that, hoping that that's going to give them months and months and months of time.

We would suggest that we do it together.  The motions are likely to cover this exact same issues.  Certainly many of the arguments are going to be the same.  They're going to argue something about sanctions.  They're going to argue something about changed circumstances.  So you're going to hear these same arguments twice.

THE COURT:  You would propose the same briefing schedule if they intend to file such a motion?

MR. WEIGEL:  Yes.

THE COURT:  Okay.

MR. WEIGEL:  There's no reason --

THE COURT:  What else?  I've got a lot of people to hear from.

MR. WEIGEL:  Certainly, Your Honor.

THE COURT:  So I've listed four things that you sort of asked me to consider.  Lift the stay or impose a bond, require them to answer the writ, allow you to brief a motion of some sort on how to conduct the sale, and require them to simultaneously brief their 60(d) motion if they are going to file one.

Is there anything else to add to that?

MR. WEIGEL:  No Your Honor.  60(c)(2) requires, allows us, basically says that filing a 60(b) motion does not give them an automatic stay of the judgment.  It does not stay the operation of the judgment.  So if they could make their motion, fine.  Let's do it expeditiously, but it should not hold up filing the sale brief.

THE COURT:  And you've made certain representations about getting approval from OFAC, I think it is, if we go forward.

Where would we be if I go with what you have asked for and now it's early February and everything is briefed?  Maybe we have a hearing.  I resolve those motions. Then where are we at that point?  What else is left to do if you prevail on everything, let's say?

MR. WEIGEL:  If we prevail on everything, Your Honor, what would happen would be, we would propose conducting the sale.  We hired an investment bank.  We're going to do everything we can.

We're going to follow the Delaware procedure exactly, which is advertising twice in the Wilmington paper, but we're also going to seriously advertise the sale, beat the bushes, because it's in our interest to get the highest possible price.

From a practical standpoint, the licenses that exist and indeed executive orders themselves make it plain that acts by government officials are completely exempt.  So what we would suggest as a purely practical matter is let's go through the sale process.  Once there is a winning bidder selected, then we can go to OFAC or they can go to OFAC and ask for permission to execute and complete the sale.  To do it beforehand would suggest that we would have to -- OFAC would gratuitously vet bidders for us, which adds an enormous amount of complications, and they simply won't do it.

So our position is we should get to a concrete proposed sale with a winning bidder and then go up to OFAC and ask them to approve that sale.  That seems to us to be the most practical way to do it.  It's sufficient timewise and will allow us to hopefully get to a position where once

a bidder is selected, we -- somebody can start to negotiate with the 2020 and say don't foreclose, you're going to get paid out, because they will get paid out by any bidder at the sale because our position is not valuable unless you pay those people off.  So anybody who bids at the sale is going to be willing to pay the 2020s off.  So we think that is a very practical way to handle it.

THE COURT:  Okay.  All right.  Thank you.

MR. WEIGEL:  Thank you, Your Honor.

THE COURT:  I want to now hear from anybody else in that first proceeding that wants to be heard.  Good afternoon.

MR. VERRILLI:  Good afternoon Your Honor.  I'm going to take a couple of minutes and talk about what we anticipate being next steps for the Republic and other parties on that side of the case, and then my colleague, Mr. Yalowitz, will handle the remaining issues that have been raised.

So with respect to what we expect as next steps, as Your Honor indicated, the Third Circuit is still considering the en banc petition.  It has been several weeks now.  In the event that the petition is granted, obviously, we'll continue to litigate there.  In the event the petition is denied, we'll be taking the case to the Supreme Court on certiori.

I don't want to be presumptuous about predicting what the Supreme Court will do.  We think we have very substantial issues.  One in particular, there is an acknowledged conflict in the Third Circuit's opinion, which is the question of whether the alter ego test requires a nexus between the exercise of control and the allegedly wrongful action.

So we think, and the reason I raise that is because it has pervasive importance for virtually all the issues in the matter before Your Honor now.  So it is our intention to move forward with that.  And, of course, if the sale were to proceed and go forward and be consummated, then that would effectively extinguish the Supreme Court's jurisdiction to decide -- if it happened in advance of the petition for certiorari being decided by the Supreme Court, it would effectively extinguish the Supreme Court's jurisdiction.

And so we would need to take whatever steps are appropriate in the event that we need to take those steps in order to make sure that doesn't happen.  Now, whether that means --

THE COURT:  May I ask you, if I were to go forward in any way along the lines of what Crystallex proposes, is there anything that would preclude Venezuela or anyone else from asking the Third Circuit again to impose a

stay?  I mean, arguably, the circumstances would be changed if I lift my stay and now going forward.

Could you ask the Third Circuit, or if you were filing a cert petition once the Third Circuit is done, can the Supreme Court be asked to order a stay?

MR. VERRILLI:  Yes.  The answer to Your Honor's question is, we would hope that Your Honor would leave the stay in place and allow us to go forward.  In the event that Your Honor makes a different decision, then we would be required, I think, to take one or the other or both of those steps in order to ensure that the Supreme Court's jurisdiction is not ultimately extinguished by the course of events.  But as I said, we would hope and ask that this Court leave the stay in place and the certiori process will be a process that will take months and not years, of course. It will take months, but it will be a process that will take months.  It's not an indefinite process with no, with no endpoint.

And we do think, as I said, I think we've got a significant issue.  It's cross-cutting, affects virtually everything, most of what's in front of Your Honor in these cases today.

And so that is our plan going forward.  I'm going to ask Mr. Yalowitz now to step to the lectern and address the rest of the issues unless Your Honor has any

more questions.

THE COURT:  Just one more that might be addressed to you.  If I did everything Crystallex has just outlined, it seems to me where we would end up is not with a consummated sale, but at least as they see it, with a concrete bidder and then a presentation of some sort to OFAC asking for executive branch approval to go forward with the sale.

Do you or does your side see it as that would be where things would be if I went with the path that they suggest and would that deprive the Supreme Court of its ability to do whatever it wants to do, or could I see that as sort of a holding stopping point that would not interfere with, you know, any reviews above my level?

MR. VERRILLI:  I understand the way Your Honor is thinking about that and Mr. Yalowitz will address much of it.  But I will say from the just purely perspective of the Supreme Court review, it seems that sets up the risk of a train wreck in the future because if there is no stay in place and OFAC issues a license at that point, then there is nothing to block the consummation of the sale when the license is issued, and that could -- and then you're just going to have emergency proceedings to try to get a stay at that juncture in order to avoid extinguishing the Supreme Court's jurisdiction at that point.

That does seem to me to be a problem and I think that that would be so far outside the normal orderly course of events in securing the Supreme Court's jurisdiction, and I do think that would be a difficulty that the Court ought to take into consideration in deciding how to proceed.

THE COURT:  Okay.

MR. VERRILLI:  Thank you.

THE COURT:  Thank you.

Good afternoon.

MR. YALOWITZ:  Good afternoon, Your Honor.  Kent Yalowitz, Arnold & Porter, on behalf of the Republic of Venezuela.

We would urge the Court very much to stay its hand until the appellate proceedings are completed, and we would very much urge the Court to stay its hand until somebody shows up with a license from OFAC saying that they're permitted to go forward, and the reason for that is twofold in addition to the comments that Mr. Verrilli made.

First of all, the OFAC regime is different now than it was in 2018.  As the Court pointed out in Your Honor's quite thorough opinion, the spirit of the OFAC, of the executive orders dealing with Venezuela at that time was to deprive the Maduro regime of accessing financing.  In

essence, the sanctions were coercive.

At this stage with the Maduro regime being declared illegitimate, with the Guaido government and the National Assembly being declared the recognized representatives of the Republic, sanctions at this point have a dual function.  They continue to be coercive to try to dislodge Maduro from his de facto control of the institution that he continues to control, but they're also protective.  They're also designed to preserve assets for the benefit of Venezuelan people in a transition to democracy and a restoration of the economy of the Republic after Maduro leaves.  And,

So the President has issued two additional very comprehensive sets of sanctions, one dealing with PDVSA and one dealing with Venezuela.  The purpose of those is different, and therefore the need for an OFAC license to move forward I think is more acute than it was even in 2018, and I think the Court was very careful, if I understood the Court, that it was moving forward one step at a time and it had not decided what else to do.

So that's one reason to maintain the stay.

The second reason to maintain the stay at this point is that the Republic of Venezuela is facing a massive humanitarian crisis.  Other than Syria, it is the worst crisis on the Planet Earth at this time.  People are going

without food.  People are leaving the country.  People do not have enough medicine.  They don't have electricity.  It is a very bad situation, and the Republic is without significant resources to address that situation right now.

The Guaido government, the National Assembly have as their goal and their intent to restore the economy of the Republic, to restore particularly the oil industry and the natural resources industries, and to engage in a voluntary restructuring of all of their debts, which, including both PDVSA and the Republic, amount to about $150 billion, which is way, way more than what can possibly be satisfied using Citgo as a cookie jar to hand out to various creditors who won the race to the courthouse.

So what is happening right now is on the one side, you have got a terrible crisis and a struggling government trying desperately to dislodge a despot and on the other side, you have a group of people, many of whom support the goals of the Guaido government, support the intention to restore the economy, restore democracy, engage in a consensual restructuring, but they see what is happening in this courtroom and they feel that they cannot stand on the sidelines.  And we see that in the Southern District of New York with very large hedge fund that filed a complaint recently saying we hate to do this, but the Third Circuit has left us with no choice.  And,

If the Court moves forward, it's creating, in essence, creating like a run on the bank.  The more the Court moves forward, the more people are going to have to feel that they have no choice but to show up and try to elbow their way in in order to be in equal position so that they're not hurt, and that eventually will lead to a much more difficult voluntary restructuring because if you have some people who are going to get 100 cents on the dollar because they won the race to the courthouse, you have other people who are being asked to sacrifice for the greater good, and they're not going to want to do it if they feel they're being treated unfairly.

THE COURT:  I am going to have to move on, but let me ask you a few questions.

MR. YALOWITZ:  Of course.

THE COURT:  Other than please keep the stay in place, is there anything else that the Republic is asking of me at this time?

MR. YALOWITZ:  No.  I mean I would say if you're not -- if your inclination is to lift the stay, we would like the opportunity to brief that.  If you're going to move forward, I think it would need to be done with extreme caution.  And we would want to -- we would not want to do anything before we addressed the changed circumstances and the motion to quash or 60(b).

THE COURT:  Do you, at this point, have any view on a bond?  I don't know if that is an issue for you.  Do you have anything to say about that at this time?

MR. YALOWITZ:  This is a general unsecured creditor asking to be put -- again, they have already gotten $400 million while the deal was pending.  They're taking -- I mean I don't -- I'm not making a moral judgment.  They're doing what they're supposed to be doing, but we have a humanitarian crisis, people starving, people going without food.  I don't think it would be appropriate to impose a bond on this Republic at this time.  And, quite frankly, I don't, I mean I don't know.  We're not in a position to represent that we could even afford one.

THE COURT:  All right.  And the question, it calls for speculation, you may want to hand it back to Mr. Verrilli, or you may just want to punt it.  But given everything you've said, why did the Third Circuit lift their stay?

MR. YALOWITZ:  You know, that would really be speculation.  The only thing I can say is it does appear that the panel lifted the stay.  The panel decides whether to -- you know, the merits panel decides motions.  And the en banc asking for -- as I understand, the Third Circuit's operating procedures, the call for response comes from a number of off panel judges asking for a response, and so

there may be something going on between the panel and off panel, but that, as I said, is really speculative.

THE COURT:  I recognize I called for speculation.

MR. YALOWITZ:  Yes.

THE COURT:  All right.  Thank you.

MR. YALOWITZ:  Sure.

THE COURT:  All right.  Who else wants to be heard on this.

MR. PIZZURRO:  Very briefly, Your Honor.

THE COURT:  Please.

MR. PIZZURRO:  Joseph Pizzurro of Curtis Mallet for PDVSA, adopting and echoing without repeating everything that counsel for the Venezuela said.  I just want to make a couple of points.

I am not surprised by Crystallex's position now that it is entitled to a bond, but to answer Your Honor's question, Crystallex has consistently taken the position up until now and this Court in fact ruled that all of it is entitled to is in the value of the PDH shares.  It is not entitled to a bond for the value of the judgment.

It is those shares, and I think they made this point in their brief on a couple of occasions, if those shares are worthless or for some reason PDVSA disposes of it, they're out of luck in this Rule 69 proceeding that they

very specifically and calculatedly styled so that they could get to this point in the litigation.  So to say that they're now entitled to a bond when they are fully secured for whatever they're entitled to by the attachment on the PDH shares we think is simply a nonstarter.

One thing I was very surprised to hear and for the first time today was that they haven't even tried to get the OFAC license.  They have been admitting since this, we argued this two years ago in front of Your Honor; and as they admitted in the Third Circuit, as they admitted in their opposition to the petition for rehearing, they can't do anything without a license.  They can't have a sale without a license, but now they're saying we don't want to get a license now.  Undoubtedly, they know it is going to be denied.

The whole regime, as was stated, has changed and the reasons for it have changed from being, in effect, punitive with respect to Venezuela to now being helpful to in trying to preserve assets of Venezuela.  The likelihood that they would get a license, we think again this is speculation, is very remote, but if you look at what has happened in the past two weeks, OFAC has prevented the 2020 bondholders from foreclosing on their liens, and there is nothing that has happened, including what statements of the President in support of the Guaido regime to suggest they

have any possibility of getting their license.

Why is that important?  Why is that important to address what they're asking for?

If you start a process which is designed to end up in a sale of these shares and there is a complete lack of certainty concerning whether or not that transaction can ever happen, it is going to severely depress the value of those shares.

Now, I understand they have an interest in maximizing that value, but that is sort of irrelevant. We're talking about a company which is worth substantially more, at least on paper, than the billion dollars or $800 million that they still haven't been paid.  Remember, they have already gotten the $500 million pursuant to that settlement that was mentioned earlier on.

But if nobody knows this can actually happen, if nobody knows whether they can actually begin to participate in a process without perhaps running afoul of the facilitation prohibition and the regulations themselves which prevents people, including lawyers giving legal advice, in connection with a transaction for blocked assets and how to get around it, there at least what you are going to end up with is something less than real value at the end of the day, and then you go -- then when they get this bidder, if they ever get the bidder, now you go to OFAC, and

there is nothing to suggest that the likelihood OFAC is going to issue a license in those circumstances is any greater than it is today.

I think that is important because it goes right to the equities.  If Your Honor is considering lifting a stay, you should look at what the equities are.  They have no equity on their side.  They're fully secured for whatever the value is of those assets.  They have dragged their feet now for over two years in even applying for a license.  They have admitted continually they need to go forward.

On the other side, you have all the things that Mr. Yalowitz alluded to; and, in addition, you have the undoubted suppression depression of the value of those shares which is going to redound to the detriment of the Venezuela people.

THE COURT:  All right.  Just one question.  Your speculation or not speculation that OFAC would not issue a license now, how much of any of that is due to agreement with Mr. Weigel's speculation that because we don't have a concrete winning bidder, OFAC would say something to the effect of it is just -- you know, we're just not going to do this, request denied?

MR. PIZZURRO:  Well, Your Honor, admittedly we're all speculating, but it seems to me that the parties here who has to take the burden on that is Crystallex, and

by trying to avoid that, by not even making the application, they can either be here saying we don't have a license because we applied 18 months ago or two years ago and we haven't gotten it yet or we're afraid to -- or it's been denied, and they're trying to thread that needle by saying we're not even going to apply until we have a bidder.  And I just think that particularly in terms of the fact that the attachment is there; right?  Your Honor has already ruled that it was a valid attachment, arguments were made that shouldn't have been done, but you ruled the way you did, and Your Honor, as I recall your opinion, relied very heavily on their assertion that all they're entitled to here is the value of those shares and nothing more.

So they're secured.  They're suffering no irreparable injury.  Irreparable injury is very significant on the other side.  And they have exacerbated this whole problem by not even trying to put themselves in the best position they could.

THE COURT:  Okay.  Thank you very much.

PDVH; right?

MR. EIMER:  Yes, Your Honor.  Good afternoon.

THE COURT:  Good afternoon.

MR. EIMER:  Good afternoon, Your Honor.  Nate Eimer on behalf of PDV Holding.

I want to echo Mr. Pizzurro's comments but

mention one more thing.  PDVH filed a motion for leave to intervene to protect PDV Holding and Citgo itself, Citgo Petroleum Corporation.  And the concern we raised with the Court with the petition for leave to intervene is if the sale of these assets adopt maximize value, there could be a change in control over Citgo Petroleum which would have adverse effects under its current loan and covenants.

Now, why those have changed somewhat from the time they filed our petition, they are still there.  And I disagree with counsel for Crystallex that they have an incentive to maximize the value of the sale.  That is not true.  Their interest is in just recovering whatever they can towards their judgment.

But proceeding down with the sale process, all the way through essentially signing a contract to sale, waiting to find out whether they're going to get a license is going to substantially diminish the value that they're able to obtain or that whoever is selling the stock will be able to obtain for Crystallex -- for the PDVH stock and will cause injury to Citgo Petroleum, a U.S. corporation with thousands of people employed.

So we would urge the Court not to go down that process at this time until it's clear that there can be a sale both through the Supreme Court process in the appeals and ultimately through a license that is obtained by

Crystallex which they haven't even bothered to attempt to obtain.

THE COURT:  Just remind me, the motion to intervene, is that still pending?

MR. EIMER:  It's still pending by Citgo Petroleum.

THE COURT:  Would you ask that I resolve that even by keeping the stay in place or are you content with things just staying where they are?

MR. EIMER:  I think if the case is stayed, I am fine to have things held in abeyance.  If Your Honor wants to move forward, then I would ask Your Honor to rule on it. Yes, sir.

THE COURT:  Thank you very much.

MR. EIMER:  Thank you, Your Honor.

THE COURT:  Did anything else wants to be heard on any of this?

Good afternoon.

MR. OAKES:  Good afternoon, Your Honor.  Mark Oakes of Norton Rose Fulbright for Rosneft Trading.  I'll be brief.

We're not weighing into the debate on whether the case should be stayed or not.  We've leave that to the parties.  We would ask that if the Court does go forward that it here decide our pending motion to intervene.

THE COURT:  Okay.

MR. OAKES:  Thank you.

THE COURT:  Thank you very much.

Does anyone else want to be heard before I turn back to Crystallex?

MR. WEIGEL:  Thank you, Your Honor.

THE COURT:  I think someone has risen.

MR. WEIGEL:  Sorry.

THE COURT:  Remind us again who you are.

MR. RIEMANN:  Yes.  Walter Rieman from the Paul Weiss law firm for MUFG Union Bank NA as Trustee under the Indenture, and GLAS Americas LLC as collateral agent under the indenture and the pledge of security agreement governing the same notes.

As Your Honor has heard, the 2020 notes are in default.  Those notes are secured by 50.1 percent of the shares in Citgo Holding.  A sale of shares of PVD Holding pursuant to orders of this Court has the potential to affect in various ways the collateral securing the 2020 notes, and consequently, if Your Honor vacates the stay that's currently in effect, the Trustee and the collateral agent would want an opportunity to comment on any structure that may be proposed, Your Honor, for the sale of shares.

It seems likely that we would seek that opportunity to comment by way of intervention subsequent to

any block of the stay, but, of course, we are open to guidance from Your Honor about how Your Honor wishes to -- wishes to hear views from entities that are involved in the way the trustee and the collateral agent are.  We are not taking a position on what should happen.

THE COURT:  Okay.  Thank you very much.

MR. RIEMAN:  Thank you, Your Honor.

THE COURT:  Mr. Weigel, come back.

MR. YALOWITZ:  Your Honor, may I just very briefly comment?

THE COURT:  Yes, you may.

MR. YALOWITZ:  I apologize, Your Honor, but with regard to the 2020s, just to be clear, any rights that Crystallex or any other general creditor has are inferior to the rights of the 2020s because that is where the 2020s sit in the corporate structure, and so Crystallex, by seeking to attach shares of PDVH, can't claim there's some sort of urgency problem because of things that are happening down below it in the corporate structure.  That's just the lot that they have by virtue of being at the top of the tree.

THE COURT:  Okay.  Thank you.  Mr. Weigel, I will hear from you again.

MR. WEIGEL:  Thank you, Your Honor.  I will try and be brief.  I know it has been a long afternoon.

First off, every argument that you heard about the difficulties in Venezuela, about the sanctions, were all presented to the Third Circuit.  In opposition to our motion to lift the identical stay that they raised, the Third Circuit lifted their stay.

PDVH really has no standing to be complaining. They're only the garnishee at this point in this one, but one fact that seems to have gotten lost here is we have a judgment against Venezuela.  That judgment was an affirmed by the D.C. Circuit.  They did not take it up to the Supreme Court.  They did not even attempt to do that.

So we are entitled to that money.  You heard them say they want to have an equitable distribution of the assets for all the others.  We are entitled to receive the judgment.  PDVSA says we're a secured creditor, you don't need to secure a bond, but Venezuela now turns up and says we're a general unsecured creditor.

So I don't know what position the other side is taking, whether they think we're unsecured, we're secured, but we are secured.  We are a secured creditor with the writ that Your Honor issued and we need an answer to that writ.

But somebody said that the Third Circuit compelled people to do something.  Well, the Third Circuit did say something that's quite relevant.  They said, I

quote, "Venezuela owes Crystallex from a judgment that has been affirmed in our Court.  Any outcome where Crystallex is not paid means that Venezuela has avoided its obligation." That's what the Third Circuit said and that's what the law is.

They've exhausted all of their appeals.  There is no question that they owe us this money, and this attempt to throw us into some restructuring and not pay us what we are owed is simply an attempt to avoid the judgment of the U.S. Courts.

Now, they claim that this OFAC regime is different and that there's no private right of act, but the thing is, we don't need a license.  The U.S. Marshals are the ones who are going to conduct the sale or somebody designated by Your Honor as their agent.  They will conduct the sale.  They will conduct the auction.  They will take the bids and we are willing to work with them.  I mean, we actually really do want to get the maximum amount possible for this asset.

THE COURT:  And you say that and I'm not suggesting you're misrepresenting, but why would that be? Why would your client have any care about that above the value of what you're owed under judgment?

MR. WEIGEL:  Because there's no guarantee that somebody is going to come in and pay a billion dollars for

this unless we beat the bushes, try and find people.  We will set up a data room.  We will put in whatever data we have.

THE COURT:  It seemed to me just general economic reasoning that the extent of your intent to do all of that ends, you know, whatever $1 above your judgment, doesn't it?

MR. WEIGEL:  Yes.  Now, you will hear from I believe people behind me, the Owens Illinois people, they have $800 million or whatever their judgment is.  They're going to want to make sure that it gets a high price.

We will -- Your Honor is going to get an opportunity.  I mean, all of these arguments about the way the sale will be conducted will be presented to Your Honor and we will get a sale process that is fair.  I mean, under Venezuelan -- sorry, under Delaware law, we're only allowed to sell as many shares as will satisfy our judgment.  So we would propose laddering it.  I mean, we think we'll offer up ten percent of the shares and if somebody will bid a billion dollars for ten percent, God bless, but we're going to keep going up.

So we're not going to sell more than is necessary to satisfy our judgment, but we want to make sure that our judgment is satisfied, and so there's no way to slice the baby and say, well, we'll only advertise enough to

get a billion dollars.  We want real bidders here.  Frankly, a real bidder is going to have a better opportunity to get an OFAC license.  We don't need an OFAC license, but the buyer does.  And, you know, if it's Maduro's brother-in-law, they are not going to grant it, but if it's Exxon or another large American company -- this company is, you know, its management, its ownership at this point can be described as a circus.  I mean, there are all of these people trying to get pieces of it.  It will do better, it's an American company, and it will do better when Citgo is in the hands of a stable ownership.  It's not just me saying it.  Fitch has said that its credit rating will go up under virtually any other owner other than PDVSA.

So what we would suggest, Your Honor, is that we go forward.  They will have objections, no doubt, to our sale motion.  They can make them there.  If they have suggestions as to what we should do differently, we will almost certainly do them, I mean, if it involves collecting, attracting more bidders and doing it.  If they want to try and do it some way consensually that's not expressly authorized by the Delaware procedure, if we do it on consent, we might be able to reach agreement on that.

But we think that it is, the Delaware procedure is straightforward.  We have a judgment.  They can't challenge that judgment anymore.  And the Third Circuit has

said any outcome that results in us not getting paid is unfair.

Thank you.

THE COURT:  All right.  Thank you.  I do want to try to move quickly through the other matters and I recognize I can't keep you here all night.

In the Crystallex I and II, is there anything different that Crystallex needs me to do, wants me to do, or what do you want to say on that one briefly?

MR. WEIGEL:  Your Honor, I think we should just continue the stay on that.  Assuming we get to the sale here, we are hopeful that we will move that case outside satisfying our judgment.

THE COURT:  Okay.  All right.  Is there anybody here that wants anything other than for me to stay, continue the stay in Crystallex I and II?  Did you want to be heard on that?

MR. OAKES:  Your Honor, Mark Oakes again for Rosneft Trading.

In January of 2018, the Third Circuit decided that you can't have a claim under the Delaware Uniform Fraudulent Transfer Act when you don't have a transfer by a debtor.  That is a fatal flaw to both Crystallex I and II.

My client has been sitting around as a party to

those suits while they just hang around and we would respectfully submit that they should be dismissed.

THE COURT:  Thank you.  Other than Rosneft, anybody?

Okay.  Mr. Weigel, do you want to respond to that briefly?  You want me to continue to stay it?

MR. WEIGEL:  I think, you know, should Your Honor want to consider that, we would brief it, but I think it's very likely it will be a waste of time, so we would ask that it be stayed.

THE COURT:  All right.  And then how about ConocoPhillips?

MR. GREEN:  Good afternoon.  Marcus Green, Kobre & Kim, for the ConocoPhillips plaintiffs.

We would ask that those two cases be stayed and the stay be continued.

THE COURT:  Thank you.

Does anybody want to be heard on whether I should not continue that stay?  Come forward.

MR. VUKELJ:  Good afternoon, Your Honor.  John Vukelj with the law firm DLA Piper representing Rosneft Trading in this case.

Our position here is there is a -- the purpose behind the stay in the ConocoPhillips case is a settlement that was entered into between Conoco Phillips and Venezuela.

They are -- in addition to the reasons that Mr. Oakes presented in the Crystallex II case, we're left, Rosneft is left sort of hanging on in this case where the case remains active despite a settlement.

We understand sort of that the parties may want to kind of wait out that settlement and see how it resolves, but there's really no prosecution happening of that against Rosneft, and our view would be that we should essentially just be let out of that case since it has been, there's a settlement between the parties.

THE COURT:  And dismiss Rosneft, but you don't care what else happens to that case?  Is that what you are requesting?

MR. VUKELJ:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  Could ConocoPhillips just respond to that briefly?

MR. GREEN:  Your Honor, although we are obliged to seek to maintain the stay pursuant to the terms of the settlement, that is without prejudice to our right to resume that case depending on the performance under the settlement, and we would submit that Rosneft's continued notional involvement in the case is without prejudice to them, and at any moment we may, ConocoPhillips may come to this Court to ask the stay to be lifted in those fraudulent transfer cases and, in addition, to ask the Court to enforce a judgment of

another Federal District Court that ConocoPhillips has against PDVSA that ConocoPhillips is not enforcing equally under the terms of the settlement.

THE COURT:  So you oppose dismissing Rosneft?

MR. GREEN:  Yes.

THE COURT:  All right.  Does anybody else want to be heard in the ConocoPhillips matter?

Okay.  I think we next have the OI cases.

MR. WILLETT:  Good afternoon, Your Honor.  Sabin Willett, Morgan Lewis.

I think what might be simplest is if we begin with the miscellaneous case.

THE COURT:  That's fine.

MR. WILLETT:  Where we have sought an attachment.  And Your Honor is asking what people want, so let me start with that.

THE COURT:  Thank you.

MR. WILLETT:  What we want is for Your Honor to issue an order granting the writ of attachment.  We also want for you to vacate the stay in Crystallex because what would happen to us is we would slot in in a junior priority position to Crystallex, but be able to work cooperatively in connection with the same process that Mr. Weigel described to get to an ultimate sale, to get through the briefing, to get to OFAC approval and to get to the sale.

And the one thing that we can be sure of with regards to OFAC is that if the stay isn't vacated in this court, then they certainly aren't going to do anything at OFAC and we are going to be stuck here for a long time.

What I would like to do if I can is explain why I think Your Honor should do that and touch briefly on why I don't think there's any difficulty in granting the writ, although you have seen briefs from us and Venezuela this week.

It's clear from today's hearing that the real issues here are how to frame this sale process that Crystallex has worked so mightily and so long and the Court has worked so long to get us to this point.

What will the mechanics of bidding be?  What will the data room look like?  How will you proceed and when to OFAC?  All of those are important issues.

We're a smaller issue than that.  We're a simple issue, which is simply, we're another secured creditor, precisely, or about to be, if the writ is granted, situated precisely as Crystallex was, except that we come second. And so under basic principles of collateral estoppel, the same rules should apply.

I think Mr. Verrilli said that it would be outside the ordinary course of proceedings for Your Honor to allow this to go forward without exhaustion of all of the

discretionary appeals.  I think exhausting discretionary appellate avenues before an attachment is granted and acted on is what's outside the ordinary course.

We don't usually wait for the sun to burn out in order to move forward in cases where the Third Circuit has affirmed.

In response to our request for a writ, the only thing that has been asserted essentially, you've heard some discussion of the sanctions, but the language in the new sanctions is the same as that which was resolved by you and by the Third Circuit.

The only really new thing is to argue that there's a new President in exile in a way, and it's a bit like a corporate defendant coming before you after an alter ego judgment goes against it and says, well, I have a new CEO now.  Nothing has been changed with regard to the relationship between Venezuela and PDVSA.

We went through your opinion and Judge Ambro's opinion in preparing for this hearing.  All of the factual determinations that you made to reach the excessive control leg of the test, none of them is contested.  In the brief that was filed this week.  Nobody says that Venezuela isn't still controlling pricing, that it isn't still governing sales.  PDVSA has not unsaid what it has told its inventors about how they, you know, they are at the risk of the

sovereign controlling their recovery.  And,

Indeed, Mr. Guaido himself has advocated a proposed workout as recently as this summer in which the debts of PDVSA will be treated equally with those of Venezuela and, in effect, admitting an alter ego is correct.

I just heard counsel say that, describe Mr. Maduro as a tyrant who continues to -- excuse me, a despot who continues to control.  That's true.  There is no change in the controlled sovereign.  Your decision and the Third Circuit's decision was not about which officers, the steward, the sovereign, but just whether the sovereign continues to control in actual fact the operations of the oil company.

MR. WILLET:  So we think that it's obviously been a busy courtroom here, but we think when you get to these briefs, you will see there is no difference here.  A junior attachment should issue.

I would request that if you don't think it is as simple as that that we schedule a hearing as soon as possible to develop it because that is a gaming issue that shouldn't precede moving for the process of the actual disposition of the asset.

The point was made about the economic crisis that exists, the humanitarian crisis in Venezuela, it's

true, a year ago as well, and it might be meaningful if there was some other thing to do here.  If there were an IMF workout, if we had any reason to believe Mr. Guaido can actually gain effective control and issue new bonds for example.

But there is no, and can be no, showing of that.  Things are not better today.  And we come, just as Crystallex does, back to what the law says.  We now have a judgment, as they do.  Delaware law and Rule 69 teach you what the remedies are.  We're just asking for the only remedy the law affords.

THE COURT:  All right.  So that is what is pending in miscellaneous matters, right?

MR. WILLET:  Yes.

THE COURT:  Do you have anything quick to say in the civil action?

MR. WILLET:  Yes.  Now, Your Honor, in the civil matter, there is no stay.  Our opponents asked for one, we objected, and there has been no ruling and no further activity.

If you agree with our position and the position of Crystallex that you should vacate the stay in Crystallex and grant us our writ of attachment, then we would accept, we would concede this, and it would make sense to enter a stay in that other case for the same reason one hopes would

become moot.

If you do not vacate the stay, we suggest that the answer would continue to be to grant the writ in our case, not impose a stay in that case unless Venezuela agreed to waive appellate rights, because we don't want to be stuck in a stay and then two years from now start an appellate process in that case. So that case -- the problem of what to do in the civil case is a lot easier frankly if you vacate the stay and we move forward behind Crystallex.

Thank you.

THE COURT:  Thank you.

Who wants to respond to any of the miscellaneous or civil actions?

MR. NEUHAUS:  Your Honor, Joe Neuhaus from Sullivan & Cromwell for the Republic.

I want to address the collateral estoppel arguments, the arguments that you should just enter a new writ of attachment in favor of a lie because everything is the same.

THE COURT:  That is in the miscellaneous action; correct?

MR. NEUHAUS:  Yes.  Sorry.  Miscellaneous action.  And I think the answer is, no, things are not at all the same.  The relevant portion of PDVSA, which is the property in the U.S., is under different control under a new

legal regime based by the National Assembly, recognized by the U.S.  That is the only authority from Venezuela that is recognized in the U.S.  They have appointed a new board of PDVSA.  They have appointed -- PDVSA board has appointed a new board of PDVH, and they appointed a new board of Citgo.

So the Guaido government, which has effective control of the assets in the United States, because of the government's recognition, is now completely in control of the property at issue.  And the relevant question is -- for alter-ego is who owns the property now?  What is the alter-ego status at the time of the writ, at the time that the attachment was issued?  Why is it at the time of the attachment?  Because this is just an attempt to say this property is not PDVSA's property, it is Venezuela's property, so you have to look at the time of the attachment; and that is what Your Honor did in August of 2018.  You asked what is the situation today?  All of your findings are in the present tense.  And what you were asked to find is who owns property today.

But the world has changed.  Now, we have a completely different regime, a legal regime, and no evidence of any improper use of PDVSA's funds or any abuse of the corporate form or anything else as to the situation today, so there is plenty of reason to believe that if examined today, you would not find an alter-ego relationship.

That is one reason why collateral estoppel cannot reply.  The alter-ego status today was not actually litigated and necessarily decided in your decision in August of 2018.

The second reason is the OFAC regime.  The OFAC regime today is quite different from what it was in 2018.  In 2018, there was a set of selective sanctions put in place for particular reasons to prevent financing.

After President Trump recognized the Guaido government, the OFAC -- he issued an executive order that provided for comprehensive blocking of all PDVSA and Venezuela assets.  Under the OFAC guidance, a blocking regime clearly and without any doubt prevents attachment.

Your Honor found, back in August of 2018, that the existing selective sanctions, based on the guidance that OFAC had issued at that time, the frequently asked questions, permitted Your Honor to -- permitted Crystallex to get an attachment.  OI is in a different position because now we have a much more comprehensive blocking regime where the OFAC guidance is absolutely clear.  There is no fudge room here that attachment is barred, so OI needs a license before it can get attachment.

And they recognize that, because back in March, after the blocking sanctions, the new blocking sanctions went in place, they sought a license from OFAC, and that

is still pending.  No answer yet.  So at the least -- so this, too, the OFAC license situation was not actually litigated or necessarily decided back when you were -- back in August of 2018.  And if Your Honor -- if this issue progresses, one thing to do is to ask for OFAC's views on whether the attachment that OI is now seeking is permitted or direct OI to ask for those views.

So in a nutshell, we think that collateral estoppel would not be appropriate.  We, of course, do agree with the position that all of these proceedings should be stayed because any attachments are harmful to the overall position, overall consensual prospects or consensual construction, but if Your Honor is inclined to go forward with the collateral estoppel issues, this collateral estoppel is not appropriate for the reasons I have said, and you have our briefs which were filed on Monday.

THE COURT:  Right.  So I was going to ask you a question about that but preface it with an excuse that I -- if today is still today, I think I had two sentencings and lengthy closing arguments in a patent bench trial, so I have not read the briefs yet, but evidently it's been characterized that you don't challenge any of the prior fact findings in the briefing.  Is that not what I will see in the briefs?

MR. NEUHAUS:  What you will in the brief is

we're here opposing collateral estoppel; and what we're saying is the world is completely different today, and we absolutely challenge that those findings apply today. You were talking about Maduro's board, and who was on the board at that time, what Maduro was doing with respect to PDVSA property at that time.

The relevant question today is -- and there was no reason to distinguish between PDVSA and Venezuela and PDVSA and the United States. Today, there is a completely different regime with respect to PDVSA property in the United States, which is the relevant question for your attachment.

THE COURT: And that is the argument I will see in your brief.

MR. NEUHAUS: That is the argument you will see.

THE COURT: Now, are you here in the civil action also?

MR. NEUHAUS: The answer is I guess I am. I frankly am not -- I was retained over the weekend, and I'm not completely familiar.

THE COURT: You're not here to say anything at the moment about that?

MR. NEUHAUS: No, I'm afraid that is correct.

THE COURT: Anybody else want to weigh in on the OI case? It looks like it's you.

MR. WILLET:  Your Honor, I'm mindful that your order said we weren't here to argue our motions, we all have been arguing our motions, and so I'll try not to do that.

I just wanted to say that if you don't find the point that we have just been debating about what was the basis for your order, if you don't find that dispose of in the briefs, we would request a prompt hearing so we have time to hear it.

Thank you, Your Honor.

THE COURT:  All right.  You did want to comment.

MR. EIMER:  Sorry, Your Honor.  I missed the cue.

THE COURT:  That's okay.

MR. EIMER:  Nate Eimer on behalf of the Citgo company.

On the civil cases, they're basically tracking the Conoco civil cases and Crystallex civil cases.  Those should all be dealt with at the same time.  If those are not going forward, there is no reason to go forward with the OIG civil cases at this point.  That should be treated separately and the group dealt with together.

THE COURT:  When you say that, do you mean, so we have a miscellaneous action 19-290, we also have a civil action 19-290, both of which are filed by OI.

MR. EIMER:  Yes.

THE COURT:  When you are referring to the civil action, are you referring to both of them?

MR. EIMER:  No, I am not referring to the miscellaneous action that we are not involved in.  I'm referring to the civil action.

THE COURT:  Thank you.

MR. EIMER:  Thank you, Your Honor.

THE COURT:  Is there anything else you wanted to add?

MR. WILLET:  No.  Thank you, Your Honor.

THE COURT:  So I think what is left is the Saint Gobain action, the 18-1963, and I also been reminded there may be a miscellaneous action that you all are parties to also, and that may be the one that I have a hearing coming up in December, but tell me what you are here to talk about.

MR. RAMOS-MROSOVSKY:  Thank you, Your Honor.  Carlos Ramos-Mrosovsky from Alston & Bird in New York for Saint-Goban.  I will try to be brief mindful of Your Honor's instruction you weren't arguing motions today.

As the Court may be aware, the motions for the default judgment is fully briefed as of the end of September.  Your Honor has scheduled oral argument on our motion for default judgment on our exit award for December 5th, coming up quite soon.

Really what we would respectfully ask the Court

is to decide upon those motions as expeditiously as it can so Saint Gobain would be in a position to participate in any auction that the Court may supervise and to attach the shares that are of concern today.

I would note that we respectfully submit that that probably should be able to be achieved quite quickly since the issues are quite limited. We have an exit award which is entitled to full faith and credit like a U.S. judgment, and the issues that have been briefed go strictly to service and venue. They're purely legal. So our ask, so to speak, for the Court would simply be that we move forward as scheduled, and as quickly as it is possible obviously for the Court with its responsibilities to do.

Your Honor mentioned the miscellaneous case. As a housekeeping matter, I should say, when we first filed, we believe that the proper form for seeking the enforcement of our exit award was a petition. The Clerk's Office in instructed us we should file a complaint.

So there is a miscellaneous case, I believe it is 18-343, which is really an artifact of that. We wanted to dismiss that. We became of aware of this. We thought we shouldn't do that before the status conference, just that it might lead to confusion, but the case in which everything has happened is Civil 1963.

THE COURT: All right. I very much appreciate

that clarification.  That was the miscellaneous action I was of.

Okay.  Is there anything else you want to say at this time?

MR. RAMOS-MROSOVSKY:  Not at this time.  We're ready to move on the schedule the Court has instructed and looking forward to the argument on the 5th of December.

THE COURT:  Thank you very much.

MR. RAMOS-MROSOVSKY:  Thank you, Your Honor.

THE COURT:  Who, if anyone, wants to be heard on this?

MR. YALOWITZ:  Your Honor, Kent Yalowitz again for the Republic.

I would just say with regard to the Saint Gobain case, the more the Court moves forward with cases against the Republic, the faster you will get new cases and other judges will get new cases because of the run on the bank problem, the mad scramble for assets problem.  And,

We addressed this in the Southern District of New York with Judge Torres who has two cases before her against the Republic, and we addressed the issue of whether she should impose a stay on the basis of humanitarian issues and on the basis of foreign policy.  She has set a briefing schedule for that motion, and our brief on that issue is due in January.  And,

So, again, we would urge the Court to proceed with great caution here in all of these cases.  Saint Gobain is not correct that the only issues in their case are service and venue, because what we heard today is they would like to pop in and be participants in an auction process, but they don't have a judgment against anybody, and if they have a judgment against anybody, it would be against the Republic.  They do not have any judgment or arbitrable award against Venezuela, so they have all of the same alter-ego issues that they would like to impose.  And,

Again, just the more we move forward on these issues at this time, the more difficult it is going to be for the Republic to engage in the kind of -- and we heard from Crystallex that they're ahead, they're first.  They're not going to participate in any kind of consensual voluntary process.  And the foreign policy of the United States is that we want to encourage voluntary consensual restructuring in the cases of or foreign allies where they run into economic crisis.  So the more we do to impede that, the worse it is for our nation's foreign policy.

And you heard Mr. Neuhaus suggest that the Court could solicit the views of the United States.  We would be very supportive of that inquiry.  You know, it's a matter for the Court's discretion.  Some judges really want to know what the United States has to say about an issue impacting

foreign policies.  Others don't.  You know, that's really up to you.

THE COURT:  If I were interested in pursuing that, what is your view on how I would do that?

MR. YALOWITZ:  I think if the Court issues an order and delivers it to the United States Attorney's Office, they will make sure that it goes to the appropriate group in the Civil Division and the Civil Division will disperse it to the appropriate agencies.

THE COURT:  Okay.  Thank you for that.

MR. YALOWITZ:  Thank you.

THE COURT:  Does anybody else want to be heard in the OI cases?

MR. WEIGEL:  Your Honor, may I be heard in response to the last comment?

THE COURT:  In a moment.  We'll have this gentleman first.  Remind us who you are.

MR. TRACEY:  Good afternoon, Your Honor.  Dennis Tracey from Hogan Lovells for PDVSA.

I just wanted to clarify one issue.  Counsel for Saint-Gobain said that the only issues before Your Honor are service and venue issues, and Mr. Yalowitz touched on this.

PDVSA was not a party to the underlying exit award that was issued solely against Venezuela, and so the

sole basis for the alleged liability against PDVSA is the alter ego issue.  So Your Honor would need to address that as part of this case, and so we would simply suggest that the alter ego issues be addressed in conjunction with or in coordination with the other cases before Your Honor to make it more efficient, and to the extent that Your Honor is inclined to defer those until after the issues are addressed by the Third Circuit and/or the Supreme Court, that the same rules should apply here.

THE COURT:  Okay.  Thank you.

Mr. Weigel, do you want to be heard?

MR. WEIGEL:  Just very quickly, Your Honor.

The assertion that we've not tried to settle with Venezuela is silly.  We actually entered into two different settlement agreements.  Each time they committed to the first step, and then as soon as we took our foot off the gas, they stopped complying.  So we tried to settle with them.  We really did, and we were just unsuccessful.

In terms of the argument that they should attract, the U.S. Government should be asked to intervene, that is again an argument they made to the Third Circuit. The Third Circuit addressed it by pointing out that the Treasury's Office would consider license applications on a case-by-case basis.

There's no question that the U.S. Government

knows what is going on here, but it's all somewhat hypothetical until we have a buyer identified and they can say, is this a good buyer?  Is this a buyer we would approve of?  Is this a buyer that is in accordance with U.S. foreign policy or is this, you know, a stooge for interest that we don't want to own a U.S. company?

And the reason they want to ask you to ask the U.S. Government, who clearly knows this is going on and has chosen not to come here, although Your Honor requested in your order that anybody who had an interest shows up, is because they know it's going to take a long time.  And we can ask -- there's no question OFAC is going to be asked for their consent to this, but it's going to happen at the -- hopefully, at the end of the process when there's a concrete transaction that they can review and opine upon.

And I do think it's -- if one looks at the regulations, OFAC makes it quite clear that this is not intended to create any rights, benefits, substantive or procedural, enforcement at law or equity by any party against the United States or any other person.  There's no private right of action under OFAC.  They keep trying to ask Your Honor to decide something that is best left for OFAC, and OFAC is not going to be able to make that decision until they know who the party is and then we will do it. And that's what we told the Third Circuit and they made the

exact same argument to the Third Circuit, and the Third Circuit said it did not prevent the attachment and it doesn't prevent Your Honor from conducting the sale.  Thank you.

THE COURT:  Since you raised it, putting aside whatever the Third Circuit said or didn't say, rather than continuing to speculate about what the views of the United States are on this litigation, if I'm going forward with some other briefing as you requested or other briefing that maybe is not requested, if we're going forward with some sort of briefing, why shouldn't I reach out as clearly as I can and say, let's at least give the United States a chance to tell us what they think while we are all doing this work?

MR. WEIGEL:  Well, I think, Your Honor, that, you know, what the Third Circuit said is the U.S. State Department has not sought to provide a statement of interest.  It goes on to say it's conceivable.  It says, that will get considered at the end.  We represent to the Court and we represent to Your Honor that we'll present it to them.

I think it's just a delay tactic.  They will get an opportunity.  They know what's going on, and to ask them to take a position at this point in time in the abstract is really just asking them to, asking them for the purpose of

causing additional delay here.

Thank you.

THE COURT:  All right.  Thank you.

Saint-Gobain, do you want to come back?

MR. RAMOS-MROSOVSKY:  Your Honor, I will be very brief.  I just wanted to address two points opposing counsel made.

It is true that we do not have the judgment in the formal sense of a judgment entered by this Court, but I wanted to reiterate that our award by U.S. law under 28 U.S.C. 1650(a) has the status of a judgment.  It has to be entered as a judgment in your Court, but it's not an ordinary arbitration award in that sense.  And,

Secondly, as to the issue of there being an alterego question in the briefing in our case, it's true that Venezuela has tried to reopen that question, but that's a finding, of course, that this Court made.

The Circuit affirmed after the change in regime in Venezuela, and from the point of view of scheduling, we wouldn't see that this Court's reconsideration of its own decision, even if that were something that should happen, would affect the calendar at all.  And so speaking from a calendaring point of view, there are only two live issues, and that's a venue and service.

THE COURT:  Okay.

MR. RAMOS-MROSOVSKY:  That's all I have.

THE COURT:  Thank you.

MR. RAMOS-MROSOVSKY:  Thank you, Your Honor.

THE COURT:  One second.  Let me just say, so I think that covers all the actions that we're here in today. I don't intend to make any decisions right now, but I don't intend to keep you waiting too long.  I think I can be in a position to tell you something about how we're going to proceed, if we're going to proceed before Thanksgiving, but it won't be today.

That said, I've got a few more minutes.  If anyone wants to make a last comment, they can.

Mr. Verrilli was the first one to rise.

MR. VERRILLI:  Thank you, Your Honor.

Just going to this question of asking for the views of the United States and the risk of delay, I can just say from the way that it normally operates, if the Court were to make that request, it will be taken very seriously, and all the Court needs to do is communicate to the United States what the Court's schedule is for making any decision, and I'm confident that the Justice Department will let the Court know whether it can meet that schedule or not and will make every effort to do so.  That's the normal course on these things.

THE COURT:  I appreciate that.  Thank you very

much.

Anyone here at the table?  Any last words that you want me to consider?

MR. WEIGEL:  No, Your Honor.  We appreciate all the effort, and I'm sure I speak for everyone that we appreciate all the time you've taken today.

THE COURT:  Thank you.  So no one at this table wants to add anything?  No?  Anyone else?

Okay.  Well, thank you all very much.  It has been very helpful, and you will hear from me by Thanksgiving.  We'll be in recess.

(Court adjourned at 5:38 p.m.)


I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


/s/ Brian P. Gaffigan
Official Court Reporter
U.S. District Court