IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

SAINT-GOBAIN PERFORMANCE PLASTICS      :
EUROPE,                                :      CIVIL ACTION
            Petitioner,                :
v                                      :
                                       :
BOLIVARIAN REPUBLIC OF VENEZUELA;      :
PETRÓLEOS DE VENEZUELA, S.A.,          :
                                       :      NO. 18-1963-LPS
            Respondents.               :

- - -

Wilmington, Delaware
Thursday, December 5, 2019
*Oral Argument Hearing*

- - -

BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

- - -

APPEARANCES:


            PACHULSKI STANG ZIEHL YOUNG & JONES, LLP
            BY:  COLIN R. ROBINSON, ESQ.

                 and

            ALSTON & BIRD
            BY:  ALEX YANOS, ESQ., and
                 CARLOS RAMOS-MROSOVSKY, ESQ.
                 (New York, New York)

                      Counsel for Saint-Gobain Performance
                      Plastics Europe



Valerie J. Gunning              Brian P. Gaffigan
Official Court Reporter         Official Court Reporter

APPEARANCES:  (Continued)


                HOGAN LOVELLS
                BY:  SCOTT R. HAIBER, ESQ.
                     (Baltimore, Maryland)

                     and

                HOGAN LOVELLS
                BY:  DENNIS H. TRACEY, III, ESQ., and
                     ROBIN L. MUIR, ESQ.
                     (New York, New York)

                          Counsel on behalf of PDVSA


                ABRAMS & BAYLISS
                BY:  A. THOMPSON BAYLISS, ESQ.

                     and

                ARNOLD & PORTER KAYE SCHOLER, LLP
                BY:  KENT A. YALOWITZ, ESQ.
                     (New York, New York)

                     and

                ARNOLD & PORTER KAYE SCHOLER, LLP
                BY:  SALLY L. PEI, ESQ., and
                     STEPHEN K. WIRTH, ESQ.
                     (Washington, District of Columbia)


                          Counsel for Bolivarian Republic of
                          Venezuela

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following hearing was held in open court, beginning at 10:32 a.m.)

THE COURT:  Good morning.  I'll have you put your appearances on the record for us, please.

MR. YANOS:  Alex Yanos from Alston & Bird on became of Saint-Gobain Performance Plastics.

MR. RAMOS-MROSOVSKY:  Carlos Ramos-Mrosovsky also from Alston & Bird for Saint-Gobain as well.

THE COURT:  Okay.

MR. ROBINSON:  Your Honor, Colin Robinson from Pachulski Stang Ziehl Young & Jones on behalf of Saint-Gobain.

THE COURT:  Thank you.

Good morning.

MR. BAYLISS:  Good morning, Your Honor.  Tom Bayliss on behalf of the Bolivarian Republic of Venezuela. It's my pleasure to introduce Kent Yalowitz, Sally Pei, and Stephen Wirth, all of Arnold & Porter.  Thank you.

THE COURT:  Good morning to all of you.

Good morning.

MR. HAIBER:  Good morning, Your Honor.  Scott Haiber of Hogan Lovells for PDVSA.  And I'll like to introduce my colleagues Dennis Tracey and Robin Muir, both

of who have been admitted pro hac vice; and Mr. Tracey will be presenting argument today.

THE COURT:  Good morning to you as well.

So we're here for argument on the motion for entry of default judgment and the motions to vacate the default.

I do want to hear argument all at the same time just as you briefed things.  The issues obviously overlap. I assume the Republic and PDVSA want to be heard separately; is that correct?

MR. YALOWITZ:  Correct.

THE COURT:  All right.  So what we'll do, we'll hear from the plaintiff first on everything, then we will hear from both defendants on everything, and time permitting, you will each get a chance to rebut one another as well up to our 45 minutes.

So any questions before we get started?

MR. YANOS:  No, sir.

THE COURT:  Any question?

MR. YALOWITZ:  No, sir.

THE COURT:  Any questions?

MR. TRACEY:  No, sir.

THE COURT:  All right.  Let's get started.

MR. YANOS:  Your Honor, thank you so much for giving us this time today.

As I mentioned, my name is Alex Yanos, and I'm here for Saint-Gobain Performance Plastics Europe, the plaintiff in this action.  And,

It is a civil action.  And I apologize, we had filed a petition.  The Clerk of the Court I think set us straight it is better filed in the civil action, so we dismissed the petition that had been filed simultaneously.

Just to keep things as simple as possible, the only relief we seek here today is a judgment in favor of Saint-Gobain.  Under the 1650(a) which is the implementing legislation of the ICSID Convention.  And the ICSID Convention, otherwise known as the Washington Convention, requires each of the members state of which the United States and at one point Venezuela were members to treat an award issued by an ICSID tribunal as if it was a judgment of its highest court.  And the way 1650(a) implemented that is to say that each of the federal courts have an obligation to treat the ICSID award as if it was essentially a judgment of the highest court of one of the several states.  So in this case, you know, it could be a judgment in New York or Pennsylvania.  It doesn't matter.  It has that status as a matter of law under the U.S. code.

So the notion of whether this is default judgment or if it was to be a regular judgment, the issues would be identical because the only defenses that one could

have brought in other than whether there was an authentic award which no one is contesting would be whether there was service or venue.  So the issues are identical.

THE COURT:  All right.  Let me stop you there.

MR. YANOS:  Yes.

THE COURT:  First off, if you were to prevail and I were to grant default judgment, which is what the motion is titled.

MR. YANOS:  Yes.

THE COURT:  Where would that leave you, and particularly where would that leave you vis-à-vis the folks in the Crystallex place?  Would you be in the same place or would you be in a different place?

MR. YANOS:  At that point, we would be in the same place, and we would probably be moving in a very similar fashion to the one that they did.

The Crystallex case was slightly different, as I'm sure the Court is aware.  That was, although an award issued under something called the ICSID additional facility, it was not an ICSID award because at that time Canada was not a member of the ICSID Convention.

THE COURT:  But that is why they had to go through DC.

MR. YANOS:  That is exactly why they went through DC.

THE COURT:  But if I were to grant what you are asking for today, you would then be in the same place where they are.

MR. YANOS:  Yes.

THE COURT:  Okay.

MR. YANOS:  And, of course, that was the idea.

THE COURT:  So let's focus on you said what the issues would be would be identical whether we would think of this as a default judgment or really a merits judgment.

MR. YANOS:  Yes.

THE COURT:  I think you are saying that because you say that all the merits issues have already been finally litigated or arbitrated through ICSID.  That is why you are saying that; correct?

MR. YANOS:  Well, I would go a step further and say that we have what is a judgment in the eyes of the U.S. Code.  And the only issue before this court, you know, the way 1650(a) is written, it says that the awards -- it creates a right under a treaty of the United States and shall be given the same full faith and credit as if the award were a final judgment of general jurisdiction of one of the several states.

So my point is just that while this is a civil action, it is not -- and we're seeking a default judgment, it is not as if there is some future litigation on the

merits that we're trying to avoid here.

THE COURT:  Okay.  So then my question is, when I come to the defendant's motion, they want to vacate the clerk's entry of default; right?

MR. YANOS:  Correct.

THE COURT:  And they cite Third Circuit law that to the extent I analyze their motion, one of the factors is what is the prejudice to the plaintiff from the vacating; correct?

MR. YANOS:  Yes.

THE COURT:  That is one of the factors, right? And I think they say there is, of course, no prejudice to you.  Help me understand what the prejudice would be because presumably it's not that you would have to prove the merits of your case all over again; right?

MR. YANOS:  Well, I don't think that is ever really the issue when you are dealing with -- it's always going to be temporal.  In this case, we're dealing with a situation where there is, as the Court is acutely aware, some, a number of potential creditors seeking to collect; and what is important to us is that we be in a position to participate in any activity, if that activity occurs, and so months could be significant in that process for sure.

THE COURT:  Okay.  But to be clear, it's not that you think -- and I'm not even -- I don't even think the

defendant is arguing this.  That if I vacate the default, suddenly your case becomes one in which we need discovery and you have to prove on the merits that you lost these certain rights to Venezuela and all the other things of the ICSID?

MR. YANOS:  Absolutely not.

THE COURT:  Okay.

MR. YANOS:  Absolutely not.  Thank you for that clarification.

So to move to the issues that they have raised as a defense to the default judgment.  The first question pertains to service.  And I should take a step back and just say we, of course, named both Venezuela and PDVSA in this complaint on the basis of the fact that this Court and the Third Circuit have found that they are alter-egos, meaning in the eyes of the law they're one and the same.  And that I may occasionally refer to Venezuela, but unless it is important, that I will be referring to both Venezuela and PDVSA.

So Venezuela was served by means of the Hague Convention back in December.  We filled out the form, the USM-94 form, and then the form was transmitted to the central authority designated by Venezuela itself, which is, there it has a much longer name, but I'm just going to call it the foreign ministry for the purposes of this

conversation, and they duly acknowledged receipt.

Now, what happened after that is that they did nothing.  Venezuela ordinarily -- and, remember, the Hague Convention is not about states.  The Hague Convention is just about service on litigants, could be a corporation, could be anybody.

Normally, upon receipt, the Central Authority has an obligation to go find the litigant and give them the papers.  In this case, that wasn't necessary because the person that they needed to go find was themselves.  The Foreign Ministry is responsible for Venezuela's foreign relations, obviously, so once the Foreign Ministry received the papers, the only thing they would be doing is handing them over to themselves.  And,

Then Venezuela has complained that we never received a certificate saying that that action has been completed.  But, again, it's simply a statement:  I have received this document and I have given it to myself.  The fact that they didn't do that shouldn't in some way alleviate their responsibility to answer this complaint, nor in some way destroy the perfection of service.  And,

The Hague Convention, in its wisdom, does anticipate that something like this could happen.  In the first paragraph -- and this is very important.  In Article 15 of the Hague Convention, there are two paragraphs dealing

with situations where you haven't received confirmation of service.  The first paragraph deals with situations of actual delivery.  The second paragraph deals with situations where there has been transmission but no record of actual delivery.

So we're dealing with the first paragraph, the paragraph dealing with actual delivery.  And it says that in those circumstances, as long as you can show actual delivery, the service is effectively proper.  And the only issue for us was did we wait the amount of time necessary under the Foreign Sovereign Immunities Act according to sovereigns who had a chance to be -- who can serve, to respond before we filed our motion for default judgment, and we did because the FSIA required us to wait 60 days.  We waited well north of 60 days.  It wasn't until April that we moved for a default judgment.  It wasn't until June that a default judgment was issued, so more than four months, and then six months almost.

So our position is that there was service on Venezuela, and that is really the end of the story.

THE COURT:  All right.  So Paragraph 2 of Article 15 you say is irrelevant?

MR. YANOS:  Completely irrelevant because that deals with transmission but not proof of actual delivery.  Maybe there was actual delivery, we don't know, but here

there was actual delivery so the first paragraph is the relevant paragraph.

THE COURT:  You are not here to argue we satisfied service under Paragraph 2.

MR. YANOS:  No.

THE COURT:  Okay.  Under Paragraph 1, you reference a time issue as being the only issue.  Is that time reference in Paragraph 1 of Article 15 or is that coming from somewhere else?

MR. YANOS:  No, no.  The time issue is actually in the Foreign Sovereign Immunities Act.

Paragraph 1 just says where a writ of summons or an equivalent document has to be transmitted abroad under the provisions of the present convention and the defendant has not appeared, judgment shalt not be given until it is established that:

(A) the document was served by a method proscribed under the internal law of the state addressed -- and we say that was done because we filed under the terms of the Hague Convention.  And,

(B) the document was actually delivered to the defendant or to his residence with another method provided for by this convention.  And,

In either of these cases, the service or the delivery was effected in sufficient time to enable the

defendant to defend.

That would normally be -- the sufficient time would be the time accorded under the, you know, the federal rule.  But the Foreign Sovereign Immunities Act amends the federal rules when a sovereign is involved by giving them extra time, and we waited that extra time.

THE COURT:  Now, what you actually transmitted I think was entitled Request For Service.  Is there any relevance to that?

MR. YANOS:  I don't think so.  Again, the -- it is the sensible authority's obligation to do that service; and the Hague Convention uses words like "must," "shall," to define the essential authorities obligation.  It's not like there was some, you know, optionality on their part to ignore the request for service.  It's just, formally, you don't serve at first.  At first, you give it to the Central Authority, and then the Central Authority serves.

But our point is that in this case where the Central Authority is the party to then be served, there is no further steps that are even conceivable, let alone necessary.

THE COURT:  All right.  Now, you're relying on this finding of alter-ego in Crystallex.  You already referenced it.

MR. YANOS:  Yes.

THE COURT:  I understand you think that is applicable here.  We're going to hear differently, I'm sure you know.

MR. YANOS:  Of course.

THE COURT:  If I were to say that doesn't just translate automatically into this case, does that have implications for your service argument, at least the service argument with respect to PDVSA?  That is, just posit a world for a moment where PDVSA is not the alter-ego of Venezuela.  What is the impact on the service issue?

MR. YANOS:  It would in the sense that while we served PDVSA as well, our position is that because we served Venezuela and they are alter-egos of one another, the fact that the central authority never delivered, or we don't know if the central authority delivered the papers to PDVSA is irrelevant.

So I think in our view, the alter-ego finding applies in all respects.  There's no, like, limited alter-ego concept.  Once two parties are found to be one and the same, it's relevant both for service, it's relevant for the question of doing business, which is the venue issue, which we'll talk about in a moment.  But if one were to not apply it, then, yes, we would be in, PDVSA, in the world of the second paragraph of Article 3.

THE COURT:  I see.  So are you here to say if I

reach that question, that you have satisfied the Paragraph 2, Article 15 exception in order to comply with your obligations for service on PDVSA?

MR. YANOS:  Now, that gets a little bit esoteric, I think, because I was looking at this and PDVSA hasn't filed a limited appearance, so to me, whether -- the fact that we didn't wait six months in order to seek the default motion with respect to PDVSA, I don't know that it should be deemed material at this point a year later since there definitely has been actual notice.  But I would say that if you were applying the second paragraph of Article 15 to PDVSA, which we say should not be applicable, you would have to say that at the moment that the default judgment was entered, that we had not complied with the six-month requirement.

THE COURT:  Well, there's also the obligation that you took every reasonable effort.

MR. YANOS:  Yes.  I feel like we did that.  I mean, we gave the documents to the central authority.  You know, short of getting on a plane and banging on the door in Caracas, which I don't think anyone requires us to do, we took the reasonable efforts required under the law.

THE COURT:  Okay.

MR. YANOS:  So to keep moving forward, I do want to talk about the issues of venue because I think there's

some confusion there as well.

In our position, venue is proper with respect to both Venezuela and PDVSA, and, of course, it is -- as I mentioned, the alter-ego finding is critical to that because this Court has held that PDVSA is engaged in commercial activity within this district.  We say that that is tantamount to doing business within this district, which is what the venue provision requires.  It says, a civil action against -- I'm quoting from 28 U.S.C. 1391 F.3 --  a civil action against a foreign state may be brought in any judicial district in which the agency or instrumentality is licensed to do business or it is doing business.

So here we said PDVSA is doing business in the district, and because Venezuela is PDVSA as a matter of law, then it, too, should be deemed to be doing business here in the district, and therefore venue is proper here.

The other side's complaints about that are to say, one, commercial activity isn't somehow doing business. We think that's a distinction without a difference, and there is a very colorful case that actually talked about that, the *Ultima* against *Austria* case.  I don't know if you saw the movie.  What's it called?  The Portrait of a Lady? It was about a painting that is in New York now.

In any event, the point is that that case did recognize that the two concepts of commercial activity and

doing business don't merit different treatment.  And in those circumstances, we said Venezuela is here.  Therefore, in its equivalents to PDVSA, therefore venue is proper here and we're good to go.

THE COURT:  I mean, you know the question, so in a world in which the alter-ego finding doesn't carry over to this case, is there some other basis in which you say venue is proper as to the Republic in this case?

MR. YANOS:  No, no.  I mean, we brought this action after this court filing in the Crystallex case for a very particular reason, and, of course, since then the Third Circuit has confirmed, denied rehearing en banc.  So we feel like that, you know, those findings are applicable here, and --

THE COURT:  So but if they weren't, then venue is not proper here, and would I transfer the case as to Venezuela to the District of Columbia?

MR. YANOS:  That's correct.

I do want to mention a couple of recent cases that were filed and supplemental authorities by the other side only to mention that they're irrelevant.  That was the *Greentech Energy* against *Italy* case and the *CEF Energia* case.  And those were cases where, there were no allegations of any kind of activity on Italy's part in New York.  The argument was solely that the claimant somewhat cleverly I

guess they thought had filed in State Court.  Cases were moved to Federal Court and then they moved for a transfer of venue.  And the claimant said, well, you can't transfer venue because we filed in the State Court and you removed, and the Court said that's not an issue here.  Unless there's a basis for venue, I'm transferring, and they did.  But that has nothing to do with the situation here, and as the Court properly pointed out, the key issue is the alter-ego finding.

THE COURT:  All right.  They also, I think the Republic is arguing that doing business requires a physical presence in Delaware.  How is that requirement satisfied, here, or maybe it's not a requirement?

MR. YANOS:  There's certainly no textual basis for that argument.  As I said, the question of whether commercial activity is engaged here has already been answered by this Court.  The Court talked about essentially PDVSA managing its U.S. affairs through this -- within this district, and there were, there were physical elements to that in the Court's findings.  But the point we're trying to make is that finding is that they were -- that PDVSA engaged in commercial activity here in Delaware is no different from a finding that they're doing business here, and we don't, we don't see a distinction there, we're thinking, and as I mentioned, the courts in California in that case made a

similar -- reached a similar conclusion.

THE COURT:  The Republic in its reply brief, page 3, said plaintiff does not identify a single case to support its assertion that the venue provisions doing business standard can be satisfied by the mere exercise of the incidence of ownership of shares of the corporation organized under the law of the state in the district.  Is that correct?

MR. YANOS:  Well, I guess what I was trying to get at there is that, first of all, if, you know, going back to your own ruling in the Crystallex case, the mere ownership of shares was not all that was found to be part of the determination that PDVSA is doing business within this district.  There was a detailed discussion of the management of U.S. operations.

You know, as I mentioned, there is no uniform definition of doing business in this court or this circuit or any other, and that was noted in a New Jersey case called *Vivadent*.  I think we cited it in one of our footnotes.  But I think the point is mere ownership of shares is not what the Court found to be happening here.

There's a much more detailed discussion in Crystallex about what PDVSA was doing in the district and that was the basis for the finding of the commercial activity, and we would reference those same findings as

critical to the finding that they are doing business here.

THE COURT:  All right.

MR. YANOS:  Your Honor, that's all I have.  If you don't have more questions, I would just reserve my time for rebuttal or I'm at your disposal.

THE COURT:  Sure.  I think just talk a little bit more about this question of whether the alter-ego finding should automatically apply here.  We're going to hear, you know, a particular record was introduced to Crystallex.  There was a particular time period focus.  Obviously, the Crystallex expropriation was different than the facts of your case.  The Third Circuit I think even talked about discretion to, you know, consider future events.  For instance, help me understand from your perspective why it's simple basically as you say.

MR. YANOS:  Sure.  There are a couple things I want to point out.

First of all, I expect we will hear a lot about the other government that, of course, the U.S. has recognized as the government of Venezuela and how that should somehow change the analysis here.  And I want to focus on a particular temporal issue when we talk about that, which is the issue is not today, but when we filed our complaint and made service.  Right.  And at that point there had not been a change in the recognized government of

Venezuela, so the fact that something happened later in terms of recognition changes nothing.  I mean, the only analogy I can give is if I serve a corporation in December and the CEO is changed in March or February, that doesn't change -- either I served that company in December or I didn't.  The fact that the person at the top is changed is meaningless to that question, and here, it is the same thing.

We served in December, and although the putative head of state may have changed since then, that doesn't retroactively un-create, un-effect service.  So in terms of that issue, I think the temporal issue is important.  And that relates also to the questions of venue and alter-ego, because the question is not have -- has the situation changed today.

I mean, they can raise the issue of whether things have changed in terms of execution of some later date, but here we're talking about the question of venue and service.  So the temporal focus has to be back in December of 2018, when service was effected and when the complaint was filed.  And at that time we would argue that there's no question that the Court's findings of alter-ego and unity between the state and PDVSA are fully applicable and therefore 100 percent relevant to the determination of whether venue is proper and 100 percent relevant to the

question of whether service had been perfected.

THE COURT:  Okay.  Well, we'll save the rest of your time then.

MR. YANOS:  Thank you.

THE COURT:  Thank you very much.

MR. YANOS:  It was a pleasure.

THE COURT:  Who is going to go first?

MR. YALOWITZ:  I will, Your Honor.

THE COURT:  Okay.  Good morning.

MR. YALOWITZ:  Good morning.  Ken Yalowitz from Arnold & Porter.

May it please the Court, although we're here primarily to talk about procedure, service and venue and personal jurisdiction, I want to begin by reminding the Court that the National Assembly and interim President Guaido deplored the expropriation that gave rise to this case, and they are committed to an orderly and consensual restructuring of the legacy debt obligations on the Republic, including this obligation and others arising out of expropriations like this.  That is a material difference from the prior regime.

I would also remind the Court that Venezuela is blessed with abundant natural resources, enterprising people, vast oil and gas reserves, and a commitment to rebuild its economy, but right now Venezuela is rift with a

humanitarian crisis that is unmatched anywhere in the world except for Syria.  And the economy has fallen faster and harder in Venezuela than it fell, for example, in the United States during the Great Depression.

Alleviating humanitarian crisis, restoring Democracy, rebuilding the economy, reaching an orderly and consensual resolution of Venezuela's debt obligation, legacy debt obligations are all things that are going to take time. And the Court I'm sure is acutely aware that forward motion in this case and other cases in this court will beget more cases in this court.

Most of the courts that have cases against Venezuela and PDVSA right now are taking the cautious approach.  They have either stayed litigation or halted action or, in the case of Judge Torres in the Southern District of New York which has some bond cases, Judge Torres has set a briefing schedule on the question of a stay.  And,

So I just want to remind the Court of those things; but in the meantime, we're here on a procedural motion and though the plaintiffs who have chosen to move forward against Venezuela, as is their right under the law, are doing so because they hope to gain an advantage over asylum and vast majority who are forbearing in this time of crisis, and those plaintiffs who have chosen to move forward are required to turn square corners.  And they're required

to turn square corners as anyone would against a foreign sovereign not only because it's the morally right thing to do here but because Congress wants it that way.  Congress wants it that way because when we -- when our government is sued in foreign lands, we want their adversaries to turn square corners as well.

So obviously the reason Saint-Gobain is here instead of the District of Columbia is because they wanted to take a shortcut and try to win the race to the courthouse as against others, and they want the Court to convert the default judgment -- the clerk's default into a judgment and issue an attachment order, and there are four problems with that:

Problem No. 1 is personal jurisdiction.

Problem No. 2 is there is a meritorious defense on the merits in addition to personal jurisdiction.

Problem No. 3, as Mr. Tracey will discuss, is the problem of subject matter jurisdiction over PDVSA.  And,

Finally, there is no venue in this court.

I just want to say I was looking at Section 1406(a) last night, and the default instruction of 1406(a) is to dismiss for lack of venue unless the interest of justice commends transfer.  And I think practice has developed that courts transfer instead of dismiss but because of the thorny issues that we have right now because

of the transition between 2018 when the case was commenced and today, I think it would be cleaner to dismiss and let Saint-Gobain file a new case, effect service in accordance with the Foreign Sovereign Immunities Act and begin again.

So with regard to service, I think that the Court should focus on three articles of the Hague Convention:

First is Article 6.  Article 6 requires the Central Authority either to complete a certificate or refuse to complete a certificate.  It doesn't -- it says that if they decide not to serve the document, they have to set out the reasons that prevented service, and they say that -- they say that the applicant may require a certificate not completed by a Central Authority to be countersigned by one of those authorities.  So the Hague Convention contemplates the concepts that there may not be service in Article 6.

The second provision I think the Court should focus on is Article 13.  Article 13 expressly permits the Central Authority to refuse delivery in cases where the Central Authority deems that compliance would infringe its sovereignty or its security.  And the Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal.

So we can imagine a world in which, say, the Maduro regime decided that service of an expropriation

complaint or a complaint to confirm an arbitrable award infringed on its sovereignty. Foreign sovereigns may consider all kinds of reasons why things infringe on their sovereignty.

I'm not advocating that this case would qualify. I'm just saying there is a world in which foreign sovereigns can refuse to accept delivery of process because it infringes on their sovereignty. That is in Article 13.

Finally, and that would be -- Article 13, that aspect of Article 13 would be meaningless if all you ever had to do to comply with the Hague Convention was deliver a request for service on the Central Authority.

The Central Authority has the power to say no, this infringes our sovereignty. It infringes our sovereign immunity from suit. And if you all you need to do under the Hague Convention is deliver the requested service, then Article 13 becomes meaningless.

THE COURT: But here, you are not contending that the Republic has complied with Article 13.

MR. YALOWITZ: Correct. Correct. I'm not contending that. The point is not that it governs, but that it would be meaningless if Article 15 is read as the plaintiffs contend. The plaintiffs contend that all you ever need to do is deliver to the foreign sovereign and that is sufficient under the Hague Convention.

And they base that -- Saint-Gobain bases that on paragraph 1 of Article 15, and I submit that is a misreading.

Paragraph 1 affirmatively forbids the entry of judgment unless there has been either formal service or actually delivery.

So Paragraph 1 is a restrictive provision.  It says you may not enter judgment unless one of these two things has happened.  It doesn't say that is enough.  It just says you may not.  And then,

Paragraph 2 permits judgment in countries that allow adopt Paragraph 2, and the United States is one. Paragraph 2 permits judgment in the absence of the certificate if certain conditions are met.

THE COURT:  So this was not at all clear from your briefing, but your contention is if the requirements of Paragraph 1, Article 15 are satisfied, that is not enough.

MR. YALOWITZ:  Correct.

THE COURT:  And you get that from what?

MR. YALOWITZ:  From Article 13.

THE COURT:  Well, why isn't Article 13 inapplicable when the Central Authority fails to give notice either way, which is what happened here?

MR. YALOWITZ:  I would say Article 13 does not govern but in understanding a treaty, we look at all the provisions and harmonize them.

THE COURT:  But what is non-harmonious about Article 13 can be triggered when the Central Authority says something but when the Central Authority says nothing, we're in Article 15 world?

MR. YALOWITZ:  We are in Article 15 world.  And the question on the table is what does Paragraph 1 of Article 15 mean?

And I contend that Paragraph 1 is restrictive, not permissive.  And the plaintiff contends that article 1 is permissive or Paragraph 1 is permissive.  That I think is the debate.

THE COURT:  All right.  Any cases on your side?

MR. YALOWITZ:  Not, not that I can think of offhand.  I don't think this issue has been litigated in a contested action.

The only case I can think of is there was a case against Venezuela, Your Honor, in Florida.  I'm going to mangle the name but it starts with a D.  It's called Devingochecha -- *Devengoechea*.  And that was a case in which the plaintiff performed Article 15 service or, you know, did -- the plaintiff made a request.  Republic of Venezuela did not respond to the request.

The plaintiff then sought a default judgment and the Court entered a default judgment and the Court said the reason I'm entering the default judgment is because of

Paragraph 2 of Article 15.

The three subparagraphs of Article 15, Paragraph 2 have been met here, and six months has elapsed.  There is no -- certificate and they made no reasonable effort and so therefore I find that Article 15 is met.

That -- now Venezuela did not appear.  They didn't contest isn't.  It wasn't -- it was, you know, ex parte proceedings and one party proceeding.  But the Court did not say I don't need to evaluate whether six months has elapsed.  I don't need to evaluate whether in my discretion I deem the time to be sufficient which Article 15 gives the Court that, that discretion.

The Court didn't say I'm going to rely on Paragraph 1.  The Court performed the analysis that I think everybody has been performing about Paragraph 2.

THE COURT:  All right.  But your contention is I have to look at Paragraph 2 in this case and further that those requirements of Paragraph 2 are not met?

MR. YALOWITZ:  Correct.

THE COURT:  So we're now obviously many more than six months.

MR. YALOWITZ:  Correct.

THE COURT:  Since service.

MR. YALOWITZ:  Correct.  I noticed that.

THE COURT:  If you persuade me I should think

about Paragraph 2, why wouldn't I say that were past six months now?  They made every reasonable effort and/or would I say the clock starts now and we'll wait six more months?  Where would it lead me?

MR. YALOWITZ:  Sure.  You know, in a world in which there was not this change in recognized governments, I would say it would be a much easier case because it has been more than six months, and the plaintiffs, although they haven't done the things that you would expect of somebody like trying to get actual notice like write a letter asking for a status report, or make a phone call asking for a status report.  And certainly there is a lot of daylight between doing nothing on the one hand and getting on an airplane to Curacao and making a personal visit to the Central Authority on the other.  And these plaintiffs didn't, this plaintiff dent do any of that.

So there might be a close question here.  And obviously the paragraph about -- let me just read the words right.

A period of time not less than six months considered adequate by the judge in the particular case would appear to give the Court significant discretion to account for all kinds of circumstances that may appear.

So there is those two problems, but there is a bigger problem, a more complicated problem which has to do

with the recognition.  I should talk about that.

The formal recognition by the President of the National Assembly and Interim President Guaido and the declaration by the President that Maduro's continued conduct within Venezuela is illegitimate in the eyes of the United States has important legal consequences.

And if you indulge me, I'd like to just sort of give you two background examples of those consequences and then talk about how that applies here.

THE COURT:  Okay.

MR. YALOWITZ:  So the sort of most immediate example is a case called *Jimenez* against *Palacios*, and that was decided by the Chancery Court here in Delaware over the summer.  It is now on appeal to the Delaware Supreme Court, and it is a very important case for the purposes of the case before Your Honor today and the other cases that are related, loosely related.

In February, the Republic -- the National Assembly enacted a transition statute requiring an ad hoc board to be appointed to control assets of PDVSA outside of Venezuela.  In April, there was a presidential decree, President decree number three requiring that ad hoc board to insist on regularity and technical, governance by technical standards, not by political standards.  So the transition of the democracy statute and presidential decree number three

are important material developments within Venezuela.

Acting under those provisions, the National Assembly appointed an ad hoc board of PDVSA.  That ad hoc board following Delaware corporate governance standards replaced the board of PVDH.  The new board of PVDH then appointed the corporate officer, which took action allowing the replacement of all the boards all the way down the chain to Citgo.  And in *Jimenez* against *Palacios*, the old board of PVDH challenged that action and they said that that was illegal under Venezuelan law, and they are the rightful controllers of PVDH and Citgo and not the National Assembly of the appointed board.  And,

The Chancery Court said because the President had recognized the National Assembly and had refused to recognize the legitimacy of Maduro and the Delaware -- and the Venezuela Supreme Court, the new board was the correct board under U.S. law to control that property, because recognition has consequences in the courts throughout.

The second case -- obviously, that decision is going to be important on the merits of any alter-ego finding in the future, because as I understand the Court's, the Court's decision in Crystallex, you were not saying I find Venezuela and PDVSA to be -- I don't find PDVSA to be primarily liable.  You were saying, in essence, the judgment creditor has discovered an asset in the hands of Venezuela

and I'm allowing them to move forward against that asset. And so sitting here today, we have an asset that is no longer in the hands of the Republic in the same way that it was because of the "regularity, corporate governance," and the lack of the kind of things that were going on in the past.

There is not going to be any evidence that Citgo is flying politicians from foreign countries around on airplanes or using its trucks to engage in political activity. There's not going to be any evidence that the National Assembly is setting prices or dictating terms or telling Citgo that it has to sell oil at a discount to foreign countries or, you know, all the kinds of things that animated the Court's decision about the relationship between PDVSA and Venezuela are not going to be in any record starting -- of any conduct starting after the new board was appointed in February of this year.

The second case -- and, by the way, the *Jimenez* case was based on a long line of Supreme Court cases that said essentially recognition is a political decision, and we don't have the power -- we, the judges, don't have the competency, institutional competency or constitutional authority to disobey the decision of the President on recognition. And that line of cases also animated a decision from the Third Circuit called the *Morette*, which

was a case that addressed who owned a ship, and the conflict was between an entity that had been created by the new, the Soviet Union Estonian government and the private owners whose property was expropriated.

And the Third Circuit said, you know, we can't recognize decrees or acts or conduct of the Estonian Soviet Union, Soviet Republic, because the President had declared that illegitimate.  That was in 1944 or thereabouts.

So, again, the Courts can't legitimize conduct of an illegitimate government.  That's the takeaway from that line of cases.  And so when we apply that to the service issue here, I agree that as of December of 2018, the Maduro regime was the recognized government, and so conduct of the Maduro regime in December of 2018 would be recognized by the United States, but today, or any day after January 28th, action or inaction by the Maduro regime is irrelevant in the eyes of the United States law.  And so it creates a bit of a conundrum for a Court measuring the six months of inaction because you can't say, well, the central authority, the Minister of Foreign Affairs, which is controlled by Maduro, has taken inaction and I'm using that inaction in order to make a decision.

And that's why we said in our brief we don't think that 1608(a)(2) of the Hague Convention is available at this time in this country for actions --

THE COURT:  Let's go back then to paragraph 1, because plaintiffs say -- they are not relying on Paragraph 2 of Article 15 we're talking about now.

Do you dispute that the requirements A and B or A or B are satisfied here?

MR. YALOWITZ:  I do, because I think that -- I think that the requirements A or B -- well --

THE COURT:  I recognize your overall point that it's not sufficient to perfect service on the Republic, but are the requirements of the first paragraph opened up now?

MR. YALOWITZ:  So the transparent answer is I don't know.  I don't know how the -- I don't know how the central -- how the people that receive this document relate to the Minister of Foreign Affairs.

There was a case involving Sudan in the Supreme Court in the last year or so in which delivery to an Embassy in the United States -- the service was addressed to the Minister of Foreign Affairs, but delivered to the Embassy and expected to make its way from the Embassy to the Minister of Foreign Affairs of Sudan, and the Supreme Court said, no, that's not what -- that's not what the Foreign Sovereign Immunity Act permits.

And so I just don't know enough to say -- standing here today, I don't know enough to say as of

December 2018 there were -- I know that there were two individuals who signed for these documents.  I don't know who they were.  I don't know what their relationship was with the Minister of Foreign Affairs, so I just can't answer the question.

THE COURT:  Let me ask you this.  You said, of course, a lot of, you know, eloquent and troubling things about the situation in the Republic, and I heard them a few weeks ago, of course, as well, and obviously we all have some awareness of that just being citizens.

I take it that plaintiff's view, coming back to the very specific procedural questions we're here for today is, to the extent there's relevance to those concerned, they come up at a later stage.  You'll be heard at the execution stage or maybe before that.

What's the response to that?

MR. YALOWITZ:  You're talking about the humanitarian crisis?  Humanitarian, political crisis.

THE COURT:  Even arguably, the exchange of control at Citgo or PVDH.  All of that I think they would say, don't worry about it today is what they would tell me.

MR. YALOWITZ:  So I would say that -- well, let's start with the specific and move to the general.

I think that to the extent we're in a -- to the

extent we're dealing with a treaty that gives the Court discretion to consider facts and circumstances, which paragraph of Article 15 clearly does, I think those are relevant to the Court's exercise of that judgment.  That's the first thing.

The second thing is there is always a right and -- there's always a right and responsibility of the Court to consider the management of its docket.  As long as there's not a rule that says you must do a thing or you may not do a thing, the Court has inherent power to control its docket and can certainly do that within the exercise of its discretion.  And,

The third thing is, you know, you and I talked about this a couple of weeks ago.  In cases that implicate significant foreign affairs concerns, as this one does, the District Court has the power to request the views of the United States.  It's not an obligation, and as I said before, not every -- not every district judge wants to hear from the United States and sometimes I think even the Supreme Court doesn't want to always hear from them.

But the United States would have views about the foreign policy concerns that we've expressed and there will come a time when they express those views, and it may be now and it may be later.

So those are sort of the three things I would

say about that in the context of today's -- the issues that you're confronting, wrestling with today.

THE COURT:  And we're starting to get short on time on your motions, because I think you are on the motion to vacate the default.  Right?

MR. YALOWITZ:  Right.

THE COURT:  Correct?  So one of the factors that the Third Circuit would have me consider is whether the default was the result of the defendant's culpable conduct. In analyzing that, if I reach that question, am I to forget about everything that happened under the Maduro regime or does the current regime inherit those responsibilities?

MR. YALOWITZ:  So the current regime inherits the liabilities, so the Court should not forget that the Chavez and Maduro regimes expropriated property.  That is, at the end of the process, that is the reality and they deserve to be compensated and I'm not standing here saying they don't.

With regard to -- I think that the Third Circuit's question of culpability is not did you do a bad act, but was your default willful in a sense?  Was it a result of a strategic decision?  Did you lay in the weeds for awhile to lure them into a false sense of security, you know.

I had a case not long ago where I was

representing some terror victims who got a default judgment against a Palestinian authority and then they testified in quite a wrenching damages inquest, and then the Palestinian authority, where the lawyers sat in the courtroom watching this testimony then showed up and said, you know, we'd like to move to vacate the default, and that was, you know, willful and strategic, and that's not what happened here. You know, I can tell you -- I can't tell you what went on with regard to this case in December and January, but I can tell you that starting in February the new management of the Republic was drinking from a firehose, and nobody is -- nobody has said, well, we're just going to -- we're just going to lure St. Gobain into some kind of a false sense of security.

THE COURT:  All right.  And I guess my only last question at the moment would be:  If I vacated the default, but the case is still here, what happens next?  Do you agree, because the ICSID award, I'm not going to have to deal with the merits of the expropriation.

MR. YALOWITZ:  We're not arguing that the award should be nullified.

THE COURT:  What would they have to show in order to give a judgment at whatever time the case went forward?

MR. YALOWITZ:  I think they would have to show

that they had the specific license.  I think you can't get a judgment -- I think that the Court can do, you know, preliminary adjudication, discovery, summary judgment.  I mean, in this case, there wouldn't be much to do.  For example, there might be a case where there is, a bond case or something where there was some question of standing, but I think that the actual entry of judgment requires a specific license.

THE COURT:  Okay.  All right.

MR. YALOWITZ:  And did you have any questions about whether owning shares is enough for --

THE COURT:  Yes.  If you want to address that briefly?  You are under 15 minutes now.

MR. YALOWITZ:  Okay.  Well, I just, the only case that -- Your Honor, I would -- counsel mentioned a *Vivadent* case.  I think that case is a very good case in terms of laying out the standard.  You know, I embrace it.

Judge Winter has a concurrence in the *Corporacion Mexicana* case that also does a very good job of laying out the standard.  Those are both quite good.

There seems to be a bit of a circuit split between the Ninth Circuit and the First Circuit about if you're soliciting business or collecting money in the district, is that doing business?

But I don't think anybody has ever said you own

shares of a corporation, you need to -- you are doing business in the state.  And the standard is key to, do you need -- at least traditional standard, the one adopted by those cases that I mentioned, is are you doing enough?  Do you have enough of a presence in the state that you need a license, or you might need a license, or you likely need a license.  It is sort of tied to that idea.  And,

Nobody has ever said you need a license to do business in the State of Delaware if you own Delaware shares or even if you own 100 percent of the shares of a Delaware organized corporation.  So I think it's just been the rule since there were general corporation laws.  It's just ...

THE COURT:  And the things I found in Crystallex that PDVSA or Venezuela were doing with their ownership of shares of the Delaware corporation, you would say all I found was exercise of your rights as a shareholder?

MR. YALOWITZ:  Exactly.  I mean none of that conduct was directed toward Delaware citizens.  That conduct was not directed toward soliciting Delaware customers, collecting money be from Delaware customers.  The conduct was directed toward ordinary incidents of ownership of shares.

THE COURT:  Okay.  Is there anything else you wanted to address?

MR. YALOWITZ:  No, I think we covered a lot.

THE COURT:  Okay.

MR. YALOWITZ:  I mean I'm sure there are things I will regret not saying.

THE COURT:  Well, thank you.  We'll turn it over to PDVSA then.

Good morning.

MR. TRACEY:  Good morning, Your Honor.  Dennis Tracey for PDVSA.  I'm going to cover the topics that you have heard about today already.

First, service, whether there was adequate service on PDVSA specifically.

Second, whether the Court should exercise, even if there was service, whether the Court should exercise its discretion to vacate the clerk's default.  And,

Third, the question of whether the plaintiff has presented any adequate evidence satisfied to the Court under 1608(e) to satisfy the Court that there is actual liability on the part of PDVSA which is required under the FSIA with respect to default judgments against sovereigns.

So starting with the service.  I think Mr. Yalowitz covered the issues well, but specifically with regard to PDVSA, I would like to emphasize the fact that the requirements of service in the Hague Convention are very clear what is required.  And it's important, I would submit, important to accommodate relationships among sovereigns to

follow the rules before entering a default judgment.  And it would be a serious issue of comity for a court to enter a default judgment when a sovereign -- when it is unfair to the sovereign because it doesn't follow the rules. Sovereigns should be able to rely on the fact that U.S. courts and U.S. plaintiffs will follow the rules.

THE COURT:  If PDVSA is alter-ego of Venezuela, is the service analysis any different for PDVSA than it is for the republic itself?

MR. TRACEY:  If it is the alter-ego for purposes of service, which I will come to, the issues would be the same, but it is not, we would submit.

THE COURT:  Okay.  Why don't you talk about it.

MR. TRACEY:  So as this Court made very clear in the Crystallex case, the findings there were based on a very specific record.  They were based on very specific facts, a specific time period, and the Court specifically said -- I'm quoting -- "the record which has persuaded this Court that PDVSA and Venezuela should be treated as alter-egos of one another may not be the same record that is created in some other action."  And then you point out even in the Crystallex case, the record may be supplemented.  And,

So I would submit that there is no basis for treating the PDVSA as the same entity as Venezuela for purposes of service under the Hague Convention.  There were

no findings in the Court's Crystallex decision that the alter-ego concept should apply to anything of that sort.  It was a totally different context relating to, as Your Honor is well aware, enforcement of a particular judgment.

THE COURT:  So assume for purposes of the question, if I agreed with that, where does that leave me in this case against PDVSA?  Do I give them a chance to try to show those facts?

MR. TRACEY:  That is one option that the Court would have.  If the Court so chose, it could have a hearing and allow the entry of evidence that would support such a finding.

THE COURT:  And would the date in question that I would be considering at that hearing be December of 2018 or would it be now or some other date?

MR. TRACEY:  It would be the date on which service was effected.  And so the plaintiff contends that service was effected in December of 2018.  We obviously strongly disagree with that.  The Hague Convention has certain specific requirements.  It does not include taking what is clearly defined in the Hague Convention as a request for service and suddenly transforming it into effected service.  And,

That is where the unfairness and the comity issues comes in, because a foreign sovereign has a right

to understand when it is served.  And under the Hague Convention, PDVSA could not be served simply by sending a request for service to the Ministry.

What Article 15 requires --  well, starting with Article -- starting with Article 2, it says:  The Central Authority will undertake to receive requests for service. It doesn't say it will receive service.  And,

Then under Article 5, it provides that the Central Authority shall, itself, serve the document or arrange to have it served.

There is no exception for a government owned entity.  And,

Then it requires the return of a certificate under Article 6.  And it specifically provides, as Mr. Yalowitz said, what happens if that certificate doesn't arrive.  And,

One of the requirements is that the Court find that an adequate time period has elapsed after the initial request for service.  Six months is mentioned, but it's a minimum.  It's not an adequate time in every case.  And,

In this case -- and, secondly, it requires, it requires reasonable efforts.  It actually says every reasonable effort to follow-up on it.

Saint-Gobain said to this Court that they served the request and nothing happened.  Well, we actually don't

know that.  We have no idea what happened after that request was put in.

THE COURT:  They didn't get a certificate back. Right?  We know that.

MR. TRACEY:  We know that there was no certificate come back.  What we don't know is if they followed up, they would have found out that there is a request pending or it is on its way or whatever.  I don't know exactly how they do it, but there is a reason that Article 15 says that you have to use every reasonable effort to follow-up.  And,

Every court that has allowed a finding of service where there was no certificate specifically relies on that Article 15 requirement that adequate time pass and that reasonable efforts be made.

So none of that has been done here.  I think that the plaintiff accepted that.  I'm not sure, but there is no evidence of it.

THE COURT:  Move on to your second issue, which I think is even if service is found to be proper, I could and presumably should still vacate.

MR. TRACEY:  Yes, Your Honor.  So there are three requirements.  As Your Honor knows, the first is whether there is any prejudice to the plaintiff from lifting the default.

Here, there has been no prejudice identified.

Yes, the process of serving, which they can do, right?  They can follow Article 15 and effectuate service.  It will not take -- I don't know how long it will take but it's not a long period of time, and the courts disfavor defaults and favor adjudication on the merits.  And so --

THE COURT:  Here, what would adjudication on the merits look like?

MR. TRACEY:  As Mr. Yalowitz said, it would not involve a determination of the underlying merits of the award.  That is clear.

With respect to PDVSA, the question would be, first of all, whether there is subject matter jurisdiction.  We'll come to that.

Whether there is venue.  And,

Third, the question of whether PDVSA is, for purposes of this case, at this time, the alter-ego of Venezuela for purposes of imposing primary liability on PDVSA as a party to a judgment, that it was not involved -- in which it was not involved in any of the underlying activities.

THE COURT:  Let's focus on that.  I know we're past your time now, but I'll give both sides some extra time.

You say that PDVSA is differently situated here

as a named defendant than PDVSA was in the Crystallex case. And you are saying the plaintiff is trying to make you primarily liable and not just attach or execute your property.

I think the plaintiffs are saying they don't really agree with that but help me understand why you're n a materially different place in this case than I confronted in Crystallex.

MR. TRACEY:  Well, I have read the complaint that was filed by the plaintiff, and it doesn't say that they simply want to execute against specific assets of PDVSA.  It says they want to make PDVSA liable on the judgment for all purposes as an alter-ego of Venezuela. That is quite clear from the complaint to me, Your Honor. I may be misreading it but that is my reading of the complaint.  And,

If it's not that, then PDVSA really isn't involved right now.  We have to wait until a judgment is entered and execution starts and then a garnishment is served, and then we can have the discussion about commercial activity and alter-ego and everything else.

THE COURT:  All right.  I'll give you a couple more minutes.  Use them however you wish.

MR. TRACEY:  I'll be very brief.

The second point for your discretion is whether

there are meritorious defenses.  And there are.  We laid them out in the brief.

I would say, the one thing I want to highlight for your purposes today is subject matter jurisdiction.

There is no question that PDVSA was not a party to any underlying arbitration agreement and therefore the exception to the Foreign Sovereign Immunities Act that would apply here under the plaintiff's theory does not apply to PDVSA.  And,

Both the *Peacock* case and Your Honor's decision in Crystallex recognize specifically that if, and, again, I may have this wrong, if the plaintiff is seeking to hold a third party liable for all purposes under a judgment against another party on an alter-ego theory, there must be an independent basis for jurisdiction against that third party, and I think the plaintiff would acknowledge that there is no such independent basis for subject matter jurisdiction in this case.

Just lastly, I would like to remind Your Honor about 28 U.S.C. 1608(e), which requires evidence satisfactory to the Court.

With respect to the judgment, the effort to impose a judgment against PDVSA, the only evidence of alter-ego is the reference to Crystallex.  The world is very different today.  I won't go through that again, but there

is no evidence in the record sufficient for this Court to find a judgment against PDVSA.

THE COURT: Okay.

MR. TRACEY: Thank you.

THE COURT: Thank you very much. We'll turn back to plaintiff and I will make sure he spends a few minutes to reply as they wish.

MR. YANOS: No problem. Your Honor, just before I answer any questions that you might have relevant to what was just said, there were a couple of points I just thought were worth drawing your attention to, and counsel for Venezuela and PDVSA can be excused for not knowing any of this because for some reason their client chose to use them instead of Mr. Pizzurro, whose firm was actually on the other side in the arbitration itself. But the factory that was expropriated in this case, and, of course, it's in the record because it's an arbitration award, was taken over by PDVSA. I mean, this is not a situation where PDVSA was serendipitously brought into a story to which it has no historical connection. Venezuela expropriated the factory by giving it to PDVSA.

THE COURT: All right. But that said, is it correct that -- I mean, you have sued PDVSA in this case.

MR. YANOS: Yes.

THE COURT: They're a named defendant. Correct?

MR. YANOS:  Yes.

THE COURT:  Does that mean you're trying to hold them to primary liability?

MR. YANOS:  No.  We're just trying to get paid for something that they should have paid us for many, many years ago.

THE COURT:  I mean, obviously, you're familiar with the Crystallex case?

MR. YANOS:  Yes.

THE COURT:  Doesn't that set you apart in a materially different status, vis-à-vis PDVSA, than Crystallex was?

MR. YANOS:  Well, I don't think so, because I think the point is once you reach the conclusion that the two entities are one and the same, it's really, we're just saying that we need -- whoever is here that is able to pay should pay, and that is the way we understand an alter-ego discussion under *Bankeck* to work.  So --

THE COURT:  So what's the response to the argument that even Crystallex and *Peacock* recognize the immediate independent basis for subject matter jurisdiction against a party that you're trying to hold primarily liable as opposed to just trying to execute on the property?

MR. YANOS:  Well, again, I think the issue in those cases came -- the determination was prior to a finding

of unity between the two parties.  In our view -- I mean, PDVSA could have been sued in the U.S. on misappropriation because they were in possession of the taken property.  So if we had been -- if there had been no treaty, we would have sued PDVSA in this jurisdiction actually, right, or in D.C. I'm not sure right now.

But we would have sued them because they were the owner or the holder of the taken property, and there are actually exceptions in the Foreign Immunity Act, I don't have them right now in front of me to quote chapter and verse, that would deal why they would be capable of answering for the claim in that context.  So there would have been independent subject matter jurisdiction even in that circumstance.

I do wanted to talk quickly about the distinction that we heard from Venezuela about, Article 15, which doesn't bear even cursory scrutiny of the language.

When we were talking about the difference between Article 15, Paragraph 1 and Paragraph 2, again, and I hate to just read, but it says, where a writ or summons or equivalent document has to be transmitted abroad for the purposes of service, under the provisions of the present convention if the defendant has not appeared, judgment shall not be given until it is established that.  So it's not structured like, well, establish this and then go on to the

next paragraph.  It just says, until it's established that, and as you pointed out in your questions to them, A or B, and B is the document was actually delivered to the defendant.  And,

There was some talk about, well, yeah, but that's the central authority and other cases don't deal with -- made different determinations relating to the central authority.  The central authority in every case is not the same.  Okay.  Venezuela could have appointed some other part of its government as a central authority.  In the record, there's a discussion of the case involving Israel and it was basically the clerk of a judicial court that was the central authority in that case.  And you might make a different analysis if that was the central authority.  But in this case, Venezuela designated its ministry of, you know, popular power of foreign affairs, and that is the very instrument of engaging in international affairs.

So I think whereas in some other situation, and this is not like the case that was referenced where you serve an Embassy and you expect that document to somehow wend its way back to the home country in some attenuated fashion.  The document was dumped into the lap of the very organ of the state that's in charge of foreign affairs, which is what we're dealing with here.  So --

THE COURT:  The case you are distinguishing

must be the Sudan Supreme Court case from earlier this year?

MR. YANOS:  Yes, that's correct.

And then the other thing I wanted to mention just because it came up, again, this idea that in Crystallex, the determination was somehow just owning shares.  You know, the Court found by a preponderance of the evidence that the PVDH shares are being used for commercial purpose by PDVSA and therefore may be attached as property of Venezuela's alter-ego.

The shares are used for a commercial purpose because through them, PDVSA manages its ownership of PVDH and consequently Citgo in the United States, so it goes way beyond just a passive holding of instruments its managing.  And that is the holding that we were seeking to rely upon when we talk about doing business in the district.

You went on to say, specifically, Venezuela uses its shares to appoint directors, approve contracts and pledge assets as security for PDVSA's debts.  Again, so that's a much broader analysis.  And,

They can talk all they want about how everything is changed now, although they made that very argument to the Third Circuit, and the Third Circuit I thought quite appropriately brushed it to one side, but the point anyway here is, we're here to talk about venue and we're here to

talk about service in December of 2018 before they claim to have changed things, which, again, is unsubstantiated by any evidence.  But even if there were such evidence, it wouldn't relate to the question of whether they were served and whether at the time that the case was filed, venue was appropriate in this district, which we say it is.

I'm going to look at my notes --

THE COURT:  Sure.

MR. YANOS:  -- to see if I have anything further to say?  If not, I'm happy just to answer questions.

On, again, I mean, not to go too far with this, but what we're seeking right now is the entry of a judgment, so whether there's a humanitarian crisis in Venezuela or not is not a reason to deny us a judgment on an award that the U.S. Code says should be treated as if it was a judgment in the United States of one of the highest courts of another state.

You know, I'm prepared to answer questions about that when we get to the execution stage, but for the purposes of our conversation now, it's really neither here nor there.

THE COURT:  They suggest, I think, that they will then ask for a writ of attachment.  Is that the stage at which we would have that conversation?

MR. YANOS:  I think it would be, yes.  And,

The other thing I wanted to mention that they did bring up was the issue of a license.  Our understanding is we only need a license to execute, not to obtain this judgment.

THE COURT:  Okay.

MR. YANOS:  Okay.

THE COURT:  All right.  Thank you very much.

MR. YANOS:  I thank you for your time.

THE COURT:  Sure.  We'll hear briefly from the Republic.

MR. YALOWITZ:  Thank you, Your Honor.  I have five very short things to say.  I thought it would be four, but I just cannot leave unanswered the comment that the Third Circuit brushed aside the notion that the Republic, things are different.  I was there.  I spoke to those judges and they were not brushing it aside.  And they said in their opinion that we were to take that up with this Court, not that it was irrelevant.  So I think I've said enough about that.

With regard to subject matter jurisdiction, the plaintiff has relied exclusively on the arbitration exception.  We heard for the first time in reply on oral argument about the expropriation exception.  It doesn't apply here.  It applies when the property is in the United States and that's not this case.  The expropriated property

is in Venezuela.

No. 3, nothing is in the record about who the people are who signed for this document.  We have a first initial and a last name.  There's no indication that they're employees.  There's no indication who they work  for.  And that information is unavailable to me as I stand here today because I don't have access to who those people are and what their relationship is to the Republic of Venezuela.

THE COURT:  Is there any dispute about the address, the address that it was delivered to as part of the foreign ministry?

MR. YALOWITZ:  I'm not disputing that, no.

No. 4.  If you look at the lead-in language of the first paragraph of Article 15, it says, and this is -- I just want to be very clear about the text.  It says, judgment shall not be given until it is established that.  It doesn't say judgment shall be given if it is established.  It says, judgment shall not be given until it is established.  And so those A or B are necessary, but not sufficient.  That is the point.  They are necessary but not sufficient.

Then I think the final thing I want to say is with regard to a license to enter judgment, I would refer the Court to the definition of transfer in 31 C.F.R. 591.310.  The definition of transfer, which transfer is what's forbidden by these executive orders.  And then the regs

define transfer as broadly as I've ever seen anything define transfer, and it includes without limitation the,   I'm going to read this verbatim, the issuance, docketing, or filing of, or levy of or under any judgment.  So at least under the regs, the issuance, docketing or filing of a judgment is deemed a transfer.

So those are the five things I wanted to say.

THE COURT:  Okay.  Thank you.

MR. YALOWITZ:  Thank you.

THE COURT:  Thank you very much.  We'll have PDVSA back.

MR. TRACEY:  I just have two quick points, Your Honor, which is less than half of five.

First, St. Gobain made the point that they could have sued PDVSA for the underlying activity and the only point I would make is they didn't.  They brought an arbitration solely against Venezuela and they are now trying to impose that judgment on PDVSA, and so clearly, that point is irrelevant.

The second point I would make is this is -- I had a moment to look at the prayer for relief in the complaint just to be clear about whether this is a request for primary or secondary liability, and the prayer for relief requests that this Court enter a final personal judgment of this Court in favor of St. Gobain and against

Venezuela and its alter-ego, PDVSA, and directing as follows, payment of the amount of the judgment.

So we're clearly in primary liability territory and therefore the rules in *Peacock* and Crystallex apply.

THE COURT:  Okay.

MR. TRACEY:  Thank you, Your Honor.

THE COURT:  Thank you very much.  I thank all counsel for helpful argument.  You did not necessarily give me easy things to decide but you did help me understand them better.  You answered my questions.  We will take it under advisement.

I wish everybody safe travels; and we will be in recess.

(Oral argument hearing at 12:10 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.


/s/ Brian P. Gaffigan
Official Court Reporter
U.S. District Court