# EXHIBIT A



**United States Department of State**

*Washington, D.C.  20520*

May 26, 2023

Ms. Angela D. Caesar
Clerk of the Court
U.S. District Court for the District of
Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

        Re:  *Saint-Gobain Performance Europe v. The Bolivarian Republic of Venezuela,*
        **1:20-cv-129-RC**

Dear Ms. Caesar:

I am writing regarding the Court's request pursuant to 28 U.S.C. Section 1608(a)(4) for transmittal of a Summons, Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgment, Civil Cover Sheet, Declaration of Alexander A. Yanos in Support of Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgement (Exhibits 1-5), Corporate Disclosure Statement, and Notice of Suit to the Bolivarian Republic of Venezuela as a defendant in the above referenced lawsuit.

The documents were delivered in Washington, DC under cover of U.S. Department of State diplomatic note to the Presidential Commissioner for Foreign Relations of the Bolivarian Republic of Venezuela, an accredited representative put forward by the National Assembly to represent the Bolivarian Republic of Venezuela to the United States. The diplomatic note was dated May 16, 2023 and delivered on May 18, 2023.  A Certified copy of the diplomatic note is enclosed.*

                    Sincerely,

                    Jared N. Hess
                    Attorney Adviser
                    Office of the Legal Adviser
                    L/CA/POG/GC

---

* Please note that performance by the Department of State of its statutory functions under 28 U.S.C. § 1608 should not be construed as an indication in any way of the United States' position or views on whether plaintiffs have properly complied with all statutory requirements of the FSIA, the status or character of a defendant, whether service was properly effected, or the merits of any claims or defenses.

Cc: Mr. Robert H. Poole
  Alston & Bird
   1201 West Peachtree Street
  Atlanta, GA 30309



**United States Department of State**

*Washington, D.C.   20520*

## <u>CERTIFICATION OF DIPLOMATIC NOTE</u>

I, Alison Dilworth, Managing Director of the Directorate of Overseas Citizens Services, in Washington, DC certify that this is a true copy of the United States Department of State diplomatic note dated May 16, 2023 and delivered to the Presidential Commissioner for Foreign Relations of the Bolivarian Republic of Venezuela in Washington, DC on May 18, 2023.

Alison Dilworth, Managing Director
Directorate of Overseas Citizens Services

May 25, 2023

The Department of State refers the Presidential Commissioner for

Foreign Relations of the Bolivarian Republic of Venezuela to the lawsuit

*Saint-Gobain Performance Europe v. The Bolivarian Republic of Venezuela*,

1:20-cv-129-RC, which is pending in the U.S. District Court for the District of

Columbia.  The Bolivarian Republic of Venezuela is a defendant in this case.

The Department transmits a Summons, Complaint to Register and Enforce

ICSID Arbitration Award as a Foreign Judgment ("Complaint"), Civil Cover

Sheet, Declaration of Alexander A. Yanos in Support of Complaint to Register

and Enforce ICSID Arbitration Award as a Foreign Judgement (Exhibits 1-5),

and Corporate Disclosure Statement herewith.  The U.S. District Court for

the District of Columbia has requested service of these documents.  This

note constitutes transmittal of these documents to the Bolivarian Republic

of Venezuela as contemplated in Title 28, United States Code, Section

1608(a)(4).

DIPLOMATIC NOTE

-2-

Under applicable U.S. law, a defendant in a lawsuit must file an answer to the Complaint or some other responsive pleading within 60 days from the date of transmittal of the Complaint, in this case, the date of this note. In failing to do so, a defendant risks the possibility of having judgment entered against it without the opportunity to present arguments or evidence on its behalf. Therefore, the Department requests that the enclosed Summons, Complaint, Civil Cover Sheet, Declaration of Alexander A. Yanos in Support of Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgement (Exhibits 1-5), and Corporate Disclosure Statement be forwarded to the appropriate authority of the Bolivarian Republic of Venezuela with a view towards taking whatever steps are necessary to avoid a default judgment.

In addition to the Summons, Complaint, Civil Cover Sheet, Declaration of Alexander A. Yanos in Support of Complaint to Register and Enforce ICSID Arbitration Award as a Foreign Judgement (Exhibits 1-5), and Corporate Disclosure Statement, the Department is enclosing a Notice of Suit, prepared by the plaintiff, which summarizes the nature of the case and includes references to U.S. laws concerning suits against foreign states.

-3-

Under U.S. law, any jurisdictional or other defense, including claims of sovereign immunity, must be addressed to the court before which the matter is pending, for which reason it is advisable to consult an attorney in the United States.  It is the practice of the Department to be available to discuss the requirements of U.S. law with counsel.  The U.S. government is not a party to this case and cannot represent other parties in this matter.

Enclosures:

As stated.

Department of State,

Washington, May 16, 2023.

# ALSTON & BIRD

90 Park Avenue
Nueva York, NY 10016
212-210-9400 | Fax: 212-210-9444

1 de diciembre de 2022

Re:     Entrega de notificaciones al Demandado República Bolivariana de Venezuela en la causa *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela et al. (Saint-Gobain Performance Plastics Europe c/: República Bolivariana de Venezuela y otros)*, n.º 1:20-cv-129-RC, conforme a 28 U.S.C. § 1608(a)(4).

A quien corresponda:

Represento a la parte actora Saint-Gobain Performance Plastics Europe (en adelante, "Saint-Gobain") en la causa arriba mencionada en el Tribunal de Distrito para el Distrito de Columbia. Esta carta y el paquete adjunto de documentos se envía para dar aviso de un juicio y notificar a la República Bolivariana de Venezuela (en adelante, "Venezuela") conforme a la Ley de Inmunidad de Soberanía Extranjera, 28 U.S.C. § 1608(a)(4).

Esta es la segunda vez que Saint-Gobain envía notificación a Venezuela sobre esta acción. Saint-Gobain primero envió los documentos requeridos a la Autoridad Central designada de Venezuela, a la Oficina de Relaciones Consulares del Ministerio del Poder Popular para Relaciones Exteriores (en adelante, el "Ministerio de Relaciones Exteriores") de Venezuela, conforme a la Convención de La Haya sobre Notificación en el Exterior de Documentos Judiciales y Extrajudiciales en lo Civil y lo Comercial[1] en diciembre de 2018. Venezuela, representada por los estudios jurídicos Arnold & Porter Kaye Scholder LLP y Abrams & Bayliss, LLP, después compareció en este juicio, pero lo hizo solo para argumentar que la notificación no se había completado debido a que el Ministerio de Relaciones Exteriores no reenvió los documentos de Saint-Gobain al Procurador General venezolano. Venezuela también instó a Saint-Gobain a notificar nuevamente a Venezuela a través de la notificación diplomática.

Como verá en la parte superior de la demanda adjunta, Saint-Gobain en un primer momento interpuso esta acción contra Venezuela y Petróleos de Venezuela S.A. (en adelante, "PDVSA") ante el Tribunal de Distrito en el Distrito de Delaware. Si bien esta demanda sigue vigente, la cuestión se transfirió al Tribunal de Distrito para el Distrito de Columbia y PDVSA fue desestimada del caso desde entonces. Esa es la razón por la cual la demanda dice "EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE DELAWARE" y enumera a PDVSA como codemandado y la razón por la cual la citación judicial adjunta a la demanda hace referencia al Tribunal de Distrito para el Distrito de Columbia. Para dejar en claro: Venezuela debe comparecer y preparar una respuesta ante el Tribunal de Distrito para el Distrito de Columbia.

Atentamente,

Alexander A. Yanos

---

[1] 15 de noviembre de 1965, 20 U.S.T. 361, 658 U.N.T.S. 163.

Alston & Bird LLP                                                                          www.alston.com

Atlanta | Beijing | Bruselas | Charlotte | Dallas | Fort Worth | Londres | Los Ángeles | Nueva York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

28 USC 1608 Citación judicial
12/11

**FORMULARIO VACÍO**

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
## PARA EL DISTRITO DE COLUMBIA

Saint-Gobain Performance Plastics Europe

*Demandante*                              )

c/                                        )          Demanda civil n.º 1:20-cv-129-RC
República Bolivariana de Venezuela    )

*Demandado*                              )

## CITACIÓN JUDICIAL EN UNA DEMANDA CIVIL

Para:   *(Nombre y dirección del Demandado)* Enrique Jose Sanchez Falcon
Oficina del Procurador Especial Republica Bolivarina de Venezuela
1099 30th St NW Washington, DC 20007

Se ha entablado una demanda en su contra.

Dentro de los 60 días posteriores a la recepción de esta citación judicial (sin contar el día en que la recibe), debe notificar al demandante una respuesta a la demanda adjunta o una petición conforme a la Regla 12 de las Reglas Federales de Procedimiento Civil. La respuesta o petición se debe notificar al demandante o al abogado del demandante, cuyo nombre y dirección es:

Alexander A. Yanos
Alston & Bird LLP
90 Park Avenue
Nueva York, NY 10016

Si no responde, se podrá iniciar una sentencia dictada en rebeldía contra usted por la exoneración solicitada en la demanda. Además, debe presentar su respuesta o pedido ante el tribunal.

*ANGELA D. CAESAR, SECRETARIA DEL TRIBUNAL*

Fecha: 10/31/2022                          [firma]

*Firma del Secretario o Subsecretario*

28 USC 1608 Citación judicial (12/11) (Página 2)

Demanda civil n.º 1:20-cv-129-RC

## ACTA DE EMPLAZAMIENTO

***(Esta sección no se debe presentar ante el tribunal a menos que sea requerido por las Reg. Fed. de Proceso Civ. 4 (l))***

Esta citación judicial para *(nombre de la persona y puesto, si corresponde)* _____fue recibida por mí el día *(fecha)*_____.

☐ Yo personalmente notifiqué la citación judicial a la persona en *(lugar)*_____

el día *(fecha)*_____; o

☐ Entregué la citación judicial en la residencia o domicilio habitual de la persona a *(nombre)*_____

_____, una persona de edad apropiada y autoridad para decidir que reside allí, el

día *(fecha)*_____, y envié por correo una copia a la última dirección conocida de la persona; o

☐ Notifiqué la citación judicial a *(nombre de la persona)*_____, que

está designada por ley para aceptar la notificación en nombre de *(nombre de la organización)*_____

_____ el día *(fecha)*_____; o

☐ Devolví la citación judicial sin firmar porque_____; o

☐ Otro *(especificar):*

Mis honorarios son $_____ por viaje y $_____por servicios, por un total de $     0,00

Declaro bajo pena de perjurio que esta información es verdadera.

Fecha: _____

_____
*Firma del oficial notificador*

_____
*Nombre en letra de imprenta y puesto*

_____
*Dirección del oficial notificador*

Información adicional relacionada con el intento de notificación, etc.:

Imprimir          Guardar como                                    Restablecer

**EN EL TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS
PARA EL DISTRITO DE DELAWARE**

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

        Demandante,

      c.

REPÚBLICA BOLIVARIANA DE
VENEZUELA; PETRÓLEOS DE
VENEZUELA, S.A.,

        Demandadas.

Acción Civil No.: _____

## DEMANDA PARA REGISTRAR Y EJECUTAR EL LAUDO ARBITRAL DEL CIADI COMO SENTENCIA EXTRANJERA

Saint-Gobain Performance Plastics Europe ("Demandante" o "Saint-Gobain"), por medio de su abogado abajo firmante, para su demanda (la "Demanda") solicita a este Tribunal que emita una orden de conformidad con el Título 22, Sección 1650a del Código de los Estados Unidos [22 U.S.C. § 1650a] y el Título 28, Sección 1738 del Código de los Estados Unidos [28 U.S.C. § 1738], registrando como sentencia extranjera un laudo arbitral ("el Laudo"), fechado el 3 de noviembre de 2017 (Declaración Yanos, Anexo 1),[1] y emitido según el Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, 18 de marzo de 1965, 17 U.S.T. 1270 (el "Convenio del CIADI" o el "Convenio") a favor de Saint-Gobain y en contra de la Demandada, la República Bolivariana de Venezuela ("Venezuela"), en una disputa derivada de la expropiación de la inversión de Saint-Gobain por parte de Venezuela. De conformidad con 22 U.C.S. § 1650a, las obligaciones pecuniarias creadas por los laudos emitidos de conformidad con el Convenio del CIADI "se ejecutarán y se les otorgará la misma plena fe y crédito como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general

---

[1] Tal y como se usa en esta Demanda, la "Declaración Yanos" se refiere a la Declaración de Alexander A. Yanos del __ de diciembre de 2018 en Apoyo a la Demanda de Saint-Gobain para Registrar y Hacer Cumplir el Laudo Arbitral del CIADI como Sentencia Extranjera.

1

de uno de los varios Estados," mientras que "[l]a Ley Federal de Arbitraje (9 U.S.C. 1 *et seq*) no se aplicará a la ejecución de los laudos dictados de conformidad con el convenio".

Por lo tanto, el 28 U.S.C. § 1738 exige que el Laudo sea registrado como una sentencia extranjera y que se le otorgue plena fe y crédito en este distrito. Ya que esta acción involucra a una soberanía extranjera, el registro del Laudo como una sentencia extranjera debe proceder después de la notificación de conformidad con la Ley de Inmunidades Soberanías Extranjeras (Foreign Sovereign Immunities Act – "FSIA"), 28 U.S.C. §§ 1602 *et seq*.

En respaldo a su Demanda, Saint-Gobain alega además lo siguiente:

## Partes, Jurisdicción y Fuero

1.      La Demandante Saint Gobain es una corporación constituida y existente bajo las leyes de Francia. Es una subsidiaria indirecta y de propiedad absoluta de Compagnie de Saint-Gobain, y un miembro del grupo de compañías Compagnie de Saint-Gobain.

2.      La Demandada Venezuela es un Estado extranjero en el sentido de la ley FSIA.

3.      La Demandada Petróleos de Venezuela S.A. ("PDVSA") es, como este Tribunal ya ha descubierto, un alter ego de Venezuela. *Véase Crystallex Int'l Corp. c. República Bolivariana de Venezuela*, 1:17-mc-00151, 2018 U.S. Dist. LEXIS 138978, *71 (D. Del., 9 de agosto de 2018) (hallando que "PDVSA puede ser considerada el alter ego de Venezuela..."). PDVSA es un instrumento de Venezuela en el sentido del 28 U.S.C. § 1603(b), y hace negocios en Delaware a través de su subsidiaria de propiedad absoluta, PDV Holding, Inc. ("PDVH"), una corporación de Delaware. *Id.*

4.      El Tribunal tiene jurisdicción sobre las Demandadas de conformidad con el 28 U.S.C. §§ 1330(a) y 1605(a), y el 22 U.S.C. § 1650a. En particular, según el 28 U.S.C. § 1605(a)(1), al hacerse parte del Convenio del CIADI y del Tratado, Venezuela renunció a su inmunidad de la jurisdicción de este Tribunal. Venezuela también está sujeta a la jurisdicción de este Tribunal según el 28 U.S.C. § 1605(a)(6)(B) porque esta acción busca la confirmación de un laudo regido por un tratado en vigencia en los Estados Unidos que exige el reconocimiento y la ejecución de

laudos arbitrales, a saber, el Convenio del CIADI. Además, el Tribunal tiene jurisdicción sobre la materia de conformidad con el 22 U.S.C. § 1650a porque esta Demanda busca hacer cumplir una obligación pecuniaria creada por un laudo arbitral emitido en virtud del Convenio del CIADI.

5. El fuero en este Distrito es apropiado según el 28 U.S.C. § 1391(f)(3) porque la Demandada PDVSA es un instrumento de Venezuela que hace negocios en Delaware a través de PDVH. El fuero también es apropiado según el 28 U.S.C. § 1738 porque la sentencia definitiva de un tribunal de jurisdicción general de uno de los varios Estados tiene derecho a la "plena fe y crédito" en "todos los tribunales dentro de los Estados Unidos," mientras que el 22 U.S.C. § 1650a requiere que un laudo del CIADI debe "recibir la misma plena fe y crédito" que "una sentencia definitiva de un tribunal de jurisdicción general de uno de los varios Estados".

6. De acuerdo con el 28 U.S.C. § 1330(b), el Tribunal puede ejercer jurisdicción en razón de la persona sobre Venezuela y su alter ego PDVSA.

## El Convenio del CIADI y el Tratado

7. El Convenio del CIADI establece un marco para el arbitraje de diferencias sobre inversiones entre "Estados Contratantes" y nacionales de otros "Estados Contratantes". *Véase* Declaración Yanos, Anexo 2 (el Convenio del CIADI). El Convenio también establece el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones ("CIADI"), una parte del Banco Mundial, para administrar los procedimientos arbitrales que se rigen por el Convenio del CIADI, incluyendo el arbitraje que otorga el Laudo.

8. El artículo 25(1) del Convenio del CIADI otorga a los tribunales que actúan dentro del marco del CIADI jurisdicción sobre "diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado  Contratante … y un nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro".

9. El Convenio del CIADI también obliga a los Estados Contratantes a hacer cumplir los laudos del CIADI. El artículo 54(1) de Convenio dispone que:

3

Todo Estado Contratante reconocerá al laudo dictado conforme a este Convenio como de carácter obligatorio y hará ejecutar dentro de sus territorios las obligaciones pecuniarias impuestas por el laudo como si se tratare de una sentencia firme dictada por un tribunal existente en dicho Estado. El Estado Contratante que se rija por una constitución federal podrá hacer que se ejecuten los laudos a través de sus tribunales federales y podrá disponer que dichos tribunales reconozcan al laudo la misma eficacia que a las sentencias firmes dictadas por los tribunales de cualquiera de los estados que lo integran.

10. Los Estados Unidos ha sido un Estado Contratante del Convenio del CIADI desde 1966. Las obligaciones de los Estados Unidos bajo el Artículo 54(1) del Convenio está implementadas en las leyes de los Estados Unidos en el 28 U.S.C. § 1650a(a) [sic], que en sus parte relevantes establece que:

El laudo de un tribunal arbitral dictado de conformidad con el capítulo IV del Convenio creará un derecho que surge en virtud de un tratado de los Estados Unidos. Las obligaciones pecuniarias impuestas por tal laudo se ejecutarán y se les otorgará la misma plena fe y crédito como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general de uno de los varios Estados.

11. Los laudos dictados en virtud del Convenio del CIADI no están sujetos a la misma revisión en virtud de la Ley Federal de Arbitraje que otros laudos de arbitraje internacional y no requieren confirmación en la forma prescrita por la Ley de Arbitraje Federal. Esto se encuentra claramente establecido en el 28 U.S.C. § 1650a [sic], el cual establece que "[l]a Ley Federal de Arbitraje (9 U.S.C. 1 *et seq*) no se aplicará a la ejecución de los laudos dictados de conformidad con el Convenio". *Véase también Mobil Cerro Negro, Ltd. c. República Bolivariana de Venezuela*, 863 F.3d 96, 102 (2d Cir. 2017) ("A los tribunales de los Estados miembros … no se les permite examinar los méritos de un laudo del CIADI, su cumplimiento con el derecho internacional o la jurisdicción del tribunal del CIADI para otorgar el laudo; según los términos del Convenio, no pueden hacer más que examinar la autenticidad de la sentencia y hacer cumplir las obligaciones impuestas por el laudo.").

12. En lugar de ello, y por diseño, la revisión de los laudos del CIADI se encapsula dentro del marco procesal del propio Convenio del CIADI. Los Laudos del CIADI pueden ser anulados o dejarse sin efecto solo por comités *ad hoc* especialmente constituidos y designados por el Presidente del

4

Consejo Administrativo del CIADI (*ex officio* el Presidente del Banco Mundial) por motivos específicos enumerados en el Convenio del CIADI. *Véase* Declaración Yanos, Anexo 2 Arts. 52-53.

13.    El Convenio del CIADI entró en efecto para Venezuela el día 1 de junio de 1995. Venezuela se retiró formalmente del Convenio del CIADI el día 25 de enero de 2012, con efecto a partir del 25 de julio de 2012. La retirada de Venezuela del Convenio del CIADI no guarda relación alguna con este caso. Según el artículo 72 del Convenio del CIADI, la notificación de retiro del Convenio por parte de un Estado "no afectará a los derechos y obligaciones, conforme a[l] Convenio, de dicho Estado ... nacido del consentimiento a la jurisdicción del [CIADI] dado ... con anterioridad al recibo de dicha notificación." *Id.*, Anexo 2.

14.    En este caso, en el Artículo 8 del Tratado Bilateral de Inversión Francia-Venezuela, fechado el 30 de abril de 2004, Francia y Venezuela aceptaron someter al CIADI las controversias que surgieren con inversionistas de cada uno de ellos en virtud del Tratado. Saint-Gobain aceptó la oferta de Venezuela de arbitrar las controversias del Tratado mediante notificaciones de controversia enviadas a Venezuela el 4 de julio de 2011 y el 17 de enero de 2012. *Véase Id.*, Anexo 1 ¶¶ 249, 253. Por lo tanto, ambas partes consintieron en arbitrar esta controversia antes de la denuncia de Venezuela del Convenio del CIADI.

15.    De hecho, Venezuela nunca ha disputado la jurisdicción del Tribunal sobre las reclamaciones de expropiación de Saint-Gobain en virtud del Tratado o el Convenio del CIADI.

### El Arbitraje y el Laudo

16.    El 29 de marzo de 2011, el Presidente de Venezuela, Hugo Chávez, decretó la expropiación del 99.99% de la participación de Saint-Gobain en NorPro Venezuela C.A., una empresa que fabricaba apuntalantes de cerámica utilizados durante la fracturación (*fracking*) para mantener "abiertas" las fracturas hidráulicas inducidas. *Véase* Declaración Yanos, Anexo 1 ¶¶ 245-47.

17.    El 25 de mayo de 2012, Saint-Gobain presentó ante el CIADI una solicitud de arbitraje contra Venezuela. En su Solicitud, Saint-Gobain buscaba una indemnización por la expropiación ilegal de su inversión en Venezuela por parte de Venezuela. *Id.* ¶¶ 5, 266.

18. La solicitud de arbitraje de Saint-Gobain fue registrada el 15 de junio de 2012 como Caso CIADI Número ARB/12/13.

19. De conformidad con el Convenio del CIADI y las Reglas de Arbitraje, se constituyó un Tribunal de tres miembros para el caso. Tres abogados internacionales eminentes constituyeron el Tribunal: el juez Charles N. Brower, ciudadano estadounidense y ex juez del Tribunal de Reclamaciones Irán-EE.UU., designado por Saint-Gobain; el Sr. Gabriel Bottini, ciudadano argentino y ex Director de Asuntos Internacionales y Controversias de la Fiscalía General de Argentina, designado por Venezuela; y el Prof. Dr. Klaus Sachs, ciudadano alemán y destacado árbitro internacional, seleccionado conjuntamente por las partes como Presidente del Tribunal.

20. Luego de intercambiar voluminosas presentaciones escritas, el Tribunal celebró una audiencia oral de cuatro días en el Banco Mundial del 2 al 5 de febrero de 2015.

21. El 30 de diciembre de 2016, el Tribunal emitió una Decisión sobre Responsabilidad y los Principios de Quantum ("Decisión sobre Responsabilidad"). *Véase* Declaración Yanos, Anexo 3 (Decisión sobre Responsabilidad). En la Decisión sobre Responsabilidad, el Tribunal determinó que Venezuela había infringido el Artículo 5 del Tratado al expropiar la inversión de Saint-Gobain sin pagar una indemnización. *Véase id.* ¶ 908.

22. La Decisión sobre Responsabilidad también discutió en detalle los principios sobre los cuales el Tribunal evaluaría el monto (*quantum*) de la indemnización que se pagaría a Saint-Gobain. *Véase id.* ¶¶ 566-905. El Tribunal luego dio a las partes dos meses para intentar llegar a un acuerdo sobre el monto de la indemnización a pagársele a Saint-Gobain, en caso contrario, escucharía más presentaciones sobre cuestiones pendientes relacionadas al monto. *Véase id.* ¶ 907.

23. Venezuela y Saint-Gobain no lograron llegar a un acuerdo sobre el monto de la indemnización a pagarse. En consecuencia, las partes presentaron nuevos alegatos y testimonios de

expertos extensos sobre la cantidad apropiada de indemnización por la expropiación ilegal de la inversión de Saint-Gobain en Venezuela.

24.     Posteriormente, el 3 de noviembre de 2017, el Tribunal emitió su Laudo de conformidad con el Capítulo IV (Artículos 48-49) del Convenio del CIADI. El Tribunal ordenó a Venezuela pagar a Saint-Gobain una indemnización de la siguiente manera:

(i)     US$ 29,6 millones como monto principal de indemnización por la expropiación de la inversión de Saint-Gobain en Venezuela;

(ii)    US$ 4,8 millones como intereses previos al laudo desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017, con intereses adicionales previos al laudo hasta el 3 de noviembre de 2017 a calcularse a una tasa equivalente al 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente;

(iii)   Intereses posteriores al laudo sobre la suma principal de la indemnización a una tasa igual al 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente;

(iv)    Los costos del arbitraje, por una suma de US$ 1.303.189,99;

(v)     Dos tercios de los honorarios y gastos legales de Saint-Gobain por un monto de US$ 4.634.532,05; y

(vi)    Intereses posteriores al laudo sobre los costos a una tasa igual al 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente.

*Véase* Declaración Yanos, Anexo 1 ¶ 72.

25.     Un cálculo detallado de las cantidades pagaderas según el Laudo (US$ 42.342.379,31 al 7 de diciembre de 2018) se encuentra adjunto. *Véase* Declaración Yanos, Anexo 4.

26.     El Laudo es vinculante para Venezuela y su alter ego PDVSA. De conformidad con el Artículo 53 del Convenio del CIADI, Venezuela y su alter ego PDVSA están obligados a "acatar y

7

cumplir con los términos del laudo" a menos que y "salvo en la medida en que su ejecución se vea suspendida" por un comité *ad hoc* constituido en virtud del artículo 52 del Convenio del CIADI.

27.    El Laudo no ha sido sobreseído. Por el contrario, un comité *ad hoc* del CIADI constituido el 7 de junio de 2018 a solicitud de Venezuela se ha negado expresamente a sobreseer el Laudo.

28.    En una Providencia dictada el 24 de octubre de 2018 (la "Providencia"), el comité *ad hoc* no halló "ninguna circunstancia que requiera el sobreseimiento de la ejecución del Laudo." *Véase* Declaración Yanos, Anexo 5 (Providencia, fechada el 24 de octubre de 2018) ¶ 25. El comité *ad hoc* también anunció la suspensión de sus procedimientos debido a la repetida falta de pago de los anticipos obligatorios de los costos por parte de Venezuela. *Véase id.* ¶¶ 27-30.

29.    Ni Venezuela ni su alter ego PDVSA han pagado ninguna de las sumas adeudadas en virtud del Laudo.

## PRIMER CARGO

### Para el Registro del Laudo como Sentencia Extranjera de Conformidad con 22 U.S.C. § 1650a

30.    La Demandante Saint-Gobain reitera y reincorpora todos los párrafos anteriores de esta Demanda como si a la letra se insertasen.

31.    El Laudo fue emitido por un tribunal arbitral de conformidad con el Convenio del CIADI.

32.    El Artículo 54(1) del Convenio del CIADI exige que los Estados Contratantes "reconozcan un laudo dictado conforme al Convenio [del CIADI] como de carácter obligatorio y hagan ejecutar dentro de sus territorios las obligaciones pecuniarias impuestas por el laudo como si se tratare de una sentencia firme dictada por un tribunal existente en dicho Estado."

33.    El Artículo 54(1) se encuentra incorporado en las leyes de los Estados Unidos por el 22 U.S.C. § 1650a, el cual requiere que el Laudo "se le otorgue la misma plena fe y crédito como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general de uno de los varios Estados."

34.    Finalmente, el 28 U.S.C. § 1738 exige que este Tribunal otorgue plena fe y crédito a las sentencias de los diversos Estados.

35.    Por todos estos motivos, el Tribunal debe registrar el Laudo como una Sentencia Extranjera.

## SEGUNDO CARGO

### Para la Ejecución del Laudo de Conformidad con 22 U.S.C. § 1650a

36.    La Demandante Saint-Gobain reitera y reincorpora todos los párrafos anteriores de esta Demanda como si a la letra se insertasen.

37.    El 22 U.S.C. § 1650a, exige que "[l]as obligaciones pecuniarias impuestas por" el Laudo "se ejecutarán como si el laudo se tratare de una sentencia firme de un tribunal de jurisdicción general de uno de los varios Estados."

38.    Por todos estos motivos, el Tribunal debe hacer cumplir las obligaciones pecuniarias del Laudo.

## PETITORIO

POR LO TANTO, Saint-Gobain respetuosamente solicita que el Laudo sea registrado en este Tribunal y que dicha Sentencia se convierta en una sentencia personal firme de este Tribunal a favor de Saint-Gobain y en contra de Venezuela y su alter ego, PDVSA, instruyendo lo siguiente:

A. Ordenar a Venezuela y PDVSA pagar a Saint-Gobain un monto igual a las obligaciones pecuniarias del Laudo (calculadas en US$ 42.342.379,31 al 7 de diciembre de 2018), compuesto de:

   a. US$ 29,6 millones como monto principal de indemnización por la expropiación de la inversión de Saint-Gobain en Venezuela; más US$ 4,8 millones como intereses previos al laudo desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017, con intereses

9

adicionales previos al laudo hasta el 3 de noviembre de 2017, por la cantidad de US$ 542.189,80, y tasa de interés posterior al laudo del 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente (igual a US$ 1.218.115,14 al 7 de diciembre de 2018);

b. US$ 1.303.189,99 por concepto de costos del arbitraje; y US$ 4.634.532,05 que representan las dos terceras partes de los honorarios y gastos legales de Saint-Gobain, estando ambas cantidades sujetas a intereses posteriores al laudo acumulados hasta la fecha de satisfacción del Laudo a una tasa del 2% sobre la tasa promedio de los bonos del Tesoro de EE.UU. a 6 meses, compuesta anualmente (igual a US$ 244.352,32 al 7 de diciembre de 2018); y

B. Otorgar cualquier otro recurso en contra de Venezuela y PDVSA que el Tribunal considere justo y adecuado.

Fecha: 12 de diciembre de 2018          PACHULSKI STANG ZIEHL & JONES LLP

                                        */f/ Laura Davis Jones*
                                        Laura Davis Jones (No. Colegio de Abogados 2436)
                                        Peter J. Keane (No. Colegio de Abogados 5503)
                                        919 N. Market Street, 17th Floor
                                        P.O. Box 8705
                                        Wilmington, DE 19899-8705 (Courier 19801)
                                        Teléfono: (302) 652-4100
                                        Fax: (302) 652-4400
                                        E-mail: ljones@pszjlaw.com
                                                pkeane@pszjlaw.com

                                        – y –

                                        Alex Yanos, *pro hac vice pendiente*
                                        Carlos Ramos-Mrosovsky, *pro hac vice pendiente*
                                        Rajat Rana, *pro hac vice pendiente*
                                        ALSTON & BIRD LLP
                                        90 Park Avenue
                                        New York, NY 10016
                                        Tel: 202-210-9400
                                        Fax: 212-210-9444
                                        Email:  alex.yanos@alston.com
                                                carlos.ramos-mrosovsky@alston.com
                                                rajat.rana@alston.com

                                        *Abogados de la Demandante, Saint-Gobain*
                                        *Performance Plastics Europe*

JS 44 (Rev. 06/17)

# HOJA DE PORTADA DEL FORMULARIO PARA CASOS CIVILES

La hoja de portada del formulario para casos civiles JS 44 y la información incluida en el presente no reemplaza ni complementa la presentación y la notificación de las actuaciones alegatorias ni otros documentos según lo requiera la ley, excepto como lo estipulen las reglas locales del tribunal. Este formulario, aprobado por la Conferencia Judicial de los Estados Unidos en septiembre de 1974, es requerido para el uso del Secretario del Tribunal con el propósito de iniciar la lista de causas civiles. *(VEA LAS INSTRUCCIONES EN LA PRÓXIMA PÁGINA DE ESTE FORMULARIO)*.

## I. (a) DEMANDANTES

Saint-Gobain Performance Plastics Europe

## DEMANDADOS

República Bolivariana de Venezuela; Petróleos de Venezuela, S.A.

**(b)** Condado de residencia del primer demandante mencionado Courbevoie, Francia

Condado de residencia del primer demandado mencionado Venezuela
*(EN CASOS DE DEMANDANTE DE EE. UU. SOLAMENTE)*

**(c)** Abogados *(Nombre del estudio jurídico, dirección y número de teléfono)*
Laura Davis Jones (#2436), Peter J. Keane (#5503), Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Fl., Wilmington, DE 19801 (302-652-4100)

Abogados *(si se conocen)*

## II. FUNDAMENTO PARA LA JURISDICCIÓN *(Coloque una "X" en una casilla solamente)*

◻ 1 Gobierno de EE. UU. Demandante

**X** 3 Cuestión federal *(el gobierno de EE. UU. no es una parte)*

◻ 2 Gobierno de EE. UU. Demandado

◻ 4 Diversidad *(Indique la ciudadanía de la partes en el Punto III)*

## III. CIUDADANÍA DE LAS PARTES PRINCIPALES *(Coloque una "X" en una casilla para el demandante (para casos de diversidad solamente) y una casilla para el demandado)*

| | DEMANDANTE | DEMANDADO | | DEMANDANTE | DEMANDADO |
|---|---|---|---|---|---|
| Ciudadano de este estado | ◻ 1 | ◻ 1 | Constituido o Sede principal de negocios en este estado | ◻ 4 | ◻ 4 |
| Ciudadano de otro estado | ◻ 2 | ◻ 2 | Constituido y Sede principal de negocios en otro estado | ◻ 5 | ◻ 5 |
| Ciudadano o sujeto de un país extranjero | ◻ 3 | ◻ 3 | Nación extranjera | ◻ 6 | ◻ 6 |

## IV. NATURALEZA DE LA DEMANDA *(Coloque una "X" en una casilla solamente)*

Haga clic aquí para: Descripciones de código de naturaleza de la demanda.

### CONTRATO
◻ 110 Seguro
◻ 120 Marítimo
◻ 130 Ley Miller
◻ 140 Instrumento negociable
◻ 150 Recuperación de pago en exceso y ejecución de sentencia
◻ 151 Ley de Medicare
◻ 152 Recuperación de préstamos estudiantiles impagos (excluye a veteranos)
◻ 153 Recuperación de sobrepago de beneficios al veterano
◻ 160 Demandas de accionistas
◻ 190 Otro contrato
◻ 195 Responsabilidad de producto de contrato
◻ 196 Franquicia

### BIENES INMUEBLES
◻ 210 Expropiación de terrenos
◻ 220 Ejecución hipotecaria
◻ 230 Alquiler y desalojo
◻ 240 Actos ilícitos al terreno
◻ 245 Responsabilidad de producto por acto ilícito
◻ 290 Todos los otros bienes inmuebles

### ACTOS ILÍCITOS

**LESIÓN PERSONAL**
◻ 310 Avión
◻ 315 Responsabilidad de producto de avión
◻ 320 Ataque, injuria y calumnia
◻ 330 Responsabilidad federal de los empleadores
◻ 340 Marítimo
◻ 345 Responsabilidad de producto marítimo
◻ 350 Vehículo automotor
◻ 355 Responsabilidad de producto del vehículo automotor
◻ 360 Otra lesión personal
◻ 362 Lesión personal - Malapraxis médica

**LESIÓN PERSONAL**
◻ 365 Lesión personal - Responsabilidad producto
◻ 367 Atención médica/ Farmacéutico Lesión personal Responsabilidad de producto
◻ 368 Asbestos Lesión personal Responsabilidad del producto

**BIENES PERSONALES**
◻ 370 Otro fraude
◻ 371 Veracidad en el préstamo
◻ 380 Otro daño a los bienes personales
◻ 385 Responsabilidad de producto de daño a la propiedad

### DERECHOS CIVILES
◻ 440 Otros derechos civiles
◻ 441 Votación
◻ 442 Empleo
◻ 443 Vivienda/ alojamientos
◻ 445 Estad. c/discapacidades- empleo
◻ 446 Estad. c/discapacidades-otro
◻ 448 Educación

### PETICIONES DE PRISIONEROS:
**Habeas Corpus:**
◻ 463 Detenido extranjero
◻ 510 Sentencia del recurso de nulidad
◻ 530 General
◻ 535 Pena de muerte
**Otro:**
◻ 540 Mandamiento y otro
◻ 550 Derechos civiles
◻ 555 Condición de prisión
◻ 560 Detenido civil-condiciones del confinamiento

### DECOMISO/PENALIDAD
◻ 625 Confiscación de bienes relacionada con las drogas 21 USC 881
◻ 690 Otro

### LABORAL
◻ 710 Ley de Estándares Laborales Justos
◻ 720 Relaciones entre empleados/administración
◻ 740 Ley de Trabajo Ferroviario
◻ 751 Ley de Licencia Familiar y Médica
◻ 790 Otro litigio laboral
◻ 791 Ley de Seguridad del Ingreso de Retiro de los Empleados

### INMIGRACIÓN
◻ 462 Solicitud de naturalización
◻ 465 Otras acciones de inmigración

### QUIEBRA
◻ 422 Apelación 28 USC 158
◻ 423 Anulación 28 USC 157

**DRECHOS PATRIMONIALES**
◻ 820 Derechos de autor
◻ 830 Patente
◻ 835 Patente - Solicitud abreviada para nuevo medicamento
◻ 840 Marca comercial

### SEGURIDAD SOCIAL
◻ 861 HIA (1395ff)
◻ 862 Enfermedad pulmonar minera (923)
◻ 863 DIWC/DIWW (405(g))
◻ 864 SSID Título XVI
◻ 865 RSI (405(g))

### DEMANDAS FISCALES
◻ 870 Impuestos (demandante o demandado de EE. UU.)
◻ 871 IRS—Tercero 26 USC 7609

### OTROS ESTATUTOS
◻ 375 Ley de Reclamaciones Fraudulentas
◻ 376 Qui Tam (31 USC 3729(a))
◻ 400 Redistribución del estado
◻ 410 Antimonopolio
◻ 430 Bancos y banca
**X** 450 Comercio
◻ 460 Deportación
◻ 470 Organizaciones chantajistas y corruptas
◻ 480 Crédito al consumidor
◻ 490 Televisión por cable/satelital
◻ 850 Valores materias primas/intercambio
◻ 890 Otras acciones estatutarias
◻ 891 Leyes agrícolas
◻ 893 Cuestiones ambientales
◻ 895 Ley de Libertad de la Información
◻ 896 Arbitraje
◻ 899 Ley Procesal Administrativa/Revisión o apelación de una decisión del organismo
◻ 950 Constitucionalidad de los estatutos estatales

## V. ORIGEN *(Coloque una "X" en una casilla solamente)*

**X** 1 Procedimiento original
◻ 2 Retirado del tribunal estatal
◻ 3 Devuelto del tribunal de apelaciones
◻ 4 Restablecido o reabierto
◻ 5 Transferido desde otro distrito *(especifique)*
◻ 6 Litigio de varios distritos- Transferencia
◻ 8 Litigio de varios distritos- Exp. directo

## VI. CAUSA DE ACCIÓN

Cite el estatuto civil de EE. UU. conforme al cual está haciendo la presentación *(No cite estatutos jurisdiccionales excepto por la diversidad)*:
22 U.S.C. 1650a, 28 U.S.C. 1738

Descripción breve de la causa:
Acción para registrar y ejecutar un laudo arbitral ICSID como una sentencia extranjera (22 U.S.C. 1650a, 28 U.S.C. 1738)

## VII. SOLICITADO EN LA DEMANDA:

◻ MARCAR SI ESTA ES UNA ACCIÓN COLECTIVA CONFORME A LA REGLA 23 Fed. Proc. Civil

**DEMANDA** 42,342,379.31

MARCAR SÍ solo si el demandado en la demanda:
**DEMANDA CON JURADO:** ◻ Sí **X** No

## VIII. CASO(S) RELACIONADO(S) SI HUBIERA ALGUNO
*(Consulte las instrucciones)*
JUEZ _____  NÚMERO DE EXPEDIENTE _____

FECHA
12/12/2018

FIRMA DEL ABOGADO OFICIAL
/s/ Laura Davis Jones

**PARA USO OFICIAL SOLAMENTE**

NOTA: EN CASOS DE EXPROPIACIÓN DE TERRENOS, USE LA UBICACIÓN DEL TRECHO DE TERRENO INVOLUCRADO.

NÚM. DE RECIBO _____  CANTIDAD _____  SOLICITA IFP _____  JUEZ _____  JUEZ MAGISTRADO _____

## ANTE EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE DELAWARE

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

             Demandante,

    c.

REPÚBLICA BOLIVARIANA DE
VENEZUELA; PETRÓLEOS DE
VENEZUELA, S.A.,

             Demandadas

Procedimiento Civil nro.: 18-cv-1963-UNA

## DECLARACIÓN DE ALEXANDER A. YANOS EN APOYO DE LA DEMANDA PARA REGISTRAR Y EJECUTAR EL LAUDO ARBITRAL DEL CIADI COMO UNA SENTENCIA DICTADA EN EL EXTRANJERO

De conformidad con el título 28 del Código de los Estados Unidos (U.S.C.), § 1746, yo, Alexander A. Yanos, por medio de la presente, declaro lo siguiente:

1. Soy abogado en Alston & Bird, LLP. Represento a Saint-Gobain Performance Plastics Europe ("Saint-Gobain" o "Demandante") en relación del caso arriba mencionado.

2. Realizo esta declaración en apoyo de la Demanda para Registrar y Ejecutar el Laudo Arbitral del CIADI como una sentencia dictada en el extranjero, presentada por Saint-Gobain el 12 de diciembre de 2018.

3. Adjunto al presente documento como Documento de prueba 1 figura una copia fiel y auténtica del Laudo certificado, dictado el 3 de noviembre de 2017 a favor de Saint-Gobain por el tribunal arbitral en el marco del arbitraje entre Saint-Gobain y la República Bolivariana de Venezuela ("Venezuela" o "Demandada") con arreglo al Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, de 18 de marzo de 1965, 17 U.S.T. 1270 (el "Convenio CIADI" o el "Convenio").

4. Se adjunta al presente, como Documento de prueba 2, una copia fiel y auténtica del Convenio CIADI.

1

5.    Se adjunta al presente, como Documento de prueba 3, una copia fiel y auténtica de la "Decisión sobre la Responsabilidad y los Principios del Monto (*Quantum)*", dictada por el tribunal arbitral el 30 de diciembre de 2016 en el marco del arbitraje entre Saint-Gobain y Venezuela.

6.    Se adjunta al presente, como Documento de prueba 4, una hoja que contiene el cálculo de la indemnización y los costos concedidos a Saint-Gobain por el tribunal arbitral el 7 de diciembre de 2018.

7.    Se adjunta al presente, como Documento de prueba 5, una copia fiel y auténtica de la "Orden de Procedimiento nro. 2", dictada por el tribunal arbitral el 24 de octubre de 2018.

Declaro, so pena de incurrir en falso testimonio con arreglo a la legislación de los Estados Unidos de América, que lo que antecede es veraz y correcto.

Fecha: Nueva York, Nueva York
        13 de diciembre de 2018

Alex Yanos
ALSTON & BIRD LLP
90 Park Avenue
Nueva York, NY 10016
Tel.: 202-210-9400
Fax: 212-210-9444
alex.yanos@alston.com

2

# Anexo 1

**Centro Internacional de Arreglo de Diferencias Relativas a Inversiones**

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

DEMANDANTE

c.

REPÚBLICA BOLIVARIANA DE VENEZUELA

DEMANDADA

**Laudo**

Dictado por un Tribunal compuesto por:

Profesor Dr. Klaus M. Sachs, Presidente
El Honorable Charles N. Brower, Árbitro
Sr. Gabriel Bottini, Árbitro

Secretario del Tribunal
Sra. Natalí Sequeira (hasta 7 de agosto de 2017)
Sr. Francisco Grob

**Fecha de envío a las Partes: 3 de noviembre de 2017**

## ÍNDICE DE CONTENIDOS

A.    LAS PARTES..................................................................................................5

      I.    Demandante ...........................................................................................5

      II.   Demandada.............................................................................................5

B.    EL TRIBUNAL DE ARBITRAJE...............................................................5

      I.    El Honorable Charles N. Brower ..........................................................6

      II.   Sr. Gabriel Bottini................................................................................6

      III.  Prof. Dr. Klaus Sachs ...........................................................................6

C.    SÍNTESIS DE LOS ANTECEDENTES PROCESALES ............................7

D.    ANTECEDENTES FÁCTICOS....................................................................11

E.    POSTURAS DE LAS PARTES.....................................................................12

      I.    Monto acordado de cuantía de daños y propuesta conjunta...................12

      II.   Síntesis de las posturas de las partes sobre los costos...........................13

F.    RAZONAMIENTO DEL TRIBUNAL..........................................................19

      I.    El acuerdo de las Partes sobre cuantía de daños ...................................19

      II.   Decisión sobre costos............................................................................20

G.    DECISIÓN DEL TRIBUNAL.......................................................................24

## ÍNDICE DE ABREVIACIONES

| | |
|---|---|
| CLA- | Autoridades Legales de la Demandante |
| Presentación sobre Costos de la Demandante | Presentación sobre Costos de la Demandante de fecha 30 de junio de 2015. |
| Primera Presentación Actualizada sobre Costos de la Demandante | Presentación Actualizada sobre Costos de la Demandante de fecha 23 de noviembre de 2015 |
| Segunda Presentación Actualizada sobre Costos de la Demandante | Presentación Actualizada sobre Costos de la Demandante de fecha 28 de julio de 2017 |
| Segunda Presentación Posterior a la Audiencia de la Demandante | Presentación simultánea de la Demandante posterior a la Audiencia en la segunda ronda, 22 de mayo de 2015 |
| Memorial de Contestación | Memorial de Contestación de la Demandada de fecha 21 de marzo de 2014 |
| CVG Bauxilum | CVG Bauxilum, C.A. |
| TJE | Trato Justo y Equitativo |
| TBI Francia-Venezuela o "el Tratado" | Acuerdo para el Estímulo y la Protección Recíproca de las Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela |
| CIADI | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| Reglas de Arbitraje CIADI | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI |
| Convenio CIADI | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados |
| Reglas de Iniciación del CIADI | Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje |

| | |
|---|---|
| Dúplica | Dúplica sobre el Fondo de la Demandada de fecha 18 de septiembre de 2014 |
| Solicitud | Solicitud de Arbitraje contra la Demandada de fecha 25 de mayo de 2012 |
| Presentación Adicional de Costos de la Demandada | Presentación Adicional sobre Costos de la Demandada de fecha 28 de julio de 2017 |
| Secretariado | Secretariado del CIADI |
| Secretaria General | Secretaria General del CIADI |
| Las "Reclamaciones sobre la Bauxita" | Las reclamaciones de la Demandante de que, como consecuencia del aumento del precio de la bauxita inicialmente pactado en el Contrato de Bauxita entre la Demandante y CVG Bauxilum, la Demandada no brindó a la Demandante un trato justo y equitativo conforme al Artículo 3(1) del Tratado, ni protegió o aseguró la inversión de la Demandante con arreglo a lo dispuesto en el Artículo 3(2) del Tratado. |
| El "Contrato de Bauxita" | El contrato suscrito por CVG Bauxilum y Saint-Gobain Proppants Venezuela C.A. el 25 de octubre de 2005 |
| La "Decisión" | La Decisión sobre Responsabilidad y Principios en Materia de Cuantía de Daños, emitida por el Tribunal en este arbitraje el 30 de diciembre de 2016 |

## A.    LAS PARTES

### I.    DEMANDANTE

1.  Saint-Gobain Performance Plastics Europe (en adelante, la "**Demandante**" o "**Saint-Gobain**"), representada en este arbitraje por sus abogados debidamente autorizados Sr. Alexander A. Yanos de Alston & Bird LLP, 90 Park Avenue, 15th Floor, Nueva York, NY 10016-1387, Estados Unidos de América; la Sra. Elizabeth C. Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, Estados Unidos de América y la Sra. Noiana Marigo, de la firma Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, 31st Floor, Nueva York, NY 10022, Estados Unidos de América.

### II.   DEMANDADA

2.  La República Bolivariana de Venezuela (en adelante, la "**Demandada**" o "**Venezuela**"), representada en este arbitraje por el Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas, República Bolivariana de Venezuela. La Demandada también se encuentra representada por sus abogados debidamente autorizados, el Sr. Benard V. Preziosi, Jr. de Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, Nueva York, NY 10178, Estados Unidos de América, y el Sr. Eloy Barbará de Parres, la Sra. Gabriela Álvarez Ávila y la Sra. Kate Brown de Vejar Dori Yoldi de la firma Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Ciudad de México, Estados Unidos Mexicanos.

3.  En lo sucesivo, se hará referencia a la Demandante y la Demandada indistintamente como la "**Parte**" y, en conjunto, las "**Partes**".

## B.    EL TRIBUNAL DE ARBITRAJE

4.  El Tribunal de Arbitraje se constituyó del siguiente modo:

### I.    EL HONORABLE CHARLES N. BROWER

(designado por la Demandante)

20 Essex Street Chambers
20 Essex Street
Londres WC2R 3AL
GRAN BRETAÑA
Tel: +44 (0)20 7842 1200
Fax: +44 (0)20 7842 1270
Correo electrónico: cbrower@20essexst.com

### II.   SR. GABRIEL BOTTINI

(designado por la Demandada)

Paraná 580- Piso 5° "J"
C1017AAL- Buenos Aires
ARGENTINA
Tel.: + 54 11 4371-3165
Fax: + 54 11 4372-7974
Correo electrónico: gbottini@outlook.com

### III.  PROF. DR. KLAUS SACHS

(designado por las Partes)

Nymphenburger Str. 12
D-80335 Múnich
ALEMANIA
Tel.: +49 89 23 807-109
Fax: + 49 89 23 807-40 621
Correo electrónico: Klaus.Sachs@cms-hs.com

## C.    SÍNTESIS DE LOS ANTECEDENTES PROCESALES

5.    Este arbitraje versa sobre una controversia legal entre Saint-Gobain y Venezuela que surge de la supuesta negativa por parte de Venezuela a indemnizar a Saint-Gobain en virtud de la expropiación de la inversión de Saint-Gobain en su subsidiaria 99,99%[1] Norpro Venezuela C.A. ("**Norpro Venezuela**" o "**Norpro**"), luego de un discurso televisado del Presidente de Venezuela Hugo Chávez del 15 de mayo de 2010. La Demandante alega que la Demandada violó el *Acuerdo para el Estímulo y la Protección Recíproca de las Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela* (el "**TBI Francia-Venezuela**" o el "**Tratado**"), el cual entró en vigor el 15 de abril de 2004, al negarse a ofrecer una indemnización por la expropiación de la planta de *proppants* de Norpro Venezuela ubicada en Puerto Ordaz, Estado de Bolívar, así como al sancionar o no intervenir en el aumento del precio del suministro de bauxita supuestamente violatorio de un contrato celebrado con un ente Estatal, por lo cual no se concedió un trato justo y equitativo a la Demandante ni se brindó seguridad y protección plena a su inversión, en violación de los artículos 5(1) y 3(1) y (2) del Tratado.

6.    El 25 de mayo de 2012, la Demandante presentó una Solicitud de Arbitraje contra la Demandada (la "**Solicitud**") ante la Secretaria General del CIADI, de conformidad con el Artículo 36 del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados (el "**Convenio CIADI**") y las Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje (las "**Reglas de Iniciación del CIADI**").

7.    El 29 de mayo de 2012, el Secretariado del CIADI (el "**Secretariado**") remitió la Solicitud a la Demandada.

8.    El 15 de junio de 2012, la Secretaria General registró la Solicitud de la Demandante de conformidad con el Artículo 36 del Convenio CIADI y las Reglas 6 y 7 de las Reglas de Iniciación del CIADI, y notificó dicho registro a las Partes. El caso quedó registrado bajo el número ARB/12/13.

9.    El 28 de septiembre de 2012, la Demandante designó al Juez Charles N. Brower, nacional de los Estados Unidos de América, como árbitro.

---

[1] El Sr. Luis Páez, ciudadano de Venezuela y Presidente de Norpro Venezuela, es tenedor de una única acción, la cual suscribió al momento de la constitución de Norpro Venezuela. La transferencia planificada de la acción del Sr. Páez a Saint-Gobain no se ha formalizado aún. Solicitud, ¶ 4, nota 4.

10.   El 3 de octubre de 2012, la Demandada designó al Sr. Gabriel Bottini, nacional de la República Argentina, como árbitro.

11.   El 4 de octubre de 2012, el Juez Brower aceptó su designación en calidad de árbitro por parte de la Demandante, luego de presentar una declaración debidamente firmada al Secretariado, de conformidad con la Regla 6(2) de las Reglas Procesales Aplicables a los Procedimientos de Arbitraje (las "**Reglas de Arbitraje CIADI**").

12.   El 25 de octubre de 2012, el Sr. Bottini aceptó su designación en calidad de árbitro por parte de la Demandada, luego de presentar una declaración debidamente firmada al Secretariado, de conformidad con la Regla 6(2) de las Reglas de Arbitraje CIADI.

13.   El 12 de noviembre de 2012, la Secretaria General informó al Prof. Dr. Klaus Sachs que las Partes acordaron su designación como Presidente del Tribunal. Mediante carta de fecha 14 de noviembre de 2012, el Prof. Sachs aceptó su designación, luego de presentar una declaración debidamente firmada al Secretariado de conformidad con la Regla 6(2) de las Reglas de Arbitraje CIADI.

14.   El 26 de noviembre de 2012, la Secretaria General informó a las Partes que el Prof. Sachs, el Juez Brower y el Sr. Bottini habían aceptado sus designaciones en calidad de árbitros y que, en consecuencia, en virtud de la Regla 6(1) de las Reglas de Arbitraje CIADI, se entendía que el Tribunal se había constituido y que el procedimiento se había iniciado en dicha fecha. Asimismo, la Sra. Natalí Sequeira fue designada para actuar como Secretaria del Tribunal (la "**Secretaria**").

15.   Luego de un intercambio de presentaciones escritas y de una audiencia oral llevada a cabo en Washington, D.C., EE. UU. del 2 al 6 de febrero de 2015, el Tribunal emitió su Decisión sobre Responsabilidad y Principios en Materia de Cuantía de Daños el 30 de diciembre de 2016 (la "**Decisión**"), la cual forma parte integral del Laudo. Para una síntesis de los antecedentes procesales que resultaron en el dictado de la Decisión, puede verse la Sección C. de la Decisión.

16.   En la parte dispositiva de la Decisión, el Tribunal concluyó que:

1.   La Demandada violó el Artículo 5(1) incisos 2 y 3 del Tratado al no especificar el monto de la compensación y al no pagar una indemnización pronta por la expropiación de la inversión de la Demandante en Venezuela.

2.   La Demandada deberá pagarle a la Demandante el monto de la compensación calculado sobre la base de las conclusiones del Tribunal sintetizadas en los párrafos 849 a 851 [de la Decisión], más los intereses

previos al laudo a partir del día 15 de mayo de 2010 hasta la fecha del Laudo a una tasa igual al 2% sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

3.  La Demandada deberá pagarle a la Demandante los intereses posteriores al laudo sobre el monto de la compensación dispuesto en el punto 2 a partir de la fecha del laudo hasta la fecha del pago a una tasa igual al 2% sobre la tasa promedio de letras del Tesoro de los EE.UU. a seis meses, capitalizados en forma anual. Los intereses posteriores al laudo se pagarán sólo sobre el capital de la compensación, y no sobre los intereses otorgados previos al laudo.

4.  La compensación y los intereses se fijan en montos netos de los impuestos venezolanos aplicables, y la Demandada no podrá deducir impuestos en relación con el pago de la compensación y los intereses.

5.  La decisión sobre costos se reserva para el Laudo.

6.  Se desestiman todas las demás pretensiones y petitorios.

17. El 11 de enero de 2017, el Tribunal emitió la Resolución Procesal No. 4, en la cual ordenó lo siguiente:

Se invita a las Partes a ponerse en contacto en un intento de llegar a un acuerdo sobre el monto final de la indemnización que debe pagar la Demandada a la Demandante con respecto a la expropiación de Norpro Venezuela -- sobre la base de las conclusiones del Tribunal, resumidas en los párrafos 849 a 851 de la Decisión sobre Responsabilidad y Principios en Materia de Cuantificación de Daños del Tribunal.

Las Partes deberán informar al Tribunal dentro de un plazo de dos meses contados a partir de la notificación de la Decisión, es decir, a más tardar, el miércoles 1 de marzo de 2017, si han logrado llegar a un acuerdo sobre la cuestión expuesta en el párrafo 3 *supra*, y en qué medida.

En caso de que las Partes no hubieran logrado llegar a un acuerdo sobre el monto final de la indemnización que debe pagar la Demandada a la Demandante al día 1 de marzo de 2017, el Tribunal invitará a las Partes a convenir sobre un calendario para sus presentaciones sobre las cuestiones

de cuantificación de daños pendientes de resolución o, de no lograrse un acuerdo, a presentar sus respectivas propuestas de dicho calendario.

18. Mediante correo electrónico de fecha 17 de febrero de 2017, las Partes solicitaron conjuntamente una prórroga del plazo del 1 de marzo de 2017, dispuesto en el párrafo 4 de la Resolución Procesal No. 4, hasta el 31 de marzo de 2017. Mediante correo electrónico de fecha 18 de febrero de 2017, el Tribunal concedió la solicitud de prórroga de las Partes.

19. Mediante carta de fecha 30 de marzo de 2017, la Demandada presentó su escrito sobre el monto definitivo de la indemnización a otorgarse a la Demandante sobre la base de las conclusiones del Tribunal en su Decisión. En concreto, la Demandada presentó cuatro cifras calculadas por los peritos de las Partes en función de sus respectivos modelos de FFD y propuso que las Partes se pongan de acuerdo con respecto a la segunda cifra más elevada de esas cuatro, es decir, el monto obtenido por los peritos de la Demandada sobre la base de su propio modelo económico.

20. Mediante carta de fecha 31 de marzo de 2017, la Demandante informó al Tribunal que consideraba que el resultado de la aplicación del método FFD, basado en los parámetros establecidos en la Decisión del Tribunal, era incompatible con el estándar de indemnización establecido en el Tratado y el derecho internacional consuetudinario, y le solicitó que ordenara a las Partes dialogar y proponer un calendario para los escritos sobre las cuestiones de cuantía de daños que debían resolverse.

21. Luego de un intercambio de escritos entre las Partes sobre la necesidad de hacer nuevas presentaciones sobre cuantía de daños, y debido a las solicitudes de reconsideración y rectificación de la Demandante relativas a la Decisión, el Tribunal emitió una Decisión sobre las Solicitudes de la Demandante de Reconsideración y Rectificación el día 28 de junio de 2017 (la "**Decisión sobre Reconsideración**"). Para una síntesis de los escritos intercambiados con anterioridad a la emisión de dicha decisión que resultaron en el dictado de la Decisión sobre Reconsideración, puede verse la Sección A de la Decisión sobre Reconsideración.

22. En su carta de transmisión de fecha 28 de junio de 2017, enviada a las Partes junto con la Decisión sobre Reconsideración, el Tribunal hizo referencia al párrafo 89 de dicha Decisión sobre Reconsideración, en donde expresaba su postura acerca de que aún no se encontraba en condiciones de calcular el monto definitivo de indemnización que la Demandada debería pagarle a la Demandante por la expropiación de la inversión de la Demandante, sin permitirle a esta expresar sus comentarios sobre el contenido de la carta de la Demandada de fecha 30 de marzo de 2017. Por lo tanto, el Tribunal invitó a la Demandante a presentar sus

comentarios, en particular sobre la propuesta de la Demandada de adoptar un monto definitivo de indemnización acorde a la segunda cifra más elevada de los cuatro montos calculados por los peritos de las Partes en función de las conclusiones del Tribunal en su Decisión, a más tardar, el 12 de julio de 2017.

23. Mediante carta de fecha 12 de julio de 2017, la Demandante presentó sus comentarios acerca de la carta de la Demandada de fecha 30 de marzo de 2017 y, en particular y sin perjuicio de sus presentaciones anteriores realizadas en el contexto de su solicitud de reconsideración y rectificación, aceptó la propuesta de la Demandada de adoptar la segunda cifra más elevada de los cuatro montos. La Demandante luego solicitó permiso para corregir su presentación sobre costos en virtud de los honorarios y gastos adicionales irrogados con posterioridad a la última actualización de costos de noviembre de 2015.

24. En su carta de fecha 14 de julio de 2017, el Tribunal invitó a las Partes a presentar cualquier actualización sobre costos que desearan que se considerase en la decisión sobre costos del Tribunal, la cual sería incluida en el Laudo, a más tardar, el 28 de julio de 2017.

25. El 28 de julio de 2017, la Demandante envió una presentación actualizada sobre costos (**"Presentación Actualizada sobre Costos de la Demandante"**). Ese mismo día, la Demandada envió una presentación adicional sobre costos (**"Presentación Adicional de Costos de la Demandada"**).

26. El 7 de agosto de 2017, el Centro informó a las Partes y al Tribunal que el Sr. Francisco Grob, Consejero Jurídico del CIADI, reemplazaría a la Sra. Sequeira como Secretario del Tribunal.

27. El 20 de septiembre de 2017, el Tribunal declaró cerrado el procedimiento de conformidad con la Regla 38(1) de las Reglas de Arbitraje CIADI.

## D. ANTECEDENTES FÁCTICOS

28. En la Sección D de la Decisión, se ofrece una síntesis detallada de los antecedentes fácticos que no se encuentran controvertidos entre las Partes o que de algún otro modo han quedado demostrados por las pruebas presentadas en este procedimiento a satisfacción del Tribunal.

## E.    POSTURAS DE LAS PARTES

29.    Las Secciones E y F de la Decisión contienen una síntesis detallada de las posturas de las Partes acerca de la cuestiones relativas a la responsabilidad y cuantía de daños, tal como se ventilaron en las presentaciones escritas de las Partes y durante la Audiencia.

30.    Aparte de la Decisión del Tribunal, que examinó la cuestión de la responsabilidad de la Demandada según el Tratado y de los principios de cuantía de daños aplicables a la determinación del monto de indemnización, las cuestiones pendientes que deben abordarse en este Laudo son las siguientes: (i) el monto exacto de la indemnización que debe pagar la Demandada a la Demandante por la expropiación de su inversión sobre la base de las conclusiones del Tribunal en su Decisión; y (ii) la distribución de los costos del arbitraje y de los honorarios legales y costos incurridos por las Partes en relación con este arbitraje.

## I.    MONTO ACORDADO DE CUANTÍA DE DAÑOS Y PROPUESTA CONJUNTA

31.    En su carta del 30 de marzo de 2017, la Demandada presentó los resultados que habían arrojado los cálculos de los peritos de las Partes, cada uno de los cuales utilizó tanto su propio modelo económico como también el del perito de la otra Parte, sobre la base de las conclusiones del Tribunal en su Decisión, y que fueron intercambiados entre las Partes el 7 de marzo de 2017. Estos resultados fueron los siguientes:

| | Cálculos del perito de la Demandada | |
| | Mediante Modelo de FFD de la Demandante | Mediante Modelo de FFD de la Demandada |
| | (millones de USD) | |
| 1. Valor al 15 de mayo de 2010 | $ 25.6 | $ 29.6 |
| 2. Intereses hasta el 31 de marzo de 2017 | $ 4.1 | $ 4.8 |
| **3. Total** | $ 29.8 | $ 34.4 |

| | Cálculos del perito de la Demandante | |
| | Mediante Modelo de FFD de la Demandante | Mediante Modelo de FFD de la Demandada |
| | (millones de USD) | |
| 4. Valor al 15 de mayo de 2010 | $ 23.0 | $ 30.6 |
| 5. Intereses hasta el 6 de marzo de 2017 | $ 3.6 | $ 4.7 |
| **6. Total** | $ 26.6 | $ 35.3 |

32. Sobre esa base, la Demandada propuso que las Partes acordaran un monto definitivo de indemnización conforme a aquel obtenido por su perito mediante su propio modelo económico, es decir, un monto de USD 34,4 millones (que incluye intereses hasta el 31 de marzo de 2017).

33. Por invitación del Tribunal a comentar sobre la carta de la Demandada de fecha 30 de marzo de 2017 y, especialmente, sobre la propuesta mencionada más arriba luego de que se dictara la Decisión de Reconsideración del Tribunal de 28 de junio de 2017, la Demandante manifestó, en su carta de fecha 12 de julio de 2017, que: (i) la carta de la Demandada reflejaba correctamente los cuatro montos calculados por los expertos de las Partes sobre la base de los parámetros establecidos en la Decisión del Tribunal; y (ii) sin perjuicio de sus escritos anteriores realizados en el contexto de su solicitud de reconsideración y rectificación de la Decisión del Tribunal, aceptó la propuesta de la Demandada de adoptar la segunda cifra más elevada de los cuatro montos, es decir, USD 34,4 millones, incluidos los intereses hasta el 31 de marzo de 2017.

## II.    SÍNTESIS DE LAS POSTURAS DE LAS PARTES SOBRE LOS COSTOS

34. Ambas Partes solicitan que el Tribunal ordene a la otra Parte reembolsar los costos en los que cada una ha incurrido durante este arbitraje. En los siguientes párrafos, se realiza una síntesis de las posturas de las Partes en materia de costos, tal como se alegaron en sus presentaciones escritas.

### 1.  Síntesis de la postura de la Demandante sobre los costos

35. La Demandante afirma que, a la luz de la conclusión del Tribunal en su Decisión de que la Demandada violó el Artículo 5(1), incisos 2 y 3, del Tratado, se debe condenar a la Demandada a pagar todos los costos de la Demandante más los intereses compuestos correspondientes calculados anualmente desde la fecha del Laudo hasta la fecha de pago por parte de Venezuela[2].

36. La Demandada sostiene que la autoridad del Tribunal para calcular y distribuir los costos entre las Partes surge del Artículo 61(2) del Convenio CIADI que, interpretado en sentido amplio, incluiría: (i) honorarios, previsiones y otros gastos de abogados y peritos; y (ii) todos

---

[2] Presentación Actualizada sobre Costos de la Demandante, pág. 1.

los costos de viaje y costos en que hubiesen incurrido los testigos, asesores y representantes de las Partes[3].

37.    La Demandante alega, además, que el tribunal debe ejercer su autoridad para asignar los costos y aplicar la regla según la cual "*la parte vencida paga*", sobre todo en casos en que el Estado demandado no ha cumplido con obligaciones establecidas en un tratado. Según la Demandante, en tales circunstancias, los tribunales "*han condenado, de manera uniforme, a la totalidad o parte de los costos a la parte demandante*". La Demandante hace referencia a los casos *ADC c. Hungría* y *Gold Reserve*, en los que los tribunales vincularon sus condenas en costos al principio de reparación íntegra establecido en *Chorzów*[4]. La Demandante cita, asimismo, otra autoridad que considera que "*existen fundamentos para considerar que los costos del arbitraje en que incurre una demandante que sufrió daños como resultado del accionar de un Estado (o viceversa) se encuentran incluidos entre las* 'consecuencias naturales, normales y previsibles del daño causado'"[5]. [Traducción del Tribunal]

38.    La Demandante alega que no es necesario que la parte demandante resulte vencedora en todas sus pretensiones para poder obtener el reintegro de sus costos razonables, y cita la decisión del tribunal de *Hochtief c. Argentina*, para el cual bastaría con que "*se hubiera acogido la esencia de la pretensión*" y que la demandante "*tuviera derecho a indemnización por las pérdidas resultantes de la violación por parte de la Demandada de los derechos de la Demandante en virtud del TBI*"[6]. Según la Demandante, la lógica de una reparación íntegra indica que "*siempre que la demandante se vea obligada a acudir al arbitraje porque se violaron sus derechos en virtud de un tratado, es indispensable una adjudicación de costos que coloque a la demandante en la posición en que habría estado, como si nunca se hubiesen vulnerado tales derechos*"[7]. [Traducción del Tribunal]

39.    La Demandante sostiene que los tribunales de *OI European c. Venezuela* y *Flughafen Zürich c. Venezuela* aplicaron este enfoque al exigirle a Venezuela el pago de los costos del procedimiento y una parte importante de las costas legales de la demandante,

---

[3] Presentación sobre Costos de la Demandante, ¶ 4.

[4] Presentación sobre Costos de la Demandante, ¶¶ 5-7, con cita de *ADC c. Hungría* (**CLA-001**), ¶¶ 531, 533 y *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 860.

[5] Presentación sobre Costos de la Demandante, ¶ 8, con cita de Bienvenu, Pierre y Valasek, Martin J., "*Compensation for Unlawful Expropriation, and Other Recent Manifestations of the Principle of Full Reparation in International Investment Law*", en Albert Jan van den Berg (ed.), *50 Years of the New York Convention: ICCA International Arbitration Conference*, 14 ICCA Congress Series 231 (2009) (**CLA-011**).

[6] Presentación sobre Costos de la Demandante, ¶ 9, con cita de *Venoklim Holding c. Venezuela* (**CLA-160**), ¶ 330.

[7] Presentación sobre Costos de la Demandante, ¶ 9.

respectivamente[8]. Asimismo, la Demandante hace referencia al caso *Tidewater c. Venezuela*, en el que el tribunal resolvió que la expropiación era lícita pero, no obstante ello, condenó en costas a las demandantes, para lo cual señaló que "*[l]as Demandantes […] tuvieron que invertir mucho tiempo, dinero y preocupación a fin de obtener la indemnización que Venezuela se había comprometido a pagar en virtud de los términos del TBI con Barbados y debería haber ofrecido en el año 2009*"[9].

40.    La Demandante advierte que la Demandada no cuestiona la autoridad del Tribunal para condenar a una parte en costas, sino que solicita una condena en su favor con base en la falta de participación de la Demandante en los procedimientos que establece la ley venezolana para el cálculo de la indemnización adeudada a la Demandante. En respuesta a ese argumento, la Demandante destaca que no habría tenido que participar en dichos procedimientos si la Demandada hubiese cumplido con sus obligaciones en virtud del Tratado y la ley venezolana, y hubiese otorgado a la Demandante una indemnización adecuada al momento de la expropiación. Como resultado de dicho incumplimiento de la Demandada, la Demandante sostiene que tuvo que iniciar acciones legales, que ocasionaron demoras que le significaron mucho tiempo y recursos financieros[10].

41.    En opinión de la Demandante, el hecho de que no prosperaran su recusación y su solicitud de medidas provisionales no es motivo para ignorar el principio de reparación íntegra, y sostiene que "*una conducta procesal de buena fe que genera un pequeño retraso*" no justifica una condena en costas en favor de la parte contraria. La Demandante alude al caso *Poštová Banka c. República Helénica*, en el que el tribunal no se pronunció en materia de costas, a pesar de fallar a favor de la demandada en jurisdicción, y sostuvo que "*la cuestión no estaba bien definida y comprendía un contexto fáctico y jurídico complejo. Cada lado planteó argumentos válidos en sustento de su respectiva postura, y actuó de manera justa y profesional*"[11]. [Traducción del Tribunal]

42.    Por otro lado, la Demandante alega que se podría justificar un ajuste en la asignación de las costas "*ante una conducta extrema o abuso de proceso de las partes, incluida una obstrucción intencional del procedimiento*", que considera que es lo que ocurre en este caso

---

[8] Presentación sobre Costos de la Demandante, ¶ 10, en referencia a *OI European Group c. Venezuela* (**CLA-156**), ¶¶ 969-976 y *Flughafen Zürich c. Venezuela* (**CLA-161**), ¶¶ 994-995, 997, 1000-1001.

[9] Presentación sobre Costos de la Demandante, ¶ 11, en referencia a *Tidewater c. Venezuela* (**CLA-155**), ¶ 213.

[10] Presentación sobre Costos de la Demandante, ¶¶ 13-14. *Véase, también,* Primera Presentación sobre Costos de la Demandante, pág. 1.

[11] Presentación sobre Costos de la Demandante, ¶ 16, con cita de *Poštová Banka c. República Helénica* (**CLA-163**), ¶ 377.

dada la negativa de la Demandada a pagar su porción de los adelantos de costas, tal como exige la Regla 14(3)(d) del Reglamento del CIADI. Por lo tanto, alega la Demandante, la Demandada "*puso en peligro la continuidad del proceso*" y la obligó a pagar la porción de la Demandada para evitar interrumpir el proceso. La Demandante hace referencia a la decisión de *Venoklim c. Venezuela*, en que el tribunal tomó nota de una conducta similar de Venezuela y la obligó a reintegrar a la demandante su porción impaga del adelanto de costos[12]. [Traducción del Tribunal]

43. En función de lo anterior, y conforme a la Regla 28 de las Reglas de Arbitraje CIADI, la Demandante solicita el reintegro de: (i) los adelantos de honorarios y gastos de los miembros del Tribunal y los gastos administrativos del CIADI; (ii) los costos de viaje y gastos de testigos y representantes de la Demandante; y (iii) los costos de su representación legal, peritos independientes y consultores[13]. Según la Presentación Actualizada sobre Costos de la Demandante, agregada el 28 de julio de 2017, la Demandante incurrió en los siguientes costos[14]:

| Descripción | Total actualizado al 28 de julio de 2017 (USD) |
|---|---|
| Costos del Tribunal y del CIADI | 1.425.000[15] |
| Viáticos y gastos de testigos y representantes | 85.227,27 |
| Honorarios y gastos de abogados | 5.214.398,70 |
| Honorarios y gastos de peritos valuadores | 1.652.172,11 |
| **Total de costos reclamados** | **8.376.798,08** |

---

[12] Presentación sobre Costos de la Demandante, ¶ 18, en referencia a *Venoklim c. Venezuela* (**CLA-165**), ¶¶ 163-165.

[13] Presentación sobre Costos de la Demandante, ¶ 19.

[14] Segunda Presentación Actualizada sobre Costos de la Demandante, pág. 2.

[15] Este monto incluye el adelanto final de costos solicitado por el CIADI mediante carta de fecha 17 de agosto de 2017, pagado por la Demandante y recibido por el CIADI el 6 de septiembre de 2017.

## 2. Petitorio de la Demandante

44.    La Demandante solicita que el Tribunal[16]:

    (a)    ORDENE a Venezuela reintegrar a Saint-Gobain los siguientes gastos y costos, con más sus intereses compuestos calculados anualmente a una tasa comercial desde la fecha del Laudo hasta la fecha de pago por parte de Venezuela:

        (i)    USD 1.425.000,00 en concepto de adelantos de honorarios y gastos del Tribunal y gastos administrativos del CIADI en que hubiese incurrido Saint-Gobain;

        (ii)    USD 85.227,27 en concepto de viáticos y gastos de otra índole razonables en que hubiesen incurrido los testigos y representantes de Saint-Gobain;

        (iii)    USD 5.214.398,70 en concepto de honorarios y gastos de los abogados de Saint-Gobain de Freshfields Bruckhaus Deringer US LLP, Hughes Hubbard & Reed LLP, LEC Partners LLC y Sosa & Martínez Estudio Jurídico (que incluye USD 53.374,49, correspondientes a los honorarios y gastos del Dr. Brewer-Carías, perito jurídico de Saint-Gobain, y USD 15.512,26, correspondientes a los honorarios y gastos de FTI Consulting e Immersion Legal Graphics, LCC, consultoras en materia de tecnología de Saint-Gobain); y

        (iv)    USD 1.652.172,11 en concepto de honorarios y gastos de Compass Lexecon, perito valuador de Saint-Gobain.

    (b)    OTORGUE cualquier otro resarcimiento que considere apropiado.

## 3. Síntesis de la postura de la Demandada sobre los costos

45.    La Demandada está de acuerdo con la Demandante en que el Artículo 61(2) del Convenio CIADI faculta al Tribunal para evaluar quién sufragará los gastos de las Partes, así como los honorarios y gastos del Tribunal, y los derechos devengados por la utilización de las instalaciones del CIADI[17].

---

[16] Presentación sobre Costos de la Demandante, ¶ 30, con cifras actualizadas de la Segunda Presentación sobre Costos de la Demandante, pág. 2.

[17] Memorial de Contestación, ¶ 271; Dúplica, ¶ 280.

46. La Demandada señala que los tribunales del CIADI suelen hacer uso de sus facultades discrecionales al asignar los costos a la parte vencedora en el arbitraje y sostiene que ella debe ser considerada como tal en este caso. La Demandada hace referencia a la solicitud de la Demandante de reconsiderar la Decisión del Tribunal, rechazada de manera unánime, y a las cifras obtenidas por los peritos de las Partes en función de las conclusiones del Tribunal. La Demandada advierte que todas estas cifras, que van de USD 23 a 30 millones (sin incluir los intereses anteriores al laudo) son *"mucho más bajas que las sumas groseramente desmesuradas que las Demandantes exigieron a lo largo del arbitraje"* [Traducción del Tribunal], a saber, USD 99,5 millones al 15 de mayo de 2010 o USD 120,5 millones al 31 de mayo de 2014[18].

47. La Demandada invoca, asimismo, la negativa de la Demandante a participar en los procedimientos para calcular la indemnización con arreglo a la legislación venezolana y su solicitud de medidas provisionales contra tales procedimientos que, conforme la opinión de la Demandada, *"frustraron su implementación"*. Según la Demandada, no hubiera sido necesario incurrir en los gastos de este arbitraje si la Demandante hubiese *"adoptado una postura razonable"* al respecto[19]. [Traducción del Tribunal]

48. La Demandada alega que *"a la luz de la decisión estratégica de la Demandante de no participar en los procedimientos que establece la legislación venezolana para el cálculo de la justa compensación y, en cambio, utilizar tácticas para demorar dicho cálculo, y ante el monto indemnizatorio tan excesivo que exige la Demandante en este caso"* [Traducción del Tribunal], se debería condenar a la Demandante al pago de todos los costos incurridos por las Partes, como también los costos del arbitraje[20].

49. Según la Presentación Adicional de Costos de la Demandada, agregada el 28 de julio de 2017, la Demandada incurrió en los siguientes costos:

| Concepto | Monto (USD) |
|---|---|
| Honorarios de Curtis, Mallet-Prevost, Colt & Mosle, LLP hasta el 23 de noviembre de 2015 | 4.144.946,25 |
| Honorarios de los Asesores Legales venezolanos | 162.637,00 |

---

[18] Presentación Adicional de Costos de la Demandada, pág. 2.
[19] Presentación Adicional de Costos de la Demandada, pág. 2.
[20] Memorial de Contestación, ¶ 272; Dúplica, ¶ 281.

| Concepto | Monto (USD) |
|---|---|
| Perito económico: Vladimir Brailovsky | 340.565,63 |
| Perito económico: Econ One (Daniel Flores) hasta el 23 de noviembre de 2015 | 1.415.833,74 |
| Gastos de transporte y viáticos | 199.955,50 |
| Exhibición de documentos/Duplicado y Procesamiento de texto | 126.876,84 |
| Servicio de mensajería | 9.390,96 |
| Honorarios y gastos de Curtis, Mallet-Prevost, Colt & Mosle, LLP después del 23 de noviembre de 2015 | 127.468,75 |
| Honorarios y gastos del perito económico de la Demandada, Econ One (Daniel Flores) después del 23 de noviembre de 2015 | 61.370,11 |
| **Total de costos reclamados** | **6.589.044,78** |

### 4. Petitorio de la Demandada

50. La Demandada solicita que el Tribunal condene en costas a la Demandante y que, de ser así, implemente esa decisión mediante la deducción de todos los costos de la Demandada indicados en la Presentación Actualizada sobre Costos de fecha 23 de noviembre de 2015 y en la Presentación Adicional de Costos del monto definitivo de la indemnización según sea calculada por el Tribunal [21].

## F.    RAZONAMIENTO DEL TRIBUNAL

### I.    EL ACUERDO DE LAS PARTES SOBRE CUANTÍA DE DAÑOS

51. Tal como se señalara más arriba, las Partes llegaron a un acuerdo sobre el monto definitivo de la indemnización que la Demandada deberá abonar a la Demandante por la expropiación de Norpro Venezuela, en línea con las conclusiones contenidas en la Decisión del Tribunal.

---

[21] Presentación Adicional de Costos de la Demandada, pág. 2.

Este consentimiento se expresa en la carta de la Demandada de fecha 30 de marzo de 2017 y en la carta de la Demandante de fecha 12 de julio de 2017.

52.    En función de este acuerdo logrado entre las Partes, el Tribunal resuelve que el monto final de la indemnización que la Demandada deberá pagar a la Demandante por la expropiación de su inversión, calculado sobre la base de las conclusiones del Tribunal resumidas en los párrafos 849 a 851 de su Decisión, asciende a USD 34,4 millones. Este monto incluye intereses anteriores al laudo desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017 por la suma de USD 4,8 millones.

53.    La Demandada abonará, asimismo, a la Demandante intereses anteriores al laudo, calculados a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual, desde el 1 de abril de 2017 hasta la fecha de este Laudo.

54.    Por último, la Demandada deberá pagar a la Demandante los intereses posteriores al laudo que especificó el Tribunal en su Decisión. Dichos intereses comenzarán a computarse a partir del trigésimo día siguiente a la fecha de este Laudo.

## II.    DECISIÓN SOBRE COSTOS

55.    Las Partes coinciden en que la facultad del Tribunal para decidir sobre la distribución de costos se basa en el Artículo 61(2) del Convenio CIADI, que establece:

> "*En el caso de procedimiento de arbitraje, el Tribunal determinará, salvo acuerdo contrario de las partes, los gastos en que estas hubieren incurrido en el procedimiento, y decidirá la forma de pago y la manera de distribución de tales gastos, de los honorarios y gastos de los miembros del Tribunal y de los derechos devengados por la utilización del Centro. Tal fijación y distribución formarán parte del laudo*".

56.    Asimismo, están de acuerdo en que la discreción del Tribunal para "*determinar los gastos en que* [las partes] *hubieren incurrido*" abarca todos los gastos de las Partes en relación con el arbitraje, es decir, incluso los honorarios de sus representantes legales y peritos valuadores.

57.    Por lo tanto, el Tribunal ejercerá la discreción que le confiere el Artículo 61(2) del Convenio CIADI y decidirá sobre la distribución de: (i) los costos del arbitraje, que incluyen los gastos administrativos que cobra el CIADI, como también los honorarios y gastos de los miembros del Tribunal; y (ii) los honorarios y gastos en que hubiesen incurrido las Partes en relación con este arbitraje.

## 1. Los costos del arbitraje

58.     En primer lugar, el Tribunal se ocupará de la cuestión que consiste en determinar quién soportará los costos del arbitraje. En cuanto a los adelantos pagados en tal sentido, el Tribunal advierte que, de acuerdo con la Regla 14(3)(d) del Reglamento Administrativo y Financiero del CIADI, el CIADI solicitó a las Partes que pagaran cada uno de los respectivos adelantos de costos en partes iguales. Sin embargo, durante este procedimiento, la Demandada no pagó su parte correspondiente del 50% de los adelantos que solicitó el CIADI. Previa solicitud, la Demandante pagó tanto su propia parte de los adelantos de costos como también la parte de la Demandada, cuyo total asciende a USD 1.425.000.

59.     El Tribunal está de acuerdo con la Demandante que la negativa de la Demandada a pagar su parte de los adelantos de costos constituye una violación del marco procesal del CIADI, que el Tribunal contemplará al momento de expedirse sobre la distribución de los costos del arbitraje.

60.     El Tribunal recuerda, asimismo, su conclusión en la Decisión de que la Demandada violó el Artículo 5(1), incisos 2 y 3, del Tratado al no especificar el monto de indemnización ni pagar indemnización pronta por la expropiación de la inversión de la Demandante[22]. Al mismo tiempo, el Tribunal advierte que no se prununció acerca de si la Demandada incumplió sus propias leyes nacionales con respecto al proceso de expropiación y si tal incumplimiento constituyó una violación del debido proceso, tal como alega la Demandante en este arbitraje[23].

61.     En cualquier caso, sin perjuicio de si la conducta de la Demandada se ajustó o no a sus propias leyes en materia de expropiación, el Tribunal advierte que, a su entender, la Demandada, hasta la fecha, es decir, luego de transcurridos más de siete años de la fecha de expropiación, no pagó ninguna indemnización a la Demandante ni depositó ninguna suma por concepto de indemnización preliminar ante algún tribunal competente de Venezuela— pese al hecho de que siempre reconoció que una expropiación requiere el pago de justa indemnización. En este contexto, el Tribunal no puede seguir el argumento de la Demandada de que la solicitud de medidas provisionales de la Demandante frustró la implementación de los procedimientos venezolanos para calcular la indemnización[24], puesto que el Tribunal decidió, en su Resolución Procesal No. 3, denegar la solicitud de la Demandante en su

---

[22] Decisión, ¶ 480 y Resolución No. 1.
[23] Decisión, ¶ 504.
[24] *Véase* Presentación Adicional de Costos de la Demandada, pág. 2.

totalidad y, de esa manera, se abstuvo de ordenar que la Demandada discontinuara todo proceso local relacionado con la expropiación de Norpro Venezuela.

62.   En este contexto y teniendo en cuenta la inobservancia por parte de la Demandada de los requisitos del Artículo 5(1), incisos 2 y 3, del Tratado, el Tribunal coincide con la Demandante en que esta se vio obligada por la conducta de la Demandada a iniciar este arbitraje con el fin de obtener indemnización adecuada por la expropiación de su inversión en Venezuela[25]. En consecuencia, el Tribunal considera apropiado que la Demandada soporte los costos del arbitraje, los cuales ascienden a (USD):[26] .

| Honorarios y Gastos de los Árbitros | |
| --- | --- |
| Prof. Dr. Klaus Sachs | 508,122.79 |
| El Honorable Charles N. Brower | 256,489.47 |
| Sr. Gabriel Bottini | 229,089.47 |
| Gastros Administrativos del CIADI | 160,000 |
| Gastos Directos[27] | 149,488.26 |
| **Total** | **1,303,189.99** |

63.   Por tanto, el Tribunal ordena a la Demandada pagar a la Demandante la suma de USD 1.303.189,99 equivalentes a la parte que ha sido gastada de los anticipos al CIADI.[28]

### 2.   Los costos en que hubiesen incurrido las Partes en relación con este arbitraje

64.   En segundo lugar, el Tribunal analizará la cuestión que consiste en determinar quién sufragará los honorarios y gastos en que incurrieron las Partes en relación con este arbitraje. Ante todo, el Tribunal advierte que ninguna de las Partes planteó una objeción respecto de la razonabilidad de los costos en que incurrió la otra Parte y que, de hecho, los costos totales en que incurrió cada una de ellas se encuentran dentro de un rango similar de aproximadamente USD 6,5-7 millones.

---

[25] *Véase* Presentación sobre Costos de la Demandante, ¶¶ 13-14.

[26] El Secretariado del CIADI proporcionará a las Partes un Estado Financiero detallado de las cuentas del caso.

[27] Este monto incluye cargos relacionados con el envío del Laudo (servicio de mensajería internacional o *courier*, impresión y copias).

[28] El saldo restante de los anticipos será devuelto a la Demandante.

65.    Por los motivos que anteceden, en particular, dado que la Demandante tuvo que iniciar el presente arbitraje para obtener indemnización, el Tribunal considera apropiado que la Demandada soporte cierta parte de los costos en que incurrió la Demandante en relación con este proceso. Para calcular la parte específica que debería soportar la Demandada, el Tribunal tuvo en cuenta, en especial, las siguientes consideraciones.

66.    En primer lugar, el Tribunal recuerda que, si bien resolvió que se había violado el Artículo 5(1), incisos 2 y 3, del Tratado y dejó abierta la cuestión de si hubo violación del debido proceso en el procedimiento de expropiación, rechazó las Reclamaciones sobre la Bauxita de la Demandante, es decir, sus reclamaciones de que la Demandada violó el Artículo 3(1) y 3(2) del Tratado al aumentar el precio de la bauxita inicialmente pactado en el Contrato de Bauxita, celebrado entre la Demandante y CVG Bauxilum[29].

67.    En segundo lugar, en cuando a la cuantía de los daños, el Tribunal recuerda que, si bien la Demandante solicitó en su presentación final una indemnización de USD 99,5 millones más intereses anteriores al laudo al 15 de mayo de 2010[30], la Demandada solicitó que se establezca una indemnización de USD 9,5 millones, sin incluir intereses anteriores al laudo[31]. La Demandada arguye que, en vista del monto acordado por las Partes sobre la base de las conclusiones del Tribunal en su Decisión, es decir, USD 29,6 millones, sin incluir los intereses anteriores al laudo, se la debe considerar parte vencedera en este arbitraje[32]. El Tribunal no está de acuerdo con esa caracterización. Además de la decisión del Tribunal sobre responsabilidad de que la Demandada incumplió sus obligaciones según el Tratado, el Tribunal advierte que, como resultado de sus conclusiones sobre los principios de cuantía de daños, la Demandante tiene derecho a aproximadamente el 30% de lo que solicitó o más del 300% de la indemnización que la Demandada consideró justa en el contexto de este arbitraje.

68.    Tal como señalara la Demandada[33], la Demandante inició otros tres procesos incidentales, a saber: (i) una solicitud de recusación del árbitro Bottini; (ii) una solicitud de medidas provisionales para discontinuar todos los procesos nacionales en Venezuela en relación con la expropiación de Norpro Venezuela; y (iii) una solicitud de reconsideración y rectificación de la Decisión del Tribunal. El Tribunal no considera necesario en esta etapa expresar su opinión acerca de si cada una de estas tres solicitudes era "*sustancial y requería la consideración y determinación adecuada del Tribunal*", como ocurrió en el caso *Tidewater*

---

[29] Decisión, ¶¶ 542 y 560.

[30] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116.

[31] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 64.

[32] Presentación Adicional de Costos de la Demandada, pág. 2.

[33] Presentación Adicional de Costos de la Demandada, pág. 2.

*c. Venezuela* que invoca la Demandante en tal sentido[34]. En opinión del Tribunal, a los efectos del presente Laudo, basta con señalar que ninguna de las tres solicitudes prosperó.

69.    Teniendo en cuenta todas las consideraciones vertidas previamente, el Tribunal no encuentra motivo alguno para resolver que la Demandada soporte todos los costos en que incurrió la Demandante en relación con este arbitraje. El Tribunal considera que lo correcto es que la Demandada soporte dos tercios de los costos de la Demandante. En consecuencia, la Demandada deberá reembolsar a la Demandante la suma de USD 4.634.532,05.

### 3. Intereses sobre costos

70.    Por último, la Demandante solicita que se ordene a la Demandada reintegrarle sus gastos, con más los intereses compuestos correspondientes, calculados anualmente, a una tasa comercial desde la fecha del Laudo hasta la fecha de pago por parte de Venezuela.

71.    El Tribunal considera apropiado otorgar intereses sobre el monto de los costos que la Demandante deberá reembolsar, a la misma tasa de intereses posteriores al laudo que la que se aplica sobre el capital de la indemnización, es decir, 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual. Dichos intereses comenzarán a devengarse a partir del trigésimo día siguiente a la fecha de este Laudo.

## G.    DECISIÓN DEL TRIBUNAL

72.    Por las razones expuestas, el Tribunal[35] resuelve lo siguiente:

### LAUDO

1. **La Demandada deberá pagar a la Demandante dentro de los 30 días siguientes a la fecha de este Laudo: (i) USD 29.6 millones por concepto de capital en forma de indemnización por la expropiación de la inversión de la Demandante en Venezuela; y (ii) USD 4.8 millones por concepto de intereses anteriores al laudo,**

---

[34] Presentación sobre Costos de la Demandante, ¶ 17, con cita de *Tidewater c. Venezuela* (**CLA-155**), ¶ 212.

[35] El árbitro Bottini considera que, siempre que un tribunal CIADI ejerza su discreción conforme al Artículo 61(2) del Convenio CIADI y dicte una resolución sobre costos ajustada (es decir, una resolución por la que ordene a una parte pagar los costos de la otra o los costos del tribunal, en todo o en parte), dos factores importantes a ser considerados son: en qué medida se hizo lugar al reclamo de indemnización de la demandante y qué parte resultó vencedora en los procesos incidentales resueltos en el arbitraje. El árbitro Bottini considera que la decisión del Tribunal sobre costos no refleja ninguno de estos dos factores.

desde el 15 de mayo de 2010 hasta el 31 de marzo de 2017.

2. La Demandada deberá pagar, asimismo, dentro los 30 días siguientes a la fecha de este Laudo, intereses anteriores al laudo sobre el monto de capital de la indeminzación según el párrafo 1 precedente; a saber, USD 29.6 millones, desde el 1 de abril de 2017 hasta la fecha de este Laudo, a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

3. Sujeto a la limitación de que sólo se pagarán intereses posteriores al laudo sobre el capital de la indemnización, y no sobre los intereses anteriores al laudo otorgados, la Demandada deberá pagar a la Demandante intereses posteriores al laudo sobre el monto de capital de la indemnización especificado en número 1 precedente, a saber, USD 29.6 millones, desde la fecha del Laudo hasta la fecha de pago, a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

4. La compensación y los intereses se fijan en montos netos de los impuestos venezolanos aplicables, y la Demandada no podrá deducir impuestos en relación con el pago de la compensación y los intereses.

5. La Demandada soportará los costos del arbitraje, es decir, los honorarios y gastos de los miembros del Tribunal como también los derechos devengados por la utilización de las instalaciones del CIADI, en su totalidad. Por lo tanto, la Demandada deberá reintegrar a la Demandante la suma de USD 1.303.189,99 en un plazo de 30 días desde la fecha de este Laudo.

6. La Demandada se hará cargo, asimismo, de dos tercios de los costos en que haya incurrido la Demandante en relación con el arbitraje y, por lo tanto, reintegrará a la Demandante la suma de USD 4.634.532,05 en un plazo de 30 días desde la fecha de este Laudo.

7. La Demandada deberá pagar a la Demandante intereses posteriores al Laudo sobre el monto de costos objeto de reembolso, especificado en los números 5 y 6 precedentes, desde el trigésimo día siguiente a la fecha de este Laudo hasta la fecha de pago, a una tasa igual al 2% sobre la tasa promedio de Letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.

8. Se desestiman todas las demás pretensiones y petitorios.

El Honorable Charles N. Brower
Árbitro
Fecha: 28 de Septiembre de 2017

Sr. Gabriel Bottini
Árbitro
Fecha: 9 de octubre de 2017

Profesor Dr. Klaus Sachs
Presidente
Fecha: 25 de Octubre de 2017

# Anexo 2

# CONVENIO SOBRE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES ENTRE ESTADOS Y NACIONALES DE OTROS ESTADOS

Convenio

## CONVENIO SOBRE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES ENTRE ESTADOS Y NACIONALES DE OTROS ESTADOS

## Indice de Materias

| Capítulo | Sección | | Artículo | Página |
|---|---|---|---|---|
| | | Preámbulo | | 11 |
| I | | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones | 1-24 | 12 |
| | 1 | Creación y Organización | 1-3 | 12 |
| | 2 | El Consejo Administrativo | 4-8 | 12 |
| | 3 | El Secretariado | 9-11 | 14 |
| | 4 | Las Listas | 12-16 | 15 |
| | 5 | Financiación del Centro | 17 | 16 |
| | 6 | Status, inmunidades y privilegios | 18-24 | 16 |
| II | | Jurisdicción del Centro | 25-27 | 18 |
| III | | La Conciliación | 28-35 | 19 |
| | 1 | Solicitud de conciliación | 28 | 19 |
| | 2 | Constitución de la Comisión de conciliación | 29-31 | 20 |
| | 3 | Procedimiento de conciliación | 32-35 | 21 |
| IV | | El Arbitraje | 36-55 | 22 |
| | 1 | Solicitud de arbitraje | 36 | 22 |
| | 2 | Constitución del Tribunal | 37-40 | 22 |
| | 3 | Facultades y funciones del Tribunal | 41-47 | 23 |
| | 4 | El laudo | 48-49 | 23 |
| | 5 | Aclaración, revisión y anulación del laudo | 50-52 | 26 |
| | 6 | Reconocimiento y ejecución del laudo | 53-55 | 28 |
| V | | Sustitución y recusación de Conciliadores y Arbitros | 56-58 | 29 |
| VI | | Costas del procedimiento | 59-61 | 30 |
| VII | | Lugar del procedimiento | 62-63 | 30 |

Convenio

9

| VIII | Diferencias entre Estados Contratantes | 64 | 31 |
| IX | Enmiendas | 65 66 | 31 |
| X | Disposiciones finales | 67-75 | 32 |
| | Cláusula relativa a la firma | | 33 |

Convenio

# CONVENIO SOBRE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES ENTRE ESTADOS Y NACIONALES DE OTROS ESTADOS

## Preámbulo

Los Estados Contratantes

**Considerando** la necesidad de la cooperación internacional para el desarrollo económico y la función que en ese campo desempeñan las inversiones internacionales de carácter privado;

**Teniendo en cuenta** la posibilidad de que a veces surjan diferencias entre Estados Contratantes y nacionales de otros Estados Contratantes en relación con tales inversiones;

**Reconociendo** que aun cuando tales diferencias se someten corrientemente a sistemas procesales nacionales, en ciertos casos el empleo de métodos internacionales de arreglo puede ser apropiado para su solución;

**Atribuyendo particular importancia** a la disponibilidad de medios de conciliación o arbitraje internacionales a los que puedan los Estados Contratantes y los nacionales de otros Estados Contratantes, si lo desean, someter dichas diferencias;

**Deseando** crear tales medios bajo los auspicios del Banco Internacional de Reconstrucción y Fomento;

**Reconociendo** que el consentimiento mutuo de las partes en someter dichas diferencias a conciliación o a arbitraje a través de dichos medios constituye un acuerdo obligatorio, lo que exige particularmente que se preste la debida consideración a las recomendaciones de los conciliadores y que se cumplan los laudos arbitrales; y

**Declarando** que la mera ratificación, aceptación o aprobación de este Convenio por parte del Estado Contratante, no se reputará que constituye una obligación de someter ninguna diferencia determinada a conciliación o arbitraje, a no ser que medie el consentimiento de dicho Estado;

**Han acordado** lo siguiente:

# Capítulo I
# Centro Internacional de Arreglo de Diferencias Relativas a Inversiones

## Sección 1
## Creación y organización

### Artículo 1

(1) Por el presente Convenio se crea el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (en lo sucesivo llamado Centro).

(2) El Centro tendrá por objeto facilitar la sumisión de las diferencias relativas a inversiones entre Estados Contratantes y nacionales de otros Estados Contratantes a un procedimiento de conciliación y arbitraje de acuerdo con las disposiciones de este Convenio.

### Artículo 2

La sede del Centro será la oficina principal del Banco Internacional de Reconstrucción y Fomento (en lo sucesivo llamado el Banco). La sede podrá trasladarse a otro lugar por decisión del Consejo Administrativo adoptada por una mayoría de dos terceras partes de sus miembros.

### Artículo 3

El Centro estará compuesto por un Consejo Administrativo y un Secretariado, y mantendrá una Lista de Conciliadores y una Lista de Árbitros.

## Sección 2
## El Consejo Administrativo

### Artículo 4

(1) El Consejo Administrativo estará compuesto por un representante de cada uno de los Estados Contratantes. Un suplente podrá actuar con carácter de representante en caso de ausencia del titular de una reunión o de incapacidad del mismo.

(2) Salvo en caso de designación distinta, el gobernador y el gobernador suplente del Banco nombrados por un Estado Contratante serán *ex officio* el representante y el suplente de ese Estado, respectivamente.

### Artículo 5

El Presidente del Banco será *ex officio* Presidente del Consejo Administrativo (en lo sucesivo llamado el Presidente) pero sin derecho a voto. En caso de ausencia o incapacidad para actuar y en caso de vacancia del cargo de Presidente del Banco, la persona que lo sustituya en el Banco actuará como Presidente del Consejo Administrativo.

### Artículo 6

(1) Sin perjuicio de las demás facultades y funciones que le confieren otras disposiciones de este Convenio, el Consejo Administrativo tendrá las siguientes:

>   (a) adoptar los reglamentos administrativos y financieros del Centro;
>
>   (b) adoptar las reglas de procedimiento a seguir para iniciar la conciliación y el arbitraje;
>
>   (c) adoptar las reglas procesales aplicables a la conciliación y al arbitraje (en lo sucesivo llamadas Reglas de Conciliación y Reglas de Arbitraje);
>
>   (d) aprobar los arreglos con el Banco sobre la utilización de sus servicios administrativos e instalaciones;
>
>   (e) fijar las condiciones del desempeño de las funciones del Secretario General y de los Secretarios Generales Adjuntos;
>
>   (f) adoptar el presupuesto anual de ingresos y gastos del Centro;
>
>   (g) aprobar el informe anual de actividades del Centro.

Para la aprobación de lo dispuesto en los incisos (a), (b), (c) y (f) se requerirá una mayoría de dos tercios de los miembros del Consejo Administrativo.

(2) El Consejo Administrativo podrá nombrar las Comisiones que considere necesarias.

(3) Además, el Consejo Administrativo ejercerá todas las facultades y realizará todas las funciones que a su juicio sean necesarias para llevar a efecto las disposiciones del presente Convenio.

### Artículo 7

(1) El Consejo Administrativo celebrará una reunión anual, y las demás que sean acordadas por el Consejo, o convocadas por el Presidente, o por el Secretario General cuando lo soliciten a este último no menos de cinco miembros del Consejo.



Convenio

13

(2) Cada miembro del Consejo Administrativo tendrá un voto, y, salvo disposición expresa en contrario de este Convenio, todos los asuntos que se presenten ante el Consejo se decidirán por mayoría de votos emitidos.

(3) Habrá quórum en las reuniones del Consejo Administrativo cuando esté presente la mayoría de sus miembros.

(4) El Consejo Administrativo podrá establecer, por mayoría de dos tercios de sus miembros, un procedimiento mediante el cual el Presidente pueda pedir votación del Consejo sin convocar a una reunión del mismo. Sólo se considerará válida esta votación si la mayoría de los miembros del Consejo emiten el voto dentro del plazo fijado en dicho procedimiento.

### Artículo 8

Los miembros del Consejo Administrativo y el Presidente desempeñarán sus funciones sin remuneración por parte del Centro.

## Sección 3
## El Secretariado

### Artículo 9

El Secretariado estará constituido por un Secretario General, por uno o más Secretarios Generales Adjuntos y por el personal del Centro.

### Artículo 10

(1) El Secretario General y los Secretarios Generales Adjuntos serán elegidos, a propuesta del Presidente, por el Consejo Administrativo por mayoría de dos tercios de sus miembros por un período de servicio no mayor de seis años, pudiendo ser reelegidos. Previa consulta a los miembros del Consejo Administrativo, el Presidente presentará uno o más candidatos para cada uno de esos cargos.

(2) Los cargos de Secretario General y de Secretario General Adjunto serán incompatibles con el ejercicio de toda función política. Ni el Secretario General ni ningún Secretario General Adjunto podrán desempeñar cargo alguno o dedicarse a otra actividad, sin la aprobación del Consejo Administrativo.

(3) Durante la ausencia o incapacidad del Secretario General y durante la vacancia del cargo, el Secretario General Adjunto actuará como Secretario General. Si hubiere más de un Secretario General Adjunto, el Consejo Administrativo determinará anticipadamente el orden en que deberán actuar como Secretario General.

14

Artículo 11

El Secretario General será el representante legal y el funcionario principal del Centro y será responsable de su administración, incluyendo el nombramiento del personal, de acuerdo con las disposiciones de este Convenio y los reglamentos dictados por el Consejo Administrativo, desempeñará la función de registrador, y tendrá facultades para autenticar los laudos arbitrales dictados conforme a este convenio y para conferir copias certificadas de los mismos.

## Sección 4
## Las Listas

Artículo 12

La Lista de Conciliadores y la Lista de Arbitros estarán integradas por los nombres de las personas calificadas, designadas tal como se dispone más adelante, y que estén dispuestas a desempeñar sus cargos.

Artículo 13

(1) Cada Estado Contratante podrá designar cuatro personas para cada Lista quienes podrán ser, o no, nacionales de ese Estado.

(2) El Presidente podrá designar diez personas para cada Lista, cuidando que las personas así designadas sean de diferente nacionalidad.

Artículo 14

(1) Las personas designadas para figurar en las Listas deberán gozar de amplia consideración moral, tener reconocida competencia en el campo del Derecho, del comercio, de la industria o de las finanzas e inspirar plena confianza en su imparcialidad de juicio. La competencia en el campo del Derecho será circunstancia particularmente relevante para las personas designadas en la Lista de Arbitros.

(2) Al hacer la designación de las personas que han de figurar en las Listas, el Presidente deberá además tener presente la importancia de que en dichas Listas estén representados los principales sistemas jurídicos del mundo y los ramos más importantes de la actividad económica.

Artículo 15

(1) La designación de los integrantes de las Listas se hará por períodos de seis años, renovables.

(2) En caso de muerte o renuncia de un miembro de cualquiera de las Listas, la autoridad que lo hubiere designado tendrá derecho a nom-

15

Convenio

brar otra persona que le reemplace en sus funciones por el resto del período para el que aquél fue nombrado.

(3) Los componentes de las Listas continuarán en las mismas hasta que sus sucesores hayan sido designados.

### Artículo 16

(1) Una misma persona podrá figurar en ambas Listas.

(2) Cuando alguna persona hubiere sido designada para integrar una Lista por más de un Estado Contratante o por uno o más Estados Contratantes y el Presidente, se entenderá que lo fue por la autoridad que lo designó primero; pero si una de esas autoridades es el Estado de que es nacional, se entenderá designada por dicho Estado.

(3) Todas las designaciones se notificarán al Secretario General y entrarán en vigor en la fecha en que la notificación fue recibida.

## Sección 5
### Financiación del Centro

### Artículo 17

Si los gastos del Centro no pudieren ser cubiertos con los derechos percibidos por la utilización de sus servicios, o con otros ingresos, la diferencia será sufragada por los Estados Contratantes miembros del Banco en proporción a sus respectivas subscripciones de capital del Banco, y por los Estados Contratantes no miembros del Banco de acuerdo con las reglas que el Consejo Administrativo adopte.

## Sección 6
### Status, inmunidades y privilegios

### Artículo 18

El Centro tendrá plena personalidad jurídica internacional. La capacidad legal del Centro comprende, entre otras, la de:

    (a) contratar,

    (b) adquirir bienes muebles e inmuebles y disponer de ellos,

    (c) comparecer en juicio.

### Artículo 19

Para que el Centro pueda dar cumplimiento a sus fines, gozará, en los territorios de cada Estado Contratante, de las inmunidades y privilegios que se señalan en esta Sección.

16

### Artículo 20

El Centro, sus bienes y derechos, gozarán de inmunidad frente a toda acción judicial, salvo que renuncie a ella.

### Artículo 21

El Presidente, los miembros del Consejo Administrativo, las personas que actúen como conciliadores o árbitros o como miembros de una Comisión designados de conformidad con lo dispuesto en el apartado (3) del Artículo 52, y los funcionarios y empleados del Secretariado:

(a) gozarán de inmunidad frente a toda acción judicial respecto de los actos realizados por ellos en el ejercicio de sus funciones, salvo que el Centro renuncie a dicha inmunidad;

(b) cuando no sean nacionales del Estado donde ejerzan sus funciones, gozarán de las mismas inmunidades en materia de inmigración, de registro de extranjeros y de obligaciones, derivadas del servicio militar u otras prestaciones análogas, y asimismo gozarán de idénticas facilidades respecto a régimen de cambios e igual tratamiento respecto a facilidades de desplazamiento, que los Estados Contratantes concedan a los representantes, funcionarios y empleados de rango similar de otros Estados Contratantes.

### Artículo 22

Las disposiciones del Artículo 21 se aplicarán a las personas que comparezcan en los procedimientos promovidos conforme a este Convenio como partes, apoderados, consejeros, abogados, testigos o peritos, con excepción de las contenidas en el párrafo (b) del mismo, que se aplicarán solamente en relación con su desplazamiento hacia y desde el lugar donde los procedimientos se tramiten y con su permanencia en dicho lugar.

### Artículo 23

(1) Los archivos del Centro, dondequiera que se encuentren, serán inviolables.

(2) Respecto de sus comunicaciones oficiales, el Centro recibirá de cada Estado Contratante un trato no menos favorable que el acordado a otras organizaciones internacionales.

### Artículo 24

(1) El Centro, su patrimonio, sus bienes y sus ingresos y las operaciones y transacciones autorizadas por este Convenio estarán exentos de toda clase de impuestos y de derechos arancelarios. El Centro quedará

17

también exento de toda responsabilidad respecto a la recaudación o pago de tales impuestos o derechos.

(2) No estarán sujetas a impuestos las cantidades pagadas por el Centro al Presidente o a los miembros del Consejo Administrativo por razón de dietas, ni tampoco los sueldos, dietas y demás emolumentos pagados por el Centro a los funcionarios o empleados del Secretariado, salvo la facultad del Estado de gravar a sus propios nacionales.

(3) No estarán sujetas a impuestos las cantidades recibidas a título de honorarios o dietas por las personas que actúen como conciliadores o árbitros o como miembros de una Comisión designados de conformidad con lo dispuesto en el apartado (3) del Artículo 52, en los procedimientos promovidos conforme a este Convenio, por razón de servicios prestados en dichos procedimientos, si la única base jurisdiccional de imposición es la ubicación del Centro, el lugar donde se desarrollen los procedimientos o el lugar de pago de los honorarios o dietas.

## Capítulo II
## Jurisdicción del Centro

Artículo 25

(1) La jurisdicción del Centro se extenderá a las diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado Contratante (o cualquiera subdivisión política u organismo público de un Estado Contratante acreditados ante el Centro por dicho Estado) y el nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro. El consentimiento dado por las partes no podrá ser unilateralmente retirado.

(2) Se entenderá como "nacional de otro Estado Contratante":

   (a) toda persona natural que tenga, en la fecha en que las partes consintieron someter la diferencia a conciliación o arbitraje y en la fecha en que fue registrada la solicitud prevista en el apartado (3) del Artículo 28 o en el apartado (3) del Artículo 36, la nacionalidad de un Estado Contratante distinto del Estado parte en la diferencia; pero en ningún caso comprenderá las personas que, en cualquiera de ambas fechas, también tenían la nacionalidad del Estado parte en la diferencia; y

   (b) toda persona jurídica que, en la fecha en que las partes prestaron su consentimiento a la jurisdicción del Centro para la diferencia en cuestión, tenga la nacionalidad de un Estado Contratante distinto del Estado parte en la diferencia, y las personas jurídicas que, teniendo en la referida fecha la nacionalidad del Estado parte en la diferencia, las partes

18

hubieren acordado atribuirle tal carácter, a los efectos de este Convenio, por estar sometidas a control extranjero.

(3) El consentimiento de una subdivisión política u organismo público de un Estado Contratante requerirá la aprobación de dicho Estado, salvo que éste notifique al Centro que tal aprobación no es necesaria.

(4) Los Estados Contratantes podrán, al ratificar, aceptar o aprobar este Convenio o en cualquier momento ulterior, notificar al Centro la clase o clases de diferencias que aceptarían someter, o no, a su jurisdicción. El Secretario General transmitirá inmediatamente dicha notificación a todos los Estados Contratantes. Esta notificación no se entenderá que constituye el consentimiento a que se refiere el apartado (1) anterior.

### Artículo 26

Salvo estipulación en contrario, el consentimiento de las partes al procedimiento de arbitraje conforme a este Convenio se considerará como consentimiento a dicho arbitraje con exclusión de cualquier otro recurso. Un Estado Contratante podrá exigir el agotamiento previo de sus vías administrativas o judiciales, como condición a su consentimiento al arbitraje conforme a este Convenio.

### Artículo 27

(1) Ningún Estado Contratante concederá protección diplomática ni promoverá reclamación internacional respecto de cualquier diferencia que uno de sus nacionales y otro Estado Contratante hayan consentido en someter o hayan sometido a arbitraje conforme a este Convenio, salvo que este último Estado Contratante no haya acatado el laudo dictado en tal diferencia o haya dejado de cumplirlo.

(2) A los efectos de este Artículo, no se considerará como protección diplomática las gestiones diplomáticas informales que tengan como único fin facilitar la resolución de la diferencia.

# Capítulo III
# La Conciliación

## Sección 1
## Solicitud de conciliación

### Artículo 28

(1) Cualquier Estado Contratante o nacional de un Estado Contratante que quiera incoar un procedimiento de conciliación, dirigirá, a tal

19

Convenio

efecto, una solicitud escrita al Secretario General quien enviará copia de la misma a la otra parte.

(2) La solicitud deberá contener los datos referentes al asunto objeto de la diferencia, a la identidad de las partes y al consentimiento de éstas a la conciliación, de conformidad con las reglas de procedimiento a seguir para iniciar la conciliación y el arbitraje.

(3) El Secretario General registrará la solicitud salvo que, de la información contenida en dicha solicitud, encuentre que la diferencia se halla manifiestamente fuera de la jurisdicción del Centro. Notificará inmediatamente a las partes el acto de registro de la solicitud, o su denegación.

## Sección 2
## Constitución de la
## Comisión de Conciliación

### Artículo 29

(1) Una vez registrada la solicitud de acuerdo con el Artículo 28, se procederá lo antes posible a la constitución de la Comisión de Conciliación (en lo sucesivo llamada la Comisión).

(2) (a) La Comisión se compondrá de un conciliador único o de un número impar de conciliadores, nombrados según lo acuerden las partes.

(b) Si las partes no se pusieren de acuerdo sobre el número de conciliadores y el modo de nombrarlos, la Comisión se constituirá con tres conciliadores designados, uno por cada parte y el tercero, que presidirá la Comisión, de común acuerdo.

### Artículo 30

Si la Comisión no llegare a constituirse dentro de los 90 días siguientes a la fecha del envío de la notificación del acto de registro, hecho por el Secretario General conforme al apartado (3) del Artículo 28, o dentro de cualquier otro plazo que las partes acuerden, el Presidente, a petición de cualquiera de éstas y, en lo posible, previa consulta a ambas partes, deberá nombrar el conciliador o los conciliadores que aún no hubieren sido designados.

### Artículo 31

(1) Los conciliadores nombrados podrán no pertenecer a la Lista de Conciliadores, salvo en el caso de que los nombre el Presidente conforme al Artículo 30.

20

(2) Todo conciliador que no sea nombrado de la Lista de Concilia-dores deberá reunir las cualidades expresadas en el apartado (1) del Artículo 14.

## Sección 3
### Procedimiento de conciliación

### Artículo 32

(1) La Comisión resolverá sobre su propia competencia.

(2) Toda alegación de una parte que la diferencia cae fuera de los límites de la jurisdicción del Centro, o que por otras razones la Comi-sión no es competente para oírla, se considerará por la Comisión, la que determinará si ha de resolverla como cuestión previa o conjuntamente con el fondo de la cuestión.

### Artículo 33

Todo procedimiento de conciliación deberá tramitarse según las disposiciones de esta Sección y, salvo acuerdo en contrario de las partes, de conformidad con las Reglas de Conciliación vigentes en la fecha en que las partes prestaron su consentimiento a la conciliación. Toda cues-tión de procedimiento no prevista en esta Sección, en las Reglas de Con-ciliación o en las demás Reglas acordadas por las partes, será resuelta por la Comisión.

### Artículo 34

(1) La Comisión deberá dilucidar los puntos controvertidos por las partes y esforzarse por lograr la avenencia entre ellas, en condiciones aceptables para ambas. A este fin, la Comisión podrá, en cualquier esta-do del procedimiento y tantas veces como sea oportuno, proponer a las partes fórmulas de avenencia. Las partes colaborarán de buena fe con la Comisión al objeto de posibilitarle el cumplimiento de sus fines y pres-tarán a sus recomendaciones la máxima consideración.

(2) Si las partes llegaren a un acuerdo, la Comisión levantará un acta haciéndolo constar y anotando los puntos controvertidos. Si en cualquier estado del procedimiento la Comisión estima que no hay probabilidades de lograr un acuerdo entre las partes, declarará conclu-so el procedimiento y redactará un acta, haciendo constar que la con-troversia fue sometida a conciliación sin lograrse la avenencia. Si una parte no compareciere o no participare en el procedimiento, la Comi-sión lo hará constar así en el acta, declarando igualmente concluso el procedimiento.

21

Artículo 35

Salvo que las partes acuerden otra cosa, ninguna de ellas podrá invocar, en cualquier otro procedimiento, ya sea arbitral o judicial o ante cualquier otra autoridad, las consideraciones, declaraciones, admisión de hechos u ofertas de avenencia, hechas por la otra parte dentro del procedimiento de conciliación, o el informe o las recomendaciones propuestas por la Comisión.

## Capítulo IV
## El Arbitraje

### Sección 1
### Solicitud de arbitraje

Artículo 36

(1) Cualquier Estado Contratante o nacional de un Estado Contratante que quiera incoar un procedimiento de arbitraje, dirigirá, a tal efecto, una solicitud escrita al Secretario General quien enviará copia de la misma a la otra parte.

(2) La solicitud deberá contener los datos referentes al asunto objeto de la diferencia, a la identidad de las partes y al consentimiento de éstas al arbitraje, de conformidad con las reglas de procedimiento a seguir para iniciar la conciliación y el arbitraje.

(3) El Secretario General registrará la solicitud salvo que, de la información contenida en dicha solicitud, encuentre que la diferencia se halla manifiestamente fuera de la jurisdicción del Centro. Notificará inmediatamente a las partes el acto de registro de la solicitud, o su denegación.

### Sección 2
### Constitución del Tribunal

Artículo 37

(1) Una vez registrada la solicitud de acuerdo con el Artículo 36, se procederá lo antes posible a la constitución del Tribunal de Arbitraje (en lo sucesivo llamado el Tribunal).

(2) (a) El Tribunal se compondrá de un árbitro único o de un número impar de árbitros, nombrados según lo acuerden las partes.

22

(b) Si las partes no se pusieren de acuerdo sobre el número de árbitros y el modo de nombrarlos, el Tribunal se constituirá con tres árbitros designados, uno por cada parte y el tercero, que presidirá el Tribunal, de común acuerdo.

**Artículo 38**

Si el Tribunal no llegare a constituirse dentro de los 90 días siguientes a la fecha del envío de la notificación del acto de registro, hecho por el Secretario General conforme al apartado (3) del Artículo 36, o dentro de cualquier otro plazo que las partes acuerden, el Presidente, a petición de cualquiera de éstas y, en lo posible, previa consulta a ambas partes, deberá nombrar el árbitro o los árbitros que aún no hubieren sido designados. Los árbitros nombrados por el Presidente conforme a este Artículo no podrán ser nacionales del Estado Contratante parte en la diferencia, o del Estado Contratante cuyo nacional sea parte en la diferencia.

**Artículo 39**

La mayoría de los árbitros no podrá tener la nacionalidad del Estado Contratante parte en la diferencia, ni la del Estado a que pertenezca el nacional del otro Estado Contratante. La limitación anterior no será aplicable cuando ambas partes, de común acuerdo, designen el árbitro único o cada uno de los miembros del Tribunal.

**Artículo 40**

(1) Los árbitros nombrados podrán no pertenecer a la Lista de Arbitros, salvo en el caso de que los nombre el Presidente conforme al Artículo 38.

(2) Todo árbitro que no sea nombrado de la Lista de Arbitros deberá reunir las cualidades expresadas en el apartado (1) del Artículo 14.

**Sección 3
Facultades y funciones
del Tribunal**

**Artículo 41**

(1) El Tribunal resolverá sobre su propia competencia.

(2) Toda alegación de una parte que la diferencia cae fuera de los límites de la jurisdicción del Centro, o que por otras razones el Tribunal no es competente para oírla, se considerará por el Tribunal, el que

determinará si ha de resolverla como cuestión previa o conjuntamente con el fondo de la cuestión.

## Artículo 42

(1) El Tribunal decidirá la diferencia de acuerdo con las normas de derecho acordadas por las partes. A falta de acuerdo, el Tribunal aplicará la legislación del Estado que sea parte en la diferencia, incluyendo sus normas de derecho internacional privado, y aquellas normas de derecho internacional que pudieren ser aplicables.

(2) El Tribunal no podrá eximirse de fallar so pretexto de silencio u oscuridad de la ley.

(3) Las disposiciones de los precedentes apartados de este Artículo no impedirán al Tribunal, si las partes así lo acuerdan, decidir la diferencia *ex aequo et bono.*

## Artículo 43

Salvo que las partes acuerden otra cosa, el Tribunal en cualquier momento del procedimiento, podrá, si lo estima necesario:

   (a) solicitar de las partes la aportación de documentos o de cualquier otro medio de prueba;

   (b) trasladarse al lugar en que se produjo la diferencia y practicar en él las diligencias de prueba que considere pertinentes.

## Artículo 44

Todo procedimiento de arbitraje deberá tramitarse según las disposiciones de esta Sección y, salvo acuerdo en contrario de las partes, de conformidad con las Reglas de Arbitraje vigentes en la fecha en que las partes prestaron su consentimiento al arbitraje. Cualquier cuestión de procedimiento no prevista en esta Sección, en las Reglas de Arbitraje o en las demás reglas acordadas por las partes, será resuelta por el Tribunal.

## Artículo 45

(1) El que una parte no comparezca en el procedimiento o no haga uso de su derecho, no supondrá la admisión de los hechos alegados por la otra parte ni allanamiento a sus pretensiones.

(2) Si una parte dejare de comparecer o no hiciere uso de su derecho, podrá la otra parte, en cualquier estado del procedimiento, instar del Tribunal que resuelva los puntos controvertidos y dicte el laudo. Antes de dictar laudo el Tribunal, previa notificación, concederá un período de gracia a la parte que no haya comparecido o no haya hecho

24

uso de sus derechos, salvo que esté convencido que dicha parte no tiene intenciones de hacerlo.

### Artículo 46

Salvo acuerdo en contrario de las partes, el Tribunal deberá, a petición de una de ellas, resolver las demandas incidentales, adicionales o reconvencionales que se relacionen directamente con la diferencia, siempre que estén dentro de los límites del consentimiento de las partes y caigan además dentro de la jurisdicción del Centro.

### Artículo 47

Salvo acuerdo en contrario de las partes, el Tribunal, si considera que las circunstancias así lo requieren, podrá recomendar la adopción de aquellas medidas provisionales que considere necesarias para salvaguardar los respectivos derechos de las partes.

## Sección 4
## El laudo

### Artículo 48

(1) El Tribunal decidirá todas las cuestiones por mayoría de votos de todos sus miembros.

(2) El laudo deberá dictarse por escrito y llevará la firma de los miembros del Tribunal que hayan votado en su favor.

(3) El laudo contendrá declaración sobre todas las pretensiones sometidas por las partes al Tribunal y será motivado.

(4) Los árbitros podrán formular un voto particular, estén o no de acuerdo con la mayoría, o manifestar su voto contrario si disienten de ella.

(5) El Centro no publicará el laudo sin consentimiento de las partes.

### Artículo 49

(1) El Secretario General procederá a la inmediata remisión a cada parte de una copia certificada del laudo. Este se entenderá dictado en la fecha en que tenga lugar dicha remisión.

(2) A requerimiento de una de las partes, instado dentro de los 45 días después de la fecha del laudo, el Tribunal podrá, previa notificación a la otra parte, decidir cualquier punto que haya omitido resolver en dicho laudo y rectificar los errores materiales, aritméticos o similares del mismo. La decisión constituirá parte del laudo y se notificará en igual forma que éste. Los plazos establecidos en el apartado (2) del Artí-

25

culo 51 y apartado (2) del Artículo 52 se computarán desde la fecha en que se dicte la decisión.

## Sección 5
## Aclaración, revisión y
## anulación del laudo

### Artículo 50

(1) Si surgiere una diferencia entre las partes acerca del sentido o alcance del laudo, cualquiera de ellas podrá solicitar su aclaración mediante escrito dirigido al Secretario General.

(2) De ser posible, la solicitud deberá someterse al mismo Tribunal que dictó el laudo. Si no lo fuere, se constituirá un nuevo Tribunal de conformidad con lo dispuesto en la Sección 2 de este Capítulo. Si el Tribunal considera que las circunstancias lo exigen, podrá suspender la ejecución del laudo hasta que decida sobre la aclaración.

### Artículo 51

(1) Cualquiera de las partes podrá pedir, mediante escrito dirigido al Secretario General, la revisión del laudo, fundada en el descubrimiento de algún hecho que hubiera podido influir decisivamente en el laudo, y siempre que, al tiempo de dictarse el laudo, hubiere sido desconocido por el Tribunal y por la parte que inste la revisión y que el desconocimiento de ésta no se deba a su propia negligencia.

(2) La petición de revisión deberá presentarse dentro de los 90 días siguientes al día en que fue descubierto el hecho y, en todo caso, dentro de los tres años siguientes a la fecha de dictarse el laudo.

(3) De ser posible, la solicitud deberá someterse al mismo Tribunal que dictó el laudo. Si no lo fuere, se constituirá un nuevo Tribunal de conformidad con lo dispuesto en la Sección 2 de este Capítulo.

(4) Si el Tribunal considera que las circunstancias lo exigen, podrá suspender la ejecución del laudo hasta que decida sobre la revisión. Si la parte pidiere la suspensión de la ejecución del laudo en su solicitud, la ejecución se suspenderá provisionalmente hasta que el Tribunal decida sobre dicha petición.

### Artículo 52

(1) Cualquiera de las partes podrá solicitar la anulación del laudo mediante escrito dirigido al Secretario General fundado en una o más de las siguientes causas:

(a) que el Tribunal se hubiere constituido incorrectamente;

26

(b) que el Tribunal se hubiere extralimitado manifiestamente en sus facultades;

(c) que hubiere habido corrupción de algún miembro del Tribunal;

(d) que hubiere quebrantamiento grave de una norma de procedimiento; o

(e) que no se hubieren expresado en el laudo los motivos en que se funde.

(2) Las solicitudes deberán presentarse dentro de los 120 días a contar desde la fecha de dictarse el laudo. Si la causa alegada fuese la prevista en la letra (c) del apartado (1) de este Artículo, el referido plazo de 120 días comenzará a computarse desde el descubrimiento del hecho pero, en todo caso, la solicitud deberá presentarse dentro de los tres años siguientes a la fecha de dictarse el laudo.

(3) Al recibo de la petición, el Presidente procederá a la inmediata constitución de una Comisión *ad hoc* integrada por tres personas seleccionadas de la Lista de Arbitros. Ninguno de los miembros de la Comisión podrá haber pertenecido al Tribunal que dictó el laudo, ni ser de la misma nacionalidad que cualquiera de los miembros de dicho Tribunal; no podrá tener la nacionalidad del Estado que sea parte en la diferencia ni la del Estado a que pertenezca el nacional que también sea parte en ella, ni haber sido designado para integrar la Lista de Arbitros por cualquiera de aquellos Estados ni haber actuado como conciliador en la misma diferencia. Esta Comisión tendrá facultad para resolver sobre la anulación total o parcial del laudo por alguna de las causas enumeradas en el apartado (1).

(4) Las disposiciones de los Artículos 41-45, 48, 49, 53, 54 y de los Capítulos VI y VII se aplicarán, *mutatis mutandis*, al procedimiento que se tramite ante la Comisión.

(5) Si la Comisión considera que las circunstancias lo exigen, podrá suspender la ejecución del laudo hasta que decida sobre la anulación. Si la parte pidiere la suspensión de la ejecución del laudo en su solicitud, la ejecución se suspenderá provisionalmente hasta que la Comisión dé su decisión respecto a tal petición.

(6) Si el laudo fuere anulado, la diferencia será sometida, a petición de cualquiera de las partes, a la decisión de un nuevo Tribunal que deberá constituirse de conformidad con lo dispuesto en la Sección 2 de este Capítulo.



27

## Sección 6
## Reconocimiento y
## ejecución del laudo

**Artículo 53**

(1) El laudo será obligatorio para las partes y no podrá ser objeto de apelación ni de cualquier otro recurso, excepto en los casos previstos en este Convenio. Las partes lo acatarán y cumplirán en todos sus términos, salvo en la medida en que se suspenda su ejecución, de acuerdo con lo establecido en las correspondientes cláusulas de este Convenio.

(2) A los fines previstos en esta Sección, el término "laudo" incluirá cualquier decisión que aclare, revise o anule el laudo, según los Artículos 50, 51 o 52.

**Artículo 54**

(1) Todo Estado Contratante reconocerá al laudo dictado conforme a este Convenio carácter obligatorio y hará ejecutar dentro de sus territorios las obligaciones pecuniarias impuestas por el laudo como si se tratare de una sentencia firme dictada por un tribunal existente en dicho Estado. El Estado Contratante que se rija por una constitución federal podrá hacer que se ejecuten los laudos a través de sus tribunales federales y podrá disponer que dichos tribunales reconozcan al laudo la misma eficacia que a las sentencias firmes dictadas por los tribunales de cualquiera de los estados que lo integran.

(2) La parte que inste el reconocimiento o ejecución del laudo en los territorios de un Estado Contratante deberá presentar, ante los tribunales competentes o ante cualquier otra autoridad designados por los Estados Contratantes a este efecto, una copia del mismo, debidamente certificada por el Secretario General. La designación de tales tribunales o autoridades y cualquier cambio ulterior que a este respecto se introduzca será notificada por los Estados Contratantes al Secretario General.

(3) El laudo se ejecutará de acuerdo con las normas que, sobre ejecución de sentencias, estuvieren en vigor en los territorios en que dicha ejecución se pretenda.

**Artículo 55**

Nada de lo dispuesto en el Artículo 54 se interpretará como derogatorio de las leyes vigentes en cualquier Estado Contratante relativas a la inmunidad en materia de ejecución de dicho Estado o de otro Estado extranjero.

# Capítulo V
## Sustitución y recusación
## de conciliadores y arbitros



Convenio

### Artículo 56

(1) Tan pronto quede constituida una Comisión o un Tribunal y se inicie el procedimiento, su composición permanecerá invariable. La vacante por muerte, incapacidad o renuncia de un conciliador o árbitro será cubierta en la forma prescrita en la Sección 2 del Capítulo III y Sección 2 del Capítulo IV.

(2) Los miembros de una Comisión o un Tribunal continuarán en sus funciones aunque hayan dejado de figurar en las Listas.

(3) Si un conciliador o árbitro, nombrado por una de las partes, renuncia sin el consentimiento de la Comisión o Tribunal de que forma parte, el Presidente nombrará, de entre los que integran la correspondiente Lista, la persona que deba sustituirle.

### Artículo 57

Cualquiera de las partes podrá proponer a la Comisión o Tribunal correspondiente la recusación de cualquiera de sus miembros por la carencia manifiesta de las cualidades exigidas por el apartado (1) del Artículo 14. Las partes en el procedimiento de arbitraje podrán, asimismo, proponer la recusación por las causas establecidas en la Sección 2 del Capítulo IV.

### Artículo 58

La decisión sobre la recusación de un conciliador o árbitro se adoptará por los demás miembros de la Comisión o Tribunal, según los casos, pero, si hubiere empate de votos o se tratare de recusación de un conciliador o árbitro único, o de la mayoría de los miembros de una Comisión o Tribunal, corresponderá resolver al Presidente. Si la recusación fuere estimada, el conciliador o árbitro afectado deberá ser sustituido en la forma prescrita en la Sección 2 del Capítulo III y Sección 2 del Capítulo IV.

## Capítulo VI
## Costas del procedimiento

**Artículo 59**

Los derechos exigibles a las partes por la utilización del Centro serán fijados por el Secretario General de acuerdo con los aranceles adoptados por el Consejo Administrativo.

**Artículo 60**

(1) Cada Comisión o Tribunal determinará, previa consulta al Secretario General, los honorarios y gastos de sus miembros, dentro de los límites que periódicamente establezca el Consejo Administrativo.

(2) Sin perjuicio de lo dispuesto en el apartado (1) de este Artículo, las partes podrán acordar anticipadamente con la Comisión o el Tribunal la fijación de los honorarios y gastos de sus miembros.

**Artículo 61**

(1) En el caso de procedimiento de conciliación las partes sufragarán por partes iguales los honorarios y gastos de los miembros de la Comisión así como los derechos devengados por la utilización del Centro. Cada parte soportará cualquier otro gasto en que incurra, en relación con el procedimiento.

(2) En el caso de procedimiento de arbitraje el Tribunal determinará, salvo acuerdo contrario de las partes, los gastos en que estas hubieren incurrido en el procedimiento, y decidirá la forma de pago y la manera de distribución de tales gastos, de los honorarios y gastos de los miembros del Tribunal y de los derechos devengados por la utilización del Centro. Tal fijación y distribución formarán parte del laudo.

## Capítulo VII
## Lugar del procedimiento

**Artículo 62**

Los procedimientos de conciliación y arbitraje se tramitarán, sin perjuicio de lo dispuesto en el Artículo siguiente, en la sede del Centro.

**Artículo 63**

Si las partes se pusieran de acuerdo, los procedimientos de conciliación y arbitraje podrán tramitarse:

Convenio

30

(a) en la sede de la Corte Permanente de Arbitraje o en la de cualquier otra institución apropiada, pública o privada, con la que el Centro hubiere llegado a un acuerdo a tal efecto; o

(b) en cualquier otro lugar que la Comisión o Tribunal apruebe, previa consulta con el Secretario General.

# Capítulo VIII
# Diferencias entre
# Estados Contratantes

### Artículo 64

Toda diferencia que surja entre Estados Contratantes sobre la interpretación o aplicación de este Convenio y que no se resuelva mediante negociación se remitirá, a instancia de una u otra parte en la diferencia, a la Corte Internacional de Justicia, salvo que dichos Estados acuerden acudir a otro modo de arreglo.

# Capítulo IX
# Enmiendas

### Artículo 65

Todo Estado Contratante podrá proponer enmiendas a este Convenio. El texto de la enmienda propuesta se comunicará al Secretario General con no menos de 90 días de antelación a la reunión del Consejo Administrativo a cuya consideración se ha de someter, y aquél la transmitirá inmediatamente a todos los miembros del Consejo Administrativo.

### Artículo 66

(1) Si el Consejo Administrativo lo aprueba por mayoría de dos terceras partes de sus miembros, la enmienda propuesta será circulada a todos los Estados Contratantes para su ratificación, aceptación o aprobación. Las enmiendas entrarán en vigor 30 días después de la fecha en que el depositario de este Convenio despache una comunicación a los Estados Contratantes notificándoles que todos los Estados Contratantes han ratificado, aceptado o aprobado la enmienda.

(2) Ninguna enmienda afectará los derechos y obligaciones, conforme a este Convenio, de los Estados Contratantes, sus subdivisiones políticas u organismos públicos, o de los nacionales de dichos Estados

31

nacidos del consentimiento a la jurisdicción del Centro dado con anterioridad a la fecha de su entrada en vigor.

# Capítulo X
## Disposiciones finales

### Artículo 67

Este Convenio quedará abierto a la firma de los Estados miembros del Banco. Quedará también abierto a la firma de cualquier otro Estado signatario del Estatuto de la Corte Internacional de Justicia al que el Consejo Administrativo, por voto de dos tercios de sus miembros, hubiere invitado a firmar el Convenio.

### Artículo 68

(1) Este Convenio será ratificado, aceptado o aprobado por los Estados signatarios de acuerdo con sus respectivas normas constitucionales.

(2) Este Convenio entrará en vigor 30 días después de la fecha del depósito del vigésimo instrumento de ratificación, aceptación o aprobación. Entrará en vigor respecto a cada Estado que con posterioridad deposite su instrumento de ratificación, aceptación o aprobación, 30 días después de la fecha de dicho depósito.

### Artículo 69

Los Estados Contratantes tomarán las medidas legislativas y de otro orden que sean necesarias para que las disposiciones de este Convenio tengan vigencia en sus territorios.

### Artículo 70

Este Convenio se aplicará a todos los territorios de cuyas relaciones internacionales sea responsable un Estado Contratante salvo aquellos que dicho Estado excluya mediante notificación escrita dirigida al depositario de este Convenio en la fecha de su ratificación, aceptación o aprobación, o con posterioridad.

### Artículo 71

Todo Estado Contratante podrá denunciar este Convenio mediante notificación escrita dirigida al depositario del mismo. La denuncia producirá efecto seis meses después del recibo de dicha notificación.

## Artículo 72

Las notificaciones de un Estado Contratante hechas al amparo de los Artículos 70 y 71 no afectarán a los derechos y obligaciones, conforme a este Convenio, de dicho Estado, sus subdivisiones políticas u organismos públicos, o de los nacionales de dicho Estado nacidos del consentimiento a la jurisdicción del Centro dado por alguno de ellos con anterioridad al recibo de dicha notificación por el depositario.

## Artículo 73

Los instrumentos de ratificación, aceptación o aprobación de este Convenio y sus enmiendas se depositarán en el Banco, quien desempeñará la función de depositario de este Convenio. El depositario transmitirá copias certificadas del mismo a los Estados miembros del Banco y a cualquier otro Estado invitado a firmarlo.

## Artículo 74

El depositario registrará este Convenio en el Secretariado de las Naciones Unidas de acuerdo con el Artículo 102 de la Carta de las Naciones Unidas y el Reglamento de la misma adoptado por la Asamblea General.

## Artículo 75

El depositario notificará a todos los Estados signatarios lo siguiente:

(a) las firmas, conforme al Artículo 67;

(b) los depósitos de instrumentos de ratificación, aceptación y aprobación, conforme al Artículo 73;

(c) la fecha en que este Convenio entre en vigor, conforme al Artículo 68;

(d) las exclusiones de aplicación territorial, conforme al Artículo 70;

(e) la fecha en que las enmiendas de este Convenio entren en vigor, conforme al Artículo 66; y

(f) las denuncias, conforme al Artículo 71.

HECHO en Washington, en los idiomas español, francés e inglés, cuyos tres textos son igualmente auténticos, en un solo ejemplar que quedará depositado en los archivos del Banco Internacional de Reconstrucción y Fomento, el cual ha indicado con su firma su conformidad con el desempeño de las funciones que se le encomiendan en este Convenio.

Convenio

33

# Anexo 3

Centro Internacional de Arreglo de Diferencias Relativas a Inversiones

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE

DEMANDANTE

c.

REPÚBLICA BOLIVARIANA DE VENEZUELA

DEMANDADA

**Decisión sobre Responsabilidad y Principios en Materia de Cuantificación de Daños**

Dictado por un tribunal compuesto por:

Profesor Dr. Klaus M. Sachs, Presidente
El Honorable Charles N. Brower, Árbitro
Sr. Gabriel Bottini, Árbitro

Secretaria del Tribunal
Sra. Natalí Sequeira

**Fecha de envío a las Partes: 30 de diciembre de 2016**

## ÍNDICE DE CONTENIDOS

**A.  LAS PARTES** ..................................................................................................**10**

    I.  Demandante ..................................................................................... 10

    II.  Demandada ..................................................................................... 10

**B.  EL TRIBUNAL DE ARBITRAJE** ..............................................................**10**

    I.  El Honorable Charles N. Brower ................................................... 10

    II.  Sr. Gabriel Bottini ......................................................................... 11

    III.  Prof. Dr. Klaus Sachs ................................................................... 11

**C.  SÍNTESIS DE LOS ANTECEDENTES PROCESALES** .............................**11**

    I.  Acuerdo de arbitraje e inicio del procedimiento ........................... 11

    II.  El procedimiento de arbitraje ........................................................ 18

**D.  ANTECEDENTES FÁCTICOS** ....................................................................**30**

    I.  Demandante .................................................................................... 30

    II.  La decisión de la Demandante de ampliar la capacidad de producción y buscar un terreno para su expansión en Sudamérica ................................................. 32

    III.  La decisión de la Demandante de invertir en Venezuela ............... 36

    IV.  Créditos de IVA ............................................................................ 37

    V.  Construcción de la Planta .............................................................. 40

    VI.  Aumentos en el precio de la bauxita .............................................. 40

    VII.  Producción y venta de *proppants* antes de la toma de control de la Planta ... 45

    VIII.  Tensión laboral .............................................................................. 48

    IX.  La toma de control temporal de la planta de fecha 24 de marzo de 2010 ...... 52

    X.  La toma de control definitiva de la Planta de fecha 15 de mayo de 2010 ...... 53

    XI.  Negociaciones posteriores a la toma de control de la planta .......... 57

XII.  El Decreto de Expropiación y la correspondencia de seguimiento ............... 63

XIII. El procedimiento administrativo de la expropiación y la notificación de controversia de la Demandante ...................................................................... 66

XIV. Negociaciones adicionales entre las Partes ................................................... 67

XV.  El procedimiento judicial de expropiación y negociaciones paralelas ........... 69

E.   **POSTURAS DE LAS PARTES** ........................................................................ **71**

I.    Síntesis de la Postura de la Demandante y Petitorio ...................................... 71

II.   Síntesis de la Postura de la Demandada y Petitorio ....................................... 83

F.   **RAZONAMIENTO DEL TRIBUNAL** ............................................................ **94**

I.    Jurisdicción ................................................................................................... 94

II.   Admisibilidad ............................................................................................... 97

III.  Violación del Tratado .................................................................................. 103

IV.   Los Principios en Materia de Cuantificación de Daños ............................... 159

V.    Decisión sobre costos .................................................................................. 259

G.   **DECISIÓN DEL TRIBUNAL** ........................................................................ **259**

## ÍNDICE DE ABREVIATURAS

| | |
|---|---|
| Actualización de la Valuación de la Demandada | Presentación por parte de la Demandada de las actualizaciones solicitadas de las valuaciones de sus peritos el día 22 de octubre de 2015 |
| Actualización de la Valuación de la Demandante | Presentación por parte de la Demandante de las actualizaciones solicitadas de las valuaciones de sus peritos el día 22 de octubre de 2015 |
| AECG | Tratado de Libre Comercio UE-Canadá |
| AMC con Halliburton | Acuerdo Marco de Compraventa con Halliburton firmado por Norpro Venezuela, junto con otras dos plantas de *proppants* de Saint-Gobain el día 1 de abril de 2009 |
| Anexo C- | Anexos Documentales de la Demandante |
| Anexo CLEX- | Anexos que acompañan la Evaluación de Daños sobre las Inversiones de Saint-Gobain en Venezuela por parte del Profesor Pablo T. Spiller de la firma Compass Lexecon |
| Anexo ER- | Anexos que acompañan la Declaración Testimonial del Sr. Eduardo Rondón |
| Anexo R- | Anexos Documentales de la Demandada |
| Anexo RL- | Autoridades Legales de la Demandada |
| Ap. BF- | Apéndices que acompañan al Dictamen Pericial sobre la Cuantía de Daños confeccionado por el Sr. Vladimir Brailovsky y el Dr. Daniel Flores |
| Brailovsky/Flores I | Primer Dictamen Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores de fecha 21 de marzo de 2014 |

| | |
|---|---|
| Brailovsky/Flores II | Segundo Dictamen Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores de fecha 18 de setiembre de 2014 |
| CIADI | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| CLA- | Autoridades Legales de la Demandante |
| Convención de Viena | Convención de Viena sobre el Derecho de los Tratados |
| CPJI | Corte Permanente de Justicia Internacional |
| *CVG* | Corporación Venezolana de Guyana |
| *CVG Bauxilum* | CVG Bauxilum, C.A. |
| *CVG EDELCA* | CVG Electrificación del Caroní, C.A. |
| DAC | *Demandé d'Autorisation Compagnie* |
| Decisión sobre Recusación | Decisión dictada por el Prof. Sachs y el Juez Brower sobre la Propuesta de la Demandante de Recusación contra el Sr. Bottini del Tribunal de fecha 27 de febrero de 2013 |
| Declaración | Nueva Declaración del Sr. Bottini en virtud de la Regla 6(2) de las Reglas de Arbitraje CIADI remitida a la Secretaria General el día 1 de marzo de 2013, de fecha 28 de febrero de 2013 |
| Dúplica | Dúplica sobre el Fondo de la Demandada de fecha 18 de setiembre de 2014 |
| El "Contrato de Bauxita" | Contrato de compraventa suscripto entre CVG Bauxilum y la empresa Saint-Gobain Proppants Venezuela C.A. |
| El "Decreto de Expropiación" | Decreto N.º 8.133 publicado por Venezuela en la Gaceta Oficial N.º 39.644 el día 29 de marzo de 2011 |

| | |
|---|---|
| El "Juzgado" | Juzgado Primero de Primera Instancia en lo Civil, Mercantil y Agrario del Segundo Circuito de la Circunscripción Judicial del Estado de Bolívar, Venezuela |
| El "Procedimiento de Expropiación" | Procedimiento judicial de expropiación iniciado por PDVSA Industrial de conformidad con los Artículos 22-24 de la Ley de Expropiación el día 18 de abril de 2012 |
| El Convenio CIADI | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados |
| Escrito Posterior a la Audiencia de la Demandada | Escrito Posterior a la Audiencia Presentado por la Demandada el día 2 de abril de 2015 |
| La "Ley de Acceso" | Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios |
| La "Ley de Expropiación" | Ley de Expropiación por Causa de Utilidad Pública o Social |
| La "Planta de Fort Smith" | La planta de *proppants* de Saint-Gobain en Fort Smith, Estado de Arkansas |
| Larry I | Primera Declaración Testimonial del Sr. Larry de fecha 28 de octubre de 2013 |
| Larry II | Segunda Declaración Testimonial del Sr. Larry de fecha 17 de junio de 2014 |
| Las "Directrices del Banco Mundial" | *Directrices sobre el Trato de la Inversión Extranjera Directa* del año 1992 |
| Las "Reclamaciones sobre la Bauxita" | Alegato de la Demandante de conformidad con el cual en virtud del aumento de precio de la bauxita acordado inicialmente mediante el Contrato de Bauxita celebrado entre la Demandante y CVG Bauxilum, la Demandada no brindó a la Demandante un trato justo y equitativo de conformidad con el Artículo 3(1) del Tratado y no proporcionó protección y seguridad a la inversión de la Demandante conforme al Artículo 3(2) del Tratado |

| | |
|---|---|
| Memorial | Memorial de la Demandante [Saint-Gobain Performance Plastics Europe] de fecha 28 de octubre de 2013 |
| Memorial de Contestación | Memorial de Contestación de la Demandada [Venezuela] de fecha 21 de marzo de 2014 |
| *MIBAM* | Ministerio del Poder Popular para las Industrias Básicas y Minería |
| MILCO | Ministerio de Industrias Ligeras y Comercio |
| Millot | Declaración Testimonial del Sr. Millot de fecha 28 de octubre de 2013 |
| PDVSA Gas | PDVSA Gas, S.A. |
| Pedersen | Declaración Testimonial del Sr. Pedersen de fecha 25 de octubre de 2013 |
| Presentación Actualizada sobre Costos de la Demandada | Presentación de la Presentación Actualizada sobre Costos de la Demandada el día 23 de noviembre de 2015 |
| Presentación Actualizada sobre Costos de la Demandante | Presentación de la Presentación Actualizada sobre Costos de la Demandante el día 23 de noviembre de 2015 |
| Presentación Posterior a la Audiencia de la Demandante | Escrito Posterior a la Audiencia Presentado por la Demandante el día 2 de abril de 2015 |
| Presentación sobre Costos de la Demandada | Presentación sobre Costos de la Demandada simultáneamente con la otra Parte el día 30 de junio de 2015 |
| Presentación sobre Costos de la Demandante | Presentación sobre Costos de la Demandante simultáneamente con la otra Parte el día 30 de junio de 2015 |
| Procedimientos Judiciales Entablados en Venezuela | Procedimientos judiciales en curso en Venezuela relacionados con la expropiación de Norpro Venezuela, C.A. |
| Propuesta de la Demandante | Propuesta de Recusación contra el Sr. Gabriel Bottini presentada por la Demandante el 29 de octubre de 2012 |

| | |
|---|---|
| Proyecto de Artículos de la CDI | Proyecto de Artículos de la Comisión de Derecho Internacional sobre Responsabilidad del Estado por Hechos Internacionalmente Ilícitos |
| PSP | Protección y seguridad plenas |
| Reglas de Arbitraje CIADI | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI |
| Reglas de Iniciación CIADI | Reglas Procesales Aplicables a la Iniciación de Procedimientos de Conciliación y Arbitraje |
| Reglas de la IBA | Reglas de la Asociación Internacional de Abogados (IBA, por su sigla en inglés) sobre la Práctica de Prueba en el Arbitraje Internacional (2010) |
| Réplica | Memorial de Réplica de la Demandante de fecha 18 de junio de 2014 |
| Resolución de Confidencialidad | Resolución de Confidencialidad contenida en la Resolución Procesal N.º 2 emitida por el Tribunal el día 10 de junio de 2014 |
| Rondón | Declaración Testimonial del Sr. Rondón de fecha 17 de marzo de 2014 |
| Secretaria General | Secretaria General del CIADI |
| Secretariado | Secretariado del CIADI |
| Segunda Presentación Posterior a la Audiencia de la Demandante | Segunda ronda de Escritos Posteriores a la Audiencia Presentados por la Demandante simultáneamente con la otra Parte el día 22 de mayo de 2015 |
| Segundo Escrito Posterior a la Audiencia de la Demandada | Segunda ronda de Escritos Posteriores a la Audiencia Presentados por la Demandada simultáneamente con la otra Parte el día 22 de mayo de 2015 |

| | |
|---|---|
| SINPROTRAC | Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares |
| Solicitud | Solicitud de Arbitraje contra la Demandada de fecha 25 de mayo de 2012 |
| Spiller I | Evaluación de Daños sobre las Inversiones de Saint-Gobain en Venezuela por parte del Prof. Pablo T. Spiller de la firma Compass Lexeconde fecha 28 de octubre de 2013 |
| Spiller II | Segunda Valuación de Daños del Prof. Spiller de fecha 18 de junio de 2014 |
| TBI – Francia-Venezuela o "el Tratado" | Acuerdo sobre Promoción y Protección Recíproca de Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela |
| TJE | Trato justo y equitativo |

## A.   LAS PARTES

### I.   DEMANDANTE

1.   Saint-Gobain Performance Plastics Europe, en adelante, la "**Demandante**" o "**Saint-Gobain**", representada en el presente arbitraje por sus abogados debidamente autorizados, el Sr. Alexander A. Yanos de la firma Hughes Hubbard & Reed LLP, One Battery Park Plaza, Nueva York, NY 10004-1482, Estados Unidos de América, la Sra. Elizabeth Solander, Hughes Hubbard & Reed LLP, 1775 I Street, N.W., Washington, D.C. 20006-2401, Estados Unidos de América, y la Sra. Noiana Marigo de la firma Freshfields Bruckhaus Deringer US LLP, 601 Lexington Ave, Piso 31, Nueva York, NY 10022, Estados Unidos de América..

### II.   DEMANDADA

2.   La República Bolivariana de Venezuela, en adelante, la "Demandada" o "Venezuela", representada en el presente arbitraje por el Dr. Reinaldo Enrique Muñoz Pedroza, Procurador General de la República and Dr. Felipe Andrés Daruiz Ferro, Coordinador Integral del Despacho del Procurador, Av. Los Ilustres, cruce con calle Francisco Lazo Martí, Urb. Santa Mónica, Caracas, República Bolivariana de Venezuela. La Demandada también se encuentra representada por sus abogados debidamente autorizados, el Sr. Benard V. Preziosi, Jr. de la firma  Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, Nueva York, NY 10178, Estados Unidos de América, y el Sr. Eloy Barbará de Parres, la Sra. Gabriela Álvarez Ávila, la Sra. Kate Brown de Vejar, y la Sra. Dori Yoldi de la firma Curtis, Mallet-Prevost, Colt & Mosle, S.C., Rubén Darío 281, Piso 9, Col. Bosque de Chapultepec, 11580 Ciudad de México,, Estados Unidos Mexicanos.

3.   En lo sucesivo, se hará referencia a la Demandante y la Demandada indistintamente como la "**Parte**" y conjuntamente como las "**Partes**".

## B.   EL TRIBUNAL DE ARBITRAJE

4.   El Tribunal de Arbitraje ha sido constituido de la siguiente manera:

### I.   EL HONORABLE CHARLES N. BROWER

(designado por la Demandante)

20 Essex Street Chambers
20 Essex Street

Londres WC2R 3AL
GRAN BRETAÑA
Tel: +44 (0)20 7842 1200
Fax: +44 (0)20 7842 1270
Correo electrónico: cbrower@20essexst.com

## II.    SR. GABRIEL BOTTINI

(designado por la Demandada)

Paraná 580- Piso 5° "J"
C1017AAL- Buenos Aires
Argentina
Tel.: + 54 11 4371-3165
Fax: + 54 11 4372-7974
Correo electrónico gbottini@outlook.com

## III.    PROF. DR. KLAUS SACHS

(designado por las Partes)

Nymphenburger Str. 12
D-80335 Munich
ALEMANIA
Tel.: +49 89 23 807-109
Fax: + 49 89 23 807-40 621
Correo electrónico: Klaus.Sachs@cms-hs.com

## C.    SÍNTESIS DE LOS ANTECEDENTES PROCESALES

### I.    ACUERDO DE ARBITRAJE E INICIO DEL PROCEDIMIENTO

5.    El presente procedimiento de arbitraje versa sobre una controversia legal entre Saint-Gobain y Venezuela que surge de la supuesta negativa de Venezuela a indemnizar a Saint-Gobain en virtud de la expropiación de la inversión de Saint-Gobain en su subsidiaria 99.99%[1] Norpro Venezuela C.A ("**Norpro Venezuela**" o "**Norpro**") luego de un discurso televisado del presidente de Venezuela Hugo Chávez el día 15 de mayo de 2010. La Demandante alega que la Demandada violó el *Acuerdo sobre Promoción y Protección*

---

[1] El Sr. Luis Páez, ciudadano de Venezuela y presidente de Norpro Venezuela, es tenedor de una única acción, la cual suscribió al momento de la constitución de Norpro Venezuela. La transferencia planificada de la acción del Sr. Páez a Saint-Gobain no ha ocurrido aún. Solicitud, ¶ 4, nota 4.

*Recíproca de Inversiones entre el Gobierno de la República Francesa y el Gobierno de la República Bolivariana de Venezuela* (el **"TBI Francia-Venezuela"** o el **"Tratado"**), que entró en vigor el día 15 de abril de 2004, al negarse a ofrecer una indemnización en virtud de la expropiación de la planta de proppants de Norpro Venezuela ubicada en Puerto Ordaz, Estado Bolívar, así como al sancionar o no intervenir en el aumento del precio del suministro de bauxita supuestamente violatorio de un contrato celebrado con un ente estatal, por lo cual no se concedió un trato justo y equitativo a la Demandante ni se brindó seguridad y protección plena a su inversión en violación de los Artículos 5(1) y 3(1) y (2) del Tratado.

6. El Artículo 5(1) del TBI Francia-Venezuela dispone en sus versiones auténticas en idioma español y francés[2]:

| | |
|---|---|
| *"Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause* | *"Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y* |

---

[2] La traducción libre al idioma inglés del texto en francés publicado en la Gaceta Oficial de la República Francesa N.º 102, de fecha 30 de abril de 2004, que ha sido presentada por la Demandante como **Anexo C-1** y no ha sido objetada por la Demandada, reza lo siguiente:

*"1. The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement.*

*All measures of expropriation which could be taken must result in the payment of prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*

*The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment."*

*d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusque'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié"[3].*

*siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuyo monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado"[4].*

9.    El Artículo 3(1) y (2) del Tratado dispone lo siguiente[5]:

---

[3] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[4] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

[5] La traducción libre al inglés presentada por la Demandante como **Anexo C-1** establece:

*"1. Each of the Contracting Parties will ensure fair and equitable treatment for investments by nationals and companies of the other Party in its territory and in its maritime area, in accordance with the rules and principles of international law, and will ensure that the exercise of this right thus recognized shall have no impediments either in law or in fact. In particular, although not exclusively, impediments to fair and equitable treatment in law or in fact are any arbitrary or discriminatory restrictions to the purchase and transport of raw and ancillary materials, of energy and fuels, as well as to any means of production and exploitation, or any impediment to the sale and transport of products within the country and overseas, along with all other measures having a similar effect.*

*"1. Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et équitable, conformément aux règles et principe du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de miyens de production et d'exploitation de tout type, tout entrave à la vente et au transport des produits à l'intérieur du pays à l'étranger, ainsi que toutes autres mesures ayant un effet analogue.*

*2. Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières"*[6].

*"1. Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así como cualquier otra medida que pueda tener un efecto análogo.*

*2. Las inversiones efectuadas por nacionales o sociedades de una u otra de las Partes Contratantes gozarán, en el territorio y en la zona marítima de la otra Parte Contratante, de una protección y de*

---

*2. Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security."*

[6] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº 102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

*una seguridad plenas y completas*"[7].

12.   La Demandante ha invocado las disposiciones sobre arbitraje del Artículo 8 del TBI Francia-Venezuela que disponen la aplicabilidad de un arbitraje ante el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (**"CIADI"**). El Artículo 8 del Tratado dispone lo siguiente[8]:

| | |
|---|---|
| "*1. Tout différend qui survient entre un national ou une société d'une Partie contractante et l'autre Partie contractante, au sujet d'une obligation de cette dernière relative à un investissement en vertu du présent Accord, est réglé à l'amiable entre les deux parties concernées.* | "*1. Cualquier controversia que surja entre un nacional o una sociedad de una Parte Contratante y la otra Parte Contratante en lo concerniente a una obligación de esta última en relación con una inversión en virtud del presente Acuerdo, será resuelta amistosamente entre las dos partes interesadas.* |
| *2. Si un tel différend n'a pas pu être réglé dans un délai de six mois à partir de moment où il a été soulevé par l'une ou l'autre des parties au* | *2. Si dicha controversia no pudiese ser resuelta en un plazo de seis meses a partir del momento en que* |

---

[7] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004,* **Anexo C-1**, págs. 332-353-332.354.

[8] La traducción libre al inglés presentada por la Demandante como **Anexo C-1** establece lo siguiente:

"*1. Any dispute which arises between a national or a company of a Contracting Party and the other Contracting Party, regarding an obligation of the latter relating to an investment under the terms of the present Agreement, shall be settled amicably between the two party concerned.*

*2. If such a dispute cannot be settled within six months from the time it was raised by either of the parties to the dispute, at the request of the national or the company in question it shall be submitted to either the competent court of the State in which the investment was made or to arbitration by the International Center* [sic] *for the Settlement of Investment Disputes (ICSID), pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965. This decision is the choice of the national or the company concerned. Once the decision has been made to pursue arbitration, the decision becomes final.*

*3. The arbitral tribunal shall determine if the Contracting Party to the dispute has met their obligations under the terms of the provisions of this agreement. If this is not the case, the court* [sic] *will set the amount of compensation for the national or company party to the dispute.*

*4. The arbitral award is final and binding to the parties to the dispute.*"

*différend, il es soumis à la demande du national ou de la société en question soit à la juridiction compétente de l'Etat dans lequel l'investissement a été réalisé soit à l'arbitrage du Centre international pour le règlement des différends relatifs aux investissements (CIRDI), créé par la Convention entre Etats et ressortissants d'autres Etats, signée à Washington le 18 mars 1965. Cette option relève du choix du national ou de la société intéressé. Une fois l'option effectuée en faveur de l'arbitrage, celle-ci devient définitive.*

*3. Le tribunal arbitral détermine si la Partie contractante partie au différend a respecté ses obligations en vertu des dispositions du présent accord. Si tel n'est pas le cas, le tribunal fixera le montant de l'indemnisation du national ou de la société partie au différend.*

*4. La sentence arbitrale est définitive et obligatoire pour les parties au différend""*[9].

*ha sido identificada por una u otra de las partes en controversia, se someterá, a pedido del nacional o de la sociedad en cuestión, a la jurisdicción competente del estado en el cual se ha efectuado la inversión o bien al arbitraje del Centro Internacional para el Arreglo de Diferencias relativas a Inversiones (C.I.A.D.I.) creado por la Convención para el arreglo de diferencias relativas a las inversiones entre Estados y nacionales de otros Estados, firmado en Washington el 18 de marzo de 1965. Dicha opción queda a elección del nacional o de la sociedad interesada. Una vez ejercida la opción de arbitraje, esta [...] definitiva.*

*3. El tribunal arbitral determinará si la Parte Contratante, parte en la controversia, ha cumplido sus obligaciones en virtud de lo dispuesto en el presente Acuerdo. Si ese no fuera el caso, el tribunal fijará el monto de la indemnización del nacional o de la sociedad parte en la controversia.*

*4. El laudo arbitral es definitivo y obligatorio para las partes en controversia"*[10].

17.    El día 25 de mayo de 2012, la Demandante presentó una Solicitud de Arbitraje contra la Demandada (**"Solicitud"**), junto con los Anexos Documentales C-001 a C-047, ante la Secretaria General del CIADI (la **"Secretaria General"**) de conformidad con el Artículo

---

[9] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, págs. 7775-7776.

[10] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

36 del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de otros Estados (el **"Convenio CIADI"**) y las Reglas Procesales Aplicables a la Iniciación de los Procedimientos de Conciliación y Arbitraje (las "**Reglas de Iniciación CIADI**").

18. El día 29 de mayo de 2012, el Secretariado del CIADI (el **"Secretariado"**) remitió la Solicitud a la Demandada.

19. El día 15 de junio de 2012, la Secretaria General registró la Solicitud de la Demandante de conformidad con el Artículo 36 del Convenio CIADI y las Reglas 6 y 7 de las Reglas de Iniciación CIADI y notificó dicho registro a las Partes. El caso quedó registrado bajo el Caso CIADI N.º ARB/12/13.

20. El día 28 de septiembre de 2012, la Demandante nombró árbitro al Juez Charles N. Brower, nacional de los Estados Unidos de América.

21. El día 3 de octubre de 2012, la Demandada nombró árbitro al Sr. Gabriel Bottini, nacional de la República Argentina.

22. El día 4 de octubre de 2012, el Juez Brower aceptó su nombramiento en calidad de árbitro por parte de la Demandante, luego de presentar una declaración debidamente suscripta al Secretariado, conforme a la Regla 6(2) de las Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI (las "**Reglas de Arbitraje CIADI**").

23. El día 25 de octubre de 2012, el Sr. Bottini aceptó su nombramiento en calidad de árbitro por parte de la Demandada, luego de presentar una declaración debidamente suscripta al Secretariado conforme a la Regla 6(2) de las Reglas de Arbitraje CIADI.

24. El día 29 de octubre de 2012, la Demandante presentó una Propuesta de Recusación en contra del Sr. Gabriel Bottini en virtud de los Artículos 57 y 58 del Convenio CIADI y la Regla 9 de las Reglas de Arbitraje CIADI (**"Propuesta de la Demandante"**), junto con los Anexos Documentales A a II. El Secretariado acusó recibo de la Propuesta de la Demandante el día 30 de octubre de 2012.

25. El día 12 de noviembre de 2012, la Secretaria General informó al Prof. Dr. Klaus Sachs que las Partes acordaban su nombramiento en calidad de Presidente del Tribunal. Mediante una carta de fecha 14 de noviembre de 2012, el Prof. Sachs aceptó su nombramiento, luego de presentar una declaración debidamente firmada al Secretariado de conformidad con la Regla 6(2) de las Reglas de Arbitraje CIADI.

26. El día 26 de noviembre de 2012, la Secretaria General informó a las Partes que el Prof. Sachs, el Juez Brower y el Sr. Bottini habían aceptado sus nombramientos en calidad de árbitros y que, en consecuencia, en virtud de la Regla 6(1) de las Reglas de Arbitraje CIADI, se entendía que el Tribunal se había constituido y que el procedimiento se había

iniciado en dicha fecha. Asimismo, la Sra. Natalí Sequeira fue designada para actuar como Secretaria del Tribunal (la **"Secretaria"**). Tal como dispone la Regla 9(2) de las Reglas de Arbitraje CIADI, ese mismo día, la Secretaría les remitió la Propuesta de la Demandante a los tres miembros del Tribunal.

## II.   EL PROCEDIMIENTO DE ARBITRAJE

27.   En virtud de la Regla 9(6) de las Reglas de Arbitraje CIADI, el día 27 de noviembre de 2012, el Secretariado informó a las Partes de la suspensión del procedimiento hasta que se arribara a una decisión respecto de la Propuesta de la Demandante.

28.   Mediante una carta de fecha 28 de noviembre de 2012, el Prof. Sachs y el Juez Brower establecieron un cronograma para las presentaciones de escritos respecto de la Propuesta de la Demandante.

29.   El día 7 de diciembre de 2012, la Demandada presentó sus Observaciones a la Propuesta de la Demandante de Recusación en contra del Sr. Bottini, junto con los Anexos Documentales R-001 a R-003 y las Autoridades Legales RL-001 a RL-013.

30.   Mediante una carta de fecha 14 de diciembre de 2012, el Sr. Bottini ofreció explicaciones al Tribunal, acompañadas por el Anexo Documental 1, conforme a la Regla 9(3) de las Reglas de Arbitraje CIADI.

31.   Mediante una carta de fecha 21 de diciembre de 2012, la Demandante comentó sobre las Observaciones de la Demandada de fecha 7 de diciembre de 2012 y la carta del Sr. Bottini de fecha 14 de diciembre de 2012 y presentó los Anexos I a L.

32.   Ese mismo día, la Demandada presentó sus Observaciones a la Propuesta de la Demandante de Recusación respecto del Sr. Bottini.

33.   El día 27 de febrero de 2013, el Prof. Sachs y el Juez Brower dictaron una Decisión sobre la Propuesta de la Demandante de Recusación contra el Sr. Bottini del Tribunal en virtud del Artículo 57 del Convenio CIADI (**"Decisión sobre Recusación"**), y rechazaron la Propuesta de la Demandante de Recusación con la condición de que el Sr. Bottini completara, firmara y remitiera a la Secretaria General del CIADI una nueva Declaración conforme a la Regla 6(2) de las Reglas de Arbitraje CIADI dentro de un plazo de 10 días a partir de la fecha de la Decisión sobre Recusación.

34. De conformidad con la Regla 9(6) de las Reglas de Arbitraje CIADI, el procedimiento se reanudó el día 27 de febrero de 2013.

35. El día 1 de marzo de 2013, de acuerdo con la Decisión sobre Recusación, el Sr. Bottini le remitió a la Secretaria General una nueva Declaración en virtud de la Regla 6(2) de las Reglas de Arbitraje CIADI, de fecha 28 de febrero de 2013 ("**Declaración**").

36. Mediante una carta dirigida a la Secretaria General de fecha 7 de marzo de 2013, la Demandante se refirió a la Declaración del Sr. Bottini y solicitó que "*notificara a las partes sobre su aceptación de cualquier mandato del Gobierno de Argentina que implicara proporcionar asesoramiento en relación con un tratado bilateral de inversión o cualquier controversia relacionada a dicho tratado*"[Traducción del Tribunal]. La Demandante hizo reserva de sus derechos a renovar las objeciones respecto del Sr. Bottini.

37. El día 13 de marzo de 2013, el Sr. Bottini realizó una divulgación de conformidad con su Declaración de fecha 28 de febrero de 2013.

38. Mediante una carta de fecha 14 de marzo de 2013, el Tribunal brindó a las Partes un borrador de agenda para la primera sesión y un borrador de resolución procesal, para recibir sus comentarios y revisión. El Tribunal también propuso la designación del Sr. Felix Lautenschlager de la firma de abogados del Prof. Sachs como Asistente del Tribunal.

39. Mediante una carta de fecha 20 de marzo de 2013, la Demandante confirmó su disponibilidad para la primera sesión, a realizarse por vía telefónica o videoconferencia, y aceptó la designación del Sr. Lautenschlager como Asistente del Tribunal.

40. Mediante un correo electrónico de fecha 20 de marzo de 2013, la Demandada sostuvo que consideraba que la primera sesión debía realizarse en persona, y confirmó que estaría disponible en las fechas de los meses de junio o julio indicadas en la carta del Tribunal de fecha 14 de marzo de 2013.

41. Mediante un correo electrónico de fecha 28 de marzo de 2013, las Partes propusieron de manera conjunta un borrador de resolución procesal a la consideración del Tribunal.

42. Mediante un correo electrónico de fecha 3 de abril de 2013, la Demandante informó al Tribunal de su disponibilidad para una primera sesión presencial a realizarse en las fechas de los meses de junio y julio propuestas por el Tribunal en su carta de fecha 14 de marzo de 2013.

43.  Mediante una carta de fecha 4 de abril de 2013, la Demandante solicitó que se le brindara más información sobre la divulgación del Sr. Bottini de fecha 12 de marzo de 2013.

44.  Mediante una carta de fecha 5 de abril de 2013, el Tribunal invitó a la Demandante a que preste su consentimiento, en virtud de la Regla 13(1) de las Reglas de Arbitraje CIADI, para una audiencia presencial a realizarse en París el día 6 de junio de 2013.

45.  Mediante un correo electrónico de fecha 9 de abril de 2013, la Demandante indicó que aún estaba disponible para una primera sesión presencial en la fecha propuesta.

46.  Mediante una carta de fecha 11 de abril de 2013, el Tribunal confirmó a las Partes que la primera sesión se llevaría a cabo en París el día 6 de junio de 2013.

47.  Mediante una carta de fecha 13 de abril de 2013, el Sr. Bottini respondió a la carta de la Demandante del día 4 de abril de 2013.

48.  El día 6 de junio de 2013, el Tribunal celebró su primera sesión con las Partes en París, Francia.

49.  Mediante un correo electrónico de fecha 8 de junio de 2013, el Sr. Bottini realizó una nueva divulgación con arreglo a su Declaración de fecha 28 de febrero de 2013.

50.  Mediante un correo electrónico de fecha 11 de junio de 2013, el CIADI brindó a las Partes un borrador revisado de la Resolución Procesal N° 1 e invitó a las Partes a que confirmen o presenten cualquier comentario sobre su contenido con anticipación al día 14 de junio de 2013.

51.  Mediante un correo electrónico de fecha 13 de junio de 2013, la Demandante presentó sus comentarios sobre el borrador revisado de la Resolución Procesal N.º 1.

52.  Mediante un correo electrónico de fecha 13 de junio de 2013, la Demandada señaló que no tenía comentarios sobre el borrador revisado de la Resolución Procesal N.º 1.

53.  El día 18 de junio de 2013, el Tribunal emitió la Resolución Procesal N.º 1, que incluye las Reglas Procesales que rigen el presente arbitraje.

54.  Mediante una carta de la misma fecha, la Demandante solicitó que se le brinde más información en relación con el Sr. Bottini a la luz de su divulgación de fecha 8 de junio de 2013.

55.  Mediante una carta de fecha 27 de junio de 2013, el Sr. Bottini respondió a la carta de la Demandante de fecha 18 de junio de 2013.

56.    Mediante un correo electrónico de fecha 6 de agosto de 2013, la Secretaria remitió a las Partes la versión en idioma español de la Resolución Procesal N.º 1.

57.    Mediante un correo electrónico de fecha 13 de agosto de 2013, el Sr. Bottini informó a los otros miembros del Tribunal y a las Partes que había sido nombrado árbitro por parte de la República Bolivariana de Venezuela en el caso *Venezuela US, S.R.L. (Barbados) c. La República Bolivariana de Venezuela*, Caso CPA N.º AA494.

58.    Mediante un correo electrónico de fecha 5 de septiembre de 2013, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

59.    Mediante una carta de fecha 27 de septiembre de 2013, la Demandante informó al CIADI y al Tribunal del acuerdo de las Partes para solicitar que el calendario procesal establecido en el Artículo 13 de la Resolución Procesal N.º 1 fuera modificado en relación con el Calendario de Presentación de Escritos y Producción de Documentos. Mediante un correo electrónico de la misma fecha, la Demandada confirmó su acuerdo al respecto.

60.    Mediante una carta de fecha 4 de octubre de 2013, el Tribunal confirmó a las Partes que no tenía objeciones al calendario procesal propuesto por las Partes el día 27 de septiembre de 2013.

61.    Mediante carta introductoria de fecha 28 de octubre de 2013, recibida el día 29 de octubre de 2013, la Demandante presentó su Memorial ("**Memorial**") junto con los Anexos Documentales C-048 a C-136 y las Autoridades Legales CLA-001 a CLA-090, las Declaraciones Testimoniales del Sr. Jack Larry, el Sr. Jorgen Pedersen y el Sr. Patrick Millot, la Evaluación de Daños sobre las Inversiones de Saint-Gobain en Venezuela por parte del Prof. Pablo T. Spiller de la firma Compass Lexecon y los anexos que la acompañan CLEX-1 a CLEX-79, más los Anexos Documentales C-001 a C-047 que se adjuntaron a la Solicitud de Arbitraje, según fueran modificados para incluir la traducción de dos anexos en idioma extranjero (tal como lo requiere la Resolución Procesal N.º 1).

62.    Mediante una carta de fecha 31 de octubre de 2013, el CIADI presentó la Resolución Procesal N.º 1 revisada a las Partes.

63.    Mediante un correo electrónico de fecha 30 de noviembre de 2013, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

64.    Mediante una carta de fecha 12 de febrero de 2014, la Demandante informó a la Demandada y al Tribunal de un error involuntario en el Dictamen Pericial del Prof. Spiller, a saber, que el anexo documental CLEX-80 había sido omitido, y que todas las referencias a CLEX-07 debería leerse como referencias a CLEX-80. La Demandante

adjuntó a su carta una lista actualizada de los anexos documentales y el anexo documental CLEX-80.

65.    Mediante una carta introductoria de fecha 21 de marzo de 2014, la Demandada presentó su Memorial de Contestación ("**Memorial de Contestación**"), junto con los Anexos Documentales R-004 a R-071 y las Autoridades Legales RL-014 a RL-125, la Declaración Testimonial del Sr. Eduardo Rondón y su traducción al idioma inglés con los anexos que la acompañan ER-001 a ER-010, y el Dictamen Pericial sobre la Cuantía de Daños confeccionado por el Sr. Vladimir Brailovsky y el Dr. Daniel Flores con los apéndices que lo acompañan BF-001 a BF-099.

66.    El día 4 de abril de 2014, de conformidad con la Resolución Procesal N.º 1, las Partes intercambiaron solicitudes para la producción de documentos.

67.    El día 5 de mayo de 2014, las Partes presentaron los documentos solicitados a los cuales no objetaron, e intercambiaron objeciones respecto de las restantes solicitudes.

68.    Mediante una carta de fecha 12 de mayo de 2014, la Demandante

    a)    presentó su Calendario Redfern, en el cual expuso sus respuestas a las objeciones de la Demandada relacionadas con las solicitudes de documentos por parte de la Demandante; y

    b)    presentó una solicitud, de acuerdo con el Artículo 9(4) de las Reglas de la Asociación Internacional de Abogados (IBA, por sus siglas en inglés) sobre Práctica de Prueba en el Arbitraje Internacional (2010) ("**Reglas de la IBA**"), para que se ordene la protección de los documentos presentados en este arbitraje y aquellos que la Demandante considere comercialmente y técnicamente confidenciales tal como prevé el Artículo 9(2)(e) de las Reglas de la IBA.

69.    Mediante un correo electrónico de fecha 12 de mayo de 2014, la Demandada presentó su Calendario Redfern, en el cual expuso sus respuestas a las objeciones de la Demandante relacionadas con las solicitudes de documentos por parte de la Demandada.

70.    Mediante una carta de fecha 15 de mayo de 2014, el Tribunal requirió aclaraciones de las Partes respecto de sus solicitudes de documentos e invitó a la Demandada a que responda a la solicitud de una resolución de confidencialidad por parte de la Demandante, a más tardar, el día 19 de mayo de 2014.

71.    El día 15 de mayo de 2014, la Demandante presentó una Solicitud de Medidas Provisionales de acuerdo con el Artículo 47 del Convenio CIADI y la Regla 39 (1) de las Reglas de Arbitraje CIADI, junto con el Anexo Documental A y las Autoridades Legales

CLA-091 a CLA-102, mediante la cual requirió que el Tribunal ordene a la Demandada que desista de los procedimientos judiciales en curso en Venezuela relacionados con la expropiación de Norpro Venezuela, C.A (los "**Procedimientos Judiciales Entablados en Venezuela**").

72. Mediante una carta de fecha 18 de mayo de 2014, la Demandada contestó a la carta del Tribunal de fecha 15 de mayo de 2014, en relación con la solicitud de documentos de la Demandante, y brindó sus comentarios objetando a la solicitud de la Demandante de una resolución de confidencialidad.

73. Mediante una carta de fecha 19 de mayo de 2014, la Demandante contestó a la carta del Tribunal de fecha 15 de mayo de 2014, en relación con la solicitud de documentos de la Demandada.

74. Mediante una carta de fecha 27 de mayo de 2014, el Tribunal invitó a la Demandante a brindar más detalles respecto de la Solicitud N.° 10 de la Demandada presente en sus solicitudes de documentos, relacionada con un "*privilegio contador-cliente*", como así también a que incluya sus comentarios sobre el escrito de la Demandada que establecía que la Demandante había renunciado a cualquier privilegio.

75. Mediante una carta de fecha 28 de mayo de 2014, la Demandante brindó más detalles sobre su afirmación de la presencia del privilegio contador-cliente respecto de la Solicitud N.° 10 de la Demandada, junto con los Anexos A, B y C de su carta.

76. El día 28 de mayo de 2014, la Demandada presentó su Contestación a la Solicitud de Medidas Provisionales de la Demandante, junto con el Anexo Documental R-072 y las Autoridades Legales RL-126 a RL-132. Se remitieron copias impresas de la Contestación y de los anexos adjuntos al CIADI dentro del plazo de dos días hábiles, en cumplimiento de lo previsto en la Resolución Procesal N.° 1.

77. Mediante un correo electrónico de fecha 30 de mayo de 2014, la Demandada ofreció comentarios relacionados con su Solicitud N.° 10, adicionalmente a la carta de la Demandante de fecha 28 de mayo de 2014.

78. Mediante una carta de fecha 3 de junio de 2014, el Tribunal invitó a las Partes a que intercambien una segunda ronda de escritos en relación con la Solicitud de Medidas Provisionales de la Demandante, el día 10 de junio de 2014, o con anterioridad a dicha fecha, en el caso de la Demandante y, el día 17 de junio de 2014, o con anterioridad a dicha fecha, en el caso de la Demandada.

79. El día 10 de junio de 2014, el Tribunal emitió su Resolución Procesal N.° 2, la cual contenía una resolución de confidencialidad ("**Resolución de Confidencialidad**"), y su Decisión sobre las solicitudes de las Partes de producción de documentos.

80. El día 10 de junio de 2014, la Demandante presentó su Réplica sobre la Solicitud de Medidas Provisionales, junto con el Anexo Documental C-137 y las Autoridades Legales CLA-103 a CLA-107, y el Dictamen Jurídico Pericial del Dr. Allan R. Brewer Carías con los apéndices A, B y C que lo acompañan.

81. Mediante una carta de fecha 12 de junio de 2014, la Demandante informó al Tribunal que las Partes habían acordado intercambiar documentos respecto de los cuales no se hubieran planteado objeciones al día 25 de junio de 2014.

82. Mediante una carta de fecha 16 de junio de 2014, la Demandada otorgó al Tribunal una lista de personas designadas por la Demandada para acceder a los Documentos Altamente Confidenciales sujetos a la Resolución de Confidencialidad del Tribunal contenida en la Resolución Procesal N.° 2.

83. Mediante una carta de fecha 17 de junio de 2014, la Demandante objetó a la inclusión del Sr. Eduardo José Rondón Cedeño en la lista de las personas designadas por la Demandada y solicitó que se exija a la Demandada que identifique una persona de reemplazo. La Demandante también destacó que se basaría en determinados documentos que serían presentados la semana siguiente en su Memorial de Réplica como Documentos Altamente Confidenciales y solicitó que la Demandada confirme que, hasta el momento en el que el Tribunal aprobara la lista de personas designadas de la Demandada, los Documentos Altamente Confidenciales no serían compartidos más allá de los individuos identificados como los asesores legales externos de Venezuela y sus peritos externos, en ausencia de la cual la Demandante solicitaría que el Tribunal emita una orden al mismo efecto.

84. El día 17 de junio de 2014, la Demandada presentó su Contestación Adicional a la Solicitud de Medidas Provisionales de la Demandante, junto con los Anexos Documentales R-073 a R-077.

85. El día 18 de junio de 2014, el Tribunal invitó a la Demandada a que formule comentarios sobre la carta de la Demandante de fecha 17 de junio de 2014 relativa a la lista de personas designadas de la Demandada, a más tardar, el día 20 de junio de 2014.

86. Mediante carta introductoria de fecha 18 de junio de 2014, la Demandante presentó su Memorial de Réplica ("**Réplica**"), junto con los Anexos Documentales C-138 a C-156 y las Autoridades Legales CLA-108 a CLA-151, la Segunda Declaración Testimonial del Sr. Jack Larry, y el Segundo Dictamen Jurídico Pericial del Dr. Allan R. Brewer Carías con los apéndices D a L que lo acompañan, y el Dictamen Complementario del Prof.

Spiller de Compass Lexecon con los anexos documentales CLEX-81 a CLEX-195 que lo acompañan.

87. Mediante una carta de fecha 20 de junio de 2014, la Demandada señaló que no estaba de acuerdo con el contenido de la carta de la Demandante de fecha 17 de junio de 2014, pero que, no obstante, procedería a la remoción del Sr. Rondón Cedeño de la lista de personas designadas, y lo reemplazaría con el Sr. Luis Govanny Cárdenas Rodríguez.

88. El día 23 de junio de 2014, el Tribunal invitó a la Demandante a declarar si tenía alguna objeción respecto de la designación del Sr. Cárdenas Rodríguez. Mediante un correo electrónico de la misma fecha, la Demandante confirmó que no tenía objeciones.

89. Mediante un correo electrónico de fecha 24 de junio de 2014, la Demandada remitió a la Secretaria los compromisos de confidencialidad suscriptos correspondientes a las 22 personas designadas por la Demandada para que tengan acceso a los Documentos Altamente Confidenciales.

90. Mediante una carta de fecha 25 de junio de 2014, el Tribunal aprobó la lista de la Demandada de Destinatarios de los Documentos Altamente Confidenciales tal como se describe en la carta de la Demandada de fecha 16 de junio de 2014 y según fuera modificada por la carta de fecha 20 de junio de 2014. La Secretaria luego remitió los compromisos suscriptos al Tribunal.

91. Mediante un correo electrónico de fecha 22 de julio de 2014, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

92. Mediante una carta de fecha 8 de agosto de 2014, el Tribunal informó a las Partes que había finalizado sus deliberaciones sobre la Solicitud de Medidas Provisionales de la Demandante y decidido, por voto de la mayoría, que la Solicitud sería denegada. Los motivos para tal decisión serían oportunamente transmitidos a las Partes a través de una Resolución Procesal, que también estaría acompañada por la opinión en disidencia.

93. El día 9 de septiembre de 2014, se emitió la Resolución Procesal N.º 3 en nombre de la mayoría del Tribunal, que incluía los fundamentos para la Decisión sobre la Solicitud de Medidas Provisionales de la Demandante, y se adjuntó la Opinión Disidente del Juez Brower.

94. Mediante carta introductoria de fecha 18 de septiembre de 2014, la Demandada presentó su Dúplica sobre el Fondo ("**Dúplica**"), junto con los Anexos Documentales R-78 a R-125, y las Autoridades Legales RL-133 a RL-189 y el Segundo Dictamen Pericial sobre la Cuantía de Daños del Sr. Vladimir Brailovsky y del Dr. Daniel Flores con los apéndices BF-100 a BF-177 que lo acompañan.

95. Mediante un correo electrónico de fecha 30 de septiembre de 2014, el Sr. Bottini realizó una nueva divulgación de conformidad con su Declaración de fecha 28 de febrero de 2013.

96. Mediante una carta de fecha 14 de noviembre de 2014, el Tribunal invitó a las Partes a que propusieran cualquier punto procesal sobre el cual desearan debatir durante la Audiencia Preliminar por vía de Teleconferencia el día 10 de diciembre de 2014 y a que indicaran si habían logrado alcanzar un acuerdo sobre dichos puntos, a más tardar, el día 25 de noviembre de 2014.

97. El día 25 de noviembre de 2014, las Partes presentaron sus Propuestas Procesales al Tribunal, e identificaron los puntos respecto de los cuales llegaron a un acuerdo, así como aquellos que deberían debatirse durante la Audiencia Preliminar por vía de Teleconferencia.

98. Mediante correos electrónicos de fechas 3 y 4 de diciembre de 2014, de acuerdo con el Artículo 9 de la Resolución Procesal N.º 1, ambas Partes acordaron celebrar la audiencia en Washington, D.C., EE. UU.

99. Mediante una carta de fecha 5 de diciembre de 2014, el CIADI informó a las Partes y al Tribunal que la Sra. Sequeira se tomaría licencia por maternidad y que la Sra. Giuliana Canè se desempeñaría como Secretaria del Tribunal durante su ausencia.

100. Mediante una carta de la misma fecha, el Tribunal informó a las Partes que el Sr. Lautenschlager dejaría de trabajar para la firma de abogados del Presidente hacia fines de ese año y, por consiguiente, dejaría de actuar en su carácter de Asistente del Tribunal en el presente caso. El Presidente propuso a las Partes que su asociada, la Sra. Susanne Häusler, fuera designada en calidad de futura Asistente del Tribunal y, salvo que las Partes tuvieran cualquier objeción, asistiera a la Audiencia Preliminar por vía de Teleconferencia en lugar del Sr. Lautenschlager.

101. Mediante correos electrónicos de fechas 8 y 9 de diciembre de 2014, las Partes informaron al Tribunal que no tenían objeciones respecto de la designación de la Sra. Häusler como Asistente del Tribunal.

102. El día 10 de diciembre de 2014 a las 12 p.m. hora estándar del Este, el Tribunal celebró la Audiencia Preliminar por vía de Teleconferencia con las Partes, durante la cual escuchó las posiciones respectivas de las Partes en relación con las cuestiones sobre las que no habían podido alcanzar un acuerdo conforme a sus Propuestas Procesales de fecha 25 de noviembre de 2014.

103. Mediante una carta de fecha 12 de diciembre de 2014, el Tribunal notificó a las Partes su Decisión sobre las Propuestas Procesales de las Partes de fecha 25 de noviembre de 2014.

104. Mediante correos electrónicos de fecha 22 de diciembre de 2014, cada Parte notificó al Tribunal y a la Parte contraria los nombres de los testigos de hecho y a los peritos testigos que deseaba someter a contrainterrogatorio durante la Audiencia.

105. Mediante correo electrónico de fecha 19 de enero de 2015, la Demandante notificó al Tribunal y a la Demandada el orden en el cual pretendía presentar a sus testigos en la Audiencia.

106. El día 23 de enero de 2015, la Demandada presentó correcciones al Segundo Dictamen Pericial sobre la Cuantía de Daños del Sr. Vladimir Brailovsky y el Dr. Daniel Flores, junto con los apéndices corregidos BF-100A a BF-103A.

107. Mediante una carta de fecha 26 de enero de 2015, la Demandada presentó una solicitud para que el Tribunal admitiera anexos documentales de hecho adicionales en el expediente. Ese mismo día, la Demandante presentó autoridades legales adicionales de CLA-152 a CLA-154 y la Demandada presentó autoridades legales adicionales, RL-190 y RL-191.

108. Mediante una carta de fecha 29 de enero de 2015, la Demandante presentó sus comentarios sobre la solicitud para que el Tribunal admitiera anexos documentales de hecho adicionales en el expediente y se opuso a ella. Mediante una carta de esa misma fecha, la Demandada respondió a los comentarios de la Demandante.

109. El día 30 de enero de 2015, el Tribunal admitió la solicitud de la Demandada, siempre que dichas pruebas fueran presentadas, a más tardar, el día 2 de febrero de 2015, y concedió a la Demandante autorización para que presente pruebas de refutación, a más tardar, el día 4 de febrero de 2015.

110. El día 31 de enero de 2015, la Demandada presentó los Anexos Documentales R-126 a R-129 al Tribunal. El día 1 de febrero de 2015, la Demandante presentó los Anexos Documentales C-159 a C-162 como pruebas de refutación.

111. Desde el día 2 al 6 de febrero de 2015, el Tribunal celebró la Audiencia con las Partes en las instalaciones del CIADI en Washington, D.C., EE. UU.

112. El día 11 de febrero de 2015, el Tribunal transmitió a las Partes una lista de preguntas para que sean abordadas en sus Escritos Posteriores a la Audiencia.

113. Mediante correo electrónico de fecha 11 de marzo de 2015, la Demandante solicitó que cualquier Laudo dictado en este procedimiento no fuera publicado conforme al Artículo 18.1 de la Resolución Procesal N.º 1, a la espera de la revisión de la Demandante y su supresión de la información comercial confidencial, reservada.

114. El día 16 de marzo de 2015, el Tribunal confirmó que, tal como se refleja en el Artículo 18.1 de la Resolución Procesal N.º 1, las resoluciones procesales, las decisiones o laudos que se emitan en el presente procedimiento no serían publicados sin que las Partes prestaren su consentimiento.

115. El día 2 de abril de 2015, las Partes presentaron simultáneamente sus escritos posteriores a la audiencia ("**Presentación Posterior a la Audiencia de la Demandante**"; "**Escrito Posterior a la Audiencia de la Demandada**").

116. El día 22 de mayo de 2015, las Partes presentaron simultáneamente su segunda ronda de escritos posteriores a la audiencia ("**Segunda Presentación Posterior a la Audiencia de la Demandante**"; "**Segundo Escrito Posterior a la Audiencia de la Demandada**").

117. El día 2 de junio de 2015, la Demandada presentó sus comentarios sobre supuestos nuevos argumentos planteados en la Segunda Presentación Posterior a la Audiencia de la Demandante.

118. El día 12 de junio de 2015, la Demandante contestó a los comentarios de la Demandada de fecha 2 de junio de 2015.

119. El día 19 de junio de 2015, el Tribunal decidió admitir las Secciones 1 y 4 de la carta de la Demandada de fecha 2 de junio de 2015 como escritos de respuesta en relación con los nuevos argumentos planteados en la Segunda Presentación Posterior a la Audiencia de la Demandante; el Tribunal también consideró que las Secciones 2 y 3 de la carta de la Demandada eran presentaciones adicionales inadmisibles que debían eliminarse del expediente.

120. El día 30 de junio de 2015, las Partes presentaron simultáneamente sus presentaciones sobre costos ("**Presentación sobre Costos de la Demandante**"; "**Presentación sobre Costos de la Demandada**").

121. El día 3 de agosto de 2015, el CIADI informó a las Partes y al Tribunal que la Sra. Sequeira había reanudado sus funciones como Secretaria del Tribunal.

122. El día 13 de agosto de 2015, el Tribunal solicitó que las Partes entregaran una actualización de la valuación de Norpro Venezuela, S.A. realizada por sus peritos a la fecha del laudo, tomando como fecha de la valuación el día 31 de agosto de 2015. El

Tribunal resaltó que solicitaba dicha actualización a los efectos de realizar una comparación, sin perjuicio de la decisión final del Tribunal sobre la fecha de valuación aplicable al presente caso. Por último, el Tribunal solicitó a las Partes que consultaran con sus peritos si la actualización requerida podía ser presentada, a más tardar, el día 30 de septiembre de 2015.

123. El día 15 de agosto de 2015, el Sr. Bottini realizó una nueva divulgación de acuerdo con su Declaración de fecha 28 de febrero de 2013.

124. Mediante correo electrónico de fecha 21 de agosto de 2015, la Demandada solicitó una prórroga del plazo propuesto para la presentación de las valuaciones actualizadas de los peritos hasta el día 15 de octubre de 2015.

125. Mediante correo electrónico de fecha 25 de agosto de 2015, la Demandante confirmó que no tenía objeciones respecto de la prórroga de la fecha límite solicitada por la Demandada. Mediante correo electrónico de la misma fecha, el Tribunal aceptó la prórroga del plazo propuesto hasta el día 15 de octubre de 2015.

126. El día 14 de octubre de 2015, la Demandante informó al Tribunal que su perito requería tiempo adicional para redactar el dictamen actualizado requerido por el Tribunal y, por consiguiente, solicitó que el plazo para su presentación se prorrogara al día 22 de octubre de 2015. Asimismo, la Demandante destacó que la Demandada no se opuso a la prórroga propuesta.

127. El día 15 de octubre de 2015, el Tribunal concedió la solicitud de la Demandante y prorrogó el plazo para la presentación de los dictámenes actualizados de los peritos de ambas Partes hasta el día 22 de octubre de 2015.

128. El día 22 de octubre de 2015, las Partes presentaron simultáneamente las actualizaciones solicitadas de las valuaciones de sus peritos ("**Actualización de la Valuación de la Demandante**"; "**Actualización de la Valuación de la Demandada**").

129. El día 30 de octubre de 2015, la Demandada pidió autorización al Tribunal para presentar una carta de no más de tres páginas para abordar determinadas cuestiones planteadas en la Actualización de la Valuación de la Demandante.

130. El día 3 de noviembre de 2015, el Tribunal admitió la solicitud de la Demandada y permitió que ambas Partes presentaran breves comentarios sobre la Actualización de la Valuación de la Parte contraria, a más tardar, el día 6 de noviembre de 2015.

131. El día 6 de noviembre de 2015, las Partes presentaron simultáneamente sus comentarios sobre la Actualización de la Valuación de la Parte contraria; la Demandada también

presentó el Anexo Documental R-131. En su correo electrónico enviado al Tribunal, la Demandante hizo reserva de su derecho a modificar su Presentación sobre Costos a la luz de los honorarios y costos adicionales incurridos en relación con su Actualización de la Valuación y sus comentarios sobre la Actualización de la Valuación de la Demandada.

132. El día 9 de noviembre de 2015, el Tribunal invitó a ambas Partes a que presentaran cualquier modificación que desearan realizar a sus respectivas Presentaciones sobre Costos, a más tardar, el día 23 de noviembre de 2015.

133. El día 23 de noviembre de 2015, las Partes presentaron simultáneamente sus presentaciones actualizadas sobre costos (**"Presentación Actualizada sobre Costos de la Demandante"**; **"Presentación Actualizada sobre Costos de la Demandada"**).

## D.    ANTECEDENTES FÁCTICOS

134. A continuación, se sintetizan los antecedentes no controvertidos entre las Partes o que, de algún otro modo, el Tribunal queda satisfecho de que quedaron demostrados mediante las pruebas presentadas en este procedimiento. La siguiente síntesis tiene por objeto brindar una visión general de la presente y no debe considerase como una lista taxativa de todos los hechos relevantes. Tales hechos adicionales podrán ser abordados en el análisis del Tribunal *infra*.

### I.    DEMANDANTE

135. Saint-Gobain es una sociedad constituida de conformidad con las leyes de la República Francesa e inscripta el día 28 de marzo de 1995[11]. Es una filial indirecta y de propiedad exclusiva de Compagnie de Saint Gobain, e integra el grupo empresarial Compagnie de Saint-Gobain[12].

136. Norpro Venezuela es una filial de propiedad exclusiva de Saint-Gobain, constituida de acuerdo con las leyes de Venezuela[13].

---

[11] Memorial, ¶ 1; **Anexo C-46**.

[12] Memorial, ¶ 1. Saint-Gobain es de propiedad absoluta de Société de Participations Financières et Industrielles, que a su vez es de propiedad absoluta de Compagnie de Saint-Gobain. Solicitud, ¶ 11.

[13] Solicitud, ¶ 4. La inversión extranjera directa de Saint-Gobain en Norpro Venezuela se registró ante la Superintendencia de Inversiones Extranjeras de Venezuela. **Anexo C-9**. Norpro Venezuela se registró inicialmente el día 25 de octubre de 2005, bajo el nombre Saint-Gobain Proppants Venezuela, C.A., ante el Registro Mercantil Quinto del Distrito Capital y el Estado Bolivariano de Miranda. **Anexo C-4**. Por acuerdo de accionistas, la empresa cambió su nombre por Proppants Venezuela, C.A. y se mudó de Caracas a Puerto Ordaz, Estado Bolívar, Venezuela. El día 19 de diciembre de 2005, Proppants Venezuela C.A. se inscribió ante el Registro Mercantil del Estado Bolívar en Puerto Ordaz, Venezuela. **Anexo C-5**. El día 15 de diciembre de 2008, los accionistas acordaron cambiar el nombre de la empresa de Proppants Venezuela a Norpro Venezuela, C.A.; este cambio de nombre se registró oficialmente el día 26 de diciembre de 2008. **Anexo C-13**. Una de las acciones en Norpro Venezuela

137. A través de su filial venezolana, la Demandante construyó y operó una planta en Puerto Ordaz, Estado Bolívar, Venezuela, con el fin de producir *proppants* cerámicos—pequeñas cuentas de cerámica hechas con bauxita, utilizadas como parte del proceso de fracturación hidráulica para "*apuntalar*" las fisuras abiertas en pozos, inducidas en las formaciones rocosas de los yacimientos, a fin de acelerar y aumentar la recuperación de hidrocarburos en cada formación[14].

138. La Demandante (a través de sus filiales) fabricó *proppants* cerámicos para sustentar la industria de gas y petróleo durante 30 años aproximadamente[15]. Hacia fines de la década de los noventa, Saint-Gobain ya ocupaba una sólida posición en el mercado norteamericano, en particular, con respecto a *proppants* cerámicos de calidad superior[16].

139. En su Memorial, la Demandante describió la reciente evolución del negocio de los *proppants*, *inter alia*, de la siguiente manera:

> "[E]*l mercado de proppants se desarrolló y expandió, de manera considerable, durante los últimos diez años y el principal factor determinante de este desarrollo y expansión fue el avance tecnológico en la industria del petróleo y el gas. En concreto, los avances permitieron a los productores de gas y petróleo: (a) realizar perforaciones más profundas; (b) perforar en dirección horizontal; y (c) utilizar la fracturación hidráulica para la extracción de hidrocarburos de fuentes no convencionales, como formaciones de esquisto. La fracturación hidráulica es una técnica que permite inyectar fluidos a alta presión en un pozo perforado en formaciones de esquisto impermeables. Los fluidos crean grietas en el esquisto para liberar el petróleo y el gas atrapado en el interior. Los* proppants *entran en las pequeñas fisuras creadas mediante la inyección de fluidos a alta presión y las mantienen abiertas, lo que permite aumentar la producción.* [...]
>
> *De esta forma, en una industria cada vez más caracterizada por pozos horizontales más profundos y fracturación, los* proppants *permiten una extracción más eficaz de hidrocarburos.*
>
> *Asimismo, al estimular el pozo, los* proppants *no sólo mejoran las tasas de extracción de petróleo y gas natural, sino que también contribuyen a una mayor productividad y longevidad del pozo.*
>
> *Hay cuatro clases de* proppants. *Según el grado de resistencia, de mayor a menor, incluyen: (a) de arena; (b) de arena con revestimiento de resina; (c) cerámicos; y (d) cerámicos con revestimiento de resina.*

---

pertenece a Luis Páez, ciudadano venezolano y Presidente de Norpro Venezuela. La transferencia planificada de la acción del Sr. Páez a Saint-Gobain no ha ocurrido aún.

[14] Solicitud, ¶ 4. Memorial, ¶ 2.

[15] Memorial, ¶ 5; **Anexo C-133**.

[16] Memorial, ¶ 8.

> *La elección del tipo de* proppant *para un determinado pozo depende de la tensión de cierre de ese pozo. Saint-Gobain fabrica* proppants *cerámicos, ideales para pozos más profundos de alta tensión de cierre, comunes en formaciones de esquisto en los Estados Unidos. Otros tipos de* proppants—*en especial, los de arena—no pueden soportar tales condiciones"*[17]. [Traducción del Tribunal]

## II. LA DECISIÓN DE LA DEMANDANTE DE AMPLIAR LA CAPACIDAD DE PRODUCCIÓN Y BUSCAR UN TERRENO PARA SU EXPANSIÓN EN SUDAMÉRICA

140. En vista de la creciente industria de los *proppants* en Norteamérica, y a nivel internacional, el Grupo Saint-Gobain comenzó, a partir del año 2000, a investigar opciones para aumentar su capacidad de producción[18]. En ese entonces, no había muchos yacimientos de bauxita de eficacia comprobada en los EE. UU., ya sea para ampliación de la planta de *proppants* de Saint-Gobain en Fort Smith, Estado de Arkansas (la **"Planta de Fort Smith"**) o para un nuevo establecimiento en Norteamérica. Como consecuencia, en 2004, Saint-Gobain comenzó a buscar un sitio para la producción de *proppants* en Sudamérica, previendo que un 70-80% de los *proppants* producidos allí se venderían al mercado norteamericano, en tanto el resto se reservaría para el mercado sudamericano[19].

141. La Demandante identificó como los principales requisitos para la producción de *proppants* a los siguientes:

> "*(a) insumos constantes de bauxita* [es decir, la materia prima principal para la producción de *proppants*]*, gas y electricidad (a precios competitivos); (b) proximidad al mercado estadounidense a fin de acceder al más grande mercado (actual) de* proppants *con costos de transporte razonables; (c) acceso a mano de obra calificada, capaz de lidiar con los aspectos técnicos de la producción de* proppants*; y (d) la capacidad de construir una planta y producir a corto plazo para atender las crecientes necesidades de los clientes"*[20]. [Traducción del Tribunal]

142. De estos requisitos, el acceso a la bauxita y la proximidad al mercado objetivo se consideraron los principales factores de la ubicación de la inversión[21].

143. Inicialmente, la Demandante contempló cuatro países—Brasil, Guyana, Trinidad y Venezuela—como posibles ubicaciones para la nueva planta de *proppants*. Sin embargo, al cabo de varios viajes de empleados del Grupo Saint-Gobain con fines de exploración

---

[17] Memorial, ¶¶ 5-7. Citas internas omitidas.
[18] Memorial, ¶ 8.
[19] Memorial, ¶ 10; Pedersen, ¶¶ 9, 11, 44.
[20] Memorial, ¶ 12. Citas internas omitidas. *Véase, también,* Pedersen, ¶ 15; Larry, ¶¶ 17, 22; **Anexos C-069 y C-107.**
[21] Memorial, ¶ 12.

para desarrollo comercial, las ubicaciones de Guyana, Trinidad y Brasil se descartaron por considerarse inviables a corto plazo o anticompetitivas desde el punto de vista económico[22].

144. La Demandante consideró a Venezuela como un posible sitio interesante para la construcción de una planta de *proppants* dada la disponibilidad de bauxita, electricidad y gas natural[23] y, según la Demandante, la posibilidad de celebrar contratos favorables con entidades estatales para el suministro de esos recursos y beneficios logísticos, como la disponibilidad de una ruta de envío conocida desde el puerto local de Puerto Ordaz hasta Corpus Christi, Estado de Texas, donde los *proppants* terminados se despacharían para su distribución en el mercado norteamericano. Además, Saint-Gobain tuvo experiencia en Venezuela y en la región de Puerto Ordaz, y esperaba contar con apoyo del Gobierno para concluir el proyecto a tiempo y dentro de lo presupuestado[24].

145. En el año 2004, representantes del Grupo Saint-Gobain se reunieron con funcionarios del Ministerio del Poder Popular para las Industrias Básicas y Minería ("*MIBAM*") y con representantes de las empresas estatales CVG Bauxilum, C.A. ("*CVG Bauxilum*"), a cargo del suministro de bauxita, CVG Electrificación del Caroní, C.A. ("*CVG EDELCA*"), a cargo del suministro eléctrico, y PDVSA Gas, S.A. ("*PDVSA Gas*"), a cargo del suministro de gas, para debatir sobre una posible inversión[25]. Las Partes están de acuerdo en que, durante esas reuniones, los funcionarios venezolanos se mostraron a favor del proyecto; no obstante, discrepan en cuanto a si tales funcionarios aseguraron que, si Saint-Gobain aceptaba invertir en Venezuela, Venezuela garantizaría la celebración de contratos favorables a largo plazo para la entrega de bauxita, gas y electricidad a Saint-Gobain[26].

146. En el mes de septiembre de 2004, Jorgen Pedersen, Vicepresidente y Gerente General de Saint-Gobain NorPro, se reunió con funcionarios de la Corporación Venezolana de Guayana ("**CVG**"), de propiedad estatal, y su filial, CVG Bauxilum, para seguir investigando sobre la posibilidad de invertir en Venezuela. Según la Demandante, CVG describió en esta ocasión la posibilidad de celebrar contratos favorables a largo plazo para el suministro de bauxita a la Demandante. De nuevo, las Partes discrepan en cuanto a lo

---

[22] Memorial, ¶ 11. Pedersen, ¶¶ 16, 17. La Demandante alega que Guyana no tenía suministros de gas disponibles, además de que los costos de electricidad eran altos y las opciones de envío bastante limitadas. En Trinidad, Saint-Gobain habría tenido que importar bauxita de Guyana, cuyo suministro continuo no podía asegurarse, y no habría tierra disponible por muchos años en la ubicación industrial preferida. Por último, en Brasil, ya se estaba vendiendo bauxita local a productores y extractores de aluminio y, además, Saint-Gobain habría tenido que extraer y transportar bauxita por su cuenta. Memorial, ¶¶ 13-15; **Anexos C-063 y C-071.**

[23] Memorial, ¶ 16; Solicitud, ¶ 12.

[24] Memorial, ¶ 16.

[25] Memorial, ¶ 17.

[26] Memorial, ¶ 17; Dúplica, ¶¶ 62 y ss.

debatido con respecto a la posibilidad y las condiciones de los contratos a largo plazo para la compra de bauxita[27].

147.    El día 3 de febrero de 2005, el equipo responsable de identificar la ubicación para la nueva inversión de la Demandante presentó a la alta gerencia de Compagnie de Saint-Gobain un *Demande d'Autorisation Compagnie* ("*DAC*") con respecto a la nueva inversión propuesta en Venezuela con una capacidad de producción anual de 50.000 toneladas métricas de *proppants* cerámicos[28]. El DAC, que sirvió como solicitud oficial a los accionistas para recibir la aprobación de una inversión, se aprobó el día 7 de febrero de 2005[29].

148.    Alrededor de la misma época, Jorgen Pedersen y Guy Rolli, director de la Delegación de Saint-Gobain que abarca Colombia, México y Venezuela, "*entre otros*"[30], comenzaron a reunirse con altos funcionarios del Gobierno venezolano, en particular, del MIBAM y del Ministerio de Industrias Ligeras y Comercio ("**MILCO**"). Según la Demandante, el MIBAM—el ministerio que supervisó la actividad de la CVG—fue "*la motivación dentro del Gobierno venezolano no sólo para obtener la aprobación del proyecto, en general, sino también específicamente para cerrar un contrato de suministro de bauxita a largo plazo*"; así, consideró que las reuniones con el MIBAM eran de "*suma importancia y determinantes con respecto a su evaluación de viabilidad de su inversión*"[31]. [Traducción del Tribunal]

149.    El día 27 de abril de 2005, representantes de Saint-Gobain se reunieron con Valmore Vásquez, Viceministro de Promoción de Inversiones del MIBAM, y con representantes de PDVSA Gas y CADAFE (Compañía Anónima de Administración y Fomento Eléctrico) para analizar el  futuro proyecto[32]. Según la Demandante, el MIBAM admitió en la reunión que la disponibilidad de producción y suministro de *proppants* a nivel local sería muy valioso para Venezuela[33].

150.    Según recuerda el Sr. Pedersen, el día 6 de mayo de 2005, Carmen Velásquez, Coordinadora de Promoción de Inversiones del MIBAM, le comunicó informalmente a representantes de la Demandante que "*la Viceministra Raiza Molina recomendaría al Ministro Álvarez conceder la solicitud de suministro de bauxita de Saint-Gobain*"[34]. En

---

[27] Memorial, ¶ 18; Pedersen, ¶ 21.
[28] Memorial, ¶ 19; Memorial de Contestación, ¶ 6; **Anexo C-057**.
[29] Memorial, ¶ 19; Memorial de Contestación, ¶ 6; **Anexo C-058**.
[30] No se especifica en el Memorial de la Demandante ni en la declaración testimonial presentada por el Sr. Pedersen a quién hace referencia la expresión "*otros*" participantes. *Cfr.* Memorial, ¶ 20; Pedersen, ¶ 24.
[31] Memorial, ¶ 20; Pedersen, ¶ 24.
[32] Memorial, ¶ 22; **Anexo C-2**.
[33] Memorial, ¶ 22.
[34] Pedersen, ¶ 27; Memorial, ¶ 23.

una reunión de fecha 10 de mayo de 2005, a la que asistieron, entre otros, la Viceministra del MIBAM Raiza Molina y el Presidente Jesús Imery de CVG Bauxilum, el MIBAM volvió a destacar su estrategia para aumentar las exportaciones de productos no derivados del petróleo y para desarrollar producción local futura a través de la transferencia de tecnología[35]. La Demandante alega que la Srta. Molina "*confirmó los términos de los contratos de suministro a largo plazo propuestos, celebrados con CVG Bauxilum y PDVSA Gas para el suministro de bauxita y gas, respectivamente, para toda inversión que a futuro realice Saint-Gobain*"[36]. [Traducción del Tribunal]

151. Según las notas del Sr. Pedersen sobre una reunión de fecha 11 de junio de 2005 con Jesús Imery, Presidente de CVG Bauxilum, el Sr. Imery señaló que había recibido el apoyo del Presidente Chávez y del Ministro Víctor Álvarez del MIBAM para la inversión de *proppants* de Saint-Gobain[37]. Luego, en una reunión de alto nivel entre representantes de los Gobiernos de Francia y Venezuela, realizada el día 20 de octubre de 2005, el representante de la Demandante en la reunión dejó constancia en un memorando que el Viceministro Vásquez del MIBAM confirmó que le había encomendado al presidente de CVG Bauxilum resolver el contrato lo antes posible[38].

152. El día 25 de octubre de 2005, la Demandante inscribió a Saint-Gobain Proppants Venezuela, C.A., predecesora de Norpro Venezuela[39]. Tres meses después, el día 27 de enero de 2006, CVG Bauxilum, actuando "**bajo el auspicio del** […] MIBAM y la […] CVG", suscribió un contrato de compraventa con la empresa Saint-Gobain Proppants Venezuela C.A. (el "**Contrato de Bauxita**")[40].

153. Durante el transcurso del año 2005, la Demandante también negoció con CVG EDELCA y PDVSA Gas en relación con contratos a largo plazo para el suministro de electricidad y gas, respectivamente. Según la Demandante, el MIBAM acordó en una reunión de fecha 2 de marzo de 2006 garantizar que CVG EDELCA y PDVSA Gas celebrarían contratos de suministro a largo plazo con Norpro Venezuela a favor del proyecto de *proppants* de Saint-Gobain[41].

154. El día 22 de agosto de 2006, el MIBAM solicitó que la CVG designara (en nombre del Ministerio) un interlocutor con sede en Puerto Ordaz como contacto diario para Saint-Gobain[42]. Así, el día 29 de agosto de 2006, se notificó a Saint-Gobain la designación de

---

[35] Memorial, ¶ 23; **Anexo C-3**.
[36] Memorial, ¶ 23.
[37] **Anexo C-068**.
[38] **Anexo C-074**.
[39] **Anexo C-9**. *Cfr.* nota 3 *supra*.
[40] **Anexo C-6**.
[41] Memorial, ¶ 26; **Anexo C-077**.
[42] Memorial, ¶ 27; **Anexo C-080**.

Manuel Henriquez como interlocutor para ayudar a Saint-Gobain a obtener los permisos necesarios para dar curso a su inversión en Venezuela, entre otras cosas[43].

155. Tras otras reuniones con representantes de las dos compañías estatales, el día 16 de agosto de 2006, Norpro Venezuela celebró un contrato de suministro eléctrico a largo plazo con CVG EDELCA y, el día 10 de octubre de 2006, celebró otro contrato de suministro eléctrico a largo plazo con PDVSA Gas[44].

## III. LA DECISIÓN DE LA DEMANDANTE DE INVERTIR EN VENEZUELA

156. El día 7 de febrero de 2006, el equipo responsable de la inversión en Venezuela presentó una adenda al DAC sobre la capacidad ampliada para la nueva planta de *proppants* en Venezuela, en la cual se contemplaba una mayor capacidad de 70.000 toneladas métricas por año[45]. Este DAC se aprobó el día 20 de febrero de 2006[46]; el día 23 de octubre de 2006, se presentó una actualización del DAC, con costos proyectados por encima de los previstos en la adenda, que se aprobó el día 9 de noviembre de 2006[47].

157. Una vez recibidas las aprobaciones internas requeridas, Saint-Gobain procedió a finalizar la adquisición de tierras en Puerto Ordaz en las que planeaba construir su planta de *proppants*[48]. La Demandante aduce que había elegido Puerto Ordaz por los siguientes motivos:

> "[O]*frecía buenas opciones de transporte y servía como terminal para los suministros necesarios de gas y electricidad, además de tener una población de trabajadores capacitados. En especial, CVG Bauxilum, proveedor de bauxita de Saint-Gobain, estaba ubicada en Puerto Ordaz. EDELCA—proveedor de electricidad—también se encontraba instalada allí*"[49]. [Traducción del Tribunal]

158. Tras la compra de tierras en Puerto Ordaz, los empleados de Saint-Gobain con experiencia en Venezuela ayudaron a determinar los requisitos del personal y los costos de la nueva inversión[50]. Jack Larry, Gerente General de Saint-Gobain Proppants (a cargo de la administración del negocio de los *proppants* a nivel mundial), participó en el desarrollo de la presentación del proyecto como también en el análisis de las cuestiones técnicas de cómo abrir una planta en Venezuela[51].

---

[43] **Anexo C-081**.
[44] Memorial, ¶ 28; **Anexos C-8 y C-10**.
[45] Memorial, ¶ 29; Memorial de Contestación, ¶ 6; **Anexo C-075**.
[46] **Anexo C-076**.
[47] **Anexos C-082 y C-083**.
[48] Memorial, ¶ 30; Pedersen, ¶¶ 38, 39.
[49] Memorial, ¶ 30. Citas internas omitidas. *Véase, también,* Pedersen, ¶ 39.
[50] Pedersen, ¶ 41.
[51] Memorial, ¶ 31; Larry, ¶ 21.

159. También en el año 2006, Saint-Gobain designó a Dominique Objois, ex Gerente General de una planta de Saint-Gobain en Corea, para liderar el esfuerzo de construcción con su equipo. El Sr. Objois contó con la colaboración *in situ* de varios empleados experimentados de la Planta de Fort Smith[52].

160. Luego, la Demandante se centró en los requisitos técnicos de los *proppants*, en especial, en las características de la bauxita, es decir, la materia prima principal que proveería CVG Bauxilum[53].

161. Para ello, el día 28 de febrero de 2006 y a fines de marzo de 2007, representantes de Saint-Gobain visitaron las instalaciones de CVG Bauxilum en Puerto Ordaz a fin de desarrollar los requisitos técnicos de la bauxita que se suministraría en virtud del Contrato de Bauxita e informarse mejor sobre las actividades y la producción de CVG Bauxilum[54]. Aunque advirtieron que CVG Bauxilum no estaba "*actualmente dispuesta a suministrar niveles de aluminio/hierro específicos para cada cliente*", los representantes de la Demandante determinaron que CVG Bauxilum estaba "*muy bien manejada*"[55]. [Traducción del Tribunal]

162. A principios del mes de abril de 2007, Saint-Gobain realizó una nueva presentación ante CVG Bauxilum y se reunió con su Presidente "*para conversar sobre las posibilidades de suministro de otras clases de bauxita y posibles desarrollos futuros*"[56]. Al poco tiempo, en mayo de 2007, Saint-Gobain presentó a CVG Bauxilum una solicitud de insumos de bauxita conforme al Contrato de Bauxita[57]. En junio de 2007, Norpro Venezuela informó, de manera interna, que CVG Bauxilum había confirmado que "*suministraría hasta un 30% de bauxita con alto contenido de aluminio*", lo que confirmaba a la Demandante que CVG Bauxilum suministraría el tipo de bauxita requerido para producir *proppants* cerámicos en Venezuela[58].[Traducción del Tribunal]

## IV. CRÉDITOS DE IVA

163. La legislación de Venezuela exige que las empresas venezolanas paguen IVA por los bienes y servicios que adquieren y cobren IVA a los compradores venezolanos, no extranjeros, de sus bienes y servicios, con lo cual excluye del cobro de IVA a los exportadores de bienes fabricados en Venezuela. Cuando una empresa paga IVA por la compra de bienes y servicios, acumula créditos de IVA y, al cobrar IVA al comprador,

---

[52] Memorial, ¶ 32; Pedersen, ¶ 40; Larry, ¶ 28.
[53] Memorial, ¶ 36.
[54] Memorial, ¶ 37; **Anexos C-078 y C-087**.
[55] Memorial, ¶ 37; **Anexo C-087**.
[56] **Anexos C-089 y C-088**.
[57] Memorial, ¶ 38; **Anexo C-090**.
[58] Memorial, ¶ 38; **Anexo C-091**.

acumula débitos de IVA que se compensan con los créditos de manera mensual. Si la empresa paga más IVA del que cobra, traslada el saldo neto al mes siguiente[59].

164. Norpro Venezuela era, en gran medida, exportadora de bienes fabricados en Venezuela y, por lo tanto, no cobraba IVA a sus clientes extranjeros, pero sí debía pagar IVA en la mayoría de sus compras porque casi todos los equipos adquiridos para la planta durante la fase de construcción, como también las materias primas (como la bauxita) utilizadas en la producción de *proppants* y la mano de obra de las empresas tercerizadoras, se adquirieron en Venezuela y, como tales, estaban sujetos al pago de IVA. Como consecuencia de este desequilibrio entre sus pagos y cobros de IVA, al 31 de diciembre de 2009, Norpro Venezuela había acumulado en su balance general VEF 11,7 millones en concepto de créditos de IVA[60].

165. Si bien los bienes importados, como los equipos de una planta de producción, suelen estar sujetos al IVA, el día 19 de octubre de 2006, la Demandada emitió el Decreto 4908, que estableció un procedimiento que podía resultar en la exoneración de ciertos equipos importados del pago de impuestos sobre las importaciones e IVA[61]. Si una empresa quería obtener dicha exoneración, tenía que solicitar un certificado de exoneración al Ministerio de Industrias Ligeras y Comercio (MILCO)[62].

166. A fines del mes de marzo de 2005, Jorgen Pedersen se reunió con William Cañas, Director General de Bienes de Capital de MILCO, para hablar sobre la planta de *proppants* propuesta y, más específicamente, la exoneración del pago de IVA y del impuesto de importación para que el proyecto fuera económicamente sostenible[63]. Mediante un correo electrónico de fecha 1 de junio de 2006, el Sr. Pedersen informó al Sr. Patrick Millot, Vicepresidente de Planificación Corporativa, Estrategia y Finanzas del Sector de Materiales de Alto Rendimiento de Saint-Gobain, que, en una reunión realizada el día 26 de mayo de 2006, MIBAM había acordado ayudar a Saint-Gobain a obtener las correspondientes exenciones del pago de derechos e impuestos de importación[64].

167. En su actualización del DAC de fecha 23 de octubre de 2006, la Demandante informó internamente que el Presidente Chávez acababa de anunciar en una conferencia de prensa la sanción del Decreto Presidencial mediante el cual se otorgaría una amplia exoneración del pago de IVA y derechos de importación aplicables a bienes de capital importados que en ese entonces no se producían en Venezuela, como equipos, maquinaria y repuestos,

---

[59] Memorial de Contestación, ¶¶ 48-49.
[60] Memorial, ¶ 162; Memorial de Contestación, ¶ 51.
[61] **Anexo R-43**.
[62] Memorial de Contestación, ¶ 52.
[63] Memorial, ¶ 21; Pedersen, ¶ 24.
[64] **Anexo C-079**.

con el fin de promover el desarrollo del sector industrial. En el mismo documento, la Demandante señaló que "*el Ministro de Industrias Básicas y Minería (MIBAM) nos ayudó a obtener una exoneración*"[65]. En un mensaje de correo electrónico enviado a los Sres. Rolli y Millot el día 2 de noviembre de 2006, el Sr. Pedersen escribió que "*es probable que el nuevo decreto de exoneración nos permita exonerarnos y simplifique el proceso*"[66]. [Traducción del Tribunal]

168.  La Demandante solicitó, y se le concedió el día 25 de octubre de 2007, una Exención para Bienes de Capital, que cubría el IVA y los derechos de importación para maquinaria y otros materiales, en total 29 tipos específicos de equipos, que la Demandante necesitaba para la instalación y manejo de la planta[67]; así, cuando se importaron los equipos, no se cobraron derechos de importación ni IVA. Para el resto de las compras, la Demandante tuvo que pagar los impuestos de importación habituales y el IVA, lo que arrojó el saldo crediticio neto de VEF 11,7 millones[68].

169.  Los créditos de IVA no crean *per se* una obligación de pago a cargo del Estado, sino que la ley venezolana sobre IVA establece un proceso por el cual los exportadores de bienes pueden obtener un beneficio financiero si presentan una solicitud mensual para la recuperación de los créditos de IVA en función del monto de las exportaciones del mes. Si las autoridades fiscales conceden la solicitud, se emite un certificado especial de reintegro tributario que el contribuyente puede utilizar para pagar sus impuestos venezolanos o vender a un tercero, quien a su vez puede utilizarlo para pagar sus propios impuestos[69].

170.  El día 15 de mayo de 2010, Norpro Venezuela había, según recuerda el Sr. Rondón:

> "*comunicado a las autoridades su intención de iniciar el proceso de reintegro de créditos de IVA mediante la solicitud de un certificado especial de reintegro tributario basado en las ventas de exportación, de acuerdo con la legislación pertinente,* [pero] *aún estaba compilando la documentación necesaria para fundar su solicitud*"[70]. [Traducción del Tribunal]

---

[65] **Anexo C-082**.

[66] **Anexo C-084**.

[67] Memorial, ¶ 21; **Anexo C-092**.

[68] *Cfr.* Memorial de Contestación, ¶¶ 53-54.

[69] Memorial de Contestación, ¶¶ 57-58 y nota 159 en referencia a los Artículos 43 y 44 del Decreto con rango, valor y fuerza de ley de reforma parcial del decreto N.º 5.189 con rango, valor y fuerza de ley que establece el impuesto al valor agregado, publicado en la Gaceta Oficial el día 26 de febrero de 2007 (Decreto N.º 5212) y Artículo 1 del Decreto No. 611, Reforma Parcial del Reglamento Parcial No. 1 de la Ley que Establece el Impuesto al Valor Agregado, en Materia de Recuperación de Créditos Fiscales, publicado en la Gaceta Oficial N.º 37794 el día 10 de octubre de 2003. **Anexos R-41 y R-47**.

[70] Rondón, ¶ 38. Durante la Audiencia, el Sr. Rondón confirmó que se había solicitado a las autoridades un certificado especial de reintegro tributario. Transcripción (Día 3), pág. 771 línea 21 – pág. 772 línea 8. *Véase,*

## V.    CONSTRUCCIÓN DE LA PLANTA

171. En el año 2007, la Demandante comenzó a construir la planta de *proppants* en Puerto Ordaz. La mayoría de los equipos necesarios arribaron al sitio en el mes de septiembre de 2007[71]. Con vistas a incrementar la capacidad de producción en el futuro, se diseñó una construcción escalonada: primero, se construyó una línea de producción, a la que se agregaría otra más adelante, "*una vez que las instalaciones funcionaran correctamente y resultaran redituables*"[72]. La Demandante previó que la segunda línea de producción planificada, básicamente, se "*copiaría y pegaría*" de la primera línea de producción y, por ende, llevaría menos tiempo pasar de la fase de inicio al aumento pleno de la producción, hasta duplicar la capacidad de la planta[73]. [Traducción del Tribunal]

172. La primera línea de producción se diseñó para comenzar con dos mezcladoras, una capacidad total de aproximadamente 4.500 toneladas por mes, con un espacio reservado para incorporar una tercera mezcladora, que aumentaría la capacidad total a aproximadamente 6.000 toneladas por mes[74]. Una vez construida la primera línea de producción con dos mezcladoras, la producción de *proppants* comenzó en el mes de septiembre de 2008. A pesar de los planes iniciales de principios del año 2010, la tercera mezcladora, programada para entrar en funcionamiento a principios del año 2013, nunca se instaló[75].

## VI.    AUMENTOS EN EL PRECIO DE LA BAUXITA

### 1.    Primer aumento de precios en el mes de septiembre de 2008

173. El día 15 de julio de 2008, el entonces Presidente de CVG Bauxilum, el Sr. Carlos Acosta Pérez, convocó a una reunión a representantes de la Demandante y de Norpro Venezuela para un "*análisis abierto de la relación contractual con respecto al precio de la bauxita*"[76]. Las Partes discrepan en cuanto a si el objeto de la reunión, celebrada el día 29 de julio de 2008, fue "*debatir sobre la situación*"[77] o simplemente informar a la Demandante sobre el aumento de precios previsto como *fait accompli*[78]. [Traducción del Tribunal]

---

*también*,  Presentación Posterior a la Audiencia de la Demandante, ¶ 156; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 204.

[71] Memorial, ¶ 39; Pedersen ¶ 42.

[72] Pedersen, ¶ 46; *Cfr.* Larry, ¶ 33; **Anexo C-057**.

[73] Memorial, ¶ 40; Pedersen, ¶ 46.

[74] Memorial, ¶ 40.

[75] Larry, ¶ 32.

[76] Memorial, ¶ 46; **Anexo C-093**. *Cfr.* Memorial de Contestación, ¶ 64.

[77] Memorial de Contestación, ¶ 64.

[78] Memorial, ¶¶ 46-47.

174. El día 30 de julio de 2008, el Sr. Oscar Cid, Gerente General de Norpro Venezuela, informó al Sr. Pedersen que CVG Bauxilum había presentado los siguientes motivos con respecto al aumento en el precio de la bauxita: (i) aumento de 600% en el Peaje del Río Orinoco; (ii) ajuste en el costo de extracción y producción hasta lograr un punto de equilibrio; (iii) aumento en los costos de transporte desde Jobal Mine hasta el puerto ACBL como consecuencia de un aumento en el contrato de trabajo con los trabajadores sindicalizados de ACBL; y (iv) un análisis del mercado internacional a fin de comparar los precios de la bauxita de diversos proveedores, a partir del cual se pudo comprobar que el precio acordado en virtud del Contrato de Bauxita era inferior al del mercado internacional[79]. El Sr. Cid señaló, además, en su mensaje de correo electrónico que, "*a* [su] *entender, el aumento* [en el precio de la bauxita] *es un hecho y ocurrirá en muy poco tiempo, quizá 1 mes*" y que CVG Bauxilum "*ofrec*[ió] *el derecho a presentar una réplica escrita, a más tardar, para fines de esta semana, con toda alegación, reclamación y cualquier otro comentario en relación con el impacto del aumento en* [Norpro Venezuela]"[80]. [Traducción del Tribunal]

175. El día 31 de julio de 2008, se publicó en la Gaceta Oficial el Decreto N.º 6220 con Rango, Valor y Fuerza de Ley de Canalización y Mantenimiento de las Vías de Navegación, mediante el cual se sancionaron legalmente los aumentos de precio previstos de 600% para el Peaje del Río Orinoco[81].

176. Mediante carta de fecha 1 de agosto de 2008, el Presidente de Norpro Venezuela, Luís Páez, escribió al Sr. Pérez:

> "*Considerando que, conforme a las políticas del MPPIBAM, Bauxilum ha asegurado a* [Norpro Venezuela] *un suministro a largo plazo de bauxita bajo el Contrato y, toda vez que cualquier ajuste del precio de venta de la bauxita se encuentra regido por lo dispuesto en la Cláusula 10 del Contrato, deseamos discutir con ustedes el impacto negativo que cualquier modificación de los términos y condiciones del Contrato podría implicar para el Proyecto Proppants y consecuentemente, para los planes de sustitución de importaciones de Petróleos de Venezuela, S.A. (PDVSA), las políticas de promoción de inversiones del MPPIBAM y el acuerdo de cooperación entre Venezuela y Francia*"[82].

177. En la misma carta, el Sr. Páez también solicitó una reunión con CVG Bauxilum para debatir sobre los posibles efectos que podría tener el aumento de precios en la inversión de la Demandante[83]. Según la Demandante, CVG Bauxilum informó a Norpro Venezuela

---

[79] **Anexo C-093**. *Cfr.* Memorial de Contestación, ¶ 64.

[80] **Anexo C-093**.

[81] **Anexo R-50**.

[82] **Anexo C-095**.

[83] Memorial, ¶ 47; **Anexo C-095**; Memorial de Contestación, ¶ 65.

en la reunión, celebrada el día 21 de agosto de 2008, que el precio de la bauxita aumentaría de USD 25,50 a USD 33,80 por tonelada métrica con efecto inmediato[84].

178. En una carta remitida al Sr. Cid bajo el membrete combinado del MIBAM, CVG y CVG Bauxilum, con fecha 2 de septiembre de 2008, el Sr. Pérez confirmó claramente que USD 33,80 por tonelada métrica sería el nuevo precio durante el resto del año 2008; invocó la disposición de revisión de precios de la Cláusula 10.2 del Contrato de Bauxita, en función de las nuevas tarifas de navegación por el Río Orinoco y "*la variación significativa que sufrieron los costos de extracción, transporte y descarga de la bauxita en nuestra planta de Matanzas*"[85]. Para concluir, el Sr. Pérez señaló que el nuevo precio seguía siendo favorable porque "*correspondía al precio de venta franco a bordo para el año 2007 y, por otro lado, a un ajuste gradual* [del precio por encima del] *aplicable al ejercicio fiscal actual*"[86]. [Traducción del Tribunal]

179. En su carta de fecha 4 de septiembre de 2008, dirigida a la Viceministra del MIBAM, la Srta. Isabel Cristina Delgado, el Presidente de Norpro Venezuela, el Sr. Páez, afirmó que Norpro Venezuela y el MIBAM habían "*acorda*[do] *que los diversos contratos de suministro que requiriera el Proyecto, incluyendo el Contrato* [de Bauxita]*, se estructurarían como contratos a largo plazo*". El Sr. Páez señaló que Norpro Venezuela deseaba discutir el impacto negativo del incremento del precio en la planta y, como consecuencia, en los planes de PDVSA de sustituir las importaciones por productos nacionales, las políticas de inversiones del MIBAM y el TBI entre Venezuela y Francia[87].

180. El día 9 de septiembre de 2008, representantes de Norpro Venezuela volvieron a reunirse con CVG Bauxilum[88]. Según la Demandante, se manifestaron en contra del aumento de precio por considerarlo *ultra vires*, pero—en aras de mantener condiciones comerciales estables—solicitaron mantener el nuevo precio hasta, al menos, el día 31 de diciembre de 2009[89]. En su carta remitida a CVG Bauxilum el día 17 de septiembre de 2008, el Sr. Cid escribió:

---

[84] Memorial, ¶ 48. En relación con un aumento de precio anterior, el precio del contrato original de USD 23,50 por tonelada métrica había ascendido a USD 25,50. Pedersen, ¶ 50, nota 9; Memorial de Contestación, ¶ 63.

[85] La Cláusula 10.2 del Contrato de Bauxita establece: "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será aplicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior*". **Anexo C-6**, Cláusula 10.2.

[86] **Anexo C-11**. *Cfr*. Memorial de Contestación, ¶ 65.

[87] **Anexo C-096**.

[88] Memorial de Contestación, ¶ 66.

[89] Memorial, ¶ 50.

"*Aunque* [Norpro Venezuela] *no comparte la opinión que Bauxilum expresa en el Oficio, con respecto a la interpretación y aplicación del numeral 10.2 de la Cláusula Décima del Contrato a los fines de justificar el incremento del Precio indicado en el Oficio,* [Norpro Venezuela] *reitera su disposición a discutir alternativas con Bauxilum que garanticen, a largo plazo, el cumplimiento efectivo de las obligaciones de ambas partes bajo el Contrato.*

*Considerando que el interés principal de* [Norpro Venezuela] *es mantener condiciones estables y claras que rijan el suministro a largo plazo de bauxita bajo el Contrato, de acuerdo a lo discutido con el Sr. Carlos Acosta Pérez y sus asesores durante nuestra reunión* [de fecha 9 de septiembre de 2008], [Norpro Venezuela] *formalmente solicita a Bauxilum que considere la posibilidad de garantizar que el precio de* [...] *USD 33,80 por tonelada de bauxita, indicado en el Oficio, se mantengan sin variación alguna hasta el 31 de diciembre de 2009.*

[…]

*En todo caso, mientras se desarrollen las discusiones que amerite la revisión de estos planteamientos,* [Norpro Venezuela] *desea aclarar que la emisión de cualquier orden de compra de bauxita bajo el Contrato, el pago de cualquier suma debida por* [Norpro Venezuela] *a Bauxilum por tales conceptos o el envío de cualquier correspondencia o comunicación a Bauxilum, con posterioridad a la fecha del Oficio, no se entenderá como una aceptación expresa o tácita por parte de* [Norpro Venezuela] *del aumento de Precio señalado en el Oficio o de cualquier hecho, afirmación, declaración, circunstancia o argumento expuesto por Bauxilum en el Oficio*"[90].

181. La Demandante alega que no recibió respuesta a su solicitud de mantener el nuevo precio, al menos, hasta el 31 de diciembre de 2009[91]; la Demandada simplemente sostiene que el precio se mantuvo en USD 33,80 por tonelada métrica hasta el año 2009[92].

182. Para recibir los envíos requeridos de bauxita durante el resto del año 2008 y todo el año 2009, Norpro Venezuela tenía que presentar la orden de compra a CVG Bauxilum hasta el día 17 de octubre de 2008[93]. Norpro Venezuela la presentó y programó las entregas al precio aumentado a fin de asegurarse un suministro continuo de bauxita para su planta; no obstante, según el Sr. Pedersen, se reservó ciertos derechos[94]. En una presentación de PowerPoint de fecha 11 de octubre de 2008, la Demandante también informó al MIBAM

---

[90] **Anexo C-12**.
[91] Memorial, ¶ 50.
[92] Memorial de Contestación, ¶ 68.
[93] Memorial, ¶ 52; **Anexo C-101**.
[94] Memorial, ¶ 52; Pedersen, ¶ 53.

acerca del aumento de precios del día 2 de septiembre de 2008, y lo calificó como *"injustificado"*[95].

183.   En un mensaje de correo electrónico de fecha 21 de noviembre de 2008, el Sr. Pedersen les informó a los Sres. Rolli y Larry que se había reunido con el nuevo Presidente de CVG Bauxilum, el Sr. Jesús Calvo, el día anterior y conversaron, en particular, sobre el aumento de precios. El Sr. Pedersen escribió:

> *"Le expliqué la situación actual que tenemos con las propuestas de precios provenientes del contrato firmado con el presidente anterior y de qué manera esto afectaba nuestro negocio.*
> *Le pedí que reconsiderara su propuesta y recordara la obligación contractual que tenemos juntos.*
>
> *Primero, explicaron el aumento del peaje del río que tuvieron y cómo subieron sus costos. Luego, expliqué que obviamente pagaremos el aumento contractual en los costos de transporte, que entendemos que responde a la cláusula de inflación del contrato. El presidente entendió mi postura y me sugirió presentarle una propuesta escrita para considerarla*"[96]. [Traducción del Tribunal]

184.   El día 8 de junio de 2009, en una actualización del DAC de fecha 23 de octubre de 2006, Norpro Venezuela informó lo siguiente:

> *"El costo de la bauxita de nuestro principal proveedor, Bauxilum, aumentó un 34% a mediados del año 2008. Este aumento estuvo fuera del alcance de las disposiciones de nuestro contrato vigente. Bauxilum citó aumentos en los costos de transporte en barcaza (Peaje de Ríos), junto con el aumento en los costos mineros [sic] aumentos de precios. El día 15 de enero de 2009, se celebró una reunión con el presidente de Bauxilum para solicitar una reducción en el aumento impuesto. A pesar de los intentos permanentes por seguir tratando el tema, todavía esperamos su respuesta*"[97]. [Traducción del Tribunal]

185.   Norpro Venezuela nunca invocó el mecanismo de resolución de controversias de la Cláusula Décima Sexta del Contrato de Bauxita, es decir, el procedimiento arbitral ante el Centro de Conciliación y Arbitraje de la Cámara de Comercio de Caracas en relación con el aumento en el precio de la bauxita[98].

**2.   Segundo Aumento de Precios en el Mes de Marzo de 2010**

---

[95] Memorial, ¶ 53; **Anexo C-100**.
[96] **Anexo C-102**.
[97] **Anexo C-107**.
[98] **Anexo C-6**. Memorial de Contestación, ¶ 68, nota 185.

186. En una reunión llevada a cabo el día 10 de marzo de 2010, CVG Bauxilum le informó a Norpro Venezuela que pretendía aumentar el precio de la bauxita suministrada en el año 2010 a USD 51,28 por tonelada métrica[99]. Mediante una carta enviada al Sr. Cid el día 12 de abril de 2010, bajo el membrete del MIBAM, CVG y CVG Bauxilum, el Sr. Calvo confirmó el aumento de precio, nuevamente invocando la Cláusula Décima del Contrato de Bauxita[100]. La Demandante alega que se manifestó en contra de este aumento de precio, tanto en la reunión del día 10 de marzo de 2010 como en comunicaciones posteriores con CVG Bauxilum[101]. Otra reunión entre la Demandante y CVG Bauxilum programada para el día 18 de marzo de 2010 se canceló debido a una visita del Presidente Chávez al área[102]. Las partes del Contrato de Bauxita nunca se reunieron para seguir debatiendo sobre esta propuesta de aumento de precio y Norpro Venezuela nunca pagó este precio por la bauxita que compró a CVG Bauxilum[103].

## VII. PRODUCCIÓN Y VENTA DE *PROPPANTS* ANTES DE LA TOMA DE CONTROL DE LA PLANTA

187. Finalizada la construcción y obtenidos los permisos necesarios, la planta de *proppants* pasó a la fase de arranque. El día 26 de septiembre de 2008, la planta produjo sus primeros *proppants* comerciales y, el día 13 de diciembre de 2008, arribó a los Estados Unidos el primer envío de 1500 toneladas de *proppants* producidos en Venezuela[104].

188. Durante la primera parte del año 2009, la Demandante se centró en garantizar una cartera de clientes a largo plazo para su primera producción de *proppants* venezolanos. En el mercado norteamericano, si bien los operadores del campo del gas y el petróleo participan en la selección del tipo, cantidad, etc. de *proppants*, las empresas de servicios petroleros son las que compran los *proppants* al proveedor y luego los inyectan en los pozos perforados[105]. Es por eso que la Demandante quiso asegurarse un contrato de suministro a largo plazo con su mayor cliente—Halliburton, un importante proveedor de servicios petroleros—y diversificar su cartera de clientes en Norteamérica y Sudamérica[106].

189. El día 1 de abril de 2009, Norpro Venezuela, junto con otras dos plantas de *proppants* de Saint-Gobain, firmaron un Acuerdo Marco de Compraventa con Halliburton ("**AMC con Halliburton**")[107]. Conforme a este acuerdo, Halliburton acordó un arreglo de "*toma o paga*", comenzando con 40 millones de libras de *proppants* durante el segundo trimestre

---

[99] Memorial, ¶ 67; *Cfr.* Memorial de Contestación, ¶ 69.
[100] **Anexo C-16**.
[101] Memorial, ¶ 68; *Cfr.* Larry, ¶ 39, nota 7.
[102] Memorial, ¶ 68; **Anexo C-108**.
[103] Memorial de Contestación, ¶ 69.
[104] Memorial, ¶¶ 54-55; Pedersen, ¶ 45; Larry, ¶ 26.
[105] Memorial, ¶ 57.
[106] Millot, ¶ 17; Memorial, ¶ 58.
[107] Memorial, ¶ 59; **Anexo C-106**.

del año 2009, que aumentaría periódicamente hasta alcanzar un pico de 100 millones por cada trimestre del año 2011 y el primer trimestre del año 2012[108].

190. Los *proppants* que Norpro Venezuela produjo en Puerto Ordaz se almacenaron en la planta o en un depósito externo cerca del puerto venezolano. Además de los *proppants* que se vendieron en el mercado sudamericano (en general, de 60 a 100 toneladas por mes), se enviaban *proppants* de Venezuela a Corpus Christi, Estado de Texas. Una vez suscrito el AMC con Halliburton, la gran mayoría de los envíos de proppants se vendieron a Halliburton en virtud del contrato[109].

191. Antes de comenzar la producción, la Demandante trajo un grupo de fabricantes de Venezuela a su planta de proppants de Fort Smith, Estado de Arkansas, y los capacitó en los procesos de la planta. Los gerentes de Norpro Venezuela fueron enviados a Fort Smith para recibir capacitación adicional, además de la capacitación que se les brindó *in situ* en Puerto Ordaz[110]. La Demandante también envió operadores y personal de mantenimiento y control de calidad de Fort Smith a Puerto Ordaz para colaborar durante la fase de arranque que, según la Demandante, duró hasta el mes de agosto de 2009[111].

192. Norpro Venezuela utilizaba el método de producción "eficiencia general de los equipos" (*OEE*, por sus siglas en inglés). Este método calcula la eficiencia de la planta en función de su capacidad general. Según la Demandante, una planta que opera con una OEE de 85% se considera de primera clase, y su planta de *proppants* suele operar en un 80-87%[112].

193. Con respecto a la planta venezolana durante la fase de arranque, el Sr. Larry indicó en su primera declaración testimonial:

> "[L]*os ajustes son siempre necesarios durante la fase de arranque y, en una planta nueva, siempre hay un proceso de aprendizaje para empleados y gerentes. Ergo, como era de esperarse, la calidad y la cantidad de proppants producidos en Norpro Venezuela mejoraron durante la fase de arranque a medida que se perfeccionaban los procesos de producción de la planta en relación con el tiempo y la temperatura. Concretamente, para el mes de julio de 2009, la planta operaba con eficacia de manera continua. Según recuerdo, en función de las cifras de OEE, es claro que había aumentado la producción.*

---

[108] El Artículo 6, Tabla 1, del AMC con Halliburton establece que Halliburton debía tomar esas cantidades "*o 45% del total de compras de* proppants *cerámicos por parte del Comprador a todos sus proveedores, lo que sea inferior*". **Anexo C-106**. Según la Demandante, de esa manera, Halliburton tenía la opción de comprar el 45% del total de sus compras de *proppants* cerámicos de todos sus proveedores previa notificación fehaciente conforme al Artículo 6(b) del AMC con Halliburton. Memorial, ¶ 59, nota 126.

[109] Memorial, ¶ 60; Larry, ¶¶ 34-36.

[110] Larry, ¶ 27.

[111] Larry, ¶ 28; Memorial, ¶ 56.

[112] Memorial, ¶ 69; Larry, ¶ 29.

> *Para el mes de septiembre de 2009 [...], ya se habían afrontado todas las cuestiones técnicas relacionadas con la puesta en marcha de una planta nueva. Asimismo, Norpro Venezuela había capacitado una importante masa de trabajadores a fin de operar la planta de manera eficaz*"[113]. [Traducción del Tribunal]

194. En la actualización del DAC de fecha 8 de junio de 2009, se señaló que "[e]*l proyecto demoró tanto al principio como durante la fase de puesta en marcha en alcanzar los niveles de producción previstos*"[114]. [Traducción del Tribunal]

195. En el mes de noviembre de 2009, la planta se cerró temporalmente por razones controvertidas entre las Partes[115]. Dado que toda planta de *proppants* debe funcionar durante seis meses seguidos para alcanzar un "*equilibrio dinámico*", es decir, un OEE de 85% o, en el caso de la planta venezolana, una producción de aproximadamente 53.000 toneladas por año, la planta nunca alcanzó su capacidad de producción plena con dos mezcladoras. Para el mes de mayo de 2010, la planta producía 3400 toneladas de *proppants* por mes, lo que habría resultado en una producción anual de aproximadamente 42.000 toneladas[116].

196. En una presentación del Plan Estratégico 2011-2015, de fecha 18 de marzo de 2010, la Demandante expuso un "Plan de Acción de Venezuela" y señaló que "*se estaba enviando un equipo 'SURGE' a Venezuela para resolver ciertos problemas críticos*": (i) "*estabilidad de procesos*"; (ii) "*aditivos*"; (iii) "*enfoque en el mantenimiento preventivo*"; y (iv) "*formación de operadores*", y que el "*objetivo principal del equipo*" era "*auditar todos los procesos para garantizar la congruencia con los sistemas de control*" y "*Estabilizar, estabilizar, estabilizar*"[117]. [Traducción del Tribunal]

197. En otra presentación del Plan Estratégico 2011-2015, de fecha 4 de mayo de 2011, la Demandante señaló que "*La producción de la planta de Venezuela cayó desde mediados de marzo. Hay problemas relacionados con varias cuestiones esenciales*": (i) "*eliminación de la nueva fase de calcinación para mantener los niveles de producción*"; (ii) "*deterioro importante de los sistemas y controles dentro de la planta*" como consecuencia, entre otras cosas, de "*cuestiones laborales que hicieron que disminuyeran la cooperación y la productividad de los trabajadores*"; (iii) "*estabilidad de lotes afectada por cambios críticos*"; y (iv) "*alto nivel de fallas eléctricas durante el mes de*

---

[113] Larry, ¶ 30.
[114] **Anexo C-107.**
[115] Memorial, ¶ 65; Larry, ¶ 31; Memorial de Contestación, ¶ 18; Rondón, ¶ 20. *Véase, también,* ¶ 206 *infra.*
[116] Larry, ¶ 31; Memorial, ¶ 65.
[117] **Anexo CLEX-80; Anexo R-9.**

*abril debido a tareas de mantenimiento de EDELCA en Puerto Ordaz*"[118]. [Traducción del Tribunal]

## VIII. TENSIÓN LABORAL

198. Al momento de la puerta en marcha operativa de la planta, la mayoría de los trabajadores de la planta no eran empleados directos de Norpro Venezuela (o cualquiera de las filiales de la Demandante), sino de empresas tercerizadoras. Ya en el DAC de fecha 3 de febrero de 2005, la Demandante propuso la creación de una nueva filial en Venezuela en lugar de utilizar SGMC Venezuela (una de las filiales venezolanas de la Demandante), entre otros motivos, para "*evitar la creación de un sindicato*"[119]. En el DAC, se manifestó lo siguiente:

> "*En Venezuela, los empleados de cualquier empresa tienen derecho a crear un sindicato si la empresa tienen más de 25 empleados en total. Con los proyectos de* Proppants, *SGMC Venezuela tendría más de 25 empleados y la creación de un sindicato seria inevitable. Con una empresa nueva, limitaríamos la cantidad de empleados permanentes a 24 y emplearíamos terceros para el suministro de mano de obra temporal para mantener el equilibrio de nuestro empleo, una práctica habitual en Venezuela. Es por eso que proponemos crear una nueva empresa*"[120]. [Traducción del Tribunal]

199. El modelo de tercerización laboral al que se alude en el DAC se utilizó en Venezuela en ese entonces y se lo denominó precisamente "*tercerización*"[121].

200. Cuando el personal de operaciones y mantenimiento de Norpro Venezuela regresó de su capacitación en Fort Smith, Estado de Arkansas en el año 2008, se les informó que debían renunciar a sus cargos en Norpro Venezuela y que los volvería a contratar RH Consultores, una empresa tercerizadora de mano de obra[122]. En cuanto a las condiciones de los nuevos contratos, el Sr. Eduardo Rondón, testigo de la Demandada, indicó lo siguiente en su declaración testimonial:

---

[118] **Anexo CLEX-80; Anexo R-10**.

[119] La segunda razón consistía en que SGMC Venezuela era propietaria 100% de Carburo Del Caroni, un empresa adquirida recientemente, cuyo propietario anterior tenía importantes deudas con algunos terceros, incluso empleados, y se consideraba que existía el riesgo de que algunos acreedores del anterior propietario demandaran a Carburo del Caroni "*y se viera potencialmente afectada su controlante SGMC Venezuela*" ante la falta de pago por parte del propietario anterior. **Anexo C-057**.

[120] **Anexo C-057**.

[121] Memorial de Contestación, ¶ 14, nota 14. La tercerización se tornó ilícita en el año 2012, *Cfr*. Artículo 48 del Decreto N.º 8938, con Rango, Valor y Fuerza de Ley Orgánica del Trabajo, los Trabajadores y las Trabajadoras, publicado en la Gaceta Oficial N.º 6076 (extraordinario) el día 7 de mayo de 2012. **Anexo R-12**. *Véase, también,* ¶ 208 *infra*.

[122] Memorial de Contestación, ¶ 15; Rondón, ¶ 10.

> "*Uno de los cambios más importantes fue en materia de seguridad laboral. RH Consultores ofrecía contratos de sólo seis meses de duración. Estos contratos se renovaban por otros seis meses y, luego, por un tercer período de seis meses. Al cabo de esto, cabía la posibilidad de ser contratado como empleado mediante un contrato de duración ilimitada. De esta manera, los trabajadores atravesaban una suerte de períodos de prueba durante los cuales la empresa tercerizadora los empleaba sin la misma seguridad laboral y sin los mismos beneficios. Aunque el salario básico era el mismo, había ciertas diferencias importantes en cuanto a los beneficios. Recuerdo que los trabajadores empleados a través de RH Consultores sólo recibían un aguinaldo equivalente a medio salario mensual (el mínimo exigido por ley). No recibían ningún premio por desempeño. Gozaban de los aumentos salariales dispuestos por ley pero no había aumentos basados en el desempeño. Recuerdo oír algunas quejas de que estos aumentos ni siquiera alcanzaban para mantenerse a la par de la inflación. Aunque los 30-40 trabajadores afectados por la nueva política no se mostraron satisfechos, aceptaron el nuevo arreglo ya que Oswaldo Luna* [director de RR. HH.] *les había dejado en claro que esa era la única manera de conservar sus empleos*"[123]. [Traducción del Tribunal]

201. En el transcurso del año 2008, Norpro Venezuela contrató más trabajadores que se emplearon a través de RH Consultores; según el relato del Sr. Rondón, hacia fines del año 2008, había unos 70 trabajadores contratados por esta empresa tercerizadora[124].

202. El Sr. Rondón indicó, asimismo, en su declaración:

> "*A principios del año 2009, comenzaron a circular rumores entre los trabajadores de la Planta acerca de la posibilidad de intentar organizarse y formar un sindicato. La principal queja de los trabajadores eran los contratos de tercerización y la falta de seguridad laboral resultante.* […] *Los partidarios del sindicato eran empleados con mucha participación entre los miembros del personal de operaciones y mantenimiento de la Planta*"[125]. [Traducción del Tribunal]

203. Antes de crearse el sindicato, a algunos de estos trabajadores que, según el Sr. Rondón, "*la gerencia de la planta identificó como los principales agitadores del sindicato*"[126] [Traducción del Tribunal], se les rescindió el contrato. Norpro Venezuela también puso fin a su relación con RH Consultores y, el día 16 de junio de 2009, suscribió un nuevo acuerdo con la firma Outstaffing Corporation, otra empresa tercerizadora de

---

[123] Rondón, ¶ 11.
[124] Rondón, ¶ 13.
[125] Rondón, ¶ 14.
[126] Rondón, ¶ 15.

Venezuela[127]. En consecuencia, se comunicó a los trabajadores que se liquidarían sus contratos con RH Consultores, es decir, se les pagaría el tiempo remanente de sus contratos de seis meses, y que tendrían que firmar un nuevo contrato con Outstaffing Corporation[128].

204. El cambio de empresas tercerizadoras fue causa de una creciente disconformidad entre los trabajadores de la planta. El Sr. Rondón describió la situación en su declaración testimonial de la siguiente manera:

> "*Los trabajadores de la Planta consideraron esta maniobra* [es decir, el hecho de tener que firmar nuevos contratos con Outstaffing Corporation] *como prueba de que sus contratos se podían manipular e incluso rescindir en cualquier momento, sin ningún tipo de justificación.* […] *algunos de los trabajadores ya iban por el tercer contrato semestral con RH Consultores y, con esta maniobra, sus esperanzas de que el siguiente contrato sería directo y de duración ilimitada se desvanecieron, ya que Outstaffing Corporation sólo ofrecía contratos de 6 meses nuevamente. Los trabajadores se dieron cuenta de que las probabilidades de tener contratos directos, de duración ilimitada, con Norpro Venezuela no eran realistas. Si bien todos los trabajadores de la Planta terminaron suscribiendo los nuevos contratos con Outstaffing Corporation, esta medida hizo que más trabajadores apoyaran la idea de crear un sindicato*"[129]. [Traducción del Tribunal]

205. Pocos meses después, los organizadores del sindicato lograron obtener las firmas necesarias para formar un sindicato y así crearon el Sindicato Profesional de Trabajadores de Abrasivos y Cerámicos, Conexos y Similares ("**SINPROTRAC**")[130].

206. El día 15 de septiembre de 2009, Norpro Venezuela rescindió el contrato con el Sr. Luna, director de RR. HH., a quien Norpro Venezuela había empleado de manera directa[131]. Mediante carta de fecha 10 de octubre de 2009, Norpro Venezuela también rescindió el contrato con Outstaffing Corporation, con efecto a partir del día 13 de noviembre de 2009, lo que significó la rescisión de contratos de aproximadamente 70 trabajadores de la planta[132]. En la carta de rescisión, Norpro Venezuela confirmó que "*asum[ía] los costos*

---

[127] **Anexo ER-2**; Rondón, ¶ 15; Memorial de Contestación, ¶ 16.

[128] Memorial de Contestación, ¶ 16; Rondón, ¶ 17.

[129] Rondón, ¶ 17.

[130] Memorial de Contestación, ¶ 17; Rondón, ¶ 18.

[131] Más tarde, el Sr. Luna inició una demanda por despido injustificado contra Norpro Venezuela, ratificada por el Tribunal de Primera Instancia de Juicio del Trabajo, Estado Bolívar, Extensión Territorial Puerto Ordaz, el día 14 de octubre de 2010. **Anexo ER-3**. La apelación del fallo se consideró infundada y la decisión de fecha 14 de octubre de 2010 fue ratificada por el Tribunal Superior Tercero del Trabajo, Estado Bolívar, Extensión Territorial, el día 13 de julio de 2011. **Anexo ER-4**. Rondón, ¶ 18.

[132] Memorial de Contestación, ¶ 17; Rondón, ¶ 19; **Anexo ER-6**.

*[derivados] de la rescisión del Acuerdo que [fueran] facturados por OUTSTAFFING CORPORATION, C.A con posterioridad al 13 de noviembre de 2009"* [133].

207.  Según la Demandada, el *"despido masivo de trabajadores"* fue el verdadero motivo del cierre de la planta en el mes de noviembre de 2009, que duró hasta el mes de enero de 2010, no la *"serie de mejoras mecánicas"* que el Sr. Larry mencionó en su declaración testimonial [134]; la Demandada admite, no obstante, que *"Norpro Venezuela sí utilizó el cierre de la Planta del mes de noviembre de 2009 para llevar a cabo ciertas reparaciones y mejoras"* [135]. [Traducción del Tribunal]

208.  Tras la rescisión de su contrato con Outstaffing Corporation, Norpro Venezuela suscribió nuevos contratos con otras tres empresas tercerizadoras: Gestión Industrial Bolívar, C.A., Gerencia de Personal Guayana, C.A. y Guayana Internacional Cargo, C.A. A través de estas empresas, se volvió a contratar a la mitad de los trabajadores de la planta. Según el Sr. Rondón, la otra mitad se unió a los líderes sindicales de SINPROTRAC *"y comenzó a realizar manifestaciones diarias frente a la Planta de Norpro Venezuela"* [136]. [Traducción del Tribunal]

209.  La tensión entre la gerencia de Norpro Venezuela y SINPROTRAC no fue un caso aislado en el área, sino que, en ese momento, se experimentaba tensión laboral en todo el sector industrial de Ciudad Guayana. Los trabajadores de las industrias del hierro, el acero y el aluminio exigieron públicamente poner fin a las prácticas laborales injustas. Una de sus principales quejas eran los acuerdos laborales de tercerización. Además, había una iniciativa nacional para retener el control de los recursos naturales de Venezuela y procesos posteriores de fabricación y refinamiento vinculados, a fin de que Venezuela pudiera gozar de los potenciales beneficios económicos y sociales de esos sectores. En consecuencia, a mediados del año 2009, se formaron grupos de trabajo que desarrollaron y ejecutaron el Plan Guayana Socialista, cuyo objeto era lograr la participación de los

---

[133] **Anexo ER-6**. Trece trabajadores con contratos rescindidos en este contexto presentaron una solicitud de reenganche y pago de salarios caídos ante la Sala de Fueros de la Inspectoría del Trabajo "Alfredo Maneiro" el día 14 de diciembre de 2009. Mediante decisión administrativa de fecha 15 de abril de 2010, se ordenó a Outstaffing Corporation reenganchar de inmediato a los trece trabajadores y pagar sus salarios caídos desde la fecha de despido el día 12 de diciembre de 2009 hasta la fecha de reincorporación definitiva a sus puestos de trabajo, dado que *"se efectuaron los despidos sin que estuviese autorizado para ello mediante proceso de calificación de falla"*. **Anexo ER-8**. El día 29 de julio de 2010, los mismos trabajadores presentaron una demanda contra Outstaffing Corporation ante el Juez de Primera Instancia de Sustanciación, Mediación y Ejecución, Estado Bolívar, mediante la cual alegaban que el motivo de su despido fue el hecho de haber intentado negociar un convenio colectivo de trabajo en nombre de SINPROTRAC. **Anexo ER-7**.

[134] Larry, ¶ 31.

[135] Memorial de Contestación, ¶ 18; Rondón, ¶ 20.

[136] Rondón, ¶ 21.

trabajadores gerenciales y administrativos de las industrias básicas y, entre otras cosas, mejorar las condiciones laborales[137].

210. En la presentación de la Demandante de fecha 18 de marzo de 2010 sobre el Plan Estratégico 2011-2015, una de las principales cuestiones fue "*El intenso enfoque en la seguridad del equipo externo* [en referencia al equipo SURGE que atendería las cuestiones operacionales]": (i) "*Todos los miembros del equipo de Mara Inn*"; (ii) "*Las restricciones sobre las actividades fuera del hotel*"; (iii) "*Traslado hacia/desde la planta controlada*"; y (iv) "*Directivas emitidas sobre conflictos de trabajadores*"[138]. [Traducción del Tribunal]

## IX.  LA TOMA DE CONTROL TEMPORAL DE LA PLANTA DE FECHA 24 DE MARZO DE 2010

211. El día 24 de marzo de 2010, alrededor de 40 personas, un grupo de ex trabajadores de una empresa tercerizadora que había utilizado Norpro Venezuela, se reunieron fuera de la planta, lograron ingresar y ocuparon el área operativa de la planta durante aproximadamente cuatro horas[139]. Entre esas personas, estaban el Sr. Ángel Marcano, miembro de la Asamblea Nacional de Venezuela, y el Sr. Asdrúbal López, miembro de la Asamblea Legislativa del Estado Bolívar y del partido gobernantes del Presidente Chávez[140]. Su rol dentro del grupo es objeto de controversia entre las Partes[141].

212. También estuvieron presentes el Sr. Vicent Acosta Williams Jose, Secretario General de SINPROTRAC, y otros miembros líderes del sindicato. En la Solicitud de Inspección Judicial que presentó Norpro Venezuela ese mismo día, el Sr. Jose también aparece como el primero de los cinco individuos identificados al frente de la toma de control; el Sr. Marcano y el Sr. López no estaban entre esos cinco individuos[142]. En una de las fotografías que tomó el inspector judicial, se puede apreciar un anuncio que decía: "*La masa obrera unidos en apoyo a nuestros compañeros despedidos por causa injustificada. Norpro, exigimos reenganche ya*"[143].

213. Cuando el líder del sindicato tomó un megáfono y pidió a los trabajadores de la planta que interrumpieran su labor, la gerencia de Norpro Venezuela apagó los equipos principales de la planta y colocó el horno en modo inactivo. Aunque retomaron el control de la planta al día siguiente, las Partes discrepan en cuanto al tiempo que llevó volver a

---

[137] Memorial de Contestación, ¶ 20, nota 57; Rondón, ¶ 25; **Anexos C-14 y ER-9**.
[138] **Anexos CLEX-80 y R-9**.
[139] Larry, ¶ 41; Rondón, ¶ 24.
[140] Memorial, ¶ 69.
[141] *Cfr.* Memorial, ¶¶ 69, 71; Dúplica, ¶ 10.
[142] **Anexos C-15 y R-14**.
[143] **Anexos C-15 y R-14**.

poner en marcha la producción de la planta[144]. Según la Demandante, el grupo también dañó la puerta de ingreso principal de la planta, destrozó el candado y bloqueó la entrada; también impidió que los empleados desarrollaran sus actividades habituales en la planta y obligó a los empleados de Norpro Venezuela a abandonar las áreas de producción de la planta[145]. La Guardia Nacional que Norpro Venezuela había contratado para brindar seguridad a la planta no intervino[146].

214. En respuesta a la toma de control, Norpro Venezuela solicitó una inspección judicial durante la cual el juez documentó los nombres de los individuos que participaron en la toma de control, identificó a los líderes de la toma y detalló los daños causados[147]. Tras confrontarse con el juez, el grupo abandonó la planta, pero varios miembros permanecieron afuera y siguieron bloqueando, de manera parcial, parte de la entrada[148].

215. En su presentación de fecha 4 de mayo de 2010 sobre el Plan Estratégico 2011-2015, la Demandante señaló que "*El contrato de tercerización con Black Union vence el día 21 de mayo*": (i) "*Se prevé una situación de inestabilidad laboral para la segunda mitad de mayo*"; y (ii) "*Nuevamente, la experiencia de los operadores y del personal de mantenimiento será un problema*". Con respecto a la "*Cuestión clave*" "*Personal (Inestable => rotación frecuente => a causa de factores externos*", se establecieron las siguientes medidas en el Plan: (i) "*Sindicalizar el sitio mediante la creación de 2 sindicatos: uno para los empleados de SG, otro para la mano de obra tercerizada => utilizar los sindicatos para reducir la presión externa y promover cierta estabilidad*"; (ii) "*mantener la estrategia de tercerización de más de una fuente*"; (iii) "*extender los contratos laborales de 6 meses a 1-3 años*"; (iv) "*estudiar la introducción de un plan de beneficios asequible para reducir la rotación del personal y la tensión laboral*"; y (v) "*promover la estabilidad a través de una mejor comunicación con los empleados*"[149]. [Traducción del Tribunal]

## X.    LA TOMA DE CONTROL DEFINITIVA DE LA PLANTA DE FECHA 15 DE MAYO DE 2010

216. El día 15 de mayo de 2010, se presentaron las conclusiones de los grupos de trabajo del Plan Guayana Socialista al Presidente Chávez durante una ceremonia pública, que también se transmitió en vivo por televisión y radio. Durante la presentación, el Presidente Chávez leyó y aprobó ciertas propuestas de los grupos de trabajo, entre ellas, las

---

[144] Memorial, ¶ 73; Millot, ¶ 23; Rondón, ¶ 24.
[145] Memorial, ¶ 69.
[146] Memorial, ¶ 70.
[147] **Anexo C-15**.
[148] Memorial, ¶ 72; **Anexo C-15**.
[149] **Anexos CLEX-80** y **R-10**.

relacionadas con Norpro Venezuela. A continuación, se proporciona la transcripción oficial de las partes relevantes de la radiodifusión:

> "*Consultar con PDVSA sobre la compra de Propan*[ts] *producido y comercializado por la empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario – aquí* [en el documento] *se sugiere – la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela*"[150].

217. Ese mismo día, llegó un grupo local a la Planta, que venía directamente del evento en el que había hablado el Presidente Chávez[151]. De nuevo, el grupo incluía a los Sres. Marcano y López[152], además de miembros de SINPROTRAC[153]. Oscar Cid, Pierre Gramond y Eric Dixon de Norpro Venezuela también llegaron al lugar, tomaron algunos objetos personales, sus computadoras portátiles y documentos y, aunque el grupo intentó detenerlos, finalmente abandonaron la planta[154]. Alrededor de 4.000 toneladas de *proppants* terminados, almacenados *in situ*, permanecieron dentro de la planta; había un envío programado para el día 17 de mayo de 2010 que se debió cancelar[155].

218. Norpro Venezuela solicitó una nueva inspección judicial que dejara constancia de los hechos, la cual se llevó a cabo el día 17 de mayo de 2010. El poder judicial local señaló que (i) cuando los empleados de Norpro Venezuela fueron a trabajar el lunes 17 de mayo de 2010, se les negó acceso a la planta; (ii) los Sres. Marcano y López también impidieron el acceso del inspector judicial y directivos de Norpro Venezuela, y manifestaron actuar para el Plan Guayana Socialista, bajo instrucciones del Presidente Chávez; (iii) había un anuncio de SINPROTRAC colgado de la puerta principal de la planta; y (iv) el grupo que organizó la toma de control se rehusó a aceptar el memorando de Norpro Venezuela en el que se le solicitaba, entre otras cosas, la designación de un representante para llevar a cabo las negociaciones pertinentes[156].

219. El día 18 de mayo de 2010, la Oficina de Comunicación y Relaciones Institucionales publicó un resumen de medios nacionales e internacionales, incluida una noticia de *El Nacional* según la cual:

> "*Trabajadores contratados de la empresa Norpro de Venezuela tomaron la fábrica después del anuncio de nacionalización del*

---

[150] **Anexo R-15**.

[151] Memorial, ¶ 77; Rondón, ¶28.

[152] **Anexo C-20**.

[153] Rondón, ¶ 28.

[154] Rondón, ¶¶ 28-29.

[155] Memorial, ¶¶ 78-79; Larry, ¶ 44.

[156] Memorial, ¶ 81; **Anexo C-20**.

> *presidente Hugo Chávez. Con la Guardia Nacional y una comisión presidida por el diputado de la Asamblea Nacional, Ángel Marcano, los trabajadores impidieron al apoderado legal de la empresa privada entrar a las instalaciones*"[157].

220. Mediante cartas de fechas 19 y 27 de mayo de 2010, el Sr. Páez le comunicó al Sr. Rafael Ramírez, Presidente de PDVSA y Ministro de Hidrocarburos (Ministerio de Petróleo y Minería), y al Sr. José Khan, Presidente de CVG y Ministro del MIBAM, que el día 15 de mayo de 2010 se había expropiado la inversión de la Demandante, y ofreció asistencia técnica para garantizar el uso correcto de los equipos y la seguridad del personal *in situ*. También solicitó la designación de un interlocutor oficial con quien la Demandante pudiera debatir sobre la expropiación[158].

221. Los días 24 y 27 de mayo de 2010, directivos de PDVSA, PDVSA Exploration and Production East y PDVSA Industrial visitaron la planta[159]. Según un comunicado de prensa publicado en *Prensa Unete*, estos directivos actuaron bajo instrucciones directas del Ministro Ramírez[160].

222. En los meses de mayo y junio de 2010, PDVSA preparó los siguientes informes y presentaciones:

- "*EVALUACIÓN GLOBAL DE LA SITUACIÓN ACTUAL DE LA EMPRESA NORPRO VENEZUELA C.A.*", mayo de 2010 (informe preliminar preparado por PDVSA E&P)[161];

- "*Sector Hidrocarburos – PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO DE VENEZUELA, C.A.*", mayo de 2010 (presentación de PowerPoint preparada por PDVSA Industrial)[162];

- "*DIAGNÓSTICO SITUACIÓN ACTUAL Y PLAN DE REESTRUCTURACIÓN PARA LA OPTIMIZACIÓN DE PROCESOS PRODUCTIVOS DE NORPRO VENEZUELA, C.A.*", junio de 2010 (presentación de PowerPoint preparada por PDVSA Industrial)[163]; y

---

[157] **Anexo C-114**.
[158] Memorial, ¶¶ 82, 84, 89, 95. **Anexo C-22; Anexo C-23**.
[159] Memorial, ¶ 84; Memorial de Contestación, ¶ 28.
[160] **Anexo C-123**.
[161] **Anexo C-141**.
[162] **Anexo C-111**.
[163] **Anexo C-142**.

-    "*SITUACIÓN ACTUAL DE PROCESO DE ESTATIZACIÓN EMPRESA NORPRO DE VENEZUELA, C.A. (NORPRO)*", 2 de junio de 2010 (memorando interno preparado por PDVSA Industrial)[164].

223.    Los días 2 y 8 de junio de 2010, se celebraron reuniones entre Norpro Venezuela, PDVSA y otros. Las actas de reuniones se titulan: "*PROCESO DE NACIONALIZACIÓN NORPRO VENEZUELA, C.A.*"[165].

224.    El día 8 de junio de 2010, el Sr. Guy Rolli le escribió al Sr. Temir Porras, Viceministro de Relaciones Exteriores para Europa, en referencia a los comunicados de prensa según los cuales PDVSA estaba involucrada en la expropiación y los equipos de la planta se habían dañado durante los hechos del 15 de mayo de 2010 y con posterioridad. Asimismo, reiteró la solicitud de la Demandante de designarse un interlocutor oficial y la oferta de asistencia técnica de la Demandante[166].

225.    Mediante carta de fecha 6 de julio de 2010, dirigida al Ministro Ramírez, el Sr. Páez reiteró la oferta de asistencia técnica de la Demandante, a fin de garantizar el uso correcto de los equipos y la seguridad del personal *in situ*[167].

226.    Mediante carta del 3 de agosto de 2010, dirigida al Sr. Eulogio del Pino, Vicepresidente del área de Exploración y Producción de PDVSA, el Sr. Patrick Dupin, Presidente de la Demandante, reiteró la inquietud de la Demandante con respecto a los daños que podrían sufrir los trabajadores de la planta y los bienes de Norpro Venezuela. El Sr. Dupin aludió a los comunicados de prensa en los que se dejaba constancia que el horno de la planta no funcionaba y que PDVSA planeaba repararlo en breve. Asimismo, reiteró las solicitudes de la Demandante en relación con la "*designación inmediata de un interlocutor autorizado que determine cuáles son los pasos a seguir para completar el proceso de nacionalización de la Planta y su cesión de PDVSA, tal como ordenó el Presidente Chávez*". Además de solicitar una reunión con PDVSA, el Sr. Dupin confirmó la predisposición de la Demandante para "*analizar la posibilidad de brindar a PDVSA la asistencia técnica necesaria para poner en marcha y operar la Planta de manera correcta*"[168]. [Traducción del Tribunal]

227.    El día 5 de agosto de 2010, Norpro Venezuela solicitó otras inspección judicial, en la que se dejó constancia que había una bandera roja de "*PDVSA*" flameando arriba de la planta y que la puerta de la planta se había pintado de color rojo brillante. Otra vez más, ese día,

---

[164] **Anexo C-143**.
[165] **Anexo C-25.**
[166] Memorial, ¶ 97; **Anexo C-26**.
[167] **Anexo C-28**.
[168] **Anexo C-30.**

se impidió el acceso a la planta de funcionarios judiciales y gerentes de Norpro Venezuela[169].

228. Poco después de la toma de control del día 15 de mayo de 2010, Norpro Venezuela comenzó a notificar a sus socios contractuales de Venezuela, incluso a INPSASEL y CVG EDELCA, que había ocurrido una causa extraña no imputable[170]. En el mes de agosto de 2010, Norpro Venezuela publicó notificaciones de fuerza mayor en periódicos venezolanos, como *Ciudadanos Nacional* (una sub-sección de *El Nacional*) y *Correo del Caroní*[171]. Por esa fecha, Norpro Venezuela despidió oficialmente a la mayor parte de sus empleados, y sólo retuvo a ciertos individuos que le permitirían a la Demandante brindar asistencia técnica en caso de que el Gobierno venezolano aceptase dicha oferta[172].

## XI. NEGOCIACIONES POSTERIORES A LA TOMA DE CONTROL DE LA PLANTA

## 1. La reunión de fecha 30 de agosto de 2010

229. El día 30 de agosto de 2010, se celebró una reunión entre PDVSA Industrial, Compagnie de Saint-Gobain y la Embajada de la República Francesa en Venezuela[173]. Según la minuta de dicha reunión, PDVSA Industrial realizó las siguientes afirmaciones y planteó los siguientes temas[174]:

- PDVSA Industrial había recibido instrucciones precisas del Presidente Chávez de llevar a cabo la estatización de Norpro Venezuela y acataría dicha orden con la mayor diligencia;

- Se estaba preparando un decreto de expropiación y, si bien PDVSA Industrial no tenía conocimiento de la fecha exacta de su publicación, sería conveniente que se publicara con anterioridad al día 15 de noviembre de 2010, fecha en la que expiraría el plazo de seis meses previsto en el Artículo 8(1) del Tratado;

- Norpro Venezuela y sus accionistas tenían la libertad de entablar acciones legales en aras de salvaguardar sus derechos en virtud del derecho aplicable y, en particular, en materia laboral y de seguridad en el trabajo;

---

[169] **Anexo C-31**; Memorial, ¶ 86.

[170] Memorial, ¶ 98; **Anexo C-21**; **Anexo C-27**.

[171] Memorial, ¶ 98; **Anexo C-32**; **Anexo C-33**.

[172] Memorial, ¶ 98; Millot, ¶ 25.

[173] Memorial, ¶ 99; Memorial de Contestación, ¶ 29.

[174] **Anexo C-34**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-17**. Aunque el documento presentado lleva la nota "*BORRADOR PARA DISCUSIÓN*", no parece estar discutido que la minuta de la reunión se firmó durante la siguiente reunión el día 14 de octubre de 2010. **Anexo C-36**.

- Sin perjuicio de la instrucción de llevar a cabo la estatización de Norpro Venezuela, PDVSA Industrial se encontraba "*abierta a considerar cualquier propuesta que los accionistas de Norpro t*[uvieran] *a bien presentar con el objeto de llevar a cabo la toma de control y transferencia a PDVSA de los activos pertenecientes a Norpro, de forma amistosa y concertada*", pero PDVSA Industrial les exigió una manifestación de voluntad escrita a los accionistas a fin de obtener las autorizaciones necesarias "*para considerar cualquier mecanismo alterno a la expropiación que permita la resolución amistosa de la controversia*";

- Mientras no se hubiera publicado el decreto de expropiación, PDVSA Industrial no podía actuar o intervenir en Norpro Venezuela, y su presencia en la planta "*corresponde a la necesidad de prepararse para la futura toma formal de posesión, una vez que se realice la publicación del Decreto*".

230. Compagnie de Saint-Gobain realizó las siguientes afirmaciones y planteó los siguientes temas durante la reunión[175]:

- Compagnie de Saint-Gobain agradeció a los representantes de PDVSA Industrial por haber respondido a su solicitud escrita de reunión y recordó que el proyecto siempre se había llevado a cabo "*con el apoyo y auspicio*" del MIBAM y diversas otras autoridades gubernamentales venezolanas;

- Compagnie de Saint-Gobain ratificó lo expuesto en las diversas comunicaciones enviadas desde el día 15 de mayo de 2015 relativas a la ocupación de la planta y confirmó su "*intención de cooperar con las autoridades en lo relacionado con la estatización de Norpro, con el fin de solucionar cualquier controversia de forma amistosa, conforme a las disposiciones del Acuerdo*";

- Compagnie de Saint-Gobain reiteró su disposición para prestarle asistencia técnica a PDVSA Industrial con respecto al control de calidad de los productos y a la estandarización del proceso si PDVSA Industrial lo requería, y propuso realizar una minuciosa inspección técnica de la planta con el propósito de reiniciar su producción y formar una comisión técnica a efectos de estudiar la forma que puede adoptar la asistencia técnica;

- Compagnie de Saint-Gobain "*expresó su interés en considerar su eventual* 'Take Off Agreement' *o acuerdo de compra de los productos que PDVSA llegue a fabricar en la planta de Norpro con posterioridad a su expropiación, sujeto a condiciones que deberán precisarse y acordarse oportunamente, incluyendo especificaciones,*

---

[175] **Anexo C-34**. Citas del original en español. Ver también traducción al inglés presentadas por la Demandada como **Anexo R-17**.

*características técnicas y estándares de calidad de los productos. Esta propuesta no podría exceder la mitad de la capacidad de la planta debido a la pérdida de clientes que no han podido ser atendidos a partir del 15 de mayo de 2010 al ordenarse la estatización de la empresa*";

- Compagnie de Saint-Gobain reiteró su interés en "*que se aclare la situación jurídica de la inversión realizada en Venezuela por* [la Demandante]*, por medio de su subsidiaria Norpro, sobre cuya planta no posee control desde la fecha del anuncio presidencial del 15 de mayo de 2010*" y le pidió a PDVSA Industrial que aclarara cuándo se publicaría el decreto de expropiación, a la luz del vencimiento del plazo de seis meses en virtud del Artículo 8(1) del Tratado el día 15 de noviembre de 2010;

- Compagnie de Saint-Gobain tenía interés en llegar a un acuerdo marco con PDVSA Industrial sobre los puntos básicos relacionados con la estatización de Norpro Venezuela y en "*analizar con PDVSA mecanismos que permitan resolver de forma amistosa la controversia, conforme a lo previsto bajo el Acuerdo, como por ejemplo la compraventa de acciones en sustitución de un procedimiento de expropiación*".

231. Durante la reunión de fecha 30 de agosto de 2010, PDVSA Industrial y Compagnie de Saint-Gobain acordaron lo siguiente: (i) redactar y suscribir una minuta de la reunión; (ii) "[s]*ostener reuniones periódicas con el objeto de analizar temas de común interés relacionados con la estatización de Norpro*"; (iii) mantener una comunicación abierta entre las partes; y (iv) celebrar una reunión de la comisión técnica el día 13 de septiembre de 2010[176].

**2.    La reunión de fecha 14 de octubre de 2010**

232. El día 14 de octubre de 2010, la comisión técnica conjunta, a la que asistieron representantes de PDVSA Industrial y Norpro Venezuela en nombre de Compagnie de Saint-Gobain, celebró su primera reunión[177].

233. Según el borrador de la minuta de dicha reunión, Norpro Venezuela realizó las siguientes afirmaciones y planteó los siguientes temas[178]:

- Norpro Venezuela preguntó si PDVSA Industrial tenía información acerca del estado de la redacción del decreto de expropiación y su posible fecha de publicación (la respuesta de PDVSA Industrial fue negativa, pero afirmó que había recibido sus

---

[176] **Anexo C-34**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-17**

[177] Memorial, ¶ 100; Memorial de Contestación, ¶ 30.

[178] **Anexo C-36**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-70**. Aunque parece surgir del expediente que esta minuta de reunión nunca se suscribió, su contenido no parece ser objeto de debate entre las Partes.

instrucciones de conformidad con las declaraciones efectuadas por el Presidente Chávez el día 15 de mayo de 2010);

- Norpro Venezuela brindó una presentación electrónica, denominada "*Tour Virtual de la Planta*", describió su propuesta de asistencia técnica y explicó la necesidad de disponer de un control operacional de calidad, así como de realizar una evaluación y un diagnóstico de las condiciones reales de la planta.

234. PDVSA Industrial realizó las siguientes afirmaciones y planteó los siguientes temas durante la reunión[179]:

- PDVSA Industrial aclaró que "*el alcance y propósito de la reunión es de índole técnico*" y "*todo lo referente a aspectos legales del proceso de estatización deberá analizarse con la Consultoría Jurídica de PDVSA*";

- PDVSA Industrial solicitó información adicional sobre la propuesta de asistencia técnica (las preguntas fueron contestadas por Norpro Venezuela) y sugirió que, además de la propuesta de asistencia técnica, "*se explor*[aran] *otras estructuras*" que les permitieran ejecutar la estatización, haciendo referencia a otros casos en los que PDVSA Industrial y los respectivos propietarios de los bienes estatizados habían creado empresas mixtas, respecto de las cuales PDVSA Industrial mantenía el control y una participación mayoritaria;

- PDVSA Industrial preguntó por la situación ambiental de la planta que fue descripta por Norpro Venezuela como "*muy limpia*" y en cumplimiento de todas las leyes aplicables y los permisos emitidos por el Ministerio del Poder Popular para el Ambiente;

- PDVSA Industrial solicitó información sobre la capacidad de producción de la planta, que Norpro Venezuela proporcionó con una explicación del desarrollo en dos fases, la primera de las cuales "*se ejecutó en su totalidad*" con 70.000 toneladas por año y la segunda de las cuales estaba destinada a iniciarse en breve, a fin de duplicar la capacidad.

235. Durante la reunión de fecha 14 de octubre de 2010, PDVSA Industrial y Norpro Venezuela acordaron lo siguiente: (i) firmar la minuta de la reunión de fecha 30 de agosto; (ii) redactar y suscribir una minuta de esta reunión; y (iii) fijar el día 8 de noviembre de 2010 como fecha tentativa para una nueva reunión[180].

---

[179] **Anexo C-36**. Citas del original en español. Ver también traducción al inglés presentada or la Demandada como **Anexo R-70**

[180] **Anexo C-36**; **Anexo R-70**.

### 3.    Correspondencia adicional y reunión de fecha 26 de octubre de 2010

236.   Mediante un correo electrónico de fecha 22 de octubre de 2010, Gabriel Rojas de la Consultoría Jurídica de PDVSA Industrial le escribió a Luis Páez (Presidente de Norpro Venezuela) y propuso el siguiente acuerdo:

"*1)    NORPRO hará entrega material a PDVSA Industrial* [de] *la planta, productos existentes y materia prima;*

*2)    PDVSA Industrial asumirá el control y la responsabilidad sobre la planta, productos, materia prima y de las operaciones;*

*3)    PDVSA Industrial asumirá la responsabilidad de contratar al personal necesario para la operación de la planta;*

*4)    NORPRO acompañará y asegurará a PDVSA Industrial la puesta en pleno funcionamiento de la planta, atendiendo a todos los parámetros de seguridad;*

*5)    Se realizará un levantamiento de información sobre el estado de las instalaciones y sus condiciones de operatividad actuales, a los fines de determinar el valor justo de dicha infraestructura, productos y materias primas*"[181].

237.   El Sr. Rojas aclaró que esta propuesta se realizaba "*sin menoscabo de la posible constitución de una empresa estatal de capital mixto*" e invitó a Norpro Venezuela a celebrar una reunión en aras de analizar la propuesta[182].

238.   El día 26 de octubre de 2010, se celebró una reunión entre el Sr. Armando Giraud, el Consejero General de PDVSA, representantes de PDVSA Industrial, Norpro Venezuela y la Embajada de la República Francesa. En esa reunión, el Sr. Giraud describió brevemente la posibilidad de que Norpro Venezuela celebrara un acuerdo de empresa mixta con PDVSA, en virtud del cual la última conservaría una participación del 60 % en el emprendimiento[183]. Las Partes disienten en cuanto a si el Sr. Giraud presentó una "*propuesta suficientemente avanzada*"[184][Traducción del Tribunal], o, más bien, una mera sugerencia, que tendría que haber sido sustentada con documentos concretos luego de la reunión a fin de que la Demandante la considerara seriamente[185].

---

[181] **Anexo C-121**. Citas del original en español. Ver también traducción al inglés presentado por la Demandada como **Anexo R-71**.

[182] **Anexo C-121**. Citas del original en español. Ver también traducción al inglés presentada por la Demandada como **Anexo R-71**.

[183] Memorial, ¶ 102; Memorial de Contestación, ¶ 31.

[184] Escrito Posterior a la Audiencia de la Demandada, nota 101.

[185] Segunda Presentación Posterior a la Audiencia de la Demandante, § 23. Cuando durante su contrainterrogatorio le preguntaron si el Sr. Giraud había realizado una propuesta en esa reunión, el Sr. Millot afirmó lo siguiente: "*No es una propuesta sino una sugerencia. Yo no la llamaría una propuesta, una propuesta habría sido distinta.* […]

239. En su correo electrónico de seguimiento de fecha 1 de noviembre de 2010 dirigido al Sr. Giraud, el Sr. Paúl destacó que la Demandante pretendía recibir los documentos que PDVSA había prometido proporcionar, incluido el borrador de estatuto y un acuerdo a efectos de la empresa mixta sugerida[186].

240. En su carta de fecha 18 de noviembre de 2010, el Sr. Páez informó al Sr. Giraud de que, el día 2 de noviembre de 2010, dos funcionarios de PDVSA, escoltados por miembros armados de la Guardia Nacional, habían abordado a Oscar Cid y Pierre-Yves Grammond de Norpro Venezuela y les habían exigido que entregaran los vehículos de la empresa, dado que los funcionarios de PDVSA decían tener instrucciones de reunir los bienes de Norpro Venezuela para la inspección judicial de la compañía. El Sr. Páez solicitó que el Sr. Giraud presentara los documentos en virtud de los cuales esos funcionarios de PDVSA estaban autorizados a confiscar los bienes de Norpro Venezuela, considerando, en particular, que, durante la reunión de fecha 26 de octubre de 2010, las partes habían acordado analizar alternativas a la expropiación de Norpro Venezuela. Por ende, el Sr. Páez reiteró el ofrecimiento de la Demandante de prestarle asistencia técnica a PDVSA[187].

241. En otro correo electrónico dirigido al Sr. Giraud de fecha 19 de noviembre de 2010, el Sr. Paúl adjuntó la carta del Sr. Páez de fecha 18 de noviembre de 2010, así como fotografías tomadas a los vehículos de la empresa confiscados y copias de las identificaciones de los dos funcionarios de PDVSA. Asimismo, resaltó que la Demandante todavía no había recibido los documentos prometidos en relación con la empresa mixta sugerida[188].

242. En su carta al Sr. Giraud de fecha 19 de enero de 2011, el Sr. Páez afirmó que la Demandante seguía estando dispuesta a analizar las alternativas a la expropiación que el

Sr. Giraud había sugerido durante la reunión el día 26 de octubre 2010 y subrayó que la Demandante aún no había recibido los documentos que el Sr. Giraud había prometido entregar a la Demandante para que esta última considerase la propuesta de empresa mixta realizada por el Sr. Giraud. El Sr. Páez resaltó que la Demandante estaba dispuesta a reunirse con PDVSA a fin de analizar las alternativas mencionadas[189].

243. En su carta al Sr. Giraud de fecha 3 de marzo de 2011, el Sr. Páez aseveró que no había recibido respuesta alguna a las cartas que había enviado luego de la reunión el día 26 de octubre de 2010 y reiteró que la Demandante todavía no había recibido los documentos

---

*Creo que el señor Giraud hizo una sugerencia, no sé qué tan bien documentada estuvo esa propuesta. Nosotros, según me acuerdo, no recibimos nada en concreto después de esa reunión"*. Transcripción (Día 2), pág. 414, líneas 9-17. *Véase* también Millot, ¶ 31.

[186] **Anexo C-151.**

[187] **Anexo C-122.**

[188] **Anexo C-151.**

[189] **Anexo C-37.**

en relación con la empresa mixta sugerida. El Sr. Páez finalizó solicitando una reunión para analizar las alternativas que el Sr. Giraud había propuesto durante la reunión de fecha 26 de octubre de 2010[190].

244. En su carta al Sr. del Pino de fecha 21 de marzo de 2011, el Sr. Páez afirmó que no había habido ninguna comunicación con PDVSA después de la reunión de fecha 26 de octubre de 2010, en tanto no había recibido respuesta alguna a sus cartas de seguimiento. El Sr. Páez destacó que había pasado casi un año desde que se había anunciado la expropiación de Norpro Venezuela y, para su sorpresa, las negociaciones que habían comenzado en el mes de agosto de 2010 se habían estancado. Por último, reiteró su solicitud de reunión en aras de resolver la controversia de manera amistosa[191].

## XII. EL DECRETO DE EXPROPIACIÓN Y LA CORRESPONDENCIA DE SEGUIMIENTO

245. El día 29 de marzo de 2011, la Demandada publicó el Decreto N.º 8.133 en la Gaceta Oficial N.º 39.644 (el **"Decreto de Expropiación"**)[192]:

*"[…] en ejercicio de las atribuciones que le confieren los artículos 115, 226 y 236 numeral 2 de la Constitución de la República Bolivariana de Venezuela, en concordancia con lo dispuesto en los artículos 4º de la Ley Orgánica de Hidrocarburos, 4º del Decreto con Rango, Valor y Fuerza de Ley Orgánica de Hidrocarburos Gaseosos, 5º de la Ley de Expropiación por Causa de Utilidad Pública o Social y 6º de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios, en el Consejo de Ministros,*

### CONSIDERANDO

*Que es obligación del Estado fortalecer a la Industria Petrolera y Gasífera, así como adoptar las medidas conducentes para garantizar la estabilidad operativa de dicha industria y el cumplimiento de los planes y metas de producción de Petróleos de Venezuela, S.A. (PDVSA) y sus filiales;*

### CONSIDERANDO

*Que las actividades relativas a los hidrocarburos e hidrocarburos gaseosos, así como las obras que su manejo requiera, son de utilidad pública e interés social;*

---

[190] **Anexo C-38.**
[191] **Anexo C-39.**
[192] **Anexo C-40.**

## CONSIDERANDO

*Que la disposición oportuna de agentes expansivos cerámicos es de importancia medular para elevar la productividad de los yacimientos gasíferos y petrolíferos;*

## CONSIDERANDO

*Que la adquisición forzosa por parte del Estado de los bienes muebles e inmuebles y demás activos, que pertenezcan o que se encuentren en posesión de la sociedad mercantil NORPRO VENEZUELA, C.A. y de cualesquiera otras empresas o personas relacionadas, resulta indispensable para la ejecución de la obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS".*

## DECRETA

**Artículo 1º.** *Se ordena la adquisición forzosa de los bienes muebles e inmuebles y demás activos incluyendo terrenos, bienhechurías, construcciones, instalaciones, equipos industriales, de oficina, implementos y materiales de trabajo, inventarios, licencias, medios de transporte o derechos necesarios para la ejecución de la obra señalada en este artículo, o a la comercialización o distribución de los productos en ella elaborados, que pertenezcan o se encuentren en posesión de la sociedad mercantil NORPRO VENEZUELA, C.A. y de cualesquiera otras empresas o personas relacionadas, que resulten indispensables para la ejecución de la obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS".*

**Artículo 2º.** *La obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS", será ejecutada por la empresa PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, adscrita al Ministerio del Poder Popular para la Energía y Petróleo, como ente expropiante, o la filial que ésta designe.*

**Artículo 3º.** *De conformidad con lo previsto en el artículo 12 de la Ley de Expropiación por Causa de Utilidad Pública o Social, se autoriza a la empresa PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, a fin que realice los trámites necesarios para la adquisición de los inmuebles y demás bienes a que se contrae el artículo 1º del presente Decreto, subrogándose en todos los derechos y obligaciones que correspondan a la República Bolivariana de Venezuela por tales conceptos, hasta la transferencia total y definitiva de la propiedad de dichos bienes.*

*Artículo 4°. Los bienes expropiados pasarán libres de gravámenes o limitaciones al Estado venezolano, a través de PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, de conformidad con lo dispuesto en el artículo 11 de la Ley de Expropiación por Causa de Utilidad Pública o Social.*

*Artículo 5°. PDVSA Industrial, S.A. o cualquier otra filial de Petróleos de Venezuela, S.A. (PDVSA) que ésta designe, efectuará las negociaciones y tramitará el procedimiento de expropiación previsto en la ley, hasta la transferencia total y definitiva de los bienes a que se refiere el presente Decreto.*

*Artículo 6°. En la ejecución del presente Decreto, deberán resguardarse de manera especial los derechos y garantías de los trabajadores y trabajadoras que laboran en la empresa NORPRO VENEZUELA, C.A. y en cualesquiera otras empresas o personas relacionadas, afectadas por lo dispuesto en el presente Decreto.*

*Artículo 7°. Se califica de urgente realización la ejecución de la obra "PRODUCCIÓN INDUSTRIAL DE AGENTES EXPANSIVOS CERÁMICOS DE ALTO DESEMPEÑO PARA ELEVAR LA PRODUCTIVIDAD DE LOS YACIMIENTOS GASÍFEROS Y PETROLÍFEROS", mediante la puesta en funcionamiento, uso y aprovechamiento de los bienes indicados en el artículo 1° del presente Decreto, con el objeto de garantizar la continuidad de las fases de la cadena de producción y distribución de los agentes cerámicos de alto desempeño, necesarios para la industria gasífera y petrolífera, pudiendo para ello adoptarse las medidas a las que se refiere el artículo 6 de la Ley para la Defensa de las Personas en el Acceso de los Bienes y Servicios, y previo cumplimiento de la normativa vigente.*

*Artículo 8°. El Ministro del Poder Popular para la Energía y Petróleo queda encargado de la ejecución del presente Decreto.*

*Artículo 9°. El presente Decreto entrará en vigencia a partir de su publicación en la Gaceta Oficial de la República Bolivariana de Venezuela.*

[…]".

246. El día 14 de abril de 2011, el Sr. Páez le escribió al Ministro Ramírez e hizo referencia a la expropiación de los bienes de Norpro Venezuela dispuesta por el Decreto de Expropiación, "*confirm*[ando] *la decisión del Presidente Chávez, anunciada públicamente el día 15 de mayo de 2010, de estatizar Norpro*". También afirmó que, lamentablemente, había sido imposible "*avanzar en un proceso que llevara a la efectiva expropiación de Norpro*" y manifestó su esperanza de que la publicación del Decreto de Expropiación les permitiera a las partes "*avanzar sin demora en la definición de los términos de una resolución amistosa de esta controversia, que garantice el pago de una indemnización determinada sobre la base del valor justo de la inversión realizada en Norpro*" por parte de la Demandante. El Sr. Páez reiteró el ofrecimiento de asistencia

técnica de la Demandante y solicitó que PDVSA Industrial en calidad de ente expropiante conforme al Decreto de Expropiación *"nombrara a un vocero autorizado a fin de que analizara, junto con los representantes de Norpro, cuestiones vinculadas a los pasos futuros del proceso de expropiación"*[193]. [Traducción del Tribunal]

247. Según los informes de prensa publicados en *Correo del Caroní* los días 13 y 15 de abril de 2011 y en *Nueva Prensa de Guayana* el día 15 de abril de 2011, 25.000 toneladas de bauxita se extrajeron de la planta para cubrir una emergencia de CVG Bauxilum[194]. El día 25 de abril de 2011, Norpro Venezuela le escribió al Presidente de PDVSA Industrial subrayando que *"Norpro, en su rol de propietaria legítima de todos los bienes que se encuentran dentro de las instalaciones, no ha autorizado ni ratificado estas acciones"*[195]. [Traducción del Tribunal]

## XIII. EL PROCEDIMIENTO ADMINISTRATIVO DE LA EXPROPIACIÓN Y LA NOTIFICACIÓN DE CONTROVERSIA DE LA DEMANDANTE

248. El día 24 de junio de 2011, PDVSA Industrial publicó las siguientes notificaciones en *Últimas Noticias* y *Nueva Prensa de Guayana*:

> *"1) […]; 2) Declarar constituida la medida preventiva de ocupación y operatividad temporal de los bienes muebles, inmuebles y otros activos incluyendo los inmateriales que estén en propiedad o posesión de la empresa NORPRO VENEZUELA, C. A., y de cualesquiera otras empresas o personas relacionadas, de conformidad con lo establecido en el numeral 1 del artículo 112 de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios; 3°) notificar a las personas arriba señaladas, mediante la publicación del presente aviso de prensa, de manera simultánea y por una sola vez, en los diarios "Últimas Noticias" y "Nueva Prensa de Guayana", a los fines que se sirvan concurrir dentro del lapso de los treinta (30) días continuos siguientes a la publicación del presente aviso, a la sede de esta Empresa, ubicada en la Avenida Francisco Solano López, Centro Empresarial Sabana Grande, piso 16, Municipio Libertador, Parroquia El Recreo, Caracas; en días hábiles y en el horario comprendido entre las […] 8:30 a.m. y las […] 4:30 p.m., acreditando, en todo caso, la prueba de sus respectivos derechos sobre los precitados bienes objeto de afectación.*
>
> *Asimismo, se informa a los interesados que 1°) […] 2°) que pueden ejercer contra la medida preventiva acordada la defensa descrita en el artículo 113 de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios; y 3°) que de no concurrir en la oportunidad*

---

[193] **Anexo C-41**. Ver también **Anexo R-16**.
[194] **Anexo C-124**; **Anexo C-125**; **Anexo C-126**; Memorial, ¶ 110.
[195] **Anexo C-127**.

*prevista persona alguna, por sí o por medio de representante o apoderado, se dará por agotado el presente procedimiento y se procederá a solicitar la expropiación de los bienes afectados por la vía judicial.*

*Notificación ésta que se hace, de conformidad con lo previsto en el artículo 22 de la Ley de Expropiación por Causa de Utilidad Pública o Social"*[196].

249. El día 4 de julio de 2011, la Demandante notificó a la Demandada de una controversia en virtud del Tratado y solicitó que "*Venezuela pague una indemnización adecuada equivalente al valor justo de su inversión en Norpro con anterioridad al día 15 de mayo de 2010 de conformidad con el Artículo 5*". La Demandante hizo referencia a las reuniones celebradas los días 30 de agosto, 14 de octubre y 26 de octubre de 2010, y aseveró que "*Saint-Gobain ha empleado sus mayores esfuerzos para reunirse con las autoridades venezolanas y analizar los términos de una resolución amistosa de la controversia actual, con arreglo al Tratado Francia-Venezuela. Sin embargo, Saint-Gobain no ha recibido respuesta alguna de PDVSA, PDVSAI*[ndustrial] *o cualquier otra autoridad venezolana competente*". La Demandante reiteró su voluntad de resolver la controversia de manera amistosa conforme a las disposiciones del Tratado y afirmó que estaba "*preparada para reunirse de inmediato con un representante autorizado de Venezuela con el objeto de arribar a una resolución justa y adecuada para ambas partes*". La Demandante finalizó la carta resaltando que "*en el supuesto de que esta diferencia no se resolviera de manera amistosa dentro del plazo de seis (6) meses a partir de la fecha de la presente carta, Saint-Gobain podrá someter esta cuestión a arbitraje*"[197]. [Traducción del Tribunal]

250. El día 26 de julio de 2011, PDVSA Industrial publicó una notificación declarando cerrado el procedimiento de arreglo amigable, "[c]*onsiderando que, el día 24 de junio de 2011, se publicaron los avisos de prensa previstos en el artículo 22 de la Ley de Expropiación por Causa de Utilidad Pública o Social y teniendo en cuenta que el plazo correspondiente vence el día de la fecha, sin la comparecencia de cualquier parte o tercero, por sí o por medio de un representante legal*" [Traducción del Tribunal], y le ordenó a la Consejería Jurídica que iniciara el procedimiento judicial en virtud de la Ley de Expropiación por Causa de Utilidad Pública o Social (la "**Ley de Expropiación**")[198].

## XIV. NEGOCIACIONES ADICIONALES ENTRE LAS PARTES

---

[196] **Anexo R-20**.

[197] **Anexo C-42**.

[198] Ley de Expropiación por Causa de Utilidad Pública o Social, publicada en la Gaceta Oficial N.º 37.475, de fecha 1 de julio de 2002. **Anexo R-4**. Ver también traducción al inglés presentada por la Demandada como **Anexo R-21**.

251. El día 26 de octubre de 2011, el Sr. Carmelo Ursaneta, Consejero General del Ministerio de Energía y Petróleo, le escribió a la Demandante, con el objeto de programar una reunión para el día 3 de noviembre de 2011 a fin de analizar la expropiación de Norpro Venezuela[199]. La Demandante le respondió al Sr. Urdaneta mediante una carta de fecha 3 de noviembre de 2011[200]. Ese mismo día, se celebró una reunión durante la cual el Ministerio, una vez más, propuso formar una empresa mixta en aras de operar la planta en Venezuela; la Demandante se comprometió a considerar esta propuesta[201].

252. Tal como reconociera el Sr. Páez en su carta de seguimiento de fecha 20 de diciembre de 2011, a la Demandante también se le pidió que preparara una comunicación que incluyera una breve presentación de Norpro Venezuela y los objetivos comerciales que habían derivado en su establecimiento en Venezuela, al igual que un resumen de los términos de un eventual acuerdo en virtud del cual las partes se embarcarían en un proyecto de inversión conjunta que tendría como resultado una empresa mixta en la que PDVSA sería titular de una participación mayoritaria. En su carta de fecha 20 de diciembre de 2011, el Sr. Páez explicó que el grupo todavía estaba analizando las especificaciones y condiciones generales del proyecto de inversión conjunta propuesto, así como las modalidades y el alcance de la asistencia técnica y capacitación del personal que el grupo puede ser capaz de ofrecer; ellos enviarían la comunicación solicitada una vez que se concluyera este análisis, lo que se esperaba para las primeras semanas del mes de enero de 2012[202]. Según la Demandada, la Demandante nunca le proporcionó la información solicitada al Ministerio[203].

253. Mediante una carta a la Demandada de fecha 17 de enero de 2012, la Demandante reiteró la existencia de una controversia en virtud del Tratado, al afirmar que "[a] *pesar de las diversas reuniones y comunicaciones entre los representantes de Saint-Gobain y PDVSA, para revisar el estado de la expropiación de Norpro y las acciones futuras a ser emprendidas por el Gobierno de Venezuela (incluyendo el pago de una indemnización adecuada conforme a lo dispuesto en el Tratado), durante los seis meses del período de 'enfriamiento' como establece el Tratado, no se ha alcanzado ningún acuerdo amistoso en relación con esta disputa con Venezuela*". La Demandante confirmó su aceptación del ofrecimiento de la Demandada previsto en el Artículo 8(2) del Tratado de resolver la controversia por vía de arbitraje ante el CIADI y, si bien manifestó su esperanza de "*alcanzar un acuerdo amistoso con el Gobierno de Venezuela*", anunció que, si dicho

---

[199] **Anexo C-130**.
[200] **Anexo C-43**.
[201] Memorial, ¶ 113; **Anexo C-131**.
[202] **Anexo C-131**; Memorial de Contestación, ¶¶ 38-39.
[203] Memorial de Contestación, ¶ 40.

acuerdo fracasaba, "*con prontitud*" iniciaría un procedimiento de arbitraje ante el CIADI[204].

254.   El día 24 de enero de 2012, la Demandada denunció el Convenio CIADI[205]. La denuncia se hizo efectiva el día 25 de julio de 2012.

## XV.  EL PROCEDIMIENTO JUDICIAL DE EXPROPIACIÓN Y NEGOCIACIONES PARALELAS

255.   El día 18 de abril de 2012, PDVSA Industrial inició el procedimiento judicial de expropiación de conformidad con los Artículos 22-24 de la Ley de Expropiación (el **"Procedimiento de Expropiación"**) mediante la presentación de una reclamación en contra de Norpro Venezuela ante el Juzgado Primero de Primera Instancia en lo Civil, Mercantil y Agrario del Segundo Circuito de la Circunscripción Judicial del Estado de Bolívar (el **"Juzgado"**)[206]. PDVSA Industrial solicitó que el Juzgado "*ordenara la expropiación*" de los bienes de Norpro Venezuela y que se ratificara la medida preventiva, es decir, la ocupación temporal de la planta sobre la base del Artículo 112(1) de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios (*véase* notificación de PDVSA de fecha 24 de junio de 2011 *supra*). Además, solicitó que se emplazara a Norpro Venezuela, en la persona de su representante legal, el Dr. Jorge Paúl[207].

256.   El día 25 de mayo de 2012, la Demandante inició el presente procedimiento de arbitraje mediante la presentación de su Solicitud de Arbitraje ante el CIADI de conformidad con el Tratado Francia-Venezuela.

257.   El día 20 de junio de 2012, el Juzgado emitió un edicto ordenando "*citar a [...] los supuestos propietarios, titulares, locatarios, acreedores y, en general, cualquier otra persona que pudiera tener algún derecho respecto de los bienes de propiedad de NORPRO VENEZUELA, C.A.*" [Traducción del Tribunal]. El Juzgado afirmó que el edicto sería publicado tres veces en los periódicos *Primicia* y *Correo del Orinoco*, con un intervalo de diez días corridos entre las publicaciones, de modo que las partes interesadas comparecieran dentro de los diez días hábiles luego de la fecha de la última publicación o, en el caso de que nadie compareciera dentro del plazo especificado, el Juzgado nombraría a un defensor de oficio en favor de Norpro Venezuela[208]. El día 10 de julio de 2012, la citación fue entregada personalmente al secretario en la oficina del Dr. Paúl[209].

---

[204] **Anexo C-44**. Ver también traducción al inglés presentada por la Demandada con **Anexo R-22**.

[205] Memorial, ¶ 114.

[206] Memorial de Contestación, ¶ 41; **Anexo R-23**.

[207] **Anexo R-23**.

[208] **Anexo R-24**.

[209] **Anexo R-25**.

258. Mediante un correo electrónico de fecha 17 de julio de 2012, el Sr. Carmelo Urdaneta (Director General de la Consejería Jurídica de PDVSA Industrial) intentó programar una reunión con el Dr. Paúl, que respondió mediante un correo electrónico de fecha 20 de julio de 2012; la reunión tuvo lugar el día 15 de agosto de 2012[210].

259. El día 23 de agosto de 2012, el Sr. Urdaneta le envió un borrador de acuerdo de confidencialidad al Dr. Paúl, tal como se había conversado durante la reunión[211]. El acuerdo había de celebrarse con la Demandada, "*por órgano del Ministerio del Poder Popular de Petróleo y Minería*" e incluía el siguiente fragmento: "*las **PARTES** y sus respectivas afiliadas han sostenido y continuarán sosteniendo negociaciones para procurar alcanzar un acuerdo con relación a lo previsto en el **DECRETO**, incluyendo sin limitación cualquier compensación que pudiera corresponderle a **xxxxxx** o sus afiliadas*"[212].

260. Mediante una carta de fecha 4 de septiembre de 2012, el Dr. Paúl preguntó si el Ministerio había comenzado la selección de los peritos que procederían a la valuación de la inversión de la Demandante en Venezuela, tal como había aseverado el Sr. Urdaneta en ocasión de la reunión de fecha 15 de agosto de 2012, y adjuntó una versión revisada del acuerdo de confidencialidad[213].

261. El día 26 de septiembre de 2012, el Juzgado emitió un segundo edicto emplazando nuevamente a las partes interesadas de parte de Norpro Venezuela en los mismos términos que el edicto de fecha 20 de junio de 2012; el edicto fue publicado los días 2, 12 y 22 de noviembre de 2012 en los periódicos *Primicia* y *Vea*[214].

262. Aproximadamente un año más tarde, el día 11 de octubre de 2013, se llevó a cabo la inspección judicial con arreglo al Artículo 57 de la Ley de Expropiación[215] y, el día 13 de noviembre de 2013, el Juzgado emitió un edicto mediante el cual disponía que, de conformidad con los Artículos 19, 56 y 57 de la Ley de Expropiación y "*cumplido como han sido los pasos relativos a la notificación de la demandada*", la designación de los Avaluadores que formarían la Comisión de Avalúos debía tener lugar cinco días hábiles después[216].

263. Ese mismo día, PDVSA Industrial solicitó que el Juzgado nombrara a un defensor de oficio conforme al Artículo 27 de la Ley de Expropiación a fin de que representara a

---

[210] **Anexo R-26; Anexo R-27; Anexo R-29**.

[211] **Anexo R-30**.

[212] **Anexo R-31**.

[213] **Anexo R-29**.

[214] Memorial de Contestación, ¶ 44, nota 122; **Anexo R-32**.

[215] **Anexo R-33**.

[216] **Anexo R-34**.

Norpro Venezuela en el marco del Procedimiento de Expropiación[217]. Dos días más tarde, el día 15 de noviembre de 2013, el Juzgado emitió un edicto mediante el cual nombraba al Sr. José Neptali Blanco Defensor Judicial de Norpro Venezuela en el Procedimiento de Expropiación y le ordenaba que compareciera ante el Juzgado el tercer día hábil posterior a su notificación en aras de que aceptara o rechazara su nombramiento[218]. El día 22 de noviembre de 2013, el Juzgado destacó que el Procedimiento de Expropiación se encontraba "*en estado de notificación del Defensor Judicial designado*" y, por ende, decidió que la resolución de fecha 13 de noviembre de 2013 "*se deja*[ra] *sin efecto*" hasta tanto el Sr. Neptali hubiera sido debidamente notificado y su citación se hubiera incorporado al expediente[219].

264. El día 3 de febrero de 2014, el Sr. Neptali aceptó formalmente su nombramiento como defensor judicial de Norpro Venezuela[220]. Al día siguiente, el 4 de febrero de 2014, Norpro Venezuela, representada por su consejero venezolano, el Dr. Paúl, compareció por primera vez ante el Juzgado a efectos de solicitar la Suspensión y Extinción del Procedimiento Judicial de Expropiación, al igual que impugnar la jurisdicción del Juzgado en función del hecho de que la Demandante había iniciado el procedimiento de arbitraje CIADI que nos ocupa[221]. El día 12 de marzo de 2014, el Juzgado desestimó la solicitud de Norpro Venezuela[222].

## E.    POSTURAS DE LAS PARTES

265. A continuación, se sintetizarán brevemente las posturas de las Partes tal como fueron planteadas en sus presentaciones escritas y durante la Audiencia.

### I.    SÍNTESIS DE LA POSTURA DE LA DEMANDANTE Y PETITORIO

266. La Demandante alega que la Demandada incurrió en varios incumplimientos del Tratado y, por lo tanto, reclama una compensación equivalente al monto que sea mayor de los siguientes: el Valor Justo de Mercado de Norpro Venezuela a la fecha del laudo (calculado en USD 90,3 millones al día 31 de agosto de 2015) o el Valor Justo de Mercado de Norpro Venezuela a la fecha de la expropiación (calculado en USD 99,5 millones) con más intereses anteriores al laudo, así como intereses posteriores al laudo.

#### 1.  Admisibilidad

---

[217] **Anexo R-35**.

[218] **Anexo R-36**.

[219] **Anexo R-37**.

[220] **Anexo R-38**.

[221] Memorial de Contestación, ¶ 45; **Anexo R-39**.

[222] **Anexo R-40**.

267. La Demandante argumenta que deberían desestimarse las excepciones de admisibilidad de la Demandada en cuanto a lo siguiente: (i) las reclamaciones relativas al aumento del precio de la bauxita, y (ii) la reclamación por violación del inciso 1 del Artículo 5(1) del Tratado.

268. Con respecto a las reclamaciones relativas al aumento del precio de la bauxita, la Demandante destaca que sus reclamaciones no se basan en el Contrato de Bauxita en sí mismo, sino en el hecho de que la Demandada sancionó la conducta de CVG Bauxilum o podría haberla impedido y, por consiguiente, violó el Tratado[223].

269. En cuanto a su reclamación por violación del inciso 1 del Artículo 5(1) del Tratado que planteó por primera vez durante la Audiencia, la Demandante alega que esta reclamación se vio influenciada por la afirmación de la Demandada en su Dúplica de "*que lo que sucedió entre mayo 2010 y marzo 2011 no era la expropiación, que la expropiación ocurrió recién en* [marzo] *de 2011*"[224]. La Demandante también asevera que su reclamación no es "*ni novedosa ni extemporánea*"[Traducción del Tribunal], dado que el argumento de que la expropiación no se llevó a cabo de manera justa y equitativa y no le concedió un debido proceso a la Demandante se planteó desde el comienzo del procedimiento[225].

### 2. Violación del Tratado

270. La Demandante alega que la Demandada incumplió las siguientes disposiciones:

- Artículo 5(1) del Tratado con respecto a sus obligaciones relativas a la expropiación **a)**;
- Artículo 3(1) del Tratado con respecto a su obligación de otorgar trato justo y equitativo **b)**; y
- Artículo 3(2) del Tratado con respecto a su obligación de otorgar protección y seguridad plenas **c)**.

### a)    Expropiación (Artículo 5(1) del Tratado)

271. La Demandante argumenta que la Demandada violó el inciso 1 del Artículo 5(1) del Tratado **(aa)**, así como los incisos 2 y 3 de esa misma disposición **(bb)**.

### aa)    Violación del inciso 1 del Artículo 5(1) del Tratado

---

[223] Réplica, ¶¶ 67-68.
[224] Transcripción (Día 3), pág. 876 líneas 19-21.
[225] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 30, 44-45, que hace referencia al Memorial, ¶¶ 180-184, y a la Réplica, ¶¶ 89-95, 125-130.

272. La Demandante alega que la conducta de la Demandada con anterioridad a la publicación del Decreto de Expropiación en el mes de marzo de 2011 constituyó una "*expropiación*" en los términos del Artículo 5(1) del Tratado. Durante la Audiencia[226], la Demandante planteó el argumento de que esta conducta era contraria a las obligaciones de la Demandada en virtud del inciso 1 del Artículo 5(1) del Tratado. En particular, la Demandante argumenta, primero, que la expropiación no se llevó a cabo con un instrumento de expropiación formal y, en consecuencia, no de conformidad con una "*medida*" ("*mesures*"/"*measures*")[227]. Segundo, la Demandante alega que la toma física de la planta con anterioridad al mes de marzo de 2011 no se realizó siguiendo el debido proceso y con la protección plena de la inversión de la Demandante, contrariamente a las obligaciones de la Demandada en virtud del Artículo 3(1) y (2) del Tratado y, por consiguiente, violó un "*compromiso especial*" ("*engagement particulier*"/"*particular undertaking*") en el sentido del inciso 1 del Artículo 5(1) del Tratado [228].

### bb)    Violación de los incisos 2 y 3 del Artículo 5(1) del Tratado

273. Asimismo, la Demandante alega que la Demandada incumple su obligación de proporcionar una pronta y adecuada indemnización y de fijar el monto de indemnización a la fecha de la expropiación con arreglo a los incisos 2 y 3 del Artículo 5(1) del Tratado.

274. Según plantea la Demandante, la Demandada expropió la inversión de la Demandante con respecto a la planta el día 15 de mayo de 2010 o poco tiempo después[229]. La Demandante argumenta que, en vista de la ley, la toma de control por parte del SINPROTRAC luego del anuncio del Presidente Chávez y la posterior gestión activa de la planta por parte de la empresa estatal PDVSA constituyeron una "*expropiación*" en los términos del Artículo 5(1) del Tratado[230]. La Demandante resalta que constantemente hizo valer sus derechos en relación con la planta, esto es, que intentó reingresar en ella, pero le denegaron el acceso[231].

275. Con respecto al requisito de fijación conforme al inciso 3 del Artículo 5(1) del Tratado, la Demandante alega que, a pesar de la clara redacción del Tratado, la Demandada estaba lejos de haber determinado la indemnización al momento de la expropiación, en tanto la Demandada nunca ha comunicado el monto o la modalidad del pago a realizarse a la Demandante y todavía no ha ofrecido indemnización alguna por la expropiación, pese a

---

[226] Transcripción (Día 1), pág. 86 línea10 – pág. 87 línea 15.

[227] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 38-39.

[228] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.

[229] Réplica, ¶ 25.

[230] Réplica, ¶¶ 21-24; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 19-32.

[231] Presentación Posterior a la Audiencia de la Demandante, ¶ 32.

los numerosos intentos de negociar de la Demandante[232]. En particular, la Demandante argumenta que el requisito de fijación no se cumple por la mera existencia de un procedimiento en el derecho interno o la referencia a él[233].

276.  En cuanto al requisito de prontitud conforme al inciso 2 del Artículo 5(1) del Tratado, de modo similar, la Demandante alega que el Tratado es muy específico acerca del requisito de que toda expropiación sea acompañada de una "*pronta*" indemnización y que las Partes Contratantes no dejaron lugar a dudas respecto de la interpretación del requisito de pronta indemnización: El Tratado dispone que "[e]*sa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación*" y "[d]*icha indemnización será* [...] *pagada sin retraso alguno*"[234]. La Demandante alega que, más de cuatro años después de la expropiación, esa indemnización es exigible hace mucho tiempo y, de ninguna manera, puede considerarse "*pronta*" de conformidad con la redacción del Tratado[235].

277.  Asumiendo hipotéticamente que el Artículo 5(1) del Tratado no exigiera que la Demandada realice una oferta de indemnización a la fecha de la expropiación, la Demandante argumenta que, por dos razones separadas, la Demandada no puede argumentar, con referencia a su derecho interno, que "*reconocí*[a] *su obligación de compensación*" [Traducción del Tribunal] y proporcionaba un mecanismo para la determinación de la indemnización en el Decreto de Expropiación[236].

278.  Primero, la Demandante alega que la Demandada no puede invocar el derecho local para excusar sus obligaciones en virtud del derecho internacional[237]; en cualquier caso, la Demandante considera las normas nacionales en materia de expropiación seguidas por la Demandada "*un procedimiento genérico instigado por el Estado*" que la Demandada "*no adopta medidas para implementar*"[238]. [Traducción del Tribunal]

279.  Segundo, la Demandante argumenta que la conducta de la Demandada no era acorde a las disposiciones de sus propias leyes internas en materia de expropiación. En particular, la Demandante alega que ni la ocupación administrativa de la planta por parte de PDVSA el día 4 de abril de 2011 ni la ocupación judicial dispuesta el día 20 de junio de 2012 se llevaron a cabo con arreglo al Artículo 56 de la Ley de Expropiación. Esta disposición admite la "*ocupación previa*" exclusivamente en casos que involucran circunstancias urgentes y sólo después de que el (probable) monto de la indemnización, determinado por

---

[232] Memorial, ¶ 140; Réplica, ¶ 75; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 50-54.
[233] Réplica, ¶ 83.
[234] Memorial, ¶ 137. Énfasis agregado por la Demandante. *Véase* también Réplica, ¶ 75.
[235] Réplica, ¶ 76.
[236] Réplica, ¶ 84.
[237] Réplica, ¶¶ 85-86.
[238] Réplica, ¶ 83.

una comisión de avalúos, se haya depositado en el juzgado de expropiación. Además, la Demandante argumenta que las medidas adoptadas por la Demandada no podrían basarse correctamente en los Artículos 6 y 112(1) de la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios (la "**Ley de Acceso**")[239].

280. En el supuesto de que, en vista de las disposiciones de su derecho interno en materia de expropiación, en virtud del Artículo 5(1), incisos 2 y 3 del Tratado, la Demandada no tuviera que ofrecer una pronta indemnización a la fecha de la expropiación, la Demandante alega que, sin embargo, la Demandada ha incurrido en una violación del Tratado, en tanto no hizo ningún intento de negociar una indemnización por la expropiación con la Demandante de buena fe[240]. En particular, la Demandante argumenta lo siguiente: (i) que no recibió "*ninguna palabra directa de Venezuela en relación con la expropiación durante todo el período comprendido entre el anuncio del Presidente el día 15 de mayo de 2010 y la emisión del Decreto de Expropiación el día 29 de marzo de 2011*" [Traducción del Tribunal]; (ii) que la Demandada nunca reconoció la obligación de pagar indemnización; y (iii) que la Demandada se rehusó a participar en negociaciones de buena fe incluso después de la publicación del Decreto de Expropiación[241].

281. La Demandante alega que el hecho de que la Demandada no haya cumplido con los requisitos de fijación y/o prontitud de conformidad con los incisos 2 y 3 del Artículo 5(1) del Tratado torna la expropiación ilícita, y afirma que la emisión tardía del Decreto de Expropiación no rectificó la violación de los incisos 2 y 3 del Artículo 5(1) del Tratado[242]. En sustento de esta alegación, la Demandante cita no sólo como autoridades a varios comentaristas, sino también una serie de decisiones arbitrales (*véase* en más detalle *infra*).

282. En su Réplica, la Demandante también argumentó que hubo una expropiación con respecto al Contrato de Bauxita y a los créditos fiscales IVA que había devengado, y alegó que esta expropiación también debe ser compensada[243]. No obstante, durante la Audiencia y en su Presentación Posterior a la Audiencia, la Demandante ya no abordó este asunto como cuestión de expropiación, sino que se concentró en el argumento de que la conducta de la Demandada con respecto al Contrato de Bauxita y a los créditos fiscales IVA era

---

[239] Réplica, ¶ 87; Brewer-Carías II, ¶¶ 14-26; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 64-68. Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios, publicada en la Gaceta Oficial N.º 39.358 de fecha 1 de febrero de 2010. **Anexo R-76**.

[240] Réplica, ¶ 89.

[241] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 34-37.

[242] Memorial, ¶ 141; Réplica, ¶¶ 77-83; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 58-63.

[243] Réplica, ¶¶ 96-100.

contraria a sus obligaciones de garantizar el trato justo y equitativo ("**TJE**") y de otorgar protección y seguridad plenas ("**PSP**") en virtud del Artículo 3(1) y (2) del Tratado[244].

### b)    Trato justo y equitativo (Artículo 3(1) del Tratado)

283.  La Demandante alega que el estándar TJE previsto en el Artículo 3(1) del Tratado se refiere a los conceptos imperantes de TJE en el contexto del derecho internacional – y no sólo al estándar mínimo de trato –, incluidas "*los conceptos contemporáneos de debido proceso, buena fe y expectativas legítimas*" [Traducción del Tribunal], y que la Demandada incumplió sus obligaciones en virtud de él con respecto tanto a la toma de control de la planta como al Contrato de Bauxita, a la luz de cualquier lectura del Artículo 3(1) del Tratado[245].

284.  En lo que respecta a la toma de control de la planta por parte del sindicato luego de la declaración del Presidente Chávez el día 15 de mayo de 2010 y a la conducta de la Demandada a partir de ese momento, la Demandante afirma que la Demandada no siguió el debido proceso en la expropiación y, por ende, violó su obligación TJE[246]. La Demandante argumenta que la expropiación efectivamente se llevó a cabo "*de la noche a la mañana*", con un "*anuncio público y repentino*" en televisión, y que, a pesar de los intentos de la Demandante de negociar de buena fe los términos de la expropiación, la Demandada "*no le dio a Saint-Gobain indicio alguno de qué proceso se seguiría a fin de garantizar que Saint-Gobain recibiera una indemnización adecuada*" e incluso "*no siguió su propio procedimiento de expropiación*"[247]. [Traducción del Tribunal]

285.  Durante la Audiencia y en su Presentación Posterior a la Audiencia, la Demandante incluyó esta reclamación TJE en la reclamación de expropiación relativa al inciso 1 del Artículo 5(1) del Tratado[248]. El Tribunal destaca, sin embargo, que, en consecuencia, la Demandante no tenía intención de abandonar su reclamación TJE separada relativa a la toma de la planta, en tanto mantiene en su petitorio la solicitud de una declaración separada de que la Demandada ha incumplido el Artículo 3(1) del Tratado[249].

---

[244] Transcripción (Día 1), pág. 94 línea 21 – pág. 97 línea 21; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 79-88.

[245] Réplica, ¶ 112.

[246] Memorial, ¶¶ 180-184; Réplica, ¶¶ 125-130.

[247] Memorial, ¶ 183; Presentación Posterior a la Audiencia de la Demandante, ¶ 42 (con nota 116); Réplica, ¶ 126.

[248] Transcripción (Día 1), pág. 85 línea 3 – pág. 95 líneas 4-9. Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.

[249] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116. Esto es confirmado por la referencia cruzada en la Presentación Posterior a la Audiencia de la Demandante (¶ 42 con nota 116) a la sección pertinente del Memorial (¶¶ 180-184) y el planteo de la Demandante de sus argumentos TJE en su Segunda Presentación Posterior a la Audiencia (¶¶ 30-45).

286. Con respecto al Contrato de Bauxita entre Norpro Venezuela y CVG Bauxilum, la Demandante alega, por un lado, que CVG Bauxilum actuaba como órgano del Estado en el sentido del Proyecto de Artículos de la Comisión de Derecho Internacional sobre Responsabilidad del Estado por Hechos Internacionalmente Ilícitos ("**Proyecto de Artículos de la CDI**"), y, por el otro, que la Demandada, a través del MIBAM y otros órganos, hizo "*promesas específicas*" y asumió "*compromisos*" y, por lo tanto, "*creó expectativas particulares*", en las que la Demandante confió al momento de realizar sus inversiones[250]. Según plantea la Demandante, la Demandada (a través de CVG Bauxilum) incumplió el Contrato de Bauxita y "*desconoció estas expectativas al no tener en cuenta [...] las acciones de CVG Bauxilum al momento de aumentar el precio de la bauxita*"[251]. [Traducción del Tribunal]

### c)    Protección y seguridad plenas (Artículo 3(2) del Tratado)

287. La Demandante también alega que la Demandada no garantizó la protección y seguridad de la inversión de la Demandante y, por consiguiente, violó el Artículo 3(2) del Tratado con respecto a la toma de control de la planta y al aumento del precio de la bauxita.

288. Como argumento alternativo en cuanto a su reclamación de expropiación, la Demandante asevera que, si la conducta de la Demandada con anterioridad al día 29 de marzo de 2011 no constituyó una "*expropiación*" en los términos del Artículo 5(1) del Tratado, el control de la planta por parte de PDVSA y el hecho de que no se la restituyera a la Demandante antes de esa fecha deben considerarse un incumplimiento de la obligación de otorgarle a la Demandante protección y seguridad plenas de conformidad con el Artículo 3(2) del Tratado[252]. [Traducción del Tribunal]

289. En relación con el aumento del precio de la bauxita, la Demandante alega que, una vez notificada de los incumplimientos del Contrato de Bauxita, la Demandada no actuó a fin de otorgarle seguridad jurídica a la inversión de la Demandante. En este contexto, la Demandante afirma que el estándar PSP requiere que el Estado adopte todas las medidas razonables "*para garantizar un entorno de inversión seguro*" [Traducción del Tribunal], incluidas no sólo la seguridad física, sino también la seguridad comercial y jurídica[253]. La Demandante argumenta que, contrariamente a este estándar, la Demandada no hizo intento alguno de investigar o actuar en aras de proteger los derechos de la Demandante

---

[250] Memorial, ¶¶ 173-176; Réplica, ¶ 120; Presentación Posterior a la Audiencia de la Demandante, ¶ 80.

[251] Memorial, ¶ 169; Réplica, ¶ 120. *Cfr.* Presentación Posterior a la Audiencia de la Demandante, ¶¶ 79-82.

[252] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 48-49.

[253] Memorial, ¶ 186.

en virtud del Contrato de Bauxita, a pesar de las reiteradas llamadas a la acción de la Demandante[254].

### 3. Cuantía de daños

#### a) Estándar de compensación y fecha de valuación

290. La Demandante alega que la reparación apropiada para el supuesto de una expropiación ilícita es el estándar de restitución del derecho internacional consuetudinario, es decir, la compensación más elevada entre aquella calculada a la fecha de expropiación y a la fecha del laudo[255].

291. En sustento de su enfoque, la Demandante subraya que el Artículo 5(1) del Tratado prevé el estándar de compensación adecuado sólo cuando se cumplan todas las condiciones de una expropiación lícita. Como esto no ocurre aquí, el estándar de compensación adecuado, que incluye la fecha adecuada en que ha de determinarse el valor, es establecido por el derecho internacional consuetudinario[256].

292. En sustento de su argumentación, la Demandante alude al fallo *Chorzów Factory* dictado por la Corte Permanente de Justicia Internacional (**"CPJI"**), así como a varios laudos arbitrales (*véase* en más detalle *infra*).

#### d) Cálculo de daños

##### aa) Método de valuación

293. La Demandante alega que la Demandada debe pagar una compensación íntegra por la planta expropiada y hace referencia a las *Guidelines on the Treatment of Foreign Direct Investment* del Banco Mundial del año 1992[257] y al comentario del Proyecto de Artículos de la CDI[258].

294. La Demandante se refiere a su experto en cuantía de daños, el Prof. Spiller, que sugiere que un tercero comprador pagaría el monto más reducido de los siguientes: (i) el valor actual neto de los flujos de fondos que un comprador interesado podría obtener de la adquisición de una participación del 100 % en Norpro Venezuela; y (ii) el costo de oportunidad en que un comprador interesado incurriría si construyera una planta similar

---

[254] Memorial de Réplica, ¶¶ 131-142.

[255] Presentación Posterior a la Audiencia de la Demandante, ¶ 73.

[256] Memorial, ¶ 197; Memorial de Réplica, ¶ 152.

[257] Memorial, ¶¶ 203-204, que hace referencia a El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), pág. 11.

[258] Réplica, ¶ 154, que cita a James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), pág. 225.

fuera de Venezuela, que está compuesto por la suma de los costos de construcción y los flujos de fondos de los que se vio privado durante el período de construcción[259].

295. Según el cálculo del Prof. Spiller al día 15 de mayo de 2010, el costo de oportunidad por la construcción de una planta similar en los EE. UU. sería inferior al valor actual neto de los flujos de fondos futuros de Norpro Venezuela (USD 99,5 millones en comparación con USD 115,1 millones). Por consiguiente, la Demandante opina que el Tribunal debería determinar el valor justo de mercado de la planta expropiada sobre la base del enfoque de los costos de construcción[260]. En cualquier caso, la Demandante efectuó las siguientes alegaciones con respecto al cálculo FFD.

### bb)  Tasa de descuento

296. La Demandante alega que los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores, aplicaron "*una tasa de descuento absurdamente elevada del 26 %*", que tiene como resultado un valor que implica que "*ningún inversionista razonable invertiría en una nueva planta de proppant o le agregaría capacidad a una planta de proppant existente*"[261]. [Traducción del Tribunal]

297. En particular, la Demandante argumenta que la "*exorbitante*" prima de riesgo país del 13,92 % que el Sr. Brailovsky y el Dr. Flores aplicaron en nombre de Venezuela es una "*medida desesperada para que el Estado trate de evitar hacerse cargo de sus acciones*". Según la Demandante, este salto refleja las amenazas del Presidente Chávez de expropiar todas las inversiones extranjeras en Venezuela sin compensación alguna[262]. Sin embargo, la Demandante afirma que un Estado "*no puede utilizar su propia tendencia a violar la ley para reducir el valor de la indemnización por expropiación*"[263]. Por lo tanto, adopta la postura según la cual la "*amenaza generalizada de confiscación*" [Traducción del Tribunal] debe eliminarse del cálculo del valor justo de mercado, ya que, de otro modo, la Demandada sería recompensada por la conducta ilícita que el presente arbitraje está destinado a subsanar[264].

---

[259] Réplica, ¶¶ 155-156, que hace referencia a la Segunda Valuación de Daños del Prof. Spiller de fecha 18 de junio de 2014 ("**Spiller II**"), ¶ 5; Presentación Posterior a la Audiencia de la Demandante, ¶ 90.

[260] Réplica, ¶¶ 157, 187 y 196; Carta de la Demandante al Tribunal de fecha 6 de noviembre de 2015; Spiller II, Tabla 12.

[261] Réplica, ¶ 158, que cita a Spiller II, ¶ 28.

[262] Réplica, ¶ 161; Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 55.

[263] Réplica, ¶ 162, que cita *Occidental c. Ecuador* (**CLA-061**), ¶ 564; Presentación Posterior a la Audiencia de la Demandante, ¶ 110, que hace referencia, en particular, a *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841.

[264] Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 56 y ¶ 59.

298. La Demandante asevera que el Prof. Spiller ha excluido sólo el riesgo de confiscación en su cálculo, pero tuvo en cuenta correctamente "*otros riesgos de invertir en Venezuela, tales como los riesgos de una economía volátil, desorden civil, una infraestructura subdesarrollada y otras cuestiones*" [Traducción del Tribunal]. La Demandante alega que el Prof. Spiller consideró el diferencial promedio de bonos soberanos de países con una calificación B1, tales como Venezuela, que incluye a muchos países en desarrollo con "*un riesgo país considerable, incluso riesgos políticos*"[265].

299. Asimismo, la Demandante asevera que también tuvo en cuenta el "*acentuado riesgo país*" de Venezuela cuando le asignó una tasa de descuento del 15 % al proyecto en el año 2006 e hizo esfuerzos considerables para obtener el apoyo significativo del Gobierno venezolano, en función del hecho de que el Tratado Francia-Venezuela había entrado en vigor en el año 2004[266]. La Demandante subraya que la tasa de descuento "*de alto riesgo*" del 12 %, que incluía una prima de riesgo país del 4 %, no fue asignada por los miembros del equipo del proyecto (ellos incluso agregaron un 3 % adicional "*para ser conservadores*"), sino que sirvió de "*medida objetiva a nivel compañía para considerar los posibles riesgos y recompensas de emprendimientos propuestos en diversas ubicaciones*"[267]. [Traducción del Tribunal]

### cc)    Flujos de Fondos Futuros

300. Con respecto al cálculo de los flujos de fondos futuros, la Demandante considera "*injustificado*" dividir las ganancias que un comprador interesado obtendría de las exportaciones de Norpro Venezuela a fin de dar cuenta de la distribución interna de costos. Según la Demandante, la valuación justa de mercado "*no depende de las cualidades idiosincráticas del comprador o vendedor*" [Traducción del Tribunal]; en consecuencia, debe asumirse que lo más probable sería que el comprador interesado que realizó la oferta más elevada fuera un inversionista estratégico que ya tiene una red de

---

[265] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 105-106; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 60 y ¶ 67. La Demandante argumenta que una manera de "*verificar*" esto consiste en analizar los diferenciales de swap de riesgo crediticio (CDS, por sus siglas en inglés) pendientes respecto de las deudas soberanas de los países y resalta que, en la lista de 63 países del Prof. Damodaran al mes de enero de 2014, la prima propuesta por el Prof. Spiller del 4.5 % calificaría como la cuarta más elevada después de Argentina (14,73 %), Venezuela (10,8 %) y Túnez (4.57 %) y, por ende, se encuentra "*muy por encima de la prima de riesgo país típica de un país en desarrollo*" [Traducción del Tribunal]. Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 61-62, que hace referencia al **Ap. BF-66**, págs. 23-25.

[266] Presentación Posterior a la Audiencia de la Demandante, ¶ 107, ¶ 116 y ¶ 130.

[267] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 131-134, que hace referencia al testimonio oral de su testigo Patrick Millot. Transcripción (Día 2), pág. 423, líneas 7-9, y pág. 433, líneas 17-20.

distribución y comercialización similar a la de Saint-Gobain y, por lo tanto, está en condiciones de percibir el 100 % de las ganancias[268].

301. La Demandante también destaca que el Sr. Brailovsky y el Dr. Flores asumieron en su cálculo que CVG Bauxilum suministraría bauxita al precio incrementado que le impuso unilateralmente a Norpro Venezuela en el mes de septiembre de 2008. Según la Demandante, este aumento de precios era ilícito y, por ende, no debe tenerse en cuenta sobre la base del principio en virtud del cual "*una parte no puede reducir su responsabilidad por un acto ilícito (aquí, la expropiación) en función de otro (el aumento de precios)*"[269]. [Traducción del Tribunal]

302. En cuanto a los costos de transporte, la Demandante alega lo siguiente: (i) que la estimación de los costos de transporte por parte del Prof. Spiller se basa en el embarque real en el mes de marzo de 2010 y es confirmada por los contratos de transporte contemporáneos de Saint-Gobain; y (ii) que el precio promedio que el Prof. Spiller le aplica a los costos de embarque dentro de los EE. UU. refleja exactamente las diversas ubicaciones y los arreglos contractuales con los clientes finales de la Demandante[270].

303. La Demandante también afirma que el Sr. Brailovsky y el Dr. Flores no establecen una distinción entre los siguientes conceptos: (i) los gastos de capital de mantenimiento destinados a "*manten*[er] *la planta en condiciones para seguir funcionando en sus niveles actuales*"; y (ii) los gastos de capital de inversión destinados a "*aument*[ar] *la producción de la planta a través de eficacia y mejoras tecnológicas*"[271] [Traducción del Tribunal]. Según la Demandante, sólo los gastos de capital de mantenimiento deberían incluirse en el cálculo de los gastos de capital[272].

304. Con respecto al capital de trabajo necesario para operar la planta, la Demandante alude a los siguientes supuestos del Prof. Spiller: (i) el saldo pendiente de los créditos fiscales IVA al año 2009 se habría pagado en el año 2010; y (ii) en lo sucesivo, habría tomado 60 días monetizar los certificados IVA, y Norpro Venezuela habría recuperado el 80 % de su valor. En cuanto a las demoras administrativas invocadas por la Demandada, la Demandante resalta que se ha concluido que tales demoras violan el estándar TJE y

---

[268] Réplica, ¶¶ 170-172; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 174-175, que hace referencia al testimonio oral del Prof. Spiller durante la Audiencia. Transcripción (Día 4), pág. 1233, líneas 1-3; pág. 948, línea 11 – pág. 949, línea 9, y pág. 946, líneas 6-19. Véase también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 89-90.

[269] Réplica, ¶ 176; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 96-97.

[270] Réplica, ¶ 179; Presentación Posterior a la Audiencia de la Demandante, ¶ 166 y ¶¶ 169-171, que hace referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), pág. 10; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 91-92, que hace referencia a Spiller II, Tabla 7 y ¶¶ 83-85.

[271] Réplica, ¶ 180, que hace referencia a Larry II, ¶¶ 21-23.

[272] Réplica, ¶ 181.

asevera que tenía una expectativa legítima de que la Demandada siguiera su propio procedimiento de créditos fiscales IVA, dado que esta cuestión se analizó específicamente con el Gobierno venezolano antes de que la Demandante invirtiera en Venezuela[273].

### 4. Petitorio de la Demandante

305. La Demandante solicita que el Tribunal haga lo siguiente[274]:

i) DECLARE que: (A) Venezuela ha violado el Artículo 5 del Tratado mediante la expropiación ilícita de la inversión de Saint-Gobain en Venezuela; y (B) Venezuela ha violado el Artículo 3(1) y (2) del Tratado al no otorgarle a la inversión de Saint-Gobain en Venezuela ni trato justo y equitativo ni protección y seguridad plenas;

ii) ORDENE a Venezuela pagarle a Saint-Gobain el monto más elevado de los siguientes: el Valor Justo de Mercado de Norpro Venezuela a la fecha del laudo (calculado en USD 90,3 millones al día 31 de agosto de 2015) o el Valor Justo de Mercado de Norpro Venezuela a la fecha de la expropiación (calculado en USD 99,5 millones) con más intereses anteriores al laudo a la tasa del 13,04 % o, en subsidio, del 9,08 %, anual hasta la fecha del Laudo del Tribunal, capitalizados en forma anual, o a cualquier otra tasa y período de capitalización que, según el Tribunal, garanticen la reparación íntegra;

iii) ORDENE a Venezuela pagar intereses posteriores al laudo a la tasa del 9,08 % anual desde la fecha del Laudo del Tribunal, capitalizados en forma anual, o a cualquier otra tasa y período de capitalización que, según el Tribunal, garanticen la reparación íntegra;

iv) DECLARE que: (A) el otorgamiento de la indemnización y los intereses se fija en montos netos de los impuestos venezolanos aplicables; y (B) Venezuela no podrá deducir impuestos en relación con el pago de la indemnización y los intereses;

v) ORDENE a Venezuela mantener indemne a Saint-Gobain de cualquier posible responsabilidad derivada de una doble imposición en Francia o en cualquier otro

---

[273] Réplica, nota 381, que hace referencia a Spiller II, ¶ 93 y ¶¶ 115-116, e *Impregilo S.p.A. c. Argentina*, Opinión Concurrente y Disidente del Juez Charles N. Brower (**CLA-127**), ¶ 9; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 158-161.

[274] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116. El valor justo de mercado que, según la Demandante, Norpro Venezuela tenía a la fecha del laudo ha sido actualizado en la Actualización de la Valuación de la Demandante presentada el día 22 de octubre de 2015. En vista de que, a la Actualización de la Valuación, la valuación a la fecha del laudo produce un valor que es inferior a la valuación a la fecha de la expropiación, la Demandante ahora reclama una compensación por el monto del valor que Norpro Venezuela tenía a la fecha de la expropiación. *Véase* Carta de la Demandante de fecha 6 de noviembre de 2015.

país, que no se hubiera verificado de no haber sido por las medidas adversas de Venezuela;

vi)     OTORGUE cualquier otro resarcimiento que el Tribunal considere apropiado; y

vii)    ORDENE a Venezuela pagar todos los costos y gastos de este Arbitraje, incluidos los honorarios de abogados y peritos de Saint-Gobain, los honorarios y gastos de los peritos designados por el Tribunal, los honorarios y gastos del Tribunal, y los costos adicionales del CIADI.

## II.    SÍNTESIS DE LA POSTURA DE LA DEMANDADA Y PETITORIO

306. La Demandada sostiene que cumplió plenamente con sus obligaciones en virtud del Tratado, en particular aquellas relacionadas con la expropiación de la planta, y que a la Demandante la asiste meramente el derecho a recibir una indemnización en base al Artículo 5(1) del Tratado por una suma de USD 9,5 millones, el valor justo de mercado de la planta al día 15 de mayo de 2010, más los intereses simples anteriores al laudo calculados a una tasa de Letras del Tesoro de EE.UU. a tres meses, más 1,1 en puntos porcentuales[275]. En la medida en la que la reclamación de la Demandante exceda dicha suma, la Demandada sostiene que debería desestimarse.

### 1.    Excepciones a la admisibilidad

307. La Demandada afirma que (i) las reclamaciones en relación con el Contrato de Bauxita y (ii) las reclamaciones respecto del inciso 1 del Artículo 5(1) del Tratado son inadmisibles.

308. Respecto del Contrato de Bauxita, la Demandada argumenta que, aún si la Demandante pudiera establecer que los precios de la bauxita se incrementaron en violación del Contrato de Bauxita, ello no podría, por sí solo, dar lugar a la responsabilidad de la Demandada en virtud del derecho internacional dado que CVG Bauxilum, entidad jurídicamente independiente de Demandada, es una parte respecto del Contrato de Bauxita[276]. La Demandada sostiene que la Demandante no logra identificar algún instrumento jurídico celebrado con el Estado, o cualquier acto relevante por parte del Estado, sobre la cual pueda basar sus reclamaciones relacionadas a la fijación de precio de la bauxita[277].

309. En relación con la presunta violación del inciso 1 del Artículo 5(1) del Tratado, la Demandada arguye que tal reclamación debería ser desestimada debido a que la

---

[275] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 64. Esta posición no ha sido modificada luego de la presentación de la Actualización de la Valuación de la Demandada de fecha 22 de octubre de 2015.
[276] Memorial de Contestación, ¶¶ 73-74; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 125-126.
[277] Dúplica, ¶ 78.

Demandante nunca planteó su "*nueva teoría*" respecto del inciso 1 del Artículo 5(1) del Tratado con anticipación a la Audiencia. Asimismo, la Demandada afirma que el cambio de postura de la Demandante es incompatible con la Regla 31(3) de las Reglas de Arbitraje CIADI[278].

### 2. No existió una violación del Tratado

310. En relación con el fondo de las reclamaciones, la Demandada sostiene que no violó ninguna de sus obligaciones en virtud del Tratado.

### a)    Expropiación (Artículo 5(1) del Tratado)

311. La Demandada sostiene que actuó de conformidad plena con los requisitos del inciso 1 del Artículo 5(1) del Tratado (**aa**)) y los incisos 2 y 3 de esa misma disposición (**bb**)).

### aa)    No existió una violación del Inciso 1 del Artículo 5(1) del Tratado

312. La Demandada afirma que la reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado carece de mérito jurídico ya que (i) la expresión "*medida*" posee un significado "*mucho más amplio que el que sugiere la Demandante*"; y (ii) la referencia a un "*compromiso especial*" ("*engagement particulier*"/"*particular agreement*") "*no pretende significar el Tratado en sí mismo, sino un acuerdo externo al Tratado*"[Traducción del Tribunal] tal como lo evidencia el uso del mismo término del Artículo 10 del Tratado[279].

### bb)    No existió una violación de los incisos 2 y 3 del Artículo 5(1) del Tratado

313. Asimismo, la Demandada señala que su conducta fue acorde a los requisitos de los incisos 2 y 3 del Artículo 5(1) del Tratado.

314. La Demandada sostiene que la "*fecha de expropiación*" dentro del sentido del inciso 3 del Artículo 5(1) del Tratado era el día 29 de marzo de 2011, es decir, la fecha de emisión del Decreto de Expropiación, que desencadenó los procedimientos en virtud de la Ley de Expropiación de Venezuela[280]. Con relación a la toma de control de la planta el día 15 de mayo de 2010 y los eventos subsiguientes, la Demandada afirma, en primer lugar, que fue el sindicato SINPROTRAC, no el Estado, el que ocupó la planta y, en segundo lugar, que la subsiguiente presencia de PDVSA en la planta fue una "*acción responsable y necesaria a la espera del decreto de expropiación para garantizar la seguridad de la*

---

[278] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 21-23.
[279] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 25-26. Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 7.
[280] Escrito Posterior a la Audiencia de la Demandada, ¶ 87 (con nota 187).

*planta*"[Traducción del Tribunal] luego de que la dirección de Norpro Venezuela la abandonara efectivamente[281].

315. Respecto del primer punto, la Demandada niega la existencia de un vínculo causal intrínseco entre el "*anuncio*" del Presidente Chávez y la toma de control de la planta, dado que el presidente "*no ordenó la toma de control de la planta*"[282]. [Traducción del Tribunal]

316. En relación con el segundo aspecto, la Demandada sostiene que la presencia de PDVSA previa a la publicación del decreto de expropiación fue programada con el objetivo de garantizar la seguridad y estabilidad de la planta, en calidad de "*cuidadores*". La Demandada afirma que, con la planta controlada por el sindicato, y ante la ausencia de supervisión por el personal gerencial de Norpro Venezuela, existían causales legítimas de preocupación respecto de la seguridad de los trabajadores y la operación adecuada de los equipos de la planta[283].

317. En este contexto, la Demandada alega que la Demandante no negó el fundamento legal de la presencia de PDVSA, no exigió la devolución de la planta ni solicitó que se le brindara acceso a ella luego del día 15 de mayo de 2010[284].

318. Asimismo, la Demandada no niega que, luego del 15 de mayo 2010, "*existió un 'proceso de nacionalización' en la medida en que, como todos lo reconocían, la Planta no había sido expropiada, sino que en el futuro sería transferida al control del Estado*" [Traducción del Tribunal]. La Demandada señala que las Partes también reconocieron (i) que en ese momento se redactaba un decreto de expropiación; (ii) que se suponía que el decreto debía indicar el punto de partida del procedimiento de expropiación en virtud del derecho venezolano; y (iii) que las Partes considerarían, mientras tanto, alternativas a la expropiación, incluida la constitución de una empresa mixta, con PDVSA como accionista mayoritario y la Demandante como titular de una participación minoritaria[285].

319. En relación con el contenido preciso del requisito de especificación del inciso 3 del Artículo 5(1) del Tratado, la Demandada rechaza la interpretación de la Demandante de acuerdo con la cual la disposición requiere no sólo el reconocimiento de que se abonará un monto equivalente al especificado en el segundo inciso del Artículo 5(1), sino también que la cifra exacta que constituye dicho "*monto*" sea determinada en la fecha en que se anuncia la intención de expropiar. En particular, la Demandada señala que, sobre la base

---

[281] Memorial de Contestación, ¶ 26 (con nota 68); Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60-65.
[282] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 30-31.
[283] Dúplica, ¶¶ 20-22; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 25.
[284] Dúplica, ¶ 23; Escrito Posterior a la Audiencia de la Demandada, ¶ 60 (con nota108), ¶¶ 42-51.
[285] Escrito Posterior a la Audiencia de la Demandada, ¶ 61.

de una interpretación *bona fide* del Artículo 5(1) del Tratado de acuerdo con el Artículo 31(1) de la Convención de Viena sobre el Derecho de los Tratados ("**Convención de Viena**"), requerir una cifra exacta a la fecha de la expropiación "*no es una interpretación de buena fe y no puede ser correcta, ya que plantearía una obligación que los Estados Contratantes no podrían satisfacer salvo de pura casualidad*"[286]. [Traducción del Tribunal]

320.   La Demandada subraya que el Tratado no dispone que el Estado "*debe, antes de anunciar una expropiación, participar en conversaciones con la entidad expropiada en aras de obtener los hechos necesarios para determinar la cifra exacta*" de indemnización, y que "*sin dicha información, sería imposible […] determinar dicha cifra de buena fe*". Por ello, la Demandada sugiere que se realice, en su opinión, una interpretación más razonable de la palabra "*monto*" que no se refiere a una "*cifra exacta en dólares o euros, sino al concepto requerido (es decir, una 'suma […] equivalente al valor real de las inversiones')*"[287]. [Traducción del Tribunal]

321.   En relación con el requisito de prontitud, la Demandada señala que el Artículo 5(1) del Tratado no exige que el Estado abone una indemnización al inversor en la fecha de la expropiación: Si bien el inciso 2 establece que "*[t]odas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización*", es el inciso 3 el que exige que, luego de la determinación de la indemnización, ella sea "*pagada sin retraso alguno*"[288].

322.   La Demandada sostiene que cumplió plenamente con tales requisitos. Primero, la Demandada señala que el Decreto N.º 8.133 y la Ley de Expropiación de Venezuela, de hecho, plasmaron el mecanismo aplicable para la determinación y el pago de una indemnización en el caso de una expropiación, congruente con las obligaciones de la Demandada en virtud del Artículo 5(1) del Tratado y del derecho internacional[289].

323.   Además, contrariamente a las afirmaciones de la Demandante, la Demandada afirma que ha cumplido debidamente con los procedimientos obligatorios exigidos por las leyes nacionales sobre expropiación para determinar la indemnización, a saber, el Artículo 56 de la Ley de Expropiación y la disposición de la Ley de Acceso. La Demandada sostiene que el hecho de que dichos procedimientos no hayan sido cerrados aún y que la Demandante aún deba recibir el pago de la indemnización se debe básicamente a la no

---

[286] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 83-84.
[287] Escrito Posterior a la Audiencia de la Demandada, ¶ 83.
[288] Dúplica, ¶ 155.
[289] Dúplica, ¶¶ 36-39, 169-170, 172.

participación de la propia Demandante en tales procedimientos y a los intentos de la Demandante de extinguirlos[290].

324.  Por último, la Demandada también rechaza el argumento sobre buena fe de la Demandante y señala que, además de sus esfuerzos continuos para determinar la indemnización con arreglo a la Ley de Expropiación, se reunía regularmente con la Demandante en pos de negociar la indemnización, incluida la opción de constituir una "*empresa mixta*"[291].

325.  En cualquier caso, la Demandada sostiene que el mero hecho que la indemnización no se ha pagado aún no convierte a la expropiación en ilícita, si se considera que la Demandada reconoció su obligación de abonar una indemnización e inició el proceso de expropiación conforme a la ley nacional[292]. La Demandada se refiere a numerosos comentaristas y decisiones dictadas por tribunales arbitrales en pos de fundamentar su argumento (*véase* en más detalle a continuación).

**b)     Trato justo y equitativo (Artículo 3(1) del Tratado)**

326.  La Demandada arguye que el Artículo 3(1) del Tratado sólo exige el estándar mínimo de trato en virtud del derecho internacional consuetudinario. En cualquier caso, la Demandada sostiene que aún bajo formulaciones más expansivas, no existiría una violación del TJE.

327.  Con respecto al Contrato de Bauxita, la Demandada señala que no asumió ninguna "*garantía*" o "*compromisos*" frente a Saint-Gobain respecto del suministro o los precios de la bauxita y señala que la Demandante "*no logra identificar un único instrumento jurídico o documento que contenga cualquiera de las supuestas garantías o los compromisos relacionados con el suministro o precio de la bauxita*"[293] [Traducción del Tribunal]. Según la Demandada, la Demandante se refiere a la decisión comercial de CVG Bauxilum de plasmar un aumento en los precios de la bauxita en virtud del Contrato de Bauxita, aun cuando la conducta de CVG Bauxilum no es atribuible a la Demandada de conformidad con el derecho internacional[294].

328.  En contestación a la declaración de la Demandante de que la Demandada no concedió a Saint Gobain el debido proceso respecto de la expropiación, la Demandada resalta que PDVSA estableció su presencia en la planta luego del día 15 de mayo de 2010 exclusivamente en calidad de cuidador y en espera de la publicación del Decreto de

---

[290] Dúplica, ¶¶ 171, 173-187.
[291] Dúplica, ¶¶ 44-56, 188.
[292] Memorial de Contestación, ¶¶ 161-173; Dúplica, ¶¶ 159-168.
[293] Dúplica, ¶¶ 127, 131.
[294] Dúplica, ¶¶ 132-134; Memorial de Contestación, ¶¶ 77-81.

Expropiación formal, lo cual estaba en plena conformidad con la legislación venezolana. Asimismo, la Demandada subraya que, con posterioridad a la toma de control de la planta, PDVSA se reunió con la Demandante para comenzar las negociaciones lo antes posible[295].

329. Por último, la Demandada arguye que el debido proceso no requiere que se entablen conversaciones con la parte expropiada previo al anuncio de la expropiación y que el debido proceso se satisface plenamente si se otorga acceso al poder judicial para ser oído, que es el caso de Venezuela. Una vez más, la Demandada sostiene que la Demandante podría haber objetado a la ocupación de la planta por parte del sindicato o PDVSA antes de la emisión del Decreto de Expropiación ante los tribunales de Venezuela. La Demandada entiende que "*el hecho de que la Demandante decidiera no hacer uso de los recursos de los tribunales de Venezuela no equivale a una denegación del debido proceso*"[296]. [Traducción del Tribunal]

c)    Protección y Seguridad Plenas (Artículo 3(2) del Tratado)

330. La Demandada sostiene que el análisis de la violación del estándar de Protección y Seguridad Plenas (PSP) exige que se considere si se ha dañado o interferido físicamente la inversión y si el Estado cumplió con su obligación de diligencia debida, y que el estándar de PSP no implica el concepto de "*seguridad jurídica*"[297] [Traducción del Tribunal]. En cualquier caso, la Demandada rechaza las reclamaciones de la Demandante relacionadas con el estándar de PSP respecto del Contrato de Bauxita y la toma de control de la planta.

331. La Demandada enfatiza que no fue responsable de los aumentos de precio aplicados por CVG Bauxilum en virtud del Contrato de Bauxita. Asimismo, la Demandada sostiene que un inversor, "*al comunicar su descontento relacionado con la conducta de un socio comercial a un representante del gobierno*", no puede crear la obligación del Estado en virtud del derecho internacional "*de investigar el fondo de su reclamo comercial ni responsabilizar al gobierno por cualquier daño*" [Traducción del Tribunal] en el caso de que el socio comercial del inversor mantenga su conducta indeseada[298].

332. En relación con la toma de control de la planta, la Demandada afirma que cumplió plenamente con sus obligaciones de PSP con anticipación a la emisión del Decreto de Expropiación. La Demandada resalta que si "*no hubiera establecido una presencia a través de PDVSA Industrial en espera de la emisión del Decreto N.° 8.133, y si se*

---

[295] Memorial de Contestación, ¶ 140; Dúplica, ¶ 136.
[296] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 11.
[297] Memorial de Contestación, ¶ 149; Dúplica, ¶ 143.
[298] Dúplica, ¶¶ 141-142.

*hubieran destruido o robado los activos o si se hubieran lastimado las personas, Venezuela claramente habría quedado sujeta a una demanda por incumplimiento con sus obligaciones de SPP*"[299]. [Traducción del Tribunal]

### 3.  Cuantía de Daños

#### a)  Estándar de Indemnización y Fecha de Valuación

333.  La Demandada afirma que, independientemente de si Venezuela cumplió con los requisitos de los incisos 2 y 3 del Artículo 5(1) del Tratado, la fecha correcta de valuación es "*la fecha anterior a la amenaza de expropiación*" tal como exige el inciso 2 del Artículo 5(1) del Tratado[300].

334.  La Demandada se refiere a la redacción del inciso 2 del Artículo 5(1) del Tratado, de acuerdo con la cual el valor del activo expropiado "*debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación*". La Demandada sostiene que este estándar se relaciona con expropiaciones tanto lícitas como ilícitas y que no se limita a las expropiaciones que cumplen con los requisitos descriptos en el inciso 1 del Artículo 5(1) del Tratado[301].

335.  Además, la Demandada sostiene que, en el caso de un mero incumplimiento del Estado con la pronta especificación y el pago de la indemnización, el estándar de indemnización en virtud del derecho internacional consuetudinario no permite que se calcule el monto indemnizatorio mediante "*la construcción de un escenario 'contrafáctico' en el cual la posibilidad de expropiación sea excluida hasta la fecha del laudo*"[302]. [Traducción del Tribunal]

#### b) Cálculo del Monto Indemnizatorio

##### aa)  Método de Valuación

336.  La Demandada concuerda en que el monto indemnizatorio a ser abonado debe reflejar el valor justo de mercado de la planta, es decir, "*el monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado*"[303]. [Traducción del Tribunal]

---

[299] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 11 (nota 42).
[300] Transcripción (Día 1), pág. 240 líneas 20-21.
[301] Dúplica, ¶ 190; Memorial de Contestación, ¶¶ 174 *y ss*.
[302] Escrito Posterior a la Audiencia de la Demandada, ¶ 109.
[303] Memorial de Contestación, ¶¶ 185-187; Escrito Posterior a la Audiencia de la Demandada, ¶ 137.

337. La Demandada no cree necesario considerar el enfoque del Prof. Spiller para comparar la valuación basada en el modelo DCF con los costos de oportunidad de construir una planta similar en detalle dado que conforme a sus expertos en cuantía de daños, el Sr. Brailovsky y el Dr. Flores, tales costos excederían el precio que un comprador interesado estaría dispuesto a pagar por la planta de la Demandante (USD 43,7 millones más los flujos de efectivo no percibidos de USD 1,3 millones al día 15 de mayo de 2010 frente a USD 9,5 millones)[304].

338. En cualquier caso, la Demandada enfatiza que el activo a ser evaluado en el presente caso es una planta autónoma ubicada en Venezuela, no en los Estados Unidos y, por consiguiente, arguye que la única manera adecuada de evaluar la indemnización pagadera a la Demandante es mediante la aplicación de un análisis FFD, incluida una tasa de descuento que toma en cuenta el hecho de que la planta está ubicada en Venezuela[305].

339. En relación con el cálculo FFD, la Demandada esgrimió los siguientes argumentos.

### bb)   Tasa de descuento

340. La Demandada afirma que la tasa de descuento calculada por el Prof. Spiller sería "*baja incluso para una empresa como Norpro Venezuela que opera en una economía madura*". La Demandada argumenta que el Prof. Spiller (i) se apartó de la tasa libre de riesgo sugerida por Ibbotson/Morningstar para proyectos a largo plazo, es decir, el rendimiento del bono del Tesoro de EE. UU. a 20 años a la fecha de valuación; (ii) se desvió de la prima general de riesgo del mercado (PRM) calculada por Ibbotson/Morningstar; e (iii) "*ignoró la evidencia empírica que establecía que el Modelo de Valoración de Activos Financieros (CAPM, por sus siglas en inglés) tiende a subestimar el costo de capital propio en el caso de los activos financieros*" [Traducción del Tribunal], el cual se corrige mediante el coeficiente *alfa*[306].

341. Según la Demandada, la mayor diferencia entre los cálculos de los peritos versa sobre la prima de riesgo país aplicable. La Demandada afirma que esta prima es "*mucho más alta*" que el 4,5% aplicado por el Prof. Spiller, que de hecho no refleja el riesgo país de Venezuela sino más bien el riesgo de cesación de pago sobre los bonos empresariales de

---

[304] Memorial de Contestación, ¶ 188; Dúplica, ¶ 201; Escrito Posterior a la Audiencia de la Demandada, ¶ 138 y ¶ 204-208; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 63; Segundo Informe Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores (**"Brailovsky/Flores II"**), ¶¶ 227 y 242.

[305] Dúplica, ¶¶ 202-203.

[306] Memorial de Contestación, ¶¶ 234-236; Dúplica, ¶ 206. Para obtener una visión general de las diferencias con respecto al costo de capital propio de EE. UU., *véase*, también, la tabla del Escrito Posterior a la Audiencia de la Demandada, posterior a ¶ 140.

EE. UU.[307]. La Demandada se refiere a los cálculos de sus peritos, el Sr. Brailovsky y el Dr. Flores, quienes principalmente se basaron en el Modelo de Calificación de Riesgo País (*CRRM*, por sus siglas en inglés) compilado por Ibbotson/Morningstar y realizaron una verificación cruzada de sus resultados mediante el método *bludgeon* diseñado por el Prof. Damodaran[308].

342. Si bien reconoce que la valuación debe excluir el impacto de la expropiación real de la Planta, la Demandada afirma que ello "*no debería confundirse con el riesgo de expropiación inherente a cualquier proyecto desde su mismo inicio*", que es parte de la "*situación económica normal imperante*" [Traducción del Tribunal] con anticipación al anuncio de expropiación de la Planta y, por ende, también es un riesgo que un comprador interesado tendría en cuenta en la evaluación del precio de compra que estaría dispuesto a pagar por la Planta[309].

343. La Demandada arguye que la prima de riesgo país debe basarse en la percepción de riesgo del comprador; la eliminación de riesgos inherentes a una inversión en Venezuela resultaría en "*el uso de una tasa de descuento que un comprador interesado no estaría dispuesto a aplicar y derivaría en un valor que el comprador interesado no abonaría, concediendo así a la Demandante un golpe de suerte que nunca podría lograr en una transacción en condiciones de libre competencia*". Según la Demandada, ello podría ser punitivo para Venezuela y, por consiguiente, "*no permisible en virtud de ninguna teoría sobre indemnización del derecho internacional*"[310]. [Traducción del Tribunal]

344. En cualquier caso, la Demandada sostiene que "*no hay manera de aislar y, por lo tanto, cuantificar*" [Traducción del Tribunal] el riesgo de una expropiación no indemnizada. Según la Demandada, el Prof. Spiller no propuso ningún método en sus dictámenes periciales para llevarlo a cabo, sino que sólo argumentó durante la Audiencia que podría aplicarse la diferencia entre el margen EMBI correspondiente a Venezuela y el valor de prima de riesgo país del 4,5% calculado por él[311].

345. En cuanto al énfasis de la Demandante colocado durante la Audiencia sobre la tasa de descuento del 15% reflejada en su DAC de fecha 23 de octubre de 2006, la Demandada observa que el significado y el objetivo de dicha tasa continúan siendo poco claros y

---

[307] Memorial de Contestación, ¶ 240; Dúplica, ¶ 207 y ¶ 228. Según la Demandada, el Prof. Spiller debería al menos haber utilizado bonos empresariales de otros países emergentes con la misma calificación que Venezuela, lo cual hubiese resultado en un margen de aproximadamente el 9%. Dúplica, ¶ 221; Escrito Posterior a la Audiencia de la Demandada, ¶ 169.

[308] La Demandada sostiene que sus peritos utilizaron la misma metodología para determinar la tasa de descuento adecuada para ambas fechas de valuación. Memorial de Contestación, ¶ 259.

[309] Dúplica, ¶ 227.

[310] Escrito Posterior a la Audiencia de la Demandada, ¶ 157.

[311] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 163-164, 171.

también sostiene que, en ese momento, el riesgo de cesación de pagos de Venezuela se encontraba "*en uno de los puntos más bajos de todos los tiempos*", con el rendimiento de sus bonos soberanos tan solo un 2,18% más alto que los bonos del Tesoro de EE.UU. La Demandada afirma que, en ese punto, la prima de riesgo país del 3% podría haberse justificado. Lo que es más importante, sin embargo, es que la Demandada enfatiza que la Demandante tomó en cuenta el riesgo de cesación de pagos de Venezuela al evaluar el riesgo país, tal como lo haría un comprador en su evaluación de una tasa de descuento adecuada para determinar el valor justo de mercado de la Planta. Según la Demandada, no existen entonces razones para excluir tal riesgo cuando este se incrementó con el transcurso del tiempo[312].

### cc)    Flujos de Fondos Futuros

346.    La Demandada sostiene que no es objeto de controversia entre las Partes que antes de la expropiación, Norpro Venezuela recibía sólo el 27% de las ganancias, mientras que el 73% restante era destinado a la empresa filial de la Demandante en EE. UU., SGCP[313]. En consecuencia, la Demandada rechaza la hipótesis del Prof. Spiller de que Norpro Venezuela retendría el 100% de las ganancias a la fecha de valuación. Sostiene que un comprador interesado no pagaría por el 100% de las ganancias ya que no estaría adquiriendo las capacidades de SGCP y no estaría dispuesto a transferir las ganancias que espera obtener a través de su propia red de comercialización, logística y distribución[314].

347.    Por ende, la Demandada se refiere a la hipótesis de sus peritos de que un comprador de la Planta obtendría "*a lo sumo*" el 75% de las ganancias ya que la propia Demandante concluyó en su estudio de precios de transferencia que SGCP aportó el 100% de la porción del 25% de los "*bienes intangibles de comercialización*"[315]. [Traducción del Tribunal]

---

[312] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 158-162. Asimismo, la Demandada observa que los mismos documentos reflejan que la Demandante estaba dispuesta a invertir en Venezuela a una tasa interna de retorno del 26,4%. Por ende, la Demandada arguye que, sin dejar de ser un 3% más alta que la tasa de descuento del Prof. Spiller, la tasa de descuento del 15% no es relevante en este caso. Segundo Escrito Posterior a la Audiencia de la Demandada, nota 132.

[313] Memorial de Contestación, ¶¶ 198-199 y ¶ 256 en referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**); Dúplica, ¶¶ 238-242; Escrito Posterior a la Audiencia de la Demandada, ¶ 182.

[314] Memorial de Contestación, ¶¶ 200-202. *Véase,* asimismo, Dúplica, ¶ 244. La Demandada enfatiza que, si bien un comprador podría obtener el 100% de los ingresos de la última venta de proppants, no se beneficiaría del 100% de las ganancias debido a que "*una gran parte de las ganancias*" estaría ligada a las funciones de comercialización, distribución y logística que no eran parte de la transferencia de la Demandante en contraprestación por el precio de compra. Escrito Posterior a la Audiencia de la Demandada, ¶¶ 184-185.

[315] Memorial de Contestación, ¶ 203 que hace referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 5; Dúplica, ¶ 243; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 54.

348. En relación con el precio de la bauxita a ser abonado por Norpro Venezuela a CVG Bauxilum, la Demandada afirma que no existen fundamentos para que la Demandante haya ordenado al Prof. Spiller que reduzca el precio acordado de USD 33,8 por TM al precio original del contrato, dado que Norpro Venezuela había aceptado el precio incrementado en la medida en que no hubiera más aumentos durante el año 2009. Por ende, la Demandada ordenó a sus peritos que basen su cálculo en el precio incrementado, aumentado por el IPP-Materias Primas de EE. UU.[316].

349. Respecto de los costos de transporte, la Demandada señala que el propio costo presupuestado por la Demandante para el transporte desde Venezuela a Alice, Estado de Texas equivalía a EUR 110 (convertido a USD 154) por TM. De acuerdo con la Demandada, esta cifra también está respaldada por el estudio de precios de transferencia de la Demandante[317]. Asimismo, la Demandada rechaza el cálculo del Prof. Spiller de los costos de envío dentro de EE. UU. y afirma que el costo presupuestado por la Demandante y el CCA de Halliburton reflejan un costo "*significativamente más alto*" [Traducción del Tribunal], por lo que sus peritos basaron su cálculo en el costo presupuestado[318].

350. En relación con los gastos de capital, la Demandada concuerda con la teoría del Prof. Spiller hasta el año 2018 inclusive, pero arguye que los gastos de capital anuales aumentarían significativamente "*a medida que la Planta envejecía y los equipos alcanzaban el final de su vida útil*"[319]. Si bien el Prof. Spiller incluyó sólo los gastos de mantenimiento, la Demandada sostiene que los gastos relativos a "*la salud y la seguridad, la tecnología y las mejoras para reducir las averías e interrupciones del proceso*" [Traducción del Tribunal] también son necesarios para asumir la operación de manera indefinida y, por consiguiente, afirma que deberían incluirse en el cálculo los cuatros gastos de capital tal como fueron previstos para la planta de la demandante ubicada en Fort Smith[320].

351. Respecto del capital de trabajo, la Demandada acepta el cálculo del Prof. Spiller salvo en relación con los créditos fiscales por el Impuesto al Valor Agregado (IVA). La Demandada sostiene que al día 15 de mayo de 2010 Norpro Venezuela no había siquiera solicitado los certificados de recuperación de impuestos y señala que el proceso de

---

[316] Memorial de Contestación, ¶ 210 y ¶ 256; Dúplica, ¶ 251 que cita parte de la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo R-52**).

[317] Memorial de Contestación, ¶ 214 y ¶ 256 que hace referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), págs. 10 y 42 y Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 195-198; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 58-59.

[318] Memorial de Contestación, ¶¶ 215-216 que hace referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1.

[319] Memorial de Contestación, ¶¶ 217-218 y ¶ 256.

[320] Dúplica, ¶ 262.

recuperación es usualmente un proceso "*extenso y complejo*". La Demandada afirma que, por ende, sus peritos asumieron que los créditos fiscales IVA pendientes al día 15 de mayo de 2010 hubieran sido monetizados en 2013 y que los demás créditos fiscales IVA acumulados a partir de entonces habrían sido monetizados a dos años de manera progresiva y, por lo tanto, habrían sido parte del capital de trabajo que un comprador no valuaría por separado[321].

### 4. Petitorio de la Demandada

352. La Demandada concluye que el Tribunal debería declarar que la expropiación de la planta fue lícita y otorgar a la Demandante una indemnización con base en el Artículo 5(1) del Tratado por la suma de USD 9,5 millones, el valor justo de mercado de la planta al día 15 de mayo de 2010, más los intereses simples anteriores al laudo calculados a una tasa de Letras del Tesoro de EE. UU. a tres meses, más 1,1 en puntos porcentuales. Las reclamaciones basadas en el aumento del precio de la bauxita deberían declararse inadmisibles, o, si se decidiera entender en ellas, deberían desestimarse sobre los hechos y el derecho. Todas las demás reclamaciones deberían desestimarse sobre los hechos y el derecho. Los costos de dichos procedimientos en los que hubiere incurrido la Demandada (incluidos los honorarios legales y desembolsos) deberían deducirse del monto indemnizatorio otorgado a la Demandante[322].

## F.  RAZONAMIENTO DEL TRIBUNAL

### I.  JURISDICCIÓN

353. Las Partes no han controvertido que la jurisdicción del Tribunal deriva del Artículo 25(1) del Convenio CIADI y del Artículo 8(2) del Tratado. El Artículo 25(1) del Convenio CIADI dispone lo siguiente en su parte pertinente:

> "*La jurisdicción del Centro se extenderá a las diferencias de naturaleza jurídica que surjan directamente de una inversión entre un Estado Contratante* [...] *y el nacional de otro Estado Contratante y que las partes hayan consentido por escrito en someter al Centro*".

354. El Artículo 8(2) del Tratado dispone lo siguiente:

---

[321] Dúplica, ¶¶ 269-271; Escrito Posterior a la Audiencia de la Demandada, ¶ 201.

[322] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 64. El petitorio de la Demandada no se ha modificado a través de la Actualización de la Valuación presentada el día 22 de octubre de 2015 debido a que dicha presentación se relacionaba exclusivamente con la valuación de la Planta a la fecha del laudo, que fue actualizada al día 31 de agosto de 2015. La Demandada, no obstante, mantiene su posición de que el valor de la Planta debe evaluarse a la fecha de la primera amenaza de expropiación con arreglo al inciso 2 del Artículo 5(1) del Tratado. *Cfr.* Escrito Posterior a la Audiencia de la Demandada, ¶ 137.

"*Si dicha controversia* [entre un nacional o una sociedad de una Parte Contratante y la Otra Parte Contratante en lo concerniente a una obligación de esta última en relación con una inversión en virtud del presente Acuerdo] *no pudiese ser resuelta en un plazo de seis meses a partir del momento en que ha sido identificada por una u otra de las partes en controversia, se someterá, a pedido del nacional o de la sociedad en cuestión, a la jurisdicción competente del estado en el cual se ha efectuado la inversión o bien al arbitraje del Centro Internacional para el Arreglo de Diferencias relativas a Inversiones (C.I.A.D.I.)creado por la Convención para el arreglo de diferencias relativas a las inversiones entre Estados y nacionales de otros Estados, firmado en Washington el 18 de marzo de 1965. Dicha opción queda a elección del nacional o de la sociedad interesada. Una vez ejercida la opción de arbitraje, esta será definitiva*"[323].

355. De conformidad con el Artículo 25(1) del Convenio CIADI, deben satisfacerse los siguientes cuatro requisitos: (i) debe existir una diferencia de naturaleza jurídica entre las Partes; (ii) la diferencia debe surgir directamente de una inversión; (iii) las Partes deben ser un Estado Contratante y un nacional de otro Estado Contratante; y (iv) ambas partes deben haber consentido por escrito en someter la diferencia al CIADI.

356. Las Partes no discrepan en que los cuatro requisitos se cumplen en el presente caso[324]. En primer lugar, existe una diferencia de naturaleza jurídica entre las Partes debido a que la Demandante pretende obtener una reparación por los supuestos incumplimientos por parte de la Demandada con los Artículos 5(1), 3(1) y (2) del Tratado[325].

357. En segundo lugar, esta controversia surge directamente de una inversión en el sentido del Artículo 1(1) del Tratado, que incluye "*todos los haberes, tales como los bienes, derechos e intereses de cualquier índole*" y, en particular, "*acciones [...] en las sociedades constituidas en el territorio de una de las Partes Contratantes*", "*derechos reales tales como hipotecas*" y "*los derechos a cualquier prestación con valor económico*"[326]. En este caso, la Demandante sostiene que (i) es tenedora del 99,99% de las acciones de Norpro Venezuela, sociedad constituida y existente en virtud de las leyes de Venezuela; (ii) proporcionó financiación de la deuda a Norpro Venezuela, que fue garantizada a través de una hipoteca sobre Norpro Venezuela; y (iii) fue propietaria de bienes y titular de derechos contractuales en relación con proveedores locales y derechos de acuerdo con la

---

[323] La traducción libre al inglés presentada como **Anexo C-1**. Los textos originales en idioma español y francés han sido citados en el párrafo 12 *supra*.

[324] La Demandada no ha planteado ninguna excepción a la jurisdicción del Tribunal. Durante la Audiencia, la Demandada afirmó en tal sentido: "*[Y] ahora por eso nos encontramos aquí y este Tribunal tendrá que determinar la indemnización también. De eso no hay -- no tenemos problema*". Transcripción (Día 1), pág. 159 líneas 16-19.

[325] *Cfr.* Memorial, ¶ 123; RfA, ¶ 69.

[326] Artículo 1(1)(a), (b) y (c) del Tratado. Traducción libre al inglés presentada como **Anexo C-1**.

legislación, tales como licencias y permisos[327]. La Demandada no objetó a ninguna de dichas afirmaciones. Por ende, la controversia entre las Partes surge directamente de la inversión de la Demandante en Norpro Venezuela.

358. En tercer lugar, a pesar de que Venezuela denunció el Convenio CIADI el día 24 de enero de 2012[328], la Demandada no controvierte que era un Estado Contratante con arreglo al sentido del Artículo 25(1) del Convenio CIADI a los efectos de este procedimiento. La Demandante observa que el Convenio CIADI entró en vigor para Venezuela el día 1 de junio de 1995 y que, por ende, Venezuela era un Estado Contratante cuando (i) consintió al Arbitraje CIADI en virtud del Tratado el día 2 de julio de 2001; (ii) la Demandante cursó sus notificaciones de controversia a la Demandada los días 4 de julio de 2011 y 17 de enero de 2012; y (iii) la Demandante presentó su Solicitud de Arbitraje el día 25 de abril de 2012, dado que la denuncia de Venezuela del Convenio CIADI sólo entró en vigencia el día 25 de julio de 2012[329]. Asimismo, la Demandante es un nacional, es decir, una persona jurídica en el sentido del Artículo 25(2)(b) del Convenio CIADI, de otro Estado Contratante debido a que la Demandante es una sociedad constituida en virtud de la legislación de Francia, para la cual el Convenio CIADI entró en vigor el día 20 de septiembre de 1967[330].

359. Por último, ambas Partes prestaron su consentimiento por escrito a someter esta controversia al CIADI. El consentimiento de la Demandada está receptado en el Artículo 8(2) del Tratado. Los requisitos de tal disposición también han sido satisfechos: (i) La controversia fue planteada por un nacional o una sociedad de una Parte Contratante del Tratado (sociedad constituida en Francia) contra la otra Parte Contratante (Venezuela); (ii) se cursó una notificación de la controversia (4 de julio de 2011) con una anticipación de al menos seis meses previo al sometimiento de la controversia al arbitraje (25 de abril de 2012) y no se alcanzó un arreglo amistoso durante tal período; y (iii) la controversia en virtud del Tratado no ha sido sometida a los tribunales de Venezuela por parte del nacional o la sociedad[331].

360. La Demandante prestó su consentimiento en su notificación de la controversia de fecha 4 de julio de 2011, que fue, *inter alia*, cursada al Presidente de Venezuela, y reiteró su consentimiento en su segunda carta remitida al Presidente de fecha 17 de enero de 2012[332].

---

[327] Memorial, ¶¶ 117-118; RfA, ¶ 66.
[328] Memorial, ¶ 114.
[329] Memorial, ¶¶ 126, 128.
[330] Memorial, ¶ 126; RfA, ¶ 69.
[331] *Cfr.* Memorial, ¶¶ 120-121; RfA, ¶¶ 72-73.
[332] Memorial, ¶ 127; RfA, ¶ 69. **Anexos C-42 y C-44**.

361. Como resultado, el Tribunal concluye que los requisitos del Artículo 25(1) del Convenio CIADI han sido satisfechos y que goza de competencia para entender en la controversia que le fue planteada.

## II.    ADMISIBILIDAD

362. La Demandada plantea excepciones en relación con la admisibilidad de las siguientes dos reclamaciones planteadas por la Demandante en este procedimiento: (i) que, en virtud del aumento de precio de la bauxita que se había acordado inicialmente mediante el Contrato de Bauxita celebrado entre la Demandante y CVG Bauxilum, la Demandada no brindó a la Demandante un trato justo y equitativo de conformidad con el Artículo 3(1) del Tratado y no proporcionó protección y seguridad a la inversión de la Demandante conforme al Artículo 3(2) del Tratado (las **"Reclamaciones sobre la Bauxita"**)[333]; y (ii) que las medidas de la Demandada fueron "*contrarias a un compromiso especial*" en el sentido del inciso 1 del Artículo 5(1) del Tratado[334].

## 1.    Reclamaciones sobre la bauxita

### a)    Síntesis de la Postura de la Demandada

363. La Demandada afirma que las Reclamaciones sobre la Bauxita son inadmisibles. Aún si la Demandante pudiera establecer que los precios de la bauxita se incrementaron en violación del Contrato de Bauxita, ello no podría, por sí solo, dar lugar a la responsabilidad de la Demandada en virtud del derecho internacional dado que no es una parte en el Contrato de Bauxita[335]. La Demandada afirma que la Demandante no logra identificar algún instrumento jurídico celebrado con el Estado, o cualquier acto relevante por parte del Estado, sobre la cual pueda basar sus Reclamaciones sobre la Bauxita[336].

364. En particular, la Demandada sostiene que los aumentos de precio invocados por CVG Bauxilum no son atribuibles a la Demandada en virtud del Proyecto de Artículos de la Comisión de Derecho Internacional[337]. La Demandada arguye que CVG Bauxilum, que posee una personalidad jurídica distinta de la correspondiente a la Demandada y no ejerce ninguna facultad ejecutiva en virtud del derecho venezolano, no puede considerarse un órgano del Estado en el sentido del Artículo 4 del Proyecto de Artículos de la CDI. Asimismo, la Demandada sostiene que CVG Bauxilum no ejerció autoridad gubernamental conforme al Artículo 5 del Proyecto de Artículos de la CDI dado que, al

---

[333] Memorial, ¶¶ 165-177; 190-194.
[334] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 38-47.
[335] Memorial de Contestación, ¶¶ 73-74; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 125-126.
[336] Dúplica, ¶ 78.
[337] Memorial de Contestación, ¶¶ 76-106; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 125-126.

actuar en su carácter de sociedad comercial del sector minero en beneficio de la Demandada, no posee ni ejerce facultades gubernamentales al llevar a cabo tales actividades[338].

365.  Por último, la Demandada señala que CVG Bauxilum no actuó siguiendo instrucciones de la Demandada, ni bajo su dirección o control, en el sentido de los términos del Artículo 8 del Proyecto de Artículos de la CDI; a pesar de que CVG Bauxilum en última instancia se encuentra sujeta a la tutela administrativa del MIBAM, ello no es suficiente para establecer un control directo del Estado conforme a los términos del Artículo 8 del Proyecto de Artículos de la CDI[339].

### b)     Síntesis de la Postura de la Demandante

366.  La Demandante afirma que los argumentos planteados por la Demandada no afectan la admisibilidad de las Reclamaciones sobre la Bauxita, pero que están relacionados con el fondo del caso. La Demandante sostiene que la admisibilidad meramente versa sobre "*si la reclamación, en la manera en que fue planteada, puede o debería ser resuelta por un tribunal internacional, que de otro modo ha determinado su jurisdicción*"[340] [Traducción del Tribunal]. La Demandante hace hincapié en que sus Reclamaciones sobre la Bauxita no se basan en el Contrato de Bauxita como tal, sino en las violaciones por parte de la Demandada del Tratado, y por ende son "*analíticamente distintas*" de cualquier reclamación que Norpro Venezuela podría haber planteado en virtud del Contrato de Bauxita[341].

367.  La Demandante se refiere a su posición de que durante la negociación del Contrato de Bauxita, Venezuela señaló claramente que "*controlaba CVG Bauxilum y que todas las decisiones relevantes respecto de la conducta de CVG Bauxilum serían tomadas a nivel ministerial*" [Traducción del Tribunal]. La Demandante sostiene que sus Reclamaciones sobre la Bauxita se basan en el hecho de que la conducta de CVG Bauxilum fue sancionada o puedo haberse evitado por el ministerio competente; por ende, constituyen reclamaciones por violación del Tratado[342].

### c)     El Análisis del Tribunal

368.  En relación con la admisibilidad, el análisis del Tribunal se limita a la cuestión que consiste en determinar si "*no puede descartarse, al menos prima facie*", que la supuesta

---

[338] Memorial de Contestación, ¶¶ 84, 89.
[339] Memorial de Contestación, ¶¶ 104-105.
[340] Réplica, ¶ 67, con cita a V. Heiskanen, *Jurisdiction, Admissibility, and Competence in Investment Treaty Arbitration*, ICSID Review (2013), **CLA-126**, p. 237.
[341] Réplica, ¶ 67.
[342] Réplica, ¶ 68.

conducta de la Demandada respecto de los derechos de la Demandante en virtud del Contrato de Bauxita puede, "*si se demuestra*", estar comprendida dentro del alcance de las obligaciones de la Demandada en virtud del Tratado[343].

369. El Tribunal observa que las excepciones planteadas por la Demandada a la admisibilidad de las Reclamaciones sobre la Bauxita están relacionadas, en cierta medida, con la distinción común y relevante entre las reclamaciones que surgen de los tratados y aquellas que surgen de los contratos. Dicha distinción es particularmente importante en los casos en que el inversor ingresa en relaciones contractuales directas con el Estado; en tales casos, los derechos contractuales del inversor pueden muy posiblemente encontrarse dentro del alcance de un tratado bilateral de inversión. No obstante, la misma distinción puede también jugar un rol en caso de que dicha relación contractual haya sido entablada con un ente estatal, como en el presente caso.

370. Los tribunales que entienden en controversias relacionadas con tratados de inversión son frecuentemente convocados para distinguir claramente entre meros incumplimientos contractuales y violaciones de tratados. En tal sentido, la Demandada se refirió correctamente a la decisión del tribunal del caso *Bayindir c. Pakistán*:

> "*[D]ebido a que una violación de un tratado es diferente de un incumplimiento contractual, el Tribunal considera que la Demandante debe establecer que existe una violación de naturaleza diferente a un simple incumplimiento contractual, es decir, una violación que el Estado comete en el ejercicio de su poder soberano*"[344]. [Traducción del Tribunal]

371. Si bien la Demandante afirma en este caso que, *inter alia*, CVG Bauxilum actuaba en violación del Contrato de Bauxita y que dicha conducta es atribuible a la Demandada[345], no sostiene que el supuesto incumplimiento del contrato como tal constituyó, al mismo tiempo, una violación del Tratado. Por el contrario, la Demandante arguye que la Demandada era propietaria de un monopolio sobre la producción y la venta de la bauxita en Venezuela, por lo cual Norpro Venezuela no tuvo otra opción más que aceptar los nuevos términos impuestos[346]. Además, la Demandante afirma que la Demandada hizo "*promesas específicas*" y asumió "*compromisos*" y que de ese modo "*creó expectativas específicas*", sobre las cuales se basó la Demandante al realizar sus inversiones; asimismo,

---

[343] Citas de *Bayindir c. Pakistán*, ¶ 246. **Anexo CLA-009**. El árbitro Bottini prefiere un concepto más amplio de admisibilidad, bajo el cual las Reclamaciones sobre la Bauxita podrían ser abordadas. Sin embargo, dada la decisión del Tribunal respecto de estas reclamaciones, entiende que fla presente observación no modificaría el resultado en este caso.

[344] Escrito Posterior a la Audiencia de la Demandada, ¶ 135 (nota 288). *Bayindir c. Pakistán*, ¶ 180. **Anexo CLA-009**.

[345] Memorial, ¶ 169 y ¶¶ 173 *y ss*.

[346] Memorial, ¶ 171.

señala que la Demandada *"repudió tales expectativas, al no abordar* [...] *las medidas de CVG Bauxilum relacionadas con el aumento del precio de la bauxita"*[347]. [Traducción del Tribunal]

372. Con base en dichas alegaciones, la Demandante sostiene que la Demandada violó sus obligaciones en virtud del Artículo 3(1) del Tratado (Trato Justo y Equitativo) y el Artículo 3(2) del Tratado (Protección y Seguridad Plenas)[348].

373. A los efectos de decidir sobre la admisibilidad de las Reclamaciones sobre la Bauxita, el Tribunal *"aceptará pro tem los hechos alegados"* por la Demandante *"como ciertos"*[349], es decir, que la Demandada hizo efectivamente promesas específicas y asumió compromisos frente a la Demandante en relación con el Contrato de Bauxita, las cuales excedieron los incentivos generales ofrecidos en aras de promocionar un ambiente ampliamente atractivo para los inversores. Sobre esta base, el Tribunal considera que, *prima facie*, la supuesta conducta de la Demandada se encuentra dentro del alcance de sus obligaciones de garantizar un trato justo y equitativo en virtud del Artículo 3(1) del Tratado y de proporcionar protección y seguridad plenas con arreglo al Artículo 3(2) del Tratado. La cuestión que consiste en determinar si la Demandada efectivamente hizo tales promesas o asumió dichos compromisos se analizará en la sección sobre el fondo de esta decisión.

## 2. Reclamación relacionada con el Inciso 1 del Artículo 5(1) del Tratado

374. Durante la Audiencia y mediante sus Presentaciones Posteriores a la Audiencia, la Demandante sostiene que la Demandada no sólo violó los incisos 2 y 3 del Artículo 5(1) del Tratado, sino también el inciso 1. Específicamente, la Demandante afirma, en primer lugar, que la expropiación no se debió a una *"medida"* (*"mesures"/"measures"*) y, en segundo lugar, que violó un *"compromiso especial"* (*"engagement particulier"/"particular undertaking"*)[350].

### a) Síntesis de la Postura de la Demandada

375. La Demandada señala que la reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado debería desestimarse. La Demandada arguye que la Demandante nunca planteó su *"nueva e inoportuna teoría"* respecto del inciso 1 con anticipación a la

---

[347] Memorial de Réplica, ¶ 120; Presentación Posterior a la Audiencia de la Demandante, ¶ 80.
[348] Memorial de Réplica, ¶¶ 122, 137-142.
[349] Citas de *Caso Relativo a Plataformas Petrolíferas (República Islámica de Irán c. EE.UU.)*, Opinión Separada de la Jueza Higgins sobre Excepciones Preliminares de fecha 12 de diciembre de 1996, (1996) Informes de la CIJ, 847 (856). **Anexo CLA-017**.
[350] Transcripción (Día 1), pág. 25 líneas 1-14; pág. 307 línea 15 – pág. 310 línea 18; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 38-47.

Audiencia, ya sea mediante su Memorial, o su Réplica, o durante la conferencia previa a la audiencia o en cualquier solicitud previa a la audiencia. La Demandada afirma que la posición de la Demandante es, por consiguiente, incompatible con la Regla 31(3) de las Reglas de Arbitraje CIADI[351].

376. En particular, la Demandada niega que esta reclamación haya sido provocada por una cambio de posición en su Dúplica y resalta que, ya en su Memorial de Contestación, adoptó la posición de que la expropiación se llevó a cabo cuando se emitió el Decreto el día 29 de marzo de 2011, tal como lo reconoció la Demandante en su resumen de los "*Hechos Controvertidos*" de su Réplica[352].

### b)    Síntesis de la Postura de la Demandante

377. La Demandante señala que sus argumentos relacionados con el inciso 1 del Artículo 5(1) del Tratado fueron informados por el hecho de que, por primera vez en su Dúplica, la Demandada planteó el argumento de "*que lo que sucedió entre mayo 2010 y marzo 2011 no era la expropiación, que la expropiación ocurrió recién en* [marzo de] *2011*"[353].

378. Asimismo, la Demandante afirma que su reclamación no es "*ni novedosa ni extemporánea*" dado que la Demandante nunca limitó su reclamación sobre expropiación al argumento de que existía una falta de indemnización. Por el contrario, la Demandante había planteado el argumento de que la expropiación no se realizó de manera justa y equitativa y que no se concedió a la Demandante el debido proceso desde el inicio del procedimiento[354].

379. Finalmente, la Demandante arguye que aún si hubiera planteado una nueva reclamación durante la Audiencia, la Demandada no logró establecer "*por qué ello es problemático*". Según la Demandante, la Regla 31(3) de las Reglas de Arbitraje CIADI "*asume una evolución natural del argumento*" [Traducción del Tribunal] durante el transcurso del procedimiento. Además, la Demandante observa que la Demandada tuvo la oportunidad de presentar sus opiniones durante su alegato de apertura y a lo largo de la Audiencia, como así también mediante sus dos Escritos Posteriores a la Audiencia[355].

---

[351] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 4, 21-23.
[352] Escrito Posterior a la Audiencia de la Demandada, ¶ 6 que hace referencia al Memorial de Contestación, ¶ 2 y Réplica, ¶ 9(c).
[353] Transcripción (Día 3), pág. 876 líneas 19-21.
[354] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 30, 44-45 que hace referencia al Memorial, ¶¶ 180-184 y la Réplica, ¶¶ 89-95, 125-130.
[355] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 46-48.

Caso CIADI N.º ARB/12/13                                                           Página 102 de 261

### c)    El Análisis del Tribunal

380. El Tribunal tiene conocimiento de que las disposiciones relativas a las presentaciones escritas contenidas en la Regla 31 de las Reglas de Arbitraje CIADI están estrechamente relacionadas con el derecho procesal fundamental de las partes a ser oídas. La Regla 31(3) dispone en tal sentido que:

> "*Los memoriales deberán contener: una relación de los hechos pertinentes, una declaración del derecho aplicable, y las peticiones. Los memoriales de contestación, la réplica o la dúplica contendrán la aceptación o negación de los hechos declarados en el último escrito presentado; cualesquiera hechos adicionales, en caso necesario; las observaciones concernientes a la declaración del derecho aplicable contenida en el último escrito presentado; una declaración de derecho en respuesta al mismo; y las peticiones*".

381. En este caso, cada una de las Partes afirma que la otra Parte planteó, en una etapa avanzada del procedimiento, una nueva cuestión que no era parte de las anteriores presentaciones de la otra Parte, y que deberá contar con la oportunidad de responder debidamente a la nueva cuestión.

382. En aras de otorgar pleno efecto a los derechos procesales de las Partes, el Tribunal sugirió, al final de la Audiencia, que deberían realizarse dos rondas de presentaciones posteriores a la audiencia[356]. De esta manera, ambas Partes tuvieron la oportunidad de reaccionar a lo que consideraban una nueva posición de la otra Parte, y de responder a la reacción de la otra Parte. El Tribunal también sugirió que no debería haber un límite fijo de páginas para las presentaciones posteriores a la audiencia de manera que cada Parte pudiera proporcionar sus consideraciones sobre las cuestiones según les pareciera adecuado, pero ambas Partes prefirieron contar con un límite de páginas para ambas presentaciones y así lo acordaron[357].

383. Por este motivo, el Tribunal concluye que, a pesar de que puede haber sido un poco tarde para que la Demandante plantee una reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado en ocasión de la Audiencia, ambas Partes tuvieron suficientes oportunidades para reaccionar ante las posiciones de la otra parte y brindar sus consideraciones al respecto como parte de sus presentaciones posteriores a la audiencia. Por ende, el Tribunal no considera apropiado rechazar esta reclamación sin proceder a analizar si tiene fundamento jurídico.

---

[356] Transcripción (Día 4), pág. 1251 líneas 11-19.

[357] Transcripción (Día 4) pág. 1252 líneas 8 – pág. 1253 línea 11.

## III.  VIOLACIÓN DEL TRATADO

384.  A continuación, el Tribunal procederá a analizar si la Demandada violó el Tratado. La Demandante alega que la Demandada incumplió las siguientes disposiciones:

- Artículo 5(1) del Tratado con respecto a sus obligaciones relativas a la expropiación (**1.**);
- Artículo 3(1) del Tratado con respecto a su obligación de otorgar trato justo y equitativo (**2.**); y
- Artículo 3(2) del Tratado con respecto a su obligación de otorgar protección y seguridad plenas (**3.**).

## 1.  Expropiación (Artículo 5(1) del Tratado)

385.  La Demandante argumenta que la Demandada violó el inciso 1 del Artículo 5(1) del Tratado (**a)**) así como los incisos 2 y 3 de la esa misma disposición (**b)**).

### a)  Violación del Inciso 1 del Artículo 5(1) del Tratado

#### aa)  Síntesis de la Postura de la Demandante

386.  El argumento de la Demandante en relación con su reclamación respecto del inciso 1 del Artículo 5(1) del Tratado tiene dos aspectos:

387.  En primer lugar, la Demandante alega que la expropiación no se realizó en virtud de una "*medida*". Según la Demandante, una "*medida*" de expropiación o nacionalización en el sentido del inciso 1 del Artículo 5(1) del Tratado consiste en "*todo tipo de actos administrativos, legislativos o judiciales, realizados por cualquiera de los Poderes que integran la República Bolivariana*", y que no existió dicho acto formal en el presente caso hasta que la Demandada emitió el Decreto de Expropiación en el mes de marzo de 2011. Según la Demandante, un Estado que toma el control de bienes sin el respaldo de algún instrumento jurídico para dicha expropiación no realiza una expropiación conforme a una medida y, por ende, no lo hace de acuerdo con ningún concepto del debido proceso[358].

388.  En segundo lugar, la Demandante afirma que la expropiación de la planta no se llevó a cabo en consonancia con la obligación de la Demandada en virtud del Artículo 3(1) del Tratado de otorgar a la inversión de la Demandante un trato justo y equitativo y, por consiguiente, se violó un "*compromiso especial*" ("*engagement particulier*"/"*particular*

---

[358] Presentación Posterior a la Audiencia de la Demandante, ¶ 39, con cita de *OI European Group c. Venezuela* ¶ 324. **Anexo CLA-156** (traducción libre).

Caso CIADI N.º ARB/12/13                                                      Página 104 de 261

*undertaking*") en los términos del inciso 1 del Artículo 5(1) del Tratado[359]. En particular, la Demandante alega que la Demandada "*tomó el control de la Planta en violación directa de los derechos de debido proceso de Saint-Gobain*" y "*sin una medida de cualquier tipo que estableciera un marco legal para la expropiación ni un esfuerzo para entablar negociaciones de buena fe sobre la indemnización*". La Demandante afirma que la expropiación fue, por consiguiente, ilícita[360]. [Traducción del Tribunal]

### bb)    Síntesis de la Postura de la Demandada

389.  La Demandada alega que la reclamación relacionada con el inciso 1 del Artículo 5(1) del Tratado carece de mérito jurídico. En relación con el argumento de la Demandante relacionado al término "*medida*", la Demandada sostiene que dicho término "*tiene un significado mucho más amplio que el sugerido por la Demandante*" [Traducción del Tribunal] y alega que, contrariamente a la posición de la Demandada, aún en el caso de que el anuncio por televisión del Presidente Chávez constituyera la expropiación, ello representaría una "*medida*" en virtud del Tratado y el derecho internacional[361].

390.  Asimismo, la Demandada sostiene que la referencia a un "*compromiso especial*" ("*engagement particulier*"/"*particular agreement*") "*no pretende significar el Tratado en sí mismo, sino un acuerdo externo al Tratado*". En tal sentido, la Demandada observa que la Demandante no citó ningún precedente jurídico para respaldar su posición y resalta que en el único caso citado por la Demandante al respecto, el tribunal tuvo que decidir sobre una disposición del tratado que – a diferencia del inciso 1 del Artículo 5(1) del Tratado – incluía explícitamente el requisito de que la expropiación "*se llevara a cabo bajo el debido proceso del derecho*" [Traducción del Tribunal]  como condición de la licitud de una expropiación[362].

391.  En sustento de su postura, la Demandada también se refiere a: (i) el uso del término "*acuerdo*" ("*accord*"/"*agreement*") en los casos en los que el Tratado se refiere a sí mismo; (ii) el uso distinto del término "*compromiso particular*" ("*engagement particulier*"/"*particular agreement*") para un acuerdo externo en el Artículo 10 del Tratado; y (iii) la redacción de otros tratados de inversión, que disponen explícitamente

---

[359] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.

[360] Presentación Posterior a la Audiencia de la Demandante, ¶ 42 con cita al tribunal de *Kardassopoulos c. Georgia*, ¶ 396. **Anexo CLA-046**.

[361] Escrito Posterior a la Audiencia de la Demandada, ¶ 29 (nota 40); Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 7.

[362] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 8-9 en referencia a *Kardassopoulos c. Georgia*, ¶ 386. **Anexo CLA-46**.

que la expropiación debe realizarse de acuerdo con otras disposiciones sustantivas del Tratado en cuestión[363].

### cc) El Análisis del Tribunal

392. Al decidir sobre esta primera reclamación por violación del Tratado, el Tribunal procederá a examinar el inciso 1 del Artículo 5(1) del Tratado a la luz de su redacción y su contexto dentro del marco del Tratado. En las versiones originales en idioma español y francés, la disposición reza lo siguiente:

*"Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier"*[364].

*"Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalización ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversiones que les pertenezcan, en su territorio y en su zona marítima, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial"*[365].

393. La traducción en idioma inglés presentada por la Demandante dispone lo siguiente:

*"The Contracting Parties shall not take any direct or indirect measures to expropriate or nationalize or any other measures with the aim of seizing investments belonging to nationals and companies of the other Party, in their territory and in maritime area, except in the public interest and provided that these measures are neither discriminatory, nor contrary to a particular agreement"*[366].

394. Con respecto al primer argumento presentado por la Demandante, el Tribunal considera que el término *"medidas"* (*"mesures"*/*"measures"*) relacionado con la expropiación o

---

[363] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 25-27.

[364] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[365] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

[366] Traducción al inglés presentada como **Anexo C-1**.

nacionalización a las que se refiere el inciso 1 del Artículo 5(1) del Tratado no constituye por sí solo un requisito relacionado con la licitud de la expropiación o nacionalización, sino que pretende incluir todos los actos o las omisiones del Estado que podrían ser equivalentes a una conducta expropiatoria. El Tribunal concuerda con la descripción brindada por la CIJ en el Caso *Fisheries Jurisdiction*:

> "*[E]n su sentido ordinario, la palabra as lo suficientemente amplia como para cubrir cualquier acto, paso o procedimiento, y no impone ningún límite particular sobre su contenido material o la finalidad que se persigue mediante su uso*"[367]. [Traducción del Tribunal]

395.  Como resultado, el Tribunal considera que una violación del inciso 1 del Artículo 5(1) del Tratado no puede derivar de la omisión de un Estado de actuar en la forma de una "*medida*", sino sólo del incumplimiento de los tres requisitos sustanciales de dicho inciso, es decir, que la medida esté justificada por causa de utilidad pública, no sea discriminatoria y no sea contraria a cualquier acuerdo o compromiso particular.

396.  En relación con el significado del término "*compromiso especial*" o " *compromiso particular*" ("*engagement particulier*"/"*particular agreement*")[368], al Tribunal no lo convence la interpretación de la Demandante, según la cual el término incluye compromisos externos e internos respecto del Tratado. De acuerdo con el Artículo 31(1) de la Convención de Viena, al cual ambas Partes hacen referencia en relación con la interpretación de las disposiciones del Tratado, el Artículo 5(1) del Tratado debería "*interpretarse de buena fe conforme al sentido corriente que haya de atribuirse a los términos del tratado en el contexto de estos y teniendo en cuenta su objeto y fin*"[369]. Según el Tribunal, el significado común de los adjetivos "*particulier*" y "*especial*" en relación con un "*engagement*" o "*compromiso*" implican una referencia a obligaciones que surgen de acuerdos distintos del Tratado o externos a él.

397.  Tal como lo ha señalado correctamente la Demandada, esta interpretación se confirma por la redacción empleada en el Artículo 10 del Tratado (que forma parte del contexto del Artículo 5(1), conforme al Artículo 31(2) de la Convención de Viena):

---

[367] Citado en *Saluka c. República Checa*, ¶ 459. **Anexo CLA-071**.

[368] Las Partes convienen en que una traducción más precisa de los términos utilizados en los textos en idioma español y francés constituiría "*particular undertaking,*" "*specific undertaking*" o "*specific commitment*". Presentación Posterior a la Audiencia de la Demandante, ¶ 38 (nota 109); Escrito Posterior a la Audiencia de la Demandada, ¶ 24 (nota 35). No obstante, ninguna de las Partes ha argumentado que cualquiera de estas traducciones habría resultado en un significado diferente del término. De hecho, la Demandante sostuvo en la Audiencia y una vez más en su Presentación Posterior a la Audiencia que "*es una distinción que no influye mucho*". Transcripción (Día 1), pág. 146 línea 14; Presentación Posterior a la Audiencia de la Demandante, ¶ 40 (nota 113).

[369] **Anexo CLA-086**, Artículo 31(1).

*"Les investissements ayant fait l'objet d'un engagement particulier de l'une des Parties contractantes à l'égard des nationaux et sociétés de l'autre Partie contractante sont régis, sans préjudice des dispositions du présent accord, par les termes de cet engagement dans la mesure où celui-ci comporte des dispositions plus favorable que celles qui sont prévues par le présent accord"*[370].

*"Las inversiones que hubiesen sido objeto de un compromiso particular de una de las Partes Contratantes referente a nacionales y sociedades de la otra Parte Contratante serán administradas, sin prejuicio de las disposiciones del presente Convenio, por los términos de este compromiso en case que este incluya disposiciones más favorables que las previstas por el presente Convenio"*[371].

398. Si bien el Tribunal observa que la redacción del inciso 1 del Artículo 5(1) y del Artículo 10 del Tratado no son completamente idénticas en la versión en idioma español dado que el Artículo 10 se refiere a un *"compromiso particular"* en lugar de un *"compromiso especial"*, la redacción de la versión en idioma francés es efectivamente idéntica (*"engagement particulier"*). Dentro del contexto del Artículo 10, estos términos claramente se refieren a un acuerdo externo al Tratado, lo cual es aplicable a la inversión si el acuerdo contiene disposiciones más favorables que el propio Tratado, al cual se hace referencia como el *"présent accord"* y el *"presente Convenio"*. El Tribunal considera que no existen motivos para asumir que las Partes Contratantes del Tratado pretendieron asignar diferentes significados al mismo término (o en el caso del texto en español, a términos muy similares) en las dos disposiciones.

399. Por último, la Demandada señaló correctamente que los Estados Contratantes que desean sujetar la licitud de una expropiación al cumplimiento con otras disposiciones sustanciales del TBI, en especial el requisito de llevar a cabo la expropiación de acuerdo con el debido proceso, usualmente incluyen un requisito explícito a tal efecto en la disposición relativa a la expropiación. Por ejemplo, en el caso citado por la Demandante, *Kardassopoulos c. Georgia*, la decisión del tribunal se basó en el Artículo 13 del Tratado sobre la Carta de Energía, que dispone lo siguiente:

*"Las inversiones de los inversores de una Parte Contratante en el territorio de otra Parte Contratante no serán objeto de*

---

[370] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*]. **Anexo C-1**, pág. 7776.

[371] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*. **Anexo C-1**, págs. 332,354.

> *nacionalización, expropiación o medida o medidas de efecto equivalente a la nacionalización o a la expropiación [...], excepto si dicha expropiación se lleva a cabo: [...] (c) con arreglo al debido procedimiento legal"*[372].

400. En este caso, las Partes Contratantes no incluyeron dicho requisito en el inciso 1 del Artículo 5(1) del Tratado (o en cualquier otro inciso o sub-inciso del Artículo 5); por ende, no hay indicios de que las Partes Contratantes de todos modos desearan condicionar la licitud de una expropiación al cumplimiento con el debido proceso. Por el contrario, pareciera que cualquier violación del derecho al debido proceso que le asiste a un inversor, incluido en el estándar TJE (*véase* en mayor detalle *infra*), debía abordarse dentro del contexto del Artículo 3(1) del Tratado, pero no pretendía afectar la licitud de la expropiación.

401. Por ende, el Tribunal concluye que los términos *"acuerdo particular"* o *"compromiso específico"* (*"engagement particulier"*/*"particular agreement"* o *"particular undertaking"*) no incluyen una referencia a otras disposiciones sustanciales del mismo Tratado, sino sólo a acuerdos que son distintos del Tratado. Dado que la Demandante no invoca la violación de un compromiso de tal índole, aparte de las disposiciones del Tratado en sí mismas[373], el Tribunal resuelve que la Demandada no ha violado el inciso 1 del Artículo 5(1) del Tratado.

### b)    Violación de los Incisos 2 y 3 del Artículo 5(1) del Tratado

402. El Tribunal ahora abordará la segunda reclamación respecto de la violación del Tratado. La Demandante sostiene que la Demandada no cumplió con sus obligaciones en virtud de los incisos 2 y 3 del Artículo 5(1) del Tratado respecto del requisito de una pronta indemnización y la fijación del monto y la modalidad de pago. En su análisis, el Tribunal primero determinará con precisión el alcance y el contenido de las obligaciones de la Demandada en virtud del Tratado (**aa)**); luego el Tribunal procederá a evaluar si la Demandada cumplió con tales requisitos (**bb)**) y, por último, procederá a determinar si su conclusión afecta de alguna manera la licitud de la expropiación (**cc)**).

### aa)    El alcance de la obligación de la Demandada de pagar una "pronta" indemnización y de fijar el "monto y la modalidad de pago" de la indemnización

#### (i)    Síntesis de la Postura de la Demandante

---

[372] *Kardassopoulos c. Georgia*, ¶ 386. **Anexo CLA-046**.
[373] Transcripción (Día 1), pág. 309 líneas 8-19.

403. Según la postura de la Demandante, debe concederse a los incisos 2 y 3 del Artículo 5(1) del Tratado su sentido corriente[374]. La Demandante afirma que el Tratado es muy específico en lo que respecta al requisito de que una expropiación esté acompañada por una "*pronta*" indemnización, ya que establece que "*su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación*" y que será "*pagada sin retraso alguno*"[375]. Según la Demandante, ello no deja lugar a dudas sobre la interpretación del requisito de una pronta indemnización[376].

404. La Demandante se refiere a las decisiones de otros tribunales internacionales en aras de demostrar que el requisito de prontitud es un principio con pleno arraigo en el derecho internacional. Por ejemplo en el caso *Norwegian Shipowners*, el tribunal habló "*del derecho de los demandantes a recibir una indemnización total e inmediata*" al resolver que "*debería haberse abonado la indemnización total, incluida la pérdida de pagos a cuenta, etc., a más tardar, el día de la toma de control efectiva [...].*"[377] En el caso *Goldenberg,* el tribunal concluyó que, si bien el derecho internacional autoriza al Estado a interferir con bienes privados en los casos que así lo requiera el interés público, "*lo hace con la condición sine qua non de que se lleve a cabo el pago justo de los bienes expropiados o requisados lo más rápido posible*"[378]. [Traducción del Tribunal]

405. Por consiguiente, la Demandante alega que el pago de la indemnización debería ser "*contemporáneo a la toma de control*" o debería al menos "*sucederla lo antes posible*" y que "*el transcurso de varios meses luego de la toma de control sin que el Estado presente ningún indicio real de que se otorgará la indemnización en breve plantearía serias dudas de que el Estado pretendía abonar una pronta indemnización en absoluto*"[379]. [Traducción del Tribunal]

406. En particular, la Demandante argumenta que el requisito de fijación no se cumple por la mera existencia de un determinado procedimiento de expropiación en el derecho interno o la referencia a él[380]. Asimismo, la Demandante rechaza la afirmación de que "*la obligación de un estado soberano de tomar las medidas adecuadas para brindar una indemnización justa de manera oportuna*" puede satisfacerse en el derecho internacional "*por su mera voluntad de debatir sobre la posibilidad de que exista un compromiso.*

---

[374] Presentación Posterior a la Audiencia de la Demandante, ¶ 51.

[375] Memorial, ¶ 137; **Anexo C-1**.

[376] Réplica, ¶ 75.

[377] Memorial, ¶ 138; **Anexo CLA-057**.

[378] Memorial, ¶ 139; **Anexo CLA-040**.

[379] Memorial, ¶ 139, con cita de L. B. Sohn y R. R. Baxter, *Responsibility of States for Injuries to the Economic Interests of Aliens*, 55 AMERICAN JOURNAL OF INTERNATIONAL LAW 545, 558 (1961), **Anexo CLA-079**.

[380] Memorial de Réplica, ¶ 83.

*Decidir tal cosa sería privar a la obligación de todo sentido*"[381]. [Traducción del Tribunal]

407. En relación con el debate sobre el arreglo de una *empresa mixta*, la Demandante afirma que ello "*careció de detalles suficientes para considerarse una negociación adecuada de los términos de la indemnización*" [Traducción del Tribunal]. La Demandante se refiere a la declaración del Sr. Millot durante la Audiencia de que la Demandante entendió que ello era una "*sugerencia*" en lugar de una "*propuesta firme*" ya que no estaba respaldada por documentación que la Demandante hubiera recibido, en especial respecto de cualquier indemnización por la pérdida de la titularidad de la Demandante del 100% de Norpro Venezuela[382].

### (ii)    Síntesis de la Postura de la Demandada

408. En relación con el requisito de fijación, la Demandada sostiene que las disposiciones contenidas en los incisos 2 y 3 del Artículo 5(1) del Tratado  deben leerse en conjunto y que deberían interpretarse en el sentido de que "*debe evaluarse la indemnización de modo tal que el monto sea equivalente al* 'valor real' *de las inversiones a la fecha determinada en la segunda oración del segundo inciso del Artículo 5(1) y que* 'a más tardar a la fecha de la expropiación', *la parte expropiadora deberá reconocer su obligación de realizar el pago de dicho monto equivalente y de establecer las modalidades de pago*"[383]. [Traducción del Tribunal]

409. La Demandada afirma que cláusulas tales como el Artículo 5(1) del Tratado requieren meramente que "*la ley o la decisión de expropiación mencionen los criterios y los procedimientos que permitirán que se evalúe la indemnización*"[384]. [Traducción del Tribunal]

410. La Demandada brinda dos argumentos respecto de su interpretación de los incisos 2 y 3 del Artículo 5(1) del Tratado de que la cifra exacta que constituye el "*monto*" debe determinarse en la fecha en la que se anuncia una intención de expropiar. Primero, la Demandada se refiere al Artículo 31(1) de la Convención de Viena y alega que requerir una cifra exacta a la fecha de la expropiación "*no es una interpretación de buena fe y no puede ser correcta, ya que plantearía una obligación que los Estados Contratantes no podrían satisfacer salvo de pura casualidad*". La Demandada también señala que el

---

[381] Presentación Posterior a la Audiencia de la Demandante, ¶ 55, con cita de *Amoco c. Irán*, pág. 83 (opinión concurrente de J. Brower). **Anexo CLA-004.**

[382] Presentación Posterior a la Audiencia de la Demandante, ¶ 56 con cita de la Transcripción (Día 2) pág. 413 líneas 20 -- pág. 414 línea 17, pág. 415 líneas 9-12.

[383] Escrito Posterior a la Audiencia de la Demandada, ¶ 82.

[384] Dúplica, ¶ 156, con cita de J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, pág. 207, **Anexo RL-155.**

Tratado no dispone que el Estado "*debe, antes de anunciar una expropiación, participar en conversaciones con la entidad expropiada en aras de obtener los hechos necesarios para determinar la cifra exacta que equivalga al valor real de los bienes en cuestión*" y que "*sin dicha información, sería imposible [...] determinar dicha cifra de buena fe*"[385]. [Traducción del Tribunal]

411. Segundo, la Demandada afirma que una interpretación tal como la propone la Demandante daría lugar a resultados "*manifiestamente absurdos o irrazonables*" y, por lo tanto, estaría en conflicto con el Artículo 32 lit. b) de la Convención de Viena, ya que las leyes sobre expropiaciones de Francia y de Venezuela no requieren que se determine la indemnización en el momento en que se inicia el proceso expropiatorio, lo cual posicionaría a cada uno de los Estados Contratantes ante una violación de sus obligaciones en virtud del Tratado[386].

412. En este contexto, la Demandada sugiere que se utilice, en su opinión, lo que representa una interpretación más razonable de la palabra "*monto*", que no se refiere a una "*cifra exacta en dólares o euros, sino al concepto requerido (es decir, una 'suma [...] equivalente al valor real de las inversiones')*"[387]. [Traducción del Tribunal]

413. En relación con el requisito de prontitud, la Demandada señala que ni la jurisprudencia citada por la Demandante ni el Artículo 5(1) del Tratado, mediante sus términos claros, exigen que el Estado abone una indemnización al inversor en la fecha de la expropiación. Si bien el inciso 2 establece que "*[t]odas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización*", es el inciso 3 exclusivamente el que exige que, luego de la determinación de la indemnización, ella sea "*pagada sin retraso alguno*"[388]. Al determinar si el pago de "*una pronta y adecuada indemnización*" se realiza "*sin retraso alguno*", deben tomarse en cuenta "*las particularidades de cada legislación nacional, las posibles demoras causadas por los recursos internos y la especificidad de cada situación*"[389]. Asimismo, la Demandada sostiene que debería considerarse si el "*Estado ha realizado esfuerzos de buena fe para cumplir con su obligación de pagar una indemnización*"[390]. [Traducción del Tribunal]

---

[385] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 83-84.

[386] Escrito Posterior a la Audiencia de la Demandada, ¶ 87.

[387] Escrito Posterior a la Audiencia de la Demandada, ¶ 83.

[388] Memorial de Contestación, ¶ 167; Dúplica, ¶ 155.

[389] Dúplica ¶ 157, con cita de J.-P. Laviec, PROTECTION AND PROMOTION OF INVESTMENTS, pág. 207, **Anexo RL-155**.

[390] Dúplica, ¶ 158, con cita de S. Ripinsky, DAMAGES IN INTERNATIONAL INVESTMENT LAW 68 (2008), págs. 68-69, **Anexo CLA-140**.

### (iii)   El Análisis del Tribunal

414. El Tribunal ha considerado, en particular, todos los argumentos presentados por las Partes en sus escritos y, no exclusivamente, los argumentos sintetizados *supra*. Al determinar los requisitos precisos en relación con la indemnización en virtud de los incisos 2 y 3 del Artículo 5(1) del Tratado, el Tribunal, ante todo, tomará en cuenta la redacción de las disposiciones del Tratado y su contexto sistemático.

415. En las versiones originales en idioma español y francés, los incisos 2 y 3 del Artículo 5(1) del Tratado rezan lo siguiente:

*"Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusque'à la date de versement, des intérêts calculés au taux d'intérêt de marché approprié"*[391].

*"Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuio monto, igual al valor real de las inversiones en cuestión, debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tardar a la fecha de la expropiación. Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la adecuada tasa de interés del mercado"*[392].

416. La traducción al idioma inglés del texto en francés presentada por la Demandante dispone lo siguiente:

---

[391] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[392] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

*"All measures of expropriation which could be taken must result in payment of a prompt and adequate compensation. The sum of this compensation should be equal to the actual value of the investments concerned, and must be assessed in relation to the normal economic situation prevailing before any threat of expropriation was of public knowledge.*

*The amount and method of payment for compensation should be specified on the date of expropriation at the latest. This compensation is indeed realizable, payments shall be made without delay and shall be freely transferable. The compensation will accrue interest calculated at the appropriate market interest rate until the date of payment"*[393].

417. El Tribunal observa que el Tratado no sólo requiere el pago de una *"pronta"* indemnización, sino que también requiere de acuerdo con la redacción inusualmente estricta del inciso 3 que *"esa indemnización, su monto"* (*"[c]ette indemnité, son montant"/"[t]he amount [...] for compensation"*) sean especificados – o más precisamente fijados (*"fixés"/"fixed"*) – a más tardar a la fecha de la expropiación. El sentido corriente de la redacción empleada en el inciso 3 sugiere que el Estado expropiante, de hecho, debe indicar una cifra específica que constituya el monto de la indemnización al momento de la expropiación; no hay indicios de que el término *"monto"* (*"montant"/"amount"*) se refiera exclusivamente a un determinado concepto o método de cálculo. La única referencia a las *"modalidades"* (*"modalités"/"method"*) en el inciso 3 se realiza respecto del *"pago"* (*"versement"/"payment"*), lo cual implica que el *"pago de una pronta y adecuada indemnización"* (*"paiement d'une indemnité prompte et adéquate"/"payment of a prompt y adequate compensation"*) como se menciona en el inciso 2 no requiere que el pago se realice al inversor en la misma fecha que la expropiación.

418. Si bien el Tribunal concuerda con la Demandada en que el inciso 3 debe ser interpretado en conjunto con el inciso 2, que efectivamente brinda más detalles en relación con el cálculo de la indemnización (*"d'une indemnité prompte et adéquate dont le montant [...]"/"una pronta y adecuada indemnización cuyo monto [...]"*), tal conexión no implica de ningún modo que el término *"monto"* (*"montant"/"amount"*) del inciso 3 deba interpretarse de manera restrictiva en el sentido de que sólo exige un reconocimiento del concepto aplicable de la indemnización. Por el contrario, el inciso 3 contiene una especificación más precisa adicional al término *"pronta"* (*"prompte"/"prompt"*) ampliamente utilizado en el inciso 2.

419. A la luz de la redacción y la estructura inequívocas de los incisos 2 y 3 del Artículo 5(1) del Tratado, el Tribunal concluye que, *prima facie*, el inciso 3 exigía que la Demandada especifique una cifra que represente el *"monto"* (*"montant"/"amount"*) indemnizatorio al

[393] **Anexo C-1**, pág. 7775.

momento de la expropiación. Subsiguientemente, esa indemnización y su monto, tal como fueran fijados ("*fixés*"/"*fixed*") en la fecha de la expropiación debían abonarse "*sin retraso*" ("*sans retard*"/"*without delay*"). Sólo si ambos requisitos se hubieran cumplido, la indemnización podría haberse considerado "*pronta*" en el sentido específico previsto por las Partes Contratantes en el inciso 2 del Artículo 5(1) del Tratado.

420.   Tal como se indica *supra*, la Demandada planteó objeciones a esta interpretación del Artículo 5(1) del Tratado. El Tribunal considera, no obstante, que ninguna de estas objeciones es convincente. En particular, requerir a un Estado la fijación de una determinada cifra que represente el monto indemnizatorio a la fecha de la expropiación no se contrapone con el principio de interpretación de buena fe conforme al Artículo 31(1) de la Convención de Viena, ni da lugar a resultados "*manifiestamente absurdos o irrazonables*" en el sentido del Artículo 32 lit. b) de la Convención de Viena.

421.   El requisito de fijar el monto exacto de indemnización a la fecha de la expropiación no es una ambición absurda, como pretende demostrar la Demandada. Si bien el Tribunal concuerda con la Demandada que la fecha de la expropiación (es decir, la decisión formal de expropiación y/o la toma del bien) no corresponde (necesariamente) a la fecha en la cual se inicia el proceso de expropiación[394], ello no significa que el Estado puede, mientras tanto, tomar *de facto* los bienes del inversor y de ese modo eludir la disposición del Tratado. En numerosas jurisdicciones, incluidas Francia y Venezuela tal como lo señaló correctamente la Demandada, la decisión formal de expropiación y la toma del bien no dan inicio sino que ocurren solo al final del procedimiento de expropiación. En el transcurso de dicho procedimiento, el Estado usualmente afirma y asegura que se cumple con los requisitos de una expropiación lícita, incluida la verificación de una utilidad pública suficiente, así como la fijación de un monto adecuado de indemnización, con base en una correcta valuación del activo.

422.   El Tribunal entiende que es evidente que los redactores del inciso 3 del Artículo 5(1) del Tratado efectivamente previeron un diseño del procedimiento de expropiación tal como se encuentra vigente en ambos Estados Contratantes. Sin embargo, esto no significa que el término "*monto*" se refiere únicamente al concepto que debe aplicarse a lo largo del procedimiento de expropiación, sino que también implica que el procedimiento de expropiación debe realizarse previo a la toma de control del activo.

423.   El hecho de que el Tratado no contemple reglas procesales detalladas sobre el modo en que el Estado expropiante debe obtener los elementos necesarios para determinar la cifra exacta que debe fijarse a la fecha de la expropiación no contraviene la interpretación propuesta del Artículo 5(1) del Tratado. Los incisos 2 y 3 meramente disponen los

---

[394] *Cfr.* Escrito Posterior a la Audiencia de la Demandada, ¶ 87 (con nota 187).

requisitos fundamentales que deben cumplirse en el caso de una expropiación. El Tratado no fue diseñado para establecer un procedimiento de expropiación detallado. Por el contrario, corresponde a los Estados Contratantes garantizar que los procedimientos expropiatorios sean llevados a cabo de acuerdo con los requisitos fundamentales del Tratado.

424. En tal sentido, el Tribunal considera que no debe analizar si la legislación venezolana realmente implementa un procedimiento expropiatorio estándar tal como se dispone en el Artículo 5(1) del Tratado. En primer lugar, la Demandante no ha planteado una reclamación de que la Ley de Expropiación no cumple con los requisitos del Tratado. Además, cualquier acuerdo en tratados bilaterales de inversión sería redundante si las Partes fueran a ponerse de acuerdo exclusivamente sobre los estándares de protección que ya son parte de sus respectivos ordenamientos jurídicos. Por consiguiente, la interpretación de que el Artículo 5(1) del Tratado proporciona normas de expropiación más estrictas que la Ley de Expropiación de Venezuela (y posiblemente que su equivalente en Francia) no produciría resultados "*manifiestamente absurdos o irrazonables*" en el sentido del Artículo 32 lit. b) de la Convención de Viena.

425. En conclusión, el Tribunal resuelve que los requisitos indemnizatorios establecidos en los incisos 2 y 3 del Artículo 5(1) exigían a la Demandada que fije una cifra exacta que constituya el monto de indemnización a la fecha de la expropiación.

### bb) Cumplimiento o incumplimiento respecto de los requisitos indemnizatorios

426. El hecho de que la Demandada haya cumplido o no con los requisitos establecidos en los incisos 2 y 3 del Artículo 5(1) del Tratado depende, en cierta medida, de la fecha en la cual se realizó la expropiación de la planta, es decir, la fecha de la expropiación en el sentido que le otorga el inciso 3. Por ende, esta cuestión será examinada en primer lugar **(i)**. Sobre esta base, se evaluará entonces la conducta de la Demandada **(ii)**.

### (i) Fecha de la expropiación de la Planta

427. Las posturas de las Partes difieren respecto de la fecha en la cual se llevó a cabo la expropiación de la planta. Particularmente, es objeto de controversia si la expropiación se efectuó recién luego de la emisión formal del Decreto de Expropiación o si la toma de control formal de la planta el día 15 mayo de 2010 ya representaba una expropiación en el sentido del Tratado. A pesar de que las Partes abordan exclusivamente este asunto como una cuestión de hecho, parece implicar también cuestiones de derecho.

### (1) Síntesis de la Postura de la Demandante

428.  La Demandante sostiene que la expropiación relacionada con la planta fue llevada a cabo el día 15 de mayo de 2010. La Demandante alega que la toma de control luego del anuncio del Presidente Chávez y la posterior gestión activa de la planta por parte de PDVSA constituyeron una expropiación en los términos del Artículo 5(1) del Tratado[395].

429.  La Demandante alega que, luego de la toma de control de un día de la planta efectuada el día 24 de marzo de 2010, fue el anuncio del Presidente Chávez el que generó que los trabajadores locales se hicieran cargo de la planta el día 15 de mayo de 2010, cuyo efecto fue forzar la salida de los directores de Norpro Venezuela. Además, la Demandante afirma que hubo políticos entre aquellos que llevaron a cabo la toma de control de la planta: el diputado de la Asamblea Nacional Ángel Marcano, el presidente de la Subcomisión de Industrias Básicas y Diputado Asdrúbal López, el presidente de la Comisión de Desarrollo Social, quienes actuaban en nombre del Estado y de acuerdo con las instrucciones del Presidente. Por ende, fue el Presidente Chávez quien prácticamente "*ordenó la toma de control de la Planta por parte de los miembros y simpatizantes del sindicato*" el día 15 de mayo de 2010[396]. Dado que la Demandante nunca recuperó el control de su inversión luego de tal fecha, el Decreto de Expropiación publicado el día 29 de marzo de 2011 sólo notificó formalmente lo que el Gobierno ya había llevado a cabo[397].

430.  Respecto del estado de la planta luego de dichos acontecimientos, la Demandante afirma que PDVSA tomó el control de la planta en pos de "*coordinar el proceso de expropiación*"[398]. En este contexto, la Demandante se refiere a varias circunstancias de la ocupación de la planta por parte de PDVSA, que incluye *inter alia:*

-  documentos confeccionados por PDVSA que reflejan que PDVSA llevaba a cabo el procedimiento de expropiación en curso en nombre de la Demandada; en particular, las actas de las reuniones celebradas entre PDVSA y Norpro Venezuela los días 2 y 8 de junio de 2010 intitulados "*Proceso de Nacionalización Norpro Venezuela, C.A.*"[399];

-  modificaciones en el aspecto de la planta y su personal, la bandera de PDVSA flameando junto con la bandera de Venezuela por encima de la planta y los trabajadores vistiendo uniformes de PDVSA[400]; y

---

[395] Réplica, ¶¶ 21-25.
[396] Réplica, ¶¶ 21-22; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 19-22.
[397] Memorial, ¶ 134.
[398] Réplica, ¶ 30; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 23-32.
[399] Presentación Posterior a la Audiencia de la Demandante, ¶ 24. Actas de las Reuniones celebradas entre Norpro Venezuela, C.A., Petróleos de Venezuela, S.A. y otros, 2 de junio y 8 de junio de 2010. **Anexo C-25**.
[400] Presentación Posterior a la Audiencia de la Demandante, ¶ 27, en referencia a la Solicitud de Norpro Venezuela, C.A. de una Inspección Judicial, 5 de agosto de 2010. **Anexo C-119**, pág. 14.

- los esfuerzos de PDVSA para conseguir que la planta vuelva a entrar en funcionamiento, por ejemplo, su intento de preparar la planta para que produzca los llamados apuntalantes ecológicos[401].

431. Por ende, la Demandante objeta a la declaración de la Demandada de que PDVSA intervino como "*cuidador*" y añade que, si ese hubiera sido el caso, PDVSA debería haber devuelto la planta a la Demandante. Según la Demandante, la sociedad extranjera no debe soportar la carga, luego de "*haber presenciado la orden del Presidente y de que se le denegara el acceso a su propiedad, de tomar más medidas en pos de preservar sus derechos*"[402]. [Traducción del Tribunal]

432. Por último, la Demandante resalta que constantemente hizo valer sus derechos relacionados con la planta, es decir, que intentó reingresar a la planta pero se le negó el acceso, tal como lo demuestran las inspecciones judiciales que inició el día 17 de mayo de 2010 y una vez más el día 5 de agosto de 2010, así como las cartas que el presidente de Norpro Venezuela remitió al Abogado General de PDVSA el día 18 de noviembre de 2010 y al presidente de PDVSA Industrial el día 25 de abril de 2011[403].

### (2)    Síntesis de la Postura de la Demandada

433. La Demandada sostiene que la fecha de expropiación en el sentido del Artículo 5(1) del Tratado era el día 29 de marzo de 2011, es decir, la fecha de emisión del Decreto de Expropiación, que desencadenó los procedimientos en virtud de la Ley de Expropiación de Venezuela[404]. En contestación a las afirmaciones de la Demandante respecto de la toma de control de la Planta el día 15 de mayo de 2010 y los eventos subsiguientes, la Demandada afirma, en primer lugar, que fue el sindicato SINPROTRAC, no el Estado, el que ocupó la planta de la Demandante los días 24 de marzo y 15 de mayo de 2010 y, en segundo lugar, que la subsiguiente presencia de PDVSA en la planta fue una "*acción responsable y necesaria a la espera del decreto de expropiación para garantizar la seguridad de la planta*" [Traducción del Tribunal] luego de que la dirección de Norpro Venezuela efectivamente la abandonara[405].

434. Con respecto al primer punto, la Demandada niega la existencia de una relación de causalidad intrínseca entre el "*anuncio*" del Presidente Chávez y la toma de control de la planta. La Demandada hace hincapié en que fue el descontento del sindicato lo que causó que el nombre de Norpro Venezuela apareciera en el *Plan Guayana Socialista 2009-2019*,

---

[401] Presentación Posterior a la Audiencia de la Demandante, ¶ 27, en referencia a Rondón, ¶ 33.

[402] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 29, 31.

[403] Presentación Posterior a la Audiencia de la Demandante, ¶ 32 en referencia al **Anexo C-20**, **Anexo C-119**, **Anexo C-122** y **Anexo C-127**.

[404] Escrito Posterior a la Audiencia de la Demandada, ¶ 87 (con nota 187).

[405] Memorial de Contestación, ¶ 26 (con nota 68); Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60-65.

que en última instancia llevó a la propuesta de que Norpro Venezuela pase al control del Estado, lo cual fue leído por el Presidente Chávez en directo por televisión el día 15 de mayo de 2010. Asimismo, la Demandada afirma que en realidad fue una llamada telefónica realizada por los trabajadores de turno de la planta a los líderes de SINPROTRAC la que informó que los directivos de la Planta retiraban ordenadores portátiles y documentos de las instalaciones y, a su vez, provocó que los funcionarios del sindicato y ex trabajadores de Norpro Venezuela tomaran medidas el día 15 de mayo de 2010. En este contexto, la Demandada sostiene que la toma de control de la planta del día 15 de mayo de 2010 no puede considerarse un acto del Estado[406].

435.  Además, la Demandada niega las alegaciones de la Demandante de que ciertos individuos entre aquellos que llevaron a cabo la toma de control de la planta actuaban en realidad en nombre de la Demandada, o bajo sus instrucciones. La Demandada sostiene que el mero hecho de que políticos que simpatizan con la difícil situación de los trabajadores estuvieran presentes no significa que la propia Demandada tomara el control de la planta[407].

436.  En relación con el segundo aspecto, es decir, la presencia de PDVSA en la planta luego de los sucesos del día 15 de mayo de 2010, la Demandada señala que la presencia de PDVSA previo a la publicación del decreto de expropiación fue programada con el objetivo de garantizar la seguridad y estabilidad de la planta, en calidad de *"cuidadores"*. La Demandada afirma que Norpro Venezuela abandonó efectivamente la planta luego del día 15 de mayo de 2010, y que la planta estaba *"en manos del sindicato y de los trabajadores que tomaron el control el día 15 de mayo, sin supervisión"* [Traducción del Tribunal]. La Demandada sostiene que estos constituyeron motivos legítimos de preocupación sobre la seguridad de los trabajadores y el correcto funcionamiento de los equipos de la planta[408].

437.  En este contexto, la Demandada resalta que la Demandante no negó el fundamento legal de la presencia de PDVSA, no exigió la devolución de la planta ni solicitó que se le brindara acceso a ella luego del día 15 de mayo de 2010[409]. En especial, la Demandada afirma que *"ninguna de las demás cartas enviadas el día 17 de mayo de 2010, o luego de ello, exigía la devolución de la Planta"* y que la Demandante nunca planteó dicha reclamación durante las reuniones celebradas los días 30 de agosto de 2010 y 14 de octubre de 2010 entre la Demandante y PDVSA. Por consiguiente, la Demandada señala

---

[406] Dúplica, ¶¶ 12-13.

[407] Dúplica, ¶ 16; Memorial de Contestación, nota 68.

[408] Dúplica, ¶¶ 20-22; Escrito Posterior a la Audiencia de la Demandada. ¶ 60; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 25.

[409] Dúplica, ¶ 23; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60 (con nota 108), 42-51.

que "*PDVSA Industrial se encontraba en la Planta dado que Norpro Venezuela no estaba presente y que la Planta planteaba riesgos para los trabajadores y la comunidad*"[410]. [Traducción del Tribunal]

438. A su vez, la Demandada no niega que, luego del 15 de mayo 2010, "*existió un 'proceso de nacionalización' en la medida en que, como todos lo reconocían, la Planta no había sido expropiada, sino que en el futuro sería transferida al control del Estado*" [Traducción del Tribunal]. La Demandada señala que las Partes también reconocieron (i) que en ese momento se redactaba un decreto de expropiación; (ii) que se suponía que el decreto debía indicar el punto de partida del procedimiento de expropiación en virtud del derecho venezolano; y (iii) que las Partes considerarían, mientras tanto, alternativas a la expropiación, incluida la constitución de una empresa mixta, con PDVSA como accionista mayoritario y la Demandante como titular de una participación minoritaria[411].

439. La Demandada considera que este proceso de nacionalización en curso no entraba en conflicto con el rol de "*cuidador*" de PDVSA. La Demandada señala que PDVSA "*ha[bía] recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro*", pero que "*mientras no se [hubiera] publicado el Decreto, no p[odía] actuar o intervenir en Norpro. Su presencia en la planta correspond[ía] a la necesidad de prepararse para la futura toma formal de posesión, una vez que se reali[zara] la publicación del Decreto*"[412].

### (3)    El Análisis del Tribunal

440. Antes de proceder a analizar las circunstancias individuales de cada caso en relación con los acontecimientos del día 15 de mayo de 2010 **(b)** y subsiguientes **(c)**, el Tribunal desea recordar la norma jurídica respecto de si se ha llevado a cabo una "*expropiación*" en el sentido del Artículo 5(1) del Tratado y, en tal caso, cuándo ha ocurrido **(a)**.

### (a)    Norma legal respecto a si se llevó a cabo una "*expropiación*" y cuándo

441. Tal como lo observara el tribunal en el caso *SD Myers c. Canadá*, el término "*expropiación*" debe interpretarse "*a la luz de todo el cuerpo de la práctica del Estado,*

---

[410] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 45-50.

[411] Escrito Posterior a la Audiencia de la Demandada, ¶ 61. Énfasis en el original.

[412] Dúplica, ¶ 32 (nota 135), con cita del Acta Borrador de la Reunión celebrada entre PDVSA Industrial, S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo R-017**, págs. 2-3.
"*PDVSA Industrial, S.A. ('PDVSA') mencionó que ha recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro. […] PDVSA informó que mientras no se haya publicado el Decreto, no puede actuar o intervenir en Norpro. Su presencia en la planta corresponde a la necesidad de prepararse para la futura toma formal de posesión, una vez que se realice la publicación del Decreto*".

*de los tratados y de las interpretaciones judiciales del término en los casos de derecho internacional*". El tribunal concluyó luego que, en general,

> "*el término* 'expropiación' *lleva consigo la connotación de una* 'toma de control' *por parte de una autoridad de tipo gubernamental de los* 'bienes' *de una persona con el fin de transferir la titularidad a otra persona, usualmente a la misma autoridad que ejerció su facultad de jure o de facto para llevar a cabo la* 'toma de control"[413]. [Traducción del Tribunal]

442.  Por ejemplo, estas consideraciones fueron ratificadas por el tribunal del caso *Rumeli c. Kazajstán*, que describió a la expropiación (directa) como el "*resultado del acto formal deliberado de una toma de control*"[414] y se refirió al razonamiento del tribunal en *Generation Ukraine c. Ucrania* que, a su vez, afirmó que la expropiación directa se caracteriza por una "*transferencia de los derechos de propiedad* [del inversor] *sobre su inversión al Estado a un tercero*"[415]. [Traducción del Tribunal]

443.  En este contexto, el término "*expropiación*" está claramente caracterizado por una cantidad de elementos, que incluyen: (i) el acto de un Estado; (ii) en relación con los bienes de una persona; (iii) que consiste en la toma de control *de jure* o *de facto* de dichos bienes; y (iv) en beneficio del Estado.

444.  No existe una controversia entre las Partes en relación con la norma aplicable a la definición del término jurídico "*expropiación*" ya que no abordaron esta cuestión en sus escritos. Por el contrario, las Partes convienen en que, en determinado punto, la Demandante fue expropiada en el sentido del Artículo 5(1) del Tratado. El desacuerdo de las Partes, en cambio, versa sobre el momento exacto en el que ocurrió la expropiación.

445.  Respecto de los elementos de una expropiación que se mencionan *supra* en el párrafo 443, la Demandante afirma que todos esos criterios ya habían sido satisfechos cuando se tomó el control de la planta el día 15 de mayo de 2010 o, al menos, poco después[416]. La Demandada, por su parte, sostiene que: (i) la toma de control del día 15 de mayo de 2010 no constituyó un acto del Estado; y (ii) la subsiguiente ocupación de la planta por parte de PDVSA no fue una toma del bien para el beneficio de la Demandada sino una necesidad apremiante que se le impuso a la Demandada debido al abandono de la planta por parte de la Demandante, que requirió la presencia de PDVSA en aras de restaurar y garantizar la seguridad en la planta, en calidad de "*cuidadores*", no como "*propietarios*" de dicha planta[417]. En este contexto, la Demandada resalta que PDVSA recibió órdenes

---

[413] *SD Myers c. Canadá* ¶ 280. **Anexo RL-119**.
[414] *Rumeli c. Kazajstán*, ¶ 700. **Anexo CLA-069**.
[415] *Generation Ukraine c. Ucrania*, ¶ 20.21. **Anexo CLA-039**.
[416] *Cfr*. Presentación Posterior a la Audiencia de la Demandante, ¶¶ 19-22.
[417] *Cfr*. Escrito Posterior a la Audiencia de la Demandada, ¶ 60.

de "*no* [...] *actuar o intervenir en Norpro*" ("*not* [to] *act or intervene in Norpro*")[418]. En conclusión, la Demandada sostiene que los criterios de una "*expropiación*" no fueron satisfechos hasta la emisión formal del decreto de expropiación el día 29 de marzo de 2011[419].

446. A la luz de lo que antecede, el Tribunal procederá ahora a analizar las pruebas presentadas por las Partes y determinar si la conducta de la Demandada con anticipación al día 29 de marzo de 2011 constituyó una "*expropiación*" en el sentido del Artículo 5(1) del Tratado.

## (b)   Toma de control el día 15 de mayo de 2010 luego de la "*Directiva de Expropiación*" del Presidente Chávez

447. Con respecto al anuncio del Presidente Chávez de fecha 15 de mayo de 2010 y a la posterior toma de control de la planta llevada a cabo por los miembros del sindicato SINPROTRAC, el Tribunal considera que esta toma de control en sí misma no puede atribuirse a la Demandada.

448. La Demandante no cuestiona el hecho de que la toma de control de la planta no fue llevada a cabo directamente por órganos del Estado en su calidad oficial, sino "*por simpatizantes y miembros del sindicato*"[420] [Traducción del Tribunal]. Al mismo tiempo, un principio consolidado del derecho internacional postula que, en general, la conducta de particulares o entidades privadas no es atribuible al Estado. Este principio general se encuentra claramente reflejado, *inter alia*, en el Artículo 8 del Proyecto de Artículos de la CDI que, como excepción a dicho principio, establece lo siguiente:

> "[Sólo] *se considerará hecho del Estado según el derecho internacional el comportamiento de una persona o de un grupo de personas si esa persona o ese grupo de personas actúa de hecho por instrucciones o bajo la dirección o el control de ese Estado al observar ese comportamiento*"[421].

449. El Tribunal considera factible que hubiera un nexo causal determinado entre el anuncio televisivo realizado por el Presidente Chávez el día 15 de mayo de 2010 y la toma de control de la planta. Tal como declarara el Sr. Eduardo Rondón, los "*miembros del sindicato SINPROTRAC*" que tomaron el control de la planta el día 15 de mayo de 2010

---

[418] Dúplica, ¶ 32 (nota 135), con cita del Acta Borrador de la Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo R-017**, págs. 2-3.

[419] Escrito Posterior a la Audiencia de la Demandada, nota 187.

[420] Presentación Posterior a la Audiencia de la Demandante, ¶ 21.

[421] Comisión de Derecho Internacional, *Responsabilidad del Estado por hechos internacionalmente ilícitos* (2001), **Anexo CLA-044**. *Cfr.* J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Anexo CLA-119** y **Anexo RL-021**, pág. 110.

*"vinieron directamente del evento en que había hablado el Presidente Chávez"*[422] [Traducción del Tribunal]. Si bien puede que la toma de control también haya sido generada tanto por la remoción por parte de la dirección de Norpro Venezuela de documentos y computadoras de la planta como por las tensiones entre la dirección de la planta y los sindicatos[423], el Tribunal considera que los simpatizantes y miembros del sindicato no habrían asumido el control de la planta el día 15 de mayo de 2010 si el Presidente Chávez no hubiera afirmado ese mismo día que la planta eventualmente sería entregada a PDVSA. Por ende, el anuncio de esta posibilidad por parte del Presidente parece haber sido *conditio sine qua non* de la toma de control de la planta (y, en consecuencia, un factor causal en relación con ella).

450. La mera causalidad, sin embargo, no establece la responsabilidad del Estado en virtud del derecho internacional. La conducta de los particulares puede atribuirse al Estado sólo si existe *"una relación de hecho específica entre la persona o entidad que observa el comportamiento y el Estado"*[424] [Traducción del Tribunal]. El Tribunal considera que no hubo una relación de hecho específica semejante entre el anuncio del Presidente Chávez y la toma de control de la planta llevada a cabo por simpatizantes y miembros del sindicato.

451. Durante la transmisión emitida el día 15 de mayo de 2010, el Presidente Chávez leyó en voz alta y aprobó una serie de propuestas preparadas por los grupos de trabajo del Plan Guayana Socialista, asociación de sindicatos de la región de Guayana[425]. Una de estas recomendaciones se relacionaba con Norpro Venezuela. El Presidente Chávez leyó en voz alta y aprobó esta propuesta en los siguientes términos:

> *"Consultar con PDVSA sobre la compra de Propan producido y comercializado por empresa Norpro de Venezuela, producto elaborado con Bauxita, Almidón y agua utilizado para lodos y perforaciones. De ser necesario −aquí se sugiere − la estatización y transferir esta empresa a manos de PDVSA. Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela"*[426].

452. Fuera de contexto, la declaración del Presidente *"Estatícese la empresa Norpro de Venezuela y pásese a manos de Petróleos de Venezuela"*[427] podría efectivamente interpretarse como una invitación, o incluso una orden, dirigida a todos los oyentes,

---

[422] Rondón, ¶ 28.

[423] Memorial de Contestación, ¶¶ 15, 137, 140 (nota 352); Dúplica, ¶¶ 8 y *ss*, 14.

[424] J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY: INTRODUCTION, TEXT AND COMMENTARIES (2002), **Anexo CLA-119** y **Anexo RL-021**, pág. 110.

[425] Presentación Posterior a la Audiencia de la Demandante, ¶ 19; Memorial de Contestación, ¶ 24.

[426] *Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Anexo R-15**, pág.14.

[427] *Grabación y Transcripción de Programas de Opinión y Transmisiones Especiales de la Tv Venezolana*, TVRADIO 2021, C. A., 15 de mayo de 2010, **Anexo R-15**, pág.14.

incluidos los miembros del sindicato y sus simpatizantes, a fin de que tomaran el control de la planta. No obstante, teniendo en cuenta las circunstancias mencionadas *supra*, parece que el lenguaje empleado por el Presidente Chávez pretendía manifestar y subrayar su aprobación y ratificación general de las propuestas de los grupos de trabajo. Las declaraciones del Presidente Chávez, incluida la aprobación de la propuesta del sindicato relativa a la nacionalización de Norpro Venezuela y *"anuncios similares vinculados a otras empresas de propiedad extranjera"*[428] [Traducción del Tribunal], suponían una promesa al pueblo de que el Estado nacionalizaría las empresas mencionadas en la declaración en el futuro; el Presidente, sin embargo, no impartió órdenes o instrucciones específicas a efectos de la toma física inmediata de la planta.

453. En vista de lo que antecede, el Presidente Chávez no facultó a los sindicatos a tomar el control de las empresas vinculadas al poder público en virtud de sus anuncios. Asimismo, aunque puede que los miembros del sindicato SINPROTRAC hayan tomado la declaración del Presidente Chávez *"al pie de la letra"*[429] [Traducción del Tribunal], el Tribunal opina que no actuaron *"por instrucciones o bajo la dirección o el control de*[l]" Presidente Chávez en los términos del Artículo 8 del Proyecto de Artículos de la CDI.

454. El hecho de que políticos nacionales y/o locales simpatizaran con los miembros del sindicato y pudieran haber participado en la toma de control de fecha 15 de mayo de 2010 no basta en sí mismo para establecer la responsabilidad de la Demandada por estas acciones. Suponiendo que los individuos mencionados por la Demandante efectivamente hubieran participado en la toma de control de fecha 15 de mayo de 2010[430], el Tribunal concluye que no hay pruebas suficientes de que estuvieran actuando en nombre o por instrucciones de la Demandada. Además, en cuanto a la presencia de la Guardia Nacional de Venezuela, que, según la Demandante, participó en la ocupación de la planta a partir del día 15 de mayo de 2010[431], el Tribunal no puede descartar la posibilidad de que estuviera presente en la planta *"en aras de preservar el orden y la seguridad pública"* [Traducción del Tribunal], tal como afirma la Demandada[432].

**(c)    La conducta de PDVSA y su presencia en la planta con posterioridad al día 15 de mayo de 2010**

---

[428] Presentación Posterior a la Audiencia de la Demandante, ¶ 19.

[429] Memorial, ¶ 77.

[430] *Cfr.* Memorial, ¶ 77; Réplica, ¶ 22.

[431] Réplica, ¶ 23, que cita Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**, pág. 5; Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144**, pág. 3.

[432] Dúplica, ¶ 13 (nota 73).

455. No obstante, el Tribunal está convencido de que la conducta posterior de PDVSA y su presencia en la planta con posterioridad al día 15 de mayo de 2010 sí constituyeron una "*expropiación*" en el sentido de los términos del Artículo 5(1) del Tratado. En particular, el Tribunal concluye, primero, que, por medio de la conducta de la empresa estatal PDVSA, la Demandada tomó el control efectivo de la planta el día 15 de mayo de 2010 o poco tiempo después (**aa**). Segundo, el Tribunal sostiene que la conducta de PDVSA constituyó una toma de la planta en beneficio de la Demandada tal como lo requería el término "*expropiación*" en el sentido del Artículo 5(1) del Tratado; al Tribunal no lo convence la argumentación de la Demandada de que no hubo toma de la planta en beneficio del Estado en tanto PDVSA actuaba simplemente como "*cuidador*" (**bb**).

**(aa) Control efectivo de la planta por parte de la Demandada**

456. Con respecto al primer punto, el Tribunal concluye que, a través de su conducta luego de la toma de control de la planta de fecha 15 de mayo de 2010 llevada a cabo por los miembros del sindicato SINPROTRAC, PDVSA reconoció y adoptó las acciones del sindicato como propias. Sobre la base de los principios aplicables del derecho internacional consuetudinario en materia de responsabilidad del Estado que se reflejan en el Artículo 11 del Proyecto de Artículos de la CDI, por consiguiente, la toma de control de la planta el día 15 de mayo de 2010 debe considerarse un acto de la Demandada. En cualquier caso, PDVSA tomó el control efectivo de la planta e inició el proceso de expropiación poco tiempo después del día 15 de mayo de 2010, tal como lo confirman sus informes y memorandos internos de principios del mes de junio de 2010.

**(1) Atribución de la conducta de PDVSA a la Demandada**

457. Antes de proceder a examinar más minuciosamente la conducta de PDVSA en relación con la planta, el Tribunal destaca que, si bien PDVSA es una empresa estatal con personalidad jurídica independiente, su conducta es atribuible a la Demandada de conformidad con el Artículo 5 del Proyecto de Artículos de la CDI, que dispone lo siguiente:

> "[s]*e considerará hecho del Estado según el derecho internacional el comportamiento de una persona o entidad que no sea órgano del Estado según el artículo 4, pero esté facultada por el derecho de ese Estado para ejercer atribuciones del poder público, siempre que, en el caso de que se trate, la persona o entidad actúe en esa capacidad*"[433].

458. Tanto en su presunta función de "*cuidador*" como en su carácter de supervisora y promotora de la nacionalización de la planta, a PDVSA se le otorgaron atribuciones del

---

[433] Comisión de Derecho Internacional, *Responsabilidad del Estado por hechos internacionalmente ilícitos* (2001), **Anexo CLA-044.**

poder público. Esto no es cuestionado por la Demandada; por el contrario, la Demandada resalta en el contexto de las negociaciones que tuvieron lugar a fines del año 2010 que a PDVSA "*se le había ordenado llevar a cabo la transición de la Planta a una operación estatal*"[434] [Traducción del Tribunal]. Esto es, asimismo, confirmado por la declaración contemporánea realizada por PDVSA durante la reunión de fecha día 30 de agosto de 2010 de que "*había recibido instrucciones precisas del Sr. Presidente de la República Bolivariana de Venezuela de llevar a cabo la estatización de Norpro*"[435].

459.    En un memorando interno preparado por PDVSA intitulado "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*" de fecha 2 de junio de 2010, también se hacía referencia a las instrucciones del Presidente:

> "***En fecha Martes 25 de Mayo,*** *personal de PDVSA bajo instrucciones de la Gerencia General EyP Division Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciones de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*
> [...]
> ***27 de mayo 2010****, se incorpora al proceso de estatización de la empresa NORPRO Venezuela,C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente*"[436].

460.    El Tribunal opina que, a la luz del mandato indiscutido que PDVSA recibió del Presidente de Venezuela a fin de que llevara a cabo la nacionalización de Norpro Venezuela, no debería ni podría establecerse una distinción entre la conducta de PDVSA destinada a cumplir con su mandato y la conducta que posiblemente estaba destinada a garantizar la seguridad de los trabajadores y el mantenimiento de los equipos en la planta mientras tanto, sino que todas las acciones de PDVSA con respecto a la planta pueden y deben atribuirse a la Demandada.

### (2) Adopción por parte de PDVSA de las acciones del sindicato como propias

461.    Como regla de derecho internacional consuetudinario, establecida en el Artículo 11 del Proyecto de Artículos de la CDI, "[e]*l comportamiento que no sea atribuible al Estado*" al momento de su encargo "*se considerará, no obstante, hecho de ese Estado según el derecho internacional en el caso y en la medida en que el Estado reconozca y adopte ese comportamiento como propio*"[437]. A diferencia de los casos de mero apoyo, respaldo o

---

[434] Memorial de Contestación, ¶ 29.

[435] **Anexo R-17**.

[436] **Anexo C-143**.

[437] Comisión de Derecho Internacional, *Responsabilidad del Estado por Hechos Internacionalmente Ilícitos* (2001), **Anexo CLA-044**; J. Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002), **Anexo RL-021**, pág. 121.

reconocimiento general por parte del Estado de una situación de hecho creada por particulares, la atribución en virtud de esta regla requiere que el Estado en forma clara e inequívoca *"identifique la conducta en cuestión y la haga propia"*[438]. [Traducción del Tribunal]

462.  En el presente caso, PDVSA ha reconocido y adoptado la toma de control de la planta de fecha 15 de mayo de 2010 llevada a cabo por miembros del sindicato como propia. En una serie de notas e informes internos, PDVSA dejó en claro que la toma de control de la planta por parte del sindicato no sólo fue congruente con las intenciones de la Demandada con respecto a la expropiación de la planta, sino que posteriormente se convirtió en parte integrante del proceso de nacionalización de Norpro Venezuela en el marco del *"Plan Socialista Guayana"* que había de ser implementado por el *"Ejecutivo Nacional"*[439]. El memorando interno de fecha 2 de junio de 2010 mencionado *supra* contiene una cronología de los pasos en el curso de la nacionalización de la planta de Norpro, incluida la *"orden"* del Presidente Chávez de fecha 15 de mayo de 2010 y la posterior toma de control de la planta:

> *"PROPÓSITO:*
>
> *Informar al Sr. Luis Pulido Director Interno de enlace de PDVSA Industrial, S.A., sobre la situación actual del proceso de Estatización de la Empresa NORPRO de Venezuela, C.A., (NORPRO).*
>
> *ANTECEDENTES:*
>
> *•* **En fecha 15 de Mayo del 2010**, *el Presidente de la República Bolivariana de Venezuela, Hugo Rafael Chávez Frías ordenó la estatización de la empresa productora de proppants la cual utiliza como materia prima la Bauxita de nombre 'NORPRO Venezuela C. A.', informando que la misma pasaría a manos de Petróleos de Venezuela S.A.*
>
> *Ese mismo día 15 de Mayo los trabajadores de NORPRO asumieron el control productivo de la planta y el personal Gerencial tomó la decisión de abandonar las instalaciones de la misma, la cual quedó en custodia de los trabajadores con apoyo de la Guardia Nacional Bolivariana.*
>
> *•* **En fecha Martes 25 de Mayo**, *personal de PDVSA bajo instrucciones de la Gerencia General EyP División Oriente y en el marco del ordenamiento emitido por el Comandante Presidente de la República, se presentó en las instalaciones de la empresa NORPRO Venezuela C.A. con miras a iniciar la fase de levantamiento y verificación de toda la información asociada a dicha empresa.*

---

[438] J. Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002), **Anexo RL-021**, pág. 123.

[439] Memorando, PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**, pág. 4.

> • *26 de mayo 2010*, *el personal de PCP de PDVSA Industrial, S.A., realiza visita e inspección a las instalaciones de la empresa NORPRO Venezuela, C.A.*
>
> • *27 de mayo 2010*, *se incorpora al proceso de estatización de la empresa NORPRO Venezuela, C.A., el equipo multidisciplinario de PDVSA Industrial, S.A. por instrucciones de nuestro Ministro-Presidente.*
>
> • *28 de mayo 2010*, *vista la empresa NORPRO Venezuela, C.A., el Gerente del Sector Hidrocarburos de PDVSA Industrial S.A., donde se realizó reunión de trabajo con el grupo multidisciplinario conformado por PDVSA Industrial, S.A. y PDVSA EyP División Oriente. Durante esta actividad, se dictan los próximos paso a seguir:* […]
>
> • *31 de mayo de 2010*, *siguiendo lineamientos emanados desde la Dirección del Sector Hidrocarburos de PDVSA Industrial S.A., realiza vista a la instalaciones de la empresa NORPRO Venezuela, C.A., el Gerente ( E ) del Sector Hidrocarburos Región Oriente de PDVSA Industrial S.A., con el fin de presentar el Plan Maestro de Abordaje a la Estatización de la empresa NORPRO Venezuela, C.A.* […]"[440].

463. Afirmaciones y descripciones similares (pero menos detalladas) de los pasos de la implementación del Plan Guayana Socialista por parte de la Demandada pueden encontrarse, en particular, en los siguientes documentos:

    - un informe preliminar preparado por la "*Comisión de Evaluación*" de PDVSA del mes de mayo de 2010 sobre la evaluación de la situación actual de Norpro Venezuela ("*Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*")[441];

    - un informe preparado por la "*Comisión de Evaluación*" de PDVSA de fecha 4 de junio de 2010 sobre el avance de la restructuración de Norpro Venezuela ("*Informe de avance 'Restructuración empresa Norpro '*")[442];

    - el "*Diagnóstico de la situación actual y plan de restructuración*" de PDVSA del mes de junio de 2010[443]; [Traducción del Tribunal]

    - un memorando de PDVSA al Ministro de Energía y Petróleo de la Demandada de fecha 9 de junio de 2010 sobre la situación actual y el plan estratégico para el control administrativo y operacional de Norpro Venezuela ("*Diagnóstico Situación Actual y*

---

[440] Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**, pág. 1.

[441] Memorando, PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**, pág. 4.

[442] Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro '*, 4 de junio de 2010, **Anexo C-144**, págs. 2-3.

[443] Diagnóstico de la situación actual y plan de reestructuración para la optimización de los procesos productivos de Norpro Venezuela, C.A., junio de 2010, **Anexo C-142**, pág. 5 ("*Antecedentes*").

*el Plan Estratégico para el Control Administrativo y Operacional de la Empresa NORPRO VENEZUELA, C.A.*")[444]; y

- el informe técnico definitivo del Sr. José Carrasco de fecha 15 de julio de 2010 ("*Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*")[445].

464. En vista de estos hechos, el Tribunal concluye que PDVSA se basó en la situación creada por los miembros del sindicato a fin de llevar a cabo el proceso de nacionalización tal como "*ordenó*" el Presidente Chávez el día 15 de mayo de 2010. Luego de la toma de control de la planta de fecha 15 de mayo de 2010, PDVSA pudo, sin perturbación alguna, evaluar la situación actual de la planta y determinar la manera en que podría ser reestructurada y operada por PDVSA[446]. La Demandada también reconoce que, en los meses de junio y julio de 2010, PDVSA estableció "*una presencia permanente, dado que se le había asignado la responsabilidad de garantizar la seguridad y estabilidad de la Planta en el curso de la determinación de la oportunidad y del mecanismo precisos a través de los cuales había de lograrse la estatización de la Planta*"[447]. [Traducción del Tribunal]

465. Según el testigo de la Demandada, el Sr. Rondón, más adelante, en el mes de octubre de 2010, PDVSA instauró al Sr. Ángel Salvarría como Gerente General de la Planta, y el Sr. Salvarría "*reorganizó la estructura de supervisión que se había implementado en la Planta a partir de la toma de control del sindicato y comenzó a preparar la Planta para el reinicio de la producción*"; por último, en el mes de noviembre de 2010, los trabajadores de la planta se convirtieron oficialmente en empleados de PDVSA[448]. [Traducción del Tribunal]

466. Si bien puede que la Demandada no haya anticipado o pretendido que el control de la planta fuera asumido por los miembros del sindicato SINPROTRAC el día 15 de mayo de 2010, es evidente que PDVSA inmediatamente se valió de esta situación a efectos de

---

[444] Memorando de la Dirección Ejecutiva de Producción de PDVSA a Rafael Ramírez Carreño (Ministro de Energía y Petróleo), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 de junio de 2010, **Anexo C-145**, págs. 1-2.

[445] Informe Técnico Definitivo, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 de julio de 2010, **Anexo C-148**, pág. 3.

[446] *Cfr.* Memorando PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**; Diagnóstico de la situación actual y plan de reestructuración para la optimización de los procesos productivos de Norpro Venezuela, C.A., junio de 2010, **Anexo C-142**; Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**.

[447] Memorial de Contestación, ¶ 28.

[448] Rondón, ¶ 33; Transcripción (Día 3), pág. 708 línea 21 – pág. 709 línea 2, pág. 711 línea 3 – pág. 711 línea 20.

llevar a cabo el proceso de nacionalización, reconociendo y adoptando de ese modo la conducta de los miembros del sindicato como propia. En cualquier caso, incluso si la conducta de PDVSA no se considerara un reconocimiento o una adopción de la toma de control de la planta por parte del sindicato como su propia acción, la Demandada efectivamente tomó el control de la planta en los meses de junio y julio de 2010 cuando estableció "*una presencia permanente*" en la planta, tal como admite la Demandada[449] [Traducción del Tribunal]. En opinión del Tribunal, el memorando de fecha 2 de junio de 2010 preparado por PDVSA, denominado "*Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*"[450], así como el memorando de fecha 4 de junio de 2010 preparado por la "*Comisión de Evaluación*" de PDVSA, denominado "*Informe de avance 'Restructuración empresa Norpro* "[451], confirman que el proceso de expropiación comenzó, al menos, poco tiempo después del día 15 de mayo de 2010.

**(bb) Naturaleza y propósito de la presencia de la Demandada en la planta**

467. Con respecto al segundo punto, el Tribunal destaca que el control *de facto* de bienes por parte del Estado no supone necesariamente una expropiación. En este contexto, la Demandada sostiene que la presencia de PDVSA en la planta se concertó a efectos de garantizar la seguridad y estabilidad de la planta, en calidad de "*cuidador*" y no de propietaria[452]. Asimismo, la Demandada alega que, si bien a PDVSA se le ordenó al mismo tiempo "[que] *llev*[ara] *a cabo la estatización de Norpro*", "*no p*[odía] *actuar o intervenir en Norpro*" hasta la publicación del decreto de expropiación formal[453]. Sin embargo, tal como indica el razonamiento vinculado a la toma de control de la planta *supra*, el Tribunal concluye que, en los propios términos de la Demandada, PDVSA efectivamente "*actu*[ó]" e "*interv*[ino] *en Norpro*" y, por ende, tomó el control de la planta, no como "*cuidador*", sino en beneficio de la Demandada, excluyendo de esa manera a Norpro Venezuela como propietaria de la planta.

468. En su defensa, la Demandada sostiene que la presencia de PDVSA en la planta estaba destinada a "*garantizar la seguridad y estabilidad de la Planta*"[454], más específicamente,

[449] Memorial de Contestación, ¶ 28.

[450] *Cfr.* Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143.**

[451] Informe, Comisión de Evaluación de PDVSA, *Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144.**

[452] Memorial de Contestación, ¶¶ 29 y 140; Dúplica, ¶¶ 3, 18, 22 (nota 101) y 32 (nota 135); Escrito Posterior a la Audiencia, ¶ 20, que cita Transcripción (Día 1), pág. 212, líneas 11-12; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 11 (nota 42), 35.

[453] Dúplica, ¶¶ 20-22, 32 (nota 135), que cita al Borrador de Minuta de Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo R-017**, págs. 2-3.

[454] Memorial de Contestación, ¶ 28; Escrito Posterior a la Audiencia de la Demandada, ¶ 7.

"*la seguridad del personal y de los bienes*" en la planta[455]. La Demandada se refiere, en particular, a la "*tensión creciente*" y "*sustancial*" entre Norpro Venezuela y los representantes del sindicato, así como a la "*acción industrial*" que finalmente derivó en la toma de control el día 15 de mayo de 2010[456]. Además, la Demandada argumenta que la "*operación de la Planta sin supervisión adecuada*" planteó un "*riesgo* [sustancial] *a la seguridad del personal de la Planta*" y subraya que los "*peligros asociados a la Planta*" fueron reconocidos tanto por la dirección de Norpro como por la Embajada de la República Francesa[457]. Lo más importante es que la Demandada alega que la dirección de Norpro "*abandonó*" la planta el día 15 de mayo de 2010, dejándola en manos del sindicato, y afirma que la Demandante "*nunca intentó recuperar la posesión*" u "*obtener acceso a la Planta*" y, con posterioridad al día 15 de mayo de 2010, tampoco aseveró que la presencia de PDVSA "*careci*[era] *de fundamento jurídico*"[458]. [Traducción del Tribunal]

469. Aunque la ocupación temporal de un bien por razones de seguridad pública no constituye una "*expropiación*" en los términos del Artículo 5(1) del Tratado, el Tribunal concluye que la toma de la planta por parte de la Demandada no se llevó a cabo principalmente por razones de seguridad, sino que estaba destinada a utilizar la planta para los propios fines de la Demandada y a excluir tanto a la Demandante como a Norpro de su propiedad.

470. Tal como se estableciera en **(aa)** *supra*, la toma de la planta a partir del día 15 de mayo de 2010 se convirtió en parte integrante del indiscutible "*proceso de nacionalización*"[459] [Traducción del Tribunal] de Norpro Venezuela en el marco del "*Plan Socialista Guayana*" que había de ser implementado por el poder ejecutivo nacional[460]. En este contexto, dependía de PDVSA "[ ] *llevar a cabo la estatización de Norpro*"[461]. El Tribunal concluye que llevar a cabo esta tarea era el objetivo principal de la presencia de PDVSA en la planta y tenía más peso que cualquier otro objetivo, incluidas las razones de seguridad.

471. Aún más importantes en opinión del Tribunal son los numerosos informes y memorandos internos preparados por PDVSA sobre la evaluación de la situación económica actual de la planta y sobre la determinación de la manera en que la planta podría ser reestructurada

---

[455] Escrito Posterior a la Audiencia de la Demandada, ¶ 8. *Véanse también* Dúplica, ¶¶ 3, 18; Escrito Posterior a la Audiencia de la Demandada, ¶ 60.

[456] Memorial de Contestación, ¶¶ 137-138; Dúplica, ¶¶ 8, 18.

[457] Dúplica, ¶ 20; Escrito Posterior a la Audiencia de la Demandada, ¶ 20.

[458] Dúplica, ¶¶ 20, 23. *Cfr.* Escrito Posterior a la Audiencia 60.

[459] Escrito Posterior a la Audiencia 61.

[460] *Cfr.* Memorando, PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**, pág. 4.

[461] Borrador de Minuta de Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, de fecha 30 de agosto de 2010, **Anexo C-34** y **Anexo R-17**, pág. 2.

y operada por PDVSA en el futuro[462], incluidas, *inter alia*, evaluaciones del inventario de la planta, de las obligaciones de pago y los equipos, al igual que su situación financiera general[463]. El Tribunal opina que este trabajo no era la conducta de un simple "*cuidador*"; era el trabajo de la nueva propietaria de la planta.

472. El objetivo de la presencia de PDVSA en la planta con posterioridad al día 15 de mayo de 2010 también se vio reflejado en determinados cambios en la apariencia de la planta y su personal. Ya en el mes de agosto de 2010, la bandera de PDVSA flameaba junto con la bandera venezolana sobre la planta, y los obreros vestían uniformes de PDVSA[464]. Tal como se detallara en **(aa)** *supra*, más adelante, en el mes de octubre de 2010, Ángel Salvarría de PDVSA fue instaurado como Gerente General de la Planta y "*reorganizó la estructura de supervisión que se había implementado en la Planta a partir de la toma de control del sindicato y comenzó a preparar la Planta para el reinicio de la producción*" [Traducción del Tribunal]. En el mes de noviembre de 2010, los trabajadores de la planta se convirtieron oficialmente en empleados de PDVSA. Por último, entre los meses de noviembre de 2010 y marzo de 2011, "*una vez que se reiniciaron las operaciones, la Planta produjo y almacenó proppants verdes*"[465] [Traducción del Tribunal]. Una vez más, estas medidas no son habituales a fin de garantizar la seguridad y estabilidad; ilustran que

---

[462] *Cfr.* Memorando PDVSA E&P, Informe Preliminar de la Comisión de Evaluación, *Evaluación global de la situación actual de la empresa Norpro Venezuela C.A.*, mayo de 2010, **Anexo C-141**; Diagnóstico de la situación actual y plan de reestructuración para la optimización de los procesos productivos de Norpro Venezuela, C.A., junio de 2010, **Anexo C-142**; Memorando Interno, PDVSA Industrial, *Situación actual del proceso de estatización empresa Norpro de Venezuela, C.A. (Norpro)*, 2 de junio de 2010, **Anexo C-143**; *Informe, Comisión de Evaluación de PDVSA, Informe de avance 'Restructuración empresa Norpro'*, 4 de junio de 2010, **Anexo C-144**; Memorando de la Dirección Ejecutiva de Producción de PDVSA a Rafael Ramírez Carreño (Ministro de Energía y Petróleo), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 de junio de 2010, **Anexo C-145**; Informe de la Comisión de Evaluación de PDVSA, *Reestructuración Empresa Norpro*, 11 de junio de 2010, **Anexo C-146**; Informe de la Comisión de Evaluación de PDVSA, *Reestructuración Empresa Norpro*, 2 de julio de 2010, **Anexo C-147**; Informe Técnico Definitivo, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 de julio de 2010, **Anexo C-148**; Memorando de Ower Manrique a Eulogio del Pino, *Situación actual de la empresa Norpro Venezuela C.A. (plan estratégico para la puesta en operación)*, 27 de julio de 2010, **Anexo C-149**; Informe de la Comisión de Evaluación de PDVSA, *Reestructuración Empresa Norpro*, 3 de agosto de 2010, **Anexo C-150**

[463] Memorando de la Dirección Ejecutiva de Producción de PDVSA a Rafael Ramírez Carreño (Ministro de Energía y Petróleo), *Diagnóstico Situación Actual y el Plan Estratégico para el Control Administrativo u Operacional de la Empresa NORPRO VENEZUELA, C.A.*, 9 de junio de 2010, **Anexo C-145**, pág. 3; Informe Técnico Definitivo, José Carrasco (PDVSA E&P), *Acciones efectuadas en la empresa Norpro Venezuela con motivo a su nacionalización, y a dos meses del pronunciamiento del Ejecutivo Nacional*, 15 de julio de 2010, **Anexo C-148**, págs. 9-10.

[464] Solicitud de Inspección Judicial de Norpro Venezuela, C.A., 5 de agosto de 2010, **Anexo C-119**, pág. 11; María Ramírez Cabello, *Norpro de Venezuela inicia fase de prearranque*, Correo del Caroní, 23 de julio de 2010, **Anexo C-117**.

[465] Rondón, ¶¶ 33-34; Transcripción (Día 3), pág. 708 línea 21 – pág. 709 línea 2, pág. 711 línea 3 – pág. 711 línea 20.

PDVSA estaba preparando la planta para la operación y la producción bajo la mirada de la Demandada.

473. El Tribunal considera que, contrariamente a las alegaciones de la Demandada, la cuestión que consiste en determinar si el decreto de expropiación formal todavía se estaba redactando en ese momento y los derechos de propiedad aún tenían que transferirse formalmente, y si la Demandante siguió los pasos legales en aras de recuperar el control, carece de relevancia[466]. El hecho de que el decreto de expropiación "*est*[uviera] *siendo elaborado*" en ese momento "*por las autoridades gubernamentales competentes, dentro del proceso previsto en las leyes aplicables*"[467] no excluye la conclusión de que la Demandante ya había sido expropiada en el sentido del Artículo 5(1) del Tratado.

474. Los conceptos y formalidades del derecho interno y el cumplimiento de sus reglas no son decisivos a efectos de determinar si ha tenido lugar una expropiación en el sentido del derecho internacional. Por el contrario, lo decisivo en virtud del Artículo 5(1) del Tratado es que la Demandada asumió el control *de facto* de la planta el día 15 de mayo de 2010 o poco tiempo después, sin perspectiva de restituírsela a sus propietarios, y la utilizó para sus propios fines, a saber, preparar y reiniciar la operación y producción de proppants. Si bien la evaluación de la situación económica de la planta, incluidos su inventario y sus obligaciones de pago, también era relevante para elaborar el decreto de expropiación (formal) y determinar la compensación justa requerida en virtud del Artículo 5(1) del Tratado, la Demandada no reunió estos datos en el marco de un procedimiento administrativo formal. En su lugar, se valió de la toma de control de la planta llevada a cabo por el sindicato, estableció una presencia permanente en la planta e inició el proceso de nacionalización sin prever participación significativa alguna de la Demandante o la dirección de Norpro en ese momento.

475. Con respecto al segundo punto, es decir, si la Demandante intentó recuperar el control de la planta luego de la toma de control el día 15 de mayo de 2010, el Tribunal destaca que la Demandante y Norpro Venezuela no le dejaron la planta a PDVSA en forma deliberada, tal como sugiere la Demandada. Por el contrario, Norpro Venezuela presentó dos solicitudes de inspección judicial de la planta los días 17 de mayo de 2010 y 5 de agosto de 2010[468]. Asimismo, Norpro Venezuela y la Demandante intentaron, en reiteradas oportunidades, entablar negociaciones con la Demandada en relación con la nacionalización de la planta, solicitaron la designación de un interlocutor, ofrecieron

---

[466] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 60-61.
[467] Borrador de Minuta de Reunión celebrada entre PDVSA Industrial S.A., Compagnie de Saint-Gobain y la Embajada de Francia en Venezuela, 30 de agosto de 2010, **Anexo C-34** y **Anexo R-17**.
[468] Solicitud de Inspección Judicial de Norpro Venezuela, C.A., 17 de mayo de 2010, **Anexo C-20**; Solicitud de Inspección Judicial de Norpro Venezuela, C.A., 5 de agosto de 2010, **Anexo C-119**.

asistencia técnica e hicieron reserva de su derecho de indemnización, comenzando por una carta del expresidente de Norpro Luis Páez a Rafael Ramírez, de fecha 19 de mayo de 2010:

> *"Considerando el interés que posee el Grupo Saint-Gobain en preservar la seguridad del personal de la planta y la condición de los activos de Norpro nos permitimos solicitar que PDVSA, en caso de ser designado como ente que llevará a cabo la estatización, designe a un interlocutor válido para analizar con los representantes del Grupo Saint-Gobain, la forma bajo la cual la misma se desea llevar a cabo.*

> *Debe destacarse que el Grupo Saint-Gobain sin prejuicio a sus derechos en materia de indemnización está abierto a proporcionar a corto y mediano plazo asistencia técnica una vez que lleve a cabo la estatización, a los fines de preservar la seguridad del personal y evitar la degradación del estado de los activos de Norpro"*[469].

476. Otras cartas de la Demandante y Norpro Venezuela, escritas en el curso del año 2010, contienen afirmaciones similares[470]. Estos mensajes no dan la impresión de que la Demandante y Norpro Venezuela, que todavía eran las propietarias legítimas de la planta, tuvieran acceso a la planta en cualquier momento y que habían decidido *"exonerarse de responsabilidad por todo lo que ocurriera en la Planta"* y dejarle la planta al Estado, tal como argumentara la Demandada[471] [Traducción del Tribunal]. En cambio, parece que, en vista del anuncio del Presidente Chávez de fecha 15 de mayo de 2010 y la posterior toma de control de la planta, la Demandante aceptó como un hecho que la planta estaba nacionalizada *de facto* e intentó aprovechar al máximo la situación cooperando con la Demandada en lugar de agotar sus recursos legales, tales como, un *"amparo"* a fin de preservar sus derechos constitucionales[472]. No obstante, esta actitud cooperativa no impide que la Demandante afirme que una *"expropiación"* en los términos del Artículo 5(1) del Tratado ya tenía lugar en ese momento.

477. En conclusión, el Tribunal no tiene dudas de que, el día 15 de mayo de 2010 o al menos poco tiempo después, la Demandada obtuvo como mínimo el control *de facto* de la planta, con el propósito de utilizarla para sus propios fines y excluir a la Demandante de su propiedad. Esta conducta supone una *"expropiación"* en los términos del Artículo 5(1) del Tratado y, por lo tanto, es decisiva a fin de determinar la fecha de expropiación en el sentido del inciso 3.

---

[469] Carta de Luis E. Páez a Rafael Ramírez, 19 de mayo de 2010, **Anexo C-22**, págs. 1-2.
[470] *Cfr.* Carta de Luis E. Páez a José Khan, 27 de mayo de 2010, **Anexo C-23**; Carta de Guy Rolli a Temir Porras, 8 de junio de 2010, **Anexo C-26**; Carta de Luis E. Páez a Rafael Ramírez, 6 de julio de 2010, **Anexo C-28**; Carta de Patrick Dupin a Eulogio del Pino, 3 de agosto de 2010, **Anexo C-30**.
[471] Escrito Posterior a la Audiencia de la Demandada, ¶ 60.
[472] Dúplica, ¶ 23.

### (ii)    El Cumplimiento o Incumplimiento por parte de la Demandada de sus Obligaciones en virtud del Tratado luego de la Fecha de Expropiación

478. Las conclusiones a las que se arribara en **(aa)** con respecto a los requisitos en cuanto a la fijación y prontitud de la indemnización en virtud de los incisos 2 y 3 del Artículo 5(1) del Tratado y en **i)** con respecto a la "*fecha de la expropiación*" en los términos del inciso 3 indican que la Demandada no cumplió con sus obligaciones en virtud del Tratado con arreglo a los incisos 2 y 3 del Artículo 5(1) con posterioridad al día 15 de mayo de 2010.

479. La Demandada nunca ha comunicado el monto del pago que ha de realizarse a la Demandante y aún no ha ofrecido indemnización alguna por la expropiación, a pesar de los intentos de la Demandante de negociar los términos de la nacionalización mencionados *supra*. El Tribunal está al tanto de que, según la Demandada, ella ofreció una indemnización en el contexto de su ofrecimiento de formar una "*empresa mixta*" en la que PDVSA se convertiría en accionista mayoritaria[473]. Sin embargo, independientemente de si el ofrecimiento de la Demandada fue suficientemente concreto para que la Demandante lo considerara[474], en cualquier caso, la Demandada no fijó el monto que le pagaría a la Demandante en contraprestación de su adquisición de una participación mayoritaria en la empresa mixta. En consecuencia, la Demandada no fijó el monto de la indemnización en el sentido del inciso 3 del Artículo 5(1) del Tratado y, por ende, tampoco pagó una indemnización pronta tal como se exige con arreglo al inciso 2.

### c)    Conclusión

480. En conclusión, el Tribunal determina que la expropiación de la planta no se llevó a cabo de conformidad con los requisitos de indemnización establecidos en los incisos 2 y 3 del Artículo 5(1). En cuanto a las consecuencias de esta conclusión, es decir, si este incumplimiento torna la expropiación ilícita, el Tribunal resalta que la controversia entre las Partes se concentra en la cuestión que consiste en determinar qué estándar de compensación ha de aplicarse en el presente caso. Por lo tanto, el Tribunal procederá a abordar esta cuestión en la sección sobre cuantía de daños (*véase* **III.1.** *infra*).

---

[473] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 53-54, que hace referencia a la carta de Gabriel Rojas a Luis Páez, de fecha 22 de octubre de 2010, **Anexo R-071.** La Demandada también se refiere a la reunión celebrada entre PDVSA y la Demandante el día 26 de octubre de 2010 analizada por el testigo de la Demandante, el Sr. Millot, en su declaración testimonial. Millot. ¶ 31.

[474] Las Partes disienten en cuanto a si el ofrecimiento constituyó una propuesta concreta que la Demandante se comprometió a considerar o si fue una mera "*insinuación*" que PDVSA prometió sustanciar antes de que a la Demandante le hubiera correspondido considerarla [Traducción del Tribunal]. Presentación Posterior a la Audiencia de la Demandante, ¶ 35; Millot, ¶ 31; Transcripción (Día 2), pág. 413 línea 16 – pág. 414 línea 17; Escrito Posterior a la Audiencia de la Demandada, ¶ 54 (con nota 101).

## 2.    Trato justo y equitativo (Artículo 3(1) del Tratado)

481. El Tribunal procede a abordar las reclamaciones TJE. Luego de definir brevemente el estándar TJE aplicable **(a)**, el Tribunal evaluará las reclamaciones TJE con respecto a la planta **(b)** y al Contrato de Bauxita **(c)**. En cuanto a las reclamaciones adicionales basadas en el hecho de que la Demandada no proporcionara las devoluciones del IVA que supuestamente le adeudaba a la Demandante en virtud del derecho venezolano y en la presunta restricción arbitraria por parte de la Demandada de la producción de proppants mediante la toma de control de la planta de fecha 24 de marzo de 2010[475], el Tribunal destaca que la Demandante no ha seguido planteando estos argumentos como reclamaciones TJE independientes después de su Memorial. Por ende, el Tribunal también se abstendrá de abordar estos argumentos en la presente sección[476].

## a)    Estándar TJE aplicable

### aa)    Síntesis de la Postura de la Demandante

482. La Demandante alega que el estándar TJE previsto en el Artículo 3(1) del Tratado se refiere, en sentido amplio, a los conceptos de TJE imperantes en el derecho internacional – y no sólo al estándar mínimo de trato –, incluidos los siguientes[477]:

- La garantía de un "*entorno jurídico y comercial estable*" con un trato "*de manera que sea consistente, predecible y transparente*";

- La creación de un "*marco jurídico, administrativo y regulatorio adecuado, el entorno jurídico que la teoría de inversión moderna ha llegado a reconocer como* conditio sine qua non *del éxito de la empresa privada*";

- El "*debido proceso*" con exclusión de la "*falta de transparencia y franqueza en el proceso administrativo*";

- La ausencia de "*conducta arbitraria o discriminatoria*"; y

- Una conducta "*de conformidad con el principio de buena fe*". [Traducción del Tribunal]

---

[475] *Cfr.* Memorial, ¶¶ 162-164 y ¶¶ 178-179.

[476] El argumento relativo a las devoluciones del IVA se analizará en la sección sobre cuantía de daños en los párrafos 824 y ss. *infra*.

[477] Memorial, ¶¶ 152-156.

483. La Demandante afirma que la referencia contenida en el Artículo 3(1) del Tratado a las *"reglas y principios del Derecho Internacional"* no constituye un techo, sino la base del trato que ha de otorgarse a los inversionistas extranjeros[478].

### bb)    Síntesis de la Postura de la Demandada

484. La Demandada argumenta que, en virtud de la referencia a las *"reglas y principios del Derecho Internacional"*, el Artículo 3(1) del Tratado requiere exclusivamente el estándar mínimo de trato al amparo del derecho internacional consuetudinario. A efectos de definir este estándar TJE restrictivo, la Demandada alude a una decisión temprana del tribunal en el caso *Neer c. México* (1926), que sostenía que, para violar este estándar, el trato de un extranjero

> *"debería constituir un ultraje, mala fe, un incumplimiento voluntario del deber o una insuficiencia de acción gubernamental tan alejada de los estándares internacionales que todo hombre razonable e imparcial reconocería fácilmente"*[479]. [Traducción del Tribunal]

485. Asimismo, la Demandada cita varias disposiciones TJE contenidas en instrumentos de derecho de inversión más recientes, tales como el borrador del Tratado de Libre Comercio UE-Canadá (**"AECG"**), que especifica que el estándar TJE comprende, por ejemplo, lo siguiente: *"Violación fundamental del debido proceso, incluida una violación fundamental de la transparencia, en el contexto de procedimientos judiciales y administrativos"* así como *"incumplimiento de las expectativas legítimas"*, *"limitados a situaciones en las que la inversión tuvo lugar sólo debido a una promesa efectuada por el Estado que posteriormente no se cumplió"*[480]. [Traducción del Tribunal]

### cc)    Análisis del Tribunal

486. La cláusula TJE contenida en el Artículo 3(1) del Tratado reza lo siguiente:

| | |
|---|---|
| *"Chacune des Parties contractantes s'engage à assurer, sur son territoire et dans sa zone maritime, un traitement juste et* | *"Cada una de las Partes Contratantes se compromete a conceder, en su territorio y en su zona marítima, un trato justo y* |

---

[478] Réplica, ¶ 104.

[479] Memorial de Contestación, ¶ 125, que cita *Neer c. México*, Comisión General de Reclamaciones México-EE.UU., Expediente N.º 136, Dictamen de fecha 15 de octubre de 1926, 21 THE AMERICAN JOURNAL OF INTERNATIONAL LAW 555 (1927), pág. 556, **Anexo RL-79**.

[480] Dúplica, ¶ 121, que cita Comisión Europea, *Investment Provisions in the EU–Canada Free Trade Agreement*, de fecha 3 de diciembre de 2013, **Anexo RL-142**; Comisión Europea, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text"*, de fecha 5 de agosto de 2014, **Anexo RL-143**.

*équitable, conformément aux règles et principes du droit international, aux investissements des nationaux et sociétés de l'autre Partie et à faire en sorte que l'exercice du droit ainsi reconnu ne soit entravé ni en droit ni en fait. En particulier, bien que non exclusivement, sont considérées comme des entraves de droit ou de fait au traitement juste et équitable, toute restriction arbitraire ou discriminatoire à l'achat et au transport de matières premières et de matières auxiliaires, d'énergie et de combustibles, ainsi que de moyens de production et d'exploitation de tout type, toute entrave à la vente et au transport des produits à l'intérieur du pays et à l'étranger, ainsi que toutes autres mesures ayant un effet analogue*[481].

*equitativo, conforme a las reglas y principios del Derecho Internacional, a las inversiones de los nacionales y sociedades de la otra Parte Contratante y a garantizar que el ejercicio del derecho así adquirido no sea obstaculizado, de hecho ni de derecho. En particular, aunque no exclusivamente, serán considerados como obstáculos de hecho o de derecho al trato justo y equitativo, cualquier restricción arbitraria o discriminatoria a la compra y al transporte de materias primas y de materias auxiliares, de energía y de combustibles, así como de medios de producción y de explotación de todo tipo, todo obstáculo a la venta y al transporte de los productos en el interior del país y en el extranjero, así como cualquier otra medida que pueda tener un efecto análogo*[482].

487. La traducción al inglés presentada por la Demandante reza lo siguiente:

*"Each of the Contracting Parties will ensure fair and equitable treatment for investments by nationals and companies of the other Party in its territory and in its maritime area, in accordance with the rules and principles of international law, and will ensure that the exercise of this right thus recognized shall have no impediments either in law or in fact. In particular, although not exclusively, impediments to fair and equitable treatment in law or in fact are any arbitrary or discriminatory restrictions to the purchase and transport of raw and ancillary materials, of energy and fuels, as well as to any means of production and exploitation, or any impediment to the sale and transport of*

---

[481] Gaceta Oficial de la República Francesa N.° 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française n°102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[482] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Anexo C-1**, pág. 332.354.

> *products within the country and overseas, along with all other measures having a similar effect*"[483].

488. El Tribunal subraya que la referencia a "*conforme a las reglas y principios del Derecho Internacional*" ("*conformément aux règles et principes du droit international*"/"*rules and principles of international law*") y la enumeración no taxativa ("*En particular, aunque no exclusivamente*"/"*En particulier, bien que non exclusivement*") de ciertos aspectos del TJE en la segunda parte de la disposición podrían, en principio, plantear dudas en cuanto a la interpretación correcta de la cláusula TJE. Sin embargo, no es necesario que el Tribunal arribe a una conclusión en este aspecto, dado que, tal como se analizará en los siguientes párrafos, la supuesta participación de la Demandada en los aumentos de precios en virtud del Contrato de Bauxita y la expropiación de la planta, si se demostrara, también podría violar el concepto más restrictivo de TJE descripto por la Demandada en el caso que nos ocupa.

489. Con respecto a la toma de control de la planta, la Demandante argumenta que la Demandada no siguió el debido proceso en el procedimiento de expropiación. Tal como ilustra la referencia de la Demandada al estándar TJE en virtud del borrador del AECG, en apariencia, la Demandada acepta que la "[v]*iolación fundamental del debido proceso, incluida una violación fundamental de la transparencia, en el contexto de procedimientos judiciales y administrativos*" forma parte del estándar TJE contenido en el Artículo 3(1) del Tratado[484]. [Traducción del Tribunal]

490. En cuanto a los aumentos de precios en virtud del Contrato de Bauxita, según la Demandante, la Demandada, a través del MIBAM y otros órganos del Estado, efectuó "*promesas específicas*", asumió "*compromisos*" y, en consecuencia, "*creó expectativas específicas*", en las que la Demandante confió al momento de realizar sus inversiones y que, posteriormente, se vieron frustradas[485]. Una vez más, la Demandada reconoce que el TJE incluye la protección de las "*expectativas legítimas*", "*limitada a situaciones en las que la inversión tuvo lugar sólo debido a una promesa efectuada por el Estado que posteriormente no se cumplió*"[486].[Traducción del Tribunal]

491. A la luz de lo que antecede, el Tribunal considerará el "*debido proceso*" y la protección de las "*expectativas legítimas*", en principio, elementos indiscutidos del TJE en virtud del

---

[483] Traducción libre al inglés presentada por la Demandante como **Anexo C-1**.

[484] Dúplica, ¶ 121, que cita Comisión Europea, *Investment Provisions in the EU–Canada Free Trade Agreement*, de fecha 3 de diciembre de 2013, **Anexo RL-142**; Comisión Europea, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text"*, de fecha 5 de agosto de 2014, **Anexo RL-143**.

[485] Réplica, ¶ 120; Presentación Posterior a la Audiencia de la Demandante, ¶ 80.

[486] Dúplica, ¶ 121, que cita Comisión Europea, *Investment Provisions in the EU–Canada Free Trade Agreement*, de fecha 3 de diciembre de 2013, **Anexo RL-142**; Comisión Europea, *Note for the Attention of the Trade Policy Committee re "CETA Consolidated text"*, de fecha 5 de agosto de 2014, **Anexo RL-143**.

Artículo 3(1) del Tratado [Traducción del Tribunal]. En caso de ser necesario, el Tribunal proporcionará una descripción del alcance preciso de estos dos elementos *infra* con mayor grado de detalle.

### b)    Debido proceso en la expropiación

#### aa)    Síntesis de la Postura de la Demandante

492. La Demandante alega que la Demandada no le otorgó trato justo y equitativo a la inversión de la Demandante, en tanto sus acciones en relación con la expropiación no fueron transparentes y no cumplieron con el estándar de buena fe en virtud del Tratado. La Demandante argumenta que su inversión fue "*efectivamente expropiada de la noche a la mañana*" sin advertencia previa y sus empleados fueron "*echados ese mismo día*" como consecuencia del "*anuncio público y repentino*" en televisión realizado por el Presidente Chávez el día 15 de mayo de 2010[487]. [Traducción del Tribunal]

493. La Demandante afirma que el Tribunal en *Middle East Cement c. Egipto* confirmó que la manera en que la inversión fue expropiada puede en sí misma violar el estándar TJE y también hace referencia a la conclusión del tribunal en *Tecmed c. México* según la cual el hecho de no consultar a la demandante con anterioridad a la acción expropiatoria dio lugar a un incumplimiento de la obligación TJE[488]. Además, la Demandante invoca la afirmación del tribunal en el marco del caso *OI European Group c. Venezuela* de que cuesta imaginar una expropiación directa ilícita que, al mismo tiempo, no implique una violación del estándar TJE[489].

494. Según la Demandante, se acercó a la Demandada en reiteradas oportunidades a fin de negociar el monto de indemnización a pagarse en virtud del Tratado, pero sus esfuerzos fueron en vano. La Demandada no realizó ofrecimiento alguno y tampoco dio ningún indicio en cuanto al proceso que pretendía seguir en aras de garantizar el pago de una indemnización adecuada. La Demandante alude a la afirmación del tribunal en el caso *ADC c. Hungría* de que la expectativa legítima de la demandante incluía la de recibir trato justo y compensación justa[490]. Por el contrario, según la Demandante, la Demandada tomó la planta sin establecer un marco jurídico a efectos de la expropiación o hacer

---

[487] Memorial, ¶¶ 180-181; Réplica, ¶ 127.
[488] Memorial, ¶ 182, que hace referencia a *Middle East Cement c. Egipto* (**CLA-053**), ¶ 143, y *Tecmed c. México* (**CLA-082**), ¶¶ 173-174.
[489] Presentación Posterior a la Audiencia de la Demandante, ¶ 47, que hace referencia a *OI European Group c. Venezuela* (**CLA-156**), ¶ 501.
[490] Memorial, ¶¶ 183-184, que hace referencia a *ADC c. Hungría* (**CLA-001**), ¶ 424.

esfuerzos para entablar negociaciones de buena fe en materia de compensación durante un período de más de diez meses[491].

495. La Demandante argumenta que el debido proceso requiere que el inversionista afectado reciba "*una oportunidad razonable dentro de un tiempo razonable de hacer valer sus derechos legítimos y lograr que sus reclamaciones sean escuchadas*". La Demandante opina que, las "*demoras considerables*" y el "*proceso turbio*", junto con la insistencia de la Demandada en continuar su procedimiento de expropiación local a pesar de que la Demandante había elegido plantear sus reclamaciones ante un tribunal CIADI, constituyen un incumplimiento de la obligación de la Demandada de garantizarle a la Demandante el debido proceso durante la expropiación[492].

496. La Demandante sostiene que la Demandada no respetó "*la interpretación del debido proceso de cualquiera*" cuando hizo lo siguiente: (i) "*declaró abruptamente la Planta propiedad nacional en un anuncio televisivo*"; (ii) no adoptó "*ninguna medida, resolución o procedimiento legal*" durante casi un año y ni siquiera pudo delinear un plazo para el inicio del proceso; (iii) no proporcionó autoridad alguna en sustento de la "*ocupación y control*" de la planta por parte de PDVSA; (iv) se rehusó a negociar de buena fe a pesar de los esfuerzos reiterados de la Demandante e hizo "*sólo 'insinuaciones' carentes de sustento de una empresa mixta*", lo que no puede considerarse un ofrecimiento de buena fe, ya que la insinuación no incluía una compensación por la pérdida de la participación del 60 % que sería tomada por PDVSA; (v) no ofreció indemnización alguna, tal como lo requerían tanto el Tratado como su Ley de Expropiación local; y (vi) no actuó conforme a los términos de la Ley de Expropiación, tal como lo confirmara su perito jurídico, el Dr. Brewer-Carías, que establece que, en virtud del derecho venezolano, la indemnización debe pagarse con anterioridad a la expropiación[493].

### bb)    Síntesis de la Postura de la Demandada

497. La Demandada rechaza la alegación de la Demandante de que la expropiación no se llevó a cabo siguiendo el debido proceso y argumenta que el derecho internacional no contiene el requisito de advertencia previa de su intención de anunciar una expropiación, ya que esto efectivamente menoscabaría el derecho soberano del Estado de expropiar[494]. La

---

[491] Presentación Posterior a la Audiencia de la Demandante, ¶ 42.
[492] Réplica, ¶¶ 128-130.
[493] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 45-46; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 22-29; Réplica, ¶ 126, que hace referencia a Brewer-Carías II, ¶¶ 14-17.
[494] Dúplica, ¶ 137.

Demandada asevera que, una vez que PDVSA había establecido presencia de cuidadora en la planta, se reunió con la Demandante lo antes posible a fin de negociar la constitución de una empresa mixta e, incluso antes de que se emitiera el Decreto de Expropiación, PDVSA "*adoptó medidas activas para comprometerse con la Demandante, colaborar con la Demandante y garantizar que la Demandante estuviera al tanto de los recursos legales disponibles*"[495]. [Traducción del Tribunal]

498.  En respuesta al argumento de la Demandante según el cual la Demandada no cumplió con su Ley de Expropiación local, la Demandada sostiene que PDVSA estaba autorizada a asumir la posesión provisional de la planta en virtud del derecho venezolano, y, en cualquier caso, no toda omisión por parte del Estado receptor de "*cumplir estrictamente con los requisitos de su legislación*" constituye un incumplimiento de su obligación TJE de conformidad con el derecho internacional[496].

499.  La Demandada resalta que, luego de la emisión del Decreto, PDVSA inició el procedimiento administrativo de expropiación amigable requerido por la Ley de Expropiación, que tiene el propósito de determinar la indemnización que ha de pagarse. Según la Demandada, la Demandante tenía pleno conocimiento del Decreto de Expropiación y de su rol en la resolución de la cuestión de la compensación; no obstante, eligió no participar en el procedimiento de arreglo amigable e ignorar el procedimiento judicial posterior. Por consiguiente, según la Demandada, el presente caso no puede compararse con los casos citados por la Demandante, dado que ella ni impugnó la expropiación ni participó en la determinación de la compensación justa y, por lo tanto, no puede quejarse de las demoras resultantes[497].

500.  Específicamente con respecto a *OI European Group c. Venezuela*, la Demandada destaca que la disposición aplicable en materia de expropiación en ese caso incluía un requisito explícito de llevar a cabo la expropiación "*en virtud del debido proceso legal*" y subraya que el tribunal rechazó todos argumentos de debido proceso de la demandante excepto uno. En particular, la Demandada resalta que el tribunal concluyó que el debido proceso no requiere debates previos con la parte expropiada y se satisface completamente si la parte recibe posteriormente el derecho a ser escuchada ante el poder judicial[498]. La Demandada sostiene que esta posibilidad habría estado a disposición de la Demandante en cualquier momento y concluye que "*el hecho de que la Demandante optara por no*

---

[495] Memorial de Contestación, ¶¶ 139-140.

[496] Dúplica, ¶ 136 (con nota 469).

[497] Memorial de Contestación, ¶¶ 141-142; Dúplica, ¶¶ 138-139.

[498] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 10-11, que hace referencia a *OI European Group c. Venezuela* (CLA-156), ¶ 322 y ¶¶ 388, 392.

*valerse de los recursos ante los tribunales venezolanos no equivale a una denegación del debido proceso*"[499]. [Traducción del Tribunal]

501. Por último, la Demandada opina que el argumento de la Demandante según el cual el procedimiento judicial en curso ignora la opción de la Demandante de iniciar un arbitraje CIADI se torna abstracto ante la decisión del Tribunal de rechazar la solicitud de medidas provisionales de la Demandante que se basaba en el mismo argumento[500].

502. En cualquier caso, la Demandada alega que la Demandante no sufrió ningún daño durante el período de diez meses y medio hasta la emisión del Decreto de Expropiación que no se encuentre ya incluido en el cálculo de la indemnización por expropiación al día 15 de mayo de 2010. Según la Demandada, ni siquiera la existencia de una violación TJE daría lugar a un cambio en la manera en que la compensación ha de calcularse en el caso que nos ocupa[501].

### cc)    El Análisis del Tribunal

503.  Durante la Audiencia y en su Presentación Posterior a la Audiencia, la Demandante incluyó esta reclamación TJE en la reclamación de expropiación relativa al inciso 1 del Artículo 5(1) del Tratado[502]. El Tribunal destaca, sin embargo, que, en consecuencia, la Demandante no tenía intención de abandonar su reclamación TJE separada relativa a la toma de la planta, en tanto mantiene en su petitorio la solicitud de una declaración separada de que la Demandada ha incumplido el Artículo 3(1) del Tratado[503].

504. El Tribunal subraya las posiciones de las Partes acerca de la reclamación de la Demandante de violación del debido proceso durante el proceso de expropiación. No obstante, tal como señalara correctamente la Demandada, la Demandante no alega haber sufrido daño alguno por el supuesto incumplimiento que no estaría incluido en la indemnización por la propia expropiación. Por lo tanto, no es necesario que el Tribunal se pronuncie respecto de la existencia de una violación del TJE en este aspecto, puesto que no alteraría el monto de compensación al que la Demandante tendrá derecho con arreglo al Laudo.

---

[499] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 11.

[500] Dúplica, ¶ 139.

[501] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 108, 112; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 32.

[502] Transcripción (Día 1), pág. 85 línea 3; pág. 95 líneas 4-9. Presentación Posterior a la Audiencia de la Demandante, ¶¶ 40-47.

[503] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116. Esto es confirmado por la referencia cruzada en la Presentación Posterior a la Audiencia de la Demandante (¶ 42 con nota 116) a la sección pertinente del Memorial (¶¶ 180-184) y por el planteo de la Demandante de sus argumentos TJE en su Segunda Presentación Posterior a la Audiencia (¶¶ 30-45).

c)     **Aumentos de precio en virtud del Contrato de Bauxita**

aa)    **Síntesis de la Postura de la Demandante**

(i)    **La Conducta de CVG Bauxilum es Atribuible a la Demandada**

505.   La Demandante alega que las acciones de CVG Bauxilum son atribuibles a la Demandada porque es de "*propiedad absoluta de la CVG y está sujeta a su dirección y supervisión*", la cual es un instituto autónomo conforme al derecho venezolano y, como tal, forma parte de las entidades públicas "*funcionalmente descentralizadas*" de la Demandada. La Demandante agrega que la CVG goza de los mismos privilegios y atribuciones que el Estado, está sujeta a la coordinación del Presidente de Venezuela y se encontraba "*asignada*" al MIBAM. En consecuencia, alega la Demandante, lo mismo rige para su subsidiaria CVG Bauxilum, cuyas actividades y servicios fueron declarados de utilidad pública e interés público conforme a la Ley de Minas de Venezuela[504]. [Traducción del Tribunal]

506.   Por lo tanto, la Demandante afirma que (i) CVG Bauxilum debería considerarse un órgano del Estado en virtud del Artículo 4 del Proyecto de Artículos de la CDI y que, de todas maneras, (ii) su conducta sería atribuible conforme al Artículo 5 ya que se encuentra "*facultada por ley estatal para ejercer elementos de autoridad gubernamental*" y "*actuó como tal en la instancia en particular*" [Traducción del Tribunal] al suscribir un contrato con Norpro Venezuela en función del monopolio otorgado por el Estado[505].

507.   En tanto CVG Bauxilum se considere un órgano del Estado, la Demandante alega que el incumplimiento del Contrato de Bauxita por parte de CVG Bauxilum constituye en sí un acto ilícito internacional que asciende al nivel de una violación del Tratado, ya que la Demandante tiene derecho a recibir el mismo trato que se concede a ciudadanos de terceros países en virtud de la cláusula de la nación  más favorecida del Tratado. Según la Demandante, el alcance de la cláusula NMF incluye cláusulas paraguas que pueden encontrarse en otros tratados, tales como el TBI entre el Reino Unido y Venezuela[506].

508.   La Demandante también hace referencia al Artículo 8 del Proyecto de Artículos de la CDI y señala que esta disposición ni siquiera requiere actividad gubernamental[507]. Además, la Demandante alega que la Demandada, a través del MIBAM, adoptó el Contrato de Bauxita como propio y luego "*ratificó el incumplimiento contractual al negarse a hablar*

---

[504] Memorial, ¶¶ 173-174; Réplica, ¶ 14.
[505] Memorial, ¶¶ 176-177, en referencia la Comisión de Derecho Internacional, Responsabilidad del Estado por Hechos Internacionalmente Ilícitos (2001) (**CLA-044**), Artículos 4 y 5.
[506] Memorial, nota 340; Réplica, nota 253.
[507] Réplica, nota 252.

*sobre el tema cuando la contactó Norpro Venezuela*" [Traducción del Tribunal], lo que genera responsabilidad conforme al Artículo 11 del Proyecto de Artículos de la CDI[508].

### (ii)    La Conducta de la Demandada (a través del MIBAM) Generó Expectativas Legítimas

509.  La Demandante sostiene que, aun si la conducta de CVG Bauxilum no fuera atribuible conforme al Proyecto de Artículos de la CDI, funcionarios públicos de la Demandada efectuaron "*promesas concretas*" y crearon así "*expectativas concretas*", que luego repudiaron al no afrontar las acciones de CVG Bauxilum con respecto al aumento de precios en violación de las disposiciones del Contrato de Bauxita[509].

510.  En opinión de la Demandante, la Demandada "*indujo*" su inversión a través de "*una serie de promesas*", entre ellas, una garantía de que sus entidades estatales firmarían contratos de suministro a largo plazo para los insumos requeridos (gas, electricidad y bauxita). Según la Demandante, el "*suministro de bauxita a largo plazo a precios competitivos*" fue "*de suma importancia*" para la Demandante, lo que explica por qué planteó el tema del suministro de bauxita directamente al MIBAM en 2005[510]. [Traducción del Tribunal]

511.  La Demandante aduce que la Demandada "*debatía sobre el Contrato de Bauxita y lo promovía con regularidad*" y que el MIBAM ofreció "*garantías expresas […] de que le había ordenado a CVG Bauxilum atender las necesidades de suministro de bauxita de Norpro Venezuela en los términos acordados*"[511]. En este sentido, la Demandante alude, entre otras cosas, a una reunión de fecha 10 de mayo de 2005 en la cual el Viceministro "[c]*onfirmó los términos por los que se regirá el suministro de bauxita y gas*", y a una reunión de fecha 20 de octubre de 2005 en la cual el Viceministro confirmó que él le había solicitado "*al presidente de* [CVG] *Bauxilum concluir el contrato de inmediato*"[512]. [Traducción del Tribunal]

512.  Según la Demandante, el Gobierno era consciente sobre la importancia de garantizar el suministro de bauxita y, por lo tanto, "*directamente se comprometió con Saint-Gobain a garantizar dicho suministro al precio del Contrato de Bauxita*" [Traducción del Tribunal]. La Demandante alega que CVG Bauxilum celebró el Contrato de Bauxita "*[bajo] instrucciones del MIBAM*", tal como lo confirma el hecho de que el Contrato se

---

[508] Réplica, ¶ 118.
[509] Réplica, ¶ 120.
[510] Memorial, ¶ 165; Réplica, ¶ 114.
[511] Presentación posterior a la Audiencia de la Demandante, ¶¶ 79-80, que hace referencia al testimonio oral de su testigo, el Sr. Pedersen. Transcripción (Día 2), págs. 501-504 y págs. 565-575.
[512] Memorial, ¶¶ 165-166, en referencia al Acta de Reunión entre Saint-Gobain, el MIBAM y CVG Bauxilum (**Anexo C-3**) y Memorando de Michel Boyer-Chammard a Guy Rolli, *et al.*, 20 de octubre de 2005 (**Anexo C-074**).

concluyó "*bajo el auspicio del Ministerio de Industrias Básicas y Minería (MIBAM) y la Corporación Venezolana de Guayana (CVG)*" y se estampó con la leyenda "*Ministerio de Industrias Básicas y Minería*" en el encabezado[513]. En consecuencia, la Demandante alega que sus expectativas legítimas, "*plasmadas*" en el Contrato de Bauxita con CVG Bauxilum, fueron creadas por el MIBAM antes de la firma, el cual "*controlaba y coordinaba*" las negociaciones sobre el suministro de bauxita y confirmaba los parámetros del contrato[514].

513. La Demandante alega que, si bien el Contrato de Bauxita contempla la posibilidad de aumentar el precio de la bauxita sólo (i) mediante ajuste anual automático basado en el Índice de Precios al Productor (PPI) de los Estados Unidos para bienes industriales (Artículo 10.1); y (ii) en caso de aumentar los costos de transporte mediante un ajuste de precios realizado de forma conjunta (Artículo 10.2), CVG Bauxilum aumentó unilateralmente el precio en violación de estas disposiciones. La Demandante señala que se opuso al aumento de precios mediante el envío de cartas separadas al MIBAM y a CVG Bauxilum, tal como lo confirma su testigo, el Sr. Millot, durante su declaración oral[515].

514. En respuesta al argumento de la Demandada de que el aumento de precios se basó en el aumento de los costos de transporte, en particular, las mayores tarifas para navegar por el Río Orinoco y, por lo tanto, se encuentra justificado en virtud del Artículo 10.2, la Demandante afirma que, pese a los "*amplios esfuerzos*" de la gerencia de Norpro Venezuela, CVG Bauxilum no logró documentar, de manera suficiente, las supuestas razones del aumento de precios, varias de las cuales resultaron "*insuficientes a simple vista*"[516].

515. La Demandante alega que la conducta de la Demandada no constituye un mero incumplimiento contractual sino una violación de su expectativa legítima de que la Demandada garantizaría el cumplimiento del Contrato. En este sentido, la Demandante alega que el tribunal de *Nykomb c. Latvia* "*dejó en claro la importancia del dominio del mercado para fines de atribución*"[517]. La Demandante sostiene que, a raíz del monopolio de la Demandada sobre la producción de bauxita en Venezuela, el MIBAM y CVG Bauxilum podían imponer sus términos a Norpro Venezuela, ya que sabían que la bauxita

---

[513] Memorial, ¶¶ 167-168; Contrato de Compraventa entre CVG Bauxilum, C.A. y Proppants Venezuela, C.A., 27 de enero de 2006 (**Anexo C-6**).

[514] Réplica, ¶¶ 116-117 y ¶ 123.

[515] Memorial, ¶¶ 169-170; Réplica, ¶ 15, en referencia a la carta de Luis Páez al MIBAM, 4 de septiembre de 2008 (Anexo C-096) y la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (Anexo C-12); Presentación posterior a la Audiencia de la Demandante, ¶ 82, en referencia a Transcripción (Día 2), págs. 371-379.

[516] Presentación posterior a la Audiencia de la Demandante, ¶¶ 83-85.

[517] Réplica, ¶ 123 (nota 251)

era la principal materia prima para la producción de *proppants* cerámicos por parte de la Demandante. La Demandante, a la vez que recalca haber manifestado su disconformidad con el aumento, señala que es por eso que "*simplemente no tuvo otra opción*" [Traducción del Tribunal] que pagar el precio aumentado[518].

516. Contrariamente a lo que sugiere la Demandada, la Demandante afirma que no podía cambiar el proveedor de bauxita porque el proceso se había calibrado a la calidad de la bauxita en bruto requerida para la producción de *proppants* y la entrega era una sola vez por año. Según la Demandante, la única razón por la que se eligió Venezuela como lugar para invertir fue la disponibilidad de cantidades suficientes de bauxita a precios que permitieran una producción redituable de *proppants*. En estas circunstancias, la Demandante alega que el aumento unilateral del precio fue "*antitético respecto del entorno jurídico transparente y estable que se había prometido a Saint-Gobain*" [Traducción del Tribunal] y, en consecuencia, "*destruyó*" sus expectativas legítimas[519].

### bb)    Síntesis de la Postura de la Demandada

517. La Demandada rechaza la alegación de la Demandante y remarca que ni la Demandante ni Venezuela eran partes del Contrato de Bauxita, que era más bien "*un acuerdo puramente comercial*" [Traducción del Tribunal] entre CVG Bauxilum y Norpro Venezuela, y no puede generar obligaciones para la Demandada con arreglo al derecho internacional.

### (i)    La Conducta de CVG Bauxilum no es Atribuible a la Demandada

518. La Demandada niega que las acciones de CVG Bauxilum sean atribuibles al Estado conforme al Proyecto de Artículos de la CDI porque estas disposiciones sólo se aplican a "*hechos internacionalmente ilícitos*". Dado que no se alegó que la celebración del Contrato de Bauxita en sí importara un hecho internacionalmente ilícito, la Demandada sostiene que el Proyecto de Artículos de la CDI no resulta de aplicación[520].

519. La Demandada afirma que, aun si el Proyecto de Artículos de la CDI fuese aplicable, CVG Bauxilum no puede considerarse un órgano del Estado conforme al Artículo 4 porque CVG es una institución autónoma y su subsidiaria, CVG Bauxilum, es una

---

[518] Memorial, ¶ 171; Réplica, ¶ 124 (con nota 251 en referencia a *Nykomb c. Latvia* (CLA-058), Sección 4.2); Presentación posterior a la Audiencia de la Demandante, ¶ 82.

[519] Memorial, ¶ 172; Réplica, nota 49; Presentación posterior a la Audiencia de la Demandante, ¶¶ 86-87.

[520] Memorial de Contestación, ¶¶ 131-132 y ¶¶ 74-81; Dúplica, ¶ 80.

empresa pública. Según la Demandada, ninguna de ellas tiene facultades ejecutivas ya que son entidades descentralizadas de la Administración Pública y, por lo tanto, personas jurídicas separadas y distintas conforme al derecho mercantil venezolano[521]. Y alega que si la naturaleza se encuentra definida en el derecho interno con la claridad con la que está definida en este caso, el derecho interno es determinante para la clasificación como "*órgano*" conforme al Artículo 4[522].

520. La Demandada alega, asimismo, que la conducta de CVG Bauxilum no es atribuible conforme al Artículo 5. En opinión de la Demandada, el ejercicio de "*autoridad gubernamental*" significa "*autoridad para ejercer facultades soberanas*" y no puede equipararse a las "*actividades de índole comercial que realizan habitualmente las empresas estatales en beneficio del Estado*" [Traducción del Tribunal]. La Demandada afirma que, si bien CVG Bauxilum es una empresa comercial que actúa en beneficio de la Demandada en el sector minero, carece de autoridad gubernamental al desarrollar sus actividades[523].

521. Aunque, por un lado, reconoce que CVG Bauxilum tiene un monopolio otorgado por el Estado en Venezuela, la Demandada señala que la Demandante identificó tres fuentes alternativas en Guayana y la República Dominicana y era "*perfectamente libre*" para importar bauxita de cualquiera de esos países. Según la Demandada, el monopolio de CVG Bauxilum es irrelevante dado que la decisión de CVG Bauxilum de aumentar el precio por el hecho de que su propio desempeño se había vuelto inviable no es un acto soberano, sino un acto "*esencialmente*" comercial[524].

522. La Demandada considera también que la conducta de CVG Bauxilum no puede atribuirse a la Demandada conforme al Artículo 8 del Proyecto de Artículos de la CDI porque la Demandante no puede demostrar un sólo hecho que fuera internacionalmente ilícito y el resultado de la "*instrucciones, directivas o control*" del Estado[525]. La Demandada hace referencia a los comentarios al Proyecto de Artículos de la CDI en los que el Prof. Crawford manifiesta lo siguiente:

> "*Se plantean cuestiones en relación con el comportamiento de sociedades o empresas de propiedad estatal o bajo control estatal. Si esas sociedades actúan de manera incompatible con las obligaciones internacionales del Estado interesado, cabe preguntarse si este comportamiento es atribuible al Estado. Al examinar esta cuestión es necesario recordar que el derecho internacional reconoce la identidad separada de las personas morales en*

---

[521] Memorial de Contestación, ¶¶ 82-85; Dúplica, ¶ 84 y ¶¶ 89-90.

[522] Dúplica, ¶¶ 85-86.

[523] Memorial de Contestación, ¶¶ 86-90, en referencia a *Hamester c. Ghana* (RL-27), ¶¶ 251-255.

[524] Memorial de Contestación, ¶¶ 91-98; Dúplica, ¶ 96.

[525] Memorial de Contestación, ¶¶ 99-101.

> *el ámbito nacional, excepto en los casos en que el "velo societario" es un simple recurso o instrumento para el fraude o la evasión. El hecho de que originalmente el Estado haya creado una sociedad, ya sea por ley especial o de otro modo, no constituye base suficiente para atribuir al Estado el comportamiento ulterior de esa entidad. Dado que las sociedades, aunque sean de propiedad del Estado y en ese sentido estén sujetas a su control, se consideran entidades separadas, a primera vista su comportamiento en el curso de sus actividades no es atribuible al Estado, a menos que ejerzan atribuciones del poder público en el sentido del artículo 5 "[526].*

523. Con respecto al argumento de la Demandante de que la CVG (y, por lo tanto, efectivamente CVG Bauxilum también) se encuentra bajo la tutela administrativa del MIBAM, la Demandada señala que, según la ley venezolana, el control de tutela es una forma de "*tutela general*" para garantizar que las actividades de las entidades descentralizadas o empresas públicas cumplan con la política de Estado, pero alega que no se puede responsabilizar al Estado por las decisiones comerciales de una empresa pública[527].

524. Por último, la Demandada afirma que la referencia de la Demandante al Artículo 11 del Proyecto de Artículos de la CDI contradice sus anteriores argumentos relacionados con los Artículos 4, 5 y 8 porque el Artículo 11 se basa en la ausencia de toda conducta gubernamental o soberana. Además, la Demandada señala que la Demandante no identificó una sola declaración o acto de adopción "*claro e inequívoco*" de parte de la Demandada y aún no puede superar el obstáculo de la conducta internacionalmente ilícita[528].

### (ii)    La Reclamación de la Demandante es Fácticamente Inexacta

525. En cualquier caso, la Demandada alega que Norpro Venezuela no se vio obligada a aceptar ningún aumento de precios sino que, tras la protesta inicial, "*pudo apreciar los motivos subyacentes*" en que CVG Bauxilum fundó el aumento, es decir, las nuevas tarifas del canal de navegación del Río Orinoco y la apreciable variación experimentada por el costo de extracción, transporte y descarga de la bauxita en la Planta de Matanzas. Según la Demandada, Norpro Venezuela tomó la decisión comercial de aceptar el aumento de precios, sujeto a su solicitud de mantener dicho precio durante todo el año 2009. La Demandada recalca que CVG Bauxilum atendió la solicitud y no pretendió imponer un nuevo aumento de precio hasta el año 2010[529]. La Demandada alega,

---

[526] *James Crawford*, "The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries" (**RL-21**), Artículo 8, pág. 112.

[527] Memorial de Contestación, ¶¶ 102-106.

[528] Dúplica, ¶¶ 99-102.

[529] Memorial de Contestación, ¶ 133; Dúplica, ¶ 132; Escrito posterior a la Audiencia de la Demandada, ¶ 124, en referencia a la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo R-52**).

asimismo, que ninguno de los documentos que invoca la Demandante refleja su supuesta solicitud de motivos o documentos adicionales en relación con dichos motivos[530].

526.   La Demandada argumenta que Norpro Venezuela podría haber decidido no comprar más bauxita a CVG Bauxilum y, en su lugar, importarla de cualquiera de los tres recursos alternativos que había identificado en Guayana y la República Dominicana. En subsidio, la Demandada señala que podría haber iniciado un procedimiento de arbitraje contra CVG Bauxilum conforme al Contrato de Bauxita[531].

527.   La Demandada rechaza también la afirmación de la Demandante de que su inversión se basó en la expectativa de que recibiría un suministro estable de bauxita por parte de CVG Bauxilum al mismo precio. Según la Demandada, la Demandante "*nunca recibió ningún tipo de garantía de la República con respecto al suministro o al precio de la bauxita*" sino que incluso advirtió a su sociedad controlante en el año 2005 acerca de importantes riesgos relacionados con el suministro de bauxita, que podían mitigar si lograban conseguir varias fuentes alternativas viables. La Demandada señala que, por ello, la Demandante dijo internamente que necesitaban un "*suministro alternativo de bauxita de Guayana si el día de mañana CVG decide cortarles el suministro*"[532]. [Traducción del Tribunal]

528.   La Demandada alega que, ante la ausencia de promesas o garantías concretas por parte del Estado, las "*expectativas*" de la Demandante no se encuentran protegidas y que incluso los casos que invoca la Demandante justifican esto. Según la Demandada, ninguno de los documentos a los que alude la Demandante en relación con los supuestos compromisos del Estado demuestran participación alguna "*más allá del apoyo general para el proyecto de la planta de* proppants" [Traducción del Tribunal], que no basta para dar lugar a expectativas legítimas, o que la Demandada "*aprobó*" la decisión de CVG Bauxilum de aumentar el precio de la bauxita[533]. En opinión de la Demandada, esto queda confirmado mediante la declaración oral del Sr. Pedersen, ya que no pudo mencionar un solo documento o comunicado específico en el que se hayan efectuado las supuestas garantías o compromisos. En particular, la Demandada señala que el Sr. Pedersen no logró identificar ninguna reunión en que se hubiera debatido la frase "*bajo el auspicio del* [...] *MIBAM*" y se le hubiera dado el significado que ahora alega la Demandante[534].

---

[530] Segundo Escrito posterior a la Audiencia de la Demandada, ¶ 28.

[531] Memorial de Contestación, ¶ 134; Escrito posterior a la Audiencia de la Demandada, ¶ 125.

[532] Memorial de Contestación, ¶ 135, en referencia al DAC del mes de febrero de 2005 (**Anexo R-5**), pág. 5 y con cita de mensaje de correo electrónico de Guy Rolli a Jorgen Pedersen, 16 de febrero de 2005 (**Anexo C-059**); Dúplica, ¶ 127.

[533] Dúplica, ¶¶ 128-133; Escrito posterior a la Audiencia de la Demandada, ¶ 127.

[534] Escrito posterior a la Audiencia de la Demandada, ¶¶ 128-132, en referencia a Transcripción (Día 2), págs. 502-512 y págs. 573-576. *Véase, también,* Segundo Escrito posterior a la Audiencia de la Demandada, ¶ 28.

529. En consecuencia, la Demandada sostiene que el Gobierno "*no hizo más que facilitar los debates con CVG Bauxilum*" [Traducción del Tribunal] y no asumió compromiso alguno ante Norpro Venezuela con respecto al suministro o precio de la bauxita. Por lo tanto, y además de considerar justificado el aumento de precio en virtud del Contrato de Bauxita, la Demandada opina que no tenía ninguna obligación de intervenir y colaborar en la resolución del conflicto entre CVG Bauxilum y Norpro Venezuela[535].

### cc)    El Análisis del Tribunal

530. En opinión del Tribunal, el argumento de la Demandante sobre el aumento de precio de la bauxita se divide en dos partes: En primer lugar, la Demandante alega que al momento en que adoptó la decisión de invertir en Venezuela en el año 2005, la Demandada (a través de sus funcionarios públicos, en particular, el MIBAM) creó una expectativa legítima de que CVG Bauxilum suministraría bauxita a Norpro Venezuela a precios estables a largo plazo, pero luego no intervino cuando CVG Bauxilum aumentó unilateralmente el precio en el año 2008 y, de esa manera, violó dichas expectativas. En segundo lugar, la Demandante alega que la conducta de CVG Bauxilum en violación del Contrato de Bauxita puede atribuirse a la Demandada de acuerdo con el Proyecto de Artículos de la CDI y, a la luz de su monopolio otorgado por el Estado sobre el suministro de bauxita en Venezuela, constituye una violación de las obligaciones internacionales de la Demandada.

531. En lo que respecta al primer argumento, el Tribunal advierte que las Partes están de acuerdo en que si bien, en términos generales, la Demandada apoyó la inversión de la Demandante en los años 2005 y 2006, esto solo no puede generarle responsabilidad a la Demandada en virtud del derecho internacional. Más bien, una expectativa legítima sólo se puede crear mediante promesas o compromisos específicos por parte del Estado. La controversia entre las Partes se refiere a si la Demandada realizó tales promesas específicas en relación con el suministro de bauxita a precios estables.

532. En opinión del Tribunal, las pruebas que presentó la Demandante en este sentido no demuestran que el Estado (a través del MIBAM) haya hecho compromisos específicos en relación con las cláusulas del Contrato de Bauxita y, en particular, los precios a los que CVG Bauxilum suministraría bauxita. En su declaración testimonial escrita, el Sr. Pedersen describió que el MIBAM estuvo ampliamente involucrado en las negociaciones con CVG Bauxilum y expresó su apoyo al proyecto en reiteradas ocasiones[536]. Sin embargo, el Sr. Pedersen no hizo referencia a ningún tipo de compromiso específico por

---

[535] Escrito posterior a la Audiencia de la Demandada, ¶¶ 129 y 134.
[536] Pedersen, ¶¶ 21-33.

parte del MIBAM en relación con el precio de la bauxita. Cuando se le preguntó sobre esto en la Audiencia, el Sr. Pedersen aclaró que:

> "*Francamente, si se lo encara de esa forma, el precio de la bauxita se negoció con el MIBAM, que brindó apoyo para obtener un contrato. Y eso fue acordado con el MIBAM. Y después hubo negociaciones con Bauxilum*"[537].

533. El testimonio oral del Sr. Pedersen confirma la impresión del Tribunal a partir del expediente de este caso de que el MIBAM facilitó y supervisó las negociaciones con CVG Bauxilum e incluso aprobó los términos generales que regirían el suministro de bauxita. No obstante, la Demandada señaló correctamente que ninguna de las declaraciones realizadas reviste el carácter de compromiso de que el Estado garantizaría el cumplimiento por parte de CVG Bauxilum de las cláusulas sobre precio del Contrato de Bauxita.

534. La Demandante alega, asimismo, que la expresión "*bajo el auspicio del* […] *MIBAM*"[538] puede equipararse con una "*garantía expresa*" de que CVG Bauxilum suministraría bauxita a Norpro Venezuela en los términos acordados[539]. Cuando se le preguntó sobre esta expresión en la Audiencia, el Sr. Pedersen testificó que en las reuniones con el MIBAM se discutió "*que básicamente apoyaban este contrato [...] y apoyaban a Bauxilum en sus convenios con nosotros*". Sin embargo, el Sr. Pedersen no pudo identificar ninguna reunión específica en la que se haya hecho esa declaración o ningún individuo concreto que la haya hecho[540]. Es por eso que el Tribunal no está convencido de que se haya discutido el término antes de firmarse el Contrato de Bauxita y, lo que es más importante, no hay indicios de que se le fuera a atribuir un significado tan amplio como para asegurar el cumplimiento del Contrato de Bauxita y/o garantizar precios estables a largo plazo.

535. En síntesis, el Tribunal concluye que la Demandante no logró demostrar la existencia de promesas o compromisos por parte de la Demandada (a través del MIBAM) en relación con el suministro de bauxita al precio acordado con CVG Bauxilum en el Contrato de Bauxita. En consecuencia, la conducta del MIBAM no generó ninguna expectativa legítima de la Demandante de que garantizaría el cumplimiento de las disposiciones relativas al precio del Contrato de Bauxita por parte de CVG Bauxilum.

---

[537] Transcripción (Día 2), pág. 506, líneas 15-19.
[538] Contrato de Compraventa entre CVG Bauxilum, C.A. y Proppants Venezuela, C.A., 27 de enero de 2006 (**Anexo C-6**), Preámbulo.
[539] Presentación posterior a la Audiencia de la Demandante, ¶ 79.
[540] Transcripción (Día 2), pág. 573, línea 20 – pág. 576, línea 3.

536. En lo que respecta al segundo argumento de la Demandante, el Tribunal no tiene que decidir si la conducta de CVG Bauxilum es atribuible a la Demandada conforme al Proyecto de Artículos de la CDI y si un incumplimiento contractual generaría responsabilidad para la Demandada con arreglo al derecho internacional a la luz del monopolio otorgado por el Estado a CVG Bauxilum sobre el suministro de bauxita en Venezuela. Aún si este fuera el caso, la Demandante no demostró que el aumento de precios del mes de septiembre de 2008 constituyera un incumplimiento contractual.

537. CVG Bauxilum fundó el aumento en el Artículo 10.2 del Contrato de Bauxita, que establece lo siguiente:

> "*Las partes acuerdan revisar el precio cuando surja un incremento de manera directa en los costos por concepto de transporte del material desde la mina hasta Matanzas, como consecuencia de la entrada en vigencia de Leyes, Decretos, Reglamentos, Impuestos Nacionales, Estadales o Municipales, tasas y modificaciones de alguna Convención Colectiva de las contratistas que ejecutan el servicio de transporte de la Bauxita, el cual será aplicable en caso que dicho incremento sea superior al del aumento establecido en el numeral 10.1 anterior*"[541].

538. Durante la primera reunión en la que se debatió el aumento de precios, CVG Bauxilum invocó los siguientes motivos: (i) el aumento de 600% del peaje del Río Orinoco; (ii) el impacto de los costos de extracción y producción que eran superiores al precio de venta; (iii) el aumento de los costos de transporte debido al mayor costo de mano de obra; y (iv) el análisis del mercado internacional, que reflejaba que el precio de CVG Bauxilum era más bajo que en el mercado internacional[542].

539. Si bien el Tribunal está de acuerdo con la Demandante en que no todos estos motivos justificaban un aumento de precios en virtud del Contrato de Bauxita, la carta de fecha 2 de septiembre de 2008 por la que CVG Bauxilum informó a la Demandante acerca del aumento de precios a USD 33,8 por TM se basa en "*las nuevas tarifas del canal de Navegación del Río Orinoco*" y "*la apreciable variación que ha experimentado el costo de extracción, transporte y descarga de la bauxita en nuestra Planta de Matanzas*"[543]. Estos motivos se contemplan explícitamente en el Artículo 10.2 del Contrato de Bauxita y, por lo tanto, de probarse, justificarían el aumento de precios.

---

[541] Contrato de Compraventa entre CVG Bauxilum, C.A. y Proppants Venezuela, C.A., 27 de enero de 2006 (**Anexo C-6**), Artículo 10.2.

[542] Mensaje de correo electrónico de Oscar Cid a Jorgen Pedersen, 30 de julio de 2008 (**Anexo C-093**).

[543] Carta de Carlos Acosta Pérez a Oscar Cid, 2 de septiembre de 2008 (**Anexo C-11**).

540. La Demandante no cuestiona que las tarifas de navegación del río Orinoco hayan aumentado un 600% por decreto de fecha 31 de julio de 2008[544]. Tampoco cuestiona el aumento de los costos de extracción, transporte y descarga en la planta de Matanzas. Lo que argumenta la Demandante, tal como lo confirmó el Sr. Pedersen en reiteradas ocasiones durante la Audiencia[545], es que jamás se le proporcionó documentación o un cálculo en relación con el aumento de precios. Si bien alega que solicitó dicha información varias veces, la Demandante no logró identificar una sola ocasión en que haya expresado dicha solicitud, sino que simplemente hace referencia a solicitudes de "*un debate más a fondo del aumento de precios propuesto*" [Traducción del Tribunal], su énfasis en la aplicabilidad del Artículo 10.2 a cualquier aumento de precios y sus protestas contra el aumento que consideraron contrario a las disposiciones del Contrato de Bauxita[546]. Cuando se preguntó al Sr. Pedersen durante la Audiencia si la Demandante alguna vez había solicitado recibir dicha documentación, dijo:

> "*Sí. No sé si está aquí, pero sí en las reuniones que celebramos con ellos sí, se los pedimos. Absolutamente.*
>
> *Coárbitro Brower: ¿Y esa compañía se negó a suministrar esa información? ¿O simplemente no lo dieron y siguieron trabajando?*
>
> *Señor Pedersen: Nunca recibimos nada. Eso fue desafortunado y era muy difícil obtener información. Y por eso también se demoró quince meses en firmar el contrato*"[547].

541. A la luz de este testimonio algo vago, el Tribunal no está convencido de que la Demandante alguna vez haya solicitado documentación sobre los motivos invocados por CVG Bauxilum. En función del expediente, en particular, la carta de la Demandante de fecha 17 de septiembre de 2008, parece más bien que Norpro Venezuela decidió aceptar el aumento de precios, aunque bajo protesta, con la condición de que se mantuviese el precio en ese nivel durante todo el año siguiente, es decir, hasta el 31 de diciembre de 2009[548]. Es incuestionable entre las Partes, y queda confirmado con las facturas que envió CVG Bauxilum a la Demandante en el año 2009[549], que CVG Bauxilum adhirió a esta solicitud y no requirió ningún otro aumento hasta principios de 2010. Si bien la Demandante recalcó en su carta que esto no debería considerarse una aceptación tácita del aumento de precios, el Tribunal advierte que Norpro Venezuela nunca emprendió

---

[544] Decreto No. 6.220 con Rango, Valor y Fuerza de Ley de Canalización y Mantenimiento de la Vías de Navegación), publicado en la Gaceta Oficial N.º 5891 (Extraordinario), 31 de julio de 2008 (**Anexo R-50**).

[545] Transcripción (Día 2), pág. 527, líneas 12-21; pág. 531, líneas 6-10; pág. 533, líneas 8-21; pág. 582:21-583:4; pág. 585, líneas 1-4.

[546] *Cfr.* Presentación posterior a la Audiencia de la Demandante, ¶ 84.

[547] Transcripción (Día 2), pág. 593, líneas 8-20.

[548] Carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo C-12**).

[549] Facturas de CVG Bauxilum, Doc. R Bates números 0041 – 0046 (**Anexo CLEX-83**).

acciones contra CVG Bauxilum en este sentido conforme a la cláusula de resolución de controversias del Contrato de Bauxita.

542. A la luz de lo que antecede, el Tribunal resuelve que la Demandante no logró demostrar que el aumento de precios del mes de septiembre de 2008 no estuviera justificado en virtud del Artículo 10.2 del Contrato de Bauxita. Ante la ausencia de incumplimiento contractual por parte de CVG Bauxilum, no es necesario determinar si la Demandada es responsable por dicho incumplimiento en virtud del derecho internacional.

## 3. Protección y Seguridad Plenas (Artículo 3(2) del Tratado)

543. Por último, el Tribunal procederá a analizar el alegato de la Demandante basado en la disposición sobre protección y seguridad plenas del Artículo 3(2) del Tratado. Tras un breve análisis del estándar PSP aplicable **((a))**, el Tribunal considerará los alegatos de PSP de la Demandante en relación con el Contrato de Bauxita **((b))** y la toma de control de la planta **((c))**.

## a) Estándar PSP Aplicable

### aa) Síntesis de la Postura de la Demandante

544. La Demandante afirma que el estándar PSP impone una obligación de "*debida diligencia*" y "*vigilancia*" al Estado receptor, que exige tomar "*medidas razonables de prevención [...] similares a las que se esperarían de un Gobierno bien administrado en circunstancias similares*"[550]. [Traducción del Tribunal]

545. La Demandante alega que, en el "*contexto comercial y empresarial moderno*", los tribunales constituidos en virtud de tratados de inversión no limitan el estándar PSP a la seguridad física sino que lo extienden también a la seguridad jurídica[551]. La Demandante señala que el estándar PSP ha evolucionado y ahora comprende "*en términos más generales, los derechos del inversor*" y se aplica "*al menos, en situaciones de 'violencia física o violación de derechos legales*'"[552]. [Traducción del Tribunal]

546. Aún si el Artículo 3(2) se limitara a la seguridad física, la Demandante sostiene que gozaría del beneficio de la "*protección jurídica plena*" que la Demandada otorgó a

---

[550] Memorial, ¶ 185, con cita de *AAPL c. Sri Lanka* (**CLA-005**), ¶ 77.
[551] Réplica, ¶ 133, con cita de sendas autoridades legales.
[552] Réplica, ¶ 134, con cita de *Vannessa Ventures c. Venezuela*. **Anexo CLA-150**, ¶ 223.

ciudadanos de terceros países en el TBI entre Uruguay y Venezuela en función de la cláusula de la nación más favorecida receptada en el Artículo 4 del Tratado[553].

### bb)    Síntesis de la Postura de la Demandada

547.    Según la Demandada, todo análisis de violación del estándar PSP requiere considerar si la inversión fue objeto de intervención o daño físico y si el Estado cumplió con su obligación de debida diligencia[554]. Según la Demandada, esta limitación es necesaria a fin de "*mantener una distinción significativa*" [Traducción del Tribunal] entre el estándar PSP y los estándares de protección establecidos en el Tratado, en particular, el estándar de TJE[555].

548.    A la vez que reconoce su deber de diligencia en virtud del estándar PSP, la Demandada alega que toda violación de este deber requiere "*un grado de negligencia, administración defectuosa o mala fe*" [Traducción del Tribunal] que refleje la relación entre el estándar PSP y el estándar internacional mínimo de trato[556].

549.    La Demandada rechaza el argumento de la Demandante de que el estándar PSP implica el concepto de "*seguridad jurídica*" y alega que la jurisprudencia internacional está bastante a favor de la opinión de que la obligación de PSP "*se relaciona principalmente, y quizá de manera exclusiva, con la integridad física de la inversión*"[557]. La Demandada recalca que, a diferencia de otros tratados, que contemplan expresamente la "*protección y seguridad jurídica plenas*", el presente Tratado no hace referencia a la seguridad jurídica y, por lo tanto, no está diseñado para convertir incumplimientos contractuales en reclamos sobre tratados[558].

### cc)    El Análisis del Tribunal

550.    El Artículo 3(2) del Tratado dispone lo siguiente:

> "*Les investissements effectués par des nationaux ou des sociétés de l'une ou l'autre des Parties contractantes bénéficient, sur le*

> "*Las inversiones efectuadas por nacionales o sociedades de una u otra de las Partes Contratantes gozarán, en el territorio y en la*

---

[553] Memorial, nota 379, en referencia al Acuerdo entre la República Oriental del Uruguay y el Gobierno de la República de Venezuela para la Promoción y Protección de Inversiones (20 de mayo de 1997, en vigor desde el día 18 de enero de 2002) (**Anexo C-050**), Artículo 4; Réplica, ¶ 135.

[554] Memorial de Contestación, ¶ 149.

[555] Dúplica, ¶ 144, en referencia a sendas autoridades legales.

[556] Dúplica, ¶ 145.

[557] Memorial de Contestación, ¶¶ 146-148, en referencia a sendas autoridades legales; Dúplica, ¶ 143.

[558] Memorial de Contestación, ¶¶ 152, 156.

| | |
|---|---|
| *territoire et dans la zone maritime de l'autre Partie contractante, d'une protection et d'une sécurité pleines et entières*"[559]. | *zona marítima de la otra Parte contratante, de una protección y de una seguridad plenas y completas*"[560]. |

552. La traducción al inglés que presentó la Demandante reza lo siguiente:

> "*Investments made by nationals or companies of either Contracting Party in the territory or the maritime area of the other Contracting Party, benefit from full protection and security*"[561].

553. El Tribunal señala que, si bien las partes están de acuerdo en que el Artículo 3(2) del Tratado impone a la Demandada una obligación de debida diligencia, discrepan en cuanto a (i) el alcance exacto de dicha obligación y (ii) si el estándar PSP abarca la seguridad jurídica. Estas cuestiones pueden quedar sin resolverse  si se descartan las dos reclamaciones de la Demandante basadas en el estándar PSP del Artículo 3(2), incluso conforme al estándar más amplio que plantea la Demandante. Por lo tanto, el Tribunal determinará el alcance exacto del Artículo 3(2) en la medida que sea necesario para resolver las reclamaciones de la Demandante.

### b)    Los Derechos de la Demandante en virtud del Contrato de Bauxita

#### aa)    Síntesis de la Postura de la Demandante

554. La Demandante afirma que, en vista de la participación del MIBAM en las negociaciones y el celebración del Contrato de Bauxita, consideró al MIBAM "*un interlocutor clave capaz de afrontar cualquier inquietud que pudiera presentarse con el Gobierno*" [Traducción del Tribunal]. Por ese motivo, señala la Demandante, Norpro Venezuela primero escribió al MIBAM y copió al MIBAM en su correspondencia a CVG Bauxilum cuando se encontró ante el aumento de precios del año 2008. No obstante, la Demandante advierte que el MIBAM ignoró las solicitudes de la Demandante de intervenir y, de esa manera, la Demandada no protegió la inversión de la Demandante frente a las acciones de CVG Bauxilum, a pesar de su obligación de PSP[562].

---

[559] Gaceta Oficial de la República Francesa N.º 102 de fecha 30 de abril de 2004 [*Journal Officiel de la République Française n°102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[560] Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004, **Anexo C-1**, págs. 332-353-332.354.

[561] Traducción libre al inglés presentada como **Anexo C-1**.

[562] Memorial, ¶¶ 190-192; Réplica, ¶ 138.

555. Según la Demandante, el tribunal de *Nykomb c. Latvia* resolvió "*en circunstancias similares*" que la falta de protección por parte de Latvia del inversionista extranjero por incumplimiento contractual de una entidad pública, a pesar de tener conocimiento de ello, constituía una violación de la obligación de PSP[563]. La Demandante hace referencia, asimismo, al énfasis que coloca el tribunal de *CME c. República Checa* en la obligación de "*garantizar que la seguridad y protección acordadas y aprobadas para las inversiones de inversores extranjeros no se vean afectadas por ninguna reforma de ley o medida de órgano administrativo*"[564].[Traducción del Tribunal]

556. La Demandante alega, por lo tanto, que la inacción de la Demandada ante la notificación de los incumplimientos del Contrato de Bauxita por parte de CVG Bauxilum constituye una violación de su obligación de otorgar seguridad jurídica a la inversión de la Demandante en virtud del Artículo 3(2) del Tratado[565].

### bb)   Síntesis de la Postura de la Demandada

557. La Demandada afirma que la alegación de la Demandante de que el aumento de precios violó el Contrato de Bauxita, pese a la aceptación de Norpro Venezuela, "*ni siquiera se acerca a activar un deber del Estado de debida diligencia*"[566]. [Traducción del Tribunal]

558. La Demandada afirma que no es responsable de la decisión de CVG Bauxilum de aumentar el precio en virtud del Contrato de Bauxita. En respuesta al argumento de la Demandante de que le escribió al MIBAM para solicitar su intervención, la Demandada alega que la Demandante intentó, por ese medio, crear una obligación para el Estado al "*comunicar a un representante del Gobierno su disconformidad frente a la conducta de un socio comercial*" [Traducción del Tribunal], lo que la Demandada considera claramente insostenible. En opinión de la Demandada, la posición de la Demandante privaría de sentido a la cláusula de resolución de controversias del Contrato de Bauxita y, en cualquier caso, las partes del Contrato resolvieron su diferencia de manera amistosa cuando CVG Bauxilum explicó los motivos del aumento de precio y Norpro Venezuela aceptó el aumento con la condición de que se mantuviera el precio en el mismo nivel hasta fines del año 2009[567].

### cc)   El Análisis del Tribunal

---

[563] Memorial, ¶ 193, en referencia a *Nykomb c. Latvia* (**CLA-058**), Sección 4.2.

[564] Memorial, ¶ 188, en referencia a *CME c. República Checa*, (**CLA-019**). ¶ 613.

[565] Réplica, ¶ 142.

[566] Memorial de Contestación, ¶ 150.

[567] Dúplica, ¶¶ 140-142 y ¶ 150. *Véase, también,* Escrito posterior a la Audiencia de la Demandada, ¶¶ 124-126.

559.  El Tribunal ya determinó *supra* en el contexto de la reclamación TJE de la Demandante que la Demandante no logró demostrar que la Demandada (a través del MIBAM) haya asumido compromiso alguno en relación con el suministro de bauxita al precio acordado con CVG Bauxilum en virtud del Contrato de Bauxita. El Tribunal también resolvió que la conducta de CVG Bauxilum en relación con el aumento de precios del mes de septiembre de 2008 no constituyó un incumplimiento contractual.

560.  Por lo tanto, el Tribunal no tiene que decidir si el estándar PSP receptado en el Artículo 3(2) del Tratado se extiende al concepto de *"seguridad jurídica"*, tal como alegara la Demandante. En cualquier caso, la Demandada no estaba obligada a intervenir en relación con el aumento del precio de la bauxita y, en consecuencia, no incumplió su obligación de otorgar protección y seguridad plenas a la inversión de la Demandante del modo invocado por ella.

c)    **Toma de control de la Planta**

   aa)    **Síntesis de la Postura de la Demandante**

561.  En el supuesto de que el Tribunal acepte la postura de la Demandada de que la expropiación recién ocurrió el día 29 de marzo de 2011 en oportunidad de la sanción del Decreto de Expropiación, la Demandante alega, asimismo, que la Demandada violó su obligación de PSP porque PDVSA tomó el control de la planta y permaneció al mando entre la toma de fecha 15 de mayo de 2010 y la sanción del Decreto de Expropiación[568].

562.  La Demandante afirma que si no hubo expropiación el día 15 de mayo de 2010, PDVSA no tenía derecho a ocupar la planta antes del día 29 de marzo de 2011 y, por lo tanto, debería haberse puesto en contacto con la Demandante "[a]*l momento en que obtuvo el control*" [Traducción del Tribunal] y debería haberle permitido volver a ocupar la planta. En cambio, la Demandante explica que la Guardia Nacional, prohibió a su personal reingresar a la planta y PDVSA comenzó a producir para beneficio propio. Según la Demandante, esta conducta constituye un claro incumplimiento de la obligación de PSP de la Demandada en virtud del Artículo 3(2) del Tratado[569].

   bb)    **Síntesis de la Postura de la Demandada**

563.  La Demandada sostiene que la expropiación ocurrió el día 29 de marzo de 2011 con la sanción del Decreto de Expropiación. La Demandada admite que PDVSA estuvo presente durante el período anterior a dicha fecha pero alega que dicha presencia fue *"apropiada*

---

[568] Presentación posterior a la Audiencia de la Demandante, ¶ 48; Segunda Presentación posterior a la Audiencia de la Demandante, nota 3.

[569] Presentación posterior a la Audiencia de la Demandante, ¶ 49.

*y necesaria ante los peligros relacionados con la Planta*". La Demandada afirma, además, que no hubo pruebas contemporáneas de denuncias acerca del rol de PDVSA y alega que la Demandante no sólo nunca solicitó la devolución de la planta sino que incluso alentó la presencia de PDVSA en la planta y la designación de un interlocutor, precisamente porque no estaba presente y la planta era "*un establecimiento peligroso en mano de trabajadores sin supervisión*"[570]. [Traducción del Tribunal]

564. Por lo tanto, la Demandada considera que cumplió con su obligación de PSP y agrega que si, por el contrario, no hubiera estado presente en la planta y se hubieran dañado los equipos o los trabajadores, la Demandante habría tenido un buen fundamento para demandarla por incumplimiento de su obligación de PSP[571].

### cc)  El Análisis del Tribunal

565. El Tribunal señala que la Demandante planteó su reclamación en subsidio de que el Tribunal resolviera que no hubo expropiación el día 15 de mayo de 2010 o poco tiempo después, sino recién el día 29 de marzo de 2011 con la sanción del Decreto de Expropiación. Dada la conclusión del Tribunal en el párrafo 477 *supra* de que la presencia de PDVSA en la planta y sus memorandos de principios del mes de junio de 2010 marcan el principio del proceso de expropiación, no es necesario resolver esta reclamación formulada en subsidio.

## IV.  LOS PRINCIPIOS EN MATERIA DE CUANTIFICACIÓN DE DAÑOS

566. El Tribunal procederá a analizar los principios en materia de cuantificación de daños aplicables como consecuencia de la expropiación y del incumplimiento por parte de la Demandada de los incisos 2 y 3 del Artículo 5(1) del Tratado. Las posturas de las Partes difieren considerablemente en cuanto al estándar de compensación aplicable, en particular, con respecto a la fecha de valuación adecuada (**1.**) y a los criterios del cálculo del monto indemnizatorio (**2.**).

## 1.  Estándar de Compensación y Fecha de Valuación

567. Una de las cuestiones jurídicas principales que es objeto de debate entre las Partes es el estándar de compensación aplicable y, en este contexto, en particular, la fecha de valuación aplicable. Tal como se destacara *supra*, el Tribunal concluye que la Demandada no cumplió con los requisitos de indemnización establecidos en los incisos 2 y 3 del

---

[570] Escrito posterior a la Audiencia de la Demandada, ¶ 20; Segundo Escrito posterior a la Audiencia de la Demandada, nota 42.

[571] Segundo Escrito posterior a la Audiencia de la Demandada, nota 42.

Artículo 5(1) del Tratado. Por lo tanto, la cuestión que consiste en determinar si esta conclusión torna la expropiación ilícita y si esto afectaría el estándar de compensación que ha de aplicarse en el presente caso se abordará en primer lugar en esta sección.

a)    **Síntesis de la Postura de la Demandante**

aa)    **Ilicitud de la Expropiación**

568. La Demandante alega que el incumplimiento por parte de la Demandada de los requisitos de fijación y/o prontitud torna la expropiación ilícita[572].

569. La Demandante argumenta que varios laudos dictados por el Tribunal de Reclamaciones Irán-Estados Unidos *"reconocen que el pago de una pronta indemnización es una consideración pertinente para la licitud de una confiscación en virtud del derecho internacional consuetudinario"*[573]. [Traducción del Tribunal]

570. En el contexto de los tratados de inversión, la Demandante alega que el tribunal en el marco del caso *Unglaube c. Costa Rica* concluyó que una expropiación era ilícita cuando no se pagaba compensación *"dentro de un plazo razonable luego de que el Estado declar*[e] *su intención de expropiar"*[574].

571. De modo similar, el tribunal en *Burlington c. Ecuador* confirmó que, en un caso en el que un Estado ha expropiado los bienes de un inversionista extranjero y *"no ha pagado ni ofrecido una indemnización [...] el Tribunal concluye que* [la] *expropiación [...] fue ilegítima"*[575].

572. La Demandante también hace referencia al tribunal en el caso *ConocoPhillips c. Venezuela*, que recientemente concluyó que, si bien *"el pago no es necesario al momento preciso de la expropiación [...], [l]as Partes deben participar en negociaciones de buena fe en aras de fijar la compensación en términos del estándar establecido [...] si un pago satisfactorio para el inversor no se propone al comienzo"*. En ese caso, el tribunal concluyó que *"la Demandada no cumplió con su obligación de negociar de buena fe a fin de determinar la compensación debida por su expropiación"* y, por ende, que la expropiación fue ilícita[576].

573. Asimismo, la Demandante alega que, en el marco del caso *Siemens c. Argentina*, el tribunal de arbitraje afirmó lo siguiente:

---

[572] Memorial, ¶ 141; Réplica, ¶¶ 77-83.
[573] Memorial, ¶ 141; **Anexo CLA-014.**
[574] Memorial, ¶ 141; **Anexo CLA-051.**
[575] Memorial, ¶ 141; **Anexo CLA-015.**
[576] Memorial, ¶ 141; **Anexo CLA-025.**

> "[N]unca se ha pagado compensación sobre causales que [...], según el Tribunal, carecen de justificación. Por estas razones, la expropiación no cumplió con los requisitos del Artículo 4(2) [del TBI Argentina-Alemania] y, por consiguiente, fue ilícita"[577]. [Traducción del Tribunal]

574. En forma similar, en el contexto del caso *Vivendi c. Argentina II*, el tribunal adoptó el siguiente razonamiento:

> "*Si concluimos que las medidas en disputa son expropiatorias, estas serán violatorias del Artículo 5(2) del Tratado, aunque pudieran obedecer a una causa de utilidad pública y no ser discriminatorias, ya que no se ha pagado alguna indemnización*"[578].

575. Por último, la Demandante argumenta que, en el marco del caso *Gemplus c. México*, el tribunal concluyó lo siguiente:

> "[D]*ichas expropiaciones fueron ilegítimas en virtud de los TBI y el derecho internacional, con fundamento en los hechos determinados por el Tribunal y, además, en el hecho de que la Demandada no satisfizo la condición establecida en el Artículo 5 de ambos tratados respecto del pago de una indemnización adecuada*"[579].

### bb)    Estándar de Compensación Aplicable

576. La Demandante alega que la reparación apropiada para el supuesto de una expropiación ilícita es el estándar de restitución del derecho internacional consuetudinario, es decir, la compensación más elevada entre aquella calculada a la fecha de expropiación y a la fecha del laudo[580].

577. En sustento de su enfoque, la Demandante subraya que el Artículo 5(1) del Tratado prevé el estándar de compensación adecuado sólo cuando se cumplan todas las condiciones de una expropiación lícita. Como esto no ocurre aquí, el estándar de compensación adecuado, que incluye la fecha adecuada en que ha de determinarse el valor, es establecido por el derecho internacional consuetudinario[581].

578. Inicialmente, la Demandante argumentó que la Demandada debe devolverle la planta a la Demandante – lo que es imposible aquí – o pagarle el equivalente en efectivo de una devolución semejante, ambas de cuyas acciones, por ende, tendrían que realizarse a la fecha del laudo[582]. Sin embargo, durante la Audiencia y en su Presentación Posterior a la

---

[577] Réplica, ¶ 78; **Anexo CLA-077**.
[578] Réplica, ¶ 78; **Anexo CLA-024**. Énfasis agregado por la Demandante.
[579] Réplica, ¶ 78; **Anexo CLA-125**. Énfasis agregado por la Demandante.
[580] Presentación Posterior a la Audiencia de la Demandante, ¶ 73.
[581] Memorial, ¶ 197; Réplica, ¶ 152.
[582] Memorial, ¶¶ 199, 208; Réplica, ¶ 152.

Audiencia, la Demandante resaltó que, en el supuesto de que el Tribunal concluyera que el valor a la fecha de la expropiación es más elevado que el valor a la fecha del laudo, el Tribunal debería determinar la compensación sobre la base del valor a la fecha de expropiación[583].

579. De conformidad con la Actualización de la Valuación de la Demandante, el valor de Norpro Venezuela al día 31 de agosto de 2015 (la fecha de cálculo a efectos de valuación a la fecha del laudo que, en definitiva, el Tribunal debe tener en cuenta en aras de adoptar su decisión) es inferior al valor al día 15 de mayo de 2010[584]. Por lo tanto, la Demandante ahora alega que tiene derecho a una indemnización por el monto del valor de Norpro Venezuela al día 15 de mayo de 2010[585].

580. Según la Demandante, el fundamento subyacente al derecho del inversionista de seleccionar la fecha de valuación es el propósito de otorgarle una compensación íntegra al inversionista que se vio privado de la posibilidad de optar por retener la inversión y gozar de los frutos derivados de ella o por venderla en el momento óptimo. En consecuencia, el inversionista "*debe recibir la ventaja a partir de ese momento, pero no puede ser obligado a asumir la desventaja*"[586]. [Traducción del Tribunal]

581. La Demandante asevera que esta argumentación es coherente con el enfoque adoptado por la Corte Permanente de Justicia Internacional en la decisión que sentó jurisprudencia emitida en el contexto del caso *Chorzów Factory*[587]. En sustento de su argumentación, en sus presentaciones escritas[588], la Demandante se refiere, en particular, a los casos *Biwater c. Tanzania*[589], *Siemens c. Argentina*[590], *ADC c. Hungría*[591], *Kardassopoulos c. Georgia*[592], *Unglaube c. Costa Rica*[593], *ConocoPhillips c. Venezuela*[594], *Texaco c.*

---

[583] Transcripción (Día 1), pág. 33 línea 14 – pág. 34 línea 4; Presentación Posterior a la Audiencia de la Demandante, ¶ 77.

[584] Actualización de la Valuación de la Demandante, Tabla 1.

[585] Carta de la Demandante de fecha 6 de noviembre de 2015.

[586] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 75-76.

[587] Memorial, ¶ 209; Presentación Posterior a la Audiencia de la Demandante, ¶ 73. **Anexo CLA-033**.

[588] Memorial, ¶¶ 210-212 (con notas 408, 409); Réplica, ¶ 146 (nota 302); Presentación Posterior a la Audiencia de la Demandante, ¶¶ 74-75.

[589] **Anexo CLA-013**.

[590] **Anexo CLA-077**.

[591] **Anexo CLA-001**.

[592] **Anexo CLA-046**.

[593] **Anexo CLA-051**.

[594] **Anexo CLA-025**.

*Libia*[595], *CMS c. Argentina*[596], *Vivendi c. Argentina II*[597], *Siag c. Egipto*[598], *Saipem c. Bangladesh*[599], *Funnekotter c. Zimbabwe*[600] y *Yukos c. Rusia*[601].

### b)   Síntesis de la Postura de la Demandada

### aa)   Licitud de la Expropiación

582. La Demandada afirma que el mero hecho de que la indemnización es aún pagadera no convierte a la expropiación en ilícita, si se considera que la Demandada reconoció su obligación de abonar una indemnización e inició el proceso de expropiación conforme a la ley nacional[602].

583. La Demandada señala que, en su opinión separada en el marco del caso *Sedco c. Irán*, el Juez Brower destacó lo siguiente:

> "*Del mismo modo, debo expresar dudas en cuanto a la cuestión que consiste en determinar si, en virtud del derecho internacional consuetudinario, al final, la mera falta de compensación por parte de un Estado con arreglo al estándar de derecho internacional aquí expuesto necesariamente torna la confiscación subyacente ilícita ipso facto. Si, por ejemplo, en forma contemporánea a la confiscación, el Estado expropiante ofrece un medio de determinación de la indemnización que prima facie parece calculada de manera de derivar en la compensación requerida, pero, en definitiva, no lo es, o si se paga de inmediato una indemnización que, aunque un tribunal concluya posteriormente que no satisfacía el estándar, no era irrazonable prima facie, parecería adecuado no concluir que la propia expropiación fue ilícita, sino que la obligación independiente de compensar no se ha cumplido*"[603]. [Traducción del Tribunal]

584. Además, en el contexto del caso *Mondev c. EE. UU.*, el tribunal concluyó lo siguiente:

> "*[P]ara que una expropiación sea lícita en virtud del Artículo 1110 [TLCAN], al menos, el Estado expropiador debe reconocer la*

---

[595] **Anexo CLA-083.**
[596] **Anexo CLA-021.**
[597] **Anexo CLA-024.**
[598] **Anexo CLA-144.**
[599] **Anexo CLA-070.**
[600] **Anexo CLA-036.**
[601] **Anexo CLA-153.**
[602] Memorial de Contestación, ¶¶ 161-173; Dúplica, ¶¶ 159-168.
[603] Memorial de Contestación, ¶ 162; **Anexo RL-099.** El Juez Brower también subrayó lo siguiente: "*Si, por otro lado, no se prevé compensación alguna en forma contemporánea a la confiscación, o si la previsión claramente no puede dar lugar a la indemnización requerida, o se paga una compensación irrazonablemente insuficiente al momento de la confiscación, parecería adecuado declarar la propia expropiación ilícita. En esos casos, puede que la restitutio in integrum sea adecuada como reparación que, además de eso o del otorgamiento de una indemnización monetaria, en el supuesto de que se seleccionara esa alternativa, un tribunal podría considerar un otorgamiento de indemnización de daños punitorios*". [Traducción del Tribunal]

> *obligación de compensar al momento de la confiscación o debe existir un procedimiento en ese momento que la demandante pueda invocar de manera eficaz e inmediata en aras de garantizar la indemnización*"[604]. [Traducción del Tribunal]

585. Asimismo, la Demandada alega que, en el caso *CDSE c. Costa Rica*, el hecho de que Costa Rica hubiera expropiado los bienes y no hubiera pagado compensación alguna durante 20 años no tornaba la expropiación ilícita[605]. En el marco del caso *Amoco*, el tribunal resolvió que no existió expropiación ilícita si bien no se pagó indemnización alguna al momento de la confiscación[606].

586. La Demandada también argumenta que, en el caso *American International Group c. Irán*, el tribunal resolvió que la nacionalización de las acciones en una compañía de seguros iraní era lícita una vez que Irán había reconocido la obligación de compensar, aunque no se había pagado indemnización alguna[607].

587. En el contexto del caso *Southern Pacific Properties c. Egipto*, el tribunal no consideró ilícita la expropiación de la demandante, si bien no se había pagado compensación alguna durante 13 años[608].

588. Además, la Demandada alega que, en el caso *LIAMCO c. Libia*, el tribunal resolvió que, aunque no se había pagado indemnización alguna, la nacionalización de los derechos de concesión de la demandante era lícita, dado que Libia había reconocido su obligación de compensar[609].

589. En forma similar, en el marco del caso *Aminoil c. Kuwait*, el tribunal resolvió que la nacionalización de la concesión de Aminoil era lícita a pesar del hecho de que no se había pagado indemnización[610].

590. Por último, la Demandada observa que, luego de analizar el Artículo 5(2) del Tratado Francia-Polonia, que, en su parte sustancial, es similar al Artículo 5(1) del Tratado Francia-Venezuela, el tribunal en el caso *Servier c. Polonia* concluyó específicamente que la cuestión que consistía de determinar si la expropiación era o no lícita no dependía del pago de compensación[611].

### bb)   Estándar de Compensación Aplicable

---

[604] Memorial de Contestación, ¶ 162; **Anexo RL-100**.
[605] Memorial de Contestación, ¶ 162; **Anexo RL-102**.
[606] Memorial de Contestación, ¶ 162; **Anexo CLA-004**.
[607] Memorial de Contestación, ¶ 162; **Anexo RL-104**.
[608] Memorial de Contestación, ¶ 162; **Anexo CLA-80**.
[609] Memorial de Contestación, ¶ 162; **Anexo RL-105**.
[610] Memorial de Contestación, ¶ 162; **Anexo RL-106**.
[611] Dúplica, ¶ 159; **Anexo RL-165**.

591.  La Demandada alega que, independientemente de si la expropiación fue lícita o ilícita, la fecha de valuación apropiada es anterior a *"toda amenaza de medidas de expropiación"*, tal como se establece en el inciso 2 del Artículo 5(1) del Tratado[612]. Durante la Audiencia, la Demandada subrayó que, si bien mantiene su postura de que la expropiación tuvo lugar recién el día 29 de marzo de 2011, considera que la fecha de valuación correcta es el día 15 de mayo de 2010, en tanto el Presidente Chávez anunció la expropiación en esa fecha[613].

592.  La Demandada se refiere a la redacción, en su opinión, clara e inequívoca, del inciso 2 del Artículo 5(1) del Tratado, de acuerdo con la cual el valor del activo expropiado *"debe ser tasado con relación a la situación económica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropiación"*[614]. La Demandada afirma que la referencia a "[t]*outes les mesures d'expropriation qui pourraient être prises*", "[a]*ll measures of expropriation which could be taken*" ("[t]*odas las medidas de expropiación que pudieran tomarse*") comprende las expropiaciones tanto lícitas como ilícitas y, en particular, no se limita a las expropiaciones en cumplimiento de los requisitos establecidos en el inciso 1 del Artículo 5(1) del Tratado.

593.  La Demandada argumenta que cualquier demora en el pago de indemnización puede ser compensada plenamente por un otorgamiento de intereses y asevera que la evaluación del activo a la fecha del laudo le impondría una sanción pecuniaria a la Demandada[615]. En particular, la Demandada alega que la Demandante no ha establecido que hubiera sufrido algún daño que no pudiera ser compensado plenamente por un monto determinado al día 15 de mayo de 2010[616].

594.  Asimismo, la Demandada sostiene que, en el caso de un mero incumplimiento del Estado con la pronta especificación y el pago de la indemnización, el estándar de indemnización en virtud del derecho internacional consuetudinario no permite que se calcule el monto indemnizatorio mediante *"la construcción de un escenario 'contrafáctico' en el cual la posibilidad de expropiación sea excluida hasta la fecha del laudo"*, tal como alega la Demandante. La Demandada alude a la *"distinción fundamental"* [Traducción del Tribunal] entre una situación en la que la expropiación está prohibida sin importar cómo se lleve a cabo y la situación en que la expropiación como tal está permitida, pero la manera en que se lleva a cabo no cumple con las condiciones impuestas en el tratado[617]. Según la Demandada, esta postura es acorde a la decisión adoptada por la CPJI en el

---

[612] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 96, 100.

[613] Transcripción (Día 1), pág. 239 línea 2 – pág. 240 línea 21, pág. 242 líneas 12-15.

[614] Memorial de Contestación, ¶ 174; Dúplica, ¶ 190.

[615] Dúplica, ¶ 190; Memorial de Contestación, ¶¶ 175 y 180.

[616] Escrito Posterior a la Audiencia de la Demandada, ¶ 112.

[617] Escrito Posterior a la Audiencia de la Demandada, ¶ 109.

marco del caso *Chorzów Factory*, que también establece una distinción entre esas dos situaciones[618].

595.   En sustento de su argumentación, en sus presentaciones escritas[619], la Demandada se refiere, en particular, a los casos *Middle East Cement c. Egipto*[620], *Tecmed c. México*[621], *Wena Hotels c. Egipto*[622], *CME c. República Checa*[623], *Metalclad c. México*[624], *Phillips c. Irán*[625], *LIAMCO c. Libia*[626], *Servier c. Polonia*[627], *Merrill & Ring c. Canadá*[628], *Funnekotter c. Zimbabwe*[629], *Norwegian Shipowners c. EE. UU.*[630] y *Gemplus c. México*[631].

### c)   El Análisis del Tribunal

596.   Al momento de determinar el estándar de compensación aplicable y la fecha de valuación pertinente, primero, el Tribunal procederá a considerar si la expropiación fue ilícita y si esto afecta el estándar de compensación que ha de aplicarse en el presente caso **(aa)**. Posteriormente, el Tribunal evaluará el estándar de compensación aplicable y, en particular, la fecha de valuación aplicable **(bb)**.

### aa)   Relevancia de un Hallazgo de Ilicitud

597.   El Tribunal resalta que la jurisprudencia existente citada por las Partes en relación con la cuestión que consiste en determinar si un incumplimiento del requisito de fijación y/o pago de una pronta indemnización torna la expropiación ilícita no parece ser coherente. Esto indica que tanto las circunstancias particulares de cada caso como el estándar individual del TBI desempeñaron un rol decisivo en la conclusión del tribunal respectivo.

598.   En el caso que nos ocupa, podría argumentarse, por un lado, que el hecho de que la Demandada no llevara a cabo la expropiación de conformidad con los requisitos de indemnización establecidos en los incisos 2 y 3 del Artículo 5(1) del Tratado torna la

---

[618] Memorial de Contestación, ¶¶ -177-179; Dúplica, ¶ 193; Escrito Posterior a la Audiencia de la Demandada, ¶ 110. **Anexo CLA-033**.

[619] Memorial de Contestación, ¶ 176 (nota 467); Dúplica, ¶¶ 189-191, 195; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 101-102, 106-107, 110.

[620] **Anexo CLA-053**.

[621] **Anexo CLA-082**.

[622] **Anexo CLA-089**.

[623] **Anexo CLA-020**.

[624] **Anexo CLA-052**.

[625] **Anexo CLA-065**.

[626] **Anexo RL-105**.

[627] **Anexo RL-165**.

[628] **Anexo RL-184**.

[629] **Anexo RL-036**.

[630] **Anexo CLA-057**.

[631] Dúplica, ¶ 196: **Anexo CLA-125**.

expropiación ilícita, es decir, en violación de las obligaciones de la Demandada en virtud del Tratado. Si el Tribunal siguiera este argumento, la calificación de "*ilicitud*" no sería indicio de que la Demandada se vio impedida de expropiar Norpro Venezuela *per se*; simplemente serviría como sinónimo de una expropiación que se llevó a cabo en violación de una disposición que las Partes Contratantes acordaron en relación con la forma en que debía llevarse a cabo la expropiación.

599. Por otro lado, cabe destacar que el inciso 1 del Artículo 5(1) del Tratado impone expresamente determinadas condiciones en las cuales se permite una expropiación, a saber, la existencia de una causa de utilidad pública, así como la ausencia de trato discriminatorio y de conflicto con un compromiso especial. Sin embargo, este inciso no hace referencia alguna a la indemnización, que se aborda en dos incisos separados. Por consiguiente, podría argumentarse que debería haber una diferencia entre las condiciones establecidas en el inciso 1, en cuya ausencia la Demandada se habría visto impedida de expropiar Norpro Venezuela *per se*, y los requisitos establecidos en los incisos 2 y 3, que se relacionan con la forma en que debe llevarse a cabo la expropiación.

600. A esta altura, al Tribunal desea subrayar que la distinción entre una expropiación lícita y una expropiación ilícita no debería ser un fin en sí mismo, sino que la cuestión que consiste en determinar si una expropiación se califica como "*ilícita*" debería considerarse a la luz de las consecuencias derivadas de dicha conclusión.

601. Tal como se advirtiera *supra*, la controversia entre las Partes en cuanto a estas consecuencias se concentra en la cuestión que consiste en determinar el estándar de compensación que debe aplicarse: si bien una expropiación lícita indiscutidamente deriva en una obligación de pagar indemnización, que se calcula con arreglo al estándar establecido en el Artículo 5(1) del Tratado, las Partes disienten en cuanto a si el mismo estándar de compensación también es aplicable en el caso de que el Tribunal concluya que la expropiación fue ilícita.

602. En vista de lo que antecede, el Tribunal opina que no corresponde arribar a una conclusión respecto de si la calificación de "*ilicitud*" debería atribuirse a la expropiación de Norpro Venezuela, sin tener en cuenta al mismo tiempo las consecuencias que una conclusión de tal naturaleza tendría para el estándar de compensación que ha de aplicarse. Asimismo, esta cuestión podría quedar abierta si, debido a los acontecimientos recientes en el mercado de *proppants*, ambos estándares de compensación planteados por las Partes derivarían en el mismo monto indemnizatorio pagadero a la Demandante.

603. Por lo tanto, el Tribunal procederá a analizar la cuestión que consiste en determinar si el estándar de compensación establecido en el Artículo 5(1) del Tratado también es aplicable en el caso de incumplimiento de los requisitos de indemnización establecidos en sus incisos 2 y 3.

### bb)   Análisis del Artículo 5(1) del Tratado

604.  El Artículo 5(1) del TBI Francia-Venezuela dispone en sus versiones auténticas en idiomas español y francés:

*"Les Parties contractantes ne prennent pas de mesures d'expropriation ou de nationalisation ou toutes autres mesures dont l'effet est de déposséder, directement ou indirectement, les nationaux et sociétés de l'autre Partie des investissements leur appartenant, sur leur territoire et dans leur zone maritime, si ce n'est pour cause d'utilité publique et à condition que ces mesures ne soient ni discriminatoires, ni contraires à un engagement particulier.*

*Toutes les mesures d'expropriation qui pourraient être prises doivent donner lieu au paiement d'une indemnité prompte et adéquate dont le montant, égal à leur valeur réelle des investissements concernés, doit être évalué par rapport à la situation économique normale prévalant avant que toute menace d'expropriation ait été de notoriété publique.*

*Cette indemnité, son montant et ses modalités de versement sont fixés au plus tard à la date d'expropriation. Cette indemnité est effectivement réalisable, versée sans retard et librement transférable. Elle produit, jusqu'à la date de versement, des intérêts*

*"Las Partes Contratantes no adoptarán medidas de expropiación o de nacionalisación ni cualquier otra medida cuyo efecto sea despojar, directa o indirectamente, a los nacionales y sociedades de la otra Parte Contratante de las inversions que les pertenezcan, en su territorio y en su zona maritime, a menos que sea por causa de utilidad pública y siempre que esas medidas no sean discriminatorias ni contrarias a un compromiso especial.*

*Todas las medidas de expropiación que pudieran tomarse deben dar lugar al pago de una pronta y adecuada indemnización cuio monto, igual al valor real de las inversiones en cuestión, deber se tasado con relación a la situación econonómica normal que prevalecía antes de que se hiciera pública toda amenaza de medidas de expropriación.*

*Esa indemnización, su monto y sus modalidades de pago serán fijados a más tadar a la fecha de la expropriación.       Dicha indemnización será efectivamente realizable, pagada sin retraso alguno y libremente transferible. Devengará, hasta la fecha del pago, intereses calculados a la*

> *calculés   au   taux   d'intérêt   de*          *adecuada   tasa   de   interés   del*
> *marché approprié*"[632].                        *mercado*"[633].

606. El Tribunal subraya que el Artículo 5(1) del Tratado tiene una estructura clara: Estructuralmente, el inciso 1 prohíbe en principio las medidas expropiatorias. No obstante, dichas medidas pueden justificarse en los siguientes casos: (i) que se basen en una causa de utilidad pública suficiente; (ii) que no sean discriminatorias; y (iii) que no sean contrarias a un compromiso especial. Los incisos 2 y 3 prevén requisitos y/o consecuencias adicionales de una expropiación, a saber, pronta y adecuada indemnización (inciso 2) al igual que la fijación del monto y la efectividad de la indemnización (inciso 3).

607. La cuestión que consiste en determinar si el estándar de compensación contenido en los incisos 2 y 3 del Artículo 5(1) del Tratado es aplicable exclusivamente a una expropiación que cumple con los requisitos adicionales establecidos en los mismos incisos 2 y 3 depende, en particular, de la interpretación de los términos "[t]*outes les mesures d'expropriation qui pourraient être prises*"/"[t]*odas las medidas de expropiación que pudieran tomarse*".

608. Por otro lado, la organización del Artículo 5(1) con tres incisos sin numerar sugiere que deben interpretarse de manera compatible entre sí. Si bien el inciso 1 contiene los requisitos "*por causa de utilidad pública*" y que "*no sean discriminatorias ni contrarias a un compromiso especial*", no alude a la indemnización, que se aborda en los incisos 2 y 3. Podría argumentarse que "[t]*odas las medidas de expropiación que pudieran tomarse*" se refiere a todas las medidas "*lícitas*", esto es, aquellas tomadas conforme a los términos del Artículo 5(1) en su conjunto. Esta opinión también podría respaldarse con el hecho de que, mediante las palabras "[c]*ette indemnité*"/"[e]*sa indemnización*", los requisitos establecidos en el inciso 3 están sujetos a la valuación establecida en el inciso 2. En consecuencia, la ausencia de fijación del monto y de la modalidad de pago del valor calculado de conformidad con el inciso 2 a más tardar en la fecha de la expropiación podría resultar en la inaplicabilidad del estándar de compensación previsto en el Artículo 5(1), en tanto la compensación no habría sido "*pronta*" y, por lo tanto, fue violatoria de esta misma disposición.

---

[632] Gaceta Oficial de la República Francesa N.º 102 del 30 de abril de 2004 [*Journal Officiel de la République Française nº102 du 30 avril 2004*], **Anexo C-1**, pág. 7775.

[633] *Gaceta Oficial de la República Bolivariana de Venezuela Número 37.896, jueves 11 de marzo de 2004*, **Anexo C-1**, págs. 332.354.

609. Por otro lado, también podría interpretarse que la estructura del Artículo 5(1) establece una distinción entre los requisitos (sustantivos) establecidos en el inciso 1, en cuya ausencia la expropiación se vería impedida *per se* y, por ende, sería "*ilícita*", y los requisitos de indemnización (adicionales) establecidos en los incisos 2 y 3, que no se relacionan con la licitud de la expropiación. Podría argumentarse que "[t]*odas las medidas de expropiación que pudieran tomarse*" se refiere a cualquier medida, sea en cumplimiento del Artículo 5(1) o no, es decir, sin agregar limitaciones ajenas al propio texto. El hecho de que los incisos 2 y 3 se encuentren vinculados por las palabras "[c]*ette indemnité*"/"[e]*sa indemnización*" también podría señalar que debería interpretarse que la ausencia de un nexo explícito semejante entre los incisos 1 y 2 significa que los requisitos de indemnización son aplicables a todas las expropiaciones.

610. En vista de lo que antecede, el Tribunal enfrenta interpretaciones contrarias del Artículo 5(1) del Tratado. En particular, la frase "[t]*odas las medidas de expropiación que pudieran tomarse*", y, más específicamente, la palabra "*pudieran*", también es susceptible de dos interpretaciones: o incluye todas las medidas que el Estado está autorizado a tomar o incluye todas las medidas que sería posible que tome el Estado.

611. Sin embargo, la cuestión relativa a la relación precisa entre los tres incisos del Artículo 5(1) y al estándar de compensación que ha de aplicarse, no requiere una decisión si, tal como se destacara *supra*, ambos estándares de compensación planteados por las Partes derivaran en el mismo monto indemnizatorio pagadero a la Demandante. En este aspecto, cabe resaltar que ambas Partes coinciden en que, en el caso de que la valuación a la fecha de expropiación arrojara un valor más elevado que la valuación a la fecha del laudo, el Tribunal debería determinar el monto indemnizatorio pagadero a la Demandante sobre la base del valor a la fecha de expropiación[634].

612. Conforme a la solicitud del Tribunal de fecha 13 de agosto de 2015, ambas Partes les ordenaron a sus peritos que actualizaran sus valuaciones a la fecha del laudo y evaluaran la planta al día 31 de agosto de 2015. Estas Actualizaciones de la Valuación se presentaron simultáneamente el día 22 de octubre de 2015[635], y ambas Partes tuvieron simultáneamente la oportunidad de realizar comentarios acerca de la Actualización de Valuación de la Parte contraria[636]. A esta fecha, ambos peritos calcularon un valor de la planta que era inferior al valor que habían calculado respecto de la planta a la fecha de expropiación. En particular, el perito de la Demandante, el Prof. Spiller, calculó el valor

---

[634] *Cfr.* Presentación Posterior a la Audiencia de la Demandante, ¶ 77; Escrito Posterior a la Audiencia de la Demandada, ¶ 106.

[635] *Véanse* Actualización de la Valuación de la Demandante y Actualización de la Valuación de la Demandada, ambas de fecha 22 de octubre de 2015.

[636] *Véanse* carta de la Demandante y carta de la Demandada, ambas de fecha 6 de noviembre de 2015.

de la planta al día 31 de agosto de 2015 en USD 90,3 millones (en comparación con USD 99,5 millones al día 15 de mayo de 2010)[637]. Según los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores, la planta tenía un valor negativo de USD 27,6 millones al día 31 de agosto de 2015 (en comparación con un valor positivo de USD 9,5 millones al día 15 de mayo de 2010)[638].

613.  A la luz de estos acontecimientos, la Demandante solicitó expresamente en su carta de fecha 6 de noviembre de 2015 que se le otorgue una indemnización por el monto de USD 99,5 millones con más intereses anteriores al laudo, esto es, el valor que, según afirma, tenía Norpro Venezuela al día 15 de mayo de 2010[639].

614.  Por consiguiente, no es necesario que el Tribunal arribe a una conclusión en este contexto en cuanto a la cuestión que consiste en determinar si el estándar de compensación que ha de aplicarse es el estándar contenido en los incisos 2 y 3 del Artículo 5(1) del Tratado o, en su lugar, el estándar de restitución en virtud del derecho internacional consuetudinario. En cualquier caso, el monto indemnizatorio pagadero a la Demandante se basará en la valuación de Norpro Venezuela a la fecha de expropiación, a saber, el día 15 de mayo de 2010.

## 2.    Criterios para el cálculo del Monto Indemnizatorio

615.  El Tribunal procederá ahora a abordar los criterios para el cálculo del monto indemnizatorio de la Demandante. En este contexto, el Tribunal primero determinará el método de valuación pertinente (**a**); luego, determinará los criterios para calcular el valor de Norpro Venezuela sobre la base de ese método (**b**); y, por último, abordará las supuestas pérdidas históricas vinculadas al aumento del precio de la bauxita (**c**).

### a)    Método Valuatorio

#### aa)    Síntesis de la Postura de la Demandante

---

[637] Dado el enfoque adoptado por el Prof. Spiller en virtud del cual considera, como valor a ser compensado por la Demandada, el monto más reducido de los siguientes: (i) el valor basado en el modelo FFD, incluidos los flujos de fondos contrafácticos históricos (de corresponder); y (ii) los costos de construcción correspondientes a una planta comparable, incluidos los flujos de fondos perdidos durante el período de construcción, la cifra al día 15 de mayo de 2010 refleja los costos de construcción (en comparación con un valor basado en el modelo FFD de USD 116,4 millones, incluido el aumento del precio de la bauxita). Por el contrario, el valor al día 31 de agosto de 2015 refleja el valor basado en el modelo FFD (en comparación con los costos de construcción de USD 94,8 millones). *Véase* Actualización de la Valuación de la Demandante, Tabla 1.

[638] En el cálculo del Dr. Flores y del Sr. Brailovsky, ambas cifras reflejan el valor basado en el modelo FFD de la planta, incluidos los flujos de fondos contrafácticos históricos (de corresponder). Actualización de la Valuación de la Demandada, Tabla 1 y ¶ 8 (nota 18).

[639] Carta de la Demandante de fecha 6 de noviembre de 2015, pág. 3.

616. La Demandante alega que la Demandada debe pagar una compensación íntegra por la planta expropiada y hace referencia a las *Directrices sobre el Trato de la Inversión Extranjera Directa* del año 1992 (las "***Directrices del Banco Mundial***") de conformidad con las cuales la indemnización por expropiación "*se considerará* 'adecuada' *si se basa en el valor justo de mercado del activo confiscado*"[640]. [Traducción del Tribunal]

617. Si bien la Demandante sostiene que el estándar de compensación previsto en el Artículo 5(1) del Tratado no es aplicable en el presente caso, sino que dicha indemnización debe determinarse en consonancia con el estándar de reparación íntegra del derecho internacional consuetudinario, la Demandante subraya que el propio Tratado refleja el principio del "*valor justo de mercado*" en su estándar de cálculo de la indemnización por expropiación lícita[641]. [Traducción del Tribunal]

618. La Demandante también alude al comentario del Proyecto de Artículos de la CDI en virtud del cual "[l]*a indemnización por el valor en capital del bien confiscado o destruido como consecuencia de un hecho internacionalmente ilícito generalmente se calcula con arreglo al* 'valor normal de mercado' *del bien perdido*"[642].

619. La Demandante también se refiere a la definición de valor justo de mercado en el contexto del caso *Starret Housing Corp c. Irán*:

> "*el precio al que un comprador interesado compraría productos determinados y el precio al que un vendedor interesado los vendería con la condición de que ninguna de las partes* [se encuentre] *bajo algún tipo de coerción y que ambas partes tengan información suficiente acerca de todas las circunstancias pertinentes involucradas en la compra*"[643]. [Traducción del Tribunal]

620. En tanto la inversión era una "*empresa en marcha*", la Demandante argumenta que el cálculo del valor justo de mercado debe tener en cuenta la rentabilidad y las perspectivas futuras de la planta. En este aspecto, la Demandante se refiere a su experto en cuantía de daños, el Prof. Spiller, que sugiere que un tercero comprador pagaría el monto más reducido de los siguientes: (i) el valor actual neto de los flujos de fondos que un comprador interesado podría obtener de la adquisición de una participación del 100 % en Norpro Venezuela; y (ii) el costo de oportunidad en que un comprador interesado incurriría si construyera una planta similar fuera de Venezuela, que está compuesto por

---

[640] Memorial, ¶¶ 203-204, que hace referencia a El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), pág. 11.

[641] Memorial, ¶¶ 197-198 y ¶206; Réplica, ¶¶ 143-146.

[642] Réplica, ¶ 154, que cita a James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), pág. 225.

[643] Memorial, ¶ 105, que cita *Starrett Housing Corp. c. Irán* (**CLA-081**), ¶ 18.

la suma de los costos de construcción y los flujos de fondos de los que se vio privado durante el período de construcción[644].

621. En lo que respecta al segundo enfoque, la Demandante afirma que la "*información más precisa disponible*" son los costos de construcción reales de la planta de *proppants* cerámicos de la Demandante ubicada en Little Rock, Estado de Arkansas (Estados Unidos) terminada a fines del año 2013 que – al igual que Norpro Venezuela – produce los *proppants* cerámicos a base de bauxita de la mejor calidad por medio de una tecnología de proceso seco[645]. La Demandante argumenta que, además del hecho de que no hay plantas comparables en Venezuela, los costos son los mismos independientemente de si la planta similar se construye en los EE. UU. o en Venezuela, ya que "*las plantas tienen estructuras de costos ajustadas por riesgos similares*" y "*las ventajas y desventajas en materia de costos vinculadas a un lugar en particular pueden compensarse entre sí*"[646]. [Traducción del Tribunal]

622. Según el cálculo del Prof. Spiller al día 15 de mayo de 2010, el costo de oportunidad para la construcción de una planta similar en los EE. UU. sería inferior al valor actual neto de los flujos de fondos futuros de Norpro Venezuela (USD 99,5 millones en comparación con USD 115,1 millones). Por consiguiente, la Demandante opina que el Tribunal debería determinar el valor justo de mercado de la planta expropiada sobre la base del enfoque de los costos de construcción[647].

### bb)    Síntesis de la Postura de la Demandada

623. La Demandada concuerda en que el monto indemnizatorio a ser abonado debe reflejar el valor justo de mercado de la planta como una empresa en marcha, es decir, "*el monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado*". La Demandada también coincide en que esta cifra puede determinarse mediante el cálculo de los "*flujos de fondos proyectados* […] *sobre la base de supuestos razonables al día 15 de mayo de 2010 y descontados a su valor actual neto a esa fecha a través de una tasa de descuento adecuada*"[648]. [Traducción del Tribunal]

624. En respuesta a la invocación por parte de la Demandante del estándar de reparación íntegra del derecho internacional consuetudinario, la Demandada asevera que el estándar establecido en el Artículo 5(1) del Tratado es "*coherente con los conceptos tanto*

---

[644] Réplica, ¶¶ 155-156, que hace referencia a la Segunda Valuación de Daños del Prof. Spiller de fecha 18 de junio de 2014 ("**Spiller II**"), ¶ 5; Escrito Posterior a la Audiencia de la Demandante, ¶ 90.

[645] Réplica, ¶¶ 189-191; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 92 y 93.

[646] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 91 y 95.

[647] Réplica, ¶¶ 157, 187 y 196; carta de la Demandante al Tribunal de fecha 6 de noviembre de 2015; Spiller II, Tabla 12.

[648] Memorial de Contestación, ¶¶ 185-187; Escrito Posterior a la Audiencia de la Demandada, ¶ 137.

*tradicional como contemporáneo de indemnización* 'íntegra' *o* 'adecuada'"[649]. [Traducción del Tribunal]

625. La Demandada no cree necesario considerar el enfoque del Prof. Spiller para comparar la valuación basada en el modelo FFD con los costos de oportunidad de construir una planta similar en detalle dado que conforme a sus expertos en cuantía de daños, el Sr. Brailovsky y el Dr. Flores, tales costos excederían el precio que un comprador interesado estaría dispuesto a pagar por la planta de la Demandante (USD 43,7 millones más los flujos de efectivo no percibidos de USD 1,3 millones al día 15 de mayo de 2010 frente a USD 9,5 millones)[650].

626. En cualquier caso, la Demandada enfatiza que el activo a ser evaluado en el presente caso es una planta autónoma ubicada en Venezuela, no en los Estados Unidos y, por consiguiente, arguye que la única manera adecuada de evaluar la indemnización pagadera a la Demandante es mediante la aplicación de un análisis FFD, incluida una tasa de descuento que tome en cuenta el hecho de que la planta está ubicada en Venezuela[651]. Si se evaluaran los costos de construcción, la Demandada alega que tendrían que calcularse los costos en Venezuela (no en los EE. UU.) y en función de supuestos "*coherentes con el análisis FFD que se utiliza a efectos comparativos*"[652]. [Traducción del Tribunal]

### cc)    El Análisis del Tribunal

627. Inicialmente, el Tribunal destaca el acuerdo de las Partes según el cual la indemnización que la Demandada ha de pagar por la expropiación de Norpro Venezuela debería reflejar el valor justo de mercado de la planta como una empresa en marcha al día 15 de mayo de 2010[653]. Primero, este valor refleja el estándar de compensación previsto en los incisos 2 y 3 del Artículo 5(1) del Tratado, que dispone que la indemnización debe ser igual al "*valor real*" ("*valeur réelle*" / "*actual value*") de la empresa en marcha Norpro Venezuela. Segundo, el valor justo de mercado también refleja el estándar de compensación en virtud del derecho internacional consuetudinario reflejado en el Proyecto de Artículos de la CDI y en las *Directrices del Banco Mundial*. Mientras que el Artículo 35 del Proyecto de Artículos de la CDI establece, principalmente, que el Estado está obligado a la restitución

---

[649] Dúplica, ¶ 197.

[650] Memorial de Contestación, ¶ 188; Dúplica, ¶ 201; Escrito Posterior a la Audiencia de la Demandada, ¶ 138 y ¶¶ 204-208; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 63; Segundo Informe Pericial sobre la Cuantía de Daños del Sr. Brailovsky y el Dr. Flores ("**Brailovsky/Flores II**"), ¶¶ 227 y 242.

[651] Dúplica, ¶¶ 202-203.

[652] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 138 y 202.

[653] El Tribunal subraya que ambas Partes se refieren repetidamente a "*la Planta*" como el bien expropiado. Tal como acertadamente sostuviera la Demandada en su Memorial de Contestación (¶ 188), sin embargo, el bien a ser valuado en el presente caso es "*la Planta operada como una empresa en marcha*". El Tribunal, por consiguiente, se referirá al bien expropiado como "*Norpro Venezuela*" o "*la empresa en marcha*".

por el daño causado, el Artículo 36 dispone, en subsidio, que ("*en la medida en que dicho daño no sea reparado por la restitución*"), el Estado está obligado a pagar una indemnización que "*cubrirá todo daño susceptible de evaluación financiera, incluido el lucro cesante en la medida en que éste sea comprobado*"[654]. Tal como señala correctamente la Demandante, en el Comentario del Artículo 36, la CDI establece que "[l]*a indemnización por el valor del capital del bien confiscado o destruido como consecuencia de un hecho internacionalmente ilícito generalmente se calcula con arreglo al* 'valor normal de mercado' *del bien perdido*"[655]. De modo similar, con respecto a las expropiaciones, las *World Bank Guidelines* disponen que "[l]*a indemnización se considerará* 'adecuada' *si se basa en el valor justo de mercado del activo confiscado*"[656][Traducción del Tribunal]. En consecuencia, una vez más, no es necesario que el Tribunal se pronuncie respecto del estándar de compensación aplicable en el caso que nos ocupa, en tanto ambos estándares requieren la determinación del valor justo de mercado de Norpro Venezuela al día 15 de mayo de 2010.

628. Asimismo, las Partes coinciden en que el valor justo de mercado es igual al monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado, siempre que el comprador esté informado acerca de todas las circunstancias pertinentes y ninguna de las partes se encuentre bajo cualquier tipo de coacción para vender o adquirir el activo[657]. Esto es confirmado por las *Directrices del Banco Mundial*, que también se refieren al "*monto que un comprador interesado normalmente le pagaría a un vendedor interesado*" en vista de todas las circunstancias pertinentes[658]. [Traducción del Tribunal]

629. Por último, las Partes coinciden en que, dado que la planta era una empresa en marcha con anterioridad a la expropiación, su valor justo de mercado puede evaluarse mediante el cálculo del valor actual neto de los flujos de fondos futuros de Norpro Venezuela. Por consiguiente, los peritos de ambas Partes han calculado los flujos de fondos futuros de la empresa en marcha y, luego, aplicado una tasa de descuento a esos flujos de fondos en aras de obtener su valor actual neto.

630. Sin embargo, el perito de la Demandante, el Prof. Spiller, ha planteado un enfoque adicional a fin de calcular el valor, a saber, a través de la evaluación del costo de

---

[654] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Artículo 36.

[655] James Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (2002) (**CLA-027**), Artículo 36, ¶ 22.

[656] El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Sección IV, ¶ 3.

[657] *Cfr.* la definición proporcionada por el tribunal en *Starrett Housing Corp. c. Irán,* que se ha citado en el párrafo 619 *supra.*

[658] El Grupo del Banco Mundial, *Guidelines on the Treatment of Foreign Direct Investment* (1992) (**CLA-090**), Sección IV, ¶ 5.

oportunidad de construir una planta comparable en los EE. UU. (que está compuesto por el costo de construcción más los flujos de fondos perdidos durante el período de construcción). Según el Prof. Spiller, un comprador interesado pagaría sólo el monto más reducido de los obtenidos por medio de la aplicación del método FFD, por un lado, y del enfoque de los costos de construcción, por el otro. Por ende, ha comparado los dos valores y concluido que el valor de los costos de construcción al día 15 de mayo de 2010 (USD 99,5 millones) es inferior al valor FFD a esa fecha (USD 115,1 millones) y, en consecuencia, refleja el valor que ha de ser compensado por la Demandada[659].

631. Al Tribunal le parece que la Demandada no impugna el enfoque adoptado por el Prof. Spiller que consiste en comparar los dos valores en sí mismos, sino que hace lo siguiente: (i) afirma que la comparación debería hacerse con una planta ubicada en Venezuela y en consonancia con los supuestos aplicados en el cálculo FFD; y (ii) en cualquier caso, considera que el enfoque de los costos de construcción carece de relevancia a la luz de la conclusión de sus peritos según la cual el valor FFD de Norpro Venezuela (USD 9,5 millones) es inferior al costo de oportunidad de una planta similar ubicada en los EE. UU. (USD 43,7 millones más los flujos de fondos de los que se vio privada de USD 1,3 millones al día 15 de mayo de 2010)[660].

632. A esta altura, al Tribunal desea expresar sus dudas en cuanto a la aplicabilidad general del enfoque para determinar el valor justo de mercado de un activo específico, por ejemplo, en el presente caso, la empresa en marcha, mediante la evaluación del costo de oportunidad de construir una planta diferente. En particular, el Tribunal no está convencido de que, incluso si el costo de oportunidad fuera inferior al valor basado en el FFD de Norpro Venezuela, éste derivaría en un valor justo de mercado menor de la inversión de la Demandante en virtud de cualquiera de los estándares de compensación planteados en el caso que nos ocupa.

633. No obstante, no es necesario que el Tribunal forme una opinión definitiva acerca de la adecuación general de este enfoque, ya que, en cualquier caso, el Tribunal considera que los cálculos del costo de oportunidad realizados por los peritos de las Partes no son concluyentes en las circunstancias actuales. Específicamente, el Tribunal coincide con la Demandada en que una planta ubicada en Little Rock, Estado de Arkansas, no puede compararse con la empresa en marcha que ha de evaluarse en el marco del presente arbitraje. Lo mismo es aplicable a la comparación efectuada por los peritos de la Demandada con un promedio de otras plantas ubicadas en los EE. UU.

---

[659] Spiller II, ¶ 5 y Tabla 12.
[660] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 138 y 202; Brailovsky/Flores II, ¶¶ 227 y 242.

634.  La propia Demandante reconoce que hay "*ventajas y desventajas en materia de costos vinculadas a un lugar en particular*", pero argumenta que estas "*pueden compensarse entre sí*"[661]. El Tribunal tiene conocimiento de que el Prof. Spiller explicó durante la Audiencia que aplicó un factor de ajuste a fin de dar cuenta de las "*Economías de Escala y Diferencias de Alcance*"[Traducción del Tribunal], que, en su opinión, se compensan entre sí[662]. Sin embargo, el Tribunal no está convencido de que este factor de ajuste refleje todas las diferencias que han de tenerse en cuenta al momento de analizar instalaciones de producción altamente especializadas en dos mercados que son tan diferentes como el mercado maduro de los EE. UU. y el mercado emergente de Venezuela.

635.  Puesto que ninguna de las Partes alega que existe una planta comparable en Venezuela, el Tribunal ignorará el enfoque de los costos de construcción y determinará los criterios para evaluar el valor justo de mercado de Norpro Venezuela sobre la base de una empresa en marcha, es decir, en función del cálculo FFD realizado por los peritos de ambas Partes respecto de la fecha de valuación del día 15 de mayo de 2010.

### b)    Valor Justo de Mercado Basado en el Método FFD de Norpro Venezuela

636.  Si bien las Partes coinciden en que, en principio, el análisis del flujo de fondos descontados es un método adecuado a fin de determinar el valor de Norpro Venezuela, sus peritos arriban a resultados considerablemente diferentes respecto de dicho valor al día 15 de mayo de 2010, a saber, entre USD 115,1 millones según el cálculo del perito de la Demandante, el Prof. Spiller, y USD 9,5 millones según el cálculo de los peritos de la Demandada, el Dr. Flores y el Sr. Brailovsky. El mayor punto de desacuerdo entre los peritos se relaciona con la tasa de descuento que ha de aplicarse a los flujos de fondos futuros; por ende, el Tribunal procederá a abordar esta cuestión en primer lugar (**aa**). En una segunda etapa, el Tribunal abordará los demás puntos de desacuerdo relativos al cálculo de los flujos de fondos futuros de Norpro Venezuela (**bb**). Tal como se determinara *supra*, el Tribunal procederá a abordar tanto la tasa de descuento aplicable como los flujos de fondos futuros desde la perspectiva de un comprador interesado al día 15 de mayo de 2010.

#### aa)    Tasa de Descuento

##### (i)    Síntesis de la Postura de la Demandante

637.  La Demandante alega que los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores, aplicaron "*una tasa de descuento absurdamente elevada del 26 %*", que tiene como

---

[661] Presentación Posterior a la Audiencia de la Demandante, ¶ 91.
[662] Presentación de Apertura del Prof. Spiller, diapositiva 32.

resultado un valor que implica que "*ningún inversionista razonable invertiría en una nueva planta de proppant o le agregaría capacidad a una planta de proppant existente*"[663]. [Traducción del Tribunal]

638.  La Demandante alega que la tasa de descuento del 26 % no tiene precedentes y supone más del doble de la tasa de descuento que los tribunales adoptan por lo común en el marco de arbitrajes CIADI. Según la Demandante, el costo de capital propio de los EE. UU. que proponen se "*aleja completamente de cualquier otra estimación que obra en el expediente*" y, además, es incoherente con el propio cálculo de la Demandante respecto del proyecto en el año 2006, en vista de que las tasas de interés han caído desde entonces[664]. [Traducción del Tribunal]

639.  En particular, la Demandante rechaza el uso por parte del Sr. Brailovsky y del Dr. Flores de una "*prima por tamaño*" del 2,66 %, por las siguientes razones: (i) la bibliografía "*no* [es] *concluyente*" en cuanto a su aplicabilidad a las inversiones extranjeras; (ii) el Prof. Damodaran la ha rechazado por considerarla una duplicación; y (iii) su aplicación contabilizaría dos veces el riesgo país en Venezuela donde Norpro Venezuela no puede clasificarse como una empresa pequeña[665]. [Traducción de Tribunal]. La Demandante también rechaza el uso de una tasa libre de riesgo basada en la tasa interna de retorno al contado de los bonos del Tesoro de los EE. UU. a 20 años a la fecha de valuación y destaca que el bono a 10 años utilizado por el Prof. Spiller es recomendado por el Prof. Damodaran y refleja el hecho de que la mayor parte de los flujos de fondos en los modelos de los peritos se perciben en diez años o menos[666].

640.  Con respecto a la prima de riesgo de mercado (PRM), la Demandante asevera que la prima histórica promedio empleada por el Sr. Brailovsky y el Dr. Flores no es apropiada a la luz de la proximidad de la crisis financiera 2008-2009, que "*distorsiona la PRM proveniente de los rendimientos históricos*". Según la Demandante, este acontecimiento llevó al Prof. Damodaran a reemplazar este método por una recomendación que se basa en "*un amplio*

---

[663] Réplica, ¶ 158, que cita Spiller II, ¶ 28.

[664] Réplica, ¶ 160; Presentación Posterior a la Audiencia de la Demandante, ¶ 103, que hace referencia a la Presentación de Apertura del Prof. Spiller, diapositiva 5; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 73.

[665] Réplica, ¶ 165; Presentación Posterior a la Audiencia de la Demandante, ¶ 103, que hace referencia a la Presentación de Apertura del Prof. Spiller, diapositiva 22, que cita la siguiente afirmación del Prof. Damodaran: "*Agregar una prima máxima pequeña me parece una manera no sólo descuidada (y muy errónea) de ajustar los rendimientos esperados, sino también una renuncia a la misión de la valuación intrínseca, que consiste en desarrollar los números sobre la base de los principios fundamentales*". [Traducción del Tribunal] **Anexo CLEX-114**, pág. 2. *Véase* también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 81.

[666] Réplica, ¶ 166; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 82.

*estudio de los métodos*", que aún incluye el promedio histórico como la prima más elevada[667]. [Traducción del Tribunal]

641. La Demandante también argumenta que la "*exorbitante*" prima de riesgo país del 13,92 % que el Sr. Brailovsky y el Dr. Flores aplicaron en nombre de Venezuela es una "*medida desesperada para que el Estado trate de evitar hacerse cargo de sus acciones*". Según la Demandante, este salto refleja las amenazas del Presidente Chávez de expropiar todas las inversiones extranjeras en Venezuela sin compensación alguna[668]. Sin embargo, la Demandante afirma que un Estado "*no puede utilizar su propia tendencia a violar la ley para reducir el valor de la indemnización por expropiación*"[669]. Por lo tanto, adopta la postura según la cual la "*amenaza generalizada de confiscación*" debe eliminarse del cálculo del valor justo de mercado, ya que, de otro modo, la Demandada sería recompensada por la conducta ilícita que el presente arbitraje está destinado a subsanar[670]. [Traducción del Tribunal]

642. La Demandante resalta que esta lógica debería aplicarse en el caso de expropiaciones tanto lícitas como ilícitas, puesto que tanto el estándar en virtud del Tratado como el estándar en virtud del derecho internacional consuetudinario requieren que "*cualquier valuación del activo expropiado elimine las amenazas del Estado de confiscar el activo expropiado*". Aunque reconoce que los tribunales en los casos *Tidewater c. Venezuela, Mobil c. Venezuela* y *Venezuela Holdings c. Venezuela* han optado por no seguir este enfoque en el supuesto de una expropiación lícita, la Demandante afirma que ningún tribunal ha hecho lo mismo en el caso de violación de un tratado y hace referencia específica a la conclusión del tribunal en el contexto del caso *Gold Reserve c. Venezuela* según la cual "*no corresponde aumentar la prima de riesgo país para reflejar la percepción del mercado de que un Estado puede tener tendencia a expropiar inversiones en violación de las obligaciones en virtud del TBI*"[671]. Según la Demandante, de otro modo, se permitiría que un país "*se beneficiara de un régimen de compromiso al trato*

---

[667] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 76-77, que hace referencia a Spiller II, Tabla 15.

[668] Réplica, ¶ 161; Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 55.

[669] Réplica, ¶ 162, que cita *Occidental c. Ecuador* (**CLA-061**), ¶ 564; Presentación Posterior a la Audiencia de la Demandante, ¶ 110, que hace referencia, en particular, a *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841.

[670] Presentación Posterior a la Audiencia de la Demandante, ¶ 104 y ¶ 111; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 56 y ¶ 59.

[671] Presentación Posterior a la Audiencia de la Demandante, ¶ 113 y ¶ 117, que cita *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841. La Demandante subraya que, en ese caso, el tribunal, en definitiva, aplicó una prima de riesgo del 4 % respecto de Venezuela. La Demandante también invoca al tribunal en el contexto del caso *OI European c. Venezuela* que coincidió con la demandante en que la prima de riesgo país debía excluir el efecto de los "*mensajes negativos en el entorno empresarial acerca de posibles expropiaciones*" expuestos por Venezuela, pero no encontró evidencia alguna de que la prima del 6 % propuesta por Venezuela se viera afectada por estos mensajes negativos. [Traducción del Tribunal] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 57 y nota 87, que hace referencia a *OI European c. Venezuela* (**CLA-156**), ¶ 782.

*justo a fin de atraer inversionistas extranjeros y posterior revocación general de tales compromisos*"[672]. [Traducción del Tribunal]

643.  La Demandante asevera que, a diferencia del perito de la demandante en el caso *Tidewater c. Venezuela*, el Prof. Spiller ha excluido sólo el riesgo de confiscación de la prima de riesgo país, pero tuvo en cuenta correctamente "*otros riesgos de invertir en Venezuela, tales como los riesgos de una economía volátil, desorden civil, una infraestructura subdesarrollada y otras cuestiones*". La Demandante alega que el Prof. Spiller consideró el diferencial promedio de bonos soberanos de países con una calificación B1, tales como Venezuela, que incluye a muchos países en desarrollo con "*un riesgo país considerable, incluso riesgos políticos*"[673]. [Traducción del Tribunal]

644.  Por otro lado, la Demandante alega que el enfoque del Sr. Brailovsky y del Dr. Flores basado en el Modelo de Calificación de Riesgo País (*CRRM*, por sus siglas en inglés), "*por definición, incorpora la percepción de los inversionistas* [institucionales] *del riesgo de invertir en Venezuela en las condiciones político-económicas actuales, incluido el de las expropiaciones sin compensación*". En forma similar, la Demandante asevera que el diferencial "*sumamente elevado*" de los bonos soberanos venezolanos de conformidad con el Índice *EMBI* no refleja la falta de capacidad de pago de Venezuela (tal como lo refleja su calificación B1), sino su falta de voluntad de pago[674]. [Traducción del Tribunal]

645.  En relación con el *CRRM*, la Demandante alega que no sólo es "*intrínsecamente poco fiable*", sino especialmente inapropiado en la "*compleja situación político-económica*" actual de Venezuela. En respuesta al argumento de que el *CRRM* ha generado tasas "*constantes*" durante los últimos veinte años, la Demandante afirma que esto no es coherente con el argumento de la Demandada según el cual el riesgo país aumenta desde 2005, año en el que la Demandante invirtió en Venezuela y el EMBI rondaba el 2 %[675]. La Demandante también rechaza el argumento de la Demandada en virtud del cual el *EMBI* se ha ubicado en un promedio del 10 % durante el mismo período, en tanto este horizonte temporal incluye una serie de "*valores atípicos*" en la historia del país, lo que

---

[672] Presentación Posterior a la Audiencia de la Demandante, ¶ 114. *Véase* también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 64.

[673] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 105-106; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 60 y ¶ 67. La Demandante argumenta que una manera de "*verificar*" esto consiste en analizar los diferenciales de swap de riesgo crediticio (CDS, por sus siglas en inglés) pendientes respecto de las deudas soberanas de los países y resalta que, en la lista de 63 países del Prof. Damodaran al mes de enero de 2014, la prima propuesta por el Prof. Spiller del 4,5 % calificaría como la cuarta más elevada después de Argentina (14,73 %), Venezuela (10,8 %) y Túnez (4,57 %) y, por ende, se encuentra "*muy por encima de la prima de riesgo país típica de un país en desarrollo*". [Traducción del Tribunal] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 61-62, que hace referencia al **Ap. BF-66**, págs. 23-25.

[674] Presentación Posterior a la Audiencia de la Demandante, ¶ 118; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 63.

[675] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 120-121.

tuvo un "*efecto extremo*" en el gobierno, pero no en los inversionistas privados, y, en consecuencia, convierte al *EMBI* en una "*tasa artificial que refleja expectativas políticas y no evaluaciones económicas*"[676]. [Traducción del Tribunal]

646. Por lo tanto, la Demandante concluye que la diferencia entre las primas de riesgo país calculadas por el Prof. Spiller y el Sr. Brailovsky, respectivamente, es "*en gran medida atribuible a las amenazas de confiscación de Venezuela*"[677]. Destaca que, en el contexto del caso *OI European c. Venezuela*, los propios peritos de Venezuela calcularon una prima de riesgo país correspondiente al año 2010 del 6 %[678]. [Traducción del Tribunal]

647. Asimismo, la Demandante asevera que también tuvo en cuenta el "*acentuado riesgo país*" de Venezuela cuando le asignó una tasa de descuento del 15 % al proyecto en el año 2006 e hizo esfuerzos considerables para obtener el apoyo significativo del Gobierno venezolano, en función del hecho de que el Tratado Francia-Venezuela había entrado en vigor en el año 2004[679]. La Demandante subraya que la tasa de descuento "*de alto riesgo*" del 12 %, que incluía una prima de riesgo país del 4 %, no fue asignada por los miembros del equipo del proyecto (ellos incluso agregaron un 3 % adicional "*para ser conservadores*"), sino que sirvió de "*medida objetiva a nivel compañía para considerar los posibles riesgos y recompensas de emprendimientos propuestos en diversas ubicaciones*"[680]. [Traducción del Tribunal]

648. En opinión de la Demandante, un inversionista como Saint-Gobain es "*inmune a la amplia mayoría de los factores de riesgo*" que se incluyen en la prima de riesgo país del Sr. Brailovsky y del Dr. Flores. La Demandante alega lo siguiente: (i) que los *proppants* producidos por la actividad de Norpro Venezuela habían de exportarse en virtud de un contrato firme de compra a largo plazo; (ii) que Norpro Venezuela había celebrado contratos de suministro de bauxita y energía a largo plazo; y (iii) que el riesgo crediticio

---

[676] Presentación Posterior a la Audiencia de la Demandante, ¶ 122. La Demandante argumenta que Venezuela se está acercando a la cesación de pagos y alude a la conclusión del tribunal en el marco del caso *EDF International c. Argentina* según la cual el enfoque del diferencial de deuda del país se convierte en "*una medida irrealista para un cálculo del costo de capital propio*" cuando los países se acercan a "*situaciones similares a una cesación de pagos*", tal como ocurrió con Argentina en el año 2001. [Traducción del Tribunal] Presentación Posterior a la Audiencia de la Demandante, ¶ 126, que cita *EDF International c. Argentina* (**CLA-122**), ¶¶ 634, 1264, 1266-1268. La Demandante también hace referencia al tribunal en el caso *Sempra Energy c. Argentina*, que concluyó que, en el año 2001, "*la prima de riesgo que exigía quien realizara una inversión en una compañía privada en Argentina era considerablemente menor que la prima de riesgo del Gobierno en ese mismo período*". Presentación Posterior a la Audiencia de la Demandante, ¶ 128, que cita *Sempra Energy c. Argentina* (**Anexo CLEX-106**), ¶ 433.

[677] Presentación Posterior a la Audiencia de la Demandante, ¶ 119.

[678] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 65, que hace referencia a *OI European c. Venezuela* (**CLA-156**), ¶¶ 772-773.

[679] Presentación Posterior a la Audiencia de la Demandante, ¶ 107, ¶ 116 y ¶ 130.

[680] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 131-134, que hace referencia al testimonio oral de su testigo Patrick Millot. Transcripción (Día 2), pág. 423, líneas 7-9, y pág. 433, líneas 17-20.

soberano de Venezuela, que constituye el fundamento del cálculo del Sr. Brailovsky y del Dr. Flores, se ve influenciado por su riesgo de entrar en estado de cesación de pagos y, por consiguiente, no refleja con exactitud el riesgo país de la inversión no especulativa a largo plazo de la Demandante en Venezuela[681]. [Traducción del Tribunal]

649. En opinión de la Demandante, el hecho particular de que Norpro Venezuela obtuviera más del 80 % de sus ingresos de las exportaciones realizadas la sometía a un riesgo país inferior al de la empresa venezolana promedio, que tiene que enfrentar la demanda de consumo estancada. La Demandante se refiere a una afirmación realizada por el Prof. Damodaran en virtud de la cual "[e]*l determinante más evidente de la exposición de una compañía al riesgo país es qué cantidad de los ingresos obtiene del país*"[682]. La Demandante también resalta que Norpro Venezuela no era una empresa de recursos naturales, sino una compañía productora "*dos pasos alejada de la industria petrolera*" y, por ende, no se veía afectada por las "*razones de riesgo político típicas*" que afectaban a las empresas petroleras[683]. En cuanto a los demás riesgos invocados por el Sr. Brailovsky y el Dr. Flores, la Demandante asevera que o no son aplicables a Norpro Venezuela o ya fueron tenidos en cuenta en la prima de riesgo país que el Prof. Spiller dedujo de la calificación de los bonos soberanos[684]. [Traducción del Tribunal]

### (ii)    Síntesis de la Postura de la Demandada

650. La Demandada afirma que la tasa de descuento calculada por el Prof. Spiller sería "*baja incluso para una empresa como Norpro Venezuela que opera en una economía madura*". [Traducción del Tribunal] La Demandada argumenta que el Prof. Spiller (i) se desvió de la tasa libre de riesgo sugerida por Ibbotson/Morningstar para proyectos a largo plazo, es decir, el retorno del bono del Tesoro de EE. UU. a 20 años a la fecha de valuación; (ii) se desvió de la prima general de riesgo de mercado (PRM) calculada por Ibbotson/Morningstar; e (iii) "*ignoró la evidencia empírica que establecía que el Modelo de Valoración de Activos Financieros (CAPM, por sus siglas en inglés) tiende a subestimar el costo de capital propio en el caso de los activos financieros*", el cual se corrige mediante el coeficiente *alfa*[685]. [Traducción del Tribunal]

651. En primer lugar, la Demandada argumenta que corresponde utilizar el bono del Tesoro de los EE. UU. a 20 años para definir la tasa libre de riesgo en el presente caso, dada la

---

[681] Réplica, ¶¶ 163-164.
[682] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 136-139, que cita **Anexo CLEX-108**.
[683] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 140-141.
[684] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 142-144.
[685] Memorial de Contestación, ¶¶ 234-236; Dúplica, ¶ 206. Para obtener una visión general de las diferencias con respecto al costo de capital propio de EE. UU., *véase*, asimismo, la tabla del Escrito Posterior a la Audiencia de la Demandada, posterior a ¶ 140.

naturaleza "*perpetua*" de los flujos de fondos sujetos a valuación[686]. En segundo lugar, la Demandada aduce que la visión del Prof. Damodaran respecto de la PRM adecuada a la que se refiere el Prof. Spiller "*fluctúa de año a año y a veces incluso dentro del mismo año, no se basa en un análisis de los datos empíricos subyacentes, y no se puede replicar*"[687] [Traducción del Tribunal]. Asimismo, la Demandada se refiere al tribunal en el caso *Tidewater c. Venezuela*, que determinó que una prima de riesgo de capital del 6,5 % era razonable en una valuación al mes de mayo de 2009[688]. En tercer lugar, la Demandada rechaza el argumento de la Demandante de que el coeficiente *alpha* sea una prima por tamaño y señala que si bien es "*más pronunciado en empresas pequeñas (por lo que atrae al rótulo de la* 'prima por tamaño'*),*" este coeficiente se aplica a empresas de todos los tamaños. En cualquier  caso, la Demandada aduce que en efecto Norpro Venezuela calificaría como una pequeña empresa en los EE. UU., y este es el motivo por el que el coeficiente *alpha* se debería agregar al costo de capital de los EE. UU.[689].

652. La Demandada asevera que estas diferencias redundan en que el cálculo del costo de capital en los EE. UU. del Prof. Spiller sea considerablemente menor que "*un rango de resultados independientes del SIC Code 1381, que utilicen el CAPM básico y sus variaciones*", que son muy similares al costo de capital estimado por los peritos de la Demandada y, de hecho, prácticamente iguales a la tasa de descuento total aplicada por el Prof. Spiller[690].

653. De acuerdo con la Demandada, la mayor diferencia entre los cálculos de los peritos versa, sin embargo, sobre la prima de riesgo país aplicable. La Demandada afirma que esta prima es "*mucho más alta*" que el 4,5 % aplicado por el Prof. Spiller, que de hecho no refleja el riesgo país de Venezuela sino más bien el riesgo de cesación de pago sobre los bonos empresariales de EE. UU.[691] [Traducción del Tribunal]. La Demandada se refiere a los

---

[686] Escrito Posterior a la Audiencia de la Demandada, ¶ 146.

[687] Escrito Posterior a la Audiencia de la Demandada, ¶ 141; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 118.

[688] Escrito Posterior a la Audiencia de la Demandada, ¶ 142, que cita *Tidewater c. Venezuela* (**RL-207**), ¶ 181.

[689] Escrito Posterior a la Audiencia de la Demandada, ¶ 145; Segundo Escrito Posterior a la Audiencia de la Demandada, nota 120.

[690] Memorial de Contestación, ¶ 237, que hace referencia a Brailovsky/Flores I, Tabla 10; Dúplica, ¶ 204 que hace referencia a Brailovsky/Flores II, Tabla 15 y ¶ 205; Escrito Posterior a la Audiencia de la Demandada, ¶ 147; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 32-35. En cuanto a las cifras presentadas por el Prof. Spiller durante la Audiencia, la Demandada asevera que su fuente es "irrelevante para la determinación de la tasa de descuento en el caso que nos ocupa", puesto que los cálculos internos de la Demandante datan de 2005 y las cifras redondas derivadas de dos informes de analistas indican que no fueron el resultado de cálculos detallados, sino sólo parte de una recomendación de "compra", y que se relacionan con el mercado de los instrumentos financieros, que es "completamente distinto" del mercado de los activos físicos. [Traducción del Tribunal] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 36.

[691] Memorial de Contestación, ¶ 240; Dúplica, ¶ 207 y ¶ 228. Según la Demandada. el Prof. Spiller debería al menos haber utilizado bonos empresariales de otros países emergentes con la misma calificación que Venezuela,

cálculos de sus peritos, el Sr. Brailovsky y el Dr. Flores, quienes principalmente se basaron en el Modelo de Calificación de Riesgo País (CRRM, por sus siglas en inglés) compilado por Ibbotson/Morningstar y realizaron una verificación cruzada de sus resultados mediante el "*bludgeon method*" diseñado por el Prof. Damodaran[692].

654. En respuesta a las críticas de la Demandante acerca del CRRM, la Demandada se refiere al Prof. Ibbotson, que afirmó que el CRRM tiene las siguientes ventajas sobre otros modelos del costo de capital: "*1. Amplitud de la cobertura; 2. Razonabilidad de los resultados; 3. Estabilidad de los resultados*"[693]. Asimismo, la Demandada se refiere a sus peritos, que demuestran que los resultados que ha producido el CRRM para Venezuela durante los últimos 20 años son estables y están en línea con la metodología del Prof. Damodaran[694]. [Traducción del Tribunal]

655. En cuanto a las críticas de la Demandada acerca del diferencial EMBI del que los peritos de la Demandada solían derivar el retorno sobre la deuda soberana de Venezuela sobre el retorno de los bonos del Tesoro de los EE. UU., la Demandada reconoce que el diferencial es, en efecto, "*muy alto*", pero argumenta que de ningún modo es comparable a una situación de cesación de pagos real como la que experimentó la Argentina desde el año 2001 hasta el año 2003, cuando el EMBI subió al 50 % y más[695].

656. Por el contrario, la Demandada aduce que la prima del 4,5 % aplicada por el Prof. Spiller no refleja la metodología del Prof. Damodaran, porque la hoja de cálculo interactiva del Prof. Damodaran demuestra que su "*mejor cálculo*" se basa en realidad en el "*bludgeon method*", incluida la aplicación del multiplicador del 1,5, y por ende está en línea con el cálculo de los peritos de la Demandada[696]. De acuerdo con la Demandada, el Prof. Damodaran establece en sus escritos "*una jerarquía de métodos para derivar el margen de cesación de pagos de un país*" y afirma que si un país tiene bonos en USD, el diferencial de cesación de pagos debería derivarse analizando el retorno de aquellos bonos sobre el bono libre de riesgo en la misma moneda o el diferencial en el mercado CDS. La Demandada también sostiene que el Prof. Damodaran sugiere el enfoque alternativo sobre la base de bonos empresariales de EE. UU. con una calificación comparable ("*diferencial*

---

lo cual hubiese resultado en un diferencial de aproximadamente el 9 %. Dúplica, ¶ 221; Escrito Posterior a la Audiencia de la Demandada, ¶ 169.

[692] La Demandada sostiene que sus peritos utilizaron la misma metodología para determinar la tasa de descuento adecuada para ambas fechas de valuación. Memorial de Contestación, ¶ 259.

[693] Dúplica, ¶ 212 que cita a Ibbotson/Morningstart, *SBBI 2013 Valuation Yearbook* (**Anexo BF-44**), págs. 136-137.

[694] Dúplica, ¶ 213 que hace referencia a Brailovsky/Flores, Figura 19.

[695] Dúplica, ¶¶ 216-217 que hace referencia a Brailovsky/Flores, Figura 20.

[696] Memorial de Contestación, ¶¶ 243-244 que hace referencia a la hoja de cálculo del mes de junio de 2013 (**Apéndice BF-65**); Dúplica, ¶ 210 que hace referencia a Brailovsky/Flores II, Tabla 10 y a la hoja de cálculo del mes de enero de 2014 (**Apéndice BF-66**).

*sintético*") solo *"como último recurso"* en el caso de que el país en cuestión – a diferencia de Venezuela – no tuviera bonos en USD[697]. [Traducción del Tribunal]

657.   La Demandada aduce que el método preferido por el Prof. Damodaran es una *"primera elección evidente"* porque "*los datos específicos del país en cuestión son sin dudas un mejor indicador [de la percepción del mercado] del riesgo que un indicador sintético*". Según la Demandada, tanto el diferencial EMBI de Venezuela y su diferencial en el mercado CDS habrían arrojado un diferencial de cesación de pagos de aproximadamente el 10 %, que se convertiría en una prima de riesgo de capital de aproximadamente el 15 %. De acuerdo con la Demandada, lo mismo se aplica al segundo método propuesto por el Prof. Damodaran, es decir, el "*Diferencial promedio (Normalizado) de los bonos*", puesto que el diferencial promedio sobre los bonos soberanos venezolanos a lo largo del ciclo de vida de EMBI desde el año 1993 fue del 10 %[698]. [Traducción del Tribunal]

658.   La Demandada rechaza también la alegación de que Norpro Venezuela fuera inmune a la mayoría de los factores de riesgo reflejados en la prima de riesgo país, y aduce que ninguno de los argumentos planteados por la Demandante influye considerablemente sobre la exposición al riesgo de Norpro Venezuela. En lo que concierne al argumento del exportador, la Demandada se refiere a la declaración de sus peritos de que "*[e]l riesgo país es un concepto mucho más amplio que la exposición a la demanda interna, que incluye a los impuestos, las regulaciones y las acciones del gobierno en la economía, en particular en el sector de los hidrocarburos*" y agrega "*el efecto desproporcionado de los fenómenos naturales como las tormentas, las inundaciones y las sequías*"[699]. La Demandada señala también que los invocados contratos a largo plazo vencen en el año 2016 (gas y electricidad) y el año 2018 (bauxita) sin derechos automáticos de renovación o un precio garantizado en caso de renovación y, en todo caso, no protegerían a Norpro Venezuela de una interrupción en el suministro. Por último, la Demandada alega que la existencia del TBI Francia-Venezuela "*no tiene un impacto discernible sobre la evaluación del riesgo país*", como lo confirman los aseguradores del riesgo político[700]. [Traducción del Tribunal]

---

[697] Memorial de Contestación, ¶ 246; Dúplica, ¶ 208 que hace referencia a *Aswath Damodaran. Equity Risk Premiums (ERP): Determinants, Estimation and Implications – The 2013 Edition,* actualizada: marzo de 2013 (**Apéndice BF-64**), págs. 53, 55; Escrito Posterior a la Audiencia de la Demandada, ¶ 168; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 45-47.

[698] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 164, -166; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 47.

[699] Dúplica, ¶¶ 226, donde se cita Brailovsky/Flores, ¶ 201; Escrito Posterior a la Audiencia de la Demandada, ¶ 175.

[700] Dúplica, ¶ 226 que hace referencia a Brailovsky/Flores, Figura 23 y **Apéndice BF-166;** Escrito Posterior a la Audiencia de la Demandada, ¶¶ 177-179.

659. En la opinión de la Demandada, no hay factores específicos relacionados a Norpro Venezuela que pudieran reducir su exposición al riesgo país en comparación con la empresa venezolana promedio, pero, "*en todo caso, los factores relacionados con Norpro Venezuela la aumentarían*". La Demandada se refiere a la posibilidad de los controles de cambio sobre la exportación de materia prima y a la declaración del Prof. Damodaran de que "[u]*na empresa se puede exponer al riesgo país, incluso si no deriva ganancias de ese país, si sus instalaciones de producción se encuentran en ese país*"[701]. La Demandada cita el testimonio oral del Sr. Brailovsky, que declaró que "*los proyectos de recursos naturales, en particular los petrolíferos o relacionados con el petróleo, conllevan un riesgo país mayor al de la empresa promedio*", y citó como ejemplo la suspensión del suministro de bauxita combinada con las restricciones a la importación[702]. [Traducción del Tribunal]

660. Si bien reconoce que la valuación debe excluir el impacto de la expropiación real de la planta, la Demandada afirma que ello "*no debería confundirse con el riesgo de expropiación inherente a cualquier proyecto desde su mismo inicio*", que es parte de la "*situación económica normal imperante*" con anticipación al anuncio de expropiación de la planta y, por ende, también es un riesgo que un comprador interesado tendría en cuenta en la evaluación del precio de compra que estaría dispuesto a pagar por la planta[703]. [Traducción del Tribunal]

661. La Demandada subraya que el Artículo 5(1) del Tratado exige que la indemnización sea equivalente al "*valor real*", es decir, el valor justo de mercado, de la planta, que tiene en cuenta "*todos los riesgos generalizados asociados con una inversión en Venezuela*", incluido "*el riesgo de que una vez que se complete la adquisición, Venezuela pueda expropiar y no indemnizar en absoluto o indemnizar solo en una cantidad y forma que el comprador considere injustas*"[704]. [Traducción del Tribunal]

662. Contrario a lo que la Demandante pareció sugerir durante la Audiencia, la Demandada considera que la determinación del valor justo de mercado no se modifica dependiendo de que la expropiación sea lícita o ilícita. Según la Demandada, el comprador interesado sería indiferente a la legalidad o ilegalidad de la expropiación, porque la expropiación en

---

[701] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 172-175 que cita *Aswath Damodaran, Measuring Company Exposure to Country Risk: Theory ad Practice*, septiembre de 2003 (**Apéndice BF-55**), pág. 18.
[702] Escrito Posterior a la Audiencia de la Demandada, ¶ 176, que cita la Transcripción (Día 4), pág. 1142.
[703] Dúplica, ¶ 227.
[704] Escrito Posterior a la Audiencia de la Demandada, ¶ 148. En la opinión de la Demandada, la postura de la Demandante acerca del riesgo de la "*expropiación sin compensación*" sigue careciendo de claridad, porque podría incluir todos los casos en los que la obligación de compensación o la suma por pagar estén controvertidos, es decir, todos los casos sujetos a litigios conforme a los tratados bilaterales de inversión; o se podría limitar a los casos en que el Estado se niegue a reconocer su obligación de pagar una compensación y a participar en la determinación de la suma exigible, que no es el caso del presente. Escrito Posterior a la Audiencia de la Demandada, ¶ 149.

particular se debe excluir de la consideración del comprador. La Demandada agrega que el comprador, sin embargo, tendría en cuenta los riesgos subyacentes, incluido el riesgo de expropiación sin compensación que el comprador considere adecuada[705].

663.  La Demandada se refiere a la conclusión del tribunal en el marco del caso *Tidewater c. Venezuela* de que el perito de la demandante, que planteó los mismos argumentos que en el caso que nos ocupa, *"combina dos elementos separados en un reclamo jurídico de este tipo"*, es decir, la cuestión de la responsabilidad y la cuestión económica del valor que el mercado atribuiría a la inversión objeto de debate. Luego, el tribunal se refirió a  las *Directrices del Banco Mundial*, que *"invitan a considerar, específicamente,* 'el riesgo asociado con este flujo de caja en circunstancias realistas"[706]. La Demandada también invoca la siguiente afirmación del tribunal:

> *"No se trata de una cuestión de permitir que un Estado demandado se aproveche de su propio acto ilícito. Por el contrario, los daños que el Tribunal tiene la facultad de otorgar en virtud del Tratado están diseñados para garantizar que el inversionista privado sea compensado por la pérdida de su inversión. No obstante, al momento de determinar el monto de dicha compensación por vía de referencia a un análisis de los flujos de caja descontados, el Tribunal debería considerar el valor que un comprador dispuesto a comprar le habría atribuido a la inversión. Al momento de determinar este valor, uno de los elementos que un comprador tendría en cuenta es el riesgo asociado a la inversión en un país en particular. Un factor semejante no es propio de la medida del Estado en particular que da lugar al reclamo. [...] En cambio, la prima de riesgo país cuantifica los riesgos generales, incluidos los riesgos políticos, de hacer negocios en el país en cuestión, tal como se aplicaban en dicha fecha y tal como podría razonablemente haberse esperado que afectaran las perspectivas y, por ende, el valor"[707].*

664.  La Demandada arguye que la prima de riesgo país debe basarse en la percepción de riesgo del comprador; la eliminación de riesgos inherentes a una inversión en Venezuela resultaría en *"el uso de una tasa de descuento que un comprador interesado no estaría dispuesto a aplicar y derivaría en un valor que el comprador interesado no abonaría,*

---

[705] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 150-152.

[706] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 153-155, que cita *Tidewater c. Venezuela* (**RL-207**), ¶¶ 184-185. La Demandada señala que en ese caso el tribunal entendió que la falta del pago de una compensación no tornaba a la expropiación ilícita.

[707] *Tidewater c. Venezuela* (**RL-207**), ¶ 186. La Demandada sostiene que luego el tribunal en Tidewater adoptó el enfoque del Dr. Flores y el Sr. Brailovsky, que también se desempeñaron como peritos para Venezuela en ese caso y utilizaron el mismo enfoque que en el presente, es decir, el CRRM comparado con el *bludgeon method* del Prof. Damodaran; y así concluye que una prima de riesgo país del 14,75 % fue una *"prima razonable, en efecto, conservadora"* [Traducción del Tribunal]. Escrito Posterior a la Audiencia de la Demandada, ¶ 156, que cita *Tidewater c. Venezuela* (**RL-207**), ¶ 190.

*concediendo así a la Demandante un golpe de suerte que nunca podría lograr en una transacción en condiciones de libre competencia".* Según la Demandada, ello podría ser punitivo para Venezuela y, por consiguiente, *"no permisible en virtud de ninguna teoría sobre indemnización del derecho internacional"*[708]. [Traducción del Tribunal]

665.   En cuanto al énfasis de la Demandante durante la Audiencia sobre la tasa de descuento del 15 % reflejada en su DAC de fecha 23 de octubre de 2006 , la Demandada observa que el significado y el objetivo de dicha tasa continúan siendo poco claros y también sostiene que, en ese momento, el riesgo de cesación de pagos de Venezuela se encontraba *"en uno de los puntos más bajos de todos los tiempos"*, con el retorno de sus bonos soberanos tan sólo un 2,18 % más alto que los bonos del Tesoro de EE.UU. La Demandada afirma que, en ese punto, la prima de riesgo país del 3 % podría haberse justificado. Lo que es más importante, sin embargo, es que la Demandada enfatiza que la Demandante tomó en cuenta el riesgo de cesación de pagos de Venezuela al evaluar el riesgo país, tal como lo haría un comprador en su evaluación de una tasa de descuento adecuada para determinar el valor justo de mercado de la planta. Según la Demandada, no existen entonces razones para excluir dicho riesgo cuando éste se incrementó con el transcurso del tiempo[709].

666.   La Demandada sostiene que *"no hay manera de aislar y, por lo tanto, cuantificar "* el riesgo de una expropiación sin compensación. De acuerdo con la Demandada, el Prof. Spiller no propuso ningún método en sus dictámenes periciales para llevarlo a cabo, sino que sólo argumentó durante la Audiencia que podría aplicarse la diferencia entre el diferencial EMBI correspondiente a Venezuela y el valor de prima de riesgo país del 4,5 % calculado por él. La Demandada asume la posición de que el argumento del Prof. Spiller se basa en una comprensión equivocada de la jerarquía de los métodos del Prof. Damodaran, y arguye que el *"riesgo país está compuesto de elementos que están mutuamente interrelacionados y que influyen unos sobre otros, y que por ende no se pueden separar"*[710]. [Traducción del Tribunal]

667.   En respuesta a la alegación de la Demandante de que el diferencial soberano de Venezuela era demasiado amplio porque declaró abiertamente que no cumpliría con sus obligaciones internacionales, la Demandada señala que la Demandante no puede invocar pruebas de aquellas *"afirmaciones increíbles"*  y afirma que *"Venezuela no ha incumplido ninguna*

---

[708] Escrito Posterior a la Audiencia de la Demandada, ¶ 157.

[709] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 158-162. Asimismo, la Demandada observa que el mismo documento refleja que la Demandante estaba dispuesta a invertir en Venezuela a una tasa interna de retorno del 26,4 %. Por ende, la Demandada arguye que, sin dejar de ser un 3 % más alta que la tasa de descuento del Prof. Spiller, la tasa de descuento del 15 % no es relevante en este caso. Segundo Escrito Posterior a la Audiencia de la Demandada, nota 132.

[710] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 163-164, 171.

*de sus obligaciones de deuda soberana, y Venezuela ha pagado la indemnización en sus casos de expropiación*"[711]. [Traducción del Tribunal]

668. Asimismo, la Demandada rechaza el argumento de la Demandante de que el Prof. Spiller tomó en cuenta los riesgos específicos del país excepto el riesgo de expropiación sin compensación, y aduce que solo aplicó el supuesto de que a cualquier país con una calificación B1 se le podría asignar un diferencial de retorno del 4,5 %, sin realizar ningún análisis de que esto en verdad reflejara el diferencial promedio de los bonos soberanos de otros países con la misma calificación[712]. En particular, la Demandada destaca que el Prof. Spiller no evaluó el retorno sobre los países en vías de desarrollo con la misma calificación a la que se refiere la Demandante, sino que sencillamente aceptó el diferencial del Prof. Damodaran del 4,5 % aplicado a todos los países con calificación B1 sobre la base del supuesto de que sus calificaciones soberanas son comparables a las calificaciones empresariales de EE. UU. Según la Demandada, sin embargo, los retornos de aquellos 15 países, según el CRRM, eran en efecto cercanos al 15 %, al igual que en el caso de Venezuela[713].

### (iii)  El Análisis del Tribunal

669. En primer lugar, el Tribunal subraya que las Partes y sus peritos coinciden en que la tasa de descuento se deriva (i) determinando el costo del capital de una planta de *proppants* en los EE. UU. con el Modelo de Fijación de Precios de Activos de Capital (CAPM, por sus siglas en inglés), que consiste de la tasa libre de riesgo más la prima de riesgo de mercado; (ii) sumando la prima de riesgo país de Venezuela; y (iii) tomando en cuenta la relación entre deuda y capital del costo de capital[714].

670. Por consiguiente, el Tribunal seguirá esta estructura en el presente análisis y en un primer paso determinará el costo del capital para una empresa que se dedique al mismo negocio que Norpro Venezuela en los EE. UU., evaluando la tasa libre de riesgo en los EE. UU. (**(1)**); y la prima de riesgo de mercado en los EE. UU., que consiste de una prima de riesgo de mercado general, un coeficiente *beta* y, posiblemente, un coeficiente *alpha* (**(2)**). En un segundo paso, el Tribunal determinará la prima de riesgo país aplicable para ajustar por el hecho de que la planta no se encuentra en los EE. UU., sino en Venezuela (**(3)**). Por último, el Tribunal convertirá la prima de riesgo de capital así derivada en la tasa de

---

[711] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 39-42.
[712] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 43-44.
[713] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 48-51.
[714] Spiller I, Anexo C; Spiller II, ¶ 31 y ¶ 139; Memorial de Contestación, ¶ 235 que hace referencia a Brailovsky/Flores I, ¶¶ 179-180; Brailovsky/Flores II, ¶¶ 154-155.

descuento del promedio ponderado del costo de capital (WACC, por sus siglas en inglés) sobre la base de la relación de deuda a capital de Norpro Venezuela (**(4)**).

### (1)    Tasa Libre de Riesgo en los EE. UU.

671.    El primer elemento del costo de capital para una empresa que opere en los EE. UU. es la tasa libre de riesgo. El perito de la Demandante, el Prof. Spiller, utilizó el retorno promedio sobre la tasa de los bonos del Tesoro de los EE. UU. a 10 años durante el período de 12 meses anterior a la fecha de valuación, que ascendió al 3,6 % al día 15 de mayo de 2010[715]. Los peritos de la Demandada, el Sr. Brailovsky y el Dr. Flores se basaron en la tasa de los bonos del Tesoro de los EE. UU. a 20 años vigente a la fecha de valuación, es decir, al día 15 de mayo de 2010, que ascendió al 4,1 %[716]. Los peritos coinciden, entonces, respecto del uso de los bonos del Tesoro de los EE. UU.; pero difieren en cuanto al vencimiento adecuado y el tiempo o el plazo durante el cual se debe considerar el retorno.

672.    El Prof. Spiller explicó su decisión afirmando que el bono a 10 años es más líquido y menos sensible a los cambios inesperados en la inflación que los bonos con un vencimiento a mayor plazo, de modo que evitan "*un sesgo ascendente no basado en el riesgo*" en relación con el costo de capital. Agregó también que los eruditos y profesionales recomiendan el uso del bono a 10 años al efecto de la valuación a largo plazo, "*fundamental, pero no exclusivamente, por la coincidencia de la duración*". Asimismo, el Prof. Spiller afirmó que utilizó el promedio del retorno de 12 meses porque corrige la volatilidad resultante de las fluctuaciones a corto plazo y, por ende, es más estable y fiable que el retorno en efectivo a la fecha de valuación[717]. [Traducción del Tribunal]

673.    El Sr. Brailovsky y el Dr. Flores afirmaron que Ibbotson/Morningstar recomiendan utilizar el bono a 20 años a la fecha de valuación para los proyectos a largo plazo, que por ende corresponde para la valuación FFD de los flujos de fondos que continúan en perpetuidad. Respecto de la elección del retorno a la fecha de valuación, explican que acredita la noción del valor justo de mercado, que exige una valuación "*inmediatamente anterior al momento en que ocurrió la expropiación*" [Traducción del Tribunal], y el hecho de que una transacción real no se puede basar en un promedio de 365 días[718].

---

[715] Spiller I, ¶ 156; Spiller II, ¶ 148.

[716] Brailovsky/Flores I, ¶ 184; Brailovsky/Flores II, ¶ 221.

[717] Spiller I, ¶ 156; Spiller II, ¶¶ 149-151 que hace referencia a los **Anexos Documentales CLEX-180, CLEX-181** y **CLEX-17**.

[718] Brailovsky/Flores I, ¶¶ 184-185 que hace referencia al **Apéndice BF-42**, pág. 5, y que cita las *World Bank Guidelines* (**Apéndice BF-43**), Capítulo 4, ¶ 3.

674. El Tribunal observa que en su segundo dictamen, el Sr. Brailovsky y el Dr. Flores no respondieron a la afirmación del Prof. Spiller de que el bono a 10 años es la medida más comúnmente recomendada de la tasa libre de riesgo, en particular debido a la coincidencia de la duración. Si bien el Tribunal está al tanto del argumento de la Demandada de que el bono a 20 años refleja la duración porque la valuación presente supone que los flujos de fondos se generarán a perpetuidad[719], vale aclarar que este suele ser el caso de las valuaciones del FFD, por lo que no se justifica un desvío de una medida comúnmente recomendada. Además, la Demandante señala acertadamente que la mayor parte del flujo de fondos futuros esperados para Norpro Venezuela se habría generado en los próximos diez años, y por ende, dentro de la duración del bono a 10 años[720].

675. Asimismo, el Tribunal concuerda con el Prof. Spiller en que el uso del retorno en efectivo a cierta fecha es menos fiable que el promedio de los 12 meses, porque podría reflejar fluctuaciones a corto plazo o incluso diarias. El Tribunal no está convencido del argumento de que la recomendación de las *Directrices del Banco Mundial* de determinar el valor justo de mercado "*inmediatamente*" antes de la expropiación torne necesario considerar solo el retorno en efectivo a la fecha de valuación. Si bien el objeto de esta valuación es, por supuesto, determinar el precio de compra que un comprador interesado habría pagado en esa fecha, el Tribunal considera dudoso que un comprador interesado basara su evaluación de la tasa libre de riesgo solo en datos de esa fecha, puesto que el comprador estaría interesado en obtener un resultado fiable para su inversión a largo plazo.

676. En consecuencia, el Tribunal sigue el enfoque del Prof. Spiller para determinar la tasa libre de riesgo sobre la base del promedio de 12 años de la tasa de los bonos del Tesoro de los EE. UU. a 10 años, que resulta en una tasa libre de riesgo del 3,6 % al día 15 de mayo de 2010.

### (2)    Prima de Riesgo de Mercado en los EE. UU.

677. El segundo elemento que se debe determinar para el costo del capital en los EE. UU. es la prima de riesgo del mercado, que consiste de una prima de riesgo de mercado general multiplicada por un coeficiente *beta* específico para la industria. Las Partes y sus peritos no concuerdan acerca de si esta prima se debería luego aumentar por un coeficiente *alpha* adicional.

---

[719] Escrito Posterior a la Audiencia de la Demandada, ¶ 146.
[720] *Cf.* Réplica, ¶ 166.

**Prima de Riesgo de Mercado General**

678. Respecto de la prima de riesgo de mercado general, el Prof. Spiller se basó en la recomendación de un erudito destacado en el campo, el Prof. Damodaran, para aplicar una prima del 4,5 % para el año 2010[721]. El Sr. Brailovsky y el Dr. Flores se basaron en el uso de Ibbotson/Morningstar de la media aritmética de las primas de riesgo del mercado históricas desde el año 1926, que resultó en una prima de riesgo de mercado general del 6,7 % al día 15 de mayo de 2010[722].

679. Mientras reconoce que la prima de riesgo de mercado "*se suele estimar a partir de los datos históricos del mayor período histórico disponible*", el Prof. Spiller explicó que la crisis financiera de los años 2008-2009 tiende a distorsionar los resultados de este método a la luz de los grandes resultados negativos sufridos durante este período, que hicieron caer el promedio histórico. Es por ello que el Prof. Damodaran suspendió su práctica de utilizar los retornos históricos y la reemplazó con la recomendación descrita *supra*[723]. El Prof. Spiller se refirió también a diversos eruditos que asumieron la postura de que el factor de descuento de los proyectos a largo plazo se debería determinar utilizando la media geométrica, más que la media aritmética aplicada por los peritos de la Demandada[724]. Por último, señaló que la prima de riesgo del mercado derivada por los peritos de la Demandada no tiene el respaldo de las investigaciones recientes, que arrojaron resultados mucho menores. Por ejemplo, un estudio realizado por Dimson y otros en el año 2011 resultó en una prima de riesgo de mercado mundial del 3-3,5 % sobre la base de la media geométrica y del 4-4,5 % sobre la base de la media aritmética[725].

680. El Sr. Brailovsky y el Dr. Flores afirmaron que utilizaron el promedio histórico para "*reducir tanto como fuera posible la variabilidad de la media del estimati*vo", mientras que el Prof. Spiller simplemente invocó la opinión del Prof. Damodaran. Asimismo, señalaron que para los EE. UU. Dimson y otros estimaron, en efecto, una prima de riesgo de mercado aritmética del 6,4-7,2 % para el año 2011, que está en línea con su cálculo para el año 2010[726]. Por último, establecieron que los eruditos a los que se refirió el Prof.

---

[721] Spiller I, ¶¶ 157-158; Spiller II, ¶ 152.

[722] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221.

[723] Spiller I, ¶ 157 que hace referencia a los **Anexos CLEX-71** y **CLEX-72**; Spiller II, ¶ 152 en referencia al **Anexo CLEX-72**.

[724] Spiller II, ¶¶ 153-156, que cita los **Anexos CLEX-184**, **CLEX-181**, **CLEX-185** y **CLEX-72**.

[725] Spiller II, ¶ 157-158 que hace referencia al **Anexo CLEX-186**. Las otras referencias del Prof. Spiller se relacionan con las primas de riesgo de mercado del año 2014, que oscilan entre el 4,14-6,18 %. *Cf.* Spiller II, ¶¶ 158-161 y Tabla 15.

[726] Brailovsky/Flores I, ¶ 186; Brailovsky/Flores II, ¶ 221 que hace referencia al **Apéndice BF-170**, pág. 169.

Spiller no suelen favorecer la media geométrica sobre la media aritmética, y se refirieron a otros académicos que prefieren la media aritmética[727].

681.  El Tribunal señala que el Prof. Spiller en principio reconoció el enfoque utilizado por el Sr. Brailovsky y el Dr. Flores como un método conocido y comúnmente utilizado para determinar la prima de riesgo de mercado. Si bien el Tribunal está, por supuesto, al tanto de que la crisis financiera de los años 2008-2009 tuvo un impacto grave sobre el mercado de valores de los EE. UU., no está satisfecho con el argumento del Prof. Spiller de que los retornos en disminución del mercado de valores necesariamente eliminen la fiabilidad del promedio histórico. En particular, el Tribunal subraya que, si bien los retornos en disminución pueden en efecto haber llevado a la sugerencia de que los inversores estaban interesados en invertir a menores retornos y, por ende, a menores primas de riesgo; esto no explica por qué la prima de riesgo derivada por los peritos de la Demandada a partir del promedio histórico es mayor a la recomendación del Prof. Damodaran.

682.  Además, el Tribunal considera que los datos de los desarrollos del mercado comprobados a lo largo de un período de más de 80 años son más fiables que la recomendación de un erudito. Si bien no caben dudas de que el Prof. Damodaran es una autoridad destacada en este respecto, esto no eleva su recomendación por sobre la necesidad de pruebas que den sustento a la elección del Prof. Spiller. En el documento invocado por el Prof. Spiller, el Prof. Damodaran solo establece que "[c]*omo las primas de riesgo disminuyeron en el año 2009, volví a utilizar la prima de riesgo del capital del 4,5 % para los mercados maduros en el año 2010*"[728] [Traducción del Tribunal]. En la opinión del Tribunal, este enunciado no puede considerarse suficiente para justificar un desvío respecto de un método establecido.

683.  Si bien el Prof. Spiller se refirió a fuentes adicionales en su segundo dictamen, solo un documento, el estudio de Dimson y otros del año 2011, puede proporcionar información pertinente para la fecha de valuación del 15 de mayo de 2010. En este respecto, el Sr. Brailovsky y el Dr. Flores señalan acertadamente, sin embargo, que las cifras presentadas por el Prof. Spiller (3-3,5 % a partir de la media geométrica; 4-4,5 % a partir de la media aritmética) no se relacionan con el mercado de los EE. UU., sino con un análisis global de distintos mercados[729]. También señalaron otro documento distinto confeccionado por los mismos académicos en el mismo año, que informa cifras mayores para el mercado estadounidense (4,4-5,3 % a partir de la media geométrica; 6,4-7,2 % a partir de la media

---

[727] Brailovsky/Flores II, ¶ 221 que hace referencia a los **Apéndices BF-171**, pág. 156, **BF-172**, pág. 56 y **BF-173**, pág. 159.
[728] **Anexo CLEX-72**, pág. 77.
[729] **Anexo CLEX-186**.

aritmética)[730]. Por ende, el Tribunal no tiene pruebas ante sí que sustenten el estimativo del Prof. Damodaran para el año 2010.

684. En lo que concierne a la diferencia entre las Partes acerca del uso adecuado de la media geométrica en lugar de la media aritmética de cierto método, el Tribunal entiende que se trata de una cuestión controvertida entre los eruditos. El Tribunal subraya que no se le ha presentado la media geométrica de las primas históricas para la fecha de valuación del 15 de mayo de 2010. No obstante, el informe de Ibbotson/Morningstar invocado por los peritos de la Demandada como fuente para su prima del 6,7 % proporciona diversas primas para los horizontes a corto, mediano y largo plazo; y el 6,7 % es la prima para el horizonte a largo plazo. A la luz del hecho de que los peritos de ambas Partes utilizan datos de Ibbotson/Morningstar en relación con diversos aspectos de sus cálculos, el Tribunal no tiene motivos para considerar que la elección de Ibbotson/Morningstar de derivar la prima de riesgo del capital sobre la base de la media aritmética carezca de justificación.

685. En consecuencia, el Tribunal sigue el enfoque del Sr. Brailovsky y el Dr. Flores para derivar la prima de riesgo del mercado general para los EE. UU. a partir de la media aritmética de las primas históricas desde el año 1926, que resulta en una prima del 6,7 % para la valuación al día 15 de mayo de 2010.

## Coeficiente *Beta* específico para la industria

686. Las Partes y sus peritos coinciden en que la prima de riesgo de mercado general se debe multiplicar por un componente específico para la industria, es decir, el coeficiente *beta*. Coinciden también en que el *beta* bruto adecuado para Norpro Venezuela se debe derivar de *SIC Code 1381 Drilling Oil and Gas Wells,* como lo calculan Ibbotson/Morningstar[731]. Los peritos de las Partes también usan el mismo método para ajustar y apalancar el *beta* bruto a fin de obtener el *beta* final para utilizarlo a los efectos del presente[732].

687. El Tribunal observa que existe una diferencia entre los peritos de las Partes en cuanto al *beta* bruto en particular que eligieron de los datos de Ibbotson/Morningstar. Mientras que el Prof. Spiller utilizó el promedio de 5 años de la empresa compuesta[733], el Sr. Brailovsky y el Dr. Flores tomaron la mediana del *beta* bruto[734]. Sin embargo, el Tribunal no debe expresarse acerca de esta cuestión, porque tanto la mediana del *beta* bruto como el

---

[730] **Apéndice BF-170.**
[731] Memorial de Contestación, ¶ 236; Spiller I, ¶ 161; Brailovsky/Flores I, nota 318 y ¶ 190.
[732] Spiller I, ¶¶ 162-164; Brailovsky/Flores I, ¶ 191.
[733] Spiller II, ¶¶ 146-147.
[734] Brailovsky/Flores I, ¶ 190.

compuesto, informados por Ibbotson/Morningstar para marzo de 2010, ascienden a 1,3, lo que resulta en un *beta* apalancado y ajustado de 1,2[735].

688.  Por ello, para su valuación de Norpro Venezuela al día 15 de mayo de 2010, el Tribunal multiplicará la prima de riesgo de mercado general por un factor específico para la industria de 1,2.

### Coeficiente *Alpha*

689.  Por último, el Tribunal debe analizar si la prima de riesgo de mercado específica de la industria debe aumentarse por un coeficiente *alpha* adicional, como arguye la Demandada.

690.  El Sr. Brailovsky y el Dr. Flores explican que el CAPM tiende a subestimar el costo del capital de los activos financieros y, por ende, debe ajustarse para capturar el desempeño real de las acciones de las empresas que cotizan en bolsa, es decir, con el coeficiente *alpha*. A pesar de su opinión de que Norpro Venezuela califica como una empresa pequeña dentro de la industria capturada en *SIC Code 1381,* el Sr. Brailovsky y el Dr. Flores enfatizaron que utilizaron el *alpha* para la empresa mediana, como lo informaron Ibbotson/Morningstar para el mes de marzo de 2010, es decir, el 1,3%[736]. Explicaron que el *alpha* contabiliza las "*volatilidades sistémicas de empresas grandes y pequeñas*", y señalaron que, a pesar de que "*muchos profesionales, incluido el Prof. Spiller, olvidan esta conclusión*", los prestadores de servicios financieros como Bloomberg informan el *alpha* en forma rutinaria[737]. Si bien reconocen que el *alpha* es mayor en las empresas más pequeñas, por lo que también se la conoce como la "*prima por tamaño*", como la llaman por ej., Ibbotson/Morningstar, afirmaron que las empresas grandes también pueden tener un *alpha* considerable, por lo que se debe agregar a la prima de riesgo de mercado[738]. [Traducción del Tribunal]

691.  El Prof. Spiller consideró que no correspondía agregar una "*prima por tamaño*" a la prima de riesgo de mercado, y señaló que es un punto sobre el que disienten los profesionales y los académicos,  incluido el Prof. Damodaran. Con referencia a varios eruditos, afirmó también que se ha determinado que el *alpha* es "*empíricamente poco fiable entre distintas regiones y períodos*" y que se entiende que refleja los factores de riesgo de mercado subyacentes, más que el efecto inherente del tamaño[739]. Asimismo, el Prof. Spiller tomó

---

[735] Spiller II, ¶ 147; Brailovsky/Flores II, Tabla 8; Ibbotson/Morningstar, *Statistics for SIC Code 1381, Drilling Oil and Gas Wells,* 31 de marzo de 2010 (**Apéndice  BF-37**).

[736] Brailovsky/Flores I, ¶¶ 192-193; Brailovsky/Flores II, ¶¶ 206-207; Ibbotson/Morningstar. *Statistics for SIC Code 1381, Drilliing Oil and Gas Wells,* 31 de marzo de 2010 (**Apéndice BF-37**).

[737] Brailovsky/Flores II, ¶¶ 209-213.

[738] Brailovsky/Flores I, ¶ 192; Brailovsky/Flores II, ¶ 214.

[739] Spiller II, ¶¶ 48-49 que hace referencia a los **Anexos Documentales CLEX-113** a **CLEX-119**.

la postura de que la adición de una "*prima por tamaño*" podría duplicar el riesgo país, porque las firmas venezolanas son más pequeñas que las estadounidenses, y Norpro Venezuela no puede describirse como una firma pequeña, o siquiera mediana, dentro de Venezuela[740]. [Traducción del Tribunal]

692. El Tribunal señala que se deben distinguir dos cuestiones en lo que concierne al coeficiente *alpha*: (i) si refleja en general un fenómeno establecido que debe tenerse en cuenta dentro del costo del capital; y (ii) si en este caso en particular duplicaría el riesgo país, que se determinará en la siguiente sección.

693. Respecto del segundo argumento, el Tribunal no está convencido de que el coeficiente *alpha* equivalga a una prima por tamaño para las empresas más pequeñas, lo que equivaldría a duplicar el hecho de que las empresas en Venezuela suelen ser más pequeñas que en los EE. UU. Si bien los datos de Ibbotson/Morningstar parecen sugerir y los peritos de la Demandada reconocen que el *alpha* es mayor para las empresas más pequeñas que para las más grandes, el Prof. Spiller también reconoció que el *alpha* no captura un efecto de tamaño inherente, sino los factores de riesgo de mercado subyacentes. Es posible que estos factores sean más pronunciados para las empresas más pequeñas, pero existen también para las empresas más grandes. Contrario a lo que la Demandante parece sugerir, el Sr. Brailovsky y el Dr. Flores no aplicaron el *alpha* para el compuesto pequeño, sino que optaron por la mediana. En la opinión del Tribunal, la Demandante no ha logrado establecer que la aplicación de la mediana del *alpha* duplicaría el riesgo país para Norpro Venezuela.

694. Sin embargo, el Tribunal está al tanto de las críticas generales del Prof. Spiller en relación con el *alpha*, respaldadas por diversas referencias a académicos y profesionales. El Tribunal señala también que el Sr. Brailovsky y el Dr. Flores reconocieron incluso que "*muchos profesionales* […] *olvidan*" aplicar el coeficiente *alpha* a la prima de riesgo de mercado. Por consiguiente, parece estar fuera de discusión que el *alpha* no se puede considerar un elemento bien establecido de la determinación de la prima de riesgo de mercado. Por ello, en consideración de las pruebas presentadas, el Tribunal no está convencido de que el coeficiente *alpha* debiera sumarse a la tasa del costo de capital en los EE. UU. [Traducción del Tribunal]

### Conclusión sobre el costo del capital para una empresa en los EE. UU.

695. En resumen, las conclusiones del Tribunal resultan en el siguiente costo del capital para una empresa en los EE. UU. al día 15 de mayo de 2010: (i) una tasa libre de riesgo del

---

[740] Spiller II, ¶¶ 50-52 y Tabla 6.

3,6 %; más (ii) una prima de riesgo de mercado del 8 %, que consiste de la prima de riesgo de mercado general del 6,7%, que debe multiplicarse por el coeficiente *beta* específico para la industria de 1,2. Por los motivos expuestos, el Tribunal no realiza ninguna otra adición en relación con un coeficiente *alpha*.

696. En consecuencia, el Tribunal resuelve que el costo del capital en los EE. UU., que debe utilizarse para determinar la tasa de descuento aplicable en este caso, asciende al 11, 6%.

### (3)    Prima de Riesgo País de Venezuela

697. Las Partes concuerdan en que el costo del capital determinado *supra* para una empresa en los EE. UU. que se dedique al mismo negocio que Norpro Venezuela debe aumentarse por una prima de riesgo país que refleje el hecho de que la planta se encuentra en Venezuela. Sin embargo, los peritos de las Partes han aplicado distintos métodos para determinar esta prima de riesgo país, y esto ha llevado a resultados con diferencias considerables.

698. El Prof. Spiller utilizó un método diseñado por el Prof. Damodaran, que se basa en la calificación soberana de la moneda local asignada a Venezuela por Moody's (B1 al día 15 de mayo de 2010), convertida en un diferencial por cesación de pagos conforme al cálculo del Prof. Damodaran para la calificación B1 (4,5 % en 2010). El Prof. Spiller aplicó este diferencial por cesación de pagos como la prima de riesgo país sin realizar otros ajustes adicionales por el riesgo de capital[741].

699. El Sr. Brailovsky y el Dr. Flores se refirieron principalmente al Modelo de Calificación de Riesgo País (CRRM) compilado por Ibbotson/Morningstar, que se basa en una encuesta realizada a 75-100 banqueros cada seis meses por la publicación *Institutional Investor*. En esta encuesta, se solicita a los banqueros que califiquen a 170 países en una escala del 0 al 100, y los editores de *Institutional Investor* ponderan las respuestas sobre la base de su percepción del nivel de desempeño global y la sofisticación de los métodos de investigación de crédito de los bancos. Luego, estas calificaciones del riesgo país se convierten en tasas de descuento de capital sobre la base de un estudio realizado por Erb, Harvey y Viskanta, que se actualiza periódicamente. Para Venezuela, el CRRM resultó en una prima de riesgo de capital del país del 14,3 % al día 15 de mayo de 2010[742].

700. A modo de cotejo, el Sr. Brailovsky y el Dr. Flores utilizaron también el llamado " *bludgeon method* " desarrollado por el Prof. Damodaran, que se basa en el diferencial

---

[741] Spiller I, ¶¶ 165-166; Spiller II, ¶ 33 sobre la base del **Anexo CLEX-75**.

[742] Brailovsky/Flores I, ¶¶ 197-199.

sobre los bonos soberanos venezolanos en dólares estadounidenses. Eligieron el Indicador de Bonos de Mercados Emergentes de JP Morgan (EMBI), que mide la diferencia entre los retornos sobre los bonos soberanos en USD venezolanos y estadounidenses, que al día 15 de mayo de 2010 ascendía al 10,26 %. Luego, el Sr. Brailovsky y el Dr. Flores aplicaron el multiplicador global (1,5) sugerido por el Prof. Damodaran para contabilizar el hecho de que la inversión en capital es más riesgosa que la inversión en bonos, y obtuvieron una prima de riesgo país del 15,4 % al día 15 de mayo de 2010[743].

701. Si bien reconoce que los peritos pueden disentir en cuanto a los datos y la metodología, el Prof. Spiller aseveró que la elección del Sr. Brailovsky y el Dr. Flores no refleja la exposición al riesgo país de Norpro Venezuela, porque no tuvieron en cuenta tres factores específicos de su negocio: (i) Norpro Venezuela exportaba sus productos y, por ende, no estaba sujeta a las condiciones y los riesgos de la demanda local; (ii) había garantizado el suministro de sus insumos fundamentales para la producción a través de contratos a largo plazo con empresas estatales; y (iii) gozaba de la protección de un tratado bilateral de inversión, que exige que los riesgos relacionados con la expropiación y las "*condiciones de crisis*" se excluyan de la presente valuación[744]. Según el Prof. Spiller, los actuales márgenes de EMBI "*muy altos*" de Venezuela reflejan la posibilidad de que el país entrara en cesación de pagos a causa de su falta de voluntad de pago de las obligaciones, pero no los riesgos específicos para la empresa a los que se enfrenta un inversor a largo plazo que no está sujeto a la voluntad o capacidad de pago del Gobierno. Agregó que la elección del Sr. Brailovsky y del Dr. Flores de utilizar el diferencial EMBI de solo un día amplifica el contraste entre su medida del riesgo a corto plazo y la inversión a largo plazo de Norpro Venezuela[745]. El Prof. Spiller asumió la postura de que, en contraste, su propia evaluación del riesgo país captura el "*impacto a largo plazo del riesgo país sobre las operaciones de Norpro Venezuela*", en congruencia con la evaluación del Prof. Damodaran[746]. Asimismo, el Prof. Spiller asumió la postura de que "*no es ni necesario conforme al CAPM ni recomendable*" calcular un riesgo país separado para el capital, porque el riesgo de capital converge en el riesgo de deuda a largo plazo, por lo que el Prof. Damodaran recomienda la aplicación de un multiplicador sólo para el corto plazo[747]. Respecto del CRRM, el Prof. Spiller planteó varias críticas, tales como (i) la falta de transparencia; (ii) la naturaleza subjetiva y cualitativa de las calificaciones; (iii) los reclamos de que las encuestas tienen un sesgo respecto de ciertas regiones del mundo; (iv) una falta de explicaciones estadísticas o económicas; y (v) la falta de fiabilidad de las bolsas de valores pequeñas o

---

[743] Brailovsky/Flores I, ¶¶ 201-204.
[744] Spiller II, ¶¶ 35-36 y ¶¶ 40-44.
[745] Spiller II, ¶¶ 37, 46 y 140-141.
[746] Spiller II, ¶ 47.
[747] Spiller II, ¶¶ 142 y 144.

ilíquidas con datos del mercado de valores en los que no se puede confiar, como en el caso de Venezuela[748].

702.    El Sr. Brailovsky y el Dr. Flores señalaron que la prima del riesgo país del Prof. Spiller es en efecto equivalente al bono estadounidense genérico con calificación B a 10 años sobre el bono del Tesoro de los EE. UU. correspondiente, por lo que refleja el riesgo de deuda de las empresas estadounidenses, pero no el riesgo país de Venezuela[749]. También afirmaron que, contrario a lo que sugirió, el Prof. Spiller no aplicó el método del Prof. Damodaran, porque el Prof. Damodaran tiene una jerarquía de métodos: su primera opción es utilizar el diferencial de los bonos soberanos en "*moneda fuerte*" como el dólar estadounidense o el euro (es decir, el "*bludgeon method*"); y solo sugiere un enfoque alternativo para los países que no emiten tales bonos, que consiste en suponer que las calificaciones soberanas son comparables a las calificaciones de las empresas[750]. En todo caso, el Sr. Brailovsky y el Dr. Flores consideraron que era necesario escalar el diferencial de cesación de pagos por un multiplicador, porque su análisis del mercado estadounidense y venezolano a lo largo de un período de 20 años no respaldó la convergencia del riesgo, sino que arrojó volatilidades de 2,05 y 2,74, respectivamente, al día 15 de mayo de 2010.[751] Por último, opinaron que Norpro Venezuela no está menos expuesta al riesgo país que otras empresas que operan en Venezuela porque (i) el riesgo país es un concepto mucho más amplio que la exposición a la demanda local, que incluye los impuestos, las regulaciones y otras acciones gubernamentales, como los controles de divisas; (ii) los citados contratos a largo plazo vencen en los años 2016 y 2018, respectivamente, y no contienen ninguna opción de renovación; y (iii) el riesgo de expropiación es parte del valor justo de mercado y cualquier comprador interesado lo tendría en cuenta; y en todo caso, los tratados bilaterales de inversión no tienen un impacto discernible sobre el riesgo país conforme a los aseguradores del riesgo político[752]. Respecto de las críticas del Prof. Spiller al CRRM, el Sr. Brailovsky y el Dr. Flores reconocieron que los criterios son subjetivos (aunque se basan en conceptos económicos fundamentales), pero afirmaron que sus consecuencias son objetivas, puesto que forman las bases de las prácticas bancarias para el otorgamiento de préstamos. También señalaron que el modelo ha producido resultados estables durante los últimos 25 años[753]. También tomaron la postura

---

[748] Spiller II, ¶ 143.

[749] Brailovsky/Flores I, ¶¶ 213, 215.

[750] Brailovsky/Flores I, ¶¶ 210, 216 que hace referencia al **Apéndice BF-64**, págs. 51, 53; Brailovsky/Flores II, ¶¶ 161, 182. El Sr. Brailovsky y el Dr. Flores sostienen que el mejor cálculo de la prima de riesgo país para el capital del Prof. Damodaran está, de hecho, en línea con su propio cálculo. Brailovsky/Flores I, ¶ 212; Brailovsky/Flores II, ¶¶ 185, 190.

[751] Brailovsky/Flores II, ¶ 199 y Tabla 14. El Sr. Brailovsky y el Dr. Flores destacan que de todos modos utilizan (sólo) el multiplicador genérico de 1,5 del Prof. Damodaran como referencia para sus cálculos.

[752] Brailovsky/Flores II, ¶¶ 200-205 que hace referencia al **Apéndice BF-166**.

[753] Brailovsky/Flores II, ¶¶ 169, 174-179 y Figura 19.

de que el diferencial EMBI al día 15 de mayo de 2010 no se encontraba en un valor inusual, sino *"casi exactamente al medio de la distribución de los datos diarios desde el año 1993; un total de 5.336 observaciones"*[754]. [Traducción del Tribunal]

703. El Tribunal subraya que hay varios puntos de desacuerdo entre los peritos de las Partes en lo que respecta a la determinación de una prima de riesgo país adecuada para Norpro Venezuela al 15 de mayo de 2010. No obstante, pareciera ser que una gran parte de estos desacuerdos dependen de una cuestión fundamental que, por ende, el Tribunal abordará en un primer lugar; a saber, si el riesgo de la expropiación sin compensación (suficiente), como lo requiere el Tratado, debe excluirse de la prima de riesgo país aplicable a Venezuela.

704. Para empezar, el Tribunal desea destacar que, en principio, concuerda con la Demandada en que la prima de riesgo país que debe aplicarse en el caso que nos ocupa debe ser un estimativo realista de la prima que un comprador interesado habría aplicado en mayo de 2010. Al mismo tiempo, el Tribunal comprende la postura de la Demandante de que el riesgo de expropiación sin compensación o sin compensación suficiente debe excluirse de la valuación de Norpro Venezuela en el contexto del presente arbitraje.

705. En este contexto, el Prof. Spiller, perito de la Demandante, declaró en su segundo dictamen pericial que las protecciones del TBI entre Francia y Venezuela sirvieron como *"una reducción adicional del riesgo país"*[755]; sin embargo, no cuantificó el impacto de dicha reducción ni proporcionó prueba alguna en sustento de esta afirmación. Por el contrario, los peritos de la Demandada presentaron un estudio llevado a cabo por Lauge N. Skovgaard Poulson, quien analizó si las aseguradoras de riesgo político le otorgan algún peso a la posibilidad de que los tratados bilaterales de inversión reduzcan el riesgo y concluyó que *"los tratados* [bilaterales de inversión] *tienen un impacto muy bajo en la cobertura y en las políticas de precios de los proveedores de seguros de riesgo político* (PRI, por sus siglas en inglés)"[756] [Traducción del Tribunal]. Si bien el Tribunal no iría tan lejos como para considerar que de esa manera la Demandada estableció que la protección de las inversiones proporcionada por los tratados bilaterales de inversión *"no posee un impacto visible sobre el riesgo país"*[757], debe destacarse que la Demandante nunca abordó las pruebas presentadas por los peritos de la Demandada, ni tampoco la Demandante, ni su perito el Prof. Spiller, presentaron ninguna prueba propia que demostrara lo contrario. En este contexto, la mayoría del Tribunal no puede concluir que la existencia del TBI entre Francia y Venezuela hubiera tenido un impacto cuantificable

---

[754] Brailovsky/Flores II, ¶¶ 166, 172.
[755] Spiller II, ¶ 41.
[756] Brailovsky/Flores II, ¶ 205 cita de **Apéndice BF-166**, pág. 1.
[757] *Cfr.* Escrito Posterior a la Audiencia de la Demandada, ¶ 179.

en la evaluación de riesgo de un comprador interesado – desde un punto de vista estrictamente económico.

706. Sin embargo, podría argumentarse que si el Tribunal no aplicara ajustes por el riesgo de expropiación sin compensación o compensación suficiente, esto permitiría que la Demandada se beneficiara de su propia conducta ilícita internacional, es decir, no solo de su violación del Artículo 5(1) del Tratado, sino también de su presunta política general de expropiar las inversiones sin pagar la compensación correspondiente. Dado que la compensación es un aspecto crucial de las obligaciones de la Demandada en relación con la expropiación, y que la Demandada sería responsable de su presunto incumplimiento de esta obligación, el riesgo de expropiación sin compensación (suficiente) debería eliminarse del riesgo país. El Tribunal observa que este argumento ya no se basa en una perspectiva exclusivamente económica, sino que incluye un elemento normativo que refleja la ambición de que la protección de los tratados se respete y aplique. Conforme a este argumento, la noción del valor justo de mercado con arreglo al Tratado debería interpretarse en el contexto de sus propios estándares de protección.

707. En la opinión del Tribunal, este razonamiento no solo se aplicaría a los riesgos relacionados con la expropiación, sino también a los riesgos relacionados con otras disposiciones del Tratado, como los riesgos de regulaciones injustas, adopción de medidas arbitrarias, quebrantamientos graves al debido proceso, etc. Conforme al razonamiento de la Demandante, todos estos riesgos deberían excluirse del riesgo país, porque surgen de la presunta tendencia de la Demandada de no cumplir con sus obligaciones internacionales.

708. Esta posición se ve respaldada en particular por el tribunal que entendió en el caso *Gold Reserve c. Venezuela*, que estableció que la prima de riesgo país no debería reflejar "*la percepción de un mercado de que un Estado pueda ser propenso a expropiar en violación a las obligaciones que surgen del TBI*"[758]. Si bien en ese caso el tribunal resolvió que no había existido expropiación, de todos modos consideró que los riesgos relacionados con la expropiación se deben excluir del riesgo país al efecto de determinar la compensación por pagar a la demandante. Al mismo tiempo, el tribunal destacó que los riesgos políticos distintos de la expropiación se deben reflejar en la prima de riesgo país. Como consideró que estos riesgos no estaban reflejados en la prima de riesgo país del 1,5 % aplicada por el perito de la demandante, se basó en la prima del 4 % utilizada en un informe de análisis, sin expresar los motivos adicionales de su elección[759]. [Traducción del Tribunal]

---

[758] *Gold Reserve c. Venezuela* (**CLA-152**), ¶ 841.
[759] *Gold Reserve c. Venezuela* (**CLA-152**), ¶¶ 841-842.

709. Por otra parte, el Tribunal señala que también hay argumentos a favor de la postura de la Demandada de que la prima de riesgo país debería incluir todos los riesgos políticos asociados con la inversión en Venezuela, incluido el supuesto riesgo general de expropiación sin compensación o compensación suficiente.

710. En primer lugar, el Tribunal recuerda que ambas Partes concuerdan en que, al margen del estándar de compensación que se aplique, el Tribunal debe determinar el valor justo de mercado de Norpro Venezuela, es decir, la suma que un comprador interesado pagaría a un vendedor interesado. Tomando en cuenta esta definición, podría ser coherente con la noción económica del valor justo de mercado mantener el riesgo de expropiación sin compensación (suficiente) como uno de los riesgos que un comprador interesado realísticamente tendría en cuenta.

711. Asimismo, como lo observó la CDI en los comentarios al Artículo 36 de su Proyecto, "*la indemnización tiene por función remediar las pérdidas efectivas sufridas como consecuencia del hecho internacionalmente ilícito*" y por eso "*es puramente compensatorio* "; "[n]*o tiene por objeto castigar al Estado responsable ni tampoco tiene un carácter expresivo o ejemplar*"[760]. Podría alegarse que si se excluyera el riesgo de la expropiación sin compensación de la presente valuación, la Demandante recibiría un beneficio injustificado, puesto que recibiría una compensación que no podría haber obtenido como precio de compra si hubiera vendido Norpro Venezuela a un comprador interesado en el año 2010, y por ende recibiría más que *las pérdidas efectivas sufridas* como resultado de la violación de los incisos 2 y 3 del Artículo 5(1) del Tratado por parte de la Demandada.

712. Tal como señalara correctamente la Demandada, esta posición tiene sustento, en especial, en la decisión del tribunal de *Tidewater c. Venezuela*, que concluyó en función de estos argumentos que, si bien la medida estatal que da lugar a la reclamación debe excluirse de la valuación, la prima de riesgo país refleja "*los riesgos generales, incluidos los riesgos políticos, de hacer negocios en el país en cuestión, tal como se aplicaban en dicha fecha*"[761]. El tribunal concluyó que una prima de riesgo país de 14,75% era apropiada en las circunstancias del caso[762].

713. A criterio del Tribunal, la cuestión principal que debe resolverse en este sentido es si, al calcular la compensación de la Demandante, el Tribunal sólo debe omitir el impacto de la violación específica del Artículo 5(1) del Tratado en cuestión o si también debe eliminar el riesgo de otras posibles violaciones del derecho internacional que tienden a

---

[760] **CLA-027**, Artículo 36, ¶ 4.
[761] *Tidewater c. Venezuela* (**RL-207**), ¶ 186.
[762] *Tidewater c. Venezuela* (**RL-207**), ¶ 190.

reducir el valor de todas las inversiones en Venezuela porque, de lo contrario, se permitiría a la Demandada abusar de su supuesta política de no respetar sus obligaciones internacionales.

714.   Este interrogante no puede responderse sin contemplar las circunstancias existentes al momento en que la Demandante decidió invertir en Venezuela. En concreto, para el Tribunal, es esencial determinar si el riesgo, que la Demandante ahora pretende excluir de la prima de riesgo país, ya existía en el año 2006 o si hubo un cambio de política desde que se realizó la inversión, es decir, de un entorno favorable para el inversor a una tendencia a expropiar a los extranjeros sin la correspondiente compensación, tal como alegara la Demandante.

715.   En este contexto, es indiscutible que cuando el equipo que rodeaba a Patrick Millot solicitó la aprobación del proyecto a la controlante de la Demandante, Compagnie de Saint-Gobain, en el año 2006, se utilizó una tasa de descuento de 15%, que comprendía la tasa de 12% generalmente asignada dentro del grupo de la Demandante a los países de "*alto riesgo*" más una prima de 3% por "*riesgos adicionales por conservadurismo*"[763]. Si bien esta tasa no se puede equiparar a la evaluación objetiva que podría haber realizado un comprador interesado, sirve para indicar que la Demandante ya consideraba Venezuela un país de "*alto riesgo*" y, aun así, agregó un 3% por riesgos adicionales al decidir invertir en el año 2006. En sus propias palabras, la Demandante invirtió "*durante el apogeo de la Revolución Bolivariana*"[764]. A criterio del Tribunal, esto demuestra que, ya en el año 2006, la Demandante ponderaba ciertos riesgos que no están cubiertos por el riesgo habitual de invertir en países de "*alto riesgo*", sino que muy probablemente se relacionen con un riesgo de ser objeto de expropiación sin que medie compensación alguna o compensación suficiente.

716.   Cabe destacar, asimismo, que es indiscutible entre las Partes que el riesgo país aumentó desde el año 2006[765]. La cuestión es si ese mayor riesgo debe o no tomarse en cuenta en la presente valuación de Norpro Venezuela, ya que el aumento se debe a la supuesta práctica de la Demandada de expropiar inversiones sin compensación (suficiente) y, de ese modo, le permitiría beneficiarse de su propia conducta ilícita.

717.   En este sentido, la mayoría del Tribunal está de acuerdo con el tribunal de *Tidewater c. Venezuela* en que el argumento de la Demandante "combina dos elementos separados en

---

[763] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 130-133; *DAC: Grains and Powders – Venezuela 70 kt Greenfield proppants update 38 M$ revised capex*, 23 de octubre de 2006 (**Anexo C-082**) y *Financial Model for DAC #3* (**Anexo CLEX-166**).

[764] Memorial, ¶ 2.

[765] Presentación Posterior a la Audiencia de la Demandante, ¶ 121; Escrito Posterior a la Audiencia de la Demandada, ¶ 159-162.

un reclamo jurídico de este tipo", es decir, (i) la cuestión de responsabilidad por la que el Tribunal resolvió que la Demandada no llevó a cabo la expropiación de acuerdo con los requisitos de compensación establecidos en el Tratado, y (ii) la etapa de cuantificación, en que el Tribunal debe determinar el valor justo de mercado de la inversión de la Demandante. Tal como resolviera el tribunal de *Tidewater*, "*el segundo elemento del reclamo es una cuestión económica. Depende del valor que el mercado le atribuiría a la inversión objeto de debate*"[766]. El tribunal sostuvo, además, que:

> "*No se trata de una cuestión de permitir que un Estado demandado se aproveche de su propio acto ilícito. Por el contrario, los daños que el Tribunal tiene la facultad de otorgar en virtud del Tratado están diseñados para garantizar que el inversionista privado sea compensado por la pérdida de su inversión. No obstante, al momento de determinar el monto de dicha compensación por vía de referencia a un análisis de los flujos de caja descontados, el Tribunal debería considerar el valor que un comprador dispuesto a comprar le habría atribuido a la inversión. Al momento de determinar este valor, uno de los elementos que un comprador tendría en cuenta es el riesgo asociado a la inversión en un país en particular. Un factor semejante no es propio de la medida del Estado en particular que da lugar al reclamo. […] En cambio, la prima de riesgo país cuantifica los riesgos generales, incluidos los riesgos políticos, de hacer negocios en el país en cuestión, tal como se aplicaban en dicha fecha y tal como podría razonablemente haberse esperado que afectaran las perspectivas y, por ende, el valor que ha de asignarse al flujo de fondos probable del negocio en curso*"[767].

718. La mayoría del Tribunal está de acuerdo con esta decisión y, por lo tanto, no puede aceptar el argumento de la Demandante de que la falta de exclusión del riesgo de expropiación sin compensación o sin compensación suficiente permitiría a la Demandada beneficiarse de su propia conducta ilícita. En opinión del Tribunal, la propia evaluación de riesgos que realizó la Demandante en el año 2006 demuestra que, desde el punto de vista económico, cualquier inversor o comprador interesado contemplaría todos los "*riesgos adicionales*" relacionados con la inversión en Venezuela, sin perjuicio de la existencia del presente Tratado.

719. El concepto de valor justo de mercado, que el Tribunal ha identificado anteriormente como el estándar de compensación aplicable[768], requiere suprimir la medida específica que fue objeto de la decisión del Tribunal sobre responsabilidad, es decir, en este caso, el incumplimiento de la obligación de la Demandada de pagar pronta y adecuada

---

[766] *Tidewater c. Venezuela* (**RL-207**), ¶¶ 184-185.
[767] *Tidewater c. Venezuela* (**RL-207**), ¶ 186.
[768] Véase párrafo 627 supra

indemnización a la Demandante. Sin embargo, no requiere y, de hecho, no permite ningún tipo de corrección de la perspectiva económica del comprador interesado en función de consideraciones normativas. En particular, la mayoría del Tribunal considera que el Tratado y este arbitraje no cumplen la finalidad de asegurar a la Demandante frente a los riesgos generales de invertir en Venezuela que un comprador interesado tomaría en cuenta al evaluar el precio de compra que pagaría por Norpro Venezuela.

720. En cualquier caso, el Tribunal advierte que, aunque admite el mayor riesgo país, la Demandada cuestiona firmemente las alegaciones de la Demandante acerca de sus amenazas generalizadas de expropiar todas las inversiones extranjeras en Venezuela y/o declaraciones públicas de que no tiene intenciones de cumplir sus obligaciones en virtud del derecho internacional. La Demandada hace hincapié en que la Demandante no presentó ninguna prueba con respecto a estas alegaciones y aduce que "*Venezuela no violó ninguna de sus obligaciones soberanas y Venezuela siempre pagó indemnización en sus casos de expropiación*"[769]. En su carta de fecha 6 de noviembre de 2015, la Demandada volvió a cuestionar que existiera divergencia entre la voluntad y la capacidad de pago de Venezuela, y se remitió al director de la empresa consultora venezolana Ecoanalítica, quien, el día 28 de octubre de 2015 señaló que los pagos de deuda de PDVSA por un total de USD 5.000 millones durante los últimos 15 días confirmaban la "*gran voluntad de pago de Venezuela*"[770].

721. En consecuencia, las Partes firmemente disienten en cuanto a si hay un riesgo general de expropiación sin compensación en Venezuela. Si bien la Demandada señaló correctamente que la Demandante no presentó ninguna prueba específica que justificara su alegación, el Tribunal considera que el alto riesgo país de Venezuela puede deberse, al menos, en parte, a la situación incierta en torno a ciertas medidas expropiatorias de la Demandada. La Demandada no cuestiona el hecho de estar involucrada en varias causas con inversores en relación con el pago de una indemnización adecuada.

722. No obstante, a la luz de la conclusión de que el valor justo de mercado debe calcularse de acuerdo con principios económicos y ponderando todos los riesgos que tomaría en cuenta un comprador interesado, el Tribunal no tiene que pronunciarse sobre las medidas expropiatorias de la Demandada en general (suponiendo que tuviera jurisdicción para adoptar dicha resolución).

723. En consecuencia, la mayoría del Tribunal coincide con la Demandada en que la prima de riesgo país debe reflejar todos los riesgos políticos que implica invertir en Venezuela,

---

[769] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 39-42.
[770] Carta de la Demandada de fecha 6 de noviembre de 2015; **Anexo R-131**.

incluso el supuesto riesgo general de ser objeto de expropiación sin que medie el pago de una compensación (suficiente).

724. Por consiguiente, el Tribunal no tiene que decidir la otra cuestión de si es posible cuantificar y así eliminar el riesgo de expropiación del riesgo país, sin excluir al mismo tiempo otros riesgos específicos del país que sin lugar a dudas deben contemplarse en la prima de riesgo país. Al contrario, el Tribunal debe analizar, desde la perspectiva del comprador interesado, cuáles de los diversos métodos que presentaron los peritos de las Partes reflejan correctamente el riesgo país al que estuvo expuesta Norpro Venezuela hasta el día 15 de mayo de 2010.

725. A esta altura, el Tribunal advierte un desacuerdo entre las Partes en cuanto a si la diferencia entre el enfoque aplicado por el Prof. Spiller y los dos enfoques aplicados por los peritos de la Demandada se debe (exclusivamente) al riesgo de expropiación sin indemnización. Mientras la Demandada alega que no se puede aislar y, por ende, cuantificar el riesgo de expropiación sin indemnización[771], la Demandante sostiene que el método del Prof. Spiller basado en la calificación de la moneda local de Venezuela excluye el riesgo de expropiación sin indemnización pero incluye "*otros riesgos de invertir en Venezuela, tales como los riesgos de una economía volátil, desorden civil, una infraestructura menos desarrollada y otras cuestiones*"[772]. La Demandante afirma explícitamente que, dado que el diferencial "*sumamente elevado*" de los bonos venezolanos expresados en dólares refleja su falta de voluntad de pago, la diferencia entre las primas de riesgo país calculadas por los peritos de las Partes "*se atribuye, en gran medida, a las amenazas de confiscación de Venezuela*"[773]. Por lo tanto, según la Demandante, el enfoque que eligió el Prof. Spiller no incluye el supuesto riesgo general de expropiación sin indemnización y, por ende, no capta el verdadero riesgo país que tomaría en cuenta un comprador interesado al realizar el avalúo de Norpro Venezuela.

726. El Tribunal advierte que el Prof. Spiller no dijo en la Audiencia que el método de calificación de la moneda local del Prof. Damodaran se hubiera concebido para eliminar el riesgo de expropiación sin indemnización de la prima de riesgo país. No obstante, ofreció la siguiente explicación en relación con el hecho de que el enfoque alternativo que eligió el Sr. Brailovsky y el Dr. Flores basado en el diferencial EMBI de Venezuela da resultados mucho más altos que el método basado en calificaciones:

> "*[L]os inversionistas en bonos venezolanos hasta diciembre de 2013 estaban determinando que a pesar de que los aspectos fundamentales de la economía de Venezuela eran comparables con los de los países*

---

[771] Escrito Posterior a la Audiencia de la Demandada, ¶ 163.

[772] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 105-106.

[773] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 118-119.

> *con una calificación de B1, temían que Venezuela no estuviera dispuesta a cumplir estas obligaciones internacionales. De manera que no difiere mucho de lo que pasó con Ecuador, cuando incumplió recientemente los pagos de la deuda. Y eso se basó en la voluntad de cumplir las obligaciones internacionales en vez de en aspectos fundamentales de la economía, como podría ocurrir ahora con Grecia, por ejemplo, que no puede pagar la deuda"* [774].

727. De esta manera, el Prof. Spiller confirma la posición de la Demandante de que la divergencia entre los resultados que arrojan los dos métodos se debe a la supuesta falta de voluntad de Venezuela de cumplir sus obligaciones internacionales. El Prof. Spiller también alega que, en el caso de Venezuela, hay una importante discrepancia entre la capacidad de pago del país (reflejada en la calificación de su moneda local) y su voluntad de pago (reflejada en los diferenciales de sus bonos en USD). La hoja de cálculo del Prof. Damodaran de fecha 1 de julio de 2013 [775] de hecho demuestra que la divergencia entre los dos métodos fue de 7,62 % para Venezuela, pero menos de 1 % para la mayoría de otros países. Los únicos países con una divergencia de más de 2 % son Túnez (2,22 %) y Argentina (31,72 %) [776].

728. En opinión del Tribunal, esta divergencia atípica entre los resultados arrojados por los dos métodos respalda la explicación del Prof. Spiller de que los diferenciales de *swap* de riesgo crediticio (*CDS*, por sus siglas en inglés) (al igual que el diferencial EMBI) podrían reflejar un riesgo que no suele estar relacionado con países con calificación B1. Si bien este riesgo adicional podría ser concretamente el riesgo relacionado con la supuesta política de Venezuela de no cumplir sus obligaciones internacionales, el Tribunal ya resolvió *supra* que está fuera del ámbito de este arbitraje pronunciarse sobre la política general de Venezuela respecto de inversores extranjeros y ajustar la prima de riesgo país en este sentido.

729. La Demandada señaló, asimismo, en su Segundo Escrito posterior a la Audiencia, que el Prof. Spiller no analizó los diferenciales de bonos en dólares de países con la misma calificación que Venezuela, sino que tomó el diferencial de 4,5 % que aplicó el Prof. Damodaran a todos los países con calificación B1, suponiendo que las calificaciones soberanas son comparables a las calificaciones empresariales estadounidenses, sin analizar ningún dato de mercado en relación con estos países [777]. Ya en oportunidad de su Dúplica, la Demandada alegó que, en lugar de basarse en los diferenciales de bonos

---

[774] Transcripción (Día 4), pág. 902, líneas 5-18.

[775] Si bien la hoja de Excel del año 2010 del Prof. Damodaran se encuentra archivada como **Apéndice BF-62**, no contiene un cálculo de la prima de riesgo país basado en los diferenciales de CDS. A los efectos de comparación, el Tribunal se remite a la hoja de cálculo del mes de julio de 2013.

[776] **Anexo CLEX-75**. págs. 5-6 y **Apéndice BF-65**, págs. 3-4.

[777] Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 44-45 y ¶ 48.

corporativos de los Estados Unidos, el Prof. Spiller debería, al menos, haber analizado los bonos corporativos de países emergentes y consultado el análisis del Sr. Brailovsky y el Dr. Flores, que generó un diferencial de deuda promedio de 9 %[778].

730. Si bien el Sr. Brailovsky reiteró el argumento de la Demandada durante la Audiencia[779], la Demandante no dijo nada al respecto en su Presentación Posterior a la Audiencia, sino que alegó por primera vez en su Segunda Presentación Posterior a la Audiencia que la precisión de la medición del riesgo país que realizó el Prof. Spiller se podía verificar en función de los diferenciales de CDS de las deudas soberanas de otros países. La Demandante señaló que, según la lista del Prof. Damodaran al mes de enero de 2014, la prima de 4,5 % aplicada por el Prof. Spiller ocuparía el cuarto lugar, "*muy por encima de la típica prima de riesgo país de un país en vías de desarrollo*"[780].

731. La Demandada respondió a este argumento mediante una carta separada en la cual señaló que (i) el Prof. Spiller nunca había consultado los diferenciales de CDS en el marco del método que utilizó; (ii) más de la mitad de los países con diferenciales de CDS de la lista del Prof. Damodaran no podrían clasificarse como "*países en vías de desarrollo*"; y (iii) la "*tipicidad*" no es un concepto válido para la valuación de un proyecto en un determinado país para el que había datos específicos de dicho país, es decir, en el caso de Venezuela, un diferencial de CDS de 10,8 %[781].

732. A criterio del Tribunal, hubiera sido útil contar con un análisis integral de datos de mercado de otros países con la misma calificación B1 que se asignó a Venezuela desde el día 15 de mayo de 2010. En particular, la Demandante debería haber planteado el argumento acerca de los diferenciales de CDS de otros países en una etapa anterior del proceso, algo que hubiera permitido a la Demandada y sus peritos contar con una oportunidad adecuada para presentar una respuesta. Además, el Tribunal podría haber consultado a los peritos de las Partes sobre esta cuestión durante la Audiencia. A falta de un debate apropiado al respecto, el Tribunal no considera justo basarse en los datos que menciona la Demandante que, en cualquier caso, corresponden al año 2014 y no a la fecha de valuación del año 2010.

733. Por otra parte, el Tribunal recuerda el análisis del Sr. Brailovsky y del Dr. Flores de los diferenciales de bonos corporativos en mercados emergentes, basado en datos de Merrill Lynch, que convirtieron en un rendimiento de bonos corporativos genéricos de mercados

---

[778] Dúplica, ¶ 221, en referencia a Brailovsky/Flores II, ¶¶ 194-195 y Tabla 12.

[779] Transcripción (Día 4), pág. 1195, líneas 16 a 21.

[780] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 61-62, en referencia al **Apéndice BF-66**, págs. 23-25.

[781] Carta de la Demandada de fecha 2 de junio de 2015, págs. 1-2. El Tribunal admitió la presentación de la Demandada relativa a los diferenciales de CDS en el expediente mediante carta de fecha 19 de junio de 2015.

emergentes de 9,11 % al mes de mayo de 2014[782]. Aunque no brindaron una cifra para la fecha de valuación del día 15 de mayo de 2010, este cálculo indiscutible suscita dudas en cuanto a si la prima del 4,5 % calculada por el Prof. Spiller refleja incluso los riesgos país generalmente asociados a un país con calificación B-1 que, sin duda, deberían incluirse en la presente valuación, además de la cuestión del riesgo de expropiación.

734. Es por eso que el Tribunal procederá a analizar los dos métodos alternativos en que se basaron los peritos de la Demandada, es decir, el CRRM y el "*bludgeon method*", los cuales incluyen todo riesgo de expropiación sin indemnización y arrojaron una prima de riesgo país de 14,3 % y 15,4 %, respectivamente.

735. Con respecto al "*bludgeon method*", basado en diferenciales soberanos denominados en USD, los peritos de la Demandada decidieron basarse en datos del EMBI. Si bien el Prof. Spiller criticó en su segundo dictamen que no es apropiado utilizar el EMBI en este caso porque el riesgo crediticio soberano de Venezuela no refleja la exposición de Norpro Venezuela al riesgo país, no cuestionó la elección de este índice como tal. El Prof. Spiller sí cuestionó el uso del índice *spot* en la fecha de valuación en lugar de un promedio a largo plazo; sin embargo, no proporcionó al Tribunal una cifra alternativa que reflejara dicho promedio[783].

736. Desde luego, el Tribunal es consciente de que el Sr. Brailovsky y el Dr. Flores aplicaron el "*bludgeon method*" del Prof. Damodaran sólo para verificar su cálculo principal, que se basa en el CRRM. El Tribunal sabe también que el Prof. Spiller criticó este método en particular por su falta de transparencia y la poca confiabilidad de los resultados que produce, entre otras cuestiones[784], y que el Sr. Brailovsky y el Dr. Flores abordaron estas críticas en detalle en su segundo dictamen pericial[785]. El Tribunal considera que no necesita expresar su opinión acerca de la confiabilidad del CRRM, ya que las posiciones de las Partes se reflejan en uno de los métodos concebidos por el Prof. Damodaran, a quien los peritos de ambas Partes reconocen como una autoridad líder. Por lo tanto, el Tribunal se concentrará en los métodos que recomienda este último.

737. La Demandada y sus peritos sostienen que el Prof. Spiller ignoró la jerarquía de métodos del Prof. Damodaran y que la mejor estimación del Prof. Damodaran es el resultado obtenido a partir del "*bludgeon method*"[786]. Pese a que ni la Demandante ni su perito consideraron este argumento, el Tribunal advierte que no obran pruebas claras en el expediente de que Prof. Damodaran ofrezca una jerarquía de sus métodos.

[782] Brailovsky/Flores II, ¶¶ 191-197.
[783] Spiller II, ¶¶ 32-36 y ¶¶ 140-141.
[784] Spiller II, ¶¶ 142-143.
[785] Brailovsky/Flores II, ¶ 169 y ¶¶ 174-179.
[786] Brailovsky/Flores I, ¶ 212 y ¶ 216.

Contrariamente a los que sugieren la Demandada y sus peritos, el Prof. Damodaran no afirma en su escrito sobre primas de riesgo de capital que el método sintético basado en calificaciones sólo deba utilizarse para países sin bonos soberanos denominados en USD. Al contrario, dice que el margen de incumplimiento "*se puede calcular de tres maneras*", entre ellas, el margen sintético[787]. Aunque señala que las otras dos maneras sólo están disponibles para países con bonos denominados en USD, no manifiesta que dichas maneras sean mejores que el margen sintético. Hace referencia a la hipótesis de que las calificaciones soberanas son equiparables a las calificaciones corporativas como "*método alternativo*" y, después de presentar los tres métodos posibles, concluye que "*podría optarse por uno de estos tres métodos y utilizar siempre el mismo o aplicar un promedio de ellos*"[788].

738. En su hoja de cálculo que constituyó la base de la decisión del Prof. Spiller de optar por la prima de 4,5 % para el año 2013, el Prof. Damodaran también afirma que para "[c]*alcular el margen de incumplimiento del país en cuestión*", "*ofrece dos opciones: una basada en la calificación soberana de la moneda local de Moody's y la otra es el diferencial de CDS del país (si lo hubiese)*"[789]. De nuevo, no dice que el método del diferencial de CDS sea mejor que el método de calificaciones. Por último, el Tribunal advierte que en su hoja de cálculo del año 2010, el Prof. Damodaran ni siquiera contempla el método del diferencial de CDS sino que simplemente señala que "[p]*ara calcular la prima de riesgo país a largo plazo, comienzo con la calificación del país (de Moody's: www.moodys.com) y calculo el margen de incumplimiento correspondiente a esa calificación (bonos corporativos o soberanos de los Estados Unidos) sobre la tasa del tesoro. Este cálculo se convierte en una medición de la prima de riesgo país agregada de ese país*"[790]. [Traducción del Tribunal]

739. A la luz de estas declaraciones, el Tribunal no está convencido de que haya una jerarquía de métodos que el Prof. Spiller no haya advertido al decidir utilizar el modelo de calificación de moneda local en lugar de los diferenciales de bonos denominados en USD. No obstante, el Tribunal recuerda que (i) según las propias presentaciones de la Demandante, el método del Prof. Spiller apunta a excluir el riesgo de expropiación sin indemnización y, por lo tanto, no refleja el verdadero riesgo país que un comprador interesado tomaría en cuenta; y (ii) aún no queda claro si incluye los riesgos país típicamente asociados a un país con calificación B-1, tal como demostrara el análisis de

---

[787] **Apéndice BF-64**, págs. 53-55.
[788] **Apéndice BF-64**, págs. 55, 57 y Figura 8.
[789] **Anexo CLEX-75**, pág. 1 y **Apéndice BF-65**, pág. 1.
[790] **Apéndice BF-62**, pág. 3.

diferenciales de bonos corporativos en mercados emergentes del Sr. Brailovsky y del Dr. Flores.

740. En cambio, el Tribunal no tiene motivos para dudar de que el "*bludgeon method*" del Prof. Damodaran incluye tanto el riesgo de expropiación sin indemnización como los típicos riesgos del país que indiscutiblemente deberían formar parte de la presente valuación. Si ben el Tribunal no está necesariamente convencido de que la diferencia entre los resultados arrojados por los dos métodos se atribuya, en su totalidad, al riesgo de expropiación sin indemnización, la Demandante no presentó ninguna prueba de que el "*bludgeon method*" incluye riesgos que un comprador interesado no contemplaría en su valuación de Norpro Venezuela. Por lo tanto, el Tribunal coincide con los peritos de la Demandada en este sentido y resuelve que la prima de riesgo país debe calcularse en función de los diferenciales de bonos denominados en USD de Venezuela, tal como lo refleja el EMBI.

741. Sin embargo, aún queda por tratar una cuestión en este sentido, es decir, si el Tribunal debe aplicar el multiplicador genérico de 1,5 del Prof. Damodaran para calcular la prima de riesgo de capital suponiendo que la inversión en capital es más riesgosa que la inversión en bonos, tal como afirmaran los peritos de la Demandada[791], o si debe abstenerse de aplicar cualquier tipo de multiplicador suponiendo que las inversiones a largo plazo conllevan tanto riesgos de capital como de deuda, tal como explicara el perito de la Demandante[792]. El Tribunal advierte que ambos peritos se basaron en las declaraciones que realizó al respecto el Prof. Damodaran en este sentido. El Dr. Flores y el Sr. Brailovsky aludieron al hecho de que el Prof. Damodaran en su hoja de cálculo expresó lo siguiente:

> "*Se puede calcular una prima de riesgo país ajustada multiplicando el margen de incumplimiento por la volatilidad relativa del mercado bursátil correspondiente a ese mercado (desviación estándar del mercado bursátil del país/desviación estándar de los bonos soberanos del país). En esta hoja de cálculo, utilicé el promedio general de volatilidad del mercado bursátil y de bonos de 1,5 para calcular la prima de riesgo de capital*"[793]. [Traducción del Tribunal]

742. El Tribunal advierte, no obstante, que esta declaración es precedida por la oración: "*Sobre todo, a corto plazo, es probable que la prima de riesgo de capital sea mayor que el*

---

[791] Brailovsky/Flores I, ¶¶ 202-205; Brailovsky/Flores II, ¶¶ 198-199 y Tabla 14.
[792] Spiller II, ¶ 144.
[793] **Apéndice BF-62**, pág. 3.

*margen de incumplimiento del país"*[794]. El Prof. Spiller también se funda en la siguiente declaración del Prof. Damodaran:

> "[L]*as diferencias entre las desviaciones estándares en los precios de las acciones y los bonos se achican en períodos más prolongados y la resultante volatilidad relativa será, por lo general, menor*[795]. *De esta manera, si consideramos rentabilidades previstas en períodos más largos, la prima de riesgo de capital convergerá con el margen de incumplimiento de los bonos soberanos"*[796]. [Traducción del Tribunal]

743. En respuesta a ello, el Sr. Brailovsky y el Dr. Flores presentaron los resultados de su propio análisis de las volatilidades relativas de los mercados de bonos y capital de los Estados Unidos y Venezuela dentro de un período de 20 años/5 años[797] anterior al día 15 de mayo de 2010, mediante el cual obtuvieron un coeficiente de 2,05 y 2,74, respectivamente[798]. El Tribunal advierte que, en su primer dictamen pericial, indicaron en una nota al pie que el Prof. Damodaran había calculado un coeficiente de volatilidad de 0,69 para Venezuela para un período de dos años desde el mes de febrero de 2012, pero luego un coeficiente de volatilidad de 1,77 para dos años hasta el mes de marzo de 2013[799]. El Sr. Brailovsky y el Dr. Flores criticaron al Prof. Damodaran por no convertir el Índice Bursátil venezolano, denominado en bolívares, a dólares estadounidenses, que es la moneda del índice de bonos venezolano. Por otra parte, según citaron en la misma nota al pie, el Prof. Damodaran señala que *"la desviación estándar relativa del capital es una cifra volátil, tanto entre países (oscila de 2,48 para la República a 0,69 para Venezuela) como a través del tiempo (las cifras de volatilidad relativa de Brasil han oscilado de casi uno a más de 2"*[800]. [Traducción del Tribunal]

744. Sin embargo, el Tribunal considera que es imposible comparar directamente ambos cálculos, ya que el Prof. Damodaran calculó la volatilidad relativa al mercado estadounidense (asignando a este una volatilidad de 1,00), mientras que el Sr. Brailovsky y el Dr. Flores calcularon la volatilidad relativa al mercado de bonos tanto de los Estados Unidos como de Venezuela.

---

[794] **Apéndice BF-62**, pág. 3. El Prof. Spiller hace referencia a la misma oración de la hoja de cálculo del Prof. Damodaran del año 2012. Spiller II, ¶ 144, en referencia al Anexo CLEX-178, pág. 1.

[795] [Cita interna:] *Jeremy Siegel informa sobre la desviación estándar en los mercados de capital en su libro* 'Stocks for the very long run' *y señala que tienden a disminuir en el tiempo.*

[796] **Anexo CLEX-108 / Apéndice BF-55**, pág. 12.

[797] Aunque el Sr. Brailovsky y el Dr. Flores sólo aluden a un período de 20 años en su segundo informe, se desprende del **Apéndice BF-105**, Tabla 7, que se basaron en datos que comprendían desde el día 6 de mayo de 2005 hasta el día 10 de mayo de 2010 para Venezuela, es decir, un período de 5 años. Esto coincide con lo que declaran en su primer informe. Brailovsky/Flores I, ¶ 205.

[798] Brailovsky/Flores II, ¶ 199 y Tabla 14. Hacen hincapié en que para su cálculo comparativo, utilizaron el multiplicador genérico de 1,5 del Prof. Damodaran.

[799] Brailovsky/Flores I, nota 352.

[800] **Apéndice BF-63**, pág. 60.

745. Por último, el Tribunal advierte que, contrariamente a lo que sugieren la Demandada y sus peritos, en vista de los escritos del Prof. Damodaran no parece que él de hecho recomiende el uso del multiplicador de capital. Más bien, se puede encontrar la siguiente declaración en uno de sus escritos que data del año 2010: "*Algunos analistas creen que las primas de riesgo de capital de los mercados deben reflejar las diferencias de riesgo de capital, medidas por las volatilidades de las acciones en estos mercados*"[801]. Aparecen declaraciones similares en otros escritos[802]. En su hoja de cálculo, también deja librado a la elección del usuario si aplicará un multiplicador o no, dado que ofrece dos opciones: "*Opción 1: Utilizar el margen de incumplimiento para medir la prima de riesgo país adicional. Para elegir esta opción, vaya a la ficha ERP y configure la celda E5 en 1,00*"; y "Opción *2: Aumente el margen de incumplimiento para reflejar el mayor riesgo de capital del mercado, en relación con el margen de incumplimiento. Podrá ver los coeficientes relativos de cada país en la ficha* 'Equity vs. Govt Bond' [Capital v. Bonos del Gob.] *de esta hoja de cálculo. Configure la celda E5 de la ficha ERP con ese número*"[803] [Traducción del Tribunal]. Para los meses de junio de 2013 y enero de 2014, el Prof. Damodaran presentó una desviación estándar relativa (hacia el mercado estadounidense) de 0,69 para Venezuela; para el mes de mayo de 2010, no se presentó dato relevante alguno ante el Tribunal[804].

746. A falta de claridad suficiente sobre el multiplicador adecuado que debe aplicarse para Venezuela, el Tribunal no está convencido de que el multiplicador genérico de 1,5 refleje, de manera suficiente, el riesgo de una inversión de capital en Venezuela. Dada la incuestionable naturaleza de largo plazo de la inversión objeto de valuación en el presente caso, aún falta resolver si debe aplicarse un multiplicador o si puede suponerse que la deuda y la prima de riesgo de capital convergerán. Aunque el Sr. Brailovsky y el Dr. Flores consideraron que esta teoría quedaría eliminada mediante su análisis de las volatilidades relativas de los mercados de capital y bonos en los Estados Unidos y Venezuela, el Tribunal advierte que el coeficiente que calcularon de hecho depende, en gran medida, del vencimiento de los bonos seleccionados en comparación con el mercado bursátil. Si bien el Sr. Brailovsky y el Dr. Flores no aportaron cifras con respecto a los distintos vencimientos de los bonos para el mercado venezolano, el coeficiente para el mercado estadounidense difiere entre 1,55 para bonos a 20 años y 2,81 para bonos a 5 años a partir del mes de mayo de 2010[805].

---

[801] **Apéndice BF-61**, pág. 178.

[802] **Apéndice BF-63**, pág. 50; **Apéndice BF-64**, pág. 52.

[803] **Anexo CLEX-75**, pág. 1 y **Apéndice BF-65**, pág. 1.

[804] **Anexo CLEX-75**, pág. 21 y **Apéndice BF-65**, pág. 22; **Apéndice BF-66**, pág. 27.

[805] **Apéndice BF-105**, Tabla 9.

747. Andrew Smithers y Stephen Wright, invocados por el Sr. Brailovsky y el Dr. Flores para respaldar su argumento de que el capital es más riesgoso que la deuda, confirman que la volatilidad de la rentabilidad del bono es "*claramente inferior*" a la de las acciones, pero también explican que los bonos a largo plazo son más riesgosos que los bonos a corto plazo[806]. Sin embargo, Jeremy Siegel, también citado por los peritos de la Demandada, afirma lo siguiente:

> "*Tal como se señalara anteriormente, las acciones son más riesgosas que las inversiones de renta fija en períodos de tenencia a corto plazo. Pero cuando el período de tenencia asciende a entre 15 y 20 años, la desviación estándar de las rentabilidades promedio anuales, que es la medición de las dispersiones de rentabilidades utilizada en la teoría de la cartera de valores, se vuelve menor que la desviación estándar de las rentabilidades promedio de los bonos o las letras. En períodos de 30 años, el riesgo de capital desciende a sólo dos tercios de los bonos o letras. A medida que aumenta el período de tenencia, la desviación estándar de las rentabilidades promedio de las acciones disminuye casi el doble de rápido que las de los activos de renta fija*"[807]. [Traducción del Tribunal]

748. A la luz de estas evidencias, el Tribunal considera que es plausible que el riesgo de inversión en capital y el riesgo de inversión en bonos converjan a largo plazo. Dado que el objeto de esta valuación —la inversión de la Demandante en Norpro Venezuela— se realizó indiscutiblemente como inversión a largo plazo de acuerdo con los estándares aplicados por el Prof. Damodaran, los Sres. Smithers y Wright, y el Sr. Siegel, la Demandada y sus peritos no demostraron que sea necesario aplicar un multiplicador al margen de incumplimiento para el cálculo de la prima de riesgo de capital. En consecuencia, el Tribunal aplicará la prima de riesgo país que calcularon el Sr. Brailovsky y el Dr. Flores en función del "*bludgeon method*" del Prof. Damodaran, salvo el multiplicador de 1,5. Al día 15 de mayo de 2010, calcularon un margen de bono soberano de 10,26 % basado en datos del EMBI que, ante la falta de un multiplicador aplicable en este caso, es igual a la prima de riesgo país para inversión en capital.

749. Las Partes y sus peritos han asimismo debatido sobre ciertos factores específicos de Norpro Venezuela como resultado de los cuales la exposición al riesgo país podría desviarse de la empresa venezolana promedio[808]. Además del factor de protección en virtud de un tratado bilateral de inversión, que se comentó en detalle *supra*, la discusión se centró en otras dos cuestiones: (i) el hecho de que Norpro Venezuela exportara más del 80 % de los *proppants* producidos, mayormente a Norteamérica, es decir, un mercado

---

[806] **Apéndice BF-60**, pág. 176.
[807] **Apéndice BF-70**, pág. 32.
[808] *Cf.* Presentación Posterior a la Audiencia de la Demandante, ¶¶ 136-144; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 172-180.

maduro, y (ii) el hecho de que hubiera suscrito contratos de suministro a largo plazo para sus insumos principales, como la energía y la bauxita[809].

750.   En cuanto a la segunda cuestión, el Sr. Brailovsky y el Dr. Flores señalaron correctamente que los contratos a largo plazo permanecerían en vigencia hasta los años 2016 y 2018, respectivamente, y no contemplaban posibilidad alguna de renovación, mucho menos a precios idénticos o similares[810]. Por lo tanto, el Tribunal no considera que este factor haría que un comprador interesado disminuya su cálculo de exposición al riesgo país de Norpro Venezuela.

751.   Con respecto a la primera cuestión, la Demandante se basó en la declaración del Prof. Damodaran de que "[e]*l factor determinante más obvio de la exposición de una empresa al riesgo país es qué parte de los ingresos se genera en el país*"[811]. Sin embargo, la Demandante señaló que el Prof. Damodaran también indicó en el mismo escrito que "[u]*na empresa puede estar expuesta al riesgo país aunque no genere ingresos en ese país, si su planta de producción se encuentra ubicada en ese país*"[812]. En este contexto, la Demandada y sus peritos alegan que el riesgo país es un concepto mucho más amplio que la exposición a la demanda local[813]. El Sr. Brailovsky señaló, asimismo, en la Audiencia que "[h]*ay muchísimas publicaciones que muestran que los proyectos basados en recursos naturales, particularmente aquellos de índole petrolera o relacionados con el petróleo, tienen un mayor riesgo país que la compañía promedio*"[814].

752.   El Tribunal advierte que la Demandante nunca alegó que Norpro Venezuela no estuviera sujeta al riesgo país venezolano en absoluto, sino simplemente que está menos expuesta al riesgo país venezolano que la compañía venezolana promedio[815]. En respuesta al comentario del Sr. Brailovsky en ocasión de la Audiencia, la Demandante sostiene que Norpro Venezuela no era una compañía de recursos naturales y alega que, en cualquier caso, a las compañías basadas en recursos naturales se les suele asignar una mejor calificación que a las compañías pertenecientes a otras industrias[816].

753.   Si bien el Tribunal considera que es plausible que la exposición al riesgo país de Norpro Venezuela sea diferente a la de cualquier compañía venezolana promedio, el Sr. Brailovsky y el Dr. Flores señalaron correctamente que el Prof. Spiller nunca cuantificó el impacto de los factores invocados por la Demandante en el riesgo país al que Norpro

---

[809] Spiller II, ¶ 35, ¶¶ 41-43; Brailovsky/Flores II, ¶¶ 200-202.

[810] Brailovsky/Flores II, ¶ 202.

[811] Presentación Posterior a la Audiencia de la Demandante, ¶ 139, que cita **Anexo CLEX-108**, pág. 18.

[812] Escrito Posterior a la Audiencia de la Demandada, ¶ 175, que cita **Anexo CLEX-108**, pág. 18.

[813] Escrito Posterior a la Audiencia de la Demandada, ¶ 175; Brailovsky/Flores II, ¶ 201.

[814] Transcripción (Día 4), pág. 1128, líneas 2-6.

[815] Presentación Posterior a la Audiencia de la Demandante, ¶ 136.

[816] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 140-141.

Venezuela estaba realmente expuesta[817]. Tal como explicara el Prof. Damodaran, el hecho de que Norpro Venezuela exportara la mayoría de sus productos pudo haber influido como parte de un enfoque *lambda* según el cual la prima de riesgo país calculada para la compañía venezolana promedio se podría haber multiplicado por un cierto coeficiente *lambda*[818]. Sin embargo, dado que ninguno de los peritos de las Partes incluyeron dicho coeficiente en sus cálculos, el Tribunal no procederá a seguir analizando este enfoque. Ante la falta de cuantificación de exposición al riesgo país específica de Norpro Venezuela, el Tribunal aplicará la prima de riesgo país de 10,26% obtenida a partir del "*bludgeon method*" concebido por el Prof. Damodaran (excluyendo cualquier tipo de multiplicador de riesgo de capital).

### (4)    Conclusión sobre la Prima de Riesgo de Capital y Conversión a la Tasa de Descuento

754.    En conclusión, el Tribunal, por mayoría, resuelve que la prima de riesgo de capital que debe aplicarse a una inversión en Norpro Venezuela al día 15 de mayo de 2010 consiste de los siguientes elementos: (i) el costo de capital de una empresa que opere en los EE. UU. por la suma del 11,6 %, es decir, una tasa libre de riesgo del 3,6 % más una prima de riesgo de mercado del 8 %, que consiste de la prima de riesgo de mercado general del 6,7 %, para multiplicarla por el coeficiente *beta* específico de la industria de 1,2; y una prima de riesgo país de Venezuela por la suma del 10,26 %. Esto resulta en una prima de riesgo de capital total del 21,86 %.

755.    Como último paso, el Tribunal debe determinar la relación de deuda a capital a fin de calcular el promedio ponderado del costo de capital (*WACC*, por sus siglas en inglés) y la tasa de descuento nominal por aplicar a la inversión de la Demandante. Los peritos de las Partes utilizaron relaciones de deuda a capital similares, pero no idénticas, en sus cálculos al día 15 de mayo de 2010. El Prof. Spiller aplicó una relación del 18,0 % de deuda al 82,0 % de capital, que representa un promedio de 5 años de la relación informada por Ibbotson/Morningstar para la empresa compuesta de *SIC Code 1381*[819]; el Sr. Brailovsky y el Dr. Flores aplicaron una relación del 15,7 % de deuda al 84,3 % de capital, que representa un promedio de 1 año, tal como informara Ibbotson/Morningstar para la empresa mediana de *SIC Code 1381*[820].

756.    Si bien el Prof. Spiller afirma que un promedio de un sólo año está segado porque puede estar afectado por acontecimientos acontecidos durante ese año en particular[821], el

---

[817] Brailovsky/Flores, ¶ 160 y ¶ 200.

[818] **Anexo CLEX-108**, págs. 17-23.

[819] Spiller II, ¶ 162; **Anexo CLEX-81**, pág. 29.

[820] Brailovsky/Flores II, Tabla 8; **Apéndice BF-37**.

[821] Spiller II, ¶ 163.

Tribunal observa que esta cuestión no ha sido objeto de debate adicional entre las Partes o sus peritos. Como Ibbotson/Morningstar informan tanto las "*últimas*" cifras y el promedio de 5 años, el Tribunal no considera que se haya establecido que se deba preferir uno sobre el otro. Lo mismo se aplica a la elección de la empresa compuesta o la empresa mediana. Por consiguiente, el Tribunal no dará preferencia a las elecciones de ninguno de los peritos, sino que aplicará el promedio de las relaciones en su evaluación de la tasa de descuento nominal, es decir, una relación del 16,85 % de deuda al 83,15 % de capital.

757. Para la determinación del costo de deuda (después de impuestos), el Tribunal se refiere a la Tabla 8 del segundo dictamen pericial del Sr. Brailovsky y el Dr. Flores, conforme al cual el costo de deuda (después de impuestos) es equivalente a la tasa libre de riesgo de los EE. UU. (3,6 %) más la prima de riesgo de deuda del país (10,26 %) más una prima de riesgo industrial (que los peritos de ambas Partes fijaron en 1,5 % para el año 2010)[822] multiplicado por uno menos la alícuota fiscal aplicable (34 %). Según la mayoría del Tribunal, esto resulta en el siguiente cálculo: (3,6 % + 10,26 % + 1,5 %) * (1 − 34 %) = 10,14 %.

758. Sobre la base del promedio de la relación de deuda a capital de 16,85/83,15 determinado *supra*, la mayoría del Tribunal arriba a una tasa de descuento nominal del 19,88 %[823].

### bb)  Flujos de Fondos Futuros

759. En la siguiente sección, el Tribunal procederá a analizar las discrepancias entre las Partes y sus peritos en lo que concierne a la determinación de los flujos de fondos futuros de Norpro Venezuela.

### (i)  Síntesis de la Postura de la Demandante

760. Con respecto al cálculo de los flujos de fondos futuros, la Demandante considera "*injustificado*" dividir las ganancias que un comprador interesado obtendría de las exportaciones de Norpro Venezuela a fin de dar cuenta de la distribución interna de costos. Según la Demandante, la valuación justa de mercado "*no depende de las cualidades idiosincráticas del comprador o vendedor*"; en consecuencia, debe asumirse que lo más probable sería que el comprador interesado que realizó la oferta más elevada fuera un inversionista estratégico que ya tiene una red de distribución y comercialización

---

[822] Brailovsky/Flores II, Tablas 8 y 9; **Anexos CLEX-81**, pág. 29 y **CLEX-192**; **Apéndice BF-156**.
[823] 10,1376 % * 0,1685 + 21,86 % * 0,8315 = 19,8847756 %.

similar a la de Saint-Gobain y, por lo tanto, está en condiciones de percibir el 100 % de las ganancias[824]. La Demandante arguye que los costos de comercialización son costos fijos del comprador que no cambian con la adquisición, pero que el comprador puede — en cambio— apalancar sus recursos existentes para sacar todo el beneficio del valor incremental del activo adquirido, así como Saint-Gobain internalizó el 100 % de las ganancias. Por último, la Demandante subraya que las estimaciones de ambos peritos ya incluyen los costos de comercialización y distribución por la suma del 7 %[825].

761. La Demandante también destaca que el Sr. Brailovsky y el Dr. Flores asumieron en su cálculo que CVG Bauxilum suministraría bauxita al precio incrementado que le impuso unilateralmente a Norpro Venezuela en el mes de septiembre de 2008. Según la Demandante, este aumento de precios era ilícito y, por ende, no debe tenerse en cuenta sobre la base del principio en virtud del cual *"una parte no puede reducir su responsabilidad por un acto ilícito (aquí, la expropiación) en función de otro (el aumento de precios)"*[826]. La Demandante asevera que el precio de la bauxita debería reflejar el acuerdo conforme al Contrato de Bauxita y, por consiguiente, ascender a USD 25,5 por TM[827].

762. En lo que concierne a los costos de transporte, la Demandante hace referencia a su testigo Jack Larry, quien declaró que, contrario a lo que supusieron el Sr. Brailovsky y el Dr. Flores, los *proppants* no se solían enviar de Corpus Christi a Alice (ambas en el Estado de Texas) para su almacenamiento, sino que la mayor parte se enviaba directamente del puerto de Corpus Christi al cliente, por lo que el costo presupuestado a Alice en el Plan Estratégico 2011-2015 era *"a meros fines ilustrativos"*[828][Traducción del Tribunal]. La Demandante alega lo siguiente: (i) que la estimación de los costos de transporte por parte del Prof. Spiller se basa en el embarque real en el mes de marzo de 2010 y es confirmada por los contratos de transporte contemporáneos de Saint-Gobain; y (ii) que el precio promedio que el Prof. Spiller le aplica a los costos de embarque dentro de los EE. UU.

---

[824] Réplica, ¶¶ 170-172; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 174-175, que hace referencia al testimonio oral del Prof. Spiller durante la Audiencia. Transcripción (Día 4), pág. 1233, líneas 1-3; pág. 948, línea 11 – pág. 949, línea 9, y pág. 946, líneas 6-19. *Véase* también Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 89-90.

[825] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 176-178 que hace referencia a la Presentación de Apertura del Prof. Spiller, diapositiva 15, y al testimonio oral del Prof. Spiller y el Dr. Flores. Transcripción (Día 4), pág. 917, líneas 21-22; pág. 1175, líneas 1-3, pág. 1177, líneas 9-17.

[826] Réplica, ¶ 176; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 96-97.

[827] Réplica, ¶ 177.

[828] Réplica, ¶ 179 que hace referencia a Larry II, ¶ 13; Presentación Posterior a la Audiencia de la Demandante, ¶ 167 que hace referencia a la presentación del día 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), pág. 42 y al testimonio oral del Sr. Larry durante la Audiencia. Transcripción (Día 3), pág. 697, línea 22- pág. 698, línea 7. Respecto del costo presupuestado de EUR 110 en el Plan Estratégico 2011-2015, el Sr. Larry afirmó también que *"el costo de flete general incluyendo entrega al cliente está en 110 euros por tonelada, en esa gama por lo menos"*. Transcripción (Día 3), pág. 692, líneas 20-22.

refleja exactamente las diversas ubicaciones y los arreglos contractuales con los clientes finales de la Demandante[829].

763. La Demandante también afirma que el Sr. Brailovsky y el Dr. Flores no establecen una distinción entre los siguientes conceptos: (i) los gastos de capital de mantenimiento destinados a "*manten*[er] *la planta en condiciones para seguir funcionando en sus niveles actuales*"; y (ii) los gastos de capital de inversión destinados a "*aument*[ar] *la producción de la planta a través de eficacia y mejoras tecnológicas*"[830] [Traducción del Tribunal]. Según la Demandante, sólo los gastos de capital de mantenimiento deberían incluirse en el cálculo de los gastos de capital[831].

764. Con respecto al capital de trabajo necesario para operar la planta, la Demandante alude a los siguientes supuestos del Prof. Spiller: (i) el saldo pendiente de los créditos fiscales IVA al año 2009 se habría pagado en el año 2010; y (ii) en lo sucesivo, habría tomado 60 días monetizar los certificados IVA, y Norpro Venezuela habría recuperado el 80 % de su valor. En cuanto a las demoras administrativas invocadas por la Demandada, la Demandante resalta que se ha concluido que tales demoras violan el estándar TJE y asevera que tenía una expectativa legítima de que la Demandada siguiera su propio procedimiento de créditos fiscales IVA, dado que esta cuestión se analizó específicamente con el Gobierno venezolano antes de que la Demandante invirtiera en Venezuela[832]. Asimismo, la Demandante aduce que la invocada demora de dos años es "*meramente especulativa*", puesto que todos los documentos en los que se basa la Demandada datan de varios años con anterioridad al año 2010 y además "*carecen de sustento legal*" [Traducción del Tribunal], ya que la legislación venezolana dispone que el fisco debe emitir su decisión dentro de los 30 días[833] .

### (ii)    Síntesis de la Postura de la Demandada

---

[829] Réplica, ¶ 179; Presentación Posterior a la Audiencia de la Demandante, ¶ 166 y ¶¶ 169-171, que hace referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), pág. 10; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 91-92, que hace referencia a Spiller II, Tabla 7 y ¶¶ 83-85.

[830] Réplica, ¶ 180, que hace referencia a Larry II, ¶¶ 21-23.

[831] Réplica, ¶ 181.

[832] Réplica, nota 381, que hace referencia a Spiller II, ¶ 93 y ¶¶ 115-116, e *Impregilo S.p.A. c. Argentina*, Opinión Concurrente y Disidente del Juez Charles N. Brower (**CLA-127**), ¶ 9; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 158-161.

[833] Presentación Posterior a la Audiencia de la Demandante, ¶ 154 y nota 348. Además, la Demandante considera que es contradictorio que, por una parte, el testigo de la Demandada Eduardo Rondón reconozca que se había solicitado a las autoridades un certificado especial de recuperación fiscal pero, por la otra, la Demandada alegue que Norpro Venezuela seguía recabando los documentos para su primera solicitud de recuperación. Presentación Posterior a la Audiencia de la Demandante, ¶ 156 y Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 95 que hace referencia al testimonio oral del Sr. Rondón. Transcripción (Día 3), pág. 771, línea 17 - pág. 772, línea 7.

765. La Demandada sostiene que no fue discutido entre las Partes que antes de la expropiación, Norpro Venezuela recibió sólo el 27 % de las ganancias, mientras que el 73 % restante fue destinado a la empresa filial de la Demandante en EE. UU., SGCP. La Demandante señala que esto se basa en el estudios de precios de transferencia de la Demandante, que distinguió entre cuatro categorías ponderadas de igual manera: funciones, riesgos, intangibles de fabricación e intangibles de comercialización. La Demandada asevera que la contribución de la planta y de SGCP a las primeras tres categorías fue dividida; mientras que la cuarta categoría, "*intangibles de comercialización*", sin embargo, se asignó en un 100 % a SGCP. La Demandada argumenta que el 25 % de las ganancias de la planta se vincularon directamente a las capacidades de distribución, logística y comercialización de SGCP, que no se expropiaron junto con la planta[834].

766. En respuesta al argumento planteado por la Demandante de que el estudio constituía un mero  mecanismo de contabilidad interno, la Demandada subraya que conforme al derecho venezolano, los contribuyentes que realicen operaciones con partes relacionadas deben "*determinar sus ingresos, costos y deducciones resultantes de aquellas operaciones considerando los precios y las cantidades que se habrían aplicado entre partes independientes en operaciones comparables*"[Traducción del Tribunal]. Por consiguiente, la Demandada mantiene su supuesto de que el acuerdo entre Norpro Venezuela y SGCP reflejaba una operación entre partes independientes (*arm's-length transaction*)[835].

767. Consecuentemente, la Demandada rechaza la hipótesis del Prof. Spiller de que Norpro Venezuela retendría el 100 % de las ganancias a la fecha de valuación. Sostiene que un comprador interesado no pagaría por el 100 % de las ganancias ya que no estaría adquiriendo las capacidades de SGCP y no estaría dispuesto a transferir las ganancias que espera obtener a través de su propia red de comercialización, logística y distribución. Si el comprador no tuviera esta red propia, la Demandada subraya que incluso debería pagar por adquirir estas capacidades o por los servicios de un tercero. En síntesis, la Demandada aduce que "*ningún comprador pagaría por algo que no obtuviera de la operación*"[836]. [Traducción del Tribunal]

---

[834] Memorial de Contestación, ¶¶ 198-199 y ¶ 256 en referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**); Dúplica, ¶¶ 238-242; Escrito Posterior a la Audiencia de la Demandada, ¶ 182.

[835] Escrito Posterior a la Audiencia de la Demandada, ¶ 183 que cita la *Ley de Impuesto sobre la Renta* (**Apéndice BF-113**), Artículo 111.

[836] Memorial de Contestación, ¶¶ 200-202. *Véase*, asimismo, Dúplica, ¶ 244. La Demandada enfatiza que, si bien un comprador podría obtener el 100 % de los ingresos de la última venta de *proppants*, no se beneficiaría del 100 % de las ganancias debido a que "*una gran parte de las ganancias*" estaría ligada a las funciones de comercialización, distribución y logística que no eran parte de la transferencia de la Demandante en contraprestación por el precio de compra. [Traducción del Tribunal] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 184-185.

768. Según la Demandada, un comprador interesado "*tendría en cuenta la valuación de la Planta, no de los activos en la cadena completa de valor, y solo consideraría las ganancias que podría generar la propia Planta*"[837]. [Traducción del Tribunal]

769. Por ende, la Demandada se refiere a la hipótesis de sus peritos de que un comprador de la planta obtendría "*a lo sumo*" el 75 % de las ganancias, ya que la propia Demandante concluyó en su estudio de precios de transferencia que SGCP aportó el 100 % de la porción del 25 % de los "*bienes intangibles de comercialización*"[838]. [Traducción del Tribunal]

770. En relación con el precio de la bauxita a ser abonado por Norpro Venezuela a CVG Bauxilum, la Demandada afirma que no existen fundamentos para que la Demandante haya ordenado al Prof. Spiller que reduzca el precio acordado de USD 33,8 por TM al precio original del contrato, dado que Norpro Venezuela había aceptado el precio incrementado en la medida en que no hubiera más aumentos durante el año 2009. Por ende, la Demandada ordenó a sus peritos que basen su cálculo en el precio incrementado, aumentado por el IPP-Materias Primas de EE. UU.[839].

771. En lo que respecta a los costos de transporte, la Demandada afirma que la estimación del Prof. Spiller de los costos de embarque a los EE. UU. se basa, aparentemente, en un único envío del mes de marzo de 2010, y señala que el mismo documento que invoca el Prof. Spiller incluye el costo presupuestado por la propia Demandante para el transporte desde Venezuela hasta Alice, Texas, por EUR 110 (convertidos a USD 154) por TM. De acuerdo con la Demandada, esta cifra también está respaldada por el estudio de precios de transferencia de la Demandante[840]. En cuanto a los documentos de transporte contemporáneos que invoca el Prof. Spiller en su segundo dictamen, la Demandada sostiene que estos documentos no reflejan los costos reales contraídos en relación con el transporte, por lo que sus peritos mantuvieron su estimación original[841].

---

[837] Escrito Posterior a la Audiencia de la Demandada, ¶ 186.

[838] Memorial de Contestación, ¶ 203 en referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 5; Dúplica, ¶ 243; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶ 54.

[839] Memorial de Contestación, ¶ 210 y ¶ 256; Dúplica, ¶ 251 que cita la carta de Oscar Cid a CVG Bauxilum, 17 de septiembre de 2008 (**Anexo R-52**).

[840] Memorial de Contestación, ¶ 214 y ¶ 256 con referencia a la Presentación de fecha 4 de mayo de 2010, Plan Estratégico 2011-2015 (**Anexo R-10 / CLEX-80**), págs. 10 y 42 y Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1; Escrito Posterior a la Audiencia de la Demandada, ¶¶ 195-198; Segundo Escrito Posterior a la Audiencia de la Demandada, ¶¶ 58-59.

[841] Dúplica, ¶ 255; Escrito Posterior a la Audiencia de la Demandada, ¶ 194. La Demandada subraya que sus peritos ajustaron su estimación sobre la base de la nueva información de que algunos *proppants* se enviaban directamente desde Corpus Christi al cliente y supusieron que sólo la mitad del embarque se enviaba primero a Alice para su almacenamiento. Dúplica, ¶¶ 255-256.

772. Asimismo, la Demandada rechaza el cálculo del Prof. Spiller de los costos de envío dentro de EE.UU. y afirma que el costo presupuestado por la Demandante y el SPA de Halliburton reflejan un costo "*significativamente más alto*", por lo que sus peritos basaron su cálculo en el costo presupuestado[842]. La Demandada subraya que, incluso a pesar de que la Demandante no proporcionó datos en sustento de la hipótesis del Prof. Spiller de que el 30 % de los *proppants* se venderían EXW y el 70 % restante se vendería en volúmenes equivalentes a cada una de las tres áreas de distribución, los peritos de la Demandada han aplicado esa hipótesis junto con el precio proporcionado en el SPA de Halliburton, que resulta en costos incluso mayores a los que ellos calcularon[843].

773. En relación con los gastos de capital, la Demandada concuerda con la teoría del Prof. Spiller hasta el año 2018 inclusive, pero arguye que los gastos de capital anuales aumentarían significativamente "*a medida que la Planta envejecía y los equipos alcanzaban el final de su vida útil*"[844]. Si bien el Prof. Spiller incluyó sólo los gastos de mantenimiento, la Demandada sostiene que los gastos relativos a "*la salud y la seguridad, la tecnología y las mejoras para reducir las averías e interrupciones del proceso*" [Traducción del Tribunal] también son necesarios para asumir la operativa de manera indefinida y, por consiguiente, afirma que deberían incluirse en el cálculo los cuatros gastos de capital tal como fueron previstos para la Planta de la Demandante en Fort Smith[845].

774. Respecto del capital de trabajo, la Demandada acepta el cálculo del Prof. Spiller salvo en relación con los créditos fiscales por el Impuesto al Valor Agregado (IVA). La Demandada sostiene que al día 15 de mayo de 2010 Norpro Venezuela no había siquiera solicitado los certificados de recuperación de impuestos y señala que el proceso de recuperación es usualmente un proceso "*largo y complejo*". La Demandada afirma que, por ende, sus peritos asumieron que los créditos fiscales IVA pendientes al día 15 de mayo de 2010 hubieran sido monetizados en el año 2013 y que los demás créditos fiscales IVA acumulados a partir de entonces habrían sido monetizados a dos años de manera progresiva y, por lo tanto, habrían sido parte del capital de trabajo que un comprador no valuaría por separado[846].

775. En sustento de su postura, la Demandada se refiere a (i) artículos periodísticos que informan la demoras de varios años en 2000 y 2003; (ii) la declaración testimonial de Eduardo Rondón de que el "*procedimiento para la recuperación del IVA en Venezuela*

---

[842] Memorial de Contestación, ¶¶ 215-216 que hace referencia al Documento de Precios de Transferencia de Saint-Gobain-NorPro, 21 de agosto de 2009 (**Anexo CLEX-35**), pág. 1.

[843] Dúplica, ¶¶ 257-258.

[844] Memorial de Contestación, ¶¶ 217-218 y ¶ 256.

[845] Dúplica, ¶ 262.

[846] Dúplica, ¶¶ 269-271; Escrito Posterior a la Audiencia de la Demandada, ¶ 201.

*lleva al menos dos años desde la presentación inicial de la solicitud*"; y (iii) la declaración de la Demandante en su DAC del mes de junio de 2009 de que "[r]*ecuperar el IVA del tesoro fiscal se ha vuelto un proceso muy largo y complejo*"[847]. [Traducción del Tribunal]

### (iii)   El Análisis del Tribunal

776.   El Tribunal procederá ahora a analizar los diversos puntos de discusión respecto de los flujos de fondos futuros de Norpro Venezuela de a uno por vez.

### (1)   Los Precios de los *Proppants*

777.   En lo que concierne a las proyecciones de los precios de los *proppants* que se deban aplicar, el Tribunal subraya que la controversia entre las Partes se ha centrado principalmente en el impacto de los recientes descubrimientos del mercado petrolífero sobre las proyecciones de los precios en una valuación a la fecha del laudo. Las Partes coinciden en que este desarrollo no se podría haber previsto al día 15 de mayo de 2010 y, por ende, no debe tomarse en cuenta en la presente valuación. Sin embargo, los peritos de las Partes también aplicaron distintos supuestos respecto de los precios de los *proppants* en sus valuaciones del día 15 de mayo de 2010.

778.   El Prof. Spiller afirmó en su Modelo de Valuación Actualizado, presentado junto con su segundo dictamen pericial, que basó los precios de las exportaciones a los EE. UU.: (i) para el año 2010, en las ventas históricas en Venezuela durante el año 2010; (ii) para los años 2011-2012, en las ventas históricas en los EE. UU.; (iii) para el año 2013, en la tasa de crecimiento de los promedios de precios de Norpro Venezuela entre los años 2012 y 2013; (iv) para los años 2014-2015, en el promedio de la tasa de crecimiento de los informes de los analistas y las proyecciones de la Demandante; y (v) para los años 2016-2018, en el aumento del Índice de Precios al Productor (*PPI*, por sus siglas en inglés) de los EE. UU. Los precios del Prof. Spiller para las exportaciones a Sudamérica y las ventas locales dentro de Venezuela se basan: (i) para el año 2010, en el Plan de Negocios de la Demandante del mes de abril de 2010; (ii) para el año 2011, en la tasa de crecimiento de las ventas de Interprop y Versaprop en los EE. UU. entre los años 2010 y 2011; y (iii) para el período comprendido entre los años 2012-2017, en los mismos supuestos que las exportaciones a los EE. UU[848].

---

[847] Escrito Posterior a la Audiencia de la Demandada, ¶ 200 que hace referencia a *Pedro García, Exportaciones crecieron 4% en el trimestre*, 3 de abril de 2000 (**Apéndice BF-34**), *Eduardo Camel, Contracción de 35% en las exportaciones de la Nación*, 28 de agosto de 2003 (**Apéndice BF-35**), Rondón, ¶ 38 y Actualización de fecha 8 de junio de 2009 a la DAC de fecha 23 de octubre de 2006 (**Anexo R-7**), pág. 6.
[848] **Anexo CLEX-81**, pág. 36.

779. El Sr. Brailovsky y el Dr. Flores basaron los precios de las ventas a Norteamérica, Sudamérica y Venezuela (i) para el período comprendido entre los años 2010-2015, en las proyecciones contenidas en el Plan de Negocios de la Demandante del mes de abril de 2010; y (ii) para el período sucesivo, en las proyecciones de inflación a largo plazo del año 2010[849].

780. El Tribunal concuerda con el Sr. Brailovsky y el Dr. Flores en que es inexacto que una valuación al día 15 de mayo de 2010 utilice los precios de ventas reales posteriores al mes de abril de 2010, porque estos no se podrían haber conocido a la fecha de valuación. Asimismo, el Sr. Brailovsky y el Dr. Flores señalaron que las proyecciones de precios del Prof. Spiller son superiores a las propias proyecciones de la Demandante para Norpro Venezuela al mes de abril de 2010[850]. El Tribunal entiende que, si bien un comprador interesado podría haber decidido no basarse sólo en las proyecciones del vendedor, sino tomar en cuenta datos adicionales, tales como los informes de los analistas, sin dudas habría dado un valor considerable a las proyecciones del Plan de Negocios del mes de abril de 2010. Si el Prof. Spiller consideraba que había motivos para desviarse del Plan de Negocios, podría haber explicado su elección, pero ni siquiera abordó la discrepancia entre el Plan de Negocios y sus propias proyecciones para la valuación al mes de mayo de 2010 en su dictamen pericial.

781. Por consiguiente, el Tribunal no tiene motivos para dudar de la razonabilidad de las propias proyecciones de precios de la Demandante al mes de abril de 2010, y, por ende, sigue el enfoque de los peritos de la Demandada en este sentido.

### (2)    Ganancias Divididas para la Parte de Comercialización

782. En lo que concierne a la cuestión que consiste en determinar si debería existir una división de las ganancias por las ventas de exportación, las Partes concuerdan en que, antes de la expropiación, Norpro Venezuela retenía en efecto el 27 % de las ganancias de las ventas de *proppants;* y el 73 % restante se destinaba a la afiliada estadounidense de la Demandante, Saint-Gobain Ceramics & Plastics (SGCP), que tenía la responsabilidad, *inter alia*, de la comercialización y distribución de los *proppants*[851]. Es objeto de debate si un comprador interesado habría supuesto una división de ganancias en sus cálculos del

---

[849] Brailovsky/Flores I, ¶¶ 50-51 y Tabla 4; Brailovsky/Flores II, ¶ 40; **Anexo CLEX-40**, págs. 13-14.
[850] Brailovsky/Flores II, ¶¶ 44-45 y Tabla 5.
[851] Spiller I, ¶ 112 y nota 55; Brailovsky/Flores I, ¶¶ 52-58; Documento sobre precios de transferencia, 21 de agosto de 2009 (**Anexo CLEX-35**).

precio de compra para reflejar el hecho de que Norpro Venezuela no contaba por sí misma con la red de comercialización y distribución necesaria para vender los *proppants* al cliente.

783. El Prof. Spiller supuso que un comprador interesado habría incluido el 100 % de las ganancias en su cálculo del precio de compra, sobre la base de la hipótesis de que quien presentara la oferta más elevada habría sido una empresa con capacidades de comercialización y distribución similares a las de SGCP. Según el Prof. Spiller, esta hipótesis es compatible con el valor justo de mercado, porque no se basa en "*sinergias únicas*" que se podrían aplicar solo a un comprador específico, sino en la consideración razonable de que existen diversos compradores potenciales con estas capacidades en el mercado y, por consiguiente, la Demandante habría realizado la venta a un comprador que pudiera obtener el 100 % de las ganancias y estuviera dispuesto a considerar esta sinergia en su oferta por Norpro Venezuela. El Prof. Spiller subrayó que no valuó ganancias o costos asociados con una red externa a la planta, sino sólo las ganancias adicionales que un comprador con acceso a tal red podría obtener al sumar la capacidad de Norpro Venezuela a su propia capacidad[852].

784. El Sr. Brailovsky y el Dr. Flores tomaron la postura de que el Prof. Spiller hizo suposiciones específicas incorrectas acerca de las características del comprador interesado e ignoró el hecho de que la red de comercialización y distribución no se expropió. El Sr. Brailovsky y el Dr. Flores arguyeron que incluso si el comprador tuviera tal red, no habría estado dispuesto a pagar y ceder las ganancias asociadas a tal red, justamente porque ya contaba con la red y no adquiriría una con la transacción[853]. El Sr. Brailovsky y el Dr. Flores entienden que el activo sujeto a la valuación es sólo la empresa en marcha Norpro Venezuela, y no la red de comercialización y distribución de SGCP. Por ello, se refirieron al estudio de precios de transferencia que ambas Partes invocaron en relación con las ganancias históricas, y señalaron que un 25 % de las ganancias se asignaron a los "*Intangibles de Mercado*". Puesto que Norpro Venezuela no podía suministrar ninguno de los servicios incluidos en esta sección, supusieron que habría retenido "*a lo sumo*" el 75 % de las ganancias totales[854].

785. Tal como acertadamente destacara la Demandante, los peritos de ambas Partes incluyeron también un rubro de costo de un 7 % llamado "*Ventas/Investigación y Desarrollo/Admin.*" en sus cálculos[855]. La Demandante y el Prof. Spiller se refirieron a este rubro de costo

---

[852] Spiller II, ¶¶ 64-68.
[853] Brailovsky/Flores I, ¶¶ 59-63; Brailovsky/Flores II, ¶ 49 y ¶ 60.
[854] Brailovsky/Flores I, ¶¶ 69-71; Brailovsky/Flores II, ¶¶ 50-55 y Figura 3 que hace referencia al Documento de precios de transferencia, 21 de agosto de 2009 (**Anexo D CLEX-35**).
[855] **Anexo CLEX-81**, pág. 37; **Apéndice BF-101**, Tablas 4A, 4B y 4C.

como los costos de comercialización y distribución, y arguyen que una deducción adicional contabilizaría dos veces la parte de comercialización[856]. Sin embargo, la Demandada adopta la postura de que este costo sólo cubría los costos de comercialización local en Venezuela y subraya que el mismo ya existía conforme al documento de precios de transferencia, que también aplicaba una deducción adicional del 25 % por comercialización en los EE. UU.[857]. En respuesta al planteo de que el 7 % al menos se debería deducir del 25 %, el Dr. Flores explicó la correlación entre los dos rubros de la siguiente manera durante la Audiencia:

> *"7 por ciento es un costo operativo. Entonces tiene que estar en el rubro costo, 25 por ciento no es un costo, está en el rubro de utilidades. Hay que calcular el beneficio total, es decir, todo el ingreso de los consumidores finales de proppants menos todos los costos a todo nivel, costo en Venezuela, costo de transporte, costo dentro de los Estados Unidos y luego ese 7 por ciento es uno de los costos. Se hace un descuento y así se tiene la ganancia total y ese es el cien por cien de las utilidades. […] Entonces, de eso,* [Norpro Venezuela] *a lo sumo tenía derecho y creemos que es un supuesto general, tenía derecho al 75 por ciento de esa utilidad total. Entonces, no puede comparar el 25 con el 7 porque son conceptos diferentes"*[858].

786. El Tribunal considera convincente la explicación del Dr. Flores y, en consecuencia, analizará la cuestión que consiste en determinar si cualquier división de ganancias debería realizarse independientemente del hecho de que Norpro Venezuela ya incurrió un 7 % en gastos de *"Ventas/Investigación y Desarrollo/Admin"*. En la opinión de la mayoría del Tribunal, la explicación del Dr. Flores queda asimismo confirmada por el estudio de precios de transferencia, que asignó el 25 % de las ganancias a los *"Intangibles de Comercialización"*, porque en efecto el mismo documento incluye el rubro de costos del 7 % en su cálculo preliminar del precio[859]. El hecho de que conforme al estudio de precios de transferencia SGCP proporcione todos los servicios incluidos bajo *"Intangibles de Mercado"* demuestra que estos servicios debían suministrarse además de los servicios para los que Norpro Venezuela incurría en los costos del rubro de costos del 7 %[860].

787. En lo que concierne a la cuestión que consiste en determinar si se deben hacer deducciones o no, el Tribunal considera que es plausible que quien presentara la oferta más elevada fuera, en efecto, una empresa con acceso a una red de comercialización y distribución que podría haber internalizado el 100 % de las ganancias de las ventas de

---

[856] Presentación de Apertura del Prof. Spiller, diapositiva 15; Escrito Posterior a la Audiencia de la Demandante, ¶ 178.
[857] Escrito Posterior a la Audiencia de la Demandada, nota 385.
[858] Transcripción (Día 4), pág. 1175, líneas 1–22.
[859] **Anexo CLEX-35**, pág. 1.
[860] *Cfr.* **Anexo CLEX-35**, pág. 5.

*proppants*. Sin embargo, esto no responde al interrogante de si el comprador habría incluido el 100 % de estas ganancias en sus cálculos del precio de compra de Norpro Venezuela. Si bien la planta produciría los *proppants* terminados, esto por sí sólo no permitiría que el comprador obtenga el 100 % de las ganancias, sino que esto sólo sería posible si aportara sus propias capacidades de comercialización y distribución.

788. De hecho, también es plausible  suponer que el comprador pudiera producir sinergias de costos al sumar las capacidades de Norpro Venezuela a sus propias capacidades y considerar esas sinergias en su cálculo del precio de compra de la planta. No obstante, la mayoría del Tribunal no está convencida de la hipótesis de que el comprador habría estado dispuesto a pagar la misma suma que si Norpro Venezuela hubiera tenido la capacidad de comercializar y distribuir los *proppants* por su cuenta. El comprador habría al menos deducido los costos adicionales que contraería en la comercialización y distribución de las capacidades adicionales adquiridas.

789. Si bien la suma de estos costos adicionales que el comprador contemplaría es desconocida, el Tribunal destaca la hipótesis del Prof. Spiller de que el comprador tendría una red similar a la de SGCP. Por ello, parece razonable remitirse al estudio de precios de transferencia de la Demandante en este sentido. Mientras que el Tribunal entiende que los costos adicionales del comprador pueden no ser equivalentes a la porción de ganancias que la Demandante asignó a los "*Intangibles de Comercialización*", también se debe subrayar que el hecho de que Norpro Venezuela sólo retenía el 27 % de las ganancias antes de la expropiación no es objeto de debate. En este contexto, para la mayoría del Tribunal, la hipótesis de que el comprador habría considerado costos adicionales por la comercialización y distribución de los *proppants* por al menos el 25 % de las ganancias parece bastante conservadora.

790. En consecuencia, la mayoría del Tribunal adoptó el enfoque del Sr. Brailovsky y el Dr. Flores de deducir el 25 % de las ganancias por ventas de exportación de los flujos de fondos futuros de Norpro Venezuela.

### (3)    Tipo de Cambio e Inflación

791. En lo que concierne al tipo de cambio al que Norpro Venezuela podría haber convertido los dólares estadounidenses en bolívares y vice versa, el Tribunal subraya que en sus valuaciones al día 15 de mayo de 2010, los peritos de ambas Partes utilizaron las proyecciones del tipo de cambio oficial de CADIVI a lo largo de todo el período de valuación[861]. Como ninguna Parte aduce que la introducción del tipo de cambio más favorable de SICAD II a principios del año 2014 fuera previsible en el mes de mayo de

---

[861] Spiller II, nota 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, nota 167.

2010, no es necesario que el Tribunal se exprese sobre la aplicación de este tipo de cambio desde el año 2014.

792. Sin embargo, parece haber una diferencia respecto de los supuestos sobre la devaluación con posterioridad al día 15 de mayo de 2010, a causa de que los peritos de las Partes se basaron en proyecciones del tipo de cambio de distintas fuentes. Mientras que el Prof. Spiller se basó en las proyecciones de Ecoanalítica, consultora macroeconómica privada con sede en Venezuela[862], el Sr. Brailovsky y el Dr. Flores calcularon la evolución del tipo de cambio sobre la base de las proyecciones del Fondo Monetario Internacional[863]. Tal como subrayara el Prof. Spiller durante la Audiencia, el FMI no proyecta directamente el desarrollo del tipo de cambio del USD-bolívar, sino las tasas de inflación en los EE. UU. y en Venezuela[864]. El Sr. Brailovsky y el Dr. Flores respondieron que el FMI proyecta el producto interno bruto de Venezuela en dólares estadounidenses y en bolívares, y explicaron que derivaron el tipo de cambio a partir de la relación entre ambas cifras[865].

793. Aunque los peritos de las Partes continuaron el debate sobre si el FMI asume supuestos independientes acerca de la devaluación o sólo asume que el tipo de cambio se desarrollará junto con ella[866], el Tribunal considera que no debe adoptar una decisión en este respecto. No hay discusión entre los peritos de las Partes en el sentido de que Econalítica proyecta directamente el desarrollo del tipo de cambio USD-bolívar. Asimismo, el Sr. Brailovsky y el Dr. Flores no cuestionaron la fiabilidad de las proyecciones de Ecoanalítica; sino que por el contrario, citan al director de Ecoanalítica, el Sr. Asdrúbal Oliveros, como fuente para su hipótesis acerca de un tipo de cambio unificado que no tuvo un papel en la valuación al día 15 de mayo de 2010[867].

794. Como Ecoanalítica es una consultora económica con sede en Venezuela, el Tribunal no tiene motivos para dudar de que conoce las particularidades del mercado cambiario venezolano y, por ende, está en la posición de proporcionar proyecciones fiables del tipo de cambio. Por consiguiente, el Tribunal seguirá el enfoque del Prof. Spiller y se basará en las proyecciones contemporáneas de Ecoanalítica respecto de la evolución del tipo de cambio con posterioridad al día 15 de mayo de 2010. En cualquier caso, el Tribunal subraya que la Demandada se refirió a una "*leve diferencia*" respecto de los supuestos

[862] Spiller I, nota 68; **Anexo CLEX-81**, pág. 57.
[863] Brailovsky/Flores I, ¶ 98; **Apéndices BF-33 y BF-101**. Tabla 12; Presentación de Apertura del Dr. Flores, diapositiva 24.
[864] Transcripción (Día 4), pág. 1202, líneas 11-16.
[865] Transcripción (Día 4), pág. 1204, líneas 4–18.
[866] *Cfr*. Transcripción (Día 4), pág. 1202, línea 16 – pág. 1204, línea 1, y pág. 1204, línea 19 – pág 1207, línea 2.
[867] *Cfr*. Brailovsky/Flores II, ¶ 82; Transcripción (Día 4), pág. 1206, línea 15 - pág. 1207, línea 2.

sobre la devaluación, y ni siquiera cuantificó esa diferencia[868]. Por ello, el Tribunal considera que es sensato suponer que en cualquier caso se trata de una diferencia nimia.

### (4)    Los Costos de la Bauxita

795. Respecto del precio de la bauxita aplicable que Norpro Venezuela debería haber pagado a CVG Bauxilum conforme al Contrato de Bauxita con posterioridad al día 15 de mayo de 2010, los peritos de las Partes recibieron distintas instrucciones de las Partes. En concordancia con la postura de la Demandante de que el aumento del precio de la bauxita del mes de septiembre de 2008 equivalió a una violación al estándar TJE, al Prof. Spiller se le indicó que eliminara el aumento del precio de sus cálculos y que aplicara en su lugar el precio del contrato original, con un aumento conforme al PPI de los Estados Unidos, como se establece en la Cláusula 10.1 del Contrato de Bauxita[869]. Por otra parte, la Demandada indicó al Sr. Brailovsky y al Dr. Flores que aplicaran el precio aumentado que Norpro Venezuela pagaba, en efecto, al mes de septiembre de 2008 y a lo largo del año 2009, con el aumento conforme al PPI de los Estados Unidos a partir del año 2010[870].

796. El Tribunal subraya que aparte del debate acerca de la justificación del aumento de precios del mes de septiembre de 2008, el Sr. Brailovsky y el Dr. Flores afirmaron también que el Prof. Spiller no había considerado dos aumentos del precio del transporte previos y no sujetos a debate de los meses de agosto de 2007 y enero de 2008[871]. El Prof. Spiller no trató los dos aumentos de precios, pero señaló que conforme a su ajuste del precio por inflación, su precio para el año 2008 fue idéntico al precio al que se refiere el documento invocado por el Sr. Brailovsky y el Dr. Flores, es decir, USD 25,5 por TM[872]. Si bien no queda totalmente en claro para el Tribunal por qué los precios son en efecto iguales para el año 2008, a pesar de que el Prof. Spiller sólo realizó ajustes por inflación, pero no por los mayores costos del transporte, el Tribunal subraya que el argumento del Prof. Spiller no es válido para el año 2007 (él aplicó el precio de USD 23,8/TM a pesar del aumento a USD 25,0/TM en el mes de agosto de 2007)[873]. En el presente contexto, sin embargo, el Tribunal debe evaluar los precios aplicables al período posterior al día 15 de mayo de 2010; de modo que un precio incorrecto para el año 2007 es irrelevante, mientras que el precio para el año 2008 sea correcto.

---

[868] Escrito Posterior a la Audiencia de la Demandada, nota 389.

[869] Spiller I, ¶ 126 y Figura 20; Spiller II, ¶¶ 124-125.

[870] Brailovsky/Flores I, ¶¶ 103, 105; Brailovsky/Flores II, ¶ 99.

[871] Brailosvky/Flores I, ¶ 102 que hace referencia al **Anexo C-100**, diapositiva 13; Brailovsky/Flores II, ¶ 95. En el mes de agosto de 2007, el precio del contrato original de USD 23,5/TM aumentó a USD 25,0/TM sobre la base de la Cláusula 10.2 del Contrato de Bauxita, y en el mes de enero de 2008, el precio aumentó a USD 25,5/TM, lo que consiste de un ajuste por inflación sobre la base de la Cláusula 10.1 (USD 0,23/TM) y de un aumento sobre la base de la Cláusula 10.2 (USD 0,27/TM).

[872] Spiller II, ¶ 125.

[873] *Compárese* **Anexo CLEX-81**, pág. 40 *con* **Anexo C-100**, diapositiva 13.

797. Respecto de la principal controversia entre las Partes, es decir, si el cálculo debería incluir el aumento del precio del mes de septiembre de 2008, el Prof. Spiller identificó correctamente el debate sobre la legalidad del aumento del precio como una cuestión jurídica sobre la cual no expresó una opinión profesional[874]. El Sr. Brailovsky y el Dr. Flores señalaron que en cualquier caso era irrazonable suponer que un comprador interesado no habría tenido en cuenta el precio real que Norpro Venezuela estaba pagando al año 2008[875]. El Tribunal concuerda con el Sr. Brailovsky y el Dr. Flores en que el punto de partida debe ser la perspectiva de un comprador interesado en el mes de mayo de 2010. Aun si el aumento de precios fue una violación contractual, el comprador habría tenido en cuenta que Norpro Venezuela estaba pagando un precio mayor y no había iniciado acciones por incumplimiento contractual ante el foro de resolución de diferencias establecido en el Contrato de Bauxita. Por consiguiente, el Tribunal resuelve que la alegada ilegalidad del aumento del precio no sería suficiente justificación para eliminar el aumento del precio de la presente valuación.

798. Si, por otra parte, el Tribunal estuviera convencido de que el aumento del precio fuera en efecto ilegal y de que la Demandada fuera responsable del aumento con arreglo al estándar TJE o al estándar PSP (fuera porque la conducta de CVG Bauxilum es atribuible al Estado o porque el MIBAM tenía la obligación de intervenir), este acto ilícito internacional debería de hecho, eliminarse de la valuación. Sin embargo, el Tribunal se remite a la conclusión a la que arribó *supra* de que la Demandante no ha demostrado que el aumento del precio del mes de septiembre de 2008 constituyera una violación contractual de CVG Bauxilum. Por ello: (i) si se puede responsabilizar a la Demandada por tal incumplimiento contractual –incluso en el supuesto de que se hubiere probado– bajo el estándar TJE es una cuestión que puede quedar abierta; y (ii) la Demandada no tenía la obligación de intervenir en relación con el aumento del precio de la bauxita con arreglo al estándar PSP[876].

799. Ante la ausencia de un acto ilícito internacional en relación con el aumento del precio de la bauxita, la Demandante no tiene derecho a ninguna compensación en este sentido. Por consiguiente, no hay motivos para eliminar el aumento del precio de la presente valuación. En cuanto a la cuestión adicional planteada por el Sr. Brailovsky y el Dr. Flores acerca del tipo de cambio aplicado por el Prof. Spiller, que supuso que Norpro Venezuela habría pagado el precio en USD con bolívares[877], el Tribunal recuerda que los peritos de

---

[874] Spiller II, ¶ 124.
[875] Brailovsky/Flores II, ¶ 96.
[876] *Véanse* párrafos, *supra* 542 and 559-560 above.
[877] Brailovsky/Flores II, ¶¶ 97-99 y Figura 9.

ambas Partes utilizaron el tipo de cambio de CADIVI en sus valuaciones al mes de mayo de 2010[878]. Por ello, no se requiere una decisión en este sentido.

### (5)    Costos de Transporte

800.  El siguiente punto se refiere a los costos de transporte que Norpro Venezuela habría incurrido por el envío de los *proppants* terminados a los clientes. Los peritos de ambas Partes distinguieron tres categorías de costos de transporte: (i) para todos los *proppants,* los costos de envío local dentro de Venezuela para transportar a los *proppants* desde la planta a Puerto Ordaz; (ii) para las exportaciones a Norteamérica y Sudamérica, los costos de embarque desde Puerto Ordaz al puerto de Corpus Christi, Estado de Texas (y posiblemente también al depósito en Alice, Estado de Texas); y (iii) para las exportaciones a Norteamérica, los costos de envío desde el Estado de Texas al cliente final.

### Costos de Envío Local en Venezuela

801.  Respecto de los costos de envío local dentro de Venezuela para todos los *proppants,* el Sr. Brailovsky y el Dr. Flores adoptaron la proyección del Prof. Spiller de que estos costos ascendían a VEF 50,5 por TM, con un aumento conforme al PPI (proyectado) para Venezuela. A pesar de que los peritos de las Partes no concuerdan respecto del tipo de cambio aplicable en sus valuaciones a la fecha del laudo, ambos aplican el tipo de cambio oficial de CADIVI en sus valuaciones al mes de mayo de 2010, lo que resulta en costos de USD 11,9 por TM al año 2010[879].

### Costos de Envío desde Venezuela a los EE. UU.

802.  En cuanto a los costos de envío desde Venezuela a los EE. UU. para todos los *proppants* para exportación, el Prof. Spiller se basó en un embarque real del mes de marzo de 2010 desde Puerto Ordaz hasta Corpus Christi, Texas, a un costo de USD 99,0 por TM[880]. El Prof. Spiller corroboró esta cifra sobre la base de diversos documentos contractuales que le suministró la Demandante, y que arrojaron un cargo de USD 91,43 por TM[881]. Sobre la base de la información proporcionada por el testigo de la Demandante, el Sr. Larry, de que algunos de los *proppants* se enviaban directamente del puerto de Corpus Christi al cliente, mientras que otros se enviaban primero al depósito de la Demandante en Alice, Estado de Texas, el Prof. Spiller también calculó los costos de envío desde Corpus Christi a Alice en USD 17,6 por TM, y arribó a la conclusión de que el promedio entre los costos

[878] Spiller II, nota 216; Brailovsky/Flores I, ¶ 97; Brailovsky/Flores II, nota 167.
[879] Spiller II, Figura 8; **Anexo CLEX-81**, pág. 38; Brailovsky/Flores I, ¶¶ 116-117; Brailovsky/Flores II, ¶ 102.
[880] Spiller II, ¶ 81 que hace referencia a CLEX-80, diapositiva 10.
[881] Spiller II, ¶ 82 y Tabla 7 que hace referencia al **Anexo CLEX-152**.

totales de envío a Alice (USD 109,03 por TM) y a Corpus Christi (USD 91,43 por TM) estaba en línea con su estimación de USD 99,0 por TM[882].

803.  El Sr. Brailovsky y el Dr. Flores se basaron en los costos de transporte presupuestados por la Demandante para el año 2010, que ascendían a EUR 110 por TM (convertidos a USD 154 por TM). Supusieron que este costo incluía los costos de envío local de USD 11,9 por TM, lo que resultaría en un costo de USD 142,1 por TM para la segunda categoría de costos de envío[883]. El Sr. Brailovsky y el Dr. Flores señalaron también que el estudio sobre precios de transferencia de Norpro Venezuela mostraba un costo de fletes a los EE. UU. para el año 2009 de USD 0,072 por libra, lo que se traduce a USD 158,7 por TM[884]. Por último, adoptaron la hipótesis del Prof. Spiller de que sólo la mitad de los *proppants* terminados se enviaban a Alice y su estimación de los costos de envío entre Corpus Christi y Alice (USD 17,6 por TM). Por consiguiente, estimaron un promedio de costo de transporte de USD 133,3 por TM[885].

804.  El Tribunal observa que los peritos de ambas Partes invocaron el Plan Estratégico 2011-2015 como la fuente principal para sus estimaciones respectivas. Mientras que el Prof. Spiller aplicó los costos de un envío real en el mes de marzo de 2010, el Sr. Brailovsky y el Dr. Flores se refirieron a los costos presupuestados para el año 2010[886]. En principio, el Tribunal considera que es razonable basarse en la propia estimación de la Demandante para sus costos presupuestados para el año 2010. El testigo de la Demandante, el Sr. Larry, que participó de la confección de la diapositiva[887], confirmó durante la Audiencia que esta estimación incluía los costos de envío a Alice, Estado de Texas[888]. Respecto de las diferencias entre las cifras invocadas por las Partes, el Sr. Larry explicó:

> *"Si vemos el costo en marzo, dólares por tonelada métrica, y constantemente tratábamos de optimizar el envío al cliente. Entonces, si el material estaba en la cuenca de premium, no lo enviaríamos a Alice, Texas. Lo enviaríamos con la mayor eficiencia directamente a la zona premium. Y pueden ver la cifra para marzo, y fue un mes de muchas ventas en esa zona. Fue de 37 dólares por libra"*[889].

805.  En la opinión del Tribunal, el testimonio del Sr. Larry no solo sustenta la hipótesis de los peritos de ambas Partes de que la mitad de los *proppants* se enviaba a Alice y la otra

---

[882] Spiller II, ¶ 81 y ¶¶ 83-85 que hace referencia a Larry I, ¶ 35.

[883] Brailovsky/Flores II, ¶¶ 118-119; Brailovsky/Flores II, ¶¶ 104 y 106 y Figura 11 que hace referencia al **Anexo CLEX-80**, diapositiva 42.

[884] Brailovsky/Flores I, ¶ 120; Brailovsky/Flores II, ¶ 106 que hace referencia al **Anexo CLEX-35**, pág. 1.

[885] Brailovsky/Flores II, ¶ 117.

[886] *Compárese* **Anexo CLEX-80**, diapositiva 10 *con* diapositiva 42.

[887] Transcripción (Día 3), pág. 682, línea 12 - pág. 683, línea 2.

[888] Transcripción (Día 3), pág. 697, línea 21- pág. 698, línea 7.

[889] Transcripción (Día 3), pág. 691, línea 18 - pág. 692, línea 5.

mitad se enviaba directamente desde Corpus Christi al cliente[890]. Lo que es más importante aún, el Sr. Larry explicó que la diferencia entre los costos del envío real en el mes de marzo de 2010 y los costos presupuestados para el año 2010 resultó, al menos en parte, del hecho de que el envío de marzo no fue hacia Alice, sino directamente desde Corpus Christi al cliente en la zona premium.

806. Asimismo, el Sr. Larry declaró que "*el costo de flete general incluyendo entrega al cliente está en 110 euros por tonelada, en esa gama por lo menos*"[891]. El Prof. Spiller también aseveró que "*[s]egún mi entendimiento, estos 110 euros incluyen todos los gastos de Puerto Ordaz hasta el cliente*"[892]. Sin embargo, el Tribunal observa que la diapositiva del Plan Estratégico 2011-2015 dice "*Suministro a Alice, Estado de Texas*". Por ello, el Tribunal no está completamente convencido de las declaraciones del Sr. Larry y el Prof. Spiller, y por ello procederá a considerar también las fuentes complementarias que los peritos de las Partes presentaron en sustento de sus respectivas estimaciones.

807. En lo que concierne a los costos por "*Flete a los EE. UU.*" detallados en el estudio de precios de transferencia que el Sr. Brailovsky y el Dr. Flores tradujeron en USD 158,7 por TM, el Tribunal señala que no hay un rubro de costo separado para los costos de flete local dentro de Venezuela, por lo que nuevamente se puede suponer que los costos de USD 11,9 por TM están incluidos en la suma. Sin embargo, existe un rubro de costo separado para "*Flete y manipulación dentro de los EE. UU.*". por lo que también se puede suponer que los costos de envío al cliente no están incluidos[893]. Como la suma de USD 146,8 por TM (excluidos los costos de envío local) es incluso mayor que la estimación del Sr. Brailovsky y el Dr. Flores, el estudio sustenta la exactitud de los costos presupuestados para el año 2010.

808. En cuanto a la corroboración realizada por el Prof. Spiller sobre los costos de envío a Corpus Christi conforme a diversos documentos contractuales que le proporcionó la Demandante, que resultó en una suma aún menor que los costos del envío real de marzo de 2010 (USD 91,43 por TM a Corpus Christi), el Tribunal subraya que el Sr. Brailovsky y el Dr. Flores cuestionaron esta corroboración en diversos sentidos. En particular, señalaron que (i) estos documentos incluían un memorando de entendimiento sin fecha y una oferta transmitida por correo electrónico en el año 2008; (ii) el contrato de servicios del año 2008 vencía en el mes de agosto de 2010 y habría estado en proceso de renegociación en el mes de mayo de 2010; y (iii) el Prof. Spiller realizó varios supuestos

---

[890] *Véase* también Larry I, ¶ 35 y Larry II, ¶ 13.
[891] Transcripción (Día 3), pág. 692, líneas 20-22.
[892] Transcripción (Día 4), pág. 968, líneas 17-19.
[893] *Véase* **Anexo CLEX-35**, pág. 1

conforme a los que los costos de envío del año 2010 eran menores que en el año 2008, cuando los documentos se firmaron o transmitieron[894].

809. Si bien el Tribunal considera que estas tres críticas no descartan toda la fiabilidad de los documentos y la corroboración del Prof. Spiller, tampoco presentan pruebas concluyentes acerca de los costos de transporte. Los resultantes costos de USD 91,43 por TM son incluso menores que los costos del envío real efectuado en el mes de marzo de 2010, que según el Sr. Larry tampoco incluían costos de envío a Alice.

810. Por consiguiente, en consideración de todas las pruebas, el Tribunal considera que corresponde basar su conclusión en el promedio de las cuatro cifras presentadas por los peritos de las Partes, es decir, USD 99,0 por TM, USD 124,5 por TM[895], USD 129,2 por TM[896] y USD 91,43 por TM (todos sin incluir los costos de envío inobjetados de USD 17,6 por TM desde Corpus Christi a Alice). Esto arroja un promedio de USD 111,03 por TM a Corpus Christi y un promedio de USD 128,63 a Alice. Puesto que los peritos de las Partes acordaron tomar el promedio entre los costos de envío a los dos destinos posibles en el Estado de Texas, esto resulta en un promedio general de USD 119,83 por TM.

### Costos de Envío desde el Estado de Texas a los Clientes

811. Por último, los peritos de las Partes aplican distintos supuestos para calcular los costos de envío desde Corpus Christi o Alice al cliente final. El Prof. Spiller invocó nuevamente los costos de un envío real efectuado en el mes de marzo de 2010, que ascendieron a USD 37,0 por TM. Supuso que el 30 % de los *proppants* se vendían EXW y el 70 % restante se distribuía en partes iguales entre las áreas de venta geográfica de la Demandante en los EE. UU., y por ende consideró que los costos de envío a un destino en Texas eran una buena representación[897].

812. Otra vez, el Sr. Brailovsky y el Dr. Flores se basaron en los costos presupuestados por la Demandante para el año 2010; pero como no existía un presupuesto de los costos de envío desde Corpus Christi o Alice al cliente, se refirieron a los costos de transporte desde la Planta de Fort Smith de la Demandante, Estado de Arkansas, hasta Alice, que ascendían a EUR 31,0 por TM (convertidos a USD 43,4 por TM). El Sr. Brailovsky y el Dr. Flores supusieron que la distancia entre Fort Smith y Alice representaba una buena estimación del promedio de los costos de transporte a destinos a lo largo de los EE. UU.[898]. El Sr. Brailovsky y el Dr. Flores destacaron que la Demandante no sólo hace envíos dentro de

---

[894] Brailovsky/Flores II, ¶¶ 111-115.
[895] USD 154,0 – USD 11,9 (costos de envío local) – USD 17,6 (costos de envío a Alice) = USD 124,5 por TM.
[896] USD 158,7 – USD 11,9 (costos de envío local) – USD 17,6 (costos de envío a Alice) = USD 129,2 por TM.
[897] Spiller II, ¶ 86; **Anexo CLEX-81**, pág. 37; **Anexo CLEX-80,** diapositiva 10.
[898] Brailovsky/Flores I, ¶¶ 124-126; Brailovsky/Flores II, ¶¶ 118-119.

los EE. UU., sino también a Canadá, y afirmaron que incluso si la estimación de la distribución de las ventas del Prof. Spiller fuera correcta, esto resultaría en un costo promedio de USD 51 por TM, si se aplicara a los costos por libra detallados en el Contrato Marco de Halliburton[899]. Al incluir las ventas a Canadá, calcularon un promedio de costos de USD 54 por TM[900].

813. El Tribunal considera que ninguno de los enfoques cuenta con suficiente sustento. El enfoque del Sr. Brailovsky y el Dr. Flores basado en los costos de transporte desde Fort Smith hasta Alice parece ser bastante especulativo, puesto que dichos costos se refieren a otra planta y a otra ruta. En relación con el enfoque del Prof. Spiller, el Tribunal subraya que el Profesor no recibió datos reales de ventas, sino que afirmó que entendía que aproximadamente un 30 % de los *proppants* se vendían EXW y supuso que el resto se distribuiría en partes iguales entre las tres regiones de venta geográficas dentro de los EE. UU. de la Demandante. Sin embargo, más allá del hecho de que el Sr. Brailovsky y el Dr. Flores señalaron que la Demandante también vende *proppants* a destinos en Canadá, no obran pruebas en el expediente de que el supuesto del Prof. Spiller fuera realista. El Tribunal concuerda con la Demandada en que la Demandante debería haber revelado la proporción real de las ventas de Norpro Venezuela en Norteamérica.

814. Además, el Tribunal no está convencido por la hipótesis del Prof. Spiller de que los costos de un envío real a un destino dentro del Estado de Texas sea una buena representación de las ventas en todos los EE. UU. En particular, el hecho de que el Sr. Brailovsky y el Dr. Flores aplicaran el supuesto de las ventas del Prof. Spiller a los precios en virtud del Contrato Marco de Halliburton y llegaran a un promedio ponderado de USD 51 por TM, genera dudas acerca de la fiabilidad de la estimación de costos del Prof. Spiller de USD 37 por TM.

815. A la luz del hecho de que la Demandante no presentó pruebas concluyentes en este sentido y tomando en cuenta también que la estimación del Sr. Brailovsky y el Dr. Flores de USD 43,4 por TM sigue siendo considerablemente menor que el costo que calcularon de conformidad con el  Contrato Marco de Halliburton, el Tribunal considera que corresponde adoptar su estimación de los costos de envío dentro de Norteamérica.

### Conclusión sobre los Costos de Transporte

816. En síntesis, el Tribunal arriba a la conclusión de que la presente valuación debe incluir (i) USD 11,9 por TM por costos de envío local dentro de Venezuela para todas las ventas; (ii) USD 119,83 por TM por costos de envío desde Venezuela a Corpus Christi o Alice,

---

[899] Brailovsky/Flores II, ¶¶ 120-122 y Tabla 6.
[900] Brailovsky/Flores II, ¶ 123 y Tabla 7.

Texas, para todas las ventas de exportación; y (iii) USD 43,4 por TM por costos de envío dentro de Norteamérica para todas las ventas de exportación a Norteamérica.

### (6)    Gastos de capital

817. En lo que concierne a los gastos de capital, el Tribunal señala que las Partes coinciden respecto del horizonte temporal para el período comprendido entre los años 2010-2018. Para este período, el Sr. Brailovsky y el Dr. Flores adoptaron el enfoque del Prof. Spiller de basarse en las cifras estimadas en el Plan de Negocios de la Demandante del mes de abril de 2010 (USD 1,4 millones en el año 2010; USD 1,0 millón en el año 2011; USD 1,5 millones en el año 2012; USD 5,0 millones en el año 2013; y USD 0,5 millón *por año* en 2014-2015) y suponer que la suma de USD 0,5 millón *por año* (incrementada conforme al PPI de los EE. UU.) también se requeriría en el período comprendido entre los años 2016-2018[901].

818. Sin embargo, los peritos de las Partes han aplicado distintas cifras para el período posterior al año 2018. El Prof. Spiller supuso que los gastos de capital a largo plazo ascenderían a USD 0,6 millón indefinidamente y señaló que esto coincidía con la estimación de los gastos de capital para el mantenimiento de la Planta de Fort Smith de la Demandada de 30 años de antigüedad para el período comprendido entre los años 2010-2018[902].

819. El Sr. Brailovsky y el Dr. Flores consideraron que no era razonable suponer que Norpro Venezuela tendría los mismos gastos de capital durante toda su vida útil, y en definitiva se basaron en cuatro gastos de capital de la Planta de Fort Smith: (i) salud, seguridad y medio ambiente (HSE, por sus siglas en inglés); (ii) mantenimiento del negocio (*MOB*, por sus siglas en inglés); (iii) tecnología (*TECH*, por sus siglas en inglés); y (iv) fabricación de primer nivel (*WCM*, por sus siglas en inglés). Calcularon que con un ajuste por el tamaño de Norpro Venezuela, esto resultaba en gastos de capital por USD 1,6 millones indefinidamente[903].

820. El Prof. Spiller aseveró que aparte de los gastos de capital de *MOB*, las otras tres categorías de gastos de capital no se relacionaban con el mantenimiento; sino con la eficacia y las mejoras tecnológicas, que sólo se podrían incluir en la valuación si también se tomaran en cuenta la mayor producción o las ganancias por eficacia también. Sin embargo, los peritos de ambas Partes supusieron que los factores de eficacia de Norpro Venezuela se mantendrían constantes a largo plazo[904].

---

[901] Spiller I, ¶ 137; **Anexo CLEX-81**, pág. 50; Brailovsky/Flores I, ¶¶ 128-130; Brailovsky/Flores II, ¶ 128.
[902] Spiller II, ¶¶ 88-90 y Figuras 9 y 10; **Anexo CLEX-81**, pág. 50.
[903] Brailovsky/Flores II, ¶¶ 130-136; **Apéndice BF-104**, Tabla 8.
[904] SpillerII, ¶ 89.

821. El Sr. Brailovsky y el Dr. Flores señalaron que las tres categorías de gastos de capital "*no relacionadas con el mantenimiento*" incluían rubros como las reparaciones de los techos y las mejoras para prevenir los resbalones, los tropiezos y las caídas (*HSE*), el reemplazo de la tecnología obsoleta (*TECH*) y las mejoras para reducir las averías y las interrupciones del proceso (*WCM*). Arribaron a la conclusión de que todos estos componentes eran necesarios para mantener la operación de la planta indefinidamente y para conservar la competitividad[905].

822. En principio, el Tribunal concuerda con el Prof. Spiller en que la inclusión de gastos que no se relacionan con el mantenimiento sino con mejoras a la tecnología o la eficacia exigirían que se tome en cuenta el valor agregado también. Sin embargo, tal como demuestra el primer ejemplo citado por el Sr. Brailovsky y el Dr. Flores bajo la categoría de gastos de capital en "*seguridad, salud y medio ambiente*", el mantenimiento no se puede reducir necesariamente a la categoría de gastos de capital por "*mantenimiento del negocio*". El mantenimiento del funcionamiento de la planta al mismo nivel de eficacia y tecnología también incluye gastos, por ejemplo, para la adaptación a los nuevos requisitos regulatorios o mejoras en materia de seguridad.

823. Por consiguiente, el Tribunal concuerda con el Sr. Brailovsky y el Dr. Flores en que la distinción del Prof Spiller entre una categoría de gastos de capital de "*mantenimiento*" y tres "*no relacionadas con el mantenimiento*" no es del todo exacta. En particular, el Tribunal entiende que el mantenimiento incluye varios de los rubros que forman parte de la categoría de gastos de capital en "*salud, seguridad y medio ambiente*". En cuanto a las categorías de gastos de capital en "*tecnología*" y "*fabricación de primer nivel*", sin embargo, el Tribunal considera que se relacionan principalmente con mejoras a la tecnología y eficacia, que no se pueden considerar sin tomar en cuenta también las resultantes ganancias de eficacia (lo que el Sr. Brailovsky y el Dr. Flores no hicieron). En consecuencia, el Tribunal resuelve que los gastos de capital a largo plazo de Norpro Venezuela deberían reflejar los gastos proyectados para la Planta de Fort Smith para los gastos de capital comprendidos por los rubros *MOB* y *HSE*, pero no por *TECH* y *WCM*.

### (7)    Capital de Trabajo – Créditos por IVA

824. En relación con el capital de trabajo necesario para operar la planta, el Sr. Brailovsky y el Dr. Flores coincidieron con el modelo planteado por el Prof. Spiller en su segundo dictamen pericial, excepto en cuanto a su tratamiento de los créditos fiscales IVA[906]. Además, el Sr. Brailovsky y el Dr. Flores no cuestionaron los cálculos del Prof. Spiller conforme a los cuales al mes de abril de 2010 Norpro Venezuela contaba con un saldo de

---

[905] Brailovsky/Flores II, ¶¶ 134-135 que hace referencia al **Anexo CLEX-91**, diapositivas 142, 144 y 145.
[906] Brailovsky/Flores II, ¶ 145.

créditos fiscales IVA pendientes por la suma de VEF 12,3 millones (convertidos a USD 2,9 millones)[907]. Los enfoques de los peritos de las Partes difieren, sin embargo, respecto del tiempo que habría llevado monetizar los créditos fiscales por IVA.

825.  Conforme a las instrucciones de los letrados, el Prof. Spiller se basó en el derecho administrativo venezolano, que establece que los créditos fiscales se deben decidir dentro de los 30 días, y por ello supuso que el saldo de VEF 12,3 millones se habría cobrado durante el transcurso del año 2010. Confeccionó un modelo sobre los requisitos de capital de trabajo sobre la base de la hipótesis de que (i) la monetización de los certificados de IVA habría llevado 60 días a partir de la presentación de la solicitud de recuperación; y (ii) Norpro Venezuela habría recuperado el 80 % de las cuentas por cobrar en concepto de IVA[908].

826.  El Sr. Brailovsky y el Dr. Flores subrayaron que Norpro Venezuela no había obtenido su licencia para exportación y no había iniciado el proceso de recuperación de IVA al mes de mayo de 2010, y supusieron que presentaría sus primeras solicitudes de recuperación de IVA a fines del año 2010 o el año 2011. Según el Sr. Brailovsky y el Dr. Flores, Norpro Venezuela habría recibido, por ende, sus primeros certificados de recuperación sólo unos dos años después, es decir, en el año 2013, a causa de las bien conocidas largas demoras del proceso de recuperación. Asimismo, se basaron en el supuesto de que hasta ese entonces Norpro Venezuela habría adquirido insumos y suministros adicionales, que habrían resultado en nuevos créditos fiscales IVA, y por consiguiente en un saldo continuo de créditos fiscales IVA pendientes. En consecuencia, no incluyeron los flujos de fondos relacionados con el IVA en su modelo[909].

827.  El Tribunal considera que hay dos cuestiones que se deben analizar en este sentido: (i) si la Demandada puede invocar las demoras en su propio procedimiento administrativo a los efectos de la presente valuación; y (ii) si la Demandada ha demostrado que los exportadores se enfrentaban, de hecho, a demoras de dos años aproximadamente en el proceso de recuperación.

828.  En cuanto a la primera cuestión, el Tribunal observa que desde la perspectiva estrictamente económica de un comprador interesado, sin dudas se habrían tenido en cuenta las demoras administrativas que lleven a demoras en el flujo de fondos; suponiendo que las demoras existieran, en efecto. No obstante, la Demandante argumenta que si Venezuela hubiera actuado de buena fe, habría seguido su propio derecho administrativo para pronunciarse sobre los créditos fiscales IVA dentro de los 30 días. Si

---

[907] **Anexo CLEX-81**, pág. 53.
[908] Spiller II, ¶¶ 92-93.
[909] Brailovsky/Flores I, ¶¶ 170-175; Brailovsky/Flores II, ¶¶ 148-150.

bien en un principio la Demandante planteó una reclamación por TJE en este sentido[910], dejó de lado este argumento en sus escritos posteriores y en la Audiencia, y en cambio se refirió a los créditos fiscales IVA sólo en el debate acerca de la cuantía de los daños, y señaló que "*las propias demoras administrativas prolongadas se han considerado en violación del estándar TJE*"[911]. La Demandante arguye que sería "*inequitativo que el Estado utilizara sus propias demoras en el procesamiento de las obligaciones legales como una forma de evitarlas en su totalidad*"[912]. [Traducción del Tribunal]

829. Si bien el Tribunal no se inclina por permitir que la Demandada invoque sus propias deficiencias administrativas para disminuir el monto indemnizatorio por pagar a la Demandante, el argumento de la Demandante sólo podría prevalecer si quedara demostrado que las demoras no existían cuando la Demandante tomó la decisión de invertir en Venezuela o que a la Demandante se le garantizó que no sería sujeta a ellas. Las pruebas demuestran que las demoras administrativas en el procedimiento de recuperación de IVA han sido bien conocidas en Venezuela ya desde principios de la década del año 2000, cuando las Demandantes consideraron invertir en Venezuela. Un artículo periodístico del año 2000 informa sobre la existencia de recuperaciones de IVA por la suma de VEF 100 mil millones adeudados desde el año 1993[913]. Otro artículo del año 2003 informa que desde el año 2001 se adeudaban VEF 170 mil millones en concepto de recuperaciones de IVA[914]. Por último, un artículo periodístico del año 2007 informa sobre la emisión de certificados de recuperación por la suma de VEF 3,1 mil millones tras demoras de varios meses[915].

830. La Demandante no niega que los exportadores se enfrentaran a demoras considerables en la obtención de las recuperaciones de IVA cuando tomó la decisión de invertir en Venezuela, pero reclama que se le garantizó que Venezuela seguiría su propio procedimiento de recuperación de créditos fiscales IVA[916]. La Demandante cita en particular el Artículo 43 de la Ley que establece el Impuesto al Valor Agregado, que dispone que la Administración Tributaria deberá pronunciarse sobre la procedencia o no de la solicitud presentada en un lapso no mayor de treinta días hábiles "*contados a partir de la fecha de su recepción definitiva, siempre que se hayan cumplido todos los requisitos que para tal fin disponga el Reglamento*"[917]. Según esta redacción, el período de treinta días comienza una vez que la administración tributaria ha recibido todos los documentos

---

[910] *Cfr.* Memorial, ¶¶ 162-164.

[911] Réplica, nota 381.

[912] Presentación Posterior a la Audiencia de la Demandante, ¶ 159.

[913] **Apéndice BF-34**.

[914] **Apéndice BF-35**.

[915] **Apéndice BF-36**.

[916] Presentación Posterior a la Audiencia de la Demandante, ¶ 159.

[917] Traducción al inglés presentada por la Demandada con **Anexo R-41**.

de sustento exigidos por la Ley que establece el Impuesto al Valor Agregado, que no necesariamente es la misma fecha en la que ha recibido la solicitud, porque no es inusual que la administración exija documentación o información adicional sobre ciertas cuestiones, tal como explicara el Sr. Rondón en su declaración testimonial escrita[918].

831. En cualquier caso, el Tribunal no considera que haya quedado demostrado que la Demandante haya recibido, en efecto, garantías específicas de que Venezuela cumpliría con esta disposición. En particular, la Demandante no pudo señalar ninguna declaración de un funcionario del gobierno de que no estaría sujeta a las mismas demoras que todas las exportadoras experimentaban en general en Venezuela en ese momento. El Sr. Pedersen afirmó en su declaración por escrito que sobre la base de las reuniones con CVG en el año 2005 esperaban recibir un "*tratamiento beneficioso en materia de IVA y tratamiento fiscal*", sin establecer, sin embargo, que se hubieran dado garantías específicas respecto del procedimiento de recuperación de IVA[919]. [Traducción del Tribunal]

832. Los documentos contemporáneos que la Demandante cita en este sentido se refieren de forma explícita a las exenciones al IVA y los derechos de importación conforme al Decreto Presidencial del año 2006, pero no al procedimiento de recuperación de IVA por materiales que no se encontraban exentos del impuesto al IVA[920]. Como lo explicaron el Sr. Brailovsky y el Dr. Flores en su primer dictamen pericial, las exenciones al IVA y el procedimiento de recuperación de IVA se referían a distintos materiales, y conforme a una exención, Norpro Venezuela no debía pagar IVA desde el principio, por lo que no podría tener derecho a ninguna recuperación[921]. Como en efecto Norpro Venezuela recibió un Certificado de Exención para Bienes de Capital de MILCO el día 25 de octubre de 2007, que cubría 29 tipos específicos de equipos, aparentemente la empresa recibía un "*tratamiento beneficioso en materia de IVA*"[Traducción del Tribunal], como se le había prometido. Como no hay una referencia específica al procedimiento de recuperación de IVA en relación con los materiales no cubiertos por este certificado, el Tribunal arriba a la conclusión de que no hay sustento jurídico conforme al derecho internacional para excluir las demoras en el procedimiento de recuperación de la presente valuación, en el caso de que queden demostradas.

833. Por consiguiente, el Tribunal debe evaluar si la Demandada ha demostrado que en efecto hubiera demoras de aproximadamente dos años en el procedimiento de recuperación de IVA en el año 2010. En cuanto a los tres artículos periodísticos mencionados *supra,* la

---

[918] Rondón, ¶ 38.
[919] Pedersen, ¶ 24.
[920] *Véanse* en particular **Anexos C-079, C-082, pág. 4 y C-084**.
[921] Brailovsky/Flores I, ¶ 163.

Demandante señaló correctamente que todos datan de tres a diez años antes[922]. Si bien sirven como prueba de que las demoras eran un problema al momento en que la Demandante invirtió en Venezuela, no establecen que las mismas demoras siguieran existiendo en el año 2010.

834. Asimismo, el Sr. Brailovsky y el Dr. Flores señalaron una declaración que figura en la actualización de la DAC de la Demandante de fecha 8 de junio de 2009:

> "*Relacionada en parte con las cuestiones de exportación, la recuperación del IVA del tesoro fiscal se ha vuelto un proceso muy largo y complejo* […] *Los principales motivos de la demora se relacionan con los requisitos legales que deben cumplirse para recibir la licencia de exportación. Se ha identificado y se ha asignado un plan a cada uno de los requisitos*"[923]. [Traducción del Tribunal]

835. Si bien la actualización de la DAC confirma que la recuperación del IVA aún llevaba un tiempo considerable, los principales motivos de las demoras se veían en la obtención de la licencia de exportación, que no se había obtenido al mes de junio de 2009. Aparte de que se informó que se estaban tratando todos los requisitos legales, el testigo de la Demandada, el Sr. Rondón, afirmó en su declaración testimonial escrita que para el momento de la expropiación "*Norpro Venezuela había notificado al fisco de su intención de iniciar el procedimiento de recuperación de créditos por IVA mediante la solicitud de un certificado especial de recuperación fiscal sobre la base de las ventas de exportación*"[924] [Traducción del Tribunal]. Durante la audiencia, el Sr. Rondón aclaró que Norpro Venezuela había presentado su solicitud de un certificado especial de recuperación fiscal, y por ende, había iniciado el proceso de recuperación[925]. Tal como explicaron el Sr. Brailovsky y el Dr. Flores en su primer dictamen pericial, primero la empresa debía obtener la licencia de exportación, para luego poder presentar la solicitud de recuperación de créditos fiscales[926]. Puesto que el testimonio del Sr. Rondón confirma que Norpro Venezuela había iniciado el segundo paso para el mes de mayo de 2010, debía haber completado el primer paso para esa fecha, y esto se ha descrito como el motivo principal de las demoras en la actualización de la DAC.

836. Al mismo tiempo, el Tribunal subraya que el Sr. Rondón afirmó lo siguiente en su declaración testimonial escrita:

> "*Estábamos al tanto de que, incluso después de la presentación inicial del certificado especial de recuperación de créditos fiscales, el proceso*

---

[922] Presentación Posterior a la Audiencia de la Demandante, nota 348.
[923] **Anexo R-7**, pág. 6.
[924] Rondón, ¶ 38.
[925] Transcripción (Día 3), pág. 771, línea 17 - pág. 772, línea 7.
[926] Brailovsky/Flores I, ¶ 168.

*sería extenso y tedioso e involucraría la verificación de todas las transacciones relacionadas. También sabíamos que sería típico como parte del proceso que el fisco solicitara documentación adicional. Entiendo que este procedimiento para la recuperación del IVA en Venezuela lleva al menos dos años a partir de la presentación de la solicitud inicial*"[927].

837. Tal como bien señalara la Demandada, no se realizó el interrogatorio cruzado del Sr. Rondón acerca de su declaración sobre el procedimiento de recuperación del IVA[928]. El Tribunal también señaló *supra* que el período de treinta días establecido en el Artículo 43 de la Ley que establece el Impuesto al Valor Agregado sólo comienza una vez que la administración tributaria haya recibido todos los documentos que considere necesarios para pronunciarse acerca de la solicitud de recuperación. Aparte de esta disposición, la Demandante no ha presentado ningún indicio de que la declaración del Sr. Rondón fuera inexacta o de que la situación hubiera cambiado desde la publicación de los artículos periodísticos de los años 2000, 2003 y 2007.

838. En consecuencia, el Tribunal sigue el enfoque de los peritos de la Demandada de que el procedimiento de recuperación llevó un tiempo considerable durante el cual los nuevos créditos fiscales IVA se acumularon, lo que creó un saldo continuo de créditos pendientes por IVA. Puesto que Norpro Venezuela no podría operar sin acumular continuamente nuevos créditos por IVA mientras esperaba que se recuperara el saldo inicial, el Tribunal considera que es plausible suponer que forman parte del capital de trabajo de Norpro Venezuela como empresa en marcha. Si bien los peritos de ambas Partes asumieron que la producción habría aumentado  hasta el año 2014[929], –y con ella la suma anual de nuevos créditos por IVA acumulados– el Tribunal asimismo coincide con los peritos de la Demandada en que Norpro Venezuela hubiera tenido un saldo  continuo de créditos por IVA equivalente, al menos, a la suma del mes de abril de 2010.  Puesto que dicha suma habría estado continuamente subsumida en el negocio en operación, no presenta un valor independiente que un comprador interesado pagaría adicionalmente al valor de Norpro Venezuela como empresa en marcha.

### (8)    Nuevos Impuestos Introducidos después de la Expropiación

839. Por último, hubo un debate entre las Partes y sus peritos en cuanto al momento en que Norpro Venezuela habría estado sujeta a una contribución de 1% de los ingresos anuales de empresas con más de 50 empleados en virtud de la Ley Orgánica de Drogas. Sin embargo, tal como señalara explícitamente la Demandada, el Sr. Brailovsky y el Dr.

---

[927] Rondón, ¶ 38.

[928] Escrito Posterior a la Audiencia de la Demandada, nota 412. La aclaración a la que se refiere el párrafo 835 se hizo en respuesta a una pregunta formulada por el  Tribunal.

[929] *Cfr.* Spiller I, ¶¶ 52 y ss. y Figura 4; Barilovsky/Flores I, ¶ 174.

Flores no incluyeron esta contribución en su valuación de fecha 15 de mayo de 2010 porque no era aplicable a Norpro Venezuela en el año 2010 debido al uso de su modelo de tercerización[930].

840.  Asimismo, las Partes están de acuerdo en que hay una segunda contribución de 1% de los ingresos anuales en virtud de la Ley Orgánica de Deportes, Actividad Física y Educación Física, que no se incluye en la valuación de fecha 15 de mayo de 2010 porque esta ley se sancionó recién en el año 2011 y, por lo tanto, ningún comprador interesado la conocía en el año 2010[931].

841.   Puesto que  las Partes están de acuerdo en que ninguna contribución podría preverse al día 15 de mayo de 2010, el Tribunal resuelve que ninguna de las dos contribuciones puede incluirse en el cálculo DCF para evaluar Norpro Venezuela a  esa fecha.

### c)    Pérdidas Históricas relacionadas con el Aumento en el Precio de la Bauxita

#### aa)    Síntesis de la Postura de la Demandante

842.  Además del valor justo de mercado de la planta, la Demandante alega que tiene derecho a indemnización por las pérdidas sufridas por el suministro de bauxita en virtud del Contrato de Bauxita debido al aumento de precios en violación del Artículo 3(1) y (2) del Tratado. Según la opinión de la Demandante, la Demandada es responsable por el pago excesivo de USD 1,3 millones al día 15 de mayo de 2010[932].

843.  La Demandante alega que su "*derecho legal a obtener bauxita al precio contractual estipulado*" de USD 25,5 por TM en el año 2008, inflado a USD 24,3 por TM en el año 2009, fue parte de los derechos que le expropió la Demandada. Según la Demandante, Norpro Venezuela pudo haber perseguido, de otro modo, sus reclamaciones legales conforme al Contrato de Bauxita contra CVG Bauxilum; es por eso que la Demandante debe ser indemnizada por la expropiación de este derecho intangible[933].

#### bb)    Síntesis de la Postura de la Demandada

844.  La Demandada sostiene que la reclamación de daños de la Demandante es infundada porque (i) Norpro Venezuela acordó el aumento de precio de la bauxita siempre que no hubiera otro aumento durante el año 2009; y (ii) la reclamación es inadmisible, ya que Norpro Venezuela debió haber entablado su reclamación por supuesto incumplimiento

---

[930] Memorial de Contestación, ¶ 256; Brailovsky/Flores I, ¶ 243.

[931] Memorial de Contestación, ¶ 256; Brailovsky/Flores I, ¶ 243.

[932] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 162-163, Spiller II, Tabla 12.

[933] Réplica, ¶¶ 198-199; Memorial, ¶ 221.

del Contrato de Bauxita en un procedimiento arbitral en Caracas, tal como se establece en el Contrato[934].

845. En respuesta al argumento de la Demandante de que expropió el derecho legal de Norpro Venezuela de hacer valer su supuesta reclamación contra CVG Bauxilum, la Demandada alega que las reclamaciones contractuales de Norpro Venezuela contra CVG Bauxilum, aun si las hubiera tenido, no fueron objeto de expropiación[935].

### cc)    El Análisis del Tribunal

846. El Tribunal advierte que esta reclamación también se relaciona con las reclamaciones de TJE y PSC de la Demandante con respecto al aumento de precio de la bauxita en el mes de septiembre de 2008. De manera similar a la decisión del Tribunal *supra* de que no hay motivo para excluir el aumento de precio de la valuación de los flujos de fondos futuros de Norpro Venezuela al día 15 de mayo de 2010, el Tribunal considera que la reclamación por parte de la Demandante de indemnización por el pago del precio aumentado antes del día 15 de mayo de 2010 carece de fundamento.

847. Esta conclusión es independiente de la cuestión que consiste en determinar si las reclamaciones de Norpro Venezuela contra CVG Bauxilum habrían formado parte de los derechos expropiados por los que la Demandante solicita resarcimiento. En cualquier caso, el Tribunal concluyó que la Demandante no logró demostrar que el aumento de precios fuera injustificado en virtud del Contrato de Bauxita y, por lo tanto, no está convencido de que haya habido expropiación de reclamaciones de Norpro Venezuela contra CVG Bauxilum por incumplimiento contractual.

848. En consecuencia, la Demandante no tiene derecho a indemnización por el hecho de haver pagado el precio aumentado de USD 33,8 por TM entre los meses de septiembre de 2008 y mayo de 2010, que el Prof. Spiller cuantificó en USD 1,3 millones al mes de mayo de 2010[936].

### d)    Conclusión sobre el Cálculo de la Indemnización

849. En conclusión, el Tribunal considera que el cálculo de la indemnización que deberá pagar la Demandada debe basarse en el valor actual neto de los flujos de fondos futuros de Norpro Venezuela al día 15 de mayo de 2010. El valor actual neto se determinará mediante aplicación de una tasa de descuento nominal de 19,88%.

---

[934] Memorial de Contestación, ¶ 266.
[935] Dúplica, nota 857.
[936] Spiller II, Tabla 12.

850. En cuanto a los flujos de fondos futuros de Norpro Venezuela, el Tribunal resuelve que (i) las suposiciones sobre los precios de los *proppants* deben fundarse en las proyecciones contenidas en el Plan de Negocios de la Demandante del mes de abril de 2010; (ii) debe aplicarse una deducción de 25% a las ganancias provenientes de exportaciones dado que Norpro Venezuela no contaba con una red propia de marketing y distribución; (iii) con respecto al tipo de cambio de divisas aplicable, las suposiciones de devaluación con posterioridad al día 15 de mayo de 2010 deben basarse en los tipos de cambio previstos por Ecoanalítica; (iv) los costos de la bauxita deben calcularse en función del precio aumentado de USD 33,8 por TM que Norpro Venezuela, de hecho, pagó al mes de septiembre de 2008; (v) los costos de transporte deben incluir USD 11,9 por TM en concepto de costos de envío local dentro de Venezuela para todas las ventas, más USD 119,83 por TM en concepto de costos de envío desde Venezuela hasta Corpus Christi o Alice, Estado de Texas, para todas las exportaciones, más USD 43,4 por TM en concepto de costos de envío dentro de Norteamérica para todas las exportaciones norteamericanas; (vi) los gastos de capital a largo plazo para Norpro Venezuela deben reflejar los desembolsos previstos para la Planta de Fort Smith en las categorías de gastos de capital de *MOB* y *HSE*, pero no los gastos de *TECH* y *WCM*; y (vii) debe suponerse que los créditos de IVA forman parte del capital de trabajo requerido para el funcionamiento continuo de Norpro Venezuela y, por lo tanto, no presentan ningún otro valor además del valor de Norpro Venezuela como empresa en marcha.

851. Por último, el Tribunal resuelve que la Demandante no tiene derecho a indemnización por pérdidas históricas relacionadas con el aumento del precio de la bauxita en el mes de septiembre de 2008 porque el aumento de precio se encontraba justificado en virtud del Artículo 10.2 del Contrato de Bauxita.

## 3.    Intereses

852. Como último paso, el Tribunal debe resolver la pretensión planteada por la Demandante de intereses anteriores al laudo al día 15 de mayo de 2010 e intereses posteriores al laudo hasta la fecha de pago por parte de Venezuela.

### a)    Síntesis de la Postura de la Demandante

853. La Demandante alega que tiene derecho a cobrar intereses anteriores y posteriores al laudo. Según la Demandante, debe quedar en la situación en que habría estado si no hubiera habido expropiación; por lo tanto, la tasa de interés debe ser igual al retorno previsto al invertir en Venezuela, es decir, su costo de oportunidad[937].

---

[937] Memorial, ¶¶ 230, 232; Réplica, ¶ 202.

854.  La Demandante se ampara en la decisión del tribunal de *Vivendi c. Argentina*, que ordenó el pago de intereses sobre el costo de capital de la demandante y concluyó que la tasa de interés debe *"representar, de manera razonable, la rentabilidad que las Demandantes habrían obtenido sobre los montos invertidos y perdidos en la [...] concesión"*[938]. La Demandante alude, asimismo, al tribunal de *France Telecom c. Líbano*, que adjudicó intereses a una tasa del 10% en concepto de retorno razonable de capital que el Estado quitó a la Demandante mediante sus acciones ilícitas[939]. La Demandante invoca también la decisión de *Alpha Projektholding c. Ucrania*, en la cual el tribunal otorgó intereses anteriores al laudo a la tasa libre de riesgo más la prima de riesgo de mercado, ya que *"esta tasa refleja mejor los costos de oportunidad relacionados con las pérdidas de la Demandante, ajustados como consecuencia de los riesgos que conlleva invertir en Ucrania"*[940] [Traducción del Tribunal]. Por otra parte, la Demandante hace referencia a la decisión del tribunal de la CCI en *ConocoPhillips c. PDVSA*, que concedió intereses a una tasa correspondiente al costo de capital del inversor en Venezuela[941].

855.  La Demandante alega que si hubiera reinvertido los flujos de fondos generados por Norpro Venezuela, habría percibido retornos a su costo de capital. Por lo tanto, la Demandante reclama que se le paguen intereses anteriores y posteriores al laudo a una tasa equivalente al costo de capital de Norpro Venezuela[942]. La Demandante considera que no hay motivos para distinguir entre la tasa de intereses anteriores al laudo y la tasa de intereses posteriores al laudo, salvo por el hecho de que la tasa de intereses posteriores al laudo debe captar la cifra del costo actual de capital (14,53% al día 31 de agosto de 2015)[943].

856.  Además, la Demandante señala que cualquier otra tasa de interés daría lugar a un enriquecimiento ilícito de la Demandada, puesto que tenía libre acceso a los fondos expropiados. La Demandante sostiene que el costo razonable en que PDVSA habría incurrido si hubiera tenido que pedir prestado el monto en cuestión es igual a las rentabilidades sobre sus bonos *bullet* [aquellos cuyo capital se paga íntegramente al

---

[938] Memorial, ¶ 232; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *Vivendi c. Argentina* (**CLA-024**), ¶ 9.2.8.

[939] Memorial, ¶ 232; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *France Telecom c. Líbano* (**CLA-034**), ¶ 209.

[940] Memorial, ¶ 233; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *Alpha Prjektholding c. Ucrania* (**CLA-002**), ¶¶ 514, 518.

[941] Memorial, ¶ 234; Presentación Posterior a la Audiencia de la Demandante, nota 406, en la que se cita *ConocoPhillips c. PDVSA* (**CLA-064**), ¶¶ 294-296; Réplica, ¶ 203, con cita de ¶ 295(ii).

[942] Memorial, ¶ 235; Réplica, ¶ 204.

[943] Réplica, ¶ 207;    Actualización de la Valuación del Prof. Spiller, Tabla 6; **Anexo CLEX-198**, pág. 2. El Prof. Spiller calculó el costo de capital de Norpro Venezuela al día 15 de mayo de 2010 en 13,56%. **Anexo CLEX-81**, pág. 32.

vencimiento en un sólo pago], que eran cercanas al 9% en el año 2013[944]. Según la Demandante, esta también sería la "*adecuada*" tasa de interés del mercado conforme al Artículo 5(1) del Tratado, pero afirma que, de acuerdo con el derecho internacional consuetudinario, tiene derecho al costo de capital de Norpro Venezuela[945].

857. En la opinión de la Demandante, la tasa de interés no puede basarse en la tasa libre de riesgo en este caso porque Venezuela tiene dificultades para cancelar sus deudas y debe pagar el Laudo en dólares estadounidenses que, al tratarse de una moneda distinta a la suya, no puede emitir para saldar el Laudo. La Demandante alega que por más de cinco años se vio obligada a prestar dinero a Venezuela pese al riesgo de verse imposibilitada de pagar, por lo que la tasa de interés del mercado debe reflejar los costos de un préstamo de mediano a largo plazo para Venezuela[946].

858. En particular, con respecto a la tasa de intereses posteriores al laudo, la Demandante alega que, de lo contrario, la Demandada no tendría interés en pagar el Laudo antes de cancelar sus otras deudas con acreedores. En la opinión de la Demandante, esto no cumpliría el propósito de los intereses posteriores al laudo de servir de incentivo eficaz para cumplir los términos del Laudo[947].

859. En cualquier caso, la Demandante asevera que la tasa de interés que propone la Demandada no es una tasa de interés del mercado sino que equivale a una tasa interbancaria, y hace referencia a la decisión del tribunal de *Tidewater c. Venezuela*, que rechazó la sugerencia de Venezuela sobre esa base. Además, la Demandante afirma que ninguno de los tribunales que cita la Demandada aplicó un bono del Tesoro a tres meses, pero considera que "*tiene arraigo el hecho de [,,,]*" que la tasa de intereses anteriores al laudo debe reflejar una tasa de interés de mediano a largo plazo[948].

---

[944] Réplica, ¶¶ 205-206. Según la Demandante, esta tasa es "*bastante conservadora*" debido a que la tasa de préstamos a largo plazo de la Demandada se sitúa en torno al 13%. Presentación Posterior a la Audiencia de la Demandante, ¶ 182.

[945] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 180-181, 183.

[946] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 184-186, Segunda Presentación Posterior a la Audiencia de la Demandante, ¶¶ 111, 114-115. Para respaldar su postura de que la tasa de interés debe reflejar el riesgo de la Demandada, la Demandante cita un documento redactado por Fisher y Romaine acerca de los intereses anteriores al fallo por indemnización otorgada en juicios en los Estados Unidos. Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 110, con cita de **Apéndice BF-96**, pág. 147. Sin embargo, la Demandada aclaró que Fisher y Romaine, en el fondo, "*mantienen la postura de que los intereses anteriores al fallo deben adjudicarse a la tasa sin riesgo*". Carta de la Demandada de fecha 2 de junio 2015, ¶ 4, con cita de **Apéndice BF-96**, págs. 147-148. El Tribunal admitió esta presentación como parte del expediente el día 19 de junio de 2015. También se habló del documento con el perito de la Demandada durante la Audiencia. Transcripción, Día 4, págs. 1099-1100.

[947] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 188, 190.

[948] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 109, con cita de *Tidewater c. Venezuela* (**CLA-155**). ¶ 206.

860. En la opinión de la Demandante, el Tribunal debe adjudicar intereses sobre una base compuesta anual a fin de reflejar completamente el valor temporal de sus pérdidas y, de esa manera, dar efecto al estándar de reparación íntegra conforme al derecho internacional consuetudinario[949]. La Demandante alega que *"casi todas las transacciones y operaciones financieras de la vida real"* comprenden intereses compuestos y señala que los tribunales de las cinco decisiones más recientes en casos CIADI sobre expropiaciones venezolanas han adjudicado intereses compuestos[950].

**b)    Síntesis de la Postura de la Demandada**

861. La Demandada rechaza el alegato de la Demandante de que se le deben otorgar intereses según el costo de capital de Norpro Venezuela y alega que esto no califica como *"adecuada tasa de interés del mercado"* conforme al Artículo 5(1) del Tratado. Además, la Demandada considera *"absurdo"* actualizar los flujos de fondos pasados a una tasa mayor que la tasa de descuento que calculó el Prof. Spiller a los fines de descontar flujos de fondos futuros, aunque no se apliquen los riesgos e incertidumbres del futuro[951].

862. En la opinión de la Demandada, el argumento alternativo de la Demandante de aplicar la tasa aplicable a la deuda de PDVSA es igualmente inapropiado porque el interés como forma de compensación debe centrarse en la pérdida de la Demandante ocasionada por el hecho de no haber recibido el pago en una fecha fija. Dado que la Demandante no corre riesgos relacionados con su inversión desde el día 15 de mayo de 2010, la Demandante alega que la tasa de interés adecuada es la tasa libre de riesgo[952].

863. Según la Demandada, las tasas de interés del mercado en el ámbito comercial se basan *"casi siempre"* en una tasa de base, como la tasa LIBOR o la tasa de letras del Tesoro de los EE. UU. a corto plazo, que se aumentan mediante un cierto margen según la solvencia del prestatario, es decir, en este caso, la principal controlante de la Demandante, Compagnie de Saint-Gobain. En vista de la cuestión de la integridad que se planteó con respecto a la tasa LIBOR, la Demandada considera que la tasa de interés debe basarse en las letras del Tesoro de los EE. UU., y escoge las letras a tres meses para compensar a la Demandante por cualquier *"préstamo a corto plazo"* que pudo haber requerido hasta el dictado del presente Laudo[953].

864. La Demandada hace referencia a la decisión del tribunal de *Siemens c. Argentina* que otorgó intereses anteriores al laudo basados en el promedio de las letras del Tesoro de los

[949] Memorial, ¶¶ 236-237; Réplica, ¶ 208; Presentación Posterior a la Audiencia de la Demandante, ¶¶ 191-194.
[950] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 112.
[951] Memorial de Contestación, ¶ 250; Dúplica, ¶ 273.
[952] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 114-115 y ¶ 121.
[953] Memorial de Contestación, ¶ 251; Dúplica, ¶ 274; Escrito Posterior a la Audiencia de la Demandada, nota 242.

EE. UU. a seis meses (2,66%)[954]. La Demandada cita, asimismo, los casos *LG&E* y *BG Group* en que los tribunales aplicaron tasas de letras del Tesoro de los EE. UU. a corto plazo[955]. La Demandada alude también a la decisión del tribunal de *Occidental c. Ecuador*, que aplicó la tasa mensual de las letras del Tesoro de los EE. UU. ya que "*refleja*[ban] *una práctica de reinversión prudente, libre de riesgos y conservadora*"[956] [Traducción del Tribunal]. Por último, la Demandada invoca el caso *Yukos c. Rusia*, en que el tribunal otorgó intereses anteriores al laudo basados en la rentabilidad promedio de los bonos del Tesoro de los EE. UU. a 10 años[957]. Según la Demandada, varios tribunales se rehusaron explícitamente a aplicar el costo de capital de la demandante como base de la tasa de intereses anteriores al laudo[958].

865.    La Demandada afirma que el rendimiento promedio de deuda con vencimiento a tres meses con la misma calificación que Compagnie de Saint-Gobain (BBB) era de 1,09%, mientras que el rendimiento de las letras del Tesoro de los EE. UU. a corto plazo era de 0,08%. Por lo tanto, la Demandada concluye que la tasa de interés de mercado aplicable al valor actual neto de los flujos de fondos al día 15 de mayo de 2010 debe ser la tasa de las letras del Tesoro de los EE. UU. a tres meses más 1,01%[959].

866.    Por último, la Demandada afirma que los intereses deben calcularse sobre una base simple porque la legislación venezolana prohíbe los intereses compuestos[960]. En este sentido, la Demandada se basa en el tribunal de *Yukos c. Rusia*, que resolvió que los intereses simples eran "*justos y razonables*"[961]. La Demandada cuestiona, asimismo, la sugerencia de la Demandante de que la norma en el arbitraje internacional es adjudicar intereses compuestos y alude a varias decisiones en las que se aplicaron intereses simples[962].

c)    El Análisis del Tribunal

---

[954] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, en referencia a *Siemens c. Argentina* (**CLA-77**), ¶ 396.

[955] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, en referencia a *LG&E* (**CLA-48**), ¶¶ 102, 105 y *BG Group* (**CLA-113**), ¶ 455.

[956] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, con cita de *Occidental c. Ecuador* (**CLA-61**), ¶ 842.

[957] Escrito Posterior a la Audiencia de la Demandada, ¶ 117, en referencia a *Yukos c. Rusia* (**CLA-153**), ¶¶ 1685-1687.

[958] Escrito Posterior a la Audiencia de la Demandada, ¶¶ 118-120, en referencia a PSEG (RL-86), ¶ 345, Guaracachi (RL-125), ¶ 615 y Tza Yap Shum (RL-173), ¶¶ 288, 290.

[959] Memorial de Contestación, ¶ 251 y ¶ 260; Dúplica, ¶ 274; Escrito Posterior a la Audiencia de la Demandada, nota 242. En su petitorio, no obstante, la Demandada solicita que se agregue 1,1% a la tasa de letras del Tesoro de los EE. UU. a tres meses. Escrito posterior a la Audiencia de la Demandada, ¶ 209; Segundo Escrito posterior a la Audiencia de la Demandada, ¶ 64.

[960] Memorial de Contestación, ¶ 252.

[961] Escrito Posterior a la Audiencia de la Demandada, ¶ 122, con cita de *Yukos c. Rusia* (**CLA-153**), ¶ 1689.

[962] Escrito Posterior a la Audiencia de la Demandada, nota 244, en referencia a *RosInvestCo* (**RL-172**), ¶¶ 687-692, *Desert Line* (**RL-88**) ¶ 295, *CME* (**CLA-20**), ¶ 647 y *SPP* (**CLA-80**), ¶ 236.

867. El Tribunal primero procederá a determinar la tasa de intereses anteriores al laudo aplicable (**aa**) y luego evaluará si existen motivos para aplicar una tasa diferente para los intereses posteriores al laudo (**bb**). Por último, el Tribunal abordará la cuestión de los intereses simples frente a los intereses compuestos (**cc**).

### aa)    Tasa de Intereses Anteriores al Laudo

868. Dado que el valor de Norpro Venezuela y, por lo tanto, el monto de compensación a pagar a la Demandante deberá calcularse al día 15 de mayo de 2010, no es objeto de debate entre las Partes que la Demandante tiene derecho a percibir intereses anteriores al laudo a partir de dicha fecha.

869. El Tribunal advierte que el Prof. Spiller no analizó los intereses anteriores al laudo (o la actualización de los flujos de fondos históricos que se realizará en la valuación alternativa en la fecha del laudo), sino que simplemente aplicó el costo de capital de Norpro Venezuela en respuesta a una instrucción del abogado de la Demandante[963]. En su valuación de fecha 15 de mayo de 2010, calculó los intereses anteriores al laudo en función del costo de capital de Norpro Venezuela (calculado en 13,04% hasta el año 2014) y, en subsidio, en función del costo de deuda de PDVSA como rendimiento promedio de siete bonos *bullet* en USD durante el año 2013 (calculado en 9,08%), pero tampoco analizó ninguna de las dos alternativas[964].

870. El Sr. Brailovsky y el Dr. Flores consideraron que "*desde el punto de vista estrictamente económico*" la tasa de intereses anteriores al laudo debe ser la tasa libre de riesgo. Sin embargo, reconocieron que en el arbitraje es común aplicar "*algún tipo de tasa comercial 'normal'*". Por lo tanto, adoptaron dos criterios: (i) un vencimiento a corto plazo de tres meses, dado que la fecha del laudo se desconoce y el préstamo requerido como resultado de la mora en el pago debe renovarse constantemente; y (ii) el riesgo de la Demandante medido como el rendimiento de la deuda con calificación BBB, es decir, la calificación de Compagnie de Saint-Gobain. Según el Sr. Brailovsky y el Dr. Flores, el rendimiento de los bonos BBB con vencimiento a tres meses emitidos por compañías industriales en los EE. UU. fue, en promedio, 1,09%, es decir, un margen de 1,01% sobre las letras del Tesoro de los EE. UU. a tres meses[965].

871. En cuanto al método aplicado por el Prof. Spiller, el Sr. Brailovsky y el Dr. Flores consideraron incorrecto utilizar las tasas de interés de los años 2013 y 2014 durante un

---

[963] Spiller I, nota 73; **Anexo CLEX-01**, ¶ 3(d).

[964] Spiller II, ¶ 138 (con nota 217) y Tabla 13.

[965] Brailovsky/Flores I, ¶¶ 248-250; Brailovsky/Flores II, ¶¶ 252-254 y Tabla 19. El Sr. Brailovsky y el Dr. Flores también señalan que, si bien la tasa LIBOR se utilizó asiduamente como parámetro en el pasado, quizá no sea apropiada en este caso dado que recientemente se cuestionó su integridad como parámetro adecuado de tasa de interés. Brailovsky/Flores I, nota 445.

período que comenzara el día 15 de marzo de 2010 en lugar de un cierto promedio durante el período en cuestión. Además, advierten que sólo dos de los bonos de PDVSA utilizados por el Prof. Spiller tenían un vencimiento a corto plazo—dieron un rendimiento de 3,6% tres meses antes del vencimiento[966].

872. El Tribunal recuerda que el inciso 3 del Artículo 5(1) del Tratado establece que se devengarán intereses a la "*adecuada tasa de interés del mercado*" ("*taux d'intérêt de marché approprié*")[967]. En cuanto al estándar del derecho internacional consuetudinario, el Artículo 38 del Proyecto de Artículos de la CDI establece que "[e]*l tipo interés y el modo de cálculo se fijarán de manera que se alcance* [el] *resultado* [asegurar la reparación íntegra]"[968]. Si bien el Tribunal sabe que una adecuada tasa de interés del mercado no necesariamente es una tasa de interés que asegura la reparación íntegra del daño sufrido por la Demandante en las circunstancias del caso, pareciera posible bajo las circunstancias actuales definir una tasa que cumpla con ambos estándares.

873. La Demandante considera que, conforme al estándar de reparación íntegra, tendría derecho a cobrar intereses a la tasa del costo de capital de Norpro Venezuela equivalente a la rentabilidad prevista por la Demandante al realizar su inversión[969]. No obstante, el Tribunal advierte que, sin perjuicio de si la expropiación sea considerada "*lícita*" o "*ilícita*", este no es un caso en que la Demandada tenía prohibido expropiar Norpro Venezuela. Más bien, el Tribunal considera que la Demandada no cumplió los requisitos relativos al pago de indemnización que debió seguir a la expropiación. En consecuencia, no se debe colocar a la Demandante en la posición en que habría estado si aún fuera propietaria de Norpro Venezuela, sino en la posición en que habría estado si la Demandada hubiera pagado la indemnización correspondiente el día 15 de mayo de 2010 o poco tiempo después.

874. En estas circunstancias, el Tribunal coincide con la Demandada en que no sería preciso otorgar intereses a la Demandante a una tasa que contemple los riesgos de invertir en una empresa ubicada en Venezuela, aunque la Demandante ya no estuviera corriendo tales riesgos y, lo que es más importante aún, no habría estado corriendo estos riesgos si se la hubiera indemnizado el día 15 de mayo de 2010. Por lo tanto, el Tribunal no adjudicará intereses al costo de capital de Norpro Venezuela.

875. En subsidio, la Demandante alega que la adecuada tasa de interés del mercado sería el costo de deuda de PDVSA, y explica que se vio obligada a otorgar un préstamo a la

---

[966] Brailovsky/Flores II, ¶ 259.
[967] **Anexo C-1**, Artículo 5(1), subpárrafo 2.
[968] **CLA-027**, Artículo 38(1).
[969] Memorial, ¶ 232; Réplica, ¶ 202.

Demandada en el monto de la indemnización adeudada a la Demandante al día 15 de mayo de 2010[970].

876. No hay indicios de que el cálculo de una adecuada tasa de interés del mercado deba incluir el costo de deuda del Estado. La Demandante no citó ninguna decisión pronunciada por ningún tribunal internacional en sustento de su alegato sino que alude a un documento de Fisher y Romaine sobre intereses anteriores al fallo en un litigio estadounidense y a una declaración del Prof. Damodaran. Sin embargo, según señalara correctamente la Demandada en su carta de fecha 2 de junio de 2015, Fisher y Romaine consideraban que los riesgos relacionados con la demandada en cuestión resultaban del litigio y no de la violación en sí y, por lo tanto, en definitiva no justificaban la no aplicación de la tasa libre de riesgo[971]. En cuanto a la declaración del Prof. Damodaran, el Tribunal advierte que esta declaración no versaba sobre el cálculo de una tasa de interés adecuada sino que se efectuó como parte de los requisitos de una inversión libre de riesgo[972]. En consecuencia, el Tribunal considera que ninguna de las autoridades que cita la Demandante respalda su postura de que la "*adecuada tasa de interés del mercado*" debe reflejar el costo de deuda de la Demandada.

877. En principio, el Tribunal coincide con la Demandada y sus peritos (basándose en Fisher y Romaine) que la pérdida que debe indemnizarse mediante intereses sobre el capital es el valor temporal del dinero, sin contemplar los riesgos que la Demandante no corrió[973]. Sin embargo, esto no resta importancia al hecho de que, si la Demandante hubiera recibido la indemnización el día 15 de mayo de 2010 o poco tiempo después, habría tenido la oportunidad de reinvertir este monto y percibir una rentabilidad muy por encima de la rentabilidad de la tasa libre de riesgo. Por lo tanto, el Tribunal considera que, en las circunstancias de este caso, tanto el estándar del derecho internacional consuetudinario de reparación íntegra como el estándar del Artículo 5(1) del Tratado requieren la aplicación de lo que el Sr. Brailovsky y el Dr. Flores describieron como "*un cierto tipo de tasa comercial* 'normal'" comúnmente aplicada en los arbitrajes[974].

878. Si bien el Sr. Brailovsky y el Dr. Flores en consecuencia agregaron a la tasa libre de riesgo el costo de deuda de la Demandante para préstamos a corto plazo, el Tribunal no está convencido de que capte correctamente la pérdida de oportunidad de inversión de la Demandante en el presente caso. De nuevo, el Tribunal desea hacer hincapié nuevamente en que no pretende otorgar intereses a una tasa equivalente al costo de oportunidad de la

---

[970] Presentación Posterior a la Audiencia de la Demandante, ¶¶ 180-186.

[971] Carta de la Demandada de fecha 2 de junio 2015, ¶ 4, con cita de **Apéndice BF-96**, págs. 147-148. El día 19 de junio de 2015 esta porción de la carta fue admitida como parte del expediente por el Tribunal.

[972] **Anexo C-158**, pág. 6.

[973] Brailovsky/Flores II, ¶ 251, con cita de **Apéndice BF-96**, pág. 146.

[974] Brailovsky/Flores I, ¶ 248; Brailovsky/Flores II, 252.

inversión de la Demandante en Norpro Venezuela (ni en ninguna otra inversión alternativa hipotética), principalmente porque la Demandante, de hecho, no corrió el riesgo asociado con dicha tasa de retorno. Al mismo tiempo, el Tribunal considera que el propio costo de deuda de la Demandante no refleja, de manera suficiente, el hecho de que, durante varios años, se privó a la Demandante de la oportunidad de disponer del dinero que debería haber recibido en relación con la expropiación de su inversión en Venezuela.

879. En estas circunstancias, la tasa de interés aplicable en este caso debe lograr un equilibrio entre, por un lado, evitar el otorgamiento de una tasa de retorno que habría sido imposible de conseguir sin importantes riesgos y, por otro lado, reconocer que la Demandante habría podido utilizar sus fondos para algo más que una inversión libre de riesgo si se le hubiera pagado el día 15 de mayo de 2010 o poco tiempo después. En opinión del Tribunal, esto rige para ciertos casos en que las tasas de interés libre de riesgo son cercanas a cero durante casi todo el período entre la fecha de la expropiación y la fecha del Laudo.

880. En consecuencia, el Tribunal, mediante la facultad que le concede el Artículo 5(1) del Tratado y el derecho internacional consuetudinario, otorga una tasa de interés que reúne las condiciones de una "*adecuada tasa de interés del mercado*" y una tasa que "*asegura la reparación íntegra*" en términos de oportunidad razonable de invertir el monto de capital en el mercado. Teniendo en cuenta las inquietudes que plantearon la Demandada y sus peritos acerca de la integridad de la tasa LIBOR como parámetro confiable para las tasas de interés, el Tribunal se remitirá a la tasa de las letras del Tesoro de los EE. UU. que los peritos de ambas Partes utilizaron en varios aspectos de sus valuaciones. En cuanto al vencimiento apropiado, el Tribunal advierte que, si bien el Sr. Brailovsky y el Dr. Flores optaron por aplicar la tasa a tres meses, esta decisión no está avalada por ninguno de los casos que invoca la Demandada en el contexto de sus presentaciones sobre intereses. Resulta que la tasa a seis meses es una tasa comúnmente aplicada por los tribunales en materia de tratados de inversiones[975].

881. El Tribunal no encuentra motivos para apartarse de su práctica y, por lo tanto, considera que la tasa de intereses anteriores al laudo debe basarse en la tasa de las letras del Tesoro de los EE. UU. a seis meses. A fin de reflejar las consideraciones mencionadas *supra* en relación con el equilibrio entre el riesgo y la oportunidad de reinversión, el Tribunal estima apropiado agregar un margen de 2% a su tasa libre de riesgo.

---

[975] *Véase, por ejemplo, Siemens c. Argentina* (**CLA-077**), ¶ 396; *LG&E Energy Corp. et al. c. Argentina* (**CLA-048**), ¶ 105; *BG Group Plc. c. Argentina* (**CLA-113**), ¶ 455; *Occidental Petroleum Corporation et al. c. Ecuador* (**CLA-061**), ¶¶ 841-842. En general, los tribunales que aplicaron la tasa LIBOR también hicieron referencia a la tasa a seis meses; *véase, por ejemplo, Lemire c. Ucrania* (**RL-122**), ¶ 353; *PSEG Global Inc. y otros c. Turquía* (**RL-86**), ¶ 348.

882. En síntesis, el Tribunal resuelve que la Demandante tiene derecho a percibir intereses anteriores al laudo a una tasa igual a 2% sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses.

### bb)  Tasa de Intereses Posteriores al Laudo

883. El Tribunal advierte que, según la Demandante, no hay motivos para distinguir entre intereses anteriores al laudo e intereses posteriores al laudo[976]. No obstante, el Tribunal sabe que la Demandante asevera esto en el contexto de su argumento de que tiene derecho a cobrar intereses anteriores al laudo a una tasa, al menos, igual al costo de deuda de la Demandada. Específicamente con respecto a los intereses posteriores al laudo, la Demandante alega que si la tasa de interés fuese inferior al costo de deuda de la Demandada, Venezuela no tendría ningún incentivo para cumplir con el Laudo—al contrario del objeto que se persigue al otorgar intereses posteriores al laudo[977].

884. Ni la Demandada ni su perito especifican qué tasa de intereses posteriores al laudo debería aplicarse en este caso. Tampoco hacen referencia al argumento de la Demandante de que los intereses posteriores al laudo deben servir de incentivo para cumplir con el Laudo.

885. El Tribunal advierte que tanto el Artículo 5(1) del Tratado como el Artículo 38(2) del Proyecto de Artículos de la CDI establecen que se seguirán devengando intereses hasta la fecha efectiva de pago[978]. Por lo tanto, el Tribunal otorgará intereses posteriores al laudo en la suma pagadera conforme al Laudo.

886. En cuanto a la tasa aplicable, el Tribunal coincide con la Demandante que, en principio, no hay motivo para aplicar tasas diferentes para los intereses anteriores y posteriores al laudo. El Tribunal considera, asimismo, que no existe ninguna razón para apartarse de esta regla general, dado que ya resolvió que la tasa de intereses anteriores al laudo aplicable puede ser inferior al (supuesto) costo de deuda de la Demandada. A criterio del Tribunal, los intereses posteriores al laudo cumplen el mismo objetivo que los intereses anteriores al laudo, es decir, indemnizar a la Demandante por el valor temporal del dinero y el hecho de no poder disponer de la suma hasta la fecha efectiva de pago; sin embargo, no aseguran el cumplimiento del Laudo. Por lo tanto, el Tribunal una vez más considera que el costo de deuda de la Demandada no es parámetro apropiado para calcular la tasa de interés aplicable; al contrario, se devengarán intereses a la misma tasa tanto antes como después de dictarse el Laudo.

---

[976] Réplica, ¶ 207.

[977] Presentación Posterior a la Audiencia de la Demandante, ¶ 188, en referencia a Irmgard Marboe, *Calculation of Compensation and Damages in International Investment Law*, 2009, (**RL-97**), ¶¶ 6.245-6.246.

[978] **Anexo C-1**, Artículo 5(1), subpárrafo 2; **CLA-027**, Artículo 38(2).

### cc)   Interés Simple/Compuesto

887.   Por último, el Tribunal debe decidir si los intereses se calcularán de manera simple, como propone la Demandada, o capitalizados anualmente, como pretende la Demandante.

888.   El Tribunal tiene presente el argumento de la Demandada de que el interés compuesto se encuentra prohibido por el Artículo 530 del Código de Comercio de Venezuela y su invocación del caso *Autopista Concesionada de Venezuela c. Venezuela*, en que el tribunal no otorgó intereses compuestos por no estar permitidos en la legislación venezolana ni requeridos en virtud del derecho internacional[979].

889.   Sin embargo, el Tribunal advierte que esta decisión, que es la única que cita la Demandada en este sentido, data del año 2003. Como bien señalara la Demandante, en varias decisiones de casos más recientes en los que Venezuela fue parte se adjudicaron intereses compuestos, como ocurrió en los casos *Tidewater*, *OI European* y *Venezuela Holdings*, que datan de los años 2015 y 2014, respectivamente[980].

890.   A criterio del Tribunal, el hecho de que la ley venezolana prohíba los intereses compuestos no impide que el Tribunal los otorgue si la base legal del reclamo de intereses de la Demandante es el Artículo 5(1) del Tratado o el derecho internacional consuetudinario. Esta decisión no se contradice con la decisión del tribunal de *Autopista c. Venezuela*, porque este último no consideró que el Artículo 530 del Código de Comercio de Venezuela le impidiera otorgar intereses compuestos propiamente dichos, sino que advirtió este hecho además de decidir que los intereses compuestos no eran un principio consolidado en virtud del derecho internacional y, por lo tanto, tampoco se exigía ese pago en virtud del derecho internacional.

891.   Dado que ha transcurrido más de una década desde que el laudo *Autopista* fue emitido, el Tribunal considera apropiado volver a considerar la decisión de si los intereses compuestos pueden considerarse un principio consolidado del derecho internacional. Tras analizar los casos citados por las Partes en relación con los intereses, el Tribunal advierte que, en la mayoría de ellos, se otorgaron intereses compuestos[981]. Si bien la Demandada

---

[979] Memorial de Contestación, ¶ 252, en referencia a **Anexo R-55**, Artículo 530 y *Autopista Concesionada de Venezuela c. Venezuela* (**RL-124**), ¶¶ 396-397.

[980] Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 112, en referencia a *Tidewater c. Venezuela* (**CLA-155**), ¶¶ 208-209, *OI European c. Venezuela* (**CLA-156**), ¶¶ 946, 952 y *Venezuela Holdings c. Venezuela* (**CLA-154**), ¶¶ 394, 399.

[981] *Alpha Projektholding c. Ucrania* (**CLA-002**), ¶ 514; *Compañía de Aguas c. Argentina* (**CLA-024**), ¶ 9.2.8; *France Telecom c. Líbano* (**CLA-034**), ¶ 209; *LG&E c. Argentina* (**CLA-048**), ¶¶ 102-105; *Unglaube c. Costa Rica* (**CLA-051**), ¶¶ 319, 325; *Occidental c. Ecuador* (**CLA-061**), ¶¶ 842, 845; *Phillips c. Petróleos de Venezuela* (**CLA-64**), ¶¶ 294 y ss.; *Siemens c. Argentina* (**CLA-077**), ¶¶ 396, 401; *Wena c. Egipto* (**CLA-089**), ¶ 129; *BG Group c. Argentina* (**CLA-113**), ¶¶ 454-457; *PSEG c. Turquía* (**RL-86**), ¶¶ 345, 348; *Lemire c. Ucrania* (**RL-122**), ¶¶ 353, 356, 361; *Guaracachi c. Bolivia* (**RL-125**), ¶¶ 615-617; *Tza Yap Shum c. Perú* (**RL-173**), ¶¶ 289-292.

citó varios casos en que se concedieron intereses simples, esto se debió a las circunstancias particulares del caso en cuestión o bien no estuvo justificado en ninguno de los fundamentos de la decisión del tribunal.

892.  En particular, el tribunal del caso *Yukos c. Rusia*, que cita la Demandada, reconoció explícitamente que "*el otorgamiento de intereses compuestos conforme al derecho internacional representa una forma de* 'jurisprudence constante' *en casos sobre expropiación entre estados e inversores*", pero se apartó de su práctica en vista del "*significativo monto indemnizatorio*" adeudado por Rusia[982]. En *RosInvest c. Rusia*, el tribunal reconoció que "*en arbitrajes recientes sobre tratados de inversiones, se otorgaron intereses compuestos*" pero también señaló que "*esta práctica no es para nada unánime*" y sostuvo que "*dada la naturaleza especulativa de la inversión*" [Traducción del Tribunal], sería injusto otorgar intereses compuestos[983]. El tribunal de *Desert Line c. Yemen* no expresó por qué decidió otorgar intereses simples y no compuestos como habían solicitado las demandantes en ese caso[984].

893.  En *CME c. República Checa*, el tribunal volvió a reconocer que "*en los últimos años, fueron cada vez más los tribunales arbitrales internacionales, en especial en virtud de tratados bilaterales de inversión, que otorgaron intereses compuestos dada la realidad comercial contemporánea predominante que las empresas prestatarias pagan intereses compuestos*" [Traducción del Tribunal]. Sin embargo, el tribunal decidió que la demandante no logró demostrar que haya pagado intereses compuestos por préstamos otorgados por bancos y, en consecuencia, no encontró "*circunstancias particulares*" que justificaran la adjudicación de intereses compuestos[985]. El Tribunal advierte que, si bien el tribunal de *CME* consideró necesario encontrar "*circunstancias particulares*" que justificaran los intereses compuestos, esta decisión data del año 2003 y es probable que no sea representativa de los recientes desarrollos en materia de préstamos de mercado y arbitraje internacional en materia de inversión.

894.  Por último, el tribunal de *SPP c. Egipto* también decidió que el interés no debía capitalizarse sin dar ningún fundamento específico para su decisión[986]. Dado que la decisión data del año 1992, el Tribunal, en cualquier caso, considera que no resulta útil en cuanto a los recientes desarrollos en el arbitraje internacional en materia de inversión.

895.  En síntesis, durante los últimos años, la mayoría de los tribunales intervinientes en casos sobre inversiones decidieron adjudicar intereses compuestos e incluso la mayoría de los

---

[982] *Yukos c. Rusia* (**CLA-153**), ¶¶ 1689, 1691.
[983] *RosInvest c. Rusia* (**RL-172**), ¶¶ 689-690.
[984] *Desert Line c. Yemen* (**RL-88**), ¶¶ 295-298.
[985] *CME c. República Checa* (**CLA-020**), ¶¶ 645-647.
[986] *SPP c. Egipto* (**CLA-080**), ¶ 236.

que decidieron otorgar intereses simples por algún motivo en particular reconocieron que los intereses compuestos representan lo que el tribunal de *CME* describió como la "*realidad comercial contemporánea predominante*" [Traducción del Tribunal]. El Tribunal se limitará a afirmar que corresponde a la Demandada demostrar que existen circunstancias particulares que justifican la denegación de intereses compuestos. Sin embargo, dado que el Tribunal ha decidido otorgar una adecuada tasa del mercado, no ve por qué no seguir el razonamiento de la mayoría de los tribunales que han decidido otorgar intereses compuestos sobre el monto del capital.

896. En consecuencia, el Tribunal resuelve que tanto los intereses anteriores al laudo como los intereses posteriores al laudo estarán sujetos a capitalización. En cuanto a la periodicidad, el Tribunal coincide con la Demandante en que los intereses se deben capitalizar de forma anual.

## 4. Obligaciones Tributarias

897. Por último, la Demandante solicita en sus dos presentaciones posteriores a la audiencia una declaración de que (i) el otorgamiento de la indemnización y los intereses se fije en montos netos de los impuestos venezolanos aplicables; y (ii) Venezuela no pueda deducir impuestos en relación con el pago de la indemnización y los intereses. Además, la Demandante solicita que se ordene a la Demandada mantener indemne a la Demandante respecto de toda responsabilidad derivada de una doble imposición en Francia o en cualquier otro país, que no se hubiera verificado de no haber sido por las medidas adversas de Venezuela[987].

898. La Demandada no realizó ningún comentario sobre esta solicitud en su Segundo Escrito Posterior a la Audiencia.

899. El Tribunal destaca que la Demandante ha planteado su reclamación respecto de las obligaciones tributarias recién después de la audiencia, es decir, en el petitorio incluido en su Presentación Posterior a la Audiencia y en su Segunda Presentación Posterior a la Audiencia. Asimismo, sumado a no proporcionar justificación alguna sobre su decisión de plantear esta reclamación en un momento tan tardío, la Demandante no ha formulado argumento alguno relativo a esta reclamación más allá de su petitorio.

900. No obstante, el Tribunal considera necesario trazar una distinción entre las dos primeras reclamaciones relativas a la imposición de impuestos de la compensación recibida dentro

---

[987]Presentación Posterior a la Audiencia de la Demandante, ¶ 195; Segunda Presentación Posterior a la Audiencia de la Demandante, ¶ 116.

de Venezuela, por un lado, y la reclamación adicional relativa a la eventual doble tributación que pudiera surgir afuera de Venezuela, por el otro.

901. Con respecto a las dos primeras reclamaciones, el Tribunal destaca que los peritos de ambas Partes han tomado en consideración una alícuota del impuesto sobre rentas del 34 % como parte de sus respectivas valoraciones de la compensación a la que la Demandante tiene derecho[988]. El Tribunal además destaca que, si bien inicialmente los peritos estaban en desacuerdo sobre un aspecto específico de la determinación de la renta imponible realizada por el Prof. Spiller, perito de la Demandante, es decir, el aspecto de la depreciación tal como fuera modelado por el Prof. Spiller en su primer dictamen[989], el Prof. Spiller adoptó el método de los peritos de la Demandada, Dr. Brailovsky y Dr. Flores, en su segundo dictamen[990]. Lo anterior fue reconocido por los peritos de la Demandada en su segundo dictamen[991]. Por consiguiente, el Tribunal entiende que los peritos de las Partes están de acuerdo en lo relativo al tratamiento de los impuestos a las rentas y de la depreciación en sus cálculos.

902. A la luz de lo que antecede, el Tribunal considera justificado asumir que el método de valoración acordado por las Partes adecuadamente considera impuestos a las rentas que hubieran tenido que ser pagados por Norpro Venezuela en el futuro en el escenario contrafáctico[992]. Cualquier impuesto adicional por parte de Venezuela sobre la compensación pagadera a la Demandante, por ende, importaría una doble imposición para ese monto. En consecuencia, el Tribunal resuelve que la solicitud de la Demandante para que (i) el pago de daños y perjuicios e intereses se dicte neto de los impuestos aplicables en Venezuela, y (ii) Venezuela no pueda deducir impuestos respecto del pago de la condena en daños y perjuicios e intereses, está justificada. De hecho, es el resultado lógico del método de valoración elegido por los peritos de las Partes y, en particular, de su consenso sobre el tratamiento de los impuestos a las rentas en sus cálculos. En la opinión del Tribunal, no fue necesaria mayor elaboración por parte de la Demandante para otorgar esta solicitud declaratoria y, más aún, no es problemático que la Demandante incluyera esta solicitud en su petitorio recién al momento de su Presentación Posterior a la Audiencia.

903. En consecuencia, la solicitud de la Demandante relativa a los impuestos de Venezuela sobre la compensación concedida es otorgada.

---

[988] Spiller I, ¶ 138; Brailovsky/Flores I, ¶ 136.
[989] Brailovsky/Flores I, ¶¶ 136-147.
[990] Spiller II, ¶ 101.
[991] Brailovsky/Flores II, ¶ 139.
[992] *Véase* también *Venezuela Holdings c. Venezuela* (**CLA-154**), ¶ 389.

904. En cuanto a la reclamación adicional sobre una indemnidad respecto de toda doble obligación impositiva hipotética que pudiera surgir en cualquier tercer país, el Tribunal considera que dicha reclamación hubiera requerido una elaboración mínima por parte de la Demandante en pos de ser considerada sustanciada. La Demandante no ha especificado ni los fundamentos jurídicos para el pago de posibles impuestos, ni la alícuota o los fundamentos sobre los cuales la Demandada debería compensarla por haber incurrido en dicha obligación. Asimismo, no existen indicios de que tal obligación con respecto a terceros Estados fuera incluida en los cálculos de los peritos de las Partes y, por ende, que el no otorgar la solicitud de la Demandante en este aspecto redundaría en una doble imposición sobre el monto otorgado. Por último, la compensación que la Demandante persigue hubiera requerido al menos un cierto grado de probabilidad de que un tercer Estado impondría, en efecto, impuestos sobre la compensación recibida, lo que no ha sido alegado por la Demandante.

905. Ante la falta de argumento alguno respecto de esta solicitud fuera del petitorio de la Demandante, el Tribunal considera que dicha solicitud es especulativa e infundada[993]; el Tribunal, por lo tanto, no encuentra fundamentos para ordenar una indemnización contra obligaciones impositivas extranjeras tal como solicita la Demandante. En consecuencia, la reclamación de la Demandante tendiente a que se le ordene a la Demandada que indemnice a la Demandante respecto de cualquier obligación por doble imposición que surja en Francia o en cualquier otro lugar, que no hubiera surgido de no haber sido por las medidas adversas que adoptó Venezuela, es denegado.

## V.    DECISIÓN SOBRE COSTOS

906. Conforme a lo establecido en el Artículo 61(2) del Convenio CIADI, la decisión del Tribunal respecto de los costos formará parte del Laudo.

## G.    DECISIÓN DEL TRIBUNAL

907. La presente decisión refleja las conclusiones del Tribunal sobre responsabilidad y los principios en materia de cuantificación de daños tal como se expusieron anteriormente. Posteriormente a la notificación de esta decisión a las Partes, el Tribunal invitará a las Partes, por separado, a que intenten llegar a un acuerdo sobre el monto final de la compensación a ser pagada por la Demandada a la Demandante con respecto a la expropiación de Norpro Venezuela –basada en las conclusiones contenidas en la presente decisión. Si las Partes no llegaran a un acuerdo dentro de los dos meses a partir de la notificación de esta decisión, el Tribunal, previa consulta con las Partes, fijará un

---

[993] *Véase Venezuela Holdings c. Venezuela* (**CLA-154**), ¶ 388.

calendario para las presentaciones de las Partes sobre las cuestiones de cuantificación de daños restantes que hubieren de resolverse.

908.  En función de lo que antecede, el Tribunal resuelve lo siguiente:

## DECISIÓN SOBRE RESPONSABILIDAD Y PRINCIPIOS EN MATERIA DE CUANTIFICACIÓN DE DAÑOS

1.  **La Demandada violó el Artículo 5(1) incisos 2 y 3 del Tratado al no especificar el monto de la compensación y al no pagar una indemnización pronta por la expropiación de la inversión de la Demandante en Venezuela.**

2.  **La Demandada deberá pagarle a la Demandante el monto de la compensación calculado sobre la base de las conclusiones del Tribunal sintetizadas en los párrafos 850 a 852 *supra*, más los intereses previos al laudo a partir del día 15 de mayo de 2010 hasta la fecha del Laudo a una tasa igual al 2 % sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual.**

3.  **La Demandada deberá pagarle a la Demandante intereses posteriores al laudo sobre el monto de la compensación dispuesto en el punto 2 a partir de la fecha del Laudo hasta la fecha del pago a una tasa igual al 2 % sobre la tasa promedio de letras del Tesoro de los EE. UU. a seis meses, capitalizados en forma anual. Los intereses posteriores al laudo se pagarán solo sobre el capital de la compensación, y no sobre los intereses otorgados previos al laudo.**

4.  **La compensación y los intereses se fijan en montos netos de los impuestos venezolanos aplicables, y la Demandada no podrá deducir impuestos en relación con el pago de la compensación y los intereses.**

5.  **La decisión sobre costos se reserva para el Laudo.**

6.  **Se desestiman todas las demás pretensiones y petitorios.**

El Honorable Charles N. Brower
Árbitro
Fecha: 21 DICEMBaE DE 2016
Sujeto a la Opinión Concurrente
y Disidente adjunta

Sr. Gabriel Bottini
Árbitro
Fecha: 9 de diciembre de 2016

Profesor Dr. Klaus Sachs
Presidente
Fecha: 8 Deciembas 2016

**OPINIÓN CONCURRENTE Y DISIDENTE DEL JUEZ CHARLES N. BROWER**

1.      Coincido con la conclusión del Tribunal (párrafo 908(1)) de que la Demandada es responsable de un incumplimiento de los incisos 2 y 3 del Artículo 5(1) del Acuerdo entre el Gobierno de la República Bolivariana de Venezuela y el Gobierno de la República Francesa para la Promoción y la Protección Recíprocas de Inversiones (en adelante, "el TBI") al expropiar la subsidiaria venezolana propiedad de la Demandante en un 99,99 %, Norpro Venezuela C.A. (en adelante, "Norpro"), así como con la mayor parte del análisis detallado del Tribunal de los elementos correctos que deben guiar el cálculo en virtud del método de flujos de fondos descontados de la compensación que ha de otorgarse a la Demandante. Sin embargo, me veo obligado a disentir de dos aspectos de dicho análisis que, como cuestión económica al igual que como cuestión de derecho aplicable, privan a la Demandante de mucho de aquello a lo que tiene derecho, sea de conformidad con el TBI, sea con arreglo al derecho internacional en general. *Véase Case Concerning the Factory at Chorzów (Claim for Indemnity) (Germany v. Poland)*, P.C.I.J. Series A No. 17 (1928). En particular, el Tribunal no ha ejecutado ni el TBI ni el derecho internacional en general en tanto ha hecho lo siguiente:

(a)      Ha incluido en la porción correspondiente al riesgo país del porcentaje por el cual ha de descontarse el flujo de fondos proyectado de Norpro (es decir, 10,26% según el párrafo 753) precisamente el riesgo de expropiación sin compensación, así como otras violaciones del TBI (párrafos 713-714), respecto a las cuales este Tribunal ha sido constituido para rescatar a la Demandante y que, en la presente Decisión sobre Responsabilidad y los Principios de Cuantificación de Daños (en adelante, "la Decisión"), el Tribunal dice cumplir, lo que deriva en un factor de riesgo país que se encuentra 5,76 puntos por encima del 4,5 %, el único número del factor de riesgo país que cualquiera de las Partes ha planteado ante el Tribunal como excluyente del riesgo de violaciones del TBI, y representa un 228 % respecto de ese número; y

(b)      Ha excluido el 25 % de las ganancias en concepto de ventas de exportación de Norpro con fundamento en que la Demandante, propietaria del 99,99 % de Norpro, mediante la fijación de precios de transferencia entre compañías sujetos a tributación u otras opciones de teneduría de libros, le ha cobrado a Norpro

2

aproximadamente dicho monto de sus ganancias a efectos de los aportes de la Demandante a la comercialización de Norpro.

Los vicios de estas dos reducciones de los derechos de la Demandante de conformidad con el TBI y con arreglo al derecho internacional general deberían ser evidentes.

2.      El primer problema, en virtud del punto 1(a) *supra*, surge de la interpretación errónea por parte del Tribunal tanto del inciso 2 del Artículo 5(1), que especifica que la compensación por expropiación debe ser "igual al valor real de la[] inversión[] en cuestión", como del derecho internacional general que, conforme al caso *Chorzów* (página 47 del Fallo) dispone que "el resarcimiento debe, en la medida de lo posible, eliminar todas las consecuencias del acto ilícito y restablecer la situación que muy probablemente habría existido si este acto no se hubiere perpetrado" [Traducción del Tribunal].  La Decisión ha transformado el derecho aplicable en la aplicación de un estándar de compensación de "valor justo de mercado", que, tal como lo aplica la Decisión, desafortunadamente ha redundado en una injusticia para la Demandante.

3.      Al aumentar el factor de riesgo país a fin de incluir precisamente el riesgo del que la Decisión se compromete a proteger a la Demandante, que, según el Tribunal, ha sufrido un daño como consecuencia del incumplimiento expropiatorio del TBI por parte de la Demandada, el Tribunal no le hace justicia a la Demandante.  Le quita con una mano lo que ha pretendido darle a la Demandante con la otra.  Reducir la recuperación en favor de la Demandante perjudicada aplicando un "valor justo de mercado" que incorpora el propio riesgo del que el Tribunal está liberando supuestamente a la Demandante equivale a negarle a la Demandante la compensación íntegra a que tiene derecho.  Es como comprometerse a restituirle al dueño de un automóvil muy dañado un vehículo perfectamente reparado y restaurado, pero luego dejarlo sin algunas partes simplemente porque podría dañarse otra vez en el futuro.  La lógica manifiesta subyacente fue reconocida por un tribunal muy distinguido en el marco del caso *Gold Reserve, Inc. c. Venezuela*, Caso CIADI N.° ARB(AF)/09/1, Laudo (22 de septiembre de 2014), ¶ 841, que debería haber persuadido a mis colegas de no seguir el precedente equivocado del caso *Tidewater Investment SRL c. Venezuela*, Caso CIADI N.° ARB/10/5, Laudo (13 de marzo de 2015).  Cabe destacar que la necesidad de excluir del factor de riesgo país el propio riesgo previsto en un tratado del que se concluye que un demandante ha sido víctima fue subrayada hace ya 27 años, en el año 1989, por el Tribunal de Reclamaciones Irán-Estados Unidos en el contexto del caso *Phillips Petroleum Company Iran c. La República Islámica de Irán, et al.*, Laudo N.° 425-39-2 (29 de junio de 1989) ¶¶ 111, 152, *reimpreso en* 21 Iran-U.S.

C.T.R. 79, y diez años después, en el año 1999, por el Tribunal en virtud del Reglamento CNUDMI en el caso *Himpurna California Energy Ltd. c. PT. (Persero) Perusahaan Listruik Negara*, Laudo Definitivo (4 de mayo de 1999) ¶ 357, *en* YEARBOOK COMMERCIAL ARBITRATION, VOL. XXV (A. Jan van den Berg ed., Kluwer 2000).

4.      Además del hecho de que la postura de la mayoría priva a la Demandante de la compensación a que tiene derecho, no adhiere al acuerdo de las Partes en cuanto a lo que constituye "valor justo de mercado". En el párrafo 628 de la Decisión, el Tribunal señala que "[l]as Partes coinciden en que el valor justo de mercado es igual al monto que un comprador interesado estaría dispuesto a pagar a un vendedor interesado, *siempre que el comprador esté informado acerca de todas las circunstancias pertinentes y ninguna de las partes se encuentre bajo cualquier tipo de violencia para vender o adquirir el activo*" (énfasis agregado). Si un comprador interesado es, por ejemplo, un nacional de Francia (Parte en el TBI que nos ocupa) o de otro Estado que goza de una protección equivalente en virtud de un tratado tal como fue o debería ser la Demandante aquí, ¿eso no forma parte del concepto de que el comprador esté "informado acerca de todas las circunstancias pertinentes"? ¿Dicha condición no podría inducir al comprador a pagar más por el bien expropiado que un posible comprador que carece de dicha protección? Tal como han coincidido las Partes en el presente caso, el "valor justo de mercado" no puede determinarse sin tener en cuenta "todas las circunstancias pertinentes".

5.      En cuanto al párrafo 1(b) *supra*, otorgarle al propietario del 99,99 % de la empresa expropiada, a saber, la Demandante, que tiene derecho al 99,99 % de las ganancias de Norpro, exclusivamente la compensación inferior resultante del 99,99 % menos el 25 % de las ganancias en concepto de ventas de exportación de Norpro implica que, en esa medida, la Demandante se ve privada de la compensación a que tiene derecho. La teneduría de libros entre compañías practicada por la sociedad controlante y la subsidiaria no tiene efecto alguno en la ganancia real que la subsidiaria generó en favor de la sociedad controlante. Suponiendo, a modo de ejemplo, que el 25 % de las ganancias en concepto de ventas de exportación de Norpro representa el 10 % de las ganancias totales de Norpro, la Demandante controlante que, de hecho, ha perdido el 99,99 % de las ganancias de Norpro, recibe en concepto de compensación, no ese 99,99 % del que fue privada, sino sólo el 89,99 %. ¿Cómo puede considerarse que eso redunda en un "valor justo de mercado" bajo cualquier parámetro?

Por las razones expuestas *supra* y en esa medida, disiento respetuosamente de la Decisión.

4

El Honorable Charles N. Brower
Árbitro
Fecha: 21 DICIEMBRE DE 2016

# Anexo 4

Case 1:20-cv-00129-RC   Document 81-1   Filed 06/01/23   Page 346 of 390

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

| | | |
|---|---|---|
| [a] | Compensación por Expropiación | $29,600,000.00 |
| [b] | Interés previo al laudo del 15 de mayo de 2010 hasta el 31 de marzo de 2017 | $4,800,000.00 |
| [c] | Interés previo al laudo del 1 de abril del 2017 al 3 de noviembre del 2017 | $542,189.80 |
| [d] | Interés posterior al laudo del 3 de diciembre de 2017 al 7 de diciembre de 2018 | $1,218,115.14 |
| [e] | Compensación al 7 de diciembre de 2018 | $36,160,304.94 |
| [f] | Reembolso de costos - Arbitraje | $1,303,189.99 |
| [g] | 29/5000 Reembolso de costos - Demandante | $4,634,532.05 |
| [h] | Costos Totales | $5,937,722.04 |
| [i] | Interés del 3 de Diciembre al 7 de Diciembre del 2018 | $244,352.34 |
| [j] | Compensación al 7 de diciembre de 2018 | $6,182,074.38 |
| [k] | Total | $42,342,379.31 |

Notas
[a]     Laudo, ¶72.1
[b]     Laudo, ¶72.1
[c]     Laudo, ¶72.2. Intereses sobre USD 29.6 millones a una tasa promedio de bonos del Tesoro de EE. UU a 6 meses más 2% (3.1%) entre el 1 de abril de 2017 y la fecha del laudo (3 de noviembre de 2017)
[d]     Laudo, ¶72.3. Intereses sobre USD 29.6 millones a una tasa promedio de bonos del Tesoro de EE. UU a 6 meses más 2% (4.1%) entre los 30 días posteriores a la fecha del laudo (3 de diciembre de 2017) hasta la fecha de pago (7 de dicieml
[e]     [a]+[b]+[c]+[d]
[f]     Laudo, ¶72.5
[g]     Laudo, ¶72.6
[h]     [f]+[g]
[i]     Laudo, ¶72.7. Intereses sobre costos a una tasa promedio de bonos del Tesoro de EE. UU a 6 meses más 2% (4.1%) entre los 30 días posteriores a la fecha del laudo (3 de diciembre de 2017) hasta la fecha de pago (7 de diciembre de 2018)
[j]     [h]+[i]
[j]     [e]+[j]

# Reserva Federal – Rendimientos del Tesoro

12/7/2018

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| Fecha | 6-Meses |
|---|---|
| 04/03/2017 | 0.92 |
| 04/04/2017 | 0.92 |
| 04/05/2017 | 0.93 |
| 04/06/2017 | 0.94 |
| 04/07/2017 | 0.95 |
| 04/10/2017 | 0.97 |
| 04/11/2017 | 0.94 |
| 04/12/2017 | 0.95 |
| 04/13/2017 | 0.94 |
| 04/17/2017 | 0.94 |
| 04/18/2017 | 0.94 |
| 04/19/2017 | 0.94 |
| 04/20/2017 | 0.93 |
| 04/21/2017 | 0.92 |
| 04/24/2017 | 0.96 |
| 04/25/2017 | 0.98 |
| 04/26/2017 | 0.99 |
| 04/27/2017 | 0.98 |
| 04/28/2017 | 0.99 |
| 05/01/2017 | 0.98 |
| 05/02/2017 | 0.99 |
| 05/03/2017 | 1.00 |
| 05/04/2017 | 1.00 |
| 05/05/2017 | 1.01 |
| 05/08/2017 | 1.02 |
| 05/09/2017 | 1.04 |
| 05/10/2017 | 1.04 |
| 05/11/2017 | 1.04 |
| 05/12/2017 | 1.03 |
| 05/15/2017 | 1.02 |
| 05/16/2017 | 1.04 |
| 05/17/2017 | 1.00 |
| 05/18/2017 | 1.02 |
| 05/19/2017 | 1.03 |
| 05/22/2017 | 1.05 |
| 05/23/2017 | 1.08 |
| 05/24/2017 | 1.07 |
| 05/25/2017 | 1.08 |
| 05/26/2017 | 1.08 |
| 05/30/2017 | 1.07 |
| 05/31/2017 | 1.08 |
| 06/01/2017 | 1.07 |
| 06/02/2017 | 1.06 |
| 06/05/2017 | 1.06 |
| 06/06/2017 | 1.08 |
| 06/07/2017 | 1.09 |
| 06/08/2017 | 1.11 |
| 06/09/2017 | 1.13 |
| 06/12/2017 | 1.09 |
| 06/13/2017 | 1.12 |
| 06/14/2017 | 1.12 |
| 06/15/2017 | 1.13 |
| 06/16/2017 | 1.13 |
| 06/19/2017 | 1.13 |
| 06/20/2017 | 1.14 |
| 06/21/2017 | 1.12 |
| 06/22/2017 | 1.10 |
| 06/23/2017 | 1.10 |
| 06/26/2017 | 1.10 |
| 06/27/2017 | 1.13 |
| 06/28/2017 | 1.12 |
| 06/29/2017 | 1.14 |
| 06/30/2017 | 1.14 |
| 07/03/2017 | 1.13 |
| 07/05/2017 | 1.15 |
| 07/06/2017 | 1.14 |
| 07/07/2017 | 1.14 |
| 07/10/2017 | 1.13 |
| 07/11/2017 | 1.14 |
| 07/12/2017 | 1.13 |
| 07/13/2017 | 1.14 |
| 07/14/2017 | 1.12 |
| 07/17/2017 | 1.10 |
| 07/18/2017 | 1.11 |
| 07/19/2017 | 1.12 |
| 07/20/2017 | 1.12 |
| 07/21/2017 | 1.10 |
| 07/24/2017 | 1.12 |
| 07/25/2017 | 1.15 |
| 07/26/2017 | 1.14 |
| 07/27/2017 | 1.13 |
| 07/28/2017 | 1.13 |
| 07/31/2017 | 1.13 |
| 08/01/2017 | 1.15 |
| 08/02/2017 | 1.15 |
| 08/03/2017 | 1.13 |
| 08/04/2017 | 1.14 |
| 08/07/2017 | 1.14 |
| 08/08/2017 | 1.16 |
| 08/09/2017 | 1.15 |
| 08/10/2017 | 1.14 |
| 08/11/2017 | 1.14 |
| 08/14/2017 | 1.13 |
| 08/15/2017 | 1.16 |
| 08/16/2017 | 1.13 |
| 08/17/2017 | 1.11 |
| 08/18/2017 | 1.13 |
| 08/21/2017 | 1.11 |
| 08/22/2017 | 1.13 |

| Fecha Inicio | Fecha de Finalizació | T-Bill+2% | Años | Factor |
|---|---|---|---|---|
| March 31, 2017 | November 03, 2017 | 3.1% | 0.59 | 1.02 |
| December 03, 2017 | December 07, 2018 | 4.1% | 1.01 | 1.04 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| Fecha | Valor |
|---|---|
| 08/23/2017 | 1.11 |
| 08/24/2017 | 1.11 |
| 08/25/2017 | 1.11 |
| 08/28/2017 | 1.12 |
| 08/29/2017 | 1.13 |
| 08/30/2017 | 1.11 |
| 08/31/2017 | 1.08 |
| 09/01/2017 | 1.10 |
| 09/05/2017 | 1.13 |
| 09/06/2017 | 1.17 |
| 09/07/2017 | 1.15 |
| 09/08/2017 | 1.14 |
| 09/11/2017 | 1.16 |
| 09/12/2017 | 1.16 |
| 09/13/2017 | 1.16 |
| 09/14/2017 | 1.17 |
| 09/15/2017 | 1.17 |
| 09/18/2017 | 1.18 |
| 09/19/2017 | 1.19 |
| 09/20/2017 | 1.20 |
| 09/21/2017 | 1.19 |
| 09/22/2017 | 1.19 |
| 09/25/2017 | 1.19 |
| 09/26/2017 | 1.19 |
| 09/27/2017 | 1.20 |
| 09/28/2017 | 1.18 |
| 09/29/2017 | 1.20 |
| 10/02/2017 | 1.22 |
| 10/03/2017 | 1.21 |
| 10/04/2017 | 1.21 |
| 10/05/2017 | 1.21 |
| 10/06/2017 | 1.22 |
| 10/10/2017 | 1.26 |
| 10/11/2017 | 1.25 |
| 10/12/2017 | 1.27 |
| 10/13/2017 | 1.26 |
| 10/16/2017 | 1.24 |
| 10/17/2017 | 1.25 |
| 10/18/2017 | 1.24 |
| 10/19/2017 | 1.25 |
| 10/20/2017 | 1.27 |
| 10/23/2017 | 1.25 |
| 10/24/2017 | 1.27 |
| 10/25/2017 | 1.27 |
| 10/26/2017 | 1.29 |
| 10/27/2017 | 1.28 |
| 10/30/2017 | 1.24 |
| 10/31/2017 | 1.28 |
| 11/01/2017 | 1.30 |
| 11/02/2017 | 1.29 |
| 11/03/2017 | 1.31 |
| 11/06/2017 | 1.30 |
| 11/07/2017 | 1.33 |
| 11/08/2017 | 1.35 |
| 11/09/2017 | 1.36 |
| 11/10/2017 | 1.37 |
| 11/13/2017 | 1.37 |
| 11/14/2017 | 1.40 |
| 11/15/2017 | 1.39 |
| 11/16/2017 | 1.42 |
| 11/17/2017 | 1.42 |
| 11/20/2017 | 1.46 |
| 11/21/2017 | 1.45 |
| 11/22/2017 | 1.45 |
| 11/24/2017 | 1.45 |
| 11/27/2017 | 1.41 |
| 11/28/2017 | 1.46 |
| 11/29/2017 | 1.45 |
| 11/30/2017 | 1.44 |
| 12/01/2017 | 1.45 |
| 12/04/2017 | 1.45 |
| 12/05/2017 | 1.48 |
| 12/06/2017 | 1.48 |
| 12/07/2017 | 1.47 |
| 12/08/2017 | 1.45 |
| 12/11/2017 | 1.47 |
| 12/12/2017 | 1.49 |
| 12/13/2017 | 1.47 |
| 12/14/2017 | 1.48 |
| 12/15/2017 | 1.48 |
| 12/18/2017 | 1.51 |
| 12/19/2017 | 1.51 |
| 12/20/2017 | 1.51 |
| 12/21/2017 | 1.54 |
| 12/22/2017 | 1.54 |
| 12/26/2017 | 1.52 |
| 12/27/2017 | 1.53 |
| 12/28/2017 | 1.54 |
| 12/29/2017 | 1.53 |
| 01/02/2018 | 1.61 |
| 01/03/2018 | 1.59 |
| 01/04/2018 | 1.60 |
| 01/05/2018 | 1.58 |
| 01/08/2018 | 1.60 |
| 01/09/2018 | 1.60 |
| 01/10/2018 | 1.59 |
| 01/11/2018 | 1.58 |
| 01/12/2018 | 1.59 |
| 01/16/2018 | 1.63 |
| 01/17/2018 | 1.63 |
| 01/18/2018 | 1.63 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| | |
|---|---|
| 01/19/2018 | 1.62 |
| 01/22/2018 | 1.65 |
| 01/23/2010 | 1.63 |
| 01/24/2018 | 1.63 |
| 01/25/2018 | 1.64 |
| 01/26/2018 | 1.64 |
| 01/29/2018 | 1.66 |
| 01/30/2018 | 1.66 |
| 01/31/2018 | 1.66 |
| 02/01/2018 | 1.64 |
| 02/02/2018 | 1.65 |
| 02/05/2018 | 1.67 |
| 02/06/2018 | 1.69 |
| 02/07/2018 | 1.73 |
| 02/08/2018 | 1.73 |
| 02/09/2018 | 1.73 |
| 02/12/2018 | 1.82 |
| 02/13/2018 | 1.80 |
| 02/14/2018 | 1.81 |
| 02/15/2018 | 1.82 |
| 02/16/2018 | 1.83 |
| 02/20/2018 | 1.87 |
| 02/21/2018 | 1.85 |
| 02/22/2018 | 1.84 |
| 02/23/2018 | 1.85 |
| 02/26/2018 | 1.87 |
| 02/27/2018 | 1.87 |
| 02/28/2018 | 1.86 |
| 03/01/2018 | 1.85 |
| 03/02/2018 | 1.86 |
| 03/05/2018 | 1.86 |
| 03/06/2018 | 1.87 |
| 03/07/2018 | 1.87 |
| 03/08/2018 | 1.89 |
| 03/09/2018 | 1.89 |
| 03/12/2018 | 1.89 |
| 03/13/2018 | 1.90 |
| 03/14/2018 | 1.94 |
| 03/15/2018 | 1.95 |
| 03/16/2018 | 1.96 |
| 03/19/2018 | 1.99 |
| 03/20/2018 | 1.97 |
| 03/21/2018 | 1.95 |
| 03/22/2018 | 1.95 |
| 03/23/2018 | 1.92 |
| 03/26/2018 | 1.94 |
| 03/27/2018 | 1.93 |
| 03/28/2018 | 1.95 |
| 03/29/2018 | 1.93 |
| 04/02/2018 | 1.92 |
| 04/03/2018 | 1.92 |
| 04/04/2018 | 1.90 |
| 04/05/2018 | 1.93 |
| 04/06/2018 | 1.91 |
| 04/09/2018 | 1.93 |
| 04/10/2018 | 1.93 |
| 04/11/2018 | 1.95 |
| 04/12/2018 | 1.95 |
| 04/13/2018 | 1.97 |
| 04/16/2018 | 1.98 |
| 04/17/2018 | 2.02 |
| 04/18/2018 | 2.01 |
| 04/19/2018 | 2.01 |
| 04/20/2018 | 2.01 |
| 04/23/2018 | 2.04 |
| 04/24/2018 | 2.05 |
| 04/25/2018 | 2.03 |
| 04/26/2018 | 2.02 |
| 04/27/2018 | 2.02 |
| 04/30/2018 | 2.04 |
| 05/01/2018 | 2.05 |
| 05/02/2018 | 2.03 |
| 05/03/2018 | 2.02 |
| 05/04/2018 | 2.03 |
| 05/07/2018 | 2.05 |
| 05/08/2018 | 2.05 |
| 05/09/2018 | 2.05 |
| 05/10/2018 | 2.05 |
| 05/11/2018 | 2.06 |
| 05/14/2018 | 2.09 |
| 05/15/2018 | 2.09 |
| 05/16/2018 | 2.09 |
| 05/17/2018 | 2.10 |
| 05/18/2018 | 2.09 |
| 05/21/2018 | 2.14 |
| 05/22/2018 | 2.13 |
| 05/23/2018 | 2.11 |
| 05/24/2018 | 2.09 |
| 05/25/2018 | 2.07 |
| 05/29/2018 | 2.06 |
| 05/30/2018 | 2.08 |
| 05/31/2018 | 2.08 |
| 06/01/2018 | 2.10 |
| 06/04/2018 | 2.13 |
| 00/05/2018 | 2.13 |
| 06/06/2018 | 2.13 |
| 06/07/2018 | 2.12 |
| 06/08/2018 | 2.12 |
| 06/11/2018 | 2.11 |
| 06/12/2018 | 2.10 |
| 06/13/2018 | 2.09 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| | |
|---|---|
| 06/14/2018 | 2.07 |
| 06/15/2018 | 2.07 |
| 06/18/2018 | 2.13 |
| 06/19/2018 | 2.13 |
| 06/20/2018 | 2.14 |
| 06/21/2018 | 2.12 |
| 06/22/2018 | 2.11 |
| 06/25/2018 | 2.13 |
| 06/26/2018 | 2.14 |
| 06/27/2018 | 2.10 |
| 06/28/2018 | 2.11 |
| 06/29/2018 | 2.11 |
| 07/02/2018 | 2.14 |
| 07/03/2018 | 2.12 |
| 07/05/2018 | 2.11 |
| 07/06/2018 | 2.13 |
| 07/09/2018 | 2.15 |
| 07/10/2018 | 2.15 |
| 07/11/2018 | 2.14 |
| 07/12/2018 | 2.17 |
| 07/13/2018 | 2.16 |
| 07/16/2018 | 2.19 |
| 07/17/2018 | 2.19 |
| 07/18/2018 | 2.17 |
| 07/19/2018 | 2.16 |
| 07/20/2018 | 2.16 |
| 07/23/2018 | 2.19 |
| 07/24/2018 | 2.19 |
| 07/25/2018 | 2.20 |
| 07/26/2018 | 2.19 |
| 07/27/2018 | 2.20 |
| 07/30/2018 | 2.21 |
| 07/31/2018 | 2.21 |
| 08/01/2018 | 2.22 |
| 08/02/2018 | 2.22 |
| 08/03/2018 | 2.23 |
| 08/06/2018 | 2.23 |
| 08/07/2018 | 2.23 |
| 08/08/2018 | 2.24 |
| 08/09/2018 | 2.25 |
| 08/10/2018 | 2.23 |
| 08/13/2018 | 2.22 |
| 08/14/2018 | 2.25 |
| 08/15/2018 | 2.23 |
| 08/16/2018 | 2.24 |
| 08/17/2018 | 2.24 |
| 08/20/2018 | 2.25 |
| 08/21/2018 | 2.25 |
| 08/22/2018 | 2.24 |
| 08/23/2018 | 2.23 |
| 08/24/2018 | 2.25 |
| 08/27/2018 | 2.25 |
| 08/28/2018 | 2.28 |
| 08/29/2018 | 2.28 |
| 08/30/2018 | 2.28 |
| 08/31/2018 | 2.28 |
| 09/04/2018 | 2.29 |
| 09/05/2018 | 2.30 |
| 09/06/2018 | 2.30 |
| 09/07/2018 | 2.30 |
| 09/10/2018 | 2.32 |
| 09/11/2018 | 2.31 |
| 09/12/2018 | 2.33 |
| 09/13/2018 | 2.33 |
| 09/14/2018 | 2.33 |
| 09/17/2018 | 2.35 |
| 09/18/2018 | 2.36 |
| 09/19/2018 | 2.36 |
| 09/20/2018 | 2.37 |
| 09/21/2018 | 2.38 |
| 09/24/2018 | 2.38 |
| 09/25/2018 | 2.38 |
| 09/26/2018 | 2.37 |
| 09/27/2018 | 2.37 |
| 09/28/2018 | 2.36 |
| 10/01/2018 | 2.40 |
| 10/02/2018 | 2.41 |
| 10/03/2018 | 2.41 |
| 10/04/2018 | 2.42 |
| 10/05/2018 | 2.41 |
| 10/09/2018 | 2.46 |
| 10/10/2018 | 2.45 |
| 10/11/2018 | 2.44 |
| 10/12/2018 | 2.44 |
| 10/15/2018 | 2.47 |
| 10/16/2018 | 2.46 |
| 10/17/2018 | 2.47 |
| 10/18/2018 | 2.47 |
| 10/19/2018 | 2.48 |
| 10/22/2018 | 2.49 |
| 10/23/2018 | 2.48 |
| 10/24/2018 | 2.47 |
| 10/25/2018 | 2.47 |
| 10/26/2018 | 2.47 |
| 10/29/2018 | 2.49 |
| 10/30/2018 | 2.48 |
| 10/31/2018 | 2.49 |
| 11/01/2018 | 2.49 |
| 11/02/2018 | 2.50 |
| 11/05/2018 | 2.51 |
| 11/06/2018 | 2.52 |

**Saint-Gobain Performance Plastics Europe c. La Republica Bolivariana de Venezuela, Caso CIADI No. ARB/12/13**

Aplicación del Laudo del Tribunal

**Reserva Federal - Rendimientos del Tesoro**

| Fecha | Valor |
|---|---|
| 11/07/2018 | 2.51 |
| 11/08/2018 | 2.52 |
| 11/09/2018 | 2.52 |
| 11/13/2018 | 2.53 |
| 11/14/2018 | 2.52 |
| 11/15/2018 | 2.51 |
| 11/16/2018 | 2.50 |
| 11/19/2018 | 2.52 |
| 11/20/2018 | 2.51 |
| 11/21/2018 | 2.52 |
| 11/23/2018 | 2.52 |
| 11/26/2018 | 2.54 |
| 11/27/2018 | 2.53 |
| 11/28/2018 | 2.53 |
| 11/29/2018 | 2.52 |
| 11/30/2018 | 2.52 |
| 12/03/2018 | 2.56 |
| 12/04/2018 | 2.58 |

Fuente:
Consejo de la Reserva Federal, Tesoro de 6 meses
Tipo de vencimiento constante (serie DGS6MO)

# Anexo 5

# CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES

**Saint-Gobain Performance Plastics Europe**
Demandada en Anulación

c.

**República Bolivariana de Venezuela**
Demandante en Anulación

**(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación**

## ORDEN DE PROCEDIMIENTO NRO. 2

*Miembros del Comité*
Prof. Ricardo Ramírez Hernández, presidente de la Comité *ad hoc*
Sra. Olufunke Adekoya, miembro de la Comité *ad hoc*
Prof. Lawrence Boo, miembro de la Comité *ad hoc*

*Secretario del Comité*
Sr. Francisco Grob

24 de octubre de 2018

*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

## I.    INTRODUCCIÓN

1.    De conformidad con las Reglas de Arbitraje 19 y 53 del CIADI, esta orden de procedimiento aborda la sede del arbitraje, la suspensión de la ejecución del Laudo y la suspensión del procedimiento.

## II.    ANTECEDENTES DE ESTA ORDEN

2.    Venezuela presentó su Solicitud de Anulación el 5 de marzo de 2018. Al mismo tiempo, Venezuela pidió que la ejecución del Laudo quedara suspendida hasta que la Solicitud fuera resuelta.

3.    El 12 de marzo de 2018, el Secretario General en funciones registró la Solicitud de Venezuela y notificó a las partes que la ejecución del Laudo quedaba suspendida provisionalmente, de conformidad con la Regla 54(2) de las Reglas de Arbitraje del CIADI.

4.    El Comité se constituyó el 7 de junio de 2018 y el 13 de junio de 2018 la Secretaría solicitó que la Demandante efectuara el primer pago anticipado de US$ 250.000 que vencía en 30 días.

5.    El 14 de junio de 2018, la Demandada en Anulación (Saint-Gobain) envió una carta en la que alegaba que, salvo que la Demandante (Venezuela) demostrara que se daban las circunstancias que exigían la continuación de la suspensión de la ejecución, la suspensión debería levantarse automáticamente en un plazo de 30 días desde la constitución del Comité; esto es, llegado el día 7 de julio de 2018.

6.    El 27 de junio de 2018, Venezuela notificó al Comité que se oponía a la postura adoptada por Saint-Gobain y que pediría la continuación de la suspensión de la ejecución del Laudo.

7.    Mediante carta de fecha 5 de julio de 2018, el Comité confirmó que la Primera Sesión se celebraría en las instalaciones del Banco Mundial en París, el 21 de agosto de 2018, e invitó a las partes a que acordaran un calendario procesal antes del 9 de julio de 2018, y, conforme a lo previsto en la Regla de Arbitraje 54(2) del CIADI, decidió mantener la suspensión provisional de la ejecución del Laudo hasta que tuviera la oportunidad de examinar las posturas alegadas por las partes y de adoptar la resolución pertinente.

8.    El 6 de julio de 2018, las partes presentaron al Comité el calendario procesal acordado, conforme al cual la Demandante presentaría su Memorial en Apoyo de la Continuación de la Suspensión antes del 25 de julio de 2018, y la Demandada en Anulación presentaría su Contramemorial antes del 13 de agosto de 2018.

9.    El 11 de julio de 2018, y en virtud de las instrucciones recibidas del Comité, el Secretario del Comité envió a las partes un borrador del orden del día relativo a la Primera Sesión y un borrador de la Orden de Procedimiento nro. 1.

10.    El 25 de julio de 2018, de conformidad con el calendario procesal acordado por las partes, la Demandante presentó su Memorial en Apoyo de la Continuación de la Suspensión. Ese mismo día, se les informó a las partes de que el CIADI todavía no había recibido el primer pago anticipado de US$ 250.000, conforme a lo solicitado en su carta de 13 de junio de 2018. El Presidente del Comité propuso a la Demandante que informara al Comité antes del 30 de julio de 2018 sobre (a) los actos que había realizado para efectuar el pago y (b) la fecha estimada en la que el CIADI podría esperar recibir dicho pago.

Case 1:20-cv-00129-RC    Document 81-1    Filed 06/01/23    Page 356 of 390
Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

11. El 30 de julio de 2018, el abogado de la Demandante notificó al Comité que estaba a la espera de recibir las instrucciones de Venezuela y que contestaría en cuanto tuviera la respuesta.

12. El 1 de agosto de 2018, el Comité instó a Venezuela a que proporcionara información adicional en relación con los actos realizados para efectuar el pago anticipado, solicitado por el CIADI en su carta de 13 de junio de 2018. Salvo que el pago fuera recibido antes del 10 de agosto de 2018, la Primera Sesión tendría que ser aplazada.

13. Ese mismo día, Saint-Gobain solicitó que si Venezuela no efectuaba el pago antes de la fecha límite impuesta por el Comité, la suspensión provisional de la ejecución del Laudo tendría que ser levantada automáticamente.

14. El 10 de agosto de 2018, el Comité instó a Venezuela a que aportara pruebas de haber transferido los fondos tan pronto como le fuera posible, pero a más tardar antes del 13 de agosto. En esa misma comunicación, el Comité informó a las partes de que la fecha de la Audiencia en París quedaba anulada hasta nuevo aviso.

15. El 13 de agosto de 2018, Venezuela informó al Comité de que el pago anticipado todavía no se había efectuado debido a motivos de carácter administrativo, y que el pago se estaba procesando. Ese mismo día, el Comité estimó la solicitud de Venezuela de contestar a la carta de Saint-Gobain de 1 de agosto. Asimismo, ese mismo día, Saint-Gobain presentó su Contramemorial de Oposición a la Continuación de la Suspensión de la Ejecución del Laudo.

16. El 15 de agosto de 2018, Venezuela presentó una contestación a la carta de Saint-Gobain del 1 de agosto. El 17 de agosto de 2018, Saint-Gobain envió una contestación a la carta de Venezuela. El 20 de agosto de 2018, Venezuela presentó una contestación a la carta de Saint-Gobain de 17 de agosto y reiteró su postura que figuraba en su carta de 15 de agosto.

17. El 21 de agosto de 2018, el Comité celebró su primera sesión a través de una teleconferencia con la participación con sus miembros, de conformidad con la Regla de Arbitraje 13(1) del CIADI. El Comité debatió sobre varias cuestiones procesales abordadas por las partes en sus escritos presentados. El Comité instó a las partes a que presentaran sus posturas en la que abordaran la suspensión de la ejecución y la propuesta de cada Parte en relación con la sede del arbitraje de conformidad con el apartado 10 del borrador de la Orden de Procedimiento nro. 1. Ese mismo día, el CIADI instó a cualquiera de las partes a que pagara el monto pendiente de US$ 250.000, y señaló que si el pago no se efectuaba, el procedimiento quedaría suspendido.

18. El 5 de septiembre de 2018, Venezuela presentó una contestación en Apoyo de la Continuación de la Suspensión de la Ejecución. También detalló los motivos para proponer París como la sede de celebración del procedimiento.

19. El 14 de septiembre de 2018, Saint-Gobain presentó una dúplica para reafirmarse en su oposición a la Continuación de la Suspensión de la Ejecución. También expuso los motivos que subyacían en su preferencia por Washington D.C. como la sede de celebración del procedimiento.

*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

20. El 28 de septiembre de 2018, el Comité dictó la Orden de Procedimiento nro. 1 relativa a varios aspectos organizativos del procedimiento.

21. Puesto que no se había recibido ningún pago, el 23 de octubre el Secretario General del CIADI solicitó que este Comité suspendiera el procedimiento relativo a este caso, de conformidad con la Regla 14 del Reglamento Administrativo y Financiero del Centro.

### III.    SEDE DE CELEBRACIÓN DEL ARBITRAJE

22. Venezuela propone que la sede de celebración del procedimiento sea París (Francia). París es una sede de celebración de arbitrajes mundialmente conocida y la ciudad tiene una ubicación ideal teniendo en cuenta la localización geográfica de las partes y de los miembros del Comité *ad hoc*. Además, dichas consideraciones son relevantes de cara a los costos y podrían influir en los pagos anticipados necesarios, que constituyen la responsabilidad de Venezuela.

23. Saint-Gobain sostiene que Washington, D.C. debería ser la sede de celebración del procedimiento. La audiencia relativa al arbitraje subyacente tuvo lugar en Washington, D.C. que es el lugar por defecto de celebración de procedimientos del CIADI en ausencia de acuerdo en contrario. La decisión de Venezuela de contratar a un nuevo abogado en París no constituye ningún motivo para incrementar los costos de Saint-Gobain en este sentido.

24. El Comité observa que de conformidad con el artículo 62 del Convenio, los procedimientos *se tramitarán* en la sede del Centro (el subrayado es nuestro), lo cual se aplica *mutatis mutandis* al presente procedimiento de anulación en virtud del artículo 52(4). Aunque el artículo 63 permite una excepción conforme a la cual el Comité podrá tramitar sus procedimientos en otra sede *(por ejemplo,* en la sede de la Corte Permanente de Arbitraje o en cualquier otro lugar), dicha excepción solo sería aplicable "si las partes se pusieran de acuerdo". En el caso que nos ocupa, no se ha llegado a ningún acuerdo en este sentido. En consecuencia, el procedimiento se tramitará en la sede del Centro en Washington, D.C.

### IV.    SUSPENSIÓN DE LA EJECUCIÓN DEL LAUDO

25. Vistos los argumentos de las partes y habiendo deliberado por varios medios, el Comité considera que no existe ninguna circunstancia que justifique la suspensión de la ejecución del Laudo. En consecuencia, la suspensión se levanta.

26. El Comité proporcionará su razonamiento por escrito una vez recibido el anticipo pendiente de pago.

### V.    SUSPENSIÓN DEL PROCEDIMIENTO DE ANULACIÓN

27. De conformidad con la Regla 14(3)(e) del Reglamento Administrativo y Financiero del CIADI, un demandante en anulación asume plena responsabilidad de efectuar los pagos anticipados relativos a los costos (sin perjuicio de una decisión posterior adoptada por el Comité en relación con la asignación de los costos entre las partes). Dichos pagos anticipados son necesarios para sufragar los costos en los que incurra el Centro y para pagar los honorarios y gastos de los miembros del Comité.

*Saint-Gobain Performance Plastics Europe c. República Bolivariana de Venezuela*
(Caso CIADI nro. ARB/12/13) - Procedimiento de Anulación

28. En el caso que nos ocupa, a Venezuela se le solicitó que proporcionara información actualizada con respecto a la situación del pago anticipado. Venezuela ha reiterado su disposición de efectuar el pago, si bien los fondos no se han recibido. Mientras tanto, el Comité ha celebrado la Primera Sesión y adoptado dos órdenes de procedimiento, incluida la presente.

29. En este momento, el pago lleva un retraso de 14 semanas y el Secretario General del CIADI ha solicitado que este Comité suspenda el procedimiento. Por otro lado, la Demandante no ha proporcionado ninguna indicación específica en cuanto a la fecha prevista para recibir el pago.

30. En consecuencia, hasta que se reciba el pago, el Comité suspenderá el procedimiento conforme a lo dispuesto en la Regla 14 del Reglamento Administrativo y Financiero del Centro. No sería adecuado que en las circunstancias actuales el Centro continuara incurriendo en costos y que los miembros del Comité siguieran devengando honorarios.

## VI.    ORDEN

31. En consecuencia, por medio de la presente el Comité elige Washington, D.C. como la sede de celebración del procedimiento; desde hoy, 24 de octubre de 2018, levanta la suspensión de la ejecución del Laudo, y suspende el procedimiento hasta que se reciba el pago anticipado solicitado el 13 de junio de 2018.

En nombre del Comité,

Ricardo Ramírez Hernández
Presidente del Comité

5

**ANTE EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
PARA EL DISTRITO DE DELAWARE**

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

        Demandante,

   c.

REPÚBLICA BOLIVARIANA
DE VENEZUELA;  PETRÓLEOS
DE VENEZUELA, S.A.,

        Demandadas.

Procedimiento Civil Nro.: 18-cv-1963-UNA

---

## DECLARACIÓN DE DIVULGACIÓN CORPORATIVA

De conformidad con la regla 7.1 de la Ley federal de enjuiciamiento civil (*Federal Rule of Civil Procedure*), la Demandante, Saint-Gobain Performance Plastics Europe ("Saint-Gobain" o "Demandante") es una sociedad constituida con arreglo a la legislación de la República Francesa. Saint-Gobain es propiedad al 100 % de Societé de Participations Financières et Industrielles, que a su vez es propiedad al 100 % de Compagnie de Saint-Gobain. Ninguna otra sociedad tiene una participación societaria del 10 % o mayor en las acciones de Saint-Gobain.

Fecha: 13 de diciembre de 2018

PACHULSKI STANG ZIEHL & JONES LLP

/firmado/ Laura Davis Jones
Laura Davis Jones (nro. de colegiación: 2436)
Peter J. Keane (nro. de colegiación: 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Teléfono: (302) 652-4100
Fax: (302) 652-4400
Correo electrónico: ljones@pszjlaw.com
                    pkeane@pszjlaw.com


- y -

Alex Yanos, *pro hac vice pendiente*
Carlos Ramos-Mrosovsky, *pro hac vice pendiente*
Rajat Rana, *pro hac vice pendiente*
ALSTON & BIRD LLP
90 Park Avenue
Nueva York, NY 10016
Tel.: 202-210-9400
Fax: 212-210-9444
Correo electrónico: alex.yanos@alston.com
        carlos.ramos-mrosovsky@alston.com
        rajat.rana@alston.com

*Abogada de la Demandante, Saint-Gobain Performance Plastics Europe*

**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
PARA EL DISTRITO DE COLUMBIA**

SAINT-GOBAIN PERFORMANCE
PLASTICS EUROPE,

        Demandante,

    c/

REPÚBLICA BOLIVARIANA DE
VENEZUELA

        Demandado

Acción Civil n.º 1:20-cv-00129-RC

**NOTIFICACIÓN DE LA DEMANDA**

1. <u>Título del procedimiento legal; nombre completo del tribunal; número de caso o expediente</u>: *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela (Saint-Gobain Performance Plastics Europe c/ República Bolivariana de Venezuela),* el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia, n.º 1:20-cv-129-RC.

2. <u>Nombre del estado extranjero (o subdivisión política) participante</u>: República Bolivariana de Venezuela

3. <u>Identidad de las otras partes</u>: Saint-Gobain Performance Plastics Europe

**DOCUMENTOS JUDICIALES**

4. <u>Naturaleza de los documentos presentados en forma oficial (por ejemplo, citación judicial y demanda; sentencia en rebeldía)</u>: los documentos que se están presentando en forma oficial son la citación judicial, la demanda y los documentos de apoyo de la demanda, que incluyen: (*i*) el 13 de diciembre de 2018, Declaración de Alexander A. Yanos; (*ii*) Anexo 1, el 3 de noviembre de 2017 el laudo arbitral dictado a favor de Saint-Gobain Performance

1

Plastics Europe y contra la República Bolivariana de Venezuela; (*iii*) Anexo 2, la Convención sobre el Arreglo de Diferencias Relativas a Inversiones entre los Estados y los Nacionales de Otros Estados; (*iv*) Anexo 3, el 30 de diciembre de 2016, la Decisión sobre Responsabilidad y los Principios sobre Cantidad; (*v*) Anexo 4, el cuadro de la Rentabilidad del Tesoro de los Estados Unidos; y (*vi*) Anexo 5, el 24 de octubre de 2018, la Orden de Procedimiento n.º 2.

También he incluido las traducciones en español de los documentos antes mencionados.

5. <u>Naturaleza y objetivo de los procedimientos; por qué se ha designado al estado extranjero (o subdivisión política); exoneración solicitada</u>: Se designa en este juicio a la República Bolivariana de Venezuela como demandada debido a las peticiones de Saint-Gobain al Tribunal para una orden conforme a 22 U.S.C. § 1650a y 28 U.S.C. § 1738 registrando como resolución extranjera un laudo arbitral del 3 de noviembre de 2017, emitido conforme a la Convención sobre el Arreglo de Diferencias Relativas a Inversiones entre los Estados y los Nacionales de Otros Estados, 18 de marzo de 1965, 17 U.S.T. 1270, en favor de Saint-Gobain y contra la Demandada la República Bolivariana de Venezuela, en un litigio que surge de la expropiación de parte de la República Bolivariana de Venezuela de la inversión de Saint-Gobain.

Estos procedimientos se iniciaron originalmente en diciembre de 2018 ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Delaware en el que se designó a la República Bolivariana de Venezuela y a Petróleos de Venezuela S.A. como partes demandadas. El 12 de diciembre de 2019, el Tribunal de Distrito para el Distrito de Delaware desestimó a Petróleos de Venezuela S.A. de la demanda y ordenó que la demanda se transfiera al Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia.

La transferencia se realizó el 16 de enero de 2020. Esa es la razón por la cual la demanda vigente, aunque actualmente se encuentra ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia y ya no se hace valer en contra de Petróleos de Venezuela S.A., nombra al Tribunal de Distrito de los Estados Unidos para el Distrito de Delaware y a Petróleos de Venezuela S.A.

Si bien tanto los Tribunales de Distrito en Delaware como en el Distrito de Columbia determinaron que Saint-Gobain notificó apropiadamente a la República Bolivariana de Venezuela en diciembre de 2018 cuando entregó copias de los alegatos a la Autoridad Central de Venezuela conforme a la Convención de La Haya sobre Notificación en el Exterior de Documentos Judiciales y Extrajudiciales en Cuestiones Civiles o Comerciales, dichas determinaciones han sido revocadas desde entonces. Saint-Gobain ahora notifica nuevamente a la República Bolivariana de Venezuela, esta vez a través de canales diplomáticos de acuerdo con la Ley de Inmunidad de Soberanía Extranjera de 1976.

6. Fecha de la sentencia en rebeldía (si hubiere): no corresponde.

7. Se requiere presentar una respuesta a una "Citación judicial" y una "Demanda" al tribunal antes de los 60 días posteriores a la recepción de estos documentos. La respuesta puede presentar excepciones jurisdiccionales (incluso excepciones relacionadas con inmunidad del estado).

8. No presentar una respuesta oportuna ante el tribunal puede resultar en un Fallo por no comparecencia y una solicitud de ejecución para hacer cumplir la sentencia. Si se ha presentado una sentencia en rebeldía, puede que haya disponible un procedimiento para revocar o abrir la sentencia.

9. Las preguntas relacionadas con las inmunidades del estado y la jurisdicción de los tribunales de los Estados Unidos sobre los estados extranjeros se rigen por la Ley de Inmunidad de Soberanía Extranjera de 1976, que aparece en las secciones 1330, 1391(f), 1441(d) y 1602 a 1611 del Título 28 del Código de los Estados Unidos (Pub. L. 94-583; 90 Ley 2891). He adjuntado una copia de la Ley de Inmunidad de Soberanía Extranjera como **Anexo A** a esta Notificación de la Demanda. También he adjuntado como **Anexo B** partes actualizadas de los estatutos que aparecen en la Ley de Inmunidad de Soberanía Extranjera de 1976 que se ha enmendado desde aquel entonces.

Fecha: 1 de diciembre de 2022

ALSTON & BIRD LLP
Alexander A. Yanos
Rajat Rana
90 Park Avenue
Nueva York, NY 10016
Teléfono: 212-210-9400
Fax: 212-210-9444
alex.yanos@alston.com
rajat.rana@alston.com

*Abogado del Demandante Saint-Gobain
Performance Plastics Europe*

4

# ANEXO A

Derecho público 94-583
94.º Congreso

## Una ley

Para definir la jurisdicción de los tribunales de Estados Unidos en juicios en contra de estados extranjeros, las circunstancias en las cuales los estados extranjeros son inmunes de un juicio y en las cuales la ejecución no se pueda imponer sobre su propiedad, y para otros fines.

*Queda promulgada por el Senado y la Cámara de Representantes de los Estados Unidos de América en Congreso reunido,* que esta Ley puede citarse como la "Ley de Inmunidad de Soberanía Extranjera de 1976".

SEC. 2. (a) Que el capítulo 85 del título 28, Código de los Estados Unidos, se enmienda mediante la inserción inmediatamente antes de la sección 1331 de la siguiente nueva sección:

### "§ 1330. Acciones en contra de los estados extranjeros

"(a) Los tribunales de distrito tendrán la jurisdicción original sin importar la cantidad en controversia de cualquier acción civil sin jurado en contra de un estado extranjero como se define en la sección 1603(a) de este título en cuanto a cualquier acción de indemnización in personam con respecto a la cual el estado extranjero no tenga derecho a inmunidad conforme a cualquiera de las secciones 1605-1607 de este título o conforme a cualquier acuerdo internacional vigente.

"(b) La jurisdicción personal sobre un estado extranjero existirá con respecto a cualquier acción de indemnización sobre la cual los tribunales de distrito tengan jurisdicción conforme al inciso (a) en donde se haya realizado un emplazamiento conforme a la sección 1608 de este título

"(c) Para los fines del inciso (b), la comparecencia de un estado extranjero no confiere jurisdicción personal con respecto a ninguna acción de indemnización que no surja de ninguna transacción u ocurrencia enumerada en las secciones 1605-1607 de este título".

(b) Al insertar en el análisis del capítulo correspondiente a ese capítulo antes

"1331. Cuestión federal: cantidad en controversia; costos".

el siguiente nuevo ítem:

"1330. Acción en contra de los estados extranjeros".

SEC. 3. Esa sección 1332 del título 28, Código de los Estados Unidos, se enmienda al quitar los incisos (a) (2) y (3) y reemplazarlos con lo siguiente:

"(2) ciudadanos de un estado y ciudadanos o sujetos de un estado extranjero;

"(3) ciudadanos de diferentes estados y en los que los ciudadanos o sujetos de un estado extranjero son partes adicionales y

"(4) un estado extranjero, definido en la sección 1603(a) de este título, como demandante y ciudadanos de un estado o de diferentes estados".

SEC. 4. (a) Que el título 28, Código de los Estados Unidos, se enmienda mediante la inserción después de la sección 95 del siguiente nuevo capítulo:

### "Capítulo 97. INMUNIDADES JURISDICCIONALES DE LOS ESTADOS EXTRANJEROS

"Sec.
"1602. Consideraciones y declaración de propósito.
"1603. Definiciones.
"1604. Inmunidad de un estado extranjero de la jurisdicción.
"1605. Excepciones generales a la inmunidad jurisdiccional de un estado extranjero.
"1606. Grado de responsabilidad.

*Margin notes:*
21 de octubre de 1976 [H.R. 11315]

Ley de Inmunidades de Soberanías Extranjeras de 1976.

Nota de 28 USC 1.

28 USC 1330.
Jurisdicción

Post, p. 2892.

Post, p. 2894.

INFORMACIÓN AUTENTICADA POR EL GOBIERNO DE EE. UU
GPO

"1607. Contrademandas.
"1608. Emplazamiento; tiempo para responder; incumplimiento.
"1609. Inmunidad del embargo y la ejecución de la propiedad de un estado extranjero.
"1610. Excepciones a la inmunidad de embargo o ejecución.
"1611. Determinados tipos de propiedad inmune de la ejecución.

**USC 1602.**

## "§ 1602. Consideraciones y declaración de propósito

"El Congreso resuelve que la determinación de los tribunales de los Estados Unidos de los reclamos de estados extranjeros para la inmunidad de la jurisdicción de dichos tribunales sirve a los intereses de la justicia y protegería los derechos de los estados extranjeros y litigantes en los tribunales de los Estados Unidos. Conforme al derecho internacional, los estados no son inmunes de la jurisdicción de los tribunales extranjeros en cuanto a lo que atañe a sus actividades comerciales, y su propiedad comercial puede embargarse para la satisfacción de sentencias dictaminadas en contra de ellos con relación a sus actividades comerciales. Los reclamos de los estados extranjeros en cuanto a la inmunidad en adelante deben ser decididos por los tribunales de los Estados Unidos y de los estados en conformidad con los principios estipulados en este capítulo.

**USC 1603.**

## "§ 1603. Definiciones

"Para los fines de este capítulo:

" (a) Un 'estado extranjero', excepto como se usa en la sección 1608 de este título, incluye una subdivisión política de un estado extranjero o un organismo o agencia de un estado extranjero según se define en el inciso (b).

"(b) Un 'organismo o agencia de un estado extranjero' significa cualquier entidad:

"(1) que sea una persona jurídica separada, una corporación o de manera y

"(2) que sea un órgano de un estado extranjero o una de sus subdivisiones políticas, o en que una mayoría de sus acciones u otra participación sea propiedad de un estado extranjero o de una de sus subdivisiones políticas y

"(3) que no sea un ciudadano de un estado de los Estados Unidos según se define en la sección 1332 (c) y (d) de este título, ni creado conforme a las leyes de ningún país tercero.

"(c) Los 'Estados Unidos' incluye todos los territorios y aguas, continentales o insulares, sujetos a la jurisdicción de los Estados Unidos.

"(d) Una 'actividad comercial' significa ya sea el curso regular de la conducta comercial o una transacción o acto comercial en particular. El carácter comercial de una actividad se determinará por referencia a la naturaleza del curso de conducta o transacción o acto particular, en lugar de por la referencia a su propósito.

"(e) Una 'actividad comercial realizada en los Estados Unidos por un estado extranjero' significa una actividad comercial llevada a cabo en dicho estado y que tenga un contacto sustancial con los Estados Unidos.

**USC 1604.**

## "§ 1604. Inmunidad de un estado extranjero de la jurisdicción

"Sujeto a los acuerdos internacionales existentes de los que Estados Unidos sea parte al momento de la promulgación de esta Ley, un estado extranjero será inmune de la jurisdicción de los tribunales de los Estados Unidos y de los estados excepto según se estipule en las secciones de la 1605 a la 1607 de este capítulo.

**USC 1605.**

## "§ 1605. Excepciones generales a la inmunidad jurisdiccional de un estado extranjero

"(a) Un estado extranjero no será inmune de la jurisdicción de los tribunales de los Estados Unidos ni de los estados en ningún caso:

"(1) en el cual el estado extranjero haya renunciado a su inmunidad ya sea de manera explícita o implícita, sin perjuicio del retiro de

la renuncia que el estado extranjero pueda pretender efectuar excepto de acuerdo con los términos de la renuncia;

"(2) en que la acción se base en una actividad comercial realiza en los Estados Unidos por el estado extranjero o en un acto realizado por los Estados Unidos con relación a una actividad comercial del estado extranjero en otro lugar o en un acto fuera del territorio de los Estados Unidos con relación a una actividad comercial del estado extranjero en otro lugar y que el acto cause un efecto directo en los Estados Unidos;

"(3) en que los derechos sobre la propiedad tomados en violación de la ley internacional estén en cuestión y que la propiedad o cualquier propiedad intercambiada por dicha propiedad esté presente en los Estados Unidos con relación a una actividad comercial realizada en los Estados Unidos por el estado extranjero; o que la propiedad o cualquier propiedad intercambiada por dicha propiedad sea propiedad o esté operada por un organismo o agencia del estado extranjero y que ese organismo o agencia participe en una actividad comercial en los Estados Unidos;

"(4) en el cual los derechos sobre la propiedad en los Estados Unidos adquirido por sucesión o donación de derechos en una propiedad inmueble situada en los Estados Unidos estén en cuestión o

"(5) que no esté de otro modo abarcado en el párrafo (2) anterior, en el cual los daños monetarios se intentan obtener en contra de un estado extranjero por una lesión personal o muerte, o por daño o pérdida de la propiedad, que ocurra en los Estados Unidos y produzca del acto ilícito u omisión de ese estado extranjero o de cualquier funcionario o empleado de ese estado extranjero mientras actúa dentro del alcance de su cargo o empleo; excepto que este párrafo no se aplicará a:

"(A) ningún reclamo basado en el ejercicio o cumplimiento o la falta de ejercicio o cumplimiento de una función discrecional independientemente de si hubo un abuso en la discreción o

"(B) ningún reclamo que surja del enjuiciamiento malicioso, el abuso de poder, la difamación, la tergiversación, el fraude o la interferencia con los derechos contractuales.

"(b) Un estado extranjero no estará inmune de la jurisdicción de los tribunales de los Estados Unidos en ningún caso en el que un juicio en el derecho marítimo se presente para hacer cumplir un derecho de retención marítimo en contra de una embarcación o cargamento del estado extranjero, en el que el derecho de retención marítimo se base en una actividad comercial del estado extranjero. *Siempre* que:

*Juicio en el derecho marítimo.*

"(1) se dé una notificación del juicio mediante la entrega de una copia de la citación y de la demanda a la persona, o a su representante, que tenga la posesión de una embarcación o cargamento en contra del cual se haga valer el derecho de retención marítimo, pero dicha notificación no debe considerarse como que se hubiera entregado ni puede entregarse después de ese momento, si la embarcación o el cargamento es arrestado conforme al proceso para obtener en nombre de la parte que entabla el juicio, a menos que la parte no estuviera al tanto de la participación de la embarcación o el cargamento de un estado extranjero, en cuyo caso la notificación de los actos procesales sobre el arresto se considerará que constituye una entrega válida de dicha notificación y

*Notificación.*

"(2) se inicie la notificación al estado extranjero del comienzo del juicio, como se estipula en la sección 1608 de este título, dentro de los 10 días de la entrega de la notificación como se estipula en el inciso (b) (1) de esta sección o, en el caso de una parte que no estuviera al tanto de que la embarcación o el cargamento de un estado extranjero estaba involucrado, de la fecha en que dicha parte determinó la existencia del interés del estado extranjero.

En cualquier momento en que se envíe la notificación conforme al inciso (b) (1) de esta sección, el derecho de retención marítimo a partir de allí se considerará un reclamo

in personam en contra del estado extranjero que en cualquier momento sea propietario de la embarcación o el cargamento involucrados. *Siempre* considerando que un tribunal no puede dictar una sentencia en contra de un estado extranjero por una cantidad superior al valor de la embarcación o el cargamento sobre el cual surgió el derecho de retención marítimo, cuyo valor se determinará a partir del momento en que se entregue la notificación conforme al inciso (b)(1) de esta sección.

28 USC 1606.

### "§ 1606. Grado de responsabilidad

"En cuanto a la acción de indemnización con respecto a la cual un estado extranjero no tiene derecho a la inmunidad conforme a la sección 1605 o 1607 de este capítulo, el estado extranjero será responsable de la misma manera y hasta el mismo grado que un individuo privado en circunstancias similares; pero un estado extranjero excepto por uno de sus organismos o agencias no será responsable de daños punitivos; sin embargo, en cualquier caso en que allí se causara la muerte, la ley del lugar donde la acción u omisión ocurrió estipula, o se ha interpretado que estipula, daños solo punitivos en naturaleza, el estado extranjero será responsable de daños reales o compensatorios medidos a través del perjuicio pecuniario que resulte de la muerte en que incurrieron de parte de las personas en cuyo beneficio se persiguió la acción.

28 USC 1607.

### "§ 1607. Contrademandas

"En cualquier acción presentada por un estado extranjero, o en la cual intervenga un estado extranjero, en un tribunal de los Estados Unidos o de un estado, el estado extranjero no recibirá inmunidad con respecto a ninguna contrademanda:

"(a) para la cual un estado extranjero no tendría derecho a la inmunidad conforme a la sección 1605 de este capítulo si dicha demanda se hubiera presentado en una acción separada en contra del estado extranjero o

"(b) que surja de la transacción u ocurrencia que sea el objeto de la demanda del estado extranjero o

"(c) hasta el punto en que la contrademanda no busque una indemnización que supere el monto o difiera en especie de la que busque el estado extranjero.

28 USC 1608.

### "§ 1608. Emplazamiento; tiempo para responder; incumplimiento

"(a) El emplazamiento en los tribunales de los Estados Unidos y de los estados se hará a un estado extranjero o subdivisión política de un estado extranjero:

"(1) mediante la entrega de una copia de la citación y la demanda de acuerdo con cualquier arreglo especial para el emplazamiento entre el demandante y el estado extranjero o una subdivisión política o

"(2) si no existe ningún arreglo en especial, a través de la entrega de una copia de la citación y la demanda de acuerdo con cualquier convención internacional correspondiente sobre el emplazamiento de los documentos judiciales o

"(3) si el emplazamiento no se puede hacer según los párrafos (1) o (2), mediante el envío de una copia de la citación y la demanda y una notificación de la demanda, junto con una traducción de cada uno al idioma oficial del estado extranjero, a través de cualquier forma de correo que requiera un recibo firmado, a dirigir y despachar por el secretario del tribunal al titular del Ministerio de Relaciones Internacionales del estado extranjero en cuestión o

"(4) si el emplazamiento no se puede realizar dentro de 30 días conforme al párrafo (3), mediante el envío de dos copias de las citaciones y la demanda y una notificación de la demanda, junto con una traducción de cada uno al idioma oficial del estado extranjero, a través de cualquier forma de correo que requiera un recibo firmado, a dirigir y despachar por el secretario del tribunal a la Secretaría de Estado en Washington, Distrito de Columbia, a la atención del director de Servicios Consulares Especiales, y

la Secretaría transmitirá una copia de los documentos a través de los canales diplomáticos al estado extranjero y enviará al secretario del tribunal una copia certificada de la nota diplomática que indique cuándo se transmitieron los documentos.

Como se usan este inciso, una 'notificación de demanda' significará un aviso de dirigido a un estado extranjero y en una forma estipulada por la Secretaria de Estado a través de una regulación.

"Notificación de demanda"

"(b) El emplazamiento en los tribunales de los Estados Unidos y de los estados se hará a un organismo o agencia de un estado extranjero:

"(1) mediante la entrega de una copia de la citación y la demanda de acuerdo con cualquier arreglo especial para el emplazamiento entre el demandante y el organismo o la agencia o

"(2) si no existe ningún arreglo especial, mediante la entrega de una copia de la citación y una demanda de un funcionario, un representante administrador o general o cualquier otro representante autorizado o mediante una designación o por la ley a recibir el emplazamiento en los Estados Unidos; o de acuerdo con un convenio internacional vigente sobre el emplazamiento de documentos judiciales o

"(3) si el emplazamiento no se puede hacer conforme a los párrafos (1) o (2), y si razonablemente se calcula dar una copia de la citación y de la demanda, junto con una traducción de cada uno al idioma oficial del país extranjero:

"(A) según lo ordene una autoridad del estado extranjero o una subdivisión política en respuesta a un exhorto o solicitud o

"(B) mediante cualquier forma de correo que requiera un recibo firmado, a enviar o despachar por el secretario del tribunal al organismo o agencia que deba recibir el emplazamiento o

"(C) según lo ordene la orden del tribunal de acuerdo con la ley del lugar en donde se realice el emplazamiento.

"(c) El emplazamiento se considerará hecho:

"(1) en el caso de un emplazamiento conforme al inciso (a) (4), a partir de la fecha de transmisión indicada en la copia certificada de la nota diplomática y

"(2) en cualquier otro caso conforme a esta sección, a partir de la fecha de recepción indicada en la certificación, con recibo firmado y devuelvo, u otra constancia del emplazamiento correspondiente al método de emplazamiento empleado.

"(d) En cualquier acción presentada en un tribunal de los Estados Unidos o de un estado, un estado extranjero, o una de sus subdivisiones políticas, o un organismo o agencia de un estado extranjero emplazará una respuesta u otra contestación a la demanda dentro de sesenta días después de que se haya realizado el emplazamiento conforme a esta sección.

"(e) No se dictaminará ninguna sentencia en rebeldía de parte de un tribunal de los Estados Unidos ni de un estado en contra de un estado extranjero, una de sus subdivisiones políticas ni un organismo o agencia de un estado extranjero, a menos que el demandante establezca su reclamo o derecho de indemnización mediante una prueba satisfactoria para el tribunal. Se enviará una copia de cualquier sentencia en rebeldía al estado extranjero o subdivisión política de la manera prescrita para el emplazamiento conforme a esta sección.

"§ 1609. Inmunidad del embargo y la ejecución de la propiedad de un estado extranjero

28 USC 1609.

"Sujeto a los acuerdos internacionales existentes de los cuales Estados Unidos sea parte al momento de la promulgación de esta Ley la propiedad

90 ESTAT. 2896            DERECHO PÚBLICO 94-583- 21 DE OCTUBRE DE 1976

en los Estados Unidos de un estado extranjero quedará inmune del embargo, el arresto y la ejecución, excepto según se estipule en las secciones 1610 y 1611 de este capítulo.

28 USC 1610.    "§ 1610. Excepciones a la inmunidad de embargo o ejecución

"(a) La propiedad en los Estados Unidos de un estado extranjero, como se define en la sección 1603(a) de este capítulo, usada para una actividad comercial en los Estados Unidos, no quedará inmune de un embargo en beneficio de la ejecución, o de la ejecución, tras una sentencia dictada por un tribunal de los Estados Unidos o de un estado después de la fecha de vigencia de esta Ley, si:

"(1) el estado extranjero ha renunciado a su inmunidad del embargo en beneficio de la ejecución o desde la ejecución ya sea de manera implícita o explícita, sin perjuicio de ningún retiro de la renuncia que el estado extranjero pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia o

"(2) la propiedad es o fue usada para la actividad comercial en la que se basa el reclamo o

"(3) la ejecución se relaciona con una sentencia que establece derechos en la propiedad que se ha tomado en violación del derecho internacional o que se ha intercambiado por propiedad tomada en violación del derecho internacional o

"(4) la ejecución se relaciona con una sentencia que establece derechos sobre la propiedad:

"(A) que se adquiere por sucesión o donación o

"(B) que es inmueble y se encuentra ubicada en los Estados Unidos: *Siempre* que dicha propiedad no se use para los fines de mantener una misión diplomática o consultar o la residencia de un Jefe de dicha misión o

"(5) la propiedad consta de cualquier obligación contractual o cualquier procedimiento de una obligación contractual para indemnizar o eximir al estado extranjero o sus empleados conforme a una póliza de automóvil u otro seguro de responsabilidad o seguro contra accidentes que cubra el reclamo que se incorporó en la sentencia.

"(b) Además del inciso (a), cualquier propiedad en Estados Unidos de un organismo o agencia de un estado extranjero que participe de una actividad comercial en los Estados Unidos no quedará inmune de un embargo en beneficio de una ejecución, o de una ejecución, tras una sentencia dictada por un tribunal de los Estados Unidos o de un estado después de la fecha de vigencia de esta Ley, si:

"(1) el organismo o la agencia ha renunciado a su inmunidad del embargo en beneficio de la ejecución o desde la ejecución ya sea de manera implícita o explícita, sin perjuicio de ningún retiro de la renuncia que el organismo o la agencia pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia o

"(2) la sentencia se relacione con un reclamo para el cual el organismo o la agencia no sea inmune en virtud de la sección 1605(a) (2), (3), o (5), o 1605(b) de este capítulo, independientemente de si la propiedad se usa o se usó para la actividad sobre la cual se basa el reclamo.

"(c) Ningún embargo ni ejecución mencionados en los incisos (a) y (b) de esta sección se permitirá hasta que el tribunal haya ordenado dicho embargo y ejecución después de haber determinado que un período razonable de tiempo ha transcurrido posterior al dictamen de la sentencia y la entrega de cualquier notificación requerida conforme a la sección 1608(e) de este capítulo.

"(d) La propiedad de un estado extranjero, como se define en la sección 1603(a) de este capítulo, usada para una actividad comercial en los Estados Unidos, no quedará inmune de un embargo antes del dictamen de una sentencia en cualquier acción presentada ante un tribunal de los Estados Unidos o de un estado, o antes de que haya transcurrido el período de tiempo estipulado en el inciso (c) de esta sección, si:

"(1) el estado extranjero ha renunciado explícitamente a su inmunidad del embargo antes de la sentencia, sin perjuicio de ningún retiro de la renuncia que el estado extranjero pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia y

"(2) el propósito del embargo es garantizar el cumplimiento de una sentencia que se ha dictado o que se puede dictar en última instancia en contra del estado extranjero, y no para obtener jurisdicción.

"§ 1611. Determinados tipos de propiedad inmune de la ejecución

"(a) Sin perjuicio de las disposiciones de la sección 1610 de este capítulo, la propiedad de aquellas organizaciones designadas por el Presidente como con derecho a gozar de privilegios, exenciones e inmunidades provistas por la Ley de Inmunidad de las Organizaciones Internacionales no quedará sujeta a un embargo ni a otro proceso judicial que impida el desembolso de fondos o a un estado extranjero, o de acuerdo con la orden de un estado extranjero, como resultado de la acción presentada en los tribunales de los Estados Unidos o de los estados.

"(b) Sin perjuicio de las disposiciones de la sección 1610 de este capítulo, la propiedad de un estado extranjero quedará inmune de un embargo y de la ejecución si:

" (1) la propiedad es aquella de un banco central extranjero o autoridad monetaria que tiene por su cuenta, a menos que dicho banco o autoridad, o su gobierno extranjero principal, haya renunciado explícitamente a su inmunidad de un embargo en beneficio de la ejecución, o de la ejecución, sin perjuicio a ningún retiro de la renuncia que el banco, la autoridad o el gobierno pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia o

"(2) la propiedad se use, o pretenda usarse, con relación a una actividad militar y

"(A) sea de carácter militar o

"(B) esté bajo el control de una autoridad militar u organismo de defensa".

(b) Que el análisis de la "PARTE IV.—JURISDICCIÓN Y FUERO APLICABLE" del título 28, Código de los Estados Unidos, se enmienda mediante la inserción después de:

"95. Tribunal aduanero",

el siguiente nuevo ítem:

"97. Inmunidades jurisdiccionales de los estados extranjeros".

SEC. 5. La sección 1391 del título 28, Código de los Estados Unidos, se enmienda mediante la inserción al final del siguiente nuevo inciso:

"(f) Una demanda civil en contra de un estado extranjero según se define en la sección 1603(a) de este título puede entablarse:

" (1) en cualquier distrito judicial en que se sitúe una parte sustancial de los eventos u omisiones que dieron lugar al reclamo ocurrieron, o una parte sustancial de la propiedad que es el objeto de la acción;

"(2) en cualquier distrito judicial en que la embarcación o el cargamento de un estado extranjero se sitúe, si el reclamo se hace valer según la sección 1605 (b) de este título;

28 USC 1611.

Nota de 28 USC 288.

Fuero

"(3) en cualquier distrito judicial en que el organismo o la agencia tenga licencia para hacer negocios o esté haciendo negocios, si la acción se presenta en contra de un organismo o agencia de un estado extranjero, como se define en la sección 1603 (b) de este título o

"(4) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia, si la acción se presenta en contra de un estado extranjero o una de sus divisiones políticas".

**Acciones que se pueden retirar.**

SEC. 6. Que la sección 1441 del título 28, Código de los Estados Unidos, se enmienda mediante la inserción al final del siguiente nuevo inciso:

"(d) Cualquier demanda civil presentada en un tribunal estatal en contra de un estado extranjero como se define en la sección 1603(a) de este título puede ser retirada por el estado extranjero al tribunal de distrito de los Estados Unidos y la división que abarque el lugar en donde dicha demanda esté pendiente. Tras el retiro, la acción debe ser intentada por el tribunal sin un jurado. En donde el retiro se base en este inciso, las limitaciones de tiempo de la sección 1446(b) de este capítulo podrán ampliarse en cualquier momento por una causa demostrada".

**28 USC 1446.**

**Nota de 28 USC 1602.**

SEC. 7. Si alguna disposición de esta Ley o aplicación de ella a cualquier estado extranjero se considerara inválida, la invalidez no afectará ninguna de las otras disposiciones o aplicaciones de la Ley que puedan estar en vigencia sin la disposición o aplicación inválida, y con este propósito todas las disposiciones de esta Ley son divisibles.

**Fecha de vigencia. Nota de 28 USC 1602.**

SEC. 8. Esta Ley entrará en vigencia noventa días después de la fecha de su promulgación.

Aprobada el 21 de octubre de 1976.

HISTORIAL LEGISLATIVO:

INFORME DE LA CÁMARA DE REPRESENTANTES núm. 94-1487 (Comité de Justicia).
INFORME DEL SENADO núm. 94-1310 que acompaña S. 3553 (Comité de Justicia).
REGISTRO DEL CONGRESO, vol. 122 (1976):
    29 de septiembre, considerada y aprobada por la Cámara de Representantes.
    1 de octubre, considerada y aprobada por el Senado.
RECOPILACIÓN SEMANAL DE LOS DOCUMENTOS PRESIDENCIALES, vol. 12, núm. 43: 22 de octubre, declaración presidencial.

# ANEXO B

**28 USCS § 1332, Parte 1 de 5**

Copiar citación

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 85. Tribunales de Distrito; Jurisdicción (§§ 1330-1389)

## § 1332. Diversidad de ciudadanía; monto en controversia; costos

(a) Los tribunales de distrito tendrán la jurisdicción original de todas las demandas civiles en donde la causa en controversia supere la suma o el valor de $75,000, exclusivo de interés y costos, y sea entre:

(1) Ciudadanos de distintos estados;

(2) ciudadanos de un estado y ciudadanos o sujetos de un estado extranjero, excepto que los tribunales de distrito no tendrán jurisdicción original según este inciso de una acción entre ciudadanos de un estado y ciudadanos o sujetos de un estado extranjero que tengan un permiso admitido legalmente para la residencia permanente en los Estados Unidos y tengan domicilio en el mismo estado;

(3) ciudadanos de diferentes estados y en que los ciudadanos o sujetos de un estado extranjero sean partes adicionales; y

(4) un estado extranjero, definido en la sección 1603(a) de este título [28 USCS § 1603(a)], como demandante y ciudadanos de un estado o de estados diferentes.

## 28 USCS §1603

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1603. Definiciones

Para los fines de este capítulo (28 USCS §§ 1602 y siguientes)

**(a)** Un 'estado extranjero', excepto como se usa en la sección 1608 de este título(28 USCS sección 1608), incluye una subdivisión política de un estado extranjero o un organismo o agencia de un estado extranjero según se define en el inciso (b).

**(b)** Un 'organismo o agencia de un estado extranjero' significa cualquier entidad:

**(1)** que sea una persona jurídica separada, una corporación o de manera y

**(2)** que sea un órgano de un estado extranjero o una de sus subdivisiones políticas, o en que una mayoría de sus acciones u otra participación sea propiedad de un estado extranjero o de una de sus subdivisiones políticas y

**(3)** que no sea un ciudadano de un estado de los Estados Unidos según se define en la sección 1332 (c) y (e) de este título (28 USCS sección 1332[c] y [e]), ni creado conforme a las leyes de ningún país tercero.

**(c)** Los 'Estados Unidos' incluye todos los territorios y aguas, continentales o insulares, sujetos a la jurisdicción de los Estados Unidos.

**(d)** Una 'actividad comercial' significa ya sea el curso regular de la conducta comercial o una transacción o acto comercial en particular. El carácter comercial de una actividad se determinará por referencia a la naturaleza del curso de conducta o transacción o acto particular, en lugar de por la referencia a su propósito.

**(e)** Una 'actividad comercial realizada en los Estados Unidos por un estado extranjero' significa una actividad comercial llevada a cabo en dicho estado y que tenga un contacto sustancial con los Estados Unidos.

# Historia

HISTORIA:

Añadido el 21 de octubre de 1976, P. L. 94-583, § 4(a), 90 Estat. 2892; 18 de febrero de 2005, P. L. 109-2, § 4(b)(2), 119 Estat. 12.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

**Final del documento**

## 28 USCS §1605

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1605. Excepciones generales a la inmunidad jurisdiccional de un estado extranjero

**(a)** Un estado extranjero no será inmune de la jurisdicción de los tribunales de los Estados Unidos ni de los estados en ningún caso:

**(1)** en el cual el estado extranjero haya renunciado a su inmunidad ya sea de manera explícita o implícita, sin perjuicio del retiro de la renuncia que el estado extranjero pueda pretender efectuar excepto de acuerdo con los términos de la renuncia;

**(2)** en que la acción se base en una actividad comercial realiza en los Estados Unidos por el estado extranjero o en un acto realizado por los Estados Unidos con relación a una actividad comercial del estado extranjero en otro lugar o en un acto fuera del territorio de los Estados Unidos con relación a una actividad comercial del estado extranjero en otro lugar y que el acto cause un efecto directo en los Estados Unidos;

**(3)** en que los derechos sobre la propiedad tomados en violación de la ley internacional estén en cuestión y que la propiedad o cualquier propiedad intercambiada por dicha propiedad esté presente en los Estados Unidos con relación a una actividad comercial realizada en los Estados Unidos por el estado extranjero; o que la propiedad o cualquier propiedad intercambiada por dicha propiedad sea propiedad o esté operada por un organismo o agencia del estado extranjero y que ese organismo o agencia participe en una actividad comercial en los Estados Unidos;

**(4)** en el cual los derechos sobre la propiedad en los Estados Unidos adquirido por sucesión o donación de derechos en una propiedad inmueble situada en los Estados Unidos estén en cuestión;

**(5)** que no esté de otro modo abarcado en el párrafo (2) anterior, en el cual los daños monetarios se intentan obtener en contra de un estado extranjero por una lesión personal o muerte, o por daño o pérdida de la propiedad, que ocurra en los Estados Unidos y produzca del acto ilícito u omisión de ese estado extranjero o de cualquier funcionario o empleado de ese estado extranjero mientras actúa dentro del alcance de su cargo o empleo; excepto que este párrafo no se aplicará a:

**(A)** ningún reclamo basado en el ejercicio o cumplimiento o la falta de ejercicio o cumplimiento de una función discrecional independientemente de si hubo un abuso en la discreción o

**(B)** ningún reclamo que surja del enjuiciamiento malicioso, el abuso de poder, la difamación, la tergiversación, el fraude o la interferencia con los derechos contractuales o

**(6)** en donde la acción se presente, ya sea para hacer cumplir un acuerdo celebrado por el estado extranjero o para el beneficio de una parte privada de someter a arbitraje todo o cualquier diferencia que haya surgido o que pueda surgir entre las partes con respecto a una relación legal definida, ya sea contractual o no, con respecto a un objeto capaz de resolución a través de un arbitraje conforme a las leyes de los Estados Unidos, o para confirmar un laudo dictaminado conforme a un acuerdo para arbitrar, si (A) el arbitraje ocurre o se pretende que ocurra en los Estados Unidos, (B) el acuerdo o el laudo se rija o pueda regirse por un tratado o cualquier otro acuerdo internacional en vigencia para los Estados Unidos que pida el reconocimiento y el cumplimiento de los laudos arbitrales, (C) el reclamo subyacente, excepto por el acuerdo de arbitraje, podría haberse presentado en un tribunal de los Estados Unidos conforme a esta sección o a la sección 1607 [28 USCS § 1607], o (D) se aplica el párrafo (1) de este inciso.

28 USCS § 1605

**(b)** Un estado extranjero no estará inmune de la jurisdicción de los tribunales de los Estados Unidos en ningún caso en el que un juicio en el derecho marítimo se presente para hacer cumplir un derecho de retención marítimo en contra de una embarcación o cargamento del estado extranjero, en el que el derecho de retención marítimo se base en una actividad comercial del estado extranjero: *Siempre* que:

   **(1)** se entregue una notificación de la demanda mediante una copia de la citación y de la demanda a la persona, o a su representante, que tenga posesión de la embarcación o el cargamento en contra del cual se hace valer el derecho de retención marítimo; y si la embarcación o el cargamento se captura de acuerdo a un proceso obtenido en nombre de la parte que presenta la demanda, la notificación de los actos procesales de la captura se considerará que constituye una entrega válida de dicha notificación, pero la parte que presenta la demanda será responsable de cualquier daño sufrido por el estado extranjero como resultado de la captura si la parte que presenta la demanda tenía conocimiento real o constructivo de que la embarcación o el cargamento de un estado extranjero estaba involucrado; y

   **(2)** notificación al estado extranjero del comienzo del juicio, como se estipula en la sección 1608 de este título [28 USCS § 1608], se inicia dentro de los 10 días de la entrega de la notificación como se estipula en el párrafo (1) de este inciso o, en el caso de una parte que no estuviera al tanto de que la embarcación o el cargamento de un estado extranjero estaba involucrado, de la fecha en que dicha parte determinó la existencia del interés del estado extranjero.

**(c)** Siempre que la notificación se entregue conforme al inciso (b)(1), la demanda para ejecutar un derecho de retención marítimo a partir de entonces procederá y se deberá juzgar y determinar de acuerdo con los principios del derecho y las normas de práctica de las demandas de acción real siempre que parezca que, si la embarcación hubiera sido propiedad privada o hubiera estado en posesión privada, se habría mantenido una demanda de acción real. Una sentencia judicial en contra de un estado extranjero puede incluir los costos de la demanda y, si la sentencia judicial incluye una sentencia monetaria, interés según lo ordene el tribunal, excepto que el tribunal no puede adjudicar una sentencia en contra de un estado extranjero por un monto mayor que el valor de la embarcación o el cargamento sobre el cual surgió el derecho de retención marítimo. Dicho valor se determinará a partir del momento en que la notificación se haya entregado conforme al inciso (b)(1). Las sentencias judiciales estarán sujetas a apelación y revisión, como se estipula en otros casos de derecho marítimo y jurisdicción marítima. Nada impedirá que el demandante en ningún caso adecuado busque un recurso in personam en la misma acción presentada para ejecutar un derecho de retención marítimo como se estipula en esta sección.

**(d)** estado extranjero no estará inmune de la jurisdicción de los tribunales de los Estados Unidos en ninguna acción presentada para ejecutar una hipoteca preferida, como se define en la sección 31301 del título 46. Dicha acción se deberá presentar, juzgar y determinar de acuerdo con las disposiciones del capítulo 313 del título 46 [46 USCS §§ 31301 y siguientes] y de acuerdo con los principios de derecho y las normas de práctica de las demandas de acción real siempre que parezca que, si la embarcación hubiera sido propiedad privada o hubiera estado en posesión privada, se habría mantenido una demanda de acción real.

**(a)** **[Derogado]**

**(b)** **[Derogado]**

**(c)** **Limitación en la producción de pruebas**

   **(1)** En general.

      **(A)** Sujeto al párrafo (2), si se presenta una acción que de otro modo esté prohibida por la sección 1604 [28 USCS § 1604], pero para la sección 1605A o la sección 1605B [28 USCS § 1605A o 1605B], el tribunal, tras la solicitud del Fiscal General, podrá suspender cualquier solicitud, demanda u orden para la presentación de prueba sobre los Estados Unidos que el Fiscal General certifique que interferiría de manera significativa con una investigación o proceso penal, o una operación de seguridad nacional, relacionada con el incidente que dio lugar a la causa de acción, hasta el momento en que el Fiscal General recomiende al tribunal que dicha solicitud, demanda u orden ya no interferirá.

      **(B)** Una suspensión conforme a este párrafo permanecerá en vigencia durante el período de 12 meses comenzando en la fecha en que el tribunal emita la orden de suspender la producción de pruebas. El tribunal renovará la orden de suspender la producción de pruebas por períodos adicionales de 12 meses tras la moción de los Estados Unidos si el Fiscal General certifica que la producción de pruebas interferiría de manera significativa con una investigación o proceso penal, o una operación de seguridad nacional, que se relacione que con el incidente que dio lugar a la causa de acción.

28 USCS § 1605

**(2)** Derogación automática.

> **(A)** Sujeto al subpárrafo (B), ninguna suspensión se concederá ni continuará en vigencia conforme al párrafo (1) después de la fecha que es de 10 años tras la fecha en la cual el incidente que dio lugar a la causa de acción ocurrió.

> **(B)** Después del período mencionado en el subpárrafo (A), el tribunal, tras la solicitud del Fiscal General, puede suspender cualquier solicitud, demanda u orden de producción de pruebas sobre los Estados Unidos que el tribunal considere que una probabilidad sustancial:

> > **(i)** generaría una amenaza grave de muerte o lesión corporal grave a cualquier persona;

> > **(ii)** afectaría de manera adversa la habilidad de los Estados Unidos de trabajar en colaboración con las autoridades policiales extranjeras e internacionales en la investigación de violaciones del derecho de Estados Unidos o

> > **(iii)** obstruiría la causa penal relacionada con el incidente que dio lugar a la causa de acción o socavaría el potencial de una condena en tal caso.

**(3)** Evaluación de las pruebas. La evaluación del tribunal de cualquier solicitud para una suspensión conforme a este inciso presentada por el Fiscal General se realizará a puertas cerradas y sin notificación.

**(4)** Prohibición de la solicitud para desestimar la demanda. Una suspensión de la presentación de pruebas conforme a este inciso constituirá una prohibición para otorgar la solicitud para desestimar la demanda conforme a las reglas 12(b)(6) y 56 de las Reglas Federales de Procedimiento Civil.

**(5)** Interpretación. Nada en este inciso evitará que los Estados Unidos busque órdenes de protección o haga valer privilegios disponibles normalmente para los Estados Unidos.

**(d)** Inmunidad jurisdiccional para determinadas actividades de exhibición de arte.

> **(1)** En general. Si

> > **(A)** un estado extranjero importa una obra a los Estados Unidos conforme a un acuerdo que estipula la exhibición o muestra temporaria de dicha obra celebrado entre un estado extranjero que sea el propietario o custodio de dicha obra y los Estados Unidos o una o más instituciones culturales o educativas dentro de los Estados Unidos;

> > **(B)** el presidente, o la persona designada del presidente, ha determinado, de acuerdo con el inciso (a) de la Ley de aplicación general 89-259 (22 U.S.C. 2459(a)), que dicha obra es de importancia cultural y la muestra o exhibición temporaria de dicha obra es de interés nacional y

> > **(C)** la notificación de aquello se ha publicado de acuerdo con el inciso (a) de la Ley de aplicación general 89-259 (22 U.S.C. 2459(a)),

> cualquier actividad en los Estados Unidos de dicho estado extranjero, o de cualquier empresa transportista, que esté asociada con la exhibición o muestra temporaria de dicha obra no será considerada una actividad comercial por dicho estado extranjero para los fines del inciso (a)(3).

> **(2)** Excepciones.

> > **(A)** Reclamos del período nazi. El párrafo (1) no se aplicará en ningún caso para hacer valer la jurisdicción conforme al inciso (a)(3) en el cual los derechos en la propiedad tomados en violación del derecho internacional estén en cuestión dentro del significado del inciso y:

> > > **(i)** la propiedad en cuestión sea la obra descrita en el párrafo (1);

> > > **(ii)** la acción se base en un reclamo de que dicha obra se tomó con relación a los actos de un gobierno cubierto durante el período cubierto;

> > > **(iii)** el tribunal determina que la actividad asociada con la exhibición o muestra es una actividad comercial, tal como el término se define en la sección 1603(d) [28 USCS § 1603(d)]; y

> > > **(iv)** una determinación conforme a la cláusula (iii) es necesaria para que el tribunal ejerza la jurisdicción sobre el estado extranjero conforme al inciso (a)(3).

28 USCS § 1605

**(B)** Otras obras culturalmente significativas. Además de los casos exentos conforme al subpárrafo (A), párrafo (1) no se aplicará en ningún caso para hacer valer la jurisdicción conforme al inciso (a)(3) en el cual los derechos en la propiedad tomados en violación del derecho internacional estén en cuestión dentro del significado del inciso y:

**(i)** la propiedad en cuestión sea la obra descrita en el párrafo (1);

**(ii)** la acción se basa en un reclamo de que dicha obra se tomó con relación a los actos de un gobierno extranjero como parte de una campaña sistemática de confiscación coactiva o apropiación indebida de las obras de miembros de un grupo específico y vulnerable;

**(iii)** la captura ocurrió después de 1900;

**(iv)** el tribunal determina que la actividad asociada con la exhibición o muestra es una actividad comercial, tal como el término se define en la sección 1603(d) [28 USCS § 1603(d)]; y

**(v)** una determinación conforme a la cláusula (iv) es necesaria para que el tribunal ejerza la jurisdicción sobre el estado extranjero conforme al inciso (a)(3).

**(3)** Definiciones. Para los fines de este inciso:

**(A)** el término "obra" significa una obra de arte u otro objeto de importancia cultural;

**(B)** el término "gobierno cubierto" significa:

**(i)** el gobierno de Alemania durante el período cubierto;

**(ii)** cualquier gobierno en cualquier área en Europa que estuvo ocupada por las fuerzas militares del gobierno de Alemania durante el período cubierto;

**(iii)** cualquier gobierno en Europa que se estableció con la asistencia o la cooperación del gobierno de Alemania durante el período cubierto y

**(iv)** cualquier gobierno en Europa que era un aliado del gobierno de Alemania durante el período cubierto y

**(C)** el término "período cubierto" significa el período a partir del 30 de enero de 1933 y hasta el 8 de mayo de 1945.

# Historia

---

**HISTORIA:**

Añadido el 21 de octubre de 1976, P. L. 94-583, § 4(a), 90 Estat. 2892; 9 de nov. 1988, P. L. 100-640, § 1, 102 Estat. 3333; 16 de nov., 1988, P. L. 100-669, §2, 102 Estat. 3969; 1 de dic. 1990, P. L. 101-650, Título III, § 325(b)(8), 104 Estat. 5121; 24 de abril de 1996, P. L. 104-132, Titulo II, Subtítulo B, § 221(a), 110 Estat. 1241; 25 de abril de 1997, P. L. 105-11, 111 Estat. 22; 28 de nov. de 2001, P. L. 107-77, Título VI, § 626(c), 115 Estat. 803; 10 de ene. de 2002, P. L. 107-117, Div. B, Cap. 2, § 208, 115 Estat. 2299; 6 de oct. de 2006, P. L. 109-304, § 17(f)(2), 120 Estat. 1708; 28 de ene. de 2008, P. L. 110-181, Div. A, Título X, Subtítulo F, § 1083(b)(1), 122 Estat. 341; 28 de sep. de 2016, P. L. 114-222, § 3(b)(2), 130 Estat. 853; 16 de dic. de 2016, P. L. 114-319, § 2(a), 130 Estat. 1618.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

---

**Final del documento**

# 28USCS§ 1605A

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1605A. Excepción de terrorismo a la inmunidad jurisdiccional de un estado extranjero

(a) **En general.**

(1) Sin inmunidad. Un estado extranjero no estará inmune de la jurisdicción de los tribunales de los Estados Unidos ni de los estados en ningún caso ni de otro modo cubierto por este capítulo en el cual se busque una indemnización monetaria en contra de un estado extranjero por una lesión personal o muerte cauda por un acto de tortura, ejecución extrajudicial, sabotaje de una aeronave, toma de rehenes o la suministro de apoyo o recursos sustanciales para tal acto si tal acto o suministro de apoyo o recursos sustanciales viene de parte de un funcionario, empleado o representante del estado extranjero mientras actúa dentro del alcance de su cargo, empleo o representación.

(2) Reclamo visto. El tribunal considerará el reclamo conforme a esta sección si:

(A)

(i)

(I) el estado extranjero se designó como un estado patrocinador del terrorismo en el momento en que el acto descrito en el párrafo (1) ocurrió, o así se designó como resultado de dicho acto, y, sujeto a la subcláusula (II), sigue así designado cuando el reclamo se presenta conforme a esta sección o estaba así designado dentro del período de 6 meses antes de que el reclamo se presentara conforme a esta sección o

(II) en el caso de una acción que se vuelva a presentar conforme a esta sección por razón de la sección 1083(c)(2)(A) de la Ley Nacional de Autorización de Defensa para el año fiscal 2008 [nota a esta sección] o se presenta conforme a esta sección por razón de la sección 1083(c)(3) de la Ley [nota a esta sección], el estado extranjero se designó como un estado patrocinador del terrorismo cuando se presentó la acción original o la acción relacionada conforme a la sección 1605(a)(7) [28 USCS § 1605(a)(7)] (como estaba en vigencia antes de la promulgación de esta sección [promulgada el 28 de enero de 2008]) o la sección 589 de la Ley de Operaciones Extranjeras, Financiación de Exportaciones y Apropiaciones de Programas Relacionados de 1997 (como se incluye en la sección 101(c) de la división A de la Ley de aplicación general 104-208) [28 USCS § 1605 nota];

(ii) el demandante o la víctima era, hasta el momento en que ocurrió el acto descrito en el párrafo (1):

(I) un ciudadano de los Estados Unidos;

(II) un miembro de las fuerzas armadas o

(III) de otro modo un empleado del gobierno de los Estados Unidos, o de un individuo que ejecuta un contrato otorgado por el gobierno de los Estados Unidos, actuando dentro del alcance del empleo del empleado y

(iii) en un caso en que el acto ocurrió en el estado extranjero contra el cual se haya presentado el reclamo, el demandante le ha dado la oportunidad razonable al estado extranjero de arbitrar el reclamo de acuerdo con las normas internacionales de arbitraje aceptadas o

28 USCS § 1605A

(B) el acto descrito en el párrafo (1) se relaciona con el Caso número 1:00CV03110 (EGS) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia.

(b) **Limitaciones.** Se puede presentar una acción o mantener conforme a esta sección si la acción se empieza, o una acción relacionada se empezó, conforme a la sección 1605(a)(7) (antes de la fecha de la promulgación de esta sección) o la sección 589 de la Ley de Operaciones Extranjeras, Financiación de Exportaciones y Apropiaciones de Programas Relacionados de 1997 (como se incluye en la sección 101 (c) de la división A de la Ley de aplicación general 104-208) [nota de 28 USCS § 1605] no después de:

(1)  10 años tras el 24 de abril de 1996; o

(2)  10 años tras la fecha en la que surgió la causa de acción.

(c) **Derecho privado de acción.** Un estado extranjero que sea o haya sido un estado patrocinador del terrorismo, como se describe en el inciso (a)(2)(A)(i), y cualquier funcionario, empleado o representante de ese estado extranjero mientras actúa dentro del alcance de su cargo, empleo o representación, será responsable ante:

(1)  un ciudadano de los Estados Unidos,

(2)  un miembro de las fuerzas armadas,

(3)  un empleado del gobierno de los Estados Unidos, o de un individuo que ejecuta un contrato otorgado por el gobierno de los Estados Unidos, actuando dentro del alcance del empleo del empleado o

(4)  el representante legal de una persona descrita en el párrafo (1), (2) o (3),

por una lesión personal o la muerte causada por los actos descritos en el inciso (a)( 1) de ese estado extranjero, o de un funcionario, empleado o agente de ese estado extranjero, para el cual los tribunales de los Estados Unidos puedan mantener jurisdicción de acuerdo con esta sección por daños monetarios. En dicha acción, los daños pueden incluir daños económicos, desagravio, daño moral y daños punitivos. En dicha acción, un estado extranjero será indirectamente responsable de los actos de sus funcionarios, empleados o agentes.

(d) **Daños adicionales.** Después de que una acción se haya presentado conforme al inciso (c), también se pueden presentar acciones por una pérdida de propiedad razonablemente previsible, ya sea asegurada o no asegurada, responsabilidad de terceros y reclamos por pérdida conforme a pólizas de seguro de vida o de la propiedad, por razón de los mismos actos en los cuales se basa la acción conforme al inciso (c).

(e) **Asesores especiales.**

(1)  En general. Los tribunales de los Estados Unidos pueden designar asesores especiales para que entiendan en los reclamos de daños presentados conforme a esta sección.

(2)  Transferencia de fondos. El Fiscal General transferirá, desde los fondos disponibles para el programa conforme a la sección 1404C de la Ley de Víctimas de Delitos de 1984 (42 U.S.C. 10603c), al Administrador del tribunal de distrito de los Estados Unidos en el cual cualquier caso esté pendiente, que se haya presentado o mantenido conforme a esta sección, esos fondos pueden requerirse para cubrir los costos de los asesores especiales designados según el párrafo (1). Cualquier monto pago en compensación a cualquiera de esos asesores especiales constituirá un ítem de las costas judiciales.

(f) **Apelación.** En una acción conforme a esta sección, las apelaciones de las órdenes que no terminan de manera concluyente el litigio pueden realizarse solo conforme a la sección 1292(b) de este título [28 USCS § 1292(b)],

(g) **Disposición de la propiedad.**

(1)  En general. En cada acción presentada en un tribunal de distrito de los Estados Unidos en el cual se alegue jurisdicción conforme a esta sección, la presentación de una notificación de acción pendiente conforme a esta sección, a la cual se adjunta una copia de la demanda presentada en la acción, tendrá el efecto de establecer una notificación preventiva del derecho de retención sobre cualquier bien inmueble o bien mueble tangible que:

(A)  esté sujeto a un embargo en beneficio de la ejecución, o ejecución, conforme a la sección 1610 [28 USCS § 1610];

(B)  esté ubicado dentro del distrito judicial y

28 USCS§ 1605A

**(C)**  con título a nombre de cualquier demandado, o con título a nombre de cualquier entidad controlada por cualquier demandado si dicha notificación contiene una declaración que menciona la entidad controlada.

**(2)**  Notificación. El secretario del tribunal de distrito presentará una notificación de acción pendiente conforme a esta sección de la misma manera que cualquier acción pendiente y se indexará a través de la mención de los demandados como demandados mencionados y todas las entidades mencionadas como controladas por cualquier demandado.

**(3)**  Exigibilidad. Los derechos de retención por razón de este inciso se podrán exigir como se estipula en el capítulo 111 de este título [28 USCS §§ 1651 y siguientes].

**(h)**  **Definiciones.** Para los fines de esta sección:

**(1)**  el término "sabotaje de aeronave" tiene el significado dado a ese término en el Artículo 1 del Convenio para la represión de actos ilícitos contra la seguridad de la aviación civil;

**(2)**  el término "toma de rehenes" tiene el significado dado a ese término en el Artículo 1 de la Convención internacional contra la toma de rehenes;

**(3)**  el término "apoyo o recursos sustanciales" tiene el significado dado a ese término en la sección 2339A del título 18;

**(4)**  el término "fuerzas armadas" tiene el significado dado a ese término en la sección 101 del título 10;

**(5)**  el término "ciudadano de los Estados Unidos" tiene el significado dado al término en la sección 101(a)(22) de la Ley de Inmigración y Nacionalidad (8 U.S.C. 1101 (a)(22));

**(6)**  el término "estado patrocinador del terrorismo" significa un país cuyo gobierno la Secretaría de Estado haya determinado, para los fines de la sección 6(j) de la Ley de Administración de las Exportaciones de 1979 (50 U.S.C. Ap. 2405(j) [50 USCS § 4605(j)]), sección 620A de la Ley de Asistencia Extranjera de 1961 (22 U.S.C. 2371), sección 40 de la Ley de Control a las Exportaciones de Armas (22 U.S.C. 2780), o cualquier otra disposición de la ley, que es un gobierno que ha brindado reiteradamente apoyo para actos de terrorismo internacional y

**(7)**  los términos "tortura" y "ejecución extrajudicial" tienen el significado dado a aquellos términos en la sección 3 de la Ley de Protección a las Víctimas de Tortura de 1991 (nota de 28 U.S.C. 1350).

## Historia

**HISTORIA:**

Añadido el 28 de ene. de 2008, P. L. 110-181, Div. A, Título X, Subtítulo F, § 1083(a)(1), 122 Estat. 338.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

Final del documento

## 28USCS§ 1605B

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1605B. Responsabilidad de los estados extranjeros del terrorismo internacional en contra de los Estados Unidos

**(a)   Definición.** En esta sección, el término "terrorismo internacional"

**(1)**   tiene el significado otorgado al término en la sección 2331 del título 18, Código de los Estados Unidos y

**(2)**   no incluye ningún acto de guerra (como se define en esa sección).

**(b)   Responsabilidad de los estados extranjeros.** Un estado extranjero no estará inmune de la jurisdicción de los tribunales de los Estados Unidos en cualquier caso en el que se intente obtener daños monetarios en contra de un estado extranjero a la persona o a la propiedad o una muerte que ocurra en los Estados Unidos y sea causado por:

**(1)**   un acto de terrorismo internacional en los Estados Unidos y

**(2)**   un acto o actos delictivos del estado extranjero, o de cualquier funcionario, empleado, o agente de un estado extranjero mientras actúe dentro del alcance de su cargo, empleo o representación, independientemente de dónde hayan ocurrido el acto o los actos delictivos.

**(c)   Reclamos de ciudadanos de los Estados Unidos.** Sin perjuicio de la sección 2337(2) del título 18 [18 USCS § 2337(2)], un ciudadano de los Estados Unidos puede presentar una demanda en contra de un estado extranjero de acuerdo con la sección 2333 de ese título [18 USCS § 2333] si el estado extranjero no sería inmune conforme al inciso (b).

**(d)   Regla de interpretación.** Un estado extranjero no será sometido a la jurisdicción de los tribunales de los Estados Unidos conforme al inciso (b) sobre la base de una omisión o un acto o actos delictivos que constituyan mera negligencia.

## Historia

### HISTORIA:

Añadido el 28 de sep. 28, 2016, P. L. 114-222, § 3(a), 130 Estat. 853.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

**Final del documento**

# 28 USCS § 1606

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1606. Grado de responsabilidad

En cuanto a la acción de indemnización con respecto a la cual un estado extranjero no tiene derecho a la inmunidad conforme a la sección 1605 o 1607 de este capítulo (28 USCS § 1605 o 1607), el estado extranjero será responsable de la misma manera y hasta el mismo grado que un individuo privado en circunstancias similares; pero un estado extranjero excepto por uno de sus organismos o agencias no será responsable de daños punitivos; sin embargo, en cualquier caso en que allí se causara la muerte, la ley del lugar donde la acción u omisión ocurrió estipula, o se ha interpretado que estipula, daños solo punitivos en naturaleza, el estado extranjero será responsable de daños reales o compensatorios medidos a través del perjuicio pecuniario que resulte de la muerte en que incurrieron de parte de las personas en cuyo beneficio se persiguió la acción.

## Historia

**HISTORIA:**

Añadido el 21 de octubre de 1976, P. L. 94-583, § 4(a), 90 Estat. 2894; 21 de oct. de 1998, P. L. 105-277, Div. A, § 101(h) [Título I, § 117(b)], 112 Estat. 2681-491; 28 de oct. de 2000, P. L. 106-386, Div. C, § 2002(g)[(f)](2), 114 Estat. 1543; 26 de nov. de 2002, P. L. 107-297, Título II, § 201(c)(3), 116 Estat. 2337.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

**Final del documento**

# 28 USCS §1607

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1607. Contrademandas

En cualquier acción presentada por un estado extranjero, o en la cual intervenga un estado extranjero, en un tribunal de los Estados Unidos o de un estado, el estado extranjero no recibirá inmunidad con respecto a ninguna contrademanda:

**(a)** para la cual un estado extranjero no tendría derecho a la inmunidad conforme a la sección 1605 o 1605A de este capítulo (28 USCS § 1605 o 1605A) si dicha demanda se hubiera presentado en una acción separada en contra del estado extranjero o

**(b)** que surja de la transacción u ocurrencia que sea el objeto de la demanda del estado extranjero o

**(c)** hasta el punto en que la contrademanda no busque una indemnización que supere el monto o difiera en especie de la que busque el estado extranjero.

## Historia

**HISTORIA:**

Añadido el 21 de octubre de 1976, P. L. 94-583, § 4(a), 90 Estat. 2894; 28 de ene. de 2008, P. L. 110-181, Div. A, Título X, Subtítulo F, § 1083(b)(2), 122 Estat. 341.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

**Final del documento**

28 USCS §1610

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## § 1610. Excepciones a la inmunidad de embargo o ejecución

(a)  La propiedad en los Estados Unidos de un estado extranjero, como se define en la sección 1603(a) de este capítulo (28 USCS § 1603[a]), usada para una actividad comercial en los Estados Unidos, no quedará inmune de un embargo en beneficio de la ejecución, o de la ejecución, tras una sentencia dictada por un tribunal de los Estados Unidos o de un estado después de la fecha de vigencia de esta Ley, si:

**(1)**  ) el estado extranjero ha renunciado a su inmunidad del embargo en beneficio de la ejecución o desde la ejecución ya sea de manera implícita o explícita, sin perjuicio de ningún retiro de la renuncia que el estado extranjero pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia o

**(2)**  la propiedad es o fue usada para la actividad comercial en la que se basa el reclamo o

**(3)**  la ejecución se relaciona con una sentencia que establece derechos en la propiedad que se ha tomado en violación del derecho internacional o que se ha intercambiado por propiedad tomada en violación del derecho internacional o

**(4)**  la ejecución se relaciona con una sentencia que establece derechos sobre la propiedad:

   **(A)**  que se adquiere por sucesión o donación o

   **(B)**  que es inmueble y se encuentra ubicada en los Estados Unidos: *Siempre* que dicha propiedad no se use para los fines de mantener una misión diplomática o consultar o la residencia de un Jefe de dicha misión o

**(5)**  la propiedad consta de cualquier obligación contractual o cualquier procedimiento de una obligación contractual para indemnizar o eximir al estado extranjero o sus empleados conforme a una póliza de automóvil u otro seguro de responsabilidad o seguro contra accidentes que cubra el reclamo que se incorporó en la sentencia o

**(6)**  la sentencia se basa en una orden que confirma un laudo arbitral dictado en contra del estado extranjero, siempre que el embargo en beneficio de la ejecución, o la ejecución, no sería inconsistente con ninguna disposición del acuerdo de arbitraje o

**(7)**  la sentencia se relaciona con una demanda para la cual el estado extranjero no sea inmune conforme a la sección 1605A [28 USCS § 1605A] o la sección 1605(a)(7) [anteriormente 28 USCS § 1605(a)(7)] (como dicha sección estaba vigente el 27 de enero de 2008), independientemente de si la propiedad está o estaba involucrada en el acto sobre el cual se basa el reclamo.

(b)  Además del inciso (a), cualquier propiedad en Estados Unidos de un organismo o agencia de un estado extranjero que participe de una actividad comercial en los Estados Unidos no quedará inmune de un embargo en beneficio de una ejecución, o de una ejecución, tras una sentencia dictada por un tribunal de los Estados Unidos o de un estado después de la fecha de vigencia de esta Ley, si:

**(1)**  el organismo o la agencia ha renunciado a su inmunidad del embargo en beneficio de la ejecución o desde la ejecución ya sea de manera implícita o explícita, sin perjuicio de ningún retiro de la renuncia que el organismo o la agencia pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia o

28 USCS § 1610

**(2)** la sentencia se relacione con un reclamo para el cual el organismo o la agencia no sea inmune en virtud de la sección 1605(a)(2), (3) o (5), o 1605(b) de este capítulo, (28 USCS § 1605[a][2], [3] o [5], o 1605[b])independientemente de si la propiedad se usa o se usó para la actividad sobre la cual se basa el reclamo.

**(3)** la sentencia se relacione con un reclamo para el cual el organismo o la agencia no sea inmune en virtud de la sección 1605A de este capítulo (28 USCS § 1605A) o de la sección 1605(a)(7) de este capítulo (anteriormente, 28 USCS § 1605[a][7]) (tal y como dicha sección estaba en vigor el 27 de enero de 2008), independientemente de si la propiedad se usa o se usó para la actividad sobre la cual se basa el reclamo.

**(c) Ningún embargo ni ejecución mencionados en los incisos (a) y (b) de esta sección se permitirá hasta que el tribunal haya ordenado dicho embargo y ejecución después de haber determinado que un periodo razonable de tiempo ha transcurrido posterior al dictamen de la sentencia y la entrega de cualquier notificación requerida conforme a la sección 1608(e) de este capítulo ([28 USCS § 1608[e].**

**(d)** La propiedad de un estado extranjero, como se define en la sección 1603(a) de este capítulo (28 USCS § 1603[a]), usada para una actividad comercial en los Estados Unidos, no quedará inmune de un embargo antes del dictamen de una sentencia en cualquier acción presentada ante un tribunal de los Estados Unidos o de un estado, o antes de que haya transcurrido el período de tiempo estipulado en el inciso (c) de esta sección, si:

**(1)** el estado extranjero ha renunciado explícitamente a su inmunidad del embargo antes de la sentencia, sin perjuicio de ningún retiro de la renuncia que el estado extranjero pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia y

**(2)** el propósito del embargo es garantizar el cumplimiento de una sentencia que se ha dictado o que se puede dictar en última instancia en contra del estado extranjero, y no para obtener jurisdicción.

**(e)** Las embarcaciones de un estado extranjero no estarán inmunes del arresto de acción real, venta interlocutoria y ejecución en acciones presentadas para ejecutar una hipoteca preferida como se estipula en la sección 1605(d) [28 USCS § 1605(d)].

**(f)**

**(1)**

(A) Sin perjuicio de ninguna otra disposición de la ley, incluida, entre otras, la sección 208(f) de la Ley de Misiones Extranjeras (22 U.S.C. 4308(f)), y excepto según se estipule en el subpárrafo (B), cualquier propiedad con respecto a la cual las transacciones financieras estén prohibidas o reguladas conforme a la sección 5(b) de la Ley de Comercio con el Enemigo (50 U.S.C. Ap. 5(b) [50 USCS § 4305(b)]), sección 620(a) de la Ley de Asistencia Extranjera de 1961 (22 U.S.C. 2370(a)), secciones 202 y 203 de la Ley de Facultades Económicas en Casos de Emergencia Internacional (50 U.S.C. 1701-1702), o cualquier otra proclamación, orden, regulación o licencia emitida según aquello, quedará sujeta a la ejecución o embargo en beneficio de la ejecución de cualquier sentencia relacionada con un reclamo para el cual un estado extranjero (incluido cualquier organismo o agencia de dicho estado) que reclame dicha propiedad no esté inmune conforme a la sección 1605(a)(7) [28 USCS § 1605(a)(7)] (según esté vigente antes de la promulgación de la sección 1605A [promulgada en 28 de enero de 2008]) o la sección 1605A [28 USCS § 1605A].

(B) El subpárrafo (A) no se aplicará si, al momento en que el estado extranjero expropia o confisca la propiedad, la propiedad ha sido mantenida en título por una persona física o, si es mantenida en fideicomiso, ha sido mantenida en beneficio de una persona o personas físicas.

**(2)**

**(A)** A solicitud de cualquier parte en cuyo favor se haya dictado una sentencia con respecto a una demanda para la cual el estado extranjero no sea inmune conforme a la sección 1605(a)(7) [28 USCS § 1605(a)(7)] (según esté vigente antes de la promulgación de la sección 1605A [promulgada el 28 de enero de 2008]) o la sección 1605A [28 USCS § 1605A], la Secretaría de Hacienda o la Secretaría de Estado deben hacer todo lo posible por asistir de manera completa, inmediata y efectiva a cualquier acreedor de la sentencia o cualquier tribunal que haya emitido dicha sentencia en la identificación, ubicación y ejecución contra la propiedad de ese estado extranjero o de cualquier organismo o agencia de dicho estado.

28 USCS § 1610

(B) Al brindar tal asistencia, las Secretarías:

(i) pueden suministrar dicha información al tribunal sellada y

(ii) deben hacer todo esfuerzo posible por brindar la información de una manera suficiente para permitir al tribunal instruir a la oficina del Alguacil de los Estados Unidos para que ejecute de manera inmediata y eficaz contra la propiedad.

(3) Renuncia. El presidente puede renunciar a cualquier disposición del párrafo (1) en el interés de la seguridad nacional.

**(g) Propiedad en determinadas acciones.**

(1) En general. Sujeto al párrafo (3), la propiedad de un estado extranjero en contra del cual se dictó una sentencia conforme a la sección 1605A [28 USCS § 1605A], y la propiedad de un organismo o agencia de dicho estado, incluida la propiedad que sea una entidad jurídica separada o tenga un interés directo o indirecto en una entidad jurídica separada, está sujeta a un embargo en beneficio de la ejecución, y la ejecución, tras dicha sentencia, como se estipula en esta sección, independientemente de:

(A) el nivel del control económico sobre la propiedad mediante el gobierno del estado extranjero;

(B) si las ganancias de la propiedad van al gobierno;

(C) el grado al cual los funcionarios de este gobierno administran la propiedad o de otra forma controlan sus asuntos cotidianos;

(D) ya sea que el gobierno sea el exclusivo beneficiario en interés de la propiedad o

(E) ya sea que se establezca la propiedad como una entidad separada que daría derecho al estado extranjero a los beneficios en los tribunales de los Estados Unidos mientras eluden sus obligaciones.

(2) Inmunidad de soberanía de los Estados Unidos inaplicable. Cualquier propiedad de un estado extranjero, u organismo o agencia de un estado extranjero, al cual el párrafo (1) se aplique no estará inmune de un embargo en beneficio de una ejecución, o ejecución, tras una sentencia dictada conforme a la sección 1605A [28 USCS § 1605A] debido a que la propiedad está regulada por el gobierno de los Estados Unidos por razón de una acción tomada en contra de ese estado extranjero conforme a la Ley de Comercio con el Enemigo [50 USCS Ap. §§ 1 y siguientes] o la Ley de Facultades Económicas en Casos de Emergencia Internacional [50 USCS §§ 1701 y siguientes].

(3) · Titulares de propiedad conjunta terceros. Nada en este inciso se deberá interpretar como que reemplaza la autoridad de un tribunal para prevenir de manera apropiada el daño de un interés que tenga una persona que no sea responsable de la acción que dio lugar a la sentencia sobre la propiedad sujeta al embargo en beneficio de una ejecución, o ejecución, tras dicha sentencia.

## Historia

**HISTORIA:**

Añadido el 21 de octubre de 1976, P. L. 94-583, § 4(a), 90 Estat. 2896; 9 de nov., 1988, P. L. 100-640, §2, 102 Estat. 3333; 16 de nov. 1988, P. L. 100-669, § 3, 102 Estat. 3969; 1 de dic. 1990, P. L. 101-650, Título III, § 325(b)(9), 104 Estat. 5121; 24 de abril de 1996, P. L. 104-132, Título II, Subtítulo B, § 221(b), 110 Estat. 1242; 21 de oct. de 1998, P. L. 105-277, Div. A, § 101(h) [Título I, § 117(a)], 112 Estat. 2681-491; 28 de oct. de 2000, P. L. 106-386, Div. C, § 2002(g)[(f)](1), 114 Estat. 1543; 26 de nov. de 2002, P. L. 107-297, Título II, § 201 (c)(3), 116 Estat. 2337; 28 de ene. de 2008, P. L. 110-181, Div. A, Título X, Subtítulo F, § 1083(b)(3), 122 Estat. 341; 10 de ago. de 2012, P. L. 112-158, Título V, § 502(e)(1), 126 Estat. 1260.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

**Final del documento**

## 28 USCS § 1611

Actual hasta la Ley de aplicación general 117-214, aprobada el 19 de octubre de 2022.

*Servicio del Código de los Estados Unidos > TÍTULO 28. PODER JUDICIAL Y PROCEDIMIENTO JUDICIAL (§§ 1-5001) > Parte IV. Jurisdicción y fuero aplicable (Capítulos 81-99) > CAPÍTULO 97. Inmunidades jurisdiccionales de los estados extranjeros (§§ 1602-1611)*

## §1611. Determinados tipos de propiedad inmune de la ejecución

(a) Sin perjuicio de las disposiciones de la sección 1610 de este capítulo (28 USCS § 1610), la propiedad de las organizaciones designadas por el Presidente con derecho a gozar de los privilegios, exenciones e inmunidades previstos en la Ley de Inmunidades de las Organizaciones Internacionales no estarán sujetas a embargo ni a ningún otro proceso judicial que impida el desembolso de fondos a un Estado extranjero o por orden de este como resultado de una acción iniciada en los tribunales de los Estados Unidos o de los Estados.

(b) Sin perjuicio de las disposiciones de la sección 1610 de este capítulo (28 USCS § 1610), la propiedad de un estado extranjero quedará inmune de un embargo y de la ejecución si:

**(1)** la propiedad es aquella de un banco central extranjero o autoridad monetaria que tiene por su cuenta, a menos que dicho banco o autoridad, o su gobierno extranjero principal, haya renunciado explícitamente a su inmunidad de un embargo en beneficio de la ejecución, o de la ejecución, sin perjuicio a ningún retiro de la renuncia que el banco, la autoridad o el gobierno pueda afirmar efectuar excepto de acuerdo con los términos de la renuncia o

**(2)** la propiedad se use, o pretenda usarse, con relación a una actividad militar y

**(A)** sea de carácter militar o

**(B)** esté bajo el control de una autoridad militar u organismo.

(c) Sin perjuicio de las disposiciones de la sección 1610 de este capítulo [28 USCS § 1610], la propiedad de un estado extranjero estará inmune del embargo y de la ejecución en una acción presentada conforme a la sección 302 de la Ley para la Libertad y la Solidaridad Democrática Cubana (LIBERTAD) de 1996 [22 USCS § 6082] hasta el punto en que la propiedad sea un establecimiento o una instalación que se utilice para una misión diplomática acreditada para fines oficiales.

## Historia

**HISTORIA:**

Añadido el 21 de octubre de 1976, P. L. 94-583, § 4(a), 90 Estat. 2897; 12 de marzo de 1996, P. L. 104-114, Título III, § 302(e), 110 Estat. 818.

Servicio del Código de los Estados Unidos
Derechos de autor © 2022 Todos los derechos reservados.

**Final del documento**